## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NILAB RAHYAR TOLTON, *et al. on behalf of themselves and all others similarly situated,*

Plaintiffs,

v.

JONES DAY, a General Partnership,

Defendant.

Civil Action No. 1:19-cv-00945 (RDM)

## DEFENDANT JONES DAY'S ANSWER AND DEFENSES
## TO PLAINTIFFS' AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

Defendant Jones Day, by and through undersigned counsel, hereby files this Answer and Defenses ("Answer") to Plaintiffs' Amended Class and Collective Action Complaint ("Complaint").  Any allegation not explicitly admitted is denied.  Headings contained in the Complaint are not substantive allegations to which an answer is required and to the extent the headings are repeated in the Answer, it is solely for ease of reference.  To the extent those headings are substantive allegations to which an answer is required, Jones Day denies the allegations.

## PRELIMINARY STATEMENT

Jones Day is a global law firm with 43 offices in major centers of business and finance on five continents.  Jones Day is unified by a governance and value system that fosters an unparalleled level of integration and collaboration across offices, practices and individual lawyers.  Jones Day could not offer its high level of client service absent a highly collaborative culture in which the most talented attorneys work together across offices and practices.  And the Firm has repeatedly been named the top U.S. firm for client service.

Jones Day has created and promotes an inclusive work environment that rewards and advances lawyers based on their individual merit.  In this environment, women can and do succeed in large numbers, as Jones Day's strong track record proves.  Jones Day has approximately 240 women partners, many of whom hold positions of leadership within the Firm and the profession. The Firm's Partnership Committee--which advises on such matters as Partner admissions and Partner compensation--is comprised of almost 30% women, all of whom were admitted to the partnership after taking, or while on, family leave.  The Firm's Advisory Committee--which advises on matters relating to the management and administration of the Firm--is comprised of nearly 40% women, the overwhelming majority of whom are working mothers.  Seventeen of the Firm's office and regional Partners-in-Charge are women, and the vast majority are working mothers.  Jones Day's largest practice group is co-chaired by a woman who is one of the top trial lawyers in the country.  And its premier Issues & Appeals Practice--which in the past five years has attracted 36 former U.S. Supreme Court clerks from across the different Justices--is chaired by a woman partner who became the practice leader while working part-time after returning from a multi-year family leave.  Dozens of women partners hold other Firm, office, and practice leadership positions.

The pipeline of Jones Day's future women leaders is also strong.  More than half (18 of 34) of the U.S. lawyers promoted to the partnership in January 2019 were women and almost three-quarters of them had taken or were on family leave at the time of promotion.  In January 2018, 44% of the U.S. lawyers admitted "up from the ranks" to the partnership were women, and of those women 71% had taken, or were on, family leave at the time of their admission.  Over the last ten years, almost 65% of the U.S. women admitted to the partnership "up from the ranks" had taken, or were on, family leave at the time they were admitted.  Indeed, the majority of those women had taken multiple leaves by the time of their admission to the partnership.  Law360's 2019 Glass

Ceiling Report thus recently ranked Jones Day in the top ten of the "Top Law Firms For Women" among law firms with 600 or more attorneys.  *See* Annie Pancak, The Best Law Firms for Female Attorneys, Law360 (May 27, 2019), https://www.law360.com/articles/1162859.   According to Law360, Jones Day is among the firms that are "leading the pack in representing women at all levels" and that have "higher representations of women than their peers."  *Id.*  Plaintiffs' false and misleading allegations cannot be reconciled with these indisputable facts.

While women have succeeded in large numbers at Jones Day, many lawyers, both male and female, decide to leave the Firm for a variety of reasons.  The job is demanding and requires a high level of skill and a strong work ethic.  The commitment required to progress toward partnership is not for everyone.  Only a relatively small number of high-performing associates who begin their careers at the Firm will be promoted to partnership.  Some lawyers, such as Plaintiffs Andrea Mazingo and Jaclyn Stahl, voluntarily choose to pursue opportunities at other firms, in the government, or in-house.  Others do not thrive at the practice of law in the segment of the profession in which Jones Day practices and are counseled about their performance issues or encouraged to pursue other options.  Plaintiff Meredith Williams, for example, left after being counseled about the need for improvement.  Plaintiff Katrina Henderson was asked to leave fairly early in her career because her performance fell well below the Firm's standards.  Plaintiffs Nilab Tolton, Saira Draper and Jane Doe 4 were told they were not progressing in a manner that would make them eligible for partnership consideration and were given significant time to find other employment.  All of these lawyers were given the opportunity and the support necessary to succeed.  That some of them--like hundreds of their male colleagues over the past decade--did not succeed had nothing to do with discrimination and everything to do with their own personal choices, talent and performance.

3

There is no commonality to Plaintiffs' claims, which are highly individualized, internally inconsistent, and lack a common theme.  Ms. Draper and Ms. Tolton allege that taking a family leave derailed their careers, while Jane Doe 4 alleges that she was discriminated against because she did not have children.  Ms. Tolton and Ms. Mazingo claim they were given recruiting responsibilities in recognition of their strong performance, while Ms. Stahl complains that such responsibilities were unfairly foisted on women.  Ms. Tolton complains that she was given too much work after her first leave; Ms. Draper complains that she was not given enough.  Plaintiffs claim that they personally excelled in work on significant client matters while claiming that all women are deprived of such opportunities.  Most claim that they personally received excellent reviews yet claim that all women are unfairly treated in the review process.

As their Amended Complaint makes abundantly clear, Plaintiffs' pay discrimination claims are based on the misconceived and legally baseless notion that all lawyers in all geographic markets have, at all times over the past decade, been entitled to so-called "Cravath scale" regardless of the quality of their performance or their productivity.  Cravath, whose only U.S. office is in Manhattan, does not compete for talent in Irvine or Atlanta and its bonus structure (and, in Atlanta, even its base compensation) was not the benchmark by which the "market" was defined during any relevant time period.  Not surprisingly, Plaintiffs do not identify any male associates in those markets with comparable experience, performance and productivity who were paid the amounts to which they now claim to have been entitled.  Ms. Henderson, for example, never cracked 1,100 hours of client billable work in any year and struggled with basic tasks.  Ms. Tolton received below-average reviews in four of her last five years, averaged 1,722 client hours in the three years before her first family leave and 523 client hours in the two years she took leaves. While that is consistent with Ms. Tolton's allegation that she joined Jones Day because she thought

she could "do the minimum" and protect her social life, it is not the type of performance that would have qualified her for "Cravath pay" at *any* firm.

Plaintiffs' allegations also omit critical context that undermines their claims. As evidence of harassment, Plaintiff Mazingo complains that a male lawyer said she would "not be single for long," but she fails to mention that the lawyer was attempting to console Ms. Mazingo when he found her crying in her office after her fiancé broke off their engagement. Jane Doe 4 alleges that female associates were invited to participate in cookie-baking contests, but leaves out that the contests were charity fundraisers open to all lawyers, and that male attorneys participated as well, with a male associate winning the top prize in 2017. And all of the plaintiffs omit dates that would reveal that most of the incidents they complain of, if they happened at all, were well outside the statute of limitations and were never reported to the Firm while they were employed.

While purporting to condemn gender stereotypes, Plaintiffs' inflammatory hostile workplace claims are entirely built on stereotypical tropes. According to Plaintiffs, no woman would choose to drink at a social event unless required to do so to fit into the "boy's club." Male partners who watch dancing at a holiday party when the music becomes too loud for conversation must be "gawking" at female associates "for amusement." If men outnumber women, then women must be tokens, with no real authority. And the hundreds of women who have succeeded at the Firm must have done so only because they drink, flirt or otherwise tolerate rampant abuse. This warped portrayal of women as weak, powerless, and incapable of making their own choices or taking responsibility for their own actions is as offensive as it is wrong and certainly does not accurately describe the women lawyers at Jones Day.

## I.   INTRODUCTION

1.   Jones Day denies the allegations in Paragraph 1 of the Complaint. Jones Day promotes an inclusive work environment that rewards and advances lawyers based on their

individual merit.  The Firm's track record in promoting successful women lawyers speaks for itself.  The Firm has approximately 240 women partners, many of whom hold positions of leadership within the Firm and the profession.  The Firm's Partnership Committee--which advises the Managing Partner on such matters as Partner admissions and Partner compensation--is comprised of almost 30% women, all of whom were admitted to the partnership after taking, or while on, family leave.  The Firm's Advisory Committee--which advises the Managing Partner on matters relating to the management and administration of the Firm--is comprised of nearly 40% women, the overwhelming majority of whom are working mothers.  Seventeen of the Firm's offices and regions, and six of its practices are led by women, and the vast majority are working mothers.  Women are the relationship partners for two of the Firm's five largest clients in 2018 and three of the Firm's five largest clients to date in 2019.  And dozens of women partners hold other Firm, office, and practice leadership positions.

More than half (18 of 34) of the U.S. lawyers promoted to the partnership in January 2019 were women and almost three-quarters of them had taken or were on family leave at the time of promotion.  In January 2018, 44% of the lawyers admitted "up from the ranks" to the partnership were women, and of those women 71% had taken, or were on, family leave at the time of their admission.  Over the last ten years, almost 65% of the U.S. women admitted to the partnership "up from the ranks" had taken, or were on, family leave at the time they were admitted.  Indeed, the majority of those women had taken multiple leaves by the time of their admission to the partnership.

These facts render implausible any claim that women--and, in particular, women who take family leave--do not and cannot succeed at Jones Day.

2.      Jones Day denies the allegations in Paragraph 2 of the Complaint, which are internally inconsistent in alleging discrimination against women who have children and against women who do not have children.

3.      Jones Day denies the allegations in Paragraph 3 of the Complaint.   The Firm engages in a comprehensive, merits-based annual evaluation of each individual associate.   The associate evaluation process is aimed at identifying the individual associates who are performing at the highest levels and compensating them commensurate with their excellent performance.   The evaluation process is also designed to identify weaknesses and gaps in an associate's overall skill set and to provide constructive feedback that will allow an associate to overcome challenges and continue to develop.   The Firm recognizes that many associates will be unable to develop the high level of all-around skills necessary for admission to the partnership.   When in annual reviews it becomes apparent that an associate is not making appropriate progress or, despite solid performance, is not demonstrating the superior qualities required for partnership, he or she is counseled to find alternative employment.

4.      Jones Day admits that it does not pay associates in lockstep after their early years. Rather, it compensates associates based on each individual's performance taking into account other factors such as the relevant geographic market.   The Firm makes annual compensation decisions after a comprehensive months-long evaluation process in which an assessment is made of each associate's overall contribution to the success of the Firm.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 4 of the Complaint and denies that its compensation system can fairly be characterized as a "black box."   While the Firm does not publish individual salaries, it has published on its website and communicated internally within the Firm detailed information about the evaluation and compensation processes.   Many mid-level and senior associates also

participate as evaluators of more junior associates, and thus they have the opportunity to observe aspects of the evaluation process from both sides.

5.      Jones Day admits that Steve Brogan is the Managing Partner of the Firm, that his principal office is in Washington, D.C., that the Firm has approximately 2,500 attorneys located in 43 global offices, and that the Partnership Agreement gives the Managing Partner significant authority over the management of the Firm.   Jones Day admits that a publication called "Washington Life Magazine" published an article referencing Steve Brogan.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 5 of the Complaint.

6.      Jones Day admits that the Firm's Partnership Agreement gives the Managing Partner significant authority and responsibility for the overall management of the institution and that the language quoted in Paragraph 6 of the Complaint appears on its website.   Jones Day admits that it has had only seven managing partners in its history, and that its governance system has been an important element of the Firm's success over the last century.   Jones Day denies the allegation that its website "embraces and affirms" the characterization of the Firm's Managing Partner as "autocratic and absolute."   Rather, as the Firm's website explains, the Managing Partner serves at the pleasure of the partners.   Given the size and geographic spread of the Firm, the Firm operates on the principle of subsidiarity, with responsibility delegated to hundreds of partners to manage offices, practices and other aspects of the Firm's day-to-day operations.   The Managing Partner has the final decision-making authority on admission to the partnership, but he makes those decisions based on the recommendations of office and practice leadership as well as the Partnership Committee, which is comprised of almost 30% women, all of whom were admitted to the partnership after taking, or while on, family leave.   The Managing Partner is also advised on matters relating to the management and administration of the Firm by the Firm's Advisory

Committee, which is comprised of nearly 40% women, the overwhelming majority of whom are working mothers.

Office, regional and practice leaders jointly have principal responsibility for associate evaluations. Office and regional Partners-in-Charge, 17 of whom are currently women, have principal responsibility for setting associate compensation, in coordination with the co-heads of the associate evaluation process (one of whom is a woman who was made a partner while on family leave). The Managing Partner does not participate in conducting the underlying reviews of associates, in the preparation of the individual assessment statements or in assigning ratings to individual associates. The primary role of the Managing Partner in the associate compensation process is in setting the Firm budgets for annual compensation adjustments, approving increases in starting salaries and other significant market-based moves, and performing a high-level review of proposed associate compensation adjustments. In each situation, he does so after consultation with other relevant partners, most notably the Partners-in-Charge of offices or regions responsible for a relevant market, the Financial Services Partner, the Firm Administrative Partner and the heads of the associate evaluation process.

7.     Jones Day admits that Greg Shumaker was the Partner-in-Charge of the Washington, D.C. office in 2013, that Mr. Brogan's principal office is in Washington, D.C., and that in 2013, a Legal Times blog reported on an interview with Greg Shumaker. Jones Day admits that the Firm's current Managing Partner, Steve Brogan, has the authority to make the final decision on many matters of significance for the Firm, including, after consultation with the Partnership Committee, partner admissions and partner compensation. Except as expressly admitted, Jones Day denies the allegations in Paragraph 7 of the Complaint.

8.      Jones Day admits that the language quoted in Paragraph 8 of the Complaint has appeared on its website and that it engages in a thorough, merits-based annual evaluation of each individual associate taking into account numerous factors including: grasp of legal issues and concepts, legal and factual analysis, written presentation, oral presentation, substantive expertise (for the more senior associates), judgment, timeliness, efficiency, ability to function as a team member, ability to work independently, ability to interact with clients, ability to interact with peers and staff, leadership and initiative, productivity and overall effectiveness.  The Firm's associate evaluation process is comprehensive and time-consuming, lasting five months each year.  It begins with the solicitation of written evaluations from each supervising lawyer the associate identifies as being familiar with his or her work.  The strength of and bases for the individual evaluations are then assessed by the practice leaders or their designees, culminating in a draft assessment and rating of each associate's individual performance.  The draft assessments are then subjected to debate and potential revision in associate review committees.  There are presently four Firmwide review committees--litigation, transactional, intellectual property, and regulatory--that contain a diverse group of lawyers and include some of the Firm's most successful women partners and "next generation" leaders.   The office Partners-in-Charge conduct their own diligence on associates and develop their own associate ratings, in some offices by holding partners meetings or convening office review committees.  After the Firmwide practice review committee meeting, the Partners-in-Charge have an opportunity to review and comment on the draft assessments to ensure that all relevant perspectives are taken into account.

Compensation adjustments are proposed by the Partner-in-Charge of each office after the assessment statements are finalized.   Each office has a budget available to be used for compensation adjustments, but each has its own process for determining how to allocate that budget.  The office's proposed compensation adjustments are then reviewed by Regional Partners-

in-Charge (as applicable), the two heads of the Firmwide associate evaluation process (one of whom is a woman), and the Managing Partner.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 8 of the Complaint.

9.      Jones Day admits that Dick Pogue was Managing Partner of Jones Day from 1984 through 1992, and that a link to a video interview of Dick Pogue has appeared on the Firm's website.  The interview speaks for itself.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 9 of the Complaint.

10.     Jones Day admits that each year two partners generally meet in person with each associate to discuss the assessment statement resulting from the comprehensive evaluation process described above, and that information regarding the underlying individual evaluations may be shared as appropriate.  Jones Day admits that the associate's practice leader or the practice leader's designee is responsible for preparing the initial draft of the assessment statement.  Jones Day also admits that it does not generally provide associates with copies of the assessment statement or underlying individual reviews.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 10 of the Complaint.

11.     Jones Day denies the allegation in Paragraph 11 of the Complaint.

12.     Jones Day denies the allegation in Paragraph 12 of the Complaint.  Partnership decisions are made after consideration of numerous sources of information, including written recommendations to the Partnership Committee which are submitted by the associate's practice and office, oral presentations to the Partnership Committee by numerous partners, the associate's current performance, information about historic performance as reflected in assessment statements and underlying evaluations, and the personal knowledge of the Partnership Committee members and the Managing Partner.  In addition, the anticipated growth of particular geographic markets and practices and the expected future demand from clients for the lawyer's legal services are all

11

considered in partnership decisions.  Jones Day further denies that the Managing Partner had any role in the decisions that Plaintiffs Tolton, Draper and Jane Doe 4 would not be considered for partnership.

13.     Jones Day denies the allegations in Paragraph 13 of the Complaint, except admits that, in recent years, it has hired roughly equal numbers of male and female associates into its New Lawyers Group and that its partnership, like every major law firm's partnership, has more men than women, which is reflective of the fact that many in the partnership began practicing law decades ago when more men than women were graduating from law school.  More than half (18 of 34) of the U.S. lawyers promoted to the partnership in January 2019 were women and almost three-quarters of them had taken or were on family leave at the time of promotion.   In January 2018, 44% (or 14 of 32) of the U.S. lawyers promoted to partnership were women, and approximately 71% of them had taken family leave.

14.     Jones Day denies the allegations in Paragraph 14 of the Complaint, which denigrate the accomplishments of hundreds of successful women lawyers at Jones Day.

15.     Jones Day admits that the Washington, D.C. office hosts an annual holiday party for attorneys and staff in the Firm's office, that a variety of beverages are available, some of which are alcoholic, and that the after-dinner activities typically include a DJ and dancing.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 15 of the Complaint.

16.     Jones Day denies the allegations in Paragraph 16 of the Complaint.

17.     Jones Day denies the allegations in Paragraph 17 of the Complaint, except admits that at a 2010 event held at a partner's home, a female summer associate in Jane Doe 4's office was pushed into a swimming pool by a friend who was a fellow summer associate.  Neither Jane

Doe 4 nor any other plaintiff was present at this long-ago event, which had no sexual connotations and had no impact whatsoever on Jane Doe 4's ability to succeed at the Firm.

18.     Jones Day admits that a lawyer who was then an Of Counsel in the Irvine office attempted in Spring 2015 to console Plaintiff Mazingo, who was crying in her office because her fiancé broke off their engagement, and he offered words of encouragement that she would find someone else, but Jones Day denies that his comments were "sexist" or "sexualized."  Except as expressly admitted, Jones Day denies the allegations in Paragraph 18 of the Complaint.

19.     Jones Day denies the allegations in Paragraph 19 of the Complaint.

20.     Jones Day denies the conclusory allegations in Paragraph 20 of the Complaint, which are not supported by any well-pled factual allegations and which denigrate the accomplishments of hundreds of successful female lawyers at Jones Day.

21.     Jones Day admits that a blog purporting to relay an interview of a Jones Day Hiring Partner appeared on the website of The Careerist in May 2010 and that the language in Paragraph 21 of the Complaint is a quote from the blog.  Jones Day further admits that the ability to function as a team member and interact with clients, peers, and staff are characteristics that Jones Day values in its attorneys and evaluates as part of the associate evaluation process.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 21 of the Complaint.

22.     Jones Day denies the conclusory allegations in Paragraph 22 of the Complaint, which are unsupported by any well-pled factual allegations and which contradict many of Plaintiffs' own allegations about the trials, appellate briefs and significant investigations on which they worked.

23.     Jones Day denies the conclusory allegations in Paragraph 23 of the Complaint, which are unsupported by any well-pled factual allegations.

24.     Jones Day admits that its first up-through-the-ranks promotion of a female partner in its Irvine office occurred in 2018.  Prior to that time, female partners based in Irvine had joined the Firm laterally or moved from other Jones Day offices, as was true of the majority of male Irvine partners as well.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 24 of the Complaint.

25.     Jones Day admits that a number of offices and practices have affinity groups but denies the remaining allegations in Paragraph 25 of the Complaint.

26.     Jones Day denies the allegations in Paragraph 26 of the Complaint, except admits that the Pro Bono Committee in Jane Doe 4's office has held baking contests, including chocolate-chip-cookie-baking contests, to raise money for charity and that male and female associates and partners are invited to and do participate in the contests, with a male associate winning the 2017 brownie-baking contest.

27.     Jones Day denies the allegations in Paragraph 27 of the Complaint, except admits that both female and male attorneys hold important administrative roles in the Firm that give them broad exposure to the partnership and position them for future leadership roles in the Firm.

28.     Jones Day denies that female associates perform a disproportionate share of the Firm's pro bono work.  Rather, all associates--male and female--are expected and encouraged to perform pro bono work, and the amount of pro bono work performed by male associates and female associates is roughly equal in the United States and Firmwide.  Jones Day recently created a permanent position in the Pro Bono practice for the associate with the most hours dedicated to the Firm's pro bono Laredo project, who is male.  Jones Day admits that in 2014, Jane Doe 4 was given the opportunity to first-chair a pro-bono jury trial, an opportunity few associates--male or

female--are afforded.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 28 of the Complaint.

