# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NILAB RAHYAR TOLTON *et al.*, *on behalf of themselves and all others similarly situated*,

    *Plaintiffs*,

    v.

JONES DAY, a General Partnership,

    *Defendant*.

Civil Action No. 19-945 (RDM)

## SECOND AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

Plaintiffs Nilab Rahyar Tolton, Andrea Mazingo, Meredith Williams, Saira Draper, Jaclyn Stahl, Jane Doe 4, and Katrina Henderson ("Plaintiffs" or "Class Representatives"), by and through their attorneys, Sanford Heisler Sharp, LLP, bring this action on behalf of themselves and all similarly situated female attorneys against Defendant Jones Day, a General Partnership ("Defendant," "Jones Day," or "the Firm"). Plaintiffs allege, with knowledge as to themselves and upon information and belief otherwise, that Defendant engages in systemic discrimination based on gender, pregnancy, and maternity, as follows:

## I.    INTRODUCTION

### A.    Jones Day's Fraternity Culture: A Brotherhood Ruled by One Man

1.    Defendant Jones Day operates as a fraternity in a perversely literal sense. Senior male partners mentor young male associates, give them preferential assignments, facilitate their access to clients, introduce them to the Firm's powerbrokers, and groom them for membership in the Firm's partnership, even when their legal skills are notably deficient. Female associates, by

contrast, have fewer opportunities for mentorship, are promoted in smaller numbers, and earn less for equal work.

2.      Prominent male partners attribute the low number of female partners at Jones Day to women who choose children instead of careers, affirming the baseline expectations that female attorneys must choose one or the other. Female associates who do not advance, particularly those who have children, are thus presumed to have chosen family over work. Meanwhile, female attorneys without children also face discrimination based on gender stereotypes about motherhood, family responsibilities, and/or marital status.

3.      For many female associates at Jones Day, particularly those who show any sign of overt resistance—which could mean as little as questioning a policy or the basis of a comment in one's review—the hostile work environment culminates in pretextual critiques of their performance followed by constructive discharge or termination. Those who are not convinced to voluntarily depart by the Firm's mistreatment are eventually forced out.

4.      Jones Day's culture predictably harms women in compensation and partnership decisions. Unlike most law firms in the AmLaw 100, Jones Day proudly states that it does not pay associates in lockstep. Instead, every associate's compensation is individualized and determined in a "black box" by the Firm's Managing Partner, Stephen J. Brogan.

5.      No male partner wields more power at Jones Day than Brogan, who runs the Firm from its Washington, DC office[1] with essentially unchecked autonomy. As a May 2018 *Washington Life* editorial, touting Brogan as one of DC's most powerful influencers, explained: "Jones Day is famously governed – unlike any other major international law firm – with control

---

[1] *See* https://www.jonesday.com/sjbrogan/ (last viewed April 1, 2019).

resting in the hands of just one man, Steve Brogan. The power Brogan exercises over Jones Day's 2,500 attorneys located in 44 global offices has been described as autocratic and absolute."[2]

6.      Jones Day's own website embraces and affirms this characterization. It explains that the Firm is governed by "the Managing Partner concept" or "system" developed by the first of only seven Managing Partners in the Firm's history, "through which the Managing Partner has authority to make all management decisions, including designating a successor."[3] As Managing Partner, Brogan "is the final decision-maker on virtually every matter of significance for the Firm," including "partner and associate compensation.", " the website formerly affirmed.[4]

7.      Managing Partner Brogan's nearly absolute control over Jones Day was emphasized by Washington, DC Partner Gregory Shumaker, who has been with the Firm for more than three decades, in a 2013 interview with the blog of *Legal Times*. In that interview, Shumaker affirmed that the DC office, of which he had then been Partner-in-Charge for more than two years, includes "the managing partner, Steve Brogan, who makes all of the partnership and compensation decisions for the entire firm."[5]

8.      Prior to the filing of this lawsuit, Jones Day's own website also confirms confirmed that Managing Partner Brogan's "considerable management responsibility at Jones Day . . . includes setting individual lawyer compensation or income allocations" for both partners and

---

[2] "Legal Eagles: Stephen Brogan," *Washington Life Magazine* (May 9, 2018), http://washingtonlife.com/2018/05/09/legal-eagles-stephen-brogan/ (last visited Apr. 3, 2019).

[3] *See* https://www.jonesday.com/principlesandvalues/firmhistory/managingpartnersystem/ (last visitedas of Apr. 1, 2019).

[4] *See* https://www.jonesday.com/principlesandvalues/clientservices/ (last visited Apr. 1, 2019).

[5] Matthew Huisman, *Q&A: Jones Day's Gregory Shumaker*, The Blog of Legal Times (June 18, 2013), https://legaltimes.typepad.com/blt/2013/06/qa-jones-days-gregory-shumaker.html.

associates.[6] While "a very thorough annual evaluation process for partners and associates . . . produces a substantial amount of both objective and subjective data on which to base these decisions . . . final decisions are made by the Managing Partner . . . ." the website formerly stated.[7]

9.      In an interview, former Jones Day Managing Partner Dick Pogue highlights the Managing Partner system as a crucial and unique aspect of Firm culture, noting,

> The culture of the firm has several aspects. Number one, we've got this managing partner system, we give all authority to make decisions and responsibility for being sure those decisions are correct to one person: the managing partner. Some people kind of make fun of it, they say, 'Gee how can you let one person make all those decisions?' But it makes it so much more efficient. We can move, make, get things done, and we're the envy of many managing partners of other firms who have more democratic systems. The managing partner can listen to all the voices, sort it all out, decide on a course of action, and then move.

"Dick Pogue, Our Culture," Jones Day, May 31, 2013, https://www.youtube.com/watch?v=qXJiFXSHY3I.

10.      The subjective considerations according to which Managing Partner Brogan makes these decisions are conveyed to associates in an annual oral review. During this review, the associate meets with two partners who may or may not be familiar with the associate's work. One of the partners reads to the associate a prepared "consensus statement" that allegedly condenses and combines the associate's evaluations, hours, and engagements into a succinct paragraph that purportedly captures the associate's overall performance and future trajectory. Upon information and belief, consensus statements are not written by reviewers. The Firm does not permit associates to keep a copy of their consensus statement and does not share the underlying individual reviews with them.

---

[6] *See* https://www.jonesday.com/principlesandvalues/compensation/ (last viewed Apr. 1, 2019).

[7] *Id.*

11.    The evaluation process can be manipulated, and upon information and belief regularly is so manipulated, to justify pushing women out. The "consensus statement" often cherry picks language from individual evaluations without context, emphasizing some aspects of performance while completely overlooking other aspects, and attributing the opinion of one evaluator to that of multiple reviewers. Perhaps unsurprisingly in a Firm where pay and promotion decisions are made by a single Managing Partner, these evaluations are easily marshaled to justify any given course of action.

12.    Partnership decisions, also made by Managing Partner Brogan, often turn on these consensus statements, which make up in gender stereotypes what they lack in objective justifications: The tireless, childless female associate is inadequately "fun" and excessively "intense"; the high-performing associate mother of small children is "deadline challenged" or lacks "commitment."

13.    The results are predetermined by this standard operating procedure of discrimination: Even though the Firm hires roughly equal numbers of men and women associates, women make less money; women are heavily outnumbered in the partnership; women who get pregnant often get fired; and women who speak up often suffer retaliation.

**B.    In Jones Day's Fraternity Culture, It Pays to Be Male**

14.    In Jones Day's fraternity culture, male brotherhood is affirmed and strengthened by comments and conduct that derogate women, leaving female associates to choose between capitulation and exclusion.

15.    For example, in ~~the~~ one non-California office ~~where Jane Doe 4 worked~~, male partners reportedly often kick off the Firm's holiday party (no outsiders allowed, including spouses) by encouraging drinking in the Firm's offices. This in-office drinking is followed by

alcohol-fueled dancing, with the Firm's male management gawking at dancing female associates for amusement.

16.     In the California office where Plaintiffs Tolton, Mazingo, Williams and Stahl worked, firm social events regularly devolved into opportunities for male partners, associates and clients to harass and humiliate female attorneys. At one dinner, Partner Cary Sullivan demanded that three female summer associates sing and dance to a ~~Care Bears song~~song originally sung by one or more cartoon bears (an event captured on video); at another, a client and former Jones Day associate, Craig Johnson, drunkenly refused to rise from the communal bench, requiring a female associate to climb over him in order to leave the table.

17.     ~~During Jane Doe 4's tenure, a~~One non-California office's summer associate event held at a partner's house reportedly culminated with a female summer associate being pushed into the swimming pool while wearing a white dress. The male summer associate who pushed her was applauded and high-fived by the Firm's summer associate committee and leadership rather than reprimanded.

18.     Sexist, sexualized comments and conduct also permeate the office environment, where female associates regularly endure comments on their appearances, their attire, and their bodies. Plaintiff Andrea Mazingo was told that she "would not be single for long," was "prettier than usual," and should wear heels. Plaintiff Nilab Tolton, too, received regular commentary on her clothes and high heels. Plaintiff Jaclyn Stahl was criticized for having a "stern face" and told to "smile more." ~~And a male partner openly referred to Jane Doe 4 as "eye candy" when he assigned a male summer associate to work with her.~~

19.     Male attorneys openly mock the Firm's problems with discrimination. Male attorneys in Jones Day's Irvine office, including Partner Cary Sullivan, frequently made sexist

comments—including about female servers during their office lunches at Hooters—only to conclude these comments with a sneering injunction to "add it to the file," a phrase meant to depict a fictitious file of sexual harassment complaints that carried no weight.

20.     Jones Day's fraternity culture presents female associates at Jones Day with an unpalatable choice: participate in a culture that is at best inhospitable to women and at worst openly misogynistic or forego any hope of success at the Firm. For a female associate to succeed at Jones Day, she must at least tolerate the stereotyped expectations of the Firm's male powerbrokers. To challenge these expectations by word or deed, even in settings ostensibly provided for "honest" feedback, is career suicide.

21.     As a hiring partner counseled potential summer associates in a 2010 interview, the candidate who doesn't get an offer is "[s]omeone who doesn't get along with others." By contrast, alcoholic "[i]ndiscretion" is eminently forgivable ("Indiscretion happens with alcohol, but people understand that. You usually have to knock a partner out cold for it to be a career-ending event.")[8]

### C.     Jones Day's Culture of Male Privilege Profits from the Women It Excludes

22.     The foreseeable consequence of Jones Day's fraternity culture is that male senior partners routinely allocate the best work to male associates, who in turn typically make more money and get promoted to partner. Male attorneys routinely receive greater support from the Firm in developing relationships both with clients and with their colleagues. Female attorneys generally receive inadequate work, mentorship, and support. When they soldier on, working tirelessly to generate stellar work product for the Firm, their contributions are regularly undervalued or outright credited to their male colleagues.

---

[8] Vivia Chen, "The Careerist: Do's and Don'ts from Jones Day's Hiring Partner," *The AmLaw Daily* (May 22, 2010), https://amlawdaily.typepad.com/amlawdaily/2010/05/jonesday0521.html.

23.     Seeking out a powerful male patron is often the only route to advancement; this route, however, is often particularly perilous for women, who experience sexual harassment or outright abuse from the male partners on whom they depend for continued work. As Plaintiffs learned firsthand, speaking up about this abuse, or about other manifestations of gender discrimination at Jones Day, is a one-way ticket out the door for female associates who attempt it.

24.     Female associates at Jones Day who try to seek out female role models, mentors, and sponsors often simply come up empty-handed. The office in which Plaintiffs Tolton, Mazingo, Williams, and Stahl worked promoted its first female partner (a lateral hire) the year after Mazingo, Tolton, and others complained.

25.     Although the Firm provides window-dressing in the form of affinity groups nominally designed to provide support for women and parents, these groups do not, in fact, provide advice on how to succeed at Jones Day. In the Irvine office, for example, the women's affinity lunch group was mocked by male attorneys as an opportunity "to talk about women things and having kids."

26.     Unlike the vast opportunities offered to male associates in Jane Doe 4's office, female associates were invited to participate in chocolate chip cookie baking contests or to attend "moms' lunch," but only if they had children. Moreover, the limited events for women were intentionally scheduled during the summer, an attempt at making the Firm marketable to summer associates.

27.26.  Female attorneys, shut out from mentorship and client development, instead shoulder a disproportionate share of the non-billable work undervalued by the Firm, such as organizing social events and staff appreciation events and handling administrative tasks.

28.27.  Similarly, female associates perform a disproportionate share of the Firm's pro bono work. Female associates often seek this work in order to get necessary stand-up experience in court, only to be critiqued later for having only pro bono in-court experience. By comparison, male associates are often given these roles on billable matters. Jane Doe 4, for example, was forced to take to trial a major pro bono case that partners told her was "unwinnable" in prime partnership-track years. Jane Doe 4 nonetheless won a seven-figure verdict. When the time came for partnership decisions, however, this success was overlooked, something also experienced by Plaintiffs Draper and Stahl.

29.28.  Although the Firm claims that pro bono work counts towards billable hours requirements in the same way as billable work, Plaintiffs learned that the Firm, in fact, discounts pro bono work when counting billable hours, even on cases that Firm management requires an associate to undertake. Thus, even when Jones Day itself benefits significantly from the work, the women who disproportionately do that work do not receive full credit toward their advancement.

30.29.  Partnership decisions predictably disadvantage women and form part of the Firm's standard operating procedure of gender discrimination. The Firm's male leadership finds pretextually false feedback to justify passing over accomplished female associates.

31.30.  As a result, men dominate Jones Day's partnership and leadership ranks, accounting for 80% of its Partner Review Committee and leading 34 of the Firm's 39 practice groups. And although Jones Day employs roughly the same number of male and female associates, male partners outnumber female partners three to one according to the 2018 Vault/MCCA Law Firm Diversity Survey.

D.    **Jones Day's "Black Box" Compensation Policy Facilitates Pay Discrimination Against Women**

32.31.  The devaluation of women at Jones Day extends to their compensation, decided in a "black box" system over which Managing Partner Brogan presides, making all decisions and signing every compensation letter himself. At the time the original Complaint in this case was filed, Jones Day's website proudly trumpets trumpeted the Firm's lack of pay transparency:

> The financial relationship of a lawyer to Jones Day is confidential. Other than the very small number of people who advise the Managing Partner on these issues, no partner at Jones Day knows anything about the amount of income allocated to any other partner. Similarly, associate compensation is also confidential, for the same reasons: Jones Day compensates its associates individually, not by lockstep and certainly not based on some billable hours formula, and thus every associate's compensation is the product of his or her individual contributions, and cannot be fairly compared to any other individual. What is sometimes critically referred to by those outside Jones Day as a "lack of transparency" is almost universally viewed inside Jones Day as one of its great strengths. This confidentiality removes any temptation to try to compare apples and oranges; it eliminates the chance of creating inappropriate comparisons and jealousies; and most importantly, it does not allow even the possibility of creating barriers to the effective interaction of all Jones Day lawyers.

*See* https://www.jonesday.com/principlesandvalues/compensation/confidentiality/ (last viewedas of Apr. 1, 2019). That is, Jones Day does not pay in so-called "lockstep"—not partners, not associates, not anyone. And Jones Day's system of "black box" compensation results in the systematic underpayment of women.

33.32.  The Firm claimsuntil recently openly affirmed that "associate evaluations and compensation adjustments [are] based upon the subjective quality of each person's overall contribution, including professional achievement, commitment to the Firm, judgment, client service, efficiency, leadership, productivity, and other appropriate factors."[9] In other words, associate evaluations are entirely subjective, and compensation is based on these subjective evaluations.

---

[9] *See* https://www.jonesday.com/principlesandvalues/associates/ (last viewedas of Feb. 14, 2019).

34.33.  In Plaintiffs' experience, these subjective factors are a mere pretext to underpay women. Plaintiffs know as much because they did not make so-called Cravath market pay. Jones Day claims that behind its "black box" compensation system, associates will find market-competitive pay and more for top performers. ItsAs its website statesformerly stated, "For those associates who produce consistent high-quality work, we intend that they be compensated at or above the upper level of the markets in which we operate."[10] Plaintiffs, however, did not receive that level of compensation.

35.34.  Jones Day promisesAs of April 2019, Jones Day's web site promised its associates that for those "who produce consistent high-quality work, we intend that they be compensated at or above the upper level of the markets in which we operate."[11] But, despite their strong performances—even in the years when those strong performances were acknowledged in their reviews—Jones Day did not compensate the Plaintiffs in line with the "Cravath" market scale.[12]

---

[10] *Id.*

[11] *See* https://www.jonesday.com/principlesandvalues/associates/ (last visited June 23, 2019).

[12] *See*  https://abovethelaw.com/2018/06/first-firm-matches-the-new-and-improved-cravath-pay-scale/ (2018 Cravath Base Salary and Bonus Scale); https://abovethelaw.com/2016/06/breaking-ny-to-180k-cravath-raises-associate-base-salaries/ (2016-2017 Cravath Base Salary); See https://www.vault.com/blogs/vaults-law-blog-legal-careers-and-industry-news/cravath-to-180k-who-what-when-where-why (2007-2016 Cravath Base Salary); https://abovethelaw.com/2017/11/associate-bonus-watch-cravath-announces-its-2017-associate-bonuses/ (2017 Cravath Bonus Scale); https://abovethelaw.com/2016/11/associate-bonus-watch-cravath-announces-its-2016-associate-bonuses/ (2016 Cravath Bonus Scale); https://abovethelaw.com/2015/12/associate-bonus-watch-cravath-announces-its-2015-associate-bonuses/ (2015 Cravath Bonus Scale); https://www.vault.com/blogs/vaults-law-blog-legal-careers-and-industry-news/be-thankful-biglaw-bonuses-to-increase-in-2015 (2014 Cravath Bonus Scale); https://abovethelaw.com/2013/12/breaking-cravath-announces-year-end-bonuses-let-the-2013-bonus-season-begin/ (2013 Cravath Bonus Scale); https://abovethelaw.com/2012/11/breaking-cravath-announces-year-end-bonuses-let-the-2012-bonus-season-begin/ (2012 Cravath Bonus Scale); https://abovethelaw.com/2011/11/breaking-cravath-bonuses-are-out-welcome-to-the-2011-bonus-season/ (2011 Cravath Bonus Scale);

| Nilab Rahyar Tolton | | | | | | |
|---|---|---|---|---|---|---|
| Year | Associate Class Year | Cravath Base | Cravath Bonus | Cravath Scale | Rahyar Tolton Pay | Differential |
| 2010-2011 | 1 | $ 160,000.00 | $ 7,500.00 | $ 167,500.00 | $160,000 | $ 7,500.00 |
| 2011-2012 | 1 | $ 160,000.00 | $ 7,500.00 | $ 167,500.00 | $160,000 | $ 7,500.00 |
| 2012-2013 | 2 | $ 170,000.00 | $ 14,000.00 | $ 184,000.00 | $180,000 | $ 4,000.00 |
| 2013-2014 | 3 | $ 185,000.00 | $ 20,000.00 | $ 205,000.00 | $200,000 | $ 5,000.00 |
| 2014-2015 | 4 | $ 210,000.00 | $ 40,000.00 | $ 250,000.00 | $215,000 | $ 35,000.00 |
| 2015-2016 | 5 | $ 230,000.00 | $ 80,000.00 | $ 310,000.00 | $225,000 | $ 85,000.00 |
| 2016-2017 | 6 | $ 280,000.00 | $ 90,000.00 | $ 370,000.00 | $225,000 | $ 145,000.00 |
| 2017-2018 | 7 | $ 300,000.00 | $ 100,000.00 | $ 400,000.00 | $225,000 | $ 175,000.00 |

| Andrea Mazingo | | | | | | |
|---|---|---|---|---|---|---|
| Year | Associate Class Year | Cravath Base | Cravath Bonus | Cravath Scale | Mazingo Pay | Differential |
| 2014-2015 | 1 | $160,000.00 | $ 15,000.00 | $175,000.00 | $160,000 | $ 15,000.00 |
| 2015-2016 | 1 | $160,000.00 | $ 15,000.00 | $175,000.00 | $160,000 | $ 15,000.00 |
| 2016-2017 | 2 | $190,000.00 | $ 25,000.00 | $215,000.00 | $190,000 | $ 25,000.00 |
| 2017-2018 | 3 | $210,000.00 | $ 50,000.00 | $260,000.00 | $220,000 | $ 40,000.00 |

| Meredith Williams | | | | | | |
|---|---|---|---|---|---|---|
| Year | Associate Class Year | Cravath Base | Cravath Bonus | Cravath Scale | Williams Pay | Differential |
| 2013-2014 | 1 | $160,000.00 | $ 10,000.00 | $170,000.00 | $160,000.00 | $ 10,000.00 |
| 2014-2015 | 1 | $160,000.00 | $ 15,000.00 | $175,000.00 | $170,000.00 | $ 5,000.00 |
| 2015-2016 | 2 | $170,000.00 | $ 25,000.00 | $195,000.00 | $185,000.00 | $ 10,000.00 |
| 2016-2017 | 3 | $210,000.00 | $ 50,000.00 | $260,000.00 | $205,000.00 | $55,000.00 |
| 2017-2018 | 4 | $235,000.00 | $ 65,000.00 | $300,000.00 | $215,000.00 | $85,000.00 |

| Saira Draper | | | | | | |
|---|---|---|---|---|---|---|
| Year | Associate Class Year | Cravath Base | Cravath Bonus | Cravath Scale | Draper Pay | Differential |
| 2011-2012 | 1 | $ 160,000.00 | $ 7,500.00 | $ 167,500.00 | $150,000 | $ 17,500.00 |
| 2012-2013 | 1 | $ 160,000.00 | $ 10,000.00 | $ 170,000.00 | $155,000 | $ 15,000.00 |
| 2013-2014 | 2 | $ 170,000.00 | $ 14,000.00 | $ 184,000.00 | $165,000 | $ 19,000.00 |
| 2014-2015 | 3 | $ 185,000.00 | $ 25,000.00 | $ 210,000.00 | *Pay records are missing, but compensation was well below market. | |
| 2015-2016 | 4 | $ 210,000.00 | $ 65,000.00 | $ 275,000.00 | $180,000 | $ 95,000.00 |
| 2016-2017 | 5 | $ 260,000.00 | $ 80,000.00 | $ 340,000.00 | $190,000 | $ 150,000.00 |
| 2017-2018 | 6 | $ 280,000.00 | $ 90,000.00 | $ 370,000.00 | $230,000 | $ 140,000.00 |
| 2018-2019 | 7 | $ 325,000.00 | $ 125,000.00 | $ 450,000.00 | $230,000 | $ 220,000.00 |

---

https://abovethelaw.com/2010/11/associate-bonus-watch-the-2010-bonus-season-is-under-way/ (2010 Cravath Bonus Scale); https://abovethelaw.com/2009/11/breaking-cravath-bonuses-are-out-and-down/ (2009 Cravath Bonus Scale); https://abovethelaw.com/2008/11/associate-bonus-watch-cravath-offers-less-than-skadden/ (2008 Cravath Bonus Scale); https://abovethelaw.com/2007/10/cravath-announces-bonuses-special-and-otherwise/?rf=1 (2007 Cravath Bonus Scale).

| Jaclyn Stahl | | | | | | |
|---|---|---|---|---|---|---|
| Year | Associate Class Year | Cravath Base | Cravath Bonus | Cravath Scale | Stahl Pay* | Differential |
| 2014-2015** | 2 | $170,000.00 | $ 15,000.00 | $185,000.00 | $170,000.00 | $ 15,000.00 |
| 2015-2016 | 2 | $170,000.00 | $ 25,000.00 | $195,000.00 | $185,000.00 | $ 10,000.00 |
| 2016-2017 | 3 | $210,000.00 | $ 50,000.00 | $260,000.00 | $205,000.00 | $ 55,000.00 |
| 2017-2018 | 4 | $235,000.00 | $ 65,000.00 | $300,000.00 | $260,000.00 | $ 40,000.00 |

* These pay figures do not include a comparison of Ms. Stahl's clerkship bonus ($50,000) with the market clerkship bonus.

