**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Style Definition: Normal

Style Definition: Comment Text

Style Definition: Revision

NILAB RAHYAR TOLTON *et al.*, *on behalf of themselves and all others similarly situated*,

Plaintiffs,

v.

JONES DAY, a General Partnership,

Defendant.

Civil Action No. 19-945 (RDM)

~~SECOND~~THIRD **AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT**

Plaintiffs Nilab Rahyar Tolton, Andrea Mazingo, Meredith Williams, Saira Draper, Jaclyn Stahl, and Katrina Henderson ("Plaintiffs" or "Class Representatives"), by and through their attorneys, Sanford Heisler Sharp, LLP, bring this action on behalf of themselves and all similarly situated female attorneys against Defendant Jones Day, a General Partnership ("Defendant," "Jones Day," or "the Firm"). Plaintiffs allege, with knowledge as to themselves and upon information and belief otherwise, that Defendant engages in systemic discrimination based on gender, pregnancy, and maternity, as follows:

~~I.      INTRODUCTION~~

**I.      JONES DAY SYSTEMATICALLY DISCRIMINATES AGAINST WOMEN**

    **A.    Jones Day's Fraternity Culture: A Brotherhood Ruled by One Man**

    1.    Defendant Jones Day operates as a fraternity in a perversely literal sense. Senior male partners mentor young male associates, give them preferential assignments, facilitate their access to clients, introduce them to the Firm's powerbrokers, and groom them for membership in the Firm's partnership, even when their legal skills are notably deficient. Female associates, by

contrast, have fewer opportunities for mentorship, are promoted in smaller numbers, and earn less for equal work.

2.       Prominent male partners attribute the low number of female partners at Jones Day to women who choose children instead of careers, affirming the baseline expectations that female attorneys must choose one or the other. ~~Female~~The Firm thus does not invest in female associates ~~who do not advance~~, particularly those who have children, ~~are thus presumed to~~presuming they have chosen family over work. Meanwhile, female attorneys without children also face discrimination based on gender stereotypes about motherhood, family responsibilities, and/or marital status.

3.       For many female associates at Jones Day, particularly those who show any sign of overt resistance—which could mean as little as questioning a policy or the basis of a comment in one's review—the hostile work environment culminates in pretextual critiques of their performance followed by constructive discharge or termination. Those who are not convinced to voluntarily depart by the Firm's mistreatment are eventually forced out.

4.       ~~Jones Day's~~Lest there be any doubt whether dissent is tolerated, the Firm's male leadership unabashedly instructs that there should be "No Whining," a mantra prominently featured on slides at annual partnership meetings and parroted by Partners in Charge at offices worldwide.

~~4.~~5.       The Firm's culture predictably harms women in compensation and partnership decisions. Unlike most law firms in the AmLaw 100, Jones Day proudly states that it does not pay associates in lockstep. Instead, every associate's compensation is individualized and determined in a "black box" by the Firm's Managing Partner, Stephen J. ~~Brogan.~~Brogan, who issues every attorney's compensation letter annually.

2

~~5.~~6.      No male partner wields more power at Jones Day than Brogan, who runs the Firm from its Washington, DC office[1] with essentially unchecked autonomy. As a May 2018 *Washington Life* editorial, touting Brogan as one of DC's most powerful influencers, explained: "Jones Day is famously governed – unlike any other major international law firm – with control resting in the hands of just one man, Steve Brogan. The power Brogan exercises over Jones Day's 2,500 attorneys located in 44 global offices has been described as autocratic and absolute."[2]

7.      Though the Firm has created an Advisory Committee that purports to "advise[] on such matters as Partner admissions and Partner compensation," Managing Partner Brogan is known to boast that the Advisory Committee exists only so he can advise it about what he is doing.

8.      Jones Day's own website embraces and affirms this characterization. ~~It~~ (though it has slightly moderated this embrace since the filing of this lawsuit in April 2019). The website explains that the Firm is governed by "the Managing Partner concept" or "system" developed by the first of only seven Managing Partners in the Firm's history, "through which the Managing Partner has authority to make all management decisions, including designating a successor."[3]

---

[1]  ~~*See*~~ *Stephen J. Brogan (Steve): Managing Partner*, Jones Day, https://www.jonesday.com/sjbrogan/ (last ~~viewed April 1~~ visited Aug. 16, 2019).

[2]  ~~"~~*Legal Eagles: Stephen Brogan*~~"~~, Washington Life ~~*Magazine*~~ Mag. (May 9, 2018), http://washingtonlife.com/2018/05/09/legal-eagles-stephen-brogan~~/ (last visited Apr. 3, 2019)~~./.

[3]  ~~*See*~~ *Firm History*, JONES DAY, https://www.jonesday.com/~~principlesandvalues/firmhistory/managingpartnersystem/ (as of Apr. 1~~en/firm?tab=history-565c8d78-eb12-4229-9e55-12f1c0315999 (last visited Aug. 16, 2019).

3

6.9.    As Managing Partner, Brogan "is the final decision-maker on virtually every matter of significance for the Firm," including "partner and associate compensation," the website formerly affirmed.[4]

10.    Even after its latest round of made-for-litigation revisions to its website, Jones Day still admits that the Managing Partner system is responsible for "unity [and] consistency" across the Firm.[5] The Firm's promotional materials emphasize that all lawyers in all offices "understand and operate under the same value system."[6]

7.11.    Managing Partner Brogan's nearly absolute control over Jones Day was emphasized by Washington, DC Partner Gregory Shumaker, who has been with the Firm for more than three decades, in a 2013 interview with the blog of *Legal Times*. In that interview, Shumaker affirmed that the DC office, of which he had then been Partner-in-Charge for more than two years, includes "the managing partner, Steve Brogan, who makes all of the partnership and compensation decisions for the entire firm."[7]

8.12.    Prior to the filing of this lawsuit, Jones Day's own website also confirmed that Managing Partner Brogan's "considerable management responsibility at Jones Day . . . includes

---

[4] *SeeClient Services*, Jones Day, https://www.jonesday.com/principlesandvalues/clientservices/ (last visitedas of Apr. 1, 2019).

[5] *Culture & Governance*, Jones Day, https://www.jonesday.com/en/values?tab=culture-governance-f0e7994f-da6b-4cc1-893d-fc05783dcc5d (last visited Aug. 16, 2019)

[6] *One Firm Worldwide*, Jones Day, https://www.jonesday.com/en/insights/2013/05/one-firm-worldwide (last visited Aug. 16, 2019).

[7] Matthew Huisman, *Q&A: Jones Day's Gregory Shumaker*, The Blog of Legal Times (June 18, 2013), https://legaltimes.typepad.com/blt/2013/06/qa-jones-days-gregory-shumaker.html.

setting individual lawyer compensation or income allocations" for both partners and associates.[8]

While "a very thorough annual evaluation process for partners and associates . . . produces a

substantial amount of both objective and subjective data on which to base these decisions . . . final

decisions are made by the Managing Partner," the website ~~formerly~~ stated.[9]

~~9.~~13.  In ~~an~~a 2013 interview, former Jones Day Managing Partner Dick Pogue

~~highlights~~highlighted the Managing Partner system as a crucial and unique aspect of Firm culture,

noting,

> The culture of the firm has several aspects. Number one, we've got this managing
> partner system, we give all authority to make decisions and responsibility for being
> sure those decisions are correct to one person: the managing partner. Some people
> kind of make fun of it, they say, 'Gee how can you let one person make all those
> decisions?' But it makes it so much more efficient. We can move, make, get things
> done, and we're the envy of many managing partners of other firms who have more
> democratic systems. The managing partner can listen to all the voices, sort it all
> out, decide on a course of action, and then move.

"Dick    Pogue,    Our    Culture,"    ~~Jones    Day~~YouTube,    May    31,    2013,

https://www.youtube.com/watch?v=qXJiFXSHY3I.

~~10.~~14.  The subjective considerations according to which Managing Partner Brogan makes

these decisions are conveyed to associates in an annual oral review. During this review, the

associate meets with two partners who may or may not be familiar with the associate's work. One

of the partners reads to the associate a prepared "consensus statement" that allegedly condenses

and combines the associate's evaluations, hours, and engagements into a succinct paragraph that

purportedly captures the associate's overall performance and future trajectory. Upon information

---

[8]  ~~See~~ *Compensation*, Jones  Day, https://www.jonesday.com/principlesandvalues/compensation/
(~~last viewed~~as of Apr. 1, 2019).

[9]  *Id.*

and belief, consensus statements are not written by reviewers., and even Jones Day Partners cannot alter them; appeals are uniformly recognized as futile. The Firm does not permit associates to keep a copy of their consensus statement and does not share the underlying individual reviews with them.

15.    The evaluation process can be manipulated, and upon information and belief regularly is so manipulated, to justify pushing women out. The "consensus statement" often cherry picks language from individual evaluations without context, emphasizing some aspects of performance while completely overlooking other aspects, and attributing the opinion of one evaluator to that of multiple reviewers. For example, in Plaintiff Tolton's case, although the Partner for whom she performed the majority of her work gave her a glowing review, Plaintiff Tolton's consensus statement attacked her for needing to take more ownership.

11.16.  Perhaps unsurprisingly in a Firm where pay and promotion decisions are made by a single Managing Partner, these evaluations are easily marshaled to justify any given course of action. Whether inadvertently or by design, this review system discriminates against female associates, including in pay and opportunities for promotion to partnership.

12.17.  Partnership decisions, also made by Managing Partner Brogan, often turn on these consensus statements, which make up in gender stereotypes what they lack in objective justifications: The tireless, childless female associate is inadequately "fun" and excessively "intense"; the high-performing associate mother of small children is "deadline challenged" or lacks "commitment."

13.18.  The results are predetermined by this standard operating procedure of discrimination: Even though the Firm hires roughly equal numbers of men and women associates,

women make less money; women are heavily outnumbered in the partnership; women who get pregnant often get fired; and women who speak up often suffer retaliation.

**Formatted:** Font: Not Bold

19.     Responsibility for this systemic discrimination lies above all with Managing Partner Brogan, who is charged with supervising performance evaluation, compensation, and promotion practices as well as the system for reviewing and investigating workplace discrimination and harassment complaints. Managing Partner Brogan alone possesses ultimate control or influence over all Firm leadership partners and any decision they carry out with respect to compensation, promotions, assignments, and other employment terms and conditions.

20.     Upon information and belief, Managing Partner Brogan has avoided taking any meaningful corrective or preventive actions, and otherwise failed to act either to end the firmwide inequality in reviews, pay, and promotions or to confront the hostility towards women in Jones Day's workplace.

B.     **In Jones Day's Fraternity Culture, It Pays to Be Male**

~~14.~~21.   In Jones Day's fraternity culture, male brotherhood is affirmed and strengthened by comments and conduct that derogate women, leaving female associates to choose between capitulation and exclusion.

22.     This culture starts with Managing Partner Brogan and permeates the Firm. Managing Partner Brogan has cultivated and reinforced a workplace that was, and continues to be, systematically hostile towards women, derisive of their professional status, and devaluing of their contributions to the practice of law.

~~15.~~23.   For example, in one non-California office, male partners reportedly often kick off the Firm's holiday party (no outsiders allowed, including spouses) by encouraging drinking in the

7

Firm's offices. This in-office drinking is followed by alcohol-fueled dancing, with the Firm's male management gawking at dancing female associates for amusement.

~~16.~~24.  In the California office where Plaintiffs Tolton, Mazingo, Williams and Stahl worked, firm social events regularly devolved into opportunities for male partners, associates, and clients to harass and humiliate female attorneys. At one ~~dinner~~karaoke event, Partner Cary Sullivan demanded that three female summer associates sing and dance to ~~a~~the Winnie the Pooh theme song ~~originally sung by one or more cartoon bears (an event~~. He and Rhianna Hughes, the social chair of the summer program, captured the event on video~~); at~~. At another Firm event, a client and former Jones Day associate, Craig Johnson, drunkenly refused to rise from the communal bench, requiring a female associate to climb over him in order to leave the table.

~~17.~~25.  One non-California office's summer associate event, held at a partner's house, reportedly culminated with a female summer associate being pushed into the swimming pool while wearing a white dress. The male summer associate who pushed her was applauded and high-fived by the Firm's summer associate committee and leadership rather than reprimanded.

~~18.~~26.  Sexist, sexualized comments and conduct also permeate the office environment, where female associates regularly endure comments on their appearances, their attire, and their bodies. Plaintiff Andrea Mazingo was told that she "would not be single for long," was "prettier than usual," and should wear heels. Plaintiff Nilab Tolton, too, received regular commentary on her clothes and high heels. Plaintiff Jaclyn Stahl was criticized for having a "stern face" and told to "smile more."

~~19.~~27.  Male attorneys openly mock the Firm's problems with discrimination. Male attorneys in Jones Day's Irvine office, including Partner Cary Sullivan, frequently made sexist comments—including about female servers during their office lunches at Hooters—only to

8

conclude these comments with a sneering injunction to "add it to the file," a phrase meant to depict a fictitious file of sexual harassment complaints that carried no weight.

20.28.  Jones Day's fraternity culture presents female associates at Jones Day with an unpalatable choice: participate in a culture that is at best inhospitable to women and at worst openly misogynistic or forego any hopetheir hopes of success at the Firm. For a female associate to succeed at Jones Day, she must at least tolerate the stereotyped expectations of the Firm's male powerbrokers. To challenge these expectations by word or deed, even in settings ostensibly provided for "honest" feedback, is career suicide.

21.29.  As a hiring partner counseled potential summer associates in a 2010 interview, the candidate who doesn't get an offer is "[s]omeone who doesn't get along with others." By contrast, alcoholic "[i]ndiscretion" is eminently forgivable ("Indiscretion happens with alcohol, but people understand that. You usually have to knock a partner out cold for it to be a career-ending event.")[10]

30.    This culture of condoning hostility towards, and humiliation of, women has persisted because of the fraternity culture fostered, ratified, and maintained by Managing Partner Brogan.

**C.    Jones Day's Culture of Male Privilege Profits from the Women It Excludes**

22.31.  The foreseeable consequence of Jones Day'sthe fraternity culture  Managing Partner Brogan fosters and reinforces is that male senior partners routinely allocate the best work to male associates, who in turn typically make more money and get promoted to partner. Male attorneys routinely receive greater support from the Firm in developing relationships both with

---

[10] Vivia Chen, "The Careerist: Do's and Don'ts from Jones Day's Day Hiring Partner," Tells All (About Getting An Offer), The AmLaw DailyCareerist (May 2221, 2010), https://amlawdaily.typepad.com/amlawdaily/2010/05/jonesday0521.html.https://thecareerist.typepad.com/thecareerist/2010/05/jonesdayhiring.html (last visited Aug. 16, 2019).

Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Italic
Formatted: Font: Not Italic

clients and with their colleagues. Female attorneys generally receive inadequate work, mentorship, and support. When they soldier on, working tirelessly to generate stellar work product for the Firm, their contributions are regularly undervalued or outright credited to their male colleagues.

23.32. Seeking out a powerful male patron is often the only route to advancement; this route, however, is often particularly perilous for women, who experience sexual harassment or outright abuse from the male partners on whom they depend for continued work. As Plaintiffs learned firsthand, speaking up about this abuse, or about other manifestations of gender discrimination at Jones Day, is a one-way ticket out the door for female associates who attempt it.

24.33. Female associates at Jones Day who try to seek out female role models, mentors, and sponsors often simply come up empty-handed. The office in which Plaintiffs Tolton, Mazingo, Williams, and Stahl worked promoted its first female partner (a lateral hire) the year after Mazingo, Tolton, and others complained. ⎯And Plaintiff Henderson's female mentor all-but-stopped collaborating with her, only to later instruct a group of female associates that they should behave in a more masculine manner.

25.34. Although the Firm provides window-dressing in the form of affinity groups nominally designed to provide support for women and parents, these groups do not, in fact, provide advice on how to succeed at Jones Day. In the Irvine office, for example, the women's affinity lunch group was mocked by male attorneys as an opportunity "to talk about women things and having kids."

35.     Facially female-friendly policies fail to mask a Firm culture fundamentally hostile to female associates. Attrition rates reflect this reality, as in the Firm's London office, where in the three years immediately following its adoption of a more generous maternity leave policy, the corporate team reportedly lost sixteen women.

26.36.  Female attorneys, shut out from mentorship and client development, instead shoulder a disproportionate share of the non-billable work undervalued by the Firm, such as organizing social events and staff appreciation events and handling administrative tasks. The Firm also disproportionally assigns female associates to assignments and matters that are billed to clients at a discounted, flat-fee rate. By making such assignments disproportionately "women's work," Jones Day further burdens female associates with more work for which they will receive less credit.

27.37.  Similarly, female associates perform a disproportionate share of the Firm's pro bono work. Female associates often seek this work in order to get necessary stand-up experience in court, only to be critiqued later for having only pro bono in-court experience. By comparison, male associates are often given these roles on billable matters.

28.38.  Although the Firm claims that pro bono work counts towards billable hours requirements in the same way as billable work, Plaintiffs learned that the Firm, in fact, discounts pro bono work when counting billable hours, even on cases that Firm management requires an associate to undertake. Thus, even when Jones Day itself benefits significantly from the work, the women who disproportionately do that work do not receive full credit toward their advancement.

29.39.  Partnership decisions predictably disadvantage women and form part of the Firm's standard operating procedure of gender discrimination. The Firm's male leadership finds pretextually false feedback to justify passing over accomplished female associates.

30.40.  As a result, men dominate Jones Day's partnership and leadership ranks, accounting for 80% of its Partner Review Committee and leading 34 of the Firm's 39 practice groups. And although Jones Day employs roughly the same number of male and female associates, male partners outnumber female partners three to one according to the 2018 Vault/MCCA Law Firm Diversity Survey.

11

**D.    Jones Day's "Black Box" Compensation Policy Facilitates Pay Discrimination Against Women**

~~31.~~41.  The devaluation of women at Jones Day extends to their compensation, decided in a "black box" system over which Managing Partner Brogan presides, making all decisions and signing every compensation letter himself. ~~At the time the original Complaint in this case was filed, Jones Day's website proudly trumpeted the Firm's lack of pay transparency:~~Emphasizing the high level from which pay decisions originate, Plaintiff Henderson was told at the end of her first year with the Firm that she was not getting a raise. The senior male partner delivering the news added that there was nothing he could do about it. Likewise, a partner told Plaintiff Williams not to request a raise because it would "attract the wrong attention" from Managing Partner Brogan.

42.    At the time the original Complaint in this case was filed, Jones Day's website, too, proudly trumpeted the Firm's centralization—and lack of transparency—when it comes to pay:

> The financial relationship of a lawyer to Jones Day is confidential. Other than the very small number of people who advise the Managing Partner on these issues, no partner at Jones Day knows anything about the amount of income allocated to any other partner. Similarly, associate compensation is also confidential, for the same reasons: Jones Day compensates its associates individually, not by lockstep and certainly not based on some billable hours formula, and thus every associate's compensation is the product of his or her individual contributions, and cannot be fairly compared to any other individual. What is sometimes critically referred to by those outside Jones Day as a "lack of transparency" is almost universally viewed inside Jones Day as one of its great strengths. This confidentiality removes any temptation to try to compare apples and oranges; it eliminates the chance of creating inappropriate comparisons and jealousies; and most importantly, it does not allow even the possibility of creating barriers to the effective interaction of all Jones Day lawyers.

~~See~~*Confidentiality,*                                          Jones                                          Day, https://www.jonesday.com/principlesandvalues/compensation/confidentiality/  (as  of  Apr.  1, 2019). That is, Jones Day does not pay in so-called "lockstep"—not partners, not associates, not

12

anyone. And Jones Day's system of "black box" compensation results in the systematic underpayment of women. Control over this system lies in the hands of one man: Managing Partner Brogan.

32.43.  The Firm until recently openly affirmed that "associate evaluations and compensation adjustments [are] based upon the subjective quality of each person's overall contribution, including professional achievement, commitment to the Firm, judgment, client service, efficiency, leadership, productivity, and other appropriate factors."[11] In other words, associate evaluations are entirely subjective, and compensation is based on these subjective evaluations. This evaluation process, upon information and belief, has a disparate negative impact on women.

33.   In Plaintiffs' experience, thesethe centralization of decision-making, with all decisions rolling up to Managing Partner Brogan, and the subjective factors involved, are a mere pretext to underpay women—whether intentionally or as a disparate impact. Plaintiffs know as much because they did not make so-called Cravath market pay. Jones Day claims that behind its "black box" compensation system, associates will find market-competitive pay and more for top performers. As its website formerly stated, "For those associates who produce consistent high-quality work, we intend that they be compensated at or above the upper level of the markets in which we operate."[12] Plaintiffs, however, did not receive that level of compensation.

34.44.  As of April 2019, Jones Day's web site promised its associates that for those "who

---

[11] *See Associates*, Jones Day, https://www.jonesday.com/principlesandvalues/associates/ (as of Feb. 14, 2019).

[12] *Id.*

13

~~produce consistent high-quality work, we intend that they be compensated at or above the upper~~ ~~level of the markets in which we operate."[13]~~ But, despite their strong performances—even in the years when those strong performances were acknowledged in their reviews—Jones Day did not compensate the Plaintiffs in line with the "Cravath" market scale.[14]

45.     Pay below the Cravath scale was the experience of each and every plaintiff as set forth in the tables below:

---

[13] ~~*See* https://www.jonesday.com/principlesandvalues/associates/ (last visited June 23, 2019).~~

[14]  *See*  https://abovethelaw.com/2018/06/first-firm-matches-the-new-and-improved-cravath-pay-scale/ (2018 Cravath Base Salary and Bonus Scale); https://abovethelaw.com/2016/06/breaking-ny-to-180k-cravath-raises-associate-base-salaries/  (2016-2017 Cravath Base Salary); See https://www.vault.com/blogs/vaults-law-blog-legal-careers-and-industry-news/cravath-to-180k-who-what-when-where-why   (2007-2016   Cravath   Base   Salary); https://abovethelaw.com/2017/11/associate-bonus-watch-cravath-announces-its-2017-associate-bonuses/ (2017 Cravath Bonus Scale); https://abovethelaw.com/2016/11/associate-bonus-watch-cravath-announces-its-2016-associate-bonuses/   (2016   Cravath   Bonus   Scale); https://abovethelaw.com/2015/12/associate-bonus-watch-cravath-announces-its-2015-associate-bonuses/   (2015 Cravath Bonus Scale);   https://www.vault.com/blogs/vaults-law-blog-legal-careers-and-industry-news/be-thankful-biglaw-bonuses-to-increase-in-2015 (2014 Cravath Bonus Scale);  https://abovethelaw.com/2013/12/breaking-cravath-announces-year-end-bonuses-let-the-2013-bonus-season-begin/       (2013       Cravath       Bonus       Scale); https://abovethelaw.com/2012/11/breaking-cravath-announces-year-end-bonuses-let-the-2012-bonus-season-begin/ (2012 Cravath Bonus Scale); https://abovethelaw.com/2011/11/breaking-cravath-bonuses-are-out-welcome-to-the-2011-bonus-season/   (2011   Cravath   Bonus   Scale); https://abovethelaw.com/2010/11/associate-bonus-watch-the-2010-bonus-season-is-under-way/ (2010 Cravath Bonus Scale); https://abovethelaw.com/2009/11/breaking-cravath-bonuses-are-out-and-down/ (2009 Cravath Bonus Scale); https://abovethelaw.com/2008/11/associate-bonus-watch-cravath-offers-less-than-skadden/       (2008       Cravath       Bonus       Scale); https://abovethelaw.com/2007/10/cravath-announces-bonuses-special-and-otherwise/?rf=1 (2007 Cravath Bonus Scale).

| Nilab Rahyar Tolton | | | | | |
|---|---|---|---|---|---|
| Year | Associate Class Year | Cravath Base | Cravath Bonus | Cravath Scale | Rahyar Tolton Pay | Differential |
| 2010-2011 | 1 | $ 160,000.00 | $ 7,500.00 | $ 167,500.00 | $160,000 | $ 7,500.00 |
| 2011-2012 | 1 | $ 160,000.00 | $ 7,500.00 | $ 167,500.00 | $160,000 | $ 7,500.00 |
| 2012-2013 | 2 | $ 170,000.00 | $ 14,000.00 | $ 184,000.00 | $180,000 | $ 4,000.00 |
| 2013-2014 | 3 | $ 185,000.00 | $ 20,000.00 | $ 205,000.00 | $200,000 | $ 5,000.00 |
| 2014-2015 | 4 | $ 210,000.00 | $ 40,000.00 | $ 250,000.00 | $215,000 | $ 35,000.00 |
| 2015-2016 | 5 | $ 230,000.00 | $ 80,000.00 | $ 310,000.00 | $225,000 | $ 85,000.00 |
| 2016-2017 | 6 | $ 280,000.00 | $ 90,000.00 | $ 370,000.00 | $225,000 | $ 145,000.00 |
| 2017-2018 | 7 | $ 300,000.00 | $ 100,000.00 | $ 400,000.00 | $225,000 | $ 175,000.00 |

| Andrea Mazingo | | | | | |
|---|---|---|---|---|---|
| Year | Associate Class Year | Cravath Base | Cravath Bonus | Cravath Scale | Mazingo Pay | Differential |
| 2014-2015 | 1 | $160,000.00 | $ 15,000.00 | $175,000.00 | $160,000 | $ 15,000.00 |
| 2015-2016 | 1 | $160,000.00 | $ 15,000.00 | $175,000.00 | $160,000 | $ 15,000.00 |
| 2016-2017 | 2 | $190,000.00 | $ 25,000.00 | $215,000.00 | $190,000 | $ 25,000.00 |
| 2017-2018 | 3 | $210,000.00 | $ 50,000.00 | $260,000.00 | $220,000 | $ 40,000.00 |

| Meredith Williams | | | | | |
|---|---|---|---|---|---|
| Year | Associate Class Year | Cravath Base | Cravath Bonus | Cravath Scale | Williams Pay | Differential |
| 2013-2014 | 1 | $160,000.00 | $ 10,000.00 | $170,000.00 | $160,000.00 | $10,000.00 |
| 2014-2015 | 1 | $160,000.00 | $ 15,000.00 | $175,000.00 | $170,000.00 | $ 5,000.00 |
| 2015-2016 | 2 | $170,000.00 | $ 25,000.00 | $195,000.00 | $185,000.00 | $10,000.00 |
| 2016-2017 | 3 | $210,000.00 | $ 50,000.00 | $260,000.00 | $205,000.00 | $55,000.00 |
| 2017-2018 | 4 | $235,000.00 | $ 65,000.00 | $300,000.00 | $215,000.00 | $85,000.00 |

| Saira Draper | | | | | |
|---|---|---|---|---|---|
| Year | Associate Class Year | Cravath Base | Cravath Bonus | Cravath Scale | Draper Pay | Differential |
| 2011-2012 | 1 | $ 160,000.00 | $ 7,500.00 | $ 167,500.00 | $150,000 | $ 17,500.00 |
| 2012-2013 | 1 | $ 160,000.00 | $ 10,000.00 | $ 170,000.00 | $155,000 | $ 15,000.00 |
| 2013-2014 | 2 | $ 170,000.00 | $ 14,000.00 | $ 184,000.00 | $165,000 | $ 19,000.00 |
| 2014-2015 | 3 | $ 185,000.00 | $ 25,000.00 | $ 210,000.00 | *Pay records are missing, but compensation was well below market. | |
| 2015-2016 | 4 | $ 210,000.00 | $ 65,000.00 | $ 275,000.00 | $180,000 | $ 95,000.00 |
| 2016-2017 | 5 | $ 260,000.00 | $ 80,000.00 | $ 340,000.00 | $190,000 | $ 150,000.00 |
| 2017-2018 | 6 | $ 280,000.00 | $ 90,000.00 | $ 370,000.00 | $230,000 | $ 140,000.00 |
| 2018-2019 | 7 | $ 325,000.00 | $ 125,000.00 | $ 450,000.00 | $230,000 | $ 220,000.00 |

| Jaclyn Stahl | | | | | |
|---|---|---|---|---|---|
| Year | Associate Class Year | Cravath Base | Cravath Bonus | Cravath Scale | Stahl Pay* | Differential |
| 2014-2015** | 2 | $170,000.00 | $ 15,000.00 | $185,000.00 | $170,000.00 | $ 15,000.00 |
| 2015-2016 | 2 | $170,000.00 | $ 25,000.00 | $195,000.00 | $185,000.00 | $ 10,000.00 |
| 2016-2017 | 3 | $210,000.00 | $ 50,000.00 | $260,000.00 | $205,000.00 | $ 55,000.00 |
| 2017-2018 | 4 | $235,000.00 | $ 65,000.00 | $300,000.00 | $260,000.00 | $ 40,000.00 |

* These pay figures do not include a comparison of Ms. Stahl's clerkship bonus ($50,000) with

15

the market clerkship bonus.

