# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NILAB RAHYAR TOLTON, *et al.*, | ) | Civ. No. 1:19-00945 (RDM) |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| | ) | **SUPPLEMENTAL MEMORANDUM** |
| *v.* | ) | **OF POINTS AND AUTHORITIES** |
| | ) | **IN SUPPORT OF DEFENDANT'S** |
| JONES DAY, | ) | **MOTION FOR PARTIAL JUDGMENT** |
| | ) | **ON THE PLEADINGS** |
| *Defendant.* | ) | |

Mary Ellen Powers
Beth Heifetz
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

Terri L. Chase (*pro hac vice* granted)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

*Attorneys for Defendant*

## **TABLE OF CONTENTS**

Page

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 1

I.     HENDERSON'S NEW RACE DISCRIMINATION CLAIM IS TIME-BARRED AND
       IMPLAUSIBLE (COUNT 23) ................................................................................ 1

II.    HENDERSON'S NYCHRL CLAIMS REMAIN TIME-BARRED ................................. 4

III.   WILLIAMS HAS NOT REMEDIED THE DEFECTS IN HER CLAIMS ......................... 5

IV.    THE AMENDMENTS DO NOT IDENTIFY A SPECIFIC EMPLOYMENT POLICY THAT HAS
       A DISPARATE IMPACT ON WOMEN, PREGNANT WOMEN, OR MOTHERS ............. 6

V.     PLAINTIFFS HAVE NO VIABLE EQUAL PAY ACT CLAIMS .................................... 9

VI.    PLAINTIFFS HAVE NOT FIXED THEIR RETALIATION CLAIMS ............................ 14

VII.   PLAINTIFFS HAVE NOT PROVIDED A JURISDICTIONAL BASIS FOR THE DCHRA
       CLAIMS ........................................................................................................... 15

VIII.  PLAINTIFFS HAVE NO STANDING TO SEEK INJUNCTIVE RELIEF AGAINST JONES
       DAY ............................................................................................................... 15

CONCLUSION............................................................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bayer v. Neiman Marcus Grp., Inc.*,
  861 F.3d 853 (9th Cir. 2017) ...............................................................16

*BEG Invs., LLC v. Alberti*,
  85 F. Supp. 3d 13 (D.D.C. 2015) .........................................................12

*Bray v. RHT, Inc.*,
  748 F. Supp. 3 (D.D.C. 1990) .............................................................2, 4

*Burley v. Nat'l R.R. Passenger Corp.*,
  801 F.3d 290 (D.C. Cir. 2015) ............................................................5, 6

*Connell v. Bank of Boston*,
  924 F.2d 1169 (1st Cir. 1991) ...............................................................14

*De La Fuente v. DNC Servs. Corp.*,
  No. 18-336, 2019 WL 1778948 (D.D.C. Apr. 23, 2019) ....................2, 3

*EEOC v. Port Auth. of N.Y. & N.J.*,
  768 F.3d 247 (2d Cir. 2014) ...........................................................11, 13

*Fields v. Vilsack*,
  207 F. Supp. 3d 80 (D.D.C. 2016) .........................................................6

*Geiss v. Weinstein Co. Holdings LLC*,
  383 F. Supp. 3d 156 (S.D.N.Y. 2019) ....................................................5

*Hedgeye Risk Mgmt., LLC v. Heldman*,
  271 F. Supp. 3d 181 (D.D.C. 2017) .......................................................6

*Hedgeye Risk Mgmt., LLC v. Heldman*,
  No. 16-935, 2019 WL 4750243 (D.D.C. Sept. 29, 2019) ....................13

*Henry v. Black*,
  No. 2:11-CV-129, 2011 WL 2938450 (D. Utah July 19, 2011) .......6, 13

*In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*,
  756 F.3d 917 (6th Cir. 2014) .................................................................8

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Jones v. R.R. Donnelley & Sons Co.*,
  541 U.S. 369 (2004)..................................................................................................2

*McFarland v. George Washington Univ.*,
  935 A.2d 337 (D.C. 2007) ......................................................................................14

*Menard v. CSX Transp., Inc.*,
  698 F.3d 40 (1st Cir. 2012).....................................................................................12

*Mesumbe v. Howard Univ.*,
  706 F. Supp. 2d 86 (D.D.C. 2010) ........................................................................3, 4

*Miller v. Aluminum Co. of Am.*,
  679 F. Supp. 495 (W.D. Pa. 1988).........................................................................14

*Renstrom v. Nash Finch Co.*,
  787 F. Supp. 2d 961 (D. Minn. 2011)................................................................11, 12

*Smith v. City of Jackson*,
  544 U.S. 228 (2005)..................................................................................................8

*Sowell v. Alumina Ceramics*,
  251 F.3d 678 (8th Cir. 2001) ..................................................................................10

