**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NILAB RAHYAR TOLTON *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br>JONES DAY, a General Partnership,<br><br>Defendant. | No. 1:19-cv-00945-RDM<br><br><br>**JURY TRIAL DEMANDED** |

<u>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR CONDITIONAL CERTIFICATION OF AN EQUAL PAY ACT COLLECTIVE ACTION AND AUTHORIZATION OF NOTICE**</u>

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND .............................................................................. 3

   A.   Plaintiffs Bring the Proposed Collective Action on Behalf of All Female Associates at Jones Day ............................................................................................................. 3

   B.   Compensation at Jones Day Is Determined Through a Centralized Process by A Centralized Management ...................................................................................... 3

   C.   Plaintiffs Allege That Under This Policy, They Were Paid Less Than Men for Substantially Equal Work ..................................................................................... 6

      1.   Jones Day Fails to Pay "Market Pay" to Top-Performing Female Associates ................ 8

      2.   Jones Day's Entrenched Discriminatory Environment Plausibly Extends to Plaintiffs' Compensation ............................................................................................ 8

      3.   The Named Plaintiffs Have Identified Male Comparators Who, on Information and Belief, Were Paid More ............................................................................. 11

      4.   Plaintiffs Performed Substantially Similar Work as Other Jones Day Associates ........ 12

III.  LEGAL STANDARD ......................................................................................... 14

IV.   ARGUMENT ...................................................................................................... 19

V.    RELIEF REQUESTED ...................................................................................... 26

## TABLE OF AUTHORITIES

**Cases**

*American Pipe & Constr. v. Utah*, 414 U.S. 538 (1974) ................................................................ 2

*Ameritech Ben. Plan Comm. v. Commc'n Workers of Am.*, 220 F.3d 814 (7th Cir. 2000) .......... 15

*Barrett v. Forest Labs., Inc.*, No. 12 v. 5224, 2015 WL 5155692 (S.D.N.Y. Sept. 2, 2015) 16, 17, 24

*Blount v. U.S. Sec. Assocs.*, 945 F. Supp. 2d 88 (D.D.C. 2013) ........................................... passim

*Bradley v. Vox Media, Inc.*, No. CV 17-1791 (RMC), 2019 WL 1060804 (D.D.C. Mar. 6, 2019) ................................................................................................................... 2, 16, 17, 18

*Campeau v. NeuroScience, Inc.*, 86 F. Supp. 3d 912 (W.D. Wis. 2015) ................................... 24

*Castillo v. P&R Enters., Inc.*, 517 F. Supp. 2d 440 (D.D.C. 2007) ......................................... 26

*Chase v. AIMCO Properties, L.P.*, 374 F. Supp. 2d 196 (D.D.C. 2005) ............................. 18, 24

*Coates v. Farmers Grp., Inc.*, No. 15-CV-01913-LHK, 2015 WL 8477918 (N.D. Cal. Dec. 9, 2015) ............................................................................................................ 15, 16, 17, 25

*Crawford v. ExlService.com, LLC*, 16 Civ 9137 (LAP), 2019 WL 5887214 (S.D.N.Y. Nov. 12, 2019) ..................................................................................................................................... 24

*Earl v. Norfolk State Univ.*, No. 2:13CV148, 2014 WL 6608769 (E.D. Va. Nov. 18, 2014) 16, 23, 24

*Ebbert v. Nassau County*, No. 05-5445, 2007 WL 2295581 (E.D.N.Y. Aug. 9, 2007) ......... 17, 24

*Freeman v. Medstar Health Inc.*, 187 F. Supp. 3d 19 (D.D.C. 2016) ................................... passim

*Galloway v. Chugach Gov't Servs., Inc.*, 263 F. Supp. 3d 151 (D.D.C. 2017) .................... passim

*Harris v. Med. Transp. Mgmt., Inc.*, 317 F. Supp. 3d 421 (D.D.C. 2018) ............................. 1, 19

*Hoffman-La Roche v. Sperling*, 493 U.S. 165 (1989) ............................................................. 1, 15

*Hunter v. Sprint Corp.*, 346 F. Supp. 2d 113 (D.D.C. 2004) ..................................................... 26

*Kassman v. KPMG LLP*, No. 11-3743, 2014 WL 3298884 (S.D.N.Y. July 8, 2014) 16, 17, 23, 25

*Meyer v. Panera Bread Co.*, 344 F. Supp. 3d 193 (D.D.C. 2018) ................................... 15, 18, 26

*Moore v. Publicis Groupe SA*, No. 11 Civ. 1279, 2012 WL 2574742 (S.D.N.Y. June 29, 2012)16, 25

*Morris v. Lettire Const., Corp.*, 896 F. Supp. 2d 265 (S.D.N.Y. 2012) ...................................... 25

*Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010) ................................................................... 16

*Rehwaldt v. Elec. Data Sys. Corp.*, No. 95-876, 1996 WL 947568 (W.D.N.Y. Mar. 28, 1996).. 24

*Rochlin v. Cincinnati Ins. Co.*, No. IP00-1898, 2003 WL 21852341  (S.D. Ind. July 8, 2003) ... 24

*Smith v. Merck & Co.*, No. CV 132970MASLHG, 2016 WL 1690087 (D.N.J. Apr. 27, 2016).. 24

*Songu-Mbriwa v. Davis Mem'l Goodwill Indus.*, 144 F.R.D. 1 (D.D.C. 1992) ......................... 15

*Spencer v. No. Parking Today, Inc.*, No. 12 Civ 6323, 2013 WL 1040052 (S.D.N.Y. Mar. 15, 2013) ..................................................................................................................................... 25

*Stephens v. Farmers Rest. Grp.*, 291 F. Supp. 3d 95 (D.D.C. 2018) ................................... passim

*Thompson v. Sawyer*, 678 F.2d 257 (D.C. Cir. 1982) ........................................................... 14, 15

*Winfield v. Citibank, N.A.*, 843 F. Supp. 2d 397 (S.D.N.Y. 2012) ........................................... 17

**Statutes**

29 U.S.C. § 206 ............................................................................................................................. 14

29 U.S.C. § 216 ......................................................................................................................... 1, 14

29 U.S.C. § 256 ............................................................................................................................... 1

## I.       INTRODUCTION

Named Plaintiffs Nilab Rahyar Tolton, Andrea Mazingo, Meredith Williams, Saira Draper, Katrina Henderson, and Jaclyn Stahl ("Named Plaintiffs" or "Plaintiffs") were employed by Defendant Jones Day ("Jones Day" or "the Firm"). In addition to their claims under Title VII of the Civil Rights Act and state laws, Plaintiffs allege under the Equal Pay Act ("EPA"), 29 U.S.C. §§ 206(d), 216(b), that Jones Day paid them and similarly situated female associates less than men performing substantially equal work.

Unlike claims brought under Title VII, which are certified under Federal Rule of Civil Procedure 23, claims brought under the Equal Pay Act are subject to a two-stage certification process. The first stage, called conditional certification, is determined early in the case to enable potential members of the collective action to affirmatively "opt-in" to become part of the suit. 29 U.S.C. §§ 216(b), 256.

