# EXHIBIT A

1            N. Tolton ███████████

2      IN THE UNITED STATES DISTRICT COURT

3        FOR THE DISTRICT OF COLUMBIA

4        Civil Action No. 1:9-00945

5    ----------------------------X

6   NILAB RAHYAR TOLTON, et al.,

7                    Plaintiffs.

8         v.

9   JONES DAY,

10                   Defendant.

11   ----------------------------X

12         VIDEOTAPED DEPOSITION OF

13           NILAB RAHYAR TOLTON

14

15          Washington, D.C.

16          September 17, 2019

17            9:57 a.m.

18

19

20

21

22

23

24   Reported by: Karen Brynteson, RMR, CRR, FAPR

25   Job No: 168044

1          N. Tolton ████████████

2     firm?

3               MS. MUETING:  Objection, asked

4          and answered.

5               THE WITNESS:  Other than the

6          description that I already provided

7          being told to me in some form by

8          all of those individuals, that's

9          what I recall at this time.

10    BY MS. CHASE:

11         Q.    What were you told about the

12    black box compensation?

13         A.    I was told that the policy of

14    the firm was that nobody knows the

15    compensation of any other attorney, and

16    that nobody discusses their compensation

17    or the compensation of others with each

18    other, and that, in fact, this black box

19    system of pay secrecy facilitates the

20    collegiality that is a hallmark of Jones

21    Day.

22         Q.    Who told you that?

23              MS. MUETING:  Objection, asked

24         and answered.

25              THE WITNESS:  Other than the

1          N. Tolton ████████████

2     specificity than that with respect to any

3     of the other individuals you identified

4     as having interviewed with prior to your

5     first summer at Jones Day?

6          A.    I recall Jim Poth speaking to

7     me about the bonus -- I recall Jim Poth

8     speaking to me about the compensation

9     system at Jones Day and that it was

10    unlike other peer big law firms in that

11    the firm didn't provide lock-step bonuses

12    or raises; rather, the firm valued

13    quality and that associates and attorneys

14    at the firm were paid based on the

15    quality of their work but also that the

16    firm paid market rates to its associate

17    and that the way Jones Day gave

18    compensation raises included both a bonus

19    and a raise at the same time.

20    BY MS. CHASE:

21         Q.    Did Jeff -- were you finished?

22    I'm sorry.

23         A.    Yes.

24         Q.    Did Mr. Poth explain to you

25    what the market was he was referring to?

1          N. Tolton ████████████

2        Q.     And when you say "starting

3    first-year salaries," you're talking

4    about Cravath's salaries?

5        A.     Yes, and market salaries as

6    set by Cravath.

7        Q.     And do you -- before you

8    interviewed with Jones Day for first-year

9    summer, did you look to see what Jones

10   Day was paying its first-year associates

11   at that time?

12       A.     I recall being told in the

13   interview process that Jones Day paid its

14   first-year associates Cravath or market

15   pay.

16       Q.     Do you recall being told the

17   number that first-years were being paid

18   in the Irvine office before interviewing

19   with Jones Day?

20       A.     I recall being told in the

21   interview process that first-year

22   associates in the Irvine office were

23   being paid Cravath or market pay, and I

24   understood that to be 160,000 at the time

25   or soon thereafter to be 160,000.

1              N. Tolton ████████████

2     compensation decisions for the firm.

3          Q.    That was not my question.  Did

4     Mr. Poth tell you that he had no role in

5     setting associate compensation?

6          A.    Mr. Poth and all of the people

7     at Jones Day with whom I spoke during the

8     recruitment and interview process, and

9     during my entire time at Jones Day,

10    described Steve Brogan as the individual

11    who made all of the compensation

12    decisions for the firm.

13         Q.    Did Mr. Poth tell you what

14    role he had, if any, in setting associate

15    comp?  It's a yes-or-no question.

16              MS. MUETING:  Objection,

17         argumentative, asked and answered.

18              THE WITNESS:  I can't answer

19         that question truthfully as a yes

20         or no.

21    BY MS. CHASE:

22         Q.    Did Mr. Poth tell you what

23    role, if any, he had in setting associate

24    comp?

25         A.    Mr. Poth identified Steve

1          N. Tolton █████████

2     accommodated his life, in addition to

3     compensating him fairly and allowing for

4     him to do good work, seemed novel.

5          Q.    Did he tell you that he

6     thought the firm compensated him fairly?

7          A.    Yes.

8          Q.    Did he tell you that the firm

9     allowed him to do good work?

10          A.    Yes.

11          Q.    Were those statements -- were

12     those statements appealing to you in your

13     consideration of Jones Day as a firm?

14          A.    What was particularly

15     appealing to me about Jones Day was how

16     the firm branded itself as one firm

17     worldwide, and that it was doing

18     top-quality work in every office and that

19     the way it was doing that was by and

20     through its very unique management

21     structure, where one person made all the

22     decisions, and also through its very

23     unique confidential pay policy, where

24     attorneys were not reduced to petty

25     grievances or looking over each other's

1              N. Tolton ███████████

2     shoulder to see exactly who's making

3     what, but, you know, one that paid

4     everyone fairly and really valued the

5     quality of their work.

