EXHIBIT F

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3   --------------------------------)

4   NILAB RAHYAR TOLTON, et al.,     )

5              Plaintiffs,          ) Civ. No.

6   v.                              ) 1:19-00945 (RDM)

7   JONES DAY,                       )

8              Defendant.           )

9   --------------------------------)

10

11

12

13

14    VIDEOTAPED DEPOSITION OF JACLYN BRIANA STAHL

15              Washington, D.C.

16           Monday, October 7, 2019

17

18

19

20

21

22    Reported by:

23    CINDY L. SEBO, RMR, CRR, RPR, CSR, CCR, CLR,
      Real-Time Systems Administrator, LiveDeposition

24    Authorized Reporter

25    JOB NO.  168046



13   Q.   When you started at Jones Day in the

14   fall of 2014, did you know the salary of any

15   other Jones Day associate?

16   A.   My understanding was that all

17   associates started at $160,000.

18                    -  -  -

19        (Stahl Deposition Exhibit Number 11,

20         Recruiting paperwork, Bates stamped

21         JD_02189149 through JD_02189196,

22         marked for identification, as of

23         this date.)

24                    -  -  -

25   Q.   Ms. Stahl, you've been handed a







[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

1                         J. Stahl

2    whether or not it considers Cravath the

3    benchmark for compensation for Jones Day Irvine

4    associates?

5        A.   My understanding was that Jones Day

6    Irvine associates were making -- were market

7    rate, and market rate was understood to be the

8    Cravath scale.

9        Q.   Did anyone at Jones Day ever tell you

10   that Jones Day considers the market for Irvine

11   associates to be Cravath?

12       A.   In those particular words?  No.

13       Q.   Did anyone ever tell you in any other

14   words that Jones Day considers the market for

15   Irvine associates to be Cravath?

16       A.   I'm sorry.  I --

17       Q.   Well, you said the -- not in those

18   particular words.

19            So were there any other words used by

20   any Jones Day lawyer that indicated to you that

21   Jones Day considered the market for Jones Day

22   Irvine associates to be Cravath?

23       A.   So --

24            MR. KORNBLITH:  Object to the form.

25            You may answer.





[redacted]

[redacted]

[redacted]

Page 146

1                          J. Stahl

2              You may answer.

3      A.     So as I explained, I don't -- I don't

4   recall us speaking in particular numbers.  So I

5   believe it was in terms of comparing to market

6   pay, which was synonymous with Cravath.

7      Q.     And when you say it "was synonymous

8   with Cravath," you're referring to Cravath base

9   plus bonus?

10     A.     Yes.

11     Q.     And do you know what Meredith's hours

12  were at the time she was displeased with her

13  salary?

14     A.     I recall her telling me that she had

15  billed -- well, I recall her telling me and

16  observing her working a lot of hours and trying

17  to not turn down work and working across

18  multiple practice groups, including IP and the

19  healthcare group that I knew was difficult for

20  her to juggle that.

21             So I -- I don't specifically recall a

22  number, if she gave me one, but I knew it was

23  high.

24     Q.     Do you know if Meredith missed

25  deadlines?

1                        J. Stahl

2    level more than it paid her --

3         A.    Well, I'm -- sorry.  I must be in the

4    wrong --

5         Q.    Paragraph 239?

6         A.    Okay.  That's -- oh, got it.

7               Okay.  Second sentence.  Sorry.

8         Q.    Second sentence, yes.  I'm sorry.

9               MR. KORNBLITH:  Take your time.

10        Q.    -- Ms. Stahl suspects Jones Day paid

11   male attorneys at her level more than it paid

12   her, but Ms. Stahl is unable to confirm this

13   because Jones Day made it clear that attorneys

14   were not allowed to talk about their

15   compensation.

16               Do you see that language?

17        A.    Yes.

18        Q.    Is that a truthful statement?

19        A.    I mean, it's -- I did not speak to

20   male attorneys at my level because of the pay

21   confidentiality policy, so I have no way of

22   knowing whether Jones Day paid male attorneys at

23   my level more than it paid me.

24               However, it was told to me that

25   Jones Day paid market and more for top

[redacted]

J. Stahl

performers, and I have -- every indication I had was that I was a top performer, and I was not making market level and more.

[redacted]

1                       J. Stahl

2     don't specifically recall.

