**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NILAB RAHYAR TOLTON, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Civ. No. 1:19-00945 (RDM) |
| | ) | |
| *v.* | ) | |
| | ) | **DEFENDANT'S MOTION** |
| JONES DAY, | ) | **FOR RULE 11 SANCTIONS** |
| | ) | |
| *Defendant.* | ) | |

Jones Day respectfully moves for sanctions under Rule 11 of the Federal Rules of Civil Procedure. A central component of Plaintiffs' case is the allegation that Jones Day pays female associates less than it pays male associates for equal work. Through discovery, it has become clear that Plaintiffs and their counsel do not currently have, nor ever had, a good-faith basis to make that allegation. Plaintiffs have admitted they have no factual basis for the allegation. And, in fact, they admitted that the facts they knew *contradicted* their allegation. Plaintiffs also admitted that they did no investigation prior to leveling the accusation of systemic sex-based disparate pay.

In compliance with Rule 11(c)(2), on November 5, 2019, Jones Day sent a draft motion along with a detailed letter to Plaintiffs' attorneys laying out the grounds for this motion. Plaintiffs refused to withdraw their claims alleging that Jones Day paid men more than women.

Accordingly, Jones Day asks the Court to enter an order imposing Rule 11 sanctions. In particular, Jones Day requests the Court (1) dismiss with prejudice all of Plaintiffs' claims against Jones Day to the extent they are based on disparate pay, including Counts 1, 2, 4, 5, 6, 11, 12, and 13; (2) order Plaintiffs' counsel to pay Jones Day's attorneys' fees and costs associated with this motion; and (3) impose any additional sanctions that the Court deems just and proper. The grounds for this motion are set forth in the attached memorandum of law.

<u>/s/ Mary Ellen Powers</u>
Mary Ellen Powers (Bar No. 334045)
Beth Heifetz (Bar No. 417199)
Yaakov Roth (Bar No. 995090)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

Terri L. Chase (*pro hac vice* granted)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

*Attorneys for Defendant*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NILAB RAHYAR TOLTON, *et al.*, | ) | |
| | ) | |
| | ) | Civ. No. 1:19-00945 (RDM) |
| *Plaintiffs*, | ) | |
| | ) | |
| *v.* | ) | **MEMORANDUM OF POINTS AND** |
| | ) | **AUTHORITIES IN SUPPORT OF** |
| JONES DAY, | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **RULE 11 SANCTIONS** |
| *Defendant.* | ) | |

Mary Ellen Powers
Beth Heifetz
Yaakov Roth
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

Terri L. Chase (*pro hac vice* granted)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES .......................................................................................................... ii

INTRODUCTION ....................................................................................................................... 1

LEGAL STANDARD................................................................................................................... 2

ARGUMENT ............................................................................................................................... 3

I.     COUNSEL LACKED A GOOD-FAITH BASIS FOR PLAINTIFFS' PAY ALLEGATIONS ................. 4

II.    PLAINTIFFS AND THEIR COUNSEL FAILED TO CONDUCT ANY INVESTIGATION................. 13

CONCLUSION........................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bletas v. Deluca,*
   2011 WL 13130879 (S.D.N.Y. Nov. 15, 2011) .......................................................................16

*Carson v. J. Curt, Inc.,*
   2008 WL 4274502 (N.D. Fla. Sept. 11, 2008) ..........................................................................2

*Coburn Optical Indus., Inc. v. Cilco Inc.,*
   610 F. Supp. 656 (M.D.N.C. 1985) ..........................................................................................3

*Del Canto v. ITT Sheraton Corp.,*
   865 F. Supp. 934 (D.D.C. 1994) ..............................................................................................3

*Hedgeye Risk Mgmt., LLC v. Heldman,*
   2019 WL 4750243 (D.D.C. Sept. 29, 2019) .....................................................................2, 3, 14

*Henry v. Black,*
   2011 WL 2938450 (D. Utah July 19, 2011) ............................................................................3, 4

*Hilton Hotels Corp. v. Banov,*
   899 F.2d 40 (D.C. Cir. 1990) ...............................................................................................2, 13

*Judin v. United States,*
   110 F.3d 780 (Fed. Cir. 1997) ..................................................................................................2

*Menard v. CSX Transp., Inc.,*
   698 F.3d 40 (1st Cir. 2012) .......................................................................................................3

*Nassau-Suffolk Ice Cream, Inc. v. Integrated Res., Inc.,*
   118 F.R.D. 45 (S.D.N.Y. 1987) ................................................................................................2

*Veal v. Geraci,*
   23 F.3d 722 (2d Cir. 1994) ........................................................................................................2

*Williams v. Verizon Washington, D.C. Inc.,*
   322 F.R.D. 145 (D.D.C. 2017) .................................................................................................2


