# EXHIBIT 3

1          M. Williams - Confidential

2      IN THE UNITED STATES DISTRICT COURT

3        FOR THE DISTRICT OF COLUMBIA

4         Civil Action No. 1:19-00945-RDM

5    ----------------------------X

6    NILAB RAHYAR TOLTON, et al.,

7                     Plaintiffs.

8          v.

9    JONES DAY,

10                   Defendant.

11   ----------------------------X

12          VIDEOTAPED DEPOSITION OF

13           MEREDITH L. WILLIAMS

14

15          Washington, D.C.

16          October 1, 2019

17           10:05 a.m.

18

19

20   Reported by:

21     Karen Brynteson, RMR, CRR, FAPR

22

     Job No. 168045

23

24

25

1          M. Williams - Confidential

12      Q.    Did you ever tell Justin Smith

13  what you were making at Jones Day?

14      A.    I know for sure I did when I

15  received my last -- my last bump in

16  compensation.

17      Q.    In 2017, you told Justin Smith

18  what you were making at Jones Day; is

19  that correct?

20      A.    I did, in violation of the

21  firm's pay secrecy policies.

22      Q.    Prior to that time, had you

23  ever told him how much you were making?

24      A.    I may have told him directly

25  or I may have been a bit more vague about

1          M. Williams - Confidential

2      it with the 2015 offer.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17      know.  To the best of my

18      recollection at this time, I

19      discussed my compensation with

20      Justin Smith in 2015.  I do not

21      recall the level of detail I gave

22      him in terms of receiving an offer

23      at ▮▮▮▮▮ in salary plus

24      potential bonuses compared to my

25      then salary, I believe, was

Page 59

1          M. Williams - Confidential

2     $185,000 with no potential for

3     bonuses.

4          I may have just conveyed to

5     him the difference, and I believe

6     he opined that it was a good offer.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     M. Williams - Confidential

2

3

4

5

6

7

8

9

10

11          So just sort of combining

12     Jones Day's representation that top

13     performing candidates are making

14     market, neither myself nor any of

15     the women I know are making market,

16     I have to assume that Jones Day's

17     representation was truthful and

18     someone is making market, and I

19     would understand that that would be

20     the male associates.

21

22

23

24

25

1          M. Williams - Confidential



12      A.     I do not have an understanding

13  of Cravath's pay structure.

Page 133

1          M. Williams - Confidential



7          Q.    Other than the named

8    plaintiffs, do you know the salary made

9    by any Jones Day associate at any point

10   in time?

11        A.    I believe ████████████████

12   I hope -- I probably said that awkwardly,

13   █████████████████████████████████████

14   ████████, I believe she was going to

15   receive above-market compensation before

16   ████████████████████████████████

     ███████████

18        Q.    And just for the record, is

19   ████████████████████████████████████?

20        A.    Yes.

1          M. Williams - Confidential

2          Q.     And how did you come to have

3     the understanding that she was going to

4     receive above-market compensation before

5     she had to leave the firm ███████████

6     ██████?

7          A.     Through talking with her.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23          Q.     Did ███████ tell you how much

24     her salary was at that time of the

25     conversation?

1          M. Williams - Confidential

2      A.    I don't recall.  For some

3  reason I think -- I think it might have

4  been a pay increase, salary increase in

5  the 20,000 range to 30,000 range, but I

6  don't recall particular number.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    M. Williams - Confidential

2

3

4

5

6

7

8

9        Q.    And I'm not asking for

10   anything outside the scope of your

11   knowledge.  I'm not asking for a legal

12   conclusion.  I'm asking you to tell me

13   every Jones Day associate who you believe

14   made -- while at Jones Day, made Cravath

15   scale.

16            MS. MUETING:  Same objection.

17            THE WITNESS:  So the

18        associates I know of, I believe,

19        are named in here somewhere as

20        comparators.  And those were

21        gentlemen I met at the firm-wide

22        trainings in D.C. and Cleveland and

23        Los Angeles.  I think the -- I

24        think the motions training was in

25        Cleveland.  I think the depositions

1      M. Williams - Confidential

2      training was definitely here.  I

3      think there was an expert

4      deposition training and maybe

5      another training in Los Angeles.

