# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NILAB RAHYAR TOLTON, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Civ. No. 1:19-00945 (RDM) |
| | ) | |
| *v.* | ) | |
| | ) | **REPLY IN SUPPORT OF** |
| JONES DAY, | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **RULE 11 SANCTIONS** |
| *Defendant.* | ) | |

Mary Ellen Powers (Bar No. 334045)
Beth Heifetz (Bar No. 417199)
Yaakov Roth (Bar No. 995090)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

Terri L. Chase (*pro hac vice* granted)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.      PLAINTIFFS' COUNSEL DELIBERATELY IGNORED FACTS THAT CONTRADICTED THE PAY EQUITY CLAIMS AND FAILED TO PERFORM ANY REASONABLE INVESTIGATION ......... 3

II.     EVEN ON THEIR OWN TERMS, PLAINTIFFS' CIRCUMSTANTIAL BASES FOR SUSPECTING PAY INEQUITY ARE UNREASONABLE. ........................................................... 11

CONCLUSION ................................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Garr v. U.S. Healthcare, Inc.*,
  22 F.3d 1274 (3d Cir. 1994)......................................................................7

*\*Hedgeye Risk Management, LLC v. Heldman*,
  2019 WL 4750243 (D.D.C. Sept. 29, 2019) ....................................................10, 11

*Hedgeye Risk Mgmt., LLC v. Heldman*,
  1:16-cv-935, Dkt. 118 (Opposition to Rule 11 Motion, filed July 26, 2018) ........................10

*Hein v. Ore. Coll. of Educ.*,
  718 F.2d 910 (9th Cir. 1983) ...................................................................8

*Heymann v. Tetra Plastics Corp.*,
  640 F.2d 115 (8th Cir. 1981) ...................................................................8

*Hilton Hotels Corp. v. Banov*,
  899 F.2d 40 (D.C. Cir. 1990)...................................................................9

*Meadow Ltd. P'ship v. Heritage Sav. & Loan Assoc.*,
  118 F.R.D. 432 (E.D. Va. 1987) ...............................................................9

*Nassau-Suffolk Ice Cream, Inc. v. Integrated Res., Inc.*,
  118 F.R.D. 45 (S.D.N.Y. 1987) ...............................................................9

*Sowell v. Alumina Ceramics, Inc.*,
  251 F.3d 678 (8th Cir. 2001) ..................................................................8

**OTHER AUTHORITIES**

BTI Consulting Group, *The All-New BTI Client Service A-Team 2020 Survey of
  Law Firm Client Service Performance,* at https://tinyurl.com/vot4wg6.................................18

*Jones Day Celebrates International Women's Day* (Mar. 2019), at
  https://tinyurl.com/vn939nc ...................................................................17

*Jones Day Ranked #1 in BTI Client Service A-Team Report for Fourth
  Consecutive Year* (Dec. 2019), at https://tinyurl.com/yx68cwqp ............................................18

**INTRODUCTION**

Seeking sanctions is not something that Jones Day takes lightly.  But neither is being falsely and baselessly accused of systemic pay discrimination.  Even still, had the Firm's only objection been the speculative, attenuated, and often illogical inferences that Plaintiffs now claim they drew to justify their allegation of nationwide gender-based pay inequity, the Firm would have contented itself with moving for judgment on the pleadings as a matter of law and, if necessary, refuting the allegation in discovery as a matter of fact.

Jones Day quickly learned, however, that this was not just a case of mistaken, good-faith beliefs based on limited information.  Plaintiffs knew far more than they let on in their pleadings— and the facts they knew *contradicted* the inference that they claim to have indirectly drawn from Plaintiffs' perceptions (from their limited vantage point) about the Firm's "culture," its evaluation process, and its long-held belief that publicizing individual lawyers' compensation interferes with client service.  While Plaintiffs continue to maintain that those sorts of observations allowed them to reasonably *suspect* that the Firm paid male associates more than female associates, they *knew* that Mazingo earned more than the two men in her office and class.  They *knew* that Stahl, too, earned more than the male colleagues in California with whom she had discussed compensation. They *knew* they could not identify any men in Irvine and Atlanta who were earning full "Cravath" pay (including bonus).  And they *knew* that the few male "comparators" they identified were bogus.

Despite knowing these facts, Plaintiffs did not revisit the viability of their "inference" that the Firm discriminates against female associates in pay.  Nor did they even *investigate* the matter, such as by inquiring with former associates (even those former associates whom Plaintiffs named in their Complaint, admittedly at random, as their comparators).  Instead, Plaintiffs pressed ahead, baldly alleged that the Firm was engaged in a nationwide practice of sex-based pay discrimination, and simply omitted from their pleadings all of the inconvenient facts that showed otherwise.

1

Rule 11 does not permit that ostrich tactic.  It is one thing, as Plaintiffs say, to see a person with a wet umbrella and allege, in good faith, that it was raining outside.  Dkt. 88 at 23.  It is another thing to see the wet umbrella, look out the window at a dry sidewalk and sunny blue sky, and then allege rain anyway, without so much as asking: "hey, how did your umbrella get wet?"

