**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NILAB RAHYAR TOLTON, *et al.*,<br><br>             *Plaintiffs*,<br><br>      v.<br><br>JONES DAY,<br><br>             *Defendant.* | Civil Action No. 19-945 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is before the Court on Defendant's motion for partial judgment on the pleadings. Dkt. 37. Plaintiffs Nilab Rahyar Tolton, Andrea Mazingo, Meredith Williams, Saira Draper, Jaclyn Stahl, and Katrina Henderson, all of whom are attorneys, allege that their former employer, Jones Day, unlawfully discriminated against them based on gender, pregnancy, and maternity during their respective tenures at the law firm's Irvine, California, Atlanta, Georgia, and New York City offices. Dkt. 41. Asserting claims under a variety of federal, California, New York, and District of Columbia antidiscrimination laws, Plaintiffs allege that they were paid less; given fewer opportunities to develop their skills, to benefit from mentorship, and to advance; and reviewed more harshly than their male counterparts. They further allege that these outcomes resulted from Jones Day's "black-box" compensation policy—a policy that, according to Plaintiffs, is dictated by the law firm's managing partner, prohibits attorneys from discussing their pay with one another, relies on highly subjective reviews of associates, and discourages attorneys from complaining. Some Plaintiffs assert that they were pushed out of the firm after taking maternity leaves. Plaintiffs also allege that they were subjected to a hostile work

environment at Jones Day because of their sex.  Some Plaintiffs claim that, when they spoke up to challenge the alleged discrimination, Jones Day retaliated against them.

Jones Day answered Plaintiffs' complaint, Dkt. 44, and moved for partial judgment on the pleadings, Dkt. 37.  Jones Day seeks dismissal of: (1) all of Williams's claims; (2) all of Henderson's claims; (3) all disparate impact claims; (4) all claims under the Equal Pay Act and its state law analogues; (5) all claims brought under the District of Columbia Human Rights Act; and (6) all claims for injunctive relief.  Jones Day does not, at least at this time, challenge the legal sufficiency of the disparate treatment claims brought by Tolton, Mazingo, Draper, or Stahl.

For the reasons explained below, the Court will **GRANT** in part and **DENY** in part Jones Day's motion.

## I.  BACKGROUND

### A.    Factual Background

The Third Amended Complaint in this action is 135 pages long.  Dkt. 41.  The Court will recount only those allegations that are relevant to the pending motion or necessary to provide context.  For the purposes of deciding the motion for judgment on the pleadings, Dkt. 37, the Court assumes the truth of the following factual allegations, *see Doe v. U.S. Dep't of Justice,* 753 F.2d 1092, 1102 (D.C. Cir. 1985); *Dial A Car, Inc. v. Transp., Inc.*, 884 F. Supp. 584, 588 (D.D.C. 1995).

### 1.    *Managing Partner System*

Plaintiffs allege that Jones Day's managing partner, Stephen Brogan, "runs the [f]irm from its Washington, [D.C.] office with essentially unchecked autonomy."  Dkt. 41 at 3 (3d Am. Compl. ¶ 6).  The Third Amended Complaint quotes a version of Jones Day's website, which has since been modified, stating that Brogan "is the final decision-maker on virtually every matter of

significance for the firm." *Id.* (3d Am. Compl. ¶ 9).  Plaintiffs allege that "every associate's compensation is individualized and determined in a 'black box' by [Brogan], who issues every attorney's compensation letter annually," *id.* at 2 (3d Am. Compl. ¶ 5), and who "is the final decision-maker on . . . 'partner and associate compensation,'" *id.* at 3 (3d Am. Compl. ¶ 9).  In addition to making these individualized compensation decisions, the managing partner also makes partnership decisions and supervises the annual employee performance evaluations.  *Id.* at 6 (3d Am. Compl. ¶¶ 17, 19).  The managing partner "alone possesses ultimate control or influence over all [f]irm leadership partners and any decision they carry out with respect to compensation, promotions, assignments, and other employment terms and conditions."  *Id.* at 6 (3d Am. Compl. ¶ 19).

2.     *Associate Evaluations and Compensation Decisions*

Plaintiffs further allege that Jones Day employs a "black[-]box" compensation scheme, a term that Plaintiffs use to describe the evaluation and compensation process and various interrelated policies.  *Id.* at 2 (3d Am. Compl. ¶ 5).  They allege that the "black-box" system, intentionally or unintentionally, causes pay inequality between male and female associates.  *Id.* at 11–12 (3d Am. Compl. ¶¶ 41–42).  According to Plaintiffs, associates are evaluated each year, and those evaluations are used in setting their compensation, including both base pay and bonuses.  *Id.* at 12, 93 (3d Am. Compl. ¶¶ 42–43, 357–58).  Although the more senior lawyers who have worked with an associate are asked to write an individualized evaluation, the firm delivers its feedback to each associate via a "consensus statement," which is supposed to synthesize all the various reviews as well as the associate's billable hours and other factors into a single paragraph that reflects the associate's performance.  *Id.* at 5 (3d Am. Compl. ¶ 14).  Plaintiffs allege—on information and belief—that the "consensus statements are not written by

reviewers, and even Jones Day [p]artners cannot alter them." *Id.* The consensus statement is then read to the associate at her annual review, but the associate is not allowed "to keep a copy of [the] consensus statement" and is not shown "the underlying individual reviews." *Id.*

Either "inadvertently or by design," according to Plaintiffs, the consensus statement review process works to disadvantage female attorneys, negatively affecting their "pay and opportunities for promotion." *Id.* at 6 (3d Am. Compl. ¶ 16). They allege that "[t]he 'consensus statement' often cherry picks language from individual evaluations without context, emphasizing some aspects of performance while completely overlooking other aspects, and attributing the opinion of one evaluator to that of multiple reviewers." *Id.* at 5 (3d Am. Compl. ¶ 15). The process leaves room for manipulation as well as "gender stereotypes" and allows biases to work their way into associates' composite "consensus" reviews. *Id.* at 6 (3d Am. Compl. ¶ 17). Plaintiffs quote an earlier version of the Jones Day website, which stated that "associate evaluations and compensation adjustments [are] based upon the subjective quality of each person's overall contribution, including professional achievement, commitment to the [f]irm, judgment, client service, efficiency, leadership, productivity, and other appropriate factors." *Id.* at 12 (3d Am. Compl. ¶ 43).

Another key component of Jones Day's black-box compensation scheme is its emphasis on pay secrecy. *See id.* at 12 (3d Am. Compl. ¶ 42). Associates and partners alike are strongly discouraged from discussing their compensation with one another. The following quote from the Jones Day website, as it existed at the time Plaintiffs brought suit, explains the firm's approach:

> The financial relationship of a lawyer to Jones Day is confidential. Other than the very small number of people who advise the Managing Partner on these issues, no partner at Jones Day knows anything about the amount of income allocated to any other partner. Similarly, associate compensation is also confidential, for the same reasons: Jones Day compensates its associates individually, not by lockstep and certainly not based on some billable hours

4

> formula, and thus every associate's compensation is the product of his or her individual contributions, and cannot be fairly compared to any other individual. What is sometimes critically referred to by those outside Jones Day as a "lack of transparency" is almost universally viewed inside Jones Day as one of its great strengths.  This confidentiality removes any temptation to try to compare apples to oranges; it eliminates the chance of creating inappropriate comparisons and jealousies; and most importantly, it does not allow even the possibility of creating barriers to the effective interaction of all Jones Day lawyers.

*Id.*  Plaintiffs allege that this policy "prevents associates from learning of gender-based pay disparities and remediating them," *id.* at 16 (3d Am. Compl. ¶ 48), and permits subjective biases to infect the process, *see id.* at 5, 16, 83 (3d Am. Compl. ¶¶ 14–15, 48, 310).  Matters are made worse, according to Plaintiffs, by the firm's "No Whining" policy, which discourages dissent and dovetails with the pay secrecy policy to discourage employees from disputing their allotted salaries and from complaining about discrimination.  *See id.* at 18 (3d Am. Compl. ¶ 55).  Plaintiffs allege that Brogan regularly includes the phrase "No Whining" in slides that he presents to the firm.  *Id.* (3d Am. Compl. ¶ 54).

Finally, Plaintiffs allege that Jones Day's statements about how it pays its associates compared to other law firms, when viewed alongside their own personal salary histories, suggest that Jones Day underpays women.  Plaintiffs allege that, in February 2019, the Jones Day website represented as follows: "For those associates who produce consistent high-quality work, we intend that they will be compensated at or above the upper level of the markets in which we operate." *Id.* at 13 (3d Am. Compl. ¶ 44).  "But, despite their strong performances—even in the years when those strong performances were acknowledged in their reviews—Jones Day did not compensate the Plaintiffs in light with the 'Cravath' market scale."[1]  *Id.*  The Third Amended

---

[1] The Cravath market scale refers to the attorney pay and bonus scale set by Cravath, Swaine, and Moore LLP, a law firm that has historically been one of the first movers in increasing associate compensation and bonuses.  *See, e.g.*, Debra Cassens Weiss, "Cravath announces

Complaint includes charts allegedly reflecting the "Cravath scale" for each year that the Plaintiffs were employed at Jones Day and compares those figures with what Plaintiffs themselves were paid during each of those years.  *See id.* at 14–15 (3d Am. Compl. ¶ 45).

3.   *Firm Culture*

Plaintiffs also allege that Jones Day has a "[f]raternity [c]ulture" in which "[s]enior male partners mentor young male associates, give them preferential assignments, facilitate their access to clients, introduce them to the [f]irm's powerbrokers, and groom them for membership in the [f]irm's partnership." *Id.* at 1 (3d Am. Compl. ¶ 1).  According to Plaintiffs, female associates "have fewer opportunities for mentorship, are promoted in smaller numbers, and earn less for equal work." *Id.* at 1–2, 9 (3d Am. Compl. ¶ 1, 31).  They allege that 80% of the firm's Partner Review Committee are men and that men lead thirty-four of the firm's thirty-nine practice groups. *Id.* at 11 (3d Am. Compl. ¶ 40).  They also allege that, although men and women enter the firm as associates in roughly equal numbers, three quarters of Jones Day's partners are men. *Id.*

Plaintiffs further allege that boorish, drunken antics have occurred at Jones Day events and, at times, have played out in harassing gendered ways—a male summer associate pushing a female summer associate wearing a white dress into a pool met with applause from members of the firm, for example, or a male partner requiring female summer associates to perform an infantilizing song and dance at a karaoke event. *Id.* at 7–8 (3d Am. Compl. ¶¶ 24–25).  Plaintiffs

---

associate bonuses; did the firm top Milbank?" ABAJournal, (Nov. 11, 2019), https://www.abajournal.com/news/article/cravath-announces-associate-bonuses-did-the-firm-top-milbank ("Associates who were hoping that Cravath would set the standard with higher bonuses this year will be disappointed with the law firm's Monday announcement."); Kathryn Rubino, "Breaking: Cravath Announces Annual Bonuses," Above the Law, (Nov. 19, 2018), https://abovethelaw.com/2018/11/breaking-cravath-announces-annual-bonuses/.

also allege that their male coworkers commented on their physical appearances, clothing, facial expressions, and relationship statuses, telling one Plaintiff, for example, "the she 'would not be single for long,' was 'prettier than usual,' and should wear heels." *Id.* at 8 (3d Am. Compl. ¶ 26). Plaintiffs further allege that "[m]ale attorneys in Jones Day's Irvine office . . . frequently made sexist comments—including about female servers during their office lunches at Hooters— only to conclude these comments" by saying "add it to the file," as if compiling "a fictitious file of sexual harassment complaints that carried no weight." *Id.* (3d Am. Compl. ¶ 27).

4.      *Nilab Rahyar Tolton*

Plaintiff Nilab Rahyar Tolton was an associate at Jones Day's Irvine Office from 2010 through 2018. *Id.* at 24 (3d Am. Compl. ¶ 79). She joined Jones Day after graduating from Harvard Law School and claims to have "initially excelled at Jones Day," producing top-notch work, winning rave reviews, interacting with clients, running the Irvine Office's summer program, and participating in recruiting. *Id.* at 25–27 (3d Am. Compl. ¶¶ 82–88). Tolton alleges that, even though she produced excellent work, she was not paid the same as "her male counterparts in jobs requiring substantially equal work" and that "the [f]irm paid her less than male associate Justin Smith," who was "in her class year." *Id.* at 27 (3d Am. Compl. ¶¶ 89–90).

Tolton became pregnant in 2015 and later took maternity leave. *Id.* at 32 (3d Am. Compl. ¶ 105). She alleges that, near the end of her leave, she was informed that Jones Day was freezing her salary, which was considered a "punitive measure" at the firm. *Id.* Tolton initially "pushed back," questioning why her pay had been frozen when she had received excellent reviews. *Id.* at 32–33 (3d Am. Comp. ¶¶ 108–09). In one meeting, she produced "a binder of emails and documents in which clients and colleagues praised her work" to rebut the partners' assertions that they had received complaints about her work, and the partners in that meeting

conceded "that they could not cite any negative reviews and suggested that . . . Tolton speak with her reviewers." *Id.* (3d Am. Compl. ¶ 108).  She then commented that the only thing that had changed since her last round of positive reviews was that she had given birth and taken maternity leave; the partners became upset and told her that she had "two more years to return to the [f]irm's good stead or else be fired." *Id.* at 33 (3d Am. Compl. ¶ 109).  Shortly after the meeting, Tolton discovered that she was pregnant with her second child. *Id.* at 33–34 (3d Am. Compl. ¶¶ 112, 114).  She worked throughout her second pregnancy but was limited to some extent by illness and pregnancy-related travel restrictions. *Id.* at 35 (3d Am. Compl. ¶¶ 117–19).  During this time, Tolton was "chastise[d] . . . for not working hard enough and accuse[d] . . . of misstating her [work] capacity." *Id.* at 35 (3d Am. Compl. ¶ 120).

While on her second maternity leave, Tolton was informed that her salary would again be frozen. *Id.* at 36 (3d Am. Compl. ¶ 122).  Then, very soon after returning to the firm, Tolton had her annual review and was informed "that she 'should look for other opportunities outside the [f]irm'" and "that she had six months to leave." *Id.*  Tolton told several female attorneys "that she was experiencing discrimination on the basis of her pregnancy" and communicated to several partners "that she believed Jones Day gave her negative reviews and froze her salary during both maternity leaves because of her pregnancy and maternity leave." *Id.* (3d Am. Compl. ¶¶ 126–27).  According to Tolton, "[t]he [f]irm swiftly retaliated." *Id.* at 37 (3d Am. Compl. ¶ 128).  A partner "went around the Irvine office asking female associates if . . . Tolton had spoken with them, and a few days before her scheduled last day, . . . Tolton found herself locked out of her Jones Day email." *Id.* at 37–38 (3d Am. Compl. ¶ 128).  The partner in charge of the office and the administrative partner "then called . . . Tolton at home [and] told her that they would ship her belongings to her and barred her from returning 'for badmouthing the office.'" *Id.* at 38 (3d Am.

Compl. ¶ 128).  Tolton alleges that male associates were not pushed out of the firm in such an

abrupt manner and that the firm facilitated their transitions to other jobs.  *See id.* (3d Am. Compl.

¶ 129) (alleging that one male associate who "routinely arrived at the office late, took regular

vacations, and failed to bill near 2000 hours in his last several years at the [f]irm" was "placed

in[-]house . . . at a major [f]irm client" and that another was pushed out but told "that there was

'no rush' for his departure" and "placed in-house at a [f]irm contact by a [f]irm partner").

     5.   *Andrea Mazingo*

     Plaintiff Andrea Mazingo graduated with honors from Northwestern Pritzker School of

Law in 2014 and worked as an associate at Jones Day's Irvine office.  *Id.* at 38, 40 (3d Am.

Compl. ¶¶ 132, 137).  According to Plaintiffs, Mazingo was held in high regard; she received

"excellent reviews" from "[e]very attorney with whom [she worked]," received "no negative

reviews[,] and was selected for important office leadership roles, including Recruitment

Committee Member, Summer Work Coordinator, Summer Social Chair, and pro bono

coordinator for the Summer Associates."  *Id.* at 38–39 (3d Am. Compl. ¶ 132).  "Once

. . . Mazingo was a third-year associate," however, "she noticed that she was not receiving pay

and face-time opportunities with the firm leadership commensurate with her talent and positive

reviews."  *Id*. at 40 (3d Am. Compl. ¶ 135).  Mazingo then asked the administrative partner for

the Irvine office if "she could relocate to another office for some time period to further her

advancement, but [was] . . . assured . . . that her practicing in Irvine would have no adverse effect

on her career of compensation."  *Id.*  Plaintiffs allege that Mazingo "was unable to verify

whether her pay really was consistent with what her male colleagues in other offices were being

paid" because "she was reminded by leadership throughout her time at Jones Day that pay

decisions were 'confidential,' and each letter she received from [f]irm Managing Partner Stephen

Brogan regarding her compensation advised her not to discuss her compensation with anyone inside or outside the [f]irm." *Id.* (3d Am. Compl. ¶136).  Plaintiffs allege "[u]pon information and belief," however, that Jones Day "paid her less than it paid comparable male associates."  *Id.*

Plaintiffs further allege that Jones Day "regularly imposed heightened demands on female associates" and that one partner, Roman Darmer, "worked . . . Mazingo to exhaustion," even as "male associates received breaks to recover during ebbs in the work."  *Id.* at 43–44 (3d Am. Compl. ¶ 146).  Mazingo's physical health suffered as a result, but when she attempted to communicate that she was overworked and ill to Darmer, he "ridiculed her and refused to let up at all."  *Id.* at 44 (3d Am. Compl. ¶ 147).  Plaintiffs allege that "[b]ecause of the sexist Jones Day environment, . . . Mazingo sought psychiatric treatment, and her doctor instructed her to take medical leave immediately."  *Id.* at 45 (3d Am. Compl. ¶ 153).  Following that advice, she took one weekend off, feeling that she could not take more because of the pressure to return to work. *Id.*  When she returned, Darmer publicly "attacked [her] for how she had communicated her medical leave" and "caused her to suffer a panic attack."  *Id.*  She alleges that Darmer later chastised her in an all-caps email for improperly communicating her medical leave and then "stopped speaking to [her] altogether, effectively ending her career at Jones Day" because he was "the principal partner with whom she had worked."  *Id.* at 46 (3d Am. Compl. ¶¶ 155–56). Mazingo further alleges that a male associate in her year at the firm was not treated so harshly when he also took a medical leave; in contrast, he was not "berated by . . . Darmer or removed from his cases," and "he had enough job security to take a proper leave that was long enough for him to recover fully."  *Id.* at 45–46 (3d Am. Compl. ¶ 154).  Mazingo alleges that, "[c]ompletely cut off from the principal partner with whom she had worked and deprived of any mentoring support to advance to partnership, . . . she" left Jones Day in 2018.  *Id.* (3d Am. Compl. ¶ 156).

6.    *Meredith Williams*

Plaintiff Meredith Williams joined Jones Day's Irvine office as an associate in October 2013.  *Id.* at 47–48 (3d Am. Compl. ¶ 161–62).  Around two years later, she received an offer to work at a large, competitor law firm, where she would have received "valuable intellectual property ('IP') law experience and [would have been] paid . . . more" than she was at Jones Day. *Id.* at 48 (3d Am. Compl. ¶ 163).  Williams told Jones Day about the offer, and the firm "agreed to facilitate more IP work for her and indicated that her compensation would improve;" as a result, Williams decided to stay at Jones Day.  *Id.*  According to Plaintiffs, however, Williams's "compensation was not increased to meet the [salary she had been offered at the other firm], even though she . . . received outstanding reviews until 2017."  *Id.* (3d Am. Compl. ¶ 164).  "[I]n her last year with the [f]irm, . . . Williams received a raise of just $10,000, despite billing over 2,100 hours."  *Id.*

Plaintiffs allege that Williams "did not earn as much as her male comparators at Jones Day who, upon information and belief, earned market salaries[,] despite the fact that they were in jobs requiring substantially equal work [to that required of Williams]."  *Id.* (3d Am. Compl. ¶ 165).  In particular, Plaintiffs allege that Williams:

> performed similar work to male associates Steven Gersten, Harrison Golden, Tom Panighetti, Gregory Martin, Adrian Garcia, and Robert Dahnke but nevertheless earned less than they did.  Upon information and belief, male associates Cyrus Ameri, John Migliarini, and Thomas Haldoren all earned more than she did when they were at her level.  All of these men performed similar work as she did, and upon information and belief attended similar firm-wide trainings.  Upon information and belief, Jones Day paid her less than male associates even though she routinely billed more hours than they did.

