**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NILAB RAHYAR TOLTON *et al*., *on behalf*
*of themselves and all others similarly situated*,

        *Plaintiffs*,

      v.

JONES DAY, a General Partnership,

        *Defendant*.

Civil Action No. 19-945 (RDM)

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR RULE 11 SANCTIONS**

i

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES ......................................................................................... iv

INTRODUCTION ......................................................................................................... 1

LEGAL STANDARD.................................................................................................... 3

   I.    Rule 11 Sanctions Must Remain an Extreme Punishment, Applied with Restraint. ........... 3

   II.    Plaintiffs Need Only Plead Pay Discrimination Claims.................................................. 6

      A.    The Equal Pay Act ...................................................................................... 6

      B.    Title VII ..................................................................................................... 8

      C.    Systemic Pay Claims Cannot Be Conclusively Disproven Without Statistical Evidence. 8

ARGUMENT ................................................................................................................. 9

   I.    Plaintiffs Have an Adequate Factual Basis to Allege Pay Discrimination. ........................ 9

      A.    Plaintiffs Experienced Gendered Hostility and Discriminatory Employment Conditions at the Firm. ................................................................................. 9

      B.    Plaintiffs' Job Performance Was Measured Through a Discriminatory Lens. ........... 11

      C.    Jones Day Consistently Promotes More Men than Women to Partner. ..................... 12

      D.    Jones Day Told Plaintiffs That It Pays Associates at Market Rates.......................... 16

      E.    Plaintiffs Identify Comparable Male Associates Who Were Paid More. ..................... 19

F.    Plaintiffs Can Infer that Jones Day Engages in Pay Discrimination in Light of the Firm's Unlawful Pay Secrecy Policy. ............................................................................................ 24

II.    Plaintiffs May Prove Pay Discrimination Through Discovery. ..................................... 28

A.    Rule 11 Allows Plaintiffs to Prove Their Claims Through Discovery. ...................... 28

B.    Sanctions Are Not Appropriate Where Relevant Information Is Primarily in the Custody and Control of Defendant. ......................................................................... 29

III.    Defendant Is Prematurely Seeking Summary Judgment Prior to Full Development of the Factual Record. ................................................................................................................ 30

A.    Defendant's Motion Does Not Disprove Plaintiffs' Pay Claims. .............................. 31

B.    Factual Disagreement Does Not Warrant Sanctions. ................................................. 32

C.    The Evidentiary Support for Plaintiffs' Pay Claims Illustrates the Sufficiency of Plaintiffs' Pre-Suit Investigation. ........................................................................... 33

IV.    The Sanctions Jones Day Seeks Are Excessive and Unwarranted. ............................... 36

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*3E Mobile, LLC v. Glob. Cellular, Inc.*, 222 F. Supp. 3d 50 (D.D.C. 2016) ............................... 36

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ........................................................ 29

*\*Baker-Notter v. Freedom Forum, Inc.*, No. 18-cv-2499, 2019 WL 4601726 (D.D.C. Sept. 23, 2019) ............................................................................................................... 7, 12, 23, 32

*Barbano v. Madison Cty.*, 922 F.2d 139 (2d Cir. 1990) ............................................................... 11

*Barlow v. McLeod*, 666 F. Supp. 222 (D.D.C. 1986) ................................................................... 4

*Barrett v. Forrest Labs., Inc.*, 39 F. Supp. 3d 407 (S.D.N.Y. 2014) ........................................ 7, 19

*Bazemore v. Friday*, 478 U.S. 385 (1986) ................................................................................. 16

*Bolden v. Morgan Stanley & Co.*, 765 F. Supp. 830 (S.D.N.Y. 1991) ........................................ 34

*Brown v. Nucor Corp.*, 785 F.3d 895 (4th Cir. 2015) ................................................................. 11

*Camm v. Kennickell*, No. 85-cv-3844, 1990 WL 198621 (D.D.C. Nov. 20, 1990)............... 33, 34

*Carswell v. Air Line Pilots Ass'n, Int'l*, 248 F.R.D. 325 (D.D.C. 2008) ........................................ 6

*Chambers v. Capital Cities/ABC*, 159 F.R.D. 441 (S.D.N.Y. 1995)............................................ 27

*Christianburg Garment Co. v. EEOC*, 434 U.S. 412 (1978) ........................................................ 6

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990)............................................................. 6

*Cornish v. District of Columbia.*, 67 F. Supp. 3d 345 (D.D.C. 2014) ........................................... 7

*County of Washington v. Gunther*, 452 U.S. 161 (1981)............................................................. 8

*Crawford v. ExlService.com, LLC*, No. 16-cv-9137, 2019 WL 5887214 (S.D.N.Y. Nov. 12, 2019) ...................................................................................................................... 7, 23

*Dove v. Wash. Metro. Area Transit Auth.*, No. 3-cv-2156, 2005 U.S. Dist. LEXIS 17955 (D.D.C. Aug. 18, 2005) ..................................................................................................... 32

*E. Gluck Corp. v. Rothenhaus*, 252 F.R.D. 175 (S.D.N.Y. 2008) ............................................. 5, 19

*Eastway Constr. Corp. v. City of New York*, 762 F.2d 243 (2d Cir.1985).................................. 3, 5

*\*EEOC v. George Washington Univ.*, No. 17-cv-1978, 2019 WL 2028398 (D.D.C. May 8, 2019)
.................................................................................................................................. 7, 21, 24, 32

*Gaiardo v. Ethyl Corp.*, 835 F.2d 479 (3d Cir. 1987)................................................................. 1, 5

*Hadges v. Yongers Racing Corp.*, 48 F.3d 1320 (2d Cir. 1995)..................................................... 34

*\*Hedgeye Risk Mgmt., LLC v. Heldman*, No. 16-cv-935, 2019 WL 4750243 (D.D.C. Sept. 29,
2019) ........................................................................................................................... passim

*Hilton Hotels Corp. v. Banov*, 899 F.2d 40 (D.C. Cir. 1990) .......................................... 30, 34, 36

*Holgate v. Baldwin*, 425 F.3d 671 (9th Cir. 2005) ....................................................................... 33

*Indep. Fed. Sav. Bank v. Bender*, 230 F.R.D. 11 (D.D.C. 2005) ............................................... 3, 6

*Intelsat USA Sales LLC v. Juch-Tech, Inc.*, No. 10-cv-2095, 2014 WL 12787643 (D.D.C. Oct. 15,
2014) ............................................................................................................................... 4, 5

*Jamilik v. Yale Univ.*, 362 Fed. App'x. 148 (2d Cir. 2009) ............................................................ 7

*Jbari v. District of Columbia.*, 304 F. Supp. 3d 201 (D.D.C. 2018)......................................... 8, 29

*Jordan v. U.S. Dep't of Labor*, 273 F. Supp. 3d 214 (D.D.C. 2017) .................................... 1, 3, 35

*Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006 (2d Cir. 1986) ..................................................... 30

*Lenzi v. Systemax, Inc.*, 944 F.3d 97 (2d Cir. 2019) ...................................................................... 8

*\*Lucas v. Duncan*, 574 F.3d 772 (D.C. Cir. 2009).................................................... 16, 19, 21, 24

*Marina Mgmt. Servs., Inc. v. Vessel My Girls*, 202 F.3d 315 (D.C. Cir. 2000).......................... 36

*Moore v. Napolitano*, 926 F. Supp. 2d 8 (D.D.C. 2013)................................................................ 8

*\*Morris v. U.S. Dep't of Justice*, 298 F. Supp. 3d 187 (D.D.C. 2018).............................. 8, 23, 32

*Naegele v. Albers*, 355 F. Supp. 2d 129 (D.D.C. 2005)................................................................. 4

*Navarro–Ayala v. Hernandez–Colon,* 3 F.3d 464 (1st Cir. 1993) ................................................ 24

*Operating Eng'rs Pension Trust v. A-C Co.*, 859 F.2d 1336 (9th Cir. 1988) ................................ 6

*Quick v. EduCap, Inc.*, No. 17-cv-01242, 2019 WL 95566 (D.D.C. Jan. 3, 2019) ...................... 6

*RIJ Pharm. Corp. v. Ivax Pharm., Inc.*, 322 F. Supp. 2d 406 (S.D.N.Y. 2004) ........................... 27

*S. Bravo Sys., Inc. v. Containment Techs. Corp.*, 96 F.3d 1372 (Fed. Cir. 1996) ...................... 34

*Safe-Strap Co., Inc. v. Koala Corp.*, 270 F. Supp. 2d 407 (S.D.N.Y. 2003) ........................... 1, 5

*Saltany v. Reagan*, 886 F.2d 438 (D.C. Cir. 1989) ....................................................................... 4

*Samuels v. Wilder*, 906 F.2d 272 (7th Cir. 1990) ...................................................................... 29

*Segar v. Smith*, 738 F.2d 1249 (D.C. Cir. 1984) .......................................................................... 9

*Sobel v. Yeshiva Univ.*, 839 F.2d 18 (2d Cir. 1988) ................................................................... 16

*Tahfs v. Proctor*, 316 F.3d 584 (6th Cir. 2003) ......................................................................... 6

*Teamsters v. United States*, 431 U.S. 324 (1977) ..................................................................... 8, 9

*Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866 (5th Cir. 1988) ............................................ 36

*Townsend v. Holman Consulting Corp.*, 929 F.2d 1358 (9th Cir. 1990) ...................................... 4

*Trout v. Garrett*, 780 F. Supp. 1396 (D.D.C. 1991) .................................................................... 3

*Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977 (1988) .............................................................. 8

*Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109 (D.C. Cir. 2016) ....................................... 23

*Williams v. Verizon Wash., D.C. Inc.*, 322 F.R.D. 145 (D.D.C. 2017) ............................... 5, 30, 35

## **Statutes**

Cal. Lab. Code § 1197.5 ............................................................................................................ 24

Fed. R. Civ. P. 11 ............................................................................................................... passim

N.Y. Lab. Law § 194 ................................................................................................................. 25

## <u>Other Authorities</u>

A6075, Bill Memo, N.Y. Assembly ............................................................................... 25

Ann M. Donaldson, Trump Town, PROPUBLICA ........................................................ 20

Annual Report to Congress on White House Office Personnel, Executive Office of the President

................................................................................................................................. 20

David Lat, Trump White House Lawyers: How Much Are They Worth (Part 2), ABOVE THE LAW

................................................................................................................................. 19

