# EXHIBIT A

1           N. Tolton - CONFIDENTIAL

2      IN THE UNITED STATES DISTRICT COURT

3        FOR THE DISTRICT OF COLUMBIA

4        Civil Action No. 1:9-00945

5    ---------------------------X

6    NILAB RAHYAR TOLTON, et al.,

7                      Plaintiffs.

8         v.

9    JONES DAY,

10                     Defendant.

11   ---------------------------X

12          VIDEOTAPED DEPOSITION OF

13            NILAB RAHYAR TOLTON

14

15             Washington, D.C.

16             September 17, 2019

17               9:57 a.m.

18

19

20

21

22

23

24   Reported by: Karen Brynteson, RMR, CRR, FAPR

25   Job No: 168044

1            N. Tolton - CONFIDENTIAL

2    firm?

3            MS. MUETING:  Objection, asked

4        and answered.

5            THE WITNESS:  Other than the

6        description that I already provided

7        being told to me in some form by

8        all of those individuals, that's

9        what I recall at this time.

10   BY MS. CHASE:

11       Q.    What were you told about the

12   black box compensation?

13       A.    I was told that the policy of

14   the firm was that nobody knows the

15   compensation of any other attorney, and

16   that nobody discusses their compensation

17   or the compensation of others with each

18   other, and that, in fact, this black box

19   system of pay secrecy facilitates the

20   collegiality that is a hallmark of Jones

21   Day.

22       Q.    Who told you that?

23            MS. MUETING:  Objection, asked

24        and answered.

25            THE WITNESS:  Other than the

1           N. Tolton - CONFIDENTIAL

2    specificity than that with respect to any

3    of the other individuals you identified

4    as having interviewed with prior to your

5    first summer at Jones Day?

6         A.    I recall Jim Poth speaking to

7    me about the bonus -- I recall Jim Poth

8    speaking to me about the compensation

9    system at Jones Day and that it was

10   unlike other peer big law firms in that

11   the firm didn't provide lock-step bonuses

12   or raises; rather, the firm valued

13   quality and that associates and attorneys

14   at the firm were paid based on the

15   quality of their work but also that the

16   firm paid market rates to its associate

17   and that the way Jones Day gave

18   compensation raises included both a bonus

19   and a raise at the same time.

20   BY MS. CHASE:

21        Q.    Did Jeff -- were you finished?

22   I'm sorry.

23        A.    Yes.

24        Q.    Did Mr. Poth explain to you

25   what the market was he was referring to?

1            N. Tolton - CONFIDENTIAL

2       A.    The market as he described it

3   to me was based on the Cravath scale,

4   which is synonymous with market pay at

5   big law firms.

6       Q.    Did Mr. Poth mention the

7   Cravath scale?

8       A.    I don't recall if I mentioned

9   Cravath or if Mr. Poth mentioned Cravath,

10  but Cravath was mentioned in that

11  discussion with Mr. Poth.

12      Q.    What was said about Cravath in

13  that discussion with Mr. Poth?

14      A.    Other than using Cravath

15  synonymously with market pay, I don't

16  recall.

17      Q.    Did Mr. Poth tell you that

18  Jones Day's Irvine office paid its

19  associates at a compensation level

20  comparable to a Cravath New York-based

21  associate?

22      A.    Yes, that is what I understood

23  from his explanation of the firm's

24  compensation system.

25      Q.    I'm not asking you what you

Page 29

```
 1              N. Tolton - CONFIDENTIAL
 2    understood.  I am asking what he said.
 3    Can you repeat the question?
 4              THE REPORTER:  "Question:  Did
 5         Mr. Poth tell you that Jones Day's
 6         Irvine office paid its associates
 7         at a compensation level comparable
 8         to a Cravath New York-based
 9         associate?"
10              THE WITNESS:  Mr. Mr. Poth
11         explained to me that Jones Day paid
12         market, which is synonymous with
13         Cravath pay, to its lawyers in the
14         Irvine office and that this was a
15         selling point of the firm.
16    BY MS. CHASE:
17         Q.    Did Mr. Poth use the term that
18    the market is synonymous with Cravath or
19    is that your interpretation of what he
20    said?
21              MS. MUETING:  Objection,
22         vague, compound, asked and
23         answered.
24              THE WITNESS:  As I already
25         stated, in that conversation with
```

1           N. Tolton - CONFIDENTIAL

2           Mr. Poth, Cravath and market pay

3           were used interchangeably.

