# EXHIBIT E

1    HIGHLY CONFIDENTIAL - COUNSEL/EXPERTS ONLY

2         UNITED STATES DISTRICT COURT

3         FOR THE DISTRICT OF COLUMBIA

4         Civil Action No. 19-945 (RDM)

5

6    _____

7    NILAB RAHYAR TOLTON, et al., on        )

8    behalf of themselves and all others    )

9    similarly situated,                    )

10                        Plaintiffs,       )

11        v.                                 )

12    JONES DAY, a General Partnership,      )

13                        Defendants.       )

14    _____ )

15

16

17        DEPOSITION OF KATRINA HENDERSON

18              Washington, D.C.

19              October 29, 2019

20

21

22

23

24    Reported by:  Mary Ann Payonk

25    Job No. 170531

1    HIGHLY CONFIDENTIAL - COUNSEL/EXPERTS ONLY

2         sorting that out?

3              MS. KCEHOWSKI:  I'd like to finish

4         this line of questioning, please.

5         Q.   What do you understand "bro culture"

6    to mean?

7         A.   I feel like that can mean a lot of

8    things.

9         Q.   What did you understand it to be

10   referred to during your interview and what you

11   described as having experienced?

12        A.   In my experience and from what I --

13   so from what I personally witnessed and what I

14   had heard, the combination of that, it was a

15   culture in which male -- stereotypically male

16   behavior was valued, where men would support

17   other men.  The way for women to succeed at the

18   firm was to adopt that stereotypical male

19   behaviors.  And if you did not or if you

20   appeared -- if you tried to be yourself and it

21   didn't conform with what they were requiring of

22   you, then you were not accepted and you were

23   restricted from opportunities that men were

24   given.  You were not given the kind of

25   mentorship opportunities and kind of guiding

Page 63

1    HIGHLY CONFIDENTIAL - COUNSEL/EXPERTS ONLY

2    you along.  It was very much focused on

3    stereotypes and -- and not accepting women and

4    people of color.

5        Q.   You experienced that during your

6    summer at Jones Day in 2012?

7        A.   I didn't realize it at the time, what

8    some of the experiences actually were.  I knew

9    that I was uncomfortable with certain

10   situations but didn't put it all together that

11   it was just a taste of the discrimination that

12   I would experience later while I was at Jones

13   Day.

14            Can I go to the bathroom?

15       Q.   Can I just ask you one question about

16   the document I've handed you as Exhibit 12.  It

17   will be the last question on this line.

18            MR. KORNBLITH:  Just one?

19            (Henderson Exhibit No. 11 was marked for

20            identification.)

21            MS. KCEHOWSKI:  I'm going to ask

22            her:  Do you recognize the document that

23            I've handed you as Exhibit 12?

24            MR. KORNBLITH:  Sorry, I think --

25            aren't we on 11, for starters?

1    HIGHLY CONFIDENTIAL - COUNSEL/EXPERTS ONLY

2    about Jones Day -- Jones Day compensation

3    policy, which is the black box policy that's

4    confidential.  I was told that by various

5    people during my interview process and

6    throughout my time at Jones Day.  And so there

7    were discussions.  I cannot at this time name

8    everyone who was involved in those

9    conversations.  I believe that it was stated to

10   us on multiple occasions maybe even at this New

11   Lawyer Group gathering in D.C. that

12   compensation is confidential.

13          So there were general conversations

14   regarding Jones Day's policies on pay secrecy

15   and compensation.

16     Q.   How about more specifically

17   discussions about actual compensation numbers?

18   Can you identify for me every current or former

19   Jones Day associate with whom you've ever

20   discussed compensation amounts?

21          MR. KORNBLITH:  Objection to the

22     form of the question.  You can answer.

