# EXHIBIT J

IN RE:

Tolton, et al v. Jones Day

RECORDED CONVERSATION

Transcribed By: Maureen Cunningham Brzycki

MAGNA LEGAL SERVICES



TOLTON-006955

```
                                                Page 38                                                 Page 40
 1   Been together for (inaudible).                      1         FEMALE SPEAKER:  Well, that's the
 2         YVETTE:  It could create                      2   thing.
 3   problems, if it doesn't work out.                   3         YVETTE:  I don't think it was
 4         FEMALE SPEAKER:  You know, it's               4   true.
 5   interesting.  When Lizanne -- when we               5         FEMALE SPEAKER:  If it was
 6   went to Lizanne to tell her ███████                 6   true --
 7   ███████████████████████████████                     7         FEMALE SPEAKER:  It was.
 8   ██████████████████████  And I -- to                 8   (Inaudible).
 9   me, I thought that was like a testament             9         FEMALE SPEAKER:  If it wasn't
10   to me that people knew us on our own.              10   true, he's (inaudible) because he had
11         YVETTE:  Yes.                                11   to disclose that.
12         FEMALE SPEAKER:  And not                     12         FEMALE SPEAKER:  Yeah.  I know
13   (inaudible) associate.                             13   him.  He and I worked at (inaudible)
14         YVETTE:  Mm-hm.                              14   together.
15   ████████████████████████████                       15         YVETTE:  What was the associate
16   ████████████████████████████                       16   salary?  I missed that.
17   ████████████████████████████                       17         FEMALE SPEAKER:  It was like
18   ██████████████████  So long story                  18   800,000.
19   short is everything she put in that                19         YVETTE:  Oh, I don't think that's
20   complaint, there may be a modicum of               20   true.
21   truth that has been amplified by a                 21         FEMALE SPEAKER:  Yeah, it's true.
22   hundred.  And the first is (inaudible)             22   But the story is different.
23   motion (inaudible) know what is it was             23         YVETTE:  Go ahead.  Tell it.
24   -- Traci is on the trial team, and I               24         FEMALE SPEAKER:  So like what

                                                Page 39                                                 Page 41
 1   would just say none of that is true.                1   I -- this is because I know -- I don't
 2   What shocks me so much about how                    2   know a lot, but this much I do know.
 3   quickly it spread through the firm is               3   That there are certain people, when
 4   that I was shocked that people who work             4   they're going into the government that
 5   here believed that so quickly and maybe             5   the firm, meaning Brogan, has some
 6   it's because we have confidential                   6   discretion and will give them more
 7   compensation.  I can tell you that I've             7   money, but it has happened to people in
 8   not seen -- I don't know everybody's                8   Atlanta, who have gone to government
 9   compensation, especially I don't know               9   roles, which is why I know it's true.
10   any of the partners, but with regard to            10         YVETTE:  That is -- right.
11   the associates, I have not seen any                11         FEMALE SPEAKER:  It didn't
12   gender disparity with regard to how                12   happen --
13   associates are paid verses whether                 13         YVETTE:  I heard that, I was like
14   they're race or gender.                            14   (inaudible).  But maybe you got to go
15         FEMALE SPEAKER:  I think the                 15   to something better, I don't know.
16   thing that got it going --                         16         FEMALE SPEAKER:  That's why you
17         YVETTE:  Mm-hm.                              17   got that wall.
18         FEMALE SPEAKER:  Was the                     18         YVETTE:  Yeah, exactly.
19   disclosure of the associate's salary.              19         FEMALE SPEAKER:  But -- so
20         YVETTE:  Mm-hm.                              20   when -- when you see that number, it is
21         FEMALE SPEAKER:  And everybody               21   reflective of some sort of (inaudible).
22   looked at that.                                    22         YVETTE:  I don't think that was
23         YVETTE:  I don't think that was              23   part of the lawsuit.  I thought that
24   true though.                                       24   came out as part of disclosures.
```



