# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001.2113

TELEPHONE: +1.202.879.3939 • FACSIMILE: +1.202.626.1700

Direct Number:  (212) 326-8386
tlchase@jonesday.com

June 19, 2020

The Honorable Randolph Moss
The U.S. District Court for the District of Columbia
333 Constitution Avenue N.W.
Washington D.C. 20001

Re:   *Nilab Rahyar Tolton, et al., v. Jones Day*, Case No. 1:19-cv-00945 (D.D.C.)

Dear Judge Moss:

By this letter and in advance of our July 9th conference on this topic, Jones Day writes to outline its objections to Plaintiffs' demand that Jones Day produce performance evaluations and compensation data for roughly 2,000 lawyers nationwide, across eighteen offices, over a seven-year period. Plaintiffs' demand is overbroad and unwarranted in at least three respects: in temporal scope, in geographic scope, and in the categories of data demanded.

As to pay data, Jones Day has offered to produce data for all associates who were based in the New York, Atlanta, and California offices at any point in 2016, 2017, and 2018 (*i.e.*, the period of time within the statute of limitations during which any of the Plaintiffs were employed by Jones Day). This offer amounts to data for nearly 600 associates across seven offices. Jones Day has also agreed to provide historical data back to 2012 (*i.e.*, the earliest year covered by Plaintiffs' document requests) for those same associates. As to performance evaluations, Jones Day has offered to produce numeric data (*e.g.*, hours, ratings and, where applicable, rankings) for the same set of associates. Jones Day cannot provide, for such a large set of associates, the narrative evaluations that reside in its database because they contain privileged client information that would be both time consuming and cost prohibitive to redact.

This proposed approach captures the proper scope of discovery into Plaintiffs' claims. Temporally, it excludes only associates whose claims are necessarily time-barred or who did not begin working at Jones Day until months (or, in some cases, even years) after Plaintiffs' departures. Geographically, it reflects the fact—as shown by the thousands of documents and three days of Rule 30(b)(6) testimony that Jones Day has already provided—that compensation decisions at Jones Day are driven by leadership at the office level. And, as to the categories of information, it gives Plaintiffs the numerical information they need for statistical inquiry, without intruding into privileged information that permeates the narrative reviews. Accordingly, Jones Day's proposal fully accommodates any legitimate need Plaintiffs may have while protecting Jones Day from undue burdens. Further, it protects the privacy of thousands of other current and former associates who have not consented to participate in this litigation or to having their highly confidential performance evaluations and salary information disclosed to counsel or to Plaintiffs.

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DETROIT
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID • MELBOURNE
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SAUDI ARABIA • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

The Hon. Randolph Moss
June 19, 2020
Page 2

Temporal Scope

Plaintiffs' request for personnel records beyond the applicable limitations period should be denied. As noted above, Jones Day is prepared to produce historical data for all associates who worked for the Firm in its Atlanta, New York and California offices between January 1, 2016 and December 31, 2018. Furthermore, for the approximately 580 associates who fit that description, Jones Day will produce historical records from their time with the Firm dating back to 2012 (as applicable). Plaintiffs continue to demand, however, (1) personnel records for associates who left the Firm before January 1, 2016; and (2) personnel records dating to the present.

It would be unreasonable to require the production of records for associates who left the Firm before 2016. The Complaint in this case was filed in April 2019. The limitations period under Title VII is, at most, 300 days. *See* 42 U.S.C. § 2000e-5(e)(1). The limitations period under the Equal Pay Act is, at most, three years. *See* 29 U.S.C. § 255(a). The limitations period under the D.C. Human Rights Act is one year. D.C. Code § 2-1403.16(a). The limitations period under the California Fair Employment and Housing Act is also one year (recently extended to three, but not retroactively). Cal. Gov't Code § 12960(e). And the limitations period under the New York City Human Rights Law is three years. N.Y.C. Admin. Code § 8-502(d). In light of those limitations periods, extending discovery back to January 2016 is more than generous. Indeed, Jones Day has agreed to produce records dating back to 2012—four years *before* the liability period—for all associates who could plausibly hold unexpired claims under these statutes. That is an extensive volume of data, more than enough to allow for robust statistical analysis. "Plaintiffs' request[s] must ... be reasonably limited in time." *Glenn v. Williams*, 209 F.R.D. 279, 282 (D.D.C. 2002). Plaintiffs' request for data concerning associates whose work at the Firm falls entirely before 2016 is unreasonable and should be rejected. *See Kapoor v. Indiana Univ. Bd. of Trustees*, 2007 WL 2901881, at *2 (S.D. Ind. July 26, 2007) (limiting discovery in Title VII case to employees whose residencies overlapped with the relevant period of plaintiff's employment "because it is those individuals who are potentially similarly situated to [plaintiff]").

