IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NILAB RAHYAR TOLTON, *et al. on behalf of themselves and all others similarly situated*,

*Plaintiffs*,

v.

JONES DAY, a General Partnership,

*Defendant*.

Civil Action No. 1:19-cv-00945 (RDM)

**DECLARATION OF COLLEEN E. LADUZINSKI**

I, Colleen Laduzinski, declare as follows:

Background

1. My name is Colleen Laduzinski. I am over the age of 18 and am otherwise competent to make this declaration.

2. All the statements in this declaration are true and accurate and are based on my personal knowledge.

3. I am a partner of the law firm Jones Day. My business address is 100 High Street, 21st Floor, Boston, Massachusetts 02110, and I also maintain an office at 250 Vesey Street, New York, New York 10281.

4. I received an undergraduate degree from Boston University in 1996, a J.D. and an M.B.A. from Tulane University in 2000, and an L.L.M. in Taxation from New York University in 2004.

1

5. After graduating law school, I joined Jones Day as an associate in the New York office in the fall of 2000. In my first year at the Firm, I was a member of the practice group now referred to as the New Lawyers Group ("NLG"). In the late spring 2001, I transferred into the Tax practice and I have been a member of that practice ever since then. While working full-time at Jones Day, I participated in the L.L.M. in Taxation program part-time in the evenings at New York University from fall 2001 through completion of the program in the summer of 2004.

6. While I was an associate, I went on two family leaves. In connection with the birth of my first child, I took a leave from late October 2006 through early May 2007. In connection with the birth of my second child, I took a leave from late July 2008 through early January 2009. I was promoted to the partnership effective January 1, 2010, which was the earliest point at which I was eligible. I received this promotion notwithstanding my two extended leaves of absence, including one shortly before the partnership decision.

7. In early 2013, I became a member of the Firm's Advisory Committee.

8. In early 2014, I assumed the role of Firmwide Practice Leader for the NLG practice. I formally held that role until June 30, 2019, but I continued to assist with transition of these duties to the new NLG Practice Leader throughout the early fall of 2019.

9. On July 1, 2019, I became the Partner-in-Charge for the Boston office and relocated to the Boston area. It was in connection with assuming the PIC role that I relinquished my role as Firmwide Practice Leader for the NLG practice.

10. Since the fall of 2014, I have been a member of the Firm's Investment Committee, which oversees investments for our partner and staff pension plans and our 401(k) plan offerings.

<u>Tax Practice - Evaluation Process</u>

11.     Each Practice is headed by one or more Practice Leaders.  Ray Wiacek was the Tax Practice Leader when I became a partner in 2010.  From 2016 to the present, Edward Kennedy and Joe Goldman have been the co-Practice Leaders for the Tax practice.

12.     The tax practice consists of a number of different subspecialties, including international tax, tax controversy and litigation, state and local tax, tax credits and incentives, among others.  The knowledge and expertise required in these subspecialties is typically unique and not interchangeable.  Thus, for example, a state and local tax practitioner typically would not advise on international tax planning matters, and vice versa.

13.     As a partner in the Tax practice, I have been a participant in the annual associate evaluation process for tax associates as an evaluator of individual associates, as a drafter of assessment statements, and as a participant in performance review meetings with individual tax associates.

14.     After the individual evaluators submit their evaluations, the Practice Leaders and various designees review the individual evaluations.  While the Practice Leaders for the Tax Practice ultimately determine the final rating for each associate, they have the option to, and often do, consult with other partners to obtain input on associates.  The Tax practice does not hold formal practice meetings for the purpose of collecting this type of feedback.  However, Ed Kennedy routinely solicits input about associates' performance from other partners, including me, before he assigns ratings and rankings for the practice.

15.     In the Tax practice, the Practice Leaders delegate the drafting of the assessment statements to a number of Tax partners.  For approximately ten years and through the 2019 evaluation year, at the request of leadership in the practice, I drafted or commented on the

assessment statements for most of the Tax associates in the New York office and/or participated in the performance review meetings with associates where their assessment statements were discussed. I have also drafted or commented on assessments for a number of years for two associates outside of the New York office with whom I regularly work. Other New York tax partners served as primary drafter or reviewer of assessments for recent lateral associates in their own subspecialty with whom they had greater familiarity.

