# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NILAB RAHYAR TOLTON, *et al.*, | ) | Civ. No. 1:19-00945 (RDM) |
|  | ) |  |
| *Plaintiffs*, | ) |  |
|  | ) | **DEFENDANT'S MEMORANDUM IN** |
| *v.* | ) | **OPPOSITION TO PLAINTIFFS'** |
|  | ) | **MOTION FOR CONDITIONAL** |
| JONES DAY, | ) | **CERTIFICATION OF AN EQUAL PAY** |
|  | ) | **ACT COLLECTIVE ACTION AND** |
| *Defendant.* | ) | **AUTHORIZATION OF NOTICE** |

Mary Ellen Powers
Beth Heifetz
Yaakov M. Roth
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

Terri L. Chase (*pro hac vice* granted)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

*Attorneys for Defendant*

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ............................................................................... 4

I.    THE ASSOCIATE EVALUATION PROCESS ............................................. 4

    A.    Work Descriptions and Supervising Lawyer Evaluations ..................... 5

    B.    Practice Group Evaluations..................................................................... 6

    C.    Office Evaluations .................................................................................. 9

    D.    Other Participants in the Evaluation Process ....................................... 10

II.   THE ASSOCIATE COMPENSATION ADJUSTMENT PROCESS................. 11

    A.    Compensation Recommendations by Office PICs................................. 11

    B.    Market Changes That Altered the Process in 2016 and 2018............... 14

    C.    The Role of the Managing Partner........................................................ 15

LEGAL STANDARD......................................................................................... 16

ARGUMENT .................................................................................................... 26

I.    CERTIFICATION IS INAPPROPRIATE BECAUSE PLAINTIFFS DO NOT IDENTIFY, MUCH LESS PROVE, A COMMON ILLEGAL POLICY AFFECTING THE PUTATIVE COLLECTIVE ....... 27

II.   CERTIFICATION IS INAPPROPRIATE BECAUSE INDIVIDUAL ISSUES WOULD OBVIOUSLY PREDOMINATE IN THE ADJUDICATION OF INDIVIDUAL EPA CLAIMS ........... 33

III.  PLAINTIFFS FAIL TO MAKE EVEN A MODEST FACTUAL SHOWING THAT THERE EXIST OTHER SEX-BASED PAY DIFFERENTIALS AT JONES DAY........................................ 37

CONCLUSION................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adair v. Wisc. Bell, Inc.*,
  2008 WL 4224360 (E.D. Wis. Sept. 11, 2008).................................................17, 37

*Aguirre v. SBC Commc'ns, Inc.*,
  2006 WL 964554 (S.D. Tex. Apr. 11, 2006) ........................................................25

*Ahad v. Bd. of Trs. of S. Illinois Univ.*,
  2019 WL 1433753 (C.D. Ill. Mar. 29, 2019)........................................19, 20, 25, 35

*Allen v. Hartford Fire Ins. Co.*,
  2017 WL 3701139 (M.D. Fla. Aug. 25, 2017) .....................................................21

*Ayala v. Tito Contractors*,
  12 F. Supp. 3d 167 (D.D.C. 2014) .......................................................................20

*Bacon v. Eaton Aeroquip, LLC*,
  2012 WL 6567603 (E.D. Mich. Dec. 17, 2012) ...................................................22

*Barron v. Henry Cty. Sch. Sys.*,
  242 F. Supp. 2d 1096 (M.D. Ala. 2003) ..............................................................31

*Basco v. Wal–Mart Stores, Inc.*,
  2004 WL 1497709 (E.D. La. July 2, 2004) ..........................................................23

*Bergman v. Kindred Healthcare, Inc.*,
  949 F. Supp. 2d 852 (N.D. Ill. 2013) ...................................................................22

*Bernard v. Household Int'l, Inc.*,
  231 F. Supp. 2d 433 (E.D. Va. 2002) ...................................................................17

*Berry v. Bd. of Supervisors of LSU*,
  715 F.2d 971 (5th Cir. 1983) ................................................................................43

*Blaney v. Charlotte–Mecklenburg Hosp. Auth.*,
  2011 WL 4351631 (W.D.N.C. Sept. 16, 2011) ..............................................22, 33

*Blount v. U.S. Sec. Assocs.*,
  945 F. Supp. 2d 88 (D.D.C. 2013) .......................................................................18

# TABLE OF AUTHORITIES

(continued)

Page(s)

*Borrero v. Am. Exp. Bank Ltd.*,
  533 F. Supp. 2d 429 (S.D.N.Y. 2008)..............................................................................16, 43

*Bouaphakeo v. Tyson Foods, Inc.*,
  564 F. Supp. 2d 870 (N.D. Iowa 2008)..................................................................................22

*Boutros v. JTC Paint. & Dec. Corp.*,
  2013 WL 3110943 (S.D.N.Y. June 19, 2013) ........................................................................26

*Bowman v. Crossmark, Inc.*,
  2010 WL 2837519 (E.D. Tenn. July 19, 2010) ......................................................................22

*Boyd v. Schwebel Baking Co.*,
  2016 WL 3555351 (N.D. Ohio June 30, 2016)........................................................................22

*Bradford v. Logan's Roadhouse, Inc.*,
  137 F. Supp. 3d 1064 (M.D. Tenn. 2015)...............................................................................38

*Bradley v. Vox Media, Inc.*,
  2019 WL 1060804 (D.D.C. Mar. 6, 2019)..............................................................................18

*Brooks v. Bellsouth Telecomm., Inc.*,
  164 F.R.D. 561 (N.D Ala. 1995)......................................................................................23, 24

*Brown v. Barnes & Noble, Inc.*,
  2018 WL 3105068 (S.D.N.Y. June 25, 2018) ........................................................................21

*Bunyan v. Spectrum Brands, Inc.*,
  2008 WL 2959932 (S.D. Ill. July 31, 2008) ....................................................................21, 22

*Byers v. Care Transp., Inc.*,
  2016 WL 4771328 (E.D. Mich. Sept. 14, 2016)......................................................................22

*Cartner v. Hewitt Assocs., LLC*,
  2010 WL 1380037 (M.D. Fla. Mar. 31, 2010) .......................................................................20

*Castillo v. P&R Enters., Inc.*,
  517 F. Supp. 2d 440 (D.D.C. 2007).......................................................................................18

*Chase v. AIMCO Properties, L.P.*,
  374 F. Supp. 2d 196 (D.D.C. 2005).......................................................................................18

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Collins v. Family Dollar Stores, Inc.*,
  2006 WL 8437440 (N.D. Ala. Dec. 8, 2006)............................................25, 29, 30

*Corning Glass Works v. Brennan*,
  417 U.S. 188 (1974)..................................................................................16

*Cornish v. Dist. of Columbia*,
  67 F. Supp. 3d 345 (D.D.C. 2014)............................................................16

*Creely v. HCR ManorCare, Inc.*,
  789 F. Supp. 2d 819 (N.D. Ohio 2011)................................................. passim

*Cross v. AMC Detroit, Inc.*,
  2019 WL 2570371 (E.D. Mich. June 20, 2019)........................................21

*Cty. of Washington v. Gunther*,
  452 U.S. 161 (1981)..................................................................................16

*Davis v. Charoen Pokphand (USA), Inc.*,
  303 F. Supp. 2d 1272 (M.D. Ala. 2004)...............................................21, 23

*Diaz v. S&H Bondi's Dep't Store*,
  2012 WL 137460 (S.D.N.Y. Jan. 18, 2012)..........................................18, 30

*Dinkel v. MedStar Health, Inc.*,
  880 F. Supp. 2d 49 (D.D.C. 2012)............................................................31

*Ebbert v. Nassau Cty.*,
  2007 WL 2295581 (E.D.N.Y. Aug. 9, 2007)...........................18, 20, 29, 30

*EEOC v. Port Auth. of N.Y. & N.J.*,
  768 F.3d 247 (2d Cir. 2014).......................................................34, 36, 39

*Fisher v. Mich. Bell Tel. Co.*,
  665 F. Supp. 2d 819 (E.D. Mich. 2009)...................................................38

*Freeman v. Medstar Health Inc.*,
  187 F. Supp. 3d 19 (D.D.C. 2016)........................................................19, 23

*Galloway v. Chugach Gov't Servs., Inc.*,
  263 F. Supp. 3d 151 (D.D.C. 2017)..................................................... passim

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Gaujacq v. EDF, Inc.*,
   601 F.3d 565 (D.C. Cir. 2010) .................................................................34

*Genesis Healthcare Corp. v. Symczyk*,
   569 U.S. 66 (2013) ..................................................................................26

*Guillen v. Marshalls of MA, Inc.*,
   750 F. Supp. 2d 469 (S.D.N.Y. 2010) ........................................19, 29, 35

*Harris v. Fee Transp. Servs., Inc.*,
   2006 WL 1994586 (N.D. Tex. May 15, 2006) ...............................23, 24

*Harris v. Med. Transp. Mgmt., Inc.*,
   317 F. Supp. 3d 421 (D.D.C. 2018) .........................................................18

*Harrison v. McDonald's Corp.*,
   411 F. Supp. 2d 862 (S.D. Ohio 2005) .....................................................41

*Hinojos v. Home Depot, Inc.*,
   2006 WL 3712944 (D. Nev. Dec. 1, 2006) ..............................................33

*Hoffmann-La Roche Inc. v. Sperling*,
   493 U.S. 165 (1989) ................................................................................17

*Holt v. Rite Aid Corp.*,
   333 F. Supp. 2d 1265 (M.D. Ala. 2004) ..........................................17, 25

*Hunter v. Sprint Corp.*,
   346 F. Supp. 2d 113 (D.D.C. 2004) .........................................................18

*Jenkins v. TJX Cos.*,
   853 F. Supp. 2d 317 (E.D.N.Y. 2012) ............................................19, 27, 29

*Jimenez v. Lakeside Pic–N–Pac, L.L.C.*,
   2007 WL 4454295 (W.D. Mich. Dec. 14, 2007) ....................................22

*Kassman v. KPMG LLP*,
   2014 WL 3298884 (S.D.N.Y. July 8, 2014) ...........................................35

*Kassman v. KPMG LLP*,
   416 F. Supp. 3d 252 (S.D.N.Y. 2018) ............................................. passim

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Kemp v. Target Corp.*,
  2013 WL 5289799 (N.D. Ala. Sept. 18, 2013) ................................................................16, 20

*Korenblum v. Citigroup, Inc.*,
  195 F. Supp. 3d 475 (S.D.N.Y. 2016) ......................................................................21, 23, 24

*Kuznyetsov v. West Penn. Allegheny Health Sys.*,
  2011 WL 6372852 (W.D. Pa. Dec. 20, 2011) ....................................................................33

*Lankford v. CWL Investments, LLC*,
  2014 WL 3956184 (E.D. Mich. Aug. 13, 2014) ................................................................22

*Luksza v. TJX Companies, Inc.*,
  2012 WL 3277049 (D. Nev. Aug. 8, 2012) ......................................................................22

*Lusardi v. Xerox Corp.*,
  122 F.R.D. 463 (D.N.J. 1988) ......................................................................................24

*MacGregor v. Farmers Ins. Exch.*,
  2012 WL 2974679 (D.S.C. July 20, 2012) ...................................................................22, 23

*Maestas v. Day & Zimmerman, LLC*,
  2010 WL 11601189 (D.N.M. Jan. 4, 2010) ...................................................................19, 30

*McClean v. Health Sys., Inc.*,
  2011 WL 6153091 (W.D. Mo. Dec. 12, 2011) ....................................................................22

*McDermott v. Fed. Sav. Bank*,
  2018 WL 1865916 (E.D.N.Y. Apr. 18, 2018) ....................................................................21

*Meyer v. Panera Bread Co.*,
  344 F. Supp. 3d 193 (D.D.C. 2018) ............................................................................18, 37

*Mike v. Safeco Ins. Co. of Am.*,
  274 F. Supp. 2d 216 (D. Conn. 2003) ..........................................................................25, 35

*Mirza v. Dep't of Treas.*,
  17 F. Supp. 2d 759 (N.D. Ill. 1998) ................................................................................41

*Morisky v. Pub. Serv. Elec. & Gas Co.*,
  111 F. Supp. 2d 493 (D.N.J. 2000) ..............................................................................25, 35

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Morris v. Lettire Const., Corp.*,
  896 F. Supp. 2d 265 (S.D.N.Y. 2012)...................................................................18

*Morris v. U.S. Dep't of Justice*,
  298 F. Supp. 3d 187 (D.D.C. 2018)....................................................................41

*Munoz v. Big Valley, Inc.*,
  915 F. Supp. 2d 46 (D.D.C. 2013).......................................................................31

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010)..................................................................18, 19, 37

*Neff v. U.S. Xpress, Inc.*,
  2013 WL 4479078 (S.D. Ohio Aug. 20, 2013)....................................................22

*Olivo v. GMAC Mortg. Corp.*,
  374 F. Supp. 2d 545 (E.D. Mich. 2004)...............................................................23

*Pacheco v. Boar's Head Provisions Co., Inc.*,
  671 F. Supp. 2d 957 (W.D. Mich. 2009) ..............................................................22

*Purdham v. Fairfax Cty. Pub. Schs.*,
  629 F. Supp. 2d 544 (E.D. Va. 2009) .............................................................24, 33

*Ray v. Motel 6 Operating Ltd.*,
  1996 WL 938231 (D. Minn. Mar. 18, 1996) ........................................................23

*Reed v. Empire Auto Parts, Inc.*,
  2015 WL 761894 (D.N.J. Feb. 23, 2015) .............................................................20

*Reich v. Homier Distributing Co.*,
  362 F. Supp. 2d 1009 (N.D. Ind. 2005) ...............................................................25

*Rollins v. Ala. Cmty. Coll. Sys.*,
  2010 WL 4269133 (M.D. Ala. Oct. 25, 2010).......................................................20

*Rudd v. T.L. Cannon Corp.*,
  2011 WL 831446 (N.D.N.Y. Jan. 4, 2011)............................................................17

*Russell v. Ill. Bell Tel. Co.*,
  721 F. Supp. 2d 804 (N.D. Ill. 2010) ...................................................................33

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Sheffield v. Orius Corp.*,
    211 F.R.D. 411 (D. Or. 2002) ....................................................................19, 27, 29

*Sloane v. Gulf Interstate Field Servs., Inc.*,
    2017 WL 1105236 (M.D. Pa. Mar. 24, 2017) ...................................................21, 24

*Smith v. City of Jackson*,
    544 U.S. 228 (2005) ....................................................................................................16

