## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NILAB RAHYAR TOLTON, *et al.*, | ) | |
| | ) | |
| | ) | Civ. No. 1:19-00945 (RDM) |
| *Plaintiffs*, | ) | |
| | ) | |
| *v.* | ) | **DEFENDANT'S MOTION** |
| | ) | **FOR SUMMARY JUDGMENT ON** |
| JONES DAY, | ) | **COUNT IV (EQUAL PAY ACT)** |
| | ) | |
| *Defendant.* | ) | |

Jones Day respectfully moves for summary judgment, under Rule 56 of the Federal Rules of Civil Procedure, on Count IV of the Third Amended Complaint, which asserts claims under the Equal Pay Act.  For the reasons set forth in the attached memorandum, the undisputed facts make it impossible for those Plaintiffs with remaining claims under that statute (Henderson, Draper, and Williams) to prevail.  The Court should therefore grant summary judgment to Jones Day.

/s/ Mary Ellen Powers
Mary Ellen Powers (Bar No. 334045)
Beth Heifetz (Bar No. 417199)
Yaakov Roth (Bar No. 995090)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

Terri L. Chase (*pro hac vice* granted)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NILAB RAHYAR TOLTON, *et al.*, | ) | Civ. No. 1:19-00945 (RDM) |
|  | ) |  |
| *Plaintiffs*, | ) |  |
|  | ) | **MEMORANDUM OF POINTS AND** |
| *v.* | ) | **AUTHORITIES IN SUPPORT OF** |
|  | ) | **MOTION FOR SUMMARY** |
| JONES DAY, | ) | **JUDGMENT ON COUNT IV** |
|  | ) | **(EQUAL PAY ACT)** |
| *Defendant.* | ) |  |

Mary Ellen Powers
Beth Heifetz
Yaakov Roth
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

Terri L. Chase (*pro hac vice* granted)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

*Attorneys for Defendant*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION .......................................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................ 3

LEGAL STANDARD .................................................................................................................. 10

ARGUMENT ............................................................................................................................... 11

I.      HENDERSON PERFORMED LITERALLY *NO* WORK DURING THE LIMITATIONS PERIOD ...... 11

II.     DRAPER DID NOT PERFORM "SUBSTANTIALLY EQUAL" WORK AS HER COMPARATORS,
        AS THEY BILLED HUNDREDS OF HOURS PER YEAR MORE THAN SHE DID ...................... 13

III.    WILLIAMS' EPA CLAIMS FAIL BECAUSE THE ONLY COMPARATORS WHO EARNED
        MORE THAN HER WORKED AT DIFFERENT "ESTABLISHMENTS" .................................... 17

CONCLUSION ............................................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.H. Phillips, Inc. v. Walling,*
  324 U.S. 490 (1945)..........................................................................................10, 18

*Allender v. Univ. of Portland,*
  689 F. Supp. 2d 1279 (D. Ore. 2010)..............................................................23

*Berry v. Bd. of Supervisors of LSU,*
  715 F.2d 971 (5th Cir. 1983) ...........................................................................17

*Borrero v. Am. Exp. Bank Ltd.,*
  533 F. Supp. 2d 429 (S.D.N.Y. 2008)...............................................................17

*Brennan v. Goose Creek Consol. Indep. Sch. Dist.,*
  519 F.2d 53 (5th Cir. 1975) .........................................................................20, 22

*Carey v. Foley & Lardner LLP,*
  577 F. App'x 573 (6th Cir. 2014) .....................................................................16

*Chiaramonte v. Animal Med. Ctr.,*
  677 F. App'x 689 (2d Cir. 2017) ......................................................................14

*Corning Glass Works v. Brennan,*
  417 U.S. 188 (1974)..........................................................................................10

*Cornish v. Dist. of Columbia,*
  67 F. Supp. 3d 345 (D.D.C. 2014)........................................................10, 11, 13

*EEOC v. Hay Assocs.,*
  545 F. Supp. 1064 (E.D. Pa. 1982) ........................................................11, 12, 17

*EEOC v. Port Auth. of N.Y. & N.J.,*
  768 F.3d 247 (2d Cir. 2014)..............................................................................11

*Gandy v. Sullivan Cty.,*
  24 F.3d 861 (6th Cir. 1994) .........................................................................11, 12

*Grumbine v. United States,*
  586 F. Supp. 1144 (D.D.C. 1984)......................................................................22

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Heymann v. Tetra Plastics Corp.*,
    640 F.2d 115 (8th Cir. 1981) .................................................................................23

*Ilhardt v. Sara Lee Corp.*,
    118 F.3d 1151 (7th Cir. 1997) ...............................................................................14

*Jaburek v. Foxx*,
    813 F.3d 626 (7th Cir. 2016) .................................................................................19

*Kassman v. KPMG LLP*,
    416 F. Supp. 3d 252 (S.D.N.Y. 2018)....................................................................20

*Lemke v. Int'l Total Servs., Inc.*,
    56 F. Supp. 2d 472 (D.N.J. 1999) ..........................................................................23

*Lindsley v. TRT Holdings*,
    2019 WL 6467256 (N.D. Tex. Dec. 2, 2019) ........................................................19

*Meeks v. Computer Assocs. Int'l*,
    15 F.3d 1013 (11th Cir. 1994) ...................................................................19, 20, 21

*Mitchell v. Bekins Van & Storage Co.*,
    352 U.S. 1027 (1957).............................................................................................18

*Parker v. Hoglander*,
    2016 WL 3527014 (D.D.C. June 23, 2016)....................................................11, 13

*Pollis v. New Sch. for Social Research*,
    132 F.3d 115 (2d Cir. 1997)...........................................................................11, 13

*Price v. N. States Power Co.*,
    664 F.3d 1186 (8th Cir. 2011) ...............................................................................19

*Renstrom v. Nash Finch Co.*,
    787 F. Supp. 2d 961 (D. Minn. 2011)............................................................ passim

*Schultz v. Dep't of Workforce Dev.*,
    2011 WL 13359148 (W.D. Wis. Mar. 1, 2011)....................................................14

*Spencer v. Va. State Univ.*,
    919 F.3d 199 (4th Cir. 2019) ..........................................................................11, 22

**<u>TABLE OF AUTHORITIES</u>**
(continued)

**Page(s)**

*Stevens v. Murphy*,
    2020 WL 977971 (D.D.C. Feb. 28, 2020) ...............................................................11

*Toomey v. Car-X Assocs. Corp.*,
    2013 WL 5448047 (N.D. Ill. Sept. 30, 2013) .........................................................20

*Trudel v. SunTrust Bank*,
    924 F.3d 1281 (D.C. Cir. 2019) ......................................................................11, 13

**STATUTES**

29 U.S.C. § 206 .....................................................................................10, 13, 16, 18

29 U.S.C. § 255 ...............................................................................................11

**OTHER AUTHORITIES**

29 C.F.R. § 1620.9 ..................................................................................10, 18, 19

## INTRODUCTION

Last month, this Court ruled that three Plaintiffs had sufficiently alleged they were paid less than certain male associates for substantially equal work, and thus that their claims under the Equal Pay Act ("EPA") could proceed past the pleadings.  Enough fact discovery has already been conducted, however, to establish that it will be impossible for these Plaintiffs' claims to succeed on the merits.  The Court should therefore grant summary judgment to Jones Day on Count IV of the Third Amended Complaint (Dkt. 41, "TAC").  Doing so will moot Plaintiffs' pending motion (Dkt. 118) to certify an EPA collective of all of Jones Day's female associates nationwide.

