## IN THE UNITED STATES DISTRICT
## COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NILAB RAHYAR TOLTON et al., | Civil Action No. 19-945 (RDM) |
| *Plaintiffs*, | |
| v. | **DEFENDANT'S RESPONSE TO** |
| JONES DAY, | **RULE 56(D) DECLARATION** |
| *Defendant*. | |

As directed by the Court, Plaintiffs' counsel served a draft of their Rule 56(d) declaration on Jones Day on Friday, July 24.  Counsel scheduled a meet-and-confer about the declaration.  In advance of that discussion, Jones Day provided a detailed written response, explaining why the further discovery Plaintiffs demanded was not warranted under Rule 56(d): Many of the broad topics on which they claimed the need for discovery were not relevant to Jones Day's narrowly tailored motion, and the remainder had already been the subject of Rule 30(b)(6) depositions and substantial document discovery.  Jones Day's responsive letter is attached as **Exhibit A**.[1]

Plaintiffs' final version of the Rule 56(d) declaration largely tracks the draft to which Jones Day responded.  Plaintiffs do not identify any particular facts that are "essential to justify [their] opposition" to the motion, Fed. R. Civ. Proc. 56(d), and do not ask for any targeted discovery that could be offered expeditiously in advance of the opposition deadline.  They instead argue that they need *all of discovery*, generally, to be completed before responding to the motion, and therefore request that the Court stay *indefinitely* their obligation to respond.

---

[1] As noted in the responsive letter, Jones Day did offer to produce unredacted or less-redacted versions of certain documents that Plaintiffs identified.  Jones Day also offered to produce documents reflecting inter-office transfers by associates in the United States, and the reasons for those transfers.  Those productions were completed earlier today.

Having failed to identify specific information needed to oppose the pending motion, and for the reasons fully set forth in Exhibit A, Jones Day asks the Court to reject Plaintiffs' request for an indefinite stay, and order that their opposition be filed on the scheduled deadline.

July 31, 2020                                    Respectfully submitted,

                                                  _/s/ Mary Ellen Powers_
                                                 Mary Ellen Powers (Bar No. 334045)
                                                 Beth Heifetz (Bar No. 417199)
                                                 Yaakov M. Roth (Bar No. 995090)
                                                 JONES DAY
                                                 51 Louisiana Avenue NW
                                                 Washington, DC 20001
                                                 Phone: (202) 879-3939

                                                 Terri L. Chase (*pro hac vice*)
                                                 JONES DAY
                                                 250 Vesey Street
                                                 New York, NY 10281
                                                 Phone: (212) 326-3939

                                                 *Attorneys for Defendant*

# Exhibit A

# JONES DAY

250 VESEY STREET • NEW YORK, NEW YORK 10281.1047

TELEPHONE: +1.212.326.3939 • FACSIMILE: +1.212.755.7306

DIRECT NUMBER: (212) 326-8386
TLCHASE@JONESDAY.COM

July 29, 2020

<u>VIA E-MAIL</u>

Russell Kornblith
Sanford Heisler Sharp, LLP
1350 Avenue of the Americas
New York, NY 10019

Re:    <u>*Tolton v. Jones Day*</u> - Case No. 1:19-cv-00945 (RDM)

Dear Russell:

Judge Moss instructed us to confer over whether certain "limited" discovery, necessary to allow Plaintiffs to respond to Jones Day's "tailored" summary judgment motion, could be provided "expeditiously" in advance of your August 10 opposition deadline.  Jones Day was and remains willing to engage in that dialogue.  But, instead, your Rule 56(d) declaration demands 16 additional depositions and approximately 35 sweeping categories of documents.  Most of these requests have absolutely nothing to do with the arguments in the summary judgment motion, and the few that do concern subjects about which Plaintiffs have already been afforded more than adequate discovery through the "substantial document discovery" and "three Rule 30(b)(6) depositions" that Plaintiffs have, by their own account, already taken.  (Dkt. 111 at 3.)  We can only conclude that Plaintiffs are not seriously interested in obtaining discovery to respond to the summary judgment motion— only in delaying the dismissal of their remaining, baseless EPA claims.

