**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NILAB RAHYAR TOLTON *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br>JONES DAY, a General Partnership,<br><br>Defendant. | No. 1:19-cv-00945-RDM<br><br><br>JURY TRIAL DEMANDED |

<u>**PLAINTIFFS' AMENDED MEMORANDUM IN SUPPORT**</u>
<u>**OF THEIR AMENDED MOTION FOR CONDITIONAL CERTIFICATION**</u>
<u>**OF AN EQUAL PAY ACT COLLECTIVE ACTION**</u>
<u>**AND AUTHORIZATION OF NOTICE**</u>

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................... 1

II.  FACTUAL BACKGROUND.................................................................................... 4

1.   All Members of the Collective Challenge the Same Centralized Compensation Policy Set by Managing Partner Brogan. ...............................................................................4

2.   All Associates Have Their Compensation Determined by Managing Partner Brogan Through the Same Compensation Process....................................................................5

3.   Jones Day Repeatedly Emphasizes that Managing Partner Brogan Makes Compensation Decisions. .................................................................................................10

4.   Representative Plaintiffs and Members of the Collective Testified Managing Partner Brogan Makes Compensation Decisions. ...................................................................11

5.   Under this Policy, Men are Paid More than Women for Substantially Equal Work. .....13

   a.   Initial Comparator Data Shows Female Associates are Paid Less than Male Comparators. .................................................................................................. 13

   b.   Anecdotal Evidence Confirms Jones Day Pay Women Less than Men Performing Substantially Equal Work. .............................................................................. 18

   c.   Jones Day's Pay Secrecy and No Whining Policies Further Indicates that the Firm Pays Women Less than Men Performing Substantially Equal Work. .............................. 20

6.   At the decertification stage, Plaintiffs will be able to rely on statistical evidence to establish compensation disparities, because all associates at Jones Day perform substantially equal work within the same establishment. ................................................................21

   a.   Plaintiffs Point to Evidence Showing they Performed Substantially Equal Work as Male Associates. ........................................................................................... 21

i

     b.    Associates at Jones Day Perform Substantially Equal Work. ..................................... 22

     c.    Evidence to Date Indicates that, at the Merits Stage, Plaintiffs Will Show that Jones Day Operates as a Single Establishment............................................................................. 23

III.  LEGAL STANDARD ............................................................................................................ 25

    1.    The Inquiry as to Whether Plaintiffs are Similarly Situated is a Low Bar. ..................... 28

    2.    Plaintiffs' Evidentiary Burden at Stage One is Typically Satisfied by Pleadings and Declarations Alone.......................................................................................................... 30

    3.    Courts Disregard Defendants' Competing Evidence at Stage One. ................................. 30

    4.    Questions of Individualized Inquiries are Deferred............................................................ 32

IV.  ARGUMENT........................................................................................................................... 33

V.  RELIEF REQUESTED ........................................................................................................... 42

# TABLE OF AUTHORITIES

**Cases**

*Ameritech Ben. Plan Comm. V. Commc'n Workers of Am.*, 220 F.3d 814 (7th Cir. 2000).......... 25

*Ayala v. Tito Contractors*, 12 F. Supp. 3d 167 (D.D.C. 2014) ................................................. 30, 39

*Barrett v. Forest Labs, Inc.*, No. 12 cv. 5224 (RA)(MHD), 2015 WL 5155692 (S.D.N.Y. Sept. 2, 2015)...................................................................................................................................... passim

*Blount v. U.S. Sec. Assocs.*, 945 F. Supp. 2d 88, 92 (D.D.C. 2013) ..................................... passim

*Bradley v. Vox Media, Inc.*, No. CV 17-1791, 2019 WL 1060804 (D.D.C. Mar. 6, 2019)... passim

*Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336 (4th Cir. 1994)........................................... 21

*Castillo v. P&R Enters., Inc.*, 517 F. Supp. 2d 440 (D.D.C. 2007) ............................................. 42

*American Pipe & Constr. v. Utah*, 414 U.S. 538 (1974) ................................................................. 2

*Chapman v. Fred's Stores of Tenn., Inc.*, 2:08-cv-1247–HGD, 2013 WL 1767791 (N. D. Ala. Mar. 15, 2013), *report & rec. adopted*, No. 2:08–cv–01247–HGD, 2013 WL 1760000 (N.D. Ala. Apr. 22, 2013)................................................................................................................... 41

*Chase v. AIMCO Props., L.P.*, 374 F. Supp. 2d 196 (D.D.C. 2005) ........................................... 31

*Clay v. Howard Univ.*, 128 F. Supp 3d 22 (D.D.C. 2015)........................................................... 21

*Coates v. Farmers Grp., Inc.*, No. 15-CV-01913-LHK, 2015 WL 8477918 (N.D. Cal. Dec. 9, 2015)...................................................................................................................................... passim

*Crawford v. ExlService.com, LLC*, No. 16 Civ. 9137 (LAP), 2019 WL 5887214 (S.D.N.Y. Nov. 12, 2019)................................................................................................................................. 33, 37

*Cunningham v. Elec. Data Sys. Corp.*, 754 F. Supp. 2d 638 (S.D.N.Y. 2010) ........................... 27

*Diaz v. S&H Bondi's Dep't Store*, No. 10 Civ. 7676(PGG), 2012 WL 137460 (S.D.N.Y. Jan. 18, 2012)……………………………………………………………………..………29, 40

*Dinkel v. MedStar Health, Inc.*, 880 F. Supp. 2d 49 (D.D.C. 2012)............................................. 28

*Earl v. Norfolk State Univ.*, No. 2:13CV148, 2014 WL 6608769 (E.D. Va. Nov. 18, 2014)…26, 29, 41

*Ebbert v. Nassau County*, No. 05-CV-5445, 2007 WL 2295581 (E.D.N.Y. Aug. 9, 2007)…28, 41

*Freeman v. Medstar Health Inc.*, 187 F. Supp. 3d 19 (D.D.C. 2016) ................................... passim

*Galloway v. Chugach Gov't Servs., Inc.*, 263 F. Supp. 3d 151 (D.D.C. 2017) .................... passim

*Grumbine v. United States*, 586 F. Supp. 1144 (D.D.C. 1984)................................................ 33, 38

*Harris v. Med. Transp. Mgmt., Inc.*, 317 F. Supp. 3d 421 (D.D.C. 2018).............................. 2, 34

*Hoffman-LaRoche*, 493 U.S. 165 ............................................................................................... 1, 25

*Hunter v. Sprint Corp.*, 346 F. Supp. 2d 113 (D.D.C. 2004)......................................................... 42

*Ingram v. Brink's, Inc.*, 414 F.3d 222 (1st Cir. 2005) ................................................................. 21

*Kassman v. KPMG LLP*, No. 11 Civ. 3743, 2014 WL 3298884 (S.D.N.Y. July 8, 2014).... passim

*McKinney v. United Stor-All Ctrs., Inc.*, 585 F. Supp. 2d 6 (D.D.C. 2008) ................................ 32

*Meyer v. Panera Bread Co.*, 344 F. Supp. 3d 193 (D.D.C. 2018).................................... 26, 32, 42

*Moore v. Publicis Groupe SA*, No. 11 Civ. 1279 (ALC)(AJP), 2012 WL 2574742 (S.D.N.Y. June 29, 2012)........................................................................................................................... passim

*Morris v. Lettire Const., Corp.*, 896 F. Supp. 2d 265 (S.D.N.Y. 2012) ....................................... 31

*Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010)...................................................................... 27

*Rehwaldt v. Elec. Data Sys. Corp.*, No. 95–876, 1996 WL 947568 (W.D.N.Y. Mar. 28, 1996) . 41

*Rochlin v. Cincinnati Ins. Co.*, No. IP00-1898, 2003 WL 21852341 (S.D. Ind. July 8, 2003) .... 41

*Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502 (2d Cir. 2020) ............................................. 26

*Smith v. Merck & Co., Inc.*, No. CV 13-2970, 2016 WL 1690087 (D.N.J. Apr. 27, 2016) ......... 41

*Spencer v. No Parking Today, Inc.*, No. 12 Civ. 6323, 2013 WL 1040052 (S.D.N.Y. Mar. 15, 2013)…………………………………………………………………………………….28, 31

*Stephens v. Farmers Rest. Grp.*, 291 F. Supp. 3d 95 (D.D.C. 2018) ..................................... passim

*Thompson v. Sawyer*, 678 F.2d 257 (D.C. Cir. 1982) .................................................................... 25

*Viriri v. White Plains Hosp. Med. Ctr.*, 320 F.R.D. 344 (S.D.N.Y. 2017) ..................................... 2

*Wellens v. Daiichi Sankyo, Inc.*, No. 13–cv–0058–WHO, 2014 WL 2126877 (N.D. Cal. May 22, 2014) ................................................................................................................................. 40

**Statutes**

29 C.F.R. § 1620.14 .................................................................................................................... 37

29 U.S.C. § 216 ..................................................................................................................... passim

29 U.S.C. §§ 206 .............................................................................................................. 1, 3, 25

29 U.S.C. §§ 216(b), 256 .......................................................................................................... 1, 2

**Rules**

Fed. R. Civ. P. 15 ........................................................................................................................ 1

**Other Authorities**

"Legal Eagles: Stephen Brogan," WASHINGTON LIFE MAGAZINE (May 9, 2018), http://washingtonlife.com/2018/05/09/legal-eagles-stephen-brogan/ (last visited June 9, 2020) ...................................................................................................................................... 11

*About Us: One Firm Worldwide*, JONES DAY, https://www.jonesdaycareers.com/en/our-values (last viewed on June 9, 2020) ......................................................................................... 23, 38

Annual Report to Congress on White House Office Personnel, Executive Office of the President (June 30, 2017), www.whitehouse.gov/sites/whitehouse.gov/files/docs/disclosures/07012017-report-final.pdf .................................................................................................................. 18

Matthew Huisman, *Q&A: Jones Day's Gregory Shumaker*, THE BLOG OF LEGAL TIMES (June 18, 2013), https://legaltimes.typepad.com/blt/2013/06/qa-jones-days-gregory-shumaker.html (last visited June 7, 2020).................................................................................................................. 35

## I.      INTRODUCTION

Named Plaintiffs Nilab Rahyar Tolton, Andrea Mazingo, Meredith Williams, Saira Draper, Katrina Henderson, and Jaclyn Stahl ("Named Plaintiffs" or "Plaintiffs")[1] were employed by Defendant Jones Day ("Jones Day") as associates in three of the firm's offices across the country. Plaintiffs allege that Jones Day paid them and similarly situated female associates less than male associates performing substantially equal work, in violation of the Equal Pay Act ("EPA"), 29 U.S.C. §§ 206(d), 216(b). They allege that this outcome resulted from Jones Day's uniformly applied compensation policy and, below, set forth more than a "modest factual showing" that other female associates "may be similarly situated" with respect to the policy. Plaintiffs therefore respectfully request that this Court conditionally certify this collective action and direct the dissemination of notice of the pendency of this action pursuant to 29 U.S.C. § 216(b).

Equal Pay Act claims, like claims under the Fair Labor Standards Act ("FLSA"), are subject to a two-stage certification process. The first stage, called conditional certification, is determined early in the case to enable potential members of the collective action to affirmatively "opt-in" to become part of the suit. 29 U.S.C. §§ 216(b), 256.  As the Supreme Court has explained, the purpose of the opt-in provisions of § 216(b) "depend[s] on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether they participate." *Hoffman-La Roche v. Sperling*, 493 U.S. 165, 170 (1989). To achieve this benefit, however, early authorization of the notice is necessary. Unlike

---

[1] While this Court dismissed the individual Equal Pay Act claims of Plaintiffs Tolton, Stahl, and Mazingo, this dismissal was without prejudice. Dkt. 110 (Order) at 88. Plaintiffs intend to move to reinstate these claims. *See* Fed. R. Civ. P. 15.  Regardless, however, the Court may consider record evidence related to these plaintiffs, as members of the proposed collective. *See Blount v. U.S. Sec. Assocs.*, 945 F. Supp. 2d 88, 92 (D.D.C. 2013) (considering declarations from members of the proposed collective who were not named plaintiffs). For ease of reference, Plaintiffs refer to Named Plaintiffs whose EPA claims were not dismissed as "Representative Plaintiffs."

claims certified under Federal Rule of Civil Procedure 23, the statute of limitations continues to run on each plaintiff's Equal Pay Act claim until that plaintiff files a consent to join the conditionally certified collective action. 29 U.S.C. § 256(b); *see Harris v. Med. Transp. Mgmt., Inc.*, 317 F. Supp. 3d 421, 425–26 (D.D.C. 2018); *Stephens v. Farmers Rest. Grp.*, 291 F. Supp. 3d 95, 120 (D.D.C. 2018) ("The filing of the complaint does not toll the limitations period for opt-in plaintiffs' FLSA claims; the statute of limitations continues to run until they affirmatively join the action."); *cf. American Pipe & Constr. v. Utah*, 414 U.S. 538, 554 (1974) (tolling the statute of limitations for class claims certified under Rule 23).[2] Indeed, the very benefits intended under § 216(b)—enabling employees to join together to vindicate their rights and judicial economy—will disappear if opt-in plaintiffs do not receive notice of a lawsuit before the statute of limitations expires on their claims.

