IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NILAB RAHYAR TOLTON, *et al.*, ) <br> ) <br> *Plaintiffs*, ) <br> ) <br> *v.* ) <br> ) <br> JONES DAY, ) <br> ) <br> *Defendant.* ) | Civ. No. 1:19-00945 (RDM) <br><br> **DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS** |

Jones Day submits the following undisputed material facts in support of its motion for summary judgment on Count IV of the Third Amended Complaint (Dkt. 41, "TAC").

**A. KATRINA HENDERSON**

1. Jones Day notified Henderson in December 2015 that her employment by the Firm would be terminated. (Dkt. 41 at 81-82 (TAC ¶¶ 300-01); Dkt. 128-25 at 11-12 (Henderson Tr. 276:17-25, 277:22-24).)

2. After the notice of termination, Jones Day allowed Henderson to stay on the Firm's payroll temporarily while she sought her next job. (Dkt. 128-25 at 13-14 (Henderson Tr. 281:14-282:9).)

3. At the end of June 2016, Henderson was placed on unpaid leave. (Dkt. 128-25 at 15 (Henderson Tr. 283:15-20); Dkt. 41 at 82 (TAC ¶ 304); *see* Bounds Decl. ¶ 8.)

4. Henderson ended her employment at Jones Day on July 15, 2016. (Bounds Decl. ¶ 8.)

5. In calendar year 2016, Henderson recorded zero client billable hours and zero pro bono hours of work. (Dkt. 128-38 at 2 (Chase Decl. Ex. 27).)

    **B.**    **SAIRA DRAPER**

6.    Draper joined Jones Day's Atlanta office as a first-year associate in October 2011. (Bounds Decl. ¶ 9.)

7.    In calendar year 2015, Draper recorded 394 client billable hours and 281 pro bono hours. (Dkt. 102-15 at 3.)

8.    On an annualized basis—meaning proportionally increased to reflect the hours an associate would have recorded had the associate been working for the entire year without leave—Draper recorded 642 client billable hours and 458 pro bono hours in calendar year 2015. (*Id.*)

9.    In calendar year 2016, Draper recorded 1,134 client billable hours and 370 pro bono hours. (*Id.*)

10.    In calendar year 2017, Draper recorded 1,032 client billable hours and 167 pro bono hours. (*Id.*)

11.    On an annualized basis, Draper recorded 1,371 client billable hours and 222 pro bono hours in calendar year 2017. (*Id.*)

12.    In calendar year 2018, Draper recorded 397 client billable hours and 486 pro bono hours. (*Id.* at 2.)

13.    On an annualized basis, Draper recorded 631 client billable hours and 774 pro bono hours in calendar year 2018. (*Id.*)

14.    Draper left the Firm on October 4, 2018. (Bounds Decl. ¶ 9.)

15.    As of July 1, 2014, Draper's compensation was $180,000 per year. (*Id.*)

16.    As of July 1, 2015, Draper's compensation was $195,000 per year. (*Id.*)

17.    As of July 1, 2016, Draper's compensation was $220,000 per year. (*Id.*)

18.    As of July 1, 2017, Draper's compensation was $230,000 per year. (*Id.*)

19. [Male Associate 3] joined Jones Day's Atlanta office as a first-year associate in October 2013. (*Id.* at ¶ 11.)

20. In calendar year 2015, [Male Assoc. 3] recorded 2,144 client billable hours and 58 pro bono hours. (Dkt. 128-37 at 2 (Chase Decl. Ex. 26).)