29.     Jones Day denies the allegations in Paragraph 29 of the Complaint.  Jones Day has a long history of commitment to pro bono work, public service, and community involvement around the world.  Because of that commitment, pro bono matters undertaken by Jones Day are provided the same level of attention and professional dedication that it provides to matters undertaken on behalf of paying clients.  Work performed on approved pro bono matters is given the same weight and consideration as client billable work for the purposes of evaluating its lawyers' overall professional development and potential.  Lawyers who are not progressing cannot, however, hide in pro bono work to cover up the lack of demand for their services.

30.     Jones Day denies the conclusory allegations in Paragraph 30 of the Complaint, which are unsupported by any well-pled factual allegations.  During the 16-year tenure of the current Managing Partner, more than 200 women have been promoted to partnership and almost 150 more women have been invited to join the partnership as laterals.  Female partners serving as office and practice leaders have significant influence over all aspects of associate evaluation, compensation and promotion decisions, including decisions on which associates to recommend for partnership consideration.  The Partnership Committee, which advises the Managing Partner on promotions to partnership, includes five female partners.  More than half (18 of 34) of the U.S. lawyers promoted to the partnership in January 2019 were women.  In January 2018, 44% (or 14 of 32) of the U.S. lawyers promoted to partnership were women.

31.     Jones Day denies the allegations in Paragraph 31 of the Complaint.  At present, approximately 30% of the Firm's U.S. partners are women, 15 of Jones Day's 43 offices have female Partners-in-Charge, two Regional Partners-in-Charge--including for the Firm's largest

region--are women, and almost 30% of the members of the Partnership Committee are women. Female partners chair or co-chair six of the Firm's 23 practices, including its largest practice. And dozens of women partners hold other Firm, office, and practice leadership positions. Notably, while recent entering classes have roughly equal numbers of male and female associates, that was not the case in the 1980s and 1990s when most of the current partners were graduating from law school.

32.     Jones Day admits that the quoted language in Paragraph 32 of the Complaint has appeared on its website and that the Firm does not compensate associates in lockstep after their early years but rather compensates them based on an assessment of each lawyer's overall contribution to the Firm.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 32 of the Complaint, including its characterization of Jones Day's compensation system as a "black box" and the allegation that the Firm's compensation system results in "systematic underpayment of women."

33.     Jones Day admits that the quoted language has appeared on its website but denies the last sentence in Paragraph 33 of the Complaint.

34.     Jones Day denies the allegations in Paragraph 34 of the Complaint, except admits that the quoted language is on its website and admits that Plaintiffs did not receive "so-called Cravath market pay" as Plaintiffs have defined it.   Plaintiffs were not top performers and most were not in geographic markets where the combined base and bonus which they claim is "Cravath scale" is the relevant benchmark.   Male associates in those markets with performance evaluations and productivity comparable to Plaintiffs also did not receive "so-called Cravath market pay."

35.     Jones Day admits that the quoted language has appeared on its website, but denies that "so-called Cravath market pay" is a relevant market benchmark for all associates within the

Firm regardless of geographic location, performance or productivity. Jones Day further denies that Plaintiffs have accurately calculated or described the so-called Cravath market pay. Plaintiffs' comparison of their own compensation to the so-called Cravath scale ignores numerous factors, like the timing of compensation adjustments and evaluation cycles, the timing and pro-ration of bonuses at other firms, the effective date of new compensation scales, and the graduated bonus structures of many other firms. Jones Day admits that, during the relevant time period, associates in the Irvine, New York, and Jane Doe 4's offices received starting salaries that were equal to the "Cravath" base. Jones Day also admits that Jones Day's top performers in geographic markets where the "Cravath scale" is relevant generally received compensation that is at or above the "Cravath scale." Jones Day denies that Plaintiffs were consistent top performers or were all in geographic markets where the "Cravath scale" is relevant, except it admits that Ms. Mazingo's performance in 2017 was above-average, with strong productivity, and, had she not left, Ms. Mazingo would have received a significant increase that would have put her at or near the top of the market for Irvine. Jones Day admits that certain of the compensation information listed for the Plaintiffs in Paragraph 35 of the Complaint is accurate, but Plaintiffs underreport their earnings in the following ways: Ms. Mazingo's compensation was increased to $175,000 on 1/2/2016 before being increased to $190,000 on 7/1/2016; Ms. Draper's compensation was increased from $155,000 to $170,000 on 7/1/2013, from $170,000 to $180,000 on 7/1/2014, from $180,000 to $195,000 on 7/1/2015, and from $195,000 to $220,000 on 7/1/2016; Jane Doe 4's compensation increased from $330,000 to $350,000 on 7/1/2015 and to $375,000 on 7/1/2016 where it remained until she left the Firm; and Ms. Henderson's compensation was increased to $180,000 on 7/1/2015, not in 2016 as Plaintiffs allege. Except as expressly admitted, Jones Day denies the allegations in Paragraph 35 of the Complaint.

36.      Jones Day denies the allegations in Paragraph 36 of the Complaint.

37.      Jones Day denies the allegations in Paragraph 37 of the Complaint.  Jones Day's partnership includes approximately 240 women, the majority of whom are mothers.  Many took multiple family leaves during their Jones Day careers and a number worked flexible schedules before or after being promoted to partnership.  More than half (18 of 34) of the U.S. lawyers promoted to the partnership in January 2019 were women and almost three-quarters of them had taken or were on family leave at the time of promotion.  In January 2018, 44% (or 14 of 32) of the U.S. lawyers promoted to partnership were women, and approximately 71% of them had taken family leave.  Almost 65% of the U.S. women promoted to partnership over the past decade had taken or were on family leave at the time of their promotion to partnership.

38.      Jones Day denies the allegations in Paragraph 38 of the Complaint, except admits that Ms. Draper and Ms. Tolton both became pregnant while employed as associates at Jones Day.  Due to performance issues unrelated to their gender, pregnancy, or leave status, each was asked to find other employment after returning from a second family leave.  Both Ms. Draper and Ms. Tolton were advised of concerns with their performance prior to their first leave of absence.

39.      Jones Day admits that a practice leader in Cleveland--an office in which none of the Plaintiffs worked--asked associates--male and female--in that office to identify any intended leaves--whether related to child care, care of a parent or other family member, extended medical leave, a clerkship, secondment, or otherwise--in the coming year, if they were comfortable sharing that information, because it would assist with annual budgeting.  The practice leader emphasized that no one needed to do so, that no reason had to be given, and that the information could be given to a female partner in office leadership as well.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 39 of the Complaint.

40.     Jones Day denies the allegations in Paragraph 40 of the Complaint.  Plaintiffs'
allegations--asserting discrimination against and in favor of parents--are internally inconsistent
and reflective of the highly-individualized nature of Plaintiffs' complaints.

41.     Jones Day admits that the Firm holds and sponsors events focused on the
advancement of women at the Firm and that associates are encouraged to ask questions at these
events.  Jones Day admits that Ms. Tolton received only a $10,000 raise in 2015 based on her
substandard performance in 2014.  Except as expressly admitted, Jones Day denies the allegations
in Paragraph 41 of the Complaint.

42.     Jones Day denies the allegations in Paragraph 42 of the Complaint.

43.     Jones Day denies the allegations in Paragraph 43 of the Complaint, except admits
that Plaintiff Tolton was told to pursue other employment and that she was told not to report to
work a few days before her scheduled last day because she had no ongoing client work and she
was engaged in disruptive behavior.  Jones Day paid Ms. Tolton through her scheduled last day.

44.     Jones Day denies the allegations in Paragraph 44 of the Complaint, except admits
that several incidents involving Jane Doe 4 raised questions about her honesty and integrity.

45.     Jones Day denies the allegations in Paragraph 45 of the Complaint, except admits
that the Firm has many "outspoken" women partners and admits that the Partner-in-Charge of
Diversity, Inclusion & Advancement, a former Ohio Supreme Court justice, had not previously
held a diversity-related role, which she willingly accepted and has committed herself to as a tireless
advocate for the mission of the role.

46.     Jones Day denies the allegations in Paragraph 46 of the Complaint.

47.     Jones Day denies the allegations in Paragraph 47 of the Complaint.

48.     Jones Day denies that plaintiffs are entitled to relief on any the claims listed in Paragraph 48 of the Complaint.

## II.     THE PARTIES

49.     Jones Day admits that Plaintiff Nilab Rahyar Tolton is a female attorney who lived and worked in California at all times relevant to this action and was employed as an associate in Jones Day's Irvine, California office from October 25, 2010, until April 20, 2018.

50.     Jones Day admits that Plaintiff Andrea Mazingo is a female attorney who lived and worked in California at all times relevant to this action and was employed as an associate in Jones Day's Irvine, California office from October 20, 2014, until April 2, 2018.

51.     Jones Day admits that Plaintiff Meredith Williams is a female attorney who lived and worked in California at all times relevant to this action and was employed as an associate in Jones Day's Irvine, California office from October 28, 2013, until September 22, 2017.

52.     Jones Day admits that Plaintiff Saira Draper is a female attorney who was employed as an associate in Jones Day's Atlanta office from October 31, 2011, until October 5, 2018.

53.     Jones Day admits that Plaintiff Jaclyn Stahl is a female attorney who lived and worked in California at all times relevant to this action and was employed as an associate in Jones Day's Irvine, California office from October 20, 2014, until January 5, 2018.

54.     Jones Day admits that Plaintiff Jane Doe 4 is a female attorney who was employed as an associate in one of Jones Day's offices outside California from October 8, 2007, until June 8, 2018.

55.     Jones Day admits that Katrina Henderson is a female attorney who was employed as an associate in Jones Day's New York office from October 28, 2013 until 2016.

56.     Jones Day denies the allegations in the fourth sentence of Paragraph 56 of the Complaint, except admits that the quoted language appears on the Firm's website.  Jones Day admits the remaining allegations in Paragraph 56 of the Complaint.

## III.     JURISDICTION, VENUE, AND ADMINISTRATIVE EXHAUSTION

57.     Paragraph 57 of the Complaint states a legal conclusion to which no response is required, and to the extent a response is required Jones Day admits that the Court has subject matter and supplemental jurisdiction over certain of the claims asserted in this suit.

58.     Jones Day admits that this District has personal jurisdiction over the Firm.

59.     Jones Day admits that it conducts substantial business in the District of Columbia but denies that employment practices originating in this District have violated the Plaintiffs' and Class's legal rights.  Paragraph 59 of the Complaint otherwise states a legal conclusion to which no response is required, and to the extent a response is required Jones Day admits that venue is proper in this District.

60.     Jones Day admits that Plaintiff Nilab Tolton filed an administrative charge with the California Department of Fair Employment and Housing ("DFEH") and the U.S. Equal Employment Opportunity Commission ("EEOC"), a complaint with the District of Columbia Office of Human Rights ("DCOHR"), and a California Private Attorneys General Act ("PAGA") claims notice with the California Labor and Workforce Development Agency.  Jones Day admits that it received a copy of Plaintiff Tolton's PAGA claims notice.  Jones Day lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 60 of the Complaint and, on that basis, denies them.

61.     Jones Day admits that Plaintiff Andrea Mazingo filed an administrative charge with the DFEH and the EEOC and a PAGA claims notice with the California Labor and Workforce Development Agency.  Jones Day admits that it received a copy of Plaintiff Mazingo's PAGA

claims notice.  Jones Day lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 61 of the Complaint and, on that basis, denies them.

62.    Jones Day admits that Plaintiff Meredith Williams filed an administrative charge with the DFEH and a complaint before the DCOHR.  Jones Day admits that it received a copy of Plaintiff Meredith William's DFEH Notice of Case Closure and Right to Sue.  Jones Day lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 62 of the Complaint and, on that basis, denies them.

63.    Jones Day admits that Plaintiff Saira Draper filed an administrative charge before the EEOC.  Jones Day lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 63 of the Complaint and, on that basis, denies them.

64.    Jones Day admits that Plaintiff Jaclyn Stahl filed an administrative charge before the DFEH and that Defendant received a copy of Plaintiff Stahl's DFEH Notice of Case Closure and Right to Sue.  Jones Day lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 64 of the Complaint and, on that basis, denies them.

65.    Jones Day admits that Plaintiff Jane Doe 4 filed an administrative charge before the EEOC and the DCOHR.  Jones Day lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 65 of the Complaint and, on that basis, denies them.

66.    Jones Day admits that it entered into tolling agreements with counsel for Plaintiffs Nilab Tolton, Andrea Mazingo, Meredith Williams, Saira Draper, and Jane Doe 4 to toll claims brought in their individual capacity from August 13, 2018, until January 9, 2019, and that it entered into a tolling agreement with counsel for Plaintiff Jaclyn Stahl to toll claims brought in her individual capacity from October 29, 2018, until January 9, 2019.  Jones Day denies that it agreed to toll claims Plaintiffs seek to bring in a representative capacity.

22

## IV.    PLAINTIFFS' ALLEGATIONS

### A.    NILAB RAHYAR TOLTON

67.    Jones Day admits that Ms. Tolton was an associate in Jones Day's Irvine office from October 25, 2010, to April 20, 2018.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 67 of the Complaint.  While Ms. Tolton generally performed solidly on entry-level tasks in her first two years, she was far from a "superstar" or "standout performer." Her work in 2013 as a third-year associate was criticized, among other things, for "unmet expectations regarding analytical depth and follow-through," a criticism that persisted throughout the remainder of her time with the Firm.  She received mixed reviews and a below-average rating from her practice for her 2014 performance, well before her pregnancy, and was again advised of "concerns about the analytical rigor she brings to some of her cases," and concerns that "she has not reached out to take a leadership role in her cases and she sometimes appears to be going through the motions without a thoughtful strategy."  Ms. Tolton's performance continued to suffer serious deficiencies in subsequent years, and she did not develop the skills required for success as a mid-level, much less a senior, associate.  Her productivity, which never approached 1,800 hours per year after her second year, fell to abysmal levels in 2016 because she turned down opportunities offered to her that would have helped her further develop her skills.  In October 2017, when she returned from her second family leave, the Firm advised her to find alternative employment and gave her a generous six months to do so, during which she was paid full time and did no client work.

68.    Jones Day admits that Ms. Tolton joined Jones Day's Irvine office following her graduation from Harvard Law School in 2010.  Jones Day lacks knowledge or information sufficient to form a belief as to the remaining allegations in the Paragraph 68 of the Complaint and, on that basis, denies them.

69.     Jones Day admits that it recruited Ms. Tolton to join the Firm and that her productivity throughout most of her career was consistent with a desire to protect her personal life and do the bare minimum.  Jones Day lacks knowledge or information sufficient to form a belief as to what statements were made to her by an unnamed former associate during the recruiting process in or before 2010, and, on that basis, denies them.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 69 of the Complaint.

70.     Jones Day admits that Ms. Tolton worked with Partner Paul Rafferty prior to 2016, that she was afforded numerous opportunities to develop her litigation skills through taking depositions and appearing in court, including at a trial, and that her law school was referenced in a post-trial fee petition, along with the law schools of other attorneys identified in the same fee petition.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 70 of the Complaint.

71.     Jones Day admits that Ms. Tolton worked on a matter involving vacatur of an interim arbitration award.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 71 of the Complaint.

72.     Jones Day admits that Ms. Tolton was afforded the opportunity to interact directly with clients and admits that the Firm hosted several "spa day" events for female clients, but denies that it was the sole event the Firm had for its female clients.  Jones Day lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 72 of the Complaint about what Ms. Tolton and her colleagues understood to be the import of Ms. Tolton being invited to a business development event.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 72 of the Complaint.  While Jones Day afforded Ms. Tolton a number of opportunities for direct client contact, Ms. Tolton failed to capitalize on these opportunities.

73.     Jones Day admits that Ms. Tolton offered informal mentorship to some of the Irvine office's junior associates and that Ms. Tolton served as the coordinator for the Irvine office's summer program in 2012.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 73 of the Complaint.

74.     Jones Day admits that Ms. Tolton participated in recruiting events and did on-campus interviews in 2012 and that former Hiring Partner Mark Finkelstein recognized Ms. Tolton as a strong recruiter for the Firm.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 74 of the Complaint.

75.     Jones Day admits that Mr. Cary Sullivan asked Ms. Tolton to participate in a few training programs for first-year lawyers, and admits that, in 2012, Ms. Tolton accompanied Irvine summer associates to a nationwide summer associate program held in Jones Day's Washington, D.C. office.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 75 of the Complaint.

76.     Jones Day admits that Ms. Tolton received some positive performance reviews early in her time at Jones Day and that the quotes are selective excerpts from Mr. Rafferty's reviews of her performance in 2012-2014, during which he also criticized her failure to be proactive and her lack of creativity.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 76 of the Complaint.  Ms. Tolton's 2014 performance as a fourth-year associate, long before her first pregnancy, was rated below-average by her practice because she failed to address significant criticisms, including insufficient depth of analysis, failure to take ownership of projects, and poor productivity.  Her performance remained at a substandard level until her departure in 2018.

77.     Jones Day denies the allegations in Paragraph 77 of the Complaint.  Ms. Tolton last worked with Mr. Landau in or around 2011, before she joined the Business & Tort Litigation practice and four years before she got married.

78.     Jones Day denies the allegations in Paragraph 78 of the Complaint, except admits that Mr. Rafferty was a source of significant work for Ms. Tolton from 2012-2015.  In 2016, Mr. Rafferty declined to work further with Ms. Tolton after she refused to take any responsibility for a defective motion which she had signed and filed.

79.     Jones Day admits that a male associate's use of the "c" word during a limousine ride from a 2014 summer event was reported to the Firm contemporaneously and that the Firm appropriately disciplined the associate, including removing him from a leadership role in the summer program and imposing a financial penalty for this conduct.  Far from being offended, Ms. Tolton thereafter served as the maid of honor in the male associate's wedding.  In her videotaped toast to the married couple, Ms. Tolton speaks warmly of the couple and hugs him afterwards. Until asserting claims against Jones Day in late 2018, neither Ms. Tolton nor anyone else reported the alleged game of "Fuck, Marry, Kill," which, on information and belief, was briefly played en route to the same 2014 summer associate event by Plaintiff Williams and one or more other female associates to make fun of male lawyers.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 79 of the Complaint and specifically denies that Ms. Tolton was present at the 2014 summer associate event, that she observed any of the alleged conduct, and that she was in any way adversely affected by it.

80.     Jones Day denies that Ms. Tolton was denied professional opportunities or assigned secretarial-type work, allegations which are contradicted by Ms. Tolton's claims about her professional accomplishments at the Firm.  Jones Day admits that Ms. Tolton assisted with

26

handling exhibits, some of which were on easels, at an oral argument in 2015 that was handled by Mr. Rafferty, the partner leading the matter.  The client's CEO and General Counsel attended the hearing and expected Mr. Rafferty to do the argument.  Mr. Rafferty invited Ms. Tolton to attend the oral argument as a training opportunity and she elected to do so.  Ms. Tolton volunteered to drive to the hearing in Los Angeles to allow Mr. Rafferty additional time to prepare.  Except as expressly admitted, Jones Day denies the allegation in Paragraph 80 of the Complaint.  In particular, Jones Day denies that the alleged "Marry, Fuck, Kill" game, in which female associates made fun of their male colleagues, is evidence of "casual misogyny" within the Firm, or that the offensive conduct of a few immature junior associates at an event Ms. Tolton did not attend had any impact on her career at Jones Day or could reasonably be viewed by her or anyone else as representative of the Firm's culture.

81.     Jones Day admits that the client's Chief Executive Officer and the General Counsel attended the hearing and thereafter had lunch with Mr. Rafferty but denies the remaining allegations in Paragraph 81 of the Complaint.

82.     Jones Day denies the allegations in Paragraph 82 of the Complaint except as expressly admitted below.  Jones Day admits that Mr. Rafferty coached Ms. Tolton, as well as other male and female associates, not to be mechanical with clients and to include common pleasantries in communications with clients, skills that would aid the associates' development in a client-facing business.  After a client commented on a junior female associate's immaturity during a client presentation, Mr. Sullivan asked Ms. Tolton to help coach the associate on her presentation style.  In or around 2011, three summer associates attending an end-of-the-summer social event told Mr. Sullivan, then an associate, that they had invented a "Pooh Bear" routine during a karaoke outing.  Having volunteered that information, they were invited to perform and

27

some of them did the routine, which was completely non-sexual in nature.  The three associates had all been informed earlier in the day that they were receiving offers and at no point did anyone suggest that offers were contingent on their performing the routine.  As an associate, Mr. Sullivan had no authority to withhold anyone's offer.