** When Ms. Stahl joined Jones Day in October 2014, she was paid at an annual rate of $160,000. The Firm raised this rate to $170,000 effective January 1, 2015.

| Jane Doe 4 | | | | | | |
|---|---|---|---|---|---|---|
| Year | Associate Class Year | Cravath Base | Cravath Bonus | Cravath Scale | Doe 4 Pay* | Differential |
| 2007-2008 | 2 | $170,000.00 | $   55,000.00 | $225,000.00 | $160,000 | $65,000.00 |
| 2008-2009 | 2 | $170,000.00 | $   20,000.00 | $190,000.00 | $170,000 | $20,000.00 |
| 2009-2010 | 3 | $185,000.00 | $   15,000.00 | $200,000.00 | $180,000 | $20,000.00 |
| 2010-2011** | 4 | $210,000.00 | $   20,000.00 | $230,000.00 | $195,000 | $35,000.00 |
| 2011-2012 | 5 | $230,000.00 | $   25,000.00 | $255,000.00 | $210,000 | $45,000.00 |
| 2012-2013 | 6 | $250,000.00 | $   40,000.00 | $290,000.00 | $260,000 | $30,000.00 |
| 2013-2014 | 7 | $265,000.00 | $   50,000.00 | $315,000.00 | $300,000 | $15,000.00 |
| 2014-2015 | 8 | $280,000.00 | $ 100,000.00 | $380,000.00 | $330,000 | $50,000.00 |

* These pay figures do not include a comparison of Jane Doe 4's clerkship bonus ($35,000) with the market clerkship bonus.

** In 2010, Jones Day changed the effective date of its yearly salary adjustments from January 1 to July 1.

| Katrina Henderson | | | | | | |
|---|---|---|---|---|---|---|
| Year | Associate Class Year | Cravath Base | Cravath Bonus | Cravath Scale | Henderson Pay | Differential |
| 2013-2014 | 1 | $160,000.00 | $   10,000.00 | $ 170,000.00 | $160,000.00 | $10,000.00 |
| 2014-2015 | 1 | $160,000.00 | $   15,000.00 | $ 175,000.00 | $160,000.00 | $15,000.00 |
| 2015-2016 | 2 | $170,000.00 | $   25,000.00 | $ 195,000.00 | $160,000.00 | $35,000.00 |
| 2016-2017 | 3 | $210,000.00 | $   50,000.00 | $ 260,000.00 | $180,000.00 | $80,000.00 |

36.35.  Upon information and belief, Jones Day facilitates this discriminatory pay system by keeping compensation confidential. At every possible opportunity, associates are instructed not to discuss their compensation with their colleagues. Jones Day maintains this policy and continues to so instruct associates, even though this policy is facially unlawful under, *inter alia*, the District

of Columbia's Wage Transparency Act of 2014, California's Fair Pay Act, and New York Labor Law Section 194. By maintaining the secrecy of each associate's compensation, Jones Day prevents associates from learning of gender-based pay disparities and remediating them. This policy, among others, has a disparate impact on Jones Day's female associates.

### E.    Pregnancy Proves Unprofitable at Jones Day

37.36.   Within Jones Day's culture of male privilege, women must work harder for less to have any hope of advancing. Once they become pregnant, the presumption is that they are on their way out; the burden is on the new mother to prove that she is the exception to the rule. A second pregnancy is almost insurmountable.

38.37.   Plaintiffs Draper and Tolton both became pregnant while employed as associates at Jones Day. Each was quickly cut off from the quantity and quality of work she had received before getting pregnant and taking maternity leave. Each then got pregnant a second time. And each was instructed to find other employment and to leave the Firm within a few months after returning from her second maternity leave.

39.38.   Typifying Jones Day's view that pregnant women are a problem for the Firm, Partner Steve Sozio—co-leader of the firm's health care practice and chair of the firm's litigation department in Cleveland—was reported to have recently "encouraged" female associates attending the Firm's Business and Tort Litigation group meeting to tell management if they were pregnant or planning on becoming pregnant within the next year, supposedly so that the group could plan its budget. Worse yet, Partner Sozio was said to have suggested that women in their first

trimester—who alone he anticipated might be uncomfortable speaking to him about their pregnancies— ~~might~~could instead speak with his female assistant.[13]

~~40.~~39.  Women who have children are also blamed for the lack of female partners at Jones Day, as where Partner Mark Finkelstein ascribed his office's serious female attorney attrition problem to "women [who] have babies and stay at home." Other male partners seconded this view, often referring to maternity leave as "six months' vacation." ~~But, in further proof that female associates are damned if they do and damned if they do not, Jane Doe 4 was criticized for not having a family, because without one, she was told, she would not be able to relate to clients.~~

~~41.~~40.  Even speaking of Jones Day's policies relating to pregnancy—at a Firm event about the advancement of women, no less—was enough to knock Plaintiff Tolton's career off track. A year before her first pregnancy, Plaintiff Tolton, attending a Firm-sponsored event focused on the advancement of women at the Firm, asked what support Jones Day offered to pregnant women and mothers. The presenters, however, did not respond; instead, they navigated to the Jones Day values page on the Firm's website, which offers no guidance on either topic. Ms. Tolton's entirely appropriate request for basic guidance about Firm policy became the subject of a whisper campaign, and her raise was reduced to $10,000 for that review period.

### F.    Women Who Speak Up Are Pushed Out

---

[13] Elie Mystal, *Biglaw Practice Leader Encourages Women To Tell Him If They Plan On Becoming Pregnant… For 'Budgetary Reasons,'* Above the Law (October 2, 2018), https://abovethelaw.com/2018/10/biglaw-practice-leader-encourages-women-to-tell-him-if-they-plan-on-becoming-pregnant-for-budgetary-reasons/. Jeremy Nobile, *Jones Day practice group leader allegedly asks lawyers to report pregnancy plans*, Crain's Cleveland Business (October 3, 2018), https://www.crainscleveland.com/legal/jones-day-practice-group-leader-allegedly-asks-lawyers-report-pregnancy-plans.

42.41.  The Firm retaliates against women who, by word or deed, push back against the fraternity culture at Jones Day. For example, one female associate in the Irvine office—a lateral recruit who had been hired and groomed for partnership—noted in an office meeting that there was a lack of mentorship for female associates. As a result, she became a pariah at the Firm, and was pushed out within a year.

43.42.  In Ms. Tolton's case, when colleagues inquired about her departure, she explained that Jones Day had told her she had no future at the Firm and that she would have to find another job. When Firm management learned of her candor, she was locked out of her email and barred from returning to the office.

44.   When Jane Doe 4 questioned the baseless criticism in her reviews, upon information and belief, she was subsequently attacked in a memorandum circulated among partners for lacking "integrity."

45.43.  By contrast, the outspoken women who advance at Jones Day are those who promote the party line. One female partner with children boasted of having a fax machine brought into her delivery room during labor so that she could close a deal. During a 2018 event, the Partner-in-Charge for Diversity told a gathering of diverse attorneys that she had never wanted her diversity-related role, nor advocated for diversity in her career until assuming that role, but when Managing Partner Brogan asked her to take the role, she did what Jones Day lawyers do and "answered the bell."

G.    **Plaintiffs' Class and Collective Action Claims**

46.44.  Jones Day subjects its female attorneys to discrimination based on their gender, pregnancy, and maternity leave. The Firm has subjected Plaintiffs and other similarly situated employees to (a) discriminatory career and development opportunities and promotion denials; (b)

discriminatory policies and procedures implemented by a male-dominated leadership that have a disparate impact on female attorneys, especially pregnant women and mothers; (c) lower pay for substantially equal work requiring equal skill, effort, and responsibility; (d) unwarranted suppression of pay, professional development, and promotions after taking federal and state protected leave; (e) disparate treatment based on gender, pregnancy and/or maternity; (f) hostile work environment based on gender; and (g) other adverse terms and conditions of employment.

47.45.  Upon information and belief, Jones Day has long been aware of these problems but has failed to take remedial measures to prevent or correct them.

48.46.  To remedy the gender and pregnancy discrimination they witnessed and experienced at the Firm, Plaintiffs, on behalf of themselves and Class and Subclass members are seeking all legal and equitable relief available under applicable local, state and federal anti-discrimination, equal pay, and retaliation statutes, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, as amended; the Family and Medical Leave Act, ("FMLA"), 29 U.S.C § 2601 *et seq.*; the Equal Pay Act of 1963, ("EPA"), 29 U.S.C. § 201 *et seq.*; the DC Human Rights Act ("DCHRA"), D.C. Code § 2-1402-11 *et seq.*; the California Equal Pay Act, Cal. Lab. Code §1197.5, as amended; the California Fair Employment and Housing Act, ("FEHA"), Cal. Gov. Code §12940 *et seq.*; the California Family Rights Act, ("CFRA"), Cal. Gov. Code §12945.2; the California Business and Professions Code, Cal. Bus. & Prof. Code § 17200 *et seq.*; and the California Private Attorneys General Act of 2004, Cal Lab. Code §2698, *et seq.*; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–107, and the New York Equal Pay Law, N.Y. Lab. Law § 194. Plaintiffs seek monetary and injunctive relief to rectify the Firm's discriminatory practices and policies and to ensure that, going forward, the Firm abides by the law.

II.    **THE PARTIES**

~~49.~~47.  **Plaintiff Nilab Rahyar Tolton** is a female attorney who lived and worked in California at all times relevant to this action. She was employed as an associate in Defendant's Irvine, California Office until 2018.

~~50.~~48.  **Plaintiff Andrea Mazingo** is a female attorney who lived and worked in California at all times relevant to this action. She was employed as an associate in Defendant's Irvine, California Office until 2018.

~~51.~~49.  **Plaintiff Meredith Williams** is a female attorney who lived and worked in California at all times relevant to this action. She was employed as an associate in Defendant's Irvine, California Office until 2017.

~~52.~~50.  **Plaintiff Saira Draper** is a female attorney who was employed as an associate in Defendant's Atlanta, Georgia Office until 2018.

~~53.~~51.  **Plaintiff Jaclyn Stahl** is a female attorney who lived and worked in California at all times relevant to this action. She was employed as an associate in Defendant's Irvine, California Office until 2018.

~~54.     **Plaintiff Jane Doe 4** is a female attorney who was employed as an associate in one of Defendant's non-California offices until 2018.~~

~~55.~~52.  **Plaintiff Katrina Henderson** is a female attorney who was employed as an associate in Defendant's New York City, New York Office until 2016.

~~56.~~53.  **Defendant Jones Day** is one of the world's largest international business and litigation firms. According to its website, Jones Day is a general partnership with offices on five continents. Jones Day transacts substantial business in Washington, DC. The Firm's DC office is the seat of power from which its Managing Partner Stephen J. Brogan "is the final decision-maker

on virtually every matter of significance for the Firm[.]"[14] The Firm employs approximately 250

attorneys in Washington, DC. At all relevant times, Jones Day was Plaintiffs' employer within the

meaning of all applicable federal and state statutes.

## III.    JURISDICTION, VENUE, AND ADMINISTRATIVE EXHAUSTION

57.54.  This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C.

§1331 and has supplemental jurisdiction over Plaintiffs' state law claims. The claims raised under

state and federal law constitute the same case and controversy.

58.55.  The District of Columbia has personal jurisdiction over the Firm because the Firm

transacts significant business in DC.

59.56.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C.

§2000e-5(f) because Defendant conducts substantial business in the District of Columbia, and

because, upon information and belief, employment practices originating in this District have

violated the Plaintiffs' and Class's legal rights.

60.57.  Plaintiff Nilab Tolton duly filed her administrative charge before the California

Department of Fair Employment and Housing ("DFEH") and the U.S. Equal Employment

Opportunity Commission ("EEOC") on August 6, 2018. She filed an amended charge with the

EEOC on March 14, 2019. Ms. Tolton received a state Notice of Case Closure and Right to Sue

under California law on August 28, 2018 and a federal Right to Sue on May 14, 2019. Ms. Tolton

filed her complaint before the District of Columbia Office of Human Rights ("DCOHR") on March

6, 2019. She withdrew her complaint before the DCOHR on April 3, 2019. Ms. Tolton also filed

a California Private Attorneys General Act ("PAGA") claims notice with the California Labor and

---

[14] https://www.jonesday.com/principlesandvalues/clientservices/ (last visited Apr. 1, 2019).

Workforce Development Agency on March 27, 2019. She served Defendant with her PAGA claims notice on March 27, 2019 via certified mail.

61.58.  Plaintiff Andrea Mazingo duly filed her administrative charge before the DFEH and the EEOC on March 22, 2019, received her Dismissal and Notice of Right to Sue from the EEOC on June 21, 2019, and from the DFEH on June 24, 2019. Ms. Mazingo also filed a California Private Attorneys General Act ("PAGA") claims notice with the California Labor and Workforce Development Agency on March 27, 2019. She served Defendant with her PAGA claims notice on March 27, 2019 via certified mail.

62.59.  Plaintiff Meredith Williams duly filed her administrative charge before the DFEH on February 14, 2019, and on February 25, 2019 she received her Notice of Case Closure and Right to Sue. On March 26, 2019, she served this notice on Defendant via certified mail. Ms. Williams also filed her complaint before the DCOHR on February 19, 2019. She withdrew her complaint before the DCOHR on April 3, 2019.

63.60.  Plaintiff Saira Draper duly filed her administrative charge before the EEOC on April 3, 2019 and is currently perfecting her right to sue; upon receipt of Notice of Case Closure and Right to Sue she will serve such notice on opposing counsel.

64.61.  Plaintiff Jaclyn Stahl duly filed her administrative charge before the DFEH on March 5, 2019, and on March 6, 2019, she received her Notice of Case Closure and Right to Sue. On March 26, 2019, she served this notice on Defendant via certified mail. Ms. Stahl also filed her complaint before the DCOHR on March 5, 2019. She withdrew her complaint before the DCOHR on April 3, 2019.

65.    Plaintiff Jane Doe 4 dual-filed her administrative charge before the EEOC and DCOHR on February 22, 2019, and is currently perfecting her right to sue before the EEOC; upon

~~receipt of Notice of Case Closure and Right to Sue she will serve such notice on opposing counsel.~~

~~She withdrew her complaint before the DCOHR on April 3, 2019.~~

~~66.~~62.  Defendant and Plaintiffs Nilab Tolton, Andrea Mazingo, Meredith Williams, and Saira Draper~~, and Jane Doe 4~~, through their attorneys acting on their behalf, entered into an agreement to toll their claims and any claims brought in a representative capacity, including the time for their administrative exhaustion, from August 13, 2018, until January 9, 2019. Defendant and Plaintiff Jaclyn Stahl's attorneys, on her behalf, entered into an agreement to toll her claims and any claims brought in a representative capacity, including the time for their administrative exhaustion, from October 29, 2018, until January 9, 2019.

**IV.    PLAINTIFFS' ALLEGATIONS**

**A.    NILAB RAHYAR TOLTON**

~~67.~~63.  Plaintiff Nilab Rahyar Tolton was an associate in Jones Day's Irvine office from 2010 until the Firm forced her out in 2018 after her second pregnancy. For eight years, Ms. Tolton proved herself to possess all of the qualities of a Jones Day superstar—distinguishing herself as a superb legal talent, a natural at recruiting, deft at managing client relationships, and a thoughtful mentor to junior associates. Despite this standout performance, Ms. Tolton's reputation began to tarnish after she dared to speak about what it means to become pregnant and a mother as a lawyer at Jones Day.

*i.    Ms. Tolton Is an Accomplished and Successful Associate*

~~68.~~64.  Ms. Tolton graduated from Harvard Law School, where she was selected as the Commencement 2010 Class Day Student Speaker. At Harvard, Ms. Tolton served on the Graduate Council, the 2010 Class Committee, the Harvard Law School Student Government, and the Executive Board of the Harvard Law California Club. She joined Jones Day's Irvine office directly

from Harvard in 2010.

69.65.  Jones Day heavily recruited Ms. Tolton. Before she joined, a then-current male associate contacted her to encourage her to accept the Firm's offer, touting Jones Day's market compensation and work-life balance as major selling points. He wrote, "our base salary is . . . supposed to be set at the market-rate." He also touted that "there doesn't appear to be any financial incentive here to bill beyond the minimum, and I personally don't have any plans on doing so:-)." And he emphasized that he had not "had to sacrifice [his] beloved social life" and could "still go out every Friday and Saturday night, and . . . still sleep till 2-3pm every Saturday and Sunday:-)."

70.66.  Ms. Tolton initially excelled at Jones Day. For most of her tenure at the Firm, Ms. Tolton worked almost exclusively with Partner Paul Rafferty, who was considered very difficult to work with, particularly for women. Ms. Tolton's superb performance, however, made her indispensable, and she was awarded deposition and court appearance opportunities early in her career. She also played a critical role in a five-month trial, achieving a full defense verdict to avoid millions of dollars in liability for the client. In recognition of Ms. Tolton's significant role, during a post-trial hearing on fees and costs, Partner Rafferty argued that Jones Day's fees were justified in part because Ms. Tolton was a superstar attorney from Harvard Law.

71.67.  The year before she went on maternity leave for the first time, Ms. Tolton played the primary role in obtaining the vacatur of an interim arbitration award for fraud, along with an award of sanctions for the Firm's client.

72.68.  Ms. Tolton also forged solid relationships with clients. The Firm trusted her to regularly interact with them, and, in recognition of these relationships, the Firm invited Ms. Tolton to the sole event the Firm had for its female clients, a "spa day" which was largely attended by partners with significant client relationships. Ms. Tolton was the only associate invited, and she

and her colleagues understood this invitation as a signal that Ms. Tolton was being groomed for advancement.

73.69.  Ms. Tolton was also a role model and mentor to many of the Irvine office's junior associates, and particularly women. The Firm recognized Ms. Tolton's value in this regard and entrusted her with heading the Irvine office's summer program in 2012—when it was unheard of for a junior (second year) associate to do so. The Firm's confidence in Ms. Tolton was rewarded: Firm management repeatedly praised her program as the best in office history.

74.70.  Soon, the Firm was sending Ms. Tolton to recruiting events and on campus interviews ("OCI"), which she conducted alongside the then-Firmwide Recruiting Partner, Kevyn Orr. In recognition of Ms. Tolton's stellar performance, the hiring partner of the Los Angeles office at the time, Erik Swanholt, told Ms. Tolton that he would try to have her sent to Harvard for OCI to supplement or replace the partners who were slated to attend. Ms. Tolton was ultimately assigned to the Irvine Office's hiring committee where Partner Mark Finkelstein assigned her the nickname "the closer," because she was so adept and successful at convincing recruits to commit to Jones Day.

75.71.  Partner Cary Sullivan often asked Ms. Tolton to provide formal training sessions for new associates in her office, including one on best practices for successful associates. Ms. Tolton also accompanied a class of summer associates from her office to the nationwide orientation and training program at Jones Day's Washington, DC office, a role usually filled by the office's hiring partner.

76.72.  Ms. Tolton's performance also won praise in her performance reviews. Partner Paul Rafferty, for whom Ms. Tolton performed the majority of her work during her early tenure at Jones Day, wrote, in 2013, that Ms. Tolton was "smart, committed, and exceptionally hard-working. She

is ready to take on any challenge, any time, anywhere." In 2014, Partner Rafferty reiterated that Ms. Tolton "is an indispensable cog in my practice and willing to work 24/7 to assist the firm's clients." And in 2015, Partner Rafferty added, "Nilab is a talented lawyer. She will take on any project, and accomplish it successfully. She is extremely committed. She will offer her time to any client any time of the day or week. She is always there to support me, and always available – no matter how unavailable she really is."

### ii.   *Despite Her Exemplary Performance, Ms. Tolton's Gender Was an Obstacle to Her Success at Jones Day*

~~77.~~73.   Ms. Tolton's superb performance did not, however, insulate her from sexist and sexualized conduct and commentary. For example, then-Partner Eric Landau, who was trying to recruit Ms. Tolton to his practice group, regularly commented on her clothes and high heels. After a deposition preparation session, he remarked that partners at his former firm kept asking him why his female associates all looked like volleyball players. Shortly after Ms. Tolton got married, however, Partner Landau seemed to abruptly lose interest in working with her.

~~78.~~74.   Partner Rafferty, Ms. Tolton's primary source of work, weighed in on a female associate's prospects for marriage given that she lived with her boyfriend, commenting: "Why buy the cow when you can get the milk for free?"

~~79.~~75.   Male associates in Irvine and elsewhere took their cues from the misconduct of male partners. During a limo ride to a summer associate event, male attorneys from the office initiated a game of "Fuck, Marry, Kill" in which they named coworkers from the office and proposed to whom they would do each of these things. Ms. Tolton avoided this event the following year, but learned from attendees that a male associate who attended had called several of his female colleagues "cunts." That male associate remains at the Firm today.

~~80.~~76.   This casual misogyny inevitably bled into the Firm's view of Ms. Tolton as an

attorney. Ms. Tolton often found herself assigned secretarial-type work and denied professional opportunities extended to her male peers. In one case, Partner Rafferty designated her as his chauffeur for a hearing on a contested arbitration award. Even though Ms. Tolton drafted the lion's share of the briefing, Partner Rafferty conducted the argument himself. He tasked her only with maneuvering demonstrative exhibits on an easel for the court to view. This assignment was particularly obtuse because Ms. Tolton was significantly pregnant at the time, making it difficult for her to move the exhibits—so much so that the opposing counsel ultimately assisted Ms. Tolton.

81.77.  As if to emphasize Ms. Tolton's role as human easel, when the male Chief Executive Officer and male General Counsel of the client departed with Ms. Tolton and Partner Rafferty to have lunch at a restaurant, Partner Rafferty turned Ms. Tolton away at the door, denying her the client interaction.

82.78.  Similarly, Ms. Tolton's facial expressions became grounds for criticism from male partners. Partner Rafferty criticized her for being too "stoic," and needing to use more "bedside manner." At the same time, illustrating the Catch-22 sex stereotyping imposes on female associates at Jones Day, Partner Cary Sullivan instructed Ms. Tolton to help coach a female associate on how to speak in a less "ditzy" manner. Partner Sullivan was the same Partner who, at a summer event, demanded that three female summer associates perform a Care Bears song and dance number in order to receive verbal offers to join the Firm as associates. Although the summer associates protested, Partner Sullivan insisted, and only when each had performed as demanded did she receive a verbal offer to join the Firm as an associate.

### iii.    *Speaking of Pregnancy Proves Unprofitable*

83.79.  Despite her proven track record and superior performance, Ms. Tolton's star began to fade when she asked questions about Firm policies concerning parenting—ironically, at a firm-

sponsored event addressing the advancement of female attorneys. In 2014, the Partner-in-Charge of the San Diego Office, Karen Hewitt, visited the Irvine office with a then recently elevated Los Angeles Partner, Erica Reilley. Their visit was intended to model female success at the Firm and to address the Firm's reputation for being inhospitable to female attorneys who were also mothers. During the presentation, Partners Hewitt and Reilley highlighted the fact that Partner Reilley had been promoted to partner while on a reduced-time, "flex" schedule.

~~84.~~80.  When the event opened for questions, Ms. Tolton asked about the Firm protocols for requesting a reduced-time schedule and notifying the Firm about one's pregnancy. The presenters, however, did not respond and instead deflected the question by navigating their presentation to the Firm's mission statement and reciting platitudes about Firm values.

~~85.~~81.  Firm leadership treated Ms. Tolton's question like an insurrection. Partner Edward Chang quickly made rounds about the Irvine office, visiting associates to gauge the perceived contagion. Ms. Tolton tried to contain the reputational fall-out by promptly apologizing to office partners. But the damage was done, visible in her reduced raise in compensation for the 2014 review period.

### iv.    Ms. Tolton Gets Pregnant and Loses Work; Gets Pregnant Again and Gets Fired

~~86.~~82.  Ms. Tolton became pregnant in 2015 and took maternity leave in January 2016. Near the end of that leave, in June 2016, the Firm informed her that her salary had been frozen. This was known at Jones Day as a punitive measure, as where a male associate had his salary frozen after he got drunk at a summer associate event and called several female associates "cunts."

~~87.~~83.  Ms. Tolton's performance over the prior year, as noted above, had been stellar. Accordingly, Ms. Tolton could only conclude that the salary freeze was a result of her pregnancy and maternity leave.

88.84.  Ms. Tolton contacted the then-Administrative Partner in the office, Partner Darren Cottriel, who suggested that she come in for her performance review. Ms. Tolton then met with Administrative Partner Cottriel and Irvine Partner-in-Charge Richard Grabowski. Both partners initially gave Ms. Tolton vague but positive feedback, saying that she had done a good job and was on the right track.

89.85.  Ms. Tolton then asked why her salary had been frozen if her performance was good. Partners Cottriel and Grabowski then attempted to backtrack, asserting that they had received complaints about her work. Ms. Tolton, however, had brought to the meeting a binder of emails and documents in which clients and colleagues praised her work. She presented this binder of positive feedback to Partners Cottriel and Grabowski and pressed them for specific complaints. The partners admitted that they could not cite to any negative reviews, and suggested that Ms. Tolton speak with her reviewers.