** When Ms. Stahl joined Jones Day in October 2014, she was paid at an annual rate of $160,000. The Firm raised this rate to $170,000 effective January 1, 2015.

**Formatted:** Justified

| Katrina Henderson | | | | | | |
|---|---|---|---|---|---|---|
| Year | Associate Class Year | Cravath Base | Cravath Bonus | Cravath Scale | Henderson Pay | Differential |
| 2013-2014 | 1 | $160,000.00 | $ 10,000.00 | $ 170,000.00 | $160,000.00 | $10,000.00 |
| 2014-2015 | 1 | $160,000.00 | $ 15,000.00 | $ 175,000.00 | $160,000.00 | $15,000.00 |
| 2015-2016 | 2 | $170,000.00 | $ 25,000.00 | $ 195,000.00 | $160,000.00 | $35,000.00 |
| 2016-2017 | 3 | $210,000.00 | $ 50,000.00 | $ 260,000.00 | $180,000.00 | $80,000.00 |

Upon                          information                          and                          belief,

| Katrina Henderson | | | | | | |
|---|---|---|---|---|---|---|
| Year | Associate Class Year | Cravath Base | Cravath Bonus | Cravath Scale | Henderson Pay | Differential |
| 2013-2014 | 1 | $160,000.00 | $ 10,000.00 | $ 170,000.00 | $160,000.00 | $10,000.00 |
| 2014-2015 | 1 | $160,000.00 | $ 15,000.00 | $ 175,000.00 | $160,000.00 | $15,000.00 |
| 2015-2016 | 2 | $170,000.00 | $ 25,000.00 | $ 195,000.00 | $180,000.00 | $15,000.00 |

46.     Plaintiffs earned less than their male comparators even though they performed jobs requiring the performance of substantially equal work as their male comparators. Upon information and belief, this is the experience of women across Jones Day: Jones Day pays female associates less than male associates, even though associates all perform substantially similar work. As Jones Day's promotional materials explain, the Firm has "no artificial boundaries." It assigns associates to matters regardless of geographical office or practice group: It claims to "staff any client matter with the 'best talent for a particular matter, regardless of office or practice."[15]

47.     Jones Day facilitates this discriminatory pay system by keeping compensation confidential. At every possible opportunity, associates are instructed not to discuss their

---

[15] *One Firm Worldwide*, Jones Day, https://www.jonesday.com/en/insights/2013/05/one-firm-worldwide (last visited Aug. 16, 2019).

compensation with their colleagues. Jones Day maintains this policy and continues to so instruct associates, even though this policy is facially unlawful under, *inter alia*, the District of Columbia's Wage Transparency Act of 2014, California's Fair Pay Act, and New York Labor Law Section 194.

~~35.~~48.  By maintaining the secrecy of each associate's compensation, Jones Day prevents associates from learning of gender-based pay disparities and remediating them. ~~This policy, among others, has a disparate impact on Jones Day's female associates~~Even those who might be inclined to speak up in the face of the Firm's open hostility to conversations about compensation often lack the information to do so. Because of Jones Day's compensation secrecy, most associates simply do not know what others are paid. Moreover, when associates do learn of pay disparities, the Firm's emphasis on pay secrecy often deters them from complaining about disparities to Firm management or otherwise questioning their pay. This policy, among others, has a disparate impact on Jones Day's female associates by ensuring that they neither learn of nor speak up in opposition to discrimination in pay.

**Formatted:** Font: 12 pt

**E.    Pregnancy Proves Unprofitable at Jones Day**

~~36.~~49.  Within Jones Day's culture of male privilege perpetuated at the highest levels of the Firm, women must work harder for less to have any hope of advancing. Once they become pregnant, the presumption is that they are on their way out; the burden is on the new mother to prove that she is the exception to the rule. A second pregnancy is almost insurmountable.

~~37.~~50.  Plaintiffs Draper and Tolton both became pregnant while employed as associates at Jones Day. Each was quickly cut off from the quantity and quality of work she had received before getting pregnant and taking maternity leave. Each then got pregnant a second time. And

each was instructed to find other employment and to leave the Firm within a few months after returning from her second maternity leave.

~~38.~~51.  Typifying Jones Day's view that pregnant women are a problem for the Firm, Partner Steve Sozio—co-leader of the ~~firm's~~Firm's health care practice and chair of the ~~firm's~~Firm's litigation department in Cleveland—was reported to have recently "encouraged" female associates attending the Firm's Business and Tort Litigation group meeting to tell management if they were pregnant or planning on becoming pregnant within the next year, supposedly so that the group could plan its budget. Worse yet, Partner Sozio was said to have suggested that women in their first trimester—who alone he anticipated might be uncomfortable speaking to him about their pregnancies—could instead speak with his female assistant.[16]

~~39.~~52.  Women who have children are also blamed for the lack of female partners at Jones Day, as where Partner Mark Finkelstein ascribed his office's serious female attorney attrition problem to "women [who] have babies and stay at home." Other male partners seconded this view, often referring to maternity leave as "six months' vacation."

~~40.~~53.  Even speaking of Jones Day's policies relating to pregnancy—at a Firm event about the advancement of women, no less—was enough to knock Plaintiff Tolton's career off track. A year before her first pregnancy, Plaintiff Tolton, attending a Firm-sponsored event focused on the advancement of women at the Firm, asked what support Jones Day offered to pregnant women

---

[16] Elie Mystal, *Biglaw Practice Leader Encourages Women To Tell Him If They Plan On Becoming Pregnant… For 'Budgetary Reasons*,*'* Above the Law (October 2, 2018), https://abovethelaw.com/2018/10/biglaw-practice-leader-encourages-women-to-tell-him-if-they-plan-on-becoming-pregnant-for-budgetary-reasons~~,~~; Jeremy Nobile, *Jones Day* ~~practice group leader allegedly asks lawyers~~*Practice Croup Leader Allegedly Asks Lawyers* to ~~report pregnancy plans~~*Report Pregnancy Plans*, Crain's Cleveland Business (~~October~~Oct. 3, 2018), https://www.crainscleveland.com/legal/jones-day-practice-group-leader-allegedly-asks-lawyers-report-pregnancy-plans.

and mothers. The presenters, however, did not respond; instead, they navigated to the Jones Day values page on the Firm's website, which offers no guidance on either topic. Ms. Tolton's entirely appropriate request for basic guidance about Firm policy became the subject of a whisper campaign, and her raise was reduced to $10,000 for that review period.

    **F.**    **Women Who Speak Up Are Pushed Out**

    54.    The Firm makes it clear that complaints about unfair compensation or advancement opportunities will not be tolerated. Managing Partner Brogan is well-known for his repeated "No Whining" instruction, which is often included in his slide presentations to the firm. Associates are expected to go along with the Firm's—with Brogan's—decisions, and any complaint, no matter how small, is viewed as insurgency. No exception is made for protected activity. The One Firm Worldwide culture touted by Jones Day is a thinly veiled One Firm Dictatorship.

    41.55.  The Firm retaliates against women who, by word or deed, push back against the fraternity culture at Jones Day. For example, one female associate in the Irvine office—a lateral recruit who had been hired and groomed for partnership—noted in an office meeting that there was a lack of mentorship for female associates. As a result, she became a pariah at the Firm, andPartner Roman Darmer, who was leading the meeting, disregarded her concerns and instead suggested that female associates were themselves to blame by offering them advice on how to be better associates. As a result of this question, the associate became a pariah at the Firm—with Partner Paul Rafferty even instructing Ms. Tolton to stay away from her because she was a "bad influence" who Ms. Tolton should not be "tied to." The associate was pushed out within a year.

    42.56.  In Ms. Tolton's case, when colleagues inquired about her departure, she explained that Jones Day had told her she had no future at the Firm and that she would have to find another

job.—shortly after giving birth to her second child. When Firm management learned of her candor, she was locked out of her email and barred from returning to the office.

57.    By contrast, theThe actions taken against Ms. Tolton are emblematic of the "no whining" motto, disseminated by Managing Partner Brogan to the Firm's offices worldwide. Managing Partner Brogan is said to have maintained a "No Whining" poster featuring a male athlete in his personal office in Washington, D.C. Managing Partner Brogan also frequently begins presentations, including presentations at Firm-wide retreats, with a slide featuring this motto. One Partner indicated that the main message Managing Partner Brogan delivered at a partner retreat was "No Whining." Echoing this lack of tolerance for dissent, one former partner told *The American Lawyer*, "You could try to complain to the managing partner, but, boy, if you start whining about it to anybody else, it will get back to [Brogan] so fast your head will spin."[17] This ethos so permeates the Firm worldwide that a posting on the site glassdoor.ie from a self-described "Personal Assistant in Brussels" complained "stop starting every meeting with the words 'no whining.'"[18] In short, dissention is not tolerated and no exceptions are made for complaints about discrimination, or retaliation or for other protected activity.

43.58.  The outspoken women who advance at Jones Day are those who promote the party line. One female partner with children boasted of having a fax machine brought into her delivery room during labor so that she could close a deal. During a 2018 event, the Partner-in-Charge for Diversity told a gathering of diverse attorneys that she had never wanted her diversity-related role,

---

[17]  Roy Strom, *A Quiet Law Firm with a Famous Client*, The American Lawyer, https://www.law.com/americanlawyer/almID/1202779428361/ (last visited Aug. 16, 2019).

[18] *Jones Day Employee Reviews*, Glass Door, https://www.glassdoor.ie/Reviews/Jones-Day-no-one-Reviews-EI_IE3244.0,9_KH10,16.htm (last visited August 16, 2019).

nor advocated for diversity in her career until assuming that role, but when Managing Partner

Brogan asked her to take the role, she did what Jones Day lawyers do and "answered the bell."

59.     To ensure that partners toe the Firm line, Jones Day withholds departing partners' capital for up to five years upon their departure from the Firm. The effect is to ensure that partners do not speak up against Jones Day and the Managing Partner system or reveal its truths lest they end up locked in a long-running legal battle against the Firm.

**G.      Plaintiffs' Class and Collective Action Claims**

44.60.  Jones Day subjects its female attorneys to discrimination based on their gender,

pregnancy, and maternity leave. The Firm has subjected Plaintiffs and other similarly situated

employees to (a) discriminatory career and development opportunities and promotion denials; (b)

discriminatory policies and procedures implemented by a male-dominated leadership that have a

disparate impact on female attorneys, especially pregnant women and mothers; (c) lower pay for

substantially equal work requiring equal skill, effort, and responsibility; (d) unwarranted

suppression of pay, professional development, and promotions after taking federal and state

protected leave; (e) disparate treatment based on gender, pregnancy and/or maternity; (f) hostile

work environment based on gender; and (g) other adverse terms and conditions of employment.

45.61.  Upon information and belief, Jones Day has long been aware of these problems but

has failed to take remedial measures to prevent or correct them.

46.62.  To remedy the gender and pregnancy discrimination they witnessed and

experienced at the Firm, Plaintiffs, on behalf of themselves and Class and Subclass members, are

seeking all legal and equitable relief available under applicable local, state and federal anti-

discrimination, equal pay, and retaliation statutes, including Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000(e) *et seq.*, as amended; the Family and Medical Leave Act, ("FMLA"), 29

U.S.C § 2601 *et seq.*; the Equal Pay Act of 1963, ("EPA"), 29 U.S.C. § 201 *et seq.*; the DC Human Rights Act ("DCHRA"), D.C. Code § 2-1402-11 *et seq.*; the California Equal Pay Act, Cal. Lab. Code §1197.5, as amended; the California Fair Employment and Housing Act, ("FEHA"), Cal. Gov. Code §12940 *et seq.*; the California Family Rights Act, ("CFRA"), Cal. Gov. Code §12945.2; the California Business and Professions Code, Cal. Bus. & Prof. Code § 17200 *et seq.*; and the California Private Attorneys General Act of 2004, Cal Lab. Code §2698, *et seq.*; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–107.; and the New York Equal Pay Law, N.Y. Lab. Law § 194. Plaintiffs seek monetary and injunctive relief to rectify the Firm's discriminatory practices and policies and to ensure that, going forward, the Firm abides by the law.

## II.     THE PARTIES

47.63.  **Plaintiff Nilab Rahyar Tolton** is a female attorney who lived and worked in California at all times relevant to this action. She was employed as an associate in Defendant's Irvine, California Office until 2018.

48.64.   **Plaintiff Andrea Mazingo** is a female attorney who lived and worked in California at all times relevant to this action. She was employed as an associate in Defendant's Irvine, California Office until 2018.

49.65.  **Plaintiff Meredith Williams** is a female attorney who lived and worked in California at all times relevant to this action. She was employed as an associate in Defendant's Irvine, California Office until 2017.

50.66.  **Plaintiff Saira Draper** is a female attorney who was employed as an associate in Defendant's Atlanta, Georgia Office until 2018.

22

**Formatted:** Border: Top: (No border), Bottom: (No border), Left: (No border), Right: (No border), Between : (No border)

51.67.  **Plaintiff Jaclyn Stahl** is a female attorney who lived and worked in California at all times relevant to this action. She was employed as an associate in Defendant's Irvine, California Office until 2018.

52.68.  **Plaintiff Katrina Henderson** is a female attorney who was employed as an associate in Defendant's New York City, New York Office until 2016.

53.69.  **Defendant Jones Day** is one of the world's largest international business and litigation firms. According to its website, Jones Day is a general partnership with offices on five continents. Jones Day transacts substantial business in Washington, DC. The Firm's DC office is the seat of power from which its Managing Partner Stephen J. Brogan "is the final decision-maker on virtually every matter of significance for the Firm[.]"[19] The Firm employs approximately 250 attorneys in Washington, DC. At all relevant times, Jones Day was Plaintiffs' employer within the meaning of all applicable federal and state statutes.

### III.   JURISDICTION, VENUE, AND ADMINISTRATIVE EXHAUSTION

54.70.  This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over Plaintiffs' state law claims. The claims raised under state and federal law constitute the same case and controversy.

55.71.  The District of Columbia has personal jurisdiction over the Firm because the Firm transacts significant business in DC.

56.72.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. §2000e-5(f) because Defendant conducts substantial business in the District of Columbia, and because, upon information and belief, employment practices originating in this District have

---

[19] *Client Services*, Jones Day, https://www.jonesday.com/principlesandvalues/clientservices/ (last visited Apr. 1, 2019).

violated the Plaintiffs' and Class's legal rights.

57.73.  Plaintiff Nilab Tolton duly filed her administrative charge before the California Department of Fair Employment and Housing ("DFEH") and the U.S. Equal Employment Opportunity Commission ("EEOC") on August 6, 2018. She filed an amended charge with the EEOC on March 14, 2019. Ms. Tolton received a state Notice of Case Closure and Right to Sue under California law on August 28, 2018 and a federal Right to Sue on May 14, 2019. Ms. Tolton filed her complaint before the District of Columbia Office of Human Rights ("DCOHR") on March 6, 2019. She withdrew her complaint before the DCOHR on April 3, 2019. Ms. Tolton also filed a California Private Attorneys General Act ("PAGA") claims notice with the California Labor and Workforce Development Agency on March 27, 2019. She served Defendant with her PAGA claims notice on March 27, 2019 via certified mail.

58.74.  Plaintiff Andrea Mazingo duly filed her administrative charge before the DFEH and the EEOC on March 22, 2019, received her Dismissal and Notice of Right to Sue from the EEOC on June 21, 2019, and from the DFEH on June 24, 2019. Ms. Mazingo also filed a California Private Attorneys General Act ("PAGA") claims notice with the California Labor and Workforce Development Agency on March 27, 2019. She served Defendant with her PAGA claims notice on March 27, 2019 via certified mail.

59.75.  Plaintiff Meredith Williams duly filed her administrative charge before the DFEH on February 14, 2019, and on February 25, 2019 she received her Notice of Case Closure and Right to Sue. On March 26, 2019, she served this notice on Defendant via certified mail. Ms. Williams also filed her complaint before the DCOHR on February 19, 2019. She withdrew her complaint before the DCOHR on April 3, 2019.

60.76.  Plaintiff Saira Draper duly filed her administrative charge before the EEOC on

24

April 3, 2019 and is currently perfecting her right to sue; upon receipt of Notice of Case Closure and Right to Sue she will serve such notice on opposing counsel.

61. 77.  Plaintiff Jaclyn Stahl duly filed her administrative charge before the DFEH on March 5, 2019, and on March 6, 2019, she received her Notice of Case Closure and Right to Sue. On March 26, 2019, she served this notice on Defendant via certified mail. Ms. Stahl also filed her complaint before the DCOHR on March 5, 2019. She withdrew her complaint before the DCOHR on April 3, 2019.

62. 78.  Defendant and Plaintiffs Nilab Tolton, Andrea Mazingo, Meredith Williams, and Saira Draper, through their attorneys acting on their behalf, entered into an agreement to toll their claims and any claims brought in a representative capacity, including the time for their administrative exhaustion, from August 13, 2018, until January 9, 2019. Defendant and Plaintiff Jaclyn Stahl's attorneys, on her behalf, entered into an agreement to toll her claims and any claims brought in a representative capacity, including the time for their administrative exhaustion, from October 29, 2018, until January 9, 2019.

## IV.     PLAINTIFFS' ALLEGATIONS

### A.      NILAB RAHYAR TOLTON

63. 79.  Plaintiff Nilab Rahyar Tolton was an associate in Jones Day's Irvine office from 2010 until the Firm forced her out in 2018 after her second pregnancy. For eight years, Ms. Tolton proved herself to possess all of the qualities of a Jones Day superstar—distinguishing herself as a superb legal talent, a natural at recruiting, deft at managing client relationships, and a thoughtful mentor to junior associates. Despite this standout performance, Ms. Tolton's reputation began to tarnish after she dared to speak about what it means to become pregnant and a mother as a lawyer at Jones Day.

### i.     *Ms. Tolton Is an Accomplished and Successful Associate*

64.80.  Ms. Tolton graduated from Harvard Law School, where she was selected as the Commencement 2010 Class Day Student Speaker. At Harvard, Ms. Tolton served on the Graduate Council, the 2010 Class Committee, the Harvard Law School Student Government, and the Executive Board of the Harvard Law California Club. She joined Jones Day's Irvine office directly from Harvard in 2010.

65.81.  Jones Day heavily recruited Ms. Tolton. Before she joined, a then-current male associate contacted her to encourage her to accept the Firm's offer, touting Jones Day's market compensation and work-life balance as major selling points. He wrote, "our base salary is . . . supposed to be set at the market-rate." He also touted that "there doesn't appear to be any financial incentive here to bill beyond the minimum, and I personally don't have any plans on doing so:-)." And he emphasized that he had not "had to sacrifice [his] beloved social life" and could "still go out every Friday and Saturday night, and . . . still sleep till 2-3pm every Saturday and Sunday:-)."

66.82.  Ms. Tolton initially excelled at Jones Day. For most of her tenure at the Firm, Ms. Tolton worked almost exclusively with Partner Paul Rafferty, who was considered very difficult to work with, particularly for women. Ms. Tolton's superb performance, however, made her indispensable, and she was awarded deposition and court appearance opportunities early in her career. She also played a critical role in a five-month trial, achieving a full defense verdict to avoid millions of dollars in liability for the client. In recognition of Ms. Tolton's significant role, during a post-trial hearing on fees and costs, Partner Rafferty argued that Jones Day's fees were justified in part because Ms. Tolton was a superstar attorney from Harvard Law.

67.83.  The year before she went on maternity leave for the first time, Ms. Tolton played the primary role in obtaining the vacatur of an interim arbitration award for fraud, along with an

award of sanctions for the Firm's client.

68.84.  Ms. Tolton also forged solid relationships with clients. The Firm trusted her to regularly interact with them, and, in recognition of these relationships, the Firm invited Ms. Tolton to the sole event the Firm had for its female clients, a "spa day" which was largely attended by partners with significant client relationships. Ms. Tolton was the only associate invited, and she and her colleagues understood this invitation as a signal that Ms. Tolton was being groomed for advancement.

69.85.  Ms. Tolton was also a role model and mentor to many of the Irvine office's junior associates, and particularly women. The Firm recognized Ms. Tolton's value in this regard and entrusted her with heading the Irvine office's summer program in 2012—when it was unheard of for a junior (second year) associate to do so. The Firm's confidence in Ms. Tolton was rewarded: Firm management repeatedly praised her program as the best in office history.

70.86.  Soon, the Firm was sending Ms. Tolton to recruiting events and on campus interviews ("OCI"), which she conducted alongside the then-Firmwide Recruiting Partner, Kevyn Orr. In recognition of Ms. Tolton's stellar performance, the hiring partner of the Los Angeles office at the time, Erik Swanholt, told Ms. Tolton that he would try to have her sent to Harvard for OCI to supplement or replace the partners who were slated to attend. Ms. Tolton was ultimately assigned to the Irvine Office's hiring committee where Partner Mark Finkelstein assigned her the nickname "the closer," because she was so adept and successful at convincing recruits to commit to Jones Day.

71.87.  Partner Cary Sullivan often asked Ms. Tolton to provide formal training sessions for new associates in her office, including one on best practices for successful associates. Ms. Tolton also accompanied a class of summer associates from her office to the nationwide orientation

27

and training program at Jones Day's Washington, DC office, a role usually filled by the office's hiring partner. And at one summer event, Of Counsel Michelle Blum toasted Ms. Tolton, telling those in attendance that Ms. Tolton was the "future of the office" and that she was passing Ms. Tolton her "torch."

72.88.  Ms. Tolton's performance also won praise in her performance reviews. Partner Paul Rafferty, for whom Ms. Tolton performed the majority of her work during her early tenure at Jones Day, wrote, in 2013, that Ms. Tolton was "smart, committed, and exceptionally hard-working. She is ready to take on any challenge, any time, anywhere." In 2014, Partner Rafferty reiterated that Ms. Tolton "is an indispensable cog in my practice and willing to work 24/7 to assist the firm's clients." And in 2015, Partner Rafferty added, "Nilab is a talented lawyer. She will take on any project, and accomplish it successfully. She is extremely committed. She will offer her time to any client any time of the day or week. She is always there to support me, and always available – no matter how unavailable she really is."

> ii.    *Despite Her Exemplary Performance, Ms. Tolton's Gender Was an Obstacle to Her Success at Jones Day*

89.    Ms. Tolton's superb performance did not, however,Despite her excellent performance, Jones Day failed to compensate her consistent with her male counterparts in jobs requiring substantially equal work. For example, upon information and belief, the Firm paid her less than male associate Justin Smith.

90.    Ms. Tolton understands that Mr. Smith, a male associate in her class year, received substantial bonuses every year he was at the Firm except the year his salary was frozen as a punitive measure. However, even in this year his salary was still higher than Ms. Tolton's, as she learned from his then-girlfriend.

73.91. Ms. Tolton's superb performance also did not insulate her from sexist and

sexualized conduct and commentary. For example, then-Partner Eric Landau, who was trying to recruit Ms. Tolton to his practice group, regularly commented on her clothes and high heels. After a deposition preparation session, he remarked that partners at his former firm kept asking him why his female associates all looked like volleyball players. ~~Shortly after Ms. Tolton got married, however, Partner Landau seemed to abruptly lose interest in working with her.~~Ms. Tolton sought refuge from Mr. Landau's aggressive and unsettling recruiting by working with Partner Paul Rafferty. Ms. Tolton avoided him and even moved her office to a different floor. Partner Landau solicited Ms. Tolton to work on a new case in 2015, but lost interest after she indicated to him that she was married.

~~74.~~92.  Similarly, Partner Rafferty, Ms. Tolton's primary source of work, weighed in on a female associate's prospects for marriage given that she lived with her boyfriend, commenting: "Why buy the cow when you can get the milk for free?" Partner Rafferty also frequently mocked this female associate's appearance and attire, including, for example, referring to her business heels as "pilgrim shoes."

93.     Partner Rafferty also regularly assigned Ms. Tolton basic secretarial tasks, such as printing and saving documents to his desktop and hand-delivering documents to his home over the weekend when he was unable to access them on his home computer. While Ms. Tolton carried out these administrative tasks, Partner Rafferty's secretary was hard at work transcribing his fictional revenge thriller, *The Trophy Hunted*, the first in a series apparently inspired by the death of Cecil the Lion.

~~75.~~94.  Male associates in Irvine and ~~elsewhere~~across the Firm took their cues from the misconduct of male partners. During a ~~limo ride to a~~ summer associate wine tasting event~~, male on June 1, 2013~~, a former associate and client commented on Ms. Tolton's physical appearance,

and also began flirting with another female associate, even encouraging her to break up with her boyfriend. During the same event, associates were answering ice breaker questions organized by one of the summer program's social chairs. Male attorneys ~~from the office initiated~~warped these into increasingly inappropriate questions until initiating a game of "Fuck, Marry, Kill" in which they named coworkers from the office and proposed to whom they would do each of these things. Ms. Tolton avoided this event the following year, but learned from attendees that the male associates again played "Fuck, Marry, Kill" the following year as well, despite the fact that Firm leadership and partners, including Kevin Espinola and Cary Sullivan, had witnessed the first incident. And, at the 2014 event, a male associate who attended ~~had~~ called several of his female colleagues "cunts." ~~That male~~This same associate ~~remains at the Firm today.~~regularly referred to a female summer associate as an "Oompa Loompa."

95.     Male associates also exhibited other unprofessional and disrespectful behavior at the June 2013 event. One male associate referred to his male supervisor, Partner Kevin Espinola, as a "fat fuck," and yelled "Andale, Andale!" to their Hispanic limo driver. A former associate and client threw a soda can at a Firm lawyer who was trying to fix the music system.