*Spencer v. Va. State Univ.*,
  919 F.3d 199 (4th Cir. 2019) ..................................................................................11

*Verfuerth v. Orion Energy Sys., Inc.*,
  65 F. Supp. 3d 640 (E.D. Wis. 2014)..................................................................12, 13

*Vergara v. City of Chicago*,
  --- F.3d ---, 2019 WL 4744701 (7th Cir. Sept. 30, 2019) ........................................5

*Watson v. Fort Worth Bank & Tr.*,
  487 U.S. 977 (1988)..................................................................................................8

*Younts v. Fremont Cty.*,
  370 F.3d 748 (8th Cir. 2004) ..................................................................................11

## **TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**STATUTES**

29 U.S.C. § 206 .................................................................................................................12

29 U.S.C. § 255 .................................................................................................................13

42 U.S.C. § 1981 ............................................................................................................1, 2

N.Y. P'ship Law § 20(2) .....................................................................................................5

**OTHER AUTHORITIES**

Harvard Business Review, *The No Whining Rule for Managers* (Nov. 2011) ...............................7

*Webster's II New College Dictionary* 1258 (2001) .......................................................................7

## INTRODUCTION

Pursuant to this Court's order of September 17, 2019, Jones Day files this supplemental memorandum to address the impact on its motion for partial judgment on the pleadings (Dkt. 37, "Mot.") of the new allegations in Plaintiffs' Third Amended Complaint (Dkt. 41, "TAC").  The Third Amended Complaint does not fix the fundamental problems with the earlier iterations of the pleading.  Aside from asserting one new cause of action—a race discrimination claim by Plaintiff Henderson that is both time-barred and implausible—most of the "new" material is redundant, irrelevant, immaterial, or merely inflammatory.  Plaintiffs repeat conclusory allegations regarding the supposedly absolute authority of the Managing Partner, but do not add a single well-pled factual allegation supporting a claim that he has exercised his authority in a discriminatory manner.  They distort the meaning of what they characterize as a "no whining mantra," seeking to convert an exhortation to action into a prohibition against raising legitimate concerns.  They add new detail about boorish behavior by a few immature junior lawyers at summer associate events in Irvine that occurred well outside the statute of limitations and have no bearing on any claims.  And the few new facts that Plaintiffs assert to support their pay-equity theory actually contradict it.

## ARGUMENT

I. **HENDERSON'S NEW RACE DISCRIMINATION CLAIM IS TIME-BARRED AND IMPLAUSIBLE (COUNT 23).**

After Jones Day pointed out that Plaintiff Henderson's *gender* discrimination claims were barred by the applicable three-year statute of limitations (Mot. 7-10), Henderson determined that she was also the victim of *race* discrimination, which triggers a four-year limitations period under 42 U.S.C. § 1981.  *See* TAC ¶¶ 580-584.  Even that longer limitations period does not help her, however, because Henderson does not allege any race-based discrimination within the past four years.  Indeed, she does not *plausibly* allege any intentional race discrimination *ever*.

**A.**     Section 1981 makes it unlawful to prevent someone from enjoying the "benefits, privileges, terms, and conditions of [a] contractual relationship" because of her race.  42 U.S.C. § 1981(a), (b).  For claims premised on conduct that occurs "after the formation of the contract" in question, the limitations period is four years.  *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 373 (2004).  Henderson therefore cannot sue Jones Day for any acts that occurred before August 16, 2015 (four years before she first asserted a race discrimination claim).

That excludes every adverse action that Henderson even *hints* was racially motivated.  She claims that "one white male associate" refused to staff her on deals—in 2014.  TAC ¶¶ 280-283. She objects that a partner "persistently excluded" her from meetings and calls while giving preferential treatment to a "white male associate"—in February 2015.  TAC ¶ 284.  And she complains that "she was denied a raise" that her "white male colleagues" received—"at the end of her first year" at the Firm (which began in 2013).  TAC ¶¶ 270, 287-290.

 As for the period after August 2015, Henderson alleges that despite being told she was "on an upward trajectory" and receiving a pay raise, she "still had difficulty obtaining billable work." TAC ¶¶ 296-297.  But she does not blame this on her race.  To the contrary, she alleges that "other female associates" had similar experiences, without mentioning their races.  TAC ¶¶ 297-298.  And Henderson was told in December 2015 that she was being terminated, but she never alleges that her termination was attributable to her race either.  TAC ¶¶ 3011-301.  Again, to the contrary, she alleges that Jones Day was especially eager to *hire* minority attorneys.  TAC ¶ 295.