As the Supreme Court has explained, the purpose of the opt-in provisions of § 216(b), which govern claims under the EPA and the Fair Labor Standards Act ("FLSA"), "depend[s] on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether they participate." *Hoffman-La Roche v. Sperling*, 493 U.S. 165, 170 (1989). In order to achieve this benefit, however, employees must receive "accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Id.* Early authorization of notice is necessary because, unlike claims certified under Federal Rule of Civil Procedure 23, the statute of limitations continues to run on each plaintiff's Equal Pay Act claim until that plaintiff files a consent to join the conditionally certified collective action. 29 U.S.C. § 256(b); *see Harris v. Med. Transp. Mgmt., Inc.*, 317 F. Supp. 3d 421, 425–26 (D.D.C. 2018); *Stephens v. Farmers Rest. Grp.*,

291 F. Supp. 3d 95, 120 (D.D.C. 2018) ("The filing of the complaint does not toll the limitations period for opt-in plaintiffs' FLSA claims; the statute of limitations continues to run until they affirmatively join the action."); *cf. American Pipe & Constr. v. Utah*, 414 U.S. 538, 554 (1974) (tolling the statute of limitations for class claims certified under Rule 23). Indeed, the very benefits intended under § 216(b)—enabling employees to join together to vindicate their rights and judicial economy—will disappear if opt-in plaintiffs do not receive notice of a lawsuit before the statute of limitations expires on their claims.

Conditional certification is appropriate here.[1] The standard the Court applies at this conditional certification stage is lenient and Plaintiffs' burden is minimal. Plaintiffs need only make a "modest factual showing" that a potential class of plaintiffs exists who "*may be* similarly situated" to the Named Plaintiffs. *Bradley v. Vox Media, Inc.*, No. CV 17-1791 (RMC), 2019 WL 1060804, at *2–3 (D.D.C. Mar. 6, 2019) (quoting *Freeman v. Medstar Health Inc.*, 187 F. Supp. 3d 19, 29 (D.D.C. 2016)). Thus, plaintiffs need only offer "*some* evidence . . . of a factual nexus between the manner in which the employer's alleged policy affected a plaintiff and the manner in which it affected other employees." *Galloway v. Chugach Gov't Servs., Inc.*, 263 F. Supp. 3d 151, 156 (D.D.C. 2017) (Moss, J.) (internal quotation omitted).

Plaintiffs far exceed this standard. Plaintiffs worked in multiple Jones Day offices and practice groups, and each has been subjected to a common compensation practice that results in women earning less than men for substantially equal work. All are challenging the same

---

[1] Pursuant to their obligations under Local Rule 7(m), counsel for Plaintiffs met and conferred telephonically with counsel for Defendant on December 2, 2019. During this call, counsel for Jones Day confirmed that Defendant would not agree to the relief requested, namely that the parties stipulate to conditional certification under the Equal Pay Act ("EPA"), 29 U.S.C. §§ 206(d), 216(b), so that notice of collective action may be issued to all female associates who worked for Jones Day since April 3, 2016.

compensation policy, under which every associate's compensation is determined in a "black box," with final decisions made by the Firm's Managing Partner, Stephen J. Brogan.[2] All are alleging that this compensation policy results in Jones Day paying women less than men in jobs requiring substantially equal work. At the current stage—early in the discovery process and well before completion of discovery into Jones Day's policies, practices, procedures, and compensation disparities—Plaintiffs present evidence demonstrating that Jones Day's compensation policies apply to all members of the collective, regardless of their geographical location or practice group. Plaintiffs' allegations and deposition testimony establish, for purposes of issuing conditional certification notice, that similarly situated individuals exist and are or have been subjected to the same discriminatory pay disparity as the Named Plaintiffs. For these reasons, the Named Plaintiffs and members of the proposed collective are "similarly situated" under 29 U.S.C. § 216(b). Plaintiffs respectfully request the Court conditionally certify the collective and authorize notice to female associates who have been employed at Jones Day since April 3, 2016, or three years prior to the filing of this litigation.

## II.     FACTUAL BACKGROUND

### A.     Plaintiffs Bring the Proposed Collective Action on Behalf of All Female Associates at Jones Day

Plaintiffs seek authorization of collective action notice to female associates who have been employed at Jones Day since April 3, 2016, three years before the filing of this Complaint. Upon information and belief, hundreds of individuals meet this definition.

### B.     Compensation at Jones Day Is Determined Through a Centralized Process by a Centralized Management

At Jones Day, compensation for every associate in its eighteen U.S. offices is determined

---

[2] *See* Section II.A., *infra.*

in a "black box" centralized system led by Managing Partner Brogan. The Firm has explained that Managing Partner Brogan has "autocratic and absolute" power over Firm decisions and is the "final decision-maker" on "partner and associate compensation." Dkt. No. 41, Third Am. Compl. ¶¶ 7–9 (hereinafter "TAC") (citing "Legal Eagles: Stephen Brogan," *Washington Life Magazine* (May 9, 2018), http://washingtonlife.com/2018/05/09/legal-eagles-stephen-brogan/ (last visited Apr. 3, 2019)); Exhibit G, Client Services https://www.jonesday.com/principlesandvalues/clientservices/ (as of Apr. 2, 2019)); *see* Dkt. No. 57, Def.'s Answer to Third Am. Compl. ¶ 9 (hereinafter "Answer") (admitting that the Managing Partner approves increases in starting salaries and market-based moves). Indeed, Jones Day directly instructs its employees that the ████████████████████████████ ████████████████ Ex. J, Jones Day Manual, at JD_00002315; *see also* Ex. A, Pl. Nilab Rahyar Tolton Dep. 38:6–38:12 (explaining that Jones Day told her during her recruitment that Stephen Brogan "made all of the compensation decisions for the firm"); Ex. F, Pl. Jaclyn Stahl Dep. 70:8–70:12 (testifying that ████████████████████████████████████████ ██████); Ex. B, Pl. Andrea Mazingo Dep. 75:3–75:5 (████); Ex. E, Pl. Katrina Henderson Dep. 55:12–55:15 (same).

Similarly, when Plaintiffs ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████. *See* Ex. B, Mazingo Dep. 74:13–75:3 (noting her supervisors were ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

████); Ex. F, Stahl Dep. 80:7–80:8 (explaining that Partner Darren Cottriel indicated that he did

not have control over Plaintiff Stahl's compensation); *id.* 99:5–99:10 ("[Administrative Partner]

Darren [Cottriel] told me that he had no control over whether I could have a raise," indicating "to

me that he did not have control over . . . associate compensation.").

Indeed, when some of the Named Plaintiffs attempted to appeal their compensation, they

were told that their compensation was final and could not be appealed. *See* TAC ¶¶ 310, 232; Ex.

A, Tolton Dep. 145:17–146:12 ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████); Ex. E, Henderson Dep. 132:20–132:23 (explaining that a Jones Day practice

leader told her there was "nothing he could do" about her compensation); Ex. C, Williams Dep.

110:21–111:111 (describing how she was discouraged from challenging her compensation and

requesting a raise because it would "attract the wrong attention" and "reflect badly" on her); Ex.

A, Tolton Dep. 230:10–230:16 ████████████████████

████████████████████████████████████

████████████████████████). 