6              And the individuals that were

7     recruiting me seemed like genuine, smart,

8     driven, successful people.  And for many

9     of them to tell me that they were also

10    able to have -- you know, able to

11    continue to live the life that they had

12    and wanted and that the firm nonetheless

13    valued their unique contribution was --

14    was absolutely very interesting to me and

15    -- and further made Jones Day stand out,

16    particularly at a time when there was so

17    much fear about, you know, the future of

18    the legal profession for attorneys

19    entering big law firms because of the

20    economy.

21        Q.    Did anyone tell you before you

22    joined Jones Day that there would be an

23    hours goal or expectation for you?

24        A.    I was told repeatedly that

25    there was a general goal of 2,000 hours

1              N. Tolton ████████████

2     salary was $160,000, correct?

3          A.    Yes, it was.

4          Q.    And do -- were you satisfied

5     with that starting salary?

6              MS. MUETING:   Objection,

7          vague.

8              THE WITNESS:   That is what I

9          understood the market or Cravath

10         scale to be, so I did not have a

11         basis to question it.

12    BY MS. CHASE:

13         Q.    Do you know if first-year

14    associates in Jones Day's Pittsburgh

15    office made that amount that year?

16         A.    Because it would have been a

17    violation of Jones Day's policy to

18    discuss compensation with other

19    associates, I never did that.

20         Q.    So the question is do you know

21    what Jones Day paid any other associate

22    in the year that you started at the firm?

23         A.    I recall the first-year

24    associates with whom I joined in my

25    office had a common understanding that we

1        N. Tolton ███████████

2        Q.    Do you see initials for Steve

3    Brogan on any of these pages?

4        A.    I see Steven J. Brogan and a

5    telephone number and a five-digit

6    extension.

7        Q.    And do you see initials for

8    Steve Brogan on any of these pages?

9        A.    I don't see Steve Brogan's

10   initials.  I see his entire name.

11       Q.    And if you could turn to the

12   last page in the packet, the page that's

13   Bates numbered JD_1160, let me know when

14   you have it.

15       A.    I'm there.

███    ███    ██████████████████████

███    ████████████████████████████

███    ████████

███    ███    █████████████

███    ███    ██████████████████

███    ██████████████████████████████

███    ███    ██████████████████

███    ██████████████████████

███    ██████████████████████████

███    ████████████████████

14      Q.    Have you talked to every

15  associate at Jones Day about their

16  receipt of their letters?

17      A.    I have never talked to every

18  single associate at Jones Day.

19      Q.    So when you say you know how

20  all associates receive things, that's not

21  an accurate statement, is it?

22          MS. MUETING:  Objection,

23      argumentative, mischaracterizes.





```
 1            N. Tolton ████████████

 2            MS. MUETING:  Same objections.

 3            THE WITNESS:  When I joined

 4       the firm, like other incoming

 5       associates, I was in the New

 6       Lawyers Group, where I was told I

 7       could work with more than one

 8       practice group.

 9   BY MS. CHASE:

10       Q.    Did you, in fact, have the

11   opportunity to work with more than one

12   practice group?

13       A.    I don't recall which practice

14   groups I worked with my first year, but I

15   do recall working with both the

16   securities litigation group and the trial

17   practice group.

18       Q.    And did you work with any

19   other practice groups that first year?

20       A.    I don't recall.

21       Q.    And what lawyers did you work

22   with during your first year?

23       A.    I don't recall all of the

24   lawyers I work with during my first year,

25   but I do recall Paul Rafferty and Eric
```





















```
19              MS. MUETING:  We can take a

20         break whenever you're at a good

21         point for that.

22    BY MS. CHASE:

23              Q.    Before we start this, then,

24         sure.

25              THE VIDEO OPERATOR:  We are
```

1              N. Tolton  ████████

2     requirement.  In fact, to the contrary,

3     many attorneys worked from home

4     frequently or for long stretches of time

5     exclusively, especially when they were

6     working for partners on matters that were

7     in other offices.

8              So I don't know what would

9     surprise or not surprise partners at

10    Jones Day or in my office.

11         Q.    Who said anything to you about

12    working from home?

13         A.    I heard that negative comments

14    were being made by Cary Sullivan and by

15    Edward Chang.

16         Q.    Did you hear Edward Chang make

17    any such negative comments?

18         A.    I -- Eddie told me some

19    comment in a -- in an informal dialogue

20    where he essentially mocked my time that

21    I, you know, would come or go as needed,

22    due to my pregnancy.

23         Q.    What did he say?

24         A.    I don't recall specifically,

25    other than feeling that general sense of

1          N. Tolton ████████████

2    contempt from some of the male attorneys,

3    specifically Cary Sullivan and Edward

4    Chang, who were well-known to make such

5    comments about other female attorneys at

6    the office, and to, in fact, keep tabs on

7    when they would come and when they would

8    go; something that I did not understand

9    to be done with regard to the male

10   attorneys in the office.