3          Q.     Do you recall if Chris was still

4     working in Irvine when those exchanges were

5     initiated?

6          A.     The text messages -- at the time the

7     text messages were sent, he was in San Diego.

8     We -- I don't specifically recall if we had any

9     communications in person when he was still in

10    the Irvine office or not.

11         Q.     Can you turn to Page 15 in the Third

12    Amended Complaint?  I'll draw your attention

13    again back to the chart that reflect -- refers

14    to you and your compensation versus the Cravath

15    scale.

16         A.     Okay.

17         Q.     In 2000- -- for the period 2015 to

18    2016, you indicate that your salary was $15,000

19    more than the Cravath base, correct?

20         A.     I'm sorry.  I'm just -- I want to

21    make sure I'm looking at the correct column.

22                So the sec- -- well, the 2015 to

23    2016, you said?

24         Q.     Correct.

25                According to this chart, the Cravath

Page 188

1                    J. Stahl

2        A.    I see that.

3        Q.    Were you conveying to Chris in

4   January 2017 that you would -- that you

5   didn't -- that you would stay at Jones Day if

6   Jones Day would let you do appeals full-time?

7        A.    I was conveying -- well, there's a

8   lot behind this message.  So as you just read

9   and my intention here, as I recall, was that I

10  was experiencing severe discrimination in the

11  BATL practice from particularly -- well, not

12  just the BATL practice, because I worked for

13  Bob Naeve and other practice groups, but I was

14  experiencing significant gender discrimination

15  that was becoming difficult to overcome, and the

16  partners and the Issues & Appeals group who I

17  had worked with seemed more open to giving me,

18  as a woman, experience and opportunities.  So I

19  was hoping that by transitioning practices, I

20  would be able to continue advancing in the firm.

21            After this message, it became clear

22  to me that it didn't matter what practice group

23  I was in, that my gender would prevent me from

24  succeeding at Jones Day.

25       Q.    Upon what basis do you allege that

1                       J. Stahl

2     your gender stopped you from succeeding at

3     Jones Day?

4          A.    Based on the comments that I received

5     where my work was conveyed to be excellent and

6     put me as a top performer, but the comments I

7     received about my appearance and personality

8     that I never heard expressed to male associates;

▮     ████████████████████████████████████████████

▮     ██████████████████████████████████████████████

▮     ████████████████████████████████████████████

▮     ██████████████████████████████████████████████

13    when she tried to rope in Chris, he was able to

14    say no and was subsequently given depositions on

15    a large case; and when I was asked and I was

16    trying to strategically place myself on

17    Bob Naeve cases, where I was the only associate

18    to take depositions in a case, I was forced to

19    take work from Cheryl.  And, in fact, when I

20    tried to gracefully turn it down in the way that

21    had been taught to me when I joined the firm, I

22    was punished for it.

23         Q.    Do you know if Chris did work for

24    Cheryl?

25         A.    I believe that at some points he did



[redacted]

[redacted]

Q. Did Chris complain to you about his work with Cheryl?

A. I don't specifically recall.

Q. Did anyone in the Irvine office complain to you about working for Cheryl?

1                      J. Stahl

2       A.    Yes.

3       Q.    Who?

4       A.    Brianne Kendall -- she was Brianne

5    Jackson until she was married -- Andi Mazingo;

6    later, Laura Lim.

7             That's all I recall at this time.

8       Q.    You mentioned before the break that

9    you believe you were subject to discrimination

10   at Jones Day.

11            Do you recall that testimony?

12      A.    I don't know that I used those words.

13      Q.    Do you believe you were subject to

14   discriminate -- gender discrimination at

15   Jones Day?

16      A.    Yes.

17      Q.    Who do you believe was discriminating

18   against you based on your gender?

19      A.    I believe that several individuals

20   worked within a system where the policies and

21   practices of the firm perpetuated gender

22   discrimination.

23      Q.    Who were the individuals that you

24   believe subjected you to gender discrimination

25   at Jones Day?

J. Stahl

1

2    A.    I think there were several: as we've

3  discussed, the fraternity culture where male

4  partners and associates made inappropriate

5  comments and were permitted to do so; the "add

6  it to the file" comments; there were comments

7  about my appearance.