OTHER AUTHORITIES

Fed. R. Civ. P. 11 ............................................................................................... *passim*

*Associate Compensation Scorecard: Which Firms Have Announced Bonuses?*
   *(Fall 2018)*, ABOVE THE LAW (Nov. 2018) ...............................................................................5

**INTRODUCTION**

From the start, Jones Day knew that Plaintiffs and their counsel had no good-faith basis to allege that the Firm systemically discriminates against women in pay.  Discovery has now proved that Plaintiffs made that claim up out of whole cloth.  Plaintiffs admitted at their depositions that they discussed compensation with their colleagues while at Jones Day, and the facts they learned from those discussions not only *do not support* their pay allegations—they flatly *contradict* them. A 2017 text exchange between Plaintiff (then-associate) Stahl and a male associate shows that Stahl knew her male colleague was making "Cravath base" with "no bonus," while she was making $25,000 *above* "Cravath base."  Both Stahl and Plaintiff Mazingo also knew that Mazingo was paid more than both of the men in the associate class that started with her in Irvine.  And Plaintiffs have also admitted that they randomly identified male associates as "comparators" in the Third Amended Complaint without *any basis* for knowing their salaries.  To make matters worse, neither Plaintiffs nor their counsel bothered to conduct even a rudimentary investigation into the matter before charging Jones Day with nationwide civil-rights violations and trumpeting those claims to the media.  These failures to comply with the basic requirements of Rule 11 warrant sanctions.

On November 5, 2019, Jones Day wrote Plaintiffs' counsel, notifying them that they had violated Rule 11.  Fed. R. Civ. P. 11(c)(2).  The Firm requested that Plaintiffs withdraw all claims grounded on the allegation that Jones Day pays women less than men.  Plaintiffs refused—and instead *doubled down* on their baseless theory in a hastily filed conditional certification motion.[1] As a sanction for making serious allegations without good-faith basis or investigation, the Court should dismiss all of Plaintiffs' claims premised on the allegation that Jones Day pays men more than women, and award Jones Day its costs and fees associated with litigating this motion.

---

[1] The pre-filing Rule 11 correspondence is attached as Chase Decl. Exs. 1-2. The parties also met and conferred about this motion on December 2, 2019, but did not reach any resolution.

## <u>LEGAL STANDARD</u>

Rule 11 provides that when presenting any "pleading, written motion, or other paper" to the court, a party's counsel "certifies" that "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). Rule 11 thus imposes two obligations on attorneys.

*First*, the attorney must have a good-faith basis to believe the allegations in any pleading he or she signs. Fed. R. Civ. P. 11(b)(3). That usually means having facts that directly support the allegations. *Hedgeye Risk Mgmt., LLC v. Heldman*, 2019 WL 4750243, at \*13 (D.D.C. Sept. 29, 2019). An "attorney act[s] unreasonably in giving blind deference to his client and assuming his client had knowledge not disclosed to the attorney." *Judin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997) (applying substantively identical Federal Circuit Rule 11). Instead, a party's counsel "should determine if [the client's] knowledge … is direct or hearsay and check closely the plausibility of the client's account." *Nassau-Suffolk Ice Cream, Inc. v. Integrated Res., Inc.*, 118 F.R.D. 45, 48 (S.D.N.Y. 1987). Counsel thus cannot remain "deliberate[ly] indifferen[t] to obvious facts" that contradict the client's claims. *Carson v. J. Curt, Inc.*, 2008 WL 4274502, at \*3 (N.D. Fla. Sept. 11, 2008). Because a client and an attorney are in a principal-agent relationship, the two are charged with each other's knowledge: what the client knows the attorney knows and vice versa. *See Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994).

*Second*, counsel must conduct "a reasonable inquiry into the factual and legal basis for a claim before filing." *Williams v. Verizon Washington, D.C. Inc.*, 322 F.R.D. 145, 148 (D.D.C. 2017). An inquiry is especially necessary when a party merely *suspects* wrongdoing. *See Hilton Hotels Corp. v. Banov*, 899 F.2d 40, 42-43 (D.C. Cir. 1990) (sanctioning counsel who "made no

attempt independently to corroborate [plaintiff's] second-hand account"); *see also Del Canto v. ITT Sheraton Corp.*, 865 F. Supp. 934, 938 (D.D.C. 1994), *aff'd*, 70 F.3d 637 (D.C. Cir. 1995). While an attorney begins with the client's account of events, the attorney "needs facts on which to ground knowledge, information or belief.  If all the attorney has is his client's assurance that facts exist or do not exist, when a reasonable inquiry would reveal otherwise, he has not satisfied his obligation." *Coburn Optical Indus., Inc. v. Cilco Inc.*, 610 F. Supp. 656, 659 (M.D.N.C. 1985).