6           It would take me a minute to

7      locate those, unless you know

8      where.

9  BY MS. CHASE:

10      Q.   Sure.  I can point you there.

11  Paragraph 165 of the third amended

12  complaint.  And why don't we just --

13  unless you're still answering it, I'll

14  ask you about them.

15      A.   So, yeah, these are the names

16  of the associates who I believe, based on

17  everything I've testified to before, were

18  paid at the Cravath market scale.

19      Q.   And did any of the individuals

20  identified in paragraph 165 tell you at

21  any point in time how much money they

22  made at Jones Day?

23      A.   I did not discuss compensation

24  with these associates.  I would have

25  understood that to be a violation of the

1          M. Williams - Confidential

2     firm's pay secrecy policy.

3          Q.    Do you know if any of these

4     associates have left Jones Day?

5          A.    I believe a number of them

6     have.

7          Q.    And have you contacted any of

8     them since they've left Jones Day to

9     inquire of them how much money they made

10    while at Jones Day?

11         A.    No, that would be a bit of an

12    awkward way to reconnect.

13         Q.    And so when you -- in turning

14    to paragraph 165, the first sentence

15    reads, "Ms. Williams also did not earn as

16    much as her male comparators at Jones Day

17    who, upon information and belief, earned

18    market salaries, despite the fact that

19    they were in jobs requiring substantially

20    equal work."

21              What research did you do to

22    support that statement that the

23    individuals in paragraph 165 earned

24    market salaries?

25         A.    I did not conduct research

1          M. Williams - Confidential

2     into their salaries.  The information and

3     belief referred to here is my

4     understanding that we all started at

5     Jones Day at the same time, we were in

6     litigation generally and so performing a

7     lot of the same types of tasks, drafting

8     and responding to discovery, preparing

9     witnesses for deposition, taking

10    depositions, defending depositions,

11    researching, drafting motions, all the

12    same sort of stuff, and that information

13    and belief is also reinforced by the fact

14    that I met these gentlemen at and saw

15    them at some of the firm-wide trainings

16    where we were learning here how to take a

17    deposition, how to defend a deposition,

18    so I understood we were performing

19    similar work.

20               And then that understanding,

21    combined with the firm's marketing

22    recruitment pitch that I had been

23    informed to provide, that, you know, we

24    pay top of market, understood

25    synonymously with Cravath scale to top

1      M. Williams - Confidential

2  performers, I knew I was not paid top of

3  market, so I assumed someone in my class

4  was.

5      Q.    So your --

6      A.    To be able to make that

7  representation to incoming law students.

8      Q.    Your assertion in this

9  paragraph upon information and belief

10  that these gentlemen earned market

11  salaries was based upon an assumption

12  that someone in the firm must be earning

13  market salaries; is that right?

14      A.    It's based on my assumption

15  that Jones Day did not misrepresent that

16  it pays market to top performers.

17      Q.    And what --

18      A.    I assumed someone must have

19  been in the top-performing category.

20      Q.    And upon what basis do you

21  allege that these gentlemen in paragraph

22  165 earned market salary?

23          MS. MUETING:  Objection, asked

24      and answered.

25          THE WITNESS:  It's an

1        M. Williams - Confidential

2    allegation on information and

3    belief.  I believe -- you know,

4    compensation was confidential the

5    entire time I was here, so I would

6    have no other access to that

7    information.

8        But I believe Jones Day has

9    access to that information, and so

10   it can respond to it.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M. Williams - Confidential

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          Did you do any fact-finding to

16     ascertain how much money Steve Gerson

17     made at any point in time while at Jones

18     Day?

19          MS. MUETING:  Objection,

20        argumentative.  Asked and answered.

21          THE WITNESS:  I reviewed the

22        training manuals that I received

23        from Jones Day in connection with

24        trainings.  I recalled meeting

25        these gentlemen there.  I did not

1         M. Williams - Confidential

2         discuss compensation with them at

3         any point because that would have

4         been a violation of the firm's pay

5         secrecy policies.

6              If there's no way for me to

7         find out that information, I don't

8         understand why you are shaming me

9         for not finding out that

10        information.