This Court should impose sanctions.  Not because Plaintiffs' allegations are insufficient to state a claim (although they are).  And not because Plaintiffs will be unable to prove their claims in discovery (although they will be).  Rather, sanctions are appropriate because Plaintiffs' counsel employed flawed and flimsy inferences to make very serious allegations in the face of known, contradictory facts, without conducting the most basic investigation into whether their inferences were warranted.  Nothing in Plaintiffs' opposition explains away those ethical lapses.

## **ARGUMENT**

Plaintiffs argue that their claims are not sanctionable because they had various indirect, circumstantial grounds for suspecting that Jones Day systemically discriminates against women in compensation.  Even if those grounds could theoretically provide a basis for a (strained) inference to that effect, however, Plaintiffs ignore the critical point: They knew facts that showed the inference was false.  Asserting that inference despite (and without acknowledging) those facts, and without first conducting an investigation into the truth of the allegations, violated Rule 11.

To be clear, each of Plaintiffs' "six independent bases" is also badly flawed on its own terms.  They point to a handful of isolated, allegedly gendered interactions with associates, partners, and clients who had no role in determining their pay.  They say that disparate pay can be inferred from disparate reviews—but have no basis to allege the latter, especially as most Plaintiffs allege that they received *positive* reviews.  They belatedly seek to draw an inference from partner promotion rates—but they cite *worldwide* and stale promotion rates, while *more than half* of the Jones Day lawyers promoted to partner in the U.S. over the last three years (the most relevant

years) were women, well beating industry averages.  Plaintiffs repeat their "Cravath" syllogism—but ignore its obvious logical holes, as well as the contradictory facts Plaintiffs knew.  Plaintiffs also purport to identify comparators, but when they were presented with the pay data for their own, hand-picked comparators—data that contradicts their allegations—Plaintiffs nonetheless doubled-down, accusing *Jones Day* of "cherry-picking."  Yet their own Exhibit I puts the lie to any claim of systemic discrimination, as Mazingo and Stahl—the only two Plaintiffs who were performing satisfactorily—were among the highest paid lawyers on the list outside of New York.  Finally, Plaintiffs point to the Firm's longstanding belief that publicizing individual lawyer compensation will interfere with client service—a value that some Plaintiffs admit *drew them* to Jones Day, and that in no way is suggestive of sex discrimination in pay.  None of this remotely justifies a belief that the Firm systemically pays women less than men.  But it certainly cannot justify such a good-faith belief in view of the *actual facts about pay* that Plaintiffs knew from the outset.

I.     **PLAINTIFFS' COUNSEL DELIBERATELY IGNORED FACTS THAT CONTRADICTED THE PAY EQUITY CLAIMS AND FAILED TO PERFORM ANY REASONABLE INVESTIGATION.**

A.     Assume *arguendo* that Plaintiffs could reasonably have suspected—based on their observations of the Firm's culture, evaluation process, and confidentiality policy—that female associates were systematically paid less than men.  *But see* Part II, *infra*.  Before alleging that suspicion as truth, any reasonable plaintiff or counsel would, at minimum, consider whether the suspicion was consistent with *the known facts* about associate pay.  Rule 11 requires no less.

Plaintiffs complain about their lack of access to comprehensive pay data.  Dkt. 88 at 36-37.  But they (and thus their counsel) did have access, as it turns out, to a number of data points about associate pay—all of which refuted their supposed "inferences" and "suspicions":

- Mazingo was the "big winner" and the "outlier of [her] class" in her final year at the Firm, earning more than the male colleagues who started with her in Irvine.  *See* Dkt. 93-16 at 9, 12-13.

- The prior year, Mazingo and her two male counterparts in Irvine had all earned the same salary.  *See id.* at 2.

- Stahl, too, knew that she earned $25,000 above the Cravath base in her last year at the Firm while her male colleagues in California did not.  *See id.* at 9.

- The prior year, Stahl reported that she and her "peeps" in another California office were all being paid the same amount.  *See id.* at 2.

- Stahl commented privately to another associate about "how underpaid" one of her *male* colleagues was.  *See id.* at 6.

- Williams knew of a female associate in Irvine who received an above-market pay adjustment, but did not know of any men in that position.  Dkt. 93-4 at 8-10, 24, 37-38 (Williams Tr. 133:7-20, 134:2-7, 134:23-135:6, 287:10-13, 344:23-345:10).

- Draper knew that another *female* litigation associate in her class year in Atlanta was earning up to $40,000 more than Draper, undermining any notion that Draper's low pay was the result of her sex.  *See* Dkt. 93-8 at 15 (Draper Tr. 131:8-16).

- According to Draper, she secretly recorded Yvette McGee Brown, the Partner-in-Charge of Diversity, Inclusion & Advancement, advising that she had "not seen any gender disparity with regard to how associates are paid."  Dkt. 88-11 at 3; Second Chase Decl. Ex. 11 at 5-6 (Draper Tr. 423:20-424:18).

In light of those known facts—which Plaintiffs continue to ignore in their opposition—Plaintiffs' counsel violated Rule 11 by nevertheless alleging systemic sex-based discrimination in pay.  Whatever attenuated grounds Plaintiffs might have had to suspect such a thing, one cannot cling to a hypothesis after the facts prove it wrong.  Doing so is sanctionable.

**B.**     Plaintiffs claim that some other known data points *confirmed* their suspicions.  But these arguments are likewise facially refuted by facts that Plaintiffs knew but declined to mention.