*Id.*  Williams alleges that she "attempted to address her compensation in late August 2015, but a partner told her not to request a raise because it would 'attract the wrong attention' from Managing Partner Brogan."  *Id.* at 49 (3d Am. Compl. ¶ 166).

Plaintiffs further allege that Williams was "subjected to sexist comments and marginalization." *Id.* (3d Am. Compl. ¶ 168).  They allege that women, including Williams, were pressured to drink to excess at Jones Day's social events and that, if they did not participate, they would "lose crucial [career] opportunities" or be "pegged by male attorneys as 'stuck up,' 'too intense,' or 'no fun,'" and therefore undesirable colleagues. *Id.*  On one occasion, "while traveling to a [f]irm-sponsored wine-tasting event by limousine," Williams alleges that "male Jones Day attorneys and male clients . . . began conducting a 'game' of 'F***, Marry, Kill," which was "popularized by Howard Stern" and requires players to assess three real people based on whether "they would wish to 'kill,' 'marry,' or 'f***'" them. *Id.*  Plaintiffs allege that "male Jones Day attorneys, including [a partner], targeted female associates to play along, asking them to select among the male attorneys at Jones Day they would wish to 'kill,' 'marry,' or 'f***,'" but that Williams and "the other female associates refused to engage and sat there in shocked discomfort." *Id.*

The complaint recounts various other experiences that Williams allegedly encountered, which Plaintiffs contend reflect the firm's bias against women.  First, "[c]oncerned about the lack of a clear path for success as a female attorney at Jones Day," Williams allegedly "reached out to potential mentors." *Id.* (3d Am. Compl. ¶ 170).  One senior female associate to whom she spoke "immediately reported the inquiry to" the administrative partner. *Id.* at 49–50 (3d Am. Compl. ¶ 170).  Second, Williams claims that a former Jones Day associate who had left the firm to work as an in-house counsel at a Jones Day client and who was also in a relationship with a Jones Day partner "gave a talk" to female associates in which "[s]he indicated that, in order to succeed at the [f]irm, women should not have children." *Id.* at 50 (3d Am. Compl. ¶ 171).  Third, Plaintiffs allege that during Williams's exit interview, a Jones Day partner responded to

her concerns about women's lack of upward mobility at the firm by "blam[ing] the [f]irm's own female recruits for the deficit, asserting . . . that they all 'choose to have families.'" *Id.* (3d Am. Compl. ¶ 172).

Plaintiffs allege that, despite Williams's continued excellent performance, she "received her first negative annual review in 2017." *Id.* (3d Am. Compl. ¶ 173).  She "had excelled at motion practice throughout 2016, billing 2,342 hours including significant pro bono work, while juggling community engagement representing the [f]irm for a total of 2,568 hours." *Id.* Nonetheless, the negative review "fixated on an incident in which another associate had dropped the ball on a motion that . . . Williams had turned over to that associate for completion." *Id.* (3d Am. Compl. ¶ 174).  Williams subsequently obtained a copy of her personnel file pursuant to California law, and the file "confirmed . . . that her evaluation for 2016 had been, once again, generally positive across the board, with the notable exception of the partner who blamed her for the error of her colleague." *Id.* at 51 (3d Am. Compl. ¶ 176).  According to Plaintiffs, "[t]his experience is exemplary of what women at Jones Day experience in their performance reviews" and, "[u]pon information and belief, Jones Day discriminates against female associates by awarding them lower overall ratings than their male colleagues, even when the individual reviews and ratings they received do not justify low overall ratings." *Id*. at 50–51 (3d Am. Compl. ¶ 174).  "In contrast," Plaintiffs continue, "the [f]irm awards male associates unwarranted positive reviews" and, by way of example, Plaintiffs allege on information and belief that "two male senior associates did not receive a lower review in 2015 after they failed to leave adequate time to prepare a summary judgment briefing and delegated important case management responsibilities to . . . Williams, who had been practicing law for less than a year and a half, and a female paralegal." *Id.* (3d Am. Compl. ¶ 175).  After this incident, one of the

male associates was eventually promoted to partner; the female paralegal was fired. *Id.* Williams asserts that she left Jones Day in the fall of 2017 because she concluded that she "had no prospect for partnership." *Id.* at 52 (3d Am. Compl. ¶ 183).

7.   *Saira Draper*

Plaintiff Saira Draper joined Jones Day's Atlanta office in 2011. *Id.* at 53 (3d Am. Compl. ¶ 184). According to Plaintiffs, Draper took on significant responsibility, achieved excellent results, and won high praise early in her tenure at Jones Day. *Id.* at 54–55 (3d Am. Compl. ¶¶ 188–94). In 2015, Draper took her first maternity leave, and, upon her return to the firm in July 2015, she found that "there was very little litigation work available." *Id.* at 55–56 (3d Am. Compl. ¶ 195). She sought, but was unable to find, billable work. When she complained to "office administration" about her lack of billable work, she was told that the problem was universal. *Id.* at 56 (3d Am. Compl. ¶ 196). Plaintiffs allege, however, that Draper's male colleagues had no difficulty finding work during this period. *Id.* Draper took on non-billable work, served on the office's diversity committee, recruited a new client to the firm, and engaged in pro bono work, which was encouraged by Jones Day. *Id.* at 56–57 (3d Am. Compl. ¶¶ 197–201).

Draper took a second maternity leave, and, "[s]everal months after [she] returned," the head of litigation at Jones Day's Atlanta office, Mike McConnell, asked her to stop working on general litigation and investigations and to start working exclusively in the firm's Tobacco Litigation Group. *Id.* at 57 (3d Am. Compl. ¶ 202). Plaintiffs allege that the "request was plainly punitive, because Jones Day associates are permitted to choose their practice groups." *Id.* at 58 (3d Am. Compl. ¶ 205). They further allege that, although Draper did not know it at the time, McConnell also asked several other associates who were either on parental leave or who

had just returned from it to join the Tobacco Litigation Group.  *Id.* (3d Am. Compl. ¶ 202).

Draper knew that joining the Tobacco Litigation Group would require a significant increase in

the time that she spent traveling for work.  *Id.* at 57–58 (3d. Am. Compl. ¶¶ 202–03).

     The Tobacco Litigation Group had two female partners.  *Id.* at 58 (3d Am. Compl.

¶ 204).  One of them was Stephanie Parker.  *Id.*  Draper asked McConnell if she could speak to

Parker "to inform her decision, but . . . McConnell insisted that all inquiries [be] run through

him."  *Id.* (3d Am. Compl. ¶ 206).  Draper asked to discuss the move with others in the Tobacco

Litigation Group, but McConnell told her not to disclose that he had asked her to join the group

and that he expected her decision within 24 hours.  *Id.* at 58–59 (3d Am. Compl. ¶ 206).  Draper

then asked McConnell if she could speak to the other female partner in the Tobacco Litigation

Group, who had children, and to "an associate of her class year who had been in the Tobacco

Litigation Group since she started at the [f]irm."  *Id.* at 59 (3d Am. Comp. ¶ 207).  McConnell

first informed Draper that he needed to check with Parker and then told Draper that she could

talk to the other female partner, but not to the associate.  *Id.*  Draper asserts that, after these

interactions with McConnell, she had the "impression that her future with the [f]irm was

contingent on her joining the Tobacco Litigation Group," and she therefore chose to move to that

group.  *Id.* (3d Am. Compl. ¶ 208).  She also claims that she was enticed by "promises that she

would gain significant litigation experience by participating in trials and taking depositions" in

the new group.  *Id.* at 60 (3d Am. Compl. ¶ 211).

     Plaintiffs allege that members of the Tobacco Litigation Group held Draper's initial

ambivalence about joining the group against her and, accordingly, "refused to assign her to

depositions and other skill-development opportunities."  *Id.* at 59 (3d Am. Compl. ¶ 209).  They

allege that the firm did not react in the same way, however, when a "male employee . . . asked

how he could make an assignment to the Tobacco Litigation Group work while also caring for his new baby." *Id.* Plaintiffs further allege that, once Draper joined the Tobacco Litigation Group, she learned that Parker had a reputation "for showing preferential treatment to men and hostility to any request for accommodation by women who were pregnant or nursing." *Id.* at 59–60 (3d Am. Compl. ¶ 210). Draper claims that the firm "froze her out of the promised opportunities to gain substantive trial or deposition experience" as a part of the new group. *Id.* at 60 (3d Am. Compl. ¶ 212). She eventually did get to work on a trial, however, and "was a valuable and committed contributor," earning the appreciation of the Cleveland partner who led the trial team, who said "he would love to work with her again." *Id.* at 60–61 (3d Am. Compl. ¶ 214). When she volunteered to assist that Cleveland "partner on his next trial," he agreed that she could join the team, but days later Draper was informed that "'the powers that be' wanted new members of the team." *Id.* at 61 (3d Am. Compl. ¶ 215). "[A] male associate from the earlier trial," however, "was staffed on the new trial team." *Id.* Draper alleges that "Parker overturned the [Cleveland] partner's request to staff . . . Draper on his team." *Id.*

Draper sought a meeting with Parker, explaining "that she wanted to discuss how to get more substantive experiences in the Tobacco Litigation Group." *Id.* (3d Am. Compl. ¶ 216). Parker asked McConnell to participate in the meeting. *Id.* Draper alleges that "[f]rom the start of the meeting, . . . Parker was openly hostile toward [Draper], blaming her for a lack of substantive experience" and criticizing Draper for attempting to be placed on a trial team without consulting Parker. *Id.* (3d Am. Compl. ¶ 218). Parker then told Draper that "the Tobacco Litigation Group was not a good fit for her and that she was being dismissed from the group." *Id.* Draper inquired why she had not been placed on more trials. *Id.* at 62 (3d Am. Compl. ¶ 219). Parker responded "that Tobacco Litigation Group partners had been reluctant to staff

[Draper] on their trials because of her higher billing rate and lack of tobacco-specific trial experience." *Id.* Draper commented that "this problem was obviously foreseeable at the time she was asked to join the group[] and that the [f]irm had set her up to fail," to which Parker responded: "It is what it is." *Id.*

Draper alleges that, one week later, she attended an "in-[f]irm women's event" at which two other women partners "offered the assembled associates tips on how to succeed as women at Jones Day." *Id.* (3d Am. Compl. ¶ 220). One partner asked if anyone had questions and then "surprised . . . Draper by asking her to" offer the first question. *Id.* Draper asked "how to navigate a work relationship where she had reason to believe a female partner was unsupportive of other female attorneys." *Id.* The two women partners said that they had never been in such a situation, and one later thanked Draper for asking a difficult question but did not inquire further into the situation that was the premise of Draper's question. *Id.* (3d Am. Compl. ¶ 221).

Draper "received her first negative annual review a few months" after her meeting with Parker, in the Spring of 2017. *Id.* at 63 (3d Am. Compl. ¶ 222). She was pregnant with her second child at the time. *Id.* McConnell told Draper that there were problems with her performance and that she was no longer on the partnership track, although it was possible that she could get back on it if she corrected course, and he provided her what Draper believed to be an "impossible" list of goals. *Id.* Draper claims to have worked hard and accomplished much prior to taking her second maternity leave in October 2017. *Id.* (3d Am. Compl. ¶ 223–24). But, after having returned from her second maternity leave in May 2018, she was told "that her career at Jones Day was over" and that she had six months "to find a new job." *Id.* (3d Am. Compl. ¶ 224). Draper's May 2018 evaluation "criticized [her] for lacking the very trial and deposition experience she had actively sought" and "accused her of being 'vocal about boundaries,'" a

phrase that Draper took to mean "speaking about her family [obligations] at work." *Id*. at 64 (3d

Am. Compl. ¶ 226).  Draper later discovered that a partner, Jamila Hall, had been the one to level

the "vocal about boundaries" criticism; Hall had never voiced such a concern to Draper herself.

*Id.* (3d Am. Compl. ¶ 227).  Draper asked the office's administrative partner "why no one from

the office had pushed back on [her] consensus statement" and was told that there was nothing to

be done about it and that the administrative partner and the partner in charge of the Atlanta office

had previously "spent six months trying to correct an untrue statement in another female

associate's consensus statement, to no avail." *Id.* at 65 (3d Am. Compl. ¶ 232).

Plaintiffs further allege that, during Draper's time at Jones Day, she "was paid less than

what certain male associates both in her office and across the [f]irm earned for doing comparable

work." *Id.* at 53 (3d Am. Compl. ¶ 187).  Plaintiffs contend that Jones Day paid Draper "less

than one Atlanta associate who was a year junior to . . . Draper and also in the Investigations &

White Collar Defense sub-practice group" to which Draper belonged before moving to the

Tobacco Litigation Group.  *Id.*  And, they further allege, "[u]pon information and belief, [that]

Jones Day also paid [Draper] less than two Atlanta male associates in the Tobacco [L]itigation

sub-practice group who were junior to her." *Id.* at 53–54 (3d Am. Compl. ¶ 187).  According to

Plaintiffs, a different male litigation associate in the Atlanta office made $220,000 as a fourth-

year associate, while Draper earned only $180,000 at the same stage of her career. *Id.* at 54 (3d

Am. Compl. ¶ 187).

8.    *Jaclyn Stahl*

Plaintiff Jaclyn Stahl began working as an associate at Jones Day's Irvine office in 2014

after finishing a clerkship on the Ninth Circuit Court of Appeals.  *Id.* at 66 (3d Am. Compl.

¶ 237).  Stahl alleges that she was subjected to gendered criticism at Jones Day.  One partner, for

18

example, "told her that she had a 'very stern face' that was 'off-putting.'"  *Id.* at 67 (3d Am. Compl. ¶ 241).  That same partner did not praise her hard work but, rather, criticized her for a minor error and for failing to complete a set of declarations (even though "one witness, a client, was on vacation and unavailable"), dismissed her explanations that she was trying her best and working very long hours (saying he did not f***ing care"), and once told her "you better figure it out, or else," before holding his hand in the shape of a gun and pretending to shoot himself in the head.  *Id.* (3d Am. Compl. ¶¶ 242–43).  Yet, while displaying this belligerent tone himself, the partner told her that she was being "too aggressive" in her efforts to settle a case and should "calm down."  *Id.* at 68 (3d Am. Compl. ¶ 244).

Plaintiffs further allege that "[t]he lone female partner in the Irvine office," Cheryl O'Connor "threatened, harassed, publicly humiliated, and spoke badly of . . . Stahl to people within the Irvine office and associates in other offices" and treated other female associates—but not male associates—in a similar manner.  *Id.* at 68–69 (3d Am. Compl. ¶¶ 245–46, 249).  On one occasion, after Stahl missed a meeting called by O'Connor because it was set "on short notice" and Stahl was "on a client call" on another case, O'Connor allegedly "stormed into . . . Stahl's office, slamming the door and screaming."  *Id.* at 68 (3d Am. Compl. ¶ 247).  Stahl claims that she "feared for her physical safety" due to O'Connor's behavior.  *Id.*  Stahl informed the administrative partner for the Irvine office, Darren Cottriel, about her conflict with O'Connor and requested to no longer have to work with her, but Cottriel did not "take her complaints seriously."  *Id.* at 68–69 (3d Am. Compl. ¶ 248).

Plaintiffs allege that Stahl received "positive" feedback during her 2016 annual review, which occurred in June 2017, but was nonetheless criticized "for looking insufficiently enthusiastic."  *Id.* at 69 (3d Am. Compl. ¶ 251).  She was also criticized for asking another

partner with whom she was working to "intervene to communicate her unavailability

to . . . O'Connor to work on a particular project." *Id*. at 70 (3d Am. Compl. ¶ 253). Plaintiffs

further allege that the firm "frequently assigned . . . Stahl work beneath her abilities and acumen,

in contrast to the work assigned to male associates." *Id*. at 70 (3d Am. Compl. ¶ 255). At the

same time Stahl was "told that she needed to take depositions" and was "encouraged . . . to

further her skills" as brief writer, she was allegedly criticized for "acting like certain work was

'beneath her'" and was told "that she must accept, and be grateful for, the work she was given."

*Id*. at 71 (3d Am. Compl. ¶¶ 258–59). In contrast, according to Plaintiffs, a male associate a year

junior to Stahl was allowed to turn down work from O'Connor so that he could spend his time

gaining experience with depositions. *Id.* (3d Am. Compl. ¶ 257).

Plaintiffs also allege that "female associates were put in charge of events such as staff

appreciation parties, while male associates were given the opportunity to plan an associate

business development event." *Id*. at 71–72 (3d Am. Compl. ¶ 261). At one point, a firm client

"made repeated inappropriate comments to . . . Stahl" while firm partners "look[ed] on," and,

when the client "insisted that . . . Stahl join him" and the partners for dinner, rather than

intervene, one of the partners "insisted that [she] attend the dinner." *Id*. at 72 (3d Am. Compl.

¶ 263). On another occasion, lawyers at the firm made dismissive comments about the

mentoring of female associates and referred to maternity leave as "six months' vacation." *Id.* at

73 (3d Am. Compl. ¶¶ 265–66). This attitude, according to Stahl, went beyond talk; "[m]ale

attorneys with children were given flexibility that was denied to female attorneys with children."

*Id.* (3d Am. Compl. ¶ 267). One male attorney, for example, "regularly left work at 5:00 PM to

attend to his five children, even as an associate," and, unlike female attorneys who attended to

their children, "[h]is commitment to the [f]irm was never questioned." *Id.* Plaintiffs allege that

"the repeated verbal abuse, the lack of praise for even exceptional work, and the more favorable treatment received by male comparators drove Stahl to the breaking point" and led her to take an extended medical leave in 2017.  *Id.* at 73 (3d Am. Compl. ¶ 268).  She states: "After observing the way other female attorneys were treated after they returned from leave, [she] knew that there would be no future for her at Jones Day once she returned from medical leave," so she left the firm.  *Id.* (3d Am. Compl. ¶ 269).

Finally, Plaintiffs allege that Jones Day "never paid [Stahl] the so-called market scale that, upon information and belief, it paid to male associates in jobs requiring substantially equal work."  *Id.* at 66 (3d Am. Compl. ¶ 239).  "Stahl suspects Jones Day paid male attorneys at her level more than it paid her," but she acknowledges that she is "unable to confirm this," in her view due to Jones Day's pay secrecy policy.  *Id.*

9.    *Katrina Henderson*

Plaintiff Katrina Henderson, an African-American woman, joined Jones Day's New York City office in October 2013, after graduating from New York University Law School.  *Id.* at 73–74 (3d Am. Compl. ¶ 270–71).  Jones Day assigned Partner Randi Lesnick as Henderson's partner mentor; Lesnick also assigned work to Henderson.  *Id.* at 74 (3d Am. Compl. ¶ 272).  Henderson alleges that Lesnick failed to mentor her and "relentlessly criticized . . . [her] for even minor infractions."  *Id.*  For example, Henderson once left the office to have dinner with her mother, who was visiting from out of town, "did not respond to an email for approximately one hour," and then returned to the office.  *Id.* (3d Am. Compl. ¶¶ 273–74).  The next day, Lesnick "berated" Henderson for finishing her assigned work two hours later (1:00 a.m., rather than 11:00 p.m.) than she would have had she not gone to dinner with her mother.  *Id.* (3d Am. Compl. ¶ 274).  Lesnick also criticized Henderson for going to the gym at lunch or in the

evenings, stating that "exercise might be 'good for [her] social life but not for [her] career.'" *Id.*
(3d Am. Compl. ¶ 275).  Once, while Henderson was on vacation visiting her family over the
winter holidays in 2013, she "did not respond to an email for twenty minutes." *Id.* (3d Am.
Compl. ¶ 276).  Lesnick "called . . . Henderson and berated her for failing to review a document
immediately, even though . . . Lesnick had not previously told . . . Henderson she needed to be
available and working at all times while she was on vacation." *Id.*  "So intense was . . .
Lesnick's attack that . . . Henderson suffered a panic attack." *Id.*  When Henderson returned to
the office after her vacation, Lesnick brought up "the incident again and attacked [her] for taking
vacation to be with her family," only letting up when Henderson began to cry. *Id.* (3d Am.
Compl. ¶ 277).  Plaintiffs allege that Henderson "never witnessed . . . Lesnick berate a male
associate in such fashion, nor did she ever witness anyone at the [f]irm question the commitment
of a male associate." *Id.* (3d Am. Compl. ¶ 278).