Fed. R. Civ. P. 11 1983 Advisory Committee Notes .................................................... 34

Fed. R. Civ. P. 11, 1993 Advisory Committee Notes ........................................... passim

James M. Burnham, Trump Town, PROPUBLICA ........................................................ 19

Law Firm Diversity Database, VAULT & MCCA ........................................................ 15

SB 358, Bill Analysis, Cal. S. Judiciary Comm. (Apr. 28, 2015) ......................... 24, 25

## **INTRODUCTION**

In the guise of a Rule 11 motion, Jones Day seeks a premature grant of summary judgment founded on a cherry-picked handful of facts and misleading caricatures of Plaintiffs' arguments. But Defendant's evidentiary proffer is incomplete, and its factual contentions are in dispute. Its motion therefore lacks merit and warrants rebuke. *See, e.g., Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 483 (3d Cir. 1987) ("[W]hen issues are close, the invocation of Rule 11 borders on the abusive."). "Rule 11 is not a toy." *Jordan v. U.S. Dep't of Labor*, 273 F. Supp. 3d 214, 246 (D.D.C. 2017) (quotation omitted). Nor is it "a proper substitute for . . . summary judgment." *Safe-Strap Co., Inc. v. Koala Corp.*, 270 F. Supp. 2d 407, 416 (S.D.N.Y. 2003). Rather, Rule 11 sanctions are "an extreme punishment," appropriate only where allegations lack any evidentiary support *and* are not likely to gain evidentiary support through discovery. *Hedgeye Risk Mgmt., LLC v. Heldman*, No. 16-cv-935, 2019 WL 4750243, at *4 (D.D.C. Sept. 29, 2019) (quotation omitted) (Moss, J.).

Here, Plaintiffs' claim that Jones Day generally pays women less than men derives from facts. Sanctions are thus inappropriate. Nothing in Defendant's Rule 11 motion undermines this claim. Nor does anything in Defendant's motion suggest these claims were asserted without adequate factual investigation. Indeed, despite their limited access to information regarding the compensation of male associates, Plaintiffs have at least six independent bases for believing that women at Jones Day are paid less than men. Together, they easily satisfy all that Rule 11 requires, namely that pleading parties "have reason to believe a fact is true but need discovery to 'confirm the evidentiary basis for the allegation.'" *Id. at* *13 (quoting Fed. R. Civ. P. 11, 1993 Advisory Committee Notes).

*First*, Plaintiffs have experienced and observed widespread hostility, harassment, and gender bias at Jones Day. They reasonably infer that this systemic discrimination extends to

compensation, as well as to the performance evaluation process upon which Jones Day purports to base pay.

*Second*, Plaintiffs have experienced and witnessed discrimination in Jones Day's performance evaluation process. Again, because Jones Day purports to base pay on performance evaluations, Plaintiffs reasonably infer that biased evaluations of performance cause pay disparities.

*Third*, Jones Day has consistently promoted more men than women to its partnership. In 2016, 70% of the lawyers named partner were men. As counsel for Jones Day has represented to the Court, bias with regard to promotions is a sound proxy for bias with regard to pay, because Jones Day purports to base promotions—like pay—on performance. Because promotions favor men roughly two to one, Plaintiffs reason that pay likely favors men as well.

*Fourth*, Jones Day represented to Plaintiffs that high-performing associates would be compensated at market rates. At least one Plaintiff was told by a male colleague that Jones Day paid him market compensation. But Plaintiffs know from their own experiences, and those of their female colleagues, that high-performing female associates at Jones Day were not paid at market rates. This information, combined with the other gender-based differential treatment that Plaintiffs observed at the Firm, supports their reasonable inference that Jones Day paid them less than comparable men based on their gender.

*Fifth*, based on the limited data available to Plaintiffs, Plaintiffs have reason to believe that they and other women were paid less than certain male associates (i.e. comparators) at the Firm who performed substantially equal work.

*Sixth*, Plaintiffs are aware that Jones Day's pay secrecy policy openly works to undermine the laws of at least two states, which guarantee employees the right to discuss their compensation

openly. Legislative history confirms that these laws were enacted to shine sunlight on pay discrimination. As Plaintiffs themselves experienced and observed, Jones Day has made every effort to render these legal rights a nullity in practice. Defendant's vigorous campaign to discourage conduct understood to facilitate the enforcement of gender pay equity laws supports Plaintiffs' inference that the Firm's pay secrecy policy operates to conceal pay disparities.

These six factors clear Rule 11's modest hurdle, notwithstanding Jones Day's well-documented efforts to suppress the disclosure of salary data and information it now condemns Plaintiffs for failing to obtain. This information regarding associate compensation, which could conclusively prove or disprove Plaintiffs' allegations regarding *systemic* disparities in pay, is jealously guarded within the custody and control of Defendant. Plaintiffs' pay claims thus present the archetypal situation contemplated by Rule 11 in which a party has good reason to believe an allegation while also requiring discovery to confirm that belief.

For a claim to merit sanctions under Rule 11, the Court must find it "patently clear" that the claim has "absolutely no chance of success"—even in view of "the freedom to litigate creatively and vigorously." *Indep. Fed. Sav. Bank v. Bender*, 230 F.R.D. 11, 16, 18 n.8 (D.D.C. 2005) (quoting *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir. 1985)). Such a determination is impossible based on the woefully incomplete and lopsided record to date, and Defendant's motion fails on this basis.

## LEGAL STANDARD

I.      **Rule 11 Sanctions Must Remain an Extreme Punishment, Applied with Restraint.**

"Sanctioning the conduct of a litigant is a solemn endeavor." *Jordan*, 273 F. Supp. 3d at 246. "The imposition of Rule 11 sanctions is . . . an extreme punishment for filings that frustrate judicial proceedings." *Hedgeye*, 2019 WL 4750243, at *4 (quotation omitted); *see also Trout v. Garrett*, 780 F. Supp. 1396, 1428 (D.D.C. 1991) (noting sanctions are a "blunt instrument" to "be

3

applied with restraint"). "A motion for sanctions under Rule 11 should not be lightly made by a party or granted by a court." *Barlow v. McLeod*, 666 F. Supp. 222, 229 (D.D.C. 1986); *see also Naegele v. Albers*, 355 F. Supp. 2d 129, 144 (D.D.C. 2005) ("The imposition of Rule 11 sanctions is not something the court takes lightly.").

A court may impose sanctions only if a "pleading, written motion, or other paper" is: (1) "presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation"; (2) "the claims, defenses, and other legal contentions are [not] warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or establishing new law"; or (3) "the factual contentions have [no] evidentiary support or . . . will likely [not] have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b).

"The test for sanctions under Rule 11 is an objective one that asks whether a reasonable inquiry would have revealed that there was no basis in law or fact for the asserted claim." *Hedgeye*, 2019 WL 4750243, at *13; *see also Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990) (explaining that, to be sanctionable, a claim must be "both baseless and made without a reasonable and competent inquiry"). A sanctionable claim is one that has "no hope whatsoever of success." *Saltany v. Reagan*, 886 F.2d 438, 440 (D.C. Cir. 1989); *see also Intelsat USA Sales LLC v. Juch-Tech, Inc.*, No. 10-cv-2095, 2014 WL 12787643, at *3 (D.D.C. Oct. 15, 2014) ("A party's representations are frivolous and thus worthy of sanctions when they are utterly lacking in legal merit and evidentiary support." (quotation omitted)).

Rule 11 does not require a plaintiff to have evidentiary proof of a claim at the time of filing. Rather, the Rule "permit[s] parties to plead matters if they have reason to believe a fact is true but need discovery to 'confirm the evidentiary basis for the allegation.'" *Hedgeye*, 2019 WL 4750243,

at *13 (quoting Fed. R. Civ. P. 11, 1993 Advisory Committee Notes). Rule 11 expressly "contemplates that a party may obtain the evidence necessary to support its allegations 'after a reasonable opportunity for further investigation or discovery.'" *Id.* (quoting Fed. R. Civ. P. 11(b)(3)). Sanctions are not appropriate where a party "did not have access to information that would have proved, or disproved, [its] belief." *Id.* (quoting *Williams v. Verizon Wash., D.C. Inc.*, 322 F.R.D. 145, 150 (D.D.C. 2017)).

Rule 11 is also not the appropriate vehicle to adjudicate the merits of a case or to resolve standard factual disputes. *See Safe-Strap Co.*, 270 F. Supp. 2d at 412, 416 (explaining Rule 11 should not be used as a "substitute" or "surrogate" for summary judgment). Accordingly, "[a] Rule 11 motion is not an opportunity for the Court to comment on, or adjudicate the merits of, a party's claims." *Intelsat*, 2014 WL 12787643, at *5; *see also Gaiardo*, 835 F.2d at 483  ("[W]hen issues are close, the invocation of Rule 11 borders on the abusive . . . Rule 11 is not to be used routinely when the parties disagree about the correct resolution of a matter in litigation." (quotation omitted)); Fed. R. Civ. P. 11, 1993 Advisory Committee Notes ("Rule 11 motions . . . should not be employed as a discovery device or to test the legal sufficiency or efficacy of allegations in the pleadings; other motions are available for those purposes.").

Thus, in considering a Rule 11 motion, all inferences must be drawn against the party seeking sanctions. *See Eastway*, 762 F.2d at 254 ("Courts must strive to avoid the wisdom of hindsight in determining whether a pleading was valid when signed, and any and all doubts must be resolved in favor of the signer."); *E. Gluck Corp. v. Rothenhaus*, 252 F.R.D. 175, 179 (S.D.N.Y. 2008) ("When divining the point at which an argument turns from merely losing to losing and sanctionable courts must resolve all doubts in favor of the signer of the pleading." (quotation omitted)).

The Court must also be mindful that "Rule 11 is not meant to chill advocacy or in any way stymie the freedom to litigate creatively and vigorously." *Indep. Fed. Sav. Bank*, 230 F.R.D. at 18; *see also Quick v. EduCap, Inc.*, No. 17-cv-01242, 2019 WL 95566, at *2 (D.D.C. Jan. 3, 2019) ("Rule 11 'is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories.'" (quoting *Tahfs v. Proctor*, 316 F.3d 584, 595 (6th Cir. 2003))). Indeed, Rule 11 "must be read in light of concerns that it will spawn satellite litigation and chill vigorous advocacy." *Carswell v. Air Line Pilots Ass'n, Int'l*, 248 F.R.D. 325, 328 (D.D.C. 2008) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 387 (1990)); *see also Operating Eng'rs Pension Trust v. A-C Co.*, 859 F.2d 1336, 1344 (9th Cir. 1988) ("[J]udges must not, by imposing sanctions unnecessarily, discourage the filing of good faith actions. It is essential that free access to the judicial system be maintained; Rule 11 was not intended to impede such access.").