4    BY MS. CHASE:

5           Q.    Were they used interchangeably

6    by you or by Mr. Poth?

7                 MS. MUETING:  Same objections.

8                 THE WITNESS:  I already

9           answered that question.

10   BY MS. CHASE:

11          Q.    So answer it.

12                MS. MUETING:  Same objections.

13                THE WITNESS:  The term

14          "Cravath" was used either by myself

15          or by Mr. Poth.  And in our

16          discussion, the term "Cravath" and

17          "market pay" were used

18          interchangeably by one or both of

19          us, and we both understood them to

20          be used as such.

21   BY MS. CHASE:

22          Q.    So you know what Mr. Poth

23   understood; is that correct?  You're

24   telling me you're in his mind?

25                MS. MUETING:  Objection.

```
 1              N. Tolton - CONFIDENTIAL
 2   BY MS. CHASE:
 3        Q.    Would you like to think about
 4    that answer again?
 5              MS. MUETING:  Objection.
 6   BY MS. CHASE:
 7        Q.    Let me ask you a question.  Do
 8    you know what Mr. Poth was thinking
 9    during that meeting?
10        A.    I know what Mr. Poth told me.
11        Q.    But you don't know what was in
12    his mind, do you?
13              MS. MUETING:  Objection, asked
14         and answered, argumentative.
15              THE WITNESS:  I know what
16         Mr. Poth told me, assuming Mr. Poth
17         says things that are on his mind, I
18         recall what those things were.
19   BY MS. CHASE:
20        Q.    I'm not asking for your
21    assumptions or your guesses about what's
22    in his mind.  Do you know what was in his
23    mind?
24              MS. MUETING:  Same objections.
25    BY MS. CHASE:
```

```
 1            N. Tolton - CONFIDENTIAL
 2       Q.    Yes or no, do you know what
 3  was in his mind?
 4            MS. MUETING:  Same objections.
 5            THE WITNESS:  I did not have
 6       access to Mr. Poth's mind.
 7  BY MS. CHASE:
 8       Q.    And do you know if Mr. Poth's
 9  understanding -- do you know what
10  Mr. Poth thought the Cravath market meant
11  at that point in time?
12            MS. MUETING:  Objection,
13       vague.
14            THE WITNESS:  In my discussion
15       with Mr. Poth, Cravath and market
16       pay were used interchangeably to
17       mean the same thing.
18  BY MS. CHASE:
19       Q.    Do you know what Cravath was
20  paying its associates in New York at that
21  point in time?
22       A.    I recall that starting
23  first-year associate salaries were either
24  160,000 at the time or were soon
25  thereafter bumped up to that number.
```

1           N. Tolton - CONFIDENTIAL

2       Q.    And when you say "starting

3    first-year salaries," you're talking

4    about Cravath's salaries?

5       A.    Yes, and market salaries as

6    set by Cravath.

7       Q.    And do you -- before you

8    interviewed with Jones Day for first-year

9    summer, did you look to see what Jones

10   Day was paying its first-year associates

11   at that time?

12      A.    I recall being told in the

13   interview process that Jones Day paid its

14   first-year associates Cravath or market

15   pay.

16      Q.    Do you recall being told the

17   number that first-years were being paid

18   in the Irvine office before interviewing

19   with Jones Day?