23     A.   No, I don't believe that I can

24   accurately name everyone involved in

25   compensation amount discussions throughout my

Page 113

1    HIGHLY CONFIDENTIAL - COUNSEL/EXPERTS ONLY

2    time at Jones Day, former and current

3    employees.  Like I said, there were lots of

4    conversations about compensation.  In the same

5    conversations when people were talking about

6    pay secrecy and the black box policy of Jones

7    Day, they reiterated that the amount that you

8    get paid, the compensation amount is secret so

9    that it can foster some kind of collegiality

10   between associates, so that you're not angry

11   that someone down the hall is making more money

12   than you.

13          The amounts were specified and

14   advertised that they would be at or above

15   market, so that's a conversation about the

16   amount, and that just -- that happened with

17   quite a few partners, associates during my

18   interview process while I was at Jones Day.

19   And -- so yeah, I can't tell you how many

20   people discussed it.  I believe this was said

21   to us in a room full of associates.

22      Q.   What about salary numbers

23   specifically?  Can you identify for me every

24   current and former Jones Day associate you

25   talked about salary numbers with?

1   HIGHLY CONFIDENTIAL - COUNSEL/EXPERTS ONLY

2   associates either brag or mention that they had

3   gotten raises.

4       Q.    What other male associates?

5       A.    One of them was Bret Stancil, who I

6   worked with on some projects.  He was -- he had

7   bragged about getting a raise, which we all

8   found a little off-putting, seeing as though

9   Jones Day had a policy about not discussing

10  your compensation with anyone.  So he was -- he

11  felt comfortable enough to discuss that.

12          And also, I believe Harrison had also

13  made a side comment or something to the effect

14  that would lead Jennie to believe that he had

15  also gotten a raise.

16      Q.    Anybody else?

17          MR. KORNBLITH:  Objection to the

18      form of the question.

19      A.    At this time, I don't recall any

20  other people disclosing their -- whether or not

21  they got a raise.  I remember in that meeting

22  Jennie specifically didn't feel comfortable

23  violating any kind of policy that Jones Day had

24  set regarding compensation confidentiality, so

25  she in that meeting did not -- did not tell me

1    HIGHLY CONFIDENTIAL - COUNSEL/EXPERTS ONLY
2    if she had gotten a raise or what her
3    compensation was.
4         Q.   Is there anybody else that was
5    identified for you as having gotten a raise at
6    that point in time?
7              MR. KORNBLITH:  Objection to form.
8         A.   At that point in time, because pay
9    was secret, confidential, no one was supposed
10   to discuss it, I was not aware of what other
11   associates were making or if they got a raise.
12        Q.   You allege in your Complaint that
13   Mr. Stancil told you that he received a raise;
14   right?
15             MR. KORNBLITH:  Objection to form.
16             And I'll just note for the record it's
17             Ms. Marcuse who signed the Complaint,
18             not Ms. Henderson.
19             THE WITNESS:  Can you repeat the
20             question?
21             MS. KCEHOWSKI:  Let me ask one
22             other question before I go to that.
23             THE WITNESS:  Can we take a
24             bathroom break soon?  I have to go.
25             MS. KCEHOWSKI:  I'm not done with

Page 153

1   HIGHLY CONFIDENTIAL - COUNSEL/EXPERTS ONLY

2       counsel.

3       A.   During my interview process, during

4   recruiting, while I was at Jones Day, people

5   discussed or it was just generally known that

6   you start at $160,000, and that your pay while

7   you're at Jones Day is based on the Cravath

8   scale of -- and the -- and I say that because

9   the Cravath scale was considered what firms

10  like Jones Day pay.  So it was a benchmark that

11  Jones Day advertised as paying at or above

12  market.

13      Q.   Did you ever talk to anyone at

14  Cravath to confirm the mechanics of their pay

15  practices?

16      A.   I believe there -- I had a

17  conversation with Cravath associates, but I

18  don't recall everything that we had discussed

19  at the time.

20      Q.   Did you talk to anyone at Cravath to

21  confirm the mechanics of their pay practices?

22          MR. KORNBLITH:  Objection, asked

23      and answered.

24      A.   I did not -- I do not recall if I

25  specifically learned of the mechanics of their

HIGHLY CONFIDENTIAL - COUNSEL/EXPERTS ONLY

1

2        A.    Yes, because Jones Day did not

3    provide bonuses.