11 (Pages 38 to 41)

```
                                              Page 42
 1        FEMALE SPEAKER:  No, it was in
 2   the complaint.
 3        FEMALE SPEAKER:  No, she
 4   (inaudible).
 5        FEMALE SPEAKER:  So then, of
 6   course, he was Bob (inaudible)
 7   son-in-law, so that didn't --
 8   (inaudible).
 9        YVETTE:  So I will this tell
10   you -- now, that is -- when it first
11   got printed, all the salaries that you
12   saw (inaudible).  Trump administration
13   were all inflated because that is what
14   happens.  Because Brogan knows -- the
15   firm sees it as prestigious for those
16   people to move into the administration,
17   so they all got a bump.  And because he
18   was making their transition from the
19   law firm life to the public life,
20   easier.  That 800,000 was not a real
21   salary.  That was just a nice little
22   cushion to help that person --
23        FEMALE SPEAKER:  A little
24   cushion?

                                              Page 43
 1        FEMALE SPEAKER:  I could get a
 2   cushion --
 3        FEMALE SPEAKER:  Yeah, no.  It
 4   makes sense, but then you look at this
 5   last year, and it's like well, did he
 6   get a one hundred percent cushion?
 7        FEMALE SPEAKER:  Yeah.  Right,
 8   right.
 9        FEMALE SPEAKER:  It's still so
10   much over what people --
11        FEMALE SPEAKER:  Yeah.
12        FEMALE SPEAKER:  I think that's
13   what (inaudible) causes.
14        FEMALE SPEAKER:  I think some
15   people said it that it was like a
16   number of years.  What I heard from
17   people who said, yes, it was done at
18   the office it was done, they tried to
19   determine that person's time and
20   service to help them transition.  And I
21   asked a number of partners in this
22   office about (inaudible) done for other
23   people.  So it's not that this person
24   got $400,000, and they're making

                                              Page 44
 1   $400,000.
 2        YVETTE:  Right.
 3        FEMALE SPEAKER:  It's that they
 4   got X amount for four years that they
 5   were going to be doing public service
 6   going from a one hundred -- two hundred
 7   thousand dollar salary to a sixty six
 8   thousand dollar salary.  And --
 9        FEMALE SPEAKER:  With the idea --
10        FEMALE SPEAKER:  -- that's how I
11   explain to people.
12        FEMALE SPEAKER:  -- when the term
13   ends --
14        FEMALE SPEAKER:  They'll come
15   back, right.
16        FEMALE SPEAKER:  The tax on that.
17        YVETTE:  Those numbers --
18        FEMALE SPEAKER:  Like can you
19   please pay me for the (inaudible)?
20        FEMALE SPEAKER:  Right.
21        FEMALE SPEAKER:  So that's why I
22   think some communication --
23        FEMALE SPEAKER:  Yeah, right.
24        FEMALE SPEAKER:  -- to people --

                                              Page 45
 1        FEMALE SPEAKER:  Yeah, right.
 2        FEMALE SPEAKER:  -- is helpful.
 3   Because then you have --
 4        FEMALE SPEAKER:  You have the
 5   context.
 6        FEMALE SPEAKER:  -- you don't
 7   have all the speculation about, oh, my
 8   God.  There's an associate making
 9   $800,000, you know?  Even if they gave
10   him a hundred percent bonus, he's still
11   making $400,000.
12        YVETTE:  But that is really not
13   our culture to say -- to send out firm
14   wide e-mails about those kinds of
15   things.
16        FEMALE SPEAKER:  And I don't even
17   think it needs to be firm wide, but I
18   think there can be -- you know, the
19   summer associates are spoken to, and
20   none of the lawyers who are actually at
21   the firm are told anything.  I think
22   that's -- that's the issue is there's
23   inconsistency.
24        FEMALE SPEAKER:  I was going to
```



12 (Pages 42 to 45)

TOLTON-006966