Plaintiffs' request for records dating *after* their employment with Jones Day ended should also be rejected. There must be an end date for the scope of discovery. The last date any of the Plaintiffs was employed by Jones Day was October 5, 2018.[1] As a result, none of the Plaintiffs participated in the evaluation and compensation process for calendar year 2018, which took place over the first half of 2019 (including after Plaintiffs filed their Complaint), nor did any of them participate in the process for calendar year 2019, which is still occurring now. (For that matter, none of the California plaintiffs was part of the pay-adjustment process even in 2018, and no New York plaintiff was part of the evaluation and compensation process for *any* relevant year.) Accordingly, information concerning these evaluations and compensation decisions does not bear on Plaintiffs' substantive claims and requiring its production would be disproportionate, whereas limiting class discovery to associates who were hired before the end of 2018 is sensible.

---

[1] For the sake of completeness, we have offered to produce data through the end of 2018.

JONES DAY

The Hon. Randolph Moss
June 19, 2020
Page 3

Geographic Scope

Jones Day has offered to produce evaluation and pay data for any associates who worked in the offices where Plaintiffs worked—namely, New York, Atlanta, and California[2]—during the relevant period. Again, this would entail the production of personnel records for approximately 580 associates. This geographic limit is appropriate, because the discovery to date has established that associate compensation is driven principally by decisions made at the local office level.

It is important to note that Jones Day has already produced thousands of documents, from 82 different custodians and central sources, including the documents reflecting its policies and procedures for associate evaluation and compensation. Jones Day has also provided three days of Rule 30(b)(6) testimony on these topics. That discovery has established that the Partner-in-Charge ("PIC") of each office is responsible for recommending individualized pay adjustments for each associate in the office at the conclusion of the annual associate evaluation process. To make those recommendations, the PIC has access to ratings, rankings, and assessment statements generated by each associate's practice group, a separate set of ratings and rankings generated by the PIC's own office, and productivity data (including pro bono) for the current and prior year. Each PIC is given a total budget for associate compensation, but the PICs have discretion in deciding how to use that budget. The offices also vary widely in *how* they decide on pay recommendations. Some PICs do it themselves or with the assistance of the office Administrative Partner. Others delegate the work to an office committee and then review those recommendations. Offices that are part of broader regions have an additional layer of review, but this too differs by region. In Irvine, the compensation adjustments are proposed by the office PIC and Administrative Partner and then vetted in a regional meeting organized by the California Regional PIC and composed of PICs and Administrative Partners from each of the five California offices. In Atlanta, the compensation adjustments are proposed by the PIC, in consultation with the Administrative Partner, and then reviewed by the Southeast Region PIC. In New York, which is not part of a broader region, a committee of partners makes the compensation recommendations, which are then reviewed and approved by the PIC.

The final compensation recommendations for each office are then subject to review by one (2016) or two (2017-2018) partners who oversee the associate evaluation process, and then by the Managing Partner. The PICs have an opportunity to comment on any proposed changes coming out of that review. In two of the three years at issue (2016 and 2018), there were major market moves in June, when the Firm's compensation-setting process was nearly complete for adjustments to become effective July 1. The Managing Partner approved different increases in starting salaries for the incoming classes in different geographic markets and asked the PICs to advise on the impact

---

[2] Although the only California office in which any of the Plaintiffs worked was Irvine, Jones Day is willing to produce data for associates who worked at any of the Firm's five California offices (*i.e.*, Irvine, Los Angeles, San Diego, San Francisco, and Silicon Valley/Palo Alto), in recognition of the fact that Irvine is a small office and that the California Region participates in a region-wide process of reviewing and setting compensation.

of these moves on the previously proposed adjustments for more senior associates in their offices. Given the time constraints, these additional consultations were conducted differently in each affected office and region—and differently as between 2016 and 2018.