16. For the Tax associates whose assessments I draft or comment on, I read the underlying reviews and draw upon my own knowledge of the associates' work. I also recommend proposed ratings (but not rankings) for those associates and typically discuss my recommendations with the Practice Leader. Thereafter, the Practice Leader finalizes the ratings and assessment statements and makes a determination about where to rank those associates senior enough to be subject to ranking. In more recent years, one of the Practice Leaders has attended a meeting with other transactional partners to further review the ratings and assessments of transactional practice associates including tax associates. Office PICs are given an opportunity to comment on the draft assessment statements before they are finalized.

17. After the evaluation process is complete, partners in the Tax practice meet and deliver performance reviews to the associates. While I was a partner in the New York office, I regularly participated with Ed Kennedy in the performance review meetings for many of the New York Tax associates, and I regularly joined by telephone the performance review meetings for the two associates outside of the New York office with whom I regularly worked. In those review meetings, it was our practice to read the assessment statement to the associates, provide additional feedback about the associates' career development and areas for improvement, and ask the associates about their goals.

<u>New York Office – Evaluation Process</u>

18. While I was in the New York office, I participated in the process of setting office ratings and rankings for New York associates for four years. In early 2016, Wesley Johnson, the PIC of the New York office, asked me to participate in an informal committee of partners who developed office ratings and, for more senior associates, rankings for performance in calendar year 2015 (referred to as non-partner evaluation (NPE) 2015). At the time, the other members of the informal committee were Wesley Johnson, Lee Armstrong (a litigator and the Administrative Partner for the New York office) and Randi Lesnick (a female M&A partner). In later years, Ted Lynch (a litigation partner) joined this informal committee.

19. Randi, Lee (and at some point, Ted) and I worked together to develop recommended ratings and rankings, which were then discussed with Wesley, who had the final say. We brought different practice perspectives to the exercise – Randi's transactional practice, Ted's and Lee's litigation practices, and my Tax and NLG practice perspective.

20. In order to make informed decisions, each member of the committee independently reviewed the underlying evaluations for each of the New York associates, as well as hours data and ratings and rankings (if applicable) from prior years. In addition to the information described above, we drew upon our interactions with the associates and our knowledge of the contributions made by the associates to the Firm, including involvement in recruiting, mentoring summer associates and junior associates, pro bono and community service, business development and administrative projects.

21. Randi, Ted (or Lee), and I each separately prepared proposed ratings and, for the more senior associates, rankings within two tiers of associates of roughly similar seniority. We then shared and debated our proposals as to each New York associate until we arrived at a

consensus on our proposed ratings and rankings. When we needed more information about the performance of an associate, we called New York partners who served as office level leaders in their respective practices. We frequently contacted John Normile, the Firmwide Administrative Partner for the Intellectual Property practice, and Brett Barragate, the Firmwide Head of the then-Banking & Finance practice, to get further input about the associates in their respective practices.

22. At some point before they were finalized, we would review our proposals with Wesley Johnson. Wesley had the final authority to assign the New York office ratings and rankings to associates. The Managing Partner was not involved in the process of setting New York office ratings and ranking for associates.

23. As we approached the ratings and rankings, we did not have any prescribed rules, nor did we impose any artificial constraints on the distribution of ratings. Stated another way, we did not endeavor to have a bell curve of ratings, nor a specific percentage of any particular numerical ratings. Rather, our ratings recommendations were based on each associate's individual merits as assessed in the manner described above.

24. While we had no prescribed rules, we did have some general practices. We typically would assign a 1 rating only when an associate had already been told to leave the Firm, and we viewed a 2 rating as an indicator that the associate likely would be asked to leave the Firm unless his or her performance substantially improved. We utilized the 3 rating for a solid associate who was generally meeting the Firm's high expectations, the 4 rating for a very strong associate, and the 5 rating for a star associate. A 3 rating was generally the most common, but there was a wide range of performance within that group, as it included lawyers who were performing satisfactorily and others who had mixed reviews.