*Spencer v. No Parking Today, Inc.*,
    2013 WL 1040052 (S.D.N.Y. Mar. 15, 2013) .......................................................19

*Spencer v. Va. State Univ.*,
    919 F.3d 199 (4th Cir. 2019) ...................................................................................34

*Stephens v. Farmers Rest. Grp.*,
    291 F. Supp. 3d 95 (D.D.C. 2018) ...........................................................19, 20, 37, 42

*Thiessen v. Gen. Elec. Capital Corp.*,
    996 F. Supp. 1071 (D. Kan. 1998) ..........................................................................23

*Thompson v. Sawyer*,
    678 F.2d 257 (D.C. Cir. 1982) ...........................................................................20, 29, 34

*Valcho v. Dallas Cty. Hosp. Dist.*,
    574 F. Supp. 2d 618 (N.D. Tex. 2008) ................................................................22, 24

*Villanueva–Bazaldua v. TruGreen Ltd. Partners*,
    479 F. Supp. 2d 411 (D. Del. 2007) .......................................................................23

*Wentzel v. Williams Scotsman Inc.*,
    2020 WL 1158547 (D. Ariz. Mar. 10, 2020) .......................................................41

*Wheeler v. City of Detroit*,
    2012 WL 1119300 (E.D. Mich. Apr. 3, 2012) .....................................................22

*White v. Osmose, Inc.*,
    204 F. Supp. 2d 1309 (M.D. Ala. 2002) ...............................................................23

*Winfield v. Citibank, N.A.*,
    843 F. Supp. 2d 397 (S.D.N.Y. 2012) ...................................................................19

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Wright v. Lehigh Valley Hosp.*,
    2010 WL 3363992 (E.D. Pa. Aug. 24, 2010) ...................................................................38, 41

**STATUTES**

29 U.S.C. § 206....................................................................................................................16, 36

29 U.S.C. § 216....................................................................................................................18, 41

**INTRODUCTION**

Three former female associates (out of hundreds) from three different Jones Day offices (out of 18 in the U.S.) and three different Jones Day practice groups (out of 20) allege that, as a result of sex discrimination, they were paid less than certain male associates at the Firm despite allegedly performing equal work. Based on those allegations, which sufficed to state claims when assumed true but have not yet faced factual scrutiny, they seek conditional certification under the Equal Pay Act of a "collective" comprising every female associate who worked at any Jones Day office in the U.S. since 2016. (Dkt. 118-1 ("CCM").) This request is utterly without merit.

To certify a collective, even on a conditional basis, a plaintiff must offer evidence (not mere allegations) that (i) she was the victim of a statutory violation, and (ii) the violation stemmed from a common policy that violated the law, such that other "similarly situated" employees with parallel claims would exist. And because Plaintiffs have, by their own account, already obtained "substantial document discovery" and taken "three Rule 30(b)(6) depositions" addressed towards Jones Day's policies and procedures for evaluating and compensating associates (Dkt. 111 at 3), their evidentiary burden is higher than for certification motions that precede any discovery.

Plaintiffs here cannot come close to satisfying their burden on either prong, regardless of the standard. *First*, for the reasons explained in Jones Day's summary judgment motion on Count IV, their individual EPA claims fail as a matter of law. Of the three Plaintiffs with extant claims, one performed literally *no work* during the entire limitations period; another compares herself to associates who billed more than *twice as many* hours as she did; and the last points to higher-paid associates *in other offices*, which are irrelevant under the statute. Because these undisputed facts establish that Plaintiffs' EPA claims are legally hopeless (without regard to any further discovery), the Court should dismiss Count IV and deny the pending certification motion as moot.

*Second*, even if the Court chooses to leave open the possibility that further discovery might resurrect Plaintiffs' individual EPA claims, those claims do not challenge any common policy that violates the law.  Certification can make sense and advance judicial economy when an employer operates an allegedly illegal policy that violates the law in a common way across a defined set of employees—for example, by misclassifying a category of employees as exempt from overtime, or refusing to allow meal breaks to workers in certain jobs, or assigning women to a job classification subject to a lower wage scale.  In those cases, there are efficiencies to adjudicating the legality of the common policy on a collective basis on behalf of all affected employees.

By contrast, Plaintiffs do not identify any allegedly illegal policy.  They instead describe, at the highest level of generality, the framework through which Jones Day determines associate pay: Supervisors provide performance reviews; practice leaders develop ratings and rankings; office leaders develop a parallel set of ratings and rankings, and recommend pay adjustments; in some offices, regional leadership provides another layer of review; two firm leaders (one man and one woman) further review pay recommendations and can propose revisions; and the Managing Partner approves final figures.  The specific processes and people involved vary widely by office, by practice, and by year; and each associate's final pay figure is the product of highly individualized input from potentially *dozens* of different collections of lawyers.

Plaintiffs do not provide any evidence that these "policies" violate the EPA, because they obviously do not.  Performance-based merit pay, based on a broad array of evaluations and subject to numerous layers of review, is perfectly consistent with the law (and, for that matter, with best practices).  At most, Plaintiffs allege that these processes could have allowed discriminatory bias to infiltrate at some (unknown) stage, resulting in unjustified pay differentials for three of them, individually, relative to particular male "comparators."  That speculation is unsubstantiated and

refuted by the record; more importantly, there is no basis to conclude that any such discrimination, even if it did occur, arose from a common policy affecting female associates nationwide.  Discrete, illegal applications of a *lawful policy* are not grounds for certification, as collective adjudication in that type of case would offer no efficiencies or judicial economy—only complications.

Indeed, at the end of the day, every female associate who seeks to prove an EPA violation must inevitably undertake a highly individualized analysis of her work, her reviews, her hours, her overall contribution to the Firm, and her compensation—as compared to the work, reviews, hours, contributions, and compensation of specified male associates in her office.  If that comparison exposes a differential in pay for equal work, Jones Day would have to show that it is attributable to a factor other than sex, such as seniority, some feature of the associates' relative performance, or a market-based distinction between their values.  There are no common questions of law or fact to be found here, and so no efficiencies to combining multiple claims into a single suit.  That is why the district court in a similar case pursued by Plaintiffs' counsel, which initially certified EPA claims, later reversed course and ruled that collective adjudication would be "impractical, if not impossible."  Plaintiffs rely heavily on the earlier decision, but never cite the later one, and would have this Court forge blindly ahead without considering these obvious, insurmountable obstacles.

*Finally*, even if scattered instances of illegal pay disparities could warrant certification in the absence of a common illegal policy, Plaintiffs have failed to show even that.  Despite 15 months of high-profile press coverage, Plaintiffs offer no declarations from putative opt-ins, and instead invoke the EPA claims this Court *dismissed*, while ignoring their legal deficiencies.  And they cite a grab-bag of conclusory assertions, irrelevant anecdotes, and inadmissible hearsay, none of which gives their motion the requisite factual heft.  For this reason too, Plaintiffs' motion does not clear the bar for conditional certification or authorization of notice.

## FACTUAL BACKGROUND

Over the course of the past 15 months, much discovery has already occurred, as Plaintiffs have acknowledged.  (Dkt. 111 at 3 (conceding "substantial" discovery).)  Jones Day has already produced 350,000 documents, totaling over 2.2 million pages, from 82 custodians and central sources, including the documents reflecting its policies and procedures and full review and pay data for Plaintiffs and the 19 alleged comparators identified in the Complaint.  (Chase Decl. ¶¶ 2, 4.)  Plaintiffs also took three days of Rule 30(b)(6) depositions, with designees prepared to testify on, among other topics, "Jones Day's practices and procedures concerning ... compensation decisions for U.S. associates," "Jones Day's practices and procedures concerning the Firm's evaluation process for associates," the "organizational structure of the Firm at the office level, practice group level, and regional level," and the "process for making, investigating[,] and responding to complaints … in the context of compensation" (*i.e.*, the imagined "no whining" policy).  (Lovitt Decl. ¶ 4; Chase Decl. Ex 8 (Bounds Tr. 46:9-47:24).)  The facts below are drawn from those documents and depositions, supplemented by declarations that address details that Plaintiffs had the opportunity to but chose not to explore during the depositions.

## I.    THE ASSOCIATE EVALUATION PROCESS.

Jones Day conducts an annual merits-based evaluation of each associate in a substantive practice group, as described below.[1]

---

[1] Most associates who join the Firm directly from law school start in the New Lawyers Group, where they typically spend 9-12 months exploring various practice areas before joining one.  (Dkt. 118-13 at 6.)  The system for evaluating and compensating lawyers in the New Lawyers Group—referred to as "NLGs"—is distinct.  (Chase Decl. Ex. 4 (Lovitt Tr. 121:24-122:9).)  As no Plaintiff was an NLG during the EPA limitations period, the NLG compensation system is not discussed in this brief save to note that, in certain years, Partners in Charge ("PICs") had the option to provide a salary increase to new lawyers in January, roughly fifteen months after their start date.  "Some, but not all PICs [do] so, and they arrive[] at their compensation adjustments in different

A.      **Work Descriptions and Supervising Lawyer Evaluations.**

The evaluation process begins in January, when associates are asked to identify the more senior lawyers who supervised their work in the prior year and to provide descriptions of their work on each project.  (Chase Decl. Ex. 4 (Lovitt Tr. 38:6-24, 42:21-43:8).)  Associates also have the option to submit additional information that they would like considered in the evaluation process—for example, a personal hardship that affected their performance or productivity.  (*Id.* at 68:2-15, 139:21-140:16.)  In recent years, associates were also asked to provide a self-assessment of their contributions and progress at the Firm.  (*Id.* at 67:16-20, 68:2-15, 69:8-13.)

The Firm then solicits written evaluations and ratings from each supervisor identified by each associate.[2]  (CCM Ex. KK).)  Supervising lawyers are asked to provide narrative evaluations of the associate's strengths and weaknesses and to grade performance on a scale of one (unacceptable) to five (exceptional) in the following categories: "grasp of legal issues and concepts," "legal research and analysis," "factual analysis," "written presentation," "oral presentation," "substantive expertise" (for the more senior associates), "judgment," "timeliness," "efficiency," "ability to function as a team member," "ability to work independently," "ability to interact with clients," "relationship with peers, subordinates and staff," "leadership and initiative," and "overall effectiveness."  (CCM Ex. LL at 3; Chase Decl. Ex. 4 (Lovitt Tr. 87:16-19).)

The individual evaluations are often project- or matter-based and may reflect a supervising lawyer's limited exposure to the associate being reviewed or, in the case of a junior supervising lawyer, the reviewer's own limited experience as a lawyer or supervisor.  (Lovitt Decl. ¶ 14.)  Jones

---

and varied ways."  (*Id.* at 303:2-17).)  Plaintiff Henderson did not receive such an increase in January 2015 because, even at that early stage, the New York office recognized her performance as well below expectations.  (Laduzinski Decl. ¶ 30; Chase Decl. Ex. 7 at 2-3, 6 (JD_02205007).)

[2] Supervising lawyers include partners, counsel, of counsel, and associates who are two or more years senior to the associate being reviewed.  (Lovitt Decl. ¶ 13.)

Day does not, therefore, simply aggregate or average the outputs of these evaluations and call the process complete.  Instead, the supervising lawyers' evaluations are used in two additional review processes—one led by practice group leadership, the other by local office leadership—designed to provide a fair, accurate, and robust assessment of each associate's performance.

### B.     Practice Group Evaluations.

The supervisor evaluations are provided to the Practice Leaders ("PLs") of the associate's practice.  (Lovitt Decl. ¶ 15.)  The PLs are then responsible for preparing a rating for each associate (from one to five, with five being the highest), and ranking each mid-level and senior associate relative to others of similar seniority in the practice.  (*Id.* ¶ 15.)  Each practice has its own process for determining ratings and rankings.  (Chase Decl. Ex. 4 (Lovitt Tr. 221:8-10); *compare* Parker Decl. ¶ 28 (for Business and Tort Litigation ("B&TL"), rankings determined by PLs after members of associate review committee independently assign quintile rankings), *with* Insogna Decl. ¶ 29 (rankings of IP associates determined by PL and IP Administrative Partner).)

PLs are also responsible for composing a draft "assessment statement" to capture the Firm's overall view of the associate's performance that year.  (Chase Decl. Ex. 4 (Lovitt Tr. 104:2-25).)  The assessment statement is "not intended to be a consensus" of the supervising lawyers' evaluations, but rather to "reflect the Firm's view" of each associate's performance.  (*Id.* at 262:9-19; Lovitt Decl. ¶ 14).)  In preparing the statements, practice leaders take into account the nature of the reviewed work (*e.g.*, is the associate taking on challenging assignments and developing new skills?) and the source of the review (*e.g.*, is a partner known as an easy or hard grader, is the reviewer an associate with limited experience?).  (Chase Decl. Ex. 4 (Lovitt Tr. 205:15-207:8).)  The statements include discussion of strengths and weaknesses, overall development, areas for improvement and, for more senior associates, an assessment of future prospects.  (CCM Ex. Q at 3; Lovitt Decl. ¶ 16.)  Beyond quality of work, the statements take into account factors such as

productivity on billable and pro bono matters, and leadership contributions to the office and practice.  (Lovitt Decl. ¶ 16; Chase Decl. Ex. 4 (Lovitt Tr. 240:5-25, 242:2-243:25)).)[3]

"[E]ach practice has their own approach to assessment drafting with different people over different periods of time."  (Chase Decl. Ex. 4 (Lovitt Tr. 185:24-186:3).)  "[S]ometimes it is the practice leader himself or herself that does the drafting of the assessment statement.  Sometimes it is the practice leader in conjunction with a designee.  Sometimes it is ... a group of senior experienced lawyers who have been in the evaluation process for a long time.  Sometimes it is [a] regional designee."  (*Id.* at 104:5-14).)  Since 2017, for example, the B&TL practice has relied on office Heads of Litigation ("HOLs") or their designees to draft assessment statements, after which a separate team of B&TL partners reviews and comments on the drafts.  (Parker Decl. ¶¶ 17-18.)  In the IP practice, by contrast, initial assessment statements are drafted by different groups of partners that "typically cover the range of IP sub-practices," such as patent prosecution, trademark litigation, and patent litigation.  (Insogna Decl. ¶ 14.)  These approaches can also vary from year to year.  (*See, e.g.*, Chase Decl. Ex. 5 (JD_02205402) (B&TL assessment drafting process for NPE 2015); Chase Decl. Ex. 6 (JD_02205136) (identifying changes to B&TL assessment drafting process for NPE 2016); Parker Decl. ¶¶ 14-18.)