*First*, Plaintiff Katrina Henderson has no chance of prevailing.  The EPA forbids paying a woman less than a male comparator for "substantially equal work."  But Henderson performed no work—*literally, none*—during the period within the statute of limitations.  She recorded zero hours of legal work (billable or pro bono) for all of 2016, because she was terminated at the end of 2015 and kept on the payroll merely as a courtesy while she looked for other jobs.  Whatever her other complaints, Henderson cannot reasonably contend that she was paid less than men for *equal* work during a period when she performed *no work at all*.  And, again, any objections to her pay in 2014 or 2015 are plainly beyond the EPA's limitations period and thus time-barred.

*Second*, Plaintiff Saira Draper also cannot hope to prove that she performed "substantially equal work" as her male comparators.  Unlike Henderson, Draper did perform work—but the male comparators who earned more than her recorded *more than twice as many billable hours* over the relevant period, and *hundreds* more hours of legal work each and every year.  Hours are not the be-all-end-all of an associate's job, but they are one objective metric of an associate's work (as Plaintiffs have conceded) and represent a measure of the revenue generated by the associate.  Given the gaping difference between Draper and her comparators in hours worked, no factfinder could conclude that they performed substantially equal work.  Draper's EPA claim therefore fails.

1

*Third*, Plaintiff Meredith Williams identified a list of male associates around the country and alleged (despite having no personal knowledge) that they earned more than she did.  As it turns out, that is mostly false.  Williams was paid *more* than the majority of the comparators she named.  She also earned more than the average of the only male comparators who worked in her office in Irvine, which defeats her claim premised on those comparators.  The other higher-paid comparators worked elsewhere—in New York City, Washington D.C., and Dallas—but the EPA limits wage comparisons to employees at a single "establishment."  As this Court has recognized, there is no nationwide market for law-firm associates, and the record confirms that associates at Jones Day are hired by local offices and their pay is determined in the first instance by local office leaders based in large part on the local market.  As a matter of law, then, an Irvine associate like Williams cannot establish an EPA claim by showing a differential with an associate in, *e.g.*, New York City.  Jones Day is entitled to summary judgment on Williams' claim too.

Importantly, all necessary discovery on these points has already been done, and no further discovery could remedy these legal deficiencies in Plaintiffs' claims.  Henderson's lack of work, Draper's hours, and the salaries and locations of Williams' comparators are not open to factual dispute.  Further, Jones Day has already provided extensive document discovery and three days of Rule 30(b)(6) depositions concerning its policies and operations—more than enough to establish that the Firm is not one of the rare businesses that operates as a "single establishment" nationwide for purposes of the Equal Pay Act.  Summary judgment on this single count is therefore appropriate at this time.  And eliminating this Count will streamline the case, because it would moot Plaintiffs' request for certification of an EPA collective embracing every woman employed by Jones Day since 2016.  If the named Plaintiffs have no viable claims under the EPA—as the undisputed facts establish—then there is certainly no occasion to certify a collective.

## FACTUAL BACKGROUND

The TAC asserted claims under the EPA for all six named Plaintiffs.  (Dkt. 41 at 102-03 (TAC ¶¶ 404-412).)  On the pleadings, this Court ruled that three of the six Plaintiffs had not pleaded enough facts to suggest a plausible entitlement to relief.  (Dkt. 110 at 71-72.)  The three surviving claims belong to Plaintiffs Henderson, Draper, and Williams.  (*Id.* at 69-71.)

1.     While mostly immaterial to this motion, detailed background facts about Jones Day's systems for evaluating and compensating associates are found in Jones Day's opposition to Plaintiffs' motion for conditional certification (Dkt. 128), and are incorporated by reference here. For present purposes, the following summary should suffice.

At Jones Day, associates—even those within the same office, practice, and class year—are not paid in lockstep after their first year.  Rather, compensation is highly individualized, based on a holistic review of the associate's performance and contribution to the Firm.  (Dkt. 102-9 at 3.) Compensation recommendations are made by the Partners in Charge ("PICs") of each local office. (SUMF ¶ 128.)  Each PIC is given a budget for associate compensation, but has discretion in deciding how to use that budget, including in assessing what is necessary to stay competitive in the local market.  (SUMF ¶ 129; Dkt. 128 at 11-12.)  In practice, PICs use different processes to generate pay recommendations and take different approaches to allocating the compensation budget across the associates within their offices.  (*See* Dkt. 128 at 12.)

The PIC compensation recommendations follow a multi-month evaluation process that includes the development by Practice Leaders ("PLs") of assessment statements for each associate, and the assignment of ratings and rankings by both the associate's office and practice.  PICs and PLs have final authority to assign ratings and rankings for associates in their offices and practices; neither the Managing Partner nor anyone else revises those numbers.  (SUMF ¶ 138.)  Each office and practice has its own method of generating ratings and rankings.  (*Id.*; Dkt. 128 at 6-10.)

3

Once each PIC has submitted compensation recommendations, the figures are reviewed by Traci Lovitt, who became responsible for the overall associate evaluation process in late 2016, along with Michael Shumaker, who has played this role since 2014.  (*See* SUMF ¶ 131.)  The two of them may suggest revisions before forwarding the recommendations to the Managing Partner for approval.  (*Id.*)  After the Managing Partner's review, the PICs have a further opportunity to challenge any changes to their recommendations.  (*Id.* ¶ 132.)  Of the 29 pay adjustments experienced by the six named Plaintiffs collectively during their tenures at the Firm, 26 adjustments were the amounts recommended by the PICs.  (*Id.* ¶ 133.)  The three outliers included one downward adjustment for Draper, one upward market adjustment for Mazingo, and the rejection for Henderson and every other associate who had started in the fall of 2013 of a proposed increase in the summer of 2014, when the decision was made to postpone those adjustments until the following January.  (Dkt. 128-9 (Coussons Decl. ¶ 16); Dkt. 128-10 (Coussons Decl. Ex. 1 cols. BC, BD, BF, rows 5, 16, 18, 20, 22, 24, 34, 44); *id.* at cols. BX, BY, CA, row 3; *id.* at cols. CS, CU, CW, row 7); Dkt. 128-18 at 6 (Chase Decl. Ex. 7).)

Beyond their role as the *de facto* decision-maker for most associate pay decisions, Jones Day's office leaders also have considerable functional independence.  Offices manage their own associate recruiting programs and make their own associate hiring decisions.  (SUMF ¶¶ 123-127.)  PICs have discretion to set the initial compensation for lateral associate hires.  (SUMF ¶ 127.)  There is no firm-wide system for assigning work to associates; and assignments for new lawyers are managed at the office level.  (SUMF ¶¶ 134-135.)  Associates cannot transfer or be transferred to another Jones Day office without approval from the PICs of both offices.  (SUMF ¶ 136.)

**2.**      With that background in mind, the following are the undisputed facts relative to the work performed and compensation received by the three Plaintiffs with surviving EPA claims.

**Henderson.**  Katrina Henderson started at Jones Day's New York office in October 2013 as a member of the New Lawyers Group.  (Dkt. 41 at 73-74 (TAC ¶ 270); Bounds Decl. ¶ 8.)  She joined the Capital Markets practice on September 1, 2014.  (Dkt. 102-13 at 2.)