Below, we respond in detail to your various sets of requests.  At the outset, however, it is important to emphasize that the question under Rule 56(d) is not whether certain information is within the bounds of discovery in this action, or even whether the information could legitimately be sought in connection with Plaintiffs' EPA claims.  Rather, the question is whether Plaintiffs are unable to "present facts essential to justify [their] opposition" to the pending motion.  Fed. R. Civ. Proc. 56(d).  Plaintiffs must identify, with precision, "what facts [they] intended to discover that would create a triable issue and why [they] could not produce them in opposition to the motion." *Byrd v. EPA*, 174 F.3d 239, 248 n.8 (D.C. Cir. 1999).  Here, that means Plaintiffs must identify facts, not covered by the discovery to date, that explain (i) how Henderson could state an EPA claim for a period of time when she performed no work at all for Jones Day; (ii) how Draper could satisfy her *prima facie* case by demonstrating that she performed "equal work" as three (self-identified) comparators who billed on average twice as many hours as she did over the relevant period; or (iii) how Williams can state an EPA claim based on (again, self-identified) comparators who either earned less than she did or worked in other "establishments."

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DETROIT
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID • MELBOURNE
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SAUDI ARABIA • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

July 29, 2020
Page 2

**1.** To start, a number of your demands assume, either explicitly or implicitly, that Plaintiffs can respond to the summary judgment motion by identifying *new* comparators, other than those identified in the Third Amended Complaint or at Plaintiffs' depositions. Hence your requests for pay, review, and hours data for "potential comparators"—presumably meaning anyone anywhere who earned more than Plaintiffs did. (Kornblith Rule 56(d) Decl. ¶ 10.)

The time to identify "potential" comparators is over. Judge Moss required each Plaintiff to identify specific comparators in the Third Amended Complaint to proceed past the pleadings. (Dkt. 110 at 69-71.) That task was not onerous, since the Court allowed Plaintiffs to plead their comparators' higher pay on "information and belief"; all your clients needed to do was identify a male associate who performed "substantially equal work." Three Plaintiffs did so, and each has since been deposed about her basis for identifying the selected individuals. And the deadline to further amend the Complaint has expired. (Minute Order (June 11, 2020).) The question now is whether Plaintiffs can sustain their EPA claims based on the comparators that they identified, not whether they can rummage through the forthcoming Title VII discovery to develop *new* EPA claims based on *new* comparators. *See Kent v. City of Chicago*, 814 F. Supp. 2d 808, 815-16 (N.D. Ill. 2011) ("In Kent's response to the City's summary judgment motion, Kent puts forth, for the first time, a new comparator, Richard Bradley. The City properly argues that Kent cannot amend her complaint through arguments in her brief opposing summary judgment.").

As you know, Jones Day has already provided Plaintiffs' salary information, reviews, and hours data, as well as the same information for the 19 alleged comparators. The fact that discovery disproves Plaintiffs' comparisons does not entitle them to sift for more. *See Kellogg v. Ball State Univ.*, 2020 WL 707846, at *4 (S.D. Ind. Feb. 12, 2020) ("[T]he court will not evaluate the portion of Kellogg's response that raises arguments related to other male employees further, since Kellogg limited the scope of this case to a comparison between her salary and McSparrin's.").

**2.** Most of the discovery sought by your declaration relates to "the factors Jones Day uses to measure work in determining compensation," and in particular the role of billable hours in the equation. (Kornblith Rule 56(d) Decl. ¶ 10.) Apparently this discovery is designed to support an argument that Henderson and Draper performed "equal work" to their comparators despite recording a fraction as many hours of legal work (or, in Henderson's case, none at all).

Plaintiffs are free to make those arguments, but evidence about Jones Day's process for setting associate compensation is not relevant—much less "essential"—to doing so. To establish an EPA claim, a plaintiff must first show that she performed "equal work" as a male comparator. For that *prima facie* case, it does not matter how the *employer* chooses to measure or compensate work. Just the opposite: The whole point of the EPA was "to achieve a clearly defined result that can be verified by *objective* measurement—equal pay for equal work." *Marshall v. Farmers Ins. Co.*, No. 75-63-C2, 1978 WL 107, at *4 (D. Kan. July 13, 1978) (emphasis added); *see also Gerlach v. Mich. Bell Tel. Co.*, 501 F. Supp. 1300, 1321 (E.D. Mich. 1980) (EPA imposes

JONES DAY

July 29, 2020
Page 3

"requiremen[t] of equal pay for *objectively defined* equal or substantially equal work" (emphasis added)).  The question is thus whether, from an *objective* standpoint, the plaintiff and comparator did "equal work."  *See Talbott v. Pub. Serv. Co. of New Mexico*, No. 18-cv-1102, 2020 WL 2043481, at *8 n.11 (D.N.M. Apr. 28, 2020) ("[t]his test is an objective one").