---

[2] This Court has previously ordered that the EPA claims of potential members of the collective be equitably tolled from December 18, 2019 to thirty days after the Court's ruling on the Defendant's Rule 12(c) Motion. *See* December 27, 2019 Minute Order. The Court ruled on Defendant's Rule 12(c) Motion on May 19, 2020, thus extending equitable tolling until June 18, 2020. Dkt. 110 (Order). In the proposed Order, Plaintiffs respectfully request additional tolling until the close of any opt-in period or to thirty days after the Court's ruling on the conditional certification motion, whichever is later. *See Harris v. Med. Transp. Mgmt., Inc.*, 317 F. Supp. 3d 421, 425–26 (D.D.C. 2018) (granting equitable tolling when the court stayed the plaintiffs' motion for conditional certification until resolution of the defendant's motion to dismiss); *Viriri v. White Plains Hosp. Med. Ctr.*, 320 F.R.D. 344, 355–56 (S.D.N.Y. 2017) (granting equitable tolling from the date the conditional certification motion was briefed to the date—seven months later—that the motion was decided); *McGlone v. Contract Callers, Inc.*, 867 F. Supp. 2d 438, 445 (S.D.N.Y. 2012) (tolling from the date the motion for conditional certification was filed to when it was decided).

Conditional certification is appropriate here.[3] The standard the Court applies at this conditional certification stage is lenient and Plaintiffs' burden is minimal.[4] Plaintiffs need make only a "modest factual showing" that a potential class of plaintiffs exists who "*may be* similarly situated" to the Named Plaintiffs. *Bradley v. Vox Media, Inc.*, No. CV 17-1791, 2019 WL 1060804, at *2–3 (D.D.C. Mar. 6, 2019) (quoting *Freeman v. Medstar Health Inc.*, 187 F. Supp. 3d 19, 29 (D.D.C. 2016)). Thus, plaintiffs need offer only "*some* evidence . . . of a factual nexus between the manner in which the employer's alleged policy affected a plaintiff and the manner in which it affected other employees." *Galloway v. Chugach Gov't Servs., Inc.*, 263 F. Supp. 3d 151, 156 (D.D.C. 2017) (Moss, J.) (internal quotation omitted).

Plaintiffs satisfy this standard. As this Court recognized in denying Jones Day's motion to dismiss class claims, Plaintiffs offer evidence that, across offices, practice groups, and class years, all associates are subjected to a common compensation practice that results in women earning less than men for substantially equal work.[5] All Plaintiffs and members of the proposed collective are challenging the same compensation policy, under which every associate's compensation is determined in a centralized "black box." All associates nationwide have their compensation determined by Managing Partner Stephen J. Brogan, in consultation with only two senior partners he tapped to assist him, Traci Lovitt and Michael Shumaker. Plaintiffs and members of the

---

[3] Pursuant to their obligations under Local Rule 7(m), counsel for Plaintiffs met and conferred over email with counsel for Defendant on December 2, 2019. Counsel for Jones Day confirmed that Defendant would not agree to the relief requested, namely that the parties stipulate to conditional certification under the EPA, 29 U.S.C. §§ 206(d), 216(b), so that notice of collective action may be issued to all female associates who worked for Jones Day since April 3, 2016.

[4] As explained below, this standard applies even where, as here, some discovery has occurred. *See supra* n. 26.

[5] *See* Dkt. 110 (Order at 69–71) (explaining that Representative Plaintiffs Williams, Draper, and Henderson alleged that they had been paid less than male comparators for substantially equal work).

proposed collective all allege that this compensation policy results in Jones Day paying women less than men in jobs requiring substantially equal work. At this current stage—before the completion of discovery into Jones Day's policies and practices and before Jones Day has produced firm-wide compensation data—Plaintiffs present evidence demonstrating that Jones Day's compensation policies apply to all members of the collective, regardless of their geographical location, class year, or practice group. Allegations in the Third Amended Complaint ("TAC"), deposition testimony of the Plaintiffs and Rule 30(b)(6) deponents, and document discovery to date, establish, for purposes of issuing conditional certification notice, that similarly situated female associates are or have been subjected to the same discriminatory pay disparity as the Representative Plaintiffs. Accordingly, Plaintiffs respectfully request the Court conditionally certify the collective and authorize notice to female associates who have been employed at Jones Day since April 3, 2016, or three years prior to the filing of this litigation.

## II.     FACTUAL BACKGROUND

### A.     Plaintiffs Bring the Proposed Collective Action on Behalf of All Female Associates at Jones Day.

Plaintiffs seek authorization of collective action notice to female associates who have been employed at Jones Day since April 3, 2016, three years before the filing of this Complaint. Upon information and belief, hundreds of individuals meet this definition.

### B.     The Representative Plaintiffs and Members of the Collective Action are Similarly Situated With Respect to their Claims.

#### 1.     *All Members of the Collective Challenge the Same Centralized Compensation Policy Set by Managing Partner Brogan.*

All members of the proposed collective challenge the same centralized compensation process, which renders the Representative Plaintiffs similarly situated to female associates nationwide. At Jones Day, compensation for every associate in its eighteen U.S. offices is

determined in a "black box" centralized system led by Managing Partner Brogan. *See* Ex. G, Evaluation & Compensation Timeline (January 2017) (JD_02202859); Ex. H, Evaluation and Compensation Timeline (February 2015) (JD_02205957). This uniform policy is heavily regulated by the highest levels of firm management and culminates in Managing Partner Brogan reviewing and finalizing all associate salaries and making any alterations he so chooses. Managing Partner Brogan has tapped two high-level partners to assist him with this process: Partners Shumaker and Lovitt, who together are co-heads of the "associate evaluation process." *See* Ex. I, Lovitt Dep. at 30:24–31:10; 48:10–13 (explaining that Partner Shumaker reviews compensation recommendations and that Managing Partner Brogan later tasked Partner Lovitt with reviewing the compensation recommendations as part of the "associate evaluation process" department); *id.* at 266:2–4 (same). Managing Partner Brogan had the sole discretion to select the individuals tapped to assist him with this process and to decide the scope of their involvement. *See id.* at 48:10–31; 265:16–266:4 (explaining that in 2016, Managing Partner Brogan appointed Partner Lovitt as co-head of this process with Partner Shumaker); *see also* Ex. J, Firm Manual at 3–4 (JD_00002299) (describing that the firm-wide Administrative Partner, which is currently Partner Shumaker, "undertakes other projects at the direction of the Managing Partner"). Managing Partner Brogan's authority is so complete that he was able to disregard recommendations from Partner Lovitt, who prepared a detailed memorandum identifying deficiencies in the compensation and evaluation process. *See* Ex. OO, December 5, 2016 Email (JD_02209816) (Managing Partner Brogan explaining he was not adopting recommendations made by Partner Lovitt).

   2.   *All Associates Have Their Compensation Determined by Managing Partner Brogan Through the Same Compensation Process.*

Partners Brogan, Shumaker, and Lovitt are involved in all associate compensation decisions, nationwide, regardless of geography or practice group. At the first stage of the

compensation process, centralized firm management provides the eighteen office Partners-in-Charge ("PICs") the same instructions, forms, information, and timeline for completing initial salary recommendations. The firm specifically instructs PICs that they are to make "recommendations" and notes that they will not make final salary decisions. *See* Ex. O April 26, 2016 Shumaker Compensation Memo (JD_02206484) (repeatedly stating that PICs are providing "salary *recommendations*" and directing PICs to provide recommendations by a certain date "in order to meet the schedule necessary to obtain Manager Partner approval"); Ex. P, Compiled Shumaker Compensation Memos (JD_02206486, JD_02209838, JD_02206481) (showing that similar memos were sent in 2015, 2017, and 2018). The firm also directs PICs to submit initial salary recommendations using the same uniform criteria for each office, informing all PICs that their recommendation for each associate's compensation should reflect "his or her level of professional achievement, productivity and potential for meaningful growth and advancement" and that "[w]hile we have not adopted arbitrary hours requirements, each lawyer's productivity should be an important factor in making compensation adjustments." *Id.* Indeed, in directing PICs to make salary recommendations, the firm explains that high-performing associates should be paid "compensation comparable to what high performing associates would make at competitive firms taking bonus possibilities into account" and that "[c]ompensation should be held flat—or decreased—for those who are stagnant and not advancing with peers." *Id.* Finally, the firm requires PICs to consider each office's firm-wide ██████████████████████████ ██████████████████████████████. *Id.*; *see also* Ex. I, Lovitt Dep. 285:15–287:11. This policy is uniform for all U.S. associates.

In submitting their initial salary recommendations, PICs also receive a "salary worksheet" to review and complete; the worksheet includes the same information for each associate in the

PIC's office, including the associates' billing rates, current compensation, billable and non-billable hours, and office and practice ratings and any rankings for the past evaluation cycle.[6] Office and practice "ratings" refer to numeric performance ratings of 1 through 5 that each PIC and practice group assigns to each associate. *See* Ex. Q, February 16, 2017 Email (JD_02205077) (describing the rating process).

Each of the eighteen U.S. offices provides ratings for all associates in their offices, regardless of practice group, and each one of the twenty-one practice groups provide ratings for all associates in their practice groups, regardless of the office. *Id.* "Rankings" refer to forced rankings that Jones Day requires office and practice group leaders to complete for senior associates. *Id.*

The firm directs PICs to review—and make their compensation adjustments consistent with—the firm's evaluation materials.[7] These evaluation materials include a narrative description

---

[6] *See, e.g.*, Ex. R, April 26, 2016 Atlanta Non-Partner Compensation Email (JD_02205792) (attaching this information and instructing PICs to provide salary recommendations by a certain date); Ex. S, 2016 Atlanta Salary Worksheet (JD_02205793) (indicating PICs provide initial salary recommendations). Jones Day sends identical emails and worksheets to each office every year. *See* Ex. T, Compiled Office Compensation Emails (2015 to 2018); Ex. U Compiled Office Salary Worksheets (2015 to 2018).

[7] Ex. Q, February 16, 2017 Email (JD_02205077) (centralized Practices Services department explaining to PICs and Practice Leaders ("PLs") that they would receive "evaluation summaries" of associates in their respective office and practice groups to assist the PICs and PLs in rating and ranking the associates); Ex. I, Lovitt Dep. 92:25–93:4 (explaining that "evaluation summaries" used in determining compensation consist of the individual evaluations for each associate for current evaluation year, as well as finalized "assessment statements" for the previous two years); Ex. O, April 26, 2016 Shumaker Compensation Memo (JD_02206484) ("[W]e need to be sure that compensation adjustments align with the associate's ratings, Final Assessment and relative rankings by the Practices and Offices."); *see also* Ex. PP, April 21, 2018 "Confidential – Information You Will Need US" Email (JD_02209662) (explaining that the Practice Services department was sending office leadership "the practices' assessment statements and an updated salary worksheet for your office which now includes the 2017 evaluation year ratings" and was requesting that the salary worksheet be returned); Ex. I, Lovitt Dep. at 40:8–14 (noting that the evaluation process "is completed before we have associate compensation recommendations"); Ex.

called an "assessment statement," which purports to condense and synthesize an associate's individual evaluations into one statement reflecting "the firm's assessment" of that associate. Ex. I, Lovitt Dep. at 262:2–19. Again, this process is uniform for all U.S. associates.

After each office PIC completes their salary recommendations, these recommendations are compiled by a centralized department called Practice Services, which maintains centralized databases on all associate evaluation and compensation and distributes evaluation and compensation information to the firm leaders who make initial salary recommendations and final salary decisions. *See* Ex. I, Lovitt Dep. 45:5–10; Ex. J, Firm Manual at 5 (JD_00002299).