21. In calendar year 2016, [Male Assoc. 3] recorded 2,185 client billable hours and 0 pro bono hours. (*Id.* at 3.)

22. In calendar year 2017, [Male Assoc. 3] recorded 2,067 client billable hours and 14 pro bono hours. (*Id.* at 4.)

23. In calendar year 2018, [Male Assoc. 3] recorded 1,896 client billable hours and 28 pro bono hours. (*Id.* at 5.)

24. As of January 2015, [Male Assoc. 3] compensation was $155,000 per year. (Bounds Decl. ¶ 11.)

25. As of July 1, 2015, [Male Assoc. 3's] compensation was $170,000 per year. (*Id.*)

26. As of July 1, 2016, [Male Assoc. 3's] compensation was $210,000 per year. (*Id.*)

27. As of July 1, 2017, [Male Assoc. 3's] compensation was $260,000 per year. (*Id.*)

28. As of July 1, 2018, [Male Assoc. 3's] compensation was $300,000 per year. (*Id.*)

29. [Male Associate 4] joined Jones Day's Atlanta office as a first-year associate in October 2014. (Bounds Decl. ¶ 12.)

30. [Male Associate 4] left the Firm on [redacted]. (*Id.*)

31. In calendar year 2015, [Male Associate 4] recorded 1,689 client billable hours and 136 pro bono hours. (Dkt. 128-40 at 2 (Chase Decl. Ex. 29).)

32. In calendar year 2016, [Male Associate 4] recorded 1,990 client billable hours and 1 pro bono hour. (*Id.* at 3.)

33. In calendar year 2017, [Male Associate 4] recorded 1,997 client billable hours and 28 pro bono hours. (*Id.* at 4.)

34. In calendar year 2018, [Male Associate 4] recorded 1,431 client billable hours and 11 pro bono hours. (*Id.* at 5.)

35. On an annualized basis, [Male Associate 4] recorded 1,908 billable hours and 15 pro bono hours for calendar year 2018. Those figures reflect his raw recorded hours for the nine months of the year during which he was a Firm employee, divided by nine and then multiplied by twelve. (*See id.*)

36. As of January 1, 2015, [Male Associate 4's] compensation was $150,000 per year. (Bounds Decl. ¶ 12.)

37. As of January 1, 2016, [Male Associate 4's] compensation was $153,000 per year. (*Id.*)

38. As of July 1, 2016, [Male Associate 4's] compensation was $190,000 per year. (*Id.*)

39. As of July 1, 2017, [Male Associate 4's] compensation was $210,000 per year. (*Id.*)

40. As of July 1, 2018, [Male Associate 4's] compensation was $250,000 per year. (*Id.*)

41. [Male Associate 2] joined Jones Day's Atlanta office as a first-year associate in October 2012. (Bounds Decl. ¶ 13.)

42. In calendar year 2015, [Male Associate 2] recorded 2,003 client billable hours and 9 pro bono hours. (Dkt. 128-31 at 2 (Chase Decl. Ex. 20).)

43. In calendar year 2016, [Male Associate 2] recorded 1,773 client billable hours and 107 pro bono hours. (*Id.* at 3.)

44. On an annualized basis, [Male Associate 2] recorded 1,923 client billable hours and 116 pro bono hours in calendar year 2016. (Dkt. 107-5 at 2.)

45. In calendar year 2017, [Male Associate 2] recorded 2,067 client billable hours and 97 pro bono hours. (*Id.* at 4.)

46. In calendar year 2018, [Male Associate 2] recorded 2,077 client billable hours and 42 pro bono hours. (*Id.* at 5.)

47. As of January 1, 2015, [Male Associate 2's] compensation was $170,000 per year. (Bounds Decl. ¶ 13.)

48. As of July 1, 2015, [Male Associate 2's] compensation was $185,000 per year. (*Id.*)

49. As of July 1, 2016, [Male Associate 2's] compensation was $230,000 per year. (*Id.*)

50. As of July 1, 2017, [Male Associate 2's] compensation was $265,000 per year. (*Id.*)

51. As of July 1, 2018, [Male Associate 2's] compensation was $315,000 per year. (*Id.*)

52. [Male Associate 5] joined Jones Day's Atlanta office as an associate in October 2015. (*Id.* at ¶ 14.)