83.     Jones Day admits that it has hosted numerous events to foster the advancement of female attorneys, including an event in the Irvine office attended by Karen Hewitt, the Partner-in-Charge of the San Diego office, and Erica Reilly, a Los Angeles lawyer who had recently been promoted to the partnership while working a reduced time schedule.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 83 of the Complaint, including the allegation that Ms. Tolton's "star began to fade" because she asked questions at this event.  Ms. Tolton's performance review in 2013--the year prior to the event in question--identified several serious performance concerns, including lack of analytical depth and follow through, a need to take ownership and expand her thinking beyond the bounds of specific assignments, and concerns about efficiency, timeliness and productivity.

84.     Jones Day admits that the event was opened for questions, but lacks knowledge or information sufficient to form a belief as to what, if any, questions were asked by Ms. Tolton.  Except as expressly admitted, Jones Day denies allegations in Paragraph 84 of the Complaint.

85.     Jones Day denies the allegations in Paragraph 85 of the Complaint.  Ms. Tolton received a $10,000 raise in 2015 because her 2014 performance did not meet the Firm's high standards and she was continuing to exhibit many of the same serious problems identified in prior years' reviews.  Jones Day denies that Edward Chang was a partner at the time and denies the remaining allegations regarding Mr. Chang's purported follow-up.

86.     Jones Day admits that Ms. Tolton took family leave from January 28, 2016, through August 7, 2016, and that she did not receive a raise in July 2016.  Ms. Tolton's performance in 2015 reflected the same performance deficiencies as she exhibited in the two years prior to her leave, with continued concerns being raised about her failure to exhibit the depth of analysis expected of someone at her level, and the need to be more efficient and proactive in developing strategies and offering solutions, rather than just identifying problems.  For the second year in a row, her practice rated her performance as below average and not meeting expectations.  The Firm commonly freezes compensation for associates, male and female, who exhibit a continuing pattern of substandard performance, as had Ms. Tolton.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 86 of the Complaint.

87.     Jones Day denies the allegations in Paragraph 87 of the Complaint.

88.     Jones Day admits that Ms. Tolton requested that the Firm conduct her review while she was on leave and that Administrative Partner Darren Cottriel and Irvine Partner-in-Charge Richard Grabowski met with her to deliver her review.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 88 of the Complaint.

89.     Jones Day admits that Ms. Tolton inquired about the reason that her salary had been frozen and asked for specific examples of performance issues but denies the remaining allegations of Paragraph 89.  Mr. Grabowski, who had worked directly with Ms. Tolton on a project, reminded her that she had made a serious mistake in her analysis of indemnity language in a contract, which fortunately had been caught by another attorney before the advice was transmitted to the client.  Mr. Cottriel pointed out that the criticisms were consistent with those identified in prior years.

90.     Jones Day admits that Ms. Tolton expressed her view that her pregnancy and leave were the cause of her negative review, a position that was contradicted by the fact that substantially

the same criticisms had been identified prior to her pregnancy.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 90 of the Complaint.

91.     Jones Day admits that Ms. Tolton obtained her personnel files from the Firm in 2018.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 91 of the Complaint.  Ms. Tolton's reviews for performance in calendar year 2015, which were the basis for 2016 compensation decisions, identified the following concerns:  Ms. Tolton "needs to show more initiative," "she should present solutions to problems, not just the problem," "she should be proactive in offering suggestions on strategy instead of waiting for it to be told to her," she "missed key language from a contract that almost caused [a] client to accept an indemnity obligation where there was none," her cost per case for resolving consumer claims was higher than average, she did not keep a supervising lawyer or the client informed of the status of her cases, and she had not exhibited the depth of analysis expected given her level of experience.  Ms. Tolton's hours were also unacceptably low for the third year in a row, even taking into account her leave of absence.

92.     Jones Day lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 92 and, on that basis, denies them.

93.     Jones Day lacks knowledge or information sufficient to form a belief as to the truth of the allegations about Ms. Tolton's emotional state and, on that basis, denies them.  Jones Day admits that, upon returning from her first leave, Ms. Tolton informed then-Administrative Partner Mr. Cottriel of her second pregnancy, and he assured her that she could take a second leave and offered Ms. Tolton flexibility should she require it.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 93 of the Complaint.

94.     Jones Day admits that Ms. Tolton was staffed on several cases upon return from her leave.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 94 of the

30

Complaint.  Ms. Tolton's time records refute her assertion that she was working multiple all-nighters in the months after she returned from leave.  Indeed, despite electing to return to work on a full-time basis when a reduced time schedule was available to her, Ms. Tolton recorded an average of fewer than 100 client hours per month in the first three full months after returning from leave.

95.     Jones Day admits that Partner O'Connor and Ms. Tolton had a conversation about Ms. Tolton's work on the cases Ms. O'Connor was supervising and that Ms. O'Connor assured Ms. Tolton that the case team would be flexible and would accommodate any restrictions that Ms. Tolton might have related to her pregnancy, including regarding travel.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 95 of the Complaint.

96.     Jones Day admits that around Thanksgiving 2016, Ms. Tolton was asked to take on additional single-plaintiff cases for an important Firm client under the supervision of Ms. O'Connor but resisted this request.  It was not uncommon for associates, male and female, who were handling single-plaintiff cases against this Firm client to have responsibility for a dozen or more cases at a time.  Ms. O'Connor informed Ms. Tolton that restrictions with respect to her pregnancy, including travel-related limitations, would be accommodated and thus were not grounds to decline to work on these cases.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 96 of the Complaint.

97.     Jones Day admits that, when confronted with timesheets that contradicted her claims that she was working around the clock and too busy to take on additional work, Ms. Tolton claimed that she was not recording all of the time she worked.  Ms. Tolton was told that she should record all of the time she actually spent on a matter and that it was up to the billing partner to determine whether to bill the time.  Ms. Tolton was also told that, even accounting for the

unrecorded hours she claimed she had worked, her hours were nowhere near a full-week's work. Ms. Tolton, who had already been told that she could work from home as necessary and take time for medical needs, also was told that if she needed further work restrictions, she should provide a doctor's note, but Ms. Tolton said she did not need any further accommodation. Jones Day lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 97 of the Complaint and, on that basis, denies them.

98.     Jones Day admits that Ms. Tolton, as a seventh-year associate, sought out a document review project on a matter being run out of the Firm's New York office and that she did so because she perceived it as fitting her desired schedule, while resisting assignments that offered substantive growth opportunities, such as drafting dispositive motions--assignments that did not require travel. Jones Day denies that Ms. Tolton was billing "full time" to the New York case by December 2016. Ms. Tolton recorded less than 72 hours to the New York case in December and she never became fully engaged in that case. Except as expressly admitted, Jones Day denies the allegations in Paragraph 98 of the Complaint.

99.     Jones Day denies that Ms. Tolton submitted a doctor's note "around this time" stating that she could not keep up her "intensive work schedule"; rather, in early September 2016, when Ms. Tolton first informed Mr. Cottriel of her pregnancy, she submitted a doctor's note that stated only that the Firm should "allow for occasional schedule changes, absences," which the Firm assured her it would--and which it did--accommodate. When sending this note, Ms. Tolton wrote that she may need to work from home occasionally, a request that the Firm also accommodated. Ms. Tolton was asked in early December 2016, in discussions about her poor productivity, if she needed further pregnancy-related accommodations and was invited to provide a doctor's note supporting any such requirements, but she declined to do so. Jones Day lacks

knowledge or information sufficient to form a belief about the substance of conversations between Ms. Tolton and her physician and, on that basis, denies them. Ms. Tolton's time sheets belie her claim that she had an "intensive work schedule" prior to the time in early December when she was confronted about her poor productivity and her efforts to avoid assignments from Ms. O'Connor. Except as expressly admitted, Jones Day denies the allegation in Paragraph 99 of the Complaint.

100.   Jones Day admits that Mr. Cottriel and Ms. O'Connor met with Ms. Tolton to express their concerns about Ms. Tolton's refusal to take on assignments when her hours in the preceding three months had averaged less than 100 per month, and that they challenged the truthfulness of her claims that she had been working late nights and weekends, none of which was reflected in her time records. The Firm had been allowing Ms. Tolton to work from home as needed consistent with the request for schedule flexibility and occasional absences. Jones Day offered to provide additional accommodations if Ms. Tolton provided a doctor's note identifying them, but Ms. Tolton did not request any further such accommodations and did not submit any proof of medical necessity. Except as expressly admitted, Jones Day denies the allegations in Paragraph 100 of the Complaint.

101.   Jones Day admits that, after being counseled about her low productivity, Ms. Tolton billed approximately 200 hours per month in December 2016 and January 2017 and that she settled some of the cases to which she had been assigned. Except as expressly admitted, Jones Day denies the allegations in Paragraph 101 of the Complaint.

102.   Jones Day admits that Ms. Tolton started her second family leave on March 20, 2017, and returned from that leave on October 8, 2017, that the Firm informed Ms. Tolton in June 2017 that her salary would not be increased as part of the annual review process, that the Firm informed Ms. Tolton in October 2017 that she should look for opportunities outside of the Firm,

33

and that she was given six months to find a new position.  Jones Day admits that Ms. Tolton was told to prioritize her job search and admits that, while she was free to take on assignments during this period, Ms. Tolton recorded no time to client, pro bono or other professional development activities in her last six months at the Firm.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 102 of the Complaint.

103.    Jones Day denies the allegations in Paragraph 103 of the Complaint.  Ms. Tolton never submitted a doctor's note stating that she was physically incapacitated due to her pregnancy, that she could not meet normal workload expectations, or that she should somehow be deemed to have worked hours she did not record because they were "attributable entirely to her state of illness."  Ms. Tolton declined work from Ms. O'Connor in November and early December 2017, claiming she had been working "around the clock" and "pulling all-nighters" but her time records for that period contradicted that claim.

104.    Jones Day admits that upon her return from leave, Ms. Tolton declined to work on any client matters despite an offer by Partner John Vogt to look for opportunities for her.  Jones Day denies that Ms. Tolton was instructed not to perform any client work but admits that she was told to prioritize her job search.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 104 of the Complaint.

105.    Jones Day admits that Mr. Chang, who had not worked closely with Ms. Tolton since 2013 and was not familiar with her performance issues, volunteered to assist Ms. Tolton in finding an in-house opportunity.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 105 of the Complaint.

106.    Jones Day admits that Ms. Tolton served as an informal mentor for certain attorneys in the office and admits that Jones Day told Ms. Tolton that she had no future at the Firm.  Except

as expressly admitted, Jones Day denies the allegations in Paragraph 106 of the Complaint.  After giving notice to the Firm that she had found a new job, Ms. Tolton, who had exhibited years of substandard performance, made false and disparaging statements about the Firm and the reason for her departure.

107.    Jones Day admits that, after receiving complaints from other associates about Ms. Tolton's disparaging statements, it instructed Ms. Tolton not to return to the office and shipped her belongings to her, while paying her until her scheduled departure date.  This information was communicated to Ms. Tolton at home in the middle of a work day only because she had not shown up at work, and Irvine's office leadership were unaware that she was taking the day off for personal reasons.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 107 of the Complaint.

108.    Jones Day admits that Ms. Tolton continued her pattern of falsely disparaging the Firm in a follow-up email to certain Firm partners.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 108 of the Complaint.

109.    Jones Day denies the allegations in Paragraph 109 of the Complaint.

**B.    ANDREA MAZINGO**

110.    Jones Day admits that Andrea Mazingo was an associate in Jones Day's Irvine office from October 20, 2014, until April 2, 2018, and that she held various roles over the years with respect to summer programs, which was common for associates--male and female--in the Irvine office and elsewhere in the Firm.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 110 of the Complaint.

111.    Jones Day admits that the Firm supported Ms. Mazingo's business-development efforts, including offering to fund a project Ms. Mazingo had proposed.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 111 of the Complaint.

35

112.    Jones Day admits that Ms. Mazingo was a productive lawyer but denies that Ms. Mazingo regularly worked up to 250 billable hours per month.  Jones Day admits that the small Securities Litigation and SEC Enforcement practice in the Irvine office during Ms. Mazingo's short tenure with the group was predominantly male; but the gender balance has fluctuated over time and has included a number of women at other points in time.  Jones Day lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 112 of the Complaint and, on that basis, denies them.

113.    Jones Day denies the allegations in Paragraph 113 of the Complaint.

114.    Jones Day admits that Ms. Mazingo joined the Firm on October 20, 2014, after graduating from Northwestern University School of Law.  Jones Day denies the remaining allegations in Paragraph 114 of the Complaint.

115.    Jones Day admits that, during her first year as an associate at the Firm, Ms. Mazingo worked on two arbitrations with the Global Disputes Practice and was afforded the opportunity to attend those arbitrations in San Francisco, but denies that she was the only female attorney on those matters.  Jones Day admits that, as is not uncommon when in trial, Ms. Mazingo once billed more than seventeen hours on two consecutive days.  Jones Day admits that, in or before 2015, then-Of Counsel Marcus Quintanilla found Plaintiff Mazingo crying in her office because her fiancé broke off their engagement, and he attempted to console her by offering words of encouragement that she would find someone else, but denies that any such consoling could reasonably be construed as flirtation or sexualized conduct.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 115 of the Complaint.

116.    Jones Day admits that Plaintiff Mazingo was invited to join the SEC Litigation and SEC Enforcement practice in 2016.  Except as expressly admitted, Jones Day denies the allegations

in Paragraph 116 of the Complaint.   Among other things, Mr. Landau was telecommuting throughout Ms. Mazingo's tenure in the group and was rarely in the office so he was in no position to, and did not, press Ms. Mazingo to wear heels or comment on her makeup or hair, let alone "continuously" or "regularly" do so.

117.    Jones Day admits that, at a staff appreciation lunch at which the secretary who supported Ms. Mazingo and Mr. Landau was honored, Mr. Landau shared a story about how his wife first met his secretary when the secretary was rollerblading in her bikini.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 117 of the Complaint.

118.    Jones Day admits that it supports and encourages events to foster the mentoring of female attorneys.  Jones Day admits that a female attorney in Irvine suggested using a cardboard cutout of a lipstick to designate the associate responsible for planning the next women's lunch for the office and that someone drew a mustache on the lipstick.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 118 of the Complaint.

119.    Jones Day denies the allegations in Paragraph 119 of the Complaint.   Mr. Quintanilla, who was then an Of Counsel, provided Ms. Mazingo numerous professional opportunities and support in 2014-2015; thereafter, they had little or no contact, as Ms. Mazingo joined a different practice and Mr. Quintanilla moved to San Francisco.  Mr. Landau also provided Ms. Mazingo numerous professional opportunities although her work was generally supervised by other senior lawyers.  Ms. Mazingo was not excluded from "boys-only lunches."  She was invited to team lunches after she joined the practice, including at Mr. Landau's club.  Of Counsel Travis Biffar and Mr. Landau occasionally had working lunches together without inviting Ms. Mazingo--or the male associates in the practice--because they had worked together for many years, including

37

at their prior firm, and would use those lunches to review pending matters on which Mr. Biffar was performing a "chief of staff" role for Mr. Landau.

120.     Jones Day denies the allegations in the first sentence of Paragraph 120 of the Complaint.  Jones Day admits, based on information and belief, that the female attorney lunches may have included socializing and conversations about families and weddings, depending on the desires of the participants.

121.     Jones Day denies the allegations in Paragraph 121 of the Complaint.

122.     Jones Day admits that Ms. Mazingo expressed a desire for appointment of a mentor to Darren Cottriel and that he offered to arrange to have a senior female partner in the San Diego office serve as a mentor.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 122 of the Complaint.

123.     Jones Day denies the allegations in Paragraph 123 of the Complaint.

124.     Jones Day lacks knowledge or information sufficient to form a belief as to the allegations about Ms. Mazingo's mental and physical health and, on that basis, denies them.  Jones Day denies the remaining allegations in Paragraph 124 of the Complaint.

125.     Jones Day denies the allegations in Paragraph 125 of the Complaint.

126.     Jones Day admits that the Irvine office invited a female in-house counsel, who had briefly been a partner at Jones Day, to speak to associates about professional development and admits that, at one such event several years ago, the in-house lawyer commented that it was not possible to be successful both as a mother and lawyer.  Any such comments were not consistent with the Firm's values or the experience of the hundreds of successful female Jones Day attorneys with children.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 126 of the Complaint.

127.    Jones Day lacks knowledge or information sufficient to form a belief as to the allegations in the first sentence of Paragraph 127 of the Complaint about Ms. Mazingo's caregiver responsibilities for a family member and, on that basis, denies them.   Jones Day denies the remaining allegations in Paragraph 127 of the Complaint.

128.    Jones Day admits that Mr. Darmer asked Ms. Mazingo to draft a critical briefing paper to be shared with co-counsel in a high-profile investigation, that she was given several weeks' notice of the deadline, and that, during the week it was due, Ms. Mazingo traveled to Phoenix for a deposition and to Palo Alto for a client meeting.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 128 of the Complaint.

129.    Jones Day admits that Ms. Mazingo billed more than 230 hours in October 2017 but denies that the principal deficiency in Ms. Mazingo's draft was typos; to the contrary, her draft had to be substantially reworked by another lawyer.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 129 of the Complaint.

130.    Jones Day lacks knowledge or information sufficient to form a belief as to the allegations about Ms. Mazingo's psychiatric treatment and, on that basis, denies them.   Jones Day admits that, on Friday November 10, 2017, Ms. Mazingo informed the Irvine office manager that she was experiencing health issues and would not be able to work that day or over the weekend, and that the office manager told Ms. Mazingo that her cases would be covered and that she should "take care of [her]self and feel better" and that "if you need some more time off, that's fine."  Jones Day also advised Ms. Mazingo that she could take a formal medical leave if she provided a doctor's note, but Ms. Mazingo declined to pursue that offer.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 130 of the Complaint.

131.     Jones Day denies the allegations in Paragraph 131 of the Complaint.  In fact, when Ms. Mazingo first told Mr. Cottriel that she was having health issues and wanted to work more from home, Mr. Cottriel told Ms. Mazingo that she could do so and could also take a formal medical leave of absence if she provided a doctor's note.  Ms. Mazingo never provided a doctor's note or sought a formal leave.  Jones Day denies that Mr. Darmer stopped speaking to Ms. Mazingo or took any other action that could cause her to believe that her career at Jones Day was effectively over.  To the contrary, Ms. Mazingo continued to work extensively with Mr. Darmer until her voluntary resignation from the Firm six months later, and Mr. Darmer submitted a positive evaluation of her performance in early 2018.

132.     Jones Day denies that Ms. Mazingo was "forced to leave the Firm" or that she was "cut off from the principal partner with whom she had worked"; to the contrary, she continued to work extensively with Mr. Darmer until she announced her resignation in March 2018, billing approximately 575 hours on a matter he supervised between mid-November 2017 and her departure.  Moreover, in 2017, Ms. Mazingo had worked with several other partners, including the Firmwide head of her practice and another New York partner who provided her with substantial opportunities.  Ms. Mazingo's reviews for her 2017 performance, which were completed around the time of her resignation, were strong and, had she not resigned, she would have been eligible for a substantial increase in compensation effective July 1, 2018.  After announcing her voluntary departure, Ms. Mazingo told colleagues at Jones Day that she was leaving for more money and for what she viewed as a better family leave policy at her new firm.  After announcing her voluntary departure, Ms. Mazingo asked a male partner to look out for a first-year female associate, but did not assert that the female associate was being provided different opportunities than male colleagues.  Jones Day lacks knowledge or information about whether Ms. Mazingo ever

commented on the Firm's mentorship programs and, on that basis, denies that allegation. After tendering her resignation, Ms. Mazingo had lunch with Mr. Landau and expressed appreciation for the support and opportunities that he had provided her. After her departure, Ms. Mazingo recommended that a friend interview at Jones Day and facilitated that interview. Both actions are wholly inconsistent with someone who believed that the Firm had a discriminatory environment. Except as expressly admitted, Jones Day denies the allegations in Paragraph 132 of the Complaint.

133. Jones Day admits that Ms. Mazingo voluntarily departed from the Firm effective April 2, 2018. Jones Day further admits that on her last day at the Firm, Ms. Mazingo sent an email to her colleagues at the Firm and that the email speaks for itself. Except as expressly admitted, Jones Day denies the allegations in Paragraph 133 of the Complaint.

134. Jones Day denies that Ms. Mazingo was subject to discriminatory treatment at Jones Day. Jones Day lacks knowledge or information sufficient to form a belief as to the truth of allegations regarding Ms. Mazingo's medical condition or her discussions with her doctors, and, on that basis, denies them. Jones Day denies the remaining allegations in Paragraph 134 of the Complaint.

135. Jones Day lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 135 of the Complaint and, on that basis, denies them.

C. **MEREDITH WILLIAMS**

136. Jones Day admits that Meredith Williams was an associate in Jones Day's Irvine office from October 28, 2013, until September 22, 2017, and that at some point during her tenure she reported that she had received an offer to join another firm but decided to stay at Jones Day. Except as expressly admitted, Jones Day denies the allegations in Paragraph 136 of the Complaint.

137.    Jones Day admits that Ms. Williams was recruited to join the Firm, was a summer associate in 2012, and joined the Firm as a full-time associate on October 28, 2013.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 137 of the Complaint.