90.86.  Again, Ms. Tolton pushed back, noting that every reviewer with whom she had spoken had given positive feedback. Ms. Tolton then observed that the only thing that had changed since her last review period had been her pregnancy and leave. Both partners became upset, and informed Ms. Tolton that she would have two more years to return to the Firm's good stead or else be fired.

91.87.  After obtaining her personnel files from the Firm under California law in 2018, Ms. Tolton was able to confirm that the reviews on which her 2016 compensation was supposedly based had, in fact, been overwhelmingly positive, a fact certainly not reflected in her compensation for that year.

92.88.  After her 2016 review, Ms. Tolton worked to draft an email memorializing and expanding upon her reasons for believing that Jones Day had given her a negative review and

frozen her salary in response to her gender and pregnancy rather than because of any performance deficiencies on her part. While she was drafting the email, however, Ms. Tolton discovered that she was pregnant with her second child.

93.89.  Terrified that she was already facing possible termination for having had her first child, Ms. Tolton went to Administrative Partner Cottriel's office and disclosed both her pregnancy and her fear that Jones Day would not permit her to take another leave. Partner Cottriel assured Ms. Tolton that she would be able to take a second leave. He also expressed understanding that returning from parental leave was challenging and asked her to let him know if she needed to limit her capacity at all. This instruction that Ms. Tolton did not need to work to capacity was seconded by Of Counsel Michelle Blum.

94.90.  Ms. Tolton set out to prove her worth to Jones Day yet again. In the months after she returned from her first leave, she virtually never turned down an assignment, but found that she was only receiving active work from Partner Cheryl O'Connor. Partner O'Connor sought to staff Ms. Tolton on several cases that required travel and multiple all-nighters due to urgent deadlines, significant dispositive motions, and pending trial dates.

95.91.  Ms. Tolton told Partner O'Connor that she would be happy to help with these cases; however, she also noted that her upcoming leave and travel restrictions would render her unavailable during critical time frames, requiring significant and costly duplicative work by a subsequent attorney taking over the cases down the line. Accordingly, Ms. Tolton suggested that assigning an associate who could handle the cases throughout their lifecycles would better serve the client.

96.92.  Nevertheless, around Thanksgiving 2016, Partner O'Connor assigned Ms. Tolton approximately one dozen cases, including one case ripe for a dispositive motion. Partner O'Connor

insisted Ms. Tolton take over these matters, despite the fact that much of the anticipated air travel for these cases would occur when Ms. Tolton would be unable to fly due to her pregnancy.

97.93.  Ms. Tolton worked tirelessly, at times so ill from her pregnancy that she could not sit at a desk. Working from home in the mornings and evenings, she took breaks and turned off lights to stave off extreme nausea while working. Concerned that her physically impaired state made her less efficient, Ms. Tolton chose to bill only the hours she felt should have been required for her to complete the work, though the hours she spent toiling through illness were considerably greater.

98.94.  Ms. Tolton also sought work on a major case being run out of the Firm's New York Office that would better accord with her state of physical limitation due to pregnancy. The New York partner leading the case called Ms. Tolton at home one evening to assess her commitment to the matter, concerned that she was not yet able to bill to it full time. Ms. Tolton affirmed her commitment and was billing full time on the New York case by December, while also handling lingering work on Partner O'Connor's cases through the new year.

99.95.  Around this time, Ms. Tolton's doctor informed her that she could not keep up her intensive work schedule. Her physician wrote a note to that effect, which Ms. Tolton submitted to Administrative Partner Cottriel. She also sent Partner Cottriel an email about her capacity for work, in which she stated that she believed she could continue to bill extensively working on the New York matter, but that transitioning some of Partner O'Connor's matters would be necessary in light of her pregnancy-related travel restrictions.

100.96.      Partner Cottriel, however, despite his earlier assurances that he would help Ms. Tolton limit her work if necessary, now summoned Ms. Tolton to a conference room to chastise her for not working hard enough and accuse her of misstating her capacity. Partner

O'Connor, who was also present, sat in silence.

101.97.        Even under these circumstances, Ms. Tolton continued to deliver exceptional results, settling several of Partner O'Connor's cases. Indeed, Ms. Tolton negotiated global settlements of cases assigned to other Jones Day attorneys, helping the client and the Firm avoid unnecessary trials. In the following months, from December 2016 through March 2017, Ms. Tolton continued to work hard for the Firm, billing approximately 200 hours per month on the New York matter.

102.98.        In March 2017, Ms. Tolton went on her second parental leave. Jones Day informed her in June 2017, during her leave, that, once again, the Firm was freezing her salary. In her first days back from leave, in October 2017, Ms. Tolton was again called in for her annual review. Partners Grabowski and Cottriel then told Ms. Tolton that she "should look for other opportunities outside the Firm," adding that she had six months to leave, and that she should prioritize finding another job instead of taking on any billable work within the Firm.

103.99.        As pretext for her abrupt termination, Partners Grabowski and Cottriel falsely accused Ms. Tolton of having misstated her work capacity when she had been physically incapacitated due to her pregnancy. Ms. Tolton's written review ultimately faulted her for not submitting a doctor's note, even though she had in fact submitted such a note. Even worse, the written review questioned Ms. Tolton's "candor" *because* she had informed the Firm that, while pregnant, she was physically unable to continue at her previous rate of work, and thus had not billed the hours that she felt were attributable entirely to her state of illness.

104.100.        Ms. Tolton's 2017 written review of her 2016 work also claimed that "there [wa]s diminishing internal demand for her work among the litigation partners in Irvine." In fact, however, shortly after Ms. Tolton returned from leave, Partner John Vogt approached Ms. Tolton

to ask if she needed billable work, offering to assign her to a number of matters under his supervision. Ms. Tolton declined, however, in light of Partner Cottriel's instruction upon giving her notice of termination. Instead, she worked diligently over the following months to seek comparable employment, billing her hours daily to an office administrative matter number as "Research opportunities per D. Cottriel."

~~105.~~101.    As word of her termination spread, several Firm partners volunteered to help Ms. Tolton seek an in-house job with Firm clients. Among those who followed through on this offer was Partner Edward Chang, widely recognized as keeping a close thumb on the Irvine office pulse, who told Ms. Tolton how surprised he was to hear she was being fired and sought out not-publicly-posted opportunities for Ms. Tolton among his business contacts.

### v.    Pushed Out for Speaking Up, Ms. Tolton Suffers Lasting Harm

~~106.~~102.    Ms. Tolton had served as a mentor to several female attorneys in her office. After she gave notice that she was leaving the Firm, a number of these attorneys approached her with questions about her departure. She told them the truth: that Jones Day had made it clear to her through its compensation decisions and performance evaluations that she no longer had a future at the Firm.

~~107.~~103.    The Firm swiftly retaliated. A few days before her scheduled last day, Ms. Tolton found herself locked out of her Jones Day email. Partner-in-Charge Grabowski and Administrative Partner Cottriel then called Ms. Tolton at home in the middle of her son's first birthday party. They told her that they would ship her belongings to her and barred her from returning to the office.

~~108.~~104.    In response to this abrupt and retaliatory expulsion, Ms. Tolton wrote a follow-up email to these partners, noting that she was being punished for honestly sharing her

experience at Jones Day with her coworkers.

~~109.~~105.    As a result of the discrimination that she experienced at Jones Day, Ms. Tolton suffered from and continues to suffer from significant emotional distress.

### B.    ANDREA MAZINGO

~~110.~~106.    Andrea Mazingo was an associate in Jones Day's Irvine office whom Firm partners long signaled was on track to join their ranks. Every attorney with whom Ms. Mazingo worked gave her excellent reviews. Indeed, she had no negative reviews and was selected for important office leadership roles, including Recruitment Committee Member, Summer Work Coordinator, Summer Social Chair, and pro bono coordinator for the Summer Associates.

~~111.~~107.    Then-Partner Eric Landau told her that Firm partners had expressly identified her as a promising partner candidate at an all-partner meeting. Kevin Espinola, the Irvine office's Business Development Partner, approved special funding for a creative business development plan that Ms. Mazingo designed to facilitate regular face-to-face contact with local entrepreneurs.

~~112.~~108.    Ms. Mazingo worked tirelessly for the Firm at great personal cost for years—logging up to 250 billable hours per month—to win over attorneys in Jones Day's Securities Litigation and SEC Enforcement Practice Group, which was a highly competitive and overwhelmingly male group. By meeting the demands of male partners in her practice group, she believed she could advance to the Firm's partnership on her merit.

~~113.~~109.    She was wrong. Instead, the Firm paid her less than the promised "top market" it recruited her with and, upon information and belief, less than that paid to comparable male associates. The Firm also denied her mentorship opportunities, sexually harassed her, and refused to accept her as a true member in its fraternity.

114.110.      Ms. Mazingo joined the Firm straight out of Northwestern Pritzker School of Law, from which she graduated with honors in 2014. From the outset, the Firm was hostile. Reflecting the Firm's knee-jerk hostility towards women's equality—in ways both large and petty—Jones Day refused to permit Ms. Mazingo to list her feminist law journal publication on her website biographical page.

115.111.      Within her first year, the Firm selected Ms. Mazingo to assist the Global Disputes Practice Group with two arbitrations in San Francisco, a rare honor for a new associate. As the only female attorney on the team, Ms. Mazingo made every effort to prove herself, billing over seventeen hours a day for several days in a row. Despite her hard work and excellent performance, Ms. Mazingo's supervisor, now Partner Marcus Quintanilla, called her "sweetheart" at a meeting with other Firm lawyers, pried into Ms. Mazingo's romantic life, and gave her unwelcome, suggestive details about his own. He told her that she was "quite the catch" and would "not be single for long." After Ms. Mazingo agreed to join him for a business dinner, Partner Quintanilla repeatedly referred to the dinner as a "date."

116.112.      After she finished with the arbitrations, Ms. Mazingo was recruited into the Firm's Securities Litigation and SEC Enforcement Practice Group. Then-Partner Eric Landau told her that he and Partner Roman Darmer were impressed with her obvious talent and work ethic. Once she joined the group, however, then-Partner Landau degraded Ms. Mazingo as a sex object, regularly subjecting her to sexist comments about her appearance, including her makeup, her hair, and her choice of footwear. For example, he continually pressed Ms. Mazingo to wear high heels, even though she assured him that she was more comfortable in flats. Then-Partner Landau also frequently demanded that Ms. Mazingo account for why she looked "prettier than usual" on any given day.

117.113.        Ms. Mazingo was not the only female Jones Day employee about whose appearance Partner Landau commented. In front of the entire Irvine office, then-Partner Landau extolled how "banging" his secretary's body looked in a bikini at an event that had been planned to honor that secretary. The secretary, who was also Ms. Mazingo's secretary, complained to Jones Day, but, so far as Ms. Mazingo is aware, the Firm never took action against then-Partner Landau. As a direct result of then-Partner Landau's actions and comments, the secretary was forced to resign, which particularly upset Ms. Mazingo because she had worked closely with the secretary since she had been a summer associate.

118.114.        Then-Partner Landau's sexist and sexualized comments were not isolated incidents. Ms. Mazingo's peers later tasked her with planning a "women's luncheon"—a dispiriting ritual in which the office's female attorneys (which included no homegrown partners) sought to mentor each other. To signify that it was Ms. Mazingo's turn to plan the luncheon, she was forced to display a 4-foot tall cardboard cut-out of a lipstick tube in her office for months.[15] When then-Partner Landau asked Ms. Mazingo why the lipstick cutout was in her office, she explained the backstory. He in turn responded, "Oh, I thought it was because you are a lipstick lawyer," an allusion to the term "lipstick lesbian."

119.115.        While Partner Quintanilla and then-Partner Landau repeatedly subjected Ms. Mazingo to unwanted sexual attention, they denied her mentorship and professional attention. Then-Partner Landau and other male attorneys on his team, including Associate Rob Tiefenbrun and Of Counsel Travis Biffar, often left Ms. Mazingo in the office to work through lunch while they went to enjoy boys-only lunches together. They excluded Ms. Mazingo even though she sat

---

[15] Male attorneys vandalized and defaced the cutout after hours on one occasion, causing consternation among the office's female attorneys.

next to them and worked on most of the same matters.

~~120.~~116.        By contrast, the female mentorship lunches—organized by the lawyer with the lipstick cutout in her office—were poor substitutes for the one-on-one professional attention that Biffar and Tiefenbrun received from then-Partner Landau. The female attorney lunches often focused on socializing and conversations about families and weddings.

~~121.~~117.        Denied mentorship and support, Ms. Mazingo approached Partner Darmer, the partner with whom she worked most, about whether he might help guide her. Even though his reviews of Ms. Mazingo had been positive, he refused to mentor her, telling her, in striking candor, that she would be best off leaving the Firm to get experience elsewhere. Ms. Mazingo declined to push Partner Landau, the other partner in her practice group at Irvine, who had also given her positive reviews, for mentorship because his last female mentee had become his romantic partner, not his business partner.

~~122.~~118.        Persisting still, Ms. Mazingo scheduled a meeting in early 2017 with Partner Cottriel, the Irvine office's Administrative Partner. At the meeting, Ms. Mazingo expressed her concerns about the lack of guidance and mentorship. Ms. Mazingo requested a mentor in Irvine— *of any gender*—to guide her towards partnership. Ms. Mazingo also brought up her concern that the Irvine office had no homegrown female partners, which Partner Cottriel dismissed, blaming "self-selection bias." Partner Cottriel sat on her request for a mentor for months and eventually assigned Ms. Mazingo a female partner mentor in San Diego. But this partner never mentored or even met with Ms. Mazingo. The Firm's message thus could not be clearer: To Jones Day, nothing signified Ms. Mazingo's value as a lawyer more than her gender.

~~123.~~119.        Lack of mentorship was not the only obstacle to success that the Firm imposed on Ms. Mazingo. Jones Day also regularly imposed heightened demands on female

associates. While male associates received breaks to recover during ebbs in the work, and recognition of the burdens of fatherhood, Partner Darmer worked Ms. Mazingo to exhaustion.

124.120.        This disparate treatment took a profound toll on Ms. Mazingo's mental and physical health, preventing her from obtaining medical care she needed, and causing her to develop several serious medical conditions. When Ms. Mazingo tried to broach this subject of being particularly overloaded, and the harm that it was causing to her physical health, Partner Darmer ridiculed her and refused to let up at all. Indeed, Ms. Mazingo overheard a conversation between Partner Darmer and Mr. Green in which the two mocked her and laughed at her for raising concerns about her physical well-being. Partner Darmer then said, "she should get back to us once she has children," a comment that illustrated why Ms. Mazingo was not given breaks: because she did not have their shared experience of fatherhood.

125.121.        Ms. Mazingo likewise raised her concerns about her diminishing physical health with Partner Cheryl O'Connor, who at the time was the only female partner in the Irvine office. Partner O'Connor smiled as Ms. Mazingo nervously confided that she was physically incapable of meeting the demands that had been placed on her. In response, Partner O'Connor offered Ms. Mazingo no advice, referred her to no further resources, and never followed up about Ms. Mazingo's concerns.

126.122.        To hammer home the message that female associates should not have a life outside the Firm, much less a family, then-Partner Landau's girlfriend, herself a former Jones Day Irvine attorney who had once worked under then-Partner Landau, expressly informed associates that, in order for women to succeed at Jones Day Irvine, they should not have children. She explained that female associates simply would not have the time or attention to care for them.

127.123.        Although Ms. Mazingo was not a parent, she did have significant caregiver

responsibilities for a family member. And, as a result of the Firm's outspoken hostility towards female caregivers (in contrast to Partner Darmer's respect for fathers), she feared revealing this information to the Firm for years. Partner Darmer's all-consuming demands eventually forced Ms. Mazingo to complain to Administrative Partner Cottriel in early 2017. Partner Cottriel, however, did nothing.

128.124.    In October 2017, Partner Darmer's hostile and verbally abusive management of Ms. Mazingo came to a head. During a particularly busy week, Ms. Mazingo was traveling both to Arizona to take a deposition for one of the Firm's biggest clients and also to another distant location to conduct custodian interviews at a client site. On short notice, Partner Darmer tasked Ms. Mazingo with preparing a set of internal talking points for a call he was to conduct.

129.125.    At the time, Ms. Mazingo was billing more than 230 hours a month and traveling for work all week, but she nonetheless completed the assignment on time. Disregarding her overbooked schedule, Associate Green then harshly informed Ms. Mazingo that her work no longer conformed to Partner Darmer's expectations, because the talking points contained typos.

130.126.    Because of the sexist Jones Day environment, Ms. Mazingo sought psychiatric treatment, and her doctor instructed her to take medical leave immediately. She did so by arranging to be out for one weekend with the Irvine office's manager. After her return, however, Partner Darmer attacked Ms. Mazingo for how she had communicated her medical leave. Berating her in front of her colleagues, he caused her to suffer a panic attack.

131.127.    Ms. Mazingo told Administrative Partner Cottriel that Partner Darmer's abuse was taking a heavy toll on her health, but Administrative Partner Cottriel again dismissed her concerns and failed to act. Partner Darmer thereafter sent a follow-up email in all-caps to

reprimand Ms. Mazingo further about how she had communicated her medical leave. Partner Darmer then stopped speaking to Ms. Mazingo altogether, effectively ending her career at Jones Day.

132.128.      Completely cut off from the principal partner with whom she had worked and deprived of any mentoring support to advance to partnership, Ms. Mazingo was forced to leave the Firm. Before she did, she approached several Firm partners to voice her concerns about the gender discrimination and lack of opportunities for females' advancement at the Firm. She suggested various measures to help remedy the Firm's problems, including assigning formal partner and senior associate mentors to each junior associate, irrespective of gender. She also discussed how one first-year female associate in particular was only being assigned paralegal and secretarial-type work, while a first-year male associate sitting just a few doors down was receiving extensive substantive work.

133.129.      Ms. Mazingo left Jones Day in April 2018. On her last day, she sent a farewell letter to her colleagues, which she concluded with some "parting words of encouragement": "it is time for a woman to define what a successful path to partnership looks like for a female associate at Jones Day Irvine, whether or not that path replicates that of our esteemed predecessors. I look forward to celebrating each of your career successes with you." Upon reading this, Partner Edward Chang stormed into Ms. Mazingo's office and stood over her until she left for good.

134.130.      Ms. Mazingo suffered greatly as a result of the gender discrimination that she endured at Jones Day. The Firm's discriminatory treatment of Ms. Mazingo triggered her fibromyalgia, a chronic pain condition that significantly affects one's quality of life. In Ms. Mazingo's case, her doctors agreed that the harm inflicted by the Firm was the cause of her relapse.

~~135.~~131.        After leaving the Firm, Ms. Mazingo was hospitalized for three days, and her physicians instructed her to take a two-month medical leave to recover.

C.    **MEREDITH WILLIAMS**

   i.    ***Meredith Williams Was a Rising Talent Whom Jones Day Underpaid and Pushed Out***

~~136.~~132.        Meredith Williams was an associate in Jones Day's Irvine office who was encouraged at the behest of Jones Day's male management to turn down a competing offer in order to stay with the Firm, only to receive minimal raises thereafter. Blocked from advancement at Jones Day, Ms. Williams was ultimately forced out of the Firm.

~~137.~~133.        Ms. Williams joined Jones Day as a summer associate in 2012 after being vigorously recruited by the Firm. She began as a full-time associate in October 2013.

~~138.~~134.        In 2015, Ms. Williams received an offer to join a competing large firm that would have provided her valuable intellectual property ("IP") law experience and paid her more (in above-market base salary and market bonuses). She approached Jones Day about the competing offer, and the Firm agreed to facilitate more IP work for her and indicated that her compensation would improve. In reliance on that representation, Ms. Williams declined the competing offer and remained with Jones Day.

~~139.~~135.        When Ms. Williams made her decision to remain at Jones Day, however, the Firm's tone changed. She was told that she should not ask for an increase in compensation because it would draw the wrong sort of attention from Managing Partner Brogan. Ms. Williams's compensation thus was not increased to meet the 2015 offer she had declined, even though she stayed with Jones Day and received outstanding reviews until 2017. Indeed, in her last year with the Firm, Ms. Williams received a raise of just $10,000, despite billing over 2,100 hours. Ms. Williams also did not earn as much as her male comparators at Jones Day who, upon information

and belief, earned market salaries.

140.136.    Ultimately, Ms. Williams was forced to leave the Firm in 2017, when she received an unfairly negative review because another associate had failed to complete an assignment.

> ### ii.    Jones Day's Toxic Culture Relegates Female Attorneys to Second-Class Status

141.137.    During her time at Jones Day, Ms. Williams was subjected to sexist comments and marginalization within the Firm's culture. Firm social events revolved around excessive drinking. Female attorneys were pressured to participate, lest they lose crucial opportunities or be pegged by male attorneys as "stuck up," "too intense," or "no fun." For example, while traveling to a Firm-sponsored wine-tasting event by limousine, male Jones Day attorneys and male clients encouraged the assembled to consume alcohol and began conducting a "game" of "Fuck, Marry, Kill." This "game," popularized by Howard Stern, asks "players" to distribute three named persons between the aforementioned buckets. The male Jones Day attorneys targeted female associates to play along, asking them to select among the male attorneys at Jones Day whom they would wish to "kill," "marry" or "fuck."

142.138.    As Ms. Williams would learn, this sexist, sexualized banter was one manifestation of the culture at Jones Day, in which male brotherhood is affirmed by comments and conduct that derogate women. In addition to lacking meaningful outlets for complaints in this regard, young female associates struggled in this environment to obtain support or advice as to how to succeed.

143.139.    One former Jones Day attorney, at the time in-house counsel at a Jones Day client and girlfriend to then-Jones Day partner Eric Landau, gave a talk to Ms. Williams and a group of other young female associates indicating that, in order to succeed at the Firm, women

should not have children.

144.140.    Partner Mark Finkelstein drove home the same point to Ms. Williams at her exit interview. At that interview, Ms. Williams expressed to Partner Finkelstein how discouraged she was by the lack of partnership pathways for women at the Firm, noting that the Irvine office lacked any internally-promoted female partners. Partner Finkelstein acknowledged the Firm's lack of female partners but blamed the Firm's own female recruits for the deficit, stating that they all "choose to have families."

### iii.    *Jones Day Discriminates Against Meredith Williams Based on Her Gender*

145.141.    After years of strong reviews, and yet another year of impressive performance, Ms. Williams received her first negative annual review in 2017. Ms. Williams had excelled at motion practice throughout 2016, billing 2,342 hours including significant pro bono work, while juggling community engagement representing the Firm for a total of 2,568 hours. Rather than acknowledging her positive performance, however, Jones Day instead fixated on an incident in which another associate had dropped the ball on a motion that Ms. Williams had turned over to that associate for completion.

146.142.    A subsequent review of her full personnel file, which she was able to obtain under California law, confirmed for Ms. Williams that her evaluations that year had been, once again, generally positive across the board, with the notable exception of the partner who blamed her for the error of her colleague.

147.143.    That exception, however, became the rule by means of the so-called "consensus statement," through which the actual "consensus" identifiable in the underlying reviews was displaced by a singularly negative perspective.

148.144.    Instead of recognizing her impressive record of responsiveness to partner

demands, Ms. Williams's annual review accused her of being "overcommitted," saying in essence that she had erred by accepting too much work from too many partners.

149.145.     Paradoxically, Ms. Williams's female colleague, Jaclyn Stahl, received a negative review that same year for exactly the *opposite* reason: Ms. Stahl was faulted for having avoided overcommitment, having asked one partner to communicate her unavailability for a particular assignment to another partner.

150.146.     Concerned about what her unfairly negative review portended for her future at Jones Day, Ms. Williams spoke with Irvine Partner-in-Charge Richard Grabowski later in the summer about her prospects for advancement at Jones Day. Partner Grabowski told Ms. Williams that a prerequisite for partnership at Jones Day was that she have *absolutely no* negative reviews. He told her that her pro bono and other contributions to the Firm were simply "icing on a bad cake."

151.147.     Conversations with female attorneys who had left Jones Day prior to Ms. Williams confirmed the lack of prospects for equal advancement and ultimately partnership for women. Indeed, at least one former associate indicated that she wished she had left Jones Day earlier. That associate said she spent years receiving under-market compensation and losing marketability while pursuing partnership, only to realize that becoming a partner at Jones Day was neither likely nor worth pursuing. She noted that even one apparently successful female partner at the Firm whom they both knew worked constantly and was not paid commensurately for her efforts.

152.148.     With the writing on the wall that she had no prospect for partnership, Ms. Williams felt she had no choice but to leave Jones Day a few months later, in the fall of 2017. Her new employer, a competing law firm, has consistently recognized Ms. Williams's excellent work

with appropriate compensation and advancement.