96.     Immediately after the 2014 event, one of the female associates in attendance complained to multiple Firm leaders. She specifically noted her offense at the term "cunts" being used to refer to her and another junior female associate, who ended up leaving the Firm due to the offending male associate's pattern of verbal and professional abuse. Although the Firm's Human Resources office received a formal complaint regarding the incident and an investigation was conducted, that male associate remains at the Firm today, even after he got into a fight with Partner Cary Sullivan during the event. The former associate and client also faced no career consequences for his inappropriate behavior at the event, which also included slapping a current associate across

the face in front of multiple people from multiple offices.

76.97.  This casual misogyny inevitably bled into the Firm's view of Ms. Tolton as an attorney. Ms. Tolton often found herself assigned secretarial-type work and denied professional opportunities extended to her male peers. In one case, Partner Rafferty designated her as his chauffeur for a hearing on a contested arbitration award. Even though Ms. Tolton drafted the lion's share of the briefing, Partner Rafferty conducted the argument himself. He tasked her only with maneuvering demonstrative exhibits on an easel for the court to view. This assignment was particularly obtuse because Ms. Tolton was significantly pregnant at the time, making it difficult for her to move the exhibits—so much so that the opposing counsel ultimately assisted Ms. Tolton.

77.98.  As if to emphasize Ms. Tolton's role as human easel, when the male Chief Executive Officer and male General Counsel of the client departed with Ms. Tolton and Partner Rafferty to have lunch at a restaurant, Partner Rafferty turned Ms. Tolton away at the door, denying her the client interaction.

78.99.  Similarly, Ms. Tolton's facial expressions became grounds for criticism from male partners. Partner Rafferty criticized her for being too "stoic," and needing to use more "bedside manner." At the same time, illustrating the Catch-22 sex stereotyping imposes on female associates at Jones Day, Partner Cary Sullivan instructed Ms. Tolton to help coach a female associate on how to speak in a less "ditzy" manner. Partner Sullivan was the same Partnerpartner who, at a summer event, demanded that three female summer associates perform a Care BearsWinnie the Pooh song and a dance number in order to receive verbal offers to join the Firm as associates. Although the summer associates protested, Partner Sullivan insisted, and only when each had performed as demanded did she receive a verbal offer to join the Firm as an associate.

     *iii.*       ***Speaking of Pregnancy Proves Unprofitable***

79. 100.     Despite her proven track record and superior performance, Ms. Tolton's star began to fade when she asked questions about Firm policies concerning parenting—ironically, at a firm-sponsored event addressing the advancement of female attorneys. In 2014, the Partner-in-Charge of the San Diego Office, Karen Hewitt, visited the Irvine office with a then recently elevated Los Angeles Partner, Erica Reilley. Their visit was intended to model female success at the Firm and to address the Firm's reputation for being inhospitable to female attorneys who were also mothers. During the presentation, Partners Hewitt and Reilley highlighted the fact that Partner Reilley had been promoted to partner while on a reduced-time, "flex" schedule.

101.    Ms. Tolton had previously sought out mentorship from Partner Hewitt, traveling to the Firm's San Diego office multiple times and eventually speaking with her about being a military spouse and how to handle deployments as a working mother—Ms. Tolton's husband is a Navy SEAL and Partner Hewitt's husband was a Marine. Ms. Tolton was pregnant with her first child at the time of this meeting. However, Partner Hewitt was unavailable to take on the mentorship role, and Ms. Tolton's search for a mentor within the Firm again proved fruitless.

80. 102.     When the event opened for questions, Ms. Tolton asked about the Firm protocols for requesting a reduced-time schedule and notifying the Firm about one's pregnancy. She further asked how Firm policies like requesting a reduced-time schedule are implemented and for identification of the relevant decision makers. The presenters, however, did not respond and instead deflected the question by navigating their presentation to the Firm's mission statement and reciting platitudes about Firm values.

81. 103.     Immediately after the meeting, Ms. Tolton was thanked by Ms. Hewitt for her question and told to "keep asking these important questions," but Firm leadership treated Ms. Tolton's question like an insurrection. Partner Edward Chang quickly made rounds about the

Irvine office, visiting associates to gauge the perceived contagion. ~~Ms. Tolton tried to contain the reputational fall-out by promptly apologizing to office partners.~~ Partner Rafferty told Ms. Tolton that he had heard in a partner meeting that Ms. Tolton's reputation was suffering because of her question and instructed her to "play political football." Another then-partner in the Irvine office confirmed negative comments were made about Ms. Tolton's reputation due to her questions at a partner meeting, and identified the then-Diversity Partner for the Irvine office, Roman Darmer, as the initiator of the discussion. Ms. Tolton tried to contain the reputational fall-out by promptly apologizing to Of Counsel Michelle Blum, who told her she need not talk to anyone else. But the damage was done, visible in her reduced raise in compensation for the 2014 review period.

104.    Although Ms. Hewitt returned to the office to give similar presentations in 2016 and 2018, she omitted the open questions portion at the end. During her 2018 visit, while Ms. Hewitt told those in attendance that there was room for improvement and opportunities for advancement for female representation in the partnership, she shared no information on how women could advance at the Firm or avail themselves of any of the purported opportunities.

> ### iv.    *Ms. Tolton Gets Pregnant and Loses Work; Gets Pregnant Again and Gets Fired*

~~82.~~105.         Ms. Tolton became pregnant in 2015 and took maternity leave in January 2016. Near the end of that leave, in June 2016, the Firm informed her that her salary had been frozen. This was known at Jones Day as a punitive measure, as where a male associate had his salary frozen after he got drunk at a summer associate event and called several female associates "cunts."

~~83.~~106.         Ms. Tolton's performance over the prior year, as noted above, had been stellar. Indeed, Ms. Tolton never received any negative feedback in any performance review, all of which had been done verbally by Firm leadership. Accordingly, Ms. Tolton could only conclude

that the salary freeze was a result of her pregnancy and maternity leave.

84.107.     Ms. Tolton contacted the then-Administrative Partner in the office, Partner Darren Cottriel, who suggested that she come in for her performance review. Ms. Tolton then met with Administrative Partner Cottriel and Irvine Partner-in-Charge Richard Grabowski. Both partners initially gave Ms. Tolton vague but positive feedback, saying that she had done a good job and was on the right track.

85.108.     Ms. Tolton then asked why her salary had been frozen if her performance was good. Partners Cottriel and Grabowski then attempted to backtrack, asserting that they had received complaints about her work. Ms. Tolton, however, had brought to the meeting a binder of emails and documents in which clients and colleagues praised her work. She presented this binder of positive feedback to Partners Cottriel and Grabowski and pressed them for specific complaints. The partners admitted that they could not cite to any negative reviews, and suggested that Ms. Tolton speak with her reviewers.

86.109.     Again, Ms. Tolton pushed back, noting that every reviewer with whom she had spoken had given positive feedback. Ms. Tolton then observed that the only thing that had changed since her last review period had been her pregnancy and leave. Both partners became upset, and informed Ms. Tolton that she would have two more years to return to the Firm's good stead or else be fired.

110.     Ms. Tolton also informed another female associate who had recently taken maternity leave that she was not happy with her 2016 review or compensation following her leave, and the associate shared her concerns. Ms. Tolton told a male employment associate that she was experiencing pregnancy discrimination, and he indicated he was shocked that she received a negative review so soon after her maternity leave. Ms. Tolton shared similar concerns about Jones

Day's mistreatment of her with former colleagues.

87. 111.     After obtaining her personnel files from the Firm under California law in 2018, Ms. Tolton was able to confirm that the reviews on which her 2016 compensation was supposedly based had, in fact, been overwhelmingly positive, a fact certainly not reflected in her compensation for that year.

88. 112.     After her 2016 review, Ms. Tolton worked to draft an email memorializing and expanding upon her reasons for believing that Jones Day had given her a negative review and frozen her salary in response to her gender and pregnancy rather than because of any performance deficiencies on her part. While she was drafting the email, however, Ms. Tolton discovered that she was pregnant with her second child.

89. 113.     Terrified that she was already facing possible termination for having had her first child, Ms. Tolton went to Administrative Partner Cottriel's office and disclosed both her pregnancy and her fear that Jones Day would not permit her to take another leave. Partner Cottriel assured Ms. Tolton that she would be able to take a second leave. He also expressed understanding that returning from parental leave was challenging and asked her to let him know if she needed to limit her capacity at all. This instruction that Ms. Tolton did not need to work to capacity was seconded by Of Counsel Michelle Blum.

90. 114.     Ms. Tolton set out to prove her worth to Jones Day yet again. In the months after she returned from her first leave, she virtually never turned down an assignment, but found that she was only receiving active work from Partner Cheryl O'Connor. Partner O'Connor sought to staff Ms. Tolton on several cases that required travel and multiple all-nighters due to urgent deadlines, significant dispositive motions, and pending trial dates.

91. 115.     Ms. Tolton told Partner O'Connor that she would be happy to help with

these cases; however, she also noted that her upcoming leave and travel restrictions would render her unavailable during critical time frames, requiring significant and costly duplicative work by a subsequent attorney taking over the cases down the line. Accordingly, Ms. Tolton suggested that assigning an associate who could handle the cases throughout their lifecycles would better serve the client. This was the first time Ms. Tolton had turned down an assignment, other than when Partner Rafferty specifically instructed her to do so—it was not uncommon for him to demand full capacity even when he wasn't assigning associates enough work.

92.116.        Nevertheless, around Thanksgiving 2016, Partner O'Connor assigned Ms. Tolton approximately one dozen cases, including one case ripe for a dispositive motion. Partner O'Connor insisted Ms. Tolton take over these matters, despite the fact that much of the anticipated air travel for these cases would occur when Ms. Tolton would be unable to fly due to her pregnancy.

93.117.        Ms. Tolton worked tirelessly, at times so ill from her pregnancy that she could not sit at a desk. Working from home in the mornings and evenings, she took breaks and turned off lights to stave off extreme nausea while working. Concerned that her physically impaired state made her less efficient, Ms. Tolton chose to bill only the hours she felt should have been required for her to complete the work, though the hours she spent toiling through illness were considerably greater.

94.118.        Ms. Tolton also sought work on a major case being run out of the Firm's New York Officeoffice that would better accord with her state of physical limitation due to pregnancy. The New York partner leading the case called Ms. Tolton at home one evening to assess her commitment to the matter, concerned that she was not yet able to bill to it full time. Ms. Tolton affirmed her commitment and was billing full time on the New York case by December,

while also handling lingering work on Partner O'Connor's cases through the new year.

95. 119.     Around this time, Ms. Tolton's doctor informed her that she could not keep up her intensive work schedule. Her physician wrote a note to that effect, which Ms. Tolton submitted to Administrative Partner Cottriel. She also sent Partner Cottriel an email about her capacity for work, in which she stated that she believed she could continue to bill extensively by working on the New York matter, but that transitioning some of Partner O'Connor's matters would be necessary in light of her pregnancy-related travel restrictions.

96. 120.     Partner Cottriel, however, despite his earlier assurances that he would help Ms. Tolton limit her work if necessary, now summoned Ms. Tolton to a conference room to chastise her for not working hard enough and accuse her of misstating her capacity. Until this conversation, no one had ever told Ms. Tolton that there was a problem with her hours, and in fact Jones Day repeatedly emphasized to its associates that the Firm valued "quality over quantity." Partner O'Connor, who was also present, sat in silence.

97. 121.     Even under these circumstances, Ms. Tolton continued to deliver exceptional results, settling several of Partner O'Connor's cases. Indeed, Ms. Tolton negotiated global settlements of cases assigned to other Jones Day attorneys, helping the client and the Firm avoid unnecessary trials. In the following months, from December 2016 through March 2017, Ms. Tolton continued to work hard for the Firm, billing approximately 200 hours per month on the New York matter.

98. 122.     In March 2017, Ms. Tolton went on her second parental leave. Jones Day informed her in June 2017, during her leave, that, once again, the Firm was freezing her salary. In her first days back from leave, in October 2017, Ms. Tolton was again called in for her annual review. Partners Grabowski and Cottriel then told Ms. Tolton that she "should look for other

opportunities outside the Firm," adding that she had six months to leave, and that she should prioritize finding another job instead of taking on any billable work within the Firm.

99. 123.       As pretext for her abrupt termination, Partners Grabowski and Cottriel falsely accused Ms. Tolton of having misstated her work capacity when she had been physically incapacitated due to her pregnancy. Ms. Tolton's written review ultimately faulted her for not submitting a doctor's note, even though she had in fact submitted such a note. Even worse, the written review questioned Ms. Tolton's "candor" *because* she had informed the Firm that, while pregnant, she was physically unable to continue at her previous rate of work, and thus had not billed the hours that she felt were attributable entirely to her state of illness.

100. 124.       Ms. Tolton's 2017 written review of her 2016 work also claimed that "there [wa]s diminishing internal demand for her work among the litigation partners in Irvine." In fact, however, shortly after Ms. Tolton returned from leave, Partner John Vogt approached Ms. Tolton to ask if she needed billable work, offering to assign her to a number of matters under his supervision. Ms. Tolton declined, however, in light of Partner Cottriel's instruction upon giving her notice of termination. Instead, she worked diligently over the following months to seek comparable employment, billing her hours daily to an office administrative matter number as "Research opportunities per D. Cottriel."

101. 125.       As word of her termination spread, several Firm partners volunteered to help Ms. Tolton seek an in-house job with Firm clients. Among those who followed through on this offer was Partner Edward Chang, widely recognized as keeping a close thumb on the Irvine office pulse, who told Ms. Tolton how surprised he was to hear she was being fired and sought out not-publicly-posted opportunities for Ms. Tolton among his business contacts.

> *v.*       ***Pushed Out for Speaking Up, Ms. Tolton Suffers Lasting Harm***

102.126.       Ms. Tolton had served as a mentor to several female attorneys in her office. After she gave notice that she was leaving the Firm, a number of these attorneys approached her with questions about her departure. She told them the truth: that she was experiencing discrimination on the basis of her pregnancy and that Jones Day had made it clear to her through its compensation decisions and performance evaluations that she no longer had a future at the Firm. Ms. Tolton also shared her experiences with a female Of Counsel, who confirmed her experiences with Jones Day's sexist leadership preventing women from advancing at the Firm.

127.    Ms. Tolton also told Partners Grabowski, Cottriel, and Chang that she believed Jones Day gave her negative reviews and froze her salary during both maternity leaves because of her pregnancy and maternity leave. She shared with Partner Chang her view that the office was "led by a critical mass of insecure bullies."

103.128.       The Firm swiftly retaliated. APartner Sullivan went around the Irvine office asking female associates if Ms. Tolton had spoken with them, and a few days before her scheduled last day, Ms. Tolton found herself locked out of her Jones Day email. Partner-in-Charge Grabowski and Administrative Partner Cottriel then called Ms. Tolton at home in the middle of her son's first birthday party. They told her that they would ship her belongings to her and barred her from returning to"for badmouthing the office.."

129.    In contrast, the Firm does not swiftly remove male associates. One male associate in Ms. Tolton's practice group routinely arrived at the office late, took regular vacations, and failed to bill near 2000 hours in his last several years at the Firm. Instead of pushing him out, Partners would jokingly reference his late arrivals to the office in a fun-loving way while treating women who were not in the office during regular business hours with derision and contempt. This associate was then graciously placed in house by Partner Grabowski at a major Firm client. Another male

associate in Ms. Tolton's practice group was told that he would never make partner but that there was "no rush" for his departure. He was then given the title "Counsel" and placed in-house at a Firm contact by a Firm partner.

104.130.    In response to this abrupt and retaliatory expulsion, Ms. Tolton wrote a follow-up email to these partners, noting that she was being punished for honestly sharing her experience at Jones Day with her coworkers. It could not have been lost that Ms. Tolton was speaking of her experience as a woman and a mother of young children.

105.131.    As a result of the discrimination that she experienced at Jones Day, Ms. Tolton suffered from and continues to suffer from significant emotional distress.

### B.    ANDREA MAZINGO

106.132.    Andrea Mazingo was an associate in Jones Day's Irvine office whom Firm partners long signaled was on track to join their ranks. Every attorney with whom Ms. Mazingo worked gave her excellent reviews. Indeed, she had no negative reviews and was selected for important office leadership roles, including Recruitment Committee Member, Summer Work Coordinator, Summer Social Chair, and pro bono coordinator for the Summer Associates.

107.133.    Then-Partner Eric Landau told her that Firm partners had expressly identified her as a promising partner candidate at an all-partner meeting. Kevin Espinola, the Irvine office's Business Development Partner, approved special funding for a creative business development plan that Ms. Mazingo designed to facilitate regular face-to-face contact with local entrepreneurs. California Partner-In-Charge Christopher Lovrien told her at a community event that Irvine partners had been singing her praises. She received praise for her work on a case involving a large financial institution out of Jones Day's New York office, and the Firm bragged in internal newsletters and on its website about her *pro bono* victories.

40

108.134.    Ms. Mazingo worked tirelessly for the Firm at great personal cost for years—logging up to 250 billable hours per month—to win over attorneys in Jones Day's Securities Litigation and SEC Enforcement Practice Group, which was a highly competitive andan overwhelmingly male group. By meeting the demands of male partners in her practice group, she believed she could advance to the Firm's partnership on her merit.

135.    She was wrong. Instead, the Firm paid her less than the promised "top market" it recruited her with and, upon information and belief, less than that paid toWhile the Firm assured her before she was hired that she would be valued the same as any associate in any other large city, the Firm failed to do so. During Ms. Mazingo's call-back interviews for the position of a Summer Associate, she questioned numerous attorneys about whether her advancement to partnership would be affected by joining the Firm's Irvine office, as opposed to an office in a larger city. The Firm assured her that her work would be valued the same as that of any associate in any other large city because all California offices are paid at "top market," and, in fact, stated that she would receive local opportunities on leanly staffed cases that may favorably affect her advancement to partnership. Once Ms. Mazingo was a third-year associate, she noticed that she was not receiving pay and face-time opportunities with firm leadership commensurate with her talent and positive reviews. At this time, she approached Irvine Administrative Partner Darren Cottriel to discuss whether she could relocate to another office for some time period to further her advancement, but Partner Cottriel again assured her that practicing in Irvine would have no adverse effect on her career or compensation.

109.136.    Ms. Mazingo was unable to verify whether her pay really was consistent with what her male colleagues in other offices were being paid, as she was reminded by leadership throughout her time at Jones Day that pay decisions were "confidential," and each letter she

41

received from Firm Managing Partner Stephen Brogan regarding her compensation advised her not to discuss her compensation with anyone inside or outside the Firm. Upon information and belief, the Firm paid her less than it paid comparable male associates. The Firm also denied her mentorship opportunities, sexually harassed her, and refused to accept her as a true member in its fraternity.

### i.   A Rising Star at Jones Day, Ms. Mazingo Is Subjected to Constant Sex-Based Harassment

110.137.    Ms. Mazingo joined the Firm straight out of Northwestern Pritzker School of Law, from which she graduated with honors in 2014. From the outset, the Firm was hostile. Reflecting the Firm's knee-jerk hostility towards women's equality—in ways both large and petty—Jones Day refused to permit Ms. Mazingo to list her feminist law journal publication on her website biographical page.

111.138.    Within her first year, the Firm selected Ms. Mazingo to assist the Global Disputes Practice Group with two arbitrations in San Francisco, a rare honor for a new associate. As the only female attorney on the team, Ms. Mazingo made every effort to prove herself, billing over seventeen hours a day for several days in a row. Despite her hard work and excellent performance, Ms. Mazingo's supervisor, now Partner Marcus Quintanilla, called her "sweetheart" at a meeting with other Firm lawyers, pried into Ms. Mazingo's romantic life, and gave her unwelcome, suggestive details about his own. HeWhen Ms. Mazingo's engagement ended during her first year as a Jones Day Associate, a staff member saw her upset in her office. When Partner Quintanilla caught wind of the news, he barged into Ms. Mazingo's office to discuss her engagement ending, even though Ms. Mazingo was not planning to discuss her personal affairs with her superiors. Later, during a business dinner attended by only Partner Quintanilla and Ms. Mazingo in San Francisco, he told her that she was "quite the catch" and would "not be single for

long." He discussed how he, too, was single and in the dating scene. After Ms. Mazingo agreed to

join him for a that business dinner, Partner Quintanilla repeatedly referred to the dinner as a "date."

Formatted: Font color: Auto

Formatted: Font color: Auto

Formatted: Font color: Auto

112.139.    After she finished with the arbitrations, Ms. Mazingo was recruited into the

Firm's Securities Litigation and SEC Enforcement Practice Group. Then-Partner Eric Landau told

her that he and Partner Roman Darmer were impressed with her obvious talent and work ethic.

Once she joined the group, however, then-Partner Landau degraded Ms. Mazingo as a sex object,

regularly subjecting her to sexist comments about her appearance, including her makeup, her hair,

and her choice of footwear. For example, he continually pressed Ms. Mazingo to wear high heels,

even though she assured him that she was more comfortable in flats. Then-Partner Landau also

frequently demanded that Ms. Mazingo account for why she looked "prettier than usual" on any

given day.

113.140.    Ms. Mazingo was not the only female Jones Day employee about whose

Formatted: Font color: Auto

appearance Partner Landau commented. In front of the entire Irvine office, then-Partner Landau

extolled how "banging" his secretary's body looked in a bikini at an event that had been planned

to honor that secretary. The secretary, who was also Ms. Mazingo's secretary, complained to Jones

Day, but, so far as Ms. Mazingo is aware, the Firm never took action against then-Partner Landau.

As a direct result of then-Partner Landau's actions and comments, the secretary was forced to

resign, which particularly upset Ms. Mazingo because she had worked closely with the secretary

since she had been a summer associate.

114.141.    Then-Partner Landau's sexist and sexualized comments were not isolated

Formatted: Font color: Auto

incidents. Ms. Mazingo's peers later tasked her with planning a "women's luncheon"—a

dispiriting ritual in which the office's female attorneys (which included no homegrown partners)

sought to mentor each other. To signify that it was Ms. Mazingo's turn to plan the luncheon, she

was forced to display a 4-foot tall cardboard cut-out of a lipstick tube in her office for months.[20]
When then-Partner Landau asked Ms. Mazingo why the lipstick cutout was in her office, she
explained the backstory. He in turn responded, "Oh, I thought it was because you are a lipstick
lawyer," an allusion to the term "lipstick lesbian."

115.142.    While Partner Quintanilla and then-Partner Landau repeatedly subjected
Ms. Mazingo to unwanted sexual attention, they denied her mentorship and professional attention.
Then-Partner Landau and other male attorneys on his team, including Associate Rob Tiefenbrun
and Of Counsel Travis Biffar, often left Ms. Mazingo in the office to work through lunch while
they went to enjoy boys-only lunches together. They excluded Ms. Mazingo even though she sat
next to them and worked on most of the same matters.

116.143.    By contrast, the female mentorship lunches—organized by the lawyer with
the lipstick cutout in her office—were poor substitutes for the one-on-one professional attention
that Biffar and Tiefenbrun received from then-Partner Landau. The female attorney lunches often
focused on socializing and conversations about families and weddings.

*ii.  Ms. Mazingo Seeks Opportunities for Advancement and Is Told to Look
Elsewhere*

117.144.    Denied mentorship and support, Ms. Mazingo approached Partner Darmer,
the partner with whom she worked most, about whether he might help guide her. Even though his
reviews of Ms. Mazingo had been positive, he refused to mentor her, telling her, in striking candor,
that she would be best off leaving the Firm to get experience elsewhere. Ms. Mazingo declined to
push Partner Landau, the other partner in her practice group at Irvine, who had also given her

---

[20] Male attorneys vandalized and defaced the cutout after hours on one occasion, causing
consternation among the office's female attorneys.

positive reviews, for mentorship because his last female mentee had become his romantic partner, not his business partner.

118.145.     Persisting still, Ms. Mazingo scheduled a meeting in early 2017 with Partner Cottriel, the Irvine office's Administrative Partner. At the meeting, Ms. Mazingo expressed her concerns about the lack of guidance and mentorship. Ms. Mazingo requested a mentor in Irvine—*of any gender*—to guide her towards partnership. Ms. Mazingo also brought up her concern that the Irvine office had no homegrown female partners, which Partner Cottriel dismissed, blaming "self-selection bias." Partner Cottriel sat on her request for a mentor for months and eventually assigned Ms. Mazingo a female partner mentor in San Diego. But this partner never mentored or even met with Ms. Mazingo. The Firm's message thus could not be clearer: To Jones Day, nothing signified Ms. Mazingo's value as a lawyer more than her gender.

### *iii.  Discrimination and Disparate Treatment Take a Toll on Ms. Mazingo; Her Complaints and Concerns Go Unaddressed and Are Mocked*

119.146.     Lack of mentorship was not the only obstacle to success that the Firm imposed on Ms. Mazingo. Jones Day also regularly imposed heightened demands on female associates. While male associates received breaks to recover during ebbs in the work, and recognition of the burdens of fatherhood, Partner Darmer worked Ms. Mazingo to exhaustion.

120.147.     This disparate treatment took a profound toll on Ms. Mazingo's mental and physical health, preventing her from obtaining medical care she needed, and causing her to develop several serious medical conditions. When Ms. Mazingo tried to broach this subject of being particularly overloaded, and the harm that it was causing to her physical health, Partner Darmer ridiculed her and refused to let up at all. Indeed, Ms. Mazingo overheard a conversation between Partner Darmer and Mr. Associate Bart Green in which the two mocked her and laughed at her for raising concerns about her physical well-being. Partner Darmer then said, "she should get back to

45

us once she has children," a comment that illustrated why Ms. Mazingo was not given breaks: because she did not have their shared experience of fatherhood.

121.148.    Ms. Mazingo likewise raised her concerns about her diminishing physical

**Formatted:** Font color: Auto

health with Partner Cheryl O'Connor, who at the time was the only female partner in the Irvine office. Partner O'Connor smiled as Ms. Mazingo nervously confided that she was physically incapable of meeting the demands that had been placed on her. In response, Partner O'Connor offered Ms. Mazingo no advice, referred her to no further resources, and never followed up about Ms. Mazingo's concerns.

122.149.    To hammer home the message that female associates should not have a life

**Formatted:** Font color: Auto

outside the Firm, much less a family, then-Partner Landau's girlfriend, herself a former Jones Day Irvine attorney who had once worked under then-Partner Landau, expressly informed associates that, in order for women to succeed at Jones Day Irvine, they should not have children. She explained that female associates simply would not have the time or attention to care for them.

123.150.    Although Ms. Mazingo was not a parent, she did have significant caregiver

**Formatted:** Font color: Auto

responsibilities for a family member. And, as a result of the Firm's unspoken hostility towards female caregivers (in contrast to Partner Darmer's respect for fathers), she feared revealing this information to the Firm for years. Partner Darmer's all-consuming demands eventually forced Ms. Mazingo to complain to Administrative Partner Cottriel in early 2017. Partner Cottriel, however, did nothing.