**B.**     Henderson's § 1981 claim also fails on the merits because she has not "allege[d] … facts that demonstrate that h[er] race was the reason" for Jones Day's actions.  *Bray v. RHT, Inc.*, 748 F. Supp. 3, 5 (D.D.C. 1990).  A plaintiff "cannot merely invoke h[er] race in the course of a claim's narrative" to survive dismissal.  *De La Fuente v. DNC Servs. Corp.*, No. 18-336, 2019 WL

2

1778948, at *4 (D.D.C. Apr. 23, 2019). If there is no "direct evidence" of intentional discrimination, she must identify "indirect evidence," *e.g.*, preferential treatment of a "similarly situated comparator" who is "nearly identical to the plaintiff" other than in race. *Id.* at *6–7. Even then, a "conclusory allegation that similarly situated [persons] of different ... race have been treated differently" does not suffice; there must be "some allegation indicating the intent behind these disparate outcomes." *Mesumbe v. Howard Univ.*, 706 F. Supp. 2d 86, 92 (D.D.C. 2010).

Henderson does not do nearly enough to raise a plausible inference of race discrimination. Indeed, she relies on the same allegations that previously formed the basis for her claims alleging *sex* discrimination, only now she has added "white" to the description of the male associates who were allegedly favored. TAC ¶¶ 283, 284, 287. She offers zero allegations from which the Court could infer any racial "intent behind these disparate outcomes." *Mesumbe*, 706 F. Supp. 2d at 92. Again, just the opposite: In the only new allegations relating to race, Henderson alleges that the Firm went to lengths to "recrui[t] other minority employees" and held a special "diversity" event to advise "women of color" on how to be successful at the Firm. TAC ¶¶ 294-295.

Looking at the alleged adverse actions confirms the absence of any plausible allegations of racial discrimination. Henderson alleges that the Firm did not staff her on deals. TAC ¶ 283. But she does not allege that this disparate staffing was *because of* her race, or plead any facts suggesting such an inference. Instead, she merely observes that one senior associate who was in a position to assign work was a "white male." *Id.* That does not state a plausible race discrimination claim. Likewise, Henderson alleges that she did not receive the same "mentorship" and "support" as one "white male associate." TAC ¶ 285. Again, however, Henderson does not provide any basis to infer that this disparity arose from racial animus. Instead, she alleges that her partner mentor "failed to reach out" and her associate mentor left the Firm "shortly after [Henderson] arrived."

TAC ¶¶ 272, 286.  Those facts may have deprived her of mentorship, but have nothing to do with race.  And, as noted above, Henderson does not make even a bare allegation that her termination was based on race.  In short, Henderson at no point alleges—much less pleads facts making it plausible to infer—that any relevant Jones Day decision was taken *because of her race*.

Finally, the allegation that Henderson was paid less than six "white male" associates (TAC ¶¶ 287-289) is likewise insufficient to raise a plausible inference of intentional race discrimination. Henderson does not allege that those responsible for salary decisions acted for race-based reasons. She does not allege that she was "nearly identical" to these other associates in terms of the quality of her work.  And, but for admitted speculation about what she (erroneously) "understands" regarding the "likely" hours of two of the white male associates, she alleges nothing about the quantity of work performed by these comparators.  TAC ¶ 287.  Simply identifying some white associates who earned more money does not suffice to state an intentional discrimination claim. *See Bray*, 748 F. Supp. at 5; *Mesumbe*, 706 F. Supp. 2d at 92-93; *see also* Part V, *infra*.

## II.   HENDERSON'S NYCHRL CLAIMS REMAIN TIME-BARRED.

Jones Day has explained why Henderson's original claims under the NYCHRL are out of time.  *See* Mot. 7-10; Dkt. 47 ("Reply") at 5-7.  In the new pleading, Henderson does not identify any new acts of discrimination within the three-year limitations period.  She does expand on the allegation that purportedly grounded her invocation of equitable estoppel.  TAC ¶ 305.  But the clarifications actually further *undermine* her effort to seek refuge in that doctrine.

In the First Amended Complaint, Henderson quoted a then-Jones Day partner as warning that the Firm would "destroy her career" if she sued.  FAC ¶ 291.  She now clarifies that the precise warning was that Jones Day would "fight back," "drag her through the mud," and "ruin her reputation."  TAC ¶ 305.  On Henderson's own account, then, the former partner merely told her that Jones Day would vigorously defend itself *in any litigation*.  That bears no resemblance to the

misconduct necessary to trigger estoppel.  *See, e.g.*, *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 175 (S.D.N.Y. 2019); *see also Vergara v. City of Chicago*, --- F.3d ---, 2019 WL 4744701, at *3-4 (7th Cir. Sept. 30, 2019) (refusing to allow "retaliatory threats to *indefinitely* extend the time to sue," as doing so would "distort the doctrine of equitable estoppel").  In addition, Henderson adds that this conversation occurred over "coffee outside the building," making clear that the partner—who is not alleged to have held any supervisory role with respect to Henderson— was not purporting to speak for the Firm.  TAC ¶ 305.  Thus, to the extent her advice constituted a threat, it was not made on the Firm's behalf and cannot estop it.  *See* N.Y. P'ship Law § 20(2).