Every year, Partner Brogan sends compensation letters informing all associates,

nationwide, what they will be paid in the upcoming year. Ex. A, Tolton Dep. 91:3–91:25; Ex. B,

Mazingo Dep. 260:13–260:16 ("I know that any [salary] recommendations ultimately would have

been made to Steve Brogan, who signed each letter."); Ex. E, Henderson Dep. 117:6–117:8. These

████████████████████████████████, and are marked

as "CONFIDENTIAL." Ex. A, Tolton Dep. 92:24–93:3; Ex. B, Mazingo Dep. 146:18–146:25; Ex.

C, Williams Dep. 137:20–137:23.

Associates' compensation is further centralized as part of the annual evaluation process. Specifically, within Jones Day's "black box" compensation system, the Firm, led by Managing Partner Brogan—who makes the ultimate decision on compensation—███████████████ ████████████████████████████████. TAC ¶ 10; Ex. F, Stahl Dep. 132:7–132:10. A consensus statement supposedly condenses and combines the associate's evaluations, hours, and engagements into a paragraph that supposedly captures the associate's overall performance and future trajectory. *Id.*; Ex. A, Tolton Dep. 135:22–136:5; Ex. F, Stahl Dep. 132:4–132:7. However, Plaintiffs in different offices were told by others at the Firm ████████ ██████████████████████████████████████████████████████. *See* Ex. A, Tolton Dep. 135:5–137:4 (explaining that █████████████████████████████████ ██████████████████████████); Ex. F, Stahl Dep. 131:17–132:17 (explaining that ██████████████████████████████████████); Ex. D, Draper Dep. 107:20–108:8 (detailing her understanding that ██████████████████ ████████████████████). ██████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████. *See, e.g.*, Ex. L, Stahl Dep. Exhibit 17; Ex. M, Williams Dep. Exhibit 11; Ex. N, Mazingo Dep. Exhibit 3.

## C.   Plaintiffs Allege That Under This Policy, They Were Paid Less Than Men for Substantially Equal Work

Plaintiffs also allege that these compensation policies and practices result in Jones Day paying female associates less than male associates for substantially equal work. TAC ¶ 46. Unlike certification under Rule 23, statistical evidence of pay disparities is not required at the first, conditional certification stage. Plaintiffs have limited access to information about what Jones Day

pays others due to the Firm's enforced compensation secrecy policy and Jones Day's refusal to provide firm-wide payroll data. Jones Day has publicly stated that "[t]he financial relationship of a lawyer to Jones Day is confidential" and that "[o]ther than the very small number of people who advise the Managing Partner" attorneys do not "know[] anything about the amount of income allocated" to others. Ex. H, *Principles & Values: Compensation: Confidentiality*, Jones Day, https://www.jonesday.com/principlesandvalues/compensation/confidentiality/ (as of July 7, 2019); *see also* Ex. J, Jones Day Manual, JD_00002314 ██████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████████████████ ); Ex. B, Mazingo Dep. 42:25–43:5 ("Jones Day had made it clear to me that there was a strict policy of pay confidentiality, and so I didn't discuss my salary or other associates' salary information with almost anyone."); Ex. A, Tolton Dep. 22:13–22:21 (explaining that Jones Day told her Firm policy provided that no one knows the compensation of any other attorney); *id.* at 95:2–95:6 (stating that ████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████ ); Ex. C, Williams Dep. 349:4–349:18 (noting the confidentiality of their compensation letters); Ex. D, Draper Dep. 82:14–83:9 (explaining that the pay secrecy policy was touted during her recruitment); Ex. O, Stahl Dep. Exhibit 12 (████████████ ██████████████████████████████████████ ).

Despite this confidentiality policy, Plaintiffs nonetheless present significant evidence illustrating that Jones Day pays female associates less than male associates engaging in substantially equal work.

### 1. Jones Day Fails to Pay "Market Pay" to Top-Performing Female Associates

First, Plaintiffs have alleged that Jones Day pays women far less than market, or "Cravath," compensation, while men are largely paid "at or above the upper level of the markets in which [it] operate[s]." TAC ¶ 44. Plaintiffs have explained that during their recruitment for Jones Day and throughout their time at the Firm they understood from the Firm that it paid top performers at or above market rate and that "market" was synonymous with the "Cravath" market pay. *See* Ex. A, Tolton Dep. 27:12–27:19; 240:7–240:11; Ex. B, Mazingo Dep. 23:1–23:18; Ex. C, Williams Dep. 51:18–52:4, 148:2–148:4; Ex. D, Draper Dep. 123:12–123:13; 123:22–123:25; Ex. E, Henderson Dep. 113:13–113:18; 153:3–153:12; 156:14–156:21; Ex. F, Stahl Dep. 106:5–106:8. Indeed, in preparing to speak with recruits, Plaintiff Williams was told that she should describe Jones Day's compensation in terms of "market" pay and that everyone understood "market" to be synonymous with "Cravath." Ex. C, Williams Dep. 46:12–48:3. Plaintiffs Williams and Stahl testified that they understood based on their own compensation, as well as conversations they had with a small number of their colleagues, that female associates, even top performers, were consistently paid under market. Ex. C, Williams Dep. 75:17-76:20; Ex. F, Stahl Dep. 157:24-158:4; *id.* at 146:3–146:23. This pattern of paying women, including women with outstanding performance reviews, less than the prevailing market rate that Jones Day purported to pay top performers, indicates that Jones Day pays women less than their male colleagues. *See, e.g.*, Ex. C, Williams Dep. 75:17-76:20; Ex. F, Stahl Dep. 157:24-158:4. Notably, Jones Day has never denied that a disparity exists.

### 2. Jones Day's Entrenched Discriminatory Environment Plausibly Extends to Plaintiffs' Compensation

Plaintiffs' understanding that they were paid less than men performing substantially equal work becomes even more plausible when viewed in light of Plaintiffs' observations and

experiences of gender discrimination and sexual harassment throughout their time at the Firm. *See, e.g.*, Ex. D, Draper Dep. 134:16–134:21 (testifying that based on the "culture at Jones Day of treating men differently from women," she understood this "preferential treatment . . . extend[ed] to other areas, including compensation"); Ex. F, Stahl Dep. 195:19–195:22 (explaining "policies and practices of the firm perpetuated gender discrimination"). The record is filled with evidence of discrimination, including gendered comments and harassment,[3] limited advancement

---

[3] Ex. C, Williams Dep. 213:17–214:25 (describing a situation in which male associates and partners encouraged female associates and summer associates to engage in a "game" of "Marry, Fuck, Kill," which made many of the female associates uncomfortable); *id.* at 193:15–193:23 (explaining that male partners referred to Plaintiff Stahl as having a "resting bitch face"); Ex. F, Stahl Dep. 432:16–24 (describing a situation where a male partner reached into Ms. Stahl's suit pocket); Ex. D, Draper Dep. 73:15–74:3 (explaining that a male partner had expressed surprise that women were able to continue working after they had children); Ex. A, Tolton Dep. 192:11–193:10 (discussing negative comments male partners made regarding Plaintiff Tolton missing work because of her pregnancy and how male partners track the comings and goings of female attorneys but not male attorneys); *id.* 243:19–244:5 (testifying a male associate ██████████████████████████████████████████████████████); Ex. B, Mazingo Dep. 84:17–89:25 (explaining that she was tasked with planning lunches for female attorneys, that a male associate asked whether they would talk "about babies and weddings," and that another male partner asked whether Plaintiff Mazingo was a "lipstick lawyer" in reference to the cardboard cutout of a lipstick tube that Plaintiff Mazingo was required to place outside her office to advertise a women's event); *id.* 104:15–105:10 (testifying a partner referred to their working dinner as a "date" and told Plaintiff Mazingo that he was single and was "looking" after Plaintiff Mazingo's engagement ended).