11       Q.    Do you know if the firm has

12   ever pulled building access records to

13   ascertain how much time you were spending

14   in the office?

15       A.    I don't know if the firm did

16   that.  I am not sure how departure from

17   the office could be logged because there

18   is not a key fob to depart, but I, you

19   know, don't know how that would otherwise

20   be possible.  And I know that you can log

21   in remotely on your computer, so I don't

22   know what the firm's capacity is in that

23   regard or what they actually did, no.

24       Q.    When did Eddie Chang allegedly

25   make these negative statements about your

1        N. Tolton ████████████

2    part of any of those reviews, nor did any

3    of the associates who ever worked with

4    Paul talk about any of the underlying

5    information in their performance reviews

6    that he participated in.

7        Q.    Is it safe to say that you do

8    not know the content of the evaluations

9    that Paul performed on other associates?

10       A.    I have no information about

11   what Paul wrote in his evaluations for

12   other associates.

13       Q.    And do you know what any

14   partner wrote in their evaluation for any

15   associate, other than yourself?

16       A.    I do not know what other

17   partners wrote in their evaluations for

18   anybody.

██  ██  ████████████████

██  ████████████████

██  ██  ████████

██  ██  ████████████

██  ████████████████

██  ██  ████████████████

██  ██████  ████████████







17        Q.    Did you ask to see your

18   personnel file at that time?

19        A.    I did not ask to receive my

20   personnel file at that time.

21        Q.    And at that time did you have

22   access to the assessment statements that

23   had been prepared for your work for 2011

24   through 2015?

25        A.    I did not have access to any

1           N. Tolton ████████████

2    written information about me or my

3    reviews.

4         Q.    And do you know if Darren

5    Cottriel and Richard Grabowski had access

6    to that information at that time?

7         A.    I do not know that.

8         Q.    Do you know who made the

9    decision to hold -- to set your salary at

10   225,000 effective July 1, 2016?

11        A.    I believe Steve Brogan made

12   that decision.

13        Q.    And upon what basis do you

14   have that belief?

15        A.    His name being signed at the

16   bottom of all of my compensation letters.

17        Q.    And other than that basis, do

18   you have any other basis?

19        A.    Yes.

20        Q.    What is your other basis?

21        A.    Every instruction and training

22   that the firm provided that Steve Brogan

23   makes the compensation decisions for the

24   attorneys at the firm.

25        Q.    Do you know if, in fact,

1          N. Tolton ██████████

2     Richard Grabowski sets compensation --

3     makes compensation recommendations for

4     all of the associates in the Irvine

5     office?

6          A.    I do not know that.

7          Q.    And do you know if the

8     administrative partner in the Irvine

9     office has input into the salary of each

10    of the associates in the Irvine office?

11         A.    I don't know.

12         Q.    And do you know if other

13    individuals in the firm have input into

14    the salary of firm associates?

15         A.    I don't know.

16         Q.    Do you know what any other

17    associate at the firm was making as of

18    July 1st, 2016?

19         A.    I don't know other salaries

20    because it would be a violation of Jones

21    Day's policy for me to ask or for anybody

22    to tell me.

23         Q.    Did you ever apply to work for

24    Cravath?

25         A.    I did not apply to law firms

1           N. Tolton ████████████

2    outside of Orange County.

3        Q.    And Cravath doesn't have an

4    office in Orange County, correct?

5        A.    Not that I'm aware of.

6        Q.    And did you ever talk to

7    anyone who worked at Cravath; a peer, a

8    friend?

9        A.    I have spoken to people who

10   worked at Cravath.  I am not sure if,

11   when I spoke with them, they were

12   employed with Cravath.

13       Q.    And did any of them ever

14   describe the Cravath compensation system

15   to you?

16       A.    Our discussions were not

17   regarding compensation.

18       Q.    Did you ever talk to anyone at

19   Cravath about how Cravath makes

20   compensation decisions?

21       A.    I did not.

22       Q.    And do you know if the cost of

23   living in New York is higher than the

24   cost of living in Irvine?

25       A.    I don't know what the cost of

1            N. Tolton █████████

2    living is in either New York or in

3    Irvine.

4         Q.    And do you know if the Cravath

5    compensation system includes both a base

6    salary and a bonus?

7         A.    I understand that to be true

8    based on my seeing articles that had the

9    Cravath scale published, but I don't have

10   any further information about the Cravath

11   scale.

12        Q.    Do you know if Cravath pays

13   all of its associates the full bonus

14   reflected on what you are referring to as

15   the Cravath scale?

16        A.    I don't know.

17        Q.    And do you know the name of

18   any associates -- let me rephrase that

19   question.

20             Can you name for me firms in

21   Irvine that pay the Cravath base and

22   bonus scale to all of their associates

23   without regard to performance or hours?

24        A.    I don't know for certain what

25   other firms in Orange County pay, other

1              N. Tolton ███████████

2    law student and associates understand --

3         Q.    You don't know what every law

4    student and associate's understanding is,

5    do you?