8            Having read my reviews now, I see

9  very gendered language in my reviews, describing

10  me as meek.  I've never heard a male attorney be

11  described as meek.  Bob Naeve commented on my

12  facial expressions, and I never heard him

13  comment on facial expressions.  Cheryl O'Connor

14  screamed at female associates but did not scream

15  at male associates.

16            I'm sure if I sat here long enough, I

17  could continue listing instances.

18    Q.    I would like you to identify by name

19  the individuals who you believe subjected you to

20  gender discrimination at Jones Day.

21            MR. KORNBLITH:  If you know their

22       identities.

23    A.    So aside from the ones I just listed?

24    Q.    So you identified Bob Naeve and

25  Cheryl.

1                         J. Stahl

2        A.    So, like, gathering information from

3   one person and then taking it to another person,

4   very high school fashion, saying, Didn't you

5   hear so-and-so about such-and-such?

6        Q.    Did you, personally, observe Ed Chang

7   stirring the pot, to use your phrase?

8        A.    Yes.  He came to me to try and ask

9   about other female associates and what felt, to

10  me, like he was trying to gather intel that he

11  could use.

12       Q.    And do you know if Ed Chang went to

13  male associates with similar questions?

14       A.    I don't have any personal knowledge

15  of that.

16       Q.    And is there anything else that

17  Ed Chang did that you believe was gender

18  discriminatory towards you?

19       A.    Other than what I've testified, I

20  don't specifically have any other recollections

21  at this time.

22       Q.    And in what way do you believe

23  Darren Cottriel was discriminating against you

24  based on your gender?

5    questioned Darren and Richard further about that

6    by indicating that seemed like a personality

7    trait to me and how was I supposed to change my

8    personality trait, the conversation devolved

9    into comments about my appearance in respect to

10   when I was receiving work and the gender

11   stereotype perception of me in general

12   throughout the office.

13       Q.    Do you believe that Jones Day had the

14   right to expect associates to be enthusiastic

15   about their work?

16       A.    I guess it depends on what

17   "enthusiasm" means to any given person.

18       Q.    Do you believe Jones Day had the

19   right to expect Jones Day associates to be

20   enthusiastic about their work?

21       MR. KORNBLITH:  Objection: asked and

22       answered.

23       You may answer.

24       A.    It was told to me that Jones Day

25   valued quality.  And I exhibited that, as shown

Page 274

1                          J. Stahl

2        Q.    Were you and Koree close friends?

3        A.    At various times, we were closer than

4   not.  I wouldn't consider her a close friend.

5        Q.    But close enough to reach out and ask

6   her how much she was making; is that right?

7              MR. KORNBLITH:  Objection: misstates

8        the prior testimony.

9              You may answer.

10       A.    As I said before, at this time, I had

11  strongly began to suspect that the firm was

12  discriminating against women on the basis of

13  gender.  And so I was reaching out to more

14  people to try and determine what the pay was,

15  including other women in other offices.

16       Q.    And did Koree ever respond to you to

17  indicate how much money she was making at that

18  time?

19       A.    Since I don't recall reaching out to

20  her, I don't recall any such response.



[redacted]

[redacted]

1                          J. Stahl

2    lead me to believe otherwise.

3         Q.    All the information that you had

4    indicated that women were being paid more than

5    men, though?

6              MR. KORNBLITH:   Objection: misstates

7         the prior testimony.

8         A.    That's not what I'm saying.

9         Q.    Tell me the name of any male

10   individual at Jones Day who you know was making

11   more than you in your class year.

12        A.    So because of the pay

13   confidentiality, I did not regularly ask male

14   associates what their pay was.  Based on the

15   information I have -- for example, we spoke of

16   James Burnham earlier.  I worked with him.  He

17   was more senior to me.  I don't have access to

18   how much he made when he was my year.  Based on

19   how much he made when he left the firm, I

20   suspect that it was higher than me.

21             He also brought on an associate,

22   Andrew Bentz, who was a year above me, but

23   substantially used the work that I wrote when he

24   submitted it to the partner.  So we did equal

25   work.  But I didn't know him personally or feel

Page 289

1                            J. Stahl

2     comfortable, given the policy, to reach out and

3     ask him what he made.

4                  Given that the Jones Day system is a

5     brotherhood, it seemed like a one-way ticket for

6     me to walk up to a man and ask him what he made.