Finally, in some circumstances a party may plead "on information and belief," but "Rule [11] does not permit parties to embark on fishing expeditions regarding claims that have no factual basis or justification."  *Hedgeye*, 2019 WL 4750243, at *13.  "[I]nformation and belief does not mean pure speculation."  *Menard v. CSX Transp., Inc.*, 698 F.3d 40, 44 (1st Cir. 2012).  And it "does not permit a party to create facts which he or she hopes will later be substantiated by future discovery."  *Henry v. Black*, 2011 WL 2938450, at *2 (D. Utah July 19, 2011).

## ARGUMENT

Counsel had no good-faith basis to assert Plaintiffs' individual pay discrimination claims, much less their claims of systemic, nationwide gender-based pay discrimination.[2]  In depositions,

---

[2] For ease of reference, Plaintiffs' employment details are set forth below:

| PLAINTIFF | OFFICE | JD YEAR | PRACTICE | EMPLOYMENT PERIOD |
|-----------|--------|---------|----------|-------------------|
| Tolton | Irvine | 2010 | Business & Tort Litigation | Oct. 25, 2010 – Apr. 20, 2018 |
| Williams | Irvine | 2013 | Intellectual Property | Oct 28, 2013 – Sept. 22, 2017 |
| Stahl | Irvine | 2013 | Business & Tort Litigation | Oct. 20, 2014 – Jan. 5, 2018 |
| Mazingo | Irvine | 2014 | Securities Litigation & SEC Enforcement | Oct. 20, 2014 – Apr. 2, 2018 |
| Draper | Atlanta | 2011 | Business & Tort Litigation | Oct. 31, 2011 – Oct. 5, 2018 |
| Henderson | New York | 2013 | Capital Markets | Oct. 28, 2013 – July 15, 2016 |

Plaintiffs admitted they had no facts that support their pay allegations. To the contrary, they admitted they were aware, from their own discussions of compensation with their colleagues, of substantial evidence *refuting* the claims. Nonetheless, counsel failed to conduct any investigation before filing suit. This is an inexcusable violation of Rule 11, and it warrants sanctions.

## I.   COUNSEL LACKED A GOOD-FAITH BASIS FOR PLAINTIFFS' PAY ALLEGATIONS.

A central component of Plaintiffs' Complaint is the allegation that "Jones Day pays female associates less than male associates, even though associates all perform substantially similar work." TAC ¶ 46. This allegation undergirds many of Plaintiffs' individual and class claims, including that (1) Jones Day's policies have a disparate impact on women—the impact being that they are paid less than men (Counts 1-2, 5-6, and 11-12); (2) Jones Day intentionally discriminated against Plaintiffs and women associates nationwide by paying them less than men (Counts 1-2, 5-6, and 11-12); and (3) Jones Day violated pay equity laws (Counts 4, 8, and 13).

Plaintiffs have never offered facts to support these allegations. Their first three Complaints relied exclusively on a "Cravath" theory: Because Plaintiffs did not make "Cravath" scale pay, Jones Day must have paid men more than women. In their Third Amended Complaint, Plaintiffs supplemented their Cravath theory with information-and-belief allegations that certain men made more than Plaintiffs for equal work. Plaintiffs repeated those same theories in their certification motion. Discovery has revealed that Plaintiffs had no good-faith basis for either theory.

**A.**   Plaintiffs' principal basis for their pay allegations has always been the following theory: Jones Day allegedly promised "market-competitive pay and more for top performers," but "did not compensate the Plaintiffs in line with the 'Cravath' market scale";[3] therefore, "Plaintiffs

---

[3] The Complaint describes "Cravath scale" as including base salaries plus bonuses that varied by class and from year to year. TAC ¶ 45. The scale changed over time, as starting salaries jumped in summer 2016 from $160,000 to $180,000, and in summer 2018 to $190,000. *Id.* n.13. While top firms in California and several other major markets paid *base* salaries that matched the

earned less than their male comparators." TAC ¶¶ 44, 46. Plaintiff Williams confirmed at her deposition that this is indeed the foundation of the case: "So just sort of combining Jones Day's representation that top performing candidates are making market, neither myself nor any of the women I know are making market, *I have to assume* that Jones Day's representation was truthful and someone is making market, and *I would understand* that that would be the male associates." Chase Decl. Ex. 3, Williams Tr. 76:11-20 (emphases added).[4]