11   BY MS. CHASE:

12        Q.    I'm not shaming you.  I'm

13   expecting you do some research as a

14   lawyer before you put a factual

15   allegation in a complaint that you have

16   no basis for knowledge.  And so the

17   question I have for you is, did you ever

18   ask them if they made market, any one of

19   these men?  At any point in time while

20   you were at the firm or since then, did

21   you do anything to ask them if they made

22   market?

23             MS. MUETING:  Objection,

24        argumentative, asked and answered,

25        compound.

1               M. Williams - Confidential

2               THE WITNESS:  I understood

3         from the firm's representation that

4         top performers make market.  And my

5         knowledge that none of the women I

6         knew of were making market, I

7         assumed, yes, that some of these

8         men were making market.

9               Did I discuss their

10        compensation with them?  No.  That

11        would have been a violation of the

12        firm's pay secrecy policy.

13   BY MS. CHASE:

14        Q.    So it wasn't a violation to

15   discuss with the women whether they were

16   making market, but it was going to be a

17   violation to ask the men if they were

18   making market; is that right?

19        A.    I discussed with the women in

20   this lawsuit in relation to this lawsuit.

21        Q.    You just previously testified

22   that you discussed with ███████ that she

23   was going to be making above market,

24   correct?

25        A.    ███████ was not very concerned

Page 149

1          M. Williams - Confidential

2    with violating the firm's policies at the

3    point she left.

4          Q.    And you never discussed with

5    any of these men whether they were making

6    market at any point; is that right?

7               MS. MUETING:   Same objections.

8               THE WITNESS:   No, I did not.

9          I assume Jones Day knows what they

10              were making, so if this information

11              and belief --

12   BY MS. CHASE:

13         Q.    I'm -- this is not Jones Day's

14   complaint.   This is your complaint.

15   You're the person who put in this

16   complaint that these individuals earn

17   market salaries.   So I am entitled to ask

18   you what knowledge you have before you

19   put that in a federal complaint.

20         A.    It's alleged --

21              MS. MUETING:   Hold up a

22              second.   I'm going to let the

23              record reflect that counsel has

24              interrupted the witness.   I'm going

25              to object on the basis of badgering

1          M. Williams - Confidential

2          the witness, argumentative, and

3          asked and answered.  Go ahead.

4               THE WITNESS:  This is an

5          allegation based on information and

6          belief.  I believe the third

7          amended complaint is full of other

8          facts, not all of which I had

9          access to individually during my

10         time at Jones Day, but this is

11         alleged truthfully on information

12         and belief to the best of my

13         knowledge and based on the

14         experience of other female

15         attorneys at Jones Day.

16

17

18

19

20

21

22

23

24

25

1          M. Williams - Confidential



25          Q.     And do you have any basis to

1          M. Williams - Confidential

2     assert that there were no women at the

3     firm that were paid at the Cravath scale?

4          A.    I don't have personal

5     knowledge of women at the firm being paid

6     Cravath scale.

7               I do have personal knowledge

8     of women at the firm not being paid at

9     the Cravath scale.

10         Q.    And you don't have any

11    personal knowledge of any men at the firm

12    being paid at the Cravath scale either,

13    do you?

14         A.    I don't have knowledge one way

15    or the other beyond what I testified to

16    earlier.



1        M. Williams - Confidential



10        Q.    Did ▮▮▮▮ tell you he was

11   unhappy with the compensation he was

12   receiving from Jones Day?

13        A.    He may have.  I don't recall.

23        Q.    Ms. William, you have just

24   been handed what has been marked as

25   Williams Deposition Exhibit 22.  It is

1          M. Williams - Confidential

2     Bates stamped Tolton 2328 through 2331.

3     I ask you to take a look at this document

4     and tell me if you recognize it?

5          A.    I recognize this as text

6     messages with ███████

7          Q.    And do you know the date of

8     these text messages?

9          A.    The first one, which appears

10    to be the last page, starts with June

11    19th, 2018.  And that is ██████ texting me

12    around 4:14 on that date.

13         Q.    And on June 19th of 2018, were

14    you employed at Jones Day?