First is the fact that Plaintiffs did not earn Cravath salary-plus-full-bonus, which they define as "market" compensation nationwide.  Plaintiffs say this "gap between what Plaintiffs were told associates were paid and what they observed high performing female associates being paid" generated an inference that Jones Day "pays male associates more than their female counterparts based on gender."  Dkt. 88 at 25.  This inference is nonsensical and Plaintiffs knew it:

4

- Plaintiffs knew from Firm guidance that associate compensation is not "uniform across all geographic markets" but instead is based on (among other things) "local market conditions." Dkt. 93-9 at 3 (Firm Manual).

- Plaintiffs knew that even first-year starting salaries did not equal Cravath's starting salary in all Jones Day offices. Dkt. 41 at 14 (TAC ¶ 45). Draper accepted a job in Atlanta at a salary that was well below even the Cravath *base*. *See id.*

- Plaintiffs knew that multiple male associates in California were earning only Cravath base (not bonus), for the two years relevant to Plaintiffs' claims, even as Mazingo and Stahl earned well *above* Cravath base in the latter of those years. *See* Dkt. 93-16 at 9-13.

- Despite learning through private discussion what many of their male colleagues were earning, Plaintiffs collectively did not know a *single* male associate outside New York who was paid at the Cravath base-plus-full-bonus level to which Plaintiffs claim they were entitled. *See* Dkt. 93 at 10 & n.5.

These facts cannot support an inference that Jones Day discriminates against women in pay at all, let alone does so systematically nationwide. The only plausible inferences to draw are that (1) Plaintiffs were not "top performers," and/or (2) Cravath salary-plus-full-bonus was not what Jones Day considered the "market" compensation in Irvine or Atlanta during the relevant period.[1]

Beyond the "Cravath" theory, the three Plaintiffs who were asked to leave the Firm for performance reasons (not "top performers" by any stretch) claim they knew of pay disparities with certain male associates. Dkt. 88 at 28-29. Even if those comparisons worked, three cases of men earning more than women could not justify an inference of nationwide pay discrimination when these Plaintiffs also knew of many more cases of women (including themselves) earning more than men. More importantly, the comparisons are again foreclosed by facts Plaintiffs knew but ignored.

---

[1] As to performance, three of the Plaintiffs (Henderson, Draper, and Tolton) were asked to leave the Firm for performance-related reasons and a fourth (Williams) was struggling. Plaintiffs' counsel received the Irvine Plaintiffs' reviews long before they filed suit and knew that even Mazingo and Stahl, who generally received good reviews, were not "top performers." Nonetheless, Mazingo, Stahl, and even Williams were paid above the average salary paid to the male comparators in Irvine that Plaintiffs have identified. *See* Second Chase Decl. Ex. 8 at 5.

Tolton and Henderson admitted that pay hinged on, among other things, their productivity. Dkt. 93-5 at 4-5 (Tolton Tr. 239:6-240:2); Dkt. 93-11 at 4 (Henderson Tr. 154:15-20). Yet they *knew* their hours were abysmally low: 897 and 1131 for Tolton's final two years at the Firm (even after being annualized to account for her leaves), and 1180 and 202 for Henderson's two full calendar years. *See* Dkt. 93-12 and 93-13. Plaintiffs retort that Title VII does not require "equal work." Dkt. 88 at 30. But Title VII only prohibits discrimination based on *sex*, not based on *productivity*. Law firms still generate revenue predominantly on the basis of hours billed. Pay disparities between associates with vastly different productivity levels therefore cannot possibly give rise to a good-faith inference of sex discrimination.[2]

As for Draper, she testified that she knew of one male associate in Atlanta who earned $40,000 more as a fourth-year associate than she had earned as a fourth-year associate. *See* Dkt. 93-8 at 27 (Draper Tr. 149:9-18). But Draper *knew* that this male associate was four years junior to her—meaning that he was a fourth-year associate *four years after her*—and that the Firm had "raised starting salaries" in Atlanta by $40,000 during the intervening period. *Id.* at 14, 27 (130:13-19, 149:19-24).[3] Moreover, Draper also knew of a *female* associate in Atlanta—in her own class year—who likewise earned up to $40,000 more than Draper. *Id.* at 15 (131:8-16). If men and women alike earned more than Draper, what is the good-faith basis to allege sex discrimination?

---

[2] Notably, while Henderson identifies men in her class in New York who received a raise when she did not, she ignores that *all of the other women in her class in New York also received raises*. Dkt. 57 at 84-85 (Answer ¶ 288). The only plausible inference is that Henderson's deficient performance, not her gender, accounted for the differential in compensation.

[3] The other "comparators" whom Draper now identifies, after discovery (Dkt. 88 at 29 n.18), likewise were all junior to her, and benefited from significant market adjustments that occurred in mid-2016 (after Draper's productivity had significantly declined) and mid-2018 (when Draper had already been told to find alternative employment). *See* Dkt. 88-10.

Beyond these three examples, Plaintiffs were unable to identify any similarly situated men at Jones Day who earned more than them.[4]   Even Williams, who alleged eight comparators, admitted she had no idea what their salaries were and had not bothered to ask.  Dkt. 93-4 at 11-21 (Williams Tr. 138:9-143:10, 146:15-150:15).  Instead, Plaintiffs argue that discovery to date has confirmed their suspicions.  Discovery material, of course, is irrelevant to whether Plaintiffs had a good-faith basis for filing their lawsuit.  *See Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1279 (3d Cir. 1994) ("A shot in the dark is a sanctionable event, even if it somehow hits the mark.").  Regardless, they so badly mischaracterize the evidence that it only reinforces the conclusion that they are acting in bad faith.  *See* Dkt. 88 at 29 nn. 18-20 & Dkt. 88-10.