In the wake of the above conflict, Lesnick ceased assigning Henderson work, and
Henderson had a hard time finding replacement work, "suppressing her billable hours in 2014."
*Id.* at 76 (3d Am. Compl. ¶ 280).  Henderson asked other partners for advice, and they
encouraged her to "keep knocking on doors" looking for "work and suggested that things would
'blow over.'" *Id.* (3d Am. Compl. ¶ 281).  "She approached then-Partner Charmaine Slack, one
of the few other African-American women in Jones Day's New York Office, seeking advice
[about] how to address . . . Lesnick's behavior." *Id.* (3d Am. Compl. ¶ 282).  Slack told
Henderson "that women, and particularly women of color, had to work harder than everyone else
if they stood a chance of being allowed to stay at Jones Day" and encouraged Henderson to
apologize to Lesnick. *Id.*

Plaintiffs further allege that "Henderson's treatment stands in contrast to that of her male colleagues at Jones Day." *Id.* at 77 (3d Am. Compl. ¶ 284).  In February 2015, for example, "Henderson was staffed on a deal with . . . a white male associate in her class year," and while the other associate, Bret Stancil, was "consistently informed . . . of meetings and phone calls," the partner "persistently excluded . . . Henderson from these communications." *Id.*  Once, Henderson was given five minutes notice before a conference call was to take place and rushed to the partner's office to participate, only to be "humiliated" in front of the client when the partner said, "nice for you to finally join us." *Id.*  More generally, Plaintiffs allege that Stancil "received mentorship, support and access to partners that the [f]irm denied . . . Henderson." *Id.* (3d Am. Compl. ¶ 285).  Indeed, he was given so much work that "he sought to offload some of it to . . . Henderson—even though the two associates were the same class year and he had no supervisory authority over her." *Id.* at 77–78 (3d Am. Compl. ¶ 285).  Henderson "received little mentorship" and was never assigned a new associate mentor after her first one left the firm soon after Henderson arrived. *Id.* at 78 (3d Am. Compl. ¶ 286).

Plaintiffs allege that Henderson was paid "less than her white male colleagues," including Stancil, "even though the two did interchangeable work." *Id.* at 78 (3d Am. Compl. ¶ 287).  Plaintiffs further allege, on information and belief, that she was paid

> less than white male associates performing substantially equal work such as [four specific comparators].  [She] performed similar work as these male comparators, attended the same trainings, and understands that she likely billed more hours than [two specific comparators].   Indeed like . . . Henderson, . . . [one of the comparators] completed a mix of corporate work and real estate assignments in his first year with the Firm.

*Id.*  Plaintiffs allege that, "like all first-year Jones Day associates in 2013, . . . Henderson received a starting salary of $160,000," but she did not receive a raise when others, including two specific comparators, did. *Id.* at 78–79 (3d Am. Compl. ¶ 289).  When Henderson

"approached a male [p]artner requesting . . . reconsideration" of the decision to deny her a raise, she was told that there was nothing the partner could do about it.  *Id.* at 79 (3d Am. Compl. ¶ 290).

Henderson recalls attending a firm "women's meeting" at which a visiting speaker advised that female associates "should not act like men" in order to succeed in law, and, instead, should "strive to be themselves." *Id.* (3d Am. Compl. ¶ 292).  Lesnick and another female partner at the firm told the assembled women associates that they disagreed with that advice and, instead, counseled: "If [men] curse in a meeting[, then] you should curse too.  If [men] yell, you yell too." *Id.* (3d Am. Compl. ¶¶ 292–93).  According to Henderson, she also once attended a Jones Day diversity event at which firm representatives "lectured the women of color on how they needed to be more productive by coming in early, staying late, and constantly being responsive." *Id.* at 80 (3d Am. Compl. ¶ 294).

In May 2015, Henderson had her second annual review.  The partner conducting the review informed her that "she was on an upward trajectory," and she soon learned that she would receive a $20,000 raise. *Id.* at 81 (3d Am. Compl. ¶ 296).  Still, Henderson had a difficult time finding billable work, and she alleges that she knows of two other female associates who were also "denied the billable work necessary for advancement." *Id.* (3d Am. Compl. ¶¶ 297–98).

In December 2015, the same partner who had conducted Henderson's May 2015 annual review invited her to a meeting at which she was informed that she was being terminated. *Id.* at 81–82 (3d Am. Compl. ¶¶ 300–01).  Jones Day initially told Henderson that she would have "plenty of time" during which she could remain at the firm and search for new employment, but in February 2016 she was informed that she had only two to four more weeks to find a new job, *id.* at 82 (3d Am. Compl. ¶ 303), although upon complaining to HR she was given until June

2016 to remain at the firm and was "formally affiliated with the [f]irm through mid-July," *id.* (3d Am. Compl. ¶ 304).  "Henderson was not aware of any comparable male associate who was . . . forced to find another job outside the [f]irm during this period."  *Id.*

Henderson alleges that, "[a]round the time [she] was preparing to depart Jones Day, . . . Slack invited [her] to coffee outside the building." *Id.* (3d Am. Compl. ¶ 305).  There, Slack told Henderson

> that [Henderson] had a valid case against Jones Day and if . . . Henderson wanted to sue Jones Day for discrimination, she would be within her legal rights. . . .  Slack, however, warned . . . Henderson that she should not file suit, because Jones Day would "fight back," "drag [her] through the mud," and "ruin [her] reputation."

*Id.* (alterations in original).  Henderson claims that Slack's comments dissuaded her from actively opposing Jones Day's actions until becoming involved in the present action.  *Id.* at 83 (3d Am. Compl. ¶ 307).

## B.     Procedural Background

Plaintiffs' Third Amended Complaint contains twenty-three counts: (1) Count 1 alleges disparate treatment and impact and the creation of a hostile work environment on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, on behalf of all named Plaintiffs and a putative class; (2) Count 2 alleges disparate treatment and impact and the creation of a hostile work environment on the basis of pregnancy and maternity in violation of Title VII on behalf of Plaintiffs Tolton and Draper and a putative class; (3) Count 3 alleges discrimination, a hostile work environment, and retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, on behalf of Plaintiffs Tolton, Mazingo, and Draper and a putative class; (4) Count 4 alleges a violation of the Equal Pay Act of 1963, 29 U.S.C. § 216(b), on behalf of all named Plaintiffs and putative collective action plaintiffs; (5) Count 5 alleges disparate treatment and impact and the creation of a hostile work

environment on the basis of gender in violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940, *et seq.*, on behalf of Plaintiffs Tolton, Mazingo, Williams, and Stahl and a putative class; (6) Count 6 alleges disparate treatment and impact and the creation of a hostile work environment on the basis of pregnancy and maternity in violation of FEHA on behalf of named Plaintiff Tolton and a putative class; (7) Count 7 alleges discrimination, the creation of a hostile work environment, and retaliation in violation of the California Family Rights Act, Cal. Gov. Code § 12945.2, on behalf of Plaintiffs Tolton and Mazingo and a putative class; (8) Count 8 alleges denial of equal pay for equal work in violation of the California Equal Pay Act, Cal. Lab. Code § 1197.5, *et. seq.*, on behalf of Plaintiffs Tolton, Mazingo, Williams, and Stahl and a putative class; (9) Count 9, alleges unfair competition in violation of the California Business and Professions Code, Cal. Bus. & Prof. Code § 17200, *et seq.*, on behalf of Plaintiffs Tolton, Mazingo, Williams, and Stahl and a putative class; (10) Count 10 seeks civil penalties under the California Private Attorneys General Act of 2004, Cal. Lab. Code § 2698 *et seq.*, on behalf of Plaintiffs Tolton, Mazingo, and others similarly aggrieved; (11) Count 11 alleges disparate treatment and impact and the creation of a hostile work environment on the basis of gender in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq.*, on behalf of Plaintiffs Tolton, Mazingo, Williams, Draper, and Stahl and a putative class; (12) Count 12 alleges disparate treatment and impact and the creation of a hostile work environment on the basis of gender in violation of the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101, *et seq.*, on behalf of Plaintiff Henderson and a putative class; (13) Count 13 alleges unequal pay in violation of the New York Equal Pay Law, N.Y. Lab. Law § 194, on behalf of Plaintiff Henderson and a putative class; (14) Count 14 alleges retaliation in violation of Title VII on behalf of Plaintiffs Tolton and

Draper; (15) Count 15 alleges retaliation in violation of California's FEHA on behalf of Plaintiff

Tolton; (16) Count 16 alleges retaliation in violation of the DCHRA on behalf of Plaintiffs

Tolton and Draper; (17) Count 17 alleges wrongful termination in violation of Title VII on

behalf of Plaintiffs Tolton and Draper; (18) Count 18 alleges wrongful termination in violation of

California's FEHA on behalf of Plaintiff Tolton; (19) Count 19 alleges wrongful termination in

violation of the DCHRA on behalf of Plaintiffs Tolton and Draper; (20) Count 20 alleges

wrongful constructive discharge in violation of California's FEHA on behalf of Plaintiffs

Mazingo, Williams, and Stahl; (21) Count 21 alleges wrongful constructive discharge in

violation of the DCHRA on behalf of Plaintiffs Mazingo, Williams, and Stahl;[2] (22) Count 22

alleges wrongful termination in violation of the NYCHRL on behalf of Plaintiff Henderson; and

(23) Count 23 alleges race-based discrimination in violation of the Civil Rights Act of 1866, 42

U.S.C. § 1981, on behalf of Plaintiff Henderson.

Jones Day's motion for judgment on the pleadings does not take aim at all twenty-three

counts but, rather, asks the Court to dismiss: (1) all of Plaintiff Williams's claims; (2) all of

Plaintiff Henderson's claims; (3) all disparate impact claims; (4) all claims under the Equal Pay

Act and its state analogues; (5) all retaliation claims; (6) all claims brought under the DCHRA;

and (7) all claims for injunctive relief.  Dkt. 37 at 1.  After the parties completed briefing, the

Court heard oral argument on December 16, 2019.  Dkt. 79.

---

[2] Although the Third Amended Complaint states that Count 21 is brought on behalf of *all* Plaintiffs, Dkt. 41 at 130–31 (3d Am. Compl. ¶¶ 568–72), the Court construes this Count alleging wrongful constructive discharge to be brought on behalf of only the Plaintiffs who were not terminated by Jones Day: Plaintiffs Mazingo, Williams, and Stahl.

## II.  LEGAL STANDARD

"When evaluating a motion for judgment on the pleadings under Federal Rule of Civil

Procedure 12(c) courts employ the same standard that governs a Rule 12(b)(6) motion to

dismiss."  *McNamara v. Picken*, 866 F. Supp. 2d 10, 14 (D.D.C. 2012).  "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The facts alleged need not be "detailed," but

they must "allow[] the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged;" it is not enough to simply demonstrate the "sheer possibility that a

defendant has acted unlawfully."  *Id.* (first quote quoting *Twombly*, 550 U.S. at 555).

Accordingly, "[a] pleading that offers [only] 'labels and conclusions' or 'a formulaic recitation

of the elements of a cause of action will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  The

Court assumes the truth of the complaint's factual allegations, "even if doubtful in fact, and

construe[s] all reasonable inferences in favor of the plaintiff."  *Townsend v. United States*, 236 F.

Supp. 3d 280, 296 (D.D.C. 2017) (citing *Twombly*, 550 U.S. at 555; *Nurriddin v. Bolden*, 818

F.3d 751, 756 (D.C. Cir. 2016)).  It does not, however, assume the truth of legal conclusions

asserted within the complaint, *Iqbal*, 556 U.S. at 678, nor need it "accept inferences drawn by [a]

plaintiff[] if such inferences are unsupported by facts set out in the complaint," *Kowal v. MCI*

*Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Finally, "[a] defendant may raise the affirmative defense of statute of limitations via a

Rule 12[c] motion when the facts that give rise to the defense are clear from the face of the

complaint." *Potts v. Howard Univ. Hosp.*, 598 F. Supp. 2d 36, 38 (D.D.C. 2009) (citing *Smith–*

*Haynie v. District of Columbia,* 155 F.3d 575, 578 (D.C. Cir. 1998)).  Courts must be wary of

granting motions to dismiss based on statutes of limitations, however, because their application often relies on disputed factual questions.  Nevertheless, "[i]f 'no reasonable person could disagree on the date' on which the cause of action accrued, the court may dismiss a claim on statute of limitations grounds."  *Id.* (quoting *Smith v. Brown & Williamson Tobacco Corp.*, 3 F. Supp. 2d 1473, 1475 (D.D.C. 1998)).

## III.  ANALYSIS

**A.     Plaintiff Williams's Claims**

Jones Day first argues that all of Williams's claims fail at the pleading stage and that, accordingly, she cannot continue as a plaintiff in this action.  The firm contends that Williams (1) does not allege facts that, even if accepted as true, would support a plausible claim that her negative performance review was based on her gender; (2) does not allege facts sufficient to state a hostile work environment claim, and (3) has not stated a claim for constructive discharge.  *See* Dkt. 37 at 14–17.  The Court will consider each argument in turn.

1.     *Disparate Treatment Claim*

To establish a prima facie disparate treatment claim under federal, California, and D.C. law, a plaintiff must plausibly allege that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007); *see also Nielson v. Trofholz Techs., Inc.*, 750 F. Supp. 2d 1157, 1165 (E.D. Cal. 2010) (noting that California courts look to Title VII decisions for guidance in interpreting the California Fair Employment and Housing Act ("FEHA")); *Johnson v. District of Columbia*, 49 F. Supp. 3d 115, 121 n.3 (D.D.C. 2014) (noting that D.C. courts "'consistently rel[y] upon decisions of the federal courts in Title VII cases' in construing the [DCHRA]") (quoting *Daka, Inc. v. Breiner*, 711 A.2d 86, 94 (D.C.

1998)). "To survive a motion [for judgment on the pleadings], however, a Title VII plaintiff need not plead each element of [her] prima facie case, but 'must allege facts that, if true, would establish the elements of each claim.'" *Tressler v. Nat'l R.R. Passenger Corp.*, 819 F. Supp. 2d 1, 5 (D.D.C. 2011) (quoting *Robinson-Reeder v. Am. Council on Educ.*, 532 F. Supp. 2d 6, 14 (D.D.C. 2008)); *see also Townsend*, 236 F. Supp. 3d at 298 (discussing the rejection of a prima facie pleading requirement in employment cases).

According to Jones Day, the fundamental flaw with Williams's sex discrimination claims, whether asserted under federal or state law, is that Plaintiffs have failed to allege any facts even "suggesting a link between her sex and the only adverse action she alleges—a bad review in 2017 from a partner whose gender (female) Williams conveniently omits." Dkt. 58 at 10. As Jones Day acknowledges, Plaintiffs do allege that the review was "unfair[]," Dkt. 41 at 52 (3d Am. Compl. ¶ 180); that "[r]ather than acknowledging her positive performance," the firm "fixated on an incident in which another associate had dropped the ball on a motion that . . . Williams had turned over to that associate for completion," *id.* at 50 (3d Am. Compl. ¶ 174); and that "two male associates did not receive a lower review in 2015 after they failed to leave adequate time to prepare a summary judgment brief[] and," indeed, Jones Day, "promoted one of male associates to partner," *id.* at 51 (3d Am. Compl. ¶ 175). These allegations are insufficient, in Jones Day's view, because (1) "unfairness is not discrimination," Dkt. 37 at 14; (2) Plaintiffs' comparison of Williams to the two male associates is insufficient to support a plausible inference of discrimination because their misdeeds differed from Williams's own infraction, Dkt. 58 at 10–11; and (3) Plaintiffs do not allege that these male associates "were evaluated by the same supervisor as" Williams, *id.*

Jones Day is, of course, correct that a plaintiff asserting a disparate treatment claim must allege more than unfair treatment.  Here, however, Plaintiffs have alleged facts that, if true, "plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679.  They have alleged that "Williams was subject to sexist comments and marginalization within the [f]irm's culture," Dkt. 41 at 49 (3d Am. Compl. ¶ 168); that Williams received "strong reviews" and billed over 2,300 hours in 2016, *id.* at 50 (3d Am. Compl. ¶ 173); that she nonetheless received a "negative annual review in 2017" based "on an incident in which another associate dropped ball on a motion that . . . Williams had turned over to that associate for completion," *id.* (3d Am. Compl. ¶¶ 173–74); that—on information and belief—other female associates received "lower overall ratings than their male colleagues, even when the individual reviews and ratings they received [did] not justify low overall ratings," *id.* at 51 (3d Am. Comp. ¶ 174); and that—on information and belief—"two male associates did not receive a lower review in 2015 after they failed to leave adequate time to prepare a summary judgment brief[] and delegated important case management responsibilities to . . . Williams, who had been practicing law for less than a year and a half," *id.* at 51 (3d Am. Compl. ¶ 175).  To be sure, at least two of these allegations are based on information and belief, but "[e]ven after the Supreme Court's decisions in *Twombly* and *Iqbal*, a plaintiff may still plead facts on information and belief 'where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible.'"  *Hedgeye Risk Mgmt. LLC v. Helman*, 271 F. Supp. 3d 181, 189 (D.D.C. 2017) (citations omitted).

Nor is the Court persuaded that Williams's claims fail as a matter of law because the comparators were not identically situated or because she fails to allege that she had the same evaluator that they had.  Without first permitting discovery, the Court is not well positioned to

determine how close the comparison is, and, in any event, the comparison is not an implausible one; notably, both incidents allegedly involve associates who were unable to complete their work and who, as a result, delegated work to other associates. *Compare* Dkt. 41 at 50–51 (3d Am. Compl. ¶ 174) *to id.* at 51 (3d Am. Compl. ¶ 175). Courts regularly conclude that plaintiffs have stated facts giving rise to an inference of discrimination by alleging that comparators were treated differently, without fleshing out the exact relative characteristics of those comparators. In *Lawrence v. District of Columbia*, No. 15-595, 2019 WL 1101329 (D.D.C. Mar. 8, 2019), for example, the plaintiff alleged that he had been fired for certain criminal behavior, "while his white counterpart, who was convicted for 'similar' behavior, was not fired." 2019 WL 1101329, at *6. In moving to dismiss, the defendant argued "that plaintiff does not set forth specific facts about the nature of the charges the other employee faced, when the similar behavior allegedly occurred, whether the purported comparator faced any discipline, etc." *Id.* The court concluded that, at the motion to dismiss "stage in the proceedings, plaintiff has alleged enough for the case to move forward: that he is [of a protected class]; he was fired; and someone [outside his protected class] who faced similar charges, and was actually convicted of those charges, was not fired. *Id.* Similarly, in *Jones v. Ottenberg's Bakers, Inc.*, 999 F. Supp. 2d 185 (D.D.C. 2013), the court concluded that the plaintiff, a professional driver who had been in car accident, had sufficiently alleged facts giving rise to an inference of discrimination because he claimed that he was subjected to non-standard drug testing that was not required of "Caucasian drivers who had been involved in accidents." *Id.* at 191. The court did not, at the motion to dismiss stage, scrutinize, for example, the relative severity of the accidents in which the plaintiff and his alleged comparators had been involved or the relative degree of certainty that the employer had that the employees had not been at fault. *Id.* And, in *Winston v. Clough*, 712 F. Supp. 2d 1

(D.D.C. 2010) the court concluded that the plaintiff had alleged facts giving rise to an inference of discriminatory motive by alleging that "coworkers outside of [his] protected class used their cell phones more than he did, yet none was suspended or disciplined for it." *Id.* at 10. Together, these cases demonstrate that a plaintiff need not plead her similarity to alleged comparators with fine detail in order to state a disparate treatment claim. Moreover, here, the firm's use of "consensus statements" and a centralized evaluation process, Dkt. 41 at 5 (3d Am. Compl. ¶¶ 14–15), provides a possible counter to Jones Day's observation that Plaintiffs do not plead that "the male associates were evaluated by the same supervisor as" Williams, Dkt. 58 at 11. Again, without permitting some discovery, the Court cannot assess whether Williams will be able to show that the comparison that she posits is sound.

The Court, accordingly, concludes that Plaintiffs have alleged facts sufficient to state a disparate treatment claim relating to Williams's 2016 evaluation and corresponding compensation.