These concerns are exacerbated in the civil rights context. Rule 11 should not be used to render impotent civil rights statutes such as Title VII and the Equal Pay Act ("EPA"). *See, e.g., Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978) ( "[A]ssessing attorney's fees against plaintiffs simply because they do not finally prevail would substantially add to the risks inhering in most litigation and would undercut the efforts of Congress to promote the vigorous enforcement of the provisions of Title VII."); *Operating Engineers*, 859 F.2d at 1344 (holding sanctions particularly improper "where such sanctions emerge from an attorney's efforts to secure the court's recognition of new rights").

## II.    Plaintiffs Need Only Plead Pay Discrimination Claims.

### A.    The Equal Pay Act

To *prove* a violation of the Equal Pay Act, a plaintiff must show "that (1) she was doing substantially equal work on the job, the performance of which required substantially equal skill, effort, and responsibility as the jobs held by members of the opposite sex; (2) the job was

performed under similar working conditions; and (3) she was paid at a lower wage than those members of the opposite sex." *Cornish v. District of Columbia.*, 67 F. Supp. 3d 345, 360 (D.D.C. 2014). The burden then shifts to the defendant to show the difference in pay is justified "by one of four enumerated defenses: a seniority system, a merit system, a system that measures pay by quality or quantity of production, or any other factor not based on sex." *Id.* (quotation omitted).

However, "[a]t the motion to dismiss stage, the plaintiff does not have to 'show' anything, but only allege, with some plausibility, enough facts to make her right to relief more than speculative. She does not have to establish every element of the prima facie case in her pleading." *Baker-Notter v. Freedom Forum, Inc.*, No. 18-cv-2499, 2019 WL 4601726, at *9 (D.D.C. Sept. 23, 2019); *see also EEOC v. George Washington Univ.*, No. 17-cv-1978, 2019 WL 2028398, at *5 (D.D.C. May 8, 2019) (holding plaintiff may plead a claim "without getting into the 'equal skill, effort, and responsibility' or 'similar working conditions' aspects of" the EPA); *Barrett v. Forrest Labs., Inc.*, 39 F. Supp. 3d 407, 452 (S.D.N.Y. 2014) (rejecting defendants' argument that plaintiffs' "allegations are insufficient because they merely plead 'upon information and belief' that they received lower salaries and because they do not allege facts supporting the inference that the jobs were equal").

The question of whether a plaintiff performed substantially equal work is left to the jury. *See Jamilik v. Yale Univ.*, 362 Fed. App'x. 148, 150 (2d Cir. 2009) (noting that questions about "the equivalence of two positions pursuant to an EPA claim are best left to the trier of fact"); *Crawford v. ExlService.com, LLC*, No. 16-cv-9137, 2019 WL 5887214, at *1 (S.D.N.Y. Nov. 12, 2019) ("Although, among other differences, [plaintiff] and her comparator colleagues at times held different titles and oversaw business lines generating different amounts of revenue, reasonable

jurors could nonetheless conclude that, for certain periods of time, [plaintiff] and her comparators performed substantially equivalent functions. This is a question for the jury to resolve.").

### B.    Title VII

 "A plaintiff may also seek relief for a pay disparity under Title VII" by showing "that her employer discriminated against her with respect to her compensation . . . because of her . . . sex." *Morris v. U.S. Dep't of Justice*, 298 F. Supp. 3d 187, 194–95 (D.D.C. 2018) (quotation omitted) (Moss, J.). The legal standard under Title VII thus differs from the standard under the EPA. Title VII, unlike the EPA, does "not include the 'equal work' requirement." *Id.* (citing *County of Washington v. Gunther*, 452 U.S. 161, 167–81 (1981)); *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 110 (2d Cir. 2019) ("[A] Title VII plaintiff alleging a discriminatory compensation practice need not establish that she performed equal work for unequal pay."). For that reason, courts allow plaintiffs to assert Title VII claims "without naming comparators." *Jbari v. District of Columbia.*, 304 F. Supp. 3d 201, 209 (D.D.C. 2018); *Lenzi*, 944 F.3d at 109 (holding comparators unnecessary for Title VII claim to survive summary judgment).

### C.    Systemic Pay Claims Cannot Be Conclusively Disproven Without Statistical Evidence.

The evidence in discrimination cases "usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 987 (1988). "[S]tatistical analyses . . . serve an important role in cases in which the existence of discrimination is a disputed issue," as statistical disparities are "often a telltale sign of purposeful discrimination." *Teamsters v. United States*, 431 U.S. 324, 339 & n.20 (1977); *see also Moore v. Napolitano*, 926 F. Supp. 2d 8, 18–19 (D.D.C. 2013) ("[T]he same statistical evidence is often relevant to both disparate treatment pattern and practice claims and disparate impact claims."). "In many cases the only available avenue of proof is the use of . . .

statistics to uncover clandestine and covert discrimination. Statistical proof [is] crucial to advancing the purposes of Title VII." *Segar v. Smith*, 738 F.2d 1249, 1278–79 (D.C. Cir. 1984) (quoting *Teamsters*, 431 U.S. at 340 n.20).

Of course, a plaintiff rarely possesses statistical evidence before discovery. Requiring such evidence as prerequisite to pleading a non-sanctionable pay-discrimination case would undermine the Title VII and the EPA. This is obviously not the law.

## ARGUMENT

### I.      Plaintiffs Have an Adequate Factual Basis to Allege Pay Discrimination.

Plaintiffs' pay claims "have evidentiary support." *See* Fed. R. Civ. P. 11(b)(3). Jones Day's strict pay secrecy policy denies Plaintiffs access to compensation data or much other evidence of pay discrimination, but Plaintiffs nonetheless have "sufficient circumstantial evidence objectively and reasonably to infer" that male associates at the Firm are paid more than female associates. *See Hedgeye,* 2019 WL 4750243, at *13. Below, Plaintiffs set forth six bases from which they inferred pay discrimination before discovery. This evidence provides an ample factual basis for Plaintiffs' pay claims and its logical progression illustrates the thorough nature of Plaintiffs' pre-filing inquiry.

#### A.      Plaintiffs Experienced Gendered Hostility and Discriminatory Employment Conditions at the Firm.

While employed at Jones Day, Plaintiffs all observed a pattern of gendered comments and hostility toward women. Ex. C, Williams Dep. 213:17–214:25 (describing a situation in which male associates and partners encouraged female associates and summer associates to engage in a "game" of "Marry, Fuck, Kill," which made many of the female associates uncomfortable); *id.* at 193:15–193:23 (explaining that male partners referred to Plaintiff Stahl as having a "resting bitch face"); Ex. F, Stahl Dep. 424:19–430:25 (explaining that a client and two senior partners made

inappropriate comments about women's clothing and appearances and the partners took no action when the client made uncomfortable advances); *see also* Pls.' Mot. Conditional Certification, Dkt. 84-1 at 8–11.[1]

Plaintiffs also observed the use of pernicious stereotypes to limit advancement opportunities for women. *See* Ex. F, Stahl Dep.291:14–291:24 (detailing a conversation with Partner Michelle Blum in which Plaintiff Stahl was told that to succeed at Jones Day, she "had to hang with the boys, essentially be like the men"); Ex. E, Henderson Dep.62:5–63:4 (describing a "bro culture" in which the "way for women to succeed at the firm was to adopt that stereotypical male behavior. And if you did not . . . then you were not accepted and you were restricted from opportunities that men were given").[2]

---

[1] *See also* Ex. F, Stahl Dep. 432:16–24 (describing a situation where a male partner reached into Ms. Stahl's suit pocket); Ex. D, Draper Dep. 73:15–74:3 (explaining that a male partner had expressed surprise that women were able to continue working after they had children); Ex. A, Tolton Dep. 192:11–193:10 (discussing negative comments male partners made regarding Plaintiff Tolton missing work because of her pregnancy and how male partners track the comings and goings of female attorneys but not male attorneys); *id.* at 243:19–244:5 (testifying a male associate made sexist and misogynistic remarks about female summer associates and associates during a work event); Ex. B, Mazingo Dep. 84:17–89:25 (explaining that she was tasked with planning lunches for female attorneys, that a male associate asked whether they would talk "about babies and weddings," and that another male partner asked whether Plaintiff Mazingo was a "lipstick lawyer" in reference to the cardboard cutout of a lipstick tube that Plaintiff Mazingo was required to place outside her office to advertise a women's event); *id.* at 104:15–105:10 (testifying a partner referred to their working dinner as a "date" and told Plaintiff Mazingo that he was single and was "looking" after Plaintiff Mazingo's engagement ended).

[2] *See also* Ex. C, Williams Dep. 280:7–280:9; 284:9–284:22 (testifying Plaintiff Williams talked with others about female associates not advancing at the Firm); *id.* at 394:18–395:17 (testifying a partner stated that female associates left the Firm to have families); *id.* at 428:24–429:11 (explaining male partners may prefer to work with male associates because they understood female associates would leave the Firm to start families); Ex. A, Tolton Dep. 277:24–278:21 (detailing that female associates in the Irvine office were predominately staffed on less prestigious and less valued projects).

Based on these experiences and observations, Plaintiffs reasoned that if the Firm and its leaders tolerated, fomented, and/or engaged in a culture that was discriminatory towards and/or hostile to women, such discrimination would logically extend to performance evaluations and compensation. *See* Ex. D, Draper Dep. 134:16–134:21 (testifying that based on the "culture at Jones Day of treating men differently from women," she understood this "preferential treatment . . . extend[ed] to other areas, including compensation"); Ex. F, Stahl Dep. 195:19–195:22 (explaining that "policies and practices of the firm perpetuated gender discrimination").[3] The theory is simple. Defendant cites no law that forbids such an inference.

### B.  Plaintiffs' Job Performance Was Measured Through a Discriminatory Lens.

Plaintiffs similarly concluded that their pay was likely discriminatory because their performance evaluations were tainted with gender bias and discriminatory double standards. Jones Day's website, at the time this lawsuit was filed, asserted that "[t]he Firm's associate compensation system is also fundamentally individual and merit-based." *See* Ex. G. Plaintiffs thus reasoned that because the performance evaluation process is infected with gender bias, such discriminatory bias would likely be reflected in compensation (and eventually promotions).