20      A.    I recall being told in the

21   interview process that first-year

22   associates in the Irvine office were

23   being paid Cravath or market pay, and I

24   understood that to be 160,000 at the time

25   or soon thereafter to be 160,000.

```
1              N. Tolton - CONFIDENTIAL

2         basis of those reviews, prepare a

3         summary of those reviews, which is

4         then used to set the associate's

5         compensation.

6              It is surprising and

7         noteworthy.  It's also very

8         concerning because, as I testified,

9         I now see my underlying reviews and

10        the consensus statements on which

11        those were based, allegedly, and

12        how unrepresentative those

13        consensus statements are, and to

14        what shocking degree they emphasize

15        or de-emphasize or completely omit

16        significant information from the

17        only attorneys with whom I actually

18        worked on the matters that I worked

19        on.  I find that very problematic

20        and at the time when somebody tells

21        you this is the person who is going

22        to essentially prepare the summary

23        of your performance, it's memorable

24        information.

25   BY MS. CHASE:
```

```
1              N. Tolton - CONFIDENTIAL

2    requirement.  In fact, to the contrary,

3    many attorneys worked from home

4    frequently or for long stretches of time

5    exclusively, especially when they were

6    working for partners on matters that were

7    in other offices.

8              So I don't know what would

9    surprise or not surprise partners at

10   Jones Day or in my office.

11       Q.    Who said anything to you about

12   working from home?

13       A.    I heard that negative comments

14   were being made by Cary Sullivan and by

15   Edward Chang.

16       Q.    Did you hear Edward Chang make

17   any such negative comments?

18       A.    I -- Eddie told me some

19   comment in a -- in an informal dialogue

20   where he essentially mocked my time that

21   I, you know, would come or go as needed,

22   due to my pregnancy.

23       Q.    What did he say?

24       A.    I don't recall specifically,

25   other than feeling that general sense of
```

1           N. Tolton - CONFIDENTIAL

2   contempt from some of the male attorneys,

3   specifically Cary Sullivan and Edward

4   Chang, who were well-known to make such

5   comments about other female attorneys at

6   the office, and to, in fact, keep tabs on

7   when they would come and when they would

8   go; something that I did not understand

9   to be done with regard to the male

10  attorneys in the office.

11        Q.    Do you know if the firm has

12  ever pulled building access records to

13  ascertain how much time you were spending

14  in the office?

15        A.    I don't know if the firm did

16  that.  I am not sure how departure from

17  the office could be logged because there

18  is not a key fob to depart, but I, you

19  know, don't know how that would otherwise

20  be possible.  And I know that you can log

21  in remotely on your computer, so I don't

22  know what the firm's capacity is in that

23  regard or what they actually did, no.

24        Q.    When did Eddie Chang allegedly

25  make these negative statements about your

```
1              N. Tolton - CONFIDENTIAL

2         true.

3    BY MS. CHASE:

4         Q.    What is your basis for

5    alleging that male associates at Jones

6    Day made the Cravath scale?

7         A.    I was told by attorneys and

8    partners at Jones Day that Jones Day paid

9    market rates, and that means that it pays

10   market rates to its associates, market,

11   i.e., Cravath.

12        Q.    And is that the basis for your

13   allegation that male associates at Jones

14   Day were paid the Cravath scale?

15        A.    That is my personal basis for

16   my knowledge, yes.  And I have other

17   anecdotal, you know, things that were

18   said to me about what other associates

19   were making that substantiates that

20   belief.

21        Q.    What was said to you

22   anecdotally about what other associates

23   at Jones Day were making?

24        A.    I was told that ████████████,

25   who is my class year, was making --
```

```
 1            N. Tolton - CONFIDENTIAL
 2    received market compensation adjustment
 3    at Jones Day during at least one of the
 4    years that I was there.
 5         Q.    Who told you this?
 6         A.    His girlfriend or wife at the
 7    time, ███████████████.
 8         Q.    Was she his girlfriend at the
 9    time or his wife?
10         A.    I believe she was his
11    girlfriend.
12         Q.    What year was this?
13         A.    I don't recall the year.
14         Q.    What specifically did she say?
15         A.    She said that he received a
16    bonus, a compensation raise, his Brogan
17    compensation letter put his compensation
18    adjustment for that year at the Cravath
19    or at the market scale.  I'm not sure if
20    she used the term, which term she used.
21         Q.    And was she employed at Jones
22    Day at that time?
23         A.    I don't recall.
24         Q.    Do you recall when she left
25    Jones Day?
```