4        Q.    Your whole New Lawyer Group class in

5    New York of men and women were paid $160,000;

6    right?

7        A.    I believe every lawyer starting in my

8    class at Jones Day made the Cravath base of

9    $160,000.

10        Q.    Nobody made the Cravath scale of

11    $170,000, did they?

12            MR. KORNBLITH:  Objection, calls

13        for speculation.  You may answer.

14        A.    During the recruiting process we were

15    told that Jones Day does not give bonuses but

16    that they made up for not giving bonuses to

17    match the Cravath scale when they gave raises,

18    so to not be worried that your base was not at

19    the Cravath scale because Jones Day would be

20    paying you market or above in your base pay

21    moving forward.

22        Q.    Nobody made $170,000 the first-year

23    at Jones Day as a new lawyer in New York in the

24    class of 2013, did they?

25        A.    Like I said --

1   HIGHLY CONFIDENTIAL - COUNSEL/EXPERTS ONLY

2   Mr. Werner as a comparator to you here?

3         MR. KORNBLITH:  Objection,

4     mischaracterizes the document.  You may

5     answer.  And calls for a legal

6     conclusion.

7     A.   I would say that Mr. Werner and I

8   worked on the same project -- a couple similar,

9   same projects together, so a couple deals

10  together, performed substantially similar work

11  while we were on those deals.  And I think

12  performed substantially similar work even while

13  we were on other deals.  Generally, what Jones

14  Day's asking you to do is review, analyze,

15  synthesize, summarize information, and I did

16  that on various projects and so did Zach on his

17  projects.  So did all of the other male

18  associates that were in my New Lawyers Group.

19     Q.   Do you know what practice group

20  Mr. Werner joined?

21     A.   I don't recall at this time what

22  group he joined.

23     Q.   Did you at any point see his

24  performance reviews or his practice group

25  rankings?

1   HIGHLY CONFIDENTIAL - COUNSEL/EXPERTS ONLY

2   performance in 2014 acting with discriminatory

3   animus towards you based on your race or

4   gender?

5           MR. KORNBLITH:  The same objection.

6       A.   I believe that the people, the

7   evaluators listed on here followed Jones Day's

8   policies in how they reviewed me, and that some

9   of those policies and the unwritten rules were

10  discriminatory.  So yes, I believe some of

11  these evaluators were following discriminatory

12  rules.

13      Q.   Was Mr. Gendzier acting with

14  discriminatory animus towards you when he

15  completed the evaluation?

16          MR. KORNBLITH:  Same objection.

17      A.   I don't know when he completed this

18  evaluation or what was on his mind.  I cannot

19  tell you honestly what he was doing when he was

20  writing this evaluation towards me.

21      Q.   Do you believe he was acting with

22  discriminatory animus towards you when he

23  evaluated your performance for 2014?

24          MR. KORNBLITH:  Same objection, and

25      asked and answered, and we are wasting

Page 269

1    HIGHLY CONFIDENTIAL - COUNSEL/EXPERTS ONLY

2        time.

3        A.    I believe he was acting within the

4    discriminatory structure and standards and

5    expectations that the firm set when he was

6    doing this evaluation.

7        Q.    How about Mr. Devlin?  Was he acting

8    with discriminatory animus when he completed

9    your evaluation?

10            MR. KORNBLITH:  Same objection.  I

11        should say rather objection to form on

12        that.  You may answer.

13        A.    The same can be said for Peter

14    Devlin.  If he was acting within the policies

15    and unwritten rules of the firm, those

16    discriminatory expectations, and if he was

17    taking all of that into consideration when he

18    was completing this review, then yes.

19        Q.    How about Ms. Wendy Prager or Ms. Jae

20    Woo Park?

21        A.    I think Jae Woo is a man.

22        Q.    All right.  How about Ms. Wendy

23    Prager?  Was she acting with discriminatory

24    animus towards you in completing your 2014

25    evaluation?