In light of these facts, it would be disproportionate and unreasonable to require Jones Day to produce pay and evaluation data for all associates at its 18 offices nationwide. Those records, for associates in geographic markets beyond those where Plaintiffs worked, are not relevant either to Plaintiffs' substantive claims or to the class allegations. Courts routinely limit discovery to the relevant geographic market or office in which putative class representatives worked. In *Cronas v. Willis Group Holdings Ltd.*, for example, plaintiffs brought a putative class action against their former employer on behalf of all current and former female officers, claiming they were denied promotional opportunities and equal compensation. 2008 WL 4548861 (S.D.N.Y. Oct. 8, 2008). Though the plaintiffs worked at only two offices, they sought nationwide discovery of documents relating to compensation and promotion "because decision-making regarding compensation for Willis employees across the country was conducted centrally" through written guidelines, a common employee appraisal form, and a centralized process for reviewing and approving salary and bonus recommendations under which "recommendations made each year by management at local offices ... are reviewed first by the Willis NA CEO, then by the Willis Group CFO and head of human resources, and finally by the Willis Group chairman." *Id.* at *1. The court denied the discovery, holding that because "local management … were responsible for recommending … salary increases," nationwide discovery was not warranted. *Id.* at *2. Rather, "[e]vidence of discriminatory acts taken by different supervisors in different offices against different employees would not tend to prove that plaintiffs had suffered discrimination." *Id.* at *2. And the inclusion of class allegations did not alter the analysis, as even "[i]f the alleged discrimination is the result of recommendations made by management at Willis NY, as the evidence suggests, evidence of discrimination elsewhere would not tend to prove that plaintiffs' claims of discrimination are typical of discrimination claims made by other, differently situated employees, nor would it reveal common questions of law or fact." *Id.* "Instead, the only purpose of nationwide discovery would be to allow plaintiffs' counsel to search for other Willis employees with colorable claims of discrimination." *Id.* The court thus concluded the requested discovery was "the proverbial 'fishing expedition.'" *Id.*

Similarly, in *Nguyen v. Baxter Health Corp.*, the court found that a plaintiff who brought a putative class action on behalf of all California employees "failed to justify discovery beyond the Irvine facility where she worked." 275 F.R.D. 503, 507-08 (C.D. Cal. 2011). Numerous other decisions are in accord. *See, e.g.*, *Salgado v. Land O'Lakes, Inc.*, 2014 WL 7272784, at *4-5 (E.D. Cal. Dec. 18, 2014) (limiting discovery in putative wage-and-hour class action to location where named plaintiff worked because plaintiff presented "no evidence to support his assumptions about other … facilities," and "proposition that allegations of violations at his facility tends to indicate violations at all other California … facilities is mere speculation and insufficient to compel discovery on that scale"); *Griffin v. Home Depot USA, Inc.*, 2013 WL 1304378, at *5 (D. Kan. Mar. 28, 2013) (limiting pre-certification discovery in putative nationwide collective action to four retail locations in which plaintiffs worked, when evidence suggested the challenged employment

decisions "were made at the local store level"); *Welch v. Eli Lilly & Co.*, 2009 WL 700199, at *1, 7-11 (S.D. Ind. Mar. 16, 2009) (refusing to allow company-wide discovery in putative class action alleging pattern or practice of racial discrimination where defendant agreed to produce personnel records for "all white and African-American employees who, at any of six specific points in time, were in the same pay scale group and who reported directly or indirectly to each named Plaintiffs' first, second or third level supervisor"); *see also Glenn*, 209 F.R.D. at 281-82 (holding that "not only must there be a 'temporal limitation,' but also a 'geographic limitation' on the documents requested" in a multi-plaintiff employment discrimination case, and limiting discovery to "units" in which plaintiffs worked); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1084-85 (11th Cir. 1990) ("While Champion's RIF was initiated at the national level, each plant was given considerable autonomy in drawing up its own RIF master plan. ... Where, as here, the employment decisions were made locally, discovery on intent may be limited to the employing unit.").

The reasoning of *Cronas*, *Nguyen*, and the litany of authority cited above compels a similar result here, because the evidence establishes that PICs at the office level drive associate pay at Jones Day.