25.     Similarly, we had no prescribed rules or practices for ranking associates. We did not divide associates into buckets or brackets. Rather, we worked from the ratings and developed rankings based on our consensus view of the relative strengths of the associates within each of two ranking tiers. When assigning both ratings and rankings, our approach was to rely most heavily on the written evaluations, but also to consider hours as a measure of commitment and demand for services, commitment to pro bono work, our personal knowledge of performance, and our knowledge of leadership contributions to the office, such as in recruiting or mentoring associates.

Associate Compensation in New York

26.     Other than starting salary for first year lawyers, the PICs are actively involved in the process for setting compensation for associates in their office. Each PIC has discretion to determine the process used in the office to set compensation. At Wesley Johnson's request, I participated in setting compensation for the New York associates starting in late 2014 and continuing through the summer of 2018. Others involved in the process during that time period were Wesley Johnson, Lee Armstrong, Ted Lynch, Randi Lesnick, and, at times, Sharyl Reisman.

27.     Over time, the composition of the group and the roles of the individuals in the composition process evolved. In the early part of that time period, Lee Armstrong was very involved in the process, and Sharyl Reisman was occasionally involved. In the later years, both Lee Armstrong and Sharyl Reisman had limited involvement, and Wesley Johnson increasingly played a more active role. For the 2016-2018 compensation adjustments, I primarily worked with Randi Lesnick and Ted Lynch to make initial compensation recommendations to Wesley

for non-NLG associates.  As the PIC, Wesley Johnson had the final responsibility for the New York office salary recommendations.

28.     I was first involved in setting New York associate compensation in late 2014.  In December 2014, a group of New York partners, including Wesley Johnson, Lee Armstrong, Sharyl Reisman, Randi Lesnick and me, were concerned that recent compensation increases by traditional New York firms would place our strong associates below what we perceived as "market" for them absent an immediate increase—before the planned July 2015 adjustment—in their compensation.  As a result, we proposed an off-cycle adjustment for most New York associates in the classes of 2007 – 2012, to be effective as of January 1, 2015  We did not recommend increases for those who were performing below the Firm's standards.  On December 23, 2014, we submitted our recommendations to Hugh Whiting, who previously had served as the Firm's Administrative Partner and who remained involved in associate compensation decisions in late 2014.  Our recommendations for an out-of-cycle increase were approved, demonstrating the significant role that the local office leadership plays in setting compensation for associates in the office and responding to what the office believes is happening in its local market.

29.     From 2015 to 2018, the NLGs were not included in the compensation adjustment process that occurs in the summer of their NLG year (*e.g.*, when they have been at the firm for approximately 8 months).  In December of several of these years, the New York office proposed a salary adjustment, effective January 1 (*e.g.*, when those lawyers have been at the Firm approximately 14 months), for most of the second year lawyers.  As the second year lawyers had not yet participated in the non-partner evaluation process, we had more limited performance data

available, and our recommendations tended to be similar for most associates, unless there were clear high performers and underperformers in the class.

30. In December 2014, the New York office conducted an off-cycle review for associates in the Class of 2013. The office recommended salary increases for every associate in the class, except for Katrina Henderson, whose performance fell significantly below the Firm's standards.

31. In addition to being involved in the off-cycle adjustments described above, during 2015-2018, I participated in the mid-year salary adjustments for New York associates. In those years, Randi Lesnick, Lee Armstrong (in the earlier years), Ted Lynch (in the later years), and I each independently developed compensation recommendations for the office. Like the evaluation process, after we developed our own independent assessments, we compared our compensation recommendations. In some years, Wesley joined us in those meetings. Other years, we developed consensus recommendations before presenting them to Wesley. In all events, we reviewed the recommendations for each individual associate.

32. In setting compensation, we considered publicly available information about our peer firms in the New York market. Most of our peer firms compensate associates using a set base salary and year-end bonus. The Firm does not pay associates performance bonuses but considers publicly available information about the bonuses for comparable performance at peer firms. It is challenging to compare ourselves to firms with such different compensation models and timing. We make our compensation adjustment recommendations in the second quarter without knowing what competitor firms might later say regarding year-end bonuses.