Since 2017, all of the practices participate in committees that discuss associate evaluations, though that was not true in earlier years.[4]  (Chase Decl. Ex. 4 (Lovitt Tr. 164:15-166:20, 212:24-

---

[3] A primary purpose of the assessment statement is to ensure each associate understands the Firm's view of his or her performance.  (Lovitt Decl. ¶ 16.)  To that end, at the conclusion of the evaluation process, practice or office leaders meet separately with each associate to review and discuss the assessment.  (Chase Decl. Ex. 4 (Lovitt Tr. 103:7-9).)

[4] Before 2017, some practices, such as Antitrust, did not participate in cross-practice committee meetings.  (Chase Decl. Ex. 4 (Lovitt Tr. 219:4-220:4).)  "Some practices would get committees, some practices would have a group of regional practice designees who work together, some practices might have the practice leader, himself or herself doing it."  (*Id.* at 212:14-18.)

25).)  In the committees, assessments and ratings are subject to debate and further revision during a "multiday, very thorough individualized exercise" in which all mid-level and senior associates are discussed.[5]  (*Id.* at 205:15-208:9).)  In recent years, there have been four cross-practice committees, for (1) the disputes-related practices, (2) the transactional practices, (3) the intellectual property practice, and (4) the regulatory practices.  (*Id.* at 164:23-165:6).)  To ensure "many voices with different perspectives," these committees contain a "diverse group of people," including numerous female partners.  (*Id.* at 109:14-110:5; Lovitt Decl. ¶ 18.)  The size of these committees and their composition (both the mix of practices and the participating partners) vary from year to year, but more than 70 partners participate each year in at least one.  (Chase Decl. Ex. 4 (Lovitt Tr. 208:10-209:18); Lovitt Decl. ¶ 18; Parker Decl. ¶ 21-24; Insogna Decl. ¶¶ 23-27.)

In advance of the committee meetings, the participants are provided the draft assessment statement and underlying evaluations of all mid-level and senior associates for the evaluation year and the preceding two years.  (Lovitt Decl. ¶ 16; *see also* Chase Decl. Ex. 4 (Lovitt Tr. 155:15-19, 156:20-157:9, 203:4-13).)  After the meetings, the PLs modify ratings and draft assessments as needed based on the committees' feedback.  (Chase Decl. Ex. 4 (Lovitt Tr. 200:16-201:17).)  The PLs have final authority over practice ratings and rankings and also over the assessment statements, subject to local office input described below.  (*Id.* at 225:7-13.)

---

[5] Some review committees, such as intellectual property, include discussion of second and third year associates, while the transactional and disputes committees focus only on mid-level and senior associates.  (Lovitt Decl. ¶ 17; Deane Decl. ¶ 10; Parker Decl. ¶ 22; Insogna Decl. ¶¶ 21-22.) Each of the three Plaintiffs with extant EPA claims was therefore subject to different types of reviews:  Given her seniority, Draper was discussed in the disputes-related associate review committee meetings in each of the years within the limitations period.  Henderson left the Firm in her third year and was too junior to be included in the transactional committee discussions.  But Williams, even as a junior associate, was discussed in the intellectual property review meetings.

C.      Office Evaluations.

In parallel to the practice-driven evaluation process, office leaders—led by the PIC of each office— review and vet the written evaluations, perform their own due diligence, and assign office-specific ratings and rankings to associates in their offices.  (*Id.* at 108:2-10, 243:11-16.) Each PIC has his or her own process for developing ratings and rankings.  (*Id.* at 108:2-10, 123:19-124:4, 186:10-18.)  During the relevant time period, for example, the New York office convened an informal committee of four partners—two men and two women—each of whom "separately prepared proposed ratings and ... rankings," which were then shared with the PIC after they achieved consensus. (Laduzinski Decl. ¶¶ 18-22.)  In Irvine, the PIC typically relied on the office Administrative Partner ("AP") to propose ratings and rankings, a process suited to that office's smaller size.  (Cottriel Decl. ¶¶ 11-12, 16.)  In Atlanta, the PIC and AP (a female partner) "independently developed provisional office ratings and rankings" before they are finalized by the PIC.  (Deane Decl. ¶¶ 14-16.)  In areas where they operate (such as California), Regional PICs also review the ratings and rankings.  (Chase Decl. Ex. 4 (Lovitt Tr. 109:2-13); Deane Decl. ¶ 17; Lovrien Decl. ¶¶ 13, 18.)  In California, this was typically done in a meeting of the PICs and APs of all five offices, though the PICs in each office retained final say on the ratings and rankings. (Cottriel Decl. ¶ 18; Lovrien Decl. ¶ 22.)

PICs also have an opportunity to comment on the assessment statements once the practices have completed their review processes, and further revisions are sometimes made after discussion with the PLs.  (Chase Decl. Ex. 4 (Lovitt Tr. 225:9-21); *see also* Parker Decl. ¶ 27; Deane Decl. ¶ 18.)  While office and practice leaders will seek to understand and reconcile divergent views, divergence is not necessarily a bad thing.  The system is designed so that offices and practices "independently arrive at their own rating."  (Chase Decl. Ex. 4 (Lovitt Tr. 186:10-18).)  For example, a PIC might assign more weight to an associate's leadership in running an office summer

program, while a PL might put more weight on trial contributions that kept an associate out of the office. (*See id.* at 185:17-188:23).)  With "practice input on one side, [and] office input on another side," the parallel evaluations operate as a system of "checks and balances."  (*Id.* at 148:15-24).)

### D.    Other Participants in the Evaluation Process.

Jones Day's Managing Partner does not participate in reviewing associates, preparing assessment statements, or assigning ratings or rankings.  (Chase Decl. Ex. 4 (Lovitt Tr. 272:12-273:9, 276:2-8); Deane Decl. ¶ 17; Insogna Decl. ¶ 34; Laduzinski Decl. ¶ 22; Lovrien Decl. ¶ 22; Parker Decl. ¶ 30.)  Rating and ranking decisions rest with office and practice leadership.  (Chase Decl. Ex. 4 (Lovitt Tr. 108:2-10, 133:17-134:3); Parker Decl. ¶ 28; Insogna Decl. ¶¶ 22, 30.)

Various partners have overseen the firmwide associate evaluation process at different times, but those partners have no authority over the practice or office ratings or rankings.  Since at least 2012, the Firm's Administrative Partner (Hugh Whiting, followed by Michael Shumaker as of 2014) has worked with the Practice Services department to coordinate the process.  (Lovitt Decl. ¶ 19; Coussons Decl. ¶ 5.)  In the second half of 2016, the Managing Partner asked Traci Lovitt to review the associate evaluation process; he thereafter asked her to take charge of that process, working with Shumaker.  (Lovitt Decl. ¶ 20; Chase Decl. Ex. 4 (Lovitt Tr. 176:8-177-22, 265:13-15, 266:2-4).)  Other than rejecting a proposed change in timing of the evaluation cycle, the Managing Partner authorized Lovitt to make changes to the process as she determined appropriate after consulting with practice and office leadership.  (Chase Decl. Ex. 4 (Lovitt Tr. 179:8-22, 216:2-6); CCM Ex. OO at 2.)  These two partners have no formal title for this role, but are referred to below as "co-heads of the associate evaluation process."  (*E.g.,* Chase Decl. Ex. 4 (Lovitt Tr. 29:24-30:10).)  In recent years, they have participated in the associate review committee meetings. (Lovitt Decl. ¶ 20.)

II.     THE ASSOCIATE COMPENSATION ADJUSTMENT PROCESS.

For associates who join the New Lawyer Group directly out of a full-time J.D. program at a U.S. law school, the Firm has set starting salaries that vary by office and that changed twice during the limitations period.  (Chase Decl. Exs. 9, 10 & 11 (2014, 2017, and 2018 NALP forms).)  For U.S. offices, the Firm publishes these salaries on the career section of its website and on forms submitted to the National Association for Law Professionals (NALP) for publication.  (*Id.*)

Other than these starting salaries, associate pay at Jones Day is not lockstep and does not include bonuses.  Rather, Jones Day compensates associates with a salary that is based on each individual's performance, while taking into account compensation practices in local geographic markets.  (Lovitt Decl. ¶ 23.)  The Firm Manual, which is available to associates, explains that "the Firm does not have a compensation structure or ladder that is uniform across all geographic markets and, even within individual geographies, each lawyer is compensated within a range that reflects both local market conditions and the fact that individuals perform at different levels."  (Dkt. 102-9 at 3.)  The Manual further explains that "compensation recommendations are made initially by PICs, with final determinations of compensation made by the Managing Partner."  (Dkt. 118-13 at 6.)  At various times when decisions setting associate compensation for 2016-2018 were being made, the PICs of 8 of the 18 U.S. offices and the Regional PIC for the Southern Region, covering Atlanta and two other offices, were women.  (Lovitt Decl. ¶ 10; Thomas Decl. ¶¶ 8-9.)

A.     **Compensation Recommendations by Office PICs.**

Compensation is reviewed annually at the completion of the evaluation process described above, and adjustments are typically made effective July 1.[6]  (CCM Ex. G at 2-3; CCM Ex. O at

---

[6] Associates who join the Firm directly after law school have sometimes received their first pay adjustment in January, roughly 15 months after joining the Firm.  (*See* Chase Decl. Ex. 4 (Lovitt Tr. 302:18-303:17).)  *See supra* n.1.

2-3; CCM Ex. P at 3, 5, 7.)  When proposing salary adjustments, PICs have available the office and practice ratings and rankings, individual evaluations, assessment statements, and productivity data (including pro bono hours) for the current and prior year.  (CCM Ex. T; CCM Ex. U; Laduzinski Decl. ¶ 34.)  Each PIC is given a total budget for associate compensation adjustments, but has discretion in how to allocate it, including in assessing what is necessary to remain competitive in their local market.  (CCM Ex. O at 3; CCM Ex. P at 3, 5, 7; Cottriel Decl. ¶ 25 (Irvine office "considered peer firms to be firms with a national presence that have offices in Orange County" and "tried to stay within the budget"); Deane Decl. ¶ 20 ("[O]ur view of the 'top of market' was the total compensation we believed might have been paid to a high performing associate at Atlanta peer firms, inclusive of the top bonus paid at such firms.").)

In practice, PICs take varying approaches to compensation adjustments and exercise discretion in different ways.  Some put more weight on the percentage increase, others on the dollar amount of the adjustment.  (*Compare, e.g.*, Cottriel Decl. ¶ 26 ("We ... decided what dollar amount increase was warranted ...."), *with* Lovrien Decl. ¶ 26 (Regional PIC would "question … adjustments that were outliers from a percentage standpoint").)  Some PICs weigh competition for talent in certain high-value practices as a significant factor, while others are practice-neutral. (*Compare* Lovrien Decl. ¶ 26 (California Regional PIC occasionally "questioned whether a larger adjustment might be needed for certain associates due to competition for talent in a particular practice"), *with* Deane Decl. ¶ 20 (Atlanta PIC would recommend adjustments based on merit, "irrespective of … practice").)  PICs' assessments of productivity may differ depending on the varying levels of activity in the office for a particular practice.  (Lovitt Decl. ¶ 23; Cottriel Decl. ¶ 27 (Irvine office considers "whether a lack of productivity was the result of a lack of available work or a lack of an internal market"); Deane Decl. ¶ 13 (similar).)

Offices also vary widely in *how* they decide on pay recommendations.  "[E]ach office has its own system of determining what its compensation recommendations are.  Some people use the PIC only, some PICs include their AP, some offices have committees that work on associate compensation.  It varies throughout the firm ... ."  (Chase Decl. Ex. 4 (Lovitt Tr. 47:22-48:9).)  For example, the AP in Irvine "develop[s] the initial compensation recommendations for the Irvine office and then [meets] with [the PIC] to review and adjust them as needed."  (Cottriel Decl. ¶ 29.)  In Atlanta, the PIC and (female) AP each "independently prepare[] proposed numbers for each associate" and "ha[ve] a meeting to discuss the proposals" before the PIC makes final decisions.  (Deane Decl. ¶ 19.)  And in New York, an informal committee of four partners, including two women, makes recommendations to the PIC, who has "authority to make the final associate compensation recommendations for the office," but in practice "work[s] together [with the informal committee] to come up with consensus recommendations."  (Laduzinski Decl. ¶¶ 26-39.)

Offices that are part of broader regions have an additional layer of review; it too differs by region.  In Irvine, the office's proposed adjustments are vetted in a meeting with the California Regional PIC and the PICs and APs from each of the five California offices.  (Cottriel Decl. ¶¶ 29-30; Lovrien Decl. ¶¶ 25-28.)  The Atlanta office's adjustments, by contrast, are generally provided only to the (female) Southern Region PIC, who either adopts the proposals or discusses them with the Atlanta PIC until they reach consensus.  (Deane Decl. ¶ 19; Thomas Decl. ¶ 10.)

Shumaker and, beginning in late 2016, Lovitt review the pay recommendations from each office, suggest revisions, and forward the figures to the Managing Partner for review and approval.  (Chase Decl. Ex. 4 (Lovitt Tr 48:10-22); CCM Ex. G at 3; Lovitt Decl. ¶ 25.)

After the Managing Partner completes his review, the proposed compensation adjustments are sent back to the co-heads of the associate evaluation process, the Regional PICs, and the office

PICs.  (Chase Decl. Ex. 4 (Lovitt Tr. 48:10-22); CCM Ex. G at 3.)  The offices can challenge any change and further adjustments can be—and are—made.  (Chase Decl. ¶ 28 & Ex. 3 at 3 (JD_02205070); Cottriel Decl. ¶ 30; Chase Decl. Ex. 4 (Lovitt Tr. 54:18-55:11).)  At that stage, Lovitt and Shumaker are authorized to implement certain changes without further consultation with the Managing Partner.  (Chase Decl. Ex. 4 (Lovitt Tr. 57:20-58:20).)

At the conclusion of this process, the Director of Practice Services, a staff member in Dallas, generates the compensation letters (also referred to as "memos") using templates bearing the Managing Partner's name.  (CCM Ex. DD; CCM Ex. EE.)  These letters direct associates who have questions about their compensation to contact their PICs.[7]  (*E.g.*, Dkt. 94-16 at 2.)  Practice Services sends the letters to the PICs for distribution in their offices.  (CCM Exs. DD, EE.)