During her first full calendar year at Jones Day (2014), Henderson recorded 1,060 billable hours and 118 pro bono hours.  (*Id.*)  Both her practice and her office rated her a 2 out of 5.  (*Id.*)  (She was too junior to be ranked.)  In 2015, Henderson's productivity dropped by about 80%; she recorded just 194 billable hours and 8 pro bono hours.  (*Id.*)  As early as January 2015, Henderson was searching for other employment.  (Dkt. 128-25 at 3-5 (Henderson Tr. 12:9-19, 15:5-16:17).)

Jones Day terminated Henderson in December 2015.  (SUMF ¶ 1.)  The Firm, however, allowed her to remain on the payroll for more than six months while she sought her next job.  (SUMF ¶ 2.)  During that time (January through June 2016), Henderson worked zero hours for Jones Day clients (whether paying or pro bono).  (SUMF ¶ 5.)  At the end of June 2016, Henderson was placed on unpaid leave.  (SUMF ¶ 3.)  She officially left Jones Day on July 15, 2016, and started her next job soon after.  (SUMF ¶ 4; Dkt. 128-25 at 6-7 (Henderson Tr. 35:25-36:6).)

Like all other associates in her class in New York, Henderson's starting salary at Jones Day was $160,000 per year.  (Bounds Decl. ¶ 8.)  Her pay increased to $180,000 effective July 1, 2015.  (Bounds Decl. ¶ 8.)  Henderson alleges that her pay was less than what male associates in her class earned for "substantially equal" work.  (Dkt. 41 at 78-79 (TAC ¶¶ 287, 289).)

**Draper.**  Saira Draper joined Jones Day's Atlanta Office in October 2011.  (Dkt. 41 at 53 (TAC ¶ 184); SUMF ¶ 6.)  She initially failed the Georgia bar exam, but Jones Day gave her paid leave to prepare for a second attempt.  (Dkt. 128-24 at 3-5 (Draper Tr. 54:4-56:7).)  After succeeding on a second try, Draper joined the Business and Tort Litigation ("B&TL") practice on August 1, 2012.  (*Id.* at 4-5 (Draper Tr. 55:9-56:7); Bounds Decl. ¶ 9.)

Draper took her first maternity leave in 2015.  (Dkt. 41 at 55-56 (TAC ¶ 195).)  That year, she recorded only 394 billable hours plus 281 pro bono hours.  (SUMF ¶ 7.)  Even on an annualized basis—*i.e.*, proportionally adjusted to account for the time she spent on leave—Draper had only 642 billable and 458 pro bono hours.  (SUMF ¶ 8.)  The Atlanta office ranked Draper 17th out of 19 associates, while the B&TL practice ranked her 49th out of 71.[1]  (Dkt. 102-15 at 3.)

In 2016, Draper recorded 1,134 billable hours and 370 pro bono hours.  (SUMF ¶ 9.)  For that year's work, she was ranked 49th out of 58 by her practice, and 18th out of 24 by her office.  (Dkt. 102-15 at 3.)  She was advised in her annual performance review the following spring that "[p]erformance at this level does not place Saira on a successful track towards partnership."  (*Id.*)

In 2017, Draper recorded 1,032 billable hours and 167 pro bono hours.  (SUMF ¶ 10.)  Because she spent the last quarter of the year on maternity leave, the annualized figures were 1,371 and 222 respectively.  (SUMF ¶ 11.)  Draper was ranked 22nd out of 24 associates by the Atlanta office, while her practice group ranked her 57th out of 63.  (Dkt. 102-15 at 3.)

During her May 2018 performance review, Draper, who was then a seventh-year associate, was advised that she would not be considered for partnership and that she should pursue alternative employment.  (Dkt. 41 at 63 (TAC ¶ 224); Dkt. 128-24 at 9-10 (Draper Tr. 402:13-403:22).)  She remained on the Firm payroll, however, until October 4, 2018.  (SUMF ¶ 14.)  In 2018, Draper recorded 397 billable hours and 486 pro bono hours (on an annualized basis, that works out to 631 and 774 hours, respectively).  (SUMF ¶ 12.)

---

[1] Office and practice rankings are composed of a numerator (the absolute ranking) and a denominator (the number of attorneys in the ranking pool).  In evaluation year 2017, one band of attorneys being ranked was expanded to include certain additional senior attorneys, but they were inadvertently added only to the numerator.  As a result, some documents produced by Jones Day have an inaccurate denominator for 2017 rankings.  (Dkt. 128-15 at 60 (Lovitt Tr. 220:5-24).)

Like all other associates in the Atlanta office in the 2011 class, Draper earned $150,000 per year to start.  (Bounds Decl. ¶ 9.)  Her pay was increased to $155,000 effective July 1, 2012; to $170,000 as of July 1, 2013; to $180,000 as of July 1, 2014; to $195,000 as of July 1, 2015; to $220,000 as of July 1, 2016; and to $230,000 as of July 1, 2017.  (*Id.*; SUMF ¶¶ 15-18.)[2]

Draper alleges that she was "paid less than what certain male associates" earned "for doing comparable work."  (Dkt. 41 at 53-54 (TAC ¶ 187).)  Specifically, Draper identified four male associates in the Atlanta office whom she alleges are comparators for her equal pay claims.  (Dkt. 118-7 at 6, 9-10 (Draper Tr. 141:4-23, 146:15-25, 149:9-24).)  They are referred to here as Atlanta Comparators 1-4.  Each worked in the B&TL practice in Atlanta.  (SUMF ¶¶ 19, 29, 41, 52.)

Atlanta Comparators 1-3 all billed vastly more hours than Draper in each and every year of the limitations period.[3]  One recorded an average of 2,073 billable hours per year.  (SUMF ¶¶ 20-23.)  Another's average was 1,896 (1,777 without annualization).  (SUMF ¶¶ 31-35.)  And the third's billable-hour average was 2,018 billable hours per year (1,980 without annualization).  (SUMF ¶¶ 42-46.)  Meanwhile, Draper averaged just 945 billable hours per year from 2015-2018 on an annualized basis, and 739 hours per year in raw hours—either way, *less than half of any of the men*.  (SUMF ¶¶ 7-13.)  Counting pro bono time, Draper still lags an average of *600 hours per year* behind these three male associates on an annualized basis, and an average of *900 hours per year* behind them on a raw-hours basis.  (*See* SUMF ¶¶ 7-13, 20-46.)  The comparative hours data for Draper and these comparators are compiled in a chart appended to this brief.  (App. 1.)

---

[2] The TAC understates some of these figures.  At her deposition, Draper admitted that Jones Day's compensation letters reflect her actual compensation history.  (Dkt. 128-24 at 8 (Draper Tr. 185:3-18).)

[3] Draper earned more than all four Atlanta Comparators prior to July 1, 2016; more than three of the four between July 1, 2016 and July 1, 2017; and more than two of the four from July 1, 2017 until July 1, 2018, by which time she had been told to pursue other employment and largely stopped working on billable client matters.  (SUMF ¶¶ 15-18, 24-28, 36-40, 48-51, 54-56.)

Atlanta Comparator 4 was four years junior to Draper and earned less than her in every calendar year.  (SUMF ¶¶ 6, 15-18, 52-56.)  Draper claimed he earned more as a junior associate in 2016-2018 than she had earned as a junior associate in 2012-2014, but Draper's junior associate years pre-date the limitations period.  And, as Draper conceded, starting salaries in Atlanta rose by $40,000 during Comparator 4's first three years at the Firm.  (SUMF ¶ 57; Dkt. 118-7 at 4, 10 (Draper Tr. 130:3-23; 149:9-24).)  Comparator 4 left Jones Day in his fourth year (Bounds Decl. ¶ 14), before he reached a level of seniority that would be relevant to Draper's claims.