From an objective standpoint, an associate's billable hours are obviously a critical measure of her work.  That is hardly a surprise to Plaintiffs, who admitted as much at their depositions.[1]  The Complaint, too, goes out of its way to emphasize how important hours are at a law firm.[2]  Indeed, Williams' EPA claim is specifically grounded on billable hours: "Upon information and belief, Jones Day paid her less than male associates *even though she routinely billed more hours than they did*."  (TAC ¶ 165 (emphasis added).)  So too for Henderson.  (*Id*. ¶ 287 (Henderson "understands she likely billed more hours than Zachary Werner and David Katz").)  We have produced all comparators' hours records, which demonstrate those allegations to be false.  For you to now disclaim your ability to address Jones Day's summary judgment motion without discovery into whether the Firm cares about an associate's hours is disingenuous.

In any event, you have had ample opportunity for discovery on how Jones Day measures work and determines compensation, including the role of hours.  Jones Day designated Traci Lovitt as its Rule 30(b)(6) witness on "practices concerning the Firm's determinations regarding salary ..., compensation adjustments, [and] salary freezes, for U.S. associates, from 2015-2018, including the process, procedure, criteria and standards used by Jones Day to evaluate, recommend and determine/approve annual compensation for associates."  (Letter from T. Chase to R. Kornblith (Jan. 10, 2020).)  She was also designated to testify about "the Firm's evaluation process for associates, ... including the criteria used to evaluate U.S. associates."  (*Id.*; *see also* Lovitt Tr. 239:13-243:25 (describing consideration of hours in evaluation and compensation process).)

---

[1] Tolton agreed that "market pay takes into account the ... hours of an associate." (Tolton Tr. 239:20-240:2.)  Mazingo also recognized that "big firms will take into consideration a variety of objective criteria including ... billable hours."  (Mazingo Tr. 25:7-26:1.)  Henderson, too, affirmed that any "law firm … would pay their associates based on the work that they perform for the firm, including client hours."  (Henderson Tr. 154:15-20.)  And Williams' "understanding coming into the firm was that 2,000 hours was the goal."  (Williams Tr. 120:5-7.)

[2] (TAC ¶ 121 ("Tolton continued to work hard for the Firm, billing approximately 200 hours per month."); *id.* ¶ 134 ("Mazingo worked tirelessly for the Firm at great personal cost for years—logging up to 250 billable hours per month."); *id.* ¶ 138 ("Mazingo made every effort to prove herself, billing over seventeen hours a day for several days in a row.") *id.* ¶ 152 ("Mazingo was billing more than 230 hours a month and traveling for work all week."); *id.* ¶ 173 ("Williams had excelled at motion practice throughout 2016, billing 2,342 hours including significant pro bono work, while juggling community engagement representing the Firm for a total of 2,568 hours.") *id.* ¶ 195 ("Draper learned she was pregnant with her first child while away at the Washington, D.C. trial, during which she billed in excess of 15 hours per day.").)

JONES DAY

July 29, 2020
Page 4

We have also already produced the documents reflecting the Firm's consideration of hours in setting compensation.  Indeed, Plaintiffs rely on many of those documents in their conditional certification motion.  (*See, e.g.*, CCM Exs. O, P ("While we have not adopted arbitrary hours requirements, each lawyer's productivity should be an important factor in making compensation adjustments."); *see also id.* ("Each lawyer's compensation should reflect the specific individual contribution of that lawyer, including his or her level of professional achievement, productivity and potential for meaningful growth and advancement."); *id.* ("there should be a range of compensation paid to associates in any class that reflects their relative performance, productivity and overall contribution to the Firm").)  We have also produced spreadsheets used by PICs to record their salary recommendations, which include columns reporting each associate's hours.