Next, all U.S. associate salary recommendations are reviewed by Partners Shumaker and Lovitt, who make their own recommendations.[8] Partners Shumaker and Lovitt have approximately two weeks to complete their recommendations. *See, e.g.*, Ex. G, Evaluation and Compensation Timeline (January 2017) (JD_02202859) (explaining that between May 1 and 15, the "Firm Admin Partner reviews salary proposals"); Ex. Z, 2017 Compensation Email Chain (JD_02203735 and JD_02209866) (indicating Partners Lovitt and Shumaker have approximately two weeks to review the recommendations and complete their own). Discovery to date indicates that, in making their recommendations, Partners Shumaker and Lovitt consider, at a minimum, information including each U.S. associate's office and practice rating, any ranking, billable hours, the PIC-recommended salary, ███████████.[9]

---

V, Lovitt PowerPoint at 9 (JD_00005242) (explaining that "compensation decisions are made with the assessments in hand").

[8] *See* Ex. W, May 2017 Lovitt Review Spreadsheet (JD_02203745 to JD_02203746) (indicating that Partner Lovitt reviews and modifies the PICs' recommendations); Ex. X, May 17, 2017 Compensation Review-U.S. Offices Correspondence (JD_02209866 and JD_02209867) (email and spreadsheet indicating Partners Lovitt and Shumaker review the PICs' recommendations and make their own salary recommendations, which deviate from the PICs' recommendations); Ex. Y, June 2018 Compensation Review Correspondence (JD_02209924 and JD_02209925) (same).

[9] *See* n. 8.

Partners Shumaker and Lovitt then forward recommendations for each U.S. associate to Managing Partner Brogan, who reviews and finalizes each associate's salary, making any alterations he chooses.  *See, e.g.*, Ex. G, Evaluation and Compensation Timeline (January 2017) (JD_02202859) ("Managing Partner reviews recommendations and finalizes salaries."); Ex. H Evaluation and Compensation Timeline (JD_02205957) ("Managing Partner finalizes salaries."). Evidence to date indicates that Managing Partner Brogan reviews the same materials and information as Partners Shumaker and Lovitt in a "master" spreadsheet for all associates. *See* Ex. AA, June 2016 Salary Decisions (JD_02203312 and JD_02203313) (illustrating Managing Partner Brogan's compensation decisions differ from Partner Shumaker's salary recommendations). Managing Partner Brogan does not automatically rubber stamp the recommendations but rather is meaningfully involved in the process. *See id.* (email and spreadsheet indicating Managing Partner Brogan's final decisions are inconsistent with the prior salary recommendations); Ex. BB, June 2017 Compensation Review Correspondence to Irvine PIC (JD_02209647 and JD_02209648) (same); Ex. CC, June 2015 Compensation Review Correspondence to Atlanta PIC (JD_02210761 and JD_02210762) (same); Ex. EE June 2017 Compensation Review Correspondence to San Diego PIC (JD_02209688 and JD_02209689) (same); *see also* Ex. X May 17, 2017 Compensation Review-U.S. Offices Correspondence (JD_02209866 and JD_02209867) (indicating that Managing Partner Brogan makes adjustments to the "recommendations" provided by Partners Shumaker and Lovitt). Managing Partner Brogan spends approximately one month considering the salary recommendations and performance information for each U.S. associate before finalizing compensation decisions.[10] *See, e.g.*, Ex. X, May 17, 2017 Compensation Review-U.S. Offices

_____

[10] While Partner Lovitt testified in her Rule 30(b)(6) deposition that she and Partner Shumaker can make changes to Managing Partner Brogan's finalized salaries, she was unable to point to any documentary evidence supporting this and described only two examples from among the thousands

Correspondence (JD_02209866 and JD_02209867) (indicating Managing Partner Brogan reviews salary recommendations from Partners Lovitt and Shumaker); Ex. BB, June 12, 2017 Compensation Review Correspondence to Irvine PIC (JD_02209647 and JD_02209648) (indicating that Managing Partner Brogan reviews proposed salary recommendations and makes "his final salary determinations").[11]

After Managing Partner Brogan determines associate salaries, he sends all associates compensation letters informing them what they will be paid in the upcoming year. Ex. A, Tolton Dep. 91:3–91:25; Ex. B, Mazingo Dep. 260:13–260:16 ("I know that any [salary] recommendations ultimately would have been made to Steve Brogan, who signed each letter."); Ex. E, Henderson Dep. 117:6–117:8. These letters are sent to all associates on the same day, are contained in sealed envelopes, and are marked as "CONFIDENTIAL." Ex. A, Tolton Dep. 92:24–93:3; Ex. B, Mazingo Dep. 146:18–146:25; Ex. C, Williams Dep. 137:20–137:23; Dkt. 94-16, Plaintiff Stahl Compensation Letter.

   3.   *Jones Day Repeatedly Emphasizes that Managing Partner Brogan Makes Compensation Decisions.*

In public and internal communications, Jones Day has expressly and consistently explained that Managing Partner Brogan has "autocratic and absolute" power over firm decisions and is the "final decision-maker" on "partner and associate compensation." *See* Dkt. No. 41, Third Am.

---

of U.S. associates where she and Michael Shumaker did so.  Ex. I, Lovitt Depo. 51:21–52:4; 60:3–61:7. More importantly, no evidence indicates that anyone other than two high-level, members of firm leadership can alter Managing Partner Brogan's final compensation decisions. *See id.* at 55:2–9; 60:19–20.

[11] While Jones has redacted the vast majority of the initial salary recommendations and Managing Partner Brogan's final compensation decisions, Plaintiffs have nonetheless been able to identify several instances where Managing Partner Brogan's final salary determination differs from the proposed salary recommendations, indicating that a review of complete salary information would reveal substantially more instances.

Compl. ¶¶ 6–9 (hereinafter "TAC") (citing "Legal Eagles: Stephen Brogan," *Washington Life Magazine* (May 9, 2018), http://washingtonlife.com/2018/05/09/legal-eagles-stephen-brogan/ (last visited June 9, 2020)). Indeed, Jones Day expressly instructs its employees that the "final determinations of compensation [are] made by the Managing Partner," Ex. J, Jones Day Manual at 6 (JD_00002299), and explains to PICs and attorneys that its compensation process culminates in the Managing Partner reviewing and finalizing salaries, *see* Ex. CC, June 2015 Compensation Review Correspondence to Atlanta PIC (JD_02210761 and JD_02210762); Ex. BB, June 2017 Compensation Review Correspondence to Irvine PIC (JD_02209647 and JD_02209648) ("The Managing Partner has now completed his review of the Offices' proposed non-partner salary adjustments. Attached is [a] spreadsheet showing you *his final salary determinations* for your office." (emphasis added)).[12]

4. *Representative Plaintiffs and Members of the Collective Testified Managing Partner Brogan Makes Compensation Decisions.*

The experiences of the Named Plaintiffs confirm the highly centralized nature of Jones Day's compensation system and the ways in which that uniform policy is consistently applied to all members of the collective. For instance, Plaintiffs all testified that, per Jones Day's internal statements, they understood that Managing Partner Brogan reviewed and finalized their salaries. *See* Ex. A, Tolton Dep. 38:6–38:12 (explaining that Jones Day told her during her recruitment that Stephen Brogan "made all of the compensation decisions for the firm"); Ex. F, Stahl Dep. 70:8–

---

[12] *See also* Ex. DD June 17, 2015 Email to New York PIC (JD_02210235) (centralized Practice Services department explaining that "[t]he Managing Partner has finalized the non-partner salary adjustments" and that spreadsheet detailing the adjustments was attached); Ex. EE June 2017 Compensation Review Correspondence to San Diego PIC (JD_02209688 and JD_02209689) (explaining that "[t]he Managing Partner has now completed his review of the Offices' proposed non-partner salary adjustments" and indicating that a female associate's salary had been changed from the PIC's initial recommendation).

11

70:12 (testifying that she understood that Stephen Brogan made the compensation decisions for the firm); Ex. B, Mazingo Dep. 75:3–75:5 (same); Ex. E, Henderson Dep. 55:12–55:15 (same).

Similarly, and consistent with document discovery to date, when Plaintiffs raised concerns relating to compensation with senior partners in their offices, the partners either expressed surprise at the Plaintiffs' low compensation or told the Plaintiffs they were unable to affect the Plaintiffs' compensation, underscoring Managing Partner Brogan's centralized control over compensation at Jones Day. *See* Ex. B, Mazingo Dep. 74:13–75:3 (noting her supervisors were surprised by her salary and that although Plaintiff Williams was promised an increased salary, Plaintiff Williams' supervisors were ultimately unable to provide that increase, indicating to Plaintiff Mazingo that they did not have the authority to secure Plaintiff Williams a raise); Ex. F, Stahl Dep. 80:7–80:8 (explaining that Partner Darren Cottriel indicated he did not have control over Plaintiff Stahl's compensation); *id.* at 99:5–99:10 (noting a local Partner "told me that he had no control over whether I could have a raise," indicating "to me that he did not have control over . . . associate compensation").

Indeed, when some associates attempted to appeal their compensation, Jones Day Partners told them that their compensation was final and could not be appealed. *See* Ex. A, Tolton Dep. 145:17–146:12 ("[W]hen I inquired about the basis for my compensation in . . . 2016 when my salary was first frozen during my maternity leave, I was told by [Partner-in-Charge] Richard Grabowski and [Administrative Partner] Darren Cottriel that . . . . the decision was not appealable and that the information that I had from my letter from [Managing Partner] Steve Brogan was final."); *id.* at 229:2–230:16 ("I asked how I could obtain responses [to my questions about my salary freeze] and if there was an appeal process, and I was told [by PIC Grabowski] that the Brogan compensation letters are final and non-appealable."); Ex. E, Henderson Dep. 132:20–

132:23 (explaining that a Jones Day practice leader told her there was "nothing he could do" about her compensation); Ex. C, Williams Dep. 110:21–111:11 (describing how she was discouraged from challenging her compensation and requesting a raise because it would "attract the wrong attention" and "reflect badly" on her).

     5.   *Under this Policy, Men are Paid More than Women for Substantially Equal Work.*

Jones Day's centralized, uniform compensation policy results in Jones Day paying female associates less than male associates for substantially equal work.

     a.  *Initial Comparator Data Shows Female Associates are Paid Less than Male Comparators.*

Discovery to date illustrates that, despite performing substantially equal work, female associates across offices, practice groups, and class years are consistently paid less than male associates. For instance, after being the only first-year New York associate not to receive a salary raise as part of the New Lawyers Group increase in January 2015—a decision that resulted in Ms. Henderson being paid between $10,000 to $20,000 less than her male comparators—one of Ms. Henderson's comparators, [Male Associate 12], received another raise as part of the annual compensation process in July 2015. *See* Dkt. 107-10 (Comparator Salary Chart); *see also* TAC ¶ 287 (identifying as comparators Bret Stancil, Zachary Werner, David Katz, Andrew Burchiel, and Sam Goldstein); Ex. E, Henderson Dep. 92:24–93:7, 158:4–17, 162:25–163:18 (discussing projects she worked on with Bret Stancil, Zachary Werner, David Katz, Andrew Burchiel, and Sam Goldstein); *id.* at 117:6–118:15 (explaining that although she was not given a raise, Bret Stancil and Harrison Golden were). As a result, Ms. Henderson's salary was $30,000 less than Mr. [Male Associate 12] as of July 2015. Dkt. 107-10 (Comparator Salary Chart). Discovery has also revealed that another male associate in Ms. Henderson's year in the New York office, [Male Associate 8]

13

was paid $15,000 and then $30,000 more than Ms. Henderson during that same period. *Id.* Plaintiffs' pleadings and Plaintiff Henderson's deposition testimony illustrate that she performed substantially equal work as her comparators; she worked with them and was held to similar standards. *See* TAC ¶ 287; Ex. E, Henderson Dep. 92:6–93:7 (explaining that she worked on projects with Zach Werner, Andrew Burchiel, and Samuel Goldstein); 102:21–103:2 (describing a project she worked on with Mr. Burchiel); *id.* at 159:8–159:17 (discussing that she and Mr. Stancil were held to the same standards); *see also* Dkt. 110 (Order at 70) (concluding that Plaintiff Henderson plausibly performed substantially equal work to her named male comparators).