53. [Male Assoc. 5's] starting salary was $150,000 per year and it was raised to $180,000 as of July 1, 2016. (*Id.*)

54. As of January 1, 2017, [Male Assoc. 5's] salary was $185,000 per year. (*Id.*)

55. As of July 1, 2017, [Male Assoc. 5's] salary was $195,000 per year. (*Id.*)

56. As of July 1, 2018, [Male Assoc. 5's]' salary was $225,000 per year. (*Id.*)

57. Between 2016 and 2018, Jones Day increased starting salaries for associates in the Atlanta office by $40,000. (Dkt. 128-2 (Deane Decl. ¶¶ 21-23); *see also* Dkt. 102-8 at 13-14, 27 (Draper Tr. 129:24-130:23; 149:9-24).)

C. **MEREDITH WILLIAMS**

58. Meredith Williams joined Jones Day's Irvine office as a first-year associate in October 2013. (Dkt. 41 at 48 (TAC ¶ 162); Bounds Decl. ¶ 10.)

59. Williams joined the Intellectual Property practice. (Bounds Decl. ¶ 10.)

60. Williams earned $160,000 per year as her starting salary. (*Id.*)

61. As of January 1, 2015, Williams's compensation was $170,000 per year. (*Id.*)

62. As of July 1, 2015, Williams's compensation was $185,000 per year. (*Id.*)

63. As of July 1, 2016, Williams's compensation was $205,000 per year. (*Id.*)

64. As of July 1, 2017, Williams's compensation was $215,000 per year. (*Id.*)

65. [Male Associate 11] joined the Firm's Dallas office as a first-year associate in October 2013. (*Id.* at ¶ 15.)

66. [Male Assoc. 11] joined the [redacted] practice. (*Id.*)

67. [Male Assoc. 11] earned $160,000 per year as his starting salary. (*Id.*)

68. As of January 1, 2015, [Male Assoc. 11's] compensation was $170,000 per year. (*Id.*)

69. As of July 1, 2015, [Male Assoc. 11's] compensation was $180,000 per year. (*Id.*)

70. As of July 1, 2016, [Male Assoc. 11's] compensation was $185,000 per year. (*Id.*)

71. [Male Assoc. 11] left the Firm on [redacted]. (*Id.*)

72. [Male Associate 8] joined the Firm's New York office as a first-year associate in October 2013. (*Id.* at ¶ 16.)

73. [Male Assoc. 8] joined the [redacted] practice. (*Id.*)

74. [Male Assoc. 8] earned $160,000 per year as his starting salary. (*Id.*)

75. As of January 1, 2015, [Male Assoc. 8's] compensation was $175,000 per year. (*Id.*)

76. As of July 1, 2015, [Male Assoc. 8's] compensation was $210,000 per year. (*Id.*)

77. As of July 1, 2016, [Male Assoc. 8's] compensation was $265,000 per year. (*Id.*)

78. As of July 1, 2017, [Male Assoc. 8's] compensation was $350,000 per year. (*Id.*)

79. [Male Associate 6] joined the Firm's Pittsburgh office as a first-year associate in October 2014. (*Id.* at ¶ 17.)

80. [Male Assoc. 6] joined the [redacted] practice. (*Id.*)

81. [Male Assoc. 6] earned $145,000 per year as his starting salary. (*Id.*)

82. As of January 1, 2016, [Male Assoc. 6's] compensation was $150,000 per year. (*Id.*)

83. As of July 1, 2016, [Male Assoc. 6's] compensation was $170,000 per year. (*Id.*)

84. As of July 1, 2017, [Male Assoc. 6's] compensation was $175,000 per year. (*Id.*)

85. As of July 1, 2018, [Male Assoc. 6's] compensation was $190,000 per year. (*Id.*)

86. [Male Associate 7] joined the Firm's San Diego office as a first-year associate in October 2013. (*Id.* at ¶ 18.)