138.    Jones Day lacks knowledge or information sufficient to form a belief as to the allegations in the first sentence of Paragraph 138 of the Complaint and, on that basis, denies them. Jones Day admits that at some point during her tenure Ms. Williams reported that she had received an offer to join another firm but decided to stay at Jones Day.  Jones Day further admits that after she gave notice of her resignation, some partners in the Irvine office inquired whether she really wanted to leave, but denies that any commitments were made to Ms. Williams regarding future compensation and denies that she relied on any such commitments.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 138 of the Complaint.

139.    Jones Day denies that Ms. Williams received outstanding reviews until 2017.  In fact, her review for her 2015 performance noted difficulties with balancing priorities, foreseeing problems and taking full ownership of assignments.  Her practice rated her 2016 performance as below expectations, and her review noted that, on more than one occasion, Ms. Williams had neglected case responsibilities and had missed important deadlines, which caused partners to question whether her commitment level was commensurate with what is expected of lawyers in the Firm.  During that review meeting, Ms. Williams was told that to succeed, she must overcome the time-management issues that had plagued her over the last two years, work on her persuasive legal writing, and take ownership of the matters to which she was assigned.  Jones Day admits that Ms. Williams received a $10,000 raise in July 2017, which reflected the fact that her performance in 2016 did not meet expectations.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 139 of the Complaint.

140.    Jones Day denies that Ms. Williams was forced to leave the Firm but admits that Ms. Williams voluntarily left Jones Day on September 22, 2017, following receipt of negative reviews for her 2016 performance.  Jones Day denies that the review was unfair and notes that Ms. Williams sent a written apology to the female partner supervising the matter, taking responsibility for the failure to complete the assignment.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 140 of the Complaint.

141.    Jones Day denies the allegations in Paragraph 141 of the Complaint.  Until asserting claims against Jones Day in late 2018, no one reported the alleged game of "Fuck, Marry, Kill," which, on information and belief, was briefly played en route to a summer associate event in 2014 by Plaintiff Williams and one or more other female associates who, as Plaintiffs admit, were making fun of male lawyers.  Jones Day denies that male associates targeted female associates to play along and denies that Ms. Williams was encouraged or pressured to drink alcohol.  Ms. Williams frequently consumed alcohol to the point of intoxication and needed no encouragement or pressure from male lawyers to do so.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 141 of the Complaint.

142.    Jones Day denies the allegations in Paragraph 142 of the Complaint.  As Plaintiffs themselves allege, the sexualized banter was engaged in by female associates, including Ms. Williams, mocking their male colleagues.  Jones Day admits that the conduct of Ms. Williams and other junior female associates at this summer associate event was immature and offensive but denies that it had anything to do with the culture of the Firm or that it supports plaintiffs' claims of a "male brotherhood" that "derogate[s] women."

143.    Jones Day admits that the Irvine office invited a female in-house counsel, who had briefly been a partner at Jones Day, to speak to associates about professional development and

admits that, at one such event several years ago, the in-house lawyer commented that it was not possible to be successful both as a mother and lawyer. Any such comments were not consistent with the Firm's values or the experience of the hundreds of successful female Jones Day attorneys with children. Except as expressly admitted, Jones Day denies the allegations in Paragraph 143 of the Complaint.

144. Jones Day admits that then-Partner Mark Finkelstein conducted an exit interview with Ms. Williams and that Ms. Williams expressed concern with the small number of women partners in the office. Except as expressly admitted, Jones Day denies the allegations of Paragraph 144 of the Complaint. During the exit interview, Mr. Finkelstein accurately commented on the broader retention issues in the profession in which lawyers leave large law firms for a number of reasons, including for family reasons. Mr. Finkelstein did not suggest that Jones Day female attorneys who leave did so primarily because they choose to have families.

145. Jones Day admits that, in 2016, Ms. Williams recorded 2,342 client hours, including pro bono work, and recorded 2,568 hours total for the year, but denies the remaining allegations in Paragraph 145 of the Complaint. Specifically, Jones Day denies that Ms. Williams had "years of strong reviews" or that she received her "first negative annual review in 2017" after "yet another year of impressive performance." To the contrary, Ms. Williams received several negative reviews in each of her years with the Firm, and her negative review delivered in 2017 (based on 2016 performance) was not because another associate "dropped the ball." Rather, Ms. Williams left for vacation without completing two briefs that she was responsible for filing and tried to blame another associate to whom she had tried to delegate the assignment at the last minute. Ms. Williams admitted as much in a written apology to the female supervising partner. Additionally, for that same year, multiple partners commented on the struggles that Ms. Williams had exhibited

with time management, including her failure to keep the lawyers with whom she is working advised of her progress and the need for partners to remind her to follow-up on various tasks. Still other partners commented that Ms. Williams needed to be more proactive on her cases and improve her poor written work product.

146.     Jones Day denies the allegations in Paragraph 146 of the Complaint.   Ms. Williams's personnel file plainly shows that she received negative reviews in 2015 and 2016 and that, in 2017, multiple partners identified concerns about Ms. Williams's performance, including, among other things, concerns about her judgment, writing, time management, and advocacy skills.

147.     Jones Day denies the allegations set forth in Paragraph 147 of the Complaint.

148.     Jones Day denies the allegations in Paragraph 148 of the Complaint.   Ms. Williams's annual reviewers did not accuse her of being "overcommitted."   Rather, lawyers for whom Ms. Williams worked noted that she had difficulty balancing competing demands and managing her time and that she often put her personal plans ahead of client responsibilities.  This concern was raised not only in 2016 but also with respect to her performance in 2015--a year in which Ms. Williams recorded 1,804 client hours, inclusive of pro bono hours.

149.     Jones Day denies the allegations in Paragraph 149 of the Complaint.

150.     Jones Day admits that Richard Grabowski spoke to Ms. Williams about her future at the Firm after her negative review in 2017.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 150 of the Complaint.

151.     Jones Day lacks knowledge or information sufficient to form a belief as to the allegations regarding conversations Ms. Williams supposedly had with unnamed former Jones Day lawyers, and, on that basis, denies them.  Jones Day denies the remaining allegations in Paragraph 151 of the Complaint.

152.    Jones Day admits that Ms. Williams voluntarily left the Firm in the fall of 2017 when she was a fourth-year associate and that, absent significant improvement in her performance, she would not have been a strong candidate for partnership but denies that Ms. Williams had no choice but to leave.  Jones Day lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 152 of the Complaint and, on that basis, denies them.

### D.    SAIRA DRAPER

153.    Jones Day admits that Ms. Draper was an associate in Jones Day's Atlanta office from October 31, 2011, until October 5, 2018, and that she was advised to seek other employment when it became apparent that she was not developing the skills required to make her a credible candidate for partnership.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 153 of the Complaint.

154.    Jones Day admits that Ms. Draper received professional opportunities throughout her career at Jones Day and that, early in her career, she received some above-average reviews, although other reviewers expressed concern about her attention to detail and the thoroughness of her analysis.  Her reviews over the next two years, prior to her pregnancy leave, were merely average, and Ms. Draper's productivity in 2013 was exceptionally poor--having billed 1,392 client billable hours and 39 pro bono hours.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 154.

155.    Jones Day admits that Ms. Draper, like all associates, received her review for her 2016 performance in the Spring of 2017 but denies that the timing of the review had anything to do with her second pregnancy.  Jones Day admits that, even by her own account, Ms. Draper's exposure within the Firm and workload in 2017 were not at the level they should be.  Jones Day admits that Ms. Draper took her second family leave in October 2017 and that the annual evaluation process for all associates was conducted in early 2018 while Ms. Draper was still on

leave.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 155 of the Complaint.

156.    Jones Day admits that Ms. Draper joined Jones Day the fall after she graduated from law school and that she was given "steady, engaging work" on a range of junior-level projects.  Jones Day denies the allegation that Ms. Draper was "paid less than what certain male associates both in her office and across the Firm earned for doing comparable work."  Except as expressly admitted, Jones Day denies the allegations in Paragraph 156 of the Complaint.

157.    Jones Day admits that, in her first year with the Firm, Ms. Draper performed well in supervising other attorneys on a document review project.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 157 of the Complaint.

158.    Jones Day admits that Ms. Draper worked with a number of partners in her office, including at least one Practice Leader, and that she was given significant professional opportunities.  Jones Day further admits that Ms. Draper was staffed on multiple investigations, that at least one reviewer stated that Ms. Draper "is well suited to investigatory work," and that one client expressed positive views of Ms. Draper's work.  Jones Day further admits that, in her first few years at the Firm, Ms. Draper generally met expectations for a junior associate but denies that she was in "high demand" throughout that period.  Jones Day also admits that Ms. Draper was asked to work on an investigation after she was advised to actively seek new employment, but denies that Ms. Draper was staffed on the investigation.  Rather, Ms. Draper had vacation plans that would have prevented her from effectively being responsive to client demands and thus she could not be staffed on the matter.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 158 of the Complaint.

159.    Jones Day admits that, when Ms. Draper was a third-year associate, she was given the opportunity to work on a federal jury trial with Partner Richard Deane, a diverse partner who was then the head of litigation for the Atlanta office and subsequently became the Partner-in-Charge of the office.   Jones Day admits that such an experience provided a significant career development opportunity for her, and that she received positive feedback for her contributions to the trial.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 159 of the Complaint.

160.    Jones Day admits that, at trial, Ms. Draper had a limited stand-up role, which primarily consisted of reading prior testimony into the record, that Mr. Deane was pleased with Ms. Draper's performance assisting him with the trial, and that Atlanta office leadership was aware that Ms. Draper participated in this trial.   Jones Day lacks knowledge or information sufficient to form a belief regarding the allegations in the last sentence of Paragraph 160 of the Complaint and, on that basis, denies them.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 160 of the Complaint.

161.    Jones Day admits that, beginning in 2014, Jones Day undertook a major pro bono initiative to represent unaccompanied minors and their mothers from Central America who were fleeing drug wars and related gang violence and seeking asylum in the United States.   Jones Day further admits that, in March 2017, the Firm established a full-time presence near Laredo, Texas, to provide representation to women with claims for immigration relief in the Laredo detention facility.   Jones Day further admits that Ms. Draper began working on the Firm's representation of unaccompanied minors in 2014 and that she, along with more than 900 other lawyers, worked on matters supporting the Firm's efforts in Laredo.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 161 of the Complaint.

48

162.    Jones Day admits that Ms. Draper helped to coordinate the efforts of Atlanta lawyers involved in the Firm's pro bono work for unaccompanied minors, but denies that Ms. Draper had a central coordinating role with respect to the Firm's Laredo Project.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 162 of the Complaint.

163.    Jones Day admits that the Firm supports various initiatives to foster the advancement of diverse attorneys and that Ms. Draper participated in those initiatives.  Jones Day also admits that Ms. Draper participated, like many associates, in the Firm's recruiting and mentoring efforts, including participating in on-campus recruiting at Georgetown University Law Center during some of the years that she was at the Firm.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 163 of the Complaint.

164.    Jones Day admits that Ms. Draper worked during her pregnancy, that she recorded in excess of 17 hours on three occasions during a four-week trial, and that she traveled from Atlanta to Tampa for work, staying one night, approximately six weeks prior to taking family leave.  Jones Day further admits that Ms. Draper returned from her first family leave in July 2015, that she conferred with partners in the office about available work, and that there was only limited litigation work that was not already fully staffed in the office outside of a specific product-liability team at that time.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 164 of the Complaint.

165.    Jones Day admits that Ms. Draper had conversations with partners in the office about her lack of work upon returning from leave.  Jones Day denies that Ms. Draper had no one "to whom she could turn for assistance in obtaining work."  A number of partners in Ms. Draper's office attempted to help Ms. Draper and sought to staff her on matters that would improve her utilization and provide her professional growth opportunities as a litigator, but Ms. Draper's

resistance to travel significantly narrowed the client opportunities available to her.  Among other things, she turned down one opportunity after returning from family leave because it would have required travel to Buffalo, N.Y.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 165 of the Complaint.

166.    Jones Day admits that Ms. Draper, like many associates, assisted a partner with a speech after returning from leave in 2015 and participated in some civic organizations but denies that Ms. Draper's time spent on these activities was extensive or unusual.  In 2015, Ms. Draper billed a total of 17 hours on "speeches and publications," 38 hours on "civic affairs," and 35.75 hours on recruiting, totaling on an annualized basis, taking account of her leave of absence, approximately 148 hours.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 166 of the Complaint.

167.    Jones Day admits that Ms. Draper brought in an energy consulting company as a client, but the relationship was terminated when it became apparent that there would be no meaningful prospect for work from that client.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 167 of the Complaint.

168.    Jones Day admits that the Firm supports various initiatives to foster the advancement of diverse attorneys and that Ms. Draper participated in those initiatives, including working on a proposed implicit-bias training program.  Jones Day admits that a specific mentoring program proposal was rejected as infeasible but denies that the Atlanta office lacked a mentorship program.  Indeed, each associate in the Atlanta office who was less than five years out of law school was paired with a mentor--a mentoring program that remains in place to the present.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 168 of the Complaint.

169.   Jones Day admits that Ms. Draper helped organize the work of Atlanta lawyers participating in the Firm's pro bono work for unaccompanied minors and that the contributions made by Ms. Draper and other lawyers working on pro bono matters are recognized by the Firm in evaluating that lawyer's performance, growth and professional advancement.  Ms. Draper spent more than 40% of her time on pro bono matters in 2015, and her productivity, including her pro bono hours, was well below expectations:  1,100 hours (annualized) in 2015, 1,504 hours in 2016, and 1,593 hours (annualized) in 2017--inclusive of pro bono work.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 169 of the Complaint.

170.   Jones Day lacks knowledge or information sufficient to form a belief as to what discussions Ms. Draper had regarding the Firm's Laredo Project and, on that basis, denies the first two sentences of Paragraph 170 of the Complaint.  Jones Day admits that work on approved pro bono matters is given the same weight and consideration as client billable work for the purposes of evaluating lawyers' overall professional development and potential at the Firm, although the Firm expects all associates to devote substantial time to client billable work.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 170 of the Complaint.

171.   Jones Day admits that, in February 2016, more than six months after she had returned from a leave of absence, Ms. Draper was offered the opportunity to join a team that handled specific product-liability claims (the "Team"), but denies that this assignment required her to leave her current practice, as the Team was part of the Business & Tort Litigation practice. Jones Day admits that the Team handles numerous trials which, by their nature, often require travel.  The Team offered extensive growth opportunities for associates, including projects aimed at developing mid-level and senior-level trial skills.  Given the client's needs, two male and two female associates in Ms. Draper's office were approached to explore their interest, all of whom--

due to an unusually high number of close-in-time births--happened to have recently had children. Except as expressly admitted, Jones Day denies the allegations in Paragraph 171 of the Complaint.

172.    Jones Day admits that Ms. Draper traveled occasionally and that the trips varied in length but denies that the travel required for the Team's trials was any different than that required for the trial in Washington, D.C. that Ms. Draper attended prior to her first leave.  Ms. Draper chose a practice that required her to develop trial skills, and that often necessitates travel.  Indeed, litigators who focus on investigations work also routinely travel, including internationally.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 172 of the Complaint.

173.    Jones Day admits that a female Atlanta partner, Stephanie Parker, is the relationship partner for the client that the Team represents, and that she serves as lead trial counsel in numerous jury trials on behalf of that client (and others).  Jones Day denies that there was only one other female partner on the Team, which included female and male lawyers throughout the United States, but admits that there was only one other female partner on the Team in Atlanta.  She is a partner who has two young children and made partner while pregnant with her second child. Approximately half of the Atlanta associates on the Team were married and several had children. Except as expressly admitted, Jones Day denies the allegations in Paragraph 173 of the Complaint.

174.    Jones Day admits that new lawyers joining U.S. offices of the Firm directly from law school begin their careers as members of the New Lawyers Group and, after approximately a year, they are assigned to a practice taking into account the lawyers' preferences and the needs of the Firm.  Ms. Draper chose the Business & Tort Litigation practice and remained in that practice until she left the Firm.  Lawyers in that practice handle a wide range of disputes, including product-liability litigation.  Jones Day denies that Ms. Draper was requested to change practices but admits that she was given a choice whether to join the Team within that practice.  Jones Day denies that

giving Ms. Draper the opportunity to join the Team and develop her trial skills was "punitive."  To the contrary, as a trial associate, Ms. Draper needed to develop trial skills to advance, and working on the Team was expected to provide Ms. Draper with the opportunity to develop such skills. Except as expressly admitted, Jones Day denies the allegations in Paragraph 174 of the Complaint.

175.    Jones Day admits that four associates were approached with the opportunity to join the Team, and that all were asked to keep the opportunity confidential until final staffing decisions were made and approved by the client.  Ms. Draper was told she could discuss the opportunity with a female partner on the Team who had children, and Ms. Draper consulted with that partner as well as with at least two other female partners (both of whom also had children) before making her decision.  Jones Day lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Ms. Draper's state of mind and, on that basis, denies them.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 175 of the Complaint.

176.    Jones Day lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Ms. Draper's state of mind and, on that basis, denies them.  Jones Day denies that Ms. Draper had inadequate information to decide whether or not to join the Team, admits that Ms. Draper asked and was provided the opportunity to confer with an Atlanta-based partner on the Team who had children, and admits that Mr. McConnell discouraged Ms. Draper from speaking with other associates before the client had approved any staffing changes.  In addition to speaking to Mr. McConnell about the Team, Ms. Draper spoke with three female partners in Atlanta before deciding to join the Team.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 176 of the Complaint.

177.    Jones Day admits that, after consulting with multiple partners about the opportunity, Ms. Draper elected to join the Team.  Jones Day denies that Ms. Draper's future at

the Firm was contingent on joining the Team; two of the other associates--male and female--who were offered the same opportunity declined. Jones Day admits, however, that Ms. Draper had been struggling to find work, that her skills were not developing, and that the Team presented potential opportunities for significant career growth. Dozens of associates in the Firm have been promoted to partner based in significant part on the trial skills they developed on the Team, and many of the next-generation trial lawyers in the Firm learned their craft on these cases. Jones Day lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 177 of the Complaint and, on that basis, denies them.

178.    Jones Day denies the allegations in Paragraph 178.

179.    Jones Day admits that the Team offered significant growth opportunities to those prepared to embrace them. The Firm paid to send Ms. Draper to an American Board of Trial Advocates ("ABOTA") trial training program in Reno, Nevada, in Spring 2016 to better position her for success. Although she was unable to attend a client training program for new members of the Team because she was on vacation, she was given the opportunity to participate in a support role on a product-liability trial. She performed satisfactorily but, unlike her peers on the Team, she did not capitalize on the opportunities afforded to members of the Team. After months and months of training and the provision of opportunities, Ms. Draper continued to exhibit entry-level associate skills. By contrast, associates on the Team who were junior to Ms. Draper exhibited more developed litigation skills faster than Ms. Draper. Ms. Draper did the work assigned to her but did not take the initiative required to become a fully invested team member and to be afforded stand-up and other growth opportunities. Except as expressly admitted, Jones Day denies the allegations in Paragraph 179 of the Complaint.

180.     Jones Day denies the allegations in Paragraph 180 of the Complaint.  Ms. Draper failed to take advantage of the significant professional opportunities offered to her and continued to perform as an entry-level associate after months on the Team.  Despite the availability of ample work on the Team, Ms. Draper billed less than 1,000 hours in the year she spent on the Team, well below what was expected of full-time associates on that, and any, team.  At this poor level of utilization, Ms. Draper was not developing the skills necessary to progress, something Ms. Draper herself acknowledged in her self-assessment.   Consequently, her 2016 performance was rated below average in her annual review.  Jones Day also denies that Ms. Draper "took assignments from whoever asked for her help."  Ms. Draper set constraints on her availability that limited her opportunities and had less-developed litigation skills than her peers, which caused her colleagues at times to turn to others when they had new opportunities to offer.

181.     Jones Day admits that Ms. Draper did not disclose her second pregnancy and miscarriage to the Firm, but denies that she had any reasonable basis to fear how the Team's partners would react to news of her pregnancy, as several lawyers working on the Team, including an Atlanta partner, had taken family leave and been promoted to partnership.  Jones Day lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 181 of the Complaint and, on that basis, denies them.

182.     Jones Day admits that Ms. Draper performed satisfactorily in a trial support role, and that she worked on a motion that resulted in the preclusion of evidence at trial concerning certain types of medical damages.  Jones Day also admits that the partner leading the trial gave her satisfactory reviews and expressed a willingness to work with her again in the future.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 182 of the Complaint.

183.    Jones Day admits that Stephanie Parker is responsible for coordinating with the client on staffing decisions for the Team's trials.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 183 of the Complaint.

184.    Jones Day admits that Ms. Draper requested a meeting to discuss her role on the Team, and that Mr. McConnell, the Atlanta office litigation coordinator, attended the meeting in February 2017 along with Ms. Parker.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 184 of the Complaint.

185.    Jones Day admits that this meeting was Ms. Draper's first substantive in-person meeting with Ms. Parker, but denies that it was a one-on-one meeting because Mr. McConnell was present for the meeting.  Jones Day further admits that Ms. Parker regularly travels for work. Except as expressly admitted, Jones Day denies the allegations in Paragraph 185 of the Complaint.