**D.    SAIRA DRAPER**

~~153.~~149.        Saira Draper joined Jones Day's Atlanta office in 2011. She stayed with the Firm until she was terminated in 2018, joining the ranks of multiple other senior associates in Atlanta who had been discharged, pushed out or demoted after becoming mothers.

~~154.~~150.        Prior to the birth of her first child, Ms. Draper received opportunities and earned positive reviews. But when Ms. Draper returned from her first parental leave in July 2015, her opportunities for advancement dwindled, and she was presumed to be uncommitted to her work because she had started a family.

~~155.~~151.        When Ms. Draper became pregnant with her second child in 2017, Jones Day promptly gave her a negative review and a long list of unachievable benchmarks that she would have to meet in order to get back on partnership track. Ms. Draper affirmed her commitment to the Firm and worked hard to meet these demands over the ensuing months. Despite her efforts, Jones Day made the decision to push her out while she was on parental leave, and ultimately terminated her employment.

> ***i.      Ms. Draper Was an Accomplished and Successful Associate Who Actively Promoted the "Jones Day Way"***

~~156.~~152.        Ms. Draper joined Jones Day immediately after law school. Before she had children, partners rewarded her dedication and high performance with steady, engaging work, and she earned excellent reviews. Nonetheless, Ms. Draper, upon information and belief, was paid less than what certain male associates both in her office and across the Firm earned for doing comparable work.

~~157.~~153.        Ms. Draper's first major assignment involved a complex litigation matter for one of the Firm's largest clients. Because of her foreign language abilities and familiarity with

the voluminous facts of the case, Ms. Draper took to managing teams of attorneys as a very junior associate.

158.154.    In her office, Ms. Draper was in high demand. She worked directly for two practice group leaders as either the sole or lead associate on several of their matters. Ms. Draper began developing an expertise within the Firm's internal investigations sub-practice, a field for which she was told by partners she had a natural aptitude. Clients also commended Ms. Draper's hard work and dedication. The partners with whom she worked praised Ms. Draper for her work and spoke with her about her future potential. The partners continued to rely on Ms. Draper's work throughout her time at the Firm, even trying to staff her as lead associate on an investigation after they knew Ms. Draper had been asked to leave the Firm.

159.155.    When Ms. Draper was a third-year associate, then head-of-litigation for her office, Partner Richard Deane, chose her to accompany him to a multi-week federal jury trial for a high-profile case in Washington, DC. This was a coveted opportunity, because trial experience was difficult to come by at a firm the size of Jones Day. Even though several associates in her office had worked on the case, some even senior to Ms. Draper, she was the only associate from the Atlanta office selected to go to trial. She was also one of just three associates on the trial team.

160.156.    At trial, Ms. Draper was Partner Deane's right-hand person. Ms. Draper received stand up opportunities at the trial, and Partner Deane praised her trial lawyer "chops." The news of Ms. Draper's performance made its way back to Atlanta, and Partner Lizanne Thomas, then Partner-in-Charge of the Atlanta office, told Ms. Draper that she liked what she heard about her trial work in DC.

161.157.    Upon Ms. Draper's return from trial, Partner Thomas approached her and a partner in the Atlanta office and asked them to go to the US-Mexico border to assist in the Firm's

pro bono immigration work. This work evolved into the Firm's preeminent pro bono project known as the "Laredo Project." Ms. Draper complied with Partner Thomas's request and was one of the first attorneys at the Firm to be involved with the project. Partner Thomas told Ms. Draper she would be a key member of the Laredo team.

162.158.　　　Ms. Draper's early contributions to the team were recognized by the partner she worked with, who told Atlanta Office leadership and the Firm's pro bono partner he was grateful for Ms. Draper's work. Several months later, Ms. Draper was asked by the Atlanta Office's pro bono partner to take on a central coordinating role on the project. By all objective measures, Ms. Draper understood she was answering the Firm's call by working on the Laredo Project.

163.159.　　　Ms. Draper also contributed to the Firm's internal initiatives by serving on the office's diversity and hiring committees, mentoring summer associates, and representing the office at Georgetown University Law Center's on campus interview program every year she was at the Firm until 2018, when she was passed over without explanation.

## ii.　*Work Dries Up After Ms. Draper's First Maternity Leave*

164.160.　　　Ms. Draper learned she was pregnant with her first child while away at the Washington, DC trial, during which she billed in excess of 17 hours per day. Ms. Draper continued working throughout her pregnancy and traveled for work well into her third trimester. She took leave in the first half of 2015 and returned in July 2015 to find that the office was slow and there was very little litigation work available. She conferred with partners in her office, but was informed matters were fully staffed; she was told she would be informed when a new opportunity arose.

165.161.　　　Ms. Draper repeatedly raised concerns with office administration about not being able to find enough work after coming back from leave. Each time, office administrators assured Ms. Draper that the issue was not specific to her and that there were other litigation

associates similarly looking for work. Conspicuously, Ms. Draper had no mentor to whom she could turn for assistance in obtaining work.

166.162.　　　Partners asked Ms. Draper to assist them with non-billable work, however, including preparing CLE presentations, preparing a PowerPoint presentation to accompany a partner's speech, drafting a diversity proposal for a highly regarded professional association, and calling references for candidates for admission to the professional association. Ms. Draper did all that was asked of her.

167.163.　　　While searching for more billable work, Ms. Draper also utilized her time to seek new Firm clients and contribute to the office's internal initiatives. Ms. Draper brought in an energy consulting company as a new client to the Firm, an accomplishment that was unusual for someone at the associate level.

168.164.　　　She also served a leadership role on her office's diversity committee, which was attempting a refresh after years of ineffectiveness. With the committee's support, Ms. Draper expended significant effort trying to retain an expert who could speak to the office on implicit bias. A promising expert candidate was located and a proposal was made, but the Firm ultimately declined to permit the training to proceed. The Firm also declined to move forward with a formal mentorship program that the Diversity Committee proposed.

169.165.　　　Ms. Draper continued her work with the Laredo Project, and at the encouragement of office management, became the project's point person for Atlanta. Ms. Draper prepared training materials, staffed her office's cases, oversaw multiple case teams simultaneously, liaised with the outside non-profit groups that referred cases to the Firm, and represented her office in Firm intra-office meetings. Recognizing the effort this coordination and oversight required, office management told Ms. Draper she could devote a significant portion of

her time to the administration of the project in Atlanta.

170.166.        Ms. Draper was asked to speak about the office's involvement in the Laredo Project to summer associate classes and law school students at recruiting events. During these pitches, she touted what she had been told by many partners at the Firm: that Jones Day valued pro bono work so much that they treated it the same as billable client work. Some first-year associates told Ms. Draper they were warned by the partner who coordinated the first-year lawyer program not to do pro bono because the hours would not be counted. Ms. Draper informed the office's pro bono partner, who responded that the partner coordinating the first-year lawyer program was incorrect, and that he would speak to him about what he was telling the first-year associates.

### iii.    As a New Mother, Ms. Draper Is Pushed into a High Travel Litigation Group

171.167.        Several months after Ms. Draper returned from maternity leave, her office's new head of litigation, Partner Mike McConnell, asked Ms. Draper to leave the general litigation and investigations practice she had been part of since joining the Firm, and to permanently and exclusively join the Firm's Tobacco Litigation Group. The Tobacco Litigation Group required more prolonged recurring travel than any other practice group in the office. Unbeknownst to Ms. Draper at the time, Partner McConnell asked several other associates who were still on parental leave or had just returned from parental leave to join the group at the same time he asked Ms. Draper.

172.168.        Ms. Draper regularly traveled for work, both before having children and after having children. That travel typically lasted days at a time. The travel for trials in the Tobacco Litigation Group, in comparison, required three to five weeks away from home, generally including weekends. Attorneys outside the group joked they didn't recognize their colleagues in

the Tobacco Litigation Group, some of whom had been at the Firm for years, because they were hardly ever in the office.

173.169.    Typically, associates who joined the Tobacco Litigation Group did so by choice, with knowledge of the group's strenuous travel, and organized their lives to make it possible. Many of the associates on the team were unmarried, and none of the associates in Ms. Draper's office who traveled for trial had children at the time she was asked to join the group. The group had only two female partners, one of whom, Partner Stephanie Parker, headed the group.

174.170.    Partner McConnell's request was plainly punitive, because Jones Day associates are permitted to choose their practice groups. Indeed, practice group choice is a key recruitment tool for the Firm. Ms. Draper wanted to further develop her skills in the investigations and white-collar practice, but was told that if she joined the Tobacco Litigation Group, she had to do it to the exclusion of all other work.

175.171.    Ms. Draper wanted to better understand what the Tobacco Litigation Group's expectations would be of her, particularly as to long term travel. She sought to ask questions of Partner Parker to inform her decision, but Partner McConnell insisted that all inquiries run through him. Ms. Draper also sought to discuss the decision to change practice groups with partners she trusted and associates in the Tobacco Litigation Group, but Partner McConnell told Ms. Draper to keep confidential that he had asked her to join the group. He also told her to give him her response within 24 hours.

176.172.    The next day, unable to come to a decision with so little information, Ms. Draper asked Partner McConnell if she could discuss the issue with the only female partner in the Tobacco Litigation Group who had children. She also asked to speak with an associate of her class year who had been in the Tobacco Litigation Group since she started at the Firm. Partner

McConnell told Ms. Draper he needed to check with Partner Parker, and later told Ms. Draper that she could confer with the partner, but not with the associate.

177.173.        The Firm's responses to her search for information left Ms. Draper with the impression that her future with the Firm was contingent on her joining the Tobacco Litigation Group. Committed to her career and to the Firm, Ms. Draper accepted the assignment and joined the group.

### iv.   After saying "Yes" to Tobacco, Ms. Draper Can't Get Staffed

178.174.        Once Ms. Draper joined the group, it was not long before she learned from others about their experiences. Colleagues in the group told Ms. Draper that Partner Parker was known for showing preferential treatment to men and hostility to any request for accommodation by women who were pregnant or nursing. In one instance, Ms. Draper was told, Partner Parker had instructed another partner to give a poor review of an associate because the associate had requested a reprieve from travel while she was nursing.

179.175.        While Ms. Draper had felt compelled to join the Tobacco Litigation Group, she had also been encouraged by the Firm's promises that she would gain significant litigation experience by participating in trials and taking depositions. She accepted the Firm's assurance that if she answered the call of duty, there was a viable path forward for her at Jones Day.

180.176.        She was wrong. Once in the Tobacco Litigation Group, Ms. Draper found herself frozen out of the promised opportunities to gain substantive trial or deposition experience. While waiting to go to trial, Ms. Draper drafted motions, case summaries, and deposition outlines for others, and otherwise followed the "we do windows" mentality the Firm claims to value. She took assignments from whomever asked for her help, including partners and associates, both senior and junior. She sought opportunities to conduct depositions from the group's work coordinator on

multiple occasions, but he either ignored her requests or stated that he had to check with Partner Parker first.

181.177.     Several months after joining the Tobacco Litigation Group, Ms. Draper suffered a miscarriage. Ms. Draper feared how Partner Parker and the other partners would react to news that she had been pregnant again. Accordingly, she hid her second pregnancy and her miscarriage from the Firm and took no time to recover physically after surgery or emotionally from the loss. She hoped that by soldiering on, she would further her career and receive the litigation experience that Partner McConnell and Partner Parker had promised her when she agreed to join the group.

182.178.     When Ms. Draper finally did get the opportunity to go to trial, she was a valuable and committed contributor. She took the lead in writing a motion that forced the plaintiff's economic damages expert to concede that her report contained inflated valuations. The Cleveland partner leading the trial, whom Ms. Draper had never worked with before, commended Ms. Draper for her work and told her that he would love to work with her again.

183.179.     Ms. Draper promptly volunteered to assist the partner on his next trial, and he told her he would staff her. Days later, though, he told her she could not go to trial with him because "the powers that be" wanted new members on the team. However, a male associate from the earlier trial was staffed on the new trial team for this partner. Upon information and belief, Partner Parker overturned the partner's request to staff Ms. Draper on his team.

> ### v.     *Ms. Draper Asks Partner Parker Questions and Is Dismissed from the Tobacco Litigation Group*

184.180.     Mystified by the negative response to her efforts at advancement, Ms. Draper reached out to Partner Parker directly and requested a meeting. She explained to Partner Parker that she wanted to discuss how to get more substantive experiences in the Tobacco

Litigation Group. Partner Parker agreed to meet, and asked Partner McConnell to attend the meeting as well, even though Partner McConnell was not part of the Tobacco Litigation Group.

185.181.     The meeting would be Ms. Draper's first one-on-one, in person interaction with Partner Parker, who traveled regularly and often communicated by way of an intermediary.

186.182.     From the start of the meeting, Partner Parker was openly hostile toward Ms. Draper, blaming her for a lack of substantive experience. She also blamed Ms. Draper for trying to place herself on a trial team. When Ms. Draper said she had been trying to proactively seek opportunities, Partner Parker shot back that Ms. Draper should have known all staffing needed to go through her. Partner Parker told Ms. Draper the Tobacco Litigation Group was not a good fit for her and that she was being dismissed from the group.

187.183.     Despite Partner Parker's confrontational tone, Ms. Draper pressed on in an effort to understand the basis for her dismissal from the group. Ms. Draper asked Partner Parker why she hadn't been staffed on more trials. Partner Parker told Ms. Draper that Tobacco Litigation Group partners had been reluctant to staff her on their trials because of her higher billing rate and lack of tobacco-specific trial experience. Partner Parker explained that each trial was budgeted for one senior associate and two junior associates, and that partners did not want to use their senior associate spot to train Ms. Draper. Ms. Draper responded that this problem was obviously foreseeable at the time she was asked to join the group, and that the Firm had set her up to fail. Partner Parker replied, "It is what it is."

188.184.     Upon information and belief, Ms. Draper's questions to Partner Parker about her career provoked the Firm to retaliate against her going forward, redoubling its efforts to push her out and ultimately terminating her.

### vi.   *Ms. Draper Becomes Pregnant Again and Is Terminated*

189.185.        At the time Ms. Draper was dismissed from the Tobacco Litigation Group, she was in the early stages of pregnancy with her second child. She received her first negative annual review a few months later, in the spring of 2017. Partner McConnell, the same partner who had asked Ms. Draper to join the Tobacco Litigation Group, now informed her that the Firm had identified numerous issues with her performance, that she had gone "off the partnership track, but with the potential to get back on," and that she would need to "right the ship" to stay at the Firm. He gave her an impossible list of goals that she needed to accomplish to get back on track. Ms. Draper remained determined, telling Partner McConnell that she would do everything she could to meet the Firm's demands.

190.186.        Ms. Draper made every effort to meet the Firm's demands. She worked throughout her entire pregnancy, including traveling well into her third trimester. She worked on a variety of matters with successful results, worked with partners in different offices, and continued her pro bono work and civic engagement. She was one of two associates the Firm nominated to participate in Atlanta's premier leadership development program for young professionals. When she was accepted into the program a year later, the Firm broadcast the accomplishment internally and on all of its social media outlets.

191.187.        Ms. Draper took her second maternity leave in October 2017. Shortly after her return from leave, Ms. Draper was told during her annual evaluation that her career at Jones Day was over. She was terminated and told to find a new job within six months.

192.188.        During her May 2018 evaluation, the Firm criticized Ms. Draper for lacking the very trial and deposition experience she had actively sought and that the Firm had consistently denied her.

193.189.        Ms. Draper's evaluation also accused her of being "vocal about

boundaries," even though no one at the Firm had ever expressed such a concern to Ms. Draper. This disparaging comment was particularly upsetting to Ms. Draper, who, like many female associates at Jones Day, had gone out of her way to limit speaking about her family at work, perceiving correctly that having a family or "boundaries" would likely be fatal to a female associate's career at the Firm.

194.190.      To her great surprise, Ms. Draper subsequently discovered that the partner who had falsely accused her of being "vocal about boundaries" was Jamila Hall, a female partner who held herself out to be a champion for associates, particularly female associates of color. Ms. Draper had enthusiastically "answered the bell" when Partner Hall had asked her to work on a matter, and Partner Hall's comments about Ms. Draper's work on that matter had been uniformly positive.

195.191.      In a final confirmation that female associates and associates with children are damned even if they do follow the Firm's guidance, the Firm completely ignored Ms. Draper's pro bono work in assessing her performance. Jones Day had actively encouraged Ms. Draper to spend time on its showcase pro bono initiative, which had generated positive press for the Firm. Indeed, the Firm continues to tout Ms. Draper's accomplishments on this project to this day.

196.192.      Ms. Draper had assumed that this significant responsibility was an honor and a distinguished contribution to the Firm's success. Indeed, the Firm even directed her to emphasize Jones Day's commitment to the project to summer associates and recruits, as evidence that the Firm truly valued pro bono work. Ms. Draper had vouched to them, as the Firm had represented to her, that this work was valued on par with client-billable work.

197.193.      When the time came for her evaluation, however, the Firm instead penalized Ms. Draper for her pro bono work by denying her credit for the time spent. The Firm encouraged

Ms. Draper and her female colleagues to shoulder non-billable work that was critical to the Firm, its image, and its success, only to ignore that work when it came time for advancement to partnership.

198.194.     After the evaluation at which she was given notice that she would be terminated, Ms. Draper went to the office's Administrative Partner and asked why no one from the office had pushed back on Ms. Draper's consensus statement. The Administrative Partner told Ms. Draper it was not worth it, explaining that the previous year, she and the Partner-in-Charge had spent six months trying to correct an untrue statement in another female associate's consensus statement, to no avail.

199.195.     Shortly before Ms. Draper left the Firm, her office launched a women's affinity group. Ms. Draper learned that the group had been proposed a year earlier, but that the proposal had languished, unapproved. The group was greenlighted shortly after a former Jones Day Partner sued the Firm for gender discrimination.

200.196.     Ms. Draper also learned around this time that multiple other senior female associates in Atlanta had been demoted, taken off partnership track, pushed out or terminated by the Firm after having children.

201.197.     As a result of the Firm's discrimination and retaliation, Ms. Draper left "Big Law." In her current position she earns less than half of her Jones Day salary.

**E.    JACLYN STAHL**

202.198.     Jaclyn Stahl was a stand-out associate in the Irvine, California Office of Jones Day until the Firm's campaign of harassment and gender discrimination forced her out in 2018.

203.199.     Ms. Stahl was a summer associate at Jones Day in 2012. She joined the

Firm's Irvine Office as an associate in 2014 after completing a clerkship with the United States Court of Appeals for the Ninth Circuit.

204.200.      Though Ms. Stahl was hired as a second-year associate in light of her clerkship experience, partners in the Irvine office never treated her with the respect accorded to her male counterparts.

205.201.      Jones Day also never paid her the so-called market scale that, upon information and belief, it paid to male associates.

206.202.      From the start of her time at Jones Day, Ms. Stahl was subjected to openly gendered criticism by the male partner, Robert Naeve, with whom she primarily worked. For example, when Ms. Stahl asked Partner Naeve for feedback about her work, he told her that she had a "very stern face" that was "off-putting." To justify his comment regarding Ms. Stahl's appearance, he noted "people tell me that I need to smile more, too."

207.203.      Rather than acknowledging Ms. Stahl's impressive work, Partner Naeve found every opportunity to criticize her unreasonably. For example, in February 2017, Ms. Stahl's loved one experienced a significant medical issue. Ms. Stahl had been billing at a very high rate for several of the preceding months, and she continued to do so during this difficult time, even responding to requests from her loved one's hospital bed. However, rather than delivering praise for her dedication, Partner Naeve berated Ms. Stahl for minor non-substantive errors that could easily have been fixed by a secretary. Ms. Stahl explained that she was doing her best, but Partner Naeve insisted that her "best wasn't fucking good enough."

208.204.      Weeks later, while Ms. Stahl's loved one was facing surgery for his condition, Partner Naeve again came to berate her for not having yet completed a set of declarations. Ms. Stahl explained that she was speaking with a key witness the following day—a

Saturday—because the witness had been previously unavailable. Rather than commending Ms. Stahl for her hard work, Partner Naeve told her, "you better figure it out, or else," put his hand in the shape of a gun, and mimicked shooting himself in the head.

209.205.     Partner Naeve's behavior towards Ms. Stahl stood in sharp contrast to the docile and subservient behavior that he expected of women. On one occasion, Partner Naeve criticized Ms. Stahl for being "too aggressive" during her attempts to settle a small matter, instructing her to "calm down." This feedback was particularly confounding because Partner Naeve had not been on the phone call or in the room during negotiations.

210.206.     The lone female partner in the Irvine office, Partner Cheryl O'Connor, was among the worst offenders in her unequal treatment of male and female associates. In one instance, Ms. Stahl missed a meeting called by Partner O'Connor on short notice because she had been on a client call for one of Partner Naeve's cases. At the conclusion of Partner O'Connor's meeting, she stormed into Ms. Stahl's office, slamming the door and screaming. Partner O'Connor then opened the office door, ensuring that other employees would hear her public humiliation of Ms. Stahl. Partner O'Connor's behavior was so hostile that Ms. Stahl feared for her physical safety.

211.207.     Ms. Stahl was not the only female associate to receive such treatment from Partner O'Connor, whom she never observed berating male associates in this fashion. Upon information and belief, Firm management did nothing about Partner O'Connor's mistreatment of female associates. Indeed, when a legal assistant complained after overhearing Partner O'Connor berate another female associate, Administrative Partner Darren Cottriel took no action. That female associate, who was often forced to do secretarial work, ultimately left Jones Day.

212.208.     The Firm was not only aware of the bullying faced by female associates, it condoned such behavior.

213.209.       Ms. Stahl's 2016 annual review, conducted in June 2017, reflected the Firm's discriminatory view of her. Although feedback on Ms. Stahl's work was positive, her office's Partner-in-Charge Richard Grabowski and Administrative Partner Cottriel criticized her for looking insufficiently enthusiastic. The Firm delivered this feedback to Ms. Stahl despite the fact that clients and partners actively sought her out for work, and that Ms. Stahl regularly met every deadline imposed, often completing work ahead of schedule.

214.210.       The Firm's feedback during the June 2017 review was a reprise of Partner Naeve's: that to be well-liked as a female associate, Ms. Stahl was expected to smile more.

215.211.       During her 2017 review, Ms. Stahl was also blamed for having appropriately requested that Partner Naeve intervene to communicate her unavailability to Partner O'Connor to work on a particular project. Though Partner O'Connor never submitted a written review, Ms. Stahl was told during her in-person review that she was expected to "stretch" herself.

216.212.       Paradoxically, however, a peer female associate, Meredith Williams, received a negative review that same year for exactly the opposite reason: having made it a point to accept every assignment offered to her, Ms. Williams was faulted for being overcommitted and not communicating this to her supervising partners.

217.213.       The Firm also frequently assigned Ms. Stahl work beneath her abilities and acumen, in contrast to the work assigned to male associates. As a third- and fourth-year associate with a clerkship, Ms. Stahl was assigned to work on document reviews, while male associates were given more substantive assignments more likely to pave the path to partnership. The Firm then reprimanded Ms. Stahl when she sought more substantial assignments to further her experience and make herself more valuable to the Firm.

218.214.       Ms. Stahl was soon told that she needed to take depositions, so she

positioned herself to gain that experience on Partner Naeve's matters. She sought to be the sole point-of-contact for all of the witnesses, and she contacted partners in other offices also in search of this experience. With the approval of Partner Naeve, Ms. Stahl prioritized such work, because it would further her skillset.

219.215.      Nonetheless, for these efforts, Partners O'Connor, Grabowski, and Cottriel scolded Ms. Stahl. In stark contrast, a male associate who was a year junior to Ms. Stahl was permitted to decline work from Partner O'Connor, giving him time to take and defend several depositions for a large case.

220.216.      The conflicting advice that Ms. Stahl received about seeking out advancement opportunities was indicative of the no-win situation in which she found herself. Partner Darmer commended Ms. Stahl on taking the opportunity to brief and argue a pro bono case before the Ninth Circuit Court of Appeals. He indicated that Ms. Stahl must be a good writer if Partner Naeve was willing to work with her on the case. He also told Ms. Stahl that her office needed a good writer and encouraged her to further her talents in that area.

221.217.      When Ms. Stahl did so, however, by taking on primary drafting responsibility for at least five federal circuit briefs and several key summary judgment briefs, she was punished. Ms. Stahl was told that she needed to stop acting like certain work was "beneath her," and that she must accept, and be grateful for, the work she was given.