124.151.    In October 2017, Partner Darmer's hostile and verbally abusive

**Formatted:** Font color: Auto

management of Ms. Mazingo came to a head. During a particularly busy week, Ms. Mazingo was traveling both to Arizona to take a deposition for one of the Firm's biggest clients and also to another distant location to conduct custodian interviews at a client site. On short notice, Partner

46

Darmer tasked Ms. Mazingo with preparing a set of internal talking points for a call he was to conduct.

125.152.    At the time, Ms. Mazingo was billing more than 230 hours a month and traveling for work all week, but she nonetheless completed the assignment on time. Disregarding her overbooked schedule, Associate Green then harshly informed Ms. Mazingo that her work no longer conformed to Partner Darmer's expectations, because the talking points contained typos.

### *iv.   Subjected to a Discriminatory Culture and Refused Assistance, Ms. Mazingo Is Forced out of the Firm*

126.153.    Because of the sexist Jones Day environment, Ms. Mazingo sought psychiatric treatment, and her doctor instructed her to take medical leave immediately. She did so by arranging to be out for one weekend with the Irvine office's manager; in light of the pressure Partner Darmer placed her under, she was not comfortable requesting a longer leave. After her return, however, Partner Darmer attacked Ms. Mazingo for how she had communicated her medical leave. Berating her in front of her colleagues, he caused her to suffer a panic attack.

154.    In contrast to the harsh treatment received by Ms. Mazingo, a male associate in Ms. Mazingo's year also took a medical leave in 2017. This associate was not berated by Partner Darmer or removed from his cases. As a result, this male associate had enough job security to take a proper leave that was long enough for him to recover fully, unlike Ms. Mazingo, who could take only a weekend of leave, and yet still suffered repercussions even for that brief leave.

127.155.    Ms. Mazingo told Administrative Partner Cottriel that Partner Darmer's abuse was taking a heavy toll on her health, but Administrative Partner Cottriel again dismissed her concerns and failed to act. Partner Darmer thereafter sent a follow-up email in all-caps to reprimand Ms. Mazingo further about how she had communicated her medical leave. Partner Darmer then stopped speaking to Ms. Mazingo altogether, effectively ending her career at Jones

Day.

128.156.    Completely cut off from the principal partner with whom she had worked and deprived of any mentoring support to advance to partnership, Ms. Mazingo was forced to leave the Firm. Before she did, she approached several Firm partners to voice her concerns about the gender discrimination and lack of opportunities for females' advancement at the Firm. SheThese partners included former Firm Hiring Partner Mark Finkelstein, former Irvine Securities Litigation and SEC Enforcement Practice Group Leader Partner Eric Landau, Firm Administrative Partner Darren Cottriel, and current Firm Hiring Partner Edward Chang. She even sent an email message to Partner Darmer in attempt to discuss these issues even though he had not been speaking to her, but he did not respond. To those who would listen, she suggested various measures to help remedy the Firm's problems, including assigning formal partner and senior associate mentors to each junior associate, irrespective of gender, and not pigeon-holing female associates into low-rate, low-stakes, and flat-fee litigation for a large credit bureau, She also discussed how one first-year female associate in particular was only being assigned paralegal and secretarial-type work, while a first-year male associate sitting just a few doors down was receiving extensive substantive work.

157.    Upon information and belief, the Firm took no meaningful action in response to Ms. Mazingo's complaints and suggestions.

129.158.    Ms. Mazingo left Jones Day in April 2018. On her last day, she sent a farewell letter to her colleagues, which she concluded with some "parting words of encouragement": "it"[I]t is time for a woman to define what a successful path to partnership looks like for a female associate at Jones Day Irvine, whether or not that path replicates that of our esteemed predecessors. I look forward to celebrating each of your career successes with you." Upon reading this, Partner Edward Chang stormed into Ms. Mazingo's office and stood over her

48

until she left for good.

130.159.　　　Ms. Mazingo suffered greatly as a result of the gender discrimination that she endured at Jones Day. The Firm's discriminatory treatment of Ms. Mazingo triggered her fibromyalgia, a chronic pain condition that significantly affects one's quality of life. In Ms. Mazingo's case, her doctors agreed that the harm inflicted by the Firm was the cause of her relapse.

131.160.　　　After leaving the Firm, Ms. Mazingo was hospitalized for three days, and her physicians instructed her to take a two-month medical leave to recover. Ms. Mazingo still suffers chronic pain to a degree and for an extended time period that she never experienced prior to her time at Jones Day, suggesting that leaving her ailments untreated while suffering discrimination at Jones Day may have led to permanent nerve damage. Ms. Mazingo undergoes physical therapy multiple times a week, regularly visits a pain management doctor, and is in consultation regarding participating in nerve regeneration treatment that is still undergoing clinical trials.

### C.　　**MEREDITH WILLIAMS**

    *i.*　　***Meredith Williams Was a Rising Talent Whom Jones Day Underpaid and Pushed Out***

132.161.　　　Meredith Williams was an associate in Jones Day's Irvine office who was encouraged at the behest of Jones Day's male management to turn down a competing offer in order to stay with the Firm, only to receive minimal raises thereafter. Blocked from advancement at Jones Day, Ms. Williams was ultimately forced out of the Firm.

133.162.　　　Ms. Williams joined Jones Day as a summer associate in 2012 after being vigorously recruited by the Firm. She began as a full-time associate in October 2013.

134.163.　　　In 2015, Ms. Williams received an offer to join a competing large firm that would have provided her valuable intellectual property ("IP") law experience and paid her more

(in above-market base salary and market bonuses). She approached Jones Day about the competing offer, and the Firm agreed to facilitate more IP work for her and indicated that her compensation would improve. In reliance on that representation, Ms. Williams declined the competing offer and remained with Jones Day.

164.   When Ms. Williams made her decision to remain at Jones Day, however, the Firm's tone changed. ~~She was told that she should not ask for an increase in compensation because it would draw the wrong sort of attention from Managing Partner Brogan.~~ Ms. Williams's compensation thus was not increased to meet the 2015 offer she had declined, even though she stayed with Jones Day and received outstanding reviews until 2017. Indeed, in her last year with the Firm, Ms. Williams received a raise of just $10,000, despite billing over 2,100 hours.

~~135.~~165.      Ms. Williams also did not earn as much as her male comparators at Jones Day who, upon information and belief, earned market salaries despite the fact that they were in jobs requiring substantially equal work. Ms. Williams understands that she performed similar work to male associates Steven Gersten, Harrison Golden, Tom Panighetti, Gregory Martin, Adrian Garcia, and Robert Dahnke but nevertheless earned less than they did. Upon information and belief, male associates Cyrus Ameri, John Migliarini, and Thomas Haldorsen all earned more than she did when they were at her level. All of these men performed similar work as she did, and upon information and belief attended similar firm-wide trainings. Upon information and belief, Jones Day paid her less than male associates even though she routinely billed more hours than they did.

166.   Ms. Williams attempted to address her compensation in late August 2015, but a partner told her not to request a raise because it would "attract the wrong attention" from Managing Partner Brogan.

~~136.~~167.      Ultimately, Ms. Williams was forced to leave the Firm in 2017, when she

received an unfairly negative review because another associate had failed to complete an assignment.

ii.   ***Jones Day's Toxic Culture Relegates Female Attorneys to Second-Class Status***

~~137.~~168.   During her time at Jones Day, Ms. Williams was subjected to sexist comments and marginalization within the Firm's culture. Firm social events revolved around excessive drinking. Female attorneys were pressured to participate, lest they lose crucial opportunities or be pegged by male attorneys as "stuck up," "too intense," or "no fun." For example, while traveling to a Firm-sponsored wine-tasting event by limousine, male Jones Day attorneys and male clients encouraged the assembled to consume alcohol and began conducting a "game" of "Fuck, Marry, Kill." This "game," popularized by Howard Stern, asks "players" to distribute three named persons between the aforementioned buckets. The male Jones Day attorneys, including Partner Cary Sullivan, targeted female associates to play along, asking them to select among the male attorneys at Jones Day whom they would wish to "kill," "marry" or "fuck." Ms. Williams and the other female associates refused to engage and sat there in shocked discomfort.

~~138.~~169.   As Ms. Williams would learn, this sexist, sexualized banter was one manifestation of the culture at Jones Day, in which male brotherhood is affirmed by comments and conduct that derogate women. In addition to lacking meaningful outlets for complaints in this regard, young female associates struggled in this environment to obtain support or advice as to how to succeed.

170.   Concerned about the lack of a clear path for success as a female attorney at Jones Day, Ms. Williams reached out to potential mentors, including a more senior female associate in her office. Rather than offering reassurance that it was possible to succeed as a woman at Jones

Day, however, that female associate immediately reported the inquiry to Administrative Partner Darren Cottriel. The message was clear: Success as a woman at Jones Day was not available to those who raised questions about gender equity at the Firm.

~~139.~~171.     One former Jones Day attorney, at the time in-house counsel at a Jones Day client and girlfriend to then-Jones Day partner Eric Landau, gave a talk to Ms. Williams and a group of other young female associates ~~indicating~~affirming this message. She indicated that, in order to succeed at the Firm, women should not have children.

~~140.~~172.     Partner Mark Finkelstein drove home the same point to Ms. Williams at her exit interview. At that interview, Ms. Williams expressed to Partner Finkelstein how discouraged she was by the lack of partnership pathways for women at the Firm, noting that the Irvine office lacked any internally-promoted female partners. Partner Finkelstein acknowledged the Firm's lack of female partners but blamed the Firm's own female recruits for the deficit, ~~stating~~asserting the gendered stereotype that they all "choose to have families~~."~~," and further illustrating that the Firm is not committed to the growth and advancement of its female associates.

### iii.    *Jones Day Discriminates Against Meredith Williams Based on Her Gender*

173.     After years of strong reviews, and yet another year of impressive performance, Ms. Williams received her first negative annual review in 2017. Ms. Williams had excelled at motion practice throughout 2016, billing 2,342 hours including significant pro bono work, while juggling community engagement representing the Firm for a total of 2,568 hours.

~~141.~~174.     Rather than acknowledging her positive performance, however, Jones Day instead fixated on an incident in which another associate had dropped the ball on a motion that Ms. Williams had turned over to that associate for completion. This experience is exemplary of what women at Jones Day experience in their performance reviews. Upon information and belief, Jones

Day discriminates against female associates by awarding them lower overall ratings than their male colleagues, even when the individual reviews and ratings they received do not justify low overall ratings. Ms. Williams, for example, routinely received high reviews from individual reviewers, yet her final numeric ratings were far lower.

175.   In contrast, the Firm awards male associates unwarranted positive reviews. For example, upon information and belief, two male senior associates did not receive a lower review in 2015 after they failed to leave adequate time to prepare a summary judgment briefing and delegated important case management responsibilities to Ms. Williams, who had been practicing law for less than a year and a half, and a female paralegal. While Jones Day fired the paralegal, the Firm eventually promoted one of the male associates to partner.

142.176.       A subsequent review of herMs. Williams's full personnel file, which she was able to obtain under California law, confirmed for Ms. Williams that her evaluations that yearfor 2016 had been, once again, generally positive across the board, with the notable exception of the partner who blamed her for the error of her colleague.

143.177.       That exception, however, became the rule by means of the so-called "consensus statement," through which the actual "consensus" identifiable in the underlying reviews was displaced by a singularly negative perspective.

144.178.       Instead of recognizing her impressive record of responsiveness to partner demands, Ms. Williams's annual review accused her of being "overcommitted," saying in essence that she had erred by accepting too much work from too many partners.

145.179.       Paradoxically, Ms. Williams's female colleague, Jaclyn Stahl, received a negative review that same year for exactly the *opposite* reason: Ms. Stahl was faulted for having avoided overcommitment, having asked one partner to communicate her unavailability for a

particular assignment to another partner.

146.180.    Concerned about what her unfairly negative review portended for her future at Jones Day, Ms. Williams spoke with Irvine Partner-in-Charge Richard Grabowski later in the summer about her prospects for advancement at Jones Day. Partner Grabowski told Ms. Williams that a prerequisite for partnership at Jones Day was that she have *absolutely no* negative reviews. He told her that her pro bono and other contributions to the Firm were simply "icing on a bad cake."

181.    Upon information and belief, male associates were not held to the same standard of *absolutely* no negative reviews, nor were they penalized for being "overcommitted"—as exemplified by the male associate who was promoted to partner after he delegated important case management duties to Ms. Williams.

147.182.    Conversations with female attorneys who had left Jones Day prior to Ms. Williams confirmed the lack of prospects for equal advancement and ultimately partnership for women. Indeed, at least one former associate indicated that she wished she had left Jones Day earlier. That associate said she spent years receiving under-market compensation and losing marketability while pursuing partnership, only to realize that becoming a partner at Jones Day was neither likely nor worth pursuing. She noted that even one apparently successful female partner at the Firm whom they both knew worked constantly and was not paid commensurately for her efforts.

148.183.    With the writing on the wall that she had no prospect for partnership, Ms. Williams felt she had no choice but to leave Jones Day a few months later, in the fall of 2017. Her new employer, a competing law firm, has consistently recognized Ms. Williams's excellent work with appropriate compensation and advancement.

54

**D.**     **SAIRA DRAPER**

~~149.~~184.        Saira Draper joined Jones Day's Atlanta office in 2011. She stayed with the Firm until she was terminated in 2018, joining the ranks of multiple other senior associates in Atlanta who had been discharged, pushed out or demoted after becoming mothers.

~~150.~~185.        Prior to the birth of her first child, Ms. Draper received opportunities and earned positive reviews. But when Ms. Draper returned from her first parental leave in July 2015, her opportunities for advancement dwindled, and she was presumed to be uncommitted to her work because she had started a family.

~~151.~~186.        When Ms. Draper became pregnant with her second child in 2017, Jones Day promptly gave her a negative review and a long list of unachievable benchmarks that she would have to meet in order to get back on partnership track. Ms. Draper affirmed her commitment to the Firm and worked hard to meet these demands over the ensuing months. Despite her efforts, Jones Day made the decision to push her out while she was on parental leave, and ultimately terminated her employment.

       ***i.***     ***Ms. Draper Was an Accomplished and Successful Associate Who Actively Promoted the "Jones Day Way"***

~~152.~~187.        Ms. Draper joined Jones Day immediately after law school. Before she had children, partners rewarded her dedication and high performance with steady, engaging work, and she earned excellent reviews. Nonetheless, Ms. Draper, upon information and belief, was paid less than what certain male associates both in her office and across the Firm earned for doing comparable work. For example, upon information and belief, Jones Day paid Ms. Draper less than one Atlanta male associate who was a year junior to Ms. Draper and also in the Investigations & White Collar Defense sub-practice group. Upon information and belief, Jones Day also paid her less than two Atlanta male associates in the Tobacco litigation sub-practice group who were junior

**Formatted:** Border: Top: (No border), Bottom: (No border), Left: (No border), Right: (No border), Between : (No border)

to her. The Firm paid another male litigation associate in Ms. Draper's office $220,000 when he was a fourth-year associate, but Ms. Draper earned only $180,000 as a fourth-year associate.

> **Formatted:** Font: 12 pt

~~153.~~188.     Ms. Draper's first major assignment involved a complex litigation matter for one of the Firm's largest clients. Because of her foreign language abilities and familiarity with the voluminous facts of the case, Ms. Draper took to managing teams of attorneys as a very junior associate.

~~154.~~189.     In her office, Ms. Draper was in high demand. She worked directly for two practice group leaders as either the sole or lead associate on several of their matters. Ms. Draper began developing an expertise within the Firm's internal investigations sub-practice, a field for which she was told by partners she had a natural aptitude. Clients also commended Ms. Draper's hard work and dedication. The partners with whom she worked praised Ms. Draper for her work and spoke with her about her future potential. The partners continued to rely on Ms. Draper's work throughout her time at the Firm, even trying to staff her as lead associate on an investigation after they knew Ms. Draper had been ~~asked~~told to ~~leave the Firm~~look for alternative employment.

~~155.~~190.     When Ms. Draper was a third-year associate, then head-of-litigation for her office, Partner Richard Deane, chose her to accompany him to a multi-week federal jury trial for a high-profile case in Washington, DC. This was a coveted opportunity, because trial experience was difficult to come by at a firm the size of Jones Day. Even though several associates in her office had worked on the case, some even senior to Ms. Draper, she was the only associate from the Atlanta office selected to go to trial. She was also one of just three associates on the trial team.

~~156.~~191.     At trial, Ms. Draper was Partner Deane's right-hand person. Ms. Draper received stand up opportunities at the trial, and Partner Deane praised her trial lawyer "chops." The news of Ms. Draper's performance made its way back to Atlanta, and Partner Lizanne Thomas,

then Partner-in-Charge of the Atlanta office, told Ms. Draper that she liked what she heard about her trial work in DC.

157.192.    Upon Ms. Draper's return from trial, Partner Thomas approached her and a partner in the Atlanta office and asked them to go to the US-Mexico border to assist in the Firm's pro bono immigration work. This work evolved into the Firm's preeminent pro bono project known as the "Laredo Project." Ms. Draper complied with Partner Thomas's request and was one of the first attorneys at the Firm to be involved with the project. Partner Thomas told Ms. Draper she would be a key member of the Laredo team.

158.193.    Ms. Draper's early contributions to the team were recognized by the partner she worked with, who told Atlanta Office leadership and the Firm's pro bono partner he was grateful for Ms. Draper's work. Several months later, Ms. Draper was asked by the Atlanta Office's pro bono partner to take on a central coordinating role on the project for the Atlanta office. By all objective measures, Ms. Draper understood she was answering the Firm's call by working on the Laredo Project.

159.194.    Ms. Draper also contributed to the Firm's internal initiatives by serving on the office's diversity and hiring committees, mentoring summer associates, and representing the office at Georgetown University Law Center's on campus interview program every year she was at the Firm until 2018, when she was passed over without explanation.

*ii.    Work Dries Up After Ms. Draper's First Maternity Leave*

160.195.    Ms. Draper learned she was pregnant with her first child while away at the Washington, DCD.C. trial, during which she billed in excess of 1715 hours per day. Ms. Draper continued working throughout her pregnancy and traveled for work well into her third trimester. She took leave in the first half of 2015 and returned in July 2015 to find that the office was slow

and there was very little litigation work available. She conferred with partners in her office, but was informed matters were fully staffed; she was told she would be informed when a new opportunity arose.

161.196.     Ms. Draper repeatedly raised concerns with office administration about not being able to find enough work after coming back from leave. Each time, office administrators assured Ms. Draper that the issue was not specific to her and that there were other litigation associates similarly looking for work. Conspicuously, Ms. Draper had no mentor to whom she could turn for assistance in obtaining work. Ms. Draper's male colleagues, however, had no trouble obtaining billable work.

162.197.     Partners asked Ms. Draper to assist them with non-billable work, however, including preparing CLE presentations, preparing a PowerPoint presentation to accompany a partner's speech, drafting a diversity proposal for a highly regarded professional association, and calling references for candidates for admission to the professional association, and handling a garnishment-related matter for non-profit organization. Non-billable requests were made of Ms. Draper throughout her tenure at Jones Day, and Ms. Draper did all that was asked of her.

163.198.     While searching for more billable work, Ms. Draper also utilized her time to seek new Firm clients and contribute to the office's internal initiatives. Ms. Draper brought in an energy consulting company as a new client to the Firm, an accomplishment that was unusual for someone at the associate level.

164.199.     She also served a leadership role on her office's diversity committee, which was attempting a refresh after years of ineffectiveness. With the committee's support, Ms. Draper expended significant effort trying to retain an expert who could speak to the office on implicit bias. A promising expert candidate was located, and a proposal was made, but the Firm ultimately

declined to permit the training to proceed. The Firm also declined to move forward with a formal mentorship program that the Diversity Committee proposed.

~~165.~~200.     Ms. Draper continued her work with the Laredo Project, and~~,~~ at the encouragement of office management, became the project's point person for Atlanta. Ms. Draper prepared training materials, staffed her office's cases, oversaw multiple case teams simultaneously, liaised with the outside non-profit groups that referred cases to the Firm, and represented her office in Firm intra-office meetings. Recognizing the effort this coordination and oversight required, office management told Ms. Draper she could devote a significant portion of her time to the administration of the project in Atlanta.

~~166.~~201.     Ms. Draper was asked to speak about the office's involvement in the Laredo Project to summer associate classes and law school students at recruiting events. During these pitches, she touted what she had been told by many partners at the Firm: that Jones Day valued pro bono work so much that they treated it the same as billable client work. Some first-year associates told Ms. Draper they were warned by the partner who coordinated the first-year lawyer program not to do pro bono because the hours would not be counted. Ms. Draper informed the office's pro bono partner, who responded that the partner coordinating the first-year lawyer program was incorrect, and that he would speak to him about what he was telling the first-year associates.

     *iii.*    ***As a New Mother, Ms. Draper Is Pushed into a High-Travel Litigation Group***

~~167.~~202.     Several months after Ms. Draper returned from maternity leave, her office's new head of litigation, Partner Mike McConnell, asked Ms. Draper to ~~leave~~abandon the general litigation and investigations ~~practice~~work she had been ~~part of~~practicing since joining the Firm~~,~~ and to permanently ~~and~~work exclusively ~~join~~in the Firm's Tobacco Litigation Group. The Tobacco

Litigation Group required more prolonged and recurring travel than any other practice group in the office. Unbeknownst to Ms. Draper at the time, Partner McConnell asked several other associates who were still on parental leave or had just returned from parental leave to join the group at the same time he asked Ms. Draper.

168.203.     Ms. Draper regularly traveled for work, both before having children and after having children. That travel typically lasted days at a time. The travel for trials in the Tobacco Litigation Group, in comparison, required three to five weeks away from home, generally including weekends. Attorneys outside the group joked they didn't recognize their colleagues in the Tobacco Litigation Group, some of whom had been at the Firm for years, because they were hardly ever in the office.

169.204.     Typically, associates who joined the Tobacco Litigation Group did so by choice, with knowledge of the group's strenuous travel, and organized their lives to make it possible. Many of the associates on the team were unmarried, and At the time Ms. Draper was asked to join the group, none of the associates in Ms. Draper's office who traveled for trial with the Tobacco Litigation Group had children at the time she was asked to join the group. The group had only two female partners, one of whom, Partner Stephanie Parker, headed the group. The second female partner in the group had two young children, and she was already a partner when they were born.

170.205.     Partner McConnell's request was plainly punitive, because Jones Day associates are permitted to choose their practice groups. Indeed, practice group choice is a key recruitment tool for the Firm. Ms. Draper wanted to develop further develop her skills in the area of investigations and white-collar practice, but was Partner McConnell told her that if she joined the Tobacco Litigation Group, she had to do it to the exclusion of all other work.

171.206.    Ms. Draper wanted to better understand what the Tobacco Litigation Group's expectations would be of her, particularly as to long-term travel. She sought to ask questions of Partner Parker to inform her decision, but Partner McConnell insisted that all inquiries run through him. Ms. Draper also sought to discuss the decision to change practice groups with partners she trusted and associates in the Tobacco Litigation Group, but Partner McConnell told Ms. Draper to keep confidential that he had asked her to join the group. He also told her to give him her response within 24 hours.

172.207.    The next day, unable to come to a decision with so little information, Ms. Draper asked Partner McConnell if she could discuss the issue with the only female partner in the Tobacco Litigation Group who had children. She also asked to speak with an associate of her class year who had been in the Tobacco Litigation Group since she started at the Firm. Partner McConnell told Ms. Draper he needed to check with Partner Parker, and later told Ms. Draper that she could confer with the partner, but not with the associate. The partner was the only person Ms. Draper was permitted to speak to within the Tobacco Litigation Group.

173.208.    The Firm's responses to her search for information left Ms. Draper with the impression that her future with the Firm was contingent on her joining the Tobacco Litigation Group. Committed to her career and to the Firm, Ms. Draper accepted the assignment and joined the group.

209.    Even though Ms. Draper joined the group, it viewed her inquiries about travel requirements and desire to speak with other females in the group as evidence of a lack of commitment and enthusiasm. In response, the Firm refused to assign her to depositions and other skill-development opportunities as it had promised it would if she joined the Tobacco Litigation Group, despite her repeated requests. In contrast, the Firm did not write off a male employee who

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

asked how he could make an assignment to the Tobacco Litigation Group work while also caring for his new baby.

### iv.   *After saying "Yes" to Tobacco, Ms. Draper Can't Get Staffed*

~~174.~~210.   Once Ms. Draper joined the group, it was not long before she learned from others about their experiences. Colleagues in the group told Ms. Draper that Partner Parker was known for showing preferential treatment to men and hostility to any request for accommodation by women who were pregnant or nursing. In one instance, Ms. Draper was told, Partner Parker had instructed another partner to give a poor review of an associate because the associate had requested a reprieve from travel while she was nursing.

~~175.~~211.   While Ms. Draper had felt compelled to join the Tobacco Litigation Group, she had also been encouraged by the Firm's promises that she would gain significant litigation experience by participating in trials and taking depositions. She accepted the Firm's assurance that if she answered the call of duty, there was a viable path forward for her at Jones Day.

~~176.~~212.   She was wrong. Once in the Tobacco Litigation Group, Ms. Draper found ~~herself frozen~~the Firm froze her out of the promised opportunities to gain substantive trial or deposition experience. While waiting to go to trial, Ms. Draper drafted motions, case summaries, ~~and~~ deposition outlines for others, and otherwise followed the "we do windows" mentality the Firm claims to value. She took assignments from whomever asked for her help, including partners and associates, both senior and junior. She sought opportunities to conduct depositions from the group's work coordinator on multiple occasions, but he either ignored her requests or stated that he had to check with Partner Parker first.

~~177.~~213.   Several months after joining the Tobacco Litigation Group, Ms. Draper suffered a miscarriage. Ms. Draper feared how Partner Parker and the other partners would react

to news that she had been pregnant again. Accordingly, she hid her second pregnancy and her miscarriage from the Firm and took no time to recover physically after surgery or emotionally from the loss. She hoped that by soldiering on, she would further her career and receive the litigation experience that Partner McConnell and Partner Parker had promised her when she agreed to join the group.

178.214.     When Ms. Draper finally did get the opportunity to go to trial, she was a valuable and committed contributor. She took the lead in writing a motion that forced the plaintiff's economic damages expert to concede that her report contained inflated valuations. The Cleveland partner leading the trial, whom Ms. Draper had never worked with before, commended Ms. Draper for her work and told her that he would love to work with her again.

179.215.     Ms. Draper promptly volunteered to assist the partner on his next trial, and he told her he would staff her. Days later, though, he told her she could not go to trial with him because "the powers that be" wanted new members on the team. However, a male associate from the earlier trial was staffed on the new trial team for this partner. Upon information and belief, Partner Parker overturned the partner's request to staff Ms. Draper on his team.

  *v.*     ***Ms. Draper Asks Partner Parker Questions and Is Dismissed from the Tobacco Litigation Group***

180.216.     Mystified by the negative response to her efforts at advancement, Ms. Draper reached out to Partner Parker directly and requested a meeting. She explained to Partner Parker that she wanted to discuss how to get more substantive experiences in the Tobacco Litigation Group. Partner Parker agreed to meet, and asked Partner McConnell to attend the meeting as well, even though Partner McConnell was not part of the Tobacco Litigation Group.