### III.   WILLIAMS HAS NOT REMEDIED THE DEFECTS IN HER CLAIMS.

Jones Day has previously explained why Plaintiff Williams has not stated viable claims for sex discrimination or a hostile work environment (much less constructive discharge).  *See* Mot. 4-6; Reply 2-5.  Nothing in the Third Amended Complaint changes that conclusion.

A.     The basic problem with Williams' sex discrimination claim is that there are no facts suggesting a link between her sex and the only adverse action she alleges—a bad review in 2017 from a partner whose gender (female) Williams conveniently omits.  To fill that gap, Williams now alleges that "two male senior associates did not receive a lower review in 2015 after they failed to leave adequate time to prepare a summary judgment briefing and delegated important case management responsibilities" to her and a paralegal.  TAC ¶ 175.

That new allegation does not raise a plausible inference of sex discrimination.  A plaintiff can establish discrimination through disparate discipline if the employees committed "similar[]" "offenses" and "were disciplined by the same supervisor."  *Burley v. Nat'l R.R. Passenger Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015).  Williams' allegation fails at both steps.  Her "offense" was not *delegating*; it was doing so, evidently without authorization or adequate oversight, to someone who "dropped the ball" and "failed to complete" the assignment.  TAC ¶¶ 167, 174.  Williams

does not allege that the male associates' delegated project ended in the same unsatisfactory way. TAC ¶ 175.  Nor does she allege that the male associates were evaluated by the same supervisor as her.  Without any indication that Williams was treated more harshly by the same reviewer for an equivalent error—or any other facts raising a plausible inference that her review was caused by her sex rather than by her admitted failure—she has not stated a plausible claim.[1]

**B.**    Williams also fails to state a hostile work environment claim.  To be sure, she now claims a partner was present when female associates were encouraged to play a sexually charged game at a summer associate event in 2014.  TAC ¶ 168.  But Williams now also alleges that she and the other female associates "refused to engage" in this fleeting incident.  *Id.*  And she does not allege that she suffered any repercussions for doing so, or that the incident had any impact whatsoever on her career at Jones Day.  The new details therefore do not fix the problem that this "single, isolated incident"—nearly five years before this lawsuit was filed and thus well outside the statute of limitations—was not severe or pervasive enough as a matter of law to create a hostile work environment.  *Fields v. Vilsack*, 207 F. Supp. 3d 80, 94 (D.D.C. 2016).

**IV.    THE AMENDMENTS DO NOT IDENTIFY A SPECIFIC EMPLOYMENT POLICY THAT HAS A DISPARATE IMPACT ON WOMEN, PREGNANT WOMEN, OR MOTHERS.**

Plaintiffs have not salvaged their disparate-impact claims on behalf of women, pregnant women, or mothers.  They still fail to identify any Jones Day policy that imposes a disparate impact on those groups with respect to either compensation or promotion.

---

[1] Williams also adds the conclusory statements ("[u]pon information and belief") that men generally receive better reviews than women and are not held to the same standards.  TAC ¶¶ 174-75, 181.  But Williams cannot hide behind conclusory "information and belief" pleading about associate reviews, as those reviews are not "peculiarly within [the Firm's] possession and control."  *Hedgeye Risk Mgmt., LLC v. Heldman*, 271 F. Supp. 3d 181, 189 (D.D.C. 2017).  Associates are free to discuss their evaluations; indeed, Tolton expressly alleges that she discussed reviews with other associates.  TAC ¶ 110.  Information-and-belief pleading "does not permit a party to create facts which he or she hopes will later be substantiated by future discovery."  *Henry v. Black*, No. 2:11-CV-129, 2011 WL 2938450, at *2 (D. Utah July 19, 2011).

**A.**     Plaintiffs now complain about a "No Whining" policy that supposedly "makes it clear that complaints ... will not be tolerated." TAC ¶¶ 4, 54.  No reasonable person could draw such an inference.  A "no whining" admonition simply means that people should solve problems instead of merely grumbling about them; it has nothing to do with voicing legitimate grievances. *Webster's II New College Dictionary* 1258 (2001) (defining "whining" as "to complain in a *childish, annoying fashion*" (emphasis added)); Harvard Business Review, *The No Whining Rule for Managers* (Nov. 2011) (urging managers not to " allow ... people to present problems without attempting to solve them on their own").

More importantly, any claim that "no whining" is a policy that causes a disparate impact based on sex or pregnancy fails for the same reasons as Plaintiffs' analogous claim about the Firm's alleged pay-confidentiality policy.  Neither of these alleged policies could conceivably *cause* any disparate impact; at most, they could interfere with one (speculative) way to redress (hypothetical) disparities that are attributable to (unidentified) *other* policies.  Reply 8-10.  That does not give rise to a disparate-impact claim under Title VII or state law.