opportunities,[4] discrimination in work,[5] and gendered criticism in performance evaluations.[6]

Indeed, ████████████████████████████████████████, TAC ¶ 10; Ex. F, Stahl

Dep. 132:7–132:10, and Plaintiffs understand that the centralized and subjective consensus

statements do not accurately reflect their work performance and include gendered criticism. *See*

Ex. A, Tolton Dep. 139:6–139:24 (expressing concern that ████████████████████████

████████████████████████████████████████████████████████████████); Ex. C,

---

[4] Ex. C, Williams Dep. 280:7–280:9; 284:9–284:22 (testifying Plaintiff Williams talked with others about female associates not advancing at the Firm); *id.* at 394:18–395:17 (testifying a partner stated that female associates left the Firm to have families); *id.* at 428:24–429:11 (explaining male partners may prefer to work with male associates because they understood female associates would leave the Firm to start families); Ex. A, Tolton Dep. 277:24–278:21 (████████ ████████████); Ex. F, Stahl Dep. 291:14–291:24 (detailing a conversation with Partner Michelle Blum in which Plaintiff Stahl was told that to succeed at Jones Day, she "had to hang with the boys, essentially be like the men"); Ex. E, Henderson Dep. 62:5–63:4 (describing a "bro culture" in which "stereotypically male behavior was valued, where men would support other men. The way for women to succeed at the firm was to adopt that stereotypical male behavior. And if you did not . . . then you were not accepted and you were restricted from opportunities that men were given. You were not given the kind of mentorship opportunities and kind of guiding you along"); *see also* Ex. K, JD_00005693, ██████████████████████████████████████).

[5] Ex. D, Draper Dep. 134:16–134:19 (explaining that there was a "culture" at Jones Day of treating female associates differently); Ex. B, Mazingo Dep. 292:17–293:7 (discussing preferential treatment given to men); Ex. E, Henderson Dep. 319:6–320:15, 322:14–322:16 (explaining Jones Day suppressed her hours ██████████████████).

[6] Ex. C, Williams Dep. 198:7–198:21 (noting that Plaintiff Stahl was criticized for not smiling while male associates were not); Ex. D, Draper Dep. 280:14–280:19 (explaining that a partner █████ ████████████████████████); Ex. F, Stahl Dep. 196:8–196:15 (detailing how she was criticized for her appearance, rather than her work performance, and that Partner O'Connor "screamed at female associates but did not scream at male associates"); *id.* 194:2–194:4, 402:2–402:25 (noting that a male associate ██████████████████ ██████████); Ex. A, Tolton Dep. 361:17–362:10; 365:17–366:2 (explaining that while a male associate was permitted to turn down work, female associates were criticized for doing so); *id.* 492:2–492:17 (explaining that although she was terminated after taking maternity leave, another male associate was not terminated for calling a female associate a "cunt"); Ex. E, Henderson Dep. 251:25–253:19 (explaining that female associates were held to a higher standard for availability than male associates); *id.* 271:16–272:3 (explaining that she was chastised for working from home while male associates were not and that that same disparate treatment appeared in her reviews).

Williams Dep. 245:13–245:21 (explaining that 

); *Ex. F*, Stahl Dep. 232:25–233:12 (noting that

); *id.* at 188:25–189:8 (explaining that she understood she

could no longer succeed at Jones Day in part because, unlike male attorneys, she was criticized for

her appearance despite her excellent work); Ex. B, Mazingo Dep. 25:19–27:13 (noting that, unlike

peer firms, Jones Day takes no steps to ensure evaluations are free from bias); Ex. E, Henderson

Dep. 268:6–269:6 (explaining that because the evaluations were based on discriminatory policies,

she believed that some of her evaluations were discriminatory).

. *See* Ex. D, Draper Dep. 105:19–107:6 (

); Ex. A, Tolton Dep.

145:17–146:12; *id.* at 228:5–230:16.

### 3. The Named Plaintiffs Have Identified Male Comparators Who, on Information and Belief, Were Paid More

While Jones Day enforces a firm-wide policy of compensation secrecy, Plaintiffs have also

provided evidence indicating that, due to Jones Day's centralized compensation and evaluation

policies, the Named Plaintiffs were underpaid relative to specific male comparators. For example,

Plaintiff Henderson alleges that she received lower raises than male associates Bret Stancil,

Harrison Golden, Zachary Werner, Andrew Burchiel, Samuel Goldstein, and David Katz. TAC ¶

287; *see also* Ex. E, Henderson Dep. 92:24–93:7, 162:25–163:18 (naming those individuals and

people she worked with on projects); *id.* at 117:6–118:15 (explaining that

). Similarly, Plaintiff Williams alleges on information and

belief that she was paid less than Steven Gersten, Harrison Golden, Gregory Martin, Adrian

Garcia, and Robert Dahnke. TAC ¶ 165; *see also* Ex. C, Williams Dep. 162:4–162:11, 163:4–
164:20 (identifying Martin, Garcia, and Dahnke as possible comparators). ██████████

███████████████████████████████████████████████████████. Ex. A, Tolton

Dep. 240:24–241:4; 245:24–246:7; 391:2–391:10 (████████████████████████

███████████████████████████████████). Plaintiffs Mazingo,

Draper, and Stahl named male comparators as well. TAC ¶ 142 (naming Associate Rob Tiefenbrun

as a fellow associate to Plaintiff Mazingo on then-Partner Landau's team); Ex. B, Mazingo Dep.

298:1–2 (naming Rob Tiefenbrun as a comparator); TAC ¶ 187 (stating that Plaintiff Draper was

paid less than at least one Atlanta male associate who was a year junior to Plaintiff Draper); Ex.

F, Stahl Dep. 158:5–7, 274:21–275:6, 288:12–289:6 (naming ████████████████

████████████████████████). Additionally, Plaintiff Tolton testified

████████████████████████████████████████████████████

███████████. Ex. A, Tolton Dep. 507:22–509:5.