6              MS. MUETING:  Let the record

7         reflect counsel has interrupted the

8         witness.

9              MS. CHASE:  Because the

10        witness keeps saying she knows what

11        every law student and every

12        associate thinks, and that is

13        clearly not the case.

14             MS. MUETING:  Objection,

15        argumentative.

16   BY MS. CHASE:

17        Q.    Do you know what every law

18   student thinks?

19             MS. MUETING:  Objection.

20             THE WITNESS:  I know the terms

21        --

22   BY MS. CHASE:

23        Q.    Do you know what every law

24   student thinks?

25             MS. MUETING:  Objection.  Let

```
1              N. Tolton ██████████████

2         true.

3    BY MS. CHASE:

4         Q.    What is your basis for

5    alleging that male associates at Jones

6    Day made the Cravath scale?

7         A.    I was told by attorneys and

8    partners at Jones Day that Jones Day paid

9    market rates, and that means that it pays

10   market rates to its associates, market,

11   i.e., Cravath.

12        Q.    And is that the basis for your

13   allegation that male associates at Jones

14   Day were paid the Cravath scale?

15        A.    That is my personal basis for

16   my knowledge, yes.  And I have other

17   anecdotal, you know, things that were

18   said to me about what other associates

19   were making that substantiates that

20   belief.
```

██   ██   █████████████

██   █████████████████████

██   ██████████████

██   ██   ██████████████████

██   █████████████████







19          Q.     Do you know what year Edward

20     Chang became a partner?

21          A.     I don't recall.

22          Q.     Do you know what year Cary

23     Sullivan became a partner?

24          A.     I believe it was the year

25     before Edward Chang.

1          N. Tolton ██████████████

2     Q.    The event that associates were

3    interviewed about, were you interviewed?

4     A.    I was not interviewed because

5    I didn't attend that event.  I attended

6    the prior year's same event where some of

7    the same sexist and misogynistic

8    statements were made by Justin, including

9    other Jones Day attorneys and clients.

10    Q.    And when you attended the same

11   event the prior year and heard

12   misogynistic comments, did you complain

13   to human resources?

14    A.    I did not complain to human

15   resources after that event.



1            N. Tolton ████████████

2    associate made Cravath scale?

3        A.    I do not know.

4        Q.    And for calendar 2013, do you

5    know if any Irvine Jones Day associate

6    made Cravath scale?

7        A.    I do not know.

8        Q.    For calendar year 2014, do you

9    know if any Irvine associate made Cravath

10   scale?

11       A.    I do not know.

12       Q.    For calendar year 2015, do you

13   know if any Irvine associate made Cravath

14   scale?

15       A.    I do not know any associate's

16   compensation level, nor did I ask for it.

17       Q.    And is that the case

18   throughout the entire time period that

19   you were working at Jones Day?

20       A.    Yes.  Throughout the entire

21   time period I was working at Jones Day, I

22   was very reluctant and nervous and

23   fearful of discussing my compensation or

████ ████████████████████████████████

████    ████    ████████████████████████████





22        Q.    Weren't there more female

23    litigation associates than men in the

24    Irvine office in general, throughout your

25    tenure in the Irvine office?

1          N. Tolton ███████████

2      Q.    And how long did you take for

3    your second leave?

4      A.    I believe I took the time

5    frame that the firm provides that's

6    similar to my first leave.

7      Q.    And were you also afforded

8    paid leave during your second leave?

9      A.    I believe that I received what

10   Jones Day provides for in maternity

11   leave.

12     Q.    Did you take the same amount

13   of time for your second leave as your

14   first leave?

15     A.    I don't know if it was exactly

16   the same time, but it was roughly the

17   same period of time.

18          THE REPORTER:  This is 20.

19          (Tolton Deposition Exhibit

20   20, August 25, 2016 e-mail chain, was

21   marked for identification.)

22   BY MS. CHASE:

23     Q.    Ms. Tolton, you have been

24   handed a two-page document that's been

25   marked as Tolton Deposition Exhibit 20.

1          N. Tolton ████████

2     It is Bates Number JD_477706 through

3     477707.

4          I ask you to take a look at

5     this document and tell me if you

6     recognize it?

7          A.    I do.

8          Q.    And is this an e-mail exchange

9     between yourself and Darren Cottriel,

10    Diana Sobel, and Sandy Daliwal?

11         A.    It is.

12         Q.    And in the bottom of the first

13    page, on the bottom of the first page, an

14    e-mail dated August 25th, 2016, you wrote

15    to Darren and Sandy and Diana, correct?

16         A.    Yes, that's correct.

17         Q.    And was -- where in connection

18    to when you first disclosed your

19    pregnancy is this date?

20         A.    I don't recall, but if I

21    returned to the firm at the end of the

22    first week of August, it could only be,

23    you know, a maximum of a couple of weeks

24    or so later.

25         Q.    And did you tell Darren what

1              N. Tolton █████████

2              So, you know, I wasn't

3    actively exploring.  I never worked

4    actively with a recruiter, that I had

5    conversations with perhaps two of them,

6    but this was not unusual for an associate

7    to be applying or working with recruiters

8    just to see what was out there.