7          Q.    Yet most of the conversations you had

8     about compensation were with a man name named

9     Chris, weren't they?

10         A.    Who was a friend.

11         Q.    So you were able to get compensation

12    information from a man even though it was a

13    brotherhood; is that right?

14         A.    Who was a friend.

15         Q.    So you had friends in the

16    brotherhood; is that right?

17         A.    Was I supposed to be a pariah?

18         Q.    You used the term "brotherhood."  I'm

19    trying to understand what you mean by it.

20                  Could you talk to the men within the

21    firm?

22                  MR. KORNBLITH:  Objection to the

23         form of the question.

24         Q.    You did talk to the men within the

25    firm, didn't you --

1                           J. Stahl

2              MR. KORNBLITH:  Do you want --

3       Q.    -- in fact, you talked to the men

4    within the firm about compensation, didn't you?

5              MR. KORNBLITH:  -- objection to the

6         form of the question.  And it's now

7         bordering into badgering.

8              You can answer the question.

9              MS. CHASE:  Read the last question

10        back.

11                        -  -  -

12         (Whereupon, the court reporter read

13          back the pertinent part of the

14          record.)

15                        -  -  -

16              MR. KORNBLITH:  Same objections.

17       A.    I spoke with at least one individual,

18    one male associate, about pay.  It appears from

19    the messages I also spoke with Doug,

20    potentially, although I don't specifically

21    recall.

22              When speaking to Michelle Blum after

23    ████████████████████████████████████████████

24    to me that Jones Day is, in fact, a brotherhood.

25    In fact, she told me that to be accepted, you

Page 291

1                          J. Stahl

2   had to act like a man.  She explained to me that

3   Cheryl O'Connor acted like a man so she was

4   accepted into the fraternity culture, that

5   Cheryl disparaged other women, which made her

6   accepted into the firm culture, and Michelle

7   specifically stated that I did not behave in

8   that way, which sent a clear message to me that

9   I would not be accepted into the fraternity

10  culture and, therefore, I would never make

11  partner at Jones Day.

12       Q.    Michelle told you you would never

13  make partner at Jones Day?

14       A.    I said that she said, To succeed at

15  Jones Day, you had to hang with the boys,

16  essentially be like the men, act like the men,

17  and that Cheryl she pointed to as a example of

18  how you act like a man to be accepted by the

19  male fraternity that was Jones Day's

20  partnership.

21            And so to me, she then specifically

22  said I did not act like a man, so I was

23  different than Cheryl.  And so that indicated to

24  me I would not be successful at Jones Day.

25       Q.    How many female partners were there

1              J. Stahl

7         Q.    And do you see that you responded to

8    Cheryl on August 1st and wrote, Thank you for

9    thinking of me; I would love to help, but I do

10   not have any -- I do not have capacity at this

11   time; I'm flying to Alaska mid-next week for my

12   Ninth Circuit judge's law clerk

13   reunion/celebration of her 15th year on the

14   bench where I will have limited access to a

15   computer given a packed schedule of events, and

16   I'm at capacity finalizing my current work

17   before I take off?

18         A.    I do see that, yes.

19         Q.    And did Cheryl respond to you on

20   August 2nd?

21         A.    Yes, she did.

22         Q.    And did she respond, at least in the

23   first sentence, This response is unacceptable,

24   both in substance and tone?

25         A.    Yes, I see that here.

CONTAINS CONFIDENTIAL PORTIONS

Page 432

1                     J. Stahl

2    believe comprises sexual harassment?

3                MR. KORNBLITH:  And I'll just object

4         to the extent it calls for a legal

5         conclusion.

6                You may answer.

7         A.    We've covered a lot of ground today,

8    so I just want to be sure that I've thought

9    about everything we did and didn't cover.

10               I don't know if this would meet the

11   legal conclusion of sexual harassment.  There

12   was an encounter with Steve Zadravecz that was

13   odd and uncomfortable and, I believe, happened

14   because I was a woman and wouldn't have happened

15   to a man.

16        Q.    And what was the odd exchange with

17   Steve Zadravecz that you're referring to?

18        A.    We were in the hallway in front of

19   the legal assistant who sat by -- kind of

20   catty-corner to Brianne.  And my cell phone was

21   in my front pocket of my suit pants, and he made

22   a comment that my pockets were small.  And then

23   he reached into my pocket and took out my cell

24   phone.

25        Q.    Okay.  Anything else said during that