That is not only deeply flawed logic but, discovery has confirmed, also pure speculation. Each of the Plaintiffs outside New York (*i.e.*, all but Henderson) admitted she did not know any men in her office who made "Cravath scale." Williams, in Irvine, admitted she did not "have any personal knowledge of any men at the firm being paid at the Cravath" level. Chase Decl. Ex. 3, Williams Tr. 212:25-213:16. Mazingo, Stahl, and Tolton (also all in Irvine) said they were not aware of *anyone*, male or female, making "Cravath scale" at any time in the Irvine office.[5]

---

"Cravath scale," there has been considerable variability in how firms treated bonuses. Many imposed hours thresholds for eligibility for any bonus or included a merits assessment in bonus decisions. *E.g.*, *Associate Compensation Scorecard: Which Firms Have Announced Bonuses? (Fall 2018)*, ABOVE THE LAW (Nov. 2018), *at* https://abovethelaw.com/2018/11/associate-compensation-scorecard-which-firms-have-announced-bonuses-fall-2018/.

Jones Day does not pay annual performance bonuses, but takes into account information about both salaries and bonus practices in local geographic markets in setting salaries. Cravath does not have a presence and does not compete for talent in Irvine or Atlanta. And as Plaintiffs themselves allege, Draper accepted a job in Atlanta knowing that even the starting salary was well below the Cravath base. TAC ¶ 45. But the issue is not whether the "Cravath scale" is relevant in Irvine and Atlanta; it is whether Plaintiffs could, consistent with their Rule 11 obligations, file a lawsuit alleging that they "know" that all women at Jones Day are discriminated against in pay "because [Plaintiffs] did not make so-called Cravath market pay." TAC ¶ 44.

[4] *See also* Chase Decl. Ex. 4, Tolton Tr. 240:4-11 (Q: "What is your basis for alleging that male associates at Jones Day made the Cravath scale?" A: "I was told by attorneys and partners at Jones Day that Jones Day paid market rates, and that means that it pays market rates to its associates, market, i.e., Cravath.").

[5] Chase Decl. Ex. 5, Mazingo Tr. 278:19-279:4 (had "no personal knowledge" of any men in Irvine making "Cravath scale"); Chase Decl. Ex. 6, Stahl Tr. 152:19-24 ("not privy" to whether anyone made "Cravath scale"); Chase Decl. Ex. 4, Tolton Tr. 247:22-248:24 (same).

For her part, Draper could not name any associate in Atlanta who earned "Cravath scale." *See* Chase Decl. Ex. 7, Draper Tr. 134:3-12.  And all Plaintiffs (and counsel) know that the fourth-year male associate identified by Draper as a comparator—allegedly making $220,000—was not making "Cravath scale."  TAC ¶ 187.  According to Plaintiffs' own allegations, "Cravath scale" for a fourth year was at least $250,000, if not $300,000, depending on the calendar year.  TAC ¶ 45.

Plaintiffs also knew that their premise that the "Cravath scale" was applicable nationwide was frivolous.  TAC ¶¶ 44–46.  The Firm Manual, which was available to Plaintiffs during their employment (Chase Decl. Ex. 8, JD_00002408 at 2497), made clear that:

> the Firm does not have a compensation structure or ladder that is uniform across all geographic markets and, even within individual geographies, each lawyer is compensated within a range that reflects both local market conditions and the fact that individuals perform at different levels.

Even their own Complaint contradicts Plaintiffs' theory.  Plaintiffs allege that the starting salaries in Irvine and Atlanta (salaries the Plaintiffs knew before they joined the Firm) were not at the "Cravath" scale.  TAC ¶ 45 (*e.g.*, alleging the "Cravath scale" for a first year in 2014-2015 was $175,000, while Mazingo was paid $160,000).  Draper (in Atlanta) admitted that her starting salary "was less than the Cravath base."  Chase Decl. Ex. 7, Draper Tr. 126:17-23.  Likewise, the recruiting e-mail Tolton selectively quoted in the Complaint (TAC ¶ 81) as promising "market" compensation referred to compensation of "California firms," *not* the "Cravath market."  Chase Decl. Ex. 9, TOLTON-0000661.

What's more, while the cornerstone of their gender discrimination complaint is the lack of "Cravath scale" pay, nearly every Plaintiff admitted she did not even know how the "Cravath scale" worked in practice.  Williams summed it up: "I do not have an understanding of Cravath's