15         A.    I was not.

16

17

18

19

20

21

22

23

24

25

1          M. Williams - Confidential

8          Q.    And so the text on June 19th

9     was ▮▮▮▮▮ reaching out to you asking you,

10    "are you open to sharing what your JD

11    letter was for last year;" is that

12    correct?

13         A.    Yes.

14         Q.    And he writes, "just got my

15    letter for this year and since we have

16    less of us to compare to, looking for

17    additional data points."  Correct?

18         A.    Yes, that's what he wrote

19    here.

20         Q.    And did you respond to him and

21    tell him that you got 215?

22         A.    I did.

1        M. Williams - Confidential

16        Q.    And in this exchange with

17 ■■■■, you shared the comp number, right?

18        A.    I did.

19        Q.    And so after leaving the firm,

20 you were comfortable sharing your comp

21 number with ■■■■, right?  The pay

22 secrecy policy didn't stop you from

23 sharing your comp number, did it?

24        A.    I was comfortable sharing it

25 with him based on his asking.

1      M. Williams - Confidential

14           You received a salary increase

15     letter in 2017 that you were unhappy

16     with, correct?

17          A.     That is correct.

18          Q.     And you have testified already

19     about conversations with Ann and a text

20     exchange with ███████

21          A.     Correct.

22          Q.     Were there other associates

23     that you communicated with about your

24     compensation from 2017?

25          A.     Yes.   I believe I mentioned I

Page 302

1          M. Williams - Confidential

2      spoke with Justin Smith.

3          Q.    And what did you and Justin

4      Smith discuss with respect to your 2017

5      compensation letter?

6          A.    If I recall correctly, I went

7      into his office, closed the door, and

8      expressed that I was not happy with my

9      increase in salary, did not understand

10     it, but understood it as a signal that I

11     would be unreasonable to stay.

12         Q.    And what if anything did

13     Justin say in response?

14         A.    I recall him agreeing with me.

15     I don't know if at that time he provided

16     any additional information or encouraged

17     me to talk with recruiters or what else

18     he may have discussed.



M. Williams - Confidential

6   Q.   And when you said that Justin

7 agreed with you, what did he say that

8 indicated to you that he was agreeing

9 with your statements?

10   A.   I conveyed the amount and that

11 I didn't think -- I think it made the

12 most sense for me to look for employment

13 elsewhere, and he agreed with that.  He

14 did not say:  No, that's a reasonable

15 amount or that's what I received or

16 anything else to indicate that 215 for my

17 year made sense.

1          M. Williams - Confidential

2          Q.    And other than Justin, did you

3    speak to anyone else about, amongst the

4    associates, about your dissatisfaction

5    with the salary increase letter that you

6    received?

7          A.    I think I must have spoken

8    with Michelle Stover about it at some

9    point.  She was no longer at Jones Day at

10   that point, so I don't know if I got into

11   the specifics of the numbers, but I

12   definitely spoke with her about

13   potentially making a move to another

14   firm.



25         Q.    Okay.  Did you talk to Nilab

1          M. Williams - Confidential

2    about your compensation?

3          A.    I think I may have, but I

4    don't recall a specific conversation

5    immediately around that time.  I think

6    later on we might have texted about it.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           M. Williams - Confidential

5          Q.    Ms. Williams, you have been

6    handed a one-page document marked

7    Williams Deposition Exhibit 28.  It is

8    Bates stamped Tolton 2311.

9             I ask you to take a look at

10   this document and tell me if you

11   recognize it?

12         A.    I do.

13         Q.    And is this an e-mail that at

14   the bottom of the document appears to be

15   an e-mail that you wrote on July 20th to

16   Nilab; is that correct?

17         A.    Yes, that's what it appears to

18   be.

1          M. Williams - Confidential

14          Q.    When you were having this
15     exchange with Nilab, did you tell her the
16     number that you had been increased to?
17          A.    I don't see that here.   I
18     don't know if I had shared the number I
19     was at with Nilab.
20          Q.    And when you write "so a
21     $10,000 raise and ending up $20,000 under
22     Cravath" --
23          A.    There, yeah.