In fact, Plaintiffs' Exhibit I, reflecting pay information produced in discovery on Plaintiffs' supposed "comparators," refutes their allegation of systemic sex-based pay inequity.  Plaintiffs conveniently omit the offices of the comparators in their exhibit (though Jones Day produced that information) to obscure that the two highly-paid males that Mazingo, Stahl, and Williams pick for comparison (Dkt. 88 at 29-30 n.20) were both in New York.  In any event, Plaintiffs' comparisons

---

[4] Plaintiffs point to an eighth-year male associate, James Burnham (whom they erroneously identify as a seventh-year), who publicly disclosed his employment income when he left the Firm, one year before he would have been considered for partnership, to become Associate White House Counsel (and later a Deputy Assistant Attorney General in the Department of Justice, handling some of the Administration's most important cases).  Dkt. 88 at 26.  Stahl claims to have worked with him on one appellate brief but she solicited an evaluation from him as her *supervisor* on the matter; she cannot credibly claim he is a comparator.  Indeed, he was four years more senior, located in D.C., practiced in the Issues & Appeals group, and had rave reviews.  And anyway, as the public filing shows and as Plaintiffs recognize, his disclosed income included a substantial departure bonus paid in recognition of many years of outstanding service to the Firm, including his critical role in the high-profile defense of former Virginia Gov. McDonnell from trial through successful appeal to the Supreme Court.  None of the five other associates who left for the new Administration in 2017 (four men and one woman, all of whom had short tenures with the Firm) were paid such a bonus.  Lovitt Decl. ¶¶ 2-5.  These unique circumstances obviously do nothing to ground Plaintiffs' claims of sex-based disparate pay, which is presumably why Plaintiffs did not even allege these facts in their Complaint.

prove nothing, as the relevant question in the context of multiple (alleged) comparators is whether a female earned "lower wages than the average of wages paid to all [male] employees ... performing substantially equal work and similarly situated with respect to any other factors ... that affect the wage scale." *Hein v. Ore. Coll. of Educ.*, 718 F.2d 910, 916 (9th Cir. 1983); *see also Heymann v. Tetra Plastics Corp.*, 640 F.2d 115, 122 (8th Cir. 1981) (rejecting "self-serving" comparison to "highest paid employee"); *Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 684 (8th Cir. 2001) (rejecting claim where plaintiff "was paid the same as, or more than, at least some male tool makers").  Here, Plaintiffs' own evidence reflects the following about their salaries relative to male salaries at comparable career levels:

- In her second year (averaging both the first and last halves of the year), Mazingo earned more than 15 of 18 men in their second years.  Two of the three higher-paid men were in New York.  Second Chase Decl. Ex. 8.[5]

- In her third and last year, Mazingo made more than 11 of 14 men in their third years.  Two of the three higher paid men were in New York.  *Id.*

- In her fourth year, Stahl made the same or more than 10 of 11 men in their fourth years.  The only higher-paid male was in New York.  *Id.*

- In years two through four, all of the Irvine Plaintiffs made the same or more than the average pay for the identified male Irvine associates.  *Id.*

---

[5] Jones Day's Exhibit 18 provided pay data for the "comparators" identified by Williams in the TAC, whom Plaintiffs later argued were also comparators for Mazingo and Stahl.  Plaintiffs' Exhibit I provides pay data, produced by Jones Day, on those same comparators plus several New York associates from Henderson's class and four Atlanta associates whom Draper named in her deposition (all of whom were junior to her).  In Exhibit 8 to this reply, Jones Day has annotated Plaintiffs' Exhibit I with each comparator's office and with average pay for (i) all the comparators and (ii) the Irvine comparators, at each level of seniority.  The Exhibit shows the wide variation in compensation by time and place, including when in an associate's career a major market move happened in a particular geography.  The Exhibit also demonstrates the significant differences in pay between New York and other markets.  For example, a fourth-year New York male associate earned $120,000 more than a high-performing fourth-year Atlanta male associate (compare the 8th and 15th male associates on the chart) and $90,000 more than even a high-performing *fifth*-year Irvine male associate (the 9th male associate on the chart).  *See* Second Chase Decl. Exs. 2-3.

- By year five, only Tolton, Draper and four "comparators" remained at Jones Day. Both Tolton and Draper were struggling at that point. The men with substantially stronger hours and reviews made more; the man with similar hours and reviews made less. *See id.*; Second Chase Decl. Exs. 2-5 (comparator assessments).

Thus, the *post hoc* discovery shows exactly what one would expect at a non-lockstep law firm: sex-neutral variation, as some women do far better than the average male (Mazingo, Stahl) and others fall below average (Draper, Tolton), depending on their individual performance.