2.   *Hostile Work Environment Claim*

A plaintiff may recover under Title VII, the California FEHA, or the DCHRA if "(1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of her [gender]; and (4) the harassment affected a term, condition, or privilege of her employment." *Richardson v. Petasis*, 160 F. Supp. 3d 88, 123 (D.D.C. 2015); *see also Lyle v. Warner Bros. Television Prods.*, 132 P.3d 211, 220 (Cal. 2006) (noting that "California courts frequently seek guidance from Title VII decisions when interpreting the FEHA and its prohibitions against sexual harassment"); *Johnson*, 49 F. Supp. 3d at 121 n.3 (D.D.C. 2014) (noting that D.C. courts look to federal Title VII cases in DCHRA-hostile-work-environment cases); *Elam v. Bd. of Trustees of the Univ. of the District of Columbia*, 530 F.

Supp.2d 4, 21 n.7 (D.D.C. 2007) (noting that "[t]he elements of a hostile work environment

claim under the DCHRA mirror the federal requirements").  Harassment may include

"'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter

the conditions of the victim's employment and create an abusive working environment.'"

*Durant v. District of Columbia Gov't*, 875 F.3d 685, 700 (D.C. Cir. 2017) (citation omitted).

"This standard is a demanding one, as Title VII is not intended to function as a 'general civility

code' that regulates the 'ordinary tribulations of the workplace, such as the sporadic use of

abusive language, gender-related jokes, and occasional teasing.'"  *Burrell v. Shepard*, 321 F.

Supp. 3d 1, 12 (D.D.C. 2018) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788

(1998)); *see also Faragher*, 524 U.S. at 788 (explaining that "the conduct must be extreme to

amount to a change in the terms and conditions of employment").

The "[s]everity and pervasiveness" of the challenged conduct is "determined by reference

to 'all the [alleged] circumstances,' including 'the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance.'"  *Baird v. Gotbaum*

("*Baird II*"), 792 F.3d 166, 169 (D.C. Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S.

17, 23 (1993)).  "[O]n rare occasion[,] . . . a single, isolated incident can alone create a hostile

work environment" if, for example, that incident involves an "act[] of serious, physical violence

or sexual assault."  *Fields v. Vilsack*, 207 F. Supp. 3d 80, 94 (D.D.C. 2016) (collecting cases).

"[A]bsent such 'extreme circumstances,'" however, "'courts have refused to hold that one

incident is so severe as to constitute a hostile environment,'" and "'[e]ven a few isolated

incidents of offensive conduct do not amount to actionable harassment.'"  *Id.* (quoting *Stewart v.

Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002)).   In contrast, a plaintiff may state a hostile work

environment claim by alleging repeated incidents of less severe harassment or discrimination,

such as the use of a "racial slur" along with "myriad incidents ranging from threats of discipline

based on false accusations to being singled out and excluded from trainings and award

ceremonies and denied promotions." *Wise v. Ferriero*, 842 F. Supp. 2d 120, 126 (D.D.C. 2012);

*see also Holmes-Martin v. Leavitt*, 569 F. Supp. 2d 184, 188–89, 193 (D.D.C. 2008) (hostile

workplace claim stated where plaintiff alleged that defendant "transferred many of the plaintiff's

responsibilities to" others, maintained "an open-door policy" for a white male colleague, but not

for her, and required that white male to attend all meetings defendant had with plaintiff,

"isolated" plaintiff, "changed the locks on her office," "manipulated her performance

evaluations," and did not provide her with work to fill the vast majority of her days); *Burrell*,

321 F. Supp. 3d at 12 (hostile workplace claim stated where plaintiff alleged that a fellow

employee posted a derogatory video about her and her coworkers were allowed to criticize her

for reporting the video, she was isolated because she reported it, the woman who posted the

video was returned to her position, and plaintiff was denied accommodations for her work-

related stress and a subsequent injury, among other things).  Finally, court may consider

allegations of "discrete acts that the plaintiff claims . . . are actionable on their own" in

evaluating a plaintiff's hostile work environment allegations.  *Brooks v. Grundmann*, 748 F.3d

1273, 1278 (D.C. Cir. 2014).  A plaintiff must nonetheless meet her burden of pleading severe

and pervasive harassment; pleading such discrete acts is not necessarily sufficient.  *See Outlaw v.

Johnson*, 49 F. Supp. 3d 88, 92 (D.D.C. 2014).

  To begin, Plaintiffs' assertion that "Williams may combine her allegations with those of

the other Plaintiffs to show a hostile work environment" is incorrect.  Dkt. 43 at 44.  Rather,

[c]onduct that [the plaintiff] did not know about . . . cannot be used to establish that [s]he was

subjected to a hostile work environment." *Wise*, 842 F. Supp. 2d at 126.  Therefore, unless Williams alleges that she was aware of discrete instances of harassment that the other Plaintiffs allegedly suffered (which she has not), those incidents cannot support her hostile work environment claim. *See Harris*, 510 U.S. at 21–22 ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.").

Turning to Plaintiffs' allegations relating to what Williams herself experienced, Jones Day incorrectly asserts that Plaintiffs have alleged "only one specific example of supposedly unwelcome conduct"—a game of "F***, Marry, or Kill" to which Williams and other female attorneys were subjected—and that this single event, which occurred outside the statute of limitations, is not enough to state a hostile work environment claim.  Dkt. 37 at 15.  As Jones Day goes on to acknowledge, Plaintiffs recount other incidents of alleged harassment Williams experienced: two "sexist comments" blaming women's decisions to rear children for their lack of success at the firm.  *Id.* at 16.  And, beyond that, Plaintiffs allege (1) that women were pressured to engage in "excessive drinking" at "[f]irm social events" and, if they did not, they would "lose crucial [career] opportunities" or be "pegged by male attorneys as 'stuck up,' 'too intense,' or 'no fun,'" Dkt. 41 at 49 (3d Am. Compl. ¶ 168), (2) that when Williams "reached out to potential mentors" based on her "[c]oncern[] about the lack of a clear path for success as a female attorney at Jones Day," one female senior associate who she approached "reported the inquiry" to a male partner, *id.* at 49–50 (3d Am. Compl. ¶ 170); (3) that she was underpaid compared to her male colleagues who "performed similar work," *id.* at 48 (3d Am. Compl. ¶ 165); (4) that her consensus statement focused on lone negative individual reviews more so than those of male associates, *id.* at 50–51 (¶ 174); (5) that she was reviewed more harshly than male associates who

committed similar errors, *id.* (3d Am. Compl. ¶¶ 174–75); and (6) that she was informed that, in order to become a partner at Jones Day, she could have no negative reviews, but men were not held to the same exacting standard, *id.* at 52 (3d Am. Compl. ¶¶ 180–81).

Even construing the complaint in the light most favorable to Williams, *see Williams v. District of Columbia*, 771 F. Supp. 2d 29, 30–31 (D.D.C. 2011), the Court concludes that the facts Williams has alleged "are not the kind of 'extreme' conditions that [the D.C. Circuit] and the Supreme Court have found to constitute a hostile work environment." *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 237 (D.C. Cir. 2018) (quoting *Faragher*, 524 U.S. at 788). Some of Plaintiff's discrete allegations may support findings of unlawful disparate treatment, but they simply do not constitute the type of "'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Durant*, 875 F.3d at 700 (citation omitted).

The Court, accordingly, will dismiss the portions of Counts 5 and 11 based on Williams's hostile work environment claims.

### 3.    *Constructive Discharge under FEHA (Count 20) and DCHRA (Count 21)*

Defendant next argues that Williams's constructive discharge claim fails.  To state a claim for constructive discharge, a plaintiff must allege facts that could plausibly "show that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Penn. State Police v. Suders*, 542 U.S. 129, 134 (2004).  This is a more demanding standard than that required to plead a hostile work environment, *see Steele v. Schafer*, 535 F.3d 689, 694–95 (D.C. Cir. 2008), which means that Williams has not met it either.  Furthermore, Plaintiffs allege that Williams decided to leave Jones Day because she concluded that "she had no prospect for partnership," Dkt. 41 at 52 (3d Am. Compl. ¶ 183), not because the working

37

conditions were intolerable.  Accordingly, the Court will dismiss Counts 20 and 21 as to Williams.

**B.** **Plaintiff Henderson's Claims**

        1.    *Timeliness of Henderson's NYCHRL Claims of Gender Discrimination*

Jones Day argues that Henderson's claims for wrongful termination and gender discrimination under the NYCHRL are time-barred because any adverse employment action based on her sex occurred more than three years before she filed the present action.  Dkt. 37 at 17–21.  Plaintiffs offer three arguments in response.  First, they contend that her wrongful termination claim under the NYCHRL did not accrue until her last day of employment, rather than on the day that she was informed of her termination.  Dkt. 60 at 10–13.  Second, they briefly argue that the continuing violations doctrine applies and that Jones Day's discriminatory actions within the statute of limitations were sufficiently related to the firm's other discriminatory actions to bring them within the statute of limitations.  *Id.* at 14–15.  Third, Plaintiffs assert that Jones Day should be equitably estopped from invoking a statute of limitations defense because a Jones Day partner, Charmaine Slack, discouraged Henderson from bringing suit by threatening that the firm would "fight back," "drag [her] through the mud," and "ruin [her] reputation" if she did so.  Dkt. 41 at 82 (3d Am. Compl. ¶ 305) (alterations in original); Dkt. 60 at 15–17.  The Court will consider each set of arguments in turn, bearing in mind that when a defendant moves for judgment on the pleadings on statute of limitations grounds, the Court should not dismiss the claim unless the timeliness defect is undisputed and appears on the face of the complaint.  *Potts*, 598 F. Supp. 2d at 38 (citing *Smith–Haynie,* 155 F.3d at 578).

a.      Statute of Limitations

Claims for gender discrimination under the NYCHRL are subject to a three-year statute

of limitations.[3]  N.Y.C. Admin. Code § 8-502(d).  Henderson alleges that she was informed of

her termination in December 2015.  Dkt. 41 at 81–82 (3d Am. Compl. ¶¶ 300–01).  Relying on

that allegation, Jones Day argues that her claims under the NYCHRL accrued in December 2015

and that the statute of limitation, accordingly, expired in December 2018, months before she

brought the present action.  Dkt. 37 at 17.  Nor does it matter, according to Jones Day, that

Henderson was only informed that she was being terminated in December 2015 but did not cease

working for the firm until months later.  As Jones Day explains, Henderson was originally given

a termination date of sometime in February or March 2016, which—like the December 2015

date—is still outside the statute of limitation.  The fact that Henderson was not removed from the

payroll until June 2016 and was "formally affiliated with the Firm through mid-July," Dkt. 41 at

82 (3d Am. Compl. ¶¶ 303–04), does not save her claim, according to Jones Day, because

Henderson does not plausibly allege that Jones Day unlawfully discriminated against her when it

agreed to continue paying her, and agreed to allow her to maintain a formal affiliation with the

firm, after her original termination date.

Plaintiffs respond that "Henderson's wrongful discharge claim is timely because it

accrued on the last day of her employment."  Dkt. 43 at 46 n.42.  They implicitly concede that a

wrongful discharge claim accrues under the federal antidiscrimination laws on the day the person

is informed of her termination, and not on the last day the person is employed.  *Id.*  They argue,

---

[3]  The Court does not understand Plaintiff Henderson to bring a claim for wrongful termination
based on race under the NYCHRL.  *See* Dkt. 41 at 131 (3d Am. Compl. ¶ 574) (Count 22
alleging wrongful termination in violation of the NYCHRL "due to gender discrimination").
Likewise, Count 12 alleges gender discrimination in violation of the NYCHRL, not race-based
discrimination.  *Id.* at 120 (3d Am. Compl ¶ 497).

however, (1) that "[r]ecent amendments to [the] NYCHRL require courts to construe the [law] 'broadly in favor of discrimination plaintiffs, to the extent such a construction is reasonably possible,'" *id.* (quoting *Albunio v. City of New York*, 947 N.E.2d 135, 137 (N.Y. 2011)); (2) that New York courts look to "counterpart federal laws only as a floor," *id.* (citing *Bennett v. Health Mgmt. Sys., Inc*, 936 N.Y.S.2d 112, 119 (N.Y. App. Div. 2011); and (3) that because it is "reasonably possible" to construe the NYCHRL to delay the start of the statute of limitations until the last day the employee is "affiliated" with her employer, the NYCHRL statute of limitations did not start to run until July 2016, *id.*  In effort to further bolster this argument, Plaintiffs further contend that New York City law provides that "the availability of a statute of limitations defense should 'be construed narrowly in order to maximize deterrence of discriminatory conduct.'"  Dkt. 43 at 46 n.42 (citing N.Y.C. Admin. Code § 8-130(b)).

Under New York law, "an employment discrimination claim accrues on the date that an adverse employment determination is made and communicated to the plaintiff," and the mere "possibility that the determination [might be] reversed . . . is insufficient to toll the limitations period."  *Cordone v. Wilens & Baker*, 730 N.Y.S. 2d 89, 90 (N.Y. App. Div. 2001).  The "recent amendments" to the New York City Administrative Code, referred to as the "Restoration Act," moreover, are not particularly recent—they were enacted by the City Council in 2005, *see* Local Law No. 85 [2005] of City of NY § 1—yet Plaintiffs fail to cite a single case even suggesting that wrongful discriminatory termination claims under the NYCHRL do not accrue on the date that the plaintiff is informed of her termination.  That rule, moreover, coheres with the relevant statutory text; the action must be brought within three years of "the alleged unlawful discriminatory practice or act."  N.Y.C. Admin. Code § 8-502(d).  To the extent that the alleged

discriminatory act was Henderson's termination, *id.* § 8-107(1)(a), the statute of limitations has run.

To the extent that the discriminatory act was Jones Day's alleged disparate payment of Henderson, however, Plaintiffs have plausibly stated a claim that Henderson was subject to unlawful sex-based discrimination after she was informed of her termination in December 2015 in the form of each paycheck that she was issued during the statutory period.  Under Title VII, as modified by the Lilly Ledbetter Fair Pay Act of 2009 ("Fair Pay Act"), Pub. L. No. 111–2, 123 Stat. 5 (Jan. 29, 2009), "each paycheck resulting from the original 'discriminatory compensation decision or other practice' triggers a new filing period, in effect reviving a claim that otherwise would have been time-barred." *Johnson v. District of Columbia*, 632 F. Supp. 2d 20, 21 (D.D.C. 2009); *see also Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 375 (D.C. Cir. 2010). This means that a plaintiff's "statute of limitations clock effectively resets each time she receive[s] a paycheck from [her employer]." *Hammel v. Marsh USA Inc.*, 206 F. Supp. 3d 219, 231 (D.D.C. 2016).  Some New York courts have read this claim accrual provision of the 2009 Fair Pay Act into the NYCHRL, in part because "[i]nterpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws as a floor below which the City's Human Rights law cannot fall." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting Restoration Act, N.Y.C. Local Law No. 85 (2005), § 7).  In *Husser v. New York City Department of Education*, 137 F. Supp. 3d 253 (E.D.N.Y. 2015), the court held that, as a matter of New York law, Congress's enactment of the federal Fair Pay Act required New York courts to give state law "similar constructions." *Id.* at 264–65.  It further noted that, because of the mandate to interpret the NYCHRL "broadly to achieve its

41

remedial goal . . . , New York courts rely on the Ledbetter Act to treat claims of pay discrimination under the NYCHRL as continuing violations."  *Id.* at 264–65; *Whitt v. Kaleida Health*, 298 F. Supp. 3d 558, 573–74 (W.D.N.Y. 2018); *see also Williams v. Deutsche Bank Group*, No. 151112, 2013WL1455924, at *6 (N.Y. Sup. Apr. 4, 2013) ("Contrary to defendants' argument that the Fair Pay Act is not applicable here, the statute has been found to apply to discrimination claims brought under state and city law.") (collecting cases).  At least one decision, *Russell v. County of Nassau*, 696 F. Supp. 2d 213 (E.D.N.Y. 2010), however, takes a different view, observing that "the New York legislature [has not] enacted a statute similar to the Ledbetter Act" and therefore that its claim accrual provision does not apply to the comparable New York law.  *Id.* at 230.

Henderson has alleged that Jones Day's determinations of her pay were discriminatory, *see* Dkt. 41 at 78–79 (3d Am. Compl. ¶¶ 287–90) (discussing Henderson's salary freeze after her first year), and that she continued to receive paychecks that plausibly "result[ed] from the original [allegedly] 'discriminatory compensation decision,'" *Johnson*, 632 F. Supp. 2d at 21, into the statutory period, *see* Dkt. 41 at 82 (3d Am. Compl. ¶ 304) (stating that Henderson "remained on the [f]irm's payroll through the end of June 2016").  As a matter of federal law, those paychecks "trigger[ed] a new filing period, in effect reviving a claim that otherwise would have been time-barred."  *Johnson*, 632 F. Supp. 2d at 21.  That same conclusion may well apply under the NYCHRL, but because the parties have yet to brief this issue, the Court will refrain from deciding the question in the present posture of the case.  The unanswered question, however, is sufficient ground to deny Jones Day's motion to dismiss this sliver of Henderson's claim.

b.  Equitable Tolling and Estoppel

Plaintiffs also argue that Henderson is entitled to discovery to determine whether equitable tolling or estoppel applies under the theory that, when "Partner Charmaine Slack informed [Henderson] that she should not 'sue Jones Day for discrimination . . . because Jones Day would destroy her career,'" Dkt. 43 at 47 (citing Dkt. 27 at 75 (Am. Compl. ¶ 291)), Defendant "wrongfully induced [Henderson] to refrain from timely commencing [the] action by deception, concealment, threats or misconduct," *Overall v. Estate of Klotz*, 52 F.3d 398, 404 (2d Cir. 1995) (quoting *Zoe G. v. Frederick F.G.*, 617 N.Y.S.2d 370, 371 (N.Y. App. Div. 1994)). Jones Day responds that, regardless of what discovery might show, neither equitable tolling nor equitable estoppel can provide Plaintiffs' with relief. *See* Dkt. 61 at 10. The Court agrees.[4]

Equitable tolling "prevents the running of a statute of limitations against the plaintiff who is unaware that [she] has a cause of action because of the defendant's fraudulent acts of concealment." *Pell v. Trs. of Columbia Univ. in City of New York*, No. 97 Civ. 0193, 1998 WL 19989, at *7 (S.D.N.Y. 1998) (quoting *Bennett v. U.S. Lines*, 64 F.3d 62, 66 (2d Cir. 1995)). It does not apply here. Henderson alleges neither that she did not know of her cause of action nor that Jones Day did anything to conceal it from her.

Equitable estoppel applies "where 'the plaintiff knew of the existence of a cause of action but the defendant's conduct caused the plaintiff to delay the bringing of a lawsuit.'" *Pell*, 1998 WL 19989, at *7 (quoting *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995)). In New York, however, "[f]ear of harm to a plaintiff's career cannot justify equitably estopping a defendant from asserting a time limitation period." *Geiss v. Weinstein Co. Holdings LLC*, 383 F.

---

[4] The Court engages in this equitable tolling and estoppel analysis to address the possibility that it might revive Plaintiff Henderson's wrongful termination claim or her claims based on allegedly discriminatory conduct that occurred outside of the statutory period.

Supp. 3d 156, 173 (S.D.N.Y. 2019) (quoting *Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1318 (S.D.N.Y. 1997)).   As a result, even accepting the truth of Plaintiffs' allegations, Slack's comments to Henderson do not support the application of equitable estoppel. Nor is the Court persuaded that discovery could remedy this difficulty.  Williams's account of what happened—and how it affected her decision whether to bring a NYCHRL claim against Jones Day—is entirely available to her and is before the Court.  Plaintiffs have failed to explain what further facts they might develop through discovery that would add to their equitable responses to Jones Day's statute of limitations defense.