Every Plaintiff testified that her job performance was not assessed fairly or using the same metrics used to assess the job performance of male associates, and several identified outright gendered critiques. *See* Ex. F, Stahl Dep. 232:25–233:12 (noting that although she received excellent reviews, her consensus statement nonetheless focused on her "enthusiasm"); *id.* at

---

[3] *Cf.*, *e.g.*, *Brown v. Nucor Corp.*, 785 F.3d 895, 912 (4th Cir. 2015) (explaining that it "strains intellect to posit" that evidence of "odious discrimination" in company's "cultural backdrop" will not have an effect on promotions); *Barbano v. Madison Cty.*, 922 F.2d 139, 143 (2d Cir. 1990) (holding "knowing and informed toleration of discriminatory statements," amounts to "acquiescence").

188:25–189:8 (explaining that, unlike male attorneys, she was criticized for her appearance); Ex. B, Mazingo Dep. 25:19–27:13 (noting that Jones Day takes no steps to ensure evaluations are free from bias); Ex. A, Tolton Dep. 139:6–139:24 (expressing concern that her consensus statement did not accurately represent her underlying reviews and the "shocking degree they . . . de-emphasize or completely omit significant information"); Ex. C, Williams Dep. 245:4–21 (explaining that her consensus statement review was unfairly negative, focusing on a single partner's negative comments while omitting positive commentary); Ex. E, Henderson Dep. 268:6–269:6 (explaining that because the evaluations were based on discriminatory policies, she believed that some of her evaluations were discriminatory); *see also* Pls.' Mot. Conditional Certification, Dkt. 84-1, at 10–11. This Court has endorsed that "where male [employees] with at least roughly comparable positions were treated so differently from [plaintiff], and where at least some explicitly gender-based criticism had been leveled at [plaintiff], it is perfectly plausible that [plaintiff] was treated worse . . . because she was a woman." *Baker-Notter*, 2019 WL 4601726, at *10. Just so here.

Plaintiffs thus reason as follows: Jones Day says pay reflects performance. Jones Day evaluated Plaintiffs' performance using discriminatory language and gender-driven double standards. Accordingly, Jones Day likely discriminated against them and other women in pay as well. Defendant cites no case forbidding this logic—much less showing that it warrants sanctions.

### C.     Jones Day Consistently Promotes More Men than Women to Partner.

Plaintiffs' claim that Jones Day generally pays men more than women finds further support in the fact that, prior to the filing of this lawsuit, Jones Day consistently promoted more men than women to partner—at a rate of roughly two to one. At oral argument on the pending Motion for Judgment on the Pleadings, counsel for Jones Day acknowledged that, even without access to pay data, Plaintiffs could infer pay disparities from disparities in promotions: "[O]ne way you could

do it is look at promotions, because they're correlated. One is a proxy for the other. Promotions are . . . a lagging indicator of reviews and pay." (Dkt. 79, Dec. 16, 2019 Hearing Tr. at 19:11–14). In fact, promotions data show that Jones Day routinely promotes more men than women to partner.

First, partnership announcements previously posted on Jones Day's website (but removed after this lawsuit was filed) indicate that the Firm has consistently promoted more men than women to the partnership. In 2010, the year Plaintiff Tolton started at Jones Day, 78% of the lawyers promoted to partner were men. In 2011, the year Plaintiff Draper started at Jones Day, 80% were men. Even in recent years *significantly* more men than women have been named partner. In 2016 and 2017, years in which all six Plaintiffs were employed and years within the statute of limitations, 70% and 68%, respectively, of partnership promotions went to men. In the four years preceding the filing of this lawsuit, 65% of the lawyers promoted to partner were men. The below table summarizes the partnership announcements that inform Plaintiffs' belief that men at Jones Day are paid more than women.

**Partnership Promotion Data from Announcements on Jones Day's Website[4]:**

| Year | Men Promoted to Partner | (%) | Women Promoted to Partner | (%) |
|---|---|---|---|---|
| 2004 | 22 | 79% | 6 | 21% |
| 2005 | Data Not Available | | | |
| 2006 | 32 | 71% | 13 | 29% |
| 2007 | 35 | 78% | 10 | 22% |
| 2008 | Data Not Available | | | |

---

[4] *See* Ex. H, Compilation of Partnership Announcements. These announcements were saved by Plaintiffs' counsel prior to the filing of this lawsuit. Jones Day removed these announcements after the lawsuit was filed. Of course, the data may be incomplete as there may have been promotions not announced on the website. Further, the announcements do not identify the gender of the individuals promoted. Accordingly, these figures are based on the names provided in the announcements, the pictures of these individuals, and pronoun usage on the Jones Day website, where such information is available.

| 2009 | 31 | 78% | 9 | 22% |
|------|-----|-----|-----|-----|
| 2010 | 28 | 78% | 8 | 22% |
| 2011 | 37 | 80% | 9 | 20% |
| 2012 | 30 | 67% | 15 | 33% |
| 2013 | 29 | 64% | 16 | 36% |
| 2014 | 20 | 59% | 14 | 41% |
| 2015 | 26 | 62% | 16 | 38% |
| 2016 | 33 | 70% | 14 | 30% |
| 2017 | 32 | 68% | 15 | 32% |
| 2018 | 22 | 56% | 17 | 44% |
| 2019* | 24 | 52% | 22 | 48% |
| Total | 401 | 69% | 184 | 31% |
| 2015 - 2018 | 113 | 65% | 62 | 35% |

*These promotions were announced after Jones Day received notice of Plaintiffs' claims.

Data submitted by Jones Day to the Law Firm Diversity Database paints a comparable picture.[5] The data show that, for each of the twelve years preceding the filing of this lawsuit, the Firm named more men than women partner. Over this twelve-year period more than two-thirds of partner promotions have gone to men. Over the most recent four years, 63%, or nearly two-thirds, of promotions have gone to men. The below table summarizes the data submitted to the Law Firm Diversity Database that inform Plaintiffs' allegations of pay disparities.

---

[5] Absent discovery, Plaintiffs cannot confirm why these figures diverge from the figures derived from the partnership announcements previously posted on Jones Day's website. Both sources, however, suggest disparities and thus provide further support for Plaintiffs' claims.

**Partnership Promotion Data from the Law Firm Diversity Database[6]:**

| Year | Men Promoted to Partner | (%) | Women Promoted to Partner | (%) |
|---|---|---|---|---|
| 2007 | 23 | 72% | 9 | 28% |
| 2008 | 26 | 79% | 7 | 21% |
| 2009 | 23 | 74% | 8 | 26% |
| 2010 | 19 | 73% | 7 | 27% |
| 2011 | 16 | 67% | 8 | 33% |
| 2012 | 18 | 62% | 11 | 38% |
| 2013 | 18 | 62% | 11 | 38% |
| 2014 | 14 | 56% | 11 | 44% |
| 2015 | 19 | 68% | 9 | 32% |
| 2016 | 23 | 66% | 12 | 34% |
| 2017 | 21 | 64% | 12 | 36% |
| 2018 | 18 | 56% | 14 | 44% |
| Total | 238 | 67% | 119 | 33% |
| 2015 - 2018 | 81 | 63% | 47 | 37% |

Again, Plaintiffs' chain of inference requires little imagination: Plaintiffs witnessed the overwhelming majority—regularly more than two-thirds—of partnership promotions go to men. Plaintiffs reasonably believe that the same biased evaluation and decision-making processes that they themselves experienced not only give rise to these consistent gender disparities in promotion but also lead to gender disparities in pay. And Defendant itself now affirms that pay and promotions "[are] correlated. One is a proxy for the other." (Dkt. 79, Dec. 16, 2019 Hearing Tr. at 19:12–13). Rule 11 requires no more for Plaintiffs to contend that Jones Day discriminates against

---

[6] Law Firm Diversity Database, VAULT & MCCA (last visited Dec. 28, 2019), http://mcca.vault.com.

women in compensation. *See Lucas v. Duncan*, 574 F.3d 772, 778–79 (D.C. Cir. 2009) ("If an attorney has evidence that a man walked into a room with a wet umbrella at a certain time, the attorney does have 'evidentiary support' for the 'factual contention' that 'it was raining' at that time. He may not have proof by a preponderance, but he certainly has 'support.' Accordingly, a lawyer does not violate Rule 11 by saying so.").[7]

### D.     Jones Day Told Plaintiffs That It Pays Associates at Market Rates.

Plaintiffs' belief that they were paid less than male associates at Jones Day is also supported by the Firm's failure to pay them the so-called "market" rates that it promised to top performers. Because Plaintiffs, all women, were not paid at Cravath rates, even in years where their hours and performance were strong, they reasoned that something was holding them back. In light of the other gender-based mistreatment they experienced and observed, and their knowledge of individual disparities, discussed below, they reasoned that the "something" could be gender. This inference is hardly sanctionable. Put otherwise, Plaintiffs believed that gender was likely an explanatory variable in whether one earned Cravath/market pay.

From their recruitment by Jones Day through their time at the Firm, Plaintiffs were told that the Firm paid associates at or above market rates and that "market rates" was synonymous with the "Cravath" pay scale. *E.g.*, Ex. A, Tolton Dep. 240:7–240:11 ("I was told by attorneys and

---

[7] To the extent that one might argue that data controls should be implemented—e.g. controlling for the proportion of male associates compared to female associates eligible for promotion—such disagreements fall far short of sanctionable. Indeed, such disagreements are the routine subject of litigation in class discrimination cases, hashed out through conflicting regression analyses offered by labor economists, all based on far more sophisticated statistical analyses than those possible based on the limited publicly available data here. *Cf. Bazemore v. Friday*, 478 U.S. 385, 400 (1986) ("[F]ailure to include variables will affect the analysis' probativeness, not its admissibility."); *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 34 (2d Cir. 1988) (noting the party that asserts an omitted variable should have been included in a regression has the burden of showing its actual relevance).

partners at Jones Day that Jones Day paid market rates, and that means that it pays market rates to

its associates, market, i.e., Cravath."); *see also* Pls.' Mot. Conditional Certification, Dkt. 84-1 at

8–11.[8] Indeed, in preparing to speak with recruits, Plaintiff Williams was told that she should

describe Jones Day's compensation in terms of "market" pay and that everyone understood

"market" to be synonymous with "Cravath." Ex. C, Williams Dep. 46:12–52:4. And Plaintiff

Tolton was told in writing by a male associate that compensation "is set at the market rate." (Dkt.