Page 242

```
 1            N. Tolton - CONFIDENTIAL
 2       A.    I don't recall.
 3       Q.    Did she tell you a number or
 4  just that ████ was at market?
 5       A.    She told me either market or
 6  Cravath.  She did not tell me a number.
 7  And I did not ask the number because I
 8  was very nervous about violating Jones
 9  Day's pay secrecy policy.
10            She described -- she described
11  his raise in additional words that I
12  don't recall other than saying market or
13  Cravath, I think she said, you know,
14  described the amount as significant or
15  some terminology like that.
16       Q.    Did she specify the amount at
17  any point?
18       A.    She did not.  I don't recall
19  her telling me the number.
20       Q.    And at any point in time did
21  she tell you the number that ████████
22  made at that point or another point?
23       A.    I don't recall her telling me
24  the specific amount of his compensation.
25       Q.    And other than this
```

1      N. Tolton - CONFIDENTIAL

2   conversation with ███████████ that

3   you just described, was there any other

4   time when anyone at the firm told you

5   what ███████████ was making, either by

6   number or by characterizing it?

7      A.    Yes.  I did hear that his

8   salary was frozen for one year after he

9   had made misogynistic remarks at a firm

10  event during a summer associate event.

11     Q.    And who did you hear that

12  from?

13     A.    I heard that from, I believe

14  directly █████, in addition to several

15  other associates.

16     Q.    So several associates were

17  discussing ██████ salary being frozen;

18  is that correct?

19     A.    Yes, almost all of the

20  associates in the Irvine office were

21  discussing ████████ for a period of

22  time because there was a human resources

23  investigation that I was told was

24  conducted after he made some sexist and

25  misogynistic remarks about summer

```
 1              N. Tolton - CONFIDENTIAL
 2    associates and female associates in the
 3    office during this work event, and that,
 4    you know, the punishment that he received
 5    was a salary freeze.
 6         Q.    And did anyone from leadership
 7    tell you that ███████████ received a
 8    salary freeze?
 9         A.    No --
10         Q.    Let me ask it differently.
11    Did any partner tell you that █████
12    █████ received a salary freeze?
13         A.    I believe that Cary Sullivan
14    discussed it as well.  I don't recall if
15    he was a partner at the time.  I think he
16    was.  And I believe Edward Chang also
17    did.  I don't recall if he was a partner
18    at the time as well.
19         Q.    Do you know what year Edward
20    Chang became a partner?
21         A.    I don't recall.
22         Q.    Do you know what year Cary
23    Sullivan became a partner?
24         A.    I believe it was the year
25    before Edward Chang.
```

1           N. Tolton - CONFIDENTIAL

2           Q.    The event that associates were

3     interviewed about, were you interviewed?

4           A.    I was not interviewed because

5     I didn't attend that event.  I attended

6     the prior year's same event where some of

7     the same sexist and misogynistic

8     statements were made by Justin, including

9     other Jones Day attorneys and clients.

10          Q.    And when you attended the same

11    event the prior year and heard

12    misogynistic comments, did you complain

13    to human resources?

14          A.    I did not complain to human

15    resources after that event.

16          Q.    And the event that led to

17    ███████  salary freeze was in 2014,

18    wasn't it?

19          A.    That is my understanding, yes.

20          Q.    And the conversation you had

21    with███████████  where she said

22    ████████  was making market, was it before

23    or after 2014?

24          A.    I don't recall if that

25    conversation was before or after, but I

1              N. Tolton - CONFIDENTIAL

2    do recall hearing from somebody, I

3    believe it was ████████ again, that

4    ████████, after his salary was unfrozen,

5    received quite a substantial raise that

6    put him, I believe, above market.   I

7    think that's what she told me.

8         Q.    And do you have any personal

9    knowledge about how much money ████████

10   ████████ made in any given year that he has

11   worked at Jones Day?