None of the authorities Plaintiffs have cited previously is to the contrary. They emphasize that courts sometimes rely on statistics in evaluating whether to certify a class or whether a plaintiff has proven a discrimination claim. But Jones Day does not propose to deprive Plaintiffs of any and all statistical evidence; to the contrary, the Firm is willing to produce information for nearly 600 associates who worked in the same geographic markets as Plaintiffs, which is sufficient for statistical study. Plaintiffs also confuse cause and effect; at best, statistical evidence can show an *impact*, not the *cause* of the impact. As one court emphasized, "common *effect* does not establish a common *cause* for that effect, even in a disparate impact case." *Christian v. Generation Mortg. Co.*, 2014 WL 4494860, at *2 (N.D. Ill. Sept. 12, 2014). Here, in light of the evidence about how compensation decisions at Jones Day are driven by discretion at the local level, nationwide data is irrelevant. "Statistical analysis—no matter how rigorous—cannot solve the commonality problem when every decision under review is discretionary." *Id.* at *6. That insight flows from the Supreme Court's seminal decision in *Wal-Mart v. Dukes*, 564 U.S. 338, 352 (2011), which rejected the notion that statistical analysis in a discrimination case could suffice as proof of commonality.[3]

Simply put, Plaintiffs cannot show that nationwide discovery of all associates in all offices would have any bearing on either their substantive claims or their class allegations. Rather, the record shows just the opposite; what associates in Pittsburgh or Minneapolis (for example) were paid has nothing to do with Plaintiffs' claims. On these facts, to allow nationwide discovery would be to sanction "the proverbial 'fishing expedition.'" *Cronas*, 2008 WL 4548861, at *2.

---

[3] Tellingly, after the Supreme Court's intervening decision in *Wal-Mart*, the court in one of the cases Plaintiffs have cited, *Bell v. Lockheed Martin Corp.*, refused to consider the statistics offered by the plaintiffs in denying class certification, showing how unnecessary the production of such company-wide information truly was. 2011 WL 6256978, at *8 (D.N.J. Dec. 14, 2011).

JONES DAY

The Hon. Randolph Moss
June 19, 2020
Page 6

Narrative Evaluations

Plaintiffs have also requested that Jones Day's production of evaluation records include the narrative evaluations that are collected for each associate during the evaluation process and the narrative "assessment statements" that are prepared by each associate's practice group toward the end of the evaluation process. Jones Day's non-partner evaluation ("NPE") database stores historical information for each associate's ratings, rankings, and narrative evaluations. While the numerical ratings and rankings do not pose any particular burden or client confidentiality concerns, the narrative evaluations are rife with highly confidential client information which, consistent with its ethical obligations, Jones Day cannot produce in unredacted form. And this is not just a matter of redacting client names; narratives often refer to confidential strategies and sensitive client issues that cannot ethically be disclosed if there is any risk that the client's identity could be inferred.

Jones Day has produced narrative evaluations in redacted form for Plaintiffs and the 19 alleged comparators Plaintiffs identified in their Complaint. Based on the experience of redacting client information for just those individuals, Jones Day estimates that redactions for associates in the seven offices proposed by Jones Day for production would require roughly 600-700 hours of attorney time. And, of course, that number would increase substantially if Jones Day were required to produce data for associates for a broader period of time or more offices.

Jones Day should not be required to produce narrative evaluation data given the undue burden such redactions would impose. *See, e.g.*, *Cole v. Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 81 (D. Conn. 2009) (denying motion to compel information concerning "employees and billable hours in particular units" as unduly burdensome in part because "substantial confidential client information [would need to be] redacted"). Notably, unlike the numerical data, these narratives cannot be subjected to any meaningful statistical analysis and therefore offer no real value to Plaintiffs. However, Jones Day remains willing to address requests for production of such data in redacted form for specific associates on a case-by-case basis if Plaintiffs can establish good cause for those requests.

\* \* \*

In summary, Jones Day's offer to produce performance and salary information for the time period of January 1, 2012 through December 31, 2018 for the nearly 600 individuals who were associates in the Atlanta, New York, and five California offices during 2016-2018 provides Plaintiffs all of the data to which they are entitled (and then some). Production of salary data for additional offices or time periods is not warranted under the allegations in and facts of this case. Moreover, it would subject hundreds of associates—male and female—who have never consented to be part of this litigation to disclosure of their sensitive private and confidential information. Similarly, production of *numeric* evaluation information for these same associates appropriately balances Plaintiffs' need for data to support their claims with the burden Jones Day would face in redacting the privileged portions of the narrative evaluations of nearly 600 associates, which Jones Day must do to carry out its ethical obligation to protect its clients' confidential information.

JONES DAY

The Hon. Randolph Moss
June 19, 2020
Page 7

Very truly yours,

/s/ Terri L. Chase