33. Throughout the years that I participated in New York's compensation process , we never defined the "market" by a single firm. Rather, we looked at publicly available

compensation information for a number of what we would view as our peer firms. While Cravath routinely publicly stated its compensation and was a consistently available data point, we also considered information publicly stated by other traditional New York firms, such as Milbank or Davis Polk.

34.     Our goal was to have our strong associates paid at or above what we viewed as market at the time our compensation adjustments were becoming effective in July. In assessing who were our strong performers, among other information, we reviewed associates' performance, including the ratings, ranking and underlying evaluations.

35.     As a Firm, we do not have an hours threshold that must be met in order for an associate to receive a compensation increase. We generally communicate a 2,000 client-hour target to most full-time associates. In recommending New York associate compensation adjustments, we did not apply a formulaic approach to assessing hours, *e.g.*, hitting a certain hours range did not translate into a certain monetary increase. While productivity matters, it is only one factor that we considered.

36.     When considering productivity, we considered all forms of productivity – client billable hours, client non-billable hours (which typically are pro bono hours), and other categories of non-billable hours reflecting contributions to the Firm (such as time spent recruiting, or working on business development initiatives). We used hours, in part, as a reflection of who was in demand and committed, but we supplemented the raw data with our personal knowledge of the associates' workload and work ethic. We took into consideration whether an associate had lower hours because a big matter settled or deal work was on pause, or whether the associate had high hours due to inefficiencies. We were mindful of leave status and relied on annualized hours as the measure of productivity, but also understood that some

associates have to "ramp down" before a leave—transitioning off of matters—and tend to have some period of "ramp up"—getting staffed on matters—after a leave.  While the quality of work was the most important factor in setting compensation, productivity matters, and two associates in the same practice, office and class, and with substantially similar performance, would likely not get the same compensation adjustment if one billed 1,700 client hours and the other 2,200.

37. Each year, the New York office had a budget for associate compensation adjustments.  We did not, however, use a formula to remain within the budget.  We did not assign a certain percentage increase to certain numeric ratings, nor did we increase classes by "lock step."  We strived to have our strong (4 and 5 rated) associates at the range that we considered market for high performers for that year, keeping in mind all of the contributions of those associates.

38. Each year, we would identify some associates that were not performing at the level expected of a Jones Day associate.  We knew that, if their performance issues persisted, some of these associates would be counseled to leave the Firm.  When an associate's performance was significantly below expectations, we might hold that associate's compensation flat from the prior year.  We did not have a rule or mandate to do so, but we often would recommend holding an associate's compensation flat if the associate was rated a 2.  Of course, we would take mitigating factors into account, such as whether the associate had addressed the performance issues and was trending in the right direction by the time we were making our compensation recommendations.

39. While Wesley had the authority to make the final associate compensation recommendations for the office, in practice, we worked together to come up with consensus recommendations..

40. After the New York office submitted its salary recommendations, I understand that those recommendations were reviewed by Mike Shumaker, Traci Lovitt (who became involved after the July 1, 2016 compensation adjustments), and Steve Brogan. For the standard cycle adjustments, in June, Wesley would receive a revised salary sheet for the office that I understood included input from Mike Shumaker, Traci Lovitt (once she became involved) and Steve Brogan. At that point, the office had the opportunity to respond to any proposed changes.

41. In 2016 and 2018, a number of competing firms announced significant increases in starting salaries in June, after the New York office had already submitted its compensation recommendations. In response, the Firm increased the New York associate starting salary to $180,000 (June 2016), and to $190,000 (June 2018). In each of those summers, the New York office provided input into salary recommendations for New York associates twice – once before the change in starting salary and then after to adjust our earlier recommendations to take into account the increase in starting salary. For example, in June 2016, Steve Brogan made initial proposed market adjustments for New York associates but asked the office to weigh in on his suggestions. Wesley Johnson, Randi Lesnick, Ted Lynch and I thereafter submitted revised salary recommendations for New York associates, all of which were implemented.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

DATED: 7-8-2020

*Colleen Laduzinski*
Colleen Laduzinski