### B.    Market Changes That Altered the Process in 2016 and 2018.

In June 2016 and again in June 2018, various firms announced increases in starting salaries in different markets.  This occurred after the PICs had already submitted their recommendations and when the compensation-setting process was nearly complete.  (Chase Decl. Ex. 12 at 2 (JD_02202776); Cottriel Decl. ¶ 31; Thomas Decl. ¶¶ 11, 14; Laduzinski Decl. ¶ 41.)  In both years, the Managing Partner approved different increases in starting salaries for the incoming classes in different geographic markets, and these changes necessitated further adjustments in other classes of associates.  (Lovitt Decl. ¶ 25.)

---

[7] Contrary to Plaintiffs' assertion that associates are forbidden or discouraged by a non-existent "no whining" policy from sharing concerns about their salaries (Dkt. 118-1 at 27), many associates (both male and female) do in fact contact their PICs or other office leaders to discuss—and raise concerns about—their compensation.  (*E.g.*, Chase Decl. Ex. 1 at 2 (JD_02202777); Chase Decl. Ex. 3 at 3 (JD_02205070); Lovrien Decl. ¶ 32.)  In 2016, a number of associates (male and female) in California and a few other offices expressed concerns about whether the compensation adjustments were competitive with what they viewed as the new "market."  (Lovrien Decl. ¶ 32.)  The California PICs worked with Lovitt to assess the situation and proposed out-of-cycle adjustments for certain associates in California based on evolving market information.  (*Id.*)  The California PICs did not propose any out-of-cycle changes to Irvine compensation.  (*See id.*)

In 2016, the Managing Partner (Steve Brogan) asked office and regional PICs to review his suggested market adjustments and propose further adjustments that were appropriate. (Chase Decl. Ex. 2 at 4-9 (JD_02206287).)  The adjustments then proposed by the New York office, the Southern Region PIC (for Atlanta), and the California Region PIC (in consultation with office PICs)—which varied considerably from one another (*see* Coussons Decl. Ex. 1)—were all adopted as final.  (Laduzinski Decl. ¶ 41; Thomas Decl. ¶¶ 12-13; Lovrien Decl. ¶ 30.)

In June 2018, the rapidly changing market necessitated multiple rounds of review of the numbers long after they had originally been submitted by the PICs.  Given the short time left before the salary letters were due to be distributed, Shumaker and Lovitt worked with the PICs to assess the impact of recent developments in each local market and to develop revised numbers.  (Lovitt Decl. ¶ 27; Deane Decl. ¶ 23; Laduzinski Decl. ¶ 41; Lovrien Decl. ¶¶ 31-32; Thomas Decl. ¶ 14; *see also* Chase Decl. Ex. 4 (Lovitt Tr. 288:9-291:16).).

### C.    The Role of the Managing Partner.

The Managing Partner approves increases in starting salaries and determines the Firm's response to significant market-based compensation adjustments.  (Lovitt Decl. ¶ 27; *see* Chase Decl. Ex. 4 (Lovitt Tr. 56:7-8).)  He also can and sometimes does revise salaries of individual associates.  (Chase Decl. Ex. 4 (Lovitt Tr. 56:9-14).)  But the Managing Partner's limited role, in practice, is evidenced by Plaintiffs' own salary adjustments at Jones Day.  The six named Plaintiffs collectively experienced 29 pay adjustments while at the Firm.  Of these, 26 adjustments were the amounts recommended by the office PICs.  (Coussons Decl. Ex. 1 cols. U, X, AK, AN, BC, BF, BI, BK, BX, CA, CD, CE, CS, CV, CW, DO, DS, EJ, EO, rows 3-13.)  Of the remaining three:

- In June 2014, the PICs in New York and Atlanta recommended increases for their entire first year classes, including Henderson, but the Firm decided to postpone salary adjustments for the class of 2013 until January 2015.  (*Id.* ¶ 16 & Ex. 1 col. BC, rows 5, 16, 18, 20, 22, 24, 34, 44; Chase Decl. Ex. 8 at 6 (JD_02205007).)

- In June 2015, Shumaker proposed reducing Draper's compensation increase—and the compensation increases of two of Plaintiffs' male comparators—by $5,000. (*See* Coussons Decl. Ex. 1 col. BY, rows 3, 30, 42.)

- The Managing Partner initiated just one change: an upward market adjustment in June 2016 for Mazingo and the other associates in Irvine in the classes of 2014 and 2015, which the California PICs then affirmed.  (*Id.* col. CU, row 7;  Lovrien Decl. ¶ 30.)

## <u>LEGAL STANDARD</u>

<u>The Equal Pay Act.</u>  Plaintiffs assert claims under the EPA.  The EPA mandates "equal pay for equal work regardless of sex."  *Corning Glass Works v. Brennan*, 417 U.S. 188, 190 (1974). To establish a prima facie case, a plaintiff must show that "she was doing substantially equal work" as "members of the opposite sex," yet "was paid at a lower wage."  *Cornish v. Dist. of Columbia*, 67 F. Supp. 3d 345, 360 (D.D.C. 2014).  If that threshold showing is made, the employer can then defend against the claim by showing that the differential was attributable to four legitimate factors, including the catchall: "any other factor other than sex."  29 U.S.C. § 206(d)(1).

In light of that broad defense, the EPA effectively prohibits only *intentional* discrimination, not practices with a "disparate impact" on women.  *See Smith v. City of Jackson*, 544 U.S. 228, 239 n.11 (2005) (plurality op.) (describing EPA as a statute in which Congress "prohibit[ed] all disparate impact claims"); *Cty. of Washington v. Gunther*, 452 U.S. 161, 170 (1981); *Borrero v. Am. Exp. Bank Ltd.*, 533 F. Supp. 2d 429, 439 (S.D.N.Y. 2008).

<u>Collective Action Procedures.</u>  Because the EPA was codified as an amendment to the Fair Labor Standards Act ("FLSA"), claims under the statute are susceptible to collective action under the FLSA's procedures.  *See Kemp v. Target Corp.*, 2013 WL 5289799, at *2 (N.D. Ala. Sept. 18, 2013).  A collective action is a type of opt-in class procedure.  In "appropriate cases," where the plaintiff identifies a class of employees similarly situated to her, courts may conditionally certify a collective action.  *Galloway v. Chugach Gov't Servs., Inc.*, 263 F. Supp. 3d 151, 155 (D.D.C.

2017).  "In practical terms, this means that the Court may facilitate notice of the collective action to the potential plaintiffs and that the action proceeds throughout discovery as a representative action for those plaintiffs who opt-in."  *Id.*  After discovery, the court revisits whether the action can be tried on a collective basis, though each opt-in plaintiff must still prove her own case.  *Id.*

Certification, including conditional certification at the first stage, is discretionary, not an entitlement.  "District courts enjoy considerable discretion to decide whether and how collective actions should proceed and to fashion procedures for joining similarly situated employees in a manner that is both orderly and sensible."  *Id.*  In doing so, courts must bear in mind the purpose of a collective lawsuit: "to serve the interests of judicial economy through resolution in a single proceeding of claims stemming from common issues of law and fact."  *Bernard v. Household Int'l, Inc.*, 231 F. Supp. 2d 433, 435 (E.D. Va. 2002).  "The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity."  *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).

For that reason, if the claims by their nature present individualized inquiries that would obviate "the economy of scale envisioned by the FLSA collective action procedure," certification should be denied.  *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1274-75 (M.D. Ala. 2004).  After all, "it would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated."  *Adair v. Wisc. Bell, Inc.*, 2008 WL 4224360, at *4 (E.D. Wis. Sept. 11, 2008).  Courts must beware of "overreaching" that "would result in loss of the efficiencies."  *Rudd v. T.L. Cannon Corp.*, 2011 WL 831446, at *5 (N.D.N.Y. Jan. 4, 2011).

<u>The Requirement of a Common Illegal Policy.</u>  Consistent with this purpose, certification requires the plaintiffs to show "that they and potential opt-in plaintiffs together were victims of a

common policy or plan that violated the law." *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010). If there is such a common, illegal policy, then all of the employees who are victims of that policy are "similarly situated," 29 U.S.C. § 216(b), and collective adjudication of its legality makes sense. While Plaintiffs quibble about the precise measure of factual support that they must provide, they appear to accept the need to adduce some evidence of a common illegal policy. (Dkt. 118-1 at 34 (need to show "the named and potential plaintiffs together were victims of a common policy or plan that allegedly violated the law" (quoting *Galloway*, 263 F. Supp. 3d at 155)); *id.* at 35 (certification requires showing "a common policy or plan that violated the law" (quoting *Ebbert v. Nassau Cty.*, 2007 WL 2295581, at *2 (E.D.N.Y. Aug. 9, 2007))); *id.* at 36 (certification proper only if employees "were subject to the same allegedly unlawful policies" (quoting *Diaz v. S&H Bondi's Dep't Store*, 2012 WL 137460, at *6 (S.D.N.Y. Jan. 18, 2012))).)

In the FLSA context, prototypical examples of a common illegal policy include not paying required overtime for certain categories of work, or deducting meal breaks from employees' pay. These are common policies that typically apply in roughly the same manner across a defined set of employees and that allegedly violate the law. Most of the cases Plaintiffs cite involved those policies. *Galloway*, for instance, involved allegations that an employer compelled a category of employees (called residential advisors) "to work through meal breaks," to work "beyond their scheduled shifts," and to work more than 40 hours per week "without paying overtime wages." 263 F. Supp. 3d at 154; *see also id.* at 156-57.[8]

---

[8] *See also Blount v. U.S. Sec. Assocs.*, 945 F. Supp. 2d 88 (D.D.C. 2013) (overtime); *Chase v. AIMCO Properties, L.P.*, 374 F. Supp. 2d 196 (D.D.C. 2005) (same); *Bradley v. Vox Media, Inc.*, 2019 WL 1060804 (D.D.C. Mar. 6, 2019) (same); *Castillo v. P&R Enters., Inc.*, 517 F. Supp. 2d 440 (D.D.C. 2007) (same); *Harris v. Med. Transp. Mgmt., Inc.*, 317 F. Supp. 3d 421 (D.D.C. 2018) (same); *Hunter v. Sprint Corp.*, 346 F. Supp. 2d 113 (D.D.C. 2004) (same); *Meyer v. Panera Bread Co.*, 344 F. Supp. 3d 193 (D.D.C. 2018) (same); *Morris v. Lettire Const., Corp.*, 896 F.

By contrast, certification is inappropriate where individual violations do not share a link to a common illegal policy.  "Putative class members must share more than a *common allegation* that they were denied overtime or paid below the minimum wage.  The class members must put forth a *common legal theory* upon which each member is entitled to relief."  *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Or. 2002) (emphases added).  That means isolated or scattered examples of violations, without a common source, do not support certification.  *E.g.*, *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469, 477 (S.D.N.Y. 2010) (denying certification where plaintiffs, who were assistant managers in nine out of 820 stores nationwide, alleged that they performed non-exempt tasks contrary to written job requirements).  It also means that a plaintiff cannot "satisfy his burden on a conditional certification motion merely by showing that he was subject to an illegal application of a common legal policy."  *Jenkins v. TJX Cos.*, 853 F. Supp. 2d 317, 323 (E.D.N.Y. 2012).  Indeed, "granting conditional certification based solely on commonly applied lawful practices would make no logical sense," as it leaves no common issues for collective adjudication.  *Maestas v. Day & Zimmerman, LLC*, 2010 WL 11601189, *2 (D.N.M. Jan. 4, 2010).

In the context of the EPA, "[t]he inquiry required to determine both liability and damages" is "vastly more complex than say, calculating unpaid overtime for time spent by foundry workers showering and changing clothes at the end of a shift."  *Ahad v. Bd. of Trs. of S. Illinois Univ.*, 2019 WL 1433753, at *7 (C.D. Ill. Mar. 29, 2019).  Of course, that does not mean that EPA collectives cannot be certified.  Certification makes sense where, for example, women are assigned to one job category, while men are assigned to a different category with a higher pay scale, and the allegation

---

Supp. 2d 265 (S.D.N.Y. 2012) (same); *Myers*, 624 F.3d at 537 (same); *Spencer v. No Parking Today, Inc.*, 2013 WL 1040052 (S.D.N.Y. Mar. 15, 2013) (same); *Winfield v. Citibank, N.A.*, 843 F. Supp. 2d 397 (S.D.N.Y. 2012) (same); *Stephens v. Farmers Rest. Grp.*, 291 F. Supp. 3d 95 (D.D.C. 2018) (failure to pay minimum wage or overtime); *Freeman v. Medstar Health Inc.*, 187 F. Supp. 3d 19 (D.D.C. 2016) (meal breaks).

is that the two jobs are substantially equal.  *E.g.*, *Ebbert*, 2007 WL 2295581, at *1-2.  That was

the fact pattern in *Thompson v. Sawyer*, where female bindery workers argued that their jobs were

equal to those of higher-paid male bookbinders.  678 F.2d 257, 264-65 (D.C. Cir. 1982).

At the same time, certification is not suitable when plaintiffs point to pay differentials

suffered by particular employees without showing that those differentials stem from a common

illegal policy.  Unless the plaintiffs are challenging the lawfulness of a cross-cutting pay policy—

like a pay scale (*Ebbert*, 2007 WL 2295581, at *3)—there are no common issues to adjudicate,

only a set of individual claims involving plaintiffs who happen to be co-workers.  Certification is

not appropriate or sensible in such cases, as courts have recognized.  *E.g.*, *Rollins v. Ala. Cmty.*

*Coll. Sys.*, 2010 WL 4269133, at *12 (M.D. Ala. Oct. 25, 2010) (denying conditional certification

in EPA case that did not challenge common illegal policy); *Kemp*, 2013 WL 5289799, at *3 (same);

*see also Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 290 (S.D.N.Y. 2018) (decertifying EPA

collective where every opt-in plaintiff was challenging her own pay and the analysis of liability

and affirmative defenses was unavoidably individualized); *Ahad*, 2019 WL 1433753, at *8 (same).

Plaintiffs' Evidentiary Burden.  Importantly, a plaintiff needs more than *allegations* at the

certification stage—there must be evidence.  *Stephens*, 291 F. Supp. 3d at 105.  The amount of

evidence depends on the stage of the proceedings.  *Creely v. HCR ManorCare, Inc.*, 789 F. Supp.

2d 819, 826 (N.D. Ohio 2011).  Typically, plaintiffs move for conditional certification shortly after

filing suit.  At that point, the bar for certification "is not high," *Ayala v. Tito Contractors*, 12 F.

Supp. 3d 167, 170 (D.D.C. 2014), though it is "not invisible and cannot be based on the conclusory

allegations of a few employees," *Cartner v. Hewitt Assocs., LLC*, 2010 WL 1380037, at *3 (M.D.