**Williams.**  Meredith Williams joined Jones Day's Irvine office in October 2013 in the New Lawyers Group, and joined the Intellectual Property practice a year later.  (SUMF ¶¶ 58-59.)

For her 2014 and 2015 work, both her office and her practice rated Williams a 3 out of 5. (Dkt. 94-14 at 2-3.)  For 2016, her practice rating dropped to 2.  (*Id.*)  (She was, at all times, too junior to be ranked.)  Williams' reviews from multiple supervisors reveal sustained problems with time management, deadlines, and quality of written work.  (*Id.*)[4]  On September 22, 2017, Williams left Jones Day for another firm.  (Dkt. 41 at 52 (TAC ¶ 183); Bounds Decl. ¶ 10.)

---

[4] In her pleadings, Williams alleged that her assessment unfairly "cherry-picked" criticisms and that her evaluations were "generally positive across the board, with the notable exception of the partner who blamed her for the error of her colleague."  (Dkt. 41 at 51 (TAC ¶ 176).)  Yet her actual reviews refute that claim:  The (female) partner about whom Williams complains described two important briefs she wrote as "abysmal rambling streams of consciousness that were poorly written" and "she gave me one draft the day before it was due and then dropped the revisions ... to go on vacation."  (Dkt. 94-14 at 6.)  The "error" of Williams' colleague was apparently a failure to fix the "abysmal" brief when Williams disappeared on the eve of a deadline.  But that was not the only negative review.  Another partner "attempted to contact Meredith ... only to learn that she was on vacation out of the country without giving me any notice."  (*Id.* at 7.)  Another partner said: "Meredith has a tendency to do what is asked of her, and no more ....  Unfortunately, I need to remind her of deadlines, and follow-up on assignments, to make sure everything is moving along." (*Id.* at 4.)  Yet a different (female) partner: "I never know what to expect from Meredith's work"; sometimes it is well-done and other times it is "mediocre at best."  (*Id.*)  Thus, while Williams' final assessment noted that "[s]he has a lot of potential, because she has strong analytical skills, is intelligent, and shows enthusiasm for practice development initiatives and office pro bono work," it appropriately included significant criticisms that appeared repeatedly in her reviews.  (*Id.* at 2.)

Williams earned $160,000 per year as her starting salary.  (SUMF ¶ 60.)  Her compensation was adjusted upward to $170,000 as of January 1, 2015; to $185,000 as of July 1, 2015; to $205,000 as of July 1, 2016; and to $215,000 as of July 1, 2017.  (SUMF ¶¶ 61-64.)

Williams alleges that Jones Day "paid her less than male associates" who "were in jobs requiring substantially equal work," even though "she routinely billed more hours than they did." (Dkt. 41 at 48 (TAC ¶¶ 165).)  *First*, she named six associates who were "generally at [her] level who [she] met at firm-wide trainings."  (Dkt. 118-6 at 13 (Williams Tr. 164:16-20).)  Those associates all worked in different offices (Dallas, New York, Pittsburgh, San Diego, and Washington, D.C.) and different practices (B&TL, Financial Institutions Litigation and Regulation, and Antitrust).  (SUMF ¶¶ 65-66, 72-73, 79-80, 86-87, 92-93, 98-99.)  One was a year senior to Williams; one was a year junior to her; the rest were 2013 graduates.  (*See id.*)  Williams admitted that she did not know the compensation of any of her comparators and had no basis for her allegations that they were paid more.  (Dkt. 102-4 at 12-13, 20 (Williams Tr. at 139:19-140:2, 140:7-12, 149:4-8); Dkt. 118-6 at 11 (Williams Tr. at 162:15-22).)

Contrary to her allegation, Williams earned *more* than most of these associates.  (SUMF ¶¶ 60-105.)  Also contrary to the Complaint, she did not routinely bill more hours than they did. In 2015, she recorded fewer hours (including pro bono) than four of the six.  In 2016, three of the five comparators still at the Firm recorded more billable hours than Williams, and she earned more than the two who billed less.  (*Compare* Dkt. 94-14 at 2, *with* Dkt. 128-32 at 2-3; Dkt. 128-33 at 2-3; Dkt. 128-34 at 2-3; Dkt. 128-35 at 2-3; Dkt. 128-36 at 2-3; Dkt. 128-39 at 2-3); SUMF ¶¶ 62-63, 69-70, 90-91.)

*Second*, Williams named three male associates who worked in the Irvine office long before the limitations period.  (Dkt. 41 at 48 (TAC ¶ 165); SUMF ¶¶ 106-122.)  One, a B&TL associate

six years senior to Williams, left Jones Day in April 2013, before Williams became an associate. (SUMF ¶¶ 106-107, 113.)  Another, a Labor and Employment associate, departed in December 2012, also before Williams joined the Firm.  (*Id.* ¶¶ 114-115, 118.)   The third, a Securities Litigation associate four years her senior, left in early 2014 after lateraling to the Firm just a year earlier.  (*Id.* ¶¶ 119-122.)   Williams earned *more* than the first two of these at every level of seniority after their first years (when all were paid the same).  (*Id.* ¶¶ 61-64, 109-112, 117.)  She earned less than the third during his one year at the Firm.  (*Id.* ¶¶ 61-64, 121-122.)  But she earned more than the average of these Irvine comparators at every year of seniority.  (*Id.* ¶¶ 61-64, 109-112, 117, 121.)   For the Court's convenience, the salary information for Williams and her comparators is compiled in a chart appended to this brief.  (*See* App. 2.)

## LEGAL STANDARD

The Equal Pay Act mandates "equal pay for equal work regardless of sex."  *Corning Glass Works v. Brennan*, 417 U.S. 188, 190 (1974).  To establish a violation, a plaintiff must prove that "she was doing substantially equal work" as "members of the opposite sex" and yet "was paid at a lower wage."  *Cornish v. Dist. of Columbia*, 67 F. Supp. 3d 345, 360 (D.D.C. 2014).  As relevant here, three legal principles bear on the plaintiff's prima facie burden of proof.

*First*, the allegedly sex-based pay differential must occur within a single "establishment" operated by the employer.  29 U.S.C. § 206(d)(1).  An "establishment" has long been understood to mean a particular "physical place of business," not the business as a whole.  *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 496 (1945).   That presumptive definition is codified in EEOC regulations.  *See* 29 C.F.R. § 1620.9(a) ("It refers to a distinct physical place of business ....").

*Second*, the plaintiff must establish that she and a higher-paid comparator performed "equal work."  29 U.S.C. § 206(d)(1).  This "demanding threshold requirement … requires a comparator to have performed work 'virtually identical' (or the apparent synonym, 'substantially equal') to

the plaintiff's." *Spencer v. Va. State Univ.*, 919 F.3d 199, 203 (4th Cir. 2019); *see also Cornish*, 67 F. Supp. 3d at 360.  For that comparison, "job content and not job title or description is the central concern." *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 255 (2d Cir. 2014).