You do not explain why, in light of all that, additional discovery on this point is "essential" to opposing the pending summary judgment motion.  Even if Jones Day's approach to measuring associates' work and to setting associate pay were relevant to the pending motion, Plaintiffs have everything they need on that score.

3.       Some of your specific requests on the topic of how the Firm measures work appear related to Henderson, who was terminated in December 2015 but allowed to remain on the payroll for six months while she looked for a new job.  The EPA limitations period covers the last week of that job search.  You ask, for example, for documents about male associates who were told to seek other employment, and about "the Firm's rationale for keeping associates on the payroll while instructing them to look for other employment."  (Kornblith Rule 56(d) Decl. ¶ 10.)

None of this is relevant to the only issue presented by the summary judgment motion— whether Henderson performed "equal work" to her comparators in the last week of June 2016, despite performing no legal work whatsoever during that entire calendar year.  If you want to argue that an associate can perform "equal work" despite performing no work, you are free to do so.  But none of this further discovery is remotely "essential," or even relevant, to that argument.

4.       The next significant category of discovery that you request relates to your argument that "Jones Day operates as one 'establishment'" and therefore that an associate in, say, Columbus could put forward a *prima facie* case by pointing to a pay disparity with an associate in New York.  (*Id.* ¶ 11.)  To support that position, you seek depositions and documents relating to local office control (or lack thereof) over associate recruiting, hiring, work assignments, training, transfers, supervision, evaluations, and compensation.  But, to the extent that any of these topics is even arguably relevant to the "establishment" inquiry, Plaintiffs have already received everything they reasonably need on this score.

Plaintiffs have already taken (or had the opportunity to take) discovery on *every one of the identified issues*.  Plaintiffs have deposed three Rule 30(b)(6) designees on topics including the Firm's policies regarding associate recruiting, hiring, work assignments, training, transfers,

JONES DAY

July 29, 2020
Page 5

supervision, evaluations, and compensation; as well as about the Firm's "organizational structure ... at the office level," and "management structure," including the responsibilities of the "Managing Partner," "Practice Leadership," and "Office and geographic leadership." (Dkt. 125-5 (Lovitt Decl. ¶ 4); Bounds Tr. 46:9-47:24.) Through these depositions, for example, Plaintiffs learned that "[r]ecruiting at Jones Day is done at the office level." (Reisman Tr. 44:4-5.) Ms. Reisman explained that the offices "ma[ke] their own decisions and … each one does it slightly differently." (*Id.* 44:6-9.) For the summer program, "the hiring partner" in each office "runs the summer program differently." (*Id.* 114:21-24.) And each office makes the decision of whether to extend an offer to a candidate after the summer program. (*Id.* 129:15-130:15.)

This discovery has amply demonstrated, as set forth in Jones Day's summary judgment materials, that Jones Day's local offices play a sufficiently meaningful role in employment matters that they cannot, as a matter of law, be deemed one national "establishment" under the FLSA— something that requires truly "unusual circumstances." *Renstrom v. Nash Finch Co.*, 787 F. Supp. 2d 961, 965 (D. Minn. 2011).

Perhaps you are unhappy with what you learned at the Rule 30(b)(6) deposition, or perhaps you regret that you did not inquire into certain topics on which the witnesses were designated and prepared to testify. Either way, that does not make 14 additional depositions "essential" to your summary judgment response. The whole point of a Rule 30(b)(6) deposition is to avoid the need for serial depositions of an organization's leadership by designating one (or a few) persons who can testify on the organization's behalf. *See Sprint Commc'ns Co., L.P. v. Theglobe.com, Inc.*, 236 F.R.D. 524, 528 (D. Kan. 2006). Accordingly, if "the Plaintiffs had the opportunity to depose the Defendants' 30(b)(6) witness," "the Plaintiffs questioned the witness" on the designated topics, and "the witness answered questions concerning" the topics, the plaintiffs are not "entitled to the protections of Rule 56(d)." *Williams v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 1:14-cv-309, 2015 WL 7761562, at *2 (N.D. Ga. Dec. 2, 2015). Notably, you do not point to a single instance in which the designated witnesses were unable to answer any questions about the designated topics.