Documentary evidence also indicates that Plaintiff Williams was paid less than male associate [Male Associate 8] ▮▮▮▮▮▮ for four continuous years, resulting in him making $135,000 more than her when they were both fourth-year associates. Dkt. 107-10 (Comparator Salary Chart); TAC ¶ 165 (identifying [Male Associate 8] ▮▮▮▮▮▮ as a comparator). Similarly, comparator [Male Associate 9] ▮▮▮▮▮▮ was paid between $5,000 and $10,000 more than Plaintiff Williams when they were both third- and fourth-year associates. Dkt. 107-10 (Comparator Salary Chart); Ex. C, Williams Dep. ▮▮▮▮ (identifying [Male Associate 9] ▮▮▮▮▮▮ as a comparator). Plaintiff Williams testified that each of these comparators performed equal work to her as they all attended the same trainings and "were being trained in the same set of skills to serve as associates within the firm." *See* Ex. C Williams Dep. 162:2–164:20 (explaining that she and her comparators attended the same trainings and were "generally at [the same] level"); *see also* Dkt. 110 (Order at 69–70) (explaining that Plaintiff Williams properly alleged she performed substantially equal work to her named male comparators). Discovery has also revealed that in her final two years at the firm, Plaintiff Williams was paid between $5,000 and $45,000 less than male associate [Male Associate 3] ▮▮▮▮▮▮, who was in her same class year. Dkt. 107-10 (Comparator Salary Chart).

Plaintiff Draper also identifies male associates who were paid more for performing substantially equal work. When Plaintiff Draper was a fourth-year associate, she was paid $195,000. Dkt. 107-10 (Comparator Salary Chart). Two of the male comparators Ms. Draper identifies—[Male Associate 2] [Male Associate 3]—were paid between $230,000 and $260,000 when they were in their fourth year. *Id.*; *see also* Ex. D, Draper Dep. [Male Associate 2](identifying [Male Associate 3] as a comparator), (identifying as a comparator). Similarly, while Plaintiff Draper was paid $220,000 in her fifth year, these male associates were paid between $265,000 and $300,000 in their fifth year at Jones Day. Dkt. 107-19 (Comparator Salary Chart). Another male associate in the Atlanta office, [Male Associate 5], was likewise paid a similar amount as Plaintiff Draper, despite his junior status. *Id.* (showing that while the associate in question, [Male Associate 5], was receiving $225,000 when he left at the end of his third year, when Plaintiff Draper left Jones Day that same year, her salary was only $5,000 more than [Male Associate 5] despite being four years more senior); *see also* Ex. D, Draper Dep. [Male Associate 5] as a comparator and explaining: "I remember he was making over $200,000 in his last year"). Consistent with her allegations, Plaintiff Draper testified that she performed substantially equal work to these comparators and other male associates at Jones Day. Ex. D, Draper Dep. 142:21– 143:4, 237:13–237:19 (describing how she and David Bouchard did similar work as part of the Investigations & White-Collar Defense group and describing the similar circumstances between her and Joel Langdon when joining the ); *id.* at 146:5–6 (noting that Mr. Bouchard was given work that both he and Plaintiff Draper were "vying for"); Dkt. 110 (Order at 70–71) (concluding Plaintiff Draper plausibly performed substantially equal work to her named male comparators).

Record evidence further demonstrates that other members of the collective, including Named Plaintiff Tolton, earned less than men performing substantially equal work. Plaintiff Tolton testified in her deposition that [Male Associate 1] was consistently paid between $5,000 and $175,000 more than Ms. Tolton beginning in their second year at Jones Day even though they were both "were required to meet the same sets of expectations by firm partners," "called upon" to work across offices, "attended similar events," and "held significant office leadership and recruitment roles." Ex. A, Tolton Dep. 240:24–241:4; 245:24–246:7; [Male Associate 1] (describing [Male Associate 1] as a comparator and the fact that [Male Associate 1] was paid the market rate while she was not); *id.* at [Male Associate 1] (describing the work she performed and noting that Mr. [Male Associate 1] regularly talked about the work he was doing for a particular client "as involving similar job duties as a litigation associate would have"). Documentary evidence confirms [Male Associate 1] was nevertheless paid more than Plaintiff Tolton. *See* Dkt. 107-10 (Comparator Salary Chart).

Likewise, documentary evidence also indicates that in her second year, Named Plaintiff Mazingo made $20,000 less than two male associates, [Male Associate 8] and [Male Associate 12], when they were in their second year. *Id.* And as a third-year associate, Plaintiff Mazingo made $45,000 less than those same associates when they were in their third year. *Id.* As explained below, Plaintiff Mazingo performed substantially equal work as male associates at Jones Day.[13]

The limited discovery to date illustrates that Jones Day paid Plaintiff Stahl less than her male comparators—$60,000 less in one year and $90,000 less in another. *Id.* Moreover, Plaintiff Stahl testified that she performed, or was capable of performing, substantially equal work to James

---

[13] Plaintiff Mazingo identified Robert Tiefenbrun, Bart Green, Dennis Slater, Paul Hines, and Benjamin Jones as comparators and explained that they worked on projects together and "performed similar duties or tasks [that] were interchangeable." Ex. B, Mazingo Dep. 297:18–301:11.

Burnham, a seventh-year associate. Ex. F, Stahl Dep. at 288:9–288:25 (explaining that although she was scheduled to work on a brief for Mr. Burnham, Mr. Burnham subsequently passed his responsibility to another male associate, who submitted Ms. Stahl's draft with minimal revisions). Public disclosures in January 2017 shows that Mr. Burnham was paid $810,000 in 2016. *See* James M. Burnham, Trump Town, ProPublica (last visited June 8, 2020), https://projects.propublica.org/trump-town/staffers/james-m-burnham. Ms. Stahl's highest salary was $260,000.[14]

Plaintiffs have also provided evidence regarding the pay disparities for substantially equal work experienced by other members of the proposed collective. For instance, Plaintiff Tolton testified that another female associate in the Irvine office was concerned that her compensation was unfairly low due to her maternity leave. Ex. A, Tolton Dep. 507:22–509:5. Likewise, Plaintiff Draper explained that a female associate she spoke with disclosed that the female associate was paid comparably to her husband, who also worked at Jones Day, despite being several years her husband's senior. Ex. D, Draper Dep. 130:6–130:10 ("[S]he must have been a seventh-year, maybe, or a sixth-year, and her husband was a junior associate. █████████████████ ████████████████████████████████ Even accepting Jones Day's assertion that it provided financial "cushions" to associates who join the Trump

---

[14] As Plaintiffs have previously explained, *see* Dkt. 115 at 26–27 (Pls.' Opp. to Def.'s R. 11 Mot.), to the extent Mr. Burnham's salary was meant to provide a "cushion" following his departure from the firm, Plaintiff Stahl was never offered any monetary cushion despite going into public service herself. *See* Ex. F, Stahl Dep. 416:1–418:2 (explaining that she left Jones Day and joined the U.S. Attorney's Office); *see also* Ex. GG, Audio Tr. at 41:3–7 (partner explaining that "there are certain people, when they're going into the government that the firm, meaning Brogan, has some discretion and will give them more money"); *id.* at 42:9–24 (partner confirming that salaries of former Jones Day lawyers who joined the Trump Administration "were all inflated . . . [b]ecause Brogan knows . . . the firm sees it as prestigious for those people to move into the administration, so they all got a bump . . . that was just a nice little cushion to help that person").

Administration, Mr. Burnham's "cushion" placed his salary at over $500,000 more than the salary of another female associate, Annie Donaldson, who likewise joined the Trump Administration. *See* Ann M. Donaldson, Trump Town, ProPublica (last visited June 8, 2020), https://projects.propublica.org/trump-town/staffers/ann-m-donaldson (disclosing salary was $266,664). Notably, once removed from Jones Day's centralized and secretive compensation process, Ms. Donaldson received a higher salary than Mr. Burnham in government service. *See* Annual Report to Congress on White House Office Personnel, Executive Office of the President (June 30, 2017), www.whitehouse.gov/sites/whitehouse.gov/files/docs/disclosures/07012017-report-final.pdf (listing Donaldson's per annum salary as $155,000 and Burnham's as $140,000).

### b. *Anecdotal Evidence Confirms Jones Day Pay Women Less than Men Performing Substantially Equal Work.*

Plaintiffs' understanding that they and similarly situated women were paid less than male associates is even more plausible when viewed in light of Plaintiffs' observations and experiences of gender discrimination, which this Court has acknowledged. *See* Dkt. 110 (Order) at 60–62 (noting Plaintiffs' allegations that "they were paid less and had fewer opportunities because of their gender" are "bolster[ed]" by "numerous anecdotal allegations of sex-based stereotyping and bias" and citing, among other allegations, that Plaintiffs received fewer mentoring opportunities, that Plaintiff Stahl was told she had a "very stern face" that was "off-putting," and that Plaintiffs were told that the firm's lack of female partners was because they "chose to have families"); *see also* Ex. D, Draper Dep. 134:16–134:21 (testifying that based on the "culture at Jones Day of treating men differently from women," she understood this "preferential treatment . . . extend[ed] to other areas, including compensation"); Ex. F, Stahl Dep. 195:19–195:22 (explaining "policies and practices of the firm perpetuated gender discrimination"). The limited record is replete with evidence of gender discrimination by firm management, including limited advancement

opportunities[15] and gendered criticism in performance evaluations.[16] Not only do these rampant inequalities in promotion opportunities suggest pay disparities as the Court has indicated,[17] but the disparities also may give rise to pay differences because Jones Day's centralized and uniform compensation policy dictates that pay should correspond to the associate's potential toward advancement. *See* Ex. O April 26, 2016 Shumaker Compensation Memo (JD_02206484); *see also* Dkt. 110 (Order at 61–62) (noting that "anecdotal [allegations] regarding the pattern of alleged

---

[15] Ex. C, Williams Dep. 280:7–280:9; 284:9–284:22 (testifying Plaintiff Williams talked with others about female associates not advancing at the firm); *id.* at 394:18–395:17 (testifying a partner stated that female associates left the firm to have families); *id.* at 428:24–429:11 (explaining male partners may prefer to work with male associates because they understood female associates would leave the firm to start families); Ex. F, Stahl Dep. 291:14–291:24 (detailing a conversation with Partner Michelle Blum in which Plaintiff Stahl was told that to succeed at Jones Day, she "had to hang with the boys, essentially be like the men"); Ex. E, Henderson Dep. 62:5–63:4 (describing a "bro culture" in which "stereotypically male behavior was valued, where men would support other men. The way for women to succeed at the firm was to adopt that stereotypical male behavior. And if you did not . . . then you were not accepted and you were restricted from opportunities that men were given. You were not given the kind of mentorship opportunities and kind of guiding you along"); *see also* Ex. K, JD_00005693, *Jones Day History* (Oct. 2017) (detailing that as of October 2017 only three of 13 members of the Partnership Committee were female partners).

[16] Ex. C, Williams Dep. 198:7–198:21 (noting that Plaintiff Stahl was criticized for not smiling while male associates were not); Ex. D, Draper Dep. 280:14–280:19 (explaining that a partner held female associates to higher standards than male associates); Ex. F, Stahl Dep. 196:8–196:15 (detailing how she was criticized for her appearance, rather than her work performance, and that Partner O'Connor "screamed at female associates but did not scream at male associates"); *id.* 194:2–194:4, 402:2–402:25 (noting that a male associate was permitted to turn down work while Plaintiff Stahl was severely criticized for doing the same); Ex. A, Tolton Dep. 361:17–362:10 (explaining that while a male associate was permitted to turn down work, female associates were criticized for doing so); Ex. E, Henderson Dep. 251:25–253:19 (explaining that female associates were held to a higher standard for availability than male associates); *id.* 271:16–272:3 (explaining that she was chastised for working from home while male associates were not).

[17] *See* Dkt. 110 (Order at 60 n.9) (noting that "the percentage of women in the partnership and holding leadership positions might provide evidence relevant to Plaintiffs' disparate impact claims relating to pay . . . ."); *see also* Dkt. 79, Dec. 16, 2019 Hrg. Tr. at 19:11–14 (counsel for Jones Day acknowledging that Plaintiffs could infer pay disparities from disparities in promotions: "[O]ne way you could do it is look at promotions, because they're correlated. One is a proxy for the other. Promotions are . . . a lagging indicator of reviews and pay"); Dkt. 115 at 19–23 (Pls.' Opp. to Def.'s R. 11 Mot.) (detailing how Jones Day regularly promotes more men than women to partnership).

discrimination in assessments and promotions," as well as allegations that such assessments were considered in compensation decisions plausibly stated a claim of disparate impact).