87. [Male Assoc. 7] joined the [redacted] practice. (*Id.*)

88. [Male Assoc. 7] earned $160,000 per year as his starting salary. (*Id.*)

89. As of January 1, 2015, [Male Assoc. 7's] compensation was $170,000 per year. (*Id.*)

90. As of July 1, 2015, [Male Assoc. 7's] compensation was $180,000 per year. (*Id.*)

91. As of July 1, 2016, [Male Assoc. 7's] compensation was $190,000 per year. (*Id.*)

92. [Male Associate 10] joined the Firm's Dallas office as a second-year associate in October 2013 after completing a judicial clerkship. (*Id.* at ¶ 19.)

93. [Male Assoc. 10] joined the [redacted] practice. (*Id.*)

94. [Male Assoc. 10] earned $160,000 per year as his starting salary, and it was increased to $170,000 as of January 1, 2014. (*Id.*)

95. As of July 1, 2014, [Male Assoc. 10's] compensation was $185,000 per year. (*Id.*)

96. As of July 1, 2015, [Male Assoc. 10's] compensation was $205,000 per year. (*Id.*)

97. As of July 1, 2016, [Male Assoc. 10's] compensation was $220,000 per year. (*Id.*)

98. [Male Associate 9] joined the Firm's Houston office as a first-year associate in October 2013. (*Id.* at ¶ 20.)

99. [Male Assoc. 9] joined the [redacted] practice. (*Id.*)

100. [Male Assoc. 9] transferred to the Firm's Washington, D.C. office on January 1, 2017. (*Id.*)

101. [Male Assoc. 9] earned $160,000 per year as his starting salary. (*Id.*)

102. As of January 1, 2015, [Male Assoc. 9's] compensation was $170,000 per year. (*Id.*)

103. As of July 1, 2015, [Male Assoc. 9's] compensation was $180,000 per year. (*Id.*)

104. As of July 1, 2016, [Male Assoc. 9's] compensation was $210,000 per year. (*Id.*)

105. As of July 1, 2017, [Male Assoc. 9's] compensation was $225,000 per year. (*Id.*)

106. [Male Associate 13] joined the Firm's Irvine office as a first-year associate in October 2007. (*Id.* at ¶ 21.)

107. [Male Assoc. 13] joined the [redacted] practice. (*Id.*)

108. [Male Assoc. 13] earned $160,000 per year as his starting salary. (*Id.*)

109. As of January 1, 2009, [Male Assoc. 13's] compensation was $175,000 per year. (*Id.*)

110. As of July 1, 2009, [Male Assoc. 13's] compensation was $175,000 per year. (*Id.*)

111. As of July 1, 2010, [Male Assoc. 13's] compensation was $175,000 per year. (*Id.*)

112. As of July 1, 2011, [Male Assoc. 13's] compensation was $190,000 per year. (*Id.*)

113. [Male Assoc. 13] left the Firm on [redacted] (*Id.*)

114. [Male Associate 15] joined the Firm's Irvine office as a first-year associate in October 2009. (*Id.* at ¶ 22.)

115. [Male Assoc. 15] joined the [redacted] practice. (*Id.*)

116. [Male Assoc. 15] earned $160,000 per year as his starting salary. (*Id.*)

117. [Male Assoc. 15's] salary remained $160,000 for his entire time at the Firm. (*Id.*)

118. [Male Assoc. 15] left the Firm on [redacted] (*Id.*)

119.   [Male Associate 14] joined the Firm's Irvine office as a fourth-year associate in March 2013.  (*Id.* at ¶ 23.)

120.   [Male Assoc. 14] joined the [ ] group.  (*Id.*)

121.   [Male Assoc. 14's] starting salary was $220,000 and it was raised to $230,000 as of July 1, 2013.  (*Id.*)

122.   [Male Assoc. 14] left the Firm on [ ], before going through an annual evaluation process.  (*Id.*)

      **D.   JONES DAY'S OFFICE-BASED SYSTEMS FOR RECRUITING, EVALUATING, AND COMPENSATING ASSOCIATES**

123.   Associate recruiting at Jones Day is conducted at the office level.  (Dkt. 128-30 at 3 (Reisman Tr. 44:4-9).)

124.   Each office decides which recruiters to send for on-campus interviews.  (Dkt. 128-30 at 6-7 (Reisman Tr. 61:22-62:2).)