186.    Jones Day admits that Ms. Draper was removed from the Team in February 2017 because she, unlike other members of the Team, had not taken advantage of the opportunities available to her to develop the skills required to make a material contribution to the Team.  At the meeting, Ms. Parker and Mr. McConnell identified other avenues for potential work for Ms. Draper.  By the next day, based on Ms. Parker's request to another litigation partner, Ms. Draper had received a call about staffing on a new matter outside of the Team.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 186 of the Complaint.

187.    Jones Day admits that the Team's trials are generally staffed with one senior associate and two junior associates.  Jones Day admits that some members of the Team had reservations about staffing Ms. Draper because of her limited relevant skill set.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 187 of the Complaint.

188.    Jones Day denies the allegations in Paragraph 188 of the Complaint.

189.    Jones Day admits that Ms. Draper was removed from the Team in February 2017, but denies that Ms. Draper had disclosed that she was pregnant with her second child to the Firm at that time.  Jones Day admits that Ms. Draper received a review for her 2016 performance in the Spring of 2017 and that Ms. Draper was told that continued performance at her current level did not put her on a successful track towards partnership.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 189 of the Complaint.

190.    Jones Day denies that Ms. Draper's performance materially improved.   Despite receiving a strong message in 2017 that she had to improve, Ms. Draper continued to perform inconsistently and far below the level that would position her for partnership.  Although her work on matters involving factual investigation received good reviews, her overall litigation skills were deficient.  Among other things, in 2017, Ms. Draper struggled with an analysis of a remand issue, resulting in a memorandum that had to be rewritten by the supervising partner over a weekend to meet the client's deadline.  Jones Day admits that the Firm continued to make efforts to support leadership development program for young professionals, and that, with the Firm's support, Ms. Draper was selected to participate in that program, an honor that the Firm noted on its website. Jones Day admits that Ms. Draper took one overnight trip to Laredo for a pro bono matter in her third trimester.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 190 of the Complaint.

191.    Jones Day admits that Ms. Draper started her second family leave in October 2017, and that Ms. Draper was informed in Spring 2018 that she was not on track for partnership.  Jones Day denies that Ms. Draper's evaluation was the result of discrimination or retaliation; Ms. Draper's solid performance on investigations work was not sufficient to compensate for the fact that, as a seventh-year associate in Jones Day's trial practice, she was well behind her peers in

developing the basic skills that were essential for a litigation associate to be considered for partnership.  Ms. Draper was therefore advised to seek employment outside of the Firm and was given six months to do so.

192.    Jones Day admits that during her May 2018 evaluation, Ms. Draper was told that she had fallen behind and lacked experience taking depositions, arguing motions, and assuming a leadership role in significant cases.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 192 of the Complaint.

193.    Jones Day admits that during her May 2018 evaluation, Ms. Draper was told that she had developed a reputation for not answering her phone or email after 7 p.m. on weekdays or at all on weekends and that this had impeded her progress at the Firm.  Given client needs, the Firm expects attorneys generally to be responsive to time-critical inquiries outside of normal business hours.  Jones Day lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Ms. Draper's state of mind and, on that basis, denies them. Except as expressly admitted, Jones Day denies the allegations in Paragraph 193 of the Complaint.

194.    Jones Day admits that Jamila Hall, a diverse female partner who had taken family leave while at the Firm, wrote in her evaluation that Ms. Draper was vocal about boundaries, a view that others shared.  Jones Day denies that Ms. Hall's comments were otherwise uniformly positive.   Indeed, Ms. Hall's evaluation also questioned Ms. Draper's judgment.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 194 of the Complaint.

195.    Jones Day denies that it ignored Ms. Draper's pro bono contributions in assessing her performance.  Taking her pro bono work into account, Ms. Draper's contribution fell far short of what was required for partnership consideration.  Her productivity (including pro bono work, and annualizing to account for leaves) was unacceptably low in four of her six years at the Firm,

and she did not develop the litigation skills required to progress in the Firm--skills that many associates develop through pro bono work but which Ms. Draper did not.  Jones Day denies that it organized and funded the unaccompanied minor and Laredo projects in order to garner positive media coverage, and denies that Ms. Draper--as just one of more than 900 Jones Day lawyers involved in Laredo--is personally responsible for whatever press coverage has occurred.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 195 of the Complaint.

196.    Jones Day admits that work performed on approved pro bono matters is given the same weight and consideration as client billable work for the purposes of evaluating its lawyers' overall professional development and potential, but, as Ms. Draper and all associates are advised, they are not a substitute for developing the professional experience and skills that are required to function as a partner, nor can associates hide in pro bono work to cover for the lack of demand for their services on billable matters.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 196 of the Complaint.

197.    Jones Day denies the allegations in Paragraph 197.  Hundreds of male and female lawyers have worked on the Laredo Project, and the most significant contributors--including its current and past leaders--have been male lawyers.  Ms. Draper's work on this project was taken into account in the decision that she would not become a partner.

198.    Jones Day admits that Ms. Draper objected to the portion of her assessment statement that commented on her being vocal about expressing boundaries and asked her office's Administrative Partner (a female partner) if this sentence could be removed from the assessment statement.  The office Administrative Partner advised Ms. Draper that she could submit a written objection to the statement to Firm Human Resources.  In 2017, after an Atlanta associate raised a question about the accuracy of a statement in the assessment of her 2016 performance, the issue

was investigated, and the investigation concluded that no edits were warranted.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 198 of the Complaint.

199.   Jones Day admits that lawyers are encouraged and supported in any initiative to organize affinity groups, that they do not need Firm approval to establish such initiatives, that the success of any such groups is dependent on the leadership of lawyers in the relevant group, and that the interest in and importance of such groups varies over time and place.   Jones Day admits that women lawyers in Atlanta decided in 2018 that it would be valuable to strengthen the support networks for female lawyers in that office and that those programs have proceeded with Firm support.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 199 of the Complaint.

200.   Jones Day admits that, in every evaluation cycle, certain associates, male and female, are advised that they are not performing satisfactorily or progressing toward partnership but denies that any such decisions are made based on gender or parental status.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 200 of the Complaint.

201.   Jones Day denies Ms. Draper's claims of discrimination and/or retaliation.   Jones Day lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 201 of the Complaint and, on that basis, denies them.

### E.   JACLYN STAHL

202.   Jones Day admits that Ms. Stahl was employed as an associate in the Irvine, California Office of Jones Day from October 20, 2014, until January 5, 2018.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 202 of the Complaint.

203.   Jones Day admits that Ms. Stahl was a summer associate at Jones Day in 2012, that she was employed as an associate in Jones Day's Irvine office from October 20, 2014, until January

5, 2018, and that she clerked for a federal appellate judge prior to joining Jones Day.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 203 of the Complaint.

204.    Jones Day admits that Ms. Stahl was hired as a second-year associate after her clerkship.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 204 of the Complaint.

205.    Jones Day denies the allegations in Paragraph 205 of the Complaint.

206.    Jones Day admits that Ms. Stahl worked with Partner Robert Naeve, but denies that he was the primary partner with whom she worked.  Rather, Ms. Stahl was given the opportunity to work with a wide range of partners both within and outside of Irvine.  Jones Day admits that Ms. Stahl was criticized by multiple reviewers for turning down, or conveying her displeasure about, work that did not interest her, not engaging with her colleagues and not being a team player. This was a criticism of her attitude and work ethic, not her physical looks.  Jones Day denies that the alleged advice to smile more--by Ms. Stahl's account, given to men as well as to women--has any gendered connotation in a client-facing services business.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 206 of the Complaint.

207.    Jones Day admits that Ms. Stahl billed more than 200 hours per month in February and March of 2017, but denies that she had been "billing at a very high rate for several of the preceding months."  Jones Day admits that Ms. Stahl's work during this time contained errors. Jones Day lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Ms. Stahl's loved one--because Ms. Stahl did not inform the Firm about her loved one's medical condition--and, on that basis, denies them.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 207 of the Complaint.

208.     Jones Day admits that Ms. Stahl failed to complete a series of declarations and that Mr. Naeve informed Ms. Stahl that the entire team would be in trouble if she did not meet the deadline for the declarations, mimicking shooting himself in the head to emphasize the point. Jones Day lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Ms. Stahl's loved one and, on that basis, denies them.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 208 of the Complaint.

209.     Jones Day denies the allegations in Paragraph 209 of the Complaint.

210.     Jones Day admits that Ms. Stahl failed to appear for a meeting with Cheryl O'Connor and was told it was unacceptable to do so without providing any notice, but denies that Ms. O'Connor treated male and female associates unequally.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 210 of the Complaint.

211.     Jones Day denies the allegations in Paragraph 211 of the Complaint.

212.     Jones Day denies the allegations in Paragraph 212 of the Complaint.

213.     Jones Day admits that Ms. Stahl received a positive review from Mr. Grabowski and Mr. Cottriel in June 2017 and that, consistent with the purpose of the annual review process, she was given constructive feedback on areas to improve.  Among other things, she was advised that her commitment, willingness or enthusiasm to handle last minute projects or projects she perceived as less important had been inconsistent and should be an area of improvement.  Jones Day denies that this criticism was unfair, discriminatory or pretextual.  Notwithstanding this criticism, Stahl received a $55,000 raise on July 1, 2017, reflecting her otherwise good 2016 performance.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 213 of the Complaint.

214.     Jones Day admits that during her June 2017 review Ms. Stahl was advised that her attitude and effort did not always seem to match her abilities, and that there was a perception that she avoided taking on work she did not view as interesting or that conflicted with her personal plans.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 214 of the Complaint.

215.     Jones Day admits that, on multiple occasions, Ms. Stahl resisted taking on work due to personal plans or disinterest, that several reviewers raised these concerns in her 2017 review, and that she was told that it was important for her to stretch herself to meet client needs.  Jones Day admits that Ms. O'Connor did not submit a review for Ms. Stahl in 2017 but that, in the previous year, Ms. O'Connor, while strongly praising Ms. Stahl's performance on two matters, expressed disappointment in her performance on another matter where Ms. Stahl declined an urgent request for assistance required after an adverse jury verdict, citing weekend plans.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 215 of the Complaint.

216.     Jones Day denies the allegations in Paragraph 216 of the Complaint.  Specifically, Jones Day denies that Plaintiff Williams's annual reviewers accused her of being "overcommitted."  Rather, lawyers for whom Ms. Williams worked noted that she had difficulty balancing competing demands and managing her time and that, like Ms. Stahl, she often put her personal plans ahead of client responsibilities.

217.     Jones Day denies assigning Ms. Stahl work "beneath her abilities and acumen," and denies that male associates were given more substantive assignments.  Ms. Stahl was given numerous substantive assignments, including drafting appellate briefs, participation on trial teams, drafting summary judgment motions, and principal responsibility for single-plaintiff ADA cases.  Like all litigation associates, male and female, Ms. Stahl was also responsible in a few cases for

managing document reviews and addressing privilege issues, projects which Ms. Stahl considered "beneath her" even though male associates several years senior to Ms. Stahl were also required to work on such projects.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 217 of the Complaint.

218.    Jones Day admits that Ms. Stahl--like all junior litigation associates, male and female--was advised to look for opportunities to take depositions and that she was given substantial opportunities for professional development on matters supervised by Mr. Naeve.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 218 of the Complaint.

219.    Jones Day denies the allegations in Paragraph 219 of the Complaint.

220.    Jones Day denies that Ms. Stahl was given "conflicting advice" about advancement opportunities or that she was in a "no-win situation" as a result.   Jones Day admits that Ms. Stahl, like all litigation associates, male and female, was expected to develop a well-rounded skill set to advance at the Firm and that being a "good writer," which she was, was necessary but not sufficient to become a partner in the litigation practice.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 220 of the Complaint.

221.    Jones Day admits that Ms. Stahl was given the opportunity to work on appellate briefs and several key summary judgment motions and admits--as Ms. Stahl herself acknowledges in Paragraph 220--that Ms. Stahl thought certain work was beneath her and regularly conveyed that attitude to supervisors and peers, which undermined her relationships with her colleagues. Jones Day admits that Ms. Stahl was advised in June 2017 that her selective approach to assignments and team work was undermining her otherwise strong performance.  Jones Day denies that Ms. Stahl "was punished"; to the contrary, she received a $55,000 raise in July 2017 based on

the review of her 2016 performance.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 221 of the Complaint.

222.   Jones Day admits that in 2016, Ms. Stahl--like other associates at the Firm, male and female--was given a leadership role managing the work assignments and activities for the summer associates in her office.   Mr. Finkelstein first asked Ms. Stahl to coordinate the social events for the summer program, a role that has been held by both male and female associates, but she declined.   Mr. Finkelstein then offered Ms. Stahl the role of work coordinator, which she accepted and shared with Ms. Mazingo.   Similarly, the social chair role declined by Ms. Stahl ended up being shared by two associates--one male and one female associate.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 222 of the Complaint.

223.   Jones Day admits that associates--male and female--are engaged in a variety of non-billable assignments.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 223 of the Complaint.

224.   Jones Day admits that Ms. Stahl was given the opportunity to be on a federal trial team in the summer of 2016, which provided her with substantial opportunities to further develop her litigation skills.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 224 of the Complaint.

225.   Jones Day admits that Ms. Stahl was given the opportunity as a junior associate to observe depositions Mr. Grabowski was taking in preparation for a large trial.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 225 of the Complaint.

226.   Jones Day denies the allegations in Paragraph 226 of the Complaint.

227.   Jones Day denies the allegations in Paragraph 227 of the Complaint.

228.   Jones Day denies the allegations in Paragraph 228 of the Complaint.

229.   Jones Day denies the allegations in Paragraph 229 of the Complaint, except admits that male and female attorneys generally are afforded flexibility to leave the office to attend to personal needs, and admits that a male attorney several years senior to Ms. Stahl has five children and became a partner after years of strong reviews and a level of productivity that significantly exceeded Ms. Stahl's.

230.   Jones Day admits that Ms. Stahl took medical leave effective August 31, 2017, ending on December 6, 2017.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 230 of the Complaint.

231.   Jones Day admits that Ms. Stahl's last day of employment with the Firm was January 5, 2018, and that she accepted a position with the federal government where she presumably makes less than she did at Jones Day.  Jones Day denies the remaining allegations in Paragraph 231 of the Complaint.

**F.     JANE DOE 4**

232.   Jones Day admits that Jane Doe 4 was an associate in a non-California office of Jones Day.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 232 of the Complaint.  Jane Doe 4 performed well as a mid-level associate but she was unwilling to assume the strategic and substantive leadership roles necessary to become a partner.  Jane Doe 4 was advised in the annual evaluation of her 2015 performance that she needed to progress beyond chief-of-staff roles and develop a full complement of strategic case leadership skills.  She was given multiple opportunities to do so, including being given key roles on two major cases led by the co-head of the Firmwide litigation practice, with specific instructions to use the opportunity to further develop her deposition and stand-up skills.  Rather than take advantage of that opportunity, she stayed in her comfort zone, keeping the trains running but delegating depositions to others, not seeking out stand-up opportunities, and making minimal contributions to overall case strategy.

66

When challenged on her failure to take advantage of that opportunity, she offered evolving and inconsistent excuses.  Jane Doe 4 was advised in June 2017 that she would not be considered for partnership and was given more than one year to find alternative employment.

233.    Jones Day admits that, during her tenure with the Firm, Jane Doe 4 worked on several large, complex cases with partners and associates in offices across the country.  Jones Day admits that, earlier in her career, Jane Doe 4 was a hard worker but her productivity declined substantially beginning in 2016 and for the remainder of her time at the Firm, she spent the majority of her time on pro bono or other non-billable matters, reflecting the declining demand for a senior lawyer with her skill set.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 233 of the Complaint.

234.    Jones Day admits that Jane Doe 4, like most litigation associates, worked on large, complex cases with partners and associates in offices across the country.  Jones Day admits  that Jane Doe 4 was part of a large team of lawyers that worked on one matter in which the Firm was retained shortly before trial to replace the client's prior counsel.  Jones Day admits that Jane Doe 4 was given the lead role on a pro bono jury trial in which the client obtained a favorable verdict. Jones Day admits that Jane Doe 4 resolved a residential real estate dispute for the daughter and son-in-law of a Firm partner, presumably the "client with important ties to the Firm" referenced in Paragraph 234.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 234 of the Complaint.

235.    Jones Day admits that Jane Doe 4 managed teams on day-to-day discovery matters in certain large litigation matters and that she performed many of the tasks listed in paragraph 235, but denies that she "led" those matters and denies that her overall performance was at the level expected of a partner.  Jones Day further admits that Jane Doe 4 played a supporting role on

successful trial teams.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 235 of the Complaint.

236.    Jones Day admits that Jane Doe 4 demonstrated knowledge of local procedure in the district where she had clerked for a federal judge, and that lawyers sought her assistance on matters pending in that district.  Jane Doe 4 was advised by a female partner with a leadership role in her practice that her knowledge of the local rules in one federal district court was not alone sufficient to justify promotion to partnership; rather, Jane Doe 4 was told that she needed to take and defend more depositions of key witnesses and contribute meaningfully to the development, not just the implementation, of case strategies, which she failed to do.  Jones Day also admits that Jones Day supported Jane Doe 4's efforts in hosting a CLE event at a Jones Day office.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 236 of the Complaint.

237.    Jones Day admits that it advised Jane Doe 4 in June 2017 that she would not be a partner, and that Jane Doe 4 left the Firm on June 8, 2018.  Jones Day admits that a highly regarded male senior associate who left the Firm for a senior position in the federal government made federally-required disclosures of income received from the Firm, which included a significant one-time severance bonus.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 237 of the Complaint.

238.    Jones Day admits that, in the spring of 2015, Partners P and S delivered Jane Doe 4's review of her 2014 performance and provided constructive feedback on areas she needed to address.  Jones Day further admits that Partners P and S informed Jane Doe 4 that they would consider recommending her for partner at the end of 2016, but that 2015 would be an important year for her to demonstrate progress in the areas identified as needing improvement.  Jones Day further admits that Partner S worked extensively with Jane Doe 4 throughout 2015, giving her

opportunities to prove herself and him the opportunity to directly observe her work.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 238 of the Complaint.

239.    Jones Day admits that complaints were made about Jane Doe 4's supervision of associates and that Jane Doe 4 was advised of these concerns in her performance evaluation in the Spring of 2014 and again in subsequent evaluations.  Jones Day denies that these concerns were new or that they were the primary reason for Jane Doe 4's failure to advance to partnership.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 239 of the Complaint.

240.    Jones Day admits that Partner P gave Jane Doe 4 both constructive and positive feedback.  Jones Day further admits that Partner P, who had not at that point personally observed Jane Doe 4's mistreatment of associates, took steps to understand the basis for complaints from associates about working with Jane Doe 4.  Subsequently, Partner P directly observed Jane Doe 4's mistreatment of associates, dishonesty and disparagement to colleagues of members of the team (both associates and partners).  Except as expressly admitted, Jones Day denies the allegations in Paragraph 240 of the Complaint.

241.    Jones Day admits that the Firm's Partnership Agreement gives the Managing Partner the final authority to admit a lawyer to the partnership, but denies that the Managing Partner had any involvement in the decision that Jane Doe 4 would not be a partner.  The practice and office leaders made the final decision not to recommend Jane Doe 4 for partnership consideration, with input from numerous partners involved in the associate evaluation process. Jane Doe 4's name was never submitted for consideration to the Partnership Committee or the Managing Partner.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 241 of the Complaint.

242.     Jones Day denies the allegations in Paragraph 242 of the Complaint, except admits that Jane Doe 4 was involved in incidents that raised questions about her honesty and integrity, causing partners to lose faith in her.

243.     Jones Day admits that, in or around 2009, an unsuccessful job applicant published an inappropriate blog post about Jane Doe 4.  Jones Day promptly intervened to address the issue, including sending a cease-and-desist letter to the chat board.  Jones Day denies that Jane Doe 4 was barred from participating in recruiting as a result of the incident.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 243 of the Complaint.

244.     Jones Day denies the allegations in Paragraph 244 of the Complaint.

245.     Jones Day lacks knowledge or information concerning the reasons why Jane Doe 4 did not report any of the alleged acts of sexual harassment that she now is asserting in the Complaint until long after she left the Firm and, on that basis, denies the allegations in Paragraph 245 of the Complaint regarding her reasoning or motives.  Jones Day denies that Partner T ever warned Jane Doe 4 not to raise issues of harassment.  Jones Day admits that Partner T was assigned to mentor Jane Doe 4, and admits that, if an associate reported concerns about sexual harassment to a partner, the partner would be expected to act on the concern by addressing it with Human Resources or other appropriate channels.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 245 of the Complaint.

246.     Jones Day denies the allegations in Paragraph 246 of the Complaint.

247.     Jones Day denies that Jane Doe 4 had any rational basis to fear having children as an associate, as most of the Firm's approximately 240 female partners have children and many of them did so as associates at the Firm.  Jones Day lacks information or knowledge sufficient to

form a belief as to the truth of the remaining allegations in Paragraph 247 of the Complaint and, on that basis, denies them.