222.218.      This command apparently included the non-billable work, such as planning festivities for summer associates, to which female associates, including Ms. Stahl, were often directed to devote substantial time. One year, for example, Partner Finkelstein—the hiring partner for the office—asked Ms. Stahl to be social chair of the summer associate program. When she declined that role and asked for a different role, Partner Finkelstein told Ms. Stahl that he thought

she would be good at party planning. When a male associate was subsequently assigned the role, Partner Finkelstein assigned a female associate to assist him.

223.219.    Similarly, female associates were put in charge of events such as staff appreciation parties, while male associates were given the opportunity to plan an associate business development event.

224.220.    In the summer of 2016, Ms. Stahl was put on a trial team with a Partner and Of Counsel from the Los Angeles office. She was told by Partner Grabowski that she had been chosen for the team because they needed a woman. The other side had two women on their team, and the client and the Firm thought it would look bad to the jury if their side did not have a female attorney. The message was clear: as a woman, Ms. Stahl was window dressing.

225.221.    Ms. Stahl was also subjected to sexist comments and sexual overtures by clients with the approval and acquiescence of Firm management. For example, in 2015, Ms. Stahl was observing Partner Grabowski take depositions for a large trial. During a lunch break, with Partners Grabowski and Finkelstein looking on, the Firm's client, Epicor Software Corporation General Counsel John Ireland, made repeated inappropriate comments to Ms. Stahl. Although Ms. Stahl attempted to ignore the comments and return to her office to work, Mr. Ireland insisted that Ms. Stahl join him, Partner Grabowski, and Partner Finkelstein for dinner, claiming that it would be "more fun." Partner Grabowski never intervened, but instead insisted that Ms. Stahl attend the dinner.

226.222.    Partner Grabowski was not the only one who refused to condemn openly sexist conduct toward female attorneys. Within the Firm, sexist or sexualized comments were often downplayed, if not condoned. For example, after making inappropriate sexualized comments, male attorneys would say jokingly that their comments should be "added to the file," invoking an

imaginary file of sexual harassment complaints that carried no weight and was openly mocked.

227.223.    The Firm's indifference towards openly gendered discriminatory comments was equaled by its lack of interest in the mentoring of women associates. Indeed, partners openly mocked mentorship lunches organized by female attorneys in the office. For example, when Partner Finkelstein saw Ms. Stahl attending such a lunch with other women in the office, he asked if they were "going to lunch to talk about women things like having kids."

228.224.    On another occasion, Partner Finkelstein ascribed the office's serious female attorney attrition problem to "women [who] have babies and stay at home." This dismissive view toward female lawyers who had children was characteristic: male attorneys referred to maternity leave as "six months' vacation" and told the female associates that they "have it so good."

229.225.    By contrast, male attorneys with children were given flexibility that was denied to female attorneys with children. For example, one male attorney regularly left the office at 5:00 PM to attend to his five children, even as an associate. His commitment to the Firm was never questioned; rather, he was mentored by Partner Naeve, and then made partner himself.

230.226.    Ms. Stahl did her best to soldier on and do as she was told. But the repeated verbal abuse, the lack of praise for even exceptional work, and the more favorable treatment received by male comparators drove Ms. Stahl to the breaking point. As a result of the discrimination she experienced at Jones Day, Ms. Stahl began suffering from serious health problems in 2016, which culminated in her doctors requiring her to take an extended medical leave in 2017.

231.227.    After observing the way other female attorneys were treated after they returned from leave, Ms. Stahl knew that there would be no future for her at Jones Day once she

returned from medical leave. She left in 2018, accepting a government position where she earns considerably less.

**F.**       *JANE DOE 4*

      *i.   Jane Doe 4 Was a Talented and Accomplished Associate Dedicated to Jones Day*

232.   As an associate in a non-California office of Jones Day, Jane Doe 4 met and exceeded the quantitative and qualitative measures by which an associate could be assessed, distinguishing herself as a leader and a team player as well as a relentless litigator. Her record of success put her squarely on track to make partner. Partners at the Firm acknowledged that her work was already at partner level and that she was well on her way to a long and successful career at the Firm.

1.   Accepted by her peers in the bar as a tireless and creative litigator, Jane Doe 4 consistently worked more than the Firm's billable requirement, successfully managing large and complex cases for partners in offices across the country. The Firm's clients consistently supported Jane Doe 4's partnership, even seeking her out specifically (in lieu of certain partners) to handle new matters.

2.   Jane Doe 4 regularly took on the toughest cases, where previous counsel was terminated and the case was quickly headed to trial, with little time to prepare. For example, she was directed to handle a jury trial for a pro bono matter which the partners told her was not winnable; yet she won a significant verdict for the client. In another matter, she represented a client with important ties to the Firm in a case that no other lawyer would handle because they said there was "zero" chance of any recovery. Jane Doe 4 secured a monetary settlement for the client well beyond expectations.

3.   In case after case, Jane Doe 4 led large litigation teams across multiple offices;

determined and implemented discovery strategy; coordinated discovery efforts with co-counsel and clients; handled discovery disputes and hearings; prepared key witnesses for depositions and trial; contributed to dispositive briefing efforts; defended witness depositions; determined case budget and staffing; identified and addressed issues before they arose; and managed trial preparations with little to no supervision. This was the same type of work that partners performed on other, similar cases. With her tireless efforts, Jane Doe 4's litigation teams typically won at trial or otherwise reached successful outcomes for key Firm clients.

4.     Jane Doe 4 was also the firm's "go to" attorney for all matters pending in a key district where she had clerked for a prominent judge. Having subsequently handled numerous cases in that jurisdiction, she possessed both procedural and substantive expertise and had a track record of litigation success. She also planned and presented at various CLEs on litigation issues, and organized a prominent conference featuring notable speakers from the bench, government, law firms, and major corporations.

5.     Despite her obvious value and dedication to Jones Day, Jane Doe 4 earned substantially less than her male peers (a gap of about $400,000 per year when compared to at least one junior associate at Jones Day who took a government position and whose compensation was therefore made public). And she never earned the market salaries that, upon information and belief, Jones Day paid to male associates performing the same or similar work. After being denied promotion to partnership, Jane Doe 4 was pushed out of the Firm.

6.     Initially, Jane Doe 4 was told by Partners P and S that she just needed "one more solid year" to prepare "a better package" for the partnership committee's consideration. Partner S assured Jane Doe 4 that he would work with her toward this end over the coming year on the case they were litigating together, a case for which he said he had specifically selected her based on her

reputation for exceptional work.

7.      Subsequently, Jane Doe 4 was told that her path to partnership was impeded by a previously undisclosed and vaguely defined "associate problem." Jane Doe 4 was unaware of any basis for this claim, as she had never received any complaints, unlike some of her colleagues who had reputations for making associates cry, being rude, and blaming associates for their own mistakes. One senior associate had written an email so belittling to junior associates that it was allegedly hanging in a senior managing partner's office. When Jane Doe 4 asked for details about this alleged issue, the administrative head of the trial group in her office, Partner P, could not provide any specific guidance, apart from indicating that the issue was not detailed in Jane Doe 4's written performance review.

8.      In fact, Partner P seemed baffled by this allegation. She herself had always given Jane Doe 4 high praise, told her she was on track to make partner, complimented her for already acting and handling matters like a partner, and claimed to trust and enjoy working with Jane Doe 4. Partner P sought to substantiate or otherwise understand Jane Doe 4's "problem" by asking a highly regarded male associate who worked closely with Jane Doe 4 what was at issue. His response was clear: Jane Doe 4 was considered one of the best litigators in the Firm, and the only real problem she had at Jones Day was her gender. The associate informed Partner P that if Jane Doe 4 were male, she would have no issues.

9.      When Jane Doe 4 sought clarification about this claim from those she worked for and with, no one could provide a basis or any insight. Indeed, Jane Doe 4 only received high praise from those for whom she worked, required little to no supervision or direction, and was sought after to handle matters throughout the Firm's offices worldwide. Her good reputation was unavailing, however, given the control one man—Managing Partner Brogan—maintained over all

partnership decisions at Jones Day. Indeed, at a senior associate event attended by Jane Doe 4, members of the partnership committee who participated in a panel discussion made clear that Managing Partner Brogan could strike anyone's name from a list of proposed partners without explanation.

10.     When Jane Doe 4 questioned the baseless criticism in her reviews, upon information and belief, she was subsequently attacked in a memorandum circulated among partners for lacking "integrity."

### ii.     *Jones Day's Hostile Work Environment*

11.     Early in Jane Doe 4's tenure at Jones Day, she was the victim of a graphic hyper-sexualized blog post written about her by a job applicant. When this post was brought to Jones Day's attention, the Firm punished Jane Doe 4, removing her from all recruiting activities even though she told Partner Q, then the Firm's recruiting partner, and Firm Administrator R that she was comfortable continuing those duties. When, in subsequent years, Jane Doe 4 requested to be a mentor and recruiter, she was denied these career-enhancing opportunities, which she understood were crucial to making partner.

12.     Sexist comments and the objectification of female associates were permitted practices at Jones Day. Senior attorneys regularly made sexist comments to and about Jane Doe 4, referring to her as "eye candy" to summer associates and asking whether she was "fun" or too "intense."

13.     Jane Doe 4 did not complain, however, because of a warning that she had received from the male partner assigned as her mentor, Partner T. In the single piece of advice he offered during her time at Jones Day, Partner T told Jane Doe 4 that if she were ever to bring sexual harassment to his attention, she should know that her report would not remain confidential. Jane

Doe 4 took this as a warning: if she raised issues relating to discrimination or harassment, her reputation at the Firm would suffer.

14.     Jane Doe 4 was also told by male colleagues that their wives would not like it if they knew that the male partners were working late with Jane Doe 4. Often, Jane Doe 4 was not even spoken to at Firm events where significant others were invited, except on those occasions where she was accompanied by a male significant other.

15.     Jane Doe 4 feared having children while an associate, well aware of the difficulties others had faced. A female associate in another office informed Jane Doe 4 that when she announced her pregnancy, Firm partners accused her of getting pregnant to avoid termination during a slowed economy.

16.     Jane Doe 4 regularly witnessed sexist comments made by Partner S, another male partner, as well as a senior male associate who was one of Partner S's favorites. These comments were often targeted at Partner P, who was mocked for her attempts to fit into the "boys' club" culture at Jones Day, as well as her appearance and her habit of working tirelessly and meticulously while male counterparts benefitted and did less work.

17.     Jane Doe 4 was also concerned about Partner S, a department head at the Firm, who was perceived as a crucial influence on Managing Partner Brogan with respect to partnership decisions, as Partner S seemed to prefer female partners and associates who acted more flirtatious than professional. One female junior partner interrupted a meeting simply so she could tell Partner S that he "was looking good" and that they "should get drinks," all the while touching his arm and giggling.

18.     Firm events both permitted and encouraged inappropriate workplace behavior, with emphasis on excessive drinking and opportunities for male partners to "mingle" with female

associates. For example, the office holiday party, which excluded spouses and significant others, typically started with pre-party festivities, namely male partners encouraging drinking games in empty offices, even setting up a beer-pong tournament with multiple tables that began around lunchtime and continued throughout the night. After dinner, the rooftop conference room was transformed into a dance club setting where older male partners stood in a circle and watched the young female associates dance, often leading to after-party drinking at local bars. The Firm even gave an award to the most memorable and drunken attendee, having circulated an odds sheet with descriptions of so-called "contenders." Such behavior did not inhibit an associate's elevation to partnership.

19.     Jones Day similarly encouraged and condoned inappropriate behavior at other Firm events. At one summer associate event, Jane Doe 4 was told, a female summer associate wearing a white dress was pushed into a swimming pool by a male summer associate. That male summer associate was applauded and embraced by the Firm's leadership.

20.     The boys' club camaraderie was on full display in the office cafeteria, where male partners sat at one lunch table together daily, often including male but not female associates. At a gender bias training, presented with a fact pattern where male partners often invited male associates to lunch, a senior male partner insisted that this was not an example of bias, he simply preferred to have lunch with friends and associates whom he liked. And this was indeed what happened in practice: Jane Doe 4 watched over the years as new male associates were taken out to lunch by male partners; female associates did not receive the same treatment.

21.     In another instance, several partners informed Jane Doe 4 that their office had had the opportunity to include a daycare during an office redesign. The Firm, however, concluded that a daycare would be a distraction to parents, and decided instead to install a second gym.

### iii. *Jones Day Discriminated Against Jane Doe 4 Based on Her Gender and Retaliated Against Her for Speaking Up*

22. Partner S benefitted from Jane Doe 4's excellent work, but, in her last two years at the Firm, criticized her for being "too polite" and inspiring loyalty from associates whom she mentored. Jane Doe 4 was even criticized for thanking or praising associates for doing a good job. She was informed that such behavior undermined her leadership and authority. Partner S ignored that Jane Doe 4 was a sought-after senior associate to work for because she mentored and trained junior associates and made sure to credit them for their contributions to case team efforts. These same associates then became highly sought-after case team members because they personally benefitted from Jane Doe 4's mentorship.

23. In one major litigation, Partner S demanded that Jane Doe 4 have information about every aspect of the case on demand, but later criticized her for functioning as a "chief of staff," just as he had asked her to do. In the same case, Partner S's favored male associate was credited with a major victory in the case that should have been attributed to Jane Doe 4. The male associate was invited to assist in writing articles about the case, marketed for future work, and given key partner and client exposure; meanwhile no mention was made of Jane Doe 4 or her work.

24. The first year Jane Doe 4 would have been considered for partner, she was told by Firm management that her male counterpart would be put up instead. He and Jane Doe 4 had attended the same law school; however, Jane Doe 4 had attended more prestigious undergraduate institutions than her male counterpart. She had also clerked for a judge before coming to Jones Day, whereas the male associate put up for partner in her stead had not.

25. The following year, Firm management again advanced Jane Doe 4's male counterpart for partner instead of her. When she inquired with Firm management, she was told that she needed to put together the best possible "package" for partnership. Partners in her office

continued to treat Jane Doe 4 like a serious candidate for partnership, informally disclosing partner finance-related information to her (a standard phenomenon known as "reading in").

26.     Following the advice of one partner, Jane Doe 4 went to speak with Partner S about what she needed to do to advance. When she arrived at his office, Partner S immediately berated her for being excessively polite because she had knocked on his door before entering. He also encouraged her to spend more time with partners, without ever clarifying how this might be possible. After their meeting, Jane Doe 4 communicated to a female partner her sense that Partner S's counsel boiled down to, "Be a man."

27.     Another partner confirmed this impression when he told Jane Doe 4 that he was disappointed by the review process that led to Jane Doe 4 not being put up for partner. He noted that she was arguably among the best lawyers at the Firm, and observed that the questions being asked about Jane Doe 4 in the partner review meetings would never have been asked about a comparable male associate. Numerous partners in various offices at Jones Day told Jane Doe 4 that she was being unfairly treated, deserved to make partner, and was one of the best lawyers at the Firm; nevertheless, they all agreed: if Managing Partner Brogan was not on board, no amount of positive reviews from other partners, or even from major clients, would matter.

28.     Jane Doe 4's excellent record speaks for itself. Jane Doe 4 outshone her male counterparts, yet was not promoted. In contrast, male colleagues worked less, made mistakes that were ignored, and often took credit for her work product, even replacing her name on memoranda she had drafted and claiming them as their own. For example, on a significant litigation matter, Jane Doe 4 was asked to order dinner, while her male counterpart watched television in his office and dined with the partners. When the case finally went to trial, so did the male associate, taking credit for the work of the many female associates left behind.

68

29.    This same male associate also did not understand the basic concept of ethical conflicts, and attempted to file a motion to dismiss on behalf of a client even after a major conflict was identified and withdrawal was sought. He also negligently filed confidential and privileged Firm records in a public federal court docket. Yet, early in his career, he was welcomed into the Jones Day boys' club, supported by Jones Day's culture, and was eventually promoted to partner while his mistakes continued but were ignored.

30.    At the partner level, a senior male partner was known to have attempted to claim privilege over third-party communications in a high-profile case; in another case, the same senior male partner sought to remove a case against the Firm to federal court on the basis of diversity, forgetting the basic principles that apply to claims of privilege and the citizenship of partnerships. These failings, however, were overlooked in male attorneys, even as stellar female attorneys like Jane Doe 4 worked tirelessly and without recognition.

31.    Jane Doe 4 left the Firm after she was informed that she would not be recommended for partner and was told she needed to leave. She now works in the public sector where she earns considerably less money. Her chances of ever being a partner at a firm like Jones Day are substantially reduced because of Jones Day's discrimination against her.

G.    **KATRINA HENDERSON**

32.228.    Plaintiff Katrina Henderson worked in Jones Day's New York City office from October 2013 until July 15, 2016. Despite her excellent credentials, hard work, and successful tenure, she never received opportunities or compensation on par with that of her male colleagues.

33.229.    Ms. Henderson earned a Bachelor of Arts from Duke University in 2010 and a Juris Doctorate from New York University in 2013. She joined Jones Day as an associate in the Firm's New York office that fall.

> **i.     *Early in Ms. Henderson's Tenure, the Firm Denies Her Mentorship and Questions Her Commitment, in Contrast to Its Treatment of Her Male Colleagues***

34.230.          Early on, the Firm assigned Partner Randi Lesnick to act as Ms. Henderson's Partner mentor as well as a source of assignments for Ms. Henderson. But unlike the numerous male associates who received mentorship, assistance in building their practice and helpful advice from their mentors—formal or informal—Partner Lesnick relentlessly criticized Ms. Henderson for even minor infractions.

35.231.          For example, in the fall of 2013, Ms. Henderson's mother traveled to New York City from out-of-state to visit Ms. Henderson. Ms. Henderson took time out of the office one evening to meet her mother for dinner across the street. Ms. Henderson informed the two mid-level associates who were also working for Partner Lesnick at this time that she was would be at dinner out of the office. One of the mid-level associates confirmed that this was acceptable.

36.232.          During the dinner, Ms. Henderson did not respond to an email for approximately one hour. She then returned to the office after dinner to complete the work that Partner Lesnick had assigned her to complete by the following morning. Ms. Henderson completed her work at approximately 1:00 am and sent it to Partner Lesnick. Partner Lesnick, however, berated Ms. Henderson for completing the work at 1:00 am instead of at 11:00 pm the preceding day.

37.233.          This was not the only spurious reprimand that Ms. Henderson received from Partner Lesnick. On another occasion, Partner Lesnick chastised Ms. Henderson for supposed lack of commitment to the Firm, because Ms. Henderson occasionally left for the gym at lunch time or in the evenings before returning to work. Partner Lesnick told Ms. Henderson that exercise might be "good for [her] social life but not for [her] career."

38.234.        One of Partner Lesnick's harshest rebukes came when Ms. Henderson took vacation to see her family around the winter holidays in 2013. On December 27, Ms. Henderson did not respond to an email for twenty minutes, because she was spending time with her family away from their home. Partner Lesnick then called Ms. Henderson and berated her for failing to immediately review a document. So intense was Partner Lesnick's attack that Ms. Henderson suffered a panic attack. Ms. Henderson then immediately returned to her family's home to work for approximately four hours.

39.235.        On December 30, 2013, after Ms. Henderson returned to the office, Partner Lesnick raised the incident again and attacked Ms. Henderson for taking vacation to be with her family. Partner Lesnick's outburst continued until Ms. Henderson was in tears. Only then did Partner Lesnick appear satisfied and conclude the rebuke.

40.236.        Ms. Henderson never witnessed Partner Lesnick berate a male associate in such fashion, nor did she ever witness anyone at the Firm question the commitment of a male associate.

41.237.        Indeed, male associates even received credit for work that Ms. Henderson performed. For example, on one deal to which Ms. Henderson contributed, the Firm circulated a "Big Deal" email at the deal's conclusion, acknowledging those who had contributed to its success. The email credited male associate Zachary Werner with assisting in the deal's success, but not Ms. Henderson, even though Ms. Henderson corrected searches performed by Mr. Werner and even though she had helped him complete his assignments.

42.238.        After Partner Lesnick's December 27, 2013 reprimand, the Firm never assigned Ms. Henderson a new partner mentor, and Ms. Henderson's assignments began to diminish.

43.239.       Ms. Henderson actively sought work from others in the New York office. She went door-to-door asking other associates in the New York office who had full caseloads for work, but was denied assignments. Ms. Henderson knew that one such associate, Rory Hood, was staffed on multiple deals. When Mr. Hood was promoted to partner shortly thereafter, Ms. Henderson came to realize that he had frozen Ms. Henderson out of work in solidarity with Jones Day's male powerbrokers.

44.240.       Ms. Henderson's treatment stands in contrast to that of her male colleagues at Jones Day. For example, in or around February 2015, Ms. Henderson was staffed on a deal with Bret Stancil, a male associate of her class year. While Partner Alex Gendzier, who was ultimately responsible for the deal, consistently informed Mr. Stancil of meetings and phone calls, he persistently excluded Ms. Henderson from these communications. On one particular call, Ms. Henderson received only five minutes' notice that the call was happening. She gathered her papers and rushed to Partner Gendzier's office for the conference call with the client. But rather than apologize to Ms. Henderson for excluding her from the call, to which he had invited Mr. Stancil, Partner Gendzier humiliated Ms. Henderson in front of the client, saying "nice for you to finally join us."

45.241.       Mr. Stancil also received mentorship, support and access to partners that the Firm denied to Ms. Henderson. These partners apparently viewed Mr. Stancil as a future member of their ranks, and groomed him for advancement accordingly. Jones Day assigned Mr. Stancil so much work, in fact, that he sought to offload some of it to Ms. Henderson—even though the two associates were the same class year and he had no supervisory authority over her. Upon information and belief, Mr. Stancil was never chastised by Jones Day for handing off his work to Ms. Henderson.

46.242.     By contrast, Ms. Henderson received little mentorship—whether formal or informal. Ms. Henderson's associate mentor, Priya Galante, left the Firm shortly after Ms. Henderson arrived, and the Firm never assigned Ms. Henderson a replacement. Nor did anyone step in to fill the void.

### ii.     The Firm Pays Ms. Henderson Less than Her Male Colleagues and Denies Her Membership in its Fraternity

47.243.     In addition to freezing Ms. Henderson out of the legal work and mentorship necessary for her to advance in her career, Jones Day also froze Ms. Henderson's salary after her first year. Ms. Henderson, like all first-year Jones Day associates in 2013, received a starting salary of $160,000. When time came for raises, however, Ms. Henderson did not receive one.

48.244.     Ms. Henderson initially did not know that she was being underpaid as a result of not receiving a raise. She, like most Jones Day associates she knew, did not talk about her salary, because Jones Day policy forbade her from doing so. Nonetheless, at a lunch, Mr. Stancil commented that he was happy with his raise and revealed that he had received a raise of approximately $15,000 to $20,000. Ms. Henderson subsequently learned that another male associate, Harrison Golden, had also received a raise.

49.245.     Indeed, in Ms. Henderson's observation, women at Jones Day were expected to work harder and walk a delicate line between gender stereotypes to have any hope of joining the male-dominated upper echelons of Jones Day. For example, at one so-called women's meeting, a speaker informed the associates in the room that they should not act like men if they wanted to break into the male-dominated legal industry. They should, the speaker said, strive to be themselves.

50.246.     After the speaker's presentation and still in the presence of all of the female associates who had attended the event, female Partners Randi Lesnick and Randi Strudler stated

that they disagreed with the speaker. They instead insisted that women at Jones Day must be as loud as men and curse just as much in order to be seen. In other words, Jones Day would accept women as part of its fraternity only if they would play by the boys' rules.[16]

### iii. Shortly After Giving Her a Positive Review, the Firm Denies Ms. Henderson Billable Work and Terminates Her

51. 247.        In May 2015, Jones Day conducted Ms. Henderson's second and last annual review. The Partner-in-Charge of the Firm's Capital Markets Group, Boris Dolgonos, delivered the review. He informed Ms. Henderson that she was on an upward trajectory. Ms. Henderson soon received a raise of $20,000 to a base salary $180,000.

52. 248.        Despite this positive review, Ms. Henderson still had difficulty obtaining billable work. Ms. Henderson volunteered for document reviews and turned to the Firm's pro bono initiatives in order to gain experience, build her skills, and fill her time with what the Firm claimed would count as billable work. Nonetheless, Ms. Henderson still found herself less and less sought out by Jones Day partners.