181.217.     The meeting would be Ms. Draper's first one-on-one, in person interaction with Partner Parker, who traveled regularly and often communicated by way of an intermediary.

182.218.      From the start of the meeting, Partner Parker was openly hostile toward Ms. Draper, blaming her for a lack of substantive experience. She also blamed Ms. Draper for trying to place herself on a trial team. When Ms. Draper said she had been trying to proactively seek opportunities, Partner Parker shot back that Ms. Draper should have known all staffing needed to go through her. Partner Parker told Ms. Draper the Tobacco Litigation Group was not a good fit for her and that she was being dismissed from the group.

183.219.      Despite Partner Parker's confrontational tone, Ms. Draper pressed on in an effort to understand the basis for her dismissal from the group. Ms. Draper asked Partner Parker why she hadn't had not been staffed on more trials. Partner Parker told Ms. Draper that Tobacco Litigation Group partners had been reluctant to staff her on their trials because of her higher billing rate and lack of tobacco-specific trial experience. Partner Parker explained that each trial was budgeted for one senior associate and two junior associates, and that partners did not want to use their senior associate spot to train Ms. Draper. Ms. Draper responded that this problem was obviously foreseeable at the time she was asked to join the group, and that the Firm had set her up to fail. Partner Parker replied, "It is what it is."

220.    A week later, Ms. Draper attended an in-Firm women's event. At the event, Partner Thomas, then Partner-in-Charge Southeast U.S. Region, and Partner Mary Ellen Powers, Partner-in-Charge Europe, offered the assembled associates tips on how to succeed as women at Jones Day. Both partners served on the Partnership Committee. Toward the end of the meeting, Partner Thomas asked if anyone had questions or concerns, and surprised Ms. Draper by asking her to start. Her meeting with Partner Parker freshly behind her, Ms. Draper asked how to navigate a work relationship where she had reason to believe a female partner was unsupportive of other

female attorneys. Partner Thomas and Partner Powers responded only that they had never been in a situation like the one Ms. Draper described.

~~184.~~221.    After the meeting, Partner Thomas shared an elevator with Ms. Draper, and thanked her for asking a "tough" question. She did not, however, inquire further about the gender discrimination Ms. Draper had disclosed. Upon information and belief, Ms. Draper's questions to Partner Parker about her career and raising concerns about how women were treated at Jones Day provoked the Firm to retaliate against her~~going forward~~, redoubling its efforts to push her out and ultimately ~~terminating~~leading to her termination.

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0", Border: Top: (No border), Bottom: (No border), Left: (No border), Right: (No border), Between : (No border)

### vi.    *Ms. Draper Becomes Pregnant Again and Is Terminated*

~~185.~~222.    At the time Ms. Draper was dismissed from the Tobacco Litigation Group, she was in the early stages of pregnancy with her second child. She received her first negative annual review a few months later, in the spring of 2017. Partner McConnell, the same partner who had asked Ms. Draper to join the Tobacco Litigation Group, now informed her that the Firm had identified numerous issues with her performance, that she had gone "off the partnership track, but with the potential to get back on," and that she would need to "right the ship" to stay at the Firm. He gave her an impossible list of goals that she needed to accomplish to get back on track. Ms. Draper remained determined, telling Partner McConnell that she would do everything she could to meet the Firm's demands.

~~186.~~223.    Ms. Draper made every effort to meet the Firm's demands. She worked throughout her entire pregnancy, including traveling well into her third trimester. She worked on a variety of matters with successful results, worked with partners in different offices, and continued her pro bono work and civic engagement. She was one of two associates the Firm nominated to participate in Atlanta's premier leadership development program for young professionals. When

she was accepted into the program a year later, the Firm broadcast the accomplishment internally and on all of its social media outlets.

~~187.~~224.       Ms. Draper took her second maternity leave in October 2017. Shortly after her return from leave, Ms. Draper was told during her annual evaluation that her career at Jones Day was over. She was terminated and told to find a new job within six months.

~~188.~~225.       During her May 2018 evaluation, the Firm criticized Ms. Draper for lacking the very trial and deposition experience she had actively sought and that the Firm had consistently denied her.

~~189.~~226.       Ms. Draper's evaluation also accused her of being "vocal about boundaries," even though no one at the Firm had ever expressed such a concern to Ms. Draper. This disparaging comment was particularly upsetting to Ms. Draper, who, like many female associates at Jones Day, had gone out of her way to limit speaking about her family at work, perceiving correctly that having a family or "boundaries" would likely be fatal to a female associate's career at the Firm.

227.    To her great surprise, Ms. Draper subsequently discovered that the partner who had falsely accused her of being "vocal about boundaries" was Jamila Hall, a female partner who held herself out to be a champion for associates, particularly female associates of color. Ms. Draper had enthusiastically "answered the bell" when Partner Hall had asked her to work on a matter~~, and Partner Hall's comments about Ms. Draper's work on that matter had been uniformly positive.~~ During the time they worked together, Partner Hall never expressed concerns to Ms. Draper about her performance, responsiveness, or availability. In fact, Partner Hall only ever made positive remarks to Ms. Draper about her work performance.

~~190.~~228.         Weeks after Ms. Draper's evaluation, Ms. Draper and Ms. Hall attended a

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0", Border: Top: (No border), Bottom: (No border), Left: (No border), Right: (No border), Between : (No border)

women's luncheon where the firm's diversity partner, Partner Brown, stated one of the best things partners could do to support associates was tell them directly when issues arose, and offer them an opportunity to self-correct. She contrasted this approach with allowing an associate to learn about a grievance for the first time through a formal evaluation. Although Partner Hall nodded along agreeingly, this sentiment was in stark contrast with her criticisms of Ms. Draper, which she never once raised with Ms. Draper, either before or after her evaluation.

191.229.      In a final confirmation that female associates and associates with children are damned even if they do follow the Firm's guidance, the Firm completely ignored Ms. Draper's pro bono work in assessing her performance. Jones Day had actively encouraged Ms. Draper to spend time on its showcase pro bono initiative, which had generated positive press for the Firm. Indeed, the Firm continues to tout Ms. Draper's accomplishments on this project to this day.

192.230.      Ms. Draper had assumed that this significant responsibility was an honor and a distinguished contribution to the Firm's success. Indeed, the Firm even directed her to emphasize Jones Day's commitment to the project to summer associates and recruits, as evidence that the Firm truly valued pro bono work. Ms. Draper had vouched to them, as the Firm had represented to her, that this work was valued on par with client-billable work.

193.231.      When the time came for her evaluation, however, the Firm instead penalized Ms. Draper for her pro bono work by denying her credit for the time spent. The Firm encouraged Ms. Draper and her female colleagues to shoulder non-billable work that was critical to the Firm, its image, and its success, only to ignore that work when it came time for advancement to partnership.

194.232.      After the evaluation at which she was given notice that she would be terminated, Ms. Draper went to the office's Administrative Partner and asked why no one from

the office had pushed back on Ms. Draper's consensus statement. The Administrative Partner told Ms. Draper she "c[ould]n't do anything about it was not worth it," explaining that the previous year, she and the Partner-in-Charge had spent six months trying to correct an untrue statement in another female associate's consensus statement, to no avail.

195.233. Shortly before Ms. Draper left the Firm, her office launched a women's affinity group. Ms. Draper learned that the group had been proposed a year earlier, but that the proposal had languished, unapproved. The group was greenlighted shortly after a former Jones Day Partner sued the Firm for gender discrimination. The group went from dormant to active so abruptly, that the attorney who coordinated the effort only found out about the launch after it occurred, and only because an associate brought it to her attention.

196.234. Ms. Draper also learned around this time that multiple other senior female associates in Atlanta had been demoted, taken off partnership track, pushed out or terminated by the Firm after having children.

197.235. As a result of the Firm's discrimination and retaliation, Ms. Draper left "Big Law." In her current position, she earns less than half of her Jones Day salary.

### E. JACLYN STAHL

198.236. Jaclyn Stahl was a stand-out associate in the Irvine, California Office of Jones Day until the Firm's campaign of harassment and gender discrimination forced her out in 2018.

199.237. Ms. Stahl was a summer associate at Jones Day in 2012. She joined the Firm's Irvine Office as an associate in 2014 after completing a clerkship with the United States Court of Appeals for the Ninth Circuit.

200.238. Though Ms. Stahl was hired as a second-year associate in light of her

clerkship experience, Jones Day partners ~~in the Irvine office~~ never treated her with the respect accorded to her male counterparts.

### *i.     The Firm Rigorously Enforces Its Pay Confidentiality Policy, Hiding Gender-Based Pay Disparities*

~~201.~~239.     Jones Day also never paid her the so-called market scale that, upon information and belief, it paid to male associates in jobs requiring substantially equal work. Ms. Stahl suspects Jones Day paid male attorneys at her level more than it paid her, but Ms. Stahl is unable to confirm this because Jones Day made it clear that attorneys were not allowed to talk about their compensation.

240.    ~~From the start of her time at Jones Day, Ms. Stahl was subjected~~In particular, Jones Day tells all associates each year in writing that "all lawyer compensation [i]s confidential," and partners and associates told Ms. Stahl before she joined the Firm about its pay confidentiality policy.

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

### *ii.     The Firm Treats Ms. Stahl As Inferior Because of Her Gender*

~~202.~~241.     Jones Day also subjected Ms. Stahl to openly gendered criticism by the male partner, Robert Naeve, with whom she primarily worked. For example, when Ms. Stahl asked Partner Naeve for feedback about her work, he told her that she had a "very stern face" that was "off-putting." To justify his comment regarding Ms. Stahl's appearance, he noted "people tell me that I need to smile more, too."

~~203.~~242.     Rather than acknowledging Ms. Stahl's impressive work, Partner Naeve found every opportunity to criticize her unreasonably. For example, in February 2017, Ms. Stahl's loved one experienced a significant medical issue. Ms. Stahl had been billing at a very high rate for several of the preceding months, and she continued to do so during this difficult time, even responding to requests from her loved one's hospital bed. However, rather than delivering praise

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

for her dedication, Partner Naeve berated Ms. Stahl for minor non-substantive errors that could easily have been fixed by a secretary. ~~Ms. Stahl explained that she was doing her best, but Partner Naeve insisted that her "best wasn't fucking good enough."~~

~~204.~~243.        ~~Weeks later~~In particular, on February 16, 2017, while Ms. Stahl's loved one was facing surgery for his condition, Partner Naeve again came to her office to berate her individually for not having yet completed a set of declarations. Ms. Stahl explained that she was ~~speaking with a key witness~~trying her best and had worked a fourteen-hour day the ~~following day—a Saturday—~~day prior. In response, Partner Naeve told her that he "do[es]n't fucking care," and insisted that her best wasn't good enough. Ms. Stahl further explained that she was unable to complete the declarations because ~~the~~one witness~~had been previously~~, a client, was on vacation and unavailable. Working around the witness's schedule, Ms. Stahl had arranged to speak with the witness that weekend. Rather than commending Ms. Stahl for her hard work, Partner Naeve ~~told her,~~instructed her to have "constant contact" with the declarants throughout the weekend and told her "you better figure it out, or else," as he put his hand in the shape of a gun~~,~~ and mimicked shooting himself in the head.

~~205.~~244.        Partner Naeve's behavior towards Ms. Stahl stood in sharp contrast to the docile and subservient behavior that he expected of women. On one occasion, Partner Naeve criticized Ms. Stahl for being "too aggressive" during her attempts to settle a ~~small~~ matter, instructing her to "calm down." This feedback was particularly confounding because Partner Naeve had not been on the phone call or in the room during negotiations.

245.    The lone female partner in the Irvine office, Partner Cheryl O'Connor, was among the worst offenders in her unequal treatment of male and female associates.

246.    Ms. Stahl frequently took on additional work from Partner O'Connor on short

notice, on top of her already full plate. Ms. Stahl was professional and responsive when working with Partner O'Connor, yet Partner O'Connor threatened, harassed, publicly humiliated, and spoke badly of Ms. Stahl to people within the Irvine office and associates in other offices. Partner O'Connor was also highly critical of other female associates as well, telling them their work was worthless and screaming at them.

206.247.    In one instance, on May 10, 2017, Ms. Stahl missed a meeting called by Partner O'Connor on short notice because she had been on a client call for one of Partner Naeve's cases. At the conclusion of Partner O'Connor's meeting, shePartner O'Connor stormed into Ms. Stahl's office, slamming the door and screaming. Partner O'Connor then opened the office door, ensuring that other employees would hear her public humiliation of Ms. Stahl. Partner O'Connor's behavior was so hostile that Ms. Stahl feared for her physical safety.

248.    Despite multiple efforts to appease Partner O'Connor and meet her ever-shifting and unrealistic expectations, Partner O'Connor's treatment of Ms. Stahl worsened. At a loss for what else to do, on August 2, 2017, Ms. Stahl met with her office's Administrative Partner, Darren Cottriel, to request that she no longer be required to work with Partner O'Connor, and that she receive assistance and guidance on how to proceed. Partner Cottriel, however, failed to take her complaints seriously, and his tone indicated he did not believe Ms. Stahl or understand the gravity of her conflict with Partner O'Connor.

207.249.    Ms. Stahl was not the only female associate to receive such treatment from Partner O'Connor, whom she never observed berating male associates in this fashion. Upon information and belief, Firm management did nothing about Partner O'Connor's mistreatment of female associates. Indeed, wheneven after a legal assistantparalegal complained after overhearing Partner O'Connor berate another female associate, Administrative in October 2018, Partner Darren

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

Cottriel ~~took no action~~failed to ensure Partner O'Connor stopped the abusive treatment of female associates. That female associate, who was often forced to do secretarial work, ultimately left Jones Day.

~~208.~~250.     The Firm was not only aware of the bullying faced by female associates, it condoned such behavior.

###     *iii.     Ms. Stahl's Reviews Again Focus on Her Appearance and Not Her Acumen*

> **Formatted:** Font: Bold, Italic, Font color: Auto

~~209.~~251.     Ms. Stahl's 2016 annual review, conducted in June 2017, reflected the

> **Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

Firm's discriminatory view of her. Although feedback on Ms. Stahl's work was positive, her office's Partner-in-Charge Richard Grabowski and Administrative Partner Cottriel criticized her for looking insufficiently enthusiastic. The Firm delivered this feedback to Ms. Stahl ~~despite the fact that~~even though clients and partners actively sought her out for work~~, and that~~. And Ms. Stahl frequently offered to take on work from other associates when issues or conflicts arose and agreed to accept last-minute assignments. Ms. Stahl also often checked in with her colleagues to offer her assistance and regularly met every deadline imposed, often completing work ahead of schedule.

> **Formatted:** Font color: Black

~~210.~~252.     The Firm's feedback during the June 2017 review was thus a reprise of Partner Naeve's assessment: that to be well-liked as a female associate, Ms. Stahl was expected to smile more.

~~211.~~253.     During her 2017 review, Ms. Stahl was also blamed for having appropriately requested that Partner Naeve intervene to communicate her unavailability to Partner O'Connor to work on a particular project. Though Partner O'Connor never submitted a written review, Ms. Stahl was told during her in-person review that she was expected to "stretch" herself.

~~212.~~254.     Paradoxically, however, a peer female associate, Meredith Williams, received a negative review that same year for exactly the opposite reason: having made it a point

to accept every assignment offered to her, Ms. Williams was faulted for being overcommitted and not communicating this to her supervising partners.

### *iv.     Ms. Stahl Finds that Her Gender Matters More than Her Abilities or Seniority*

~~213.~~255.     The Firm also frequently assigned Ms. Stahl work beneath her abilities and acumen, in contrast to the work assigned to male associates. As a third- and fourth-year associate with a clerkship, Ms. Stahl was assigned to work on document reviews, while male associates were given more substantive assignments that were more likely to pave the path to partnership. The Firm then reprimanded Ms. Stahl when she sought more substantial assignments to further her experience and make herself more valuable to the Firm.

~~214.~~256.     Ms. Stahl was soon told that she needed to take depositions, so she positioned herself to gain that experience on Partner Naeve's matters. She attended deposition training (as well as trainings on motions, expert witnesses, trials, and negotiations). She sought to be the sole point-of-contact for all of the witnesses, and she contacted partners in other offices also in search of this experience. With the approval of Partner Naeve, Ms. Stahl prioritized such work, because it would further her skillset.

~~215.~~257.     Nonetheless, ~~for these efforts,~~ Partners O'Connor, Grabowski, and Cottriel scolded Ms. Stahl for these efforts. In stark contrast, a male associate who was a year junior to Ms. Stahl was permitted to decline work from Partner O'Connor, giving him time to take and defend several depositions for a large case.

~~216.~~258.     The conflicting advice that Ms. Stahl received about seeking out advancement opportunities was indicative of the no-win situation in which she found herself. Partner Darmer commended Ms. Stahl on taking the opportunity to brief and argue a pro bono case before the Ninth Circuit Court of Appeals. He indicated that Ms. Stahl must be a good writer if

73

Partner Naeve was willing to work with her on the case. He also told Ms. Stahl that her office needed a good writer and encouraged her to further her talents in that area.

217.259.     When Ms. Stahl did so, however, by taking on primary drafting responsibility for at least five federal circuit briefs and several key summary judgment briefs, she was punished. Ms. Stahl was told that she needed to stop acting like certain work was "beneath her," and that she must accept, and be grateful for, the work she was given.

218.260.     This command apparently included the non-billable work that the Firm did not credit like it credited billable hours, such as planning festivities for summer associates, to which female associates, including Ms. Stahl, were often directed to devote substantial time. One year, for example, Partner Finkelstein—the hiring partner for the office—asked Ms. Stahl to be social chair of the summer associate program. When she declined that role and asked for a different role, Partner Finkelstein told Ms. Stahl that he thought she would be good at party planning. When a male associate was subsequently assigned the role, Partner Finkelstein assigned a female associate to assist him.

219.261.     Similarly, female associates were put in charge of events such as staff appreciation parties, while male associates were given the opportunity to plan an associate business development event.

220.262.     In the summer of 2016, Ms. Stahl was put on a trial team with a Partner and Of Counsel from the Los Angeles office. She was told by Partner Grabowski told her that she had been chosen for the team because they needed a woman. The other side had two women on their team, and the client and the Firm thought it would look bad to the jury if their side did not have a female attorney. The message was clear: asAs a woman, Ms. Stahl was window dressing.

> v.     *The Firm Condones Sexist Statements, Sexist Attitudes, and Sexist Treatment of Ms. Stahl*

~~221.~~263.    Ms. Stahl was also subjected to sexist comments and sexual overtures by clients with the approval and acquiescence of Firm management. For example, in 2015, Ms. Stahl was observing Partner Grabowski take depositions for a large trial. During a lunch break, with Partners Grabowski and Finkelstein looking on, the Firm's client, Epicor Software Corporation General Counsel John Ireland, made repeated inappropriate comments to Ms. Stahl. Although Ms. Stahl attempted to ignore the comments and return to her office to work, Mr. Ireland insisted that Ms. Stahl join him, Partner Grabowski, and Partner Finkelstein for dinner, claiming that it would be "more fun." Partner Grabowski never intervened, but instead insisted that Ms. Stahl attend the dinner.

~~222.~~264.    Partner Grabowski was not the only one who refused to condemn openly sexist conduct toward female attorneys. Within the Firm, sexist or sexualized comments were often downplayed, if not condoned. For example, after making inappropriate sexualized comments, male attorneys would say jokingly that their comments should be "added to the file," invoking an imaginary file of sexual harassment complaints that carried no weight and was openly mocked.

~~223.~~265.    The Firm's indifference towards openly gendered discriminatory comments was equaled by its lack of interest in the mentoring of women associates. Indeed, partners openly mocked mentorship lunches organized by female attorneys in the office. For example, when Partner Finkelstein saw Ms. Stahl attending such a lunch with other women in the office, he asked if they were "going to lunch to talk about women things like having kids."

~~224.~~266.    On another occasion, Partner Finkelstein ascribed the office's serious female attorney attrition problem to "women [who] have babies and stay at home." This dismissive view toward female lawyers who had children was characteristic: male attorneys referred to maternity leave as "six months' vacation" and told the female associates that they "have it so

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

good."

~~225.~~267.     By contrast, male attorneys with children were given flexibility that was denied to female attorneys with children. For example, one male attorney regularly left the office at 5:00 PM to attend to his five children, even as an associate. His commitment to the Firm was never questioned; rather, he was mentored by Partner Naeve, and then made partner himself.

~~226.~~268.     Ms. Stahl did her best to soldier on and do as she was told. But the repeated verbal abuse, the lack of praise for even exceptional work, and the more favorable treatment received by male comparators drove Ms. Stahl to the breaking point. As a result of the discrimination she experienced at Jones Day, Ms. Stahl began suffering from serious health problems in 2016, which culminated in her doctors requiring her to take an extended medical leave in 2017.

~~227.~~269.     After observing the way other female attorneys were treated after they returned from leave, Ms. Stahl knew that there would be no future for her at Jones Day once she returned from medical leave. She left in 2018, accepting a government position where she earns considerably less.

**F.    KATRINA HENDERSON**

~~228.~~270.     Plaintiff Katrina Henderson worked in Jones Day's New York City office from October 2013 until July 15, 2016. Despite her excellent credentials, hard work, and successful tenure, she never received opportunities or compensation on par with that of her male colleagues.

~~229.~~271.     Ms. Henderson earned a Bachelor of Arts from Duke University in 2010 and a Juris Doctorate from New York University in 2013. She joined Jones Day as an associate in the Firm's New York office that fall.

       *i.*    ***Early in Ms. Henderson's Tenure, the Firm Denies Her Mentorship and Questions Her Commitment, in Contrast to Its Treatment of Her Male***

Formatted: Font: 12 pt

Formatted: Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

*Colleagues*

230.272.     Early on, the Firm assigned Partner Randi Lesnick to act as Ms. Henderson's Partner mentor as well as a source of assignments for Ms. Henderson. But unlike the numerous male associates who received mentorship, assistance in building their practice, and helpful advice from their mentors—formal or informal—Partner Lesnick relentlessly criticized Ms. Henderson for even minor infractions and failed to reach out to Ms. Henderson to provide mentorship or support.

231.273.     For example, in the fall of 2013, Ms. Henderson's mother traveled to New York City from out-of-state to visit Ms. Henderson. Ms. Henderson took time out of the office one evening to meet her mother for dinner across the street. Ms. Henderson informed the two mid-level associates who were also working for Partner Lesnick at this time that she was would be at dinner out of the office. One of the mid-level associates confirmed that this was acceptable.

232.274.     During the dinner, Ms. Henderson did not respond to an email for approximately one hour. She then returned to the office after dinner to complete the work that Partner Lesnick had assigned her to complete by the following morning. Ms. Henderson completed her work at approximately 1:00 am and sent it to Partner Lesnick. Partner Lesnick, however, berated Ms. Henderson for completing the work at 1:00 am instead of at 11:00 pm the preceding day, even though Partner Lesnick had not communicated that deadline in advance.

233.275.     This was not the only spurious reprimand that Ms. Henderson received from Partner Lesnick. On another occasionWhile Ms. Henderson was typically available for work, Partner Lesnick chastised Ms. Henderson for supposed lack of commitment to the Firm, because Ms. Henderson occasionally left for the gym at lunch time or in the evenings before returning to work. Partner Lesnick told Ms. Henderson that exercise might be "good for [her] social life but

not for [her] career."

~~234.~~276.        One of Partner Lesnick's harshest rebukes came when Ms. Henderson took vacation to see her family around the winter holidays in 2013. Ms. Henderson got permission from more senior attorneys she was working with. On December 27, Ms. Henderson did not respond to an email for twenty minutes, because she was spending time with her family away from their home. Partner Lesnick then called Ms. Henderson and berated her for failing to ~~immediately review a document.~~review a document immediately, even though Partner Lesnick had not previously told Ms. Henderson she needed to be available and working at all times while she was on vacation. So intense was Partner Lesnick's attack that Ms. Henderson suffered a panic attack. Ms. Henderson then immediately returned to her family's home to work for approximately four hours.

~~235.~~277.        On December 30, 2013, after Ms. Henderson returned to the office, Partner Lesnick raised the incident again and attacked Ms. Henderson for taking vacation to be with her family. Partner Lesnick's outburst continued until Ms. Henderson was in tears. Only then did Partner Lesnick appear satisfied and conclude the rebuke.

~~236.~~278.        Ms. Henderson never witnessed Partner Lesnick berate a male associate in such fashion, nor did she ever witness anyone at the Firm question the commitment of a male associate.

~~237.~~279.        Indeed, male associates even received credit for work that Ms. Henderson performed. For example, on one deal to which Ms. Henderson contributed, the Firm circulated a "Big Deal" email at the deal's conclusion, acknowledging those who had contributed to its success. The email credited male associate Zachary Werner with assisting in the deal's success, but not Ms. Henderson, even though Ms. Henderson spent a significant amount of time on the matter, corrected searches performed by Mr. Werner, and ~~even though she had~~ helped him complete his assignments.

238.280. After Partner Lesnick's December 27, 2013 reprimand, the Firm never assigned Ms. Henderson a new partner mentor, and Ms. Henderson's assignments began to diminish. Partner Lesnick failed to continue assigning work to Ms. Henderson. Ms. Henderson's assignments began to diminish, substantially suppressing her billable hours in 2014. Despite hustling for work, Ms. Henderson had very few billable hours from January through March of 2014. Ms. Henderson continued to take advantage of all available opportunities for career development and spent a substantial amount of time doing so. But, instead of billable work, Jones Day assigned Ms. Henderson to non-billable research work and administrative work.

281. Ms. Henderson approached Jones Day Partners for advice on how to address Partner Lesnick's treatment. One Partner told Ms. Henderson to "keep knocking on doors" to obtain work and suggested that things would "blow over," but failed to provide any helpful advice or intervention.

282. Ms. Henderson also approached then-Partner Charmaine Slack, one of the few other African-American women in Jones Day's New York Office, seeking advice on how to address Partner Lesnick's behavior. Ms. Slack, herself an employment lawyer, was one of the first—if not the first—African-American woman partner at the Firm, and Jones Day has since pushed Ms. Slack out of the Firm. Ms. Slack stated that women, and particularly women of color, had to work harder than everyone else if they stood a chance of being allowed to stay at Jones Day. While Ms. Slack acknowledged that Partner Lesnick had been inappropriate, Ms. Slack advised Ms. Henderson to fall on her sword and apologize. Ms. Slack's advice recognized that Jones Day would refuse to take any action to assist Ms. Henderson until she submitted to its brotherhood. Ms. Slack further suggested that Ms. Henderson should beg for work.

239.283. Ms. Henderson did so. She actively sought work from others in the New

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

York office. She and made herself available, as her timesheets show. Ms. Henderson also went door-to-door asking other associates in the New York office who had full caseloads for work, but was denied assignments. Ms. Henderson knew, for example, that one suchwhite male associate, Rory Hood, was staffed on multiple deals. When Mr. Hood was promoted to partner shortly thereafter, Ms. Henderson came to realize that he had frozen Ms. Hendersonher out of work in solidarity with Jones Day's male powerbrokers.