**B.**     Plaintiffs also double down on their theme that Brogan has "ultimate control" over the Firm.  *E.g.*, TAC ¶¶ 19, 42.  Yet the fundamental problem remains: Even if a *person* could be a *practice*—a dubious proposition for which Plaintiffs have never cited any legal authority—they identify no facts that permit an inference that Brogan's exercise of authority creates a disparate impact.  Reply 10-12.  Without such factual allegations, Plaintiffs have no claim.

Lacking those allegations and recognizing that defect, Plaintiffs instead allege that Brogan has failed "*to end* the firmwide inequality in reviews, pay, and promotions." TAC ¶ 20 (emphasis added).  Having not plausibly alleged that any such firmwide inequality exists in the first place, however, that allegation obviously cannot suffice to generate a claim.  Moreover, recognizing a

7

disparate-impact claim based on an alleged failure to *correct* a disparity would circumvent the critical legal requirement that a plaintiff identify the specific employment practice responsible for *causing* the disparate impact.  *See* Mot. 12-13.  If it were enough to complain that a supervisor did not *close* a disparity, identifying that statistical disparity would suffice to state a claim—exactly the opposite of what the cases hold.  *See, e.g.*, *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005); *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 993-94 (1988) (plurality op.).[2]

**C.**      Plaintiffs have also argued that Jones Day's associate review system has a disparate impact.  But the only new allegation on that score is an "information and belief" claim that the evaluation process "has a disparate negative impact on women."  TAC ¶ 43.  That is a conclusion, not a fact.  And Plaintiffs have offered no factual basis to make it plausible, only pure speculation.  "The mere fact that someone believes something to be true does not create a plausible inference that it is true."  *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 931 (6th Cir. 2014); *see also supra* Part III.A (addressing Williams' new allegations about her review).

As for "consensus statements," Plaintiffs add one new allegation—that Tolton's negative statement must have been "manipulated" based on her pregnancy since "the Partner for whom she performed the majority of her work gave her a glowing review."  TAC ¶ 15.  Even if that anecdote were credited, it would support—at most—an intentional discrimination claim by Tolton.  It comes nowhere close to supporting the illogical claim that the "consensus statement" process somehow imposes a disparate impact on pregnant women (or all women) *as a group*.  *See* Reply 14.

---

[2] Plaintiffs also assert that "Brogan has cultivated and reinforced a workplace that was, and continues to be, systematically hostile towards women."  TAC ¶ 22; *see also* TAC ¶ 30 (alleging that he "fostered, ratified, and maintained" a "fraternity culture").  But these conclusory allegations are just that—conclusory.  Plaintiffs plead no facts to plausibly suggest that Brogan even knew about, much less condoned or ignored, any of the isolated events they claim created a hostile work environment.  More importantly for their disparate-impact claims, they do not plausibly allege that Brogan's decisions carry a systemic disparate impact for women as a group.

## V.    PLAINTIFFS HAVE NO VIABLE EQUAL PAY ACT CLAIMS.

In the original briefing, Jones Day explained that the EPA claims fail because Plaintiffs did not identify male comparators who performed virtually identical work to them yet were paid more. *See* Mot. 21-28; Reply 15-19.  Indeed, they did not identify specific male comparators at all, much less make the requisite allegations about their work, and only *speculated* about their pay.  The Third Amended Complaint does not rectify this deficiency.  Some (but not all) of Plaintiffs now purport to identify comparators, but none of them provides well-pled factual allegations that would plausibly permit an inference that a truly equivalent male associate was paid more than her.

Plaintiffs' theory of the case continues to rest on the assertion that "Plaintiffs know [women are underpaid] because they did not make so-called Cravath market pay."  TAC ¶ 43.  But the only *factual* information about male compensation in the entire pleading refutes that notion.  Plaintiffs allege the salary of one alleged comparator—an unidentified fourth-year male litigation associate in Atlanta who allegedly made $220,000 in some unspecified year.  TAC ¶ 187.[3]  While that was more than Plaintiff Draper (erroneously) claimed she earned as a fourth-year associate in 2015-2016 ($180,000),[4] this allegation puts the lie to Plaintiffs' theory that Jones Day pays men (but not women) "Cravath pay."  TAC ¶¶ 43-44; Reply 17-18.  Plaintiffs allege that "Cravath pay" for a fourth-year associate ranged from $250,000 to $300,000 depending on the year—at least $30,000 *higher* than this male associate supposedly earned.  TAC ¶ 45.  Meanwhile, Plaintiff Mazingo, in

---

[3] Jones Day has been unable to identify any person who matches this description.