### 4. Plaintiffs Performed Substantially Similar Work as Other Jones Day Associates

Finally, the Named Plaintiffs have pointed to evidence illustrating that they perform

substantially equal work as other associates at the Firm. Jones Day presents itself as being a single

establishment across all offices, calling itself "One Firm Worldwide" and stating that "[o]ur

lawyers work across offices, practices, and continents" and that "[w]e are not a constellation of

individuals and offices and practices. We have no 'branch' or 'satellite' offices and no

headquarters."[7] Jones Day treats associate work as interchangeable, and Jones Day associates

---

[7] *A Global Institution: One Firm Worldwide*, Jones Day, https://www.jonesdaycareers.com/#/one-firm-and-a-global-institution#pane_0 (last viewed on Dec. 4, 2019); *see also* Ex. A, Tolton Dep. 63:14–64:5; 391:19–391:25 (describing how Jones Day branded itself as "One Firm Worldwide" to Plaintiff Tolton and modeled its working culture around this concept); Ex. E, Henderson Dep.

routinely work in other practice groups and offices. *See, e.g.*, TAC ¶ 138 (noting Plaintiff Mazingo assisted the Global Disputes Practice Group even though she was in the Securities Litigation and SEC Enforcement Practice Group); Ex. D, Draper Dep. 78:6–78:15; 143:7–143:11 (explaining that

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████); Ex. A, Tolton Dep. 97:14–97:17

(recalling that Plaintiff Tolton worked with both the Securities Litigation group and the Trial Practice group); *id.* at 163:15–164:2 (describing that ███████████████████████

███████████████████████████████████████████████████████████████████

██████); Ex. B, Mazingo Dep. 68:25–69:8 (noting that Plaintiff Mazingo had been a member of the Securities Litigation group, the Global Disputes group, the New Lawyers group, and Commercial Litigation team); *id.* at 300:13–300:16 (explaining that Associate Bart Green was working in at least three different practice groups); Ex. E, Henderson Dep. 340:14–340:18 (explaining that she worked on various projects for the Real Estate practice group, the Mergers and Acquisitions group, and assisted on capital markets in New York); Ex. C, Williams Dep. 94:19–94:23, 97:5–97:8 (stating that Plaintiff Williams worked in the Intellectual Property group, the Healthcare group and in the General Litigation group); *id.* at 92:15–93:3 (explaining that she would often be staffed on large litigation projects across offices and practice groups); Ex. F, Stahl Dep. 60:3–60:12 (explaining that ███████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████); *id.* 161:6–161:10 (explaining that an associate transferred between offices).

---

69:18–69:25 (discussing the "One Firm Worldwide" brand and explaining that she often did work outside the New York office and that attorneys transitioned between offices in different states).

The Named Plaintiffs have also testified about the work they do and how it is substantially equal to their comparators. *See, e.g.*, Ex. A, Tolton Dep. 391:17–392:9; 399:16–403:6 (describing the work and responsibilities she shared with Justin Smith, such as reviewing motions, briefs and documents; taking and defending depositions; appearing in court; and participating in mediations); Ex. B, Mazingo Dep. 299:6–300:6 (naming male comparators and explaining that although they were mostly senior associates, she engaged in "interchangeable" tasks and her abilities were trusted as equally as theirs were); Ex. C, Williams Dep. 141:2–141:19 (noting she believed her comparators performed the same types of tasks and had similar skills in part because they attended the same trainings and learned the same skills); Ex. D, Draper Dep. 142:21–143:4, 237:13–237:19 (describing how █████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████); Ex. F, Stahl Dep. 288:9–288:25 (explaining that she worked on a project with James Burnham and that Andrew Bentz used Plaintiff Stahl's work when submitting a project to a partner, showing that they did "equal" work); Ex. E, Henderson Dep. 102:21–103:2 (describing a project she worked on with Andrew Burchiel); *id.* at 159:8–159:17 (discussing that she and Stancil were both new lawyers and held to the same standards); *id.* at 163:7–163:18 (discussing that she performed the same type of work as Werner and other members of the New Lawyers Group engaged in). Nevertheless, Jones Day compensates female associates less than male associates for substantially equal work. TAC ¶ 370.

## III.    LEGAL STANDARD

Certification of Equal Pay Act claims is governed by 29 U.S.C. § 216(b), which also governs FLSA certification. 29 U.S.C. §§206(d), 216(b); *Thompson v. Sawyer*, 678 F.2d 257, 269 (D.C. Cir. 1982) (members of the class in an EPA action may recover if they "opt-in" under §

216(b)); *Ameritech Ben. Plan Comm. v. Commc'n Workers of Am.*, 220 F.3d 814, 820 (7th Cir. 2000) (noting the EPA incorporates the requirements of the FLSA "opt-in" procedure); *Coates v. Farmers Grp., Inc.*, No. 15-CV-01913-LHK, 2015 WL 8477918, at *5 (N.D. Cal. Dec. 9, 2015) ("The EPA . . . incorporates the FLSA's enforcement and collective action provisions.").

In Section 216(b), "Congress has stated its policy that . . . plaintiffs should have the opportunity to proceed collectively" because a collective action serves the twin goals of judicial economy and the lowering "of individual costs to vindicate rights by the pooling of resources." *Hoffmann-LaRoche*, 493 U.S. at 170. Unlike class actions brought under Rule 23 of the Federal Rules of Civil Procedure, certification of collective actions is appropriate under § 216(b) if the Named Plaintiffs and members of the proposed collective are "similarly situated" with respect to their claims. *Thompson*, 678 F.2d at 269 ("Suits for recovery under the Equal Pay Act differ from the mainstream of class actions under the Federal Rules."); *Galloway*, 263 F. Supp. 3d at 154 (Moss, J.) (explaining that Rule 23's procedural safeguards of numerosity, commonality, and typicality are inapposite for certification under § 216(b)); *Songu-Mbriwa v. Davis Mem'l Goodwill Indus.*, 144 F.R.D. 1, 1–2 (D.D.C. 1992) (holding an EPA collective action cannot be certified under Rule 23). As this Court has noted, unlike class actions certified under Federal Rule of Civil Procedure 23, § 216(b) requires members of the collective to affirmatively opt in to the litigation, and for this reason the due process concerns underlying Rule 23 are inapplicable. *Galloway*, 263 F. Supp. 3d at 154–55.

Courts in this circuit have adopted a two-stage certification procedure for claims certified under § 216(b). *See, e.g.*, *Freeman*, 187 F. Supp. 3d at 22 ("[C]ourts in this Circuit and others have settled on a two-stage inquiry for determining when a collective action is appropriate[.]"); *Galloway*, 263 F. Supp. 3d at 155 (recognizing and applying two-stage certification); *Meyer v.*

*Panera Bread Co.*, 344 F. Supp. 3d 193, 200 (D.D.C. 2018) (same); *Bradley*, 2019 WL 1060804, at *2 ("A collective action under the FLSA does not require certification under [Rule] 23."). Other federal courts also adhere to this same two-stage process. *See, e.g.*, *Barrett v. Forest Labs., Inc.*, No. 12 v. 5224, 2015 WL 5155692, at *1 (S.D.N.Y. Sept. 2, 2015); *Coates*, 2015 WL 8477918, at *5 n.3 (collecting cases from several federal circuits); *Kassman v. KPMG LLP*, No. 11-3743, 2014 WL 3298884, at *5, 9 (S.D.N.Y. July 8, 2014) (acknowledging two-step approach and conditionally certifying a collective of tax and consulting professionals); *Moore v. Publicis Groupe SA*, No. 11 Civ. 1279, 2012 WL 2574742, at *9, 13 (S.D.N.Y. June 29, 2012) (noting "two-step formula commonly followed by district courts in collective actions" and conditionally certifying a collective of public relations management employees); *Earl v. Norfolk State Univ.*, No. 2:13CV148, 2014 WL 6608769, at *4, 9 (E.D. Va. Nov. 18, 2014) (applying two-stage certification to EPA collective action to conditionally certify a collective of teaching faculty).