9              It was something that was --

10   in fact, I have personal knowledge of

11   many other associates doing, just to see

12   what was out there and not necessarily

13   because they were leaving the firm.  And,

14   you know, at that time I didn't actively

15   think that I was going to get -- you

16   know, go to a different employer.

17        Q.   Didn't you, in fact, also

18   reach out to other law firms during that

19   time period?

20        A.   During which time period?

21        Q.   '14 and '15?

22        A.   I don't recall if I reached

23   out to other law firms myself.  I recall

24   having a conversation with one or maybe

25   two recruiters who alerted me to other

 1              N. Tolton ██████████████

 2      firms.  And I recall that some of them

 3      were in San Diego, which was something

 4      that I was considering in terms of a

 5      geographic relocation, and so that I was

 6      interested in what opportunities were out

 7      there.

 8              I don't recall if I actually

 9      consented for a recruiter to submit my

10      application to any of those firms, but

11      they might have.





22        Q.    Do you believe this is

23   responsive to the question or are you

24   just making more speeches now?

25               MS. MUETING:   I am going to

1          N. Tolton ████████████

2      Q.    We have to take a break for

3   the tape.  We can go right back on.  He

4   just needs to change the tapes.

5              THE VIDEO OPERATOR:  We're off

6          the record, 4:58.

7              (Discussion off the record.)

8              THE VIDEO OPERATOR:  We're

9          back on the record, 4:59.

10             THE WITNESS:  After I

11         explained all of this to Cheryl

12         O'Connor in my initial phone call

13         with her, she told me that she

14         would contact other associates to

15         see if they could do the work

16         instead.

17             One of those associates, Chris

18         Waidelich, a male associate in

19         Irvine several years my junior,

20         told me and others that he simply

21         said no to Cheryl.  Even though he

22         had availability to take on that

23         work and additional work on the

24         ████████  bankruptcy team, he just

25         said no.  And he was laughing about

```
 1                 N. Tolton ███████████

 2         it.

 3              Cheryl never followed up with

 4         him, never criticized his rejection

 5         of her workload.  And this stands

 6         in sharp contrast to how Cheryl

 7         O'Connor treated other female

 8         associates who expressed limitation

 9         concerns about their workload or

10         capacity.

11              So this e-mail that we were

12         referring to earlier sent by Cheryl

13         on November 16th, 2016 to me and

14         cc'ing Michael Deshong is a

15         follow-up where she is telling me

16         after considering all our options,

17         and one of those options was her

18         calling a junior male associate and

19         asking him if he had time because I

20         was expressing medical limitations

21         and a full workload, and he simply

22         said no.

23    BY MS. CHASE:

24         Q.   Is that associate still at the

25    firm?
```

```
 1              N. Tolton ███████████
 2    ever worked with Cheryl O'Connor?
 3         A.    I don't recall that, and I
 4    believe that his statements were contrary
 5    to him having worked with her
 6    substantively.
 7         Q.    Do you know if Chris was, in
 8    fact, told that he did not have the
 9    choice about whether or not he would work
10    with Cheryl O'Connor?
11         A.    Can you repeat that?
12              THE REPORTER:  "Question:  Do
13         you know if Chris was, in fact,
14         told that he did not have the
15         choice about whether or not he
16         would work with Cheryl O'Connor?"
17              THE WITNESS:  Chris expressed
18         that he simply rejected work from
19         Cheryl O'Connor, which stood in
20         sharp contrast to every female
21         litigation associate in the office
22         who expressed that they did not
23         want to work for Cheryl and did not
24         have availability to work for
25         Cheryl but, nonetheless, were
```

1                    N. Tolton █████████

2          required to do so.

3      BY MS. CHASE:

4          Q.    Do you know about the

5      conversations between the partners and

6      every female litigation associate in

7      Irvine?  You have personal knowledge to

8      that, to support that statement you just

9      made?

10              MS. MUETING:  Objection.

11     BY MS. CHASE:

12         Q.    Do you have personal knowledge

13     to support the statement you just made?

14              MS. MUETING:  Objection,

15              argumentative.

16              THE WITNESS:  I have personal

17              knowledge about what the female

18              litigation associates personally

19              told me; Ann Rossum, Brianne

20              Kendall, actually Andy Mazingo was

21              not a business and tort litigation

22              associate but she was a securities

23              litigation associate, I think at

24              the time, or maybe global disputes,

25              and the other female associates in

1          N. Tolton ███████████

2          the office, I don't believe, were

3          litigation associates.  So these

4          would have been the individuals who

5          would have been assigned to

6          litigation matters that Cheryl was

7          handling.

8               And all three of those

9          individuals expressed to me that

10         they did not want to do the work

11         that they were being forced to do

12         and that they, indeed, did not have

13         the capacity to do it, but they did

14         not have a choice.

15              MS. MUETING:  Whenever you are

16         ready for a break, it has been a

17         couple of hours and I could use

18         one.