pay structure." Chase Decl. Ex. 3, Williams Tr. 131:12-13.[6]  But, even so, most Plaintiffs assumed that performance and productivity were likely relevant considerations even at Cravath.  For example, Henderson testified, "I think that Cravath, like any other law firm, would pay their associates based on the work that they perform for the firm, including client hours, pro bono, work for their specific practice group, and business development."  Chase Decl. Ex. 10, Henderson Tr. 154:15-20.  Tolton agreed that "market pay"—which she had earlier equated to "Cravath" pay— "takes into account the productivity, i.e., hours of an associate."  Chase Decl. Ex. 4, Tolton Tr. 239:6-240:2.  Mazingo too: "My understanding of the Cravath pay scale is that big firms will take into consideration a variety of objective criteria including the contribution of a particular associate to the firm in terms of billable hours, high quality work, pro bono hours, business development hours, recruitment hours."  Chase Decl. Ex. 5, Mazingo Tr. 25:7-26:1.  Stahl also "assume[d] that low performers [at Cravath] would earn less."  Chase Decl. Ex. 6, Stahl Tr. 114:18-115:6.  Yet their Complaint alleges that Plaintiffs were victims of gender discrimination because they did not receive "Cravath scale"—including full bonuses—in years when their productivity was unacceptably low (Tolton, Henderson and Draper) and when their reviews were below average (Tolton, Henderson, Draper and Williams).[7]

---

[6] Chase Decl. Ex. 6, Stahl Tr. 111:5-19; Chase Decl. Ex. 4, Tolton Tr. 233:18-21; Chase Decl. Ex. 7, Draper Tr. 124:19-126:4; Chase Decl. Ex. 10, Henderson Tr. 153:20-154:20.

[7] In her last three full years at the Firm, Tolton recorded 1703, 616, and 430 client hours (inclusive of pro bono), respectively.  Annualizing those figures to account for her family leaves, she would have recorded only 1131 and 897 client hours in her last two full years at the Firm. Chase Decl. Ex. 11, JD_00001528 at 1529-1530.  Henderson recorded less than 1200 client hours in 2014, her first full year at the firm, and 202 hours in the remaining eighteen months of her tenure with Jones Day.  Chase Decl. Ex. 12, JD_00001506 at 1506; Chase Decl. Ex. 13, JD_02194726 at 2194741-2194758.  Draper recorded 675 client hours in 2015 (annualized 1100), 1504 in 2016, and 1199 (annualized 1593) in 2017, and a quarter of those client hours were devoted to pro bono. Chase Decl. Ex. 14, JD_00001489 at 1490.

It gets worse.  Plaintiffs also admit they knew information that *directly contradicts* their theory that men make "Cravath scale" but women do not.  Stahl regularly texted with a male associate who began his career in Irvine before transferring to the San Diego office.  The two discussed the compensation of numerous associates, including Plaintiff Andrea ("Andi") Mazingo.  Chase Decl. Ex. 15, TOLTON-003360 at 3368.  After announcement of the July 1, 2017 round of salary adjustments, Stahl initiated this exchange:



Chase Decl. Ex. 15, TOLTON-003360 at 3375.  The male associate later texted Stahl more details:

Andi told me (don't spread or tell her unless she tells you since she's all embarrassed about it now) that she's at 220 ▮▮▮▮▮▮

Chase Decl. Ex. 15, TOLTON-003360 at 003379.

These texts cannot be reconciled with the allegations in Plaintiffs' Complaint. Stahl and Mazingo both knew they were being paid more than "Cravath" base their last year at the Firm, even while male colleagues were not. Notwithstanding her disingenuous response to her male colleague's inquiry, Stahl's compensation as of July 1, 2017 was $25,000 *above* "Cravath base" whereas her male colleague received only "Cravath base" that year.[8] *See* TAC ¶ 45 (alleging $235,000 "Cravath base" and $260,000 Stahl salary); Chase Decl. Ex. 6, Stahl Tr. 168:5-17, 252:6-12, 279:10-16. Plaintiffs therefore knew the Cravath theory was a ruse.[9]

In sum, Plaintiffs had no facts that supported their illogical "Cravath" syllogism and knew facts that critically undermined it. Their counsel violated Rule 11 by nonetheless asserting these baseless allegations in the Complaint.

**B.**     In response to Jones Day's Motion for Partial Judgment on the Pleadings, Plaintiffs amended their Complaint to add a purported new basis for their pay-equity claims. Some of the

---

[8] Jones Day typically makes salary adjustments for associates effective July 1. Stahl made $25,000 above Cravath base effective July 1, 2017 even though she fell well short of her 2,000 client hours goal for the prior calendar year, including her 350+ pro bono hours. *See* TAC ¶ 45; Chase Decl. Ex. 6, Stahl Tr. 251:7-20, 373:4-375:8. Stahl would not have qualified for any bonus at many firms.

[9] Williams likewise admitted knowing of a female associate who received an above-market compensation adjustment and a male colleague who was unhappy with his compensation—both facts that further undercut the Complaint's allegation of sex-based pay disparities. Chase Decl. Ex. 3, Williams Tr. 133:7-20, 134:2-7, 134:23-135:6, 287:10-13, 344:23-345:10.