1          M. Williams - Confidential

16       Q.    And do you know if any

17    associate in Jones Day's Irvine office

18    was making the amount that you believed

19    Cravath was paying in July of 2017?

20       A.    I think at some point, and I

21    don't know when it was, I found out that

22    Jaclyn had been put at the salary for

23    Cravath but not making a bonus in

24    addition to that salary.

25       Q.    So at some point you learned

1          M. Williams - Confidential

2     that Jaclyn was making the salary for

3     Cravath, correct?

4          A.    Yes, which I understood, I

5     believe at this point to be 235.

Page 344

1        M. Williams - Confidential



1        M. Williams - Confidential



## CALIFORNIA JURAT WITH AFFIANT STATEMENT     GOVERNMENT CODE § 8202

☒ See Attached Document (Notary to cross out lines 1-6 below)
☐ See Statement Below (Lines 1-6 to be completed only by document signer(s), *not* Notary)

1. _____
2. _____
3. _____
4. _____
5. _____
6. _____

Signature of Document Signer No. 1          Signature of Document Signer No. 2 (if any)

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of California        )
                           ) ss.
County of Orange           )

Subscribed and sworn to (or affirmed) before me on this 18th day of November, 2019, by

Meredith L. Williams, aka Meredith L. Sivakumar ,

Name(s) of Signer(s)

**DEBORAH E. CORWIN**
Commission # 2141275
Notary Public - California
Orange County
My Comm. Expires Feb 28, 2020

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____

Signature of Notary Public

Seal
Place Notary Seal Above

━━━━ *OPTIONAL* ━━━━

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document:  Transcript of the Deposition of Meredith Williams Taken on October 1, 2019 – Tolton v. Jones Day, USDC District of Columbia, Civil Action No. 1:19-00945-RDM

Number of Pages:  473     Signer(s) Other Than Named Above:  none

1        M. Williams - Confidential

2   STATE OF _California_ )

3                          )  :ss

4   COUNTY OF _Orange_ )

5

6

7        I, Meredith Williams, the

8   witness herein, having read the

9   foregoing testimony of the pages of

10  this deposition, do hereby certify it

11  to be a true and correct transcript,

12  subject to the corrections, if any,

13  shown on the attached page.

14

15

16  _Meredith Williams a/k/a Meredith Sivakumar_

17    MEREDITH WILLIAMS

18

19

20  Sworn and subscribed to before me

21  this _____ day of _____,

22  2019.

23

24  _____

25        Notary Public

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NILAB RAHYAR TOLTON *et al.*, *on behalf of themselves and all others similarly situated*,<br><br>　　　　*Plaintiffs,*<br><br>　　v.<br><br>JONES DAY, a General Partnership,<br><br>　　　　*Defendant.* | Civil Action No. 19-945 (RDM) |

**DEPOSITION TRANSCRIPT OF MEREDITH WILLIAMS (10/01/2019) ERRATA**

| Page | Line | Change From | Change To | Reason (e.g. misspelling, transcription error) |
|---|---|---|---|---|
| | | | | |



| 287 | 23 | Ms. William | Ms. Williams | Misspelling |

_Meredith Sivakumar_  _11/11/2019_
SIVAKUMAR
**MEREDITH ~~WILLIAMS~~**          **DATE**

Subscribed and sworn to before me this _____ day of _____, 20____.

My commission expires: _____

_____    See Attached Document ⟞⟨
**Notary Public**

# CALIFORNIA JURAT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document, to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA  }

COUNTY OF __Orange__  }

Subscribed and sworn to (or affirmed) before me on this __11th__ day of __November__, __2019__
                                     Date                  Month          Year

by __Meredith Siva Kumar__

_____
Name of Signers

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature: _Erik Sanchez_

_Signature of Notary Public_

ERIK SANCHEZ
COMM...2170922
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Term Exp. November 6, 2020

Seal
Place Notary Seal Above

------------------------------------------------ OPTIONAL ------------------------------------------------
_Though this section is optional, completing this information can deter alteration of the document or fraudulent attachment of this form to an unintended document._

**Description of Attached Document**
Title or Type of Document:_____

Document Date:_____

Number of Pages:_____

Signer(s) Other Than Named Above:_____