    **C.**    Given the contradictory facts Plaintiffs knew, they were obligated to investigate before filing a complaint premised on suspicion and attenuated inferences. *See Nassau-Suffolk Ice Cream, Inc. v. Integrated Res., Inc.*, 118 F.R.D. 45, 48 (S.D.N.Y. 1987). Instead, they ignored the facts and asserted mere suspicion as fact. That deliberate indifference and failure to investigate deserve sanction. *See Hilton Hotels Corp. v. Banov*, 899 F.2d 40, 42-43 (D.C. Cir. 1990).

Plaintiffs admit that they did *no* investigation despite the wealth of evidence discrediting their claims. Dkt. 88 at 40-43. They argue that three reasons absolve their failure. None do.

*First*, Plaintiffs assert that because "their pay claims have factual support," no investigation is needed. Dkt. 88 at 40. As shown, that is demonstrably false. And when parties or counsel know facts that *contradict* their theories, investigation is especially critical. *See Meadow Ltd. P'ship v. Heritage Sav. & Loan Assoc.*, 118 F.R.D. 432, 434 (E.D. Va. 1987).

*Second*, Plaintiffs argue that Jones Day has not shown that "the steps [counsel] took to investigate … were unreasonable." Dkt. 88 at 42. But counsel do not identify *any* steps they took to investigate. Nor did Plaintiffs themselves investigate. Draper testified she did not "have any insight into what male counterparts were making at the firm" and "did not specifically ask them." Dkt. 93-8 at 22 (Draper Tr. 140:12-23); *see also id.* at 20-21 (138:24-139:7). Williams admitted she "did not conduct research into" the salaries of the "comparators" she named in the Complaint because that would have been too "awkward." Dkt. 93-4 at 13-14 (Williams Tr. 140:7-141:2).

*Third*, Plaintiffs argue that no inquiry "would have conclusively disproven Plaintiffs' belief that" Jones Day pays women less, because only Jones Day has the necessary "statistical pay data." Dkt. 88 at 42-43. But Rule 11 does not authorize filing claims so long as they are not "conclusively disproven." Rather, it requires a good-faith basis to believe the allegation's truth.

Plaintiffs' failure to investigate distinguishes this case from *Hedgeye Risk Management, LLC v. Heldman*, 2019 WL 4750243 (D.D.C. Sept. 29, 2019). There, this Court found it a "close question" whether the plaintiff had a reasonable belief that the defendant had solicited its clients before his resignation. *Id.* at *13. The company relied on the defendant's "alleged uptick in searches for client contact data, pre-departure in-person client meetings, and the fact that a client stopped paying for [the company's] services after [the defendant] left." *Id.* Importantly, the company tried to investigate its theory, by "reach[ing] out to former clients," but the former clients "indicated that they would not provide information without a subpoena." *Hedgeye Risk Mgmt., LLC v. Heldman*, 1:16-cv-935, Dkt. 118, at 13 (Opposition to Rule 11 Motion, filed July 26, 2018). That put the plaintiff in the "precarious position of having to subpoena clients that it either was still doing business with or hoped to regain their business." *Id.*

Here, unlike in *Hedgeye*, counsel was aware of facts that directly contradicted Plaintiffs' tenuous, inferential theory of discrimination. Nonetheless, unlike in *Hedgeye*, Plaintiffs' counsel did not even *try* to talk to other former associates to investigate Plaintiffs' suspicion of a firm-wide gender pay gap. It would be one thing if counsel had emailed former associates and got the cold shoulder. But counsel did not take even that basic step. The best explanation Plaintiffs muster is that they believed "outreach would have been unavailing given the emphasis Jones Day places on pay secrecy." Dkt. 88 at 42. This rings hollow, because Plaintiffs themselves talked extensively about pay while they were at Jones Day (and after they left). Dkt. 93 at 20. And *former*

associates—which all but one of Plaintiffs' collective "comparators" now are—could not possibly be bound by any sort of "pay secrecy" policy.  Outreach was the least counsel could do.  By failing to take even that rudimentary step, Plaintiffs' counsel here did not "toe[] the line separating reasonable pleadings from frivolous ones," *Hedgeye*, 2019 WL 4750243, at *13—but crossed it.

## II.     EVEN ON THEIR OWN TERMS, PLAINTIFFS' CIRCUMSTANTIAL BASES FOR SUSPECTING PAY INEQUITY ARE UNREASONABLE.

Aside from the pay-related facts above, Plaintiffs point to four circumstantial, inferential bases for suspecting that Jones Day pays women less than men.  These inferences could not satisfy Rule 11 in view of the contradictory *facts* about pay that Plaintiffs knew, and their failure to investigate the matter.  But these four grounds also fail on their own terms.

**A.**     Plaintiffs first claim they "observed a pattern of gendered comments and hostility toward women."  Dkt. 88 at 16.  But the isolated incidents that Plaintiffs identify mostly involved *non-partners*[6] and partners who played no role in setting pay.[7]  *Cf.* Dkt. 94-11 (Firm Manual) at 5; *see also* Dkt. 57 at 9 (Answer ¶ 9).  At a global firm with 2,500 lawyers, it is not reasonable to infer systemic discrimination in pay based on (unreported) comments or conduct of a few scattered individuals who are not involved in the compensation process, particularly when Plaintiffs go to great lengths to (over)-emphasize the centralization of pay decisions.