\*   \*   \*

The Court, accordingly, concludes that Henderson's NYCHRL wrongful termination claim accrued in December 2015 and has since expired.  It will therefore dismiss that claim. Jones Day, however, has not carried its burden of showing that Plaintiffs' claim for sex discrimination under the NYCHRL based on Henderson's pay during the three-year period before she joined the present action is untimely.[5]

---

[5] Plaintiffs contend that Henderson's NYCHRL claims are timely under the continuing violation doctrine.  As Plaintiffs observe, New York courts have recognized that "[a] continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice."  *Matter of Lozada v. Elmont Hook & Ladder Co. No. 1*, 54 N.Y.S.3d 688, 689–90 (N.Y. App. Div. 2017) (quoting *Clark v. State of New York*, 754 N.Y.S.2d 814, 817 (N.Y. App. Div. 2003)).  The parties devote little attention to the scope of this doctrine; the extent to which, under New York law, it extends beyond hostile work environment claims; what is required to establish an ongoing "discriminatory policy or practice;" or its interaction with the Ledbetter Fair Pay Act as it may have been incorporated into the NYCHRL.  The Court need not decide the applicability of the continuing violations doctrine or the full scope of the conduct forming the basis for Plaintiffs' NYCHRL claim at this juncture and will not do so given the lack of comprehensive briefing on the subject.

2.      *Henderson's 42 U.S.C. § 1981 Claim*

Jones Day also challenges the timeliness of Plaintiffs' claim that the firm discriminated

against Henderson based on her race in violation of 42 U.S.C. § 1981.  Plaintiffs' claim that

Jones Day denied Henderson "the enjoyment of all benefits, privileges, terms, and conditions of

[its] contractual relationship" based on her race, 42 U.S.C. § 1981(b), is subject to a four-year

statute of limitation, *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382–85 (2004); *see also*

Dkt. 60 at 18 n.6; Dkt. 58 at 7 (parties agreeing that a four-year statute of limitations applies to

this claim).   Furthermore, "[o]rdinarily, claims asserted in an amended complaint relate back to

the date of the original pleading if they arose out of the conduct described in the original

complaint." *Uzoukwu v. Metropolitan Washington COG*, 130 F. Supp. 3d 403, 413 (D.D.C.

2015) (citing Fed. R. Civ. P. 15(c)(1)(B)).  Henderson's original complaint, filed on June 24,

2019,[6] describes the same conduct that gave rise to her later asserted racial discrimination claim.

Accordingly, the governing statute of limitations covers conduct occurring after June 24, 2015.[7]

"To state a claim for racial discrimination under Section 1981, a plaintiff must allege that

(1) [she] is a member of a racial minority; (2) the defendant intended to discriminate against the

plaintiff on the basis of race; and (3) the discrimination concerned an activity enumerated in

§ 1981." *Mazloum v. District of Columbia Metro. Police. Dep't*, 522 F. Supp. 2d 24, 37 (D.D.C.

2007) (quoting *Williams v. Fed. Nat'l Mortgage Ass'n*, No. 05-1483, 2006 WL 1774252, at *4

(D.D.C. Jun. 26, 2006)).  Plaintiff Henderson has stated a claim based on Jones Day's

---

[6] Plaintiff Henderson was not included in the first complaint in this action, filed on April 3, 2019 by Plaintiffs Tolton, Mazingo, and three Jane Doe plaintiffs of whom Henderson was not one. Dkt. 4; *see also* Dkt. 27-1 at 1, 72–79.

[7]  The parties assume that the relevant beginning of the limitations period is August 2015, four years prior to Henderson's filing of the third amended complaint, which first alleged race-based discrimination.  The difference between April and August 2015, in any event, is not dispositive.

termination of her employment in December 2015, which falls within the four-year statutory period.  First, Henderson is African American.  Dkt. 41 at 80 (3d Am. Compl. ¶ 295).  Second, Plaintiffs allege facts that could plausibly support the conclusion that Henderson's termination was based, at least in part, on her race, *see* Dkt. 41 at 132 (3d Am. Compl. ¶ 580), and has done considerably more than "merely invoke h[er] race in the course of [the] claim's narrative," Dkt. 58 at 7 (quoting *De La Fuente v. DNC Servs. Corp.*, No. 18-336, 2019 WL 1778949, at *4 (D.D.C. Apr. 23, 2019)).  She alleges, for example, that she was told by an African-American partner that "women of color . . . had to work harder than everyone else" in order to stand "a chance of being allowed to stay at Jones Day."  Dkt. 41 at 76 (3d Am. Compl. ¶ 282).  She alleges that Jones Day invited her to attend a "diversity event" that was "attended only by about a dozen lawyers, nearly all of whom were women of color," and that "Jones Day did not discuss its diversity initiatives or how it could improve in this area, but instead lectured the women of color on how they needed to be more productive by coming in early, staying late, and constantly being responsive."  *Id.* at 80 (3d Am. Compl. ¶ 294).  She further alleges that she was paid less than a "white male associate . . . even though the two did interchangeable work," that she made less than other "white male associates performing substantially equal work" and, indeed, that "she likely billed more hours" than at least two of those white male associates."  *Id.* at 78 (3d Am. Compl. ¶ 287).  Third, termination of employment qualifies as "an activity enumerated in § 1981."  *Mazloum*, 522 F. Supp. 2d at 37; 42 U.S.C. § 1981(b) (enumerated activities include "the making, performance, modification, and termination of contracts, and the enjoyments of all benefits, privileges, terms, and conditions of the contractual relationship"); *see also Dickerson v. District of Columbia*, 315 F. Supp. 3d 446, 453–55 (D.D.C. 2018); *Bowie v. Gonzales*, 433 F.

46

Supp. 2d 24, 29–30 (D.D.C. 2006) (acknowledging that asserting "wrongful termination based on . . . race" states a claim under § 1981).

Jones Day closely parses Plaintiffs' complaint in an effort to distinguish between Henderson's claims of sex and race discrimination and to show that Plaintiffs have failed to allege the Jones Day engaged in any racially discriminatory conduct after August 2015.  Dkt. 58 at 6–9.  But, reading the complaint "in the light most favorable to [Plaintiffs]," *Williams*, 771 F. Supp. 2d at 30–31, the allegations of racial discrimination against Henderson throughout her time at the firm paired with her sudden termination in December 2015, Dkt. 41 at 81–82 (3d Am. Compl. ¶¶ 300–02), and partner Slack's targeted comments informing Henderson that she could bring a discrimination claim against the firm, *id.* at 82–83 (3d Am. Compl. ¶ 305–06), plausibly state a claim for wrongful termination in violation of § 1981.

In responding to Henderson's § 1981 claim, Jones Day also makes much of Plaintiffs' allegations that the firm attempted to recruit minority employees and held special events for women of color, asserting that these allegations undermine any claim of race-based discrimination.  Dkt. 58 at 8 (citing Dkt 41 at 80 (3d Am. Compl. ¶¶ 294–95)).  But it is possible for the same employer to both favor candidates of one race during recruitment and to discriminate against of the same race once they have joined the firm.  *Cf. Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1150 (D.C. Cir. 2004) ("[E]ven if a plaintiff is replaced by someone within her class, she could still demonstrate that the employer treated her worse than others because she was a member of the protected class.") (citing *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 353 (3d Cir. 1999)).  Jones Day also argues that Henderson "relies on the same allegations that previously formed the basis for her claims alleging sex discrimination, only now she has added 'white' to the description of the male associates who were allegedly

47

disfavored."  Dkt. 58 at 8 (citing Dkt. 41 at 77–78 (3d Am. Compl. ¶¶ 283, 284, 287)).  But it is

not disqualifying—or even uncommon—for plaintiffs to allege, based on the same adverse

employment action, that they were discriminated against based both on their sex and their race.

*See, e.g.*, *Savage v. Azar*, 317 F. Supp. 3d 438, 439 (D.D.C. 2018) (discussing plaintiff's claim

that her employer's "refusal to transfer her out of her position was unlawful discrimination on

the basis of race or sex in violation of Title VII").

 The Court therefore concludes that Henderson's claim of racial discrimination in

violation of § 1981 is not barred by the statute of limitations.

**C. Plaintiffs' Disparate Impact Claims**

 In addition to asserting various disparate treatment claims, Plaintiffs invoke a disparate

impact theory of recovery in six counts of the Third Amended Complaint.  Dkt. 41 at 97, 99,

104–06, 118–19, 121 (3d Am. Compl. ¶¶ 376–77, 388, 418–19, 428, 430–431, 484, 487, 497,

501) (Counts 1, 2, 5, 6, 11, 12).  Although those counts allege claims under Title VII and

California, D.C., and New York law, the parties address all six claims under the framework that

governs Title VII disparate impact claims,[8] *see* Dkt. 37 at 21; Dkt. 43 at 11 n.2, and the Court

does so as well.  *See Davis v. District of Columbia*, 925 F.3d 1240, 1249 (D.C. Cir. 2019) (Title

VII framework governs DCHRA claims); *Gordon v. City of New York*, 14-6115,

2018WL4681615, at *22 (S.D.N.Y. Sept. 28, 2018) (noting the similar treatment of disparate

impact claims brought under the NYCHRL and Title VII); *King v. Stanislaus Consol. Fire*

---

[8]  Plaintiffs state that "[f]or purposes of this motion, besides NYCHRL claims, Plaintiffs do not
contend that any relevant differences exist for the disparate-impact claims under federal and state
laws."  Dkt. 43 at 11 n.2.  Because the Court concludes that all of Plaintiffs' disparate impact
claims survive under the Title VII framework and caselaw, and because Plaintiffs argue that the
NYCHRL is even more permissive of Plaintiffs' disparate impact claims, *see id.*; *see also id.* at
46 & n.42, the Court need not address here any difference that might result from applying the
NYCHRL caselaw.

*Protection Dist.*, 985 F. Supp. 1228, 1234 (E.D. Cal. 1997) ("Disparate impact claims under Title VII and [the California] FEHA are . . . analyzed under the same rules."). According to Jones Day, all of Plaintiffs' disparate impact claims fail as a matter of law. Although Plaintiffs will, once again, face a far steeper hill at summary judgment, the Court is persuaded that they have alleged enough to survive Defendant's motion for judgment on the pleadings with regard to their sex-based disparate impact claims, but not their pregnancy- or maternity-based disparate impact claims.

A disparate treatment claim alleges that an employer intentionally discriminated against an employee based on that employees' protected status, such as sex or race. *See 2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 682 (D.C. Cir. 2006). A disparate impact claim, in contrast, alleges that a facially neutral employment practice "causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). To state a disparate impact claim, the plaintiff must do more than allege a gender or "racial *imbalance* in the work force." *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 656–57 (1989). Rather, the plaintiff must allege facts that plausibly support a claim that "the application of a specific or particular employment practice . . . has created the disparate impact under attack." *Id.* at 657; *see also Smith v. City of Jackson*, 544 U.S. 228, 241 (2005); 42 U.S.C. § 2000e-2(k)(1)(A)(i). Ultimately, the plaintiff must prove that "each particular challenged employment practice causes a disparate impact," unless "the [plaintiff] can demonstrate . . . that the elements of [her employer's] decisionmaking process are not capable of separation  for analysis," in which case the court "may . . . analyze[]" the process "as one employment practice." 42 U.S.C. § 2000e-2(k)(1)(B)(i). "[T]o sustain a disparate impact claim, a 'plaintiff must generally demonstrate with statistical evidence that the practice or policy has an adverse

effect on the protected group.'"  *Wu v. Special Counsel*, No. 14-7159, 2015 WL 10761295 at \*1

(D.C. Cir. Dec. 22, 2015) (quoting *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of

Hous. & Urban Dev.*, 639 F.3d 1078, 1085–86 (D.C. Cir. 2011)).  But "to withstand a Rule

12(b)(6)" or Rule 12(c) motion, a plaintiff is not required to offer "prima facie proof []or detailed

factual allegations."  *Id.*  It is enough to allege facts, if accepted as true, that are sufficient to

"allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged," and "to raise a right to relief above the speculative level."  *Id.* (first quoting *Iqbal*, 556

U.S. at 678, and then quoting *Twombly*, 550 U.S. at 555)).   Finally, although disparate treatment

and disparate impact claims are analytically distinct, nothing prohibits plaintiffs from bringing

both types of claims together to challenge the same or related conduct.  *See McReynolds v.

Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 1, 28 (D.D.C. 2004) ("Indeed, a disparate

treatment claim may morph into a disparate impact claim, depending on the employment

practices involved and the defendant's arguments.").

     1.    *Identification of a Practice or Policy*

     Defendant first argues that Plaintiffs have not identified "a specific employment practice"

and that Plaintiffs' challenge to Jones Day's black-box compensation system is overly general

because that term is simply a "derogatory label for Jones Day's *overall* evaluation and

compensation system."   Dkt. 37 at 23–24.  Plaintiffs respond that they challenge the "'[b]lack

[b]ox decision-making process" generally, but then break down that challenge into what they

allege are four "constitutive elements" that had a disparate impact on women:  (1) the "No

Whining" policy; (2) the pay secrecy policy; (3) the subjective evaluation system; and (4) the

"hyper-centralization of final pay, promotion, and related policy decision-making in the hands of

Firm Managing Partner Stephen J. Brogan."  Dkt. 43 at 11.

Plaintiffs advancing claims under the disparate impact theory must "identify the particular employment practices they challenge" to avoid "holding employers 'liable for the myriad of innocent causes that may lead to statistical imbalances' in a given workforce." *Davis*, 925 F.3d at 1249 (quoting *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) (internal quotations omitted)). The D.C. Circuit has stated that the "object" of such a suit must be "an identifiable practice, criterion, or bundle of criteria" and that simply identifying disparate outcomes will not suffice. *Id.* "An actionable 'specific employment practice' might be set of 'subjective criteria' such as hiring based on personal networks or firing based on a manager's subjective sense of who best to retain." *Id.* (quoting *Wards Cove Packing Co.*, 490 U.S. at 656). It could also be an objective criterion such as a minimum IQ test score or the ability to bench press a certain weight. *Id.* The D.C. Circuit has held that both subjective and objective criteria may be challenged under the disparate impact framework, as may be employment practices that combine the two. *Id.*

Courts have recognized disparate impact claims targeting a variety of particular employment practices. For example, when faced with the need to significantly downsize its workforce, an employer's decision to "select[] only certain (predominantly female) departments" or units in which "black employees are concentrated" from which to conduct layoffs is actionable under a disparate impact theory. *Id.* at 1250 (first quote quoting *Shollenbarger v. Planes Moving & Storage*, 297 F. App'x 483, 486 (6th Cir. 2008); second quote quoting *Council 31, Am. Fed'n of State, Cty. & Mun. Emps. v. Ward*, 978 F.2d 373, 375, 377–78 (7th Cir. 1992)). So is a challenge to an employer "mandat[ing]" that its various bureaus evaluate employees using a "five-level performance evaluation system" with "generic" standards that "[could not] be changed" and were "excessively subjective." *Howard*, 571 F. Supp. 2d at 160.

Jones Day principally argues that the elements of its black-box decision-making process are "capable of separation for analysis" and, therefore, it may not "be analyzed as one employment practice."  42 U.S.C. § 2000e-2(k)(1)(B)(i); Dkt. 37 at 26.  Plaintiffs respond that "discovery may show that Defendant's processes for associate compensation are 'not capable of separation for analysis,'" but they "need not so prove before discovery."  Dkt. 43 at 13 (quoting 42 U.S.C. § 2000e-2(k)(B)(i)).  At this stage of the proceeding, Plaintiffs have the better argument.

Jones Day is correct that a plaintiff must typically show that "each particular challenged employment practices causes a disparate impact."  42 U.S.C. § 2000e-2(k)(1)(B)(i).  For two reasons, however, that requirement does not warrant dismissal of Plaintiffs' disparate impact claims.  First, the particularity requirement admits of an exception; "if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice."  42 U.S.C. § 2000e-2(k)(1)(B)(i).  Nothing in Title VII suggests that a plaintiff must make that showing at the pleading stage, without the benefit of discovery.  Second, even if the exception to the particularity requirement does not apply, it asks too much at the pleading stage, before any discovery has occurred, to require a plaintiff "to identify what specific portion or portions of the [employer's] complex [compensation] formula is responsible for the alleged inequality."  *Powell v. Ridge*, 189 F.3d 387, 396–97 (3d Cir. 1999), *abrogated on other grounds in Alexander v. Sandoval*, 532 U.S. 275, 293 (2001).  That is particularly true in the present context, where Plaintiffs have alleged that each associate's compensation is set "'individually, not by lockstep'" or by "'some billable hours formula;'" is based on each associate's "'individual contributions[] and cannot be fairly compared to any other individual;'"

and the compensation decisions suffer from a "'lack of transparency.'"  Dkt. 41 at 11–12 (3d Am. Compl. ¶ 42).

Ultimately, what matters at this stage of the proceeding is whether Plaintiffs have "put the defendant[] on notice of what [they] intend to prove at trial," *Powell*, 189 F.3d at 397, and whether those allegations support "the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678.  Plaintiffs have cleared that modest hurdle.  They have alleged that Jones Day employs a highly centralized, subjective evaluation process in which a consensus statement is prepared by "cherry picking" feedback from some, but not all, evaluations, and in which complaints about compensation decisions are not tolerated.  Drawing all reasonable inference in Plaintiffs' favor at this stage of the proceeding, the Court cannot accept Jones Day's conclusion that each of these elements is necessarily capable of separation for analysis.  For example, it is the very alleged secrecy and the quashing of complaints that purportedly allowed the disparate impact caused by the centralized, subjective, consensus evaluation system to continue from year to year.

But, even if each element is separated, for present purposes Plaintiffs need identify only a single, specific employment practice that plausibly caused the asserted disparate impact.  They have done so here.  It is plausible, for example, that the "consensus statements," which Plaintiffs allege are "easily manipula[ted]" and allow for "cherry pick[ing]" of content from the various underlying reviews, shape an overall picture of an associate that is both inaccurate and disadvantageous to women associates.  Dkt. 43 at 14; Dkt. 41 at 5–6 (3d Am. Compl. ¶¶ 14–15).  Jones Day does not dispute that the "consensus statement" process constitutes "a specific or particular employment practice," *Wards Cove Packing Co., Inc.*, 490 U.S. at 656, but argues that it fails to support Plaintiffs' disparate impact claims for three reasons.

*First*, Jones Day argues the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), precludes Plaintiffs from premising their disparate impact claims on a highly subjective decision-making process. Dkt. 37 at 25. But that is not how D.C. Circuit has read *Dukes*. After *Dukes*, the D.C. Circuit wrote, "[d]isparate impact analysis is 'no less applicable to subjective employment criteria than to objective or standardized tests.'" *Davis*, 925 F.3d at 1249 (quoting *Watson*, 487 U.S. at 990). Indeed, far from reading *Dukes* to foreclose such an argument, the D.C. Circuit cited *Dukes* for the proposition that "[a]n employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination." *Id.* (quoting *Dukes*, 564 U.S. at 355) (second alteration in original); *see also McReynolds*, 349 F. Supp. 2d at 28 ("Suits alleging subjective practices that result in disparate effects may proceed in order to counter the 'unfairness in permitting an employer to perpetuate discriminatory effects by relying for discriminatory results on the individual biases of its managers.'" (quoting *Mozee v. Am. Commercial Marine Serv. Co.*, 940 F.2d 1036, 1050 (7th Cir. 1991))).

*Second*, Jones Day argues that Plaintiffs' allegations are ultimately premised on a theory of purposeful discrimination. *See* Dkt. 47 at 22–23 (arguing that Plaintiffs' disparate impact claims ultimately reduce to allegations of "particular incidents of allegedly intentional discrimination"); Dkt. 37 at 23–24. The reason that subjectivity matters, according to Jones Day, is because it opens the door to purposeful discrimination. *See* Dkt. 37 at 25 (characterizing Plaintiffs' challenge to subjective performance evaluations as "form[ing] part of Plaintiffs' *intentional* discrimination claim"). The fact that Plaintiffs complaint is filled with claims of purposeful discrimination, however, does not preclude Plaintiffs from invoking an alternative theory of relief. Moreover, there is no inconsistency in alleging that a centralized, subjective

evaluation system admits of intentional discrimination even in the context of alleging a disparate

impact claim.  As the Court of Appeals for the Seventh Circuit has explained:

> Disparate-impact claims may be based on any employment policy, not just a
> facially neutral policy.  The Supreme Court addressed this point in *Watson v.*
> *Fort Worth Bank & Trust*, 487 U.S. 977 (1988).  There, an employer put an
> employee through subjective performance reviews and denied him a promotion.
> One of the reviewers had made racist comments, so there was a hint that the
> reviews were not only subjective but also were infected with racial bias and
> perhaps were intentionally discriminatory.  *Id.* at 990.  The fair implication of
> the plaintiff's complaint was that the subjective reviews allowed racial bias to
> affect the employment decisions.  The lower courts in *Fort Worth* had held that
> "subjective practices" could only be challenges in a disparate-*treatment* claim,
> not a disparate-*impact* claim.
>
> The Supreme Court reversed, holding "that subjective or discretionary
> employment practices may be analyzed under the disparate impact approach in
> appropriate cases."  *Id.* at 991.