68-10, Ex. 9 to Def.'s Mot. for Rule 11 Sanctions ("Mot.").)

---

[8]*See also* Ex. A, Tolton Dep. 27:6–33:25 ("I recall Jim Poth speaking to me about the compensation system at Jones Day and that . . . the firm paid market rates to its associate[s] . . . The market as he described it to me was based on the Cravath scale, which is synonymous with market pay at big law firms."); Ex. B, Mazingo Dep. 23:1–24:15 (recalling that she understood Jones Day to pay "the top market rate"); *id.* at 276:2–276:17 ("I was told during my interview process that Jones Day's pay was competitive with its peers who are the top big law firms . . . [A]nd I also received fairly frequent emails from recruiters in the Orange Country and other California geographies [regarding firms] that were paying . . . Cravath."); Ex. C, Williams Dep. 49:9–52:4 ("He shared with me that . . . the firm pays top market for good associates . . . He may have said 'Cravath' or 'market' interchangeably and it wouldn't have stood out to me as having any different meaning."); 126:23–127:8 ("The firm[] represent[ed] to me that I was supposed to give to other law students who were interested that the firm pays market and pays amounts comparable to other big firms, which is generally understood to be Cravath scale."); Ex. D, Draper Dep. 123:12–123:25 ("Our understanding was that Jones Day paid top of market, which is synonymous with Cravath scale."); Ex. E, Henderson Dep. 112:23–113:21 ("The amounts were specified and advertised that they would be at or above market . . . that happened with quite a few partners, associates during my interview process while I was at Jones Day."); 153:3–153:12 ("During my interview process, during recruiting, while I was at Jones Day, people discussed . . . that your pay while you're at Jones Day is based on the Cravath scale . . . So, it was a benchmark that Jones Day advertised as paying at or above market."); 156:14–156:21 ("During the recruiting process we were told that Jones Day does not give bonuses but that they made up for not giving bonuses to match Cravath when they gave raises, so not to be worried that your base was not at the Cravath scale because Jones Day would be paying you market or above in your base pay moving forward."); Ex. F, Stahl Dep. 106:5–106:8 ("My understanding was that Jones Day Irvine associates were making . . . market rate, and market rate, and market rate was understood to be the Cravath scale.").

Plaintiffs, however, were not paid Cravath rates, nor were other high-performing female associates. Plaintiffs understood, based on their own compensation, that female associates, even top performers, were consistently paid under market. In light of the substantial gap between what Plaintiffs were told associates were paid and what they observed high performing female associates being paid, coupled with other indicia of gender discrimination, Plaintiffs infer that Jones Day likely pays male associates more than their female counterparts based on gender. *See, e.g.*, Ex. C, Williams Dep.75:17–76:20 ("[M]y personal experience was that I understood that the top performing attorneys at Jones Day received market compensation, sort of synonymous with Cravath compensation. I did not make that market salary. To the extent I was aware of other folks' compensation . . . the women attorneys I knew were not receiving market compensation. So just sort of combining Jones Day's representation that top performing candidates are making market, neither myself nor any of the women I know are making market, I have to assume that Jones Day's representation was truthful, and someone is making market, and I would understand that would be the male associates.").[9]

Jones Day's strident insistence to the contrary, Plaintiffs' inference here is plainly plausible. (*See* Dkt. 79, Dec. 16, 2019 Hearing Tr. at 39:16–21 (The Court: "And then you say to yourself: Okay. Why is it that I wasn't paid at that level? It wasn't because of my work. It's possible that I wasn't paid at that level because the firm has made a misrepresentation to me, but it is also

---

[9] *See also* Ex. C, Williams Dep.148:2–12 ("I understood from the firm's representation that top performers make market . . . I assumed, yes, that some of these men were making market. Did I discuss their compensation with them? No. That would have been a violation of the firm's pay secrecy policy."); Ex. F, Stahl Dep.157:24–158:4 ("[I]t was told to me that Jones Day paid market and more for top performers, and . . . every indication I had was that I was a top performer, and I was not making market level and more.").

actually plausible that it's because in fact there was some other factor at play, which is my sex and my gender.")). Yet, Jones Day insists that this inference is so baseless as to be sanctionable.[10] This is obviously not the law. Plaintiffs are entitled to rely on circumstantial evidence, *Lucas*, 574 F.3d at 777, and where the evidence is inconclusive, Rule 11 mandates that doubts be resolved in their favor, *Gluck Corp.*, 252 F.R.D. at 179.

### E. Plaintiffs Identify Comparable Male Associates Who Were Paid More.

Plaintiffs have also identified specific male associates who performed similar work to Plaintiffs and other female associates, yet were paid more.[11] These comparators further enhance the plausibility of Plaintiffs' claims of class-wide, gender-based pay disparities at Jones Day.

#### 1. Publicly Available Salary Data

Limited publicly available data regarding associate compensation at Jones Day supports Plaintiffs' pay discrimination claims. Male seventh-year associate James Burnham made $810,000 according to a public disclosure in January 2017.[12] When Plaintiff Tolton was a seventh-year associate in 2018 she made $225,000. Ex. I. The most any Plaintiff ever made at Jones Day was $260,000, which Plaintiff Stahl earned as a fourth-year associate. *Id.*

---

[10] Contrary to Defendant's contention (Mot. 4–7), the fact that certain Plaintiffs did not know any men who were paid the Cravath scale is no death knell to this theory. Plaintiffs' contention is not that all men earned the Cravath scale and all women earned less. Rather, Plaintiffs contend that Jones Day's failure to pay any of them what they understood to be Jones Day's benchmark was an indicator that women were underpaid.

[11] Defendants' hostility to Plaintiffs' information and belief pleading is misplaced. *See Barrett*, 39 F. Supp. 3d at 432 (approving information and belief pleading for pay comparators).

[12] *See* James M. Burnham, Trump Town, PROPUBLICA (last visited Dec. 28, 2019), https://projects.propublica.org/trump-town/staffers/james-m-burnham; David Lat, Trump White House Lawyers: How Much Are They Worth (Part 2), ABOVE THE LAW (Apr. 4, 2017), https://abovethelaw.com/2017/04/the-trump-white-house-lawyers-how-much-are-they-worth-part-2/.

Jones Day's suggestion that Managing Partner Stephen Brogan inflated Burnham's salary to subsidize his service to the Trump Administration does not render comparison invalid.[13] Notably, Jones Day failed to inflate the salaries of female associates who departed for public service. Indeed, disclosures show that the Firm paid Annie Donaldson (who was subsequently paid more than Mr. Burnham by the Trump Administration)[14] over half a million dollars less than Mr. Burnham.[15]  Nor did Jones Day similarly inflate the salary of Plaintiff Stahl, who before she left Jones Day for a job in public service actually worked with Burnham herself. Ex. F, Stahl Dep.416:1–418:2 (testifying that she left Jones Day and joined the U.S. Attorney's Office); 288:9–288:25 (testifying that she worked directly with Burnham and had firsthand knowledge of his responsibilities at the Firm).[16]

---

[13] Ex. J, Audio Tr. at 41:3–7 (partner explaining that "there are certain people, when they're going into the government that the firm, meaning Brogan, has some discretion and will give them more money."); *id.* at 42:9–24 (partner confirming salaries of former Jones Day lawyers who joined the Trump Administration "were all inflated . . . [b]ecause Brogan knows . . .  the firm sees it as prestigious for those people to move into the administration, so they all got a bump . . . that was just a nice little cushion to help that person"). Plaintiffs also question Jones Day's explanation that it subsidized participation in the Trump Administration based on the magnitude of the disparity between their salaries and Burnham's salary. *See id.* at 43:3–10 (female associate stating, "It makes sense, but then you look at this last year, and it's like well, did he get a one hundred percent cushion? . . . It's still so much over what [other people made]."); *id.* at 39:11–24 (female associate noting, "I think the thing that got [discussion of potential pay disparities] going . . . [w]as the disclosure of [Burnham's] salary . . . and everybody looked at that").

[14] *See* Annual Report to Congress on White House Office Personnel, Executive Office of the President (June 30, 2017), https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/disclosures/07012017-report-final.pdf (listing Donaldson's per annum salary as $155,000 and Burnham's as $140,000).

[15] *See* Ann M. Donaldson, Trump Town, ProPublica (last visited Dec. 28, 2019), https://projects.propublica.org/trump-town/staffers/ann-m-donaldson (disclosing salary of $266,664).

[16] Whether Burnham, his Trump administration colleague, and Plaintiffs performed work of equal skill, effort, and responsibility under similar working conditions for EPA purposes is a merits issue not properly addressed on the pleadings, much less in a Rule 11 motion. *See George Washington*

From this, too, Plaintiffs plausibly inferred that men at Jones Day are likely paid more than women. *See Lucas*, 574 F.3d at 777 ("[Rule 11] merely requires an attorney to certify that the factual contentions in a paper he presents to the court 'have evidentiary support.' Fed. R. Civ. P. 11(b)(3). 'Inferences'—which are commonly described as 'circumstantial evidence'—are as capable of providing evidentiary support as 'facts'—which are commonly described as direct evidence.").

### 2.   Other Comparators

Plaintiffs are further aware of certain male former colleagues who were paid more than them despite performing comparable work.[17] *First*, Plaintiff Tolton understands that her male colleague ███████, unlike her, received substantial raises every year he was at the Firm, with the exception of one year when his salary was frozen as a punitive measure. Plaintiff Tolton learned this information directly from Mr. ███████████, who told Plaintiff Tolton that, even in the year in which his salary was frozen, Mr. ████ still made more than Tolton. Ex. A, Tolton Dep. at 240:24–243:15; 245:20–246:7. Discovery has now confirmed that, starting in July of their second year at the Firm, Ms. Tolton was consistently paid less than Mr. ████, who made between $5,000 and $175,000 more than her each year. Ex. I.

*Second*, Plaintiff Draper identified certain male associates in the Atlanta office whom she believes, based on conversations she had with a female associate in the office, were paid more than

---

*Univ.*, 2019 WL 2028398, at *5. Nonetheless, Plaintiff Stahl testified that she was slated to draft a brief with Burnham, but that Burnham subsequently passed his responsibility to another male associate, who submitted Stahl's draft with minimal revisions—implying that all three performed similar work, or at least were capable of it. Ex. F, Stahl Dep.288:9–288:25.