12        A.    I didn't ask ████████ how much

13   he made or I didn't ask anybody else who

14   might have known how much ████████ made

15   because that would have been a violation

16   of Jones Day's policy, and I did not want

17   to violate Jones Day's policy.

18        Q.    And when all these associates

19   were talking about ████████████ salary

20   being frozen, were any of them

21   disciplined for discussing that?

22        A.    The associates were discussing

23   the fallout and the aftermath of the 2014

24   wine tasting event in the Irvine office.

25   So part of that fallout was the salary

1          N. Tolton - CONFIDENTIAL

2    way they were viewed by the firm was not

3    equal as other client work, including

4    other cases for ████████, its class

5    action work.

6         Q.    Did you ever sit in a review

7    meeting for the Litigation Department and

8    hear partners discuss how the ████████

9    work was viewed by the litigation

10   practice?

11        A.    I never sat in partner

12   meetings.

13        Q.    And did you ever participate

14   in a discussion with any partner of the

15   firm in which the partner stated --

16   withdraw that.

17             Do you know if Ed Chang worked

18   on ████████ matters before he was

19   promoted?

20        A.    I believe that Ed Chang did

21   some of the single plaintiff work, but he

22   primarily did the class action work that

23   Richard Grabowski oversaw.

24        Q.    Do you know if as an associate

25   prior to being promoted, he did the same

```
 1              N. Tolton - CONFIDENTIAL
 2    type of single plaintiff work that you
 3    did?
 4         A.    I do not believe that he was
 5    as extensively staffed on the single
 6    plaintiff cases as myself or other
 7    similarly-situated female associates in
 8    the Irvine office or in other offices.
 9         Q.    But you don't know the gender
10    breakdown of the lawyers who worked on
11    the ██████ matters, do you?
12         A.    I don't know the gender
13    breakdown of the entire ████████████
14    ████████████████████, but I do
15    know that in the Irvine office, there
16    were predominantly, if not entirely,
17    female associates staffed on the team and
18    that it was a subject of discussion
19    amongst the female associates that they
20    were being relegated to work that was
21    considered second tier by the firm.
22         Q.    Weren't there more female
23    litigation associates than men in the
24    Irvine office in general, throughout your
25    tenure in the Irvine office?
```

1          N. Tolton - CONFIDENTIAL

2              THE WITNESS:  Jones Day's

3          black box system of pay secrecy

4          prevents me from having full

5          knowledge of all of my comparators,

6          but I do think that Justin Smith is

7          a comparator, I think also possibly

8          Jeremy Close when he was there,

9          although he was a year my senior,

10         would be potential comparators.

11    BY MS. CHASE:

12         Q.    What information about the

13    duties performed by Justin Smith while he

14    was -- while you were both working at

15    Jones Day do you have based upon personal

16    knowledge?

17         A.    Justin and I, like all

18    associates at Jones Day, were evaluated

19    in the same process.  We were required to

20    meet the same sets of expectations by

21    firm partners.  We were called upon to do

22    -- to heed the firm's one firm worldwide

23    mantra and be staffed on any case, any

24    time, anywhere that would best serve the

25    interests of the client and of the firm.

Page 392

1          N. Tolton - CONFIDENTIAL

2              And, importantly, we both held

3     significant office leadership and

4     recruitment roles at times and were

5     heavily involved in the office's summer

6     programs and mentorship, office

7     trainings, office events.  We were -- we

8     are very similarly situated in that

9     regard.

10        Q.    Do you know how many hours

11    Justin Smith billed any of the years that

12    you both were working at Jones Day?

13        A.    I don't recall Justin's

14    billable hours or ever being told what

15    his billable hours were.

16        Q.    Do you know if Justin Smith

17    consistently billed significantly more

18    hours than you?

19        A.    I don't know what Justin

20    Smith's billable hours were, but I do

21    know that Justin Smith worked at Jones

22    Day and, like all associates, the firm

23    valued quality over quantity.  And those

24    were the same expectations that were

25    applied to me and to Justin.