Fla. Mar. 31, 2010).  Even at that earliest stage, a plaintiff must "provide factual support in the

form of pleadings, affidavits, deposition testimony, or other supporting documents."  *Reed v.*

*Empire Auto Parts, Inc.*, 2015 WL 761894, at *4 (D.N.J. Feb. 23, 2015).

Although Plaintiffs argue that this "modest" burden applies here, and hinge most of their arguments on that premise, the overwhelming weight of authority is to the contrary. "[N]either law nor logic supports rigidly applying the same standard of review at all points prior to discovery's close." *Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475, 481-82 (S.D.N.Y. 2016) (Furman, J.). "The rationale for the fairly lenient standard is that at the early stages of litigation, plaintiffs have not had time to conduct discovery and marshal their best evidence." *Davis v. Charoen Pokphand (USA), Inc.*, 303 F. Supp. 2d 1272, 1276 (M.D. Ala. 2004). "This rationale disappears, however, once plaintiffs have had an opportunity to conduct discovery with respect to defendant's policies and procedures." *Id.* "The Court cannot close its eyes to the amount of discovery already performed …." *Bunyan v. Spectrum Brands, Inc.*, 2008 WL 2959932, at *2-4 (S.D. Ill. July 31, 2008). Thus, "when the parties have been permitted to conduct some limited discovery to determine whether a class of similarly situated plaintiffs may exist," courts apply a more rigorous "intermediate standard." *Creely*, 789 F. Supp. 2d at 823-24.[9]

---

[9] *E.g.*, *Cross v. AMC Detroit, Inc.*, 2019 WL 2570371, at *3 (E.D. Mich. June 20, 2019) ("[T]he Court finds the parties had an ample opportunity to obtain substantial information about Defendant's policies and procedures and Plaintiffs' claims. Accordingly, the Court will employ the modest-plus standard and determine whether Plaintiffs advanced the ball down the field."); *Brown v. Barnes & Noble, Inc.*, 2018 WL 3105068, at *7 (S.D.N.Y. June 25, 2018) ("[T]he additional evidence obtained in discovery should show that it is more likely that a group of similarly situated individuals may be uncovered by soliciting opt-in plaintiffs...."); *McDermott v. Fed. Sav. Bank*, 2018 WL 1865916, at *5 (E.D.N.Y. Apr. 18, 2018) ("[W]here discovery has been conducted on the issue of conditional certification, the Court should consider all evidence relevant to that determination."); *Allen v. Hartford Fire Ins. Co.*, 2017 WL 3701139, at *6 (M.D. Fla. Aug. 25, 2017) ("[T]he Court deems it necessary to apply a more searching approach than the traditional, lenient conditional certification analysis."); *Sloane v. Gulf Interstate Field Servs., Inc.*, 2017 WL 1105236, at *7 (M.D. Pa. Mar. 24, 2017) ("Application of a more searching standard is nothing new in FLSA cases where discovery has already changed hands."); *Korenblum*, 195 F. Supp. 3d at 481-482 ("[T]he Court will look beyond the pleadings and affidavits submitted by Plaintiffs and will consider the evidence submitted by both parties, albeit with an understanding 'that the body

of evidence is necessarily incomplete.'"); *Byers v. Care Transp., Inc.*, 2016 WL 4771328, at \*3 (E.D. Mich. Sept. 14, 2016) ("It is this heightened standard that the Court will apply in deciding the pending conditional certification motion in this case."); *Boyd v. Schwebel Baking Co.*, 2016 WL 3555351, at \*4 (N.D. Ohio June 30, 2016) ("Where, as here, substantial discovery on the question of conditional certification has already taken place, courts have employed a standard that falls between the 'modest' showing required at the first step, and the more exacting showing required at the second step."); *Lankford v. CWL Investments, LLC*, 2014 WL 3956184, at \*4 (E.D. Mich. Aug. 13, 2014) ('When a plaintiff has been afforded the opportunity to conduct discovery, courts typically apply a heightened or more restrictive—but not stringent—standard."); *Bergman v. Kindred Healthcare, Inc.*, 949 F. Supp. 2d 852, 856 (N.D. Ill. 2013) ("Both sides' evidentiary submissions will be considered in determining whether there is a group of similarly situated employees who may be discovered by sending out an opt-in notice."); *Neff v. U.S. Xpress, Inc.*, 2013 WL 4479078, at \*3 (S.D. Ohio Aug. 20, 2013) ("[W]hen some, but not all, discovery has been undertaken relating to the issue of class certification, a heightened, but not stringent, standard must be applied."); *Bacon v. Eaton Aeroquip, LLC*, 2012 WL 6567603, at \*3 (E.D. Mich. Dec. 17, 2012) ("[T]his matter is beyond the initial stage, necessitating a more exacting review of Plaintiffs' factual support for granting class certification."); *Luksza v. TJX Companies, Inc.*, 2012 WL 3277049, at \*9 (D. Nev. Aug. 8, 2012) ("[T]he Court will review Plaintiffs' allegations and affidavits in conjunction with the evidence obtained through discovery and apply a heightened standard."); *MacGregor v. Farmers Ins. Exch.*, 2012 WL 2974679, at \*3 (D.S.C. July 20, 2012) ("Since plaintiffs rely on evidence recovered during discovery to provide the basis for the alleged unwritten policy violating the FLSA, it would be inequitable to allow plaintiffs to proceed with the more lenient standard applied in cases where the parties have not yet begun discovery."); *Wheeler v. City of Detroit*, 2012 WL 1119300, at \*3 (E.D. Mich. Apr. 3, 2012) ("In the instant case, Plaintiff has been afforded some opportunity to conduct discovery. Therefore, although his burden in seeking conditional certification is still lenient, Plaintiff must show at least modest factual support for his proposed class."); *McClean v. Health Sys., Inc.*, 2011 WL 6153091, at \*4-5 (W.D. Mo. Dec. 12, 2011) ("The Court believes the intermediate approach … is appropriate here given the status of the litigation."); *Blaney v. Charlotte–Mecklenburg Hosp. Auth.*, 2011 WL 4351631, at \*5 (W.D.N.C. Sept. 16, 2011) ("[T]he Court will apply the 'intermediate' approach which allows for the Court to determine whether a sound basis exists for proceeding as a collective action while also considering all evidence available at the time."); *Creely*, 789 F. Supp. 2d at 826-27; *Bowman v. Crossmark, Inc.*, 2010 WL 2837519, at \*5 (E.D. Tenn. July 19, 2010) ("[A] more demanding standard is applied after considerable discovery has been conducted, and this review standard includes a consideration of the factors employed at the second or decertification stage of the analysis."); *Pacheco v. Boar's Head Provisions Co., Inc.*, 671 F. Supp. 2d 957, 960 (W.D. Mich. 2009) ("Where the plaintiffs have been afforded discovery …, courts typically apply a more restrictive, but still lenient standard ...."); *Valcho v. Dallas Cty. Hosp. Dist.*, 574 F. Supp. 2d 618, 622 (N.D. Tex. 2008) ("[T]he court has less cause for leniency during the 'notice' phase of the analysis where a plaintiff has already conducted discovery on the certification issue."); *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 894 (N.D. Iowa 2008) (agreeing with "argument that a more demanding standard should be required of Plaintiffs at this point"); *Bunyan*, 2008 WL 2959932, at \*2-4 (stating that in light of discovery taken, "the Court's analysis proceeds under the intermediate approach"); *Jimenez v. Lakeside Pic–N–Pac, L.L.C.*, 2007 WL 4454295, at

As noted above, discovery to date in this case has been more than "limited": Jones Day has produced over 2 million pages of documents and presented three days of Rule 30(b)(6) testimony addressed to the issues of associate evaluation and pay and the Firm's management and structure. *Supra* at p.4 (listing topics). "Since plaintiffs rely on evidence recovered during discovery …, it would be inequitable to allow plaintiffs to proceed with the more lenient standard applied in cases where the parties have not yet begun discovery." *MacGregor*, 2012 WL 2974679, at *3.[10]

---

*2 (W.D. Mich. Dec. 14, 2007) ("[W]here the parties have had an opportunity to conduct pre-certification discovery, courts tend to hold plaintiffs to a higher standard of proof."); *Villanueva–Bazaldua v. TruGreen Ltd. Partners*, 479 F. Supp. 2d 411, 415 (D. Del. 2007) ("District courts in other circuits have adopted an intermediate approach to the 'similarly situated' inquiry when the parties voluntarily engage in discovery prior to a decision on conditional certification."); *Harris v. Fee Transp. Servs., Inc.*, 2006 WL 1994586, at *3 (N.D. Tex. May 15, 2006) ("But where the parties have had the opportunity to conduct discovery on the issue of certification, the similarly situated inquiry is more stringent."); *Basco v. Wal–Mart Stores, Inc.*, 2004 WL 1497709, at *4 (E.D. La. July 2, 2004) ("[I]n light of the substantial discovery that has occurred in this matter, the Court will consider the criteria for both the first and second steps in deciding whether it should certify this matter."); *Davis*, 303 F. Supp. 2d at 1276 ("[A] more searching standard of review is appropriate."); *Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 548 n.1 (E.D. Mich. 2004) (stating that because "[t]he Court … has afforded Plaintiffs a period of discovery …. the Court is applying the more restrictive standard"); *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1313 n.2 (M.D. Ala. 2002) (stating in light of discovery taken, "the court deems it necessary to carefully consider the submissions of the parties with respect to the class allegations, rather than merely relying on the handful of affidavits that support White's position"); *Thiessen v. Gen. Elec. Capital Corp.*, 996 F. Supp. 1071, 1081 (D. Kan. 1998) (adopting an "intermediate" approach in analyzing the "similarly situated" issue where the parties had engaged in three months of discovery); *Ray v. Motel 6 Operating Ltd.*, 1996 WL 938231, at *4 (D. Minn. Mar. 18, 1996) (applying a more stringent standard at the initial stage because "the facts before the Court are extensive"); *Brooks v. Bellsouth Telecomm., Inc.*, 164 F.R.D. 561, 568-69 (N.D Ala. 1995) (finding that a three month period for discovery was extensive enough to prompt the second stage of the analysis).

[10] Plaintiffs insist on "an inflexible burden of proof that is incapable of being increased in proportion to the discovery conducted." *Korenblum*, 195 F. Supp. 3d at 482. But, as shown, the weight of authority is otherwise, and many of Plaintiffs' cited cases (Dkt. 118-1, at 34 n.26) do not support their position. In *Freeman v. MedStar Health Inc.*, the court found "no basis to apply a heightened legal standard" because it was the *defendants* who had sought the discovery to respond to the conditional certification motion, "which had already been filed." 187 F. Supp. 3d 19, 28-29 (D.D.C. 2016). Here *Plaintiffs* sought discovery, and rely on it in their amended motion. Plaintiffs also cite a few cases from the Southern District of New York but, as *Korenblum* noted, "even where courts in this Circuit have ostensibly declined to increase scrutiny after some discovery has

In applying the intermediate standard, courts compare the plaintiffs' "allegations set forth in their Complaint with the factual record assembled through discovery . . . to determine whether [they] have made sufficient showing beyond their original allegations that would tend to make it more likely that a class of similarly situated employees exists." *Creely*, 789 F. Supp. 2d at 827; *see also Valcho*, 574 F. Supp. 2d at 623 ("[B]ecause the court does not intend that its powers be used for a frivolous fishing expedition, it will hesitate to facilitate notice where a plaintiff, having already conducted discovery, still cannot support her claim with evidence."). Said differently, "the Court will review whether Plaintiffs have advanced the ball down the field" such that "soliciting opt-in plaintiffs" is likely to be fruitful. *Creely*, 789 F. Supp. 2d at 827.

Predominance of Individualized Issues. In applying the intermediate standard, courts also give consideration to factors that govern the analysis at the second stage of the process, such as whether individual issues predominate on the merits. *Id.* at 824; *e.g.*, *Brooks*, 164 F.R.D. at 569 (denying certification where court "would be faced with numerous individualized defenses"). Where individual issues predominate, it makes no sense to certify, as any benefits of adjudicating common issues would be outweighed by the need to conduct mini-trials on each individual claim. *See Lusardi v. Xerox Corp.*, 122 F.R.D. 463, 467 (D.N.J. 1988) ("Manageability of a jury trial in which there would be more than 1300 separate trials would not be possible.").[11]

_____

taken place, they have considered the evidence obtained in discovery" and thus were, "at least tacitly, applying a more stringent test." 195 F. Supp. 3d at 481.

[11] *E.g.*, *Sloane*, 2017 WL 1105236, at *16-17 ("Because the applicable exemptions hinge on whether each Plaintiff received a salary, the Court will necessarily need to inquire into the individual employment agreements, pay letters, and economic realities."); *Purdham v. Fairfax Cty. Pub. Schs.*, 629 F. Supp. 2d 544, 550 (E.D. Va. 2009) (finding claims "not appropriate for a collective action" because "the Court will likely need to make an individual determination as to whether the amount paid to each non-exempt employee who provides coaching services is 'nominal'"); *Harris*, 2006 WL 1994586, at *4 ("The different classifications and varying job duties would require Defendants to present a highly individualized defense for each plaintiff's claims.");

Predominance of individualized inquiries can prove to be a particularly serious obstacle in EPA cases.  In *Ahad*, for example, the court explained, in decertifying a collective, that "the highly individualized process used to determine compensation will necessarily require Defendants to present individualized evidence as to each Plaintiff in order to show that 'any other factor other than sex' accounts for the differential in compensation."  2019 WL 1433753 at *8; *see also Collins v. Family Dollar Stores, Inc.*, 2006 WL 8437440, at *4 (N.D. Ala. Dec. 8, 2006) (decertifying EPA collective because too many individuals played role in pay decisions); *Kassman*, 416 F. Supp. 3d at 288 (decertifying collective because there was no "uniform causal mechanism for determining pay and promotion operating across the Proposed Collective," meaning "there are likely 1,100 defenses to justify why the 1,100 Opt-Ins were paid as they were").

*      *      *

Conditional certification is not the time to resolve genuine factual disputes or adjudicate the legality of the employer's challenged policies.  But, particularly if meaningful discovery has already occurred, it *is* the time to test whether the plaintiffs have adduced sufficient evidence to show that there are employees who were similarly affected by an illegal policy and that proceeding as a collective would promote the values of judicial economy and efficiency.