*Finally*, the limitations period for an EPA claim is two years, or three years if the violation was willful.  29 U.S.C. § 255(a).  "The Equal Pay Act is violated each time an employer presents an 'unequal' paycheck to an employee for equal work." *Gandy v. Sullivan Cty.*, 24 F.3d 861, 864 (6th Cir. 1994).  Thus, a plaintiff must show that, within the limitations period, she received an "unequal" paycheck for "equal work." *Id.*  "[R]ecovery for pay differentials prior to the limitations period is barred." *Pollis v. New Sch. for Social Research*, 132 F.3d 115, 119 (2d Cir. 1997).

Summary judgment is warranted when "there is no genuine dispute as to any material fact" and the movant is "entitled to judgment as a matter of law." *Stevens v. Murphy*, 2020 WL 977971, at *2 (D.D.C. Feb. 28, 2020).  It should be granted before the close of discovery "if there's already indisputable evidence that defeats the claim." *Parker v. Hoglander*, 2016 WL 3527014, at *4 (D.D.C. June 23, 2016); *see also Trudel v. SunTrust Bank*, 924 F.3d 1281, 1287 (D.C. Cir. 2019).

## ARGUMENT

## I.   HENDERSON PERFORMED LITERALLY *NO* WORK DURING THE LIMITATIONS PERIOD.

To prevail on her EPA claim, Henderson must establish that she performed "substantially equal work" as a male associate yet "was paid at a lower wage." *Cornish*, 67 F. Supp. 3d at 360.  And, of course, that violation—receipt of "an 'unequal' paycheck" for "equal work"—must have taken place within the applicable limitations period. *Gandy*, 24 F.3d at 864.  Thus, in *EEOC v. Hay Associates*, the court rejected an effort to ground an EPA claim on two comparators because the plaintiff "ha[d] not shown that her work *at any time within the limitations period* was equal to [their] work."  545 F. Supp. 1064, 1083 (E.D. Pa. 1982) (Becker, C.J.) (emphasis added).

The undisputed facts make it impossible for Henderson to establish a violation within the limitations period.  Even assuming a three-year statute of limitations (which applies only to willful violations), her claim reaches back at most to June 24, 2016.  (Dkt. 110 at 45 & n.6-7.)  Henderson was put on unpaid leave as of the end of June 2016.  Thus, she must show that in the last week of June 2016—the only period even arguably during the limitations period when she was still being paid by Jones Day—she was paid unequally for doing "equal work."  Yet such a showing is impossible, because Henderson did no work—*literally no work at all*—in 2016.  (SUMF ¶ 5.) After her termination in December 2015, Jones Day kept Henderson on the payroll as a courtesy while she searched for a new job.  (SUMF ¶ 2.)  Having done *no work* for Jones Day during the relevant period, Henderson cannot establish that she was paid less than a man for "equal work."

Put another way, Jones Day continued to pay Henderson in 2016 even though she was no longer performing any work.  The Firm could have made her termination effective immediately in December 2015, in which case she obviously would have no unexpired EPA claim.  By generously paying her *to do nothing* for an additional six months, Jones Day did not violate the EPA.

To be clear, the issue is not that Henderson did not receive paychecks within the limitations period (she did) or that she would be unable to challenge those paychecks if they continued to pay her less than men for equal work (she would).  As this Court explained in its order on the motion for partial judgment on the pleadings, a claim under Title VII for discriminatory pay accrues with every discriminatory paycheck.  (Dkt. 110 at 41.)  Analogously, a claim under the EPA for unequal pay accrues with every paycheck that compensates the employee unequally for equal work.  *See Gandy*, 24 F.3d at 864.  The problem, however, is that Henderson did not perform equal work within the limitations period.  Consequently, any EPA challenge to her 2016 paychecks must fail. *See Hay Assocs.*, 545 F. Supp. at 1080, 1083 (asking whether plaintiff's work "within the

limitations period was equal").  And insofar as Henderson alleges that she was paid less than male associates for "equal work" she allegedly performed in 2014-2015, those claims are time-barred. "[R]ecovery for pay differentials prior to the limitations period is barred."  *Pollis*, 132 F.3d at 119.

Importantly, no further discovery could change these facts or alter this legal conclusion. There is no factual dispute that Henderson performed no work in June 2016 (or any other time in 2016).  Accordingly, Henderson will never be able to establish that she was paid unequally for equal work within the limitations period.  Jones Day is entitled to summary judgment.  *See Trudel*, 924 F.3d at 1287; *Parker*, 2016 WL 3527014, at \*4.[5]

## II.    DRAPER DID NOT PERFORM "SUBSTANTIALLY EQUAL" WORK AS HER COMPARATORS, AS THEY BILLED HUNDREDS OF HOURS PER YEAR MORE THAN SHE DID.

To establish a prima facie case under the EPA, Draper must prove that "she was doing substantially equal work on the job" as her male comparators.  *Cornish*, 67 F. Supp. 3d at 360. (*See* Dkt. 110 at 64.)  Unless the plaintiff performed equal work, the employer need not justify any differential.  One facet of an employee's work, highlighted by the statute, is the "effort" that goes into it.  29 U.S.C. § 206(d)(1) (listing "effort" as one of the elements for comparability).

The undisputed facts preclude Draper from making the requisite showing.  She identified four male comparators in the Atlanta office.  (Dkt. 110 at 70-71.)  But of the three who (in some years) earned more than her, each billed *hundreds* more hours of work than Draper every year. (*Supra* pp.7-8.)  In light of those enormous gaps in productivity, no reasonable factfinder could conclude that Draper did "substantially equal work" as these male associates.

---

[5] Jones Day is not now seeking summary judgment on the discriminatory-pay "sliver" of Henderson's NYCHRL claim.  (Dkt. 110 at 42.)  As this Court explained, Henderson alleges that "Jones Day's determinations of her pay were discriminatory" and resulted in lower pay within the limitations period.  (*Id.*)  Whether or not that continuation of a salary tainted by discrimination suffices to pursue an NYCHRL claim (an issue this Court left open), it does not give rise to a timely EPA claim, because there was no *unequal pay for equal work* within the limitations period. If an employee performs no work, she cannot prevail on an EPA claim for that period.

An employee's temporal contribution necessarily informs the nature of her work.  A doctor who works 20 hours per week and one who works 70 hours per week are not doing "equal work" or putting in anywhere near equal effort.  For that reason, it is generally inappropriate to compare part-time and full-time employees.  *See Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1155 (7th Cir. 1997).  And the same point holds even without a formal full-time/part-time dichotomy.  Consider *Chiaramonte v. Animal Medical Center*, where the Second Circuit affirmed summary judgment for the employer because the female veterinarian "carried a low patient load, seeing only one to three patients a day," while "[s]ome of her better-paid male colleagues ... treated up to 15 patients a day."  677 F. App'x 689, 691 (2d Cir. 2017).  They were not doing equal work.  *Id.*  Similarly, in *Schultz v. Department of Workforce Development*, two employees could not be comparators since the plaintiff "was permitted to leave work at 3:15 every day" while her male colleague had "to work normal full-day business hours."  2011 WL 13359148, at *4 (W.D. Wis. Mar. 1, 2011).  And in *Renstrom v. Nash Finch Co.*, the female grocer had not identified viable comparators, as she worked "40 hours per week," but one comparator "worked an average of 50 hours per week" and the other averaged "60 or more."  787 F. Supp. 2d 961, 969-70 (D. Minn. 2011).  For that reason, she could not "meet her burden to show that the jobs required equal effort."  *Id.* at 970.