You also request additional documents about these same topics (Kornblith Rule 56(d) Decl. ¶ 11), and a set of hypothetical documents that would "cast doubt on" the Rule 30(b)(6) testimony (*id.* ¶ 13). But, again, you have already obtained substantial document discovery on these topics. Among other things, we produced emails to and from office PICs soliciting and conveying local associate salary recommendations and local associate performance ratings and rankings, several of which you cited in your CCM. (*See* CCM Exs. O, P, R, T, H.) Nothing more is needed to demonstrate that Jones Day's 18 U.S. offices are not a single "establishment."

Finally, it is worth adding that Plaintiffs' need for discovery is at its *lowest* with respect to topics like associate recruiting, supervision, training, work assignments, evaluations, and the like. Plaintiffs *personally experienced* these things during their time at the Firm. Williams herself— the only plaintiff affected by the "establishment" issue—testified in detail about many of these

July 29, 2020
Page 6

points.  She had an on-campus interview with lawyers from the Irvine office.  (Williams Tr. 10:21-11:11, 12:6-10.)  She went to a callback interview in the Irvine office.  (*Id.* 11:12-15.)  She met with partners in the Irvine office.  (*Id.* 11:21-12:5.)  She had discussions about what sort of work was available in the Irvine office.  (*Id.* 12:14-18:9.)  After her summer in the Irvine office, she received an offer from the Irvine office to become a full time associate.  (JD_00001387-93.)  As an associate, her mentor was in the Irvine office.  (Williams Tr. 355:12-16.)  Her salary letters directed her to the Partner in Charge of the Irvine office if she had any concerns.  (*E.g.*, JD_00001305; Williams Tr. 189:5-13 (testifying that she was "sure [she] saw that" the letters "directed you, if you have any questions about your salary, to speak with your office's partner-in-charge").)  When Williams was concerned about a negative review she "spoke with Irvine Partner-in-Charge Richard Grabowski."  (TAC ¶ 180; Williams Tr. 324:20-330:21.)  And her exit interview was in the Irvine office with an Irvine partner.  (Williams Tr. 393:4-8.)  In short, her personal testimony confirms exactly what the Rule 30(b)(6) deponent testified—that Jones Day's offices in Irvine and New York are not a single "establishment."[3]

Having said all that, we are prepared to produce data reflecting associate transfers between U.S. offices and the reasons for those transfers (which are overwhelmingly to accommodate the personal needs of associates).  While none of these documents are relevant—Jones Day does not dictate the offices in which associates work or require associates to move from the office they

---

[3] The testimony of the other Plaintiffs was to the same effect: They all interviewed with lawyers in their local offices, received offers directly from their local offices, raised concerns with partners in their local offices, received their annual oral reviews from supervisors in their local offices, and so forth.  (*E.g.*, Mazingo Tr. 81:5-13 (testifying that Irvine partner discussed consensus statements with her on an annual basis); *id.* 283:15-187:7, 292:6-293:7, 293:25-294:14 (discussing concerns with Irvine partners); *id.* 295:21-297:4 (discussing concerns and participating in exit interview with Irvine Hiring Partner); Tolton Tr. 21:19-24 (interviewing with Irvine office Hiring Partner and Irvine associates); *id.* 52:12-23 (discussing offer letter from Irvine office); *id.* 225:3-236:16 (complaining to Irvine Administrative Partner about salary decrease); *id.* 510:25-511:10 (testifying that Irvine Administrative Partner provided annual performance evaluation and offered to help her find a new job); Draper Tr. 41:9-22 (testifying she interviewed on campus with Atlanta partners); *id.* 42:19-21 (testifying she came to a callback in Atlanta); *id*. 60:16-61:6 (discussing leave with HR staff in the Atlanta office); *id.* 412:4-6 (noting her annual review was given to her by Atlanta partners); Henderson Tr. 77:24-78:4 (discussing her associate mentor who was in the New York office); *id.* 82:12-83-5 (noting there were coordinators of the New York office's New Lawyer Group); *id.* 175:3-18 (stating she sought permission to go on vacation from more senior attorneys in New York); *id.* 235:13-236:13 (complained about salary to New York partners); *id.* 280:1-19 (asking New York partner to keep Henderson on the pay roll after being terminated); Stahl Tr. 11:6-22 (noting her on campus interview was with Irvine partners); *id.* 68:13-17 (agreeing that her salary letter said to direct any questions to the office's partner in charge); *id.* 73:12-74:7 (asking Irvine partner about salary and raises); *id.* 132:11-17 (testifying that Irvine's partner in charge and administrative partner delivered her annual final assessment).)  There is no basis for Plaintiffs to contend otherwise, and no need for further discovery on these points.