> c.  *Jones Day's Pay Secrecy and No Whining Policies Further Indicates that the Firm Pays Women Less than Men Performing Substantially Equal Work.*

Finally, as this Court has recognized, Jones Day's strictly enforced pay secrecy[18] and no whining policies[19]—through which associates are discouraged, and indeed reprimanded, for discussing their salaries or concerns regarding their work opportunities—can work in tandem to "clos[e] natural feedback channels," thereby "caus[ing] continued disparities" over time. Dkt. 110 (Order at 56). Both practices are integral parts of Jones Day's compensation system. *See* Ex. II, November 2016 Lovitt Memo (JD_02206206) (explaining to Managing Partner Brogan that a number of associates were dissatisfied with their July 2016 salary increase but noting: "I have to believe that our superstars—our top-talent and future leaders—are not the ones discussing compensation and emailing Above the Law").

---

[18] *See* Ex. A, Tolton Dep. 248:20–248:24 ("Throughout the entire time period I was working at Jones Day, I was very reluctant and nervous and fearful of discussing my compensation or the compensation of others."); Ex. B, Mazingo Dep. 42:25–43:5 ("Jones Day had made it clear to me that there was a strict policy of pay confidentiality, and so I didn't discuss my salary or other associates' salary information with almost anyone."); Dkt. 94-16, Plaintiff Stahl Compensation Letter (labeling letter as "CONFIDENTIAL" and explaining that "[t]he Firm treats all lawyer compensation as confidential"); Dkt. 94-9, *Principles & Values: Compensation: Confidentiality*, Jones Day, www.jonesday.com/principlesandvalues/compensation/confidentiality (as of July 7, 2019) ("The financial relationship of a lawyer to Jones Day is confidential.").

[19] *See* Ex. K, October 2017 PowerPoint to New Lawyers Group at slide 36 (JD_00005693) (explaining that "[o]nce [a] decision [is] made, no further conflict"); Ex. V, Lovitt PowerPoint at slide 25 (JD_00005242) (telling associates "NEVER be this person. The 'eye roll' associate . . . This kind of eye rolling at the Firm trickles up and can harm an otherwise successful career . . . ."); Ex. HH August 19, 2016 Lovitt Memo (JD_02206472) (explaining to Managing Partner Brogan that any changes to the compensation process "should be accompanied by a strong message to the PICs and PLs about the Firm's interests and an equally strong statement that whining, rabble-rousing associates undercut Firm culture and should be treated accordingly regardless of their merit").

> 6. *At the decertification stage, Plaintiffs will be able to rely on statistical evidence to establish compensation disparities, because all associates at Jones Day perform substantially equal work within the same establishment.*

Plaintiffs are not required, at the conditional certification stage, to establish that they performed substantially equal work to their comparators[20] or that all members of the proposed collective are within the same establishment.[21] Nonetheless, Plaintiffs have provided sufficient evidence of both.

> a. *Plaintiffs Point to Evidence Showing they Performed Substantially Equal Work as Male Associates.*

First, Plaintiffs point to substantial evidence about the work they did and how it was substantially equal to their comparators. As the Court noted, Representative Plaintiffs Williams, Draper, and Henderson provided allegations they were paid less than male comparators for performing substantially equal work, despite the fact that some comparators were in different Jones Day class years.[22] *See* Dkt. 110 (Order at 69–71). The Representative Plaintiffs' testimony confirms this. *See, e.g.,* Ex. D, Draper Dep. 142:21–143:4, 237:13–237:19 (describing how she

---

[20] *Blount* 945 F. Supp. 2d at 94, 97 (D.D.C. 2013) (noting that "the Court's task at this stage is not to resolve factual disputes" and that "issues going to the merits are not appropriate for consideration at this juncture").

[21] *Barrett v. Forest Labs, Inc.*, No. 12 cv. 5224 (RA)(MHD), 2015 WL 5155692, at *8–9 (S.D.N.Y. Sept. 2, 2015) ("The general approach of the cases has been to decline to determine at the conditional-certification stage whether the plaintiffs will be able to satisfy the 'establishment' requirement.") (collecting cases); *Moore v. Publicis Groupe SA*, No. 11 Civ. 1279 (ALC)(AJP), 2012 WL 2574742, at *11 (S.D.N.Y. June 29, 2012) (same).

[22] Indeed, predecessors and successors may serve as valid comparators, as well as more senior employees. *See, e.g.*, *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994) ("A plaintiff may make her *prima facie* [EPA] case by comparing her salary to that of her predecessor or successor."); *accord Ingram v. Brink's, Inc.*, 414 F.3d 222, 232 n.10 (1st Cir. 2005); *see also Clay v. Howard Univ.*, 128 F. Supp 3d 22, 31 (D.D.C. 2015) (concluding the plaintiff had plausibly stated an EPA claim when she alleged that her comparator, plaintiff's non-consecutive replacement, "was hired to do the same work as [the plaintiff] in the [same position], and was paid significantly more"); *Kassman v. KPMG LLP*, No. 11 Civ. 3743, 2014 WL 3298884, at *5, 9 (S.D.N.Y. July 8, 2014) (considering a comparator in a higher-level position where plaintiff performed work above the level of her position).

and David Bouchard did similar work as part of the Investigations & White-Collar Defense group and describing the similar circumstances between her and Joel Langdon when joining the ███████

████████████; Ex. E, Henderson Dep. 102:21–103:2 (describing a project she worked on with Andrew Burchiel); *id.* at 159:8–159:17 (discussing that she and Mr. Stancil were held to the same standards); *id.* at 163:7–163:18 (discussing that she performed the same type of work as Mr. Werner); Ex. C, Williams Dep. 141:2–141:19 (noting she believed her comparators performed the same types of tasks and had similar skills in part because they attended the same trainings and learned the same skills).

Additionally, other members of the collective testified that they performed substantially equal work to men throughout the firm. *See, e.g.*, Ex. A, Tolton Dep. 391:17–394:2; 402:22–403:19 (explaining that she and Justin Smith attended the same events, worked across offices, both held "significant leadership roles" in the Irvine office, and performed similar tasks and job duties); Ex. B, Mazingo Dep. 299:6–300:6 (naming male comparators and explaining that although they were mostly senior associates, she engaged in "interchangeable" tasks and her abilities were trusted equally); Ex. F, Stahl Dep. 288:9–288:25 (explaining that she worked on a project with James Burnham and that Andrew Bentz used Plaintiff Stahl's work when submitting a project to a partner, showing that they did "equal" work).

   *b. Associates at Jones Day Perform Substantially Equal Work.*

In addition, the firm rates associates using the same criteria and guidelines, further indicating that associates perform substantially equal work to their male comparators. *See* Ex. JJ, January 27, 2015 Email (JD_02206503) (explaining the firm-wide rating criteria for all associates)[23]; Ex. LL Blank Non-Partner Evaluations Form at 2 (JD_02206266, Att. A) (indicating

---

[23] Similar emails were sent in February 2016, January 2017, and January 2018. Ex. KK, Compilation of Evaluation Emails (2016–2018) (JD_02206496, JD_02206492, JD_02206488).

associates are compared to other associates at their level, regardless of office or practice group, on the basis of common criteria); Ex. MM, 2016 Lawyer Performance Evaluation Ratings Description (JD_02209684) (defining how to use the firm-wide rating system to ensure consistency across offices and practice groups). Indeed, the fact that Jones Day requires both office leaders and practice leaders to force rank senior associates indicates that the work of female associates can be compared to the work of male associates without regard to office and practice group. Ex. Q February 16, 2017 Email (JD_02205077) (explaining that office leaders rank senior associates within their office without regard to their practice group and that practice leaders rank senior associates within the practice group without regard to their geographical office); *see also* Ex. I, Lovitt Dep. 106:14–15 (explaining that the firm-wide ranking system is meant to "impose some discipline" into the firm-wide process).

        c.  *Evidence to Date Indicates that, at the Merits Stage, Plaintiffs Will Show that Jones Day Operates as a Single Establishment.*

Finally, Plaintiffs point to substantial evidence that Jones Day presents itself as a single establishment across all offices, calling itself "One Firm Worldwide" and stating that "[o]ur lawyers work across offices, practices, and continents" and that "[w]e are not a constellation of individuals and offices and practices. We have no 'branch' or 'satellite' offices and no headquarters."[24] As Firmwide Hiring Partner Sheryl Reisman explained in her Rule 30(b)(6) deposition: "When we refer to a team, it largely goes beyond the matter you're working on . . . we review our team as much larger. When we staff our cases, we staff them with [who] we see as a

---

[24] *About Us: One Firm Worldwide*, Jones Day, https://www.jonesdaycareers.com/en/our-values (last viewed on June 9, 2020); *see also* Ex. A, Tolton Dep. 63:14–64:5; 391:19–391:25 (describing how Jones Day branded itself as "One Firm Worldwide" to Plaintiff Tolton and modeled its working culture around this concept); Ex. E, Henderson Dep. 69:18–69:25 (discussing the "One Firm Worldwide" brand and explaining that she often did work outside the New York office and that attorneys transitioned between offices in different states).

good fit for the client . . . ." Ex. NN, Dep. Partner Sheryl Reisman at 93:18–25.

Evidence also shows that Jones Day treats associate work as interchangeable and that Jones Day associates routinely work in other practice groups and offices. *See, e.g.*, TAC ¶ 138 (noting Plaintiff Mazingo assisted the Global Disputes Practice Group even though she was in the Securities Litigation and SEC Enforcement Practice Group); Ex. D, Draper Dep. 78:6–78:15; 143:7–143:11 (explaining that she transferred between practices); Ex. A, Tolton Dep. 163:15–164:2 (describing that one associate, "like all Jones Day associates, . . . was called upon to help other practice groups based on his availability and client and firm needs"); *id.* at 391:21–25 (explaining that she and Justin Smith were both "called upon . . . to heed the firm's one firm worldwide mantra and be staffed on any case, any time, anywhere that would best serve the interests of the client and of the firm"); Ex. B, Mazingo Dep. 68:25–69:8 (noting that Plaintiff Mazingo had been a member of multiple practice groups); *id.* at 300:13–300:16 (explaining that one associate was working in at least three practice groups); Ex. E, Henderson Dep. 340:14–340:18 (explaining that she worked on various projects for multiple practice groups); Ex. C, Williams Dep. 94:19–94:23, 97:5–97:8 (stating that Plaintiff Williams worked in the Intellectual Property group and the Healthcare group); *id.* at 92:15–93:3 (explaining that she would also work on general litigation matters and often on large litigation projects across offices and practice groups); Ex. F, Stahl Dep. 60:3–60:12 (explaining that as part of the "One Firm Worldwide" brand, Plaintiff Stahl was told "that it was very frequent for people to work across offices and be staffed on large matters no matter where they were located"); *id.* at 161:6–161:10 (explaining that an associate transferred between offices). Indeed, multiple Plaintiffs received evaluations from partners in multiple offices and practice groups. *See* Ex. L, Stahl Evaluation Sheet; Ex. M, Williams Evaluation Sheet; Ex. N, Mazingo Evaluation Sheet; *see also* Ex. QQ, October 2014 Labor and Employment PowerPoint at

24

12 (JD_02199304) (indicating associates in the Labor & Employment practice group engage in both litigation and corporate work).

## III.    LEGAL STANDARD

Certification of Equal Pay Act claims is governed by 29 U.S.C. § 216(b), which also governs FLSA certification. *See* 29 U.S.C. §§206(d), 216(b); *Thompson v. Sawyer*, 678 F.2d 257, 269 (D.C. Cir. 1982) (members of the class in an EPA action may recover if they "opt-in" under § 216(b)); *Ameritech Ben. Plan Comm. V. Commc'n Workers of Am.*, 220 F.3d 814, 820 (7th Cir. 2000) (noting the EPA incorporates the requirements of the FLSA "opt-in" procedure); *Coates v. Farmers Grp., Inc.*, No. 15-CV-01913-LHK, 2015 WL 8477918, at *5 (N.D. Cal. Dec. 9, 2015) ("The EPA . . . incorporates the FLSA's enforcement and collective action provisions.").