125.   Each office selects candidates that they individually as an office would like to call back for further interviews.  (Dkt. 128-30 at 8, 9-10 (Reisman Tr. at 70:4-9, 74:24-75:2).)

126.   Each office makes independent hiring decisions, both as to summer associates and full-time associate positions.  (Dkt. 128-30 at 3, 4-5, 11-12 (Reisman Tr. at 44:4-11, 50:24-51:21, 123:16-124:15).)

127.   No approval at the firm-wide level is needed for associate hiring decisions.  (Dkt. 128-30 at 11-13 (Reisman Tr. at 123:16-125:7).)  The Partner in Charge "PIC" of each office has discretion to set the initial compensation for lateral associate hires.  (Dkt. 128-5 (Lovitt Decl. ¶ 21).)

128.   The PIC in each office is responsible for making the recommendations for salary adjustments for associates in that office.  (Dkt. 128-15 at 8, 10 (Lovitt Tr. at 47:22-23, 50:13-16).)

129. Each PIC exercises independent discretion in apportioning its office compensation budget. (Dkt. 128-5 (Lovitt Decl. ¶ 24).)

130. The Firm does not have a compensation structure or ladder that is uniform across all geographic markets. (Dkt. 102-9 at 3.)

131. Each PIC transmits a list of recommended compensation adjustments to Traci Lovitt (since late 2016) and Michael Shumaker, who review the recommendations and may suggest revisions before forwarding the recommended adjustments to the Managing Partner for approval. (Dkt. 128-5 (Lovitt Decl. ¶¶ 24-27); *see* Dkt. 128-15 at 8-9 (Lovitt Tr. 47:22-48:22).)

132. Any changes made by the Managing Partner to the recommended compensation adjustments are sent back to the PIC, who conducts another review and can challenge any changes. (Dkt. 128-15 at 9, 11 (Lovitt Tr. 48:10-22, 54:18-55:11); Dkt. 128-6 (Lovrien Decl. ¶ 28); Dkt. 128-14 (Chase Decl. Ex. 3 at 3.))

133. Of the 29 pay adjustments experienced by the six named Plaintiffs collectively during their tenures at the Firm, 26 adjustments were the amounts recommended by the PICs. (Dkt. 128-10 (Coussons Decl. Ex. 1 cols. U, X, AK, AN, BC, BF, BI, BK, BX, CA, CD, CE, CS, CV, CW, DO, DS, EJ, EO, rows 3, 5, 7, 9, 11, 13).)

134. There is no firm-wide system for assigning work to associates. (Dkt. 128-15 at 79-80 (Lovitt Tr. 310:23-311:4).)

135. Work assignments for new lawyers are managed by the new lawyer group coordinator in each office. (Dkt. 128-30 at 14, 15-19 (Reisman Tr. 205:5-15, 206:20-210:16).)

136. Associates cannot transfer or be transferred to another office without approval from both offices' PICs. (Dkt. 128-5 (Lovitt Decl. ¶ 9).)

137. Inter-office transfers, where approved, are generally an accommodation to an associate, not a management decision for the benefit of the Firm. (*Id*.)

138. During the annual review process, each Jones Day office uses its own process to rate and rank its associates and has final say over those rating and rankings. (Dkt. 128-15 at 22, 28-29, 45 (Lovitt Tr. 108:2-10, 123:19-124:4, 186:10-18); Dkt. 128-4 (Laduzinski Decl. ¶¶ 18-22); Dkt. 128-1 (Cottriel Decl. ¶¶ 11, 16, 18)).

July 13, 2020                                    Respectfully submitted,

/s/ Mary Ellen Powers
Mary Ellen Powers (Bar No. 334045)
Beth Heifetz (Bar No. 417199)
Yaakov Roth (Bar No. 995090)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939


Terri L. Chase (*pro hac vice* granted)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

*Attorneys for Defendant*