248.    Jones Day denies the allegations in Paragraph 248 of the Complaint.

249.    Jones Day lacks information or knowledge sufficient to form a belief as to the truth of the allegations about Jane Doe 4's concerns, but denies that she had any rational basis for any such concerns and, on that basis, denies them.   Jones Day denies the remaining allegations in Paragraph 249 of the Complaint.

250.    Jones Day admits that Jane Doe 4's office hosts a holiday party each year for lawyers and staff.   Jones Day further admits that some lawyers chose to gather in a social setting in advance of, and/or following, the office party and that such events were typically organized by associates, including female associates.   Jones Day denies that its office events encouraged "inappropriate workplace behavior."   Except as expressly admitted, Jones Day denies the allegations in Paragraph 250 of the Complaint.

251.    Jones Day admits that, at a summer associate event in 2010 that Jane Doe did not attend, a male summer associate pushed a female friend who was also a summer associate into a swimming pool but denies that this event had any sexual connotation.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 251 of the Complaint.

252.    Jones Day denies the allegations in Paragraph 252 of the Complaint.   Lawyers in Jane Doe 4's office often eat lunch together in the office café, and they tend to congregate based upon practice, lunch room timing, friendship, ongoing legal matters, and myriad other factors, on a planned and unplanned basis.   Partners and associates--both male and female--are welcome to join together, and regularly do join together, at the café tables.   Jones Day further denies that Jane Doe 4 was deprived of mentorship.   Multiple partners, including female partners in Jane Doe 4's

office, reached out to offer guidance on her career development, but Jane Doe 4 ignored or rebuffed those offers.

253.    Jones Day denies the allegations in Paragraph 253 of the Complaint.

254.    Jones Day denies the allegations in Paragraph 254 of the Complaint.

255.    Jones Day denies the allegations in Paragraph 255 of the Complaint except admits that, by choice, Jane Doe 4 functioned as a "chief of staff" on certain major litigation matters and that, in that capacity, she was expected to stay on top of case developments.

256.    Jones Day admits that practice and office leadership recommended a male associate for partnership at the end of 2015, that the male associate went to the same law school as Jane Doe 4, and that the male associate was not promoted that year.  Jones Day denies that the male associate was "put up instead" of her, and further denies that Jane Doe 4's undergraduate school or district court clerkship made her more qualified for partnership.  Nine lawyers from Jane Doe's practice were admitted to the partnership as of January 1, 2016, and four of them were women.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 256 of the Complaint.

257.    Jones Day admits that practice and office leadership again recommended the same male associate referenced in Paragraph 256 for partnership in late 2016 and that he was promoted to partner effective January 1, 2017, along with another female lawyer from Jane Doe 4's same office and practice.  Jones Day denies that the male associate was put up for partner "instead of" Jane Doe 4.  Jones Day further denies that Jane Doe 4 reasonably believed in 2016 that she was a strong candidate for partnership.  To the contrary, Jane Doe 4 was told in 2016 that she had not displayed the full complement of strategic case leadership skills and that she would need to turn things around in the next year to have a chance at becoming partner.  In 2017, Jane Doe 4 was advised again that her overall litigation skill set was less fully developed than that of peers and

that she would not be recommended for partnership.  Jones Day further denies that it maintains a practice known as "reading in."  Except as expressly admitted, Jones Day denies the allegations in Paragraph 257 of the Complaint.

258.    Jones Day admits that Jane Doe 4 spoke with Partner S about her career prospects but denies the remaining allegations in Paragraph 258 of the Complaint.

259.    Jones Day denies that Jane Doe 4 was "one of the best lawyers at the Firm," and denies that the Managing Partner had any role in the decision not to recommend Jane Doe 4 for partnership.  Jones Day lacks knowledge or information sufficient to form a belief as to what unnamed partners may have told Jane Doe 4 and, on that basis, denies the remaining allegations in Paragraph 259 of the Complaint.

260.    Jones Day denies the allegations in Paragraph 260 of the Complaint.

261.    Jones Day denies the allegations in Paragraph 261 of the Complaint.

262.    Jones Day denies the allegations in Paragraph 262 of the Complaint.

263.    Jones Day admits that her practice leader advised Jane Doe 4 in June 2017 that she would not be recommended for partnership, and that Jane Doe 4 left the Firm in June 2018.  Jones Day also admits, on information and belief, that Jane Doe 4 accepted a position to work in the public sector after she declined a partner position in another law firm.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 263 of the Complaint.

G.    **KATRINA HENDERSON**

264.    Jones Day admits that Ms. Henderson was employed as an associate in the New York City office of the Firm from October 23, 2013, that she remained on the payroll until June 30, 2015 and that she took an unpaid leave of absence until her final termination date of July 15, 2016.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 264 of the

Complaint. Ms. Henderson's overall performance throughout her tenure with the Firm was unacceptable and her compensation reflected her deficient performance.

265. Jones Day admits that Ms. Henderson had a Bachelor's degree from Duke University and a Juris Doctorate from New York University and that Ms. Henderson joined Jones Day's New York office on October 23, 2013.

266. Jones Day admits that Partner Randi Lesnick, one of the Firm's leading M&A lawyers, agreed to serve as Ms. Henderson's partner mentor during the period that Ms. Henderson was in the New Lawyers Group ("NLG"). Jones Day provides lawyers in the NLG with a partner and an associate mentor, who serve as resources as a new lawyer integrates into the Firm, before they join a practice. In her role as Ms. Henderson's NLG mentor, Ms. Lesnick provided her career development opportunities by working directly with her on a transaction for a Firm client. Ms. Henderson's performance did not meet the Firm's expectations and Ms. Lesnick provided reasonable and appropriate constructive feedback, including regarding issues with Ms. Henderson's availability and responsiveness during a critical pre-closing period in which there was time-sensitivity for client deliverables. Except as expressly admitted, Jones Day denies the allegations in Paragraph 266 of the Complaint.

267. Jones Day lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 267 of the Complaint and, on that basis, denies them.

268. Jones Day lacks knowledge or information sufficient to form a belief as to the allegations regarding Ms. Henderson's dinner plans or the precise time that she completed the project and, on that basis, denies them. Jones Day expects associates who have time-sensitive obligations on urgent client matters to keep the supervising partner advised of any problems that might interfere with timely delivery of promised work, which Ms. Henderson did not do. Jones

Day denies that Ms. Lesnick ever berated Ms. Henderson.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 268 of the Complaint.

269.    Jones Day denies the allegations set forth in Paragraph 269 of the Complaint.

270.    Jones Day lacks knowledge or information sufficient to form a belief as to the allegations regarding Ms. Henderson's activities with her family over the winter holiday or regarding any panic attack allegedly suffered by Ms. Henderson and, on that basis, denies them. Jones Day denies that Ms. Lesnick ever berated Ms. Henderson.  Ms. Henderson was unavailable for extended stretches during the critical pre-closing period in a transaction despite being advised about the expectations for her availability and the need to communicate with the team if she would be unavailable.  Ms. Lesnick and other partners therefore counseled Ms. Henderson about the Firm's and clients' expectations in this regard.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 270 of the Complaint.

271.    Jones Day admits that Ms. Lesnick counseled Ms. Henderson about her lack of responsiveness and communication deficiencies.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 271 of the Complaint.

272.    Jones Day denies that Ms. Lesnick has provided differential treatment to male and female associates and denies the Firm requires a different level of commitment from associates based on their gender.  In order to deliver a high level of client service, Jones Day expects all lawyers to exhibit a strong commitment to clients' needs.

273.    Jones Day denies the allegations set forth in Paragraph 273 of the Complaint.

274.    Jones Day admits that Ms. Lesnick was assigned as Ms. Henderson's partner mentor for the period that Ms. Henderson was in the New Lawyers Group, and that Ms. Lesnick remained committed to coaching and advising Ms. Henderson throughout that period.  Once Ms.

Henderson transferred to the Capital Markets practice, she was no longer part of the NLG mentoring program. Despite repeated coaching and counseling by multiple partners, including the partners responsible for overseeing the NLG program in New York and partners in the Capital Markets practice, Ms. Henderson repeatedly failed to exhibit the performance and commitment expected of a Jones Day associate. As a result of these performance deficiencies, Ms. Henderson's work flow began to diminish. Except as expressly admitted, Jones Day denies the allegations in Paragraph 274 of the Complaint.

275. Jones Day admits that Ms. Henderson, at times, sought out additional work opportunities. The NLG coordinators in the New York Office worked with Ms. Henderson to try to teach her how to manage her work flow and to obtain projects that would enable her to develop the skills needed in a transactional practice. However, despite never cracking 1,100 hours of actual client billable time in any year, Ms. Henderson frequently indicated that she was out of the office or otherwise unavailable for work. Jones Day denies that Mr. Rory Hood or anyone else froze Ms. Henderson out of work opportunities. Ms. Henderson's work opportunities were negatively impacted by her unavailability, her resistance to taking on certain work when requested to do so, and the poor quality of some of the work that she did perform. Except as expressly admitted, Jones Day denies the allegations of Paragraph 275 of the Complaint.

276. Jones Day admits that Ms. Henderson was staffed on a deal with Partner Alex Gendzier and Mr. Bret Stancil, a former Jones Day associate who was in the same class as Ms. Henderson. Jones Day admits that the client requested a number of calls on short notice, that none of the team (men or women) had more than limited advance notice for such calls, and that Ms. Henderson was regularly late despite receiving communications scheduling such calls. Jones Day denies that Ms. Henderson was excluded from communications scheduling such calls. Jones Day

admits that, after Ms. Henderson was late to join a number of calls, Mr. Gendzier commented on her tardiness, but denies that the comment was made in front of the client.  Except as expressly admitted, Jones Day denies the allegations of Paragraph 276 of the Complaint.

277.    Jones Day denies that Mr. Stancil, who left the Firm in his second year, received mentorship, support, access to partners or "groom[ing] for advancement" that was denied to Ms. Henderson.  Jones Day admits that Mr. Stancil had no supervisory authority over Ms. Henderson. Except as expressly admitted, Jones Day denies the allegations of Paragraph 277 of the Complaint. Multiple Jones Day partners provided mentorship, support and coaching to Ms. Henderson, who failed to take advantage of the opportunities for career development that were made available to her.

278.    Jones Day admits that Priya Galante was the associate mentor assigned to work with Ms. Henderson during her NLG year and that Ms. Galante was seconded to a client during part of that period.  Except as expressly admitted, Jones Day denies the allegations of Paragraph 278 of the Complaint.  Jones Day assigned another highly-regarded associate as a replacement associate mentor to Ms. Henderson, and the NLG coordinators worked closely with Ms. Henderson to help her find work, manage her work flow, and to coach her on concrete steps to take to improve her performance, including in multiple formal review meetings in Ms. Henderson's first year and in regularly scheduled informal feedback and coaching meetings.

279.    Jones Day denies that it froze Ms. Henderson out of mentorship and legal work. Jones Day admits that it paid Ms. Henderson a starting salary of $160,000 and that this amount was the same starting salary as other associates in her class in New York in 2013.  Jones Day admits that all of the other associates in Ms. Henderson's class in New York--half of whom were women--received salary increases in January 2015 and that Ms. Henderson did not receive a raise

at that time because her performance had been far below expectations.   Except as expressly admitted, Jones Day denies the allegations of Paragraph 279 of the Complaint.

280.     Jones Day admits that, with the exception of Ms. Henderson, all of the associates in her class in New York received raises in January 2015.   Jones Day denies that Ms. Henderson was underpaid given that the quality of her performance, responsiveness and productivity were at an unacceptable level and far below her peers.   Jones Day denies that associates are forbidden from discussing their compensation; indeed, Ms. Henderson admits that such discussion occurred.   Jones Day lacks knowledge or information sufficient to form a belief as to the remaining allegations and, on that basis, denies them.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 280 of the Complaint.

281.     Jones Day admits that, at one meeting sponsored by the Women's Initiative in New York in November 2015, an external speaker offered her opinion on how to be successful in the legal industry.   As part of that presentation, the speaker suggested that women do not need to adopt stereotypical male behavior and gave some examples of behaviors that the speaker implied were masculine in nature.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 281 of the Complaint.

282.     Jones Day admits that various participants in the meeting, including female Partners Lesnick and Strudler, voiced disagreement with the external speaker's expression of stereotypical thinking.   Ms. Lesnick and Ms. Strudler encouraged women to be themselves, including if that meant they might choose to curse from time to time.   With respect to the allegations in the footnote to Paragraph 282, Jones Day admits that, in a 2013 interview, Partner Mary Ellen Powers mentioned her siblings when asked about old boys' networks, but denies that she implied that description applied to Jones Day.   To the contrary, Ms. Powers, who as the article notes, was

"partner-in-charge of Jones Day's Europe/Middle East region, overseeing 14 offices and 500 lawyers…[and] has served in leadership roles at Jones Day for almost 20 years, including heading the 220-lawyer Washington, D.C. office and serving as firm administrative partner and on the partnership and advisory committees," explained that she "was lucky to join a firm that put a premium on teamwork and eschewed a star system.  In a place that doesn't tolerate 800-pound gorillas or sharp elbows, testosterone is not as highly valued as talent, hard work, and effective team play.  Becoming indispensable to important client matters goes a long way toward breaking down barriers."  Ms. Powers, a Midwesterner, described issues she experienced, both cultural and gender-related, while interviewing at other firms in Atlanta in the 1970s and praised Lizanne Thomas, a Florida native who was then the Partner-in-Charge of Jones Day's Atlanta office, as "the perfect agent for change in that city just a few years later, helping to open doors for generations of young women lawyers."  With respect to the interview with Partner Jamila Hall, Jones Day admits that she described how she embraces opportunities to attend major client development events, observes that male lawyers sometimes "unintentionally" offer tickets to male friends, and explains that once she lets them know she is interested in attending, she is included in the events, and has experienced excellent client development opportunities alongside male colleagues at these events.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 282 of the Complaint.

283.    Jones Day admits that Boris Dolgonos, a partner in the Firm's Capital Markets practice, delivered Ms. Henderson's annual review in the spring of 2015, and that, effective July 1, 2015, Ms. Henderson received a $20,000 raise that increased her salary to $180,000.  In the spring 2015 review of Ms. Henderson's performance for calendar year 2014, Ms. Henderson was told that she had made strides in demonstrating her understanding and commitment to the practice,

but also that she needed to work on developing her substantive skills, to focus on consistently showing her enthusiasm for, and commitment to, the practice and to improve her productivity.  In 2014, Ms. Henderson billed only 1,180 client hours, inclusive of her pro bono client work, which was significantly below the productivity level expected of a full-time associate.   While Ms. Henderson's performance had shown some improvement, she was still performing well below her peers.  Except as expressly admitted, Jones Day denies the allegations of Paragraph 283 of the Complaint.

284.    Jones Day admits that the demand for Ms. Henderson's work declined over time due to her continued pattern of unavailability and unresponsiveness and her deficient work product.   Throughout her first and second year at the Firm, multiple partners provided Ms. Henderson with opportunities on client transactions only to find her work unsatisfactory and frequently unreasonably delayed notwithstanding her limited workload.  Jones Day admits that Ms. Henderson performed some pro bono work, but denies that Ms. Henderson made efforts to reasonably fill her time with work that would provide her with skills or experience.  In 2014, Ms. Henderson billed only 1,180 client hours, inclusive of pro bono client work.   In 2015, Ms. Henderson billed only 202 client hours, inclusive of 8 hours of pro bono client work, averaging less than 20 hour of work per month.  Ms. Henderson did not make herself reasonably available for work, which rendered it impossible for her to succeed at the Firm.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 284 of the Complaint.

285.    Jones Day denies that Ms. Henderson or any other associate was denied the billable work needed for advancement due to their gender.  Jones Day lacks knowledge or information sufficient to form a belief as to the remaining allegations regarding Ms. Henderson's communications with other associates about their perception of their work experiences and, on that

basis, denies them.  Jones Day denies any other remaining allegations in Paragraph 285 of the Complaint.

286.    Jones Day admits that Mr. Dolgonos invited Ms. Henderson to a meeting in December 2015.  Jones Day denies that Mr. Dolgonos previously had provided a positive review to Ms. Henderson.  Jones Day lacks knowledge or information sufficient to form a belief as to the remaining allegations and, on that basis, denies them.  Except as expressed admitted, Jones Day denies the allegations in Paragraph 286 of the Complaint.

287.    Jones Day admits that, in December 2015, the Partner-in-Charge of the New York office, Mr. Dolgonos and another partner in the Capital Markets practice informed Ms. Henderson that she should pursue other employment.  Except as expressed admitted, Jones Day denies the allegations in Paragraph 287 of the Complaint.

288.    Jones Day denies that Ms. Henderson received a positive review earlier in 2015, and denies that Ms. Henderson could reasonably have been shocked by the message she received, which did not at that time include a deadline for finding a new position.  Except as expressly admitted, Jones Day denies the allegations of Paragraph 288 of the Complaint.

289.    Jones Day admits that, in the December 2015 meeting, the Firm did not give Ms. Henderson a specific deadline for her departure.  Jones Day further admits that it later set a deadline, but also communicated flexibility with respect to that deadline in the hope that Ms. Henderson would obtain a job prior to her termination date.  Except as expressly admitted, Jones Day denies the allegations of Paragraph 289 of the Complaint.

290.    Jones Day admits that Ms. Henderson reached out to Barbara Nicoll, Office Administrator for Jones Day's New York office, to request more time to find alternate employment and that Ms. Henderson was given several additional months to find a job.  Jones Day further

admits that Jones Day paid Ms. Henderson through the end of June 2016, and that Ms. Henderson's employment officially ended following a brief unpaid leave on July 15, 2016.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 290 of the Complaint.

291.    Jones Day admits that Charmaine Slack was an African American female partner in the Firm's New York office during Ms. Henderson's tenure at the Firm.  Jones Day denies that Ms. Slack was an employment lawyer.  Jones Day denies that Ms. Slack made any statement to Ms. Henderson on behalf of the Firm.   Except as expressly admitted, Jones Day denies the allegations in Paragraph 291 of the Complaint.

292.    Jones Day denies that Ms. Henderson had any reasonable basis to believe that the Firm would "stop at nothing to harm her professionally" and lacks knowledge or information sufficient to form a belief as to the remaining allegations and, on that basis, denies them.

293.    Jones Day denies that Ms. Henderson's delay in filing this complaint is justified by anything Ms. Slack may have said to her in 2016, and denies that Ms. Henderson is entitled to invoke equitable tolling with respect to her claims.

## V.    CLASS ACTION ALLEGATIONS

294.    Jones Day denies the allegations in Paragraph 294 of the Complaint.

295.    Jones Day denies the allegations in Paragraph 295 of the Complaint.

296.    Jones Day denies the allegations in Paragraph 296 of the Complaint.

297.    Jones Day denies the allegations in Paragraph 297 of the Complaint.

298.    Jones Day denies the allegations in Paragraph 298 of the Complaint.

299.    Jones Day denies the allegations in Paragraph 299 of the Complaint.

300.    Jones Day denies the allegations in Paragraph 300 of the Complaint.

301.    Jones Day denies the allegations in Paragraph 301 of the Complaint.

302.    Jones Day denies the allegations in Paragraph 302 of the Complaint.

303.    Jones Day denies the allegations in Paragraph 303 of the Complaint.

304.    Jones Day denies the allegations in Paragraph 304 of the Complaint.

305.    Jones Day denies the allegations in Paragraph 305 of the Complaint and denies that Plaintiffs, as former employees, have standing to pursue injunctive relief.

**A.      Rule 23 Class Definition**

306.    Jones Day admits only that the Plaintiffs seek to represent the putative class defined in Paragraph 306 of the Complaint.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 306 of the Complaint and specifically denies that class certification is appropriate.

307.    Jones Day admits only that the Plaintiffs seek to represent the putative subclasses defined in Paragraph 307 of the Complaint.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 307 of the Complaint and specifically denies that class certification is appropriate.

308.    Jones Day admits that Plaintiffs Tolton, Mazingo, Draper and Jane Doe 4 purport to be members of the putative Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., as amended ("Title VII") Class and that Plaintiffs Tolton, Mazingo, Williams, Draper, Stahl, and Jane Doe 4  purport to be members of the putative D.C. Human Rights Act ("DCHRA") Class. Jones Day denies that Plaintiffs Tolton, Mazingo, Williams, Draper and Stahl have standing to bring claims under the DCHRA and therefore denies that they can be members of the putative DCHRA Class.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 308 of the Complaint and specifically denies that class certification is appropriate.

309.    Jones Day admits only that Plaintiffs Tolton and Draper purport to be members of the putative Title VII and DCHRA Pregnancy Subclasses but denies that Tolton and Draper have standing to assert claims under the DCHRA and therefore denies that they can be members of the putative DCHRA Pregnancy Subclass.  Except as expressly admitted, Jones Day denies the

allegations in Paragraph 309 of the Complaint and specifically denies that class certification is appropriate.