---

[16] Thus Jones Day Partner Mary Ellen Powers, asked in a 2013 interview how she broke into "what many consider to be an old boy's network," responded, "Having three brothers, playing sports and liking beer probably didn't hurt." She later in the same interview cited her "Southern-talking, rattlesnake-hunting partner, Lizanne Thomas" as another example of how to succeed as a woman at Jones Day. *Female Powerbrokers Q&A: Jones Day's Mary Ellen Powers*, Law360 (Nov. 22, 2013), *available at*: https://www.jonesday.com/files/upload/Female%20Powerbrokers.pdf. A third female partner, Jamila Hall, offered a similar account in a 2019 interview, explaining that she embraces opportunities to join Firm sanctioned "whiskey or cigar tastings, fishing trips, ski trips, and going to the Masters." She acknowledged that male partners often "allocate the tickets to their male friends," thus excluding of women from these business development activities, but nonetheless blamed female attorneys for their own marginalization, asserting that they must be "more determined about their client relationship development." *Interview with Jamila Hall*, Women Criminal Defense Attorneys Blog (Apr. 1, 2019), *available at*: https://womencriminaldefenseattorneys.com/interview-with-jamila-hall/.

53.249.       Upon information and belief, Ms. Henderson was not the only female associate to experience being denied the billable work necessary for advancement in this manner. She is aware of two other female associates whom she believes had similar experiences.

54.250.       In December 2015, Ms. Henderson received an email from Partner Dolgonos inviting her to a meeting. Mr. Dolgonos told Ms. Henderson that he was "checking in." She presumed, given her availability and the positive review that he had delivered to her just months earlier, that he was calling her to assign her to a new matter.

55.251.       Instead, when Ms. Henderson arrived at the meeting, she found three men the room: Partner Dolgonos, the Partner-in-Charge of the New York office, and another man. These men unceremoniously informed Ms. Henderson that the Firm was terminating her employment.

56.252.       Ms. Henderson was shocked. She had received a positive 2015 review, and she knew that December into the new year would be a difficult time to find another job in the law. She left the meeting in tears.

57.253.       Initially, Ms. Henderson was told that Jones Day would continue to employ her for "plenty of time" to find new employment. In February 2016, however, the Firm's tune changed. Now, they told her, she would have just another 2 to 4 weeks to find a new position.

58.254.       Ms. Henderson complained about her situation to Barbara Nicoll in Jones Day's Human Resources department. In response, the Firm gave Ms. Henderson several additional months to search for a new job. She remained on the Firm's payroll through the end of June, and formally affiliated with the Firm through mid-July.

   *iv.*  ***The Firm Warns Ms. Henderson That If She Pursues Legal Actions Against Jones Day, the Firm Will Retaliate***

59.255.       Around the time Ms. Henderson was preparing to depart Jones Day, then-Partner

Charmaine Slack, one of the few other African-American women in Jones Day's New York Office, invited Ms. Henderson to coffee. Ms. Slack, herself an employment lawyer, informed Ms. Henderson that if Ms. Henderson wanted to sue Jones Day for discrimination, she would be within her legal rights, but that she should not, because Jones Day would destroy her career.

60.256.    Ms. Slack's warning convinced Ms. Henderson that making a complaint or filing a lawsuit to redress the discrimination that she had experienced at Jones Day would only compound the damage Jones Day had already done to her career. Ms. Henderson was already aware of Jones Day's worldwide reach, and feared that if she pursued her claims, the Firm would stop at nothing to harm her professionally.

61.257.    As a result of Partner Slack's warning, Ms. Henderson did not come forward with her claims against Jones Day until the instant lawsuit was filed. Defendant Jones Day should accordingly be estopped from raising any statute of limitations defenses to her claims; in the alternative, this Court should grant equitable tolling with respect to those claims.

V.    **CLASS ACTION ALLEGATIONS**

62.258.    Jones Day tolerates and cultivates a work environment that discriminates against female attorneys, particularly those who are pregnant or take maternity leave.

63.259.    Female attorneys, pregnant attorneys, and mothers are subjected to continuing unlawful disparate treatment in pay and promotions. Moreover, the Firm's policies and procedures have an ongoing disparate impact on female attorneys and mothers.

64.260.    The Firm maintains policies and methods of setting compensation that promote gender-based inequities in compensation, and policies and methods for promotion that lead to gender-based unequal promotion. The Firm's discriminatory policies, practices, and

procedures include a "black box" pay system, centralizing pay decision-making in the hands of one man, Firm Managing Partner Steve Brogan, and basing decisions on admittedly "subjective" criteria, which are almost invariably infected with gender bias. The Firm's nationwide practices, policies, and procedures thus result in lower compensation for female attorneys than similarly situated male attorneys.

65.261.    Within the Firm's system of subjective, gender-based reviews, all women are denied equal opportunities for advancement. All women must not only compete with their male counterparts, but also with stereotypes that view them as uncommitted, prone to maternity leave, and less deserving of the kinds of mentorship provided to their male peers.

66.262.    Women who become pregnant and take maternity leave are particularly harmed by this system. They are denied opportunities for advancement and frequently forced out after giving birth.

67.263.    In general, the policies, practices, and procedures that govern the pay and promotions of female attorneys lack the sufficient standards, quality controls, implementation metrics, transparency, and oversight to ensure equal opportunity at the Firm.

68.264.    Because the Firm's management does not provide sufficient oversight or safety measures to protect against intentional and overt discrimination or the disparate impact of facially neutral policies and procedures, female attorneys suffering from discrimination are without recourse. Whatever complaint and compliance policies may exist lack meaningful controls, standards, implementation metrics, and means of redress such that upper management may ignore, disregard, minimize, cover up, mishandle, or otherwise fail to properly respond to evidence of discrimination in the workplace.

69.265.    The Firm's policies, practices, and procedures are not valid, job-related, or

justified by business necessity. Alternative, objective, and more valid procedures are available to the Firm that would avoid such a disparate impact on female attorneys. The Firm has failed or refused to use such alternative procedures.

70.266.      Upon information and belief, the Firm's discriminatory employment practices, policies, and procedures are centrally established and implemented at the highest levels of the Firm.

71.267.      Upon information and belief, the Firm's employment policies, practices, and procedures are not unique or limited to any office or practice group; rather, they apply uniformly and systematically to attorneys throughout the Firm, occurring as a pattern and practice throughout all office locations and practice groups.

72.268.      Because of the Firm's systemic pattern and practice of gender and pregnancy discrimination, the Plaintiffs and members of the proposed Classes and Subclasses have suffered harm including lost compensation, back pay, employment benefits, and emotional distress.

73.269.      The Plaintiffs and members of the Classes and Subclasses have no plain, adequate, or complete remedy at law to redress the rampant and pervasive wrongs alleged herein, and this suit is their only means of securing adequate relief. The Plaintiffs and members of the Classes and Subclasses have suffered and are now suffering irreparable injury from the Firm's ongoing, unlawful policies, practices, and procedures set forth herein, and they will continue to suffer unless those policies, practices, and procedures are enjoined by this Court.

A.      **Rule 23 Class Definition**

74.270.      The proposed nationwide Rule 23 Classes consist of all female attorneys who are, have been, or will be employed by the Firm in the United States during the applicable

liability period until the date of judgment. Upon information and belief, there are more than 40 members of the proposed nationwide Classes.

75.271.     Plaintiffs also seek to represent subclasses of female attorneys who are, have been or will be employed at the Firm in the United States, and (a) who have been or will become pregnant or a mother, and/or take maternity leave during the applicable liability period through the date of judgment (the "Pregnancy Subclass"); or (b) who have taken or will take family or medical leave during the applicable liability period through the date of judgment (the "Leave Subclass").

76.272.     Plaintiffs Tolton, Mazingo, and Draper, and Jane Doe 4 are each members of the Title VII Class. Plaintiffs Tolton, Mazingo, Williams, Draper, and Stahl, and Jane Doe 4 are members of the DCHRA Class.

77.273.     Plaintiffs Tolton and Draper are each members of the Title VII and DCHRA Pregnancy Subclasses.

78.274.     Plaintiffs Tolton, Mazingo, and Draper are each members of the Leave Subclass.

79.275.     Plaintiffs Tolton, Mazingo, Williams, and Stahl also seek to represent classes of female attorneys in California for violations of California law (a) during the applicable liability period through the date of judgment for violations of the Fair Employment Practices Act (the "California Class"); (b) during the applicable liability period through the date of judgment for violations of the California Equal Pay Act (the "CEPA Class"); and (c) during the applicable liability period through the date of judgment for violations of the California Unfair Competition Act (the "California Unfair Competition Class").

80.276.     Plaintiffs Tolton, Mazingo, Williams, and Stahl are each members of the

California Class, the CEPA Class, and the California Unfair Competition Class.

~~81.~~ 277.     Plaintiff Tolton seeks to represent a subclass of female attorneys in California during the applicable liability period through the date of judgment and who have been or will become pregnant or a mother, and/or take maternity leave during the applicable liability period through the date of judgment (the "California Pregnancy Subclass").

~~82.~~ 278.     Plaintiff Tolton is a member of the California Pregnancy Subclass.

~~83.~~ 279.     Plaintiffs Tolton and Mazingo seek to represent a subclass of female attorneys in California during the applicable liability period through the date of judgment who have taken or will take family or medical leave during the applicable liability period through the date of judgment (the "California Leave Subclass").

~~84.~~ 280.     Plaintiffs Tolton and Mazingo are members of the California Leave Subclass.

~~85.~~ 281.     Plaintiff Henderson seeks to represent classes of female attorneys in New York for violations of New York law (a) during the applicable liability period through the date of judgment for violations of the New York City Human Rights Law (the "New York Class"); and (b) during the applicable liability period through the date of judgment for violations of the New York Equal Pay Law (the "NYEPL Class").

~~86.~~ 282.     Plaintiff Henderson is a member of the New York Class and the NYEPL Class.

~~87.~~ 283.     The systemic discrimination described in this Complaint has been, and is, continuing in nature.

~~88.~~ 284.     Plaintiffs reserve the right to amend the class definitions based on discovery or legal developments.

**B.**     **Efficiency of Class Prosecution of Class Claims**

~~89.~~285.          Certification of the proposed Class and Subclasses is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Plaintiffs and the Class.

~~90.~~286.          The individual claims of Plaintiffs, as Class Representatives, require resolution of the common questions concerning whether the Firm has engaged in a pattern and/or practice of gender discrimination against its female attorneys, particularly against women who are pregnant or have children, and/or take family or medical leave, and whether its policies or practices have an adverse effect on the Class. Class Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives, careers, and working conditions and in the lives, careers, and working conditions of the Class members, and to prevent the Firm's continued gender discrimination.

~~91.~~287.          The Class Representatives have standing to seek such relief because of the adverse effect that such discrimination has on them individually and on female attorneys generally. Jones Day caused Plaintiffs' injuries through its discriminatory practices, policies, and procedures and through the disparate impact its policies, practices, and procedures have on female and/or pregnant attorneys. These injuries are redressable through systemic relief, such as equitable and injunctive relief and other remedies sought in this action. Plaintiffs have a personal interest in the policies, practices, and procedures implemented at the Firm.

~~92.~~288.          To obtain relief for themselves and the Class members, the Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief they seek. Without class certification, the same evidence and issues would be subject to relitigation in a multitude of individual lawsuits with an attendant risk of inconsistent

adjudications and conflicting obligations.

93.289.        Certification of the proposed Class is the most reasonable and efficient means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the Class members, and the Firm.

## C.      **Numerosity and Impracticability of Joinder**

94.290.        The Class that the Class Representatives seek to represent is so numerous that joinder of all members is impracticable. In addition, joinder is impractical as the attorneys are physically based in different locations throughout the United States. Fear of retaliation on the part of the Firm's female attorneys is also likely to undermine the possibility of joinder.

## D.      **Common Questions of Law and Fact**

95.291.        The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to their individual claims and those of the Class they seek to represent.

96.292.        The common issues of law include, *inter alia*: (a) whether Jones Day has engaged in unlawful, systemic gender discrimination in its promotion and compensation policies, practices, and procedures; (b) a determination of the proper standard for proving whether Jones Day's employment policies had a disparate impact on the Class and Subclasses; (c) a determination of the proper standards for proving a pattern or practice of discrimination by the Firm against its female attorneys, and under the disparate treatment theory of liability for attorneys; and (d) whether the Firm is liable for continuing systemic violations of Title VII and other statutes.

97.293.        The common questions of fact include, *inter alia*, whether the Firm has: (a) used a compensation system that lacks appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (b) relied on compensation criteria that

perpetuate discrimination, such as highly subject evaluations, basing salaries on prior salaries or on whether that person was pregnant or took maternity leave; (c) compensated female attorneys less than similarly situated male attorneys in base salary, bonuses, and/or promotions; (d) minimized, ignored, or covered up evidence of gender and pregnancy discrimination in the workplace and/or otherwise mishandled the investigation of and response to complaints of discrimination; and (e) otherwise discriminated against female attorneys, especially those who are pregnant or have children, in the terms and conditions of employment.

98.294.    Upon information and belief, the Firm's employment policies, practices, and procedures are not unique or limited to any office or practice group; rather, they apply uniformly and systematically to attorneys throughout the Firm, occurring as a pattern and practice throughout all office locations and practice groups. They thus affect the Class Representatives and Class members in the same ways regardless of the office location or practice group in which they work. Discrimination in compensation occurs as a pattern and practice throughout the Firm's offices and practice groups.

E.    **Typicality of Claims and Relief Sought**

99.295.    The Class Representatives' claims are typical of the claims of the proposed Class and Subclasses. The Class Representatives possess and assert each of the claims they assert on behalf of the proposed Class and Subclasses. They pursue the same factual and legal theories and seek similar relief.

100.296.    Like members of the proposed Class and Subclasses, the Class Representatives are female attorneys who were employees of the Firm during the liability period and who were pregnant, had children, and took maternity leave or other leave during the liability period.

83

101.297.        Differential treatment between male and female attorneys occurs as a pattern and practice throughout all offices and practice groups of the Firm. The Firm discriminates against female attorneys, especially those who are pregnant or have children, in compensation and promotion and subjects them to a misogynistic work culture dominated by men. This differential treatment has affected the Class Representatives and the Class members in the same or similar ways.

102.298.        The Firm has failed to respond adequately or appropriately to evidence and complaints of discrimination. The Class Representatives and Class members have been affected in the same or similar ways by the Firm's failure to implement adequate procedures to detect, monitor, and correct this pattern and practice of discrimination.

103.299.        The Firm has failed to create adequate procedures to ensure its executive leadership complies with equal employment opportunity laws regarding each of the policies, practices, and procedures referenced in this Complaint, and the Firm has failed to discipline adequately others in Firm leadership when they violate anti-discrimination laws. These failures have affected the Class Representatives and the Class members in the same or similar ways.

104.300.        The relief necessary to remedy the claims of the Class Representatives is the same as that necessary to remedy the claims of the proposed Class members.

105.301.        The Class Representatives seek the following relief for their individual claims and for the claims of the members of the proposed Classes: (a) a declaratory judgment that the Firm has engaged in systemic gender and pregnancy discrimination against female attorneys by (i) denying promotions to female attorneys who are pregnant, have children, or take maternity leave, or take other family or medical leave, and on the basis of gender, (ii) paying female attorneys and those who are pregnant, have children, or take maternity leave, or take other family or medical

leave, less than their male counterparts in base compensation and/or bonuses, and (iii) otherwise exposing female attorneys, especially those who are pregnant or have children, to differential treatment; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief that effects a restructuring of the Firm's policies, practices, and procedures for promoting and awarding compensation to female attorneys; (d) equitable relief that effects a restructuring of the Firm compensation system so female attorneys receive the compensation they would have been paid in the absence of the Firm's discrimination; (e) back pay, front pay, reinstatement, and other equitable remedies necessary to make female attorneys whole from the Firm's past discrimination; (f) compensatory damages; (g) punitive damages to deter the Firm from engaging in similar discriminatory practices in the future; and (h) attorneys' fees, costs, and expenses.

## F.     Adequacy of Representation

~~106.~~302.        The Class Representatives' interests are coextensive with those of the members of the proposed Class. The Class Representatives seek to remedy the Firm's discriminatory policies, practices, and procedures so female attorneys, and those who are pregnant, have children, or take maternity leave, or take other family or medical leave, will not receive disparate pay and differential treatment.

~~107.~~303.        The Class Representatives' experiences are capable of repetition, yet evading review. To the extent that the Class Representatives' are ineligible for reinstatement as associates at Jones Day, their experiences—being discriminated against, being terminated or forced to leave the Firm, and being deemed ineligible for reinstatement because of Jones Day's policies, the wrongs that the Class Representatives experienced will continue to affect other female associates unless they are reviewed and remedied.

108.304. The Class Representatives are willing and able to represent the proposed Class fairly and vigorously as they pursue their similar individual claims in this action.

109.305. The Class Representatives have retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity. The combined interests, experience, and resources of the Class Representatives and their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

### G. Requirements of Rule 23(b)(2)

110.306. The Firm has acted on grounds generally applicable to the Class Representatives and the proposed Class by adopting and following systemic policies, practices, and procedures that discriminate on the basis of gender, pregnancy, and maternity. Gender discrimination is the Firm's standard operating procedure rather than a sporadic occurrence.

111.307. The Firm has also acted or refused to act on grounds generally applicable to the Class Representatives and the proposed Class by, *inter alia*: (a) using a promotion system that systematically, intentionally, or knowingly disadvantages women, pregnant women, and mothers; (b) systematically, intentionally, or knowingly denying promotions for women, pregnant women, and mothers in favor of similarly situated males; (c) using a compensation system and promotion system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (d) compensating women, pregnant women, and mothers less than similarly situated males in salary and/or bonuses; (e) systematically, intentionally, or knowingly compensating women, pregnant women, and mothers less than similarly situated male attorneys, including less base salary and/or bonus pay; (f) cultivating an

indifference to evidence of discrimination in the workplace or otherwise minimizing, ignoring, mishandling, or covering up evidence of or complaints of gender, pregnancy, and maternity discrimination; and (g) otherwise discriminating against women, pregnant women, and mothers in the terms and conditions of employment as attorneys.

112.308.    The Firm's policies, practices, and procedures with respect to compensation have led to gender, pregnancy, and maternity discrimination and stratification. The systemic means of accomplishing such gender-based stratification include, but are not limited to, the Firm's policies, practices, and procedures for awarding base compensation, bonus pay, and promotions to female attorneys and those who are pregnant or have children. These practices and procedures all suffer from a lack of: transparency; adequate quality standards and controls; sufficient implementation metrics; and opportunities for redress or challenge. As a result, female attorneys and attorneys who are pregnant or who have children are compensated within a system that is insufficiently designed, articulated, explained, or implemented to consistently, reliably or fairly manage or reward them.

113.309.    The Firm's systemic discrimination and refusals to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief with respect to the Class as a whole.

114.310.    Injunctive, declaratory, and affirmative relief are a predominant form of relief sought in this case. Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of the Firm's systemic gender discrimination. In turn, entitlement to declaratory, injunctive, and affirmative relief forms the factual and legal predicate for recovery by the Class Representatives and Class members of monetary and non-monetary remedies for individual losses caused by the systemic discrimination, as well as their recovery of

compensatory and punitive damages.

**H.    Requirements of Rule 23(b)(3)**

~~115.~~311.        The common issues of fact and law affecting the claims of the Class Representatives and proposed Class members—including, but not limited to, the common issues identified above—predominate over any issues affecting only individual claims. The common issues include whether the Firm has engaged in gender, pregnancy, and maternity discrimination against female attorneys by paying and promoting female attorneys, particularly those who become mothers or take maternity leave, less than their male counterparts.

~~116.~~312.        A class action is superior to other available means for fairly and efficiently adjudicating the claims of the Class Representatives and members of the proposed Class.

~~117.~~313.        By virtue of the pattern and practice of discrimination at the Firm, the Class Representatives and Class members are eligible for monetary remedies for losses caused by the systemic discrimination, including back pay, front pay, reinstatement, compensatory damages, and other relief.

~~118.~~314.        Additionally, or in the alternative, the Court may grant "partial" or "issue" certification under Rule 23(c)(4). Resolution of common questions of fact and law would materially advance the litigation for all Class members.

**VI.    COLLECTIVE ALLEGATIONS UNDER THE EQUAL PAY ACT**

~~119.~~315.        Plaintiffs incorporate all allegations of the Complaint alleging class-based discrimination.

~~120.~~316.        Plaintiffs bring collective claims under the Equal Pay Act pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), on behalf of all members of the EPA Collective Action. The EPA Collective Action includes female attorneys (a)

who were not compensated equally to male attorneys who had substantially similar job classifications, functions, titles, and/or duties, (b) who were not compensated equally to male attorneys who performed substantially similar work, and/or (c) who were denied compensation equal to similarly situated male attorneys by being held back to lesser pay levels than male attorneys who performed substantially similar work and had substantially similar experience.

121.317.    Plaintiffs and the EPA Collective Action members are similarly situated with respect to their claims that the Firm paid and promoted them less than their male counterparts.

122.318.    There is a common nexus of fact and law suggesting that Plaintiffs and the EPA Collective Action members were discriminated against in the same manner. Questions at issue in the case include:

(a)    Whether the Firm unlawfully awarded less in base pay to female attorneys than to similarly-qualified male attorneys;

(b)    Whether the Firm unlawfully assigned and continues to assign female attorneys to positions with lesser pay and other compensation than similarly-qualified male attorneys;

(c)    Whether the Firm's resulting failure to compensate female attorneys on par with comparable male attorneys was willful within the meaning of the EPA.

123.319.    Counts for violations of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b) for all claims asserted by the EPA Collective Action Plaintiffs who opt-in to this action because the claims of the Plaintiffs are similar to the claims of the EPA Collective Action Class.

124.320.    Plaintiffs and the EPA Collective Action Plaintiffs (a) are similarly situated; (b) have substantially similar job classifications, functions, titles, and/or duties; and (c) are subject

to the Firm's common policy and practice of gender discrimination in failing to compensate female attorneys commensurate with compensation given to male attorneys who perform substantially equal work.

## VII.   COUNTS

### COUNT 1
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
42 U.S.C. § 2000(e),** *et seq.*
**GENDER DISCRIMINATION
On Behalf of the Title VII Class Representatives and all Title VII Class Members**

~~125.~~321.   Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

~~126.~~322.   This Count is brought by Plaintiffs Tolton, Mazingo, and Draper~~, and Jane Doe 4~~ ("Title VII Class Representatives") individually and on behalf of all members of the Class.

~~127.~~323.   Plaintiffs Tolton, Mazingo, and Draper~~, and Jane Doe 4~~ each filed a timely charge with the EEOC on behalf of herself and the Class Members. Plaintiffs Mazingo, Williams, Draper, and Stahl~~, and Jane Doe 4~~ may "piggyback" off the first-in-time filing of Plaintiff Tolton because Plaintiff Tolton's EEOC charge relates to the same claims that the other Plaintiffs assert.

~~128.~~324.   Jones Day, an employer of the Title VII Class Representatives and Class Members within the meaning of Title VII, has discriminated against the Title VII Class Representatives and the Class Members in violation of Title VII by subjecting them to different treatment on the basis of their gender, including by engaging in intentional disparate treatment, and by maintaining uniform policies and practices that have an adverse, disparate impact on them.

~~129.~~325.      Jones Day has engaged in an intentional, firm-wide and systemic policy, pattern, and/or practice of discrimination against the Title VII Class Representatives and the Class by, among other things: maintaining a discriminatory system of determining compensation; maintaining a discriminatory system for promotions; discriminating against the Title VII Class Representatives and Class members in pay and promotions; discriminatorily denying development opportunities; subjecting the Title VII Class Representatives and the Class to a hostile work environment; and other forms of discrimination.

~~130.~~326.      These foregoing common policies, practices, and/or procedures have produced an unjustified disparate impact on the Title VII Class Representatives and the Class with respect to the terms and conditions of their employment.

~~131.~~327.      As a result of this disparate treatment and disparate impact discrimination, Jones Day has treated the Title VII Class Representatives and the Class differently from and less preferentially than similarly situated male employees with respect to pay and promotions.

~~132.~~328.      Jones Day has failed to prevent, to respond to, to investigate adequately, and/or to appropriately resolve this gender discrimination.

~~133.~~329.      Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Title VII Class Representatives and the Class, entitling the Title VII Class Representatives and all members of the Class to punitive damages.

~~134.~~330.      Because of the continuous nature of Jones Day's discriminatory conduct, which persisted throughout the employment of the Title VII Class Representatives and the Class, the Class Representatives and all members of the Class are entitled to application of the continuing violations doctrine to all violations alleged herein.

~~135.~~331.        By reason of Jones Day's discrimination, the Title VII Class Representatives and the Class are entitled to all legal and equitable remedies available for violations of Title VII.

~~136.~~332.        As a result of Jones Day's conduct alleged in this Complaint, the Title VII Class Representatives and the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

~~137.~~333.        As a further result of Jones Day's unlawful conduct, the Title VII Class Representatives and the Class have suffered and continue to suffer, *inter alia*, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish. Title VII Class Representatives and the Class are entitled to recover damages for such injuries from Jones Day under Title VII.