240.284.    Ms. Henderson's treatment stands in contrast to that of her male colleagues at Jones Day. For example, in or around February 2015, Ms. Henderson was staffed on a deal with Bret Stancil, a white male associate ofin her class year. While Partner Alex Gendzier, who was ultimately responsible for the deal, consistently informed Mr. Stancil of meetings and phone calls, he persistently excluded Ms. Henderson from these communications. On one particular call, Ms. Henderson received only five minutes' notice that the call was happening. She gathered her papers and rushed to Partner Gendzier's office for the conference call with the client. But rather than apologize to Ms. Henderson for excluding her from the call, to which he had invited Mr. Stancil, Partner Gendzier humiliated Ms. Henderson in front of the client, saying "nice for you to finally join us."

241.285.    Mr. Stancil also received mentorship, support and access to partners that the Firm denied to Ms. Henderson. These partners apparently viewed Mr. Stancil as a future member of their ranks, and groomed him for advancement accordingly. Jones Day assigned Mr. Stancil so much work, in fact, that he sought to offload some of it to Ms. Henderson—even though the two associates were the same class year and he had no supervisory authority over her. Upon information and belief, Mr. Stancil was never chastised by Jones Day for handing off his work to Ms. Henderson.

242.286.   By contrast, Ms. Henderson received little mentorship—whether formal or informal. Ms. Henderson's associate mentor, Priya Galante, left the Firm shortly after Ms. Henderson arrived, and the Firm never assigned Ms. Henderson a replacement. Nor did anyone step in to fill the void.

  *ii. **The Firm Pays Ms. Henderson Less than Her White Male Colleagues and Denies Her Membership in its Fraternity***

287.   In addition to freezing Ms. Henderson out of the legal work and mentorship necessary for her to advance in her career, Jones Day also paid Ms. Henderson less than her white male colleagues. For example, Jones Day paid Ms. Henderson less than white male associate Bret Stancil, even though the two did interchangeable work. Upon information and belief the Firm also paid her less than white male associates performing substantially equal work such as Zachary Werner, Andrew Burchiel, Samuel Goldstein, and David Katz. Ms. Henderson performed similar work as these male comparators, attended the same trainings, and understands she likely billed more hours than Zachary Werner and David Katz. Indeed, like Ms. Henderson, Mr. Goldstein completed a mix of corporate work and real estate assignments in his first year with the Firm.

243.288.   Jones Day also froze Ms. Henderson's salary after her first year. Ms. Henderson, like all first-year Jones Day associates in 2013, received a starting salary of $160,000. When time came for raises, however, Ms. Henderson did not receive one.

244.289.   Ms. Henderson initially did not know that she was being underpaid as a result of not receiving a raise. She, like most Jones Day associates she knew, did not talk about her salary, because Jones Day policy forbade her from doing so. Nonetheless, at a lunch, Mr. Stancil commented that he was happy with his raise and revealed that he had received a raise of approximately $15,000 to $20,000. Ms. Henderson subsequently learned that another male associate performing similar work, Harrison Golden, had also received a raise.

290.    Ms. Henderson attempted to remedy the pay disparities after she was denied a raise at the end of her first year. She approached a male Partner about requesting a reconsideration, but he told her that there was "nothing [he] c[ould] do about it."

291.    Indeed, in Ms. Henderson's observation, women at Jones Day were expected to work harder and walk a delicate line between gender stereotypes to have any hope of joining the male-dominated upper echelons of Jones Day. For example, at

245.292.    At one so-called women's meeting, a speaker informed the associates in the room that they should not act like men if they wanted to break into the male-dominated legal industry. They should, the speaker said, strive to be themselves.

246.293.    After the speaker's presentation and still in the presence of all of the female associates who had attended the event, female Partners Randi Lesnick and Randi Strudler stated that they disagreed with the speaker. They insteadNo others voiced their disagreement, but Partners Lesnick and Strudler insisted that women at Jones Day must be as loud as men and curse just as much in order to be seen.: "If they curse in a meeting than you should curse too. If they yell, you yell too." In other words, Jones Day would accept women as part of its fraternity only if they would play by the boys' rules.[21]

---

[21] Thus Jones Day Partner Mary Ellen Powers, asked in a 2013 interview how she broke into "what many consider to be an old boy's network," responded, "Having three brothers, playing sports and liking beer probably didn't hurt." She later in the same interview cited her "Southern-talking, rattlesnake-hunting partner, Lizanne Thomas" as another example of how to succeed as a woman at Jones Day. *Female Powerbrokers Q&A: Jones Day's Mary Ellen Powers*, Law360 (Nov. 22, 2013), *available at*: https://www.jonesday.com/files/upload/Female%20Powerbrokers.pdf.  A third female partner, Jamila Hall, offered a similar account in a 2019 interview, explaining that she embraces opportunities to join Firm sanctioned "whiskey or cigar tastings, fishing trips, ski trips, and going to the Masters." She acknowledged that male partners often "allocate the tickets to their male friends," thus excluding of women from these business development activities, but nonetheless blamed female attorneys for their own marginalization, asserting that they must be "more determined about their client relationship development." *Interview with Jamila Hall*,

294.    The barriers to entry into Jones Day's upper ranks were even greater for women of color like Ms. Henderson. For example, Jones Day invited Ms. Henderson other Firm lawyers to a diversity event. At the event, however, (which was attended only by about a dozen lawyers, nearly all of whom were women of color), Jones Day did not discuss its diversity initiatives or how it could improve in this area, but instead lectured the women of color on how they needed to be more productive by coming in early, staying late, and constantly being responsive.

295.    Despite failing to provide advancement opportunities to women, and particularly women of color, the Firm did not hesitate to use Ms. Henderson—one of only a few African American associates—as the face of the Firm in recruiting other minority employees. In approximately February 2014, for example, Recruiting Manager Shari Friedman, instructed Ms. Henderson, the only African-American associate at the event and one of the few at the Firm, to speak with specific people at a recruiting event, all of whom were African-American. Likewise, the only instances in which Jones Day asked Ms. Henderson to get involved with recruiting was in the rare instance when the Firm was trying to recruit a minority attorney. The Firm hired so few African-American associates that one associate, a white male mid-level, assumed she was part of the Firm's college internship program for minority students.

### iii.    *Shortly After Giving Her a Positive Review, the Firm Denies Ms. Henderson Billable Work and Terminates Her*

247.296.    In May 2015, Jones Day conducted Ms. Henderson's second and last annual review. The Partner-in-Charge of the Firm's Capital Markets Group, Boris Dolgonos, delivered

---

Women   Criminal   Defense   Attorneys   Blog   (Apr.   1,   2019),   *available   at*: https://womencriminaldefenseattorneys.com/interview-with-jamila-hall/.

the review. He informed Ms. Henderson that she was on an upward trajectory. Ms. Henderson

soon received, in July of that year, a raise of $20,000 to a base salary of $180,000, signed by

Managing Partner Brogan.

248.297.     Despite this positive review, Ms. Henderson still had difficulty obtaining

billable work. Ms. Henderson volunteered for document reviews and turned to the Firm's pro bono

initiatives in order to gain experience, build her skills, and fill her time with what the Firm claimed

would count as billable work. Nonetheless, Ms. Henderson still found herself less and less sought

out by Jones Day partners, and the Firm further suppressed her billable hours by preventing her

from entering her billable time as such.

249.298.     Upon information and belief, Ms. Henderson was not the only female

associate to experience being denied the billable work necessary for advancement in this manner.

She is aware of two other female associates whom she believes had similar experiences.

299.    During this period, even when Ms. Henderson did obtain billable work, male

associates often claimed it for themselves. For example, in September 2015, Ms. Henderson

drafted a checklist for a fund offering, which she submitted to Associate Peter Devlin. She told

Mr. Devlin that the draft was still preliminary and that she was available to revise it as necessary.

Later, however, she learned that a male associate, Adam Berkaw, had been asked to edit the

document in her stead, thereby depriving Ms. Henderson of the billable hours.

250.300.     In December 2015, Ms. Henderson received an email from Partner

Dolgonos inviting her to a meeting. Mr. Dolgonos told Ms. Henderson that he was "checking in."

She presumed, given her availability and, the positive review that he had delivered to her just

months earlier, and her recent raise, that he was calling her to assign her to a new matter.

251.301.     Instead, when Ms. Henderson arrived at the meeting, she found three men

the room: Partner Dolgonos, the Partner-in-Charge of the New York office, and another man. These men unceremoniously informed Ms. Henderson that the Firm was terminating her employment.

252.302.    Ms. Henderson was shocked. She had received a positive 2015 review and a raise, and she knew that December into the new year would be a difficult time to find another job in the law. She left the meeting in tears.

253.303.    Initially, Ms. Henderson was told that Jones Day would continue to employ her for "plenty of time" to find new employment. In February 2016, however, the Firm's tune changed. Now, they told her, she would have just another 2 to 4 weeks to find a new position.

254.304.    Ms. Henderson complained about her situation to Barbara Nicoll in Jones Day's Human Resources department. In response, the Firm gave Ms. Henderson several additional months to search for a new job. She remained on the Firm's payroll through the end of June 2016, and formally affiliated with the Firm through mid-July. Ms. Henderson was not aware of any comparable male associate who was given a set end date for his tenure or forced to find another job outside the Firm during this period.

iv.    *The Firm Warns Ms. Henderson That If She Pursues Legal Actions Against Jones Day, the Firm Will Retaliate*

255.305.    Around the time Ms. Henderson was preparing to depart Jones Day, then Partner Charmaine Ms. Slack, one of the few other African-American women in Jones Day's New York Office, invited Ms. Henderson to coffee outside the building. Ms. Slack, herself an employment lawyer, informed Ms. Henderson that if Ms. she had a valid case against Jones Day and if Ms. Henderson wanted to sue Jones Day for discrimination, she would be within her legal rights, but Ms. Slack, however, warned Ms. Henderson that she should not file suit, because Jones Day would destroy "fight back," "drag [her career.] through the mud," and "ruin [her] reputation."

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

~~256.~~306.     Ms. Slack's warning convinced Ms. Henderson that making a complaint or filing a lawsuit to redress the discrimination that she had experienced at Jones Day would only compound the damage Jones Day had already done to her career. Ms. Henderson was already aware of Jones Day's worldwide reach, and feared that if she pursued her claims, the Firm would stop at nothing to harm her professionally.

~~257.~~307.     As a result of Partner Slack's warning, Ms. Henderson did not come forward with her claims against Jones Day until ~~the instant~~this lawsuit was filed. Defendant Jones Day should accordingly be estopped from raising any statute of limitations defenses to her claims; in the alternative, this Court should grant equitable tolling with respect to those claims.


**V.     CLASS ACTION ALLEGATIONS**

~~258.~~308.     Jones Day tolerates and cultivates a work environment that discriminates against female attorneys, particularly those who are pregnant or take maternity leave.

~~259.~~309.     Jones Day has a pattern or practice of channeling women into positions and job assignments that the Firm views as less valuable and that are less likely to lead to promotions or increased compensation. Female attorneys, pregnant attorneys, and mothers are subjected to continuing unlawful disparate treatment in pay and promotions. Moreover, the Firm's policies and procedures have an ongoing disparate impact on female attorneys and mothers.

~~260.~~310.     The Firm maintains policies and methods of setting compensation that promote gender-based inequities in compensation, and policies and methods for promotion that lead to gender-based unequal promotion. The Firm's discriminatory policies, practices, and procedures include a "black box" pay system, centralizing pay decision-making in the hands of one man, Firm Managing Partner Steve Brogan, and basing decisions on admittedly "subjective"

criteria, which are almost invariably infected with gender bias. The Firm's nationwide practices, policies, and procedures thus result in lower compensation for female attorneys than similarly situated male attorneys.

261.311.    Within the Firm's system of subjective, gender-based reviews, all women are denied equal opportunities for advancement. All women must not only compete with their male counterparts, but also with stereotypes that view them as uncommitted, prone to maternity leave, and less deserving of the kinds of mentorship provided to their male peers.

262.312.    Women who become pregnant and take maternity leave are particularly harmed by this system. They are denied opportunities for advancement and frequently forced out after giving birth.

263.313.    In general, the policies, practices, and procedures that govern the pay and promotions of female attorneys lack the sufficient standards, quality controls, implementation metrics, transparency, and oversight to ensure equal opportunity at the Firm.

264.314.    Because the Firm's management does not provide sufficient oversight or safety measures to protect against intentional and overt discrimination or the disparate impact of facially neutral policies and procedures, female attorneys suffering from discrimination are without recourse. The Firm actively tamps down on dissent through its no whining philosophy. Whatever complaint and compliance policies may exist lack meaningful controls, standards, implementation metrics, and means of redress such that upper management may ignore, disregard, minimize, cover up, mishandle, or otherwise fail to properly respond to evidence of discrimination in the workplace.

265.315.    The Firm's policies, practices, and procedures are not valid, job-related, or justified by business necessity. Alternative, objective, and more valid procedures are available to

87

the Firm that would avoid such a disparate impact on female attorneys. The Firm has failed or refused to use such alternative procedures.

266.316.     Upon information and belief, the Firm's discriminatory employment practices, policies, and procedures are centrally established and implemented at the highest levels of the Firm.

267.317.     Upon information and belief, the Firm's employment policies, practices, and procedures are not unique or limited to any office or practice group; rather, they apply uniformly and systematically to attorneys throughout the Firm, occurring as a pattern and practice throughout all office locations and practice groups.

268.318.     Because of the Firm's systemic pattern and practice of gender and pregnancy discrimination, the Plaintiffs and members of the proposed Classes and Subclasses have suffered harm including lost compensation, back pay, employment benefits, and emotional distress.

269.319.     The Plaintiffs and members of the Classes and Subclasses have no plain, adequate, or complete remedy at law to redress the rampant and pervasive wrongs alleged herein, and this suit is their only means of securing adequate relief. The Plaintiffs and members of the Classes and Subclasses have suffered and are now suffering irreparable injury from the Firm's ongoing, unlawful policies, practices, and procedures set forth herein, and they will continue to suffer unless those policies, practices, and procedures are enjoined by this Court.

A.     **Rule 23 Class Definition**

270.320.     The proposed nationwide Rule 23 Classes consist of all female attorneys who are, have been, or will be employed by the Firm in the United States during the applicable liability period until the date of judgment. Upon information and belief, there are more than 40

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

members of the proposed nationwide Classes.

271.321.    Plaintiffs also seek to represent subclasses of female attorneys who are, have been or will be employed at the Firm in the United States, and (a) who have been or will become pregnant or a mother, and/or take maternity leave during the applicable liability period through the date of judgment (the "Pregnancy Subclass"); or (b) who have taken or will take family or medical leave during the applicable liability period through the date of judgment (the "Leave Subclass").

272.322.    Plaintiffs Tolton, Mazingo, and Draper are each members of the Title VII Class. Plaintiffs Tolton, Mazingo, Williams, Draper, and Stahl are members of the DCHRA Class.

273.323.    Plaintiffs Tolton and Draper are each members of the Title VII and DCHRA Pregnancy Subclasses.

274.324.    Plaintiffs Tolton, Mazingo, and Draper are each members of the Leave Subclass.

275.325.    Plaintiffs Tolton, Mazingo, Williams, and Stahl also seek to represent classes of female attorneys in California for violations of California law (a) during the applicable liability period through the date of judgment for violations of the Fair Employment Practices Act (the "California Class"); (b) during the applicable liability period through the date of judgment for violations of the California Equal Pay Act (the "CEPA Class"); and (c) during the applicable liability period through the date of judgment for violations of the California Unfair Competition Act (the "California Unfair Competition Class").

276.326.    Plaintiffs Tolton, Mazingo, Williams, and Stahl are each members of the California Class, the CEPA Class, and the California Unfair Competition Class.

277.327.    Plaintiff Tolton seeks to represent a subclass of female attorneys in

89

California during the applicable liability period through the date of judgment and who have been or will become pregnant or a mother, and/or take maternity leave during the applicable liability period through the date of judgment (the "California Pregnancy Subclass").

278.328.     Plaintiff Tolton is a member of the California Pregnancy Subclass.

279.329.     Plaintiffs Tolton and Mazingo seek to represent a subclass of female attorneys in California during the applicable liability period through the date of judgment who have taken or will take family or medical leave during the applicable liability period through the date of judgment (the "California Leave Subclass").

280.330.     Plaintiffs Tolton and Mazingo are members of the California Leave Subclass.

281.331.     Plaintiff Henderson seeks to represent classes of female attorneys in New York for violations of New York law (a) during the applicable liability period through the date of judgment for violations of the New York City Human Rights Law (the "New York Class"); and (b) during the applicable liability period through the date of judgment for violations of the New York Equal Pay Law (the "NYEPL Class").

282.332.     Plaintiff Henderson is a member of the New York Class and the NYEPL Class.

283.333.     The systemic discrimination described in this Complaint has been, and is, continuing in nature.

284.334.     Plaintiffs reserve the right to amend the class definitions based on discovery or legal developments.

**B.      Efficiency of Class Prosecution of Class Claims**

285.335.     Certification of the proposed Class and Subclasses is the most efficient and

economical means of resolving the questions of law and fact that are common to the claims of the Plaintiffs and the Class.

286.336.    The individual claims of Plaintiffs, as Class Representatives, require resolution of the common questions concerning whether the Firm has engaged in a pattern and/or practice of gender discrimination against its female attorneys, particularly against women who are pregnant or have children, and/or take family or medical leave, and whether its policies or practices have an adverse effect on the Class. Class Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives, careers, and working conditions and in the lives, careers, and working conditions of the Class members, and to prevent the Firm's continued gender discrimination.

287.337.    The Class Representatives have standing to seek such relief because of the adverse effect that such discrimination has on them individually and on female attorneys generally. Jones Day caused Plaintiffs' injuries through its discriminatory practices, policies, and procedures and through the disparate impact its policies, practices, and procedures have on female and/or pregnant attorneys. These injuries are redressable through systemic relief, such as equitable and injunctive relief and other remedies sought in this action. Plaintiffs have a personal interest in the policies, practices, and procedures implemented at the Firm.

288.338.    To obtain relief for themselves and the Class members, the Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief they seek. Without class certification, the same evidence and issues would be subject to relitigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

289.339.    Certification of the proposed Class is the most reasonable and efficient

means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the Class members, and the Firm.

**C.     Numerosity and Impracticability of Joinder**

~~290.~~340.     The Class that the Class Representatives seek to represent is so numerous that joinder of all members is impracticable. In addition, joinder is impractical as the attorneys are physically based in different locations throughout the United States. Fear of retaliation on the part of the Firm's female attorneys is also likely to undermine the possibility of joinder.

**D.     Common Questions of Law and Fact**

~~291.~~341.     The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to their individual claims and those of the Class they seek to represent.

~~292.~~342.     The common issues of law include, *inter alia*: (a) whether Jones Day has engaged in unlawful, systemic gender discrimination in its promotion and compensation policies, practices, and procedures; (b) a determination of the proper standard for proving whether Jones Day's employment policies had a disparate impact on the Class and Subclasses; (c) a determination of the proper standards for proving a pattern or practice of discrimination by the Firm against its female attorneys, and under the disparate treatment theory of liability for attorneys; and (d) whether the Firm is liable for continuing systemic violations of Title VII and other statutes.

~~293.~~343.     The common questions of fact include, *inter alia*, whether the Firm has: (a) used a compensation system that lacks appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (b) relied on compensation criteria that perpetuate discrimination, such as highly subject evaluations, basing salaries on prior salaries or on whether that person was pregnant or took maternity leave; (c) compensated female attorneys

92

less than similarly situated male attorneys in base salary, bonuses, and/or promotions; (d) minimized, ignored, or covered up evidence of gender and pregnancy discrimination in the workplace and/or otherwise mishandled the investigation of and response to complaints of discrimination; and (e) otherwise discriminated against female attorneys, especially those who are pregnant or have children, in the terms and conditions of employment.

294.344.    Upon information and belief, the Firm's employment policies, practices, and procedures are not unique or limited to any office or practice group; rather, they apply uniformly and systematically to attorneys throughout the Firm, occurring as a pattern and practice throughout all office locations and practice groups. They thus affect the Class Representatives and Class members in the same ways regardless of the office location or practice group in which they work. Discrimination in compensation occurs as a pattern and practice throughout the Firm's offices and practice groups.

E.    <u>**Typicality of Claims and Relief Sought**</u>

295.345.    The Class Representatives' claims are typical of the claims of the proposed Class and Subclasses. The Class Representatives possess and assert each of the claims they assert on behalf of the proposed Class and Subclasses. They pursue the same factual and legal theories and seek similar relief.

296.346.    Like members of the proposed Class and Subclasses, the Class Representatives are female attorneys who were employees of the Firm during the liability period and who were pregnant, had children, and took maternity leave or other leave during the liability period.

297.347.    Differential treatment between male and female attorneys occurs as a pattern and practice throughout all offices and practice groups of the Firm. The Firm discriminates

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

against female attorneys, especially those who are pregnant or have children, in compensation and promotion and subjects them to a misogynistic work culture dominated by men. This differential treatment has affected the Class Representatives and the Class members in the same or similar ways.

298.348.     The Firm has failed to respond adequately or appropriately to evidence and complaints of discrimination. The Class Representatives and Class members have been affected in the same or similar ways by the Firm's failure to implement adequate procedures to detect, monitor, and correct this pattern and practice of discrimination.

299.349.     The Firm has failed to create adequate procedures to ensure its executive leadership complies with equal employment opportunity laws regarding each of the policies, practices, and procedures referenced in this Complaint, and the Firm has failed to discipline adequately others in Firm leadership when they violate anti-discrimination laws. These failures have affected the Class Representatives and the Class members in the same or similar ways.

300.350.     The relief necessary to remedy the claims of the Class Representatives is the same as that necessary to remedy the claims of the proposed Class members.

301.351.     The Class Representatives seek the following relief for their individual claims and for the claims of the members of the proposed Classes: (a) a declaratory judgment that the Firm has engaged in systemic gender and pregnancy discrimination against female attorneys by (i) denying promotions to female attorneys who are pregnant, have children, or take maternity leave, or take other family or medical leave, and on the basis of gender, (ii) paying female attorneys and those who are pregnant, have children, or take maternity leave, or take other family or medical leave, less than their male counterparts in base compensation and/or bonuses, and (iii) otherwise exposing female attorneys, especially those who are pregnant or have children, to differential

94

treatment; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief that effects a restructuring of the Firm's policies, practices, and procedures for promoting and awarding compensation to female attorneys; (d) equitable relief that effects a restructuring of the Firm compensation system so female attorneys receive the compensation they would have been paid in the absence of the Firm's discrimination; (e) back pay, front pay, reinstatement, and other equitable remedies necessary to make female attorneys whole from the Firm's past discrimination; (f) reinstatement to the positions they previously held or should hold but for Defendant's unlawful discrimination; (g) compensatory damages; (gh) punitive damages to deter the Firm from engaging in similar discriminatory practices in the future; and (hi) attorneys' fees, costs, and expenses.

**F.**    **Adequacy of Representation**

302.352.      The Class Representatives' interests are coextensive with those of the members of the proposed Class. The Class Representatives seek to remedy the Firm's discriminatory policies, practices, and procedures so female attorneys, and those who are pregnant, have children, or take maternity leave, or take other family or medical leave, will not receive disparate pay and differential treatment.

303.353.      The Class Representatives' experiences are capable of repetition, yet evading review. To the extent that the Class Representatives' are ineligible for reinstatement as associates at Jones Day, their experiences—being discriminated against, being terminated or forced to leave the Firm, and being deemed ineligible for reinstatement because of Jones Day's policies, the wrongs that the Class Representatives experienced will continue to affect other female associates unless they are reviewed and remedied.

304.354.      The Class Representatives are willing and able to represent the proposed

95

> **Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

Class fairly and vigorously as they pursue their similar individual claims in this action.

~~305.~~355.        The Class Representatives have retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity. The combined interests, experience, and resources of the Class Representatives and their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

**G.     Requirements of Rule 23(b)(2)**

~~306.~~356.        The Firm has acted on grounds generally applicable to the Class Representatives and the proposed Class by adopting and following systemic policies, practices, and procedures that discriminate on the basis of gender, pregnancy, and maternity. Gender discrimination is the Firm's standard operating procedure rather than a sporadic occurrence.

~~307.~~357.        The Firm has also acted or refused to act on grounds generally applicable to the Class Representatives and the proposed Class by, *inter alia*: (a) using a promotion system that systematically, intentionally, or knowingly disadvantages women, pregnant women, and mothers; (b) systematically, intentionally, or knowingly denying promotions for women, pregnant women, and mothers in favor of similarly situated males; (c) using a compensation system and promotion system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (d) compensating women, pregnant women, and mothers less than similarly situated males in salary and/or bonuses; (e) systematically, intentionally, or knowingly compensating women, pregnant women, and mothers less than similarly situated male attorneys, including less base salary and/or bonus pay; (f) cultivating an indifference to evidence of discrimination in the workplace or otherwise minimizing, ignoring,

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

mishandling, or covering up evidence of or complaints of gender, pregnancy, and maternity discrimination; and (g) otherwise discriminating against women, pregnant women, and mothers in the terms and conditions of employment as attorneys.

308.358.    The Firm's policies, practices, and procedures with respect to compensation have led to gender, pregnancy, and maternity discrimination and stratification. The systemic means of accomplishing such gender-based stratification include, but are not limited to, the Firm's policies, practices, and procedures for awarding base compensation, bonus pay, and promotions to female attorneys and those who are pregnant or have children. These practices and procedures all suffer from a lack of: transparency; adequate quality standards and controls; sufficient implementation metrics; and opportunities for redress or challenge. As a result, female attorneys and attorneys who are pregnant or who have children are compensated within a system that is insufficiently designed, articulated, explained, or implemented to consistently, reliably or fairly manage or reward them.

309.359.    The Firm's systemic discrimination and refusal to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief with respect to the Class as a whole.

310.360.    Injunctive, declaratory, and affirmative relief are a predominant form of relief sought in this case. Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of the Firm's systemic gender discrimination. In turn, entitlement to declaratory, injunctive, and affirmative relief forms the factual and legal predicate for recovery by the Class Representatives and Class members of monetary and non-monetary remedies for individual losses caused by the systemic discrimination, as well as their recovery of compensatory and punitive damages.

**H.**     **Requirements of Rule 23(b)(3)**

~~311.~~361.        The common issues of fact and law affecting the claims of the Class Representatives and proposed Class members—including, but not limited to, the common issues identified above—predominate over any issues affecting only individual claims. The common issues include whether the Firm has engaged in gender, pregnancy, and maternity discrimination against female attorneys by paying and promoting female attorneys, particularly those who become mothers or take maternity leave, less than their male counterparts.

~~312.~~362.        A class action is superior to other available means for fairly and efficiently adjudicating the claims of the Class Representatives and members of the proposed Class.

~~313.~~363.        By virtue of the pattern and practice of discrimination at the Firm, the Class Representatives and Class members are eligible for monetary remedies for losses caused by the systemic discrimination, including back pay, front pay, reinstatement, compensatory damages, and other relief.

~~314.~~364.        Additionally, or in the alternative, the Court may grant "partial" or "issue" certification under Rule 23(c)(4). Resolution of common questions of fact and law would materially advance the litigation for all Class members.