[4] Draper, who admits she is missing some of her own compensation records (TAC ¶ 45), was in fact making $195,000 as a fourth-year associate.  *See* Dkt. 57, Am. Answer, ¶ 45.  That was in 2015-2016.  Moreover, as Plaintiffs' pleading itself acknowledges, "Cravath" base salaries increased substantially in 2016, after a nearly ten-year plateau, and then rose again in 2018.  TAC ¶ 44 n.14 (citing articles about these salary levels and increases).  The Third Amended Complaint does not identify the year in which the Atlanta fourth-year associate supposedly earned $220,000, but comparing a salary set in 2015 to one set in 2018 is apples-to-oranges given these market shifts.

her *third* year, was earning the same as this unidentified *fourth-year* male associate.  *Id.*  And

Plaintiff Stahl, in her fourth year, earned *$40,000 more* than the male lawyer.  *Id.*  Viewed in its

totality, the Third Amended Complaint thus renders implausible Plaintiffs' conclusory claim that

the Firm pays men more than women.  Looking to each Plaintiff only confirms the point.

      **A.**      To start, Plaintiffs Mazingo and Stahl still have not identified any male comparator

who earned more than they did.  There is no reason to credit conclusory allegations—made on

"information and belief," with no supporting facts—that the Firm paid them "less than it paid

comparable male associates."  TAC ¶ 136; *see also* TAC ¶ 239 (alleging that Stahl "suspects"

Jones Day paid her less than "male attorneys at her level").  Plus, because both Mazingo and Stahl

were paid as much as (or more than) the only male associate whose salary Plaintiffs allege (TAC

¶ 187), their claims must fail.  *Sowell v. Alumina Ceramics*, 251 F.3d 678, 684 (8th Cir. 2001).

      **B.**      The other four Plaintiffs now identify male comparators (some by name), whom

they allege—generally on information and belief—earned more than they did.  But Plaintiffs do

not provide any facts from which the Court can evaluate these conclusory allegations.  They do

not allege any facts plausibly showing that they performed equal work—in substance, quality, and

quantity—as these male associates and, with the exception of the unnamed Atlanta associate, they

do not allege what any male associate was paid during any relevant time period.

      Tolton identifies one male associate, Justin Smith, and asserts that he was paid more than

her.  TAC ¶ 89.  But she fails to include even a *boilerplate* allegation (as other Plaintiffs do) that

he performed similar (much less "virtually identical") work.  She does not allege that she and

Smith were in the same practice group (they were not), performed the same tasks (they did not),

worked for the same supervisors (they did not), had similar reviews (they did not), or billed similar

hours (they did not).[5]  *See Renstrom v. Nash Finch Co.*, 787 F. Supp. 2d 961, 970 (D. Minn. 2011)
(skill, effort, and responsibility are "separate tests, each of which must be met in order for the equal
pay standard to apply").  Without factual allegations showing equivalence of their work in terms
of substantive expertise, quantity, and quality, Tolton has not alleged a plausible EPA claim based
on the comparison to Smith.

Draper cites four unnamed male associates in Atlanta who, on "information and belief,"
were paid more than her.  TAC ¶ 187.  But she fails to provide sufficient information to identify
these alleged comparators, and alleges *nothing* about the quality or quantity of their work.

Williams lists two groups of male associates but omits any facts from which the Court
could assess whether these are true "comparators" or simply a random group of individuals whose
names she picked out of a hat.  She alleges that these associates performed "similar work as she
did."  TAC ¶ 165.  But "similar" work is not the standard.  *See EEOC v. Port Auth. of N.Y. & N.J.*,
768 F.3d 247, 254 (2d Cir. 2014).  To serve as a comparator, the employees must perform "virtually
identical" work.  *Spencer v. Va. State Univ.*, 919 F.3d 199, 203-04 (4th Cir. 2019).  And, like
Tolton and Draper, Williams alleges *no facts* about these supposed male comparators' work: what
practices they were in, the quality of their work, or how many hours they billed.  In the absence of
those allegations, her naked conclusion that the jobs were "similar" is inadequate to state a claim.
*Younts v. Fremont Cty.*, 370 F.3d 748, 753 (8th Cir. 2004) (noting that courts are "not particularly
interested in a plaintiff's conclusory allegations about which jobs are equal").[6]

---

[5] Smith, an M&A lawyer, actually billed 5,000+ more hours than Tolton during the period
they were both employed at Jones Day.  *See* Dkt. 57, Am. Answer, ¶ 89.