The first stage, or notice stage, occurs early in the litigation. The purpose of stage one conditional certification is to "facilitate notice of the collective action to potential plaintiffs to give them the opportunity to opt in to the litigation." *Blount v. U.S. Sec. Assocs.*, 945 F. Supp. 2d 88, 92 (D.D.C. 2013). Plaintiffs' burden at this stage is low. Plaintiffs need merely to make a "modest factual showing that the named and potential plaintiffs together were victims of a common policy or plan that allegedly violated the law." *Galloway*, 263 F. Supp. 3d at 155 (internal quotation marks omitted and alteration incorporated); *see also Bradley*, 2019 WL 1060804, at *2. Courts in this Circuit have consistently and recently emphasized that the factual showing "should remain a low standard of proof because the purpose of this first stage is merely to determine *whether* 'similarly situated' plaintiffs do in fact exist." *Freeman*, 187 F. Supp. 3d at 22–23 (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010)). Thus, plaintiffs need only offer "*some* evidence . . . of a

factual nexus between the manner in which the employer's alleged policy affected a plaintiff and the manner in which it affected other employees." *Galloway*, 263 F. Supp. 3d at 156 (internal quotation marks omitted); *Freeman*, 187 F. Supp. 3d at 23. Notably, Plaintiffs do not need to present "proof that those potential plaintiffs are, actually, similarly situated before those potential plaintiffs even identify themselves." *Bradley*, 2019 WL 1060804, at *3 (quoting *Freeman*, 187 F. Supp. 3d at 29).

Importantly, members of the collective need be "similarly situated" only with respect to their allegations that the law has been violated. *Stephens v. Farmers Rest. Grp.*, 291 F. Supp. 3d 95, 105–06 (D.D.C. 2018) (proposed class need only consist of "plaintiffs who *may be* 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred"); *see also Barrett*, 2015 WL 5155692, at *2–3; *Kassman*, 2014 WL 3298884, at *6–7; *Ebbert v. Nassau County*, No. 05-5445, 2007 WL 2295581, at *2 (E.D.N.Y. Aug. 9, 2007) ("[C]ourts have held that plaintiffs can meet this burden by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law."). "The plaintiffs need not demonstrate that they are similarly situated in every respect, provided they are similarly situated with respect to the . . . violations they allege." *Winfield v. Citibank, N.A.*, 843 F. Supp. 2d 397, 404 (S.D.N.Y. 2012). In other words, it is not necessary for Plaintiffs to demonstrate that they worked in the same office, practice group, or that they performed the same work or suffered the same damages—just that they are similarly situated *with respect to their claims. Id.*; *see also Blount*, 945 F. Supp. 2d at 95; *Coates*, 2015 WL 8477918, at *9–10; *Earl*, 2014 WL 6608769, at *4; *Stephens*, 291 F. Supp. 3d at 106 (noting a defendant cannot defeat a motion for conditional certification by "pointing to immaterial variations in how the improper policies alleged by the plaintiff were applied[,]" nor by pointing to differences in damages that

may be calculated on an individualized basis after a collective trial on liability).

In light of this low evidentiary burden, courts in this Circuit have repeatedly held that this standard is satisfied based on only pleadings and affidavits. *Bradley*, 2019 WL 1060804, at *3; *Blount*, 945 F. Supp. 2d at 93; *Chase v. AIMCO Properties, L.P.*, 374 F. Supp. 2d 196, 200 (D.D.C. 2005). For example, in *Galloway v. Chugach Government Services, Inc.*, this Court conditionally certified a collective based only on a single declaration that addressed the similarly situated issue "only in general terms." 263 F. Supp. 3d at 156.

Importantly, at this stage, courts cannot resolve factual disputes or make credibility determinations and do not consider competing evidence offered by defendants. *Blount*, 945 F. Supp. 2d at 97 (denying a defendant's motion for pre-conditional certification discovery because "the Court's task at this stage is not to resolve factual disputes, so allowing defendants to expand the record as requested likely would serve no useful purpose"); *Stephens*, 291 F. Supp. 3d at 105 (noting a defendant cannot defeat certification by "contradicting plaintiffs' claims" with "voluminous documentation purporting to show that no violations occurred" (internal quotation marks omitted)). This is because "the Court's task at this stage is not to resolve factual disputes," *Blount*, 945 F. Supp. 2d at 97, and "issues going to the merits are not appropriate for consideration at this juncture," *id.* 94.

Defendants also cannot defeat conditional certification based on arguments that collective treatment is inappropriate due to individualized inquiries. *See, e.g.*, *Meyer*, 344 F. Supp. at 207–08 ("[A]lthough defendants often argue that the necessity of fact-intensive individualized inquiries will render a collective action unmanageable, courts tend not to consider such arguments at the conditional certification stage, and, instead, put these issues off until the decertification stage, when discovery is complete." (internal quotation marks omitted)); *see also Freeman*, 187 F. Supp.

18

3d at 31 (concluding that "any further consideration of manageability issues is properly postponed until after other 'similarly situated' employees have had an opportunity to opt-in" because "further discovery, potential dispositive motions, and any motions for 'de-certification' [at stage two] have the potential to further shape the scope of the case").

The second stage of EPA certification occurs after members of the collective have been given the opportunity to opt in and discovery has concluded. At this stage, the defendant may move for "decertification," at which point the court will "on a fuller record, determine whether . . . the plaintiffs who have opted in are *in fact* 'similarly situated' to the named plaintiffs," *Freeman*, 187 F. Supp. 3d at 22 (emphasis added), requiring a "more searching inquiry" than stage one, *Stephens*, 291 F. Supp. 3d at 105 (internal quotation marks omitted).

## IV.   ARGUMENT

Plaintiffs' preliminary evidence far exceeds their minimal burden at the notice stage. In addition to allegations from their Amended Complaint, Plaintiffs present documentary evidence demonstrating that Jones Day has firm-wide compensation policies and procedures, and testimony from the Named Plaintiffs demonstrating that other members of the collective are also adversely affected in similar ways by these policies. Courts routinely grant conditional certification based on a similar evidentiary record, and often with far less evidentiary support. *See, e.g.*, *Galloway*, 263 F. Supp. 3d at 156–57, 159 (granting plaintiffs' motion for conditional certification in part even though only one plaintiff submitted a declaration and the declaration described the plaintiff's experiences "in only general terms" based on the declarant's personal knowledge); *Harris*, 317 F. Supp. 3d at 424 (holding that allegations and sworn affidavits were sufficient for conditional certification).