19              MS. CHASE:  Okay.  Go.

20              THE VIDEO OPERATOR:  We are

21         off the record, 5:04.

22              (A recess was taken at

23    5:04 p.m., after which the deposition

24    resumed at 5:14 p.m.)

25              THE VIDEO OPERATOR:  We're

1          N. Tolton ███████████

2          back on the record, 5:14.

3    BY MS. CHASE:

4          Q.    You currently working at Call

5    & Jensen, correct?

6          A.    Call & Jensen, yes.

7          Q.    And you started there in April

8    of 2018, correct?

9          A.    That is correct.

10         Q.    Was your first day there April

11   23rd, 2018?

12         A.    I don't recall, but that

13   sounds right.

14              (Tolton Deposition Exhibit

15   23, April 5, 2018 e-mail chain, was

16   marked for identification.)

17   BY MS. CHASE:

18         Q.    Ms. Tolton, you have been

19   handed what's been marked as Tolton

20   Exhibit 23.  It is Bates JD_510787

21   through 510803.  And I ask you to tell me

22   if you recognize it?  Let's pause for a

23   moment.

24              (Discussion off the record.)

25   BY MS. CHASE:

1          N. Tolton ██████████

2          Q.     Thank you for everybody's

3     cooperation on that.  Plaintiff's Exhibit

4     -- Tolton Exhibit 23, are you familiar

5     with this?

6          A.     I don't recall it

7     specifically.

8          Q.     And do you recall receiving

9     information from Sherie Sellers at Call

10    Jensen about your start date?

11         A.     I do recall receiving

12    onboarding information from her.

13         Q.     And do you recall that that

14    information included your start date?

15         A.     I imagine that it did.  I

16    don't see my start date yet.  Oh, I do

17    see it at the end on page ending in 790.

18         Q.     Do you see that it indicates a

19    start date of Monday, April 23rd?

20         A.     Correct.

21         Q.     And did you, in fact, start --

22    does this refresh your recollection that

23    you started on April 23rd, 2018?

24         A.     Yes.  Yes, I did.

25         Q.     Your last day on payroll at

1          N. Tolton ████████████

2    Jones Day was April 20th, 2018; is that

3    correct?

4         A.    That's what I was told after I

5    was barred from returning to the office,

6    that they would pay me through Friday,

7    the 20th.

8         Q.    And were you, in fact, paid

9    through Friday, the 20th?

10        A.    I believe I was.

11        Q.    And when did you receive your

12   offer with Call Jensen?

13        A.    I don't recall when I received

14   my formal written offer from the firm.

15        Q.    When did you first receive an

16   offer of employment from Call & Jensen?

17        A.    I received an informal offer

18   in 2016, in the later part of 2016.

██   ██   █████████████████

██   ███████████████████████

██   ██   ███████████████████

██   █████████████████

██   ████████████████████

██   ███████████████████

██   ████████████████████

```
 1            N. Tolton ███████████

 2            THE WITNESS:  Jones Day's

 3       black box system of pay secrecy

 4       prevents me from having full

 5       knowledge of all of my comparators,

 6       but I do think that Justin Smith is

 7       a comparator, I think also possibly

 8       Jeremy Close when he was there,

 9       although he was a year my senior,

10       would be potential comparators.

11  BY MS. CHASE:

12       Q.    What information about the

13  duties performed by Justin Smith while he

14  was -- while you were both working at

15  Jones Day do you have based upon personal

16  knowledge?

17       A.    Justin and I, like all

18  associates at Jones Day, were evaluated

19  in the same process.  We were required to

20  meet the same sets of expectations by

21  firm partners.  We were called upon to do

22  -- to heed the firm's one firm worldwide

23  mantra and be staffed on any case, any

24  time, anywhere that would best serve the

25  interests of the client and of the firm.
```

```
1            N. Tolton ████████████

2                And, importantly, we both held

3    significant office leadership and

4    recruitment roles at times and were

5    heavily involved in the office's summer

6    programs and mentorship, office

7    trainings, office events.  We were -- we

8    are very similarly situated in that

9    regard.

10       Q.   Do you know how many hours

11   Justin Smith billed any of the years that

12   you both were working at Jones Day?

13       A.   I don't recall Justin's

14   billable hours or ever being told what

15   his billable hours were.

16       Q.   Do you know if Justin Smith

17   consistently billed significantly more

18   hours than you?

19       A.   I don't know what Justin

20   Smith's billable hours were, but I do

21   know that Justin Smith worked at Jones

22   Day and, like all associates, the firm

23   valued quality over quantity.  And those

24   were the same expectations that were

25   applied to me and to Justin.
```

1            N. Tolton ███████████

2    at Jones Day?

3         A.    I was not.

4         Q.    Did you ever work on a patent

5    matter while you were at Jones Day?

6         A.    I worked on IP cases.  I don't

7    think that I worked on a patent matter at

8    Jones Day.

9         Q.    Did you ever work on

10   healthcare compliance matters?