Plaintiffs alleged, "on information and belief," that certain identified male associates earned more than they did.  TAC ¶¶ 89, 165, 187, 287.  Here too, discovery has revealed that Plaintiffs had no good-faith factual basis to support those allegations, and knew facts that undercut their theory.

For example, Williams (Irvine 2013 Intellectual Property) alleged that she earned less than eight identified male associates.[10]  These associates were spread around the United States and had different levels of seniority; none worked in her practice.  Only two had ever worked in Irvine and they were 4-6 years her senior and had left the Firm before she became an associate.  Plaintiffs asserted in their supplemental opposition to the Rule 12(c) motion that these same male associates are also comparators to Mazingo (Irvine 2014 Securities Litigation and SEC Enforcement) and Stahl (Irvine 2013 Business & Tort Litigation).  Dkt. 60 at 32.  But Williams admitted that, while she affirmatively alleged that these men made more than her, *she actually had no idea what any of them earned and made no effort to discover their compensation*.  *See* Chase Decl. Ex. 3, Williams Tr. 138:9-143:10, 146:15-150:15.  Nor did she have any idea whether their work was substantially equal to her own; they were just random male associates she had met at various Firm events.  *Id.*  Mazingo, too, "had no idea what [my comparators] were making."  Chase Decl. Ex. 5, Mazingo Tr. 51:18-52:5.

---

[10] TAC ¶ 165.  Williams identified a ninth male lawyer who was hired laterally as a fourth-year associate and left one year later without ever going through a complete annual evaluation cycle (which Williams either knew or could have easily learned).  The other eight alleged comparators are identified by office, practice and graduation year in Exhibit 18 to the Declaration of Terri Chase.  The Exhibit lists compensation adjustments at comparable stages in each lawyer's career.  Year 1 is the first full calendar year of employment after law school.  Recent law school graduates typically start in late October of the prior year at the same compensation as is listed for Year 1.  Although there have been variations by office and over time, associates performing at an acceptable level typically are eligible to receive their first compensation adjustment effective January 1 of Year 2 (after 14+ months at the Firm) and a second adjustment in July of the same year.  The compensation listed for Years 3 and 4 was effective as of July 1 in each of those years.

Even assuming any of these men are legitimate comparators, the facts—had Plaintiffs bothered to investigate them— refute Plaintiffs' pay discrimination claims. *See* Chase Decl. Ex. 1 at 10. Apart from the one New York associate in the purported comparator group, and based on compensation adjustments at comparable stages in each of the lawyers' career:

- Mazingo made the same or more than the highest paid male *every* year;

- Stahl's salary increase in July of her fourth and last year put her $35,000 above the highest-paid male;

- Stahl and Williams made the same or more than all seven non-New York males as of July of their second year, and the same or more than six of the seven males in their third year;

- After receiving a below-average review in her fourth year, Williams *still* earned more than the mean male compensation for this group; and

- None of the non-New York male lawyers made what Plaintiffs characterize as "Cravath scale" (including bonuses).

Turning to Draper (in Atlanta), she testified that she "d[oes] not know what men made," and she "ha[s] no idea if there are women that are paid more than men." Chase Decl. Ex. 7, Draper Tr. 87:3-6, 137:19-24. Nonetheless, Draper identified four "comparators" whom she claimed were paid more than she was (TAC ¶ 187), although she now admits she had no knowledge about what three of them were paid. *See* Chase Decl. Ex. 7, Draper Tr. 145:15-146:13, 147:1-148:3, 148:10-149:8. As for the fourth, Draper claims he made more as a fourth year associate than she did at that point in her career. But she admits that he was four years her junior and that starting salaries had increased by $40,000 in Atlanta between 2016-2018. Draper therefore knew that fourth year compensation in 2015 could not be compared to fourth year compensation in 2019. *Id.* at 129:24-130:23, 149:9-24.

As for Tolton's single alleged comparator, a male Mergers & Acquisitions associate in Irvine, Tolton had no good-faith basis for alleging that they performed equal work. Tolton was a

11

litigator.  Her alleged comparator was a transactional lawyer.  They did not work on any remotely similar matters after their first year in the New Lawyers Group (2010-2011).  Chase Decl. Ex. 4, Tolton Tr. 405:19-406:25.  Though Tolton claims she does not recall what the male associate did after their first year at the Firm, her amnesia is a tough sell.  *Id.* at 402:5-13.  His practice group and illustrative experience are published on the Firm's website.  And the two were close enough to have attended each other's weddings; indeed, Tolton was the maid-of-honor in his wedding.  *Id.* at 317:14-318:2, 492:23-493:3.  But even putting aside their vastly different skills and experience, Tolton's productivity in her last several years at the Firm was unacceptably low and well below her purported comparator's.  In her last three full years at the Firm, she recorded 1703, 616, and 430 client hours, respectively.  Annualizing for her family leaves, she would have recorded only 1131 and 897 client hours respectively in her last two full years at the Firm.[11]  In those same years, the male associate recorded ██████████ client hours, respectively.[12]  Whether or not she knew his precise hours—and there was nothing to prevent her from inquiring—Tolton had no basis to assume that they were in the same range as her own.  Having admitted that hours should be a factor in determining compensation, Tolton had no plausible basis for asserting that the M&A associate was a comparator.  *See id.* 239:6-240:2, 402:5-13; Chase Decl. Ex. 11, JD_00001528 at 1528-1529.