---

[6] Dkt. 88-3 at 10-14, 16-17 (Mazingo Tr. 84:17–88:24, 104:15-105:10) (testifying about actions by an associate and an Of Counsel, misidentified as a partner, Dkt. 88 at 17 n.1); Dkt. 88-7 at 14 (Stahl Tr. 291:14–291:24) (complaining about a conversation with a female Of Counsel, erroneously identified as a Partner, Dkt. 88 at 17); Dkt. 88-2 at 17-18 (Tolton Tr. 243:19–244:5) (recounting Firm's investigation and disciplinary action against an associate for objectionable conduct—the only incident alleged in the Complaint that was reported to Firm management).

[7] Dkt. 88-4 at 18-20 (Williams Tr. 193:15-23, 213:17–214:25) (partner who never reviewed Williams); Dkt. 88-7 at 25 (Stahl Tr. 432:16–24) (partner who never reviewed Stahl); Dkt. 88-2 at 12-13 (Tolton Tr. 192:11-193:10) (partners who never reviewed Tolton or did so as associates).

**B.**    Plaintiffs' second ground is that discrimination in the review process can be expected to impact pay, given Jones Day's merit-based compensation system.  The problem is that Plaintiffs point to nothing to support any good-faith belief that Jones Day associate evaluations were discriminatory.  Mazingo says every attorney "gave her excellent reviews"; she had "no negative reviews."  Dkt. 41 at 38-39 (TAC ¶ 132).  Tolton calls her reviews "overwhelmingly positive."  *Id.* at 33 (¶ 111).  Stahl says the feedback on her work was "positive."  *Id.* at 69 (¶ 251).  Draper alleges that her "first negative annual review" came six years into her tenure.  *Id.* at 53, 63 (¶¶ 184, 222).  Williams, too, cites "years of strong reviews."  *Id.* at 50 (¶ 173).  Even Henderson says she got a "positive" review.  *Id.* at 81 (¶ 297).  Plaintiffs cannot claim they had stellar reviews, yet at the same time pin suspicions of pay inequity on "inferences" that their reviews were biased.

Plaintiffs cite Mazingo's opinion that "Jones Day takes no steps to ensure evaluations are free from bias."  Dkt. 88 at 19.  Even if that incompetent conclusion were true (it is not), the lack of steps to *prevent* bias is not equivalent to the *existence* of biased reviews.  And, as noted, Mazingo herself claimed she received no negative reviews, even from the partner whom she accuses of sexualized comments (Dkt. 41 at 41-42 (TAC ¶¶ 139-41)).  Similarly, Plaintiffs quote Henderson's vacuous testimony that "because the evaluations were based on discriminatory policies" (what policies, she would not say), "she believed that some of her evaluations were discriminatory" (which evaluations, she would not say).  Dkt. 88 at 19.  That cannot possibly support a good-faith belief that the reviews were discriminatory, much less that they caused a nationwide pay disparity.

Three Plaintiffs claim their "consensus statements"—the assessment statements prepared based on the inputs to the evaluation process—were manipulated in a discriminatory fashion.  But they knew that was not true.  These Plaintiffs had their reviews and assessment statements long before they filed suit.  This Court can now see for itself that these Plaintiffs' claims are false.

12

Start with Stahl, the only Plaintiff who claims to have found a "gendered critique" in her assessment statement. Dkt. 88 at 18-19. She claims her final assessment for her performance as a third-year associate focused on her lack of "enthusiasm" and "criticized [her] for her appearance" despite her "excellent reviews." Dkt. 88-7 at 11-12 (Stahl Tr. 232:25-233:12). Lack of enthusiasm has nothing to do with gender, and she has no basis to allege that disinterested, disengaged men were not similarly criticized. But Stahl's facts are wrong too. Her final assessment did not "focus" on her lack of enthusiasm or even mention her appearance, and it highlighted the strong (although not uniformly excellent) work reflected in her reviews. Stahl's final assessment begins: "Jaclyn received highly complimentary reviews from numerous partners and reviewers in multiple offices and practice groups." Dkt. 94-13 at 2. It proceeds with a series of complimentary sentences. Then it says: "Her commitment, willingness or enthusiasm to handle last minute projects or what she perceives as less important projects has been inconsistent, and should be an area of improvement this year." *Id.* But that legitimate critique is drawn from the underlying reviews. One reviewer said Stahl "gives the impression" that "document review" "should be assigned elsewhere." *Id.* at 3. Another said she "attempted to pawn the weekend work off onto [new lawyers] who had just started work five days prior." *Id.* Another: "She has also created the perception that she is less than enthusiastic about certain projects and that affects her willingness to take them on." *Id.* Indeed, Stahl herself told a colleague she wanted to "do appeals full time" but was "over BATL"— *i.e.*, "Business and Tort Litigation," her practice group. Dkt. 93-16 at 4. And she affirmatively alleges that, in her view, she was too good for document review (which her male BATL peers were also required to do). Dkt. 41 at 70 (TAC ¶ 255). Her assessment thus accurately reflected both her reviews and the reality that Stahl was not interested in doing important aspects of her job. There is nothing gendered about that.