*Adams v. City of Indianapolis*, 742 F.3d 720, 731 (7th Cir. 2014).  The same analysis holds true

here and disposes of Jones Day's second argument.

> *Third*, Jones Day argues that "Plaintiffs do not allege facts showing that women fare

worse on these reviews than men" and, indeed, at times Plaintiffs allege that they received

positive reviews.  Dkt. 37 at 29.  Jones Day is correct that Plaintiffs—at times—allege that they

received positive reviews.  But to give deciding weight to that contention would violate the rule

that, at this stage of the proceeding, the complaint must be read in the light most favorable to the

plaintiff; Defendants would rely portions of the Third Amended Complaint helpful to their

argument, while ignoring the overall tenor of the complaint.  When read fairly, Plaintiffs' factual

allegations support the theory of their disparate impact claims.  Plaintiffs allege, for example,

that Tolton "won praise in her performance reviews" from individual partners, Dkt. 41 at 26–27

(3d Am. Compl. ¶ 88), and that she "never received any negative feedback in any performance

reviews," *id.* at 32 (3d Am. Compl. ¶ 106).  But they also allege that Tolton's "consensus

statement" did not reflect the "glowing review" that she received from the "[p]artner for whom she performed the majority of her work" and, instead, "attacked her for needing to take more ownership." *Id.* at 5–6 (3d Am. Compl. ¶ 15). Plaintiffs also allege that Tolton was "chastised" at her official, annual review "for not working hard enough," *id.* at 35 (3d Am. Compl. ¶ 120), and she was told at a subsequent annual review "that she 'should look for other opportunities outside the Firm,'" *id.* at 36 (3d Am. Compl. ¶ 122). Read in context, these allegations, like the allegations respecting the other Plaintiffs, posit that Plaintiffs' "consensus statements," even if at times positive, did not fairly reflect the quality of their work or their commitment to the firm.

It is also plausible that the "No Whining" or the "Pay Secrecy" policy caused continued disparities by closing natural feedback channels. Jones Day disagrees, arguing that the "No Whining Policy" "simply means that people should solve problems instead of merely grumbling about them; it has nothing to do with voicing legitimate grievances" and that, in any event, the policy could not have "*cause[d]* any disparate impact; at most, [it] could interfere with one . . . way to redress . . . disparities that are attributable to . . . *other* policies." Dkt. 58 at 12. The same holds true, according to Jones Day, for the "Pay Secrecy" policy; the direction to keep confidential associate pay allocations follows—and does not cause—the decision about how much to pay each associate in the first place. *Id.* But, Jones Day once again declines to read the complaint in the light most favorable to Plaintiffs and, more importantly, fails to place either of these purported policies in temporal context. Plaintiffs allege that, over time, these challenged policies have allowed subjective decisionmaking to proceed unfettered by transparency and have perpetuated, and thereby caused, the disparate impact they allege. *See Sobel v. Yeshiva Univ.*, 839 F.2d 18, 30–33 (2d Cir. 1988) (allowing plaintiffs to challenge sex-based pay disparities

after the enactment of Title VII on the theory that they perpetuated the effects of pay differences

that began prior to the passage of the law making them illegal).

The Court, accordingly, concludes that Plaintiffs have adequately identified one or more

specific employment practices in support of their disparate impact claims.

2.     *Allegation of a Quantifiable Adverse Effect*

Jones Day also contends that Plaintiffs have not plausibly alleged that the challenged

practices caused a disparate impact on women (or pregnant women or mothers) because the

Third Amended Complaint "includes no facts or data suggesting any meaningful disparities in

pay or promotions."  Dkt. 37 at 21.  Plaintiffs respond that that it is sufficient merely to allege the

existence of a disparate impact but, in any event, they have pleaded underlying facts that support

the existence of a disparate impact.  *See* Dkt. 60 at 38.

To prevail on a disparate impact claim, a plaintiff must eventually proffer "statistical

evidence that the [allegedly discriminatory] practice or policy has an adverse effect on the

protected group."  *Greater New Orleans Fair Hous. Action Ctr.*, 639 F.3d at 1085–86.  This does

not mean, however, that the complaint must itself include statistical evidence in order to survive

a motion to dismiss.  *See McQueen v. City of Chi.* 803 F. Supp. 2d 892, 906 (N.D. Ill. 2011) ("A

Title VII disparate impact claim need not allege statistical support to survive a motion to

dismiss."); *see also Menoken v. McGettigan*, 273 F. Supp. 3d 188, 199–200 (D.D.C. 2017)

(denying a motion to dismiss a disparate impact claim that included no statistical evidence and

noting that "Plaintiff will now have to . . . come forward with the necessary statistical

evidence"); *Martin v. District of Columbia*, 78 F. Supp. 3d 279, 314 (D.D.C. 2015) (requiring

statistical evidence at the summary judgment stage); *Townsend*, 236 F. Supp. 3d at 308–09

(dismissing a disparate impact claim because the plaintiff "offer[ed] no statistical *or other*

57

*evidence* to support his claim that the policy had a disparate impact," and his complaint only stated that "data regarding the impact of the . . . is still outstanding") (emphasis added).

Two decisions—one from the Court of Appeals and the other from the district court—highlight what is required to plead a disparate impact claim.  In *Boykin v. Fenty* the D.C. Circuit considered a disparate impact claim based on the plaintiff's "claim that the District's closure of [a] shelter produced an unlawful disparate impact" on disabled plaintiffs.  650 F. App'x 42, 44 (D.C. Cir. 2016).  The Court of Appeals held that the district court correctly granted a motion to dismiss because the complaint was devoid of factual allegations that "the closure affected a greater proportion of disabled individuals than non-disabled, as it did not, for instance, include an allegation that disabled homeless individuals are more likely to rely on low-barrier shelters than non-disabled individuals."  *Id.*  In *Ramseur v. Perez*, 962 F. Supp. 2d 21 (D.D.C. 2013), in contrast, the plaintiff survived a motion for judgment on the pleadings where his complaint plausibly alleged that the implementation of an unnecessary "specialized[-]experience" requirement for applicants for a new position, "had a . . . disparate impact on eight women and African-American applicants," who were less likely to possess that extra qualification.  *Id.* at 26.  As the court explained, the "gist of [the plaintiff's] allegations [was] that the impact of the specialized[-]experience[] qualification was to disproportionately disqualify female and African-American applicants."  *Id.*

Plaintiffs may not rely solely on anecdotal allegations regarding an adverse impact on a small group of individuals; they must also plead facts that allow for the plausible inference that the identified policy affected the protected group as a whole.  It was not enough in *Boykin v. Fenty*, for example, for the plaintiffs to allege that "some of them have disabilities and that the shelter's closure makes it more difficult for [them] to obtain services."  650 F. App'x at 44.  As

the D.C. Circuit explained, the allegations regarding the plaintiffs' "individual

experiences . . . say nothing" about whether the neutral practice "had a disparate impact on

persons with disabilities[] . . . as opposed to persons without disabilities[]" in general.  *Id.*

Similarly, in *Palmer v. Homecomings Fin. LLC*, 677 F. Supp. 2d 233, 242 (D.D.C. 2010), the

district court concluded that the plaintiff's "disparate impact claim [was] deficient" because she

"only allege[d] a disparate impact on *herself*" and had not made allegations pertaining to the

protected group as a whole.

       Although individual, anecdotal allegations are insufficient, at the pleading stage courts do

not generally scrutinize causation claims or evaluate the degree to which other variables might be

responsible for an observed disparate effect.  In *Ramseur*, for example, it was sufficient for the

plaintiff to allege that requiring "specialized experience in planning, implementing, or evaluating

compliance and technical assistance activities . . . [and in] conducting . . . investigations"

disproportionately disadvantaged women and African-American applicants, who were less likely

to have the particular (and unnecessary) experience.  962 F. Supp. 2d at 24, 26.  In another case,

*Howard v. Gutierrez*, 571 F. Supp. 2d 145, 150 (D.D.C. 2008), the plaintiffs alleged that the

Department of Commerce had "violated Title VII by using overly subjective performance-

appraisal criteria that result[ed] in a disparate impact on African American employees with

respect to promotions and promotion-related opportunities."  The district court concluded that

the statistical evidence cited in the complaint, which merely showed "that the percentage of

African Americans employed at the Department decline[d] as the GS level increase[d]," suffered

"from a number of flaws" and would not suffice at trial.  *Id.* at 161.  But it nonetheless held that

"the information from the Department's website explaining the role of [subjective] performance

appraisals in promotion opportunities, the anecdotal evidence regarding the pattern of alleged

discrimination in assessments and promotions, and the statistical information presented by plaintiffs [were] sufficient overcome the Department's motion to dismiss for failure to adequately plead causation." *Id.*

Here, although a close question, the Court concludes that Plaintiffs have alleged facts sufficient to support a plausible inference that the challenged policies have a disparate impact on women associates. They allege that the partnership and management is predominantly male: men "account[] for 80% of [the firm's] Partnership Review Committee and lead[] 34 of the [f]irm's 39 practice groups."[9] Dkt. 41 at 11 (3d Am. Compl. ¶ 40). Plaintiffs further allege that, "although Jones Day employs roughly the same number of male and female associates, male partners outnumber female partners three to one according to the 2018 Vault/MCAA Law Firm Diversity Survey." *Id.* Plaintiffs also allege that they were paid less and had fewer opportunities because of their gender and, at least at times, offer plausible comparisons to male associates in support of those allegations. *See id.* at 53, 78 (3d Am. Compl. ¶¶ 187, 287). They bolster these allegations, moreover, with numerous anecdotal allegations of sex-based stereotyping and bias. They allege, for example, that one male partner "demanded that three female summer associates sing and dance to the Winnie the Pooh theme song," *id.* at 7 (3d Am. Compl. ¶ 24), and "made

---

[9]  As Jones Day notes, none of the plaintiffs who remain in the case at this time has alleged that she was under consideration for partnership or even that she was at the point in her career at which partnership was a prospect. That may be true, but, for three reasons, it does not render the statistics regarding the percentage of female partners immaterial. First, the percentage of women in the partnership and holding leadership positions might provide evidence relevant to Plaintiffs' disparate impact claims relating to pay and other benefits short of partnership. Second, Plaintiffs have alleged a single evaluation process that applies to both compensation and promotion. *See, e.g.*, Dkt. 41 at 6 (3d Am. Compl. ¶ 17). Third, at least some of the remaining plaintiffs have alleged that they were on the path to partnership and left the law firm only because they received less-than-glowing evaluations and understood that, even a single "negative review" was sufficient to defeat any reasonable prospect of promotion. *Id.* at 52 (3d Am. Compl. ¶¶ 180, 183); *see also id.* at 53, 63, 66 (3d Am. Compl. ¶¶ 186, 222, 234).

sexist comments—including about female servers during their office lunches at Hooters—only to conclude these comments with a sneering injunction to 'add it to the file,' a phrase meant to depict a fictitious file of sexual harassment complaints that carried no weight," *id*. at 8 (3d Am. Compl. ¶ 27); another male partner allegedly commented "[i]n front of the entire Irvine office" on "how 'banging' his secretary's body looked in a bikini," *id.* at 41 (3d Am. Compl. ¶ 140); that female associates received less desirable work and fewer mentoring opportunities, *see, e.g.*, *id*. at 30–31, 42–43, 74 (3d Am. Compl. ¶¶ 101, 142, 144–45, 272); that male partners, at times, commented on (and even mocked) the appearance or attire of female associates, *id.* at 28, 41, 67 (3d Am. Compl. ¶¶ 92, 139, 241), such as having "a 'very stern face' that was 'off-putting,'" *id.* at 67 (3d. Am. Compl. ¶ 241); that those plaintiffs who had children while at Jones Day noted a corresponding change in the opportunities at the firm, *id.* at 33, 57–58 (3d Am. Compl. ¶¶ 109, 202–05); that a firm partner explained "the [f]irm's lack of female partners [by] asserting the gendered stereotype that they all 'chose to have families,'" *id.* at 50 (3d Am. Compl. ¶ 172); *see also id.* at 73 (3d Am. Compl. ¶ 266), while "male attorneys with children were given [the] flexibility that was denied to female attorneys with children," *id.* (3d Am. Compl. ¶ 267); and that one of the plaintiffs was told by a firm partner that "women, and particularly women of color, had to work harder than everyone else if they stood a chance of being allowed to stay at Jones Day," *id.* at 76 (3d Am. Compl. ¶ 282).

As in *Howard*, Plaintiffs' "statistical evidence suffers from a number of flaws," 571 F. Supp. 3d at 161, and the low percentage of women in the firm's partnership and leadership might—as Jones Day urged at oral argument—be explained by factors unrelated to the centralized, subjective evaluation system used at the firm. But, also as in *Howard*, the complaint includes "anecdotal [allegations] regarding the pattern of alleged discrimination in assessments

and promotions" and explains the "role of [the subjective] performance appraisals" in making

pay and promotion decisions.  *Id*.  Remarks and conduct on the type Plaintiffs allege may or

"may not prove discriminatory intent, but," if accepted as true, "they do suggest a lingering form

of the problem that Title VII was enacted to combat."  *Watson*, 487 U.S. at 990–91.  Although

Plaintiffs may not ultimately survive a motion for summary judgment, they have pled enough—

although just enough—"to state a claim for relief that is plausible on its face."  *Twombly*, 550

U.S. at 570.

> 3.    *Pregnancy- and Maternity-Based Claims*

The Court will grant Defendant's motion for judgment on the pleadings as to Plaintiffs'

Counts 2 and 6, which allege pregnancy discrimination under federal and California law.  Dkt.

41 at 98–100, 105–07 (3d Am. Compl. ¶¶ 385–94, 426–37).  A plaintiff may state a disparate

impact claim under the Pregnancy Discrimination Act by "identif[ying] a facially-neutral policy

and plausibly alleg[ing] that it causes a significant disparity" in its negative effects on pregnant

employees as opposed to non-pregnant employees.  *Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d

407, 448–51 (S.D.N.Y. 2014); *Legg v. Ulster Cty.*, 820 F.3d 67, 72 (2d Cir. 2016); *Troupe v.*

*May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994) ("[D]isparate impact is a permissible

theory of liability under the Pregnancy Discrimination Act, as it is under other provisions of Title

VII.").  In defending their disparate impact claims, Plaintiffs explicitly do not distinguish

between the challenged practices or policies' alleged impacts on women versus on pregnant

women or mothers.  Rather, they state that "for simplicity, [they] will refer to women as

encompassing mothers and those who are pregnant."  Dkt. 43 at 11 n.2; Dkt. 60 at 31 n.13 ("For

ease of reference, Plaintiffs will continue to refer to 'women' as encompassing women who are

pregnant and mothers.  In so doing, Plaintiffs do not relinquish any claims; to the contrary, the

impact of gender discrimination on this sub-class may reasonably be inferred to only intensify in the contexts of the specific employment practices that Plaintiffs have identified.").  Defendant's motion for judgment on the pleadings challenges all of Plaintiffs' disparate impact claims, generally attacking those based on sex and those based on pregnancy or motherhood on the same grounds.  *See* Dkt. 37 at 27 ("[T]he Complaint fails to plausibly allege an adverse effect on women (or pregnant women) as to either pay or promotions."); *id.* at 31 ("[T]he Complaint does not trace Plaintiff's alleged injuries to any specific employment practice, let alone a practice that imposes a systemic disadvantage on women or pregnant women as a group."); *but see id.* at 25 n.6 ("The pleading deficiency is even more obvious for the pregnancy discrimination counts. Those counts refer, without any detail, to Jones Day's 'policies, practices, [and/or] procedures.' Plaintiffs otherwise merely recount allegations of intentional discrimination against particular pregnant women or mothers, which cannot support a disparate-impact claim." (citations omitted)).

While Plaintiffs have alleged just enough to state claims for a disparate impact on women, their factual allegations supporting a disparate impact on pregnant women or mothers in particular are considerably thinner and do not clear the bar.  In alleging a disparate impact on women, Plaintiffs cited the ratio of male to female partners at the firm. Dkt. 41 at 11 (3d Am. Compl. ¶ 40) ("[M]ale partners outnumber female partners three to one.").  They provide no parallel ratio of mothers to non-mothers within the partnership.  Only two of the six Plaintiffs were pregnant and gave birth while employed by Jones Day, and accordingly their anecdotal evidence specific to their treatment with regard to those experiences is more limited and carries less force than the allegations concerning sex-based bias at the firm that all six Plaintiffs amass. Plaintiffs' approach of "refer[ring] to women as encompassing mothers and those who are

pregnant," Dkt. 43 at 11 n.2, means that they may rely on pregnancy and motherhood-related evidence to support their sex-based claims, but it does not mean that they may rely on their entire body of allegations to support the distinct and more specific pregnancy-based claims brought by only two Plaintiffs.  *See Garcia v. Woman's Hosp. of Tex.*, 97 F.3d 810, 813 (5th Cir. 1996) (analyzing pregnancy-based disparate impact claim with regard to its impact on "pregnant women as a group," not on women as a group).  The Court will, accordingly, dismiss Counts 2 and 6 without prejudice.

### D.   Plaintiffs' Equal Pay Act Claims

Jones Day also argues that Plaintiffs fail to state claims under the Equal Pay Act ("EPA") or its state-law analogues because they have not identified appropriate comparator male attorneys who were paid more than they were.[10]  Plaintiffs respond that they have gone above and beyond the pleading requirements by identifying particular male associates who were paid more than them for substantially similar work.  As explained below, the Court concludes that some of the plaintiffs have alleged sufficient facts to state an EPA claim, while others have not.

"The Equal Pay Act establishes the 'principle of equal pay for equal work regardless of sex.'"  *Cornish v. District of Columbia*, 67 F. Supp. 3d 345, 360 (D.D.C. 2014) (quoting *Corning Class Works v. Brennan*, 417 U.S. 188, 190 (1974)).  In order to state a prima facie case under the EPA, a plaintiff "must allege that (1) she was doing substantially equal work on the job, the performance of which required substantially equal skill, effort, and responsibility as the jobs held by members of the opposite sex; (2) the job was performed under similar working conditions;

---

[10]  The same legal standard and analysis governs Plaintiffs' equal pay claims under federal, New York, and California law.  *See Lehman v. Bergmann Assocs., Inc.*, 11 F. Supp. 3d 408, 420 n.6 (W.D.N.Y. 2014); *Hall v. Cty. of Los Angeles*, 148 Cal. App. 4th 318, 324 n.4 (Cal. Ct. App. 2007).

and (3) she was paid at a lower wage than those members of the opposite sex." *Id.*  "[J]obs need

not be identical in every respect before the Equal Pay Act is applicable; the phrase 'equal work'

does not mean that the jobs must be identical, but merely that they must be 'substantially equal.'"

*Laffey v. Nw. Airlines, Inc.*, 567 F.2d 429, 448–49 (D.C. Cir. 1976) (internal quotations and

footnotes omitted).  After the plaintiff has established a prima facie case, "the burden . . . shifts

to [the] defendant[] to show that the pay differential was justified under one of the exceptions to

the act." *Thompson v. Sawyer*, 678 F.2d 257, 271 (D.C. Cir. 1982).  These exceptions include "a

seniority system, a merit system, a system that measures pay by quality or quantity of

production, or any other factor not based on sex." *Id.* at 263 (citing 29 U.S.C. § 206(d)(1)).  At

the motion to dismiss stage, however, the relevant question is simply whether the plaintiff has

alleged facts that could plausibly establish a *prima facie* EPA claim.  *See EEOC v. George

Washington Univ.*, No. 17-1978, 2019 WL 2028398, at *4 (D.D.C. May 8, 2019).

The parties' dispute centers on the extent to which a plaintiff must plead detailed facts

that establish that the work she performed was substantially similar to that of the male

comparators who she alleges were paid more.  Jones Day cites several out-of-circuit cases in

which courts have arguably required detailed factual allegations concerning both the plaintiff and

her proposed comparator to state an EPA claim.  In *Spencer v. Virginia State University*, 224 F.