[17] Jones Day's pay secrecy policy limited Plaintiffs' ability to ascertain what their male colleagues were being paid. *See infra* pp. 28–31. Nonetheless, Plaintiffs have some specific information that provides further factual support for their pay claims.

her. The female associate told Plaintiff Draper she was paid comparably to her husband, who was

also at Jones Day, even though the wife was several years the husband's senior. *See* Ex. D, Draper

Dep. 130:6–10 ("[She] must have been a seventh-year, maybe, or sixth-year, and her husband was

a junior associate. ████████████████████████████████████████████

████████████████████"). Plaintiff Draper later learned from the friend's husband what he

was paid and knew that his salary was similar to her own despite his far lesser seniority. *See id.*

138:11–14, 149:25–150:4 ("I remember he was making over ████████ in his last year.").[18]

    *Third*, Plaintiff Henderson understands that she was paid less than five male associates of

her class year in the New York office. Henderson believes that she was paid less than these men

because, in January 2013, she did not receive a raise, but two of the male associates openly bragged

about receiving raises. Ex. E, Henderson Dep. 118:5–15.[19] Prior to filing, other Plaintiffs also

inferred, based on the experiences of their co-Plaintiffs and the other circumstantial evidence

(discussed throughout this Brief), that they were paid less than their male colleagues.[20]

---

[18] Discovery has now confirmed Plaintiff's Draper's belief. When the male associate mentioned above left Jones Day, in 2018, at the end of his third year, his salary was $225,000. Ex I. When Plaintiff Draper left Jones Day, also in 2018, her salary was $230,000, only $5,000 more despite being four years more senior. *Id.* Draper's inference and pleading that she made less than other male associates has similarly been borne out. (Dkt. 41, Third Amended Compl. ("TAC"), ¶ 187) When Draper was a fourth-year associate, she made $195,000. Ex. I. The male comparators she names in the complaint were paid between $230,000 and $260,000 when they were in their fourth year. *Id.* When Draper was a fifth-year associate, she was paid $220,000. *Id.* In their fifth years, the male associates were paid between $265,000 and $300,000. *Id.*

[19] Discovery has confirmed that this is correct. In January 2013, five male associates whom she identified as comparators received raises, but Plaintiff Henderson did not. Ex. I. As a result, Henderson's salary was between ███████████ less than her male counterparts, all of whom were in her same class year and, like her, worked in the New York office. *Id.* In July 2013, one of these male associates received yet another raise, resulting in him making $30,000 more than Henderson. *Id.*

[20] Although, to date, Jones Day has produced salary data for only a handful of male associates, this discovery has nonetheless confirmed that the other Plaintiffs were also correct in their belief that

Jones Day's attempts to distinguish these comparators are premature. Determining whether these comparators are valid requires factual findings and is therefore a merits determination.[21] Courts have thus held that the issue cannot be resolved on the pleadings, or even at summary judgment. *See, e.g.*, *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1116 (D.C. Cir. 2016) ("[D]etermining whether two employees are similarly situated is ordinarily a question of fact for the jury."); *Crawford*, 2019 WL 5887214, at *1 (explaining that whether job duties are substantially equivalent "is a question for the jury to resolve").

And Plaintiffs are most certainly not required to prove that they performed equal work as compared to specific male associates in their office simply to plead pay discrimination claims. *See* cases cited supra p. 8.  For starters, as set forth above, *there is no "substantially equal work" requirement for pay claims under Title VII. Morris*, 298 F. Supp. 3d at 194. And even under the EPA, a plaintiff need not prove her responsibilities are identical to male employees merely to plead a pay claim. *See Baker-Notter*, 2019 WL 4601726, at *9 ("[T]he jobs being surveyed were at least comparable . . . and courts should not require so much detail about similarity at the front end of a

---

they were paid less than some male associates. First, Plaintiff Stahl was consistently paid less than some male associates of her same class year at the Firm. In her third year, she was making $60,000 less than two male associates, and in her fourth year, she was making $90,000 less than one male associate. Ex. I. Second, Plaintiff Mazingo, in her second year at the Firm, made $20,000 less than two male associates when they were in their second year, and, as a third-year associate, made $45,000 less than these same associates when they were in their third year. *Id.* Third, Plaintiff Williams was paid less than one male associate of her same class year for four straight years, resulting in her making $135,000 less than this associate in her fourth year. *Id.* And, in her final two years, Williams also made between $5,000 and $10,000 less than another male associate. *Id.*

[21] *Compare e.g.*, Ex. E, Henderson Dep. 163:7–18 (describing having worked on the same deals and performed similar tasks as comparators); Ex. A, Tolton Dep.391:17–392:9 (describing similar duties and responsibilities), *with* Mot. 11–13 (arguing that Plaintiffs Tolton and Henderson had no basis to compare their compensation to compensation of other male associates in their offices because of differences in hours and practice group).

lawsuit as to make equal pay laws largely inapplicable."); *George Washington Univ.*, 2019 WL

2028398, at *5 ("It is sufficient . . . to plead that [employees] performed substantially equal work—

and yet were paid differently—without getting into the 'equal skill, effort, and responsibility' or

'similar working conditions' of [the EPA]."). Based on the facts set forth here, Plaintiffs are

entitled to allege that they performed substantially equal work based on their experience of having

had interchangeable responsibilities and may permissibly plead, under Title VII, that they earned

less even than men who did not perform similar work. Rule 11 requires no more. *See Lucas*, 574

F.3d at 780 ("Rule 11 normally does not require one party to uncover and to set forth the facts that

support the other side's position." (quoting *Navarro–Ayala v. Hernandez–Colon,* 3 F.3d 464, 467

(1st Cir. 1993)). And it certainly does not mandate deterrence of such pleadings.

### F. Plaintiffs Can Infer that Jones Day Engages in Pay Discrimination in Light of the Firm's Unlawful Pay Secrecy Policy.

  Jones Day's pay-secrecy practices further support Plaintiffs' belief and claim that Jones

Day discriminates in pay based on gender. Both the California and New York legislatures have

determined that gender-based pay discrimination habitually hides behind pay-secrecy policies.

When California enacted the California Fair Pay Act in 2015, amending the California Equal Pay

Act ("CEPA"), the legislature included language in the law expressly prohibiting employers from

implementing pay secrecy policies: "An employer shall not prohibit an employee from disclosing

the employee's own wages, discussing the wages of others, inquiring about another employee's

wages, or aiding or encouraging any other employee to exercise his or her rights under this

section." Cal. Lab. Code § 1197.5 (k)(1). The express purpose of this provision was to enable

women to enforce California's laws regarding pay discrimination. *See* SB 358, Bill Analysis, Cal.

S. Judiciary Comm. (Apr. 28, 2015) ("This bill seeks to strengthen the [CEPA] by helping

employees gain access to wage rate information to determine whether they are being paid

unequally based on gender.").[22] Proponents of the law argued that, despite the fact that CEPA had

been on the books for over 65 years, pay inequities remained entrenched in large part because pay

secrecy withheld from women the information necessary to enforce pay equality. *See id.* ("The

current culture of pay secrecy undermines attempts to reduce the wage gap . . . This secrecy means

that workers are unlikely even to discover ongoing pay discrimination, much less to be able to

fight against it.").

Similarly, New York amended its equal pay law in 2016 to make it illegal for employers

to bar employees from "inquiring about, discussing, or disclosing" their wages. N.Y. Lab. Law §

194(4)(a). Like the California law, the express purpose of the amendment was to prevent pay

discrimination. A6075, Bill Memo, N.Y. Assembly ("Employers would also be prohibited from

forbidding employees from sharing wage information that would otherwise deny women workers

the ability to discover whether their wages are unequal to their male counterparts.").[23]

In disregard of the stated rationale for these amendments—to stomp out gender

discrimination in pay—Jones Day maintains a strict pay-secrecy policy, which it proudly asserts

is an integral part of the Firm's culture, norms, and values. For example, prior to this litigation, the

Firm openly touted the policy on its website: "The financial relationship of a lawyer to Jones Day

is confidential . . . [and] associate compensation is . . . confidential . . . What is sometimes critically

referred to by those outside Jones Day as a 'lack of transparency' is almost universally viewed

inside Jones Day as one of its great strengths." Ex. K. The Firm Manual also leaves no doubt that

---

[22]     *Available    at*    https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=
201520160SB358 ("04/27/15 Senate Judiciary," at 9).

[23]     *Available    at*    https://nyassembly.gov/leg/?default_fld=&leg_video=&bn=A06075&term=
2015&Summary=Y&Actions=Y&Committee%26nbspVotes=Y&Floor%26nbspVotes
=Y&Memo=Y

Jones Day expects its associates not to freely discuss their compensation with one another: "A part of the Firm's culture of mutual respect is the confidentiality of compensation. . . . The evaluation of each individual's performance and the compensation each individual receives are confidential matters between the individual and the Firm. The Firm expects that all lawyers and other personnel will honor the Firm's commitment to discretion and confidentiality regarding performance evaluations, compensation, and other employment matters." Ex. L.

In furtherance of this policy, when the Firm delivered annual compensation letters to associates, the envelopes were marked "**CONFIDENTIAL**" and the letters reminded the associates, "The Firm treats all lawyer compensation as confidential." *E.g.*, Ex. M; Ex. C, Williams Dep. 60:2–8. The Firm regularly reminded associates that it expected that compensation would be kept confidential. *E.g.*, Ex. N, Feb. 2015 email from Irvine Partner-in-Charge ("I would remind you that both the Firm's policy and its culture are not to diverge, exchange, or publish specific salary information."); Ex. O, Feb. 2015 from Atlanta PIC (same language); Ex. P, Feb. 2016 email from Director of Recruiting (same language).