---

*Holt*, 333 F. Supp. 2d at 1274-75 (denying certification because "the court would have to inquire ... as to the daily tasks of each putative collective action member to determine whether they are similarly situated to the persons identified by the Plaintiffs, and then, on the merits, whether they had suffered an FLSA violation"); *see also Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220-21 (D. Conn. 2003) ("Because the proof in this case is specific to the individual, Mike has not provided evidence of a common thread binding his proposed class of employees."); *Aguirre v. SBC Commc'ns, Inc.*, 2006 WL 964554, at *7 (S.D. Tex. Apr. 11, 2006) (denying conditional certification where differences among potential plaintiffs predominated over their similarities); *Reich v. Homier Distributing Co.*, 362 F. Supp. 2d 1009, 1013-14 (N.D. Ind. 2005) (refusing to conditionally certify where defendant's liability to any particular plaintiff would depend on a set of facts specific to that individual); *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000) ("[M]any specific dissimilarities between the job duties of the name plaintiffs and the opt-in plaintiffs [ ] make certification as a collective action inappropriate.").

## **ARGUMENT**

This case is not appropriate for certification.  At the threshold, no individual Plaintiffs have viable claims under the EPA.  This Court held that three of the six Plaintiffs had *alleged* plausible claims by pointing to male associates who allegedly earned more than they did for equal work. (Dkt. 110 at 69-71.)  But, for the reasons set forth in Jones Day's motion for summary judgment on Count IV, the undisputed facts necessarily foreclose those claims.  At minimum, the record at this stage does not suffice to carry Plaintiffs' burden of establishing that *any* violations occurred. That is reason enough to deny the motion for conditional certification.  *See Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 78 (2013) ("[W]e conclude that respondent [whose FLSA claim was moot] has no personal interest in representing putative, unnamed claimants.").  It goes without saying that "it does not promote efficient case management to facilitate notice to potential class members where the representative plaintiffs have failed to state plausible ... violations." *Boutros v. JTC Paint. & Dec. Corp.*, 2013 WL 3110943, at *4 (S.D.N.Y. June 19, 2013).

Assuming *arguendo*, however, that Henderson, Draper, or Williams has adduced enough evidence to suggest that they were paid less than male associates for equal work, certification is still inappropriate because their claims do not even share a common legal theory *with one another*, let alone with the hundreds of other female associates nationwide.  Plaintiffs have not identified, much less provided any evidence showing, a common illegal policy affecting female associates at the Firm.  Rather, they have shown—at most—three scattered instances of pay differentials arising from three distinct sets of decision-makers exercising discretion to apply individualized, sex-neutral criteria.  Certification makes no sense in this setting.  And even if no illegal policy were required, Plaintiffs have not done even the bare minimum of showing that other women were also victims of EPA violations.  Their innuendo and attenuated inferences can no longer carry the day.

I.   **CERTIFICATION IS INAPPROPRIATE BECAUSE PLAINTIFFS DO NOT IDENTIFY, MUCH LESS PROVE, A COMMON ILLEGAL POLICY AFFECTING THE PUTATIVE COLLECTIVE.**

As explained above, certification is appropriate if there are "similarly situated" employees, and courts have construed "similarly situated" to mean employees whose claims share a common legal theory, such as by challenging a common policy that violates the law. *See supra* at 17-20. That does not exist here. The only thing that links the EPA claims of the putative collective is that each of its members was employed by Jones Day. That is not enough. The putative collective members need "more than a common *allegation*"; they need "a common *legal theory*" that will link "each member." *Sheffield*, 211 F.R.D. at 413 (emphases added). Yet Plaintiffs cannot and do not show that Jones Day's "process" for setting associate compensation—a multi-stage individualized process that draws on input from hundreds of different lawyers, depending on the associate's office, practice, seniority, and work—runs afoul of the EPA. Individual unlawful *outcomes*, even if they could be shown, do not warrant certification, as they do not present common questions. *See Jenkins*, 853 F. Supp. 2d at 323 (plaintiff cannot "satisfy his burden on a conditional certification motion merely by showing that he was subject to an illegal application of a common legal policy").

A.   To recap, the record shows that associate compensation adjustments at Jones Day are made after a lengthy, careful evaluation process that integrates input from many different lawyers around the Firm. In a typical year:

- *First*, every supervisor who worked with the associate during the prior year grades the associate on a host of sex-neutral and appropriate job-related metrics and provides a narrative review of the associate's performance.

- *Second*, the associate's practice group assigns the associate a rating from 1 to 5, and for more senior associates, also ranks the associate within a seniority band. In determining ratings and rankings, practice groups use different procedures and rely on different groups of partners.

- *Third*, the practice drafts an "assessment statement" to capture the associate's performance during the prior year. This assessment is designed to be conveyed to the associate during an in-person review. Again, each practice has its own system for developing, drafting, and editing these statements, and relies on different sets of partners to prepare them, and different partners to review them, including through meetings of different review committees, to gather feedback from a diverse and variable set of partners.

- *Fourth*, in parallel, each office develops its own independent ratings (from 1 to 5) and rankings (for more senior associates). Each office PIC has discretion in how to generate these ratings and rankings and uses a different process to do so.

- *Fifth*, regional leadership may have input into the office ratings and rankings. In California, the Regional PIC and the PICs and APs of all five offices meet to discuss and review all of the associates in the region. For Atlanta associates, the Southern Regional PIC shares her views with the office PIC. In all cases, the office PIC has final authority over office ratings and rankings.

- *Sixth*, each office PIC recommends a pay adjustment for each associate, based on individual performance, market factors, and the compensation budget allotted by the Firm. In doing so, each office follows its own unique procedures and is guided by its PIC's discretion in choosing how to best allocate the funds allotted.

- *Seventh*, depending on the office, regional leadership may have input into the PIC's compensation recommendations. In California, the regional PIC and the PICs and APs of all five offices meet to discuss the compensation recommendations for all associates in the region. But again, the PIC determines the numbers to submit.

- *Eighth*, Shumaker and (since late 2016) Lovitt review the office PIC recommendations and can suggest revisions.

- *Ninth*, the Managing Partner reviews the adjustments and, although he too can revise them, he defers to the PIC recommendations in the vast majority of cases.

- *Finally*, the adjustments are sent back down the chain, ultimately to the PICs, who have another opportunity to review and challenge any change they disagree with.

*See supra* at 4-14. Even this "typical" process can vary significantly from year to year. In two of

the three years within the limitations period—2016 and 2018—there were major market shifts in

June that resulted in yet another review and revision to compensation numbers. In June 2016, the

varied market-adjusted proposals submitted by office and regional leadership for California, New

York, and Atlanta were all adopted as final. In 2018, Lovitt and Shumaker worked with the office

and regional PICs to revise compensation numbers in affected markets. *See supra* at 14-15.

Plaintiffs cannot argue that any aspect of this process—and even calling it a "process" just masks the countless ways in which it varies by associate—itself runs afoul of the EPA. This is not like a challenge to a policy, written or *de facto*, that allegedly deprives a class of employees of overtime pay or the minimum wage contrary to the FLSA. *See supra* at 17-20. Nor is it like an EPA challenge to a pay scale that is lower for a female-dominated job type than a male-dominated analogue, and where the equality of the two jobs can be compared across the board. *E.g.*, *Ebbert*, 2007 WL 2295581, at *1-2; *Thompson*, 678 F.2d at 264-65. Rather, Jones Day operates a sex-neutral, merit-based, individualized compensation model that is lawful on its face. Plaintiffs never claim otherwise; their objection is that, as *applied* to them (and allegedly unknown others), it generated pay differentials that allegedly cannot be justified by factors other than sex. (*E.g.*, Dkt. 118-1 at 8 (arguing that differentials "resulted from" Firm's process for setting associate pay).)

To be sure, that allegation might state an individual claim under the EPA, but it is not appropriate for certification, because the legality of the pay policy is not at issue—only the legality of particular, individual outcomes that are influenced and controlled by a large and highly variable group of lawyers exercising their discretion to weigh a large set of objective and subjective factors. Given the individualized nature of the evaluation and compensation process, and the differences (from office to office, practice to practice, year to year, and associate to associate) in both *how* the process occurs and *who* plays a role in it, there is no way to conclude that any pay differentials arise from a common illegal policy. Plaintiffs do not share a common *legal theory*; they are merely pursuing claims under the same *statute* against the same *employer*. That does not warrant certification. *See Sheffield*, 211 F.R.D. at 413; *Guillen*, 750 F. Supp. 2d at 477; *Jenkins*, 853 F. Supp. 2d at 323; *Collins*, 2006 WL 8437440, at *4; *see also Kassman*, 416 F. Supp. 3d at 288.

Notably, the sets of decision-makers for the three Plaintiffs (aside from the three Firm-wide leaders who review all pay adjustments, discussed below) are distinct: Each of the three worked in a different office, in a different practice, and for different supervisors.  Different lawyers wrote their reviews, drafted their assessment statements, rated and ranked them, and recommended their pay adjustments.  Accordingly, even the three Plaintiffs do not share a common legal theory.  *A fortiori*, they cannot make the requisite showing that the collective—every female associate at every Jones Day office in the U.S. since 2016—was affected by a common illegal policy.

**B.**     In an effort to establish a common legal theory, Plaintiffs argue that Jones Day's compensation system is "centralized" due to review of all associate pay adjustments by Shumaker, Brogan, and in later years, Lovitt.  They say all members of the collective "challenge the same centralized compensation policy set by managing partner Brogan." (Dkt. 118-1 at 11.)  They argue that this "centralized compensation policy" is what ties together their claims and warrants certification of the claims for collective adjudication.  (*Id.* at 40.)  Plaintiffs' "centralization" theory is both legally and factually meritless.

To start, "centralization" is not even *allegedly* illegal under the EPA.  As Plaintiffs' own cited cases say, the employees must base their claims on "a common policy or plan that *allegedly violated the law*."  *Galloway*, 263 F. Supp. 3d at 155 (emphasis added); *see also Ebbert*, 2007 WL 2295581, at *2 (requiring "common policy or plan *that violated the law*" (emphasis added)); *Diaz*, 2012 WL 137460, at *6 (employees must be subject to "the same allegedly *unlawful* policies" (emphasis added)).  Indeed, "granting conditional certification based solely on commonly applied lawful practices would make no logical sense."  *Maestas*, 2010 WL 11601189, at *2.

At a meaninglessly high level of generality, all associates at Jones Day have their pay set using the same general "process."  But that is irrelevant unless that process itself (as opposed to

particular outcomes resulting from it) is unlawful.  Every employer has *some* process for setting compensation, even if it is literally pulling a number out of a hat.  If that were enough to warrant certification once one employee alleges a disparity, every EPA suit would be certified.  Yet "the mere fact that violations occurred cannot be enough to establish similarity."  *Barron v. Henry Cty. Sch. Sys.*, 242 F. Supp. 2d 1096, 1104 (M.D. Ala. 2003).  Much of Plaintiffs' brief—arguing that all Jones Day lawyers evaluate associates using the same criteria, that all practice groups write assessment statements, that all PICs look to "professional achievement, productivity and potential for meaningful growth" to inform pay recommendations, and that all PICs use the same worksheets to record those recommendations (Dkt. 118-1 at 12-17)—is therefore entirely beside the point.

There is no basis, moreover, to believe that Lovitt, Shumaker, or Brogan were engaged in systematic, discriminatory reductions of female associate pay.  Plaintiffs did not even allege such discrimination, let alone offer evidence of it,[12] and speculation cannot carry their burden, certainly under the intermediate standard but even under the "modest" threshold standard.  *See Munoz v. Big Valley, Inc.*, 915 F. Supp. 2d 46, 49 (D.D.C. 2013); *Dinkel v. MedStar Health, Inc.*, 880 F. Supp. 2d 49, 52-53 (D.D.C. 2012); *Creely*, 789 F. Supp. 2d at 831-32.  Indeed, despite extensive discovery, Plaintiffs offer *no* evidence suggesting that *any* unjustified sex-based pay differentials exist at Jones Day (*infra* Part III)—and certainly no evidence to suggest that any unjustified

---

[12] Plaintiffs claim that the "record is replete with evidence of gender discrimination by firm management" (Dkt. 118-1 at 18) but they do not identify a single such incident or action involving Brogan, Shumaker, Lovitt or any partner with decision-making authority over compensation. Continuing their effort at misdirection, Plaintiffs assert that "only three of 13 members of the Partnership Committee were female partners" in October 2017, but the Partnership Committee has no role in associate compensation.  (*See* Lovitt Decl. ¶¶ 20-25.)  Compensation decisions during the relevant time period were made by female PICs in 8 of the 18 U.S. offices and by the female Regional PIC for the Southern Region. (Lovitt Decl. ¶ 10; Thomas Decl. ¶¶ 8-9.) And even in offices with male PICs, female partners have often participated in the associate compensation process.  Deane Decl. ¶ 19  (female AP in Atlanta); Laduzinski Decl. ¶¶ 18, 26-27 (New York compensation committee included two men and two women).

disparities that may (hypothetically) exist stem from the "centralized" actions of Lovitt, Shumaker, or Brogan, as opposed to any other of the countless inputs into the system.  The Court cannot certify claims based on the common legal theory of "centralization" without *any* evidence that alleged pay differentials were attributable to intentional discrimination at the "centralized" level.

In fact, the record affirmatively *refutes* the notion that associate pay decisions are dictated by the Managing Partner, or even by Lovitt or Shumaker.  Performance evaluations (upon which compensation is principally based) are controlled by the practice groups, without any input from the Managing Partner.  *Supra* at 6-8.  Associate pay is determined in the first instance by office PICs, based on procedures and priorities that the PICs select.  *Supra* at 11-14.  Their recommended adjustments are reviewed by Lovitt and Shumaker and then by the Managing Partner.  But, as any court of appeals will confirm, *review* is not the same as *first-instance decision-making*.

Indeed, Jones Day produced documents reflecting all of the pay adjustments for all six named Plaintiffs during their tenures at the Firm—29 pay adjustments in total.  Of those, the office PICs' recommendations were implemented on 26 occasions—nearly 90% of the time.  (*Supra* at 15-16; *see also* Cottriel Decl. ¶ 34; Deane Decl. ¶ 26.)  Draper and Henderson each had their proposed adjustments reduced once; Mazingo had hers increased once as a result of the 2016 market adjustment for her class in Irvine.  *Supra* at 15-16.  In Henderson's case, the change was because the Firm declined, across the board, to increase the salary of associates who had just started the prior fall.  (Coussons Decl. ¶ 16; Chase Decl. Ex. 7 at 6 (JD_02205007).)  If anything, this evidence confirms the principal role of the PICs in determining associate pay.