At a law firm, the relevance of hours in assessing an associate's work and contribution is even more self-evident.  Most legal work at major law firms—and certainly most litigation work of the type Draper did—is still billed to clients on an hourly basis.  As a matter of pure economics, an associate billing 2,000 client hours is generating substantially more revenue and making a bigger financial contribution than an associate producing the same quality work at the same billing rate but only billing 1,500 hours.  Plaintiffs have therefore admitted that hours should matter in compensation.  Tolton agreed that "market pay takes into account the productivity, i.e., hours of

an associate." (Dkt. 102-5 at 4-5 (Tolton Tr. 239:20-240:2).)  Mazingo also recognized that "big firms will take into consideration a variety of objective criteria including ... billable hours." (Dkt. 102-6 at 3-4 (Mazingo Tr. 25:7-26:1).)  Henderson, too, affirmed that any "law firm … would pay their associates based on the work that they perform for the firm, including client hours." (Dkt. 102-11 at 4 (Henderson Tr. 154:15-20).)  Thus, if one is going to ask whether associates performed "equal work," their recorded client hours must certainly be a central component of that inquiry.

Here, the gap in client hours between Draper and her "comparators" is so stark that no factfinder could look past it, even if her work was otherwise identical in type and quality.[6]  During the years implicated by the statute of limitations, Draper recorded *fewer than half* the billable hours, even on an annualized basis, as the three associates who earned more than her:

- In 2015, Draper billed 642 hours (annualized).  Atlanta Comparators 1-3 billed 2,144; 1,689; and 2,003, respectively.

- In 2016, Draper billed 1,134 hours.  Atlanta Comparators 1-3 billed 2,185; 1,990; and 1,923 (annualized), respectively.

- In 2017, Draper billed 1,371 hours (annualized).  Atlanta Comparators 1-3 billed 2,067; 1,997; and 2,067, respectively.

- And in 2018, Draper billed 631 hours (annualized).  Atlanta Comparators 1-3 billed 1,896; 1,908 (annualized); and 2,077, respectively.

(SUMF ¶¶ 7-13, 20-23, 31-35, 42-46; *see also* App. 1.)  There is simply no comparing a lawyer who bills on average fewer than 1,000 hours per year to lawyers who are billing, on average, twice that amount.  Again, no factfinder could, on these facts, conclude that Draper's work was equal to her comparators' work.[7]

---

[6] Comparators 1-3 all had higher ratings than Draper in some or all years in the limitations period, and those who were senior enough to be ranked had far higher rankings than her. (Dkt. 102-15 at 2-3; Dkt. 128-10 (Coussons Decl. Ex. 1 cols. DI-DL, EC-EF, rows 42, 44, 48).)

[7] Draper earned *more* than Atlanta Comparator 4 each calendar year.  (SUMF ¶¶ 15-18, 53-36.)  True, his salary in his second and third years at the Firm were higher than Draper's had

Even including Draper's pro bono hours, which generate no revenue for the Firm, she only worked about two-thirds as much as Atlanta Comparators 1-3.  Over the 2015-2018 period, she logged an average of 1,400 hours of client work per year (inclusive of pro bono, on an annualized basis), whereas Atlanta Comparators 1-3 logged *more than 145% of that total* (2,083; 2,098; 1,944).  (*See* SUMF ¶¶ 7-13, 20-23, 31-35, 42-46.)  Even assuming that pro bono work is equal to billable work for EPA purposes, Draper still worked dramatically less than her male comparators: so much so that she could not possibly make out a prima facie case of equal work.[8]

Another way of making the same point is by looking at the relative amounts that Draper and the comparators were paid on a per-hour basis.  The EPA forbids paying a woman "at a rate less than the rate at which" male comparators were paid.  29 U.S.C. § 206(d)(1).  In the law-firm context, where revenue is generated for hourly work, precedent suggests that the relevant "rate" can be measured on an hourly basis.  *See Carey v. Foley & Lardner LLP*, 577 F. App'x 573, 579 (6th Cir. 2014) (evaluating disparity based on "total compensation divided by billable hours").  Viewed that way, and even assuming that Draper's work was equal in quality and type to that performed by the comparators (it was not), Draper was paid at a *higher* rate.  From 2015-2018, she earned roughly *two and a half times* the average rate paid to the men per billable hour.  Atlanta Comparators 1-3 earned on average $106 per billable hour; Draper earned $250 per billable hour.  She did better than each comparator in each relevant year.  (SUMF ¶¶ 7-51.)  Counting pro bono work, Draper was still paid about 50% higher per hour than the men during the relevant period.  She earned on average $153 per client hour; the men made $104 per client hour, on average.  (*Id.*)

---

been at that stage of her career, but Draper's pay as a second or third year is beyond the limitations period (plus separated by $40,000 in increases to starting salaries in Atlanta).  *See supra* at 5, 8.

[8] To be clear, the Firm strongly encourages lawyers to engage in pro bono activities and provides extensive support for such activities, but it still requires a reasonable level of productivity on paying work—a level that Draper never approached in the years within the limitations period.

One final note: Draper complains that she was discriminated against in work assignments and blames her low hours on that fact. (*E.g.*, Dkt. 41 at 59-61 (TAC ¶¶ 210-15).) But, even if she could prove as much, that would not give rise to an EPA claim. "If the unequal pay is a result of unequal work, a plaintiff does not have an EPA claim even if the unequal work is the result of discrimination, though she may have a Title VII claim." *Borrero v. Am. Exp. Bank Ltd.*, 533 F. Supp. 2d 429, 439 (S.D.N.Y. 2008); *see also Berry v. Bd. of Supervisors of LSU*, 715 F.2d 971, 976-78 (5th Cir. 1983) (holding that EPA does not reach claims of "work load discrimination," as plaintiff must prove "equal work"); *Hay Assocs.*, 545 F. Supp. at 1083 n.22 (similar).

Once again, no further discovery can change this analysis. Draper would presumably seek evidence that she performed the same *type* of work as her comparators, and that her work was just as *good*. But even if that were true, no reasonable factfinder could deem her work "substantially equal" when she performed *so much less of it*. The undisputed facts defeat Draper's claim; there is no reason to delay the inevitable. Jones Day is entitled to summary judgment.

## III. WILLIAMS' EPA CLAIMS FAIL BECAUSE THE ONLY COMPARATORS WHO EARNED MORE THAN HER WORKED AT DIFFERENT "ESTABLISHMENTS."

On the pleadings, this Court held that Williams had adequately alleged that she performed equal work as nine male associates who allegedly earned more than she did. (Dkt. 110 at 69-70.) Those comparators fall into two groups: (i) six random associates of roughly her vintage from around the country whom she met at training events, and (ii) three far more senior lawyers who had worked in the Irvine office many years earlier. Undisputed facts preclude Williams from establishing an EPA claim based on either set of cherry-picked comparators. Of the associates in the first set, most earned *less* than Williams, and in any event none of them worked in the same "establishment" as her; they are therefore irrelevant for EPA purposes. As for the Irvine associates, Williams earned *more* than their average in each and every year of seniority.