JONES DAY

July 29, 2020
Page 7

joined—the data will disprove any claim that is even tangentially related to the existence, or lack thereof, of a "single establishment."

**5.**     Last, you seek "unredacted versions" of 73 documents.  (Kornblith Rule 56(d) Decl. ¶ 12.)  These documents generally fall into three broad categories: (1) attendance lists at training programs, (2) collections of assessment statements for associates other than Plaintiffs and their comparators, and (3) spreadsheets used to solicit or reflecting compensation recommendations from office PICs.  With the exception of a handful of emails that we will produce with fewer redactions, these documents are not relevant to the pending motion.

*First*, who attended training programs has nothing to do with Plaintiffs' EPA claims.  The EPA does not concern equal *training*; it concerns equal *work*.  All lawyers attend law school; that does not mean they all perform equal work after graduation.  And Jones Day's motion establishes that Henderson and Draper did not perform "equal work" as their comparators, regardless of what training they attended.  Nor does some nationwide training mean all Jones Day employees work for a single "establishment"; no court has held otherwise.  Perhaps more importantly, Plaintiffs do not need more discovery to testify about who attended trainings with them.  Williams has already named the associates she met at training sessions.  (*See* Williams Tr. 138:17-139:5 (describing her comparators as "gentlemen I met at the firm-wide trainings in D.C. and Cleveland and Los Angeles"); *id.* 139:10-140:19 ("I met these gentlemen at and saw them at some of the firm-wide trainings where we were learning here how to take a deposition, how to defend a deposition, so I understood we were performing similar work.").)  Nonetheless, we will produce further unredacted training lists for trainings attended by Williams.

*Second,* the assessment statements of associates other than Plaintiffs and their comparators are obviously irrelevant to Jones Day's motion.  You do not explain otherwise.  Moreover, as we have explained in prior letters, the assessment statements contain client privileged information.  For that reason, your firm previously withdrew its request for this data.  Of course, as directed by the Court, the numeric evaluation data for approximately 2300 U.S. associates for the time period 2012-2018 will be produced shortly in connection with your Title VII claims.  But none of that data relates to Plaintiffs' EPA claims or is relevant (let alone "essential") to your opposition to the pending summary judgment motion.

*Third*, the redacted portions of the compensation spreadsheets add no relevant information.  Most of them are spreadsheets sent to PICs with blank columns in which to fill in their compensation recommendations, thereby demonstrating the role of the office in setting compensation.  As explained above, who decided particular compensation figures and why they made particular decisions are not relevant to the "equal work" inquiry.  The general process for setting pay might bear on the "establishment" inquiry, but Jones Day has already provided extensive deposition and document discovery on the general evaluation and compensation processes, as confirmed by your own motion for conditional certification.  Further, Jones Day has

JONES DAY

July 29, 2020
Page 8

produced spreadsheets showing how the salaries for Plaintiffs and their comparators were recommended and approved during their tenures at the Firm. (*See* JD_02210932.) Anything else is irrelevant to the pending motion. Nonetheless, we will produce further unredacted versions of some of these documents – those that might arguably bear on Plaintiffs' claims.

*       *       *

Nearly a year ago, we predicted your strategy: "Plaintiffs speculate (on information and belief) that someone at the Firm must have been paid more than they were, so they seek discovery on every associate in the Firm to find someone whom they can then try to justify, after the fact, as a comparator. This is the epitome of a fishing expedition." (Dkt. 47 at 18.) Unfortunately, your Rule 56(d) declaration proves this prediction true. If you were seriously interested in pursuing some discrete discovery necessary to your summary judgment response, Jones Day would engage and make every effort to get it done. But the discovery that Plaintiffs seek is not relevant to Jones Day's pending motion for summary judgment—it is an obvious delay tactic. We look forward to discussing further during our meet-and-confer about this topic.

Sincerely,

/s/ *Terri L. Chase*

Terri L. Chase

cc:    Mary Ellen Powers
       Yaakov Roth
       Deborah Marcuse
       Kate Mueting