### A.    Plaintiffs "should have the opportunity to proceed collectively."

In Section 216(b), "Congress has stated its policy that . . . plaintiffs should have the opportunity to proceed collectively" because a collective action serves the twin goals of judicial economy and of lowering the "individual costs to vindicate rights by the pooling of resources." *Hoffman-LaRoche*, 493 U.S. at 170. Unlike class actions brought under Rule 23 of the Federal Rules of Civil Procedure, certification of collective actions is appropriate under § 216(b) if the Named Plaintiffs and members of the proposed collective are "similarly situated" with respect to their claims. *Thompson*, 678 F.2d at 269 ("Suits for recovery under the Equal Pay Act differ from the mainstream of class actions under the Federal Rules."); *Galloway*, 263 F. Supp. 3d at 154 (explaining that Rule 23's procedural requirements of numerosity, commonality, and typicality are inapposite for certification under § 216(b)); *Songu-Mbriwa v. Davis Mem'l Goodwill Indus.*, 144 F.R.D. 1, 1–2 (D.D.C. 1992) (holding an EPA collective action cannot be certified under Rule 23).

As this Court has noted, unlike class actions certified under Federal Rule of Civil Procedure

23, Section 216(b) requires members of the collective to affirmatively opt-in to the litigation, and

for this reason the due process concerns underlying Rule 23 are inapplicable. *Galloway*, 263 F.

Supp. 3d at 154–55; *see also Bradley*, 2019 WL 1060804, at *2 ("A collective action under the

FLSA does not require certification under [Rule] 23[.]"). Rule 23 and § 216(b) serve

"fundamentally different purposes," including that while "Rule 23 provides a general procedural

mechanism for the resolution of claims on a class-wide basis subject to the sound discretion of the

district court," Section 216(b) "is tailored specifically to vindicating federal labor rights, [so that]

where the conditions of § 216(b) are met, employees have a substantive 'right' to proceed as a

collective, a right that does not exist under Rule 23." *Scott v. Chipotle Mexican Grill, Inc.*, 954

F.3d 502, 519–20 (2d Cir. 2020). Accordingly, the similarly situated requirement in Section 216(b)

is "quite distinct" from Rule 23. *Id.* at 518 (internal quotation marks and citation omitted).

### B. A Two-Stage Certification Process Governs Motions for Conditional Certification Under the EPA

District courts in this circuit have adopted a two-stage certification procedure for claims

certified under Section 216(b). *See, e.g.*, *Freeman*, 187 F. Supp. 3d at 22 ("[C]ourts in this Circuit

and others have settled on a two-stage inquiry for determining when a collective action is

appropriate[.]"); *Galloway*, 263 F. Supp. 3d at 155 (recognizing and applying two-stage

certification); *Meyer v. Panera Bread Co.*, 344 F. Supp. 3d 193, 200 (D.D.C. 2018) (same);

*Bradley*, 2019 WL 1060804, at *2 (applying a two-stage inquiry for certification under Section

216(b)).[25]

---

[25] Other federal courts also adhere to this same two-stage process. *See, e.g.*, *Barrett*, 2015 WL
5155692, at *1; *Coates v. Farmers Grp., Inc.*, No. 15–CV–01913–LHK, 2015 WL 8477918, at *5
n.3 (N.D. Cal. Dec. 9, 2015) (collecting cases from several federal circuits); *Kassman* 2014 WL
3298884, at *3 (acknowledging two-step approach and conditionally certifying a collective of tax
and advisory professionals under the EPA); *Moore*, 2012 WL 2574742, at *9, 13 (noting "two-
step formula commonly followed by district courts in collective actions" and conditionally

The first stage, or notice stage, occurs early in the litigation. The purpose of the stage one conditional certification is to "facilitate notice of the collective action to potential plaintiffs to give them the opportunity to opt in to the litigation." *Blount v. U.S. Sec. Assocs.*, 945 F. Supp. 2d 88, 92 (D.D.C. 2013).

### C.     Plaintiffs' Burden at Stage One Is Minimal

Plaintiffs' burden at this stage is low. As this Court has recognized, Plaintiffs need merely to make a "modest factual showing that the named and potential plaintiffs together were victims of a common policy or plan that allegedly violated the law." *Galloway*, 263 F. Supp. 3d at 155 (internal quotation marks and citations omitted and alteration incorporated); *see also Bradley*, 2019 WL 1060804, at *2. Courts in this Circuit have consistently and recently emphasized that the factual showing "should remain a low standard of proof because the purpose of this first stage is merely to determine *whether* 'similarly situated' plaintiffs do in fact exist." *Freeman*, 187 F. Supp. 3d at 22–23 (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010)). Thus, plaintiffs need offer only "*some* evidence . . . of a factual nexus between the manner in which the employer's alleged policy affected a plaintiff and the manner in which it affected other employees." *Galloway*, 263 F. Supp. 3d at 156 (internal quotation marks and citations omitted); *Freeman*, 187 F. Supp. 3d at 23. Plaintiffs' burden remains minimal even though the Parties have engaged in some discovery.[26] Notably, Plaintiffs do not need to present "proof that those potential plaintiffs are,

---

certifying a collective of public relations management employees under the EPA); *Earl v. Norfolk State Univ.*, No. 2:13CV148, 2014 WL 6608769, at *4, 9 (E.D. Va. Nov. 18, 2014) (applying two-stage certification to EPA collective action to conditionally certify a collective of teaching faculty). [26] *See, e.g.*, *Freeman*, 187 F. Supp. 3d at 28–29 ("There is no basis in the text of the FLSA or in the associate case law for a higher standard" even after some discovery had taken place.); *Cunningham v. Elec. Data Sys. Corp.*, 754 F. Supp. 2d 638, 645 (S.D.N.Y. 2010) (noting that the first-stage certification analysis applies "[e]ven where the parties have undertaken substantial discovery") (collecting cases); *Coates*, 2015 WL 8477918, at *7 (rejecting the defendant's argument that the second-stage standard should apply as doing so "might deprive some plaintiffs

actually, similarly situated before those potential plaintiffs even identify themselves" after conditional certification is granted and notice is authorized. *Bradley*, 2019 WL 1060804, at *3 (quoting *Freeman*, 187 F. Supp. 3d at 29). Instead, it is enough that similarly situated individuals may exist.

   1. *The Inquiry as to Whether Plaintiffs are Similarly Situated is a Low Bar.*

Members of the collective need be "similarly situated" only with respect to their allegations that the law has been violated. *Stephens*, 291 F. Supp. 3d at 105–06 (proposed collective need only consist of "plaintiffs who *may be* 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred") (internal citations omitted); *see also Ebbert v. Nassau County*, No. 05-CV-5445, 2007 WL 2295581, at *2 (E.D.N.Y. Aug. 9, 2007) ("[C]ourts have held that plaintiffs can meet this burden by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law.") (internal citation omitted). Plaintiffs need not show that they are similarly situated in every respect; rather, "the proper inquiry during conditional certification is whether the named

---

of a meaningful opportunity to participate" and "skipping to the second-stage standard not only requires the court to evaluate an incomplete factual record—it interferes with the future completion of that record," since the number and type of opt-in plaintiffs could affect the court's second-tier inquiry); *Spencer v. No Parking Today, Inc.*, No. 12 Civ. 6323, 2013 WL 1040052, at *5 (S.D.N.Y. Mar. 15, 2013) ("The first-step standard applies to certification applications up to the completion of discovery, regardless of whether the parties have already engaged in substantial discovery practice."); *Moore*, 2012 WL 2574742, at *10–11 (applying the first stage standard despite the "large amount of discovery" and the plaintiffs' reliance on "employment and compensation policies, sample pay data, policy documents, deposition excerpts of various plaintiffs, and declarations from the Named Plaintiffs, potential class members, and individuals with knowledge of Defendants' practices," as well as limited statistical analysis); *see also Galloway*, 263 F. Supp. 3d at 155 (noting that "[t]he second, more demanding stage takes place *after* discovery, at which time the defendant may move to decertify the class based on the evidentiary record developed *during the discovery period*") (internal quotation marks and citations omitted) (emphasis added); *Dinkel v. MedStar Health, Inc.*, 880 F. Supp. 2d 49, 53 (D.D.C. 2012) ("After conducting discovery, the parties then proceed to the second stage of analysis.").

plaintiffs and the other potential members of the proposed collective are similarly situated *with respect to their allegations that the law has been violated*." *Kassman v. KPMG LLP*, No. 11 Civ. 3743 (LGS), 2014 WL 3298884, at *7 (S.D.N.Y. July 8, 2014) (internal quotation marks and citation omitted); *id.* at *2, 7–9 (certifying a collective of tax and advisory professionals with job titles of associates, senior associates, managers, senior managers, directors, and managing directors).

In other words, it is not necessary for Plaintiffs to demonstrate that they worked in the same office, practice group, or that they performed the same work—just that they are similarly situated with respect to their claims.[27] *See Diaz v. S&H Bondi's Dep't Store*, No. 10 Civ. 7676(PGG), 2012 WL 137460, at *6 (S.D.N.Y. Jan. 18, 2012) ("Courts have found employees 'similarly situated' for purposes of the FLSA where they performed different job functions or worked at different locations, as long as they were subject to the same allegedly unlawful policies."); *Earl*, 2014 WL 6608769, at *7 (granting conditional certification regardless of whether, as defendant asserted, the plaintiff and collective members worked in different departments and had different skills and responsibilities, because all were challenging the same compensation policy); *see also Coates*, 2015 WL 8477918, at *9–10 ("[T]he focus of the 'similarly situated' inquiry pursuant to § 216(b) is the relationship between the plaintiff and the proposed class members, and whether the proposed class members are similarly situated with respect to their EPA allegations.") (internal quotation marks and citation omitted); *cf. Stephens*, 291 F. Supp. 3d at 106 (noting a defendant "cannot defeat a motion for conditional certification by pointing to immaterial variations in how the

---

[27] While Plaintiffs need not have similar job duties and skills as other members of the collective, as explained below, Plaintiffs have presented evidence illustrating that associates perform similar work. *See infra* Section IV (indicating associates perform substantially equal work across offices and practice groups).

improper policies alleged by the plaintiff were applied[,]" nor by pointing to differences in damages that may be calculated on an individualized basis after a collective trial on liability); *Ayala v. Tito Contractors*, 12 F. Supp. 3d 167, 172 (D.D.C. 2014) ("[U]niformity is not a prerequisite."). Indeed, "courts routinely grant conditional certification of multiple-job-title classes" and "[c]onditional certification does not require named plaintiffs from each geographic area included in the collective." *Kassman*, 2014 WL 3298884, at *7.

### 2. Plaintiffs' Evidentiary Burden at Stage One is Typically Satisfied by Pleadings and Declarations Alone.

In light of this low evidentiary burden, courts in this Circuit have repeatedly held that this standard is satisfied based on only pleadings and affidavits. For example, in *Galloway v. Chugach Government Services, Inc.*, this Court conditionally certified a collective based only on the complaint and a single declaration that addressed the similarly situated issue "only in general terms." 263 F. Supp. 3d at 156; *see also Bradley*, 2019 WL 1060804, at *3 ("Plaintiffs' burden at this stage . . . may be satisfied based on pleadings and affidavits." (quoting *Blount*, 945 F. Supp. 2d at 93)).

### 3. Courts Disregard Defendants' Competing Evidence at Stage One.

At the conditional certification stage, courts generally may not resolve factual disputes or make credibility determinations and do not consider competing evidence offered by defendants. *Blount*, 945 F. Supp. 2d at 97 (denying a defendant's motion for pre-conditional certification discovery because "the Court's task at this stage is not to resolve factual disputes, so allowing defendants to expand the record as requested likely would serve no useful purpose"); *Stephens*, 291 F. Supp. 3d at 105 (noting a defendant cannot defeat certification by "contradicting plaintiffs' claims" with "voluminous documentation purporting to show that no violations occurred" (internal quotation marks omitted)). This is because "the Court's task at this stage is not to resolve factual

30

disputes," *Blount*, 945 F. Supp. 2d at 97, and "issues going to the merits are not appropriate for consideration at this juncture," *id.* 94; *see also Barrett*, 2015 WL 5155692, at *5 (noting the "fundamental[]" rule that "attacks on plaintiffs' evidence are premature at the notice stage") (internal alterations incorporated and internal quotations omitted).