310.    Jones Day admits only that Plaintiffs Tolton, Mazingo, and Draper purport to be members of the putative Leave Subclass, but denies that Ms. Mazingo in fact took a leave of absence and therefore denies that Ms. Mazingo can be a member of the putative Leave Subclass. Except as expressly admitted, Jones Day denies the allegations in Paragraph 310 of the Complaint and specifically denies that class certification is appropriate.

311.    Jones Day admits only that the Plaintiffs Tolton, Mazingo, Williams, and Stahl also seek to represent the putative class defined in Paragraph 311 of the Complaint.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 311 of the Complaint and specifically denies that class certification is appropriate.

312.    Jones Day admits only that Plaintiffs Tolton, Mazingo, Williams, and Stahl purport to be members of the putative California Class, the California Equal Pay Act ("CEPA") Class, and the California Unfair Competition Class.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 312 of the Complaint and specifically denies that class certification is appropriate.

313.    Jones Day admits only that Plaintiff Tolton seeks to represent the putative subclass defined in Paragraph 313 of the Complaint.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 313 of the Complaint and specifically denies that class certification is appropriate.

314.    Jones Day admits that Tolton purports to be a member of the putative subclass defined in Paragraph 313 of the Complaint.  Except as expressly admitted, Jones Day denies the

allegations in Paragraph 314 of the Complaint and specifically denies that class certification is appropriate.

315.     Jones Day admits only that Plaintiffs Tolton and Mazingo seek to represent the putative subclass defined in Paragraph 315 of the Complaint but denies that Ms. Mazingo is a member of the putative class.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 315 of the Complaint and specifically denies that class certification is appropriate.

316.     Jones Day admits that Ms. Tolton and Ms. Mazingo purport to be members of the putative subclass defined in Paragraph 315 of the Complaint, but denies that Ms. Mazingo is a member of the putative subclass.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 316 of the Complaint and specifically denies that class certification is appropriate.

317.     Jones Day admits only that Ms. Henderson seeks to represent the putative classes defined in Paragraph 317 of the Complaint.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 317 of the Complaint and specifically denies that class certification is appropriate.

318.     Jones Day admits that Ms. Henderson purports to be a member of the putative subclasses defined in Paragraph 317 of the Complaint.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 318 of the Complaint and specifically denies that class certification is appropriate.

319.     Jones Day denies the allegations in Paragraph 319 of the Complaint.

320.     Jones Day admits only that Plaintiffs so allege.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 320 of the Complaint.

**B.     Efficiency of Class Prosecution of Class Claims**

321.     Jones Day denies the allegations in Paragraph 321 of the Complaint.

322.     To the extent Paragraph 322 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

323.     To the extent Paragraph 323 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations in Paragraph 323 of the Complaint and denies that any of the Plaintiffs have standing to seek equitable or injunctive relief.

324.     To the extent Paragraph 324 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

325.     To the extent Paragraph 325 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

C.     **Numerosity and Impracticability of Joinder**

326.     To the extent Paragraph 326 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

D.     **Common Questions of Law and Fact**

327.     To the extent Paragraph 327 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

328.     To the extent Paragraph 328 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

329.     To the extent Paragraph 329 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

330.     Jones Day denies the allegations in Paragraph 330 of the Complaint.

E.     **Typicality of Claims and Relief Sought**

331.     To the extent Paragraph 331 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

332.     To the extent Paragraph 332 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

333.     To the extent Paragraph 333 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

334.     To the extent Paragraph 334 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

335.     To the extent Paragraph 335 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

336.     To the extent Paragraph 336 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

337.     To the extent Paragraph 337 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

**F.      Adequacy of Representation**

338.     To the extent Paragraph 338 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

339.     To the extent Paragraph 339 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

340.     To the extent Paragraph 340 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

341.     To the extent Paragraph 341 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

**G.      Requirements of Rule 23(b)(2)**

342.     To the extent Paragraph 342 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

343.     To the extent Paragraph 343 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

344.     To the extent Paragraph 344 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

345.     To the extent Paragraph 345 states a legal conclusion, no response is required. Jones Day denies the remaining allegations in Paragraph 345 of the Complaint.

346.     To the extent Paragraph 346 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations and denies that Plaintiffs have standing to seek injunctive relief.

**H.     Requirements of Rule 23(b)(3)**

347.     To the extent Paragraph 347 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.  Jones Day specifically denies that class treatment is appropriate and denies that common issues predominate over issues affecting individual claims.

348.     To the extent Paragraph 348 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

349.     To the extent Paragraph 349 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

350.     To the extent Paragraph 350 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

**VI.     COLLECTIVE ALLEGATIONS UNDER THE EQUAL PAY ACT**

351.     Jones Day incorporates Paragraphs 1-350 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 351 of the Complaint.

352.     Jones Day admits only that Plaintiffs purport to assert collective claims under the Equal Pay Act pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), on behalf of the putative class described in Paragraph 352.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 352 and specifically denies that collective action certification is appropriate.

353.     To the extent Paragraph 353 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

354.     To the extent Paragraph 354 states a legal conclusion, no response is required. Jones Day denies the remaining allegations in Paragraph 354 of the Complaint.

355.     To the extent Paragraph 355 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

356.     To the extent Paragraph 356 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

## VII.   COUNTS

### COUNT 1
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
### 42 U.S.C. § 2000(e), *et seq.*
### GENDER DISCRIMINATION
### On Behalf of the Title VII Class Representatives and all Title VII Class Members

357.     Jones Day incorporates Paragraphs 1-356 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 357 of the Complaint.

358.     Jones Day admits only that Plaintiffs Tolton, Mazingo, Draper, and Jane Doe 4 purport to bring Count 1 on behalf of themselves and all members of the putative class.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 358 of the Complaint and denies class certification is appropriate.

359.     To the extent Paragraph 359 states a legal conclusion, no response is required. Jones Day admits that Plaintiffs Tolton, Mazingo, Draper, and Jane Doe 4 each filed a charge with the EEOC.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 359 of the Complaint.

360.     To the extent Paragraph 360 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

361.     Jones Day denies the allegations in Paragraph 361 of the Complaint.

362.     Jones Day denies the allegations in Paragraph 362 of the Complaint.

363.     Jones Day denies the allegations in Paragraph 363 of the Complaint.

364.     Jones Day denies the allegations in Paragraph 364 of the Complaint.

365.     Jones Day denies the allegations in Paragraph 365 of the Complaint.

366.     Jones Day denies the allegations in Paragraph 366 of the Complaint.

367.     Jones Day denies the allegations in Paragraph 367 of the Complaint.

368.     Jones Day denies the allegations in Paragraph 368 of the Complaint.

369.     Jones Day denies the allegations in Paragraph 369 of the Complaint.

370.     Jones Day denies the allegations in Paragraph 370 of the Complaint.

## COUNT 2
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000(e), *et seq.*,
### *as amended by the* PREGNANCY DISCRIMINATION ACT OF 1978
### PREGNANCY AND MATERNITY (SEX PLUS) DISCRIMINATION
### On Behalf of the Title VII Pregnancy Class Representatives and all Title VII Pregnancy Subclass Members

371.     Jones Day incorporates Paragraphs 1-370 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 371 of the Complaint.

90

372.    Jones Day admits only that Plaintiffs Tolton and Draper purport to bring Count 2 on behalf of themselves and all members of the putative Title VII Pregnancy Subclass.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 372 of the Complaint and denies class certification is appropriate.

373.    To the extent Paragraph 373 states a legal conclusion, no response is required. Jones Day admits that Plaintiffs Tolton and Draper each filed a charge with the EEOC.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 373 of the Complaint.

374.    Jones Day denies the allegations in Paragraph 374 of the Complaint.

375.    Jones Day denies the allegations in Paragraph 375 of the Complaint.

376.    Jones Day denies the allegations in Paragraph 376 of the Complaint.

377.    Jones Day denies the allegations in Paragraph 377 of the Complaint.

378.    Jones Day denies the allegations in Paragraph 378 of the Complaint.

379.    Jones Day denies the allegations in Paragraph 379 of the Complaint.

380.    Jones Day denies the allegations in Paragraph 380 of the Complaint.

<u>**COUNT 3**</u>
**VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT,**
**29 U.S.C § 2601 *et seq.***
**DISCRIMINATION, INTERFERENCE AND RETALIATION**
**On Behalf of the FMLA Class Representatives and the FMLA Class**

381.    Jones Day incorporates Paragraphs 1-380 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 381 of the Complaint.

382.    Jones Day admits that Plaintiffs Tolton, Mazingo, and Draper purport to bring Count 3 on behalf of themselves and the putative Family Medical Leave Act ("FMLA") subclass. Jones Day denies that Ms. Mazingo is a member of the putative FMLA Class because she did not take leave under the FMLA.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 382 of the Complaint and denies class certification is appropriate.

383.     To the extent Paragraph 383 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

384.     To the extent Paragraph 384 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

385.     To the extent Paragraph 385 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

386.     To the extent Paragraph 386 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

387.     To the extent Paragraph 387 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

388.     To the extent Paragraph 388 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

**COUNT 4**
**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, *as amended by***
**THE EQUAL PAY ACT OF 1963, 29 U.S.C. § 216(b)**
**DENIAL OF EQUAL PAY FOR EQUAL WORK**
**On Behalf of All Plaintiffs and the EPA Collective Action Plaintiffs**

389.     Jones Day incorporates Paragraphs 1-388 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 389 of the Complaint.

390.     Jones Day admits only that Plaintiffs purport to bring Count 4 on behalf of themselves and all Equal Pay Act ("EPA") Collective Action Plaintiffs who opt in to this action. Except as expressly admitted, Jones Day denies the allegations in Paragraph 390 of the Complaint.

391.     Jones Day denies the allegations in Paragraph 391 of the Complaint.

392.     Jones Day denies the allegations in Paragraph 392 of the Complaint.

393.     Jones Day denies the allegations in Paragraph 393 of the Complaint.

394.     Jones Day denies the allegations in Paragraph 394 of the Complaint.

395.    Jones Day denies the allegations in Paragraph 395 of the Complaint.

396.    Jones Day denies the allegations in Paragraph 396 of the Complaint.

397.    Jones Day denies the allegations in Paragraph 397 of the Complaint.

398.    Jones Day denies the allegations in Paragraph 398 of the Complaint.

<u>**COUNT 5**</u>
**VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,**
**Cal. Gov. Code § 12940,** *et seq*.
**GENDER DISCRIMINATION**
**On Behalf of California Class Representatives and the California Class**

399.    Jones Day incorporates Paragraphs 1-398 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 399 of the Complaint.

400.    Jones Day admits that Plaintiffs Tolton, Mazingo, Williams, and Stahl purport to bring Count 5 on behalf of themselves and all members of the putative California Class.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 400 of the Complaint and denies class certification is appropriate.

401.    Jones Day admits Plaintiffs Tolton, Mazingo, Williams, and Stahl each filed a charge with the DFEH.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 401 of the Complaint.

402.    Jones Day denies the allegations in Paragraph 402 of the Complaint.

403.    Jones Day denies the allegations in Paragraph 403 of the Complaint.

404.    Jones Day denies the allegations in Paragraph 404 of the Complaint.

405.    Jones Day denies the allegations in Paragraph 405 of the Complaint.

406.    Jones Day denies the allegations in Paragraph 406 of the Complaint.

407.    Jones Day denies the allegations in Paragraph 407 of the Complaint.

408.    Jones Day denies the allegations in Paragraph 408 of the Complaint.

93

409.     Jones Day denies the allegations in Paragraph 409 of the Complaint.

410.     Jones Day denies the allegations in Paragraph 410 of the Complaint.

411.     Jones Day denies the allegations in Paragraph 411 of the Complaint.

**COUNT 6**
**VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,**
**Cal. Gov. Code § 12940, *et seq.***
**PREGNANCY AND MATERNITY (SEX PLUS) DISCRIMINATION**
**On Behalf of California Pregnancy Class Representative and the California Pregnancy**
**Subclass**

412.     Jones Day incorporates Paragraphs 1-411 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 412 of the Complaint.

413.     Jones Day admits that Plaintiff Tolton purports to bring Count 6 on behalf of herself and the putative California Pregnancy Subclass.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 413 of the Complaint and denies class certification is appropriate.

414.     Jones Day denies the allegations in Paragraph 414 of the Complaint.

415.     Jones Day denies the allegations in Paragraph 415 of the Complaint.

416.     Jones Day denies the allegations in Paragraph 416 of the Complaint.

417.     Jones Day denies the allegations in Paragraph 417 of the Complaint.

418.     Jones Day denies the allegations in Paragraph 418 of the Complaint.

419.     Jones Day denies the allegations in Paragraph 419 of the Complaint.

420.     Jones Day denies the allegations in Paragraph 420 of the Complaint.

421.     Jones Day denies the allegations in Paragraph 421 of the Complaint.

422.     Jones Day denies the allegations in Paragraph 422 of the Complaint.

423.     Jones Day denies the allegations in Paragraph 423 of the Complaint.

## COUNT 7
### VIOLATION OF THE CALIFORNIA FAMILY RIGHTS ACT,
### Cal. Gov. Code § 12945.2
### DISCRIMINATION, INTERFERENCE AND RETALIATION
### On Behalf of the California Leave Class Representatives and the California Leave Subclass

424.   Jones Day incorporates Paragraphs 1-423 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 424 of the Complaint.

425.   Jones Day admits that Plaintiffs Tolton and Mazingo purport to bring Count 7 on behalf of themselves and all members of the putative California Leave Subclass.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 425 of the Complaint, denies that Ms. Mazingo is a member of the putative "California Leave Subclass," and denies class certification is appropriate.

426.   Jones Day admits that Plaintiffs Tolton and Mazingo filed charges with the DFEH. Except as expressly admitted, Jones Day denies the allegations Paragraph 426 of the Complaint.

427.   Jones Day denies the allegations in Paragraph 427 of the Complaint.

428.   Jones Day denies the allegations in Paragraph 428 of the Complaint.

429.   Jones Day denies the allegations in Paragraph 429 of the Complaint.

430.   Jones Day denies the allegations in Paragraph 430 of the Complaint.

431.   Jones Day denies the allegations in Paragraph 431 of the Complaint.

432.   Jones Day denies the allegations in Paragraph 432 of the Complaint.

## COUNT 8
### VIOLATION OF THE CALIFORNIA EQUAL PAY ACT, *as amended by* THE
### CALIFORNIA FAIR PAY ACT, Cal. Lab. Code § 1197.5, *et seq*.
### DENIAL OF EQUAL PAY FOR EQUAL & SUBSTANTIALLY SIMILAR WORK
### On Behalf of California Class Representatives and the CEPA Subclass

433.   Jones Day incorporates Paragraphs 1-432 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 433 of the Complaint.

434.     Jones Day admits that Plaintiffs Tolton, Mazingo, Williams, and Stahl purport to bring Count 8 on behalf of themselves and all members of the putative California Class.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 434 of the Complaint and denies class certification is appropriate.

435.     Jones Day denies the allegations in Paragraph 435 of the Complaint.

436.     Jones Day denies the allegations in Paragraph 436 of the Complaint.

437.     Jones Day denies the allegations in Paragraph 437 of the Complaint.

438.     Jones Day denies the allegations in Paragraph 438 of the Complaint.

439.     Jones Day denies the allegations in Paragraph 439 of the Complaint.

440.     Jones Day denies the allegations in Paragraph 440 of the Complaint.

441.     Jones Day denies the allegations in Paragraph 441 of the Complaint.

**COUNT 9**
**VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE,**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**UNFAIR COMPETITION**
**On Behalf of California Class Representatives and the California Class**

442.     Jones Day incorporates Paragraphs 1-441 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 442 of the Complaint.

443.     Jones Day admits that Plaintiffs Tolton, Mazingo, Williams, and Stahl purport to bring Count 9 on behalf of themselves and all members of the putative California Class.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 443 of the Complaint and denies class certification is appropriate.

444.     To the extent Paragraph 444 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

445.     Jones Day denies the allegations in Paragraph 445 of the Complaint.

446.     Jones Day denies the allegations in Paragraph 446 of the Complaint.

## COUNT 10
## CIVIL PENALTIES UNDER THE CALIFORNIA PRIVATE ATTORNEYS GENERAL ACT OF 2004, Cal. Lab. Code § 2698 *et seq.*
## On Behalf of Plaintiffs Tolton, Mazingo, and Others Similarly Aggrieved

447.     Jones Day incorporates Paragraphs 1-446 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 447 of the Complaint.

448.     Jones Day admits that Plaintiffs Tolton and Mazingo purport to bring Count 10 on behalf of themselves and other current and former female associates who worked for Jones Day in California at any time on or after the date that is 515 days prior to the filing of their PAGA claims notices.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 448 of the Complaint.

449.     To the extent Paragraph 449 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

450.     To the extent Paragraph 450 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

451.     Paragraph 451 states a legal conclusion to which no response is required.

452.     Paragraph 452 states a legal conclusion to which no response is required.

453.     Paragraph 453 states a legal conclusion to which no response is required.

454.     To the extent Paragraph 454 states a legal conclusion, no response is required, and to the extent a response is required Jones Day denies the allegations.

455.     Paragraph 455 states a legal conclusion to which no response is required.

456.     Paragraph 456 states a legal conclusion to which no response is required.

457.     Paragraph 457 states a legal conclusion to which no response is required.

458.     Paragraph 458 states a legal conclusion to which no response is required.

459.     Paragraph 459 states a legal conclusion to which no response is required.

460.     Paragraph 460 states a legal conclusion to which no response is required.

461.     Jones Day denies the allegations in Paragraph 461 of the Complaint.

462.     Jones Day denies the allegations in Paragraph 462 of the Complaint.

463.     Jones Day denies the allegations in Paragraph 463 of the Complaint.

464.     Jones Day admits that, prior to filing this Complaint, Plaintiffs Tolton and Mazingo filed notice of their PAGA claims with the California Labor and Workforce Development Agency and served that notice on Jones Day via certified mail.

465.     Jones Day denies that Plaintiffs Tolton and Mazingo are entitled to recover the penalties they claim to seek as stated in Paragraph 465 of the Complaint.

466.     Jones Day denies that Plaintiffs are entitled to costs and attorneys' fees under Labor Code § 2699(g) or any other statute.

### COUNT 11
**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT,**
**D.C. Code § 2-1401 *et seq*. as amended**
**GENDER DISCRIMINATION**
**On Behalf of Class Representatives and all Class Members**

467.     Jones Day incorporates Paragraphs 1-466 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 467 of the Complaint.

468.     Jones Day admits that Plaintiffs Tolton, Mazingo, Williams, Draper, Stahl, and Jane Doe 4 purport to bring Count 11 on behalf of themselves and all members of the putative DCHRA Class.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 468 of the Complaint, and denies that class certification is appropriate.

469.     Paragraph 469 of the Complaint states a legal conclusion to which no response is required, and to the extent a response is required Jones Day denies the allegations.

470.     Jones Day denies the allegations in Paragraph 470 of the Complaint and denies that Plaintiffs have alleged any action or decision taken by Mr. Brogan in the District of Columbia that discriminated against Plaintiffs or any putative class members or that otherwise violated the DCHRA.

471.     Jones Day denies the allegations in Paragraph 471 of the Complaint and denies that Plaintiffs have alleged any action or decision taken by Mr. Brogan in the District of Columbia that discriminated against Plaintiffs or any putative class members.

472.     Jones Day denies the allegations in Paragraph 472 of the Complaint and denies that Plaintiffs have alleged any action or decision taken by Mr. Brogan in the District of Columbia that produced an unjustified disparate impact nationwide on Plaintiffs or any putative class members.

473.     Jones Day denies the allegations in Paragraph 473 of the Complaint.

474.     Jones Day denies the allegations in Paragraph 474 of the Complaint.

475.     Jones Day denies the allegations in Paragraph 475 of the Complaint.

476.     Jones Day denies the allegations in Paragraph 476 of the Complaint.

477.     Jones Day denies the allegations in Paragraph 477 of the Complaint.

478.     Jones Day denies the allegations in Paragraph 478 of the Complaint.

479.     Jones Day denies the allegations in Paragraph 479 of the Complaint.

480.     Jones Day denies the allegations in Paragraph 480 of the Complaint.

## COUNT 12
### VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW,
### N.Y.C. Admin. Code § 8-101, et seq.
### GENDER DISCRIMINATION
### On behalf of Plaintiff Katrina Henderson and the New York subclass

481.     Jones Day incorporates Paragraphs 1-480 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 481 of the Complaint.

482.    Jones Day admits that Plaintiff Henderson purports to bring Count 12 on behalf of herself and all members of the putative New York subclass.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 482 of the Complaint and denies class certification is appropriate.

483.    Paragraph 483 of the Complaint states a legal conclusion to which no response is required, and to the extent a response is required Jones Day denies the allegations.

484.    Jones Day denies the allegations in Paragraph 484 of the Complaint.

485.    Jones Day denies the allegations in Paragraph 485 of the Complaint.

486.    Paragraph 486 of the Complaint states a legal conclusion to which no response is required, and to the extent a response is required Jones Day denies the allegations.