~~138.~~334.        Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

### COUNT 2
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000(e),**
***et seq.*, *as amended by the* PREGNANCY DISCRIMINATION ACT OF 1978**
**PREGNANCY AND MATERNITY (SEX PLUS) DISCRIMINATION**
**On Behalf of the Title VII Pregnancy Class Representatives and all Title VII Pregnancy**
**Subclass Members**

~~139.~~335.        Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

~~140.~~336.        This Count is brought by Plaintiffs Tolton and Draper ("Title VII Pregnancy Class Representatives") individually and on behalf of all members of the Title VII Pregnancy Subclass.

~~141.~~337.        Plaintiffs Tolton and Draper each filed a timely charge with the EEOC on behalf of herself and the Class Members. Plaintiff Draper may "piggyback" off the first-in-time

filing of Plaintiff Tolton because Plaintiff Tolton's EEOC charge relates to the same claims that Plaintiff Draper asserts.

~~142.~~338. Jones Day has discriminated against the Title VII Pregnancy Class Representatives and all members of the Subclass in violation of Title VII by subjecting them to different treatment on the basis of their gender, including pregnancy and maternity. The Title VII Pregnancy Class Representatives and members of the Title VII Pregnancy Subclass have been disparately impacted and disparately treated as a result of Jones Day's wrongful conduct and its policies, practices, and procedures.

~~143.~~339. Jones Day has discriminated against the Title VII Pregnancy Class Representatives and Subclass members by treating them differently from and less preferably than similarly situated male employees and female employees who are not pregnant and who do not have children, and by subjecting them to differential and substandard terms and conditions of employment, including but not limited to discriminatory denials of fair compensation, discriminatory denials of promotional opportunities, and discriminatory treatment with respect to leave, work responsibilities, a hostile work environment, and other terms and conditions of employment in violation of Title VII.

~~144.~~340. Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Title VII Pregnancy Subclass Representatives and the members of the proposed Title VII Pregnancy Subclass, entitling the Title VII Pregnancy Class Representatives and the members of the Title VII Pregnancy Subclass to punitive damages.

~~145.~~341. As a result of Jones Day's conduct alleged in this Complaint, the Title VII Pregnancy Class Representatives and the members of the Title VII Pregnancy Subclass have

suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

146.342.     Because of the continuous nature of Jones Day's discriminatory conduct, which persisted throughout the employment of the Title VII Pregnancy Class Representatives and the Title VII Pregnancy Subclass, the Class Representatives and all members of the Subclass are entitled to application of the continuing violations doctrine to all violations alleged herein.

147.343.     By reason of Jones Day's discrimination, the Title VII Pregnancy Class Representatives and members of the Title VII Pregnancy Subclass are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

148.344.     Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT 3
### VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT, 29 U.S.C § 2601 *et seq.*
### DISCRIMINATION, INTERFERENCE AND RETALIATION
#### On Behalf of the FMLA Class Representatives and the FMLA Class

149.345.     Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

150.346.     This Count is brought on behalf of Plaintiffs Tolton, Mazingo, and Draper ("FMLA Class Representatives") individually and on behalf of all members of the FMLA subclass.

151.347.     Under the FMLA, an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. Further, an employer cannot use the taking of FMLA leave as a "negative factor" in employment actions such as hiring, promotions, or disciplinary actions. Plaintiffs took approved FMLA leave.

~~152.~~348.      Jones Day interfered with the taking of protected leave by FMLA Class Representatives and FMLA Class members and discriminated against them for the taking of such leave, in violation of the FMLA.

~~153.~~349.      Jones Day interfered with the taking of protected leave by FMLA Class Representatives and FMLA Class members and discriminated against them for taking such leave by using the taking of FMLA leave as a negative factor in employment actions, including, *inter alia*, paying them less because they had taken leave, failing to promote them because they had taken leave, denying them career-advancement opportunities and work opportunities because they had taken leave, making inaccurate statements harmful to their professional careers because they had taken leave, and creating an environment hostile to pregnancy and the taking of statutorily protected maternity and other health or family leave.

~~154.~~350.      Jones Day acted willfully, intentionally, and with reckless disregard for FMLA Class Representatives' and FMLA Class members' rights under the FMLA.

~~155.~~351.      As a direct and proximate result of Jones Day's actions, FMLA Class Representatives and the FMLA Class members suffered injury and monetary damages, including but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses, and costs.

~~156.~~352.      By reason of Jones Day's discrimination, FMLA Class Representatives and the FMLA Class members are entitled to all legal and equitable remedies available for violations of the FMLA, including an award of liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 2617.

**COUNT 4**
**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938,** *as amended by*
**THE EQUAL PAY ACT OF 1963, 29 U.S.C. § 216(b)**
**DENIAL OF EQUAL PAY FOR EQUAL WORK**
**On Behalf of All Plaintiffs and the EPA Collective Action Plaintiffs**

157.353.     Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

158.354.     This Count is brought on behalf of all Plaintiffs and all EPA Collective Action Plaintiffs who "opt-in" to this action ("the EPA Collective").

159.355.     Jones Day has discriminated against Plaintiffs and the EPA Collective within the meaning of the Equal Pay Act of 1963 ("EPA"), in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. § 206, *et seq*., as amended by the EPA, by providing them with a lower rate of pay than similarly situated male colleagues on the basis of their female gender, even though Plaintiffs and all others similarly situated have performed and continue to perform similar duties requiring the same skill, effort, and responsibility as their male counterparts.

160.356.     Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated male attorneys all have performed and continue to perform similar job duties and functions. Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated male attorneys all have performed and continue to perform jobs that required equal skill, effort, and responsibility.

161.357.     Jones Day has discriminated against Plaintiffs and all EPA Collective Action Plaintiffs by subjecting them to discriminatory pay in violation of the EPA.

162.358.     The differential in pay between male and female attorneys is not due to a legitimate seniority system, merit, quantity or quality of production, or a factor other than sex, but is due to gender.

163.359.     Jones Day has caused, attempted to cause, or contributed to the continuation

of pay discrimination based on gender, in violation of the EPA. The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a). Because Jones Day has willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

164.360.    As a result of Jones Day's conduct as alleged in this Complaint, Plaintiffs and all EPA Collective Action Plaintiffs have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

165.361.    By reason of Jones Day's discrimination, Plaintiffs and all EPA Collective Action Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA, including liquidated damages, interest, and other compensation pursuant to 29 U.S.C. § 216(b).

166.362.    Attorneys' fees should be awarded under 29 U.S.C. §216(b).


## COUNT 5
### VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,
### Cal. Gov. Code § 12940, *et seq*.
### GENDER DISCRIMINATION
### On Behalf of California Class Representatives and the California Class

167.363.    Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

168.364.    This Count is brought by Plaintiffs Tolton, Mazingo, Williams, and Stahl ("California Class Representatives") individually and on behalf of all members of the California Class.

169.365.    Plaintiffs Tolton, Mazingo, Williams, and Stahl each filed a timely charge with the DFEH on behalf of herself and the Class Members. Plaintiffs Mazingo, Williams, and

97

Stahl may "piggyback" off the first-in-time filing of Plaintiff Tolton because Plaintiff Tolton's DFEH charge relates to the same claims that the other Plaintiffs assert.

~~170.~~366.    Jones Day has discriminated against the California Class Representatives and the California Class in violation of the California Fair Employment and Housing Act (the "FEHA"), Cal. Gov. Code § 12940, *et seq.*, by subjecting them to different treatment because and on the basis of their gender (including pregnancy), by engaging in intentional disparate treatment, and by maintaining uniform policies and practices that have an adverse, disparate impact on them.

~~171.~~367.    Jones Day has engaged in an intentional, firm-wide, and systemic policy, pattern, and/or practice of discrimination against the California Class Representatives and the California Class by, *inter alia*: maintaining a discriminatory system for compensation, maintaining a discriminatory system for promotions, unwarrantedly suppressing pay, promotions, and professional development for women, subjecting the California Class Representatives and the California Class to a hostile work environment; and other forms of discrimination.

~~172.~~368.    These foregoing common policies, practices, and/or procedures have produced an unjustified disparate impact on the California Class Representatives and the members of the California Class with respect to the terms and conditions of their employment.

~~173.~~369.    As a result of this disparate treatment and disparate impact discrimination, Jones Day has treated the California Class Representatives and California Class differently from and less preferentially than similarly situated male attorneys with respect to pay and promotions.

~~174.~~370.    Jones Day has failed to prevent, respond to, adequately investigate, and/or appropriately resolve this gender discrimination.

~~175.~~371.    Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the California Class Representatives

and all members of the California Class, entitling the California Class Representatives and all members of the California Class to punitive damages.

176.372.    As a result of Jones Day's conduct alleged in this Complaint, California Class Representatives and the California Class have suffered and continue to suffer harm, including but not limited to, lost earnings, lost benefits, lost future employment opportunities, and other financial loss, as well as non-economic damages.

177.373.    By reason of the continuous nature of Jones Day's discriminatory conduct, which persisted throughout the employment of the California Class Representatives and the members of the California Class, the continuing violations doctrine applies to all violations alleged herein.

178.374.    By reason of Jones Day's discrimination, California Class Representatives and the members of the California Class are entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of compensatory and punitive damages.

179.375.    Attorneys' fees should be awarded under Cal. Gov. Code § 12940.

### COUNT 6
**VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,**
**Cal. Gov. Code § 12940, *et seq*.**
**PREGNANCY AND MATERNITY (SEX PLUS) DISCRIMINATION**
**On Behalf of California Pregnancy Class Representative and the California Pregnancy Subclass**

180.376.    Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

181.377.    This Count is brought by Plaintiff Tolton (the "California Pregnancy Class Representative") individually and on behalf of all members of the California Pregnancy Subclass.

182.378.     Jones Day has discriminated against the California Pregnancy Class Representative and the California Pregnancy Subclass in violation of the FEHA by subjecting them to different treatment because and on the basis of their gender, in particular their pregnancy and maternity, including by engaging in intentional disparate treatment, and by maintaining uniform policies and practices that have an adverse, disparate impact on them.

183.379.     Jones Day has engaged in an intentional, firm-wide and systemic policy, pattern, and/or practice of discrimination against the California Pregnancy Class Representative and the California Pregnancy Subclass by, *inter alia*: maintaining a discriminatory system for compensation, maintaining a discriminatory system for promotions, unwarrantedly suppressing pay, promotions, and professional development for women who are pregnant or have children, maintaining a hostile work environment, and other forms of discrimination.

184.380.     These foregoing common policies, practices, and/or procedures have produced an unjustified disparate impact on the California Pregnancy Class Representative and the members of the California Pregnancy Subclass with respect to the terms and conditions of their employment.

185.381.     As a result of this disparate treatment and disparate impact discrimination, Jones Day has treated the California Pregnancy Class Representative and California Pregnancy Subclass differently from and less preferentially than similarly situated male attorneys and female attorneys who are not pregnant or do not have children, with respect to pay and promotions.

186.382.     Jones Day has failed to prevent, respond to, adequately investigate, and/or appropriately resolve this gender discrimination.

187.383.     Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the California Pregnancy Class

Representative and all members of the California Pregnancy Subclass, entitling the California Pregnancy Class Representative and all members of the California Pregnancy Subclass to punitive damages.

~~188.~~384.     As a result of Jones Day's conduct alleged in this Complaint, the California Pregnancy Class Representative and the California Pregnancy Subclass have suffered and continue to suffer harm, including but not limited to, lost earnings, lost benefits, lost future employment opportunities, and other financial loss, as well as non-economic damages.

~~189.~~385.     Because of the continuous nature of Jones Day's discriminatory conduct, which persisted throughout the employment of the California Pregnancy Class Representative and the members of the California Pregnancy Subclass, the continuing violations doctrine applies to all violations alleged herein.

~~190.~~386.     By reason of Jones Day's discrimination, the California Pregnancy Class Representative and the members of the California Pregnancy Subclass are entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of compensatory and punitive damages.

~~191.~~387.     Attorneys' fees should be awarded under Cal. Gov. Code § 12940.

## COUNT 7
### VIOLATION OF THE CALIFORNIA FAMILY RIGHTS ACT,
#### Cal. Gov. Code § 12945.2
### DISCRIMINATION, INTERFERENCE AND RETALIATION
**On Behalf of the California Leave Class Representatives and the California Leave Subclass**

~~192.~~388.     Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

193.389.      This Count is brought by Plaintiffs Tolton and Mazingo ("California Leave Class Representatives") individually and on behalf of all members of the California Leave Subclass.

194.390.      Plaintiffs Tolton and Mazingo each filed a timely charge with the DFEH on behalf of herself and the Class Members. Plaintiff Mazingo may "piggyback" off the first-in-time filing of Plaintiff Tolton because Plaintiff Tolton's DFEH charge relates to the same claims that Plaintiff Mazingo asserts.

195.391.      Under the California Family Rights Act ("CFRA"), an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. Further, an employer cannot use the taking of CFRA leave as a "negative factor" in employment actions such as hiring, promotions, or disciplinary actions. California Leave Class Representatives took approved CFRA leave.

196.392.      Jones Day interfered with the taking of protected leave by California Leave Class Representatives and California Leave Subclass members and discriminated against them for the taking of such leave, in violation of the CFRA.

197.393.      Jones Day interfered with the taking of protected leave by California Leave Class Representatives and California Leave Subclass members and discriminated against them for taking such leave by using the taking of CFRA leave as a negative factor in employment actions, including, *inter alia*, failing to promote them, denying them career-advancement opportunities and work opportunities, making inaccurate statements harmful to their professional careers, and creating an environment hostile to pregnancy and the taking of statutorily protected maternity leave.

198.394.        Jones Day acted willfully, intentionally, and with reckless disregard for California Leave Class Representatives' rights under the CFRA.

199.395.        As a direct and proximate result of Jones Day's actions, California Leave Class Representatives suffered injury and monetary damages, including but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses, and costs, and are entitled to all legal and equitable remedies available.

200.396.        By reason of Jones Day's discrimination, California Leave Class Representatives and California Leave Subclass members are entitled to all legal and equitable remedies available for violations of the CFRA, including an award of liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation.

## COUNT 8
**VIOLATION OF THE CALIFORNIA EQUAL PAY ACT,** *as amended by* **THE CALIFORNIA FAIR PAY ACT, Cal. Lab. Code § 1197.5,** *et seq.*
**DENIAL OF EQUAL PAY FOR EQUAL & SUBSTANTIALLY SIMILAR WORK**
**On Behalf of California Class Representatives and the CEPA Subclass**

201.397.        Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

202.398.        This Count is brought on behalf of Plaintiffs Tolton, Mazingo, Williams, and Stahl ("California Class Representatives") individually and on behalf of all members of the California Class.

203.399.        Jones Day has discriminated against the California Class Representatives and all members of the California Class in violation of the California Equal Pay Act, Cal. Lab.

Code § 1197.5 (West 2015) (amended 2015), *et seq.* Jones Day has paid California Class Representatives and members of the California Class less than similarly situated male attorneys in the same establishment performing substantially equal work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions.

204.400.       Jones Day subjected the California Class Representatives and the members of the California Class to common discriminatory pay policies, including: maintaining a discriminatory system of determining compensation; maintaining a discriminatory system for promotions; and other forms of discrimination affecting pay.

205.401.       The differential in pay between male and female attorneys was not due to a legitimate seniority system, merit, or the quantity or quality of production, a bona fide factor other than sex, such as education, training, or experience, but was due to gender. In the alternative, to the extent that Jones Day relied upon one or more of these factors, said factor(s) were not reasonably applied and did/do not account for the entire wage differential.

206.402.       The foregoing conduct constitutes a willful violation of the California Equal Pay Act, Cal. Lab. Code §1197.5 *et seq.*, as amended by the California Fair Pay Act. Therefore, a three-year statute of limitations applies to such violations, pursuant to California Equal Pay Act, Cal. Lab. Code § 1197.5(h), *et seq.*, and California Equal Pay Act, as amended by the California Fair Pay Act, Cal. Lab. Code § 1197.5(h).

207.403.       As a result of Jones Day's conduct alleged in this Complaint and/or Jones Day's willful, knowing, and intentional discrimination, the California Class members have suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

208.404.       California Class Representatives and the California Class are therefore

entitled to all legal and equitable remedies, including doubled compensatory awards for all willful violations.

209.405.    Attorneys' fees should be awarded under California Labor Code § 1197.5(g).

**COUNT 9**
**VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE,**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**UNFAIR COMPETITION**
**On Behalf of California Class Representatives and the California Class**

210.406.    Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

211.407.    This Count is brought by Plaintiffs Tolton, Mazingo, Williams, and Stahl ("California Class Representatives") individually and on behalf of all members of the California Class.

212.408.    Jones Day is a "person" as defined under California Business and Professions Code § 17201.

213.409.    Jones Day's willful failure to pay women equally, to promote women equally, and otherwise to offer women equal employment opportunities as alleged above, constitutes unlawful, unfair and/or fraudulent activity prohibited by California Business and Professions Code § 17200. As a result of its unlawful, unfair and/or fraudulent acts, Jones Day reaped and continues to reap unfair benefits and illegal profits at the expense of California Class Representatives and the California Class. Jones Day should be enjoined from this activity.

214.410.    Accordingly, California Class Representatives and the California Class members are entitled to restitution with interest and other equitable relief, pursuant to California Business and Professions Code § 17203.

**COUNT 10**
**CIVIL PENALTIES UNDER THE CALIFORNIA PRIVATE ATTORNEYS GENERAL**
**ACT OF 2004,**
**Cal. Lab. Code § 2698** *et seq.*
**On Behalf of Plaintiffs Tolton, Mazingo, and Others Similarly Aggrieved**

215.411.     Plaintiffs re-allege and incorporate each and every allegation contained in this Complaint.

216.412.     Plaintiffs Tolton and Mazingo bring this claim on behalf of themselves and other current and former female associates who worked for Jones Day in California at any time on or after the date that is 515 days prior to the filing of their PAGA claims notices.

217.413.     The California Private Attorneys General Act of 2004, Cal. Lab. Code § 2698, *et seq.*, gives any employee aggrieved by an employer's violation of the Labor Code the right to file an action to recover civil penalties for Labor Code violations.

218.414.     The California Equal Pay Act ("CEPA"), Cal. Lab. Code § 1197.5(a), prohibits employers from "pay[ing] . . . employees at wage rates less than the rates paid to employees of the opposite sex for substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions," subject to certain affirmative defenses. "Prior salary shall not, by itself, justify any disparity in compensation." Cal. Lab. Code § 1197.5(a)(3).

219.415.     The CEPA further provides that "[a]n employer shall not prohibit an employee from disclosing the employee's own wages, discussing the wages of others, inquiring about another employee's wages, or aiding or encouraging any other employee to exercise his or her rights under this section." Cal. Lab. Code § 1197.5(k)(1).

220.416.     Labor Code Section 204(a) provides that "[a]ll wages, other than those

mentioned in Section 201, 201.3, 202, 204.1, or 204.2, earned by any person in any employment are due and payable twice during each calendar month, on days designated in advance by the employer as the regular paydays . . . " It provides further that "salaries of executive, administrative, and professional employees . . . may be paid once a month on or before the 26th day of the month during which the labor was performed if the entire month's salaries, including the unearned portion between the date of payment and the last day of the month, are paid at that time." *Id.*

221.417.    Labor Code Section 204.2 provides that "[s]alaries of executive, administrative, and professional employees . . . earned for labor performed in excess of 40 hours in a calendar week are due and payable on or before the 26th day of the calendar month immediately following the month in which such labor was performed."

222.418.    Labor Code Section 226 requires employers to provide wage statements that accurately state the amount of gross and net wages earned.

223.419.    Labor Code Section 232(a) prohibits "[r]equir[ing] . . . as a condition of employment, that an employee refrain from disclosing the amount of his or her wages."

224.420.    Labor Code Section 232.5(a) prohibits "[r]equir[ing] . . . as a condition of employment, that an employee refrain from disclosing information about the employer's working conditions."

225.421.    Labor Code Section 1102.5(a) prohibits an employer or person acting on behalf of an employer from preventing an employee from disclosing information "to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part

of the employee's job duties."

~~226.~~422.	Labor Code Section 1102.5(b) prohibits an employer or person acting on behalf of an employer from retaliating against an employee "for disclosing information, or because the employer believes that the employee disclosed or may disclose information . . . to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."

~~227.~~423.	Labor Code Section 1102.5(c) prohibits an employer or person acting on behalf of the employer from retaliating against an employee for "refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."

~~228.~~424.	Labor Code Section 98.6 provides that "[a] person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee . . . because the employee . . . engaged in any conduct delineated in this chapter, including the conduct described in subdivision (k) of Section 96, and Chapter 5 (commencing with Section 1101) of Part 3 of Division 2, or because the employee . . . made a written or oral complaint that he or she is owed unpaid wages . . . or because of the exercise by the employee or applicant for employment on behalf of himself, herself, or others of any rights afforded him or her."

~~229.~~425.	Jones Day has violated the California Labor Code by:

    a. Paying female associates a wage rate less than that paid to male associates for performing equal or substantially similar work when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions, in

violation of the California Equal Pay Act, Cal. Lab. Code § 1197.5(a), as amended by the California Fair Pay Act of 2015.

b.   As a result of pay discrimination, depriving female associates of timely payment of wages, thereby violating Labor Code §§ 204, 204c and/or 204.2 by failing to pay them all wages due and payable at regular, prescheduled intervals during each calendar month, within the timeframes set forth in these provisions, pursuant to statute.

c.   As a result of pay discrimination throughout employment, failing to pay departing female associates all wages due and owing at the time of discharge, upon the last day of employment if the associate resigned and provided at least 72 hours' notice, or within 72 hours of the associate quitting her employment, in violation of Labor Code §§ 201–03.

d.   As a result of pay discrimination, Defendant's pay statements reflect the amount it actually pays female associates, rather than the rightful amounts they earned; therefore each pay statement issued to any female Jones Day associate inaccurately states the net and gross amount of wages earned, in violation of Labor Code § 226(a).

e.   Prohibiting and preventing Plaintiffs Tolton and Mazingo and other female associates from disclosing the amount of or information about their and others' wages in violation of Labor Code §§ 1197.5(k), 232, and 232.5.

f.   Prohibiting Plaintiffs Tolton's, Mazingo's and other female associates' aiding or encouraging any other employee to exercise his or her rights under the CEPA, in violation of Labor Code § 1197.5(k).

g.  Requiring, as a condition of employment, that Plaintiffs Tolton, Mazingo, and other female associates refrain from disclosing information about Jones Day's working conditions, including the amount of their wages, in violation of Labor Code §§ 1197.5(k), 232, and 232.5.

h.  Preventing Plaintiffs Tolton and Mazingo from disclosing information regarding terms and conditions of employment that they have reasonable cause to believe discloses a violation of, *inter alia*, the aforementioned laws, in addition to the California Fair Employment and Housing Act, Title VII, the Federal Equal Pay Act, the California Equal Pay Act, the Family and Medical Leave Act, and the California Family Rights Act, in violation of Labor Code § 1102.5(a).

i.  Retaliating against Plaintiffs Tolton and Mazingo including by, *inter alia*, restricting their professional opportunities, terminating or constructively terminating their employment, and engaging in other adverse actions, because they disclosed information that they reasonably believed constituted a violation of the aforementioned laws, as well as the California Fair Employment and Housing Act, Title VII of the Civil Rights Act of 1964, the Federal Equal Pay Act, the California Equal Pay Act, the Family and Medical Leave Act, and/or the California Family Rights Act, all of which are actions that are themselves violations of Labor Code § 1102.5(b).

j.  Retaliating against Plaintiffs Tolton and Mazingo because they opposed and/or refused to participate in conduct that would have constituted a violation of the aforementioned laws, in addition to the California Fair Employment and Housing Act, Title VII, the Federal Equal Pay Act, the California Equal Pay Act, the Family

and Medical Leave Act, and/or the California Family Rights Act, in violation of labor Code § 1102.5(c), including by, *inter alia*, restricting their professional opportunities, terminating or constructively terminating  employment, and engaging in other adverse actions.

k.  Retaliating against Plaintiff Tolton in response to the actions she took to enforce the California Equal Pay Act, her invocation of and/or efforts to vindicate her and/or others rights under the California Equal Pay Act, her disclosure of wage information and discussions regarding her own and/or others' wages, and/or her efforts to aid other employees in exercising their rights under the California Equal Pay Act, in violation of Labor Code § 1197.5(k).

l.  Retaliating against Plaintiffs Tolton and Mazingo because they discussed their working conditions and/or compensation at Jones Day, in violation of Labor Code §§ 232 and/or 232.5.

m.  Retaliating against Plaintiffs Tolton and Mazingo in violation of Labor Code Section 98.6(a), for exercising their right to speak out against violations of the law, for complaining that they are owed unpaid wages as a result of the discrimination they faced, for engaging in the aforementioned conduct delineated under Labor Code § 1102.5, and/or for exercising the rights afforded to them (1) to receive equal pay pursuant to the Equal Pay Act, 29 U.S.C. 206, and the California Equal Pay Act, Cal. Lab. Code 1197.5; (2) to be free from sex-based discrimination with respect to compensation and other terms and conditions of employment, pursuant to Title VII, 42 U.S.C. § 2000e *et seq.*, and the California Fair Employment and Housing Act, Cal. Gov. Code § 12940 *et seq.*; (3) to be free from discrimination,

interference, or retaliation for taking protected leave pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, and the California Family Rights Act, Cal. Gov. Code § 12945; (4) to disclose their own wages, to discuss their own and others' compensation, and to discuss working conditions pursuant to Labor Code §§ 232, 232.5, and 1197.5; and/or (5) to oppose and/or to disclose facts that Plaintiffs Tolton and Mazingo have reason to believe disclose violations of state, federal, and local laws, including Title VII, the Equal Pay Act, and the Labor Code Sections identified in this Complaint, pursuant to Labor Code § 1102.5.