**VI.**     **COLLECTIVE ALLEGATIONS UNDER THE EQUAL PAY ACT**

~~315.~~365.        Plaintiffs incorporate all allegations of the Complaint alleging class-based discrimination.

~~316.~~366.        Plaintiffs bring collective claims under the Equal Pay Act pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), on behalf of all members of the EPA Collective Action. The EPA Collective Action includes female attorneys (a) who were not compensated equally to male attorneys who had substantially similar job classifications, functions, titles, and/or duties, (b) who were not compensated equally to male

attorneys who performed substantially similar work, and/or (c) who were denied compensation equal to similarly situated male attorneys by being held back to lesser pay levels than male attorneys who performed substantially similar work and had substantially similar experience.

~~317.~~367.     Plaintiffs and the EPA Collective Action members are similarly situated with respect to their claims that the Firm paid and promoted them less than their male counterparts.

~~318.~~368.     There is a common nexus of fact and law suggesting that Plaintiffs and the EPA Collective Action members were discriminated against in the same manner. Questions at issue in the case include:

       (a)     Whether the Firm unlawfully awarded less in base pay to female attorneys than to similarly-qualified male attorneys;

       (b)     Whether the Firm unlawfully awarded less in bonus pay to female attorneys than to male attorneys in jobs requiring the performance of substantially equal work;

      ~~(b)~~(c)     Whether the Firm unlawfully assigned and continues to assign female attorneys to ~~positions with~~roles and responsibilities for which it awards lesser pay and other compensation than similarly-qualified male attorneys;

      ~~(c)~~(d)     Whether the Firm's resulting failure to compensate female attorneys on par with comparable male attorneys was willful within the meaning of the EPA.

~~319.~~369.     Counts for violations of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b) for all claims asserted by the EPA Collective Action Plaintiffs who opt-in to this action because the claims of the Plaintiffs are similar to the claims of the EPA Collective Action Class.

~~320.~~370.     Plaintiffs and the EPA Collective Action Plaintiffs (a) are similarly situated; (b) have substantially similar job classifications, functions, titles, and/or duties; and (c) are subject

> **Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

to the Firm's common policy and practice of gender discrimination in failing to compensate female attorneys commensurate with compensation given to male attorneys who perform substantially equal work.

**VII.   COUNTS**

**COUNT 1**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000(e),** *et seq.*
**GENDER DISCRIMINATION**
**On Behalf of the Title VII Class Representatives and all Title VII Class Members**

321.371.      Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

322.372.      This Count is brought by Plaintiffs Tolton, Mazingo, and Draper ("Title VII Class Representatives") individually and on behalf of all members of the Class.

323.373.      Plaintiffs Tolton, Mazingo, and Draper each filed a timely charge with the EEOC on behalf of herself and the Class Members. Plaintiffs Mazingo, Williams, Draper, and Stahl may "piggyback" off the first-in-time filing of Plaintiff Tolton because Plaintiff Tolton's EEOC charge relates to the same claims that the other Plaintiffs assert.

324.374.      Jones Day, an employer of the Title VII Class Representatives and Class Members within the meaning of Title VII, has discriminated against the Title VII Class Representatives and the Class Members in violation of Title VII by subjecting them to different treatment on the basis of their gender, including by engaging in intentional disparate treatment, and by maintaining uniform policies and practices that have an adverse, disparate impact on them.

325.375.      Jones Day has engaged in an intentional, firm-wide and systemic policy, pattern, and/or practice of discrimination against the Title VII Class Representatives and the Class by, among other things: maintaining a discriminatory system of determining compensation;

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

maintaining a discriminatory system for promotions; discriminating against the Title VII Class Representatives and Class members in pay and promotions; discriminatorily denying development opportunities; subjecting the Title VII Class Representatives and the Class to a hostile work environment; and other forms of discrimination.

326.376.     These foregoing common policies, practices, and/or procedures have produced an unjustified disparate impact on the Title VII Class Representatives and the Class with respect to the terms and conditions of their employment.

327.377.     As a result of this disparate treatment and disparate impact discrimination, Jones Day has treated the Title VII Class Representatives and the Class differently from and less preferentially than similarly situated male employees with respect to pay and promotions.

328.378.     Jones Day has failed to prevent, to respond to, to investigate adequately, and/or to appropriately resolve this gender discrimination.

329.379.     Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Title VII Class Representatives and the Class, entitling the Title VII Class Representatives and all members of the Class to punitive damages.

330.380.     Because of the continuous nature of Jones Day's discriminatory conduct, which persisted throughout the employment of the Title VII Class Representatives and the Class, the Class Representatives and all members of the Class are entitled to application of the continuing violations doctrine to all violations alleged herein.

331.381.     By reason of Jones Day's discrimination, the Title VII Class Representatives and the Class are entitled to all legal and equitable remedies available for violations of Title VII.

332.382.    As a result of Jones Day's conduct alleged in this Complaint, the Title VII Class Representatives and the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

333.383.    As a further result of Jones Day's unlawful conduct, the Title VII Class Representatives and the Class have suffered and continue to suffer, *inter alia*, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish. Title VII Class Representatives and the Class are entitled to recover damages for such injuries from Jones Day under Title VII.

334.384.    Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

<u>COUNT 2</u>
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000(e),**
*et seq., as amended by the* **PREGNANCY DISCRIMINATION ACT OF 1978**
**PREGNANCY AND MATERNITY (SEX PLUS) DISCRIMINATION**
**On Behalf of the Title VII Pregnancy Class Representatives and all Title VII Pregnancy Subclass Members**

335.385.    Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

336.386.    This Count is brought by Plaintiffs Tolton and Draper ("Title VII Pregnancy Class Representatives") individually and on behalf of all members of the Title VII Pregnancy Subclass.

337.387.    Plaintiffs Tolton and Draper each filed a timely charge with the EEOC on behalf of herself and the Class Members. Plaintiff Draper may "piggyback" off the first-in-time filing of Plaintiff Tolton because Plaintiff Tolton's EEOC charge relates to the same claims that Plaintiff Draper asserts.

338.388.    Jones Day has discriminated against the Title VII Pregnancy Class Representatives and all members of the Subclass in violation of Title VII by subjecting them to

102

different treatment on the basis of their gender, including pregnancy and maternity. The Title VII Pregnancy Class Representatives and members of the Title VII Pregnancy Subclass have been disparately impacted and disparately treated as a result of Jones Day's wrongful conduct and its policies, practices, and procedures.

339.389.     Jones Day has discriminated against the Title VII Pregnancy Class Representatives and Subclass members by treating them differently from and less preferably than similarly situated male employees and female employees who are not pregnant and who do not have children, and by subjecting them to differential and substandard terms and conditions of employment, including but not limited to discriminatory denials of fair compensation, discriminatory denials of promotional opportunities, and discriminatory treatment with respect to leave, work responsibilities, a hostile work environment, and other terms and conditions of employment in violation of Title VII.

340.390.     Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Title VII Pregnancy Subclass Representatives and the members of the proposed Title VII Pregnancy Subclass, entitling the Title VII Pregnancy Class Representatives and the members of the Title VII Pregnancy Subclass to punitive damages.

341.391.     As a result of Jones Day's conduct alleged in this Complaint, the Title VII Pregnancy Class Representatives and the members of the Title VII Pregnancy Subclass have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

~~342.~~392.     Because of the continuous nature of Jones Day's discriminatory conduct, which persisted throughout the employment of the Title VII Pregnancy Class Representatives and the Title VII Pregnancy Subclass, the Class Representatives and all members of the Subclass are entitled to application of the continuing violations doctrine to all violations alleged herein.

~~343.~~393.     By reason of Jones Day's discrimination, the Title VII Pregnancy Class Representatives and members of the Title VII Pregnancy Subclass are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

~~344.~~394.     Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

<u>COUNT 3</u>
**VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT,**
**29 U.S.C § 2601** *et seq.*
**DISCRIMINATION, INTERFERENCE AND RETALIATION**
**On Behalf of the FMLA Class Representatives and the FMLA Class**

~~345.~~395.     Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

~~346.~~396.     This Count is brought on behalf of Plaintiffs Tolton, Mazingo, and Draper ("FMLA Class Representatives") individually and on behalf of all members of the FMLA subclass.

~~347.~~397.     Under the FMLA, an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. Further, an employer cannot use the taking of FMLA leave as a "negative factor" in employment actions such as hiring, promotions, or disciplinary actions. Plaintiffs took approved FMLA leave.

~~348.~~398.     Jones Day interfered with the taking of protected leave by FMLA Class Representatives and FMLA Class members and discriminated against them for the taking of such leave, in violation of the FMLA.

104

349.399.    Jones Day interfered with the taking of protected leave by FMLA Class Representatives and FMLA Class members and discriminated against them for taking such leave by using the taking of FMLA leave as a negative factor in employment actions, including, *inter alia*, paying them less because they had taken leave, failing to promote them because they had taken leave, denying them career-advancement opportunities and work opportunities because they had taken leave, making inaccurate statements harmful to their professional careers because they had taken leave, and creating an environment hostile to pregnancy and the taking of statutorily protected maternity and other health or family leave.

350.400.    Jones Day acted willfully, intentionally, and with reckless disregard for FMLA Class Representatives' and FMLA Class members' rights under the FMLA.

351.401.    As a direct and proximate result of Jones Day's actions, FMLA Class Representatives and the FMLA Class members suffered injury and monetary damages, including but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses, and costs.

352.402.    By reason of Jones Day's discrimination, FMLA Class Representatives and the FMLA Class members are entitled to all legal and equitable remedies available for violations of the FMLA, including an award of liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 2617.

## COUNT 4
### VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, *as amended by* THE EQUAL PAY ACT OF 1963, 29 U.S.C. § 216(b) DENIAL OF EQUAL PAY FOR EQUAL WORK
#### On Behalf of All Plaintiffs and the EPA Collective Action Plaintiffs

353.403.    Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

354.404.    This Count is brought on behalf of all Plaintiffs and all EPA Collective Action Plaintiffs who "opt-in" to this action ("the EPA Collective").

355.405.    Jones Day has discriminated against Plaintiffs and the EPA Collective within the meaning of the Equal Pay Act of 1963 ("EPA"), in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. § 206, *et seq*., as amended by the EPA, by providing them with a lower rate of pay than similarly situated male colleagues onin jobs requiring the basisperformance of their female gendersubstantially equal work, even though Plaintiffs and all others similarly situated have performed and continue to perform similar duties requiring the same skill, effort, and responsibility as their male counterparts.

356.406.    Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated male attorneys all have performed and continue to perform similarsubstantially equal job duties and functions. Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated male attorneys all have performed and continue to perform jobs that required equal skill, effort, and responsibility.

357.407.    Jones Day has discriminated against Plaintiffs and all EPA Collective Action Plaintiffs by subjecting them to discriminatory pay in violation of the EPA.

358.408.    The differential in pay between male and female attorneys is not due to a legitimate seniority system, merit, quantity or quality of production, or a factor other than sex, but is due to gender.

359.409.    Jones Day has caused, attempted to cause, or contributed to the continuation of pay discrimination based on gender, in violation of the EPA. The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a). Because Jones Day has willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

360.410.    As a result of Jones Day's conduct as alleged in this Complaint, Plaintiffs and all EPA Collective Action Plaintiffs have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

361.411.    By reason of Jones Day's discrimination, Plaintiffs and all EPA Collective Action Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA, including liquidated damages, interest, and other compensation pursuant to 29 U.S.C. § 216(b).

362.412.    Attorneys' fees should be awarded under 29 U.S.C. § 216(b).

**COUNT 5**
**VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,**
**Cal. Gov. Code § 12940, *et seq.***
**GENDER DISCRIMINATION**
**On Behalf of California Class Representatives and the California Class**

363.413.    Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

364.414.    This Count is brought by Plaintiffs Tolton, Mazingo, Williams, and Stahl ("California Class Representatives") individually and on behalf of all members of the California Class.

365.415.    Plaintiffs Tolton, Mazingo, Williams, and Stahl each filed a timely charge with the DFEH on behalf of herself and the Class Members. Plaintiffs Mazingo, Williams, and Stahl may "piggyback" off the first-in-time filing of Plaintiff Tolton because Plaintiff Tolton's DFEH charge relates to the same claims that the other Plaintiffs assert.

366.416.    Jones Day has discriminated against the California Class Representatives and the California Class in violation of the California Fair Employment and Housing Act (the "FEHA"), Cal. Gov. Code § 12940, *et seq.*, by subjecting them to different treatment because and

107

on the basis of their gender (including pregnancy), by engaging in intentional disparate treatment, and by maintaining uniform policies and practices that have an adverse, disparate impact on them.

367.417.     Jones Day has engaged in an intentional, firm-wide, and systemic policy, pattern, and/or practice of discrimination against the California Class Representatives and the California Class by, *inter alia*: maintaining a discriminatory system for compensation, maintaining a discriminatory system for promotions, unwarrantedly suppressing pay, promotions, and professional development for women, subjecting the California Class Representatives and the California Class to a hostile work environment;, and other forms of discrimination.

368.418.     These foregoing common policies, practices, and/or procedures have produced an unjustified disparate impact on the California Class Representatives and the members of the California Class with respect to the terms and conditions of their employment.

369.419.     As a result of this disparate treatment and disparate impact discrimination, Jones Day has treated the California Class Representatives and California Class differently from and less preferentially than similarly situated male attorneys with respect to pay and promotions.

370.420.     Jones Day has failed to prevent, respond to, adequately investigate, and/or appropriately resolve this gender discrimination.

371.421.     Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the California Class Representatives and all members of the California Class, entitling the California Class Representatives and all members of the California Class to punitive damages.

372.422.     As a result of Jones Day's conduct alleged in this Complaint, California Class Representatives and the California Class have suffered and continue to suffer harm,

including but not limited to, lost earnings, lost benefits, lost future employment opportunities, and other financial loss, as well as non-economic damages.

373.423.     By reason of the continuous nature of Jones Day's discriminatory conduct, which persisted throughout the employment of the California Class Representatives and the members of the California Class, the continuing violations doctrine applies to all violations alleged herein.

374.424.     By reason of Jones Day's discrimination, California Class Representatives and the members of the California Class are entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of compensatory and punitive damages.

375.425.     Attorneys' fees should be awarded under Cal. Gov. Code § 12940.

**COUNT 6**
**VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,**
**Cal. Gov. Code § 12940, *et seq*.**
**PREGNANCY AND MATERNITY (SEX PLUS) DISCRIMINATION**
**On Behalf of California Pregnancy Class Representative and the California Pregnancy**
**Subclass**

376.426.     Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

377.427.     This Count is brought by Plaintiff Tolton (the "California Pregnancy Class Representative") individually and on behalf of all members of the California Pregnancy Subclass.

378.428.     Jones Day has discriminated against the California Pregnancy Class Representative and the California Pregnancy Subclass in violation of the FEHA by subjecting them to different treatment because and on the basis of their gender, in particular their pregnancy and maternity, including by engaging in intentional disparate treatment, and by maintaining uniform policies and practices that have an adverse, disparate impact on them.

109

379.429.      Jones Day has engaged in an intentional, firm-wide and systemic policy, pattern, and/or practice of discrimination against the California Pregnancy Class Representative and the California Pregnancy Subclass by, *inter alia*: maintaining a discriminatory system for compensation, maintaining a discriminatory system for promotions, unwarrantedly suppressing pay, promotions, and professional development for women who are pregnant or have children, maintaining a hostile work environment, and other forms of discrimination.

380.430.      These foregoing common policies, practices, and/or procedures have produced an unjustified disparate impact on the California Pregnancy Class Representative and the members of the California Pregnancy Subclass with respect to the terms and conditions of their employment.

381.431.      As a result of this disparate treatment and disparate impact discrimination, Jones Day has treated the California Pregnancy Class Representative and California Pregnancy Subclass differently from and less preferentially than similarly situated male attorneys and female attorneys who are not pregnant or do not have children, with respect to pay and promotions.

382.432.      Jones Day has failed to prevent, respond to, adequately investigate, and/or appropriately resolve this gender discrimination.

383.433.      Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the California Pregnancy Class Representative and all members of the California Pregnancy Subclass, entitling the California Pregnancy Class Representative and all members of the California Pregnancy Subclass to punitive damages.

384.434.      As a result of Jones Day's conduct alleged in this Complaint, the California Pregnancy Class Representative and the California Pregnancy Subclass have suffered and continue

to suffer harm, including but not limited to, lost earnings, lost benefits, lost future employment opportunities, and other financial loss, as well as non-economic damages.

~~385.~~435.        Because of the continuous nature of Jones Day's discriminatory conduct, which persisted throughout the employment of the California Pregnancy Class Representative and the members of the California Pregnancy Subclass, the continuing violations doctrine applies to all violations alleged herein.

~~386.~~436.        By reason of Jones Day's discrimination, the California Pregnancy Class Representative and the members of the California Pregnancy Subclass are entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of compensatory and punitive damages.

~~387.~~437.        Attorneys' fees should be awarded under Cal. Gov. Code § 12940.

**COUNT 7**
**VIOLATION OF THE CALIFORNIA FAMILY RIGHTS ACT,**
**Cal. Gov. Code § 12945.2**
**DISCRIMINATION, INTERFERENCE AND RETALIATION**
**On Behalf of the California Leave Class Representatives and the California Leave Subclass**

~~388.~~438.        Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

~~389.~~439.        This Count is brought by Plaintiffs Tolton and Mazingo ("California Leave Class Representatives") individually and on behalf of all members of the California Leave Subclass.

~~390.~~440.        Plaintiffs Tolton and Mazingo each filed a timely charge with the DFEH on behalf of herself and the Class Members. Plaintiff Mazingo may "piggyback" off the first-in-time filing of Plaintiff Tolton because Plaintiff Tolton's DFEH charge relates to the same claims that Plaintiff Mazingo asserts.

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

391.441.    Under the California Family Rights Act ("CFRA"), an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. Further, an employer cannot use the taking of CFRA leave as a "negative factor" in employment actions such as hiring, promotions, or disciplinary actions. California Leave Class Representatives took approved CFRA leave.

392.442.    Jones Day interfered with the taking of protected leave by California Leave Class Representatives and California Leave Subclass members and discriminated against them for the taking of such leave, in violation of the CFRA.

393.443.    Jones Day interfered with the taking of protected leave by California Leave Class Representatives and California Leave Subclass members and discriminated against them for taking such leave by using the taking of CFRA leave as a negative factor in employment actions, including, *inter alia*, failing to promote them, denying them career-advancement opportunities and work opportunities, making inaccurate statements harmful to their professional careers, and creating an environment hostile to pregnancy and the taking of statutorily protected maternity leave.

394.444.    Jones Day acted willfully, intentionally, and with reckless disregard for California Leave Class Representatives' rights under the CFRA.

395.445.    As a direct and proximate result of Jones Day's actions, California Leave Class Representatives suffered injury and monetary damages, including but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses, and costs, and are entitled to all legal and equitable remedies available.

112

396.446.    By reason of Jones Day's discrimination, California Leave Class Representatives and California Leave Subclass members are entitled to all legal and equitable remedies available for violations of the CFRA, including an award of liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation.

**COUNT 8**
**VIOLATION OF THE CALIFORNIA EQUAL PAY ACT,** *as amended by* **THE CALIFORNIA FAIR PAY ACT, Cal. Lab. Code § 1197.5,** *et seq.*
**DENIAL OF EQUAL PAY FOR EQUAL & SUBSTANTIALLY SIMILAR WORK**
**On Behalf of California Class Representatives and the CEPA Subclass**

397.447.    Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

398.448.    This Count is brought on behalf of Plaintiffs Tolton, Mazingo, Williams, and Stahl ("California Class Representatives") individually and on behalf of all members of the California Class.

399.449.    Jones Day has discriminated against the California Class Representatives and all members of the California Class in violation of the California Equal Pay Act, Cal. Lab. Code § 1197.5 (West 2015) (amended 2015), *et seq.* Jones Day has paid California Class Representatives and members of the California Class less than similarly situated male attorneys in the same establishment performing substantially equal work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions.

400.450.    Jones Day subjected the California Class Representatives and the members of the California Class to common discriminatory pay policies, including: maintaining a

113

discriminatory system of determining compensation; maintaining a discriminatory system for promotions; and other forms of discrimination affecting pay.

401.451.    The differential in pay between male and female attorneys was not due to a legitimate seniority system, merit, or the quantity or quality of production, a bona fide factor other than sex, such as education, training, or experience, but was due to gender. In the alternative, to the extent that Jones Day relied upon one or more of these factors, said factor(s) were not reasonably applied and did/do not account for the entire wage differential.

402.452.    The foregoing conduct constitutes a willful violation of the California Equal Pay Act, Cal. Lab. Code §1197.5 *et seq*., as amended by the California Fair Pay Act. Therefore, a three-year statute of limitations applies to such violations, pursuant to California Equal Pay Act, Cal. Lab. Code § 1197.5(h), *et seq*., and California Equal Pay Act, as amended by the California Fair Pay Act, Cal. Lab. Code § 1197.5(h).

403.453.    As a result of Jones Day's conduct alleged in this Complaint and/or Jones Day's willful, knowing, and intentional discrimination, the California Class members have suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

404.454.    California Class Representatives and the California Class are therefore entitled to all legal and equitable remedies, including doubled compensatory awards for all willful violations.

405.455.    Attorneys' fees should be awarded under California Labor Code § 1197.5(g).

**COUNT 9**
**VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE,**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**UNFAIR COMPETITION**
**On Behalf of California Class Representatives and the California Class**

~~406.~~456.    Plaintiffs re-allege and incorporate each and every allegation in this

Complaint.

~~407.~~457.    This Count is brought by Plaintiffs Tolton, Mazingo, Williams, and Stahl

("California Class Representatives") individually and on behalf of all members of the California

Class.

~~408.~~458.    Jones Day is a "person" as defined under California Business and

Professions Code § 17201.

~~409.~~459.    Jones Day's willful failure to pay women equally, to promote women

equally, and otherwise to offer women equal employment opportunities as alleged above,

constitutes unlawful, unfair and/or fraudulent activity prohibited by California Business and

Professions Code § 17200. As a result of its unlawful, unfair and/or fraudulent acts, Jones Day

reaped and continues to reap unfair benefits and illegal profits at the expense of California Class

Representatives and the California Class. Jones Day should be enjoined from this activity.

~~410.~~460.    Accordingly, California Class Representatives and the California Class

members are entitled to restitution with interest and other equitable relief, pursuant to California

Business and Professions Code § 17203.

**COUNT 10**
**CIVIL PENALTIES UNDER THE CALIFORNIA PRIVATE ATTORNEYS GENERAL**
**ACT OF 2004,**
**Cal. Lab. Code § 2698 *et seq.***
**On Behalf of Plaintiffs Tolton, Mazingo, and Others Similarly Aggrieved**

~~411.~~461.    Plaintiffs re-allege and incorporate each and every allegation contained in

this Complaint.

412.462.     Plaintiffs Tolton and Mazingo bring this claim on behalf of themselves and other current and former female associates who worked for Jones Day in California at any time on or after the date that is 515 days prior to the filing of their PAGA claims notices.

413.463.     The California Private Attorneys General Act of 2004, Cal. Lab. Code § 2698, *et seq.*, gives any employee aggrieved by an employer's violation of the Labor Code the right to file an action to recover civil penalties for Labor Code violations.

414.464.     The California Equal Pay Act ("CEPA"), Cal. Lab. Code § 1197.5(a), prohibits employers from "pay[ing] . . . employees at wage rates less than the rates paid to employees of the opposite sex for substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions," subject to certain affirmative defenses. "Prior salary shall not, by itself, justify any disparity in compensation." Cal. Lab. Code § 1197.5(a)(3).

415.465.     The CEPA further provides that "[a]n employer shall not prohibit an employee from disclosing the employee's own wages, discussing the wages of others, inquiring about another employee's wages, or aiding or encouraging any other employee to exercise his or her rights under this section." Cal. Lab. Code § 1197.5(k)(1).

416.466.     Labor Code Section 204(a) provides that "[a]ll wages, other than those mentioned in Section 201, 201.3, 202, 204.1, or 204.2, earned by any person in any employment are due and payable twice during each calendar month, on days designated in advance by the employer as the regular paydays . . . " It provides further that "salaries of executive, administrative, and professional employees . . . may be paid once a month on or before the 26th day of the month during which the labor was performed if the entire month's salaries, including the unearned portion

between the date of payment and the last day of the month, are paid at that time." *Id.*

~~417.~~467.     Labor Code Section 204.2 provides that "[s]alaries of executive, administrative, and professional employees . . . earned for labor performed in excess of 40 hours in a calendar week are due and payable on or before the 26th day of the calendar month immediately following the month in which such labor was performed."

~~418.~~468.     Labor Code Section 226 requires employers to provide wage statements that accurately state the amount of gross and net wages earned.

~~419.~~469.     Labor Code Section 232(a) prohibits "[r]equir[ing] . . . as a condition of employment, that an employee refrain from disclosing the amount of his or her wages."

~~420.~~470.     Labor Code Section 232.5(a) prohibits "[r]equir[ing] . . . as a condition of employment, that an employee refrain from disclosing information about the employer's working conditions."

~~421.~~471.     Labor Code Section 1102.5(a) prohibits an employer or person acting on behalf of an employer from preventing an employee from disclosing information "to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

~~422.~~472.     Labor Code Section 1102.5(b) prohibits an employer or person acting on behalf of an employer from retaliating against an employee "for disclosing information, or because the employer believes that the employee disclosed or may disclose information . . . to a person with authority over the employee or another employee who has the authority to investigate,

discover, or correct the violation or noncompliance . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."

423.473.      Labor Code Section 1102.5(c) prohibits an employer or person acting on behalf of the employer from retaliating against an employee for "refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."

424.474.      Labor Code Section 98.6 provides that "[a] person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee . . . because the employee . . . engaged in any conduct delineated in this chapter, including the conduct described in subdivision (k) of Section 96, and Chapter 5 (commencing with Section 1101) of Part 3 of Division 2, or because the employee . . . made a written or oral complaint that he or she is owed unpaid wages . . . or because of the exercise by the employee or applicant for employment on behalf of himself, herself, or others of any rights afforded him or her."