[6] Williams does allege, on "information and belief," that "she routinely billed more hours"
than unidentified higher-paid male associates, but does not allege anything about the hours billed
by the specific comparators she names.  TAC ¶ 165.  Nor does she allege any facts from which the
Court could conclude that Williams would be competent to know how many hours any of them

Moreover, Williams (unlike Tolton and Draper) does not say that her comparators worked in the same office as her.  Yet, recognizing that geography is a common non-sex-based reason for disparate pay, the EPA applies only "within any establishment."  29 U.S.C. § 206(d)(1).  That has "repeatedly been held to refer to 'a distinct physical place of business' and not to an entire business or enterprise."  *Renstrom*, 787 F. Supp. 2d at 964.  Accordingly, Williams cannot state an EPA claim by comparing her salary to male associates who worked, for example, in New York City.  *See* TAC ¶ 44 n.14 (citing a news article that notes that "[g]eography is not an issue for Cravath, which has almost all of its lawyers in the Big Apple, but it is an issue for many other firms").[7]

Finally, Henderson's allegations do not suffice to show that any of the six male associates she names did substantially equal work.  She admits that one (Stancil) did far *more* work than she did.  *See* TAC ¶ 280 (Henderson's work "began to diminish" a few months in), TAC ¶ 285 (Stancil had so much work that he tried to share it).  She says nothing about the productivity of three of the associates and merely speculates (erroneously) that the hours of two others were "likely" below hers.  TAC ¶ 287.  She gives factual detail only about the work of one male associate (Goldstein), who allegedly performed "a mix of corporate work and real estate assignments" like Henderson,

---

worked.  She does not allege, for example, that she worked with any of them, or that any worked in the Irvine office at the same time as her (they did not).  *See* Dkt. 57, Am. Answer, ¶ 165.

[7] Nor does Williams allege what any of her alleged comparators were paid.  In fact, none of the named male associates outside of New York ever earned what Plaintiffs claim is "Cravath pay," and Williams actually earned the same *or more* than many (in some years, most) of these male associates at comparable stages in their careers.  Indeed, Mazingo, who worked in the same office as Williams, made the same or more than *all* of these non-New York male associates at *every* stage of her career.  Information and belief "does not mean pure speculation."  *Menard v. CSX Transp., Inc.*, 698 F.3d 40, 44 (1st Cir. 2012).  Nor is it "a license to undertake a fishing expedition."  *Verfuerth v. Orion Energy Sys., Inc.*, 65 F. Supp. 3d 640, 647 (E.D. Wis. 2014).  And it does not excuse a plaintiff from her obligation to undertake "a reasonable inquiry into the facts," which none of the Plaintiffs bothered to do before making broad ranging allegations of systemic pay discrimination.  *BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 52 (D.D.C. 2015).

but this allegation is about the associates' "first year with the Firm"—a time when she admits she was being paid the same as her peers.  TAC ¶¶ 287-288.  Henderson alleges nothing about what work *any* of the male associates did in 2015 or beyond, when her pay allegedly began to lag.[8]

**C.**      Ultimately, Plaintiffs' exercise of identifying male associates—often apparently at random—and then alleging, on "information and belief," that those associates were paid more than them, is fundamentally misguided.  The only way Plaintiffs' conclusory allegations can survive scrutiny is on the premise that all Jones Day associates perform the same work.  TAC ¶ 46 (alleging that "associates all perform substantially similar work").  But that is decidedly not the law; a law firm is not a widget factory.  *See Port Auth.*, 768 F.3d at 256-57.  Plaintiffs must therefore allege enough facts to support a reasonable inference that their comparators' work was the same as their own in the relevant respects; none of them does that.  Furthermore, pleading on "information and belief" does not turn rank speculation into a basis for discovery, especially when there are ample avenues for the "reasonable inquiry" demanded by Rule 11 (including, here, speaking with former associates or reviewing the publicly available data about Jones Day associate compensation).  *See Henry*, 2011 WL 2938450, at *2 (information-and-belief pleading "does not permit a party to create facts which he or she hopes will later be substantiated by future discovery").  Plaintiffs' strategy appears to be to identify a male associate, speculate that he earned more money, and argue that their groundless speculation gives them "a license to undertake a fishing expedition," *Verfuerth*, 65 F. Supp. 3d at 647, into all of Jones Day's pay and evaluation data for all associates across the Firm.  The Court should not allow that tactic.  *Hedgeye Risk Mgmt., LLC v. Heldman*, No. 16-935, 2019 WL 4750243, at *13 (D.D.C. Sept. 29, 2019) ("Rule [11] does not permit parties to embark on fishing expeditions regarding claims that have no factual basis or justification ….").

---

[8] Henderson's EPA claim also fails because it is time-barred.  *See* 29 U.S.C. § 255.

## VI.   PLAINTIFFS HAVE NOT FIXED THEIR RETALIATION CLAIMS.

The amended allegations do not save the retaliation claims pressed by Tolton and Draper.