In its manual, Jones Day explicitly states that ████████████████████████████

████████████████████████. *See* Ex. J, JD_00002392. Jones Day further describes its compensation policy on its website, where the Firm has admitted that the compensation process is the same for all associates, regardless of practice group or geographical office.[8] Jones Day has also indicated that compensation decisions are controlled by one individual, Managing Partner Brogan, who exercises unchecked authority over final compensation decisions. TAC ¶¶ 6–9 (citing *Stephen J. Brogan (Steve): Managing Partner*, Jones Day, https://www.jonesday.com/sjbrogan/ (last visited Dec. 4, 2019); *Legal Eagles: Stephen Brogan*, Washington Life Mag. (May 9, 2018), http://washingtonlife.com/2018/05/09/legal-eagles-stephen-brogan/; *Firm History*, JONES DAY, https://www.jonesday.com/en/firm?tab=history-565c8d78-eb12-4229-9e55-12f1c0315999 (last visited Dec. 4, 2019); Ex. G.). Jones Day has described its compensation policies in other publications, noting Partner Brogan "makes all of the partnership and compensation decisions for the entire firm." *Id.* at ¶¶ 10–11 (citing Matthew Huisman, *Q&A: Jones Day's Gregory Shumaker*, The Blog of Legal Times (June 18, 2013), https://legaltimes.typepad.com/blt/2013/06/qa-jones-days-gregory-shumaker.html (last visited Dec. 4, 2019)). Jones Day has affirmed publicly that compensation decisions for all associates, regardless of geographical office or practice group, are based on the same standard criteria, including an associate's "overall contribution, including professional achievement, commitment to the firm, judgment, client service, efficiency, leadership, productivity, and other appropriate factors." TAC ¶ 43 (citing Ex. I, *Principles & Values: Compensation: Associates*, Jones Day, https://www.jonesday.com/principlesandvalues/associates/ (as of April 2, 2019)). At this stage, the Court credits Plaintiffs' claims based on these representations from Jones Day and must not resolve

---

[8]     Ex.     G,     *Client     Services,*     JONES     DAY, https://www.jonesday.com/principlesandvalues/clientservices/ (as of Apr. 2, 2019).

factual disputes or consider any contradictory evidence Jones Day may offer. *Blount*, 945 F. Supp.

2d at 94, 97; *Stephens*, 291 F. Supp. 3d at 105.

Moreover, the Named Plaintiffs have consistently testified that they understood from Jones

Day that final compensation decisions were made by Managing Partner Brogan and that regional

Partners-in-Charge could not change compensation without authorization from the Firm, led by

Managing Partner Brogan—who makes the ultimate decisions on compensation. *See* Ex. A, Tolton

Dep. 38:6–38:12 (explaining she was told during her recruitment that Stephen Brogan "made all

of the compensation decisions for the firm"); Ex. B, Mazingo Dep. 74:13–75:3 (noting that █

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ ); Ex. F,

Stahl Dep. 99:5–99:10 ████████████████████████████████

██████████████████████████████████████████████████████████

███████████████ ); Ex. C, Williams Dep. 189:18–189:25 ("I understood from [Partner]

Jim Poth that if I raised an issue of compensation, that that would be something that would need

to go through the . . . firm leadership in D.C. and that it would attract the wrong sort of attention.").

Similarly, Plaintiffs have explained that Jones Day's evaluation system, which directly affects their

compensation, is itself centralized outside of their regional offices and practice groups. *See supra*

Section II.B.

Plaintiffs also testified that Jones Day operates a Firm-wide policy of pay secrecy through

which associates are prohibited from discussing compensation. *See, e.g.*, Ex. A, Tolton Dep.

248:20–248:24 ("Throughout the entire time period I was working at Jones Day, I was very

reluctant and nervous and fearful of discussing my compensation ███████████████████.");

Ex. B, Mazingo Dep. 42:25–43:5 ("Jones Day had made it clear to me that there was a strict policy of pay confidentiality, and so I didn't discuss my salary or other associates' salary information with almost anyone."). To further shroud compensation decisions in secrecy, associates who are found to have violated the policy are threatened with and subject to adverse treatment. *See* Ex. A Tolton Dep. 515:6–518:8, 527:12–527:24, 529:3–529:16 (explaining that after she reported discriminatory actions and concerns regarding her frozen salary, she was terminated and later barred from returning to the office).

As a result, female associates who suspect unfair treatment in their compensation decisions have little recourse and are discouraged from speaking up. Ex. A, Tolton Dep. 230:10–230:16 ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ );

*id.* at 145:21–146:8 ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ ); Ex. C, Williams Dep. 189:18–189:25 (explaining she was discouraged from challenging her compensation because it "would attract the wrong attention" from Partner Brogan).

Furthermore, Plaintiffs have identified that this compensation policy results in underpaying women relative to men in jobs requiring substantially equal work. Jones Day represents that it pays associates "at or above the upper level" of market compensation and a comparison of this compensation to Plaintiffs' indicates the Firm is paying them less than male associates. TAC ¶ 46; Ex. A, Tolton Dep. 33:12–33:15, 81:8–81:11; Ex. B, Mazingo Dep 23:12–23:18, 47:9–47:14; Ex. C, Williams Dep. 148:2–148:4, 51:18–52:4, 75:17–76:20; Ex. E, Henderson Dep. 113:13–113:18;

Ex. F, Stahl Dep. 157:24–158:4. Despite Jones Day's policy of pay secrecy, Plaintiffs also provide evidence indicating they were underpaid relative to specific male comparators and that their compensation is affected by a centralized and discriminatory review process. TAC ¶ 165; *id.* at. ¶ 287; *supra* Section II.B; *supra* Section II.D. Indeed, Plaintiffs' understanding regarding systemic pay disparities is entirely consistent with their testimony on Firm-wide instances of gender discrimination. *See supra* Section II.D.2. Courts in this Circuit routinely grant stage one certification on similar or lesser showings.

In *Galloway v. Chugach Government Services, Inc.*, this Court conditionally certified an FLSA collective action and issued notice based on *one* declaration that spoke "only in general terms." 263 F. Supp. 3d at 156. While the single declaration was "short on detail" it was still "minimally sufficient" to meet the "low bar of evidence" required at stage one. *Id.* Additionally, in *Blount v. U.S. Security Associates*, the court conditionally certified an FLSA collective based on plaintiffs' complaint and declarations asserting simply that they had a common employer, challenged the same compensation policy, and were all affected by the same compensation policy in the same way. 945 F. Supp. 2d at 93–95.

Courts in other circuits also hold this level of evidence is sufficient to grant conditional certification. In *Earl v. Norfolk State University,* the court found that the plaintiff seeking certification of a collective of college professors had made the requisite modest factual showing based on two affidavits presenting "only skeletal, conclusory allegations" and simple evidence of an "evaluation policy" that "affects" compensation of all collective action members, regardless of the faculty department. 2014 WL 6608769, at *6–7. The court held that members of the collective

were similarly situated *with respect to their claims* even if all members of the collective did not perform substantially equal work to one another. [9] *Id.* at *7–8.

Moreover, courts have routinely granted conditional certification even in cases where defendants have attempted to introduce evidence illustrating that a centralized policy does not operate as Plaintiffs allege. *See, e.g.*, *Chase*, 374 F. Supp. 2d at 199–201 (granting conditional certification despite significant discovery undermining the plaintiffs' claims, in part because permitting notice to be served "is consistent with the policy choice Congress made when it created

---

[9] Plaintiffs here have presented evidence that they have performed substantially equal work to their comparators, as explained in section II.C.4. *See Crawford v. ExlService.com, LLC*, 16 Civ 9137 (LAP), 2019 WL 5887214, at *1 (S.D.N.Y. Nov. 12, 2019) (finding the Plaintiff and Comparators performed substantially equal work even though they "held different titles and oversaw business lines generating different amounts of revenue").