11        A.    I don't recall if I worked on

12   healthcare cases while I was a full-time

13   associate.  I believe either at some

14   point when I was an associate or during

15   my summer associate periods, I worked

16   with Jim Poth.

17        Q.    Did you ever work on antitrust

18   matters at Jones Day?

19        A.    I don't recall.

20        Q.    Did you ever work on an M&A

21   matter at Jones Day?

22        A.    I believe I did assist with

23   something for the M&A group.  I don't

24   recall when it was.

25        Q.    Was it while you were an NLG?

1            N. Tolton ████████████

2       A.    I don't recall.

3       Q.    Did you ever work on an

4   employee benefits executive comp matter

5   at the firm?

6       A.    I recall conferring with a

7   partner in our office who I believe had

8   that specialty, but I don't recall

9   whether it was on a matter for him

10  specifically or whether I was seeking his

11  input on a matter where it was relevant.

12      Q.    As part of your duties as a

13  trial or BATL associate, did you draft

14  and respond to document requests?

15      A.    I did.

16      Q.    As part of your duties as a

17  trial or BATL associate at Jones Day, did

18  you review motions and other briefs?

19      A.    I did.

20      Q.    As part of your duties as an

21  associate at Jones Day, as a trial

22  associate, did you review documents as

23  part of the discovery process?

24      A.    I did review documents during

25  discovery at Jones Day.

1            N. Tolton ██████████

2        Q.     As part of your duties as a

3    BATL associate, did you take and defend

4    depositions?

5        A.     I took and defended

6    depositions at Jones Day.

7        Q.     And at Jones Day as a trial

8    associate, while you were in the trial

9    practice at Jones Day, did you appear in

10   court?

11       A.     I appeared in court at Jones

12   Day.

13       Q.     And how many times did you

14   appear in court when you were a trial

15   associate at Jones Day?

16       A.     I don't recall.

17       Q.     Was it more than five?

18       A.     Yes.

19       Q.     Was it more than ten?

20       A.     I believe so.

21       Q.     Did you ever participate in

22   mediations when you were a trial

23   associate at Jones Day?

24       A.     I did.

25       Q.     And how many times?

1             N. Tolton ███████████

2        A.    I don't recall.

3        Q.    Was it more than five?

4        A.    Possibly.

5        Q.    Do you know if Justin Smith

6   ever performed any of those tasks?

7        A.    Yes, at least during his first

8   year, Justin and I both worked

9   extensively with Paul Rafferty.  And

10  Justin was competing with me to join

11  Paul's group.  I don't recall what he did

12  thereafter when I was not working with

13  him.

14       Q.    And when associates are in the

15  NLG group, they are expected to take work

16  from a range of practice areas, correct?

17       A.    In addition to being available

18  to work in a variety of practice areas,

19  by having that work given to you, they

20  are encouraged to seek out the work that

21  they want, which is what Justin did.

7        Q.     Did you ever draft or review

8   an asset purchase agreement --

9        A.     I --

10       Q.     -- once you moved into the

11  trial practice?

12       A.     I recall having reviewed an

13  asset purchase agreement.  I don't recall

14  if it was at Jones Day and at what time

15  at Jones Day.

16       Q.     When you were a trial

17  associate at Jones Day, do you recall

18  ever drafting or reviewing either an

19  asset or a stock purchase agreement?

20       A.     I don't recall.  I know that I

21  worked on those documents when they were

22  relevant to my litigation cases.

23       Q.     Did you ever draft or review

24  an asset purchase agreement when you were

25  a trial associate at Jones Day?

1        N. Tolton Vol 2 ███████████

2            THE WITNESS:  I was fired for

3    being pregnant and taking two

4    maternity leaves and communicating

5    my leave honestly and sharing what

6    happened to me honestly with my

7    co-workers when they asked me.

8            Certainly in that context my

9    male comparator, who called a

10   co-worker a cunt, made racist and

11   other sexist remarks, called his

12   own boss a fat fuck to his face,

13   and didn't, you know, wasn't fired,

14   in that -- in that context then,

15   yes, I absolutely believe that, if

16   I was fired, then Justin should

17   have been fired for what he did.

18   BY MS. CHASE:

19       Q.   You were friends with Justin

20   Smith, correct?

21       A.   I do not consider Justin Smith

22   to be my friend.

23       Q.   In 2017 you were the maid of

24   honor in his wedding, weren't you?

25       A.   I considered myself the friend

1        N. Tolton Vol 2 ████████████

2    first sentence, "Ms. Tolton also informed

3    another female associate who had recently

4    taken maternity leave that she was not

5    happy with the 2016 review."

6            Who is the female associate

7    you are referring to there?

8        A.    Ann Rossum.

9        Q.    And what did you tell Ann

10   Rossum about being unhappy with your 2016

11   review?

12       A.    I recall after the 2016

13   review, I -- I believe I was still on

14   maternity leave at this time when I --

15   when this conversation happened.

16           I don't believe at this point

17   I told anybody what -- that my salary had

18   been frozen.  But I recall expressing

19   some concern, and I believe it was with

20   Carly Rothenberg, or -- I might not have

21   that accurate.