---

[11]  Chase Decl. Ex. 11, JD_00001528 at 1528-1529.  After advising Tolton to seek other employment in October 2017, Jones Day continued to pay her for six months while she supposedly searched for a new job, during which time she did no client work.  In reality, Tolton had interviewed and received a job offer from her current firm before Jones Day told her to look for a new job and, thus, was holding a job offer the entire six-month period that Jones Day was paying her to look for a new job.  Chase Decl. Ex. 4, Tolton Tr. 374:8-375:9, 382:24-385:6; Chase Decl. Ex. 16, JD_00012368 at 12452-12458.

[12]  Chase Decl. Ex. 17, JD_02201923 at 2201974-2202009.

Finally, Henderson too lacked any good-faith basis for alleging that certain male associates were comparators.  She claims they worked on similar matters in 2013-2014 when they were all in the New Lawyer Group—and received identical compensation—not in later years when they joined different practices and their pay diverged.  *See* TAC ¶ 287.  And Henderson has not identified any "comparator" in *any* practice who made more than she did while performing at the same sub-standard level.  During the 18-month period when she alleges she was paid less than male peers, she billed about 200 client hours *total*—less than three hours per week.  Henderson, like Tolton, was entitled to equal pay for *equal* work, not equal pay for *no* work.

*           *           *

Discovery has exposed that Plaintiffs' counsel knew there was no factual basis to allege systemic sex-based pay discrimination at Jones Day.  Their principal theory of the case—that the proof of discrimination is the fact that Plaintiffs did not earn "Cravath scale"—was sophistry on its own terms.  And, to make matters worse, Plaintiffs knew facts that contradicted their theory and knew no facts that supported it.  As for the "comparators," Plaintiffs had no good-faith basis to believe they were paid more for equal work.  Counsel's willingness to file the Complaint without a factual basis and in the face of facts that contradicted the allegations warrants sanctions.

## II.    PLAINTIFFS AND THEIR COUNSEL FAILED TO CONDUCT ANY INVESTIGATION.

In addition to ignoring inconvenient facts, Plaintiffs and their counsel failed to perform a basic investigation into the claims of pay inequity.  That failure is a separate reason for sanctions. *See Hilton Hotels*, 899 F.2d at 42-43.

**A.**    Plaintiffs have confirmed that they did not conduct any investigation of their pay claims prior to filing suit.  Draper's admission stands out.  When asked about her investigation efforts, Draper testified that she did not "have any insight into what male counterparts were making at the firm" and "did not specifically ask them."  Chase Decl. Ex. 7, Draper Tr. 140:12-23; *see*

13

*also id.* at 138:24-139:7.  In fact, Draper and her counsel failed to confirm Draper's *own* compensation before filing the Complaint, which grossly understated her compensation, in some years by as much as $30,000.[13]  Draper admitted that she did not bother to look at her bank records or tax returns before alleging her own compensation.  *Id.* at 113:2:115-18, 187:10-15, 192:2-4.  It is deeply troubling that officers of the court would sign a pleading containing significant misrepresentations of material facts within their own control.

Other Plaintiffs too admit they did not investigate whether there was any basis for their claims.  When asked whether she had "been in touch with any Jones Day associate to ask them what they had made at Jones Day," Stahl could muster no more than: "Not that I specifically recall."  Chase Decl. Ex. 6, Stahl Tr. 262:21-263:8.  Pressed to identify any "research [she] did [] to support that statement that the individuals in paragraph 165 [of the TAC] earned market salaries," Williams admitted: "I did not conduct research into their salaries."  Chase Decl. Ex. 3, Williams Tr. 140:21-141:2.  When asked whether she had "contacted any of them since they've left Jones Day to inquire of them how much money they made while at Jones Day," Williams responded:  "No, that would be a bit of an awkward way to reconnect."  *Id.* at 140:7-12.  But apparently not too awkward to make up facts about them in a publicly filed complaint.