13

Likewise for Williams.  She claims her underlying reviews were "generally positive" but her final assessment was "unfairly negative, focusing on a single partner's negative comments while omitting positive commentary."  Dkt. 88 at 19; *see also* Dkt. 41 at 51 (TAC ¶ 176).  But counsel knew that characterization was untrue.  Williams, in fact, received serious criticism from multiple partners (male and female).  The supposedly unfair evaluation came from a *female* partner and stated the following, in full:

> Time management, judgment and concise persuasive writing are issues for Meredith.  Meredith was assigned two important briefs in the [CLIENT] matter, an opposition to a motion to compel/motion for sanctions and a motion to compel.  Both were abysmal rambling streams of consciousness that were poorly written.  Neither included the arguments I asked her to make. More troubling was the fact that she gave me one draft the day before it was due and then dropped the revisions and the research needed to complete the brief to go on vacation. When I called her the afternoon the brief was due to inquire as to when I would see the next draft and she told me she sent a vacation memo so she was not going to be able to complete the papers. Meredith's enthusiasm and support on practice development initiatives is welcome and refreshing, but are not a substitute for doing good legal work in a timely fashion.
>
> Goals: Meredith's writing is a rambling mess. She needs to learn to organize an argument and then execute it persuasively. She also needs to decide if she wants to commit to being a lawyer, dropping an assignment to go on vacation is not acceptable.

Dkt. 94-14 at 6.  Another partner echoed much the same, saying he "attempted to contact Meredith for assistance only to learn that she was on vacation out of the country without having given me any notice."  *Id.* at 7.  Another partner, while praising her work on one project, stated: "Unfortunately, I need to remind her of deadlines, and follow-up on assignments, to make sure everything is moving along."  *Id.* at 4.  Yet another (female) partner: "I never know what to expect from Meredith's work.  At times, she will produce work product that is very well-written, strongly argued, and considers creative angles that I would not expect from her level.  At other times, she has given me work product that is mediocre at best and needs extensive changes."  *Id.*  Williams' overall assessment was understandably critical in light of these reviews.  But it also noted that

"[s]he has a lot of potential, because she has strong analytical skills, is intelligent, and shows enthusiasm for practice development initiatives and office pro bono work for which she receives praise." *Id.* at 2.  On this record, counsel had no good-faith basis for alleging that Williams had only received one negative review or that her assessment was the result of gendered manipulation.

Finally, Tolton claims that she was "shock[ed]" at how her "consensus statement" did not accurately represent her underlying reviews.  Dkt. 88-2 at 11 (Tolton Tr. 139:6-24).  Yet even a cursory comparison shows that this is baseless.  In her early years, Tolton was described as: "Hard worker, very bright, and good team player."  Second Chase Decl. Ex. 7 at 4.  But as she became more senior, she began receiving "[m]ixed reviews." *Id.*  For 2014, her assessment said: "While recognized as smart and committed to the Firm, there is a concern about the analytical rigor that she brings to some of her cases." *Id.*  And her individual reviews went downhill from there, as did her productivity.  Her limited work in 2016 was criticized (by a female partner) as "unacceptable" and untimely. *Id.* at 7.  Another partner agreed Tolton's "performance and level of effort ... was unsatisfactory." *Id.* at 8.  The partner noted a "continuing lack of internal demand for her services." *Id.*  Tolton also "did not proactively seek out additional … cases or seek other work." *Id.*  And in the one instance where she did take that initiative, the reviewer noted: "I never felt like she really dug into this case." *Id.* at 9.  Her final assessment for 2016 reflected those criticisms accurately. *Id.* at 2.  And she did so little work in 2017 that there was no meaningful work to review.

**C.**     Plaintiffs' next purported basis for believing that Jones Day pays women less is promotion rates.  Plaintiffs admit that they had this data from publicly available source prior to filing this suit (Dkt. 88 at 20 fn. 4) yet they do not mention it in their Complaint because, contrary to their new claims, the numbers *refute* any inference of unequal pay.  Plaintiffs make two critical errors attempting to argue otherwise.  First, they look at *worldwide* promotions, including in

Europe, Asia, and Latin America, which have nothing to do with this case and where there is no data about the gender composition of the associate pool.[8]  Second, they ignore how favorably Jones Day's statistics on this score compare with industry statistics from major U.S. law firms—statistics that are published on the same website that Plaintiffs cite (Vault.com, Dkt. 88 at 22).

The facts are these: Over the last three years—the years that most closely track Plaintiffs' associate classes—*more than half* the U.S. partners promoted at Jones Day were women.  Second Chase Decl. Ex. 9.  Over the last five years, 44.4% were women.  *Id.*  And even over the last ten years, 41.7% were women.  *Id.*  Meanwhile, the industry average of female promotions at large law firms during the period 2011-2018 (the latest year for which the data was publicly available on Vault) was only 35%.  *Id.*[9]  Publicly available promotion data thus shows that law firms *without* a Managing Partner system, *without* "pay secrecy," and *without* individualized compensation have *worse* female promotion rates than Jones Day.  This data thus offers no good-faith basis to infer that Jones Day's practices result in pay discrimination.

Moreover, as Plaintiffs concede, partnership promotion is a *lagging* indicator, affected by the pool of associates who started at the Firm ten years before the partnership decision was made.  Publicly available data from Vault.com show that female associates have historically accounted for about 45% of associates at firms nationwide, and that the female proportion of Jones Day's

---

[8] The first chart in Plaintiffs' brief (Dkt. 88 at 20) contains data on worldwide promotions taken from Jones Day's public announcements, which are compiled at Plaintiffs' Ex. H.  Those announcements identify the geographic location of the new partner, information Plaintiffs ignore.  Plaintiffs' second chart (Dkt. 88 at 22) contains data from Vault.com which, although limited to U.S. data, contains an error for 2012.  As shown by the 2012 announcement in Plaintiffs' Ex. H, 10 women and 12 men were promoted to partner in the U.S. that year, a 45% female promotion rate.