Supp. 3d 449, 456–57 (E.D. Va. 2016), for example, the district court dismissed a plaintiff

professor's EPA claim because she did not "allege with specificity the responsibilities and

requirements of her own position" or "any information detailing her proposed comparators' job

duties, scholarly and research responsibilities, extracurricular activities, or working conditions,"

despite the fact that both she and her proposed comparators were all "Associate Professor[s]."

Jones Day also cites *EEOC v. Port Authority of New York and New Jersey*, 768 F.3d 247, 256–

57 (2d Cir. 2014), which affirmed a district court's dismissal of an EPA claim, for the proposition that a plaintiff must plead specific facts tending to establish that her work was substantially similar to that of her male comparators because not "all lawyers perform the same or similar functions." Dkt. 37 at 33.  In that case, attorney plaintiffs based their claim on the allegation that they had the same job codes as their alleged comparators and argued that they need not allege facts demonstrating that the attorneys performed the same kinds of work because "all lawyers perform the same or similar functions" and "most legal jobs involve the same skill." *Port Authority*, 768 F.3d at 257–58 (quotation marks and citation omitted).  The Second Circuit held that, in order to survive a motion for judgment on the pleadings, an EPA claim must plead facts plausibly alleging  that the "content" of the plaintiff's and her comparator's jobs were "substantially equal" and that simply asserting that women nonsupervisory attorneys were paid less "for substantially equal work" than male nonsupervisory attorneys who had "the same job code" would not suffice. *Id.* at 256–58.  In doing so, the court acknowledged that the "bulk of the[] cases" that it considered in reaching its holding "concerned whether plaintiffs had proven their EPA claims following summary judgment or trial, not whether the plaintiffs had adequately pleaded their claims." *Id.* at 256.

Precedent from this district has not demanded as much factual detail as the courts in *Spencer* and, arguably, in *Port Authority*. *See Baker-Notter v. Freedom Forum, Inc.*, No. 18-2499, 2019 WL 4601726, at *9 (D.D.C. Sept. 23, 2019) (discussing out-of-circuit cases requiring a more fact-intensive pleading in EPA cases and concluding that "[t]he pleading standard is not so high").  A complaint alleging a violation of the EPA need not include detailed factual descriptions of the similarities of the work performed by male and female workers, the relative levels of responsibility, or the quality of their work in order to survive a motion to dismiss.  *See*

*id.* ("It will take much more detail to prove that [the alleged comparators] did in fact have 'substantially similar' jobs, but [plaintiff] has said enough that the Court cannot dismiss her equal pay claims before giving her an opportunity to make this case.").  The complaint must, however, include factual allegations that could support the plausible inference that the work performed by the alleged comparators was substantially similar to that performed by the plaintiff. *See Iqbal*, 556 U.S. at 662 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.").  Such allegations might include that the plaintiff and her alleged comparators worked in the same department, held the same level of seniority, or their job descriptions substantially matched.

In *Cornish v. District of Columbia*, for example, the plaintiff, who worked in the Budget and Finance Division of the D.C. Superior Court, "allege[d] that she ha[d] performed job functions 'that require or entail substantially the same skill, effort, and responsibility' as at least three specifically-referenced men in the [same division], but she is compensated at a JS-11 pay grade, while the . . . male employees are or were compensated at higher pay grades.'"  67 F. Supp. 3d at 361.  The district court denied the defendant's motion to dismiss, despite the lack of detailed factual allegations regarding both the plaintiff's and her comparators' exact types of work, quality of work, hours, and levels of responsibility.  *Id.*  Likewise, in *Baker-Notter*, the defendants argued that the plaintiff had failed to allege facts sufficient to establish that her work was substantially similar to that of her male comparators.  2019 WL 4601726, at *9.  The district court denied their motion to dismiss because the plaintiff, a Director of Training and Volunteer Services, alleged that she did more work but was paid less than her proposed male comparators, who were a Facilities Director, a Security Director, and a Visitor Services/Admissions Director in the same department as her.  *Id.*  The facts that the plaintiff and her alleged comparators

occupied "director" roles and worked in the same department could support a plausible inference that they performed substantially similar work. *Id.*

Other decisions follow a similar approach. In *EEOC v. George Washington University*, the plaintiff's complaint described "some of 'the work that [she] performed' . . . and then [alleged] that the . . . job posting [for the position that her male comparator eventually occupied] identifies substantially equal work." 2019 WL 2028398, at *5. In denying the defendant's motion to dismiss, the district court stressed that the plaintiff alleged that she performed "substantially equal work" and duties as her comparator, and the motion to dismiss stage of the proceeding was not the time to decide whether that allegation was correct or whether the plaintiff's employer knew what duties she was actually performing. *Id.* And, in yet another EPA case, *Clay v. Howard University*, 128 F. Supp. 3d 22, 31 (D.D.C. 2015), the district court held that the plaintiff had stated a claim by alleging that her male comparator, the plaintiff's eventual replacement, "was hired to do the same work as [the plaintiff] in the position of Senior Benefits Analyst, and was paid significantly more."

Here, Plaintiffs allege—without differentiation—that they all "earned less than their male comparators even though they . . . perform[ed] . . . substantially equal work [to] their male comparators." Dkt. 41 at 15 (3d Am. Compl. ¶ 46). They also allege that "associates all perform substantially similar work." Dkt. 41 at 15 (3d Am. Compl. ¶ 46). Because these general allegations amount to little more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 662, at least standing alone, they fail to state a claim.

Plaintiffs seek to bolster these conclusory allegations by averring that they did not receive "Cravath market pay" and that male associates did. Dkt. 41 at 13–15 (3d Am. Compl. ¶¶44–46).

According to Plaintiffs, the firm made representations that "associates will find market-competitive pay and more for top performers" and will "be compensated at or above the upper level of the markets in which [Jones Day] operate[s]." *Id.* at 13 (3d Am. Compl. ¶ 44). Plaintiffs, however, did not receive "Cravath market pay," even though they allegedly worked long hours, achieved some positive reviews, and generated excellent work product. *Id.* In contrast, Plaintiffs allege "upon information and belief" that "male associates in jobs requiring substantially equal work" were paid "market scale." *Id.* at 66 (3d Am. Compl. ¶ 239). But this, again, is insufficient to state an EPA claim for two reasons. First, Plaintiffs never allege (1) that all Jones Day offices operated in the same "market;" (2) that "upper level" market pay in Irvine and Atlanta was the same as "upper level" market pay in New York; or (3) that the Cravath scale otherwise applied in Irvine or Atlanta. Second, Plaintiffs' allegation that higher paid male associates held "jobs requiring substantially equal work" again constitutes the type of "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory allegations" that will "not suffice" to state a claim. *Iqbal*, 556 U.S. at 668.

Plaintiffs' Third Amended Complaint also includes more particularized allegations relating to certain specific plaintiffs and alleged comparators. Assuming the truth of these allegations "and constru[ing] all reasonable inferences in favor of the plaintiff," as the Court is required to do at this stage of the proceeding, *Townsend*, 236 F. Supp. 3d at 296 (citing *Twombly*, 550 U.S. at 555; *Nurriddin*, 818 F.3d at 756), these efforts are sufficient to state a claim for three of the six plaintiffs.

1.   *Williams*

Plaintiffs allege that Williams "performed similar work to male associates Steven Gersten, Harrison Golden, Tom Panighetti, Gregory Martin, Adrian Garcia, and Robert Dahnke

but nevertheless earned less than they did." Dkt. 41 at 48 (3d Am. Compl. ¶ 165).  They further

allege that she and these male employees "attended similar firm-wide trainings" and that "male

associates Cyrus Ameri, John Migliarini, and Thomas Haldorson all earned more than she did

when they were at her level" and "performed similar work as she did."  *Id.*  Finally, they allege

that Williams was paid "less than male associates even though she routinely billed more hours

than they did."  *Id.*  The Court concludes that these additional factual allegations are sufficient

"to render [Williams' EPA] claim plausible."  *Iqbal*, 556 U.S. at 670 (emphasis omitted).

2.      *Henderson*

Plaintiffs allege that Jones Day paid Henderson less than "male associates performing

substantially equal work such as Zachary Werner, Andrew Burchiel, Samuel Goldstein, and

David Katz;" that "she likely billed more hours than" the latter two; and that, like Henderson,

"Goldstein completed a mix of corporate work and real estate assignments in his first year with

the [f]irm."  Dkt. 41 at 78 (3d Am. Compl. ¶ 287).  Plaintiffs also allege that Henderson was paid

"less than white male associate Bret Stancil, even though the two did interchangeable work."  *Id.*

According to Plaintiffs, while Henderson did not receive a raise after her first year, Stancil and

Harrison Golden, "another male associate performing similar work," did.  *Id.* at 78–79 (Compl.

¶ 289).  Although Plaintiffs acknowledge that Stancil was assigned "so much work . . . that he

sought to offload some of it to . . . Henderson," Dkt. 41 at 77–78 (3d Am. Compl. ¶ 285), thus

rendering him a less than perfect comparator, the Court nonetheless concludes that Plaintiffs

have alleged enough to state an EPA claim respecting Henderson's compensation.

3.      *Draper*

Plaintiffs allege that Draper, who worked in Jones Day's Atlanta office, was "paid less

than . . . certain male associates both in her office and across the [f]irm" for doing "comparable

work." *Id.* at 53 (3d Am. Compl. ¶ 187).  They allege, in particular, that she was paid less than "one Atlanta male associate who was a year junior to [her] and also in the Investigations and White Collar Defense sub-practice group" as well as "two Atlanta male associates in the [t]obacco litigation sub-practice group who were junior to her." *Id.* at 53–54 (3d Am. Compl. ¶ 187).  Draper herself worked in both these practice groups during her time at Jones Day.  *Id.* at 54, 59 (3d Am. Compl. ¶¶ 189, 209).  Finally, Plaintiffs allege that Draper was paid $180,000 when she was a fourth-year associate but that a male litigation associate in the same office was paid $220,000 as a fourth-year associate.  *Id*. at 54 (3d Am. Compl. ¶ 187).  The Court concludes that these factual allegations are sufficient to state a plausible claim that the comparators who were paid more than Draper were performing work that was substantially similar to hers.

4.      *Tolton*

Plaintiffs allege that Tolton was paid "less than male associate Justin Smith," who was "in her class year."  Dkt. 41 at 27 (3d Am. Compl. ¶¶ 89–90).  Simply alleging that Smith was in her class year, without any additional factual detail, however, fails to meet Plaintiffs' burden of alleging facts that plausibly state a claim that Tolton was paid less for doing "substantially equal work" to a member of the opposite sex.  Plaintiffs' general allegation that "associates all perform substantially similar work," Dkt. 41 at 15 (3d Am. Compl. ¶ 46), does not suffice to thread the needle.  Accordingly, the Court concludes that Plaintiffs have failed to state an EPA claim with respect to Tolton's compensation.

5.      *Mazingo*

Turning to Mazingo, Plaintiffs allege only that she was paid less than "comparable male associates."  Dkt. 41 at 40 (Compl. ¶ 136).  This conclusory allegation, unsupported by any

factual allegations, is insufficient to render plausible Plaintiffs' EPA claim respecting Mazingo's compensation.

      6.     *Stahl*

Finally, Plaintiffs allege that that Stahl "suspects [that] Jones Day paid male attorneys at her level more than it paid her," but they acknowledge that she is "unable to confirm" that fact. Dkt. 41 at 66 (Compl. ¶ 239). She does not include any allegations that could support the conclusion that her work was the substantially the same as the work of a male comparator who was paid more than her. Stahl's suspicion is not a fact that can support an EPA claim, and the Court, accordingly, concludes that Plaintiffs have failed to state an EPA claim respecting Stahl's compensation.

*   *   *

In summary, the Court concludes that Plaintiffs have stated EPA claims with respect to Williams's, Henderson's, and Draper's compensation, but not with respect to Plaintiffs Tolton, Mazingo, and Stahl. The Court will dismiss Plaintiffs Tolton's, Mazingo's, and Stahl's EPA claims without prejudice.

**E.**      **Plaintiffs Tolton's and Draper's Retaliation Claims**

Jones Day moves for judgment on the pleadings with respect to Tolton's and Draper's retaliation claims, arguing that Plaintiffs have not plausibly alleged that they engaged in protected conduct; that they suffered sufficiently severe adverse employment actions; or that there exists a causal link between the protected conduct and the adverse employment actions. Dkt. 37 at 38–42; Dkt. 58 at 19–20.

Title VII's anti-retaliation provision "prohibits an employer from 'discriminat[ing] against' an employee . . . because that individual 'opposed any practice' made unlawful by Title

72

VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation.'"[11] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 2000e-3(a)).  To state a retaliation claim, a plaintiff must allege facts that could plausibly establish that "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) the adverse action was causally related to the exercise of her rights."  *Simmons v. Cox*, 495 F. Supp. 2d 57, 66 (D.D.C. 2007).  The third prong requires that the "protected activity was a but-for cause of the alleged adverse action by the employer."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

1. *Tolton*

Jones Day concedes in its Supplemental Memorandum in support of its motion for partial judgment on the pleadings that the Third Amended Complaint adequately alleges that Tolton engaged in protected conduct.  Dkt. 58 at 19.  It argues, however, that Jones Day's locking Tolton out of her email and barring her from entering the office does not constitute an adverse employment action.[12]  Plaintiffs disagree, arguing that these actions constituted adverse employment actions for purposes of Title VII's prohibition on retaliation.  Dkt. 60 at 48; Dkt 43 at 38; Dkt. 41 at 39 (3d Am. Compl. ¶ 128).   These actions were adverse, in Plaintiffs' view,

---

[11]  Plaintiffs' claims under the DCHRA's anti-retaliation provision, D.C. Code § 2-1402.61, and California's anti-retaliation statute, Cal. Gov. Code § 12940(h), are analyzed under the same standard applicable to their Title VII anti-retaliation claim.  *See Rabara v. Heartland Emp't Servs., LLC*, No. 17-cv-3770, 2019 WL 1877351, at *21 (N.D. Cal. Apr. 26, 2019); *Touvian v. District of Columbia*, 330 F. Supp. 3d 246, 251 (D.D.C. 2018).

[12]  Jones Day does not seek to dismiss the claim on the ground that Tolton had already been informed of her termination at the time of the alleged retaliatory adverse employment action. *See Connell v. Bank of Boston*, 924 F.2d 1169, 1179 (1st Cir. 1991) (noting that a plaintiff can bring a valid claim for retaliation that allegedly occurred after she had already been terminated).

because they "cut [Tolton] off from her colleagues, clients, and prospective employers, denied

her a dignified transition, and humiliated her among her peers." Dkt. 43 at 38.

In *Burlington Northern & Santa Fe Railway Co. v. White*, the Supreme Court held that

the second prong of a retaliation claim requires an action "that would have been materially

adverse to a reasonable employee"—that is, the alleged action must have been "harmful to the

point that [it] could well dissuade a reasonable worker from making or supporting a charge of

discrimination." *Burlington*, 548 U.S. at 57.  This standard is distinct from, and less demanding

than, the type of adverse employment action required to establish a substantive discrimination

claim.  *Id.* at 64 ("[T]he antiretaliation provision, unlike the substantive [discrimination]

provision, is not limited to discriminatory actions that affect the terms and conditions of

employment.").  Despite that lesser standard, however, Title VII's anti-retaliation provision still

"protects employees [only] from 'significant harms' and does not protect an employee from

'trivial harms,' *i.e.*, 'those petty slights or minor annoyances that often take place at work and

that all employees experience.'"  *Baird v. Gotbaum* ("*Baird I*"), 888 F. Supp. 2d 63, 70 (D.D.C.

2012) (quoting *Burlington*, 548 U.S. at 68).  The Supreme Court has also counseled that

"[c]ontext matters" and that "the significance of any given act of retaliation will often depend

upon the particular circumstances." *Burlington*, 548 U.S. at 69.

Jones Day invokes the wrong standard for assessing what constitutes an adverse action

for purposes of retaliation claim, arguing that a plaintiff must allege "'a significant change in

employment status,' such as 'hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing significant change in benefits.'"  Dkt. 37 at 39

(quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)).  Its reliance on the First

Circuit's decision in *Connell v. Bank of Boston*, 924 F.2d 1169, 1179 (1st Cir. 1991), Dkt. 37 at

74

41, is also misplaced.  That case was decided before the Supreme Court in *Burlington* articulated

that lesser standard applicable to retaliation claims.  The question presented, accordingly, is not

whether Tolton suffered a significant change in the terms or conditions of her employment but,

rather, whether she was subjected to the type of action that would "dissuade a reasonable worker

from making or supporting a charge of discrimination."  *Burlington*, 548 U.S. at 57.

Courts in this Circuit have held that actions that harass, embarrass, and ostracize

employees can satisfy this less demanding standard.  In *Mogenhan v. Napolitano*, for example,

the D.C. Circuit held that a reasonable jury could find that a reasonable worker would be

dissuaded from making or supporting a charge of discrimination by her employer's (1) posting of

her EEO complaint on the employer's intranet "where her fellow employees could and did access

it," which could "ostracize" the employee and "label [her] as a 'troublemaker;'" and (2)

"increas[ing] her workload to five to six times that of other employees" so that she would be "too

busy to file complaints."  613 F.3d 1162, 1166–67 (D.C. Cir. 2010).  In *Mitchell v. District of

Columbia*, the district court concluded that a reasonable jury could find that the employer's

posting of a notice "on a public entrance and addressed to all staff members" barring the plaintiff

entry to the office and "prevent[ing] her from attending a scheduled training class . . . would be

sufficiently humiliating to dissuade an employee from complaining about discrimination."  304

F. Supp. 3d 110, 117–18 (D.D.C. 2018); *see also Passer v. Am. Chem. Soc.*, 935 F.2d 322, 331

(D.C. Cir. 1991) (concluding that plaintiff had pleaded an adverse employment action by

alleging that his employer had cancelled a "major public symposium in [the employee's] honor,"

causing him humiliation before his professional peers); *Doe 1 v. George Washington Univ.*, 369

F. Supp. 3d 49, 81 (D.D.C. 2019) (plaintiffs had pleaded adverse employment action by alleging

that coworker had publicly discussed in the workplace his sexual encounters with plaintiffs in a harassing and degrading manner).

Here, in contrast, Plaintiffs have alleged only that "Tolton found herself locked out of her Jones Day email" and barred from returning to the office "a few days before her scheduled last day." Dkt. 41 at 38 (3d Am. Compl. ¶ 128). They do not allege that either action was taken in a public manner that humiliated or ostracized Tolton or that she suffered any injury or loss as a result. Plaintiffs do assert in their opposition brief that "the Court could infer" that these actions "injured . . . Tolton as it cut her off from her colleagues, clients, and prospective employers, denied her a dignified transition, and humiliated her among her peers." Dkt. 43 at 38. But a party cannot amend or supplement a complaint—and certainly not a third amended complaint containing almost six hundred numbered paragraphs that was prepared by counsel—in an opposition brief. *See Durand v. District of Columbia*, 38 F. Supp. 3d 119, 129 (D.D.C. 2014) ("[F]actual allegations, included for the first time in an opposition to a motion to dismiss, cannot save Plaintiff's Complaint."). As drafted, Plaintiffs' Third Amended Complaint fails to allege facts the plausibly support the claim that Tolton suffered any adverse employment action due to her protected activity.

Accordingly, the Court will dismiss Tolton's retaliation claims.

2.      *Draper*

Jones Day also argues that Plaintiffs have failed to allege facts permitting the plausible inference that Draper engaged in any protected conduct or that she was fired for doing so. Dkt. 37 at 41–42. The Court is unpersuaded on the first point but agrees on the second.