Plaintiffs' personal experience is consistent with these policies: All understood that they were not to discuss compensation. Ex. A, Tolton Dep. 22:13–21 ("I was told that the policy of the firm was that nobody knows the compensation of any other attorney, and that nobody discusses their compensation or the compensation of others with each other, and that, in fact, this black box system of pay secrecy facilitates the collegiality that is a hallmark of Jones Day.").[24] Although

---

[24] *See also* Ex. B, Mazingo Dep. 42:25–43:5 ("Jones Day had made it clear to me that there was a strict policy of pay confidentiality, and so I didn't discuss my salary or other associates' salary information with almost anyone."); Ex. C, Williams Dep.59:23–61:7 ("And that was also pitched to me as part of being recruited to be an advantage to Jones Day's system, is that unlike other firms where its more transparent . . . at Jones Day, the black box keeping pay secret keeps associates

associates, of course, at times did discuss compensation, they did so only quietly with trusted confidants, in order to avoid retaliation. *See* Ex. F, Stahl Dep. 179:5–7 ("It was my understanding that we could be . . . disciplined for violating pay secrecy."); Ex. E, Henderson Dep. 118:19–119:3 (explaining that a female colleague would not share her compensation because of the pay secrecy policy).[25]

Plaintiffs not unreasonably infer that Jones Day's pay secrecy policy may be concealing gender-based pay inequities. It is well established that where a party improperly invokes confidentiality in order to shield itself from litigation, an adverse inference may be drawn against the party. *See Chambers v. Capital Cities/ABC*, 159 F.R.D. 441, 445 (S.D.N.Y. 1995) ("Where conduct of a party tends to preclude availability of information relevant to a litigation and where no genuine basis for keeping that information confidential exists, a court or factfinder may infer that the information, if disclosed, would be contrary to the position of the party engaging in such conduct."); *see also RIJ Pharm. Corp. v. Ivax Pharm., Inc.*, 322 F. Supp. 2d 406, 419 (S.D.N.Y. 2004) ("It is well settled that where a party fails to provide relevant information within its control concerning the subject matter of the litigation, the Court may infer that the information, if disclosed, would be harmful to the party who fails to provide it."). Here, Jones Day not only refuses to allow Plaintiffs this inference—the same inference made by California and New York, that pay secrecy may mask inequities—but insists that the inference is sanctionable.

---

from looking over each other's shoulders."); Ex. D, Draper Dep. 82:12–83:9 ("I mean, the firm does have a pay secrecy policy. That's, like, generally understood information . . . . There was an understanding within the firm that we did not discuss compensation.")

[25] *See also* Ex. D, Draper Dep. 145:22–23 ("I was prohibited from asking him what his salary was."); Ex. E, Henderson Dep. 119:8–11 ("[B]ecause pay was secret, confidential, I was not aware of what other associates were making."); Ex. F, Stahl Dep. 142:20–22 ("Because of the pay confidentiality . . . it wouldn't have been something that would have been discussed.").

Jones Day cannot have it both ways. It cannot flout laws designed to ensure Plaintiffs have access to the information necessary to determine whether they have been subject to pay discrimination and then turn around and assail Plaintiffs for lacking a factual basis for their pay claims. Defendant's unlawful efforts to prevent Plaintiffs from learning how much their colleagues are paid is itself a legitimate basis to believe the Firm's compensation system may discriminate against women.

*    *    *

Plaintiffs thus identify six bases from which to infer pay discrimination. Collectively, they leave little doubt that Plaintiffs' allegation that the Firm systemically discriminates against women in pay is not "made . . . up out of whole cloth." (Mot. at 1.) To the contrary, it is Defendant's motion that seeks to put the cart before the horse.

## II.  Plaintiffs May Prove Pay Discrimination Through Discovery.

Defendant's Rule 11 motion is built on a faulty premise—that Plaintiffs must obtain evidence sufficient to *prove* pay discrimination before so much as pleading a pay claim, or else be sanctioned for failing to do so. This is decidedly not the law. Plaintiffs are entitled to plead their pay claims based on circumstantial evidence that suggests Jones Day pays women less than men. And Plaintiffs are entitled to confirm the veracity of their allegations through discovery. This is particularly the case where, as here, Plaintiffs do not have access to the information that will ultimately prove or disprove their claims.

### A.  Rule 11 Allows Plaintiffs to Prove Their Claims Through Discovery.

Rule 11 expressly allows a party to make allegations on "information[] and belief." Fed. R. Civ. P. 11(b). The Rule "contemplates that a party may obtain the evidence necessary to support its allegations 'after a reasonable opportunity for further investigation or discovery.'" *Hedgeye*, 2019 WL 4750243, at *13 (quoting Fed. R. Civ. P. 11 (b)(3)). The Rule therefore "permit[s] parties

to plead matters if they have reason to believe a fact is true but need discovery to 'confirm the evidentiary basis for the allegation.'" *Id.* (quoting Fed. R. Civ. P. 11, 1993 Advisory Committee Notes). For that reason, sanctions are inappropriate where the plaintiff has "sufficient reason to believe that its allegations would 'likely have evidentiary support after a reasonable opportunity for . . . discovery.'" *Id.* (quoting Fed. R. Civ. P. 11(b)). This is particularly so "where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010); *see Jbari*, 304 F. Supp. 3d at 209 ("Courts have . . . permitted claims for disparate treatment based upon information and belief."). Put simply, "Rule 11 must not bar the courthouse door to people who have some support for a complaint but need discovery to prove their case." *Samuels v. Wilder*, 906 F.2d 272, 274 (7th Cir. 1990) (quotation omitted).

Here, Plaintiffs have articulated the extensive factual matter—including public salary data, public promotion data, anecdotal data, and other circumstantial evidence—that allows a reasonable inference of pay discrimination. That inference may or may not be validated "after a reasonable opportunity . . . for discovery." Fed. R. Civ. P. 11(b)(3). But, in light of the wealth of circumstantial evidence underlying Plaintiffs' claims, Defendants cannot credibly contend that those claims are so void of a factual basis to be sanctionable.

### B. Sanctions Are Not Appropriate Where Relevant Information Is Primarily in the Custody and Control of Defendant.

Rule 11 sanctions are particularly inappropriate where, as here, the relevant information that will ultimately prove or disprove the allegations is peculiarly in the control of Defendant. Plaintiffs testified that Jones Day's pay secrecy policy made it difficult, if not impossible, for Plaintiffs to ascertain what male associates at the Firm were paid. *See supra* pp. 24–28. And the

statistical data that would permit the kinds of analysis central to proving or disproving pay discrimination was obviously well outside Plaintiffs' reach. *See supra* pp. 8–9.

This Court recently denied a motion for sanctions where the plaintiff "did not have access to information that would have proved or disproved" its allegations and, "in fact, only learned through the discovery process" of the existence of evidence contradicting the allegations. *Hedgeye*, 2019 WL 4750243, at *13. The Court appropriately rejected the proposition that sanctions were warranted merely because "the sustainability of [the plaintiff]'s claims would turn on what discovery revealed." *Id.*

Just so here. Plaintiffs did not—and still do not—have access to the pay data that will show whether women are systematically paid less than male associate. Plaintiffs made reasonable inferences based on circumstantial evidence that strongly suggests the presence of pay disparities. Plaintiffs are entitled to do just that: "[T]he reality of Rule 11 is that a sanction is appropriate *only* when the lack of factual support is (or could have been) apparent *prior to* the filing of the deficient submission." *Williams*, 322 F.R.D. at 150; *see also Hilton Hotels Corp. v. Banov*, 899 F.2d 40, 43 (D.C. Cir. 1990) (suggesting sanctions are inappropriate in "a case in which the relevant information was largely in the control of the defendant" (quotation omitted)); *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1012 (2d Cir. 1986) (denying sanctions because "the relevant information was largely in the control of the defendants").

### III. Defendant Is Prematurely Seeking Summary Judgment Prior to Full Development of the Factual Record.

Defendant's Motion does not disprove Plaintiffs' pay claims. Rather, it contests a handful of allegations and asks the Court to dismiss Plaintiffs' pay claims, in their entirety, on that basis, and stick Plaintiffs with the bill. In many instances, Jones Day is either misconstruing the record

or mischaracterizing Plaintiffs' allegations. Elsewhere, Jones Day is simply attempting to convert standard factual disputes, of the variety that arise in any litigation, into a basis for sanctions.

### A.     Defendant's Motion Does Not Disprove Plaintiffs' Pay Claims.

Jones Day's motion does not identify any sanctionable deficiency in Plaintiffs' pay claims. It, at best, identifies three factual disputes, which cannot be resolved without additional discovery.

First, Jones Day disputes whether male associates were paid more than Plaintiffs. It points to a handful of comparators named in the Third Amended Complaint that discovery has revealed were paid comparably to Plaintiffs. (*See* Mot. 10–11). These comparators were alleged in good faith and on information and belief. The paragraph at issue uses the phrase "upon information and belief" four times. *See* TAC ¶ 165. The basis for this belief has now been set out extensively in this Brief.

These comparators, however, are not fatal to Plaintiffs' systemic pay claims, which do not turn on any anecdotal comparisons—much less the handful that Defendant cherry-picks. Defendant's myopic focus on its preferred comparators ignores the wealth of other circumstantial evidence, discussed above, underlying Plaintiffs' class claims. Moreover, even measured by the metric of specific comparators, Plaintiffs named other comparators in the complaint who have been validated by discovery. Indeed, all of the comparators named by Plaintiffs Tolton, Henderson, and Draper have been validated. *See* supra pp. 21–24. And there plainly remains a factual dispute as to whether Plaintiffs were paid less than male associates and whether Jones Day pays men more than women to a statistically significant degree.

Second, Jones Day disputes whether some male associates performed substantially equal work as Plaintiffs. (Mot. 11–13). As set forth above, however, Plaintiffs have testified to having performed similar work to the male associates they named as comparators. *See* supra p. 16. More to the point, Plaintiffs are not even required show equal work for the purposes of Title VII, *Morris*,

298 F. Supp. 3d at 194, nor are they required to plead facts regarding equality of skill, effort. and responsibility merely to assert an EPA claim, *Baker-Notter*, 2019 WL 4601726, at *9; *George Washington Univ.*, 2019 WL 2028398, at *5; *see* supra p. 8. Jones Day's disagreement with Plaintiffs' contention that they performed work comparable to the male associates referenced in the complaint in no way renders the contention sanctionable.

Third, Jones Day disputes whether some male associates were paid at Cravath rates, the manner in which the Cravath pay scale operates, and whether the Cravath pay scale is the market rate in all geographies. Defendant points to examples of male associates who were not paid at Cravath rates and to the fact that one Plaintiff in one year made more than Cravath base pay. But, as set forth above, *supra* note 11, Plaintiffs did not allege that all male associate were always paid Cravath rates, nor did they allege that female associates were never paid on the Cravath scale. And Plaintiffs did not allege direct knowledge that any male associate was paid Cravath rates. They alleged, rather, that they perceived, from their own experiences, a general trend of women not being paid Cravath rates or market pay that was difficult to square with Jones Day's representation that top associates are paid on that scale. In the context of other gender discrimination that they observed and experienced, Plaintiffs reasoned that gender could be a factor in Jones Day's failure to pay them as advertised. *See* supra pp. 16–19. Defendant's various factual assertions regarding the Cravath pay scale, all of which are contested, do nothing to undercut this inference.