As evidence that the Managing Partner is "meaningfully involved" in pay, Plaintiffs cite an exhibit showing that, for the San Diego office, the PIC's recommended pay adjustments for 2017 were approved as to *all but one* associate.  (CCM Ex. EE.)  Another of their exhibits shows

just a *single* change to the pay recommendations in Irvine—for Plaintiff Tolton.  (CCM Ex. BB.)
In fact, that change—recommended by Shumaker and accepted by the Managing Partner—was
not ultimately made, proving that even "final" numbers emerging from the "centralized" review
are subject to push back from office leaders.  (*Compare* CCM Ex. BB at 3 (showing proposed
reduction from \$225K to \$200K), *with* Dkt. 41 at 14 (TAC ¶ 45) (showing Tolton's pay for 2017-
18 was instead kept at \$225K), *and* Coussons Decl. Ex. 1 cols. DO-DS, row 11.)  This all *refutes*
Plaintiffs' theory.

As a factual matter, therefore, Plaintiffs' theory cannot support certification, because the
record shows that pay decisions are largely driven by discretion exercised at the local level, and
there is no evidence that revisions at the firmwide level are to blame for any (still-hypothetical)
sex-based inequities.  There is therefore no common, illegal policy to tie together the claims of the
putative collective.  *See Kuznyetsov v. West Penn. Allegheny Health Sys.*, 2011 WL 6372852, at
\*6 (W.D. Pa. Dec. 20, 2011) (rejecting certification where "individual supervisors had discretion"
over how to apply meal-break policy); *Purdham*, 629 F. Supp. 2d at 549 (denying certification
where individual schools had discretion over pay); *Blaney*, 2011 WL 4351631, at \*7 (denying
certification when it turned out that "many of the alleged common policies the Plaintiffs complain
of are actually left to the decentralized discretion of the individual units").

## II.   CERTIFICATION IS INAPPROPRIATE BECAUSE INDIVIDUAL ISSUES WOULD OBVIOUSLY PREDOMINATE IN THE ADJUDICATION OF INDIVIDUAL EPA CLAIMS.

Even if Plaintiffs could identify the existence of "similarly situated" women at some level
of abstraction, certifying a collective action would make no sense in this situation.  Where "claims
require significant individual determinations and considerations, they are inappropriate for
conditional certification."  *Hinojos v. Home Depot, Inc.*, 2006 WL 3712944, at \*2 (D. Nev. Dec.
1, 2006); *see also Russell v. Ill. Bell Tel. Co.*, 721 F. Supp. 2d 804, 822 (N.D. Ill. 2010) ("A

collective action is oxymoronic ... where proof regarding each individual plaintiff is required to show liability."). Here, every individual associate's EPA claim will eventually—and necessarily—rise or fall based on an individualized inquiry into that associate's work, her reviews, her hours, her contributions to the Firm, and her compensation, as compared to the work, reviews, hours, contributions, and compensation of similarly situated male associates. The analysis is entirely individualized; there are no common issues that would advance the ball for all members of the putative collective.

Again, an EPA plaintiff must start by identifying a "virtually identical" man who did "equal work" but was paid more than her. *Spencer v. Va. State Univ.*, 919 F.3d 199, 203 (4th Cir. 2019). Doing so might be easy where large sets of laborers perform interchangeable work. But at a global, multidisciplinary law firm, identifying a comparator necessarily requires a highly individualized analysis. *Cf. id.* at 204 ("Professors are not interchangeable like widgets."); *see also EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 257 (2d Cir. 2014) (rejecting notion that "an attorney is an attorney is an attorney" as "not cognizable under the EPA"). Next, the defendant can prevail by proving that the pay differential was attributable to a factor other than sex, including "subjective factors." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 575-76 (D.C. Cir. 2010). Again, this might be easy to do *en masse* when workers are paid according to a fixed scale or formula. *E.g.*, *Thompson*, 678 F.2d at 276-77. But at a firm like Jones Day, where associate pay is non-lockstep and office PICs rely on evaluations, two parallel sets of ratings and rankings, narrative assessments, billable hours, pro bono work, contributions to the Firm, seniority, market factors, and many other considerations, this showing can be conducted only on an associate-by-associate basis. *See Port Auth.*, 768 F.3d at 257 (rejecting categorical comparisons in context of employer "that does not employ a lockstep pay model"). There is no alternative to individualized comparisons of associates.

34

This case is thus analogous to those in which employees argued that, despite their formal written job descriptions, their actual work did not exclude them from FLSA overtime protections. Adjudicating such a claim "is extremely individual and fact-intensive," and "precludes proceeding on a collective basis." *Mike*, 274 F. Supp. 2d at 220-21. Because each employee's claim would "turn upon evidence relating to [that employee's] day-to-day tasks, and not upon any [employer] company policy," "[t]here is no way for the court to conclude that resolution of the claims of many plaintiffs at the same time would be sensible." *Id.*; *see also Guillen*, 750 F. Supp. 2d at 476-80; *Morisky*, 111 F. Supp. 2d at 499 (refusing to certify where "[d]etermining whether an employee's duty is administrative or productive ... is extremely individual and fact-intensive").

The problems with certifying here are even more profound, as literally *every* associate's compensation is the product of a distinct and individualized process that accounts for a long list of subjective and objective considerations. "[T]he highly individualized process used to determine compensation will necessarily require Defendants to present individualized evidence as to each Plaintiff in order to show that 'any other factor other than sex' accounts for the differential in compensation." *Ahad*, 2019 WL 1433753, at *8. That makes collective treatment impractical.

The experience of the federal courts in handling similar claims is instructive. Plaintiffs repeatedly cite *Kassman v. KPMG LLP*, where the court initially granted conditional certification in an EPA case involving a merit-based compensation system. (Dkt. 118-1 at 28 n.22, 33 n.25, 36, 37, 38, 46 n.33, 47 (citing 2014 WL 3298884 (S.D.N.Y. July 8, 2014).) More telling, though, is the court's later, published, thoroughly reasoned decision *decertifying* the collective, which Plaintiffs never even mention. As the court then explained, "there is no (non-discretionary) uniform causal mechanism for determining pay and promotion operating across the Proposed Collective," and so "there are likely 1,100 defenses to justify why the 1,100 Opt-Ins were paid as

they were." *Kassman*, 416 F. Supp. 3d at 288.  Accordingly, "[a]djudicating the claims of the proposed collective in a single action would give rise to obvious procedural difficulties and could not assure fair treatment of any party involved." *Id.*  The court elaborated:

> [I]f the Proposed Collective were certified, it would be necessary to: (1) match the Opt-Ins with 1,100 unique proposed male comparators; (2) adjudicate approximately 1,100 "equal work" questions and only then (3) turn to any individualized defenses KPMG might raise with respect to specific Opt-Ins (e.g., poor performance reviews). Such an undertaking is impractical if not impossible.

*Id.* at 290.  Indeed, Jones Day is not aware of a single case—and Plaintiffs do not cite any—that actually adjudicated, on a collective basis, EPA claims challenging individualized pay decisions. For good reason: As *Kassman* recognized, doing so "is impractical if not impossible." *Id.*

At points, Plaintiffs appear to suggest that this problem can be circumvented because "all associates at Jones Day perform substantially equal work." (Dkt. 118-1 at 28.)  If that were true— if *all* associates at the Firm perform "equal work"—then identical salaries would be mandated by law, and performance-based (and seniority-based) pay would be illegal in all law firms.  Plaintiffs cite nothing for that novel proposition; the law is otherwise.  Lawyers do not all do interchangeable work.  *Port Auth.*, 768 F.3d at 257 (rejecting theory that "an attorney is an attorney is an attorney"). This Court has held as much. (Dkt. 110 at 68 (rejecting allegation that "associates all perform substantially similar work").)  And the EPA, by its very terms, authorizes disparate pay based on individualized factors—indeed, "any other factor other than sex."  29 U.S.C. § 206(d)(1).

Predictably, Plaintiffs also argue that the Court should simply kick the can down the road, by ignoring the predominance of individual inquiries until the decertification stage.  (Dkt. 118-1 at 39-40.)  There is no reason to be so short-sighted.  "[I]t would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly

situated." *Adair*, 2008 WL 4224360, at *4. That is why even "conditional certification may be inappropriate where defendants' liability to each putative class member turns on individualized questions." *Stephens*, 291 F. Supp. 3d at 106. Here, discovery is already far enough along that the unworkability of collective adjudication, as in *Kassman*, is patent, and inviting opt-ins would be a fool's errand. *Creely*, 789 F. Supp. 2d at 826 ("judicial efficiency" calls for court to consider, before close of discovery, "factors commonly considered under stage two").[13]

Ultimately, courts must use their "considerable discretion" in determining which cases are "sensible" for conditional certification. *Galloway*, 263 F. Supp. 3d at 155. It is clear as day that the claims in this case are not, and never will be, suitable for collective adjudication.

### III. PLAINTIFFS FAIL TO MAKE EVEN A MODEST FACTUAL SHOWING THAT THERE EXIST OTHER SEX-BASED PAY DIFFERENTIALS AT JONES DAY.

Even looking past Plaintiffs' failure to identify a common illegal policy, and even assuming that Henderson, Draper, or Williams has a viable claim,[14] Plaintiffs' motion still fails because they identify no evidence to suggest that any other female associates are paid less than men for equal work. Yet that—a showing that "similarly situated" women "do in fact exist," *Myers*, 624 F.3d at 555—is the "bare minimum" for certification. *Stephens*, 291 F. Supp. 3d at 116-17.

---

[13] Contrary to their assertion (Dkt. 118-1 at 39), *Galloway* does not support Plaintiffs on this point. The Court there could not conclude "on the present record" that "individualized issues necessarily so permeate the claims as to render collective action inappropriate." 263 F. Supp. 3d at 158. On *this* record, by contrast, there is no *avoiding* that conclusion. Plaintiffs also cite a few other decisions (Dkt. 118-1 at 39), but none was applying the intermediate standard that governs here. *E.g.*, *Meyer*, 344 F. Supp. 3d at 211 ("discovery has not commenced"); *see also supra* at n.10 (discussing *Freeman* on this point).

[14] Again, the failure of these three Plaintiffs' claims is addressed in Jones Day's summary judgment motion. Insofar as Plaintiffs rely, in their certification motion, on the fact that Henderson did not obtain a pay increase in January 2015—long before the EPA limitations period—that does not support their theory, because they acknowledge that she was the "only" associate in her class in New York who did not get a raise. (Dkt. 118-1 at 20.) That makes it impossible to attribute the resulting pay differential to Henderson's gender. The numerous other female associates in her class in New York all got a raise.

A.      Before considering the "evidence" that Plaintiffs do proffer, it is worth observing what they *do not* provide.  More than fifteen months after filing their first Complaint, and despite high-profile coverage throughout the legal press, Plaintiffs have *zero* declarations from putative opt-in plaintiffs.  Such declarations are often presented in significant numbers when plaintiffs seek to certify collectives as large as this one.  *E.g.*, *Fisher v. Mich. Bell Tel. Co.*, 665 F. Supp. 2d 819, 822 (E.D. Mich. 2009) (conditionally certifying based on declarations from 67 putative opt-ins); *Bradford v. Logan's Roadhouse, Inc.*, 137 F. Supp. 3d 1064, 1073 (M.D. Tenn. 2015) (conditionally certifying based on declarations from 98 putative opt-ins).  Plaintiffs' inability to produce any—let alone a meaningful number of—declarations from putative collective members is "telling."  *Wright v. Lehigh Valley Hosp.,* 2010 WL 3363992, at *4 (E.D. Pa. Aug. 24, 2010).

B.      Instead of pointing to putative opt-ins, the motion relies heavily on the three EPA claims that this Court *dismissed on the pleadings*—those asserted by Plaintiffs Mazingo, Tolton, and Stahl.  (*See* Dkt. 110 at 71-72.)  Given that this Court concluded that those Plaintiffs had not even *alleged* plausible EPA claims, it strains reason to argue that their allegations could support certification of a collective.  Indeed, these three Plaintiffs abandoned their announced plan to move to amend their Complaints to try to replead their EPA claims and that deadline has now passed.

Start with Mazingo.  Plaintiffs say she earned less than two more senior male associates when they were at comparable levels of seniority.  (Dkt. 118-1 at 23.)  But even putting aside the fatal problem that those two associates worked in *New York*—a different "establishment"— Plaintiffs offer no evidence whatsoever that Mazingo and these associates (who were in different practices, *see* Coussons Decl. Ex. 1 col. C, rows 18, 34) did equal work.  At her deposition, Mazingo identified five "comparators"—but never mentioned these two associates.  (*See* Dkt. 118-1 at 23 n.13.)  The best Plaintiffs can do is assert that Mazingo "performed substantially equal

work as male associates at Jones Day," writ large.  (*Id.* at 23.)  But that is precisely the theory that this Court held insufficient even as a pleading matter.  (Dkt. 110 at 68 (rejecting allegation that "associates all perform substantially similar work").)  It is also the same theory—that "an attorney is an attorney is an attorney"—that the Second Circuit held was "not cognizable under the EPA." *Port Auth.*, 768 F.3d at 257.  The fact that two associates in New York earned more than Mazingo, particularly in the context of a non-lockstep firm where pay is primarily determined by office PICs and influenced by local market considerations, does not even begin to demonstrate that there is a class of female associates at Jones Day who are victims of systemic EPA violations.

The same goes for Tolton.  She compares herself to an Irvine associate in her class.  But as this Court held in dismissing her claim on the pleadings, there must be "additional factual detail" to support an inference that these two associates performed "substantially equal work."  (Dkt. 110 at 71.)  Tolton cannot supply that detail.  She admitted that, after their first year at the Firm (2012), when the male associate moved into the M&A practice, she could not "recall what he did."  (Dkt. 118-4 at 31 (Tolton Tr. 402:7-13).)  Instead she offered the most vague generalities: that she and he "were evaluated in the same process," "required to meet the same sets of expectations" in terms of serving "the interests of the client and of the firm," "attended similar events," and held "office leadership and recruitment roles."  (*Id.* at 25-27 (Tolton Tr. 391:17-392:9, 393:19).)  Of course, *all* associates are evaluated using the same general criteria, are expected to serve clients, and attend similar training and social events; many are involved in office activities and recruitment.  That cannot be enough to show that they perform "equal work."  Moreover, while Tolton denied knowing how his billable hours compared to hers (*id.* at 26 (Tolton Tr. 392:10-25)), discovery has shown that Tolton recorded 1,703, 1,131, and 897 billable hours in 2015, 2016, and 2017 respectively (all on an annualized basis), but the male associate recorded 2,371, 2,406, and 2,031

billable hours during those years.  (*Compare* Dkt. 107-9 at 2-3, *with* Dkt. 102-18 at 13, 25, 37.)
Tolton's annualized client hours during the limitations period were not only, on average, 1,000
hours per year below her "comparator," but her reviews were below average while his ranged from
above average to exceptional.  (Dkt. 107-9 at 2-3; Dkt. 107-4 at 2.)  Tolton's dismissed claims
provide no evidence of the existence of similarly situated women across the Firm as a whole.