1.      Start with the six associates whom Williams says she met at "firm-wide trainings." (Dkt. 118-6 at 13 (Williams Tr. 164:16-20).)  Not a single one worked in Williams' practice. (SUMF ¶¶ 59, 66, 73, 80, 87, 93, 99.)  As one might expect given that Williams alleged disparate pay without any personal knowledge, half of these associates earned *less* than her.  (SUMF ¶¶ 60-64, 67-70, 81-85, 88-91.)  Of the other three: One earned the same as Williams most years, but 2% more in one year (*id.* ¶¶ 60-64, 94-97); another earned about 2% *less* than Williams one year, 2% more another year, and 4% more in the final year (*id.* ¶¶ 60-64, 101-105); and only one—a New York associate—earned materially more than Williams each year (*id.* ¶¶ 60-64, 75-78).  On these facts alone, Williams' claim based on these comparators necessarily fails.  *See infra* pp.18-22.

All of that aside, each of these supposed comparators is legally invalid for another reason that compels summary judgment: None of them worked in Irvine.  (SUMF ¶¶ 65, 72, 79, 86, 92, 98.)  When a company operates offices in multiple markets, the EPA does not require justification of pay differentials across locations.  The EPA applies only "within any establishment."  26 U.S.C. § 206(d)(1).  Under its "well settled meaning," the term "establishment" "refers to a distinct physical place of business rather than to an entire business or 'enterprise' which may include several separate places of business."  29 C.F.R. § 1620.9(a).  Indeed, by the time Congress enacted the EPA as an amendment to the Fair Labor Standards Act, the Supreme Court had long held that the word "establishment" in the latter statute "mean[s] a distinct physical place of business." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 496 (1945); *see also Mitchell v. Bekins Van & Storage Co.*, 352 U.S. 1027, 1027 (1957) (per curiam).  As one particularly scholarly opinion explains, "it is very difficult to believe that Congress intended the term to have one meaning in the EPA and an entirely different meaning in the rest of the FLSA."  *Renstrom*, 787 F. Supp. 2d at 967.

Apart from being compelled by statutory text and Supreme Court precedent, this rule also makes sense.  When two employees doing the exact same job across the hall from one another are paid different amounts, that might generate an inference of discrimination.  Yet the same pay differential in different cities, involving different labor markets and market competition and potentially different compensation decision makers does not.  Lawyers are paid more in New York than in Cleveland.  As the EPA recognizes, that isn't sex discrimination.

Applying the "establishment" rule, courts regularly reject EPA claims where the plaintiff identifies a comparator in a different city.  *E.g.*, *Jaburek v. Foxx*, 813 F.3d 626, 632 (7th Cir. 2016) ("none of these male employees worked in the Chicago or Fort Worth offices"); *Price v. N. States Power Co.*, 664 F.3d 1186, 1194-95 (8th Cir. 2011) (rejecting claim based on higher-paid employees at another service center); *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1017 (11th Cir. 1994) (same).  The same result follows here.  Williams cannot establish an EPA claim by comparing herself to male associates who worked in New York City, Washington D.C., or Dallas.

In prior briefs, Plaintiffs have invoked a narrow, judicially created exception under which separate offices could be considered a single establishment in "unusual circumstances."  *Renstrom*, 787 F. Supp. 2d at 965-67.  Even assuming this exception is consistent with Congress's use of the term "establishment," the undisputed facts make clear that it would not apply here.

Courts have applied the exception where a "central administrative unit" unilaterally "hire[s] all employees" and assigns them to particular offices, determines their compensation, controls work assignments, and frequently transfers employees among different offices.  29 C.F.R. § 1620.9(b).  To be clear, this means more than "commonplace" corporate "oversight," or else the exception would swallow the rule.  *Renstrom*, 787 F. Supp. 2d at 965.  Only "very unique facts" can trigger this exception.  *Lindsley v. TRT Holdings*, 2019 WL 6467256, at \*5 (N.D. Tex. Dec. 2,

2019).

To illustrate, one court held that a school district was a single establishment where it "did not just set wages and job classifications; it also conducted all of the hiring, assigned the janitors to various locations, and then transferred janitors from one location to another as necessary." *Renstrom*, 787 F. Supp. 2d at 965 (discussing *Brennan v. Goose Creek Consol. Indep. Sch. Dist.*, 519 F.2d 53, 58 (5th Cir. 1975)).  By contrast, the Eleventh Circuit held that a Florida office of a software company was its own establishment because (1) "job applicants [were] interviewed by local officials and hired upon their recommendation," and (2) although central management "set[] broad salary ranges, the specific salary to be offered a job applicant [was] determined by the local supervisor."  *Meeks*, 15 F.3d at 1017; *see also Lindsley*, 2019 WL 6467256, at *6 (each office was an establishment where the local managers "have a say in determining … salary"); *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 287 (S.D.N.Y. 2018) (each office was an establishment where central office "set generally applicable guidelines," but "individual pay and promotion decisions were left to the discretion of local practice area leaders" and "reviewed by firm leadership on an aggregate basis"); *Toomey v. Car-X Assocs. Corp.*, 2013 WL 5448047, at *7 (N.D. Ill. Sept. 30, 2013) (each office an establishment where "the manager of each store hired that location's technicians" and "mobility between stores was actually quite minimal").

Undisputed facts establish that Jones Day's offices are not a single establishment under this standard. *First*, "[r]ecruiting at Jones Day is done at the office level."  (Dkt. 128-30 at 3 (Reisman Tr. 44:4-5).)  Each office decides which recruiters to send for on-campus interviews; each office selects candidates that they individually as an office would like to call back for further interviews; and each office makes independent hiring decisions, both as to summer associates and full-time positions.  (SUMF ¶¶ 123-127.)  No approval at the firm-wide level is needed.  (*Id.* ¶ 127.)

*Second*, local "offices are primarily in charge of associate compensation" as well.  (Dkt. 128-15 at 8 (Lovitt Tr. 47:22-23).)  Each PIC makes salary recommendations based on that office's own method, and exercises independent discretion in apportioning that office's compensation budget.  (SUMF ¶ 128-129.)  As the Firm Manual makes clear, "the Firm does not have a compensation structure or ladder that is uniform across all geographic markets."  (Dkt. 102-9 at 3.)  While the PICs' recommendations are reviewed at the firm-wide level, any changes are sent back to the PIC, who can (and do) challenge them.  (SUMF ¶¶ 128-132.) Of the 29 pay adjustments experienced by the six named Plaintiffs collectively during their tenures at the Firm, 26 adjustments were the amounts recommended by the PICs.  (*Id.* ¶ 133.)

*Third*, each office has considerable functional independence.  There is no firm-wide system for assigning work to associates.  (SUMF ¶ 134.)  And work assignments for new lawyers are managed by the new lawyer group coordinator in each office.  (SUMF ¶ 135.)  Associates cannot transfer to another office without approval from both the sending and receiving office PICs.  (SUMF ¶ 136.)  And such transfers, where approved, are generally an accommodation to an associate, not a management decision for the benefit of the Firm.  (SUMF ¶ 137.)  For annual reviews, each office uses its own process to rate and rank its associates and has final say over those ratings and rankings.  (SUMF ¶ 138.)