Accordingly, courts routinely ignore competing evidence. *See, e.g.*, *Chase v. AIMCO Props., L.P.*, 374 F. Supp. 2d 196, 199–201 (D.D.C. 2005) (granting conditional certification despite significant discovery undermining the plaintiffs' claims, in part because permitting notice to be served "is consistent with the policy choice Congress made when it created the FLSA right of action"); *Morris v. Lettire Const., Corp.*, 896 F. Supp. 2d 265, 271–72 (S.D.N.Y. 2012) (granting conditional certification and rejecting defendant's attempt to introduce competing declarations that purported to show plaintiffs' allegations were unsupported); *Barrett*, 2015 WL 5155692, at *2 ("The focus is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are similarly situated with respect to their allegations that the law has been violated." (internal quotation marks and citation omitted and alterations incorporated)); *Spencer v. No Parking Today, Inc.*, No. 12 Civ 6323, 2013 WL 1040052, at *5 (S.D.N.Y. Mar. 15, 2013) ("The first-step standard applies to certification applications up to the completion of discovery, regardless of whether the parties have already engaged in substantial discovery practice."); *Kassman*, 2014 WL 3298884, at *8 (granting conditional certification when Plaintiffs "presented evidence that job responsibilities were generally the same across offices, compensation policies were firm-wide, and ultimate compensation decisions were made by centralized leadership," and noting that "Defendant's arguments [regarding how the pay policy operated] are more suited to a later, more demanding stage of the proceedings"). Courts grant certification even when there are genuine factual disputes, because issues relating to the merits and

credibility of evidence are not appropriate for consideration at this initial stage. *Blount*, 945 F. Supp. 2d at 94, 97; *Moore v. Publicis Groupe SA*, No. 11 Civ. 1279, 2012 WL 2574742, at *9 (S.D.N.Y. June 29, 2019).

### 4.   *Questions of Individualized Inquiries are Deferred.*

Defendants also cannot defeat conditional certification based on arguments that collective treatment is inappropriate due to individualized inquiries. *See, e.g.*, *Meyer*, 344 F. Supp. at 207–08 ("[A]lthough defendants often argue that the necessity of fact-intensive individualized inquiries will render a collective action unmanageable, courts tend not to consider such arguments at the conditional certification stage . . . ." (internal quotation marks omitted)); *see also Galloway*, 263 F. Supp. 3d at 158 ("[T]he Court cannot and need not conclude on the present record that individualized issues necessarily so permeate the claims as to render collective action inappropriate."); *Freeman*, 187 F. Supp. 3d at 31 (concluding that "any further consideration of manageability issues is properly postponed until after other 'similarly situated' employees have had an opportunity to opt-in" because "further discovery, potential dispositive motions, and any motions for 'de-certification' [at stage two] have the potential to further shape the scope of the case"). "[The] argument that determining whether the potential plaintiffs are similarly situated requires a highly individualized and fact-intensive analysis is more appropriately addressed at the second stage of the certification process." *McKinney v. United Stor-All Ctrs., Inc.*, 585 F. Supp. 2d 6, 10 (D.D.C. 2008).

The second stage of EPA certification occurs after members of the collective have been given the opportunity to opt in and discovery has concluded. At that stage, the defendant may move for "decertification," at which point the Court will "on a fuller record, determine whether . . . the plaintiffs who have opted in are *in fact* 'similarly situated' to the named plaintiffs," *Freeman*,

187 F. Supp. 3d at 22 (emphasis added), requiring a "more searching inquiry" than stage one, *Stephens*, 291 F. Supp. 3d at 105 (internal quotation marks omitted).

If the Court determines at the second stage that the Opt-In Plaintiffs are, in fact, similarly situated to the Representative Plaintiffs, the case will then progress to the merits phase, at which point the Court will determine whether members of the collective were actually paid less than men performing substantially equal work and whether members of the proposed collective worked within the same "establishment." *See Crawford v. ExlService.com, LLC*, No. 16 Civ. 9137 (LAP), 2019 WL 5887214 at *1 (S.D.N.Y. Nov. 12, 2019) (denying summary judgment on an EPA claim because whether plaintiff and her comparators performed substantially equal work "is a question for the jury"); *Grumbine v. United States*, 586 F. Supp. 1144, 1146 (D.D.C. 1984) (considering on summary judgment whether the government's offices constituted one "establishment"); *see also Barrett*, 2015 WL 5155692, at *8–9 ("The general approach of the cases has been to decline to determine at the conditional-certification stage whether the plaintiffs will be able to satisfy the 'establishment' requirement.").

## IV.   ARGUMENT

Plaintiffs' preliminary evidence far exceeds their minimal burden at the notice stage. Plaintiffs present documentary evidence and deposition testimony demonstrating that (1) Jones Day has a firm-wide and centralized compensation policy that applies to all members of the collective, regardless of geography, class year, or practice group and (2) the compensation policy results in lower pay for female associates compared to male associates, thus rendering the Representative Plaintiffs similarly situated to the members of the collective. While not required at this stage, Plaintiffs present evidence showing they perform substantially equal work to their male comparators and that all Jones Day U.S. offices constitute a single establishment. Courts routinely

grant conditional certification based on similar evidentiary records, and often on far less evidence. *See, e.g.*, *Galloway*, 263 F. Supp. 3d at 156–57, 159 (granting the plaintiffs' motion for conditional certification in part even though only one plaintiff submitted a declaration and the declaration described the plaintiff's experiences "in only general terms" based on the declarant's personal knowledge); *Harris*, 317 F. Supp. 3d at 424 (holding that allegations and sworn affidavits were sufficient for conditional certification); *Coates*, 2015 WL 8477918, at *6 ("[A]t this notice stage, the court requires little more than substantial allegations, supported by declarations or discovery[.]").

A.  **Jones Day's Compensation Policy Applies to All Associates.**

All Plaintiffs and members of the collective are similarly situated because they challenge the same centralized compensation policy. This policy applies to all U.S. associates regardless of Jones Day class year, office, or practice group. As explained above, Jones Day has a uniform, firm-wide policy for making compensation decisions, in which office leaders make recommendations at the same time, relying on the same information to the same two people. Partners Lovitt and Shumaker review those recommendations and make their own, and Managing Partner Brogan makes final salary decisions. *See supra* Section II. The same materials and criteria are used in reviewing recommendations and making final salary determinations for all associates. *See, e.g., id.*; Ex. S, 2016 Atlanta Employee Summary (JD_02205793) (indicating office leaders provide recommendations based on the same criteria); Ex. X, May 17, 2017 Compensation Review-U.S. Offices Correspondence (JD_02209866 and JD_02209867) (indicating Partners Shumaker and Lovitt make salary recommendations relying on the same criteria); *id.* (indicating Managing Partner Brogan reviews recommendations and makes final salary decisions). Jones Day's public statements confirm Jones Day makes compensation decisions based on standardized criteria. Dkt.

94-10, *Principles & Values: Associates,* Jones Day, https://www.jonesday.com/principlesandvalues/associates/ (as of April 2, 2019)) (noting compensation decisions are based on standardized criteria).

Moreover, Jones Day articulates its uniform compensation policy externally and internally by pointing to Managing Partner Brogan's centralized authority to review, alter, and finalize associate compensation. In its manual, Jones Day explicitly states that "final determinations of compensation [are] made by the Managing Partner," Stephen Brogan. *See* Ex. J at 6 (JD_00002299). Jones Day further describes its compensation policy on its website, where the firm has admitted that the compensation policy is the same for all associates, regardless of practice group or geographical office.[28] Such statements are echoed in internal emails and memos. *See, e.g.*, Ex. G, Compensation and Evaluation Timeline (January 2017) (JD_02202859) (noting that from May 18 to June 9, the "Managing Partner reviews recommendations and finalizes salaries").[29] Plaintiffs' anecdotal testimony also indicates that salaries are not determined by office or practice group leaders.[30]

---

[28] Dkt. 94-8, *Principles & Values: Client Services,* JONES DAY, https://www.jonesday.com/principlesandvalues/clientservices/ (as of Apr. 2, 2019); *see also* TAC ¶¶ 10–11 (citing Matthew Huisman, *Q&A: Jones Day's Gregory Shumaker*, The Blog of Legal Times (June 18, 2013), https://legaltimes.typepad.com/blt/2013/06/qa-jones-days-gregory-shumaker.html (last visited June 7, 2020)) (noting that Managing Partner Brogan "makes all of the partnership and compensation decisions for the entire firm").

[29] Ex. O, April 26, 2016 Shumaker Compensation Memo (JD_02206484) (noting that initial recommendations must be received by a certain date consistent with the firm-wide schedule "to obtain Managing Partner approval").

[30] *See, e.g.*, Ex. B, Mazingo Dep. 74:13–75:3 (noting that her supervisors were surprised by her salary and that although Plaintiff Williams was promised an increased salary, Plaintiff Williams' supervisors were not able to provide that increase, indicating to Plaintiff Mazingo that they did not have authority to secure Plaintiff Williams a raise); Ex. F, Stahl Dep. 99:5–99:10 ("[Administrative Partner] Darren [Cottriel] told me that he had no control over whether I could have a raise . . . so that expressed to me that he did not have control over . . . associate compensation."); Ex. A, Tolton Dep. 230:10–230:16 ("I asked how I could obtain responses [to my questions about my salary

Not only are the Representative Plaintiffs and members of the collective similarly situated because they challenge this centralized compensation process, but they are also similarly situated because they challenge other aspects of Jones Day's firm-wide compensation policy, including pay secrecy and its "no whining" policy. In particular, Jones Day has a strict policy of pay secrecy, and a policy that discourages associates from questioning the firm's decisions. *See, e.g., supra* Section II; Ex. B, Mazingo Dep. 42:25–43:5 ("Jones Day had made it clear to me that there was a strict policy of pay confidentiality."); *see also* Ex. V, Lovitt PowerPoint at slide 25 (JD_00005242) (telling associates "NEVER be this person. The 'eye roll' associate . . . This kind of eye rolling at the Firm trickles up and can harm an otherwise successful career . . . .").

### B.    Jones Day's Compensation Policy Results in Women Being Paid Less.

Plaintiffs have further provided evidence that Jones Day's centralized compensation policy results in underpaying female associates relative to male associates in jobs requiring substantially equal work. Specifically, despite Jones Day's pay secrecy (and failure to produce firm-wide compensation data required for a methodologically rigorous study), Plaintiffs have pointed to evidence indicating that as a result of Jones Day's centralized compensation policy, Representative Plaintiffs and members of the collective were underpaid relative to specific male comparators. *Supra* Section II. Plaintiffs' testimony on firm-wide instances of gender discrimination and disparate advancement opportunities further reinforces their understanding that the firm has systemic pay disparities. *Id.* As this Court has acknowledged, Plaintiffs' "numerous anecdotal allegations of sex-based stereotyping and bias" serves to "bolster[]" their allegations that "they were paid less and had fewer opportunities because of their gender." *See* Dkt. 110 (Order at 60–

---

freeze] and if there was an appeal process, and I was told that the Brogan compensation letters are final and non-appealable.").

61). Finally, as this Court has recognized, Jones Day's firm-wide pay secrecy and no whining policies may create and reinforce gender disparities in pay by preventing associates from recognizing such disparities and moving to correct them. *Id.* at 56 (noting that these policies could "cause[] continued disparities by closing natural feedback channels" over time).

### C.  While Not Required at this Stage, Evidence Shows that Plaintiffs Performed Substantially Equal Work to Male Associates Whom They Identified and Likely Others Whose Identities They Do Not Yet Know.

The question of whether female associates perform substantially equal work to male associates is a merits question inapplicable at this stage.[31]  Nonetheless, Plaintiffs have presented evidence indicating that male and female associates perform substantially equal work.  *See supra* Section II. For example, the Plaintiffs provided detailed testimony about their work and the work of their male comparators. *Id.* Moreover, Jones Day evaluates all associates using the same criteria, regardless of office or practice group, further illustrating that associates perform substantially equal work. *Id.*; 29 C.F.R. § 1620.14 (providing that in determining whether jobs require substantially equal work, courts should consider "whether and to what extent" the employer has differentiated between the jobs for purposes of setting pay). Indeed, Jones Day requires that office leaders (who themselves belong to a practice group), not practice leaders, provide salary recommendations for all associates, regardless of practice group, further illustrating that associates in different practice groups perform substantially equal work. *See infra* Section II.

---

[31] *See Coates*, 187 F.3d at *8–10 (explaining that the question of substantially equal work is a merits question not applicable when determining whether named plaintiffs are "similarly situated" to members of the collective at stage one); *Crawford v. ExlService.com, LLC*, No. 16 Civ. 9137 (LAP), 2019 WL 5887214 at *1 (S.D.N.Y. Nov. 12, 2019) (denying summary judgment on EPA claim because whether plaintiff and her comparators performed substantially equal work "is a question for the jury to resolve"); *see also Blount*, 945 F. Supp. 2d at 94, 97 (noting that "the Court's task at this stage is not to resolve factual disputes" and that "issues going to the merits are not appropriate for consideration at this juncture").