487.    Jones Day denies the allegations in Paragraph 487 of the Complaint.

488.    Jones Day denies the allegations in Paragraph 488 of the Complaint.

489.    Jones Day denies the allegations in Paragraph 489 of the Complaint.

490.    Paragraph 490 of the Complaint states a legal conclusion to which no response is required, and to the extent a response is required Jones Day denies the allegations.

491.    Jones Day denies the allegations in Paragraph 491 of the Complaint.

492.    Jones Day denies the allegations in Paragraph 492 of the Complaint.

493.    Jones Day denies the allegations in Paragraph 493 of the Complaint.

**COUNT 13**
**VIOLATION OF THE NEW YORK EQUAL PAY LAW,**
**N.Y. Lab. Law § 194**
**UNEQUAL PAY**
**On behalf of Katrina Henderson and the New York subclass Case**

494.    Jones Day incorporates Paragraphs 1-493 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 494 of the Complaint.

495.    Jones Day admits that Plaintiff Henderson purports to bring Count 13 on behalf of herself and all members of the putative New York subclass.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 495 of the Complaint and denies class certification is appropriate.

496.    Paragraph 496 of the Complaint states a legal conclusion to which no response is required, and to the extent a response is required Jones Day denies the allegations.

497.    Jones Day denies the allegations in Paragraph 497 of the Complaint.

498.    Paragraph 498 of the Complaint states a legal conclusion to which no response is required, and to the extent a response is required Jones Day denies the allegations.

499.    Jones Day denies the allegations in Paragraph 499 of the Complaint.

500.    Jones Day denies the allegations in Paragraph 500 of the Complaint.

501.    Jones Day denies the allegations in Paragraph 501 of the Complaint.

### COUNT 14
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
### 42 U.S.C. § 2000e-2(a), *et seq.*
### RETALIATION
### On Behalf of Plaintiffs Tolton, Draper, and Jane Doe 4

502.    Jones Day incorporates Paragraphs 1-501 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 502 of the Complaint.

503.    Jones Day admits that Plaintiffs Tolton, Draper, and Jane Doe 4 each filed a charge with the EEOC.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 503 of the Complaint.

504.    Jones Day denies the allegations in Paragraph 504 of the Complaint.

505.    Jones Day denies the allegations in Paragraph 505 of the Complaint.

506.    Jones Day denies the allegations in Paragraph 506 of the Complaint.

101

507.    Jones Day denies the allegations in Paragraph 507 of the Complaint.

508.    Jones Day denies the allegations in Paragraph 508 of the Complaint.

509.    Jones Day denies the allegations in Paragraph 509 of the Complaint.

510.    Jones Day denies the allegations in Paragraph 510 of the Complaint.

511.    Jones Day denies the allegations in Paragraph 511 of the Complaint.

<u>COUNT 15</u>
**VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,**
**Cal. Gov. Code § 12940, *et seq.***
**RETALIATION**
**On behalf of Plaintiff Tolton**

512.    Jones Day incorporates Paragraphs 1-511 above.  Except as expressly admitted,
Jones Day denies the allegations in Paragraph 512 of the Complaint.

513.    Jones Day denies the allegations in Paragraph 513 of the Complaint.

514.    Jones Day denies the allegations in Paragraph 514 of the Complaint.

515.    Jones Day denies the allegations in Paragraph 515 of the Complaint.

516.    Jones Day denies the allegations in Paragraph 516 of the Complaint.

517.    Jones Day denies the allegations in Paragraph 517 of the Complaint.

518.    Jones Day denies the allegations in Paragraph 518 of the Complaint.

519.    Jones Day denies the allegations in Paragraph 519 of the Complaint.

<u>COUNT 16</u>
**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code § 2-1401, *et seq.***
**RETALIATION**
**On Behalf of Plaintiffs Tolton, Draper, and Jane Doe 4**

520.    Jones Day incorporates Paragraphs 1-519 above.  Except as expressly admitted,
Jones Day denies the allegations in Paragraph 520 of the Complaint.

521.    Jones Day denies the allegations in Paragraph 521 of the Complaint.

522.     Jones Day denies the allegations in Paragraph 522 of the Complaint and denies that Mr. Brogan, whether in the District of Columbia or elsewhere, made any decision or took any action that wrongfully deprived Tolton, Draper or Jane Doe 4 of pay, and denies that Mr. Brogan had any role in their negative performance reviews or with respect to any decisions regarding their advancement, promotion or termination.

523.     Jones Day denies the allegations in Paragraph 523 of the Complaint.

524.     Jones Day denies the allegations in Paragraph 524 of the Complaint.

525.     Jones Day denies the allegations in Paragraph 525 of the Complaint.

526.     Jones Day denies the allegations in Paragraph 526 of the Complaint.

527.     Jones Day denies the allegations in Paragraph 527 of the Complaint.

528.     Jones Day denies the allegations in Paragraph 528 of the Complaint.

**COUNT 17**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e-2(a),** *et seq.*,
**WRONGFUL TERMINATION**
**On Behalf of Plaintiffs Tolton, Draper, and Jane Doe 4**

529.     Jones Day incorporates Paragraphs 1-528 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 529 of the Complaint.

530.     Jones Day admits that Plaintiffs Tolton, Draper, and Jane Doe 4 each filed charges with the EEOC.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 530 of the Complaint.

531.     Jones Day denies the allegations in Paragraph 531 of the Complaint.

532.     Jones Day denies the allegations in Paragraph 532 of the Complaint.

533.     Jones Day denies the allegations in Paragraph 533 of the Complaint.

534.     Jones Day denies the allegations in Paragraph 534 of the Complaint.

535.     Jones Day denies the allegations in Paragraph 535 of the Complaint.

**COUNT 18**
**CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,**
**Cal. Gov. Code § 12940, *et seq.***
**WRONGFUL TERMINATION**
**On Behalf of Plaintiff Tolton**

536.     Jones Day incorporates Paragraphs 1-535 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 536 of the Complaint.

537.     Jones Day denies the allegations in Paragraph 537 of the Complaint.

538.     Jones Day denies the allegations in Paragraph 538 of the Complaint.

539.     Jones Day denies the allegations in Paragraph 539 of the Complaint.

540.     Jones Day denies the allegations in Paragraph 540 of the Complaint.

541.     Jones Day denies the allegations in Paragraph 541 of the Complaint.

**COUNT 19**
**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code §§ 2-1401, *et seq.***
**WRONGFUL TERMINATION**
**On behalf of Plaintiffs Tolton, Draper, and Jane Doe 4**

542.     Jones Day incorporates Paragraphs 1-541 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 542 of the Complaint.

543.     Jones Day denies the allegations in Paragraph 543 of the Complaint and denies that Mr. Brogan had any involvement, in the District of Columbia or elsewhere, in the decisions to terminate the employment of Tolton, Draper and Jane Doe 4.

544.     Jones Day denies the allegations in Paragraph 544 of the Complaint.

545.     Jones Day denies the allegations in Paragraph 545 of the Complaint.

546.     Jones Day denies the allegations in Paragraph 546 of the Complaint.

547.     Jones Day denies the allegations in Paragraph 547 of the Complaint.

## COUNT 20
**CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,**
**Cal. Gov. Code § 12940, *et seq.***
**WRONGFUL CONSTRUCTIVE DISCHARGE**
**On Behalf of Plaintiffs Mazingo, Williams, and Stahl**

548.    Jones Day incorporates Paragraphs 1-547 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 548 of the Complaint.

549.    Jones Day denies the allegations in Paragraph 549 of the Complaint.

550.    Jones Day denies the allegations in Paragraph 550 of the Complaint.

551.    Jones Day denies the allegations in Paragraph 551 of the Complaint.

552.    Jones Day denies the allegations in Paragraph 552 of the Complaint.

553.    Jones Day denies the allegations in Paragraph 553 of the Complaint.

## COUNT 21
**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code §§ 2-1401, *et seq.***
**WRONGFUL CONSTRUCTIVE DISCHARGE**
**On Behalf of All Plaintiffs**

554.    Jones Day incorporates Paragraphs 1-553 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 554 of the Complaint.

555.    Jones Day denies the allegations in Paragraph 555 of the Complaint and specifically denies that Mr. Brogan had any involvement, whether in the District of Columbia or elsewhere, in any adverse employment action or other decision that constituted a construction termination of the employment of any Plaintiff.

556.    Jones Day denies the allegations in Paragraph 556 of the Complaint.

557.    Jones Day denies the allegations in Paragraph 557 of the Complaint.

558.    Jones Day denies the allegations in Paragraph 558 of the Complaint.

**COUNT 22**
**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW,**
**N.Y.C. Admin Code § 8-101, *et seq.***
**WRONGFUL TERMINATION**
**On behalf of Plaintiff Katrina Henderson**

559.    Jones Day incorporates Paragraphs 1-558 above.  Except as expressly admitted, Jones Day denies the allegations in Paragraph 559 of the Complaint.

560.    Paragraph 560 of the Complaint states a legal conclusion to which no response is required, and to the extent a response is required Jones Day denies the allegations.

561.    Jones Day denies the allegations in Paragraph 561 of the Complaint.

562.    Jones Day denies the allegations in Paragraph 562 of the Complaint.

563.    Jones Day denies the allegations in Paragraph 563 of the Complaint.

564.    Jones Day denies the allegations in Paragraph 564 of the Complaint.

## XIII.  PRAYER FOR RELIEF

Jones Day denies that Plaintiffs are entitled to any relief.

## AFFIRMATIVE & OTHER DEFENSES

Without admitting any of the facts alleged in the Complaint, Jones Day hereby asserts and alleges the following separate and additional defenses, without assuming the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to Plaintiffs, and without prejudice to Jones Day's right to argue that Plaintiffs bear the burden of proof as to any one or more of said defenses.  Furthermore, all such defenses are pleaded in the alternative and do not constitute an admission of liability or an admission that Plaintiffs are entitled to any relief whatsoever.  Jones Day presently has insufficient knowledge or information as to whether it may have additional, as yet unasserted, defenses.  Jones Day therefore reserves the right to assert

additional defenses in the event discovery or further proceedings indicate such additional defense would be appropriate:

### FIRST DEFENSE

The Complaint fails, in whole or in part, to state a claim upon which relief can be granted or a claim for which the relief sought may be awarded.

### SECOND DEFENSE

Plaintiffs lack standing to seek declaratory or injunctive relief because they are no longer employed by Jones Day.

### THIRD DEFENSE

Plaintiffs Draper, Henderson, Mazingo, Stahl, Tolton, and Williams, and all members of the putative class and/or collective who were not employed in the Washington, D.C. office of Jones Day, lack standing to assert, and have failed to state, a claim for relief under the DCHRA.

### FOURTH DEFENSE

Plaintiffs' claims and/or the claims of the putative class and/or collective members, are barred, in whole or in part, by the applicable statutes of limitation and/or by statutory filing deadlines which they failed to meet.

### FIFTH DEFENSE

Plaintiffs' claims and/or the claims of the putative class and/or collective members, are barred, in whole or in part, by equitable defenses, including the doctrines of equitable estoppel, laches, waiver and/or unclean hands.

### SIXTH DEFENSE

Plaintiffs' claims and/or the claims of the putative class and/or collective members are barred, in whole or in part, as for any matters for which Plaintiffs have failed to satisfy

administrative, procedural or jurisdictional prerequisites for commencing and maintaining this action.

## SEVENTH DEFENSE

All actions by Jones Day with respect to Plaintiffs and/or the putative class and/or collective members were lawful and were made in good faith compliance with applicable provisions of law, rules and regulations, and all actions by Jones Day with respect to Plaintiffs and/or the putative class and/or collective members were taken for legitimate, non-discriminatory, non-retaliatory, non-prohibited reasons and/or for good cause.

## EIGHTH DEFENSE

Plaintiffs' claims and/or the claims of the putative class and/or collective members are barred in whole or in part because Jones Day's employment decisions and actions were based on legitimate, nondiscriminatory business reasons and were not pretexts for discrimination.

## NINTH DEFENSE

Plaintiffs' claims and/or the claims of the putative class and/or collective members are barred in whole or in part because Jones Day's employment decisions and actions were job-related and consistent with business necessity.

## TENTH DEFENSE

Plaintiffs' claims and/or the claims of the putative class and/or collective members are barred in whole or in part because Jones Day's employment decisions and actions were based on bona fide factors other than sex, gender, pregnancy, or parenthood.

## ELEVENTH DEFENSE

Plaintiffs' claims and/or the claims of the putative class and/or collective members are barred in whole or in part to the extent that the claims challenge employment decisions and actions that were based on a bona fide seniority, merit, or incentive system.

## TWELFTH DEFENSE

Plaintiffs' claims are barred in whole or in part by the after-acquired evidence doctrine.

## THIRTEENTH DEFENSE

Jones Day at all relevant times has maintained, disseminated and observed equal employment, affirmative action, a harassment-free work environment, and anti-retaliation policies, that inter alia, provide that all personnel decisions are to be made on the basis of merit without regard to gender or on any other basis that is protected under applicable law, prohibit any form of harassment or intimidation on any basis that is protected by applicable law, and prohibit any form of retaliation against an individual who in good faith reports a claim of discrimination or who opposes any act or practice made unlawful by any federal, state, or local statute, or who cooperates in the investigation of such a report.

## FOURTEENTH DEFENSE

Plaintiffs' claims are barred in whole or in part because Jones Day did not intentionally engage in an unlawful employment practice.

## FIFTEENTH DEFENSE

Plaintiffs' claims are barred in whole or in part to the extent that the claims are based on alleged incidents that do not constitute tangible adverse employment actions against Plaintiffs, Jones Day exercised reasonable care to prevent the alleged incidents, and the Plaintiffs unreasonably failed to take advantage of available preventative or corrective opportunities.

## SIXTEENTH DEFENSE

Plaintiffs' claims are barred in whole or in part because actual payments paid to Plaintiffs were reasonable, appropriate, and commensurate with the services and work actually performed.

## SEVENTEENTH DEFENSE

Plaintiffs' claim of purported "pattern and practice" discrimination fails because Jones Day has not engaged in any "pattern or practice" of discrimination.

## EIGHTEENTH DEFENSE

Plaintiffs' claims, and those of the putative class and/or collective members, are barred, in whole or in part, by the jurisdictional requirements of the FLSA.

## NINETEENTH DEFENSE

This action may not be maintained as a collective action under section 16(b) of the FLSA because Plaintiffs cannot establish that they are similarly situated to other members of the purported collective action.

## TWENTIETH DEFENSE

Jones Day cannot be liable for any alleged violation of the Unfair Competition Law, California Business and Professions Code sections 17200 et seq., because its actions were not unfair, fraudulent, or likely to mislead, and its conduct and dealings were lawful, as authorized by applicable state and federal statutes, rules, and regulations, and such actions, conduct, and dealings were carried out in good faith and for legitimate business purposes.

## TWENTY-FIRST DEFENSE

Any award of restitution under California Business & Professions Code, sections 17200 et seq., would constitute a taking of property without just compensation in violation of the Takings Clauses of the Fifth Amendment to the United States Constitution (as incorporated into the Fourteenth Amendment to the United States Constitution) and of Article I, Section 19, of the California Constitution.

### TWENTY-SECOND DEFENSE

Any finding of liability under California Business & Professions Code sections 17200, 17203, and 17204 would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and of Article I, Section 7 of the California Constitution, because the standards of liability under these statutes are unduly vague and subjective, and permit retroactive, random, arbitrary, and capricious punishment that serves no legitimate governmental interest.  Any award of restitution under California Business & Professions Code section 17203 to persons who refuse to execute an acknowledgement that the payment is in full settlement of claims against Jones Day would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, § 7 of the California Constitution.

### TWENTY-THIRD DEFENSE

Any award of restitution under California Business & Professions Code section 17203 to persons who refuse to execute an acknowledgement that the payment is in full settlement of claims against Jones Day would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

### TWENTY-FOURTH DEFENSE

Plaintiffs' claims for relief under PAGA, Labor Code section 2698 et seq., are barred by their failure to provide the proper notice required by statute and to properly exhaust administrative remedies.

### TWENTY-FIFTH DEFENSE

Plaintiffs cannot assert representative claims under the PAGA without meeting requirements to act as a class representative under federal law.

111

### TWENTY-SIXTH DEFENSE

Imposition of fines under PAGA on behalf of a purported representative group regardless of the individual circumstances or harm surrounding any purported violation would violate Jones Day's constitutional rights under the United States and California constitutions, including the Due Process Clause of the Fourteenth Amendment and the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.

### TWENTY-SEVENTH DEFENSE

Plaintiffs have suffered no damages as a result of any alleged act or omission of Jones Day.

### TWENTY-EIGHTH DEFENSE

Even if Plaintiffs have suffered damages, Plaintiffs' claims are barred in whole or in part by their failure to mitigate, or attempt to mitigate, their damages.

### TWENTY-NINTH DEFENSE

Plaintiffs' claims are barred to the extent that damages, if any, resulted from the acts and/or omissions of a Plaintiff or any person on whose behalf relief is sought.

### THIRTIETH DEFENSE

Plaintiffs' claims for equitable relief are barred in whole or in part to the extent Plaintiffs have not suffered injury or harm and will not suffer imminent and irreparable injury or harm as a result of any action or conduct by Jones Day.

### THIRTY-FIRST DEFENSE

Plaintiffs' claims for injunctive, equitable, and/or declaratory relief are inappropriate to the extent Plaintiffs have an adequate remedy at law.

### THIRTY-SECOND DEFENSE

Plaintiffs' claims are barred to the extent they result in an unjust enrichment to Plaintiffs and/or any person on whose behalf relief is sought.

## THIRTY-THIRD DEFENSE

The Complaint fails to state a claim upon which an award of punitive damages can be granted.

## THIRTY-FOURTH DEFENSE

Plaintiffs' claims and the claims of the putative class and/or collective members for punitive damages are barred because Jones Day did not act with, ratify, authorize, or acquiesce in any acts of fraud, oppression, malice, wanton, willful, or conscious disregard, or reckless indifference toward Plaintiffs.

## THIRTY-FIFTH DEFENSE

Plaintiffs' claims and the claims of the putative class and/or collective members for punitive damages are barred because Jones Day engaged in good faith effort to comply with the law.

## THIRTY-SIXTH DEFENSE

Plaintiffs' claims and the claims of the putative class and/or collective members for punitive damages are barred because no managerial agent of Jones Day acted with the requisite mental state toward any individual.

## THIRTY-SEVENTH DEFENSE

Plaintiffs' claims and the claims of the putative class and/or collective members for punitive damages are barred to the extent such damages are not authorized by applicable federal or state law.

## THIRTY-EIGHTH DEFENSE

The imposition of punitive damages would violate the federal and state constitutions.  The Complaint, to the extent it seeks exemplary damages or penalties, violates Jones Day's right to equal protection under the United States and California Constitutions, violates Jones Day's right

to procedural due process under the Fourteenth Amendment of the United States Constitution, and under Article I, Section 7 of the Constitution of the State of California, and violates Jones Day' right to substantive due process under the Fifth and Fourteenth Amendments of the United States Constitution and, therefore, fails to state a cause of action upon which exemplary, double, or punitive damages or penalties may be awarded.

### THIRTY-NINTH DEFENSE

Plaintiffs and the putative class and/or collective members are not entitled to recover attorneys' fees and costs under the causes of action as demanded in the Complaint.

### FORTIETH DEFENSE

This action may not be maintained as a class action because one or more of the requirements for a class action are not met, including but not limited to: (1) joinder of all members of the purported class is not impracticable; (2) there are no questions of fact or law common to all purported members of the class; (3) the claims asserted in the Complaint are not typical of the claims of the purported class; (4) the representative parties and proposed class counsel will not fairly and adequately protect the interests of the purported class; (5) facts common to the purported class do not predominate over questions affecting only individual members; and (6) a class action lawsuit is not superior to other methods for the fair and efficient adjudication of the matter.

### FORTY-FIRST DEFENSE

Plaintiffs Tolton and Mazingo's claim to represent all alleged aggrieved employees under PAGA is barred because a multitude of individualized assessments would be necessary to resolve the claims. Thus, the claims are unmanageable as a PAGA "representative" group action due to the numerous individualized factual issues that would be necessary to resolve the matter in a manner that is favorable to the Plaintiffs.

## FORTY-SECOND DEFENSE

Trying this case as a class action or a collective action would violate the U.S. Constitution and the California Constitution.

## FORTY-THIRD DEFENSE

Plaintiffs' and any opt-ins' claims are barred, in whole or in part, by the doctrine of judicial estoppel to the extent such individual filed a personal bankruptcy without disclosing their claims against Jones Day.

Dated:  July 26, 2019

         /s/ *Terri L. Chase*
        Mary Ellen Powers (Bar No. 334045)
        Beth Heifetz (Bar No. 417199)
        JONES DAY
        51 Louisiana Avenue NW
        Washington, DC 20001
        Phone: (202) 879-3939

        Terri L. Chase (*pro hac vice*)
        JONES DAY
        250 Vesey Street
        New York, NY 10281
        Phone: (212) 326-3939

        *Counsel for Defendant Jones Day*