~~230.~~426.     In addition to Plaintiffs Tolton and Mazingo, there are dozens of female associates who have experienced one or more of these violations as of this filing. This number will continue to grow with each new female associate that Jones Day employs while it fails to rectify these violations.

~~231.~~427.     The above-referenced violations are willful, intentional, and ongoing. Plaintiffs Tolton and Mazingo, as private attorneys general, seek to recover the maximum civil penalties for all violations.

~~232.~~428.     Prior to filing this Complaint, Plaintiffs Tolton and Mazingo filed notice of their PAGA claims for these violations with the California Labor and Workforce Development Agency and served that notice on Jones Day via certified mail.

~~233.~~429.     Plaintiffs Tolton and Mazingo seek to recover the maximum civil penalties available for each of these violations. This includes, for wages owed as a result of gender-based pay inequity, "(1) for any initial violation, one hundred dollars ($100) for each failure to pay each employee. (2) For each subsequent violation, or any willful or intentional violation, two hundred dollars ($200) for each failure to pay each employee, plus 25 percent of the amount unlawfully

withheld." Cal. Lab. Code § 210.

234.430.     In addition, Plaintiffs seek costs and attorneys' fees under Labor Code § 2699(g).

### COUNT 11
**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT,**
**D.C. Code § 2-1401 *et seq*. as amended**
**GENDER DISCRIMINATION**
**On Behalf of Class Representatives and all Class Members**

235.431.     Plaintiffs re-allege and incorporate each and every allegation contained in this Complaint.

236.432.     This Count is brought by Plaintiffs Tolton, Mazingo, Williams, Draper, and Stahl, and Jane Doe 4, individually and on behalf of all members of the DCHRA Class.

237.433.     Defendant Jones Day is an employer within the meaning of the DCHRA.

238.434.     Defendant Jones Day, acting through decision-maker Managing Partner Stephen J. Brogan working out of Jones Day's District of Columbia office, discriminated against Class Representatives and Class Members, in violation of the DCHRA, by subjecting them to differential treatment on the basis of their gender, including by engaging in intentional disparate treatment, and by maintaining uniform policies and practices that have an adverse disparate impact on them.

239.435.     Jones Day, through decision-maker Managing Partner Brogan, has engaged in an intentional, firm-wide and systemic policy, pattern, and/or practice of discrimination against Class Representatives and the Class by, *inter alia*: maintaining a discriminatory system of determining compensation; maintaining a discriminatory system for promotions; discriminating against Class Representatives and Class members in pay and promotions; discriminatorily denying development opportunities; subjecting Class Representatives and the Class members to a hostile work environment, and other forms of discrimination.

240.436.     These foregoing common policies, practices, and/or procedures, established and/or ratified by Managing Partner Brogan in the District of Columbia, have produced an unjustified disparate impact nationwide on Class Representatives and the Class with respect to the terms and conditions of their employment.

241.437.     As a result of this disparate treatment and disparate impact discrimination, Jones Day has treated Class Representatives and the Class differently from and less preferentially than similarly situated male employees with respect to pay and promotions.

242.438.     Jones Day has failed to prevent, to respond to, to investigate adequately, and/or to appropriately resolve this gender discrimination.

243.439.     Jones Day's conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted in callous disregard of the rights of the Class Representatives and the Class, entitling the Class Representatives and all members of the Class to punitive damages.

244.440.     By reason of the continuous nature of Jones Day's discriminatory conduct, which persisted throughout the employment of the Class Representatives and the Class, the Class Representatives and all members of the Class are entitled to application of the continuing violations doctrine to all violations alleged herein.

245.441.     As a result of Jones Day's conduct alleged in this Complaint, the Class Representatives and the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

246.442.     As a further result of Jones Day's unlawful conduct, the Class Representatives and the Class have suffered and continue to suffer, *inter alia*, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish.

247.443.        By reason of Defendant's discrimination, Class Representatives and the Class are entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

248.444.        Attorneys' fees and costs should be awarded under D.C. Code § 2-1403.13(e).

<div align="center">

**COUNT 12**
**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW,**
**N.Y.C. Admin. Code § 8-101, *et seq.***
**GENDER DISCRIMINATION**
**On behalf of Plaintiff Katrina Henderson and the New York subclass**

</div>

249.445.        Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

250.446.        This Count is brought on behalf of Plaintiff Katrina Henderson in her individual and representative capacities, and all members of the New York subclass.

251.447.        Defendant, an employer within the meaning of the NYCHRL, wrongfully discriminated against Katrina Henderson and members of the New York subclass in violation of the NYCHRL by treating them less well because of and on the basis of their gender, including by engaging in intentional disparate treatment, and by maintaining uniform policies, practices, and procedures that have an adverse, disparate impact on them.

252.448.        Jones Day has engaged in an intentional, firm-wide and systematic policy, pattern, and/or practice of discrimination against Katrina Henderson and the New York subclass by, among other things: maintaining a discriminatory system of determining compensation; maintaining a discriminatory system for promotions; discriminating against Katrina Henderson and subclass members in pay and promotions; discriminatorily denying development opportunities; subjecting Katrina Henderson and the subclass members to a hostile work environment, and other forms of discrimination.

253.449.        These foregoing common policies, practices, and procedures have produced an unjustified disparate impact on Katrina Henderson and the members of the New York subclass

with respect to the terms and conditions of their employment.

254.450.      Defendant's discrimination against the New York subclass, including its termination of Katrina Henderson, constituted adverse employment actions that materially and adversely affected her employment in violation of the NYCHRL.

255.451.      As a result of this disparate treatment and disparate impact discrimination, Jones Day has treated Katrina Henderson and the New York subclass differently from and less preferentially than similarly situated male attorneys, with respect to pay and promotions.

256.452.      Defendant has failed to prevent, respond to, adequately investigate, and/or appropriately resolve this gender discrimination.

257.453.      Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Katrina Henderson and members of the New York subclass, entitling them to punitive damages.

258.454.      By reason of the continuous nature of Jones Day's discriminatory conduct, which persisted throughout the employment of Katrina Henderson and the New York subclass, they are entitled to application of the continuing violations doctrine to all violations alleged herein.

259.455.      Jones Day's discrimination against Katrina Henderson and the New York subclass caused them to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

260.456.      Katrina Henderson and members of the New York Subclass are therefore entitled to all legal and equitable remedies available for violations of the NYCHRL, including reinstatement and an award of punitive damages.

261.457.      Attorneys' fees should be awarded under N.Y.C. Admin. Code § 8-502(g).


**COUNT 13**
**VIOLATION OF THE NEW YORK EQUAL PAY LAW,**

**N.Y. Lab. Law § 194**
**UNEQUAL PAY**
**On behalf of Katrina Henderson and the New York subclass**

262.458.       Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

263.459.       This Count is brought on behalf of Katrina Henderson in her individual and representative capacities, and all members of the New York subclass.

264.460.       Defendant Jones Day, the employer of Katrina Henderson within the meaning of the New York Equal Pay Law, has discriminated against her and members of the New York subclass in violation of New York Labor Law § 194 by subjecting them to unequal pay on the basis of sex and by treating them differently and less preferably when compared to male attorneys in the same establishment performing equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

265.461.       Defendant subjected Katrina Henderson and members of the New York subclass to common discriminatory pay policies, practices, and procedures including: maintaining a discriminatory system of determining compensation; maintaining a discriminatory system for advancement; and other forms of discrimination affecting pay.

266.462.       The differential in pay between male and female attorneys was not due to a legitimate seniority system, merit, or the quantity or quality of production, or a bona fide factor other than sex, such as education, training, or experience, but was due to gender. In the alternative, to the extent that Defendant relied upon one or more of these factors, said factor(s) were not job-related, not consistent with business necessity, not reasonably applied and/or did/do not account for the entire wage differential.

267.463.       Defendant caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the New York Equal Pay Law. Moreover, Defendant willfully violated the New York Equal Pay Law by intentionally paying Katrina Henderson and subclass members less than similarly situated men.

268.464.      As a result of Defendant's conduct alleged in this Complaint and/or Defendant's willful, knowing, and intentional discrimination, Katrina Henderson and the New York subclass members have suffered and will continue to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

269.465.      Katrina Henderson and the New York subclass members are therefore entitled to all remedies available for violations of New York Labor Law § 194, including liquidated damages and attorneys' fees and costs for all willful violations, pursuant to New York Labor Law § 198(1-a).

**COUNT 14**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e-2(a),** *et seq.*
**RETALIATION**
**On Behalf of Plaintiffs Tolton, and Draper, and Jane Doe 4**

270.466.      Plaintiffs Tolton, and Draper, and Jane Doe 4 re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

271.467.      Plaintiffs Tolton, and Draper, and Jane Doe 4 each filed a timely charge with the EEOC on behalf of herself and the Class Members. PlaintiffsPlaintiff Draper and Jane Doe 4 may "piggyback" off the first-in-time filing of Plaintiff Tolton because Plaintiff Tolton's EEOC charge relates to the same claims that PlaintiffsPlaintiff Draper and Jane Doe 4 assert.asserts.

272.468.      Plaintiffs Tolton, and Draper, and Jane Doe 4 engaged in protected activity that included, but is not limited to, complaining to Jones Day about gender and/or pregnancy and maternity discrimination and disclosing it to others.

273.469.	Jones Day retaliated against Plaintiffs Tolton, and Draper, and Jane Doe 4 by, *inter alia*, depriving them of pay, depriving them of advancement opportunities, providing them with negative performance reviews, failing to promote them, and wrongfully terminating them.

274.470.	Jones Day's retaliatory acts against Plaintiffs Tolton, and Draper, and Jane Doe 4 were a direct and proximate result of their protected activities.

275.471.	A reasonable person would find Jones Day's retaliatory acts materially adverse and such acts would dissuade a reasonable person from complaining or opposing discrimination.

276.472.	Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Plaintiffs Tolton, and Draper, and Jane Doe 4, entitling them to punitive damages.

277.473.	Defendant's actions and failures to act have caused Plaintiffs Tolton, and Draper, and Jane Doe 4 to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

278.474.	Plaintiffs Tolton, and Draper, and Jane Doe 4 are therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

279.475.	Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

### COUNT 15
### VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,
### Cal. Gov. Code § 12940, *et seq*.
### RETALIATION
### On behalf of Plaintiff Tolton

280.476.      Plaintiff Tolton re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

281.477.      Plaintiff Tolton engaged in protected activity that included, but is not limited to, complaining to Jones Day about gender, pregnancy, and maternity discrimination and disclosing it to others.

282.478.      Jones Day retaliated against Plaintiff Tolton by, *inter alia*, depriving her of pay, depriving her of advancement opportunities, providing her with negative performance reviews, failing to promote her, and wrongfully terminating her.

283.479.      Jones Day's retaliatory acts against Ms. Tolton were a direct and proximate result of her protected activities.

284.480.      A reasonable person would find Jones Day's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

285.481.      Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Ms. Tolton's rights, entitling her to punitive damages.

286.482.      Defendant's actions and failures to act have caused Ms. Tolton to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

287.483.      Ms. Tolton is therefore entitled to all legal and equitable remedies available for violations of the FEHA, including an award of punitive damages.

## COUNT 16
### VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
### D.C. Code § 2-1401, *et seq.*
### RETALIATION

**On Behalf of Plaintiffs Tolton~~,~~ and Draper~~, and Jane Doe 4~~**

~~288.~~484.        Plaintiffs Tolton~~,~~ and Draper~~, and Jane Doe 4~~ re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

~~289.~~485.        Plaintiffs Tolton~~,~~ and Draper~~, and Jane Doe 4~~ engaged in protected activity that included, but is not limited to, complaining to Jones Day about gender and/or pregnancy and maternity discrimination and disclosing it to others.

~~290.~~486.        Jones Day, an employer within the meaning of the DCHRA, retaliated against Plaintiffs Tolton~~,~~ and Draper~~, and Jane Doe 4~~ through decision-maker Stephen J. Brogan working out of Jones Day's District of Columbia office by, *inter alia*, depriving them of pay, depriving them of advancement opportunities, providing them with negative performance reviews, failing to promote them, and wrongfully terminating them.

~~291.~~487.        Jones Day's retaliatory acts against Plaintiffs Tolton~~,~~ and Draper~~, and Jane Doe 4~~ were a direct and proximate result of their protected activities.

~~292.~~488.        A reasonable person would find Jones Day's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

~~293.~~489.        Jones Day's conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted in callous disregard of the rights of Plaintiffs Tolton~~, Drapre,~~ and ~~Jane Doe 4~~Draper.

~~294.~~490.        Defendant's actions and failures to act have caused Plaintiffs Tolton~~,~~ and Draper~~, and Jane Doe 4~~ to suffer harm, including, without limitation, lost earnings, lost benefits,

and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

295.491.     Plaintiffs Tolton, and Draper, and Jane Doe 4 are therefore entitled to all legal and equitable remedies available for violations of the DCHRA, including reinstatement and an award of punitive damages.

296.492.     Attorneys' fees should be awarded under D.C. Code § 2-1403.13(e).

<div align="center">

**COUNT 17**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e-2(a),** *et seq.*,
**WRONGFUL TERMINATION**
**On Behalf of Plaintiffs Tolton, and Draper, and Jane Doe 4**

</div>

297.493.     Plaintiffs Tolton, and Draper, and Jane Doe 4 re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

298.494.     Plaintiffs Tolton, and Draper, and Jane Doe 4 each filed a timely charge with the EEOC on behalf of herself and the Class Members. PlaintiffsPlaintiff Draper and Jane Doe 4 may "piggyback" off the first-in-time filing of Plaintiff Tolton because Plaintiff Tolton's EEOC charge relates to the same claims that Plaintiff Draper and Jane Doe 4 assertasserts.

299.495.     Jones Day terminated the employment of Plaintiffs Tolton, and Draper, and Jane Doe 4 due to gender and/or pregnancy and maternity discrimination. Jones Day's discharge of Plaintiffs Tolton, and Draper, and Jane Doe 4 was an adverse employment action that materially

and adversely changed the overall terms and conditions of their employment in violation of Title VII.

300.496.    Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Plaintiffs Tolton, and Draper, and Jane Doe 4, entitling them to punitive damages.

301.497.    Jones Day's discharge of Plaintiffs Tolton, and Draper, and Jane Doe 4 caused them to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

302.498.    Ms. Tolton, Plaintiffs Tolton, and Draper, and Jane Doe 4 are therefore entitled to all legal and equitable remedies available for violations of Title VII, including reinstatement and an award of punitive damages.

303.499.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

### COUNT 18
### CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,
### Cal. Gov. Code § 12940, *et seq.*
### WRONGFUL TERMINATION
### On Behalf of Plaintiff Tolton

304.500.    Plaintiff Tolton re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

305.501.    Jones Day terminated the employment of Plaintiff Tolton due to gender, pregnancy, and maternity discrimination. Jones Day's discharge of Plaintiff Tolton was an adverse employment action that materially and adversely changed the overall terms and conditions of her employment in violation of the FEHA.

~~306.~~502.	Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Plaintiff Tolton, entitling her to punitive damages.

~~307.~~503.	Jones Day's discharge of Plaintiff Tolton caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

~~308.~~504.	Plaintiff Tolton is therefore entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of punitive damages.

~~309.~~505.	Attorneys' fees should be awarded under Cal. Gov. Code § 12940.

**COUNT 19**
**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code §§ 2-1401, *et seq.***
**WRONGFUL TERMINATION**
**On behalf of Plaintiffs Tolton~~,~~ and Draper~~, and Jane Doe 4~~**

~~310.~~506.	Plaintiffs Tolton~~,~~ and Draper~~, and Jane Doe 4~~ re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

~~311.~~507.	Jones Day, an employer within the meaning of the DCHRA, wrongfully terminated the employment of Plaintiffs Tolton~~,~~ and Draper~~, and Jane Doe 4~~ due to gender and/or pregnancy and maternity discrimination, acting through decision-maker Managing Partner Stephen J. Brogan, working out of the Firm's District of Columbia office. Jones Day's termination was an adverse employment action that materially and adversely affected the employment of Plaintiffs Tolton~~,~~ and Draper~~, and Jane Doe 4~~ in violation of the DCHRA.

312.508.    Jones Day's conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted in callous disregard of the rights of Plaintiffs Tolton, and Draper, and Jane Doe 4.

313.509.    Jones Day's discharge of Plaintiffs Tolton, and Draper, and Jane Doe 4 caused them to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

314.510.    Plaintiffs Tolton, and Draper, and Jane Doe 4 are therefore entitled to all legal and equitable remedies available for violations of the DCHRA, including reinstatement and an award of punitive damages.

315.511.    Attorneys' fees should be awarded under D.C. Code § 2-1403.13(e).

## COUNT 20
### CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,
### Cal. Gov. Code § 12940, *et seq.*
### WRONGFUL CONSTRUCTIVE DISCHARGE
### On Behalf of Plaintiffs Mazingo, Williams, and Stahl

316.512.    Plaintiffs Mazingo, Williams, and Stahl re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

317.513.    Jones Day constructively terminated the employment of Plaintiffs Mazingo, Williams, and Stahl due to gender discrimination. Jones Day's discharge of Plaintiffs Mazingo, Williams, and Stahl was an adverse employment action that materially and adversely changed the overall terms and conditions of their employment in violation of the FEHA.

318.514.      Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Plaintiffs Mazingo, Williams, and Stahl, entitling them to punitive damages.

319.515.      Jones Day's discharge of Plaintiffs Mazingo, Williams, and Stahl caused them to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

320.516.      Plaintiffs Mazingo, Williams, and Stahl are therefore entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of punitive damages.

321.517.      Attorneys' fees should be awarded under Cal. Gov. Code § 12940.

## COUNT 21
**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code §§ 2-1401, *et seq.***
**WRONGFUL CONSTRUCTIVE DISCHARGE**
**On Behalf of All Plaintiffs**

322.518.      Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

323.519.      Jones Day, an employer within the meaning of the DCHRA, constructively terminated the employment of Plaintiffs due to gender discrimination. Jones Day's constructive terminations were adverse employment actions by decision-maker Managing Partner Stephen J. Brogan, working out of the Firm's District of Columbia office, that materially and adversely affected the employment of Plaintiffs in violation of the DCHRA.

~~324.~~520.       Jones Day's conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted in callous disregard of the rights of Plaintiffs Tolton, Mazingo, Williams, Draper, Stahl, and ~~Jane Does 1-4~~Henderson.

~~325.~~521.       Jones Day's discharge of Plaintiffs caused them to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

~~326.~~522.       Plaintiffs are therefore entitled to all legal and equitable remedies available for violations of the DCHRA, including reinstatement and an award of punitive damages. Attorneys' fees should be awarded under D.C. Code § 2-1403.13(e).

### COUNT 22
**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW,**
**N.Y.C. Admin. Code § 8-101, *et seq.***
**WRONGFUL TERMINATION**
**On behalf of Plaintiff Katrina Henderson**

~~327.~~523.       Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

~~328.~~524.       Jones Day, an employer within the meaning of the NYCHRL, terminated the employment of Plaintiff Henderson due to gender discrimination. Jones Day's discharge of Plaintiff Henderson was an adverse employment action that materially and adversely affected her employment in violation of the NYCHRL.

~~329.~~525.       Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff Henderson, entitling her to punitive damages.

~~330.~~526.       Jones Day's discharge of Plaintiff Henderson caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

331.527.          Plaintiff Henderson is therefore entitled to all legal and equitable remedies available for violations of the NYCHRL, including reinstatement and an award of punitive damages.

332.528.          Attorneys' fees should be awarded under N.Y.C. Admin. Code § 8-502(g).

# XIII.   PRAYER FOR RELIEF

Wherefore, Plaintiffs, on their own behalf and on behalf of the Classes, Subclasses, and EPA Collective, request the following relief:

a.          Acceptance of jurisdiction of this case;

b.          Certification of this case as a class action under Federal Rule of Civil Procedure 23, on behalf of the proposed Plaintiff Class and Subclasses, designation of the proposed Class Representatives as representatives of this Class and Subclasses, and designation of Plaintiffs' counsel of record as Class Counsel;

c.          Designation of this action as a collective action on behalf of the proposed EPA Collective (asserting EPA claims) and:

i.          promptly issuing notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the EPA Collective, which (a) apprises them of the pendency of this action and (b) permits them to assert timely EPA claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b); and

ii.          tolling the statute of limitations on the claims of all members of the EPA Collective from the date the original Complaint was filed until the Collective members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Plaintiffs;

d.      Designation of Plaintiffs as representatives of the EPA Collective Action;

e.      Designation of Plaintiffs Tolton~~, Mazingo, Williams, Draper, Stahl, Jane Doe 4, and Henderson~~ and Mazingo as representatives of the PAGA action;

f.      A declaratory judgment that the practices complained of therein are unlawful and violate, among other laws, 42 U.S.C. § 2000(e) *et seq.*, as amended; 29 U.S.C. § 2601, *et seq.*; 29 U.S.C. § 206, *et seq.*; and the applicable state and local laws;

g.      A determination that Katrina Henderson is entitled to equitable tolling and/or equitable estoppel of the limitations period for her claims;

h.      A permanent injunction against Jones Day and its partners, officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them from engaging in any further unlawful practices, policies, customs, and usages set forth therein;

i.      An Order requiring the Firm to initiate and implement programs that (i) remedy the hostile work environment at Jones Day; (ii) ensure prompt, remedial action regarding all claims of gender, pregnancy, and maternity discrimination; and (iii) eliminate the continuing effects of the discrimination and retaliatory practices described therein;

j.      An Order requiring Jones Day to initiate and implement systems for promoting and compensating female attorneys in a non-discriminatory manner;

k.      An award of back pay, front pay, lost benefits, preferential rights to jobs, recovery of penalties, and other damages for lost compensation and job benefits suffered by the Plaintiffs, Members of the Classes, and Members of the EPA Collective Action, in an amount not less than $50,000,000;

l.      An award of nominal, liquidated, and compensatory damages to Plaintiffs and Members of the Classes, Subclasses and Collective, in an amount not less than $50,000,000;

m.      Award punitive damages to Plaintiffs and Members of the Classes and Subclasses,

in an amount not less than $100,000,000;

n.      An award of penalties available under applicable laws, including waiting time

penalties and all civil penalties recoverable under PAGA;

o.      Restitution of all monies due to Plaintiffs and the Class and Subclass members, as

well as disgorgement of Defendant's profits from its unlawful and/or unfair business practices;

p.      An award of litigation costs and expenses, including reasonable attorneys' fees to

the Plaintiffs;

q.      An award of pre-judgment and post-judgment interest; and

r.      Such other and further relief as the Court may deem just and proper.

## XIV.   **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues triable of right to a jury.

Respectfully submitted,

Date: ~~June 24~~August 12, 2019

    */s/ Deborah K. Marcuse*
Deborah K. Marcuse (D.C. Bar No. 995380)
SANFORD HEISLER SHARP, LLP
111 S. Calvert Street, Ste. 1950
Baltimore, MD 21202
Telephone: (410) 834-7415
Facsimile: (410) 834-7425
dmarcuse@sanfordheisler.com

David W. Sanford (DC Bar No. 457933)
Russell L. Kornblith*
SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
rkornblith@sanfordheisler.com

*admitted *pro hac vice*

*Attorneys for Plaintiffs, the Proposed Classes, and the Proposed Collective*