425.475.      Jones Day has violated the California Labor Code by:

a.  Paying female associates a wage rate less than that paid to male associates for performing equal or substantially similar work when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions, in violation of the California Equal Pay Act, Cal. Lab. Code § 1197.5(a), as amended by the California Fair Pay Act of 2015.

b.  As a result of pay discrimination, depriving female associates of timely payment of wages, thereby violating Labor Code §§ 204, 204c and/or 204.2 by failing to pay them all wages due and payable at regular, prescheduled intervals during each

118

calendar month, within the timeframes set forth in these provisions, pursuant to statute.

c.  As a result of pay discrimination throughout employment, failing to pay departing female associates all wages due and owing at the time of discharge, upon the last day of employment if the associate resigned and provided at least 72 hours' notice, or within 72 hours of the associate quitting her employment, in violation of Labor Code §§ 201–03.

d.  As a result of pay discrimination, Defendant's pay statements reflect the amount it actually pays female associates, rather than the rightful amounts they earned; therefore each pay statement issued to any female Jones Day associate inaccurately states the net and gross amount of wages earned, in violation of Labor Code § 226(a).

e.  Prohibiting and preventing Plaintiffs Tolton and Mazingo and other female associates from disclosing the amount of or information about their and others' wages in violation of Labor Code §§ 1197.5(k), 232, and 232.5.

f.  Prohibiting Plaintiffs Tolton's, Mazingo's and other female associates' aiding or encouraging any other employee to exercise his or her rights under the CEPA, in violation of Labor Code § 1197.5(k).

g.  Requiring, as a condition of employment, that Plaintiffs Tolton, Mazingo, and other female associates refrain from disclosing information about Jones Day's working conditions, including the amount of their wages, in violation of Labor Code §§ 1197.5(k), 232, and 232.5.

h.  Preventing Plaintiffs Tolton and Mazingo from disclosing information regarding terms and conditions of employment that they have reasonable cause to believe discloses a violation of, *inter alia*, the aforementioned laws, in addition to the California Fair Employment and Housing Act, Title VII, the Federal Equal Pay Act, the California Equal Pay Act, the Family and Medical Leave Act, and the California Family Rights Act, in violation of Labor Code § 1102.5(a).

i.  Retaliating against Plaintiffs Tolton and Mazingo including by, *inter alia*, restricting their professional opportunities, terminating or constructively terminating their employment, and engaging in other adverse actions, because they disclosed information that they reasonably believed constituted a violation of the aforementioned laws, as well as the California Fair Employment and Housing Act, Title VII of the Civil Rights Act of 1964, the Federal Equal Pay Act, the California Equal Pay Act, the Family and Medical Leave Act, and/or the California Family Rights Act, all of which are actions that are themselves violations of Labor Code § 1102.5(b).

j.  Retaliating against Plaintiffs Tolton and Mazingo because they opposed and/or refused to participate in conduct that would have constituted a violation of the aforementioned laws, in addition to the California Fair Employment and Housing Act, Title VII, the Federal Equal Pay Act, the California Equal Pay Act, the Family and Medical Leave Act, and/or the California Family Rights Act, in violation of ~~labor~~Labor Code § 1102.5(c), including by, *inter alia*, restricting their professional opportunities, terminating or constructively terminating ~~—~~employment, and engaging in other adverse actions.

k.  Retaliating against Plaintiff Tolton in response to the actions she took to enforce the California Equal Pay Act, her invocation of and/or efforts to vindicate her and/or others rights under the California Equal Pay Act, her disclosure of wage information and discussions regarding her own and/or others' wages, and/or her efforts to aid other employees in exercising their rights under the California Equal Pay Act, in violation of Labor Code § 1197.5(k).

l.  Retaliating against Plaintiffs Tolton and Mazingo because they discussed their working conditions and/or compensation at Jones Day, in violation of Labor Code §§ 232 and/or 232.5.

m.  Retaliating against Plaintiffs Tolton and Mazingo in violation of Labor Code Section 98.6(a), for exercising their right to speak out against violations of the law, for complaining that they are owed unpaid wages as a result of the discrimination they faced, for engaging in the aforementioned conduct delineated under Labor Code § 1102.5, and/or for exercising the rights afforded to them (1) to receive equal pay pursuant to the Equal Pay Act, 29 U.S.C. § 206, and the California Equal Pay Act, Cal. Lab. Code § 1197.5; (2) to be free from sex-based discrimination with respect to compensation and other terms and conditions of employment, pursuant to Title VII, 42 U.S.C. § 2000e *et seq.*, and the California Fair Employment and Housing Act, Cal. Gov. Code § 12940 *et seq.*; (3) to be free from discrimination, interference, or retaliation for taking protected leave pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, and the California Family Rights Act, Cal. Gov. Code § 12945; (4) to disclose their own wages, to discuss their own and others' compensation, and to discuss working conditions pursuant to Labor Code

§§ 232, 232.5, and 1197.5; and/or (5) to oppose and/or to disclose facts that Plaintiffs Tolton and Mazingo have reason to believe disclose violations of state, federal, and local laws, including Title VII, the Equal Pay Act, and the Labor Code Sections identified in this Complaint, pursuant to Labor Code § 1102.5.

426.476.    In addition to Plaintiffs Tolton and Mazingo, there are dozens of female associates who have experienced one or more of these violations as of this filing. This number will continue to grow with each new female associate that Jones Day employs while it fails to rectify these violations.

427.477.    The above-referenced violations are willful, intentional, and ongoing. Plaintiffs Tolton and Mazingo, as private attorneys general, seek to recover the maximum civil penalties for all violations.

428.478.    Prior to filing this Complaint, Plaintiffs Tolton and Mazingo filed notice of their PAGA claims for these violations with the California Labor and Workforce Development Agency and served that notice on Jones Day via certified mail.

429.479.    Plaintiffs Tolton and Mazingo seek to recover the maximum civil penalties available for each of these violations. This includes, for wages owed as a result of gender-based pay inequity, "(1) for any initial violation, one hundred dollars ($100) for each failure to pay each employee. (2) For each subsequent violation, or any willful or intentional violation, two hundred dollars ($200) for each failure to pay each employee, plus 25 percent of the amount unlawfully withheld." Cal. Lab. Code § 210.

430.480.    In addition, Plaintiffs seek costs and attorneys' fees under Labor Code § 2699(g).

122

**COUNT 11**
**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT,**
**D.C. Code § 2-1401 *et seq.* as amended**
**GENDER DISCRIMINATION**
**On Behalf of Class Representatives and all Class Members**

431.481.    Plaintiffs re-allege and incorporate each and every allegation contained in this Complaint.

432.482.    This Count is brought by Plaintiffs Tolton, Mazingo, Williams, Draper, and Stahl, individually and on behalf of all members of the DCHRA Class.

433.483.    Defendant Jones Day is an employer within the meaning of the DCHRA.

434.484.    Defendant Jones Day, acting through decision-maker Managing Partner Stephen J. Brogan working out of Jones Day's District of Columbia office, discriminated against Class Representatives and Class Members, in violation of the DCHRA, by subjecting them to differential treatment on the basis of their gender, including by engaging in intentional disparate treatment, and by maintaining uniform policies and practices that have an adverse disparate impact on them.

435.485.    Jones Day, through decision-maker Managing Partner Brogan, has engaged in an intentional, firm-wide and systemic policy, pattern, and/or practice of discrimination against Class Representatives and the Class by, *inter alia*: maintaining a discriminatory system of determining compensation; maintaining a discriminatory system for promotions; discriminating against Class Representatives and Class members in pay and promotions; discriminatorily denying development opportunities; subjecting Class Representatives and the Class members to a hostile work environment, and other forms of discrimination.

436.486.    These foregoing common policies, practices, and/or procedures, established and/or ratified by Managing Partner Brogan in the District of Columbia, have produced an

unjustified disparate impact nationwide on Class Representatives and the Class with respect to the terms and conditions of their employment.

437.487.    As a result of this disparate treatment and disparate impact discrimination, Jones Day has treated Class Representatives and the Class differently from and less preferentially than similarly situated male employees with respect to pay and promotions.

438.488.    Jones Day has failed to prevent, to respond to, to investigate adequately, and/or to appropriately resolve this gender discrimination.

439.489.    Jones Day's conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted in callous disregard of the rights of the Class Representatives and the Class, entitling the Class Representatives and all members of the Class to punitive damages.

440.490.    By reason of the continuous nature of Jones Day's discriminatory conduct, which persisted throughout the employment of the Class Representatives and the Class, the Class Representatives and all members of the Class are entitled to application of the continuing violations doctrine to all violations alleged herein.

441.491.    As a result of Jones Day's conduct alleged in this Complaint, the Class Representatives and the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, including interest.

442.492.    As a further result of Jones Day's unlawful conduct, the Class Representatives and the Class have suffered and continue to suffer, *inter alia*, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish.

443.493.    By reason of Defendant's discrimination, Class Representatives and the Class are entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

444.494.    Attorneys' fees and costs should be awarded under D.C. Code § 2-1403.13(e).

**COUNT 12**
**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW,**
**N.Y.C. Admin. Code § 8-101, *et seq.***
**GENDER DISCRIMINATION**
**On behalf of Plaintiff Katrina Henderson and the New York subclass**

445.495.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

446.496.    This Count is brought on behalf of Plaintiff Katrina Henderson in her individual and representative capacities, and all members of the New York subclass.

447.497.    Defendant, an employer within the meaning of the NYCHRL, wrongfully discriminated against Katrina Henderson and members of the New York subclass in violation of the NYCHRL by treating them less well because of and on the basis of their gender, including by engaging in intentional disparate treatment, and by maintaining uniform policies, practices, and procedures that have an adverse, disparate impact on them.

448.498.    Jones Day has engaged in an intentional, firm-wide and systematic policy, pattern, and/or practice of discrimination against Katrina Henderson and the New York subclass by, among other things: maintaining a discriminatory system of determining compensation; maintaining a discriminatory system for promotions; discriminating against Katrina Henderson and subclass members in pay and promotions; discriminatorily denying development opportunities; subjecting Katrina Henderson and the subclass members to a hostile work environment, and other forms of discrimination.

449.499.    These foregoing common policies, practices, and procedures have produced an unjustified disparate impact on Katrina Henderson and the members of the New York subclass

with respect to the terms and conditions of their employment.

450.500.     Defendant's discrimination against the New York subclass, including its termination of Katrina Henderson, constituted adverse employment actions that materially and adversely affected her employment in violation of the NYCHRL.

451.501.     As a result of this disparate treatment and disparate impact discrimination, Jones Day has treated Katrina Henderson and the New York subclass differently from and less preferentially than similarly situated male attorneys, with respect to pay and promotions.

452.502.     Defendant has failed to prevent, respond to, adequately investigate, and/or appropriately resolve this gender discrimination.

453.503.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Katrina Henderson and members of the New York subclass, entitling them to punitive damages.

454.504.     By reason of the continuous nature of Jones Day's discriminatory conduct, which persisted throughout the employment of Katrina Henderson and the New York subclass, they are entitled to application of the continuing violations doctrine to all violations alleged herein.

455.505.     Jones Day's discrimination against Katrina Henderson and the New York subclass caused them to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

456.506.     Katrina Henderson and members of the New York Subclass are therefore entitled to all legal and equitable remedies available for violations of the NYCHRL, including reinstatement and an award of punitive damages.

457.507.     Attorneys' fees should be awarded under N.Y.C. Admin. Code § 8-502(g).


**COUNT 13**
**VIOLATION OF THE NEW YORK EQUAL PAY LAW,**

**N.Y. Lab. Law § 194**
**UNEQUAL PAY**
**On behalf of Katrina Henderson and the New York subclass**

458.508.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at: 0.5" + Indent at: 0"

459.509.    This Count is brought on behalf of Katrina Henderson in her individual and representative capacities, and all members of the New York subclass.

460.510.    Defendant Jones Day, the employer of Katrina Henderson within the meaning of the New York Equal Pay Law, has discriminated against her and members of the New York subclass in violation of New York Labor Law § 194 by subjecting them to unequal pay on the basis of sex and by treating them differently and less preferably when compared to male attorneys in the same establishment performing equal work on jobs, the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

461.511.    Defendant subjected Katrina Henderson and members of the New York subclass to common discriminatory pay policies, practices, and procedures including: maintaining a discriminatory system of determining compensation; maintaining a discriminatory system for advancement; and other forms of discrimination affecting pay.

462.512.    The differential in pay between male and female attorneys was not due to a legitimate seniority system, merit, or the quantity or quality of production, or a bona fide factor other than sex, such as education, training, or experience, but was due to gender. In the alternative, to the extent that Defendant relied upon one or more of these factors, said factor(s) were not job-related, not consistent with business necessity, not reasonably applied and/or did/do not account for the entire wage differential.

463.513.    Defendant caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the New York Equal Pay Law. Moreover, Defendant willfully violated the New York Equal Pay Law by intentionally paying Katrina Henderson and subclass members less than similarly situated men.

464.514.    As a result of Defendant's conduct alleged in this Complaint and/or Defendant's willful, knowing, and intentional discrimination, Katrina Henderson and the New York subclass members have suffered and will continue to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

465.515.    Katrina Henderson and the New York subclass members are therefore entitled to all remedies available for violations of New York Labor Law § 194, including liquidated damages and attorneys' fees and costs for all willful violations, pursuant to New York Labor Law § 198(1-a).

**COUNT 14**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e-2(a), *et seq.***
**RETALIATION**
**On Behalf of Plaintiffs Tolton and Draper**

466.516.    Plaintiffs Tolton and Draper re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

467.517.    Plaintiffs Tolton and Draper each filed a timely charge with the EEOC on behalf of herself and the Class Members. Plaintiff Draper may "piggyback" off the first-in-time filing of Plaintiff Tolton because Plaintiff Tolton's EEOC charge relates to the same claims that Plaintiff Draper asserts.

468.518.    Plaintiffs Tolton and Draper engaged in protected activity that included, but is not limited to, complaining to Jones Day about gender and/or pregnancy and maternity discrimination and disclosing it to others.

469.519.    Jones Day retaliated against Plaintiffs Tolton and Draper by, *inter alia*, depriving them of pay, depriving them of advancement opportunities, providing them with negative performance reviews, failing to promote them, and wrongfully terminating them.

128

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

470.520.　　Jones Day's retaliatory acts against Plaintiffs Tolton and Draper were a direct and proximate result of their protected activities.

471.521.　　A reasonable person would find Jones Day's retaliatory acts materially adverse and such acts would dissuade a reasonable person from complaining or opposing discrimination.

472.522.　　Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Plaintiffs Tolton and Draper entitling them to punitive damages.

473.523.　　Defendant's actions and failures to act have caused Plaintiffs Tolton and Draper to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

474.524.　　Plaintiffs Tolton and Draper are therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

475.525.　　Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT 15
### VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,
### Cal. Gov. Code § 12940, *et seq.*
### RETALIATION
### On behalf of Plaintiff Tolton

476.526.　　Plaintiff Tolton re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

477.527.　　Plaintiff Tolton engaged in protected activity that included, but is not limited to, complaining to Jones Day about gender, pregnancy, and maternity discrimination and disclosing it to others.

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at: 0.5" + Indent at: 0"

478.528.     Jones Day retaliated against Plaintiff Tolton by, *inter alia*, depriving her of pay, depriving her of advancement opportunities, providing her with negative performance reviews, failing to promote her, and wrongfully terminating her.

479.529.     Jones Day's retaliatory acts against Ms. Tolton were a direct and proximate result of her protected activities.

480.530.     A reasonable person would find Jones Day's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

481.531.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Ms. Tolton's rights, entitling her to punitive damages.

482.532.     Defendant's actions and failures to act have caused Ms. Tolton to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

483.533.     Ms. Tolton is therefore entitled to all legal and equitable remedies available for violations of the FEHA, including an award of punitive damages.

**COUNT 16**
**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code § 2-1401, *et seq.***
**RETALIATION**
**On Behalf of Plaintiffs Tolton and Draper**

484.534.     Plaintiffs Tolton and Draper re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

485.535.        Plaintiffs Tolton and Draper engaged in protected activity that included, but is not limited to, complaining to Jones Day about gender and/or pregnancy and maternity discrimination and disclosing it to others.

486.536.        Jones Day, an employer within the meaning of the DCHRA, retaliated against Plaintiffs Tolton and Draper through decision-maker Stephen J. Brogan working out of Jones Day's District of Columbia office by, *inter alia*, depriving them of pay, depriving them of advancement opportunities, providing them with negative performance reviews, failing to promote them, and wrongfully terminating them.

487.537.        Jones Day's retaliatory acts against Plaintiffs Tolton and Draper were a direct and proximate result of their protected activities.

488.538.        A reasonable person would find Jones Day's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

489.539.        Jones Day's conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted in callous disregard of the rights of Plaintiffs Tolton and Draper.

490.540.        Defendant's actions and failures to act have caused Plaintiffs Tolton and Draper to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

491.541.        Plaintiffs Tolton and Draper are therefore entitled to all legal and equitable remedies available for violations of the DCHRA, including reinstatement and an award of punitive damages.

492.542.        Attorneys' fees should be awarded under D.C. Code § 2-1403.13(e).

**COUNT 17**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e-2(a),** *et seq.,*
**WRONGFUL TERMINATION**
**On Behalf of Plaintiffs Tolton and Draper**

493.543.    Plaintiffs Tolton and Draper re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

494.544.    Plaintiffs Tolton and Draper each filed a timely charge with the EEOC on behalf of herself and the Class Members. Plaintiff Draper may "piggyback" off the first-in-time filing of Plaintiff Tolton because Plaintiff Tolton's EEOC charge relates to the same claims that Plaintiff Draper asserts.

495.545.    Jones Day terminated the employment of Plaintiffs Tolton and Draper due to gender and/or pregnancy and maternity discrimination. Jones Day's discharge of Plaintiffs Tolton and Draper was an adverse employment action that materially and adversely changed the overall terms and conditions of their employment in violation of Title VII.

496.546.    Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Plaintiffs Tolton and Draper, entitling them to punitive damages.

132

497.547.    Jones Day's discharge of Plaintiffs Tolton and Draper caused them to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

498.548.    Plaintiffs Tolton and Draper are therefore entitled to all legal and equitable remedies available for violations of Title VII, including reinstatement and an award of punitive damages.

499.549.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT 18**
**CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,**
**Cal. Gov. Code § 12940,** *et seq.*
**WRONGFUL TERMINATION**
**On Behalf of Plaintiff Tolton**

500.550.    Plaintiff Tolton re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

501.551.    Jones Day terminated the employment of Plaintiff Tolton due to gender, pregnancy, and maternity discrimination. Jones Day's discharge of Plaintiff Tolton was an adverse employment action that materially and adversely changed the overall terms and conditions of her employment in violation of the FEHA.

502.552.    Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Plaintiff Tolton, entitling her to punitive damages.

503.553.    Jones Day's discharge of Plaintiff Tolton caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

**Formatted:** Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 155 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

~~504.~~555.	Plaintiff Tolton is therefore entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of punitive damages.

~~505.~~555.	Attorneys' fees should be awarded under Cal. Gov. Code § 12940.

**COUNT 19**
**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. Code §§ 2-1401, *et seq.***
**WRONGFUL TERMINATION**
**On behalf of Plaintiffs Tolton and Draper**

~~506.~~556.	Plaintiffs Tolton and Draper re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

~~507.~~557.	Jones Day, an employer within the meaning of the DCHRA, wrongfully terminated the employment of Plaintiffs Tolton and Draper due to gender and/or pregnancy and maternity discrimination, acting through decision-maker Managing Partner Stephen J. Brogan, working out of the Firm's District of Columbia office. Jones Day's termination was an adverse employment action that materially and adversely affected the employment of Plaintiffs Tolton and Draper in violation of the DCHRA.

~~508.~~558.	Jones Day's conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted in callous disregard of the rights of Plaintiffs Tolton and Draper.

~~509.~~559.	Jones Day's discharge of Plaintiffs Tolton and Draper caused them to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

~~510.~~560.	Plaintiffs Tolton and Draper are therefore entitled to all legal and equitable remedies available for violations of the DCHRA, including reinstatement and an award of punitive damages.

~~511.~~562.          Attorneys' fees should be awarded under D.C. Code § 2-1403.13(e).

**COUNT 20**
**CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,**
**Cal. Gov. Code § 12940, *et seq*.**
**WRONGFUL CONSTRUCTIVE DISCHARGE**
**On Behalf of Plaintiffs Mazingo, Williams, and Stahl**

~~512.~~562.          Plaintiffs Mazingo, Williams, and Stahl re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

~~513.~~563.          Jones Day constructively terminated the employment of Plaintiffs Mazingo, Williams, and Stahl due to gender discrimination. Jones Day's discharge of Plaintiffs Mazingo, Williams, and Stahl was an adverse employment action that materially and adversely changed the overall terms and conditions of their employment in violation of the FEHA.

~~514.~~564.          Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Plaintiffs Mazingo, Williams, and Stahl, entitling them to punitive damages.

~~515.~~565.          Jones Day's discharge of Plaintiffs Mazingo, Williams, and Stahl caused them to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

~~516.~~566.          Plaintiffs Mazingo, Williams, and Stahl are therefore entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of punitive damages.

~~517.~~567.          Attorneys' fees should be awarded under Cal. Gov. Code § 12940.

**COUNT 21**
**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**

**D.C. Code §§ 2-1401,** *et seq.*
**WRONGFUL CONSTRUCTIVE DISCHARGE**
**On Behalf of All Plaintiffs**

~~518.~~568.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

~~519.~~569.    Jones Day, an employer within the meaning of the DCHRA, constructively terminated the employment of Plaintiffs due to gender discrimination. Jones Day's constructive terminations were adverse employment actions by decision-maker Managing Partner Stephen J. Brogan, working out of the Firm's District of Columbia office, that materially and adversely affected the employment of Plaintiffs in violation of the DCHRA.

~~520.~~570.    Jones Day's conduct was intentional, deliberate, willful, malicious, and reckless, and was conducted in callous disregard of the rights of Plaintiffs Tolton, Mazingo, Williams, Draper, Stahl, and Henderson.

~~521.~~571.    Jones Day's discharge of Plaintiffs caused them to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

~~522.~~    Plaintiffs are therefore entitled to all legal and equitable remedies available for violations of the DCHRA, including reinstatement and an award of punitive damages.

572.    Attorneys' fees should be awarded under D.C. Code § 2-1403.13(e).

**COUNT 22**
**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW,**
**N.Y.C. Admin. Code § 8-101,** *et seq.*
**WRONGFUL TERMINATION**
**On behalf of Plaintiff Katrina Henderson**

~~523.~~573.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

524.574.    Jones Day, an employer within the meaning of the NYCHRL, terminated the employment of Plaintiff Henderson due to gender discrimination. Jones Day's discharge of Plaintiff Henderson was an adverse employment action that materially and adversely affected her employment in violation of the NYCHRL.

525.575.    Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff Henderson, entitling her to punitive damages.

526.576.    Jones Day's discharge of Plaintiff Henderson caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

527.577.    Plaintiff Henderson is therefore entitled to all legal and equitable remedies available for violations of the NYCHRL, including reinstatement and an award of punitive damages.

528.578.    Attorneys' fees should be awarded under N.Y.C. Admin. Code § 8-502(g).

## XIIICOUNT 23
## VIOLATIONS OF SECTION 1981 OF THE CIVIL RIGHTS ACT OF 1866
## 42 U.S.C. § 1981
## RACE DISCRIMINATION
## On behalf of Plaintiff Katrina Henderson

579.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

580.    Defendant Jones Day denied Ms. Henderson, who is African-American, the same right to make and enforce contracts as enjoyed by white citizens employed by Defendant, including rights involving the making, performance, modification, and termination of contracts of employment with Defendant, as well as the enjoyment of all benefits, privileges, terms and conditions of that relationship, in violation of Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C § 1981.

581.   Jones Day's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff Henderson, entitling her to punitive damages.

582.   Jones Day's conduct caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

583.   Plaintiff Henderson is therefore entitled to all legal and equitable remedies available for violations of § 1981, including reinstatement and an award of punitive damages.

584.   Attorneys' fees should be awarded under 42 U.S.C. 1988.

## VIII.   PRAYER FOR RELIEF

Wherefore, Plaintiffs, on their own behalf and on behalf of the Classes, Subclasses, and EPA Collective, request the following relief:

a.       Acceptance of jurisdiction of this case;

b.       Certification of this case as a class action under Federal Rule of Civil Procedure 23, on behalf of the proposed Plaintiff Class and Subclasses, designation of the proposed Class Representatives as representatives of this Class and Subclasses, and designation of Plaintiffs' counsel of record as Class Counsel;

c.       Designation of this action as a collective action on behalf of the proposed EPA Collective (asserting EPA claims) and:

i.        promptly issuing notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the EPA Collective, which (a) apprises them of the pendency of this action and (b) permits them to assert timely EPA claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b); and

ii.    tolling the statute of limitations on the claims of all members of the EPA Collective from the date the original Complaint was filed until the Collective members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Plaintiffs;

d.    Designation of Plaintiffs as representatives of the EPA Collective Action;

e.    Designation of Plaintiffs Tolton and Mazingo as representatives of the PAGA action;

f.    A declaratory judgment that the practices complained of therein are unlawful and violate, among other laws, 42 U.S.C. § 2000(e) *et seq.*, as amended; 29 U.S.C. § 2601, *et seq.*; 29 U.S.C. § 206, *et seq.*; and the applicable state and local laws;

g.    A determination that Katrina Henderson is entitled to equitable tolling and/or equitable estoppel of the limitations period for her claims;

h.    Reinstatement into the positions that Plaintiffs previously held and any appropriate promotions Plaintiffs would have obtained but for the discrimination that they experienced;

h.i.    A permanent injunction against Jones Day and its partners, officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them from engaging in any further unlawful practices, policies, customs, and usages set forth therein;

i.j.    An Order requiring the Firm to initiate and implement programs that (i) remedy the hostile work environment at Jones Day; (ii) ensure prompt, remedial action regarding all claims of gender, pregnancy, and maternity discrimination; and (iii) eliminate the continuing effects of the discrimination and retaliatory practices described therein;

j.k.    An Order requiring Jones Day to initiate and implement systems for promoting and compensating female attorneys in a non-discriminatory manner;

k.l.     An award of back pay, front pay, lost benefits, preferential rights to jobs, recovery

of penalties, and other damages for lost compensation and job benefits suffered by the Plaintiffs,

Members of the Classes, and Members of the EPA Collective Action, in an amount not less than

$50,000,000;

l.m.     An award of nominal, liquidated, and compensatory damages to Plaintiffs and

Members of the Classes, Subclasses and Collective, in an amount not less than $50,000,000;

m.n.     Award punitive damages to Plaintiffs and Members of the Classes and Subclasses,

in an amount not less than $100,000,000;

n.o.     An award of penalties available under applicable laws, including waiting time

penalties and all civil penalties recoverable under PAGA;

o.p.     Restitution of all monies due to Plaintiffs and the Class and Subclass members, as

well as disgorgement of Defendant's profits from its unlawful and/or unfair business practices;

p.q.     An award of litigation costs and expenses, including reasonable attorneys' fees to

the Plaintiffs;

q.r.     An award of pre-judgment and post-judgment interest; and

r.s.     Such other and further relief as the Court may deem just and proper.

## XIVIX.     DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues triable of right to a jury.

Respectfully submitted,

Date: August 1216, 2019

_/s/ Deborah K. Marcuse_
Deborah K. Marcuse (D.C. Bar No. 995380)
SANFORD HEISLER SHARP, LLP
111 S. Calvert Street, Ste. 1950
Baltimore, MD 21202
Telephone: (410) 834-7415
Facsimile: (410) 834-7425
dmarcuse@sanfordheisler.com

140

David W. Sanford (DC Bar No. 457933)
Russell L. Kornblith*
SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
rkornblith@sanfordheisler.com

Kate Mueting (DC Bar No. 988177)
SANFORD HEISLER SHARP, LLP
700 Pennsylvania Avenue, SE, Ste 300
Washington, D.C. 20003
Telephone: (202) 499-5206
Facsimile: **(202) 499-5199**
kmueting@sanfordheisler.com

*admitted *pro hac vice*

*Attorneys for Plaintiffs, the Proposed Classes,
and the Proposed Collective*