**A.**      In the new pleading, Tolton alleges that she told certain partners "that she believed Jones Day gave her negative reviews and froze her salary during both maternity leaves because of her pregnancy and maternity leave."  TAC ¶¶ 127-28.  But even if this new allegation represents "protected conduct" under the statutes, being locked out of her email and office a few days before her already-scheduled termination was not an adverse action.  *Connell v. Bank of Boston*,  924 F.2d 1169, 1179 (1st Cir. 1991); *Miller v. Aluminum Co. of Am.*, 679 F. Supp. 495, 504 (W.D. Pa. 1988).

Notably, Tolton's counsel's arguments in opposition to Jones Day's motion—that Tolton suffered adverse action by being cut off "from her colleagues, clients, and prospective employers" and "humiliated" (Dkt. 43 at 30) did not make it into the Third Amended Complaint as factual allegations.  *See* Reply 21.  Nor could Tolton have alleged those injuries in good faith: She admits that she did no work in her last twelve months at the Firm (TAC ¶ 122), so she had no clients; she had already announced her departure for a new job (TAC ¶ 126), so she was not interviewing with prospective employers; and she certainly did not need a Jones Day email account to contact her colleagues.

**B.**      Draper adds a new episode of purportedly protected conduct: She claims she asked, at a Firm-sponsored women's event, "how to navigate a work relationship where she had reason to believe a female partner was unsupportive of other female attorneys."  TAC ¶ 220.  Like her questions one week earlier about the basis for her dismissal from a client litigation team, however, that is not *opposition* to an "unlawful practice."  It is not a complaint about conduct that allegedly violates anti-discrimination laws, but merely a question about how to approach a difficult situation involving an "unsupportive" partner.  That is not protected activity under the applicable statutes. *See, e.g.*, *McFarland v. George Washington Univ.*, 935 A.2d 337, 359-61 (D.C. 2007).

14

Draper also still lacks a causal relationship between her questions (whether to Parker, as alleged in the prior iteration of the pleading, or at the event, as alleged in the current version) and her termination.  It is undisputed that the time between the two events (more than a year) does not support an inference of causality.  *See* Dkt. 43 at 33.  And Draper has added no facts to allow the Court to infer a retaliatory motive.  Instead, she continues to allege, much more plausibly, that she was fired based on a "disparaging" review from a (different female) partner and a continuing lack of trial and deposition experience.  TAC ¶¶ 225-227.

## VII.   PLAINTIFFS HAVE NOT PROVIDED A JURISDICTIONAL BASIS FOR THE DCHRA CLAIMS.

This Court still lacks jurisdiction over Plaintiffs' DCHRA claims.  Plaintiffs' only tie to the District of Columbia is that the Firm's Managing Partner has an office here.  But, despite the new allegations about Brogan's general authority, they still have not plausibly alleged that he had any personal involvement in the specific employment actions they complain about in this suit— their assignments, reviews, promotions, terminations, or constructive discharges—or that he made any such decisions in the District.  The Court should accordingly dismiss the DCHRA claims.  *See* Reply 23-24.

## VIII.   PLAINTIFFS HAVE NO STANDING TO SEEK INJUNCTIVE RELIEF AGAINST JONES DAY.

In an attempt to manufacture standing to seek injunctive relief against Jones Day's current employment policies, Plaintiffs have added boilerplate language regarding reinstatement to their prayer for relief.  *See* TAC at p.134 ¶ (h).  That generic amendment can only be described as disingenuous; no Plaintiff has pled facts suggesting that she personally desires reinstatement and would return to Jones Day if that were an option, and half of the Plaintiffs (Mazingo, Williams, and Stahl) actually left the Firm of their own volition (*see* TAC ¶¶ 156, 183, 269).  Regardless, these amendments do not solve the standing problem even if accepted at face value.  A mere *request* to be reinstated does not confer standing to enjoin a former employer's policies.  *See* Mot.

35-36; Reply 25.  Only a *current* employee—or perhaps an ex-employee whom a court concludes is "reasonably certain" to be reinstated, *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 865 (9th Cir. 2017)—is positioned to seek that relief.  Plaintiffs plainly fall into neither category.

## **CONCLUSION**

For these reasons, the Court should grant partial judgment on the pleadings to Jones Day as to the claims discussed in the original briefing and above.


October 8, 2019                                    Respectfully submitted,


                                                   /s/ Mary Ellen Powers
                                                   Mary Ellen Powers (Bar No. 334045)
                                                   Beth Heifetz (Bar No. 417199)
                                                   JONES DAY
                                                   51 Louisiana Avenue NW
                                                   Washington, DC 20001
                                                   Phone: (202) 879-3939

                                                   Terri L. Chase (*pro hac vice* granted)
                                                   JONES DAY
                                                   250 Vesey Street
                                                   New York, NY 10281
                                                   Phone: (212) 326-3939

                                                   *Attorneys for Defendant*