Courts in circuits across the country have continued to grant conditional certification to proposed EPA collectives based on minimal showings. *See Campeau v. NeuroScience, Inc.*, 86 F. Supp. 3d 912 (W.D. Wis. 2015); *Smith v. Merck & Co.*, No. CV 132970MASLHG, 2016 WL 1690087 (D.N.J. Apr. 27, 2016); *Barrett*, 2015 WL 5155692, at *6; *Kassman*, 2014 WL 329884, at *4–5; *Chapman v. Fred's Stores of Tenn., Inc.*, No. 8-1247, 2013 WL 1767791, *8-9, 16 (Mar. 15, 2013) (certifying nationwide EPA collective of thousands of assistant managers at more than 650 stores based on common job description, training manual, and pay provisions and employee declarations "upon information and belief" that female managers were paid less than men); *id.* at *8–9, 11, 16 (granting conditional certification and noting that even though district managers made the initial salary decision, "their decisions are subject to review at a higher level in many cases and are limited by corporate policy and pay scales"); *Moore*, 2012 WL 2574742, at *11–12; *Ebbert*, 2007 WL 2295581, at *1–3 (allowing notice of EPA collective to 172 current employees plus former employees upon allegations of four plaintiffs and finding that plaintiffs made a modest factual showing that "as a result of a common pay scale, they were paid wages lower than the wages paid to men for the performance of substantially equal work"); *Rochlin v. Cincinnati Ins. Co.*, No. IP00-1898, 2003 WL 21852341, at *1, 14–16, 21 (S.D. Ind. July 8, 2003) (allowing notice of EPA collective to current and former female employees working in multiple divisions and locations nationwide based on "evidence tending to indicate that 'at least some' female employees were paid less than their equally qualified male counterparts, and that those employees are similarly situated to plaintiffs"); *Rehwaldt v. Elec. Data Sys. Corp.*, No. 95-876, 1996 WL 947568, at *4–5, 9 (W.D.N.Y. Mar. 28, 1996) (allowing notice of EPA collective to all female sales employees in a two-division business unit where plaintiff (i) alleged that she and other women in the proposed collective were paid less than male employees doing essentially the same work; and (ii) "submitted wage and bonus information relating to herself, one other female co-employee and one male co-employee").

the FLSA right of action"); *Morris v. Lettire Const., Corp.*, 896 F. Supp. 2d 265, 271–72 (S.D.N.Y. 2012) (granting conditional certification and rejecting defendant's attempt to introduce competing declarations that purported to show plaintiffs' allegations were unsupported); *Spencer v. No. Parking Today, Inc.*, No. 12 Civ 6323, 2013 WL 1040052, at *5 (S.D.N.Y. Mar. 15, 2013) ("The first-step standard applies to certification applications up to the completion of discovery, regardless of whether the parties have already engaged in substantial discovery practice."); *Kassman*, 2014 WL 3298884, at *8 (granting conditional certification when Plaintiffs "presented evidence that job responsibilities were generally the same across offices, compensation policies were firm-wide, and ultimate compensation decisions were made by centralized leadership," and noting that "Defendant's arguments [regarding how the pay policy operated] are more suited to a later, more demanding stage of the proceedings"). These decisions are grounded in the clearly established principle that issues relating to the merits and credibility of evidence are not appropriate for consideration at this initial stage. *Blount*, 945 F. Supp. 2d at 94, 97; *Moore*, 2012 WL 2574742, at *9.

Plaintiffs' evidence, including Firm publications addressing the Firm's compensation policies and testimony from the Named Plaintiffs' depositions describing their experiences relating to those policies, demonstrate the "factual nexus" between "the manner in which the employer's alleged policy affected a plaintiff and the manner in which it affected other employees." *Galloway*, 263 F. Supp. 3d at 156; *see also Freeman*, 187 F. Supp. 3d at 23. Evidence of "a compensation policy that is applied across the proposed class, coupled with evidence that the policy results in discriminatorily unequal pay, suggests the existence of other similarly situated plaintiffs who may have EPA claims arising from the application of that policy." *Coates*, 2015 WL 8477918, at *11. Plaintiffs have presented more than sufficient evidence through their allegations and deposition

testimony that there is a compensation policy that is applied to all female associates at Jones Day and that the policy results in unequal pay based on gender, indicating that other female associates at Jones Day are similarly situated to the plaintiffs and conditional certification is appropriate.

## V.    RELIEF REQUESTED

In light of Plaintiffs' preliminary evidence, the Court should conditionally certify the collective and should authorize opt-in notice to all female associates who have been employed at Jones Day since April 3, 2016, or three years prior to the filing of this litigation.[10] Consistent with the EPA's remedial purposes, courts favor broad notice to employees who may be victims of alleged unlawful practices. This avoids a multiplicity of duplicative actions and enables employees to preserve their claims and provide evidence to show that they are, in fact, similarly situated to Plaintiffs. In contrast, failure to provide notice will mean that employees' EPA claims will needlessly expire and that the judicial system may be burdened with overlapping suits.

Accordingly, the Court should conditionally certify the proposed collective and order the parties to meet and confer on a proposed notice.

---

[10] Courts routinely authorize notice three years prior to the filing of the Complaint, recognizing the applicability of equitable tolling and the EPA's three-year statute of limitations. *See Meyer*, 344 F. Supp. at 210 ("[B]ecause equitable tolling issues often arise for prospective plaintiffs, courts frequently permit notice to be keyed to the three-year period prior to the filing of the complaint, with the understanding that challenges to the timeliness of individual plaintiffs' actions will be entertained at a later date." (internal quotation marks omitted)); *Hunter v. Sprint Corp.*, 346 F. Supp. 2d 113, 120 n.4 (D.D.C. 2004) (approving notice to be sent based on the filing of the complaint); *see also Castillo v. P&R Enters., Inc.*, 517 F. Supp. 2d 440, 449 (D.D.C. 2007) (noting that it makes administrative sense to extend the period based on the date the complaint is filed, rather than the date the notice is sent).

Respectfully submitted,

Date: December 4, 2019                     */s/ Kate Mueting*
                                          Kate Mueting (DC Bar No. 988177)
                                          Paul Blankenstein (DC Bar No. 304931)
                                          SANFORD HEISLER SHARP, LLP
                                          700 Pennsylvania Avenue, SE, Ste. 300
                                          Washington, D.C. 20003
                                          Telephone: (202) 499-5206
                                          Facsimile: (202) 499-5199
                                          kmueting@sanfordheisler.com

                                          Deborah K. Marcuse (D.C. Bar No. 995380)
                                          SANFORD HEISLER SHARP, LLP
                                          111 S. Calvert Street, Ste. 1950
                                          Baltimore, MD 21202
                                          Telephone: (410) 834-7415
                                          Facsimile: (410) 834-7425
                                          dmarcuse@sanfordheisler.com

                                          David W. Sanford (D.C. Bar No. 457933)
                                          Russell L. Kornblith*
                                          SANFORD HEISLER SHARP, LLP
                                          1350 Avenue of the Americas, 31st Floor
                                          New York, NY 10019
                                          Telephone: (646) 402-5650
                                          Facsimile: (646) 402-5651
                                          dsanford@sanfordheisler.com
                                          rkornblith@sanfordheisler.com

                                          *admitted *pro hac vice*

                                          *Attorneys for Plaintiffs, the Proposed Classes, and the
                                          Proposed Collective*