13        So I -- I called her, I

14  believe I called her, and -- or I spoke

15  to her on the phone, I don't know who

16  called who, and I -- I did not tell her

17  that my salary was frozen but I expressed

18  to her that I was very shocked and

19  disappointed, and that I did not think

20  that it was fair and I was concerned did

21  it have something to do with my leave.



20        Q.    The last sentence of paragraph

21   110 states:   "Ms. Tolton shared similar

22   concerns about Jones Day's mistreatment

23   of her with former colleagues."

24             Who are the former colleagues

25   you are referring to there?

6       Q.    In paragraph 131, it reads:

7   "As a result of the discrimination that

8   she experienced at Jones Day, Ms. Tolton

9   suffered from and continues to suffer

10  from significant emotional distress."

11        Can you describe that

12  significant emotional distress to me?

13      A.   I can try.  The first time my

14  salary was frozen I was on maternity

15  leave.  My child was four-months-old.  I

16  had just finished a year where I thought

17  I did really good work on significant

18  matters and I was given really good

19  feedback for my work.

20        I was gutted when I opened my

21  compensation letter.  And I had further

22  concern because I was now responsible for

23  another human being.  And so the, you

24  know, consequences to me, the stakes were

25  just infinitely higher.

1          N. Tolton Vol 2 ████████████

2              My second salary freeze, I had

3      a one-year-old child and a two-month-old

4      son.  My husband, who is a Navy SEAL, was

5      deployed for seven months in parts of the

6      world where sometimes I didn't know where

7      he was.

8              And then I was given the

9      communication that, you know, despite

10     having, you know, done good work and --

11     and -- and done my best and communicated

12     honestly with people, that I needed to

13     find a new job.

14             And so it was really terrible

15     and problematic and concerning and

16     illegal timing.  It was very painful on a

17     personal level to be told something that

18     you know is not true about you and to be

19     told that you did things that you didn't

20     do, to be told that you didn't do things

21     that you did do.

22             It felt very abusive and very

23     malicious.  And it was a very painful

24     experience to me in particular because I

25     spent so much of my life investing in the

1       N. Tolton Vol 2 ▮▮▮▮▮▮▮▮

2  firm and in that office and caring about

3  it and the people there.

4       And to top off that, you know,

5  very consistent, shocking malice, I was

6  then called in -- during my son's first

7  birthday party, right before we were

8  supposed to sing happy birthday, and

9  Richard Grabowski and Darren Cottriel

10  yelled at me on the phone.

11       And I remember being outside

12  of my house so I didn't interrupt the

13  party.  And I was really confused and

14  kind of out of breath because I had never

15  been, you know, I never received a

16  speeding ticket, so I had never been

17  yelled at by someone in a position of

18  authority, especially for something that

19  wasn't true.

20       And I remember being really

21  just so confused, like I didn't know, I

22  didn't understand, I didn't know what was

23  happening.  And I was like pressing my

24  back up against the side of the house

25  that's kind of -- it's rough.  And I

Page 518

1          N. Tolton Vol 2 █████████████

2    remember, you know, for a while

3    afterwards I had the imprints of my house

4    just on my back.

5            And I remember they said that

6    I, you know, my e-mail -- my office

7    access was deactivated.  They were going

8    to send me my stuff.

1       N. Tolton Vol 2 ███████████

2    write "I think it was Eddie," was that in

3    reference to believing that Eddie was the

4    individual who spoke to firm -- to office

5    leadership that led to your being told

6    not to come into the office?

7        A.    Yes.

8        Q.    And then Jaclyn Stahl writes:

9    "Ann?  Cary via Brianne?"

10           Do you see that?

11       A.    Yes.

12       Q.    And had you said anything to

13   Ann or Cary that you believed prompted

14   the office telling you not to come in the

15   last few days of your employment?

16       A.    I spoke to Ann very briefly in

17   somewhat general terms about my

18   departure.  It -- I don't recall telling

19   her the more specific egregious things

20   that had happened to me at Jones Day.

21           And so for that reason I did

22   not think that Ann was the individual who

23   spoke about my talking to her with firm

24   leadership.

25           But I do recall -- and the

1          N. Tolton Vol 2 ████████████

2     A.    Carol Su.

3     Q.    And what did you say to Carol

4  Su about the circumstances of your

5  separation?

6     A.    I recall Carol called me after

7  she heard that I gave notice and she

8  expressed concern about why I was leaving

9  and she asked if I would go to lunch with

10 her.

11          And I recall going to lunch

12 with her and telling her pretty much

13 exactly what happened and the timing of

14 my salary freezes and that it was quite

15 surprising and shocking and disappointing

16 for me.

17    Q.    And turn to the next page,

18 Tolton 1623.

19          In the middle of the page, the

20 dark gray box, which you've identified as

21 your texts, you reference a feminist

22 e-mail that you sent for Andi.

23          What e-mail are you referring

24 to there?

25    A.    When I learned that Andi gave