    **B.**    Plaintiffs cannot justify their failure to investigate on the grounds of the Firm's purported "pay secrecy" policy.  This is not a case where information is solely in the defendant's possession.  *See Hedgeye*, 2019 WL 4750243, at *13.  Notwithstanding sanctimonious speeches about their strict adherence to confidentiality, Plaintiffs admitted that they regularly discussed compensation with colleagues—without any repercussions:

---

[13] Chase Decl. Ex. 7, Draper Tr. 187:25-188:14 (admits understating compensation for 2013-2014), 189:6-23 (admits understating compensation for 2015-2016), 189:24-190:15 (admits understating compensation for 2016-2017).

- Williams discussed pay with associates Smith, Rothenberg, Mazingo, Stahl, Tolton, and Stover.  Chase Decl. Ex. 3, Williams Tr. 57:12-58:2, 58:17-59:6, 133:7-20, 134:2-7, 134:23-135:6, 301:14-302:18, 303:6-17, 304:2-14, 304:25-305:6, 333:5-18, 341:14-23, 342:16-343:5.

- Mazingo discussed compensation with associates █████ Stahl, and Williams.  Chase Decl. Ex. 5, Mazingo Tr. 42:19-43:11, 277:18-279:4.

- Stahl repeatedly texted with associate █████ about the compensation of other colleagues, including Heyrani, Williams, Mazingo, and their mutual "peeps" at Jones Day.  Chase Decl. Ex. 15, TOLTON-003360 at 3368-80.   While Stahl initially asserted that she discussed compensation only "with some associates [she] considered close friends," she later admitted that she also "reach[ed] out to more people to try and determine what the pay was." Chase Decl. Ex. 6, Stahl Tr. 144:17-21, 274:2-15.

- Draper discussed compensation with several male and female associates, including M. Rooks, W. Rooks, Weizenecker, and N. Williams.  Chase Decl. Ex. 7, Draper Tr. 127:8-131:7, 131:8-133:16, 133:17-134:2.

- Tolton discussed compensation with Stover and was aware of other associates that were going out to lunch where they discussed their salaries.  Chase Decl. Ex. 4, Tolton Tr. 240:21-241:7, 251:4-25.

In addition, Draper, Mazingo, and Stahl admitted that information was publicly available on *Above the Law* and from other media sources.  Chase Decl. Ex. 5, Mazingo Tr. 156:8-18; Chase Decl. Ex. 6, Stahl Tr. 75:16-25, 77:12-78:7; Chase Decl. Ex. 7, Draper Tr. 115:23-116:6.  Of course, Plaintiffs' Complaint does not allege or even acknowledge the facts that emerged from these discussions, because they undermined Plaintiffs' claims.

Moreover, Plaintiffs and nearly all of their so-called comparators have long since left Jones Day.  No alleged Firm policy could conceivably forbid Plaintiffs from investigating their claims about the compensation of these departed lawyers.  Indeed, Williams testified that, after she left Jones Day, she discussed her compensation with a former male colleague.  Chase Decl. Ex. 3, Williams Tr. 287:23-288:15, 289:8-22, 291:16-25.  Similarly, no policy could have precluded Plaintiffs' *counsel* from contacting the alleged comparators, for example, to determine whether there was a good-faith basis for claiming that they were paid more than Plaintiffs for equal work.

Instead, counsel "fire[d] shots into the proverbial dark," making a host of baseless allegations which Plaintiffs then touted in the media in a (largely unsuccessful) effort to drum up new plaintiffs. *Bletas v. Deluca*, 2011 WL 13130879, at *10 (S.D.N.Y. Nov. 15, 2011).

*          *          *

Plaintiffs' counsel violated Rule 11 in filing the original Complaint and every iteration after.  There was no good-faith factual support for the allegation that Plaintiffs themselves, much less all female associates nationwide, were discriminated against in pay.  Plaintiffs, in fact, knew information that directly refuted their claims.  As a sanction for this misconduct, the Court should dismiss Plaintiffs' claims that are based on the allegation that Jones Day paid women less than men, and award Jones Day its costs and fees to litigate this motion.

<h2 style="text-align:center"><u>CONCLUSION</u></h2>

For these reasons, the Court should grant Jones Day's Motion for Rule 11 Sanctions.

December 6, 2019                          Respectfully submitted,

                                         /s/ Mary Ellen Powers
                                         Mary Ellen Powers (Bar No. 334045)
                                         Beth Heifetz (Bar No. 417199)
                                         Yaakov Roth (Bar No. 995090)
                                         JONES DAY
                                         51 Louisiana Avenue NW
                                         Washington, DC 20001
                                         Phone: (202) 879-3939


                                         Terri L. Chase (*pro hac vice* granted)
                                         JONES DAY
                                         250 Vesey Street
                                         New York, NY 10281
                                         Phone: (212) 326-3939

                                         *Attorneys for Defendant*

16