[9] This is the period that encompasses all of the Plaintiffs' employment at Jones Day.  The promotions effective January 2011 were announced shortly after Tolton, the most senior Plaintiff, joined Jones Day.  All of the Plaintiffs left Jones Day before the end of 2018.

associate ranks have long hovered around the same figure.  Lovitt Decl. Ex. 1.  That aligns with Jones Day's proportion of female partner promotions over the last five years, and is *below* the rate of the Firm's female partner promotions over the past three years—suggesting, if anything, that in the most relevant recent years, women are being promoted at *higher* rates than men.

**D.**      Last, Plaintiffs point to "Jones Day's pay-secrecy practices," invoking the theory that Jones Day must be "hid[ing]" something by treating its lawyers' compensation as confidential. Dkt. 88 at 31.  But, as they admit, confidentiality could only give rise to a suspicion of misconduct if there is "no genuine basis for keeping that information confidential."  Dkt. 88 at 34 (quoting *Chambers v. Capital Cities / ABC*, 159 F.R.D. 441, 445 (S.D.N.Y. 1995)).  And there is no question the Firm has genuine, well-founded reasons for not publishing individual lawyer compensation— a practice that existed even before Jones Day hired its first female attorney in the early 1960s.[10]

Specifically, when compensation is individualized and merit-based, confidentiality helps to promote collegiality by avoiding jealousy, bitterness, and anger (on the part of the lower-paid) and arrogance, superiority, and ego (on the part of the higher-paid).  It also prevents embarrassment both for those who make less than their peers *and* those who make more—as Mazingo learned first-hand when her salary was higher than her male counterparts.  *See* Dkt. 93-16 at 9, 13 (reporting that "Andi" was "embarrassed" by her higher pay).  For these reasons, Jones Day has long believed that publication and broad disclosure of individual attorneys' compensation would detract from the Firm's singular goal of providing seamless, collaborative client service.  Indeed,

---

[10]   Video, *Jones Day Celebrates International Women's Day* (Mar. 2019), *at* https://tinyurl.com/vn939nc. Of course, Jones Day has taken steps to ensure compliance with evolving legislation, such as the California and New York statutes enacted in 2015 and 2016, neither of which requires the publication of individual compensation figures.

by keeping the focus on client work instead of pay, Jones Day has been able to deliver unparalleled client service that is the envy of the legal industry.[11]

And Plaintiffs knew all this from the outset. They understood, before joining the Firm, that Jones Day treated salary information as confidential.[12] None of them saw it as a drawback and, in fact, some agreed that it was a positive feature, including after seeing it in operation. Williams, for example, turned down a competing offer after two years at the Firm "based on some of the advantages, long-term cultural advantages, at Jones Day of pay secrecy, confidentiality, [and] the collegial working environment." Second Chase Decl. Ex. 6 at 6-8 (Williams Tr. 93:15-95:2); *see also* Second Chase Decl. Ex. 10 at 3-4 (Stahl Tr. 16:21-17:24). Having recognized the good reasons for confidentiality, Plaintiffs cannot now in good faith assert that it is illegitimate and evidence of discrimination.

*                    *                    *

Plaintiffs had no good-faith reason to believe that Jones Day was paying women less than men. But even if their strained inferences could be credited, that could not justify counsel's failure to do *any* investigation upon learning facts about associate pay that directly undermined their core allegation. As a consequence for that failure, the Court should order sanctions.

## CONCLUSION

For these reasons, the Court should grant Jones Day's motion for Rule 11 sanctions.

---

[11] BTI Consulting Group, *The All-New BTI Client Service A-Team 2020 Survey of Law Firm Client Service Performance* (based on client surveys, ranking Jones Day as the top law firm in terms of client service for the fourth consecutive year), *at* https://tinyurl.com/vot4wg6. Jones Day has been ranked first in twelve of the nineteen years BTI has published its client service rankings and second in six of the remaining years. *Jones Day Ranked #1 in BTI Client Service A-Team Report for Fourth Consecutive Year* (Dec. 2019), *at* https://tinyurl.com/yx68cwqp.

[12] *E.g.*, Second Chase Decl. Ex. 11 at 3-4 (Draper Tr. 46:5-47:8); Second Chase Decl. Ex. 6 at 3-5 (Williams Tr. 59:23-61:7); Second Chase Decl. Ex. 10 at 3-4 (Stahl Tr. 16:21-17:24).

January 24, 2020                         Respectfully submitted,

                                         /s/ Mary Ellen Powers
                                         Mary Ellen Powers (Bar No. 334045)
                                         Beth Heifetz (Bar No. 417199)
                                         Yaakov Roth (Bar No. 995090)
                                         JONES DAY
                                         51 Louisiana Avenue NW
                                         Washington, DC 20001
                                         Phone: (202) 879-3939


                                         Terri L. Chase (*pro hac vice* granted)
                                         JONES DAY
                                         250 Vesey Street
                                         New York, NY 10281
                                         Phone: (212) 326-3939

                                         *Attorneys for Defendant*