In order to satisfy the first prong of a retaliation claim, "an employee 'must in some way allege unlawful discrimination' for her conduct to qualify as protected activity.'" *Touvian v.*

76

*District of Columbia*, 330 F. Supp. 3d 246, 251 (D.D.C. 2018) (quoting *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)).  "While no 'magic words' are required, the complaint [that constitutes the asserted protected conduct] must in some way allege unlawful discrimination, not just frustrated ambition." *Broderick*, 437 F.3d at 1232.  As the Seventh Circuit has observed, "an employee need not use" the terms "'sex' or 'gender discrimination,'" but she must "at least say something to indicate her [gender] is an issue." *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) (alteration in original).  Even if an employee "honestly believe[s] [that] she is the object of discrimination[,] . . . if she never mentions it," she has not engaged in protected conduct because "an employer cannot retaliate when it is unaware of any complaints." *Id.*

Plaintiffs allege that, after returning from maternity leave, Draper was asked to transfer to the firm's Tobacco Litigation Group and that, once there, she struggled to find work that would allow her to take a leading role and to improve her litigation skills.  Dkt. 41 at 59 (3d Am. Compl. ¶ 209).  They further allege that, at a meeting that appears to have occurred around late 2016, *id.* at 63 (Compl. ¶ 222), Draper "asked . . . Parker," a partner and leader of her group, "why she had not been staffed on more trials" while in the group, *id.* at 62 (Compl. ¶ 219). Parker informed her that she had not been staffed on more trials "because of [her] higher billing rate and lack of tobacco-specific trial experience." *Id.*  According to Plaintiffs, Draper then told Parker that she felt that "the [f]irm had set her up to fail" because her billing rate and lack of experience with tobacco litigation had been clear from the time she was first reassigned to the group, and Parker responded: "It is what it is." *Id.*

The Court concludes that these allegations do not satisfy the first prong of the retaliation standard.  Plaintiffs argue that, given the fact that Draper was asked to join the Tobacco

Litigation Group several months after her first maternity leave, and given her other allegations concerning sexism and the firm's preferential treatment of men, when Draper told Parker that she felt that she had been set up to fail, she was implicitly stating that the reason this had occurred was her sex and that Parker understood this to be the case.  Dkt. 60 at 50–52.  To be sure, in evaluating whether a certain action constitutes an adverse employment action, "[c]ontext matters" and "the significance of any given act of retaliation will often depend upon the particular circumstances."  *Burlington*, 548 U.S. at 69.  The same is also true when it comes to assessing whether a plaintiff has adequately alleged that she engaged in protected activity; an employee's complaint, for example, that she has been denied a meaningful opportunity to succeed might mean one thing if she works with many successful women and something entirely different if she is the first woman ever hired in a workplace previously regarded as an exclusively male domain.  In the latter context, a reasonable jury might find that the employee implicitly "indicate[ed] [that] her [gender] is an issue."  *Sitar*, 344 F.3d at 727 (third alteration in original); *see also Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 144 (D.D.C. 2014) (plaintiff argued that, although his email itself did not allege that the challenged actions were taken because of his race, religion, or national origin, "there was a clear understanding, apparently based on meetings surrounding these written complaints, that in this document he was complaining of improper treatment" based on these personal characteristics).

 This, however, is not such a situation.  Draper does not allege that she ever indicated to Jones Day that she believed that she had been transferred to the Tobacco Litigation Group because she had taken maternity leave or because of her sex.  The conversation in which Draper told Parker that she felt that she had been set up to fail in moving to the Tobacco Litigation Group included no mention of her maternity or gender.  It focused, instead, on her

disappointment with the level of responsibility and amount of trial opportunities that she had

been given while in the group.  Because Draper's comments to Parker alleged "frustrated

ambition" rather than "unlawful discrimination," she has not plausibly alleged protected conduct

based on those statements.  *Broderick*, 437 F.3d at 1232.

Plaintiffs also argue that Draper's question at a firm women's event constituted protected

conduct.  One week after her meeting with Parker and dismissal from the Tobacco Litigation

Group, Draper attended "an in-[f]irm women's event" at which two partners, neither of whom

was Parker, "offered the assembled associates tips on how to succeed as women at Jones Day."

Dkt. 41 at 62 (Compl. ¶ 220).  One partner asked if the associates had questions or concerns and

asked Draper to begin the discussion.  *Id.*  "Draper asked how to navigate a work relationship

where she had reason to believe a female partner was unsupportive of other female attorneys."

*Id.*  Jones Day argues that this is "not a complaint about conduct that allegedly violates anti-

discrimination laws, but merely a question about how to approach a difficult situation involving

an unsupportive partner."  Dkt. 58 at 19.

Although to state a claim for retaliation, "a plaintiff need not . . . have opposed an action

that in fact violated Title VII to win a retaliation claim," *Fine v. Ryan Int'l Airlines*, 305 F.3d

746, 752 (7th Cir. 2002), she must allege facts that could support the plausible inference "that

[s]he 'reasonably believed in good faith that the practice [s]he opposed violated Title VII,'" *Tate

v. Exec. Mgmt. Servs., Inc.*, 546 F.3d 528, 532 (7th Cir. 2008) (quoting *Fine*, 305 F.3d at 752);

*see also George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005) (same).  The Court concludes that

Plaintiffs have plausibly alleged that Draper's question constituted protected activity.  First, the

Court does not automatically disqualify Draper's alleged protected activity because it took the

form of a question rather than a statement.  The question contained within it a factual premise

that, when viewed in the light most favorable to Plaintiffs, conveyed a complaint about the conduct of a partner at the firm.  Second, the Court concludes that, unlike Draper's statement at the meeting with Parker, Draper's question, again viewed in the light most favorable to Plaintiffs, raised an allegation of sex discrimination.  The premise of the question, at least arguably, was that the partner was "unsupportive of . . . female attorneys"—as opposed to male attorneys.  Notably, the question was not simply what to do if a partner failed to provide female attorneys with support above and beyond the support she provided to other associates.  Rather, the question posited the existence of a problem in the workplace and that Draper needed help to "navigate" this problematic "work relationship."  Finally, drawing all inferences in favor of Plaintiffs, the allegation could support the plausible inference that Draper "reasonably believed in good faith that the practice she opposed"—a female partner being "unsupportive" of female attorneys—constituted unlawful discrimination under Title VII.  *Fine*, 305 F.3d at 752.

Jones Day's final argument, however, is persuasive.  The firm argues that Plaintiffs have not plausibly alleged that Draper's question at the women's event caused—or had any bearing on—her termination more than one year later.  *See* Dkt. 41 at 62–64 (3d Am. Compl. ¶¶ 220, 222, 225) (placing the women's event in Fall 2016 or Winter 2016/2017 and her termination in May 2018).  Plaintiffs, in response, argue that "temporal proximity is not the only way to allege causation."  Dkt. 43 at 41.  That is certainly true, but Plaintiffs never confront the absence of any other factual allegations that might support a plausible claim of causation.  They assert that "Draper alleges she has complained about her post-maternity leave treatment, was later terminated, and the reasons given her for termination were false, suggesting that the true reason was her willingness to complain."  *Id.*  And, in their Supplemental Memorandum, they seek to bolster this contention by pointing to their allegation that "other female associates had been

80

demoted, taken off partner track, and pushed out or terminated for having children." Dkt. 60 at

52.  The former set of allegations, however, are conclusory and fail to grapple with the absence

of any basis for drawing a causal link, and the latter set might support a claim of pregnancy

discrimination but have no bearing on Draper's retaliation claim.

The Court will, accordingly, dismiss Draper's retaliation claims.

## F.      Extraterritorial Application of the D.C. Human Rights Act

Jones Day further contends that the Court lacks jurisdiction over Plaintiffs' DCHRA

claims because Plaintiffs do not allege that any of the challenged conduct occurred in the District

of Columbia or that its effects were felt here.  Dkt. 37 at 43.  According to Jones Day, no non-

conclusory allegations contained in the Third Amended Complaint tie the firm's managing

partner, Steve Brogan, who is based in the District, to the challenged conduct, and none of the

Plaintiffs worked at Jones Day's D.C. office.  *Id.*  Plaintiffs respond that they have alleged that

Brogan had authority to make decisions on all important matters and that he sets firm-wide

policies from the D.C. office.  Dkt. 43 at 34.  Although Defendant nominally frames its argument

in terms of the subject-matter jurisdiction of this Court,[13] the thrust of its argument really goes to

the territorial reach of the DCHRA as it relates to the facts alleged in this case.  *See* Dkt. 37 at 43

(discussing the locations (or jurisdictions) in which the DCHRA may be applied, not the subject-

matter jurisdiction of this Court).

The DCHRA does not apply extraterritorially.  *Cole v. Boeing Co.*, 845 F. Supp. 2d 277,

284 (D.D.C. 2012).  "[F]or the DCHRA to apply to a set of facts, '[e]ither the decision must be

made, or its effects must be felt, or both must have occurred, in the District of Columbia.'"

---

[13]  This Court has subject-matter jurisdiction over claims brought under the DCHRA due to its
federal-question jurisdiction over the federal-law claims in this action, 28 U.S.C. § 1331, and its
supplemental jurisdiction over related state-law claims, 28 U.S.C. § 1367(a).

*Higgs v. Cava Grp., Inc.*, 239 F. Supp. 3d 257, 260 (D.D.C. 2017) (quoting *Monteith v. AFSCME, AFL-CIO*, 982 A.2d 301, 304–05 (D.C. 2009)).   The DCHRA might apply, for example, to a decision made in D.C. to institute a policy that a plaintiff challenges as the source of an unlawful disparate impact.   *See Abdul-Baaqiy v. Fed. Nat'l Mortg. Ass'n*, 149 F. Supp. 3d 1, 7 (D.D.C. 2015).   But, simply alleging that the employer has its headquarters in the District of Columbia is insufficient to invoke the DCHRA.   *Higgs*, 239 F. Supp. 3d at 261.   In *Higgs v. Cava Group, Inc.*, the district court concluded that a plaintiff had "sufficiently alleged that certain decisions underlying her hostile work environment claim were allegedly made in the District of Columbia" by averring that "she complained about her hostile work environment to [company] representatives in Washington, D.C." and that they did nothing to correct the situation and eventually "decided to terminate [p]laintiff for complaining."   *Id.* at 260–61.   The court also rebuffed the defendant's argument that the plaintiff's allegations that those decisions were made in the District of Columbia were "speculat[ive]" because "at the motion to dismiss stage the Court accepts [p]laintiff's allegations as true."   *Id.*

The DCHRA also applies where a policy is adopted or enforced in the employer's Washington, D.C. office, but the plaintiff's suit is based on how that policy affected him outside of the District.   In *Abdul-Baaqiy v. Federal National Mortgage Association*, for example, the district court concluded that plaintiff's DCHRA claim could proceed "based on the contention that supervisors rated [the plaintiff] poorly and eventually fired him due to a 'forced ranking' policy instituted and enforced by [the employer's] headquarters, located in the District of Columbia."   149 F. Supp. 3d at 7.   The forced ranking scheme "required that managers evaluate employees 'relative to their peers,'" such that only five percent of employees got top ratings, twenty-five percent got second-tier ratings, etc.   *Id.* at 3.

Plaintiffs bring Count 11 (gender discrimination under both disparate treatment and disparate impact theories by Tolton, Mazingo, Williams, Draper, and Stahl), Court 16 (retaliation claims by Tolton and Draper), Count 19 (wrongful termination claims by Tolton and Draper), and Count 21 (wrongful constructive discharge claims by Mazingo, Stahl, and Williams) under the DCHRA. The Court conducts its extraterritoriality analysis count by count and Plaintiff by Plaintiff to determine whether the DCHRA applies.

      1.    *Count 11: Gender Discrimination*

Jones Day argues that Plaintiffs' disparate impact claim falls beyond the scope of the DCHRA because Plaintiffs have failed to allege a specific employment practice adopted in the District that had a disparate impact on them. As discussed above, the Court concludes that Plaintiffs have stated a plausible disparate impact claim. Plaintiffs have alleged, moreover, that Brogan set and enforced the challenged policies or practices from his office in D.C. Dkt. 41 at 3 (3d Am. Compl. ¶¶ 6–9). "[A]ssum[ing] the truth of all material factual allegations in the compliant," the Court concludes that Plaintiffs have alleged a sufficient nexus to the District of Columbia to invoke the DCHRA. *Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).

      2.    *Count 16: Retaliation*

Because the Court has concluded that neither Tolton nor Draper has stated a plausible retaliation claim, it will not analyze whether these claims are properly brought under the DCHRA.

      3.    *Count 19*: *Wrongful Termination*

Jones Day argues that "Tolton and Draper do not allege facts showing that their terminations were ordered from within the District" and that Plaintiffs' allegations that Brogan

himself was involved in "every matter of significance for the [f]irm," including compensation and promotion decisions, Dkt. 41 at 3 (3d Am. Compl. ¶ 9), and exercised control over "performance evaluation[s]" and "other employment terms and conditions," *id.* at 6 (3d Am. Compl. ¶19); *see also id.* at 13 (3d Am. Compl. ¶ 44), are "implausible" given the size of the firm.  Dkt. 37 at 44–45.  Plaintiffs respond that they have alleged that Brogan controls all decisions regarding pay, promotions, and terminations," Dkt. 43 at 35, and that Defendant's own website proclaimed that Brogan occupied this sweeping role.

At the motion to dismiss stage, the Court must assume the truth of the complaint's factual allegations, "even if doubtful."  *Townsend*, 236 F. Supp. 3d at 296 (citing *Twombly*, 550 U.S. at 555).  Accordingly, Plaintiffs' allegations that Brogan was involved in discrete termination decisions suffice for present purposes.  Tolton and Draper have sufficiently alleged that the decisions to terminate them were made within the District of Columbia and are thus subject to the DCHRA.

    4.    *Count 21: Wrongful Constructive Termination*

Jones Day argues that "Mazingo, Stahl, and Williams have not alleged that anything happened in D.C. that caused them to quit the firm."  Dkt. 37 at 44.  Plaintiffs respond that their allegations that Brogan "controls firmwide policies" of discrimination, which led them to leave the firm, are sufficient.  Dkt. 43 at 36.  These alleged firmwide policies include the black-box compensation policy, which has as its constituent elements the "No Whining" policy, the pay secrecy policy, highly subjective evaluations, and Brogan's domination of firm decisionmaking. *Id.* ("These matters within Brogan's control include the policies challenged by Plaintiffs' disparate impact claims.").

a.      Mazingo

Plaintiffs allege that Mazingo "was forced to leave the firm" because she was "cut off from the principal partner with whom she had worked and deprived of any mentoring support to advance to partnership" after the partner reacted badly to the way that she informed him that she was taking a medical leave.  Dkt. 41 at 45–46 (3d Am. Compl. ¶¶ 153–56).  Mazingo has not pleaded facts that implicate Brogan in these events, and she has not alleged that the black-box compensation policies that she alleges that Brogan instituted caused her to leave the firm.  Accordingly, her claims do not fall within the scope of the DCHRA.

b.      Stahl

Plaintiffs allege that, as a result of "repeated verbal abuse, . . . lack of praise for even exceptional work, and the more favorable treatment received by male comparators," Stahl "began suffering from serious health problems" and had to "take an extended medical leave."  *Id.* at 73 (Compl. ¶ 268).  They claim that "[a]fter observing the way other female attorneys were treated after they returned from leave, [Stahl] knew that there would be no future for her at Jones Day" and therefore left the Firm.  *Id.* (Compl. ¶ 269).  They do not allege that Brogan set a policy to treat female attorneys poorly after they returned from medical leaves.  As a result, Plaintiffs have failed to allege facts sufficient to bring the alleged constructive discharge of Stahl within the ambit of the DCHRA.

c.      Williams

The Court has already determined that Plaintiffs have not alleged a plausible claim that Williams was constructively discharged and, therefore, need not decide whether this claim bears a sufficient nexus to the District of Columbia to fall within the scope of the DCHRA.

**G.      Standing to Seek Injunctive Relief**

Finally, Jones Day argues that Plaintiffs lack standing to seek injunctive relief because they are no longer Jones Day employees and their plea for reinstatement is "disingenuous."  Dkt. 58 at 20.  Plaintiffs respond that they "have standing to seek injunctive relief against discrimination and retaliation within Jones Day, because they will benefit from any injunction . . . if and when they are reinstated."  Dkt. 43 at 49.  The Court concludes that Plaintiffs have alleged facts that could plausibly support their standing to seek injunctive relief.

At the motion to dismiss stage, a plaintiff must plead facts that, if accepted as true, plausibly establish: (1) an injury-in-fact, (2) that the challenged conduct of the defendant caused, and (3) that a favorable decision will likely redress.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Medina v. Sessions*, 279 F. Supp. 3d 281, 285–86 (D.D.C. 2017) (discussing standing requirement specific to the pleading stage).  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by continuing, present adverse effects."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).   Accordingly, if a plaintiff seeks injunctive relief, she must also plead facts plausibly supporting the existence of a "real and immediate threat of repeated injury."  *Id.*  This means that, if "there is no prospect that [the plaintiff] will be injured in the future," she "lacks standing to seek injunctive or declaratory relief against . . . her former employer."  *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 465–66 (S.D.N.Y. 2013).

Plaintiffs argue in favor of a more categorical rule, arguing the that Supreme Court held in *Wal-Mart Stores, Inc. v. Dukes* "that plaintiffs who are 'no longer employed by [a company] lack standing to seek injunctive or declaratory relief against its employment practices.'"  Dkt. 37

at 45–46 (quoting *Dukes*, 564 U.S. at 364).  That is incorrect.  Rather, the Supreme Court merely

reported what the Ninth Circuit had "concluded" and then explained how that conclusion bore on

the question of class certification.  *Dukes*, 564 U.S. at 364.  Nothing in *Dukes* or any other

binding authority precludes a plaintiff asserting an employment discrimination claim from

seeking reinstatement as a remedy, and reinstatement is an injunctive remedy.  Consistent with

that view, numerous decisions post-dating *Dukes* have recognized that, "[w]here . . . a plaintiff

seeks reinstatement with a former employer . . . the former employee does have standing to seek

prospective relief."  *Kassman*, 925 F. Supp. 2d at 466; *see also Chen-Oster v. Goldman, Sachs &*

*Co.* ("*Chen-Oster I*"), 877 F. Supp. 2d 113, 122 (S.D.N.Y. 2012) ("[A] specific request for

reinstatement absent a corresponding injunction would expose plaintiffs to the immediate threat

of further discrimination." (quotation marks and citation omitted)), *Chen-Oster v. Goldman,*

*Sachs & Co.* ("*Chen-Oster II*"), 251 F. Supp. 3d 579, 588–89 (S.D.N.Y 2017) (concluding that

this interpretation did not contradict *Dukes*); *Levin v. Madigan*, 697 F. Supp. 2d 958, 975 (N.D.

Ill. 2010) ("To the extent that Plaintiff seeks an injunction requiring Defendants to cease

engaging in sex or age discrimination, such relief *would* remedy a harm that Plaintiff is likely to

suffer again.").

Here, Plaintiffs seek reinstatement.  Dkt. 41 at 134 (3d Am. Compl. ¶ h); *see also*, *e.g.*,

*id.* at 107 (3d Am. Compl. ¶ 436), and that request for relief is both legally cognizable and

sufficient to reject Jones Day's motion for judgment on the pleadings on their injunctive claims.

Recognizing as much, Jones Day falls back on the argument that Plaintiffs' request for

reinstatement is insincere.  Dkt. 57 at 20.  A threshold motion, however, is not the proper time

for the Court to scrutinize the sincerity of a plaintiff's request for reinstatement.  *Cf. Bayer v.*

*Neiman Marcus Group, Inc.*, 861 F.3d 853, 865 (9th Cir. 2017) (concluding at *summary*

*judgment* that plaintiff lacked standing to pursue injunctive relief because he had "produced no evidence to suggest he plans to seek employment with [defendant] again").

The Court will, accordingly, deny Jones Day's motion for judgment on the pleadings with respect to Plaintiffs' claims for injunctive relief.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings, Dkt. 37, is hereby **GRANTED** in part and **DENIED** in part.  Williams's hostile work environment claims under FEHA and the DCHRA (Counts 5 & 11 as to Williams's hostile work environment theory); Williams's wrongful constructive discharge claim under the FEHA (Count 20 as to Williams); Henderson's sex-based wrongful termination claim under the NYCHRL (Count 22); Tolton's and Draper's pregnancy- and maternity-based disparate impact claims under Title VII, the Pregnancy Discrimination Act, and FEHA (Counts 2 & 6 as to disparate impact); Tolton, Mazingo, and Stahl's claims under the EPA and its California analogue (Counts 4 & 8 as to Tolton, Mazingo, and Stahl); Tolton and Draper's retaliation claims (Counts 14 & 16); Mazingo's DCHRA wrongful constructive termination claim (Count 21 as to Mazingo); Stahl's DCHRA wrongful constructive termination claim (Count 21 as to Stahl); and Williams's DCHRA wrongful constructive termination claim (Count 21 as to Williams) are hereby **DISMISSED**.

SO ORDERED.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  May 19, 2020