### B.    Factual Disagreement Does Not Warrant Sanctions.

Contested factual issues are not an appropriate basis to seek sanctions. Even when discovery conclusively disproves a claim, sanctions are generally not warranted. *See Hedgeye*, 2019 WL 4750243, at *6, *12–13 (granting summary judgment where record was "entirely one-sided" with "less than a modicum of evidence" but denying sanctions); *Dove v. Wash. Metro. Area Transit Auth.*, No. 3-cv-2156, 2005 U.S. Dist. LEXIS 17955, at *12 (D.D.C. Aug. 18, 2005)

("Although the claims contained in the plaintiff's amended complaint were sufficiently ill-founded to merit the granting of summary judgment, a consideration of Rule 11 sanctions involves more than an inquiry into the objective merits of a complaint."); *Camm v. Kennickell*, No. 85-cv-3844, 1990 WL 198621, at *6 (D.D.C. Nov. 20, 1990) ("Although discovery ultimately did not produce facts sufficient to prevail on those claims, the counterclaim is not so lacking in factual basis or so unwarranted by existing law as to violate Rule 11.").

Here, Jones Day has not even disproven Plaintiffs' claims. At best, Jones Day has identified, based on the limited discovery that has occurred to date, facts favorable to its position. But in present case, where discovery has just begun, and already there is ample evidentiary support for Plaintiffs' claims, sanctions are clearly not appropriate. *See Hedgeye*, 2019 WL 4750243, at *12 ("Given that the Court has concluded that there are triable issues of fact . . . the sanctions motion clearly fails."); *see also* Fed. R. Civ. P. 11, 1993 Advisory Committee Notes ("[I]f a party has evidence with respect to a contention that would suffice to defeat a motion for summary judgment based thereon, it would have sufficient 'evidentiary support' for purposes of Rule 11.")

### C.    The Evidentiary Support for Plaintiffs' Pay Claims Illustrates the Sufficiency of Plaintiffs' Pre-Suit Investigation.

Because Plaintiffs have shown that their factual contentions have evidentiary support— and did at the time of filing—Defendant's claim that Plaintiffs conducted an inadequate pre-suit investigation also fails. The evidence identified by Plaintiffs in this Brief proves the sufficiency of Plaintiffs' investigation for three reasons.

*First*, once Plaintiffs have established that their pay claims have factual support, Plaintiffs' obligations are satisfied, and the Rule 11 inquiry is complete. This is because for a claim to be sanctionable it must be "*both* baseless *and* made without a reasonable and competent inquiry." *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005) (emphasis in original); *S. Bravo Sys., Inc.*

*v. Containment Techs. Corp.*, 96 F.3d 1372, 1375 (Fed. Cir. 1996) (same); *Bolden v. Morgan Stanley & Co.*, 765 F. Supp. 830, 834 (S.D.N.Y. 1991) (same).[26] Accordingly, "[i]n considering sanctions regarding a factual claim, the initial focus of the district court should be on whether an objectively reasonable evidentiary basis for the claim was demonstrated . . . . Where such a basis was shown, no inquiry into the adequacy of the attorney's pre-filing investigation is necessary." *Hadges v. Yongers Racing Corp.*, 48 F.3d 1320, 1329 (2d Cir. 1995) (quotation omitted).

Any other rule would allow a defendant to merely allege an inadequate pre-suit investigation as a means to demand the plaintiff's protected work product. Such a rule would plainly contradict the purposes of Rule 11. Fed. R. Civ. P. 11, 1993 Advisory Committee Notes ("Rule 11 motions should not be made . . . to seek disclosure of matters otherwise protected by the attorney-client privilege or the work product doctrine."); Fed. R. Civ. P. 11 1983 Advisory Committee Notes ("The rule does not require a party or an attorney to disclose . . . work product.").

*Second*, counsel are required to conduct only a "reasonable inquiry." *Hedgeye*, 2019 WL 4750243, at *13; *Camm*, 1990 WL 198621, at *5 ("Rule 11 only requires a reasonable inquiry; the challenged attorney or party cannot be held to what might be required by an exhaustive inquiry. Sanctions will not be imposed when factual errors are not critical and the surrounding circumstances indicate that counsel did not conduct a reasonable inquiry." (internal citation omitted)). The party seeking sanctions must offer more than a "conclusory assertion that [counsel]

---

[26] Defendant cites *Hilton Hotels*, 899 F.2d 40 at 42–43, for the proposition that an inadequate pre-suit investigation is a "separate reason for sanctions." (Mot. at 13.) There, the lower court granted summary judgment, having found no factual basis for the claims, and then sanctions. The D.C. Circuit affirmed the sanctions on the basis that counsel "should have realized that [plaintiff] could not possibly prevail at trial" and "should have known that his client's entire case was meritless." 899 F.2d at 42, 43. *Hilton Hotels* thus provides scant support for Defendant's theory that sanctions may be appropriate even where there is factual support for Plaintiffs' claims.

failed to conduct a reasonable inquiry into the facts." *Williams*, 322 F.R.D. at 149 (quotation omitted). The movant is required to provide "support for the assertion that the steps [counsel] took to investigate his client's factual allegations prior to the filing of the complaint were unreasonable or inadequate" and to "identify particular deficiencies in [counsel]'s prefiling inquiry." *Id.*; *see also Jordan*, 273 F. Supp. 3d at 245 (party seeking sanctions must show by "clear and convincing evidence" that plaintiff "did not engage in a reasonable inquiry").

Jones Day has not satisfied this burden. Instead, Jones Day intimates that counsel should have called former male associates to ask what they were paid.[27] Jones Day does not offer any argument as to why surveying discretionary third-party witnesses was a necessary step under the circumstances. Moreover, Plaintiffs had a good faith belief that such outreach would have been unavailing given the emphasis Jones Day places on pay secrecy. *See* supra 24–28. Jones Day's assertion that these would-be witnesses would have provided any evidence is thus pure speculation, and its assertion that such witnesses would have definitively disproven Plaintiffs' comparisons is conjecture built upon this speculation—conjecture that has not been borne out by evidence the Defendant has produced. Ex. I. Jones Day's request for sanctions on this basis is absurd.

*Finally,* sanctions are appropriate only "where reasonable inquiry would have revealed there was *no basis in fact* for the asserted claim." *Hedgeye*, 2019 WL 4750243, at *13 (quotation omitted) (emphasis added). Here, no reasonable inquiry—much less anecdotal evidence from

---

[27] Jones Day's assertion that Plaintiff Draper should have consulted her tax returns is misleading. (*See* Mot. at 14.) Plaintiff Draper repeatedly stated that she consulted her W-2s, among other financial records, when determining how much she was paid at Jones Day. *See* Ex. D, Draper Dep. 114:4–9, 186:16–187:12. Of course, as Jones Day is well aware, both W-2s and tax returns contain salary information. That Jones Day would make such a misleading representation in something as serious as a Rule 11 motion is troubling.

third-party witnesses—would have conclusively disproven Plaintiffs' belief that Jones Day suffers from systemic pay discrimination based on the six theories identified above. No one, except Jones Day, holds the statistical pay data necessary to properly adjudicate this case.

## IV. The Sanctions Jones Day Seeks Are Excessive and Unwarranted.

Finally, even if the Court finds a violation of Rule 11(b), it should decline to award the punitive sanction suggested by Jones Day. Rule 11 sanctions are discretionary. *See* Fed. R. Civ. P. 11(c)(1) (stating that, upon finding a violation, a court "may impose an appropriate sanction"). Moreover, when a sanction is imposed, it should be the mildest sanction necessary to deter similar misconduct. Fed. R. Civ. P. 11(c)(4) ("A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."); 1993 Advisory Committee Notes on Fed. R. Civ. P. 11, Subdivisions (b) and (c) (noting the court's discretion is limited by "the principle that the sanctions should not be more severe than reasonably necessary"); *see also Hilton Hotels Corp.*, 899 F.2d at 46 ("[A] district court should impose the least severe sanction adequate to the purpose of Rule 11.").

Here, Jones Day's requested sanctions are overly harsh and inappropriate. *See Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 878 (5th Cir. 1988) (the appropriate sanction "may be a warm friendly discussion on the record"). Indeed, dismissal of a claim is the most serious sanction, reserved for extraordinary circumstances. *See Marina Mgmt. Servs., Inc. v. Vessel My Girls*, 202 F.3d 315, 325 (D.C. Cir. 2000) (dismissal is only appropriate for "serious misconduct when lesser sanctions would be ineffective or unavailable"); *3E Mobile, LLC v. Glob. Cellular, Inc.*, 222 F. Supp. 3d 50, 53–54 (D.D.C. 2016) (penal sanctions, including dismissals and attorneys' fees, require clear and convincing evidence of bad faith or misconduct). Defendants do not even attempt to show that no alternative is available here.

CONCLUSION

Jones Day's motion fails for all of the reasons discussed herein. Determining whether Plaintiffs' claims are borne out must therefore await further proceedings. For all of the foregoing reasons, Jones Day's motion should be denied.

Date: January 7, 2020

Respectfully submitted,

*/s/ Russell L. Kornblith*
David W. Sanford (D.C. Bar No. 457933)
Russell L. Kornblith*
SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
rkornblith@sanfordheisler.com

Deborah K. Marcuse (D.C. Bar No. 995380)
SANFORD HEISLER SHARP, LLP
111 S. Calvert Street, Ste. 1950
Baltimore, MD 21202
Telephone: (410) 834-7415
Facsimile: (410) 834-7425
dmarcuse@sanfordheisler.com

Kate Mueting (D.C. Bar No. 988177)
Paul Blankenstein (D.C. Bar No. 304931)
SANFORD HEISLER SHARP, LLP
700 Pennsylvania Avenue, SE, Ste. 300
Washington, D.C. 20003
Telephone: (202) 499-5206
Facsimile: (202) 499-5199
kmueting@sanfordheisler.com

*admitted *pro hac vice*

*Attorneys for Plaintiffs, the Proposed Classes, and the Proposed Collective*