Finally, Plaintiffs cannot draw support from Stahl's allegations, either.  They say "her male
comparators" earned more than her, without even *identifying* those comparators or any evidence
they performed equal work.  (Dkt. 118-1 at 23.)  The only male associate identified in relation to
Stahl is James Burnham, a former Washington, D.C. associate in the Issues & Appeals Practice
(I&A), four years more senior than Stahl.  (Dkt. 107 at 10 n.4.)  Contrary to Plaintiffs' assertion,
Stahl never testified that she "performed, or was capable of performing, substantially equal work"
to Burnham.  Rather, she said she "worked with him" on one project, and that she and a different
D.C.-based I&A associate (on whom Plaintiffs do not rely) "did equal work" on that project.  (Dkt.
118-9 at 11 (Stahl Tr. 288:12-25).)  In fact, evaluation records show that she identified Burnham
as her *supervisor* on that project, which involved a mere 48 hours of work on her part.  (Dkt. 118-
15 at 6.)  In sum, this is no better than the dismissed allegations of the Complaint.

**C.**     What about evidence relating to anyone *other than* the six Plaintiffs in this case—
*i.e.*, the supposed collective of "similarly situated" women?  That is what a conditional certification
motion is supposed to demonstrate, yet Plaintiffs' motion makes only three fleeting gestures in
that direction, each more inapposite and irrelevant than the last.

*First*, "Tolton testified that another female associate in the Irvine office was concerned that
her compensation was unfairly low due to her maternity leave."  (Dkt. 118-1 at 24.)  That is
inadmissible hearsay.  "Courts, however, have repeatedly held that only admissible evidence may

be considered in connection with a § 216(b) [certification] motion."  *Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 865 (S.D. Ohio 2005); *see also Wright,* 2010 WL 3363992, at *4 ("[O]nly admissible evidence may be considered when deciding ... conditional class certification ....").  And mere *concern* is "not a fact that can support an EPA claim."  (Dkt. 110 at 72.)

*Second*, "Draper explained that a female associate she spoke with disclosed that the female associate was paid comparably to her husband, who also worked at Jones Day, despite being several years her husband's senior."  (Dkt. 118-1 at 24.)  That, too, is inadmissible hearsay.  And it, too, does not identify an EPA violation, because the associate was paid *more* than her husband— just not as much more as she believed warranted based on her seniority.  (*See id.*)  Such claims are not cognizable under the EPA.  *See Mirza v. Dep't of Treas.*, 17 F. Supp. 2d 759, 772-73 (N.D. Ill. 1998) ("Since she was not paid less than her male counterparts Ms. Mirza fails to meet the prima facie requirements of the EPA.  While her argument that she should have been making even more money might have merit under Title VII, it does not apply in the EPA context."); *Wentzel v. Williams Scotsman Inc.*, 2020 WL 1158547, at *4 (D. Ariz. Mar. 10, 2020) ("Even assuming Ms. Wentzel had to work *harder* than Mr. Whitaker for her pay, she was still paid *more*."); *Morris v. U.S. Dep't of Justice*, 298 F. Supp. 3d 187, 196 (D.D.C. 2018) (granting summary judgment because "uncontroverted evidence demonstrates that she was not paid less").

*Third*, Plaintiffs argue that a male associate, James Burnham, received a departure bonus when he left the Firm for a senior position in the White House Counsel's Office, whereas neither Plaintiff Stahl nor another female associate who left for public service received such a bonus.  (Dkt. 118-1 at 24-25 & n.14.)  The record already explains the reasons why Burnham—who was nearing partnership after many years of distinguished service to the Firm—was the *only* associate (male or female) who received such a discretionary payment upon joining the new administration in 2017.

(*See* Dkt. 107 at 10 n.4; Dkt. 107-1 at 1-2, ¶¶ 2-5.)  It obviously had nothing to do with his sex, and Plaintiffs provide no reason to believe otherwise.  More importantly, the proposed collective that Plaintiffs seek to certify has nothing to do with discretionary bonuses paid upon departure for public service, so this entire episode is utterly irrelevant to the present motion.

**D.**     Left with nothing else, Plaintiffs resort to their usual laundry list of miscellaneous allegations, trying to create an appearance of factual depth by quoting long excerpts of irrelevant testimony.  (Dkt. 118-1 at 25-26 & nn.15-16.)  They claim the "record is replete with evidence" of "discrimination by firm management" and "gendered criticism in performance evaluations."  (*Id.* at 25-26.)  But most of what Plaintiffs cite is not evidence at all, merely self-serving and conclusory generalities in the guise of testimony.[15]  They also repeatedly quote this Court's recitations of their *allegations*.  (*See id.* at 10 & n.5, 21, 22, 25-28 & n.17, 43-44.)  Allegations cannot satisfy Plaintiffs' burden at the certification stage.  *See Stephens*, 291 F. Supp. 3d at 105.

The few specific anecdotes for which Plaintiffs do cite testimony are far too attenuated to support even a weak inference of discriminatory pay.  As to the supposed "gender discrimination by firm management," Plaintiffs point to isolated, largely anodyne comments having either nothing at all to do with pay[16] or nothing to do with those who set pay.[17]  As to the "gendered criticism in

---

[15]  *E.g.*, Dkt. 118-8 at 4-5 (Henderson Tr. 62:12-63:4) (claiming she experienced and "heard" about "a culture in which ... stereotypically male behavior was valued"); *id.* at 18-19 (Henderson Tr. 251:25-252:2) ("I believe that women were held to a different standard than men when it came to availability."); Dkt. 118-7 at 5 (Draper Tr. 134:16-18) ("I believe there is a culture at Jones Day of treating men differently from women."); *id.* at 13 (Draper Tr. 280:18-19) (asserting that a female Atlanta partner "generally had a reputation in the office for being harder on women than on men"); Dkt. 118-9 at 9 (Stahl Tr. 195:19-22) ("I believe that ... the policies and practices of the firm perpetuated gender discrimination.").

[16]  *See* Dkt. 118-6 at 17-18 (Williams Tr. 394:18-395:17) (partner who had no involvement in compensation decisions allegedly stated that, despite Firm efforts, there is "attrition" when female associates "choose to have families").

[17]  *See* Dkt. 118-9 at 12 (Stahl Tr. 291:14-291:24) (complaining about statement by female

performance evaluations," Plaintiffs point to two criticisms, neither of which had anything to do with gender.  Henderson says a female partner criticized her for not being available during work hours.  She admitted she had no evidence that male associates were not similarly criticized.  (Dkt. 118-8 at 21-22 (Henderson Tr. 271:16-272:14).)  Stahl points to a single comment in a review by a partner (who had no involvement in compensation) that "she can be a bit meek so she needs to push for [deposition and courtroom] opportunities."  (Dkt. 118-9 at 10 (Stahl Tr. 195:8-196:15); Dkt. 118-15 at 8.)  But she offered no reason to believe a man would not garner a similar adjective if he did not seek out opportunities.  That is the sum total of the ostensibly "gendered" criticisms in reviews—out of the hundreds of individual reviews Plaintiffs have now been able to read.[18]

Insofar as Plaintiffs speculate that women are paid less than men because women allegedly obtain fewer "advancement opportunities," eventually leading to lower compensation (Dkt. 118-1 at 43; *see also id.* at 26 nn.15 & 17), that is an argument about *unequal work*, not a complaint of *unequal pay for equal work*.  "If the unequal pay is a result of unequal work, a plaintiff does not have an EPA claim even if the unequal work is the result of discrimination, though she may have a Title VII claim."  *Borrero*, 533 F. Supp. 2d at 439; *see also Berry v. Bd. of Supervisors of LSU*, 715 F.2d 971, 976-78 (5th Cir. 1983) (EPA does not reach "work load discrimination"). At the appropriate time, Jones Day will demonstrate the falsity of this allegation as well.

---

Of Counsel, erroneously identified as a partner, that female associates should "hang with the boys"); *id.* at 10 (Stahl Tr. 196:4-5) (claiming that "associates made inappropriate comments").

[18] The remaining "criticisms" were not in evaluations and largely relate to a single, female partner in Irvine who had no role in setting pay or even in setting office or practice ratings and rankings. (Dkt. 118-9 at 10 (Stahl Tr. 196:13-15) (asserting that female partner in Irvine "screamed at female associates" but not at male associates"); *id.* at 13 (Stahl Dep. 402:7-25) (same female partner told Stahl it was "unacceptable" to decline work because of a "packed schedule of events" on a personal trip); Dkt. 118-4 at 21-22 (Tolton Tr. 361:17-362:10) (complaining about perceived unequal treatment by same female partner); *see also* Dkt. 118-6 at 14 (Williams Tr. 198:7-198:21) (opining that Stahl was perceived as not "eager" because she did not smile).)

Finally, Plaintiffs argue that the Firm's alleged "pay secrecy" and "no whining" policies somehow serve as evidence of widespread sex-based pay disparities. (Dkt. 118-1 at 27.) Again, they cite this Court's decision on the pleadings, which simply recognized that the *alleged* policies could *plausibly* work in tandem with other factors to "perpetuat[e]" disparities, if they exist. (Dkt. 110 at 56.) At this stage, however, Plaintiffs must adduce evidence.

On the existence of a "no whining" policy, the "evidence" Plaintiffs cite (Dkt. 118-1 at 27 n.19) shows nothing of the kind. Jones Day has never had any policy, formal or informal, barring associates from complaining about their pay or raising concerns about their work experience. To the contrary, the record shows that associates are invited to raise compensation concerns with their PICs and regularly do so. *See supra* n.7. All of the Plaintiffs admitted in depositions that they had no recollection of ever hearing the Managing Partner forbid "whining"[19]— because he has never conveyed that message in any presentation to associates. (Lovitt Decl. ¶ 12.) Notably, counsel interposed a privilege objection when Mazingo was asked where she heard about this "policy," demonstrating that it is a theory concocted by counsel. (Chase Decl. Ex. 16 (Mazingo Tr. 134:20-135:13).) While the Managing Partner has used a "no whining" slide at *partners'* meetings, the message he conveys is that partners should take ownership and solve problems, not just gripe. This is far removed from what Plaintiffs—who never personally heard the message—would have this Court believe. (*Id.*) All of this was within the scope of the Rule 30(b)(6) depositions, which covered (among other things) the Firm's policies regarding "complaints." *Supra* at 4.

As for "pay secrecy," the record already shows that Plaintiffs regularly discussed pay with each other and other associates. (Dkt. 102 at 20.) Plaintiffs have produced no evidence that any

---

[19] (Chase Decl. Exs. 13 (Draper Tr. 89:10-17); 14 (Henderson Tr. 106:12-18, 109:23-110:5; 15 (Williams Tr. 85:9-24, 86:11-19); 16 (Mazingo Tr. 134:13-16); 17 (Stahl Tr. 119:2-10); 18 (Tolton Tr. 115:22-116:12).)

associate was ever disciplined for discussing compensation or raising concerns about their work experience, because there is none.  More crucially, Plaintiffs have identified no pay disparities that could have been "perpetuated" by these alleged sex-neutral "policies."

In short, Plaintiffs have not shown the existence of any similarly situated women, and the "evidence" they do put forth—mostly just repackaged allegations—fails to show that even the named Plaintiffs, much less any putative opt-ins, were paid less than men for equal work.  This is not remotely close to sufficient for conditional certification of a nationwide EPA collective.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion.[20]

---

[20] In a pair of footnotes, Plaintiffs ask the Court both to toll the unasserted claims of putative class members and to authorize notice covering three years prior to the filing of the Complaint. (Dkt. 118-1 at 9 n.2, 49 n.35.)  Plaintiffs provide no legal argument for either request.  And there is no basis to grant either.  Both turn on an assumption that opt-in plaintiffs will be able to avail themselves of equitable tolling.  Plaintiffs "have not argued that any such doctrin[e] appl[ies] here."  *Galloway*, 263 F. Supp. 3d at 158.  And there is no reason to believe these unidentified women will be entitled to tolling.  *See Alvarez v. BI Inc.*, 2018 WL 2288286, at *16 (E.D. Pa. May 17, 2018) (holding equitable tolling was not appropriate and rejecting plaintiffs' proposition "that all potential opt-in plaintiffs have been diligent in pursuing and preserving their claims, merely because they have not received a court-approved notice"); *Contrera v. Langer*, 278 F. Supp. 3d 702, 724 (S.D.N.Y. 2017) ("[T]he test for equitable tolling is not concerned with the diligence of a plaintiff who has already timely filed a claim, but rather with the diligence of a plaintiff who is seeking the application of the doctrine."); *Hintergerger v. Catholic Health Sys.*, 2009 WL 3464134, at *15 (W.D.N.Y. Oct. 21, 2009) (denying tolling where plaintiffs failed to show "diligence" on the part of potential opt-ins); *Sparacino v. Shepherd Commc'ns, Inc.*, 2015 WL 631240, at *4 (W.D. Ky. Feb. 12, 2015) (same); *Greenstein v. Meredith Corp.*, 2013 WL 4028732, at *2 (D. Kan. Aug. 7, 2013) (same).  "Congress knew ... that time would lapse between the filing of the collective action complaint by the named plaintiff and the filing of written consents by the opt-in plaintiffs, yet it chose not to provide for tolling of the limitations period."  *Woodard v. FedEx Freight E., Inc.*, 250 F.R.D. 178, 194 (M.D. Pa. 2008).  Thus, if the Court certifies, notice should only be sent to associates who worked for Jones Day during the three years prior to this Court's certification order (plus the tolling this Court already ordered).  *See* Minute Order (Dec. 27, 2019); *see also Galloway*, 263 F. Supp. 3d at 158 (certifying three years preceding the date the Court ordered notice); *Cryer v. Intersolutions, Inc.*, 2007 WL 1053214, at *3 (D.D.C. Apr. 7, 2007) (basing class period on date notice was issued, not date of complaint or conditional certification motion).

July 13, 2020

Respectfully submitted,


/s/ Mary Ellen Powers
Mary Ellen Powers (Bar No. 334045)
Beth Heifetz (Bar No. 417199)
Yaakov M. Roth (Bar No. 995090)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

Terri L. Chase (*pro hac vice* granted)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

*Attorneys for Defendant*