To be sure, Jones Day lawyers collaborate across offices on client matters, and firm-wide leaders provide oversight of local decisions.  Far from an "unusual circumstance," such oversight fails to distinguish Jones Day from any corporation with multiple offices and a CEO.  *Renstrom*, 787 F. Supp. 2d at 965.  Given that each Jones Day office is primarily responsible for its own hiring, associate compensation, and operations, the unusual-circumstances exception does not apply.  *Meeks*, 15 F.3d at 1017.  Jones Day is not like a school district with a superintendent who

unilaterally hires employees, sets their pay, assigns them to a school, and frequently changes their assignment. *Renstrom*, 787 F. Supp. 2d at 965 (discussing *Goose Creek*, 519 F.2d at 58).[9]

Once again, further discovery could change none of this. There can be no dispute about where the comparators worked. Plaintiffs have already taken extensive document discovery about Jones Day's operations and structure. And Plaintiffs have deposed three Rule 30(b)(6) designees on topics including associate hiring, compensation, training, work assignments, and evaluations. (*See* Dkt. 128-5 (Lovitt Decl. ¶ 4; Dkt. 128-19 at 3-4 (Bounds Tr. 46:9-47:24)).) Thus, the "establishment" issue is ripe for disposition, and it compels the rejection of Williams' EPA claims based on the non-Irvine comparators.

2.      Next up are the three men who worked in Irvine years earlier and, on "information and belief," earned more than Williams. (Dkt. 41 at 48 (TAC ¶ 165).) At the outset, none of the three were in Williams' practice (SUMF ¶¶ 107, 115, 120), making it dubious that they are valid comparators. *See Spencer*, 919 F.3d at 204 (professors in different departments were invalid comparators). All were far senior to Williams; two of the three left Jones Day before she even joined. (SUMF ¶¶ 58, 106, 113, 114, 118-119, 122.) The third was a lateral hire who worked for just one year and never went through the Firm's annual evaluation process. (SUMF ¶ 122.) All three left Jones Day more than 5 years before Plaintiffs sued. (SUMF ¶¶ 113, 118, 122.)

Regardless, even accepting Williams' allegation, her EPA claim fails because she earned *more* than the average of these three men. When a plaintiff alleges multiple comparators, the claim

---

[9] Nor is Jones Day like a federal agency, with a central administrator wielding unilateral regulatory control over hiring and pay in branch offices. *See Grumbine v. United States*, 586 F. Supp. 1144, 1151-52 (D.D.C. 1984). *Grumbine* is also questionable on its own terms, as neither this Court nor the D.C. Circuit has ever cited it, the case was decided before the 1986 EEOC regulation addressing the meaning of "establishment," and the opinion fails to give sufficient weight to the Supreme Court's longstanding interpretation of "establishment" in the FLSA. *See Renstrom*, 787 F. Supp. 2d at 966-67 (disagreeing with *Grumbine*).

22

fails if she earned more than their average. *Heymann v. Tetra Plastics Corp.*, 640 F.2d 115, 121-22 (8th Cir. 1981) (rejecting "self-serving" comparison to "highest-paid" male; affirming summary judgment where plaintiff did not earn less than "average wage" paid to men); *Lemke v. Int'l Total Servs., Inc.*, 56 F. Supp. 2d 472, 490 (D.N.J. 1999) (finding that plaintiff failed to establish a prima facie EPA case because "her salary was higher than the average salary" of her self-identified comparator pool); *Allender v. Univ. of Portland*, 689 F. Supp. 2d 1279, 1286 (D. Ore. 2010) (comparing plaintiff's salary to average of three male comparators').

Here, Williams earned *more* than two of the Irvine comparators at each year of seniority; the third—a lateral hire—earned slightly more as a fourth-year associate than Williams did a few years later. (SUMF ¶¶ 60-64, 106-122; *see also* App. 2.) But Williams still earned about $5K more, as a fourth-year, than the average of the two male Irvine comparators who lasted into their fourth year. (SUMF ¶¶ 64, 112, 121.) By the relevant measure, then, the Irvine comparators made less than Williams, and her claim based on them fails. *See Heymann*, 640 F.2d at 121-22; *Lemke*, 56 F. Supp. 2d at 490; *Allender*, 689 F. Supp. 2d at 1286.

## **CONCLUSION**

For these reasons, the Court should grant Jones Day's motion for summary judgment, and dismiss Count IV of the TAC.

July 13, 2020                              Respectfully submitted,

                                          /s/ Mary Ellen Powers
                                          Mary Ellen Powers (Bar No. 334045)
                                          Beth Heifetz (Bar No. 417199)
                                          Yaakov Roth (Bar No. 995090)
                                          JONES DAY
                                          51 Louisiana Avenue NW
                                          Washington, DC 20001
                                          Phone: (202) 879-3939


                                          Terri L. Chase (*pro hac vice* granted)
                                          JONES DAY
                                          250 Vesey Street
                                          New York, NY 10281
                                          Phone: (212) 326-3939

                                          *Attorneys for Defendant*

# Appendix 1

| ASSOCIATE | Hour Type | 2015 | 2016 | 2017 | 2018 | Average |
|---|---|---|---|---|---|---|
| | Billable | 642* | 1134 | 1371* | 631* | 945 |
| Saira Draper | Pro bono | 458* | 370 | 222* | 774* | 456 |
| | Total | 1100 | 1504 | 1593 | 1405 | 1401 |
| | | | | | | |
| | Billable | 2144 | 2185 | 2067 | 1896 | 2073 |
| ████ | Pro bono | 58 | 0 | 14 | 28 | 25 |
| | Total | 2202 | 2185 | 2081 | 1924 | 2098 |
| | | | | | | |
| | Billable | 2003 | 1923* | 2067 | 2077 | 2018 |
| ████ | Pro bono | 9 | 116* | 97 | 42 | 66 |
| | Total | 2012 | 2039 | 2164 | 2119 | 2084 |
| | | | | | | |
| | Billable | 1689 | 1990 | 1997 | 1908* | 1896 |
| ████ | Pro bono | 136 | 1 | 28 | 15* | 45 |
| | Total | 1825 | 1991 | 2025 | 1923 | 1941 |
| | | | | | | |

Note: The figures in this chart are drawn from the SUMF using annualized hours where applicable. The chart is intended for convenience only.
*Annualized hours.

# Appendix 2

| NAME | JD YEAR | OFFICE | PRACTICE | Year 1 | Year 2 - Jan | Year 2 - July | Year 3 | Year 4 |
|---|---|---|---|---|---|---|---|---|
| Williams | 2013 | Irvine | Intellectual Property | $160,000 | $170,000 | $185,000 | $205,000 | $215,000 |
| | | | | | | | | |
| ███ | ██ | Pittsburgh | ███ | $145,000 | $150,000 | $170,000 | $175,000 | $190,000 |
| ███ | ██ | San Diego | ███ | $160,000 | $170,000 | $180,000 | $190,000 | $190,000 |
| ███ | ██ | Dallas | ███ | $160,000 | $170,000 | $180,000 | $185,000 | N/A |
| ███ | ██ | Dallas | ███ | Judicial Clerk | $170,000 | $185,000 | $205,000 | $220,000 |
| ███ | ██ | Houston/D.C. | ███ | $160,000 | $170,000 | $180,000 | $210,000 | $225,000 |
| ███ | ██ | New York | ███ | $160,000 | $175,000 | $210,000 | $265,000 | $350,000 |
| | | | | | | | | |
| ███ | ██ | Irvine | ███ | $160,000 | $175,000 | $175,000 | $175,000 | $190,000 |
| ███ | ██ | Irvine | ███ | $160,000 | $160,000 | $160,000 | $160,000 | N/A |
| ███ | ██ | Irvine | ███ | N/A | N/A | N/A | $230,000 | N/A |
| **Average Irvine Comparator Salary** | | | | $160,000 | $167,500 | $167,500 | $188,500 | $190,000 |

Note: The figures in this chart are drawn from the SUMF.  The chart is intended for convenience only.