**D.      While Not Required at this Stage, Plaintiffs Show that All U.S. Offices
             Constitute a Single Establishment.**

At this stage the Court does not need to consider whether Jones Day's offices constitute a

single "establishment."[32] Plaintiffs nevertheless present substantial evidence that Jones Day

operates as a single establishment, without regard to geography. First, as explained above, Jones

Day operates as a single establishment because all associates, nationwide, are subjected to the

same compensation policy and practice. *See supra* Section II; *Grumbine*, 586 F. Supp. at 1148 ("It

would hardly make sense to permit an employer to rely on a geographic 'establishment' concept

in defense of an unequal pay practice[] when that employer has itself adopted a uniform, non-

geographic pay policy and system.").

Second, Jones Day operates as "One Firm Worldwide" whereby their associates are

assigned to "work across offices, practices, and continents." *About Us: One Firm Worldwide*,

https://www.jonesdaycareers.com/en/our-values, (last viewed on June 9, 2020). This is not just an

advertising slogan; the Named Plaintiffs testified that, consistent with this policy, they regularly

worked on projects across offices. *See, e.g.*, Ex. C, Williams Dep. 92:15–93:3 (explaining that she

would often be staffed on large litigation projects across offices and practice groups); Ex. F, Stahl

Dep. 60:3–60:12 (explaining that as part of the "One Firm Worldwide" brand, Plaintiff Stahl was

told "that it was very frequent for people to work across offices and be staffed on large matters no

matter where they were located"); *id.* at 161:6–161:10 (explaining that an associate transferred

between offices); Ex. E, Henderson Dep. 69:18–69:25 (discussing the "One Firm Worldwide"

brand and explaining that she often worked outside the New York office and that attorneys

---

[32] *See Barrett,* 2015 WL 5155692, at *8–9 ("The general approach of the cases has been to decline
to determine at the conditional-certification stage whether the plaintiffs will be able to satisfy the
'establishment' requirement.") (collecting cases); *Moore*, 2012 WL 2574742, at *11  (same); *see
also Grumbine*, 586 F. Supp. at 1146 (considering on summary judgment whether the
government's offices constituted one "establishment").

transitioned between offices in different states). Consequently, at the merits stage, Plaintiffs will be able to establish that Jones Day operates as one "establishment."[33]

### E.   Courts Routinely Grant Conditional Certification Based on Evidence Like Plaintiffs'.

Courts in this Circuit routinely grant stage one certification on similar or lesser showings. For instance, in *Galloway v. Chugach Government Services, Inc.*, this Court conditionally certified an FLSA collective action and issued notice based on a single declaration that spoke "only in general terms," describing the plaintiff's personal knowledge "that other Residential Advisors were required to work through meal breaks and beyond their scheduled shifts without receiving overtime wages." 263 F. Supp. 3d at 157. While the declaration was "short on detail" it was still "minimally sufficient" to meet the "low bar of evidence" required at the conditional certification stage. *Id.* at 156.

Similarly, in *Blount v. U.S. Security Associates*, the court conditionally certified an FLSA collective based on plaintiffs' complaint and declarations asserting that they had a common employer, challenged the same compensation policy alleged to be unlawful, and were all affected by that same compensation policy in the same material way. 945 F. Supp. 2d at 93–95; *see also Ayala*, 12 F. Supp. 3d at 170–71 (granting conditional certification based on the pleadings and several declarations explaining that all members of the collective were challenging the same violations of the same policy). Plaintiffs have produced far more than pleadings and declarations.

---

[33] *See Barrett*, 2015 WL 5155692, at *9 (noting that it was unlikely that plaintiffs would be required to show that they worked in the same "physical place" when they performed the same type of work under centralized controls and worked across geographic regions); *Kassman*, 2014 WL 3298884, at *8 (noting that whether plaintiffs worked in the same "establishment" was not an appropriate consideration for conditional certification but explaining that, nonetheless, plaintiffs presented evidence that the company operated as "one establishment" where "job responsibilities were generally the same across offices, compensation policies were firm-wide and ultimate compensation decisions were made by centralized leadership").

Courts in other circuits also hold this level of evidence sufficient to grant conditional certification on a plaintiff's EPA claims. For instance, in *Kassman v. KPMG LLP*, the court conditionally certified a collective of female accounting and advisory professionals in different positions, locations, and levels of seniority based on the plaintiffs' "declarations detailing their personal experiences; documentary evidence of KPMG's firm-wide compensation policies and job descriptions; and statistical evidence of discrimination," including testimony and evidence regarding comparator data. 2014 WL 3298884, at *6. Similar to Jones Day's compensation system, at KPMG "firm policy provides that all employee compensation is ultimately decided by persons at the highest level of firm leadership, who 'review compensation recommendations,' make 'revisions,' and 'notify [lower level leadership] when all salary and compensation planning has been approved." *Id.* at *2. The court stressed that, despite the defendant's contention to the contrary, "'[c]ourts have found employees 'similarly situated' for purposes of the FLSA where they performed different job functions or worked at different locations, as long as they were subject to the same allegedly unlawful policy.'" *Id.* at *6 (quoting *Diaz*, 2012 WL 137460, at *6); *see also Wellens v. Daiichi Sankyo, Inc.*, No. 13–cv–0058–WHO, 2014 WL 2126877, at *5 (N.D. Cal. May 22, 2014) (rejecting the defendant's claim that the plaintiffs and the collective members were not similarly situated because their job duties varied and noting that the relevant question was instead whether "plaintiffs [are] similarly situated with respect to their EPA allegations").

Likewise, in *Earl v. Norfolk State University*, the court granted conditional certification to a collective of faculty members based on the pleadings, two "skeletal" affidavits of third-party faculty members alleging pay disparities based on gender, and documentary evidence of the defendant's university-wide annual review process, which affected compensation and through which faculty members were evaluated using the same criteria, including "teaching," "research,"

and "community service." 2014 WL 6608769, at *6–7. Notably, the court concluded that any difference in the application of the evaluation criteria to each department did not defeat conditional certification of a collective including multiple departments because all members of the collective challenged that the employer paid them less than comparators within their departments. *Id.* at *7.[34]

Plaintiffs' evidence, including preliminary compensation information of a small number of named comparators, publications, internal communications addressing the firm's compensation policies, and deposition testimony describing associates' experiences relating to those policies,

---

[34] Courts in circuits across the country have continued to grant conditional certification to proposed EPA collectives based on minimal showings. *See, e.g.*, *Smith v. Merck & Co., Inc.*, No. CV 13-2970, 2016 WL 1690087, at *2, 5 (D.N.J. Apr. 27, 2016) (granting conditional certification based on pleadings, documentary evidence, and declarations from named plaintiffs, in which they "attest[ed] that Defendant had a centralized compensation system . . . ."); *Chapman v. Fred's Stores of Tenn., Inc.*, 2:08-cv-1247–HGD, 2013 WL 1767791, *8–9, 16 (N. D. Ala. Mar. 15, 2013), *report & rec. adopted*, No. 2:08–cv–01247–HGD, 2013 WL 1760000 (N.D. Ala. Apr. 22, 2013) (recommending conditional certification of a nationwide EPA collective of thousands of assistant managers at more than 650 stores based on common job description, training manual, and pay provisions and employee declarations "upon information and belief" that female managers were paid less than men); *id.* at *8–9, 11, 16 (recommending granting conditional certification and noting that even though district managers made the initial salary decision, "their decisions are subject to review at a higher level in many cases and are limited by corporate policy and pay scales"); *Moore*, 2012 WL 2574742, at *10–12 (granting conditional certification based on "employment and compensation policies, sample pay data, policy documents, deposition excerpts of various plaintiffs, and declarations from the Named Plaintiffs, potential class members, and individuals with knowledge of Defendants' practices," all of which indicated a common compensation policy that led to female employees being paid less than male employees, despite the plaintiffs working in "different job functions" and in different locations); *Ebbert*, 2007 WL 2295581, at *1–3 (certifying a collective based on the allegations of four plaintiffs that "as a result of a common pay scale, they were paid wages lower than the wages paid to men for the performance of substantially equal work"); *Rochlin v. Cincinnati Ins. Co.*, No. IP00-1898, 2003 WL 21852341, at *1, 14–16, 21 (S.D. Ind. July 8, 2003) (certifying a collective to current and former female employees working in multiple divisions and locations nationwide based on "evidence tending to indicate that 'at least some' female employees were paid less than their equally qualified male counterparts, and that those employees are similarly situated to plaintiffs"); *Rehwaldt v. Elec. Data Sys. Corp.*, No. 95–876, 1996 WL 947568, at *4–5, 9 (W.D.N.Y. Mar. 28, 1996) (allowing notice of EPA collective to all female sales employees in a two-division business unit where plaintiff (i) alleged that she and other women in the proposed collective were paid less than male employees doing essentially the same work; and (ii) "submitted wage and bonus information relating to herself, one other female co-employee and one male co-employee").

demonstrate the "factual nexus between the manner in which the employer's alleged policy affected a plaintiff and the manner in which it affected other employees." *Galloway*, 263 F. Supp. 3d at 156; *see also Freeman*, 187 F. Supp. 3d at 23. Evidence of "a compensation policy that is applied across the proposed class, coupled with evidence that the policy results in discriminatorily unequal pay, suggests the existence of other similarly situated plaintiffs who may have EPA claims arising from the application of that policy." *Coates*, 2015 WL 8477918, at *11. Plaintiffs have presented more than sufficient evidence that there is a compensation policy that is applied to all female associates at Jones Day and that the policy results in unequal pay based on gender, indicating that other female associates at Jones Day are similarly situated to the plaintiffs and that conditional certification is appropriate.

## V.   RELIEF REQUESTED

In light of Plaintiffs' preliminary evidence, the Court should conditionally certify the collective and should authorize opt-in notice to all female associates who have been employed at Jones Day since April 3, 2016, or three years prior to the filing of this litigation.[35] Consistent with the EPA's remedial purposes, courts favor broad notice to employees who may be victims of alleged unlawful practices. This avoids a multiplicity of duplicative actions and enables employees to preserve their claims and provide evidence to show that they are, in fact, similarly situated to

---

[35] Courts routinely authorize notice three years prior to the filing of the Complaint. *See Meyer*, 344 F. Supp. at 210 ("[B]ecause equitable tolling issues often arise for prospective plaintiffs, courts frequently permit notice to be keyed to the three-year period prior to the filing of the complaint, with the understanding that challenges to the timeliness of individual plaintiffs' actions will be entertained at a later date." (internal quotation marks and citation omitted)); *Hunter v. Sprint Corp.*, 346 F. Supp. 2d 113, 120 n.4 (D.D.C. 2004) (approving notice to be sent based on the filing of the complaint); *see also Castillo v. P&R Enters., Inc.*, 517 F. Supp. 2d 440, 449 (D.D.C. 2007) (noting that it makes administrative sense to extend the period based on the date the complaint is filed, rather than the date the notice is sent).

Plaintiffs. In contrast, failure to provide notice will mean that employees' EPA claims will needlessly expire and that the judicial system may be burdened with overlapping suits.

Accordingly, the Court should conditionally certify the proposed collective and order the parties to meet and confer on a proposed notice.

Respectfully submitted,

Date: June 9, 2020

*/s/ Kate Mueting*
Kate Mueting (DC Bar No. 988177)
Paul Blankenstein (DC Bar No. 304931)
SANFORD HEISLER SHARP, LLP
700 Pennsylvania Avenue, SE, Ste. 300
Washington, D.C. 20003
Telephone: (202) 499-5206
Facsimile: (202) 499-5199
kmueting@sanfordheisler.com

Deborah K. Marcuse (D.C. Bar No. 995380)
SANFORD HEISLER SHARP, LLP
111 S. Calvert Street, Ste. 1950
Baltimore, MD 21202
Telephone: (410) 834-7415
Facsimile: (410) 834-7425
dmarcuse@sanfordheisler.com

David W. Sanford (D.C. Bar No. 457933)
Russell L. Kornblith*
SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
rkornblith@sanfordheisler.com

*admitted *pro hac vice*

*Attorneys for Plaintiffs, the Proposed Classes, and the Proposed Collective*