**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NILAB RAHYAR TOLTON *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JONES DAY, a General Partnership,<br><br>Defendant. | No. 1:19-cv-00945-RDM<br><br><br>JURY TRIAL DEMANDED |

<u>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR**</u>
<u>**SUMMARY JUDGMENT**</u>

## <u>**TABLE OF CONTENTS**</u>

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................ 3

I.        The EPA Plaintiffs Were All Paid Less than Male Associates Who Performed Substantially Equal Work ..................................................................................................... 3

II.       At Jones Day, the Definition of Establishment Is Not Geographically Constrained .............................................................................................................................................4

    A.       Jones Day Operates as "One Firm Worldwide" ................................................ 5

    B.       Jones Day Has a Centralized Process for Setting Associate Compensation ..... 5

    C.       Other Functions at Jones Day Are Equally Centralized ................................... 6

III.      Jones Day Does Not Define Work by the Billable Hour ...................................... 7

LEGAL STANDARDS ......................................................................................................... 8

ARGUMENT ...................................................................................................................... 10

I.        Jones Day Has Not Indisputably Proven that Each Office Operates as a Single Establishment for the Purposes of the Equal Pay Act ........................................................ 11

    A.       Courts Take a Functional Approach to Defining "Establishment" ................ 12

    B.       Applying This Functional Approach, Evidence Shows that Jones Day Operates as a Single Establishment for Purposes of the EPA ........................................................... 14

        1.       The Associate Compensation Process at Jones Day Is Centralized .............. 14

        2.       Recruiting and Hiring at Jones Day Are Directed by the Firm, Not by Offices .......................................................................................................................................17

        3.       Associates at Jones Day Regularly Work With, and Are Evaluated By, Attorneys in Other Offices ................................................................................................. 19

        4.       Firm Structure, Policy Administration, and "One Firm Worldwide" Operating Principle Offer Additional Evidence of a High Degree of Functional Interdependence Between Offices ................................................................................................................... 22

            i.       Policy Making at the Firm Is Centralized ................................................... 22

            ii.      The Firm Facilitates Seamless Transfers Between Offices ....................... 23

            iii.     At Jones Day, "One Firm Worldwide" Is More than a Slogan ................ 23

    C.       Discovery to Date Suggests Additional Comparators for Plaintiff Williams.. 24

    D.       The Court Should Not Determine that Each Jones Day Office Constitutes a Separate "Establishment" for the Purposes of the EPA on the Partial Record. ................... 26

        1.       Plaintiffs Seek Testimony from Individuals Who Exercise Central Control . 26

         2.       Plaintiffs Seek Further Documents Evidencing Jones Day's Functional Integration .......................................................................................................................27

II.        Jones Day Has Not Carried Its Burden of Proving that Plaintiffs' Compensation Was Justified Under the EPA's Affirmative Defenses ............................................................ 28

   A.       Jones Day Misinterprets the EPA. .................................................................. 29

      1.       Supreme Court Precedent Confirms that the Equal Work Inquiry Focuses on Whether the Job's Duties Are Equal ............................................................................... 29

      2.       The Act's Affirmative Defenses, on Which the Employer Bears the Burden of Proof, Speak to Differentials in Production—i.e. Hours ................................................ 30

      3.       D.C. Circuit Case Law Affirms that an Employer Who Seeks to Pay More Based on Additional Work Must Demonstrate that the Additional Work Is "genuinely the motivating factor" for the Higher Pay ............................................................................ 31

   B.       On the Partial and One-Sided Record Before the Court, and Drawing All Reasonable Inferences in Plaintiffs' Favor, Jones Day Cannot Sustain Its Burden of Showing It Paid Plaintiff Draper Less Because of the Number of Hours She Billed .......................... 32

      1.       Jones Day Fails to Carry Its Burden of Showing that It Paid Ms. Draper Less than Her Comparators Because of the Number of Hours She Billed .............................. 33

      2.       Even Measured as Billable Hours, Viable Comparators Exist for Ms. Draper ………….....………………………………………………………………………36

      3.       Additional Evidence Will Likely Confirm that Ms. Draper's Pay Was Not Set Based on the Number of Hours She Billed ....................................................................... 36

         i.       Plaintiffs Are Seeking the Deposition Testimony of the Individuals Likely Responsible for Setting Ms. Draper's Pay and Documents Related Thereto .............. 36

         ii.       More Broadly, Whether Jones Day Sets Pay Based on Gender, Hours, or Some Other Combination of Factors Is Susceptible to Statistical Analysis ................. 38

         iii.       Plaintiffs Seek Evidence Regarding the Core Tasks of Associates and the Job Market for Such Skills........................................................................................... 40

         iv.       Plaintiffs Have Been Diligent in Their Discovery Efforts to Date ........... 41

   C.       Plaintiff Henderson Performed Work ............................................................. 41

      1.       Defendant Has Not Carried Its Burden of Proving Why It Set Plaintiff Henderson's Pay at Zero ............................................................................................. 41

      2.       Searching for Other Employment Constitutes Work Under the Equal Pay Act ………….....………………………………………………………………………42

      3.       Discovery Has Identified Other Potential Comparators for Plaintiff Henderson ………….....………………………………………………………………………44

      4.       Additional Discovery Is Necessary Before the Court May Decide that Searching for Outside Employment at Jones Day's Direction Cannot Constitute Work . 44

   CONCLUSION .................................................................................................................. 45

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.H. Phillips, Inc. v. Walling*, 324 U.S. 490 (1945) ...................................................... 22

*AFSCME v. County of Nassau*, 609 F. Supp. 695 (E.D.N.Y. 1985) ...................................... 12, 13

*\*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................ 8, 37, 41, 45

*Balk v. U.S. Info. Agency*, No. 81-1565, 1985 WL 1634 (D.D.C. Mar. 26, 1985) ...................... 31

*Barney v. Zimmer Biomet Holdings, Inc.*, No. 3:17-CV-616-JD-MGG, 2020 WL 4368359 (N.D. Ind. July 30, 2020) ................................................................................................. 25

*Barrett v. Forest Labs., Inc.*, No. 12 cv. 5224(RA)(MHD), 2015 WL 5155692 (S.D.N.Y. Sept. 2, 2015) ............................................................................................................. 11

*Bauer v. Curators of Univ. of Mo.*, 680 F.3d 1043 (8th Cir. 2012) ................................... 9

*Beck-Wilson v. Principi*, 441 F.3d 353 (6th Cir. 2006) ................................................. 39

*Belfi v. Prendergast*, 191 F.3d 129 (2d Cir. 1999) ...................................................... 9

*Bell v. Lockheed Martin Corp.*, No. 08–6292 (RBK/AMD), 2010 WL 3724271 (D.N.J. Sept. 15, 2010). ............................................................................................................ 38

*\*Brennan v. Goose Creek Consol. Indep. Sch. Dist.*, 519 F.2d 53 (5th Cir. 1975) ............... 12, 14

*Brennan v. Owensboro-Daviess Cty. Hosp.,* 523 F.2d 1013 (6th Cir. 1975) ........................ 10

*Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336 (4th Cir. 1994) ................................ 25

*Broadus v. O.K. Indus., Inc.*, 226 F.3d 937 (8th Cir. 2000) ........................................... 25

*Brownlee v. Gay & Taylor, Inc.*, 642 F. Supp. 347 (D. Kan. 1985) .................................. 12, 14

*Carey v. Foley & Lardner LLP*, 577 F. App'x 573, 579 (6th Cir. 2014) ............................ 35

*\*Chiaramonte v. Animal Med. Ctr.*, No. 13 CIV. 5117 (KPF), 2014 WL 3611098 (S.D.N.Y. July 22, 2014) ......................................................................................................... 25

*Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689, 691 (2d Cir. 2017) .......................... 32

*Clay v. Howard Univ.*, 128 F. Supp. 3d 22 (D.D.C. 2015) ........................................................ 25

*Convertino v. U.S. Dep't of Justice*, 684 F.3d 93 (D.C. Cir. 2012) ........................................ 8, 41

*\*Corning Glass Works v. Brennan*, 417 U.S. 188  (1974) .................................................... passim

*Crawford v. ExlService.com, LLC*, No. 16 Civ. 9137 (LAP), 2019 WL 5887214 (S.D.N.Y. Nov.

12, 2019) .................................................................................................................. 9

*Doe v. Trump*, 329 F.R.D. 262 (W.D. Wash. 2018) ................................................................ 37

*Edwards v. Scripps Media, Inc.*, 331 F.R.D. 116 (E.D. Mich. 2019) ........................................ 37

*EEOC v. Md. Ins. Admin.*, 879 F.3d 114 (4th Cir. 2018) ........................................................ 9

*Finefrock v. Five Guys Operations, LLC*, No. 1:16-cv-1221, 2017 WL 1196509 (M.D. Pa. Mar.

31, 2017) ............................................................................................................... 11

*Gaujacq v. EDF, Inc.*, 601 F.3d 565 (D.C. Cir. 2010) ............................................................ 10

*\*Glodek v. Jersey Shore State Bank*, No. 4:07–CV–2237, 2009 WL 2778286 (M.D. Pa. Aug. 28,

2009) ....................................................................................................... 12, 14, 17

*\*Goodrich v. Int'l Bhd. of Elec. Workers, AFL-CIO*, 712 F.2d 1488 (D.C. Cir. 1983) ... 29, 30, 32

*\*Grover v. Smarte Carte, Inc.*, 836 F. Supp. 2d 860 (D. Minn. 2011) ............................. 12, 13, 22

*\*Grumbine v. United States*, 586 F. Supp. 1144 (D.D.C. 1984) .................................................. 13

*Heymann v. Tetra Plastics Corp.*, 640 F.2d 115 (8th Cir. 1981) ................................................ 11

*Hilton Hotels Corp. v. Dunnet*, No. 00-2852-GV, 2002 WL 1482543 (W.D. Tenn. Mar. 15, 2002)

.......................................................................................................................... 37

*Hodgson v. Robert Hall Clothes, Inc.*, 473 F.2d 589 (3rd Cir. 1973) ........................................ 10

*\*Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27 (2014) ..................................................... 2, 43

*Jaburek v. Foxx*, 813 F.3d 626 (7th Cir. 2016) ....................................................................... 14

*Jamilik v. Yale Univ.*, 362 F. App'x. 148 (2d Cir. 2009) ........................................................ 9

*Kassman v. KPMG LLP*, 416 F. Supp. 3d 252 (S.D.N.Y. 2018) .................................................. 18

*Kellogg v. Ball State Univ.*, No. 1:18-cv-02564-TAB-TWP, 2020 WL 707846 (S.D. Ind. Feb. 12, 2020) ........................................................................................................................................ 24

*Kent v. City of Chicago*, 814 F. Supp. 2d 808 (N.D. Ill. 2011) .................................................. 24

*\*Laffey v. Nw. Airlines, Inc.*,  567 F.2d 429 (D.C. Cir. 1976) .............................................. passim

*Laffey v. Nw. Airlines, Inc.*, 740 F.2d 1071 (D.C. Cir. 1984) .................................................... 29

*\*Lavin-McEleney v. Marist Coll.*, 239 F.3d 476 (2d Cir. 2001) ............................................ 10, 39

*\*Lemke v. International Total Services, Inc.*, 56 F. Supp. 2d 472 (D.N.J. 1999) ........................ 10

*Lenihan v. Boeing Co.*, 994 F. Supp. 776 (S.D. Tex. 1998) ........................................ 12, 13, 14, 22

*Lindsley v. TRT Holdings*, No. 3:17-cv-02942-X, 2019 WL 6467256 (N.D. Tex. Dec. 2, 2019) 13

*Madeira v. United Talmudical Acad.*, 351 F. Supp. 2d 162 (S.D.N.Y. 2004) ............................. 15

*Marshall v. Dallas Independent School District*, 605 F.2d 191 (5th Cir. 1979) ......................... 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .................................... 8

*Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013 (11th Cir. 1994) ................................................ 18

*Merrill Iron & Steel, Inc. v. Yonkers Contr. Co.*, No. 05 Civ 5042, 2006 U.S. Dist. LEXIS 66625 (S.D.N.Y. Sep. 19, 2006) ........................................................................................................ 15

*Mitchell v. Bekins Van & Storage Co.*, 352 U.S. 1027 (1957) .................................................... 22

*Mitchell v. Jefferson Cty. Bd. of Educ.*, 936 F.2d 539 (11th Cir. 1991) ......................................... 9

*\*Mulhall v. Advance Sec., Inc.*, 19 F.3d 586 (11th Cir. 1994) .................................... 10, 12, 13, 14

*Musgrove v. Gov't of D.C.*, 458 F. App'x 1 (D.C. Cir. 2012) ........................................................ 9

*\*Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365 (2d Cir. 1989) ....................... 11, 39

*Patkus v. Sangamon-Cass Consortium*, 769 F.2d 1251 (7th Cir. 1985) ......................................... 9

*Pitrolo v. Cty. of Buncombe*, No. 1:06CV199, 2007 WL 1041193 (W.D.N.C. Apr. 4, 2007) ..... 25

*Price v. N. States Power Co.*, 664 F.3d 1186 (8th Cir. 2011) ........................................ 21

*Prise v. Alderwoods Grp., Inc.*, 657 F. Supp. 2d 564 (W.D. Pa. 2009) .................................. 13, 24

*Renstrom v. Nash Finch Co.*, 787 F. Supp. 2d (D. Minn. 2011) .................................. 12

*Resolution Tr. Corp. v. N. Bridge Assocs., Inc.*, 22 F.3d 1198 (1st Cir. 1994) ............................ 8

*Rhoades v. Young Women's Christian Ass'n of Greater Pittsburgh*, No. CIV. A. 09-261, 2009 WL 3319820 (W.D. Pa. Oct. 14, 2009) ...................................................... 25

*Rizo v. Yovino*, 950 F.3d 1217 (9th Cir. 2020) ............................................................ 9

*Russell v. Placeware, Inc.*, No. Civ 03-836-MO, 2004 WL 2359971 (D. Or. Oct. 15, 2004)  9, 13

*Sara Lee Corp. v. Kraft Foods Inc.*, 276 F.R.D. 500 (N.D. Ill. 2011) ........................................ 37

Schultz v. Department of Workforce Development, No. 09-CV-274-SLC, 2011 WL 13359148 (W.D. Wis. Mar. 1, 2011). ...................................................... 32

*Segar v. Smith*, 738 F.2d 1249 (D.C. Cir. 1984) ........................................................ 39

*Sherald v. Embrace Techs., Inc.*, No. 11 Civ. 939(TPG), 2013 WL 126355 (S.D.N.Y. Jan. 10, 2013) ...................................................... 43

*\*Stough v. Inns*, No. 3:05CV421-SRW, 2006 WL 2009087 (M.D. Ala. July 17, 2006) ................
.............................................................................................. 9, 12, 13, 14

*Thompson v. Sawyer*, 678 F.2d 257 (D.C. Cir. 1982) ...................................................... 28

*Toomey v. Car-X Assocs. Corp.*, No. 12 C 4017, 2013 WL 5448047 (N.D. Ill. Sept. 30, 2013) . 18

*Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865 F.2d 506 (2d Cir. 1989) ........................ 8, 41

*Vickers v. Int'l Baking Co.*, No. Civ.A. 398CV1864D, 2000 WL 1804612 (N.D. Tex. Dec. 7, 2000)
.............................................................................................. 12

### Statutes

29 U.S.C. § 206(d)(1) ...................................................................................... 9, 15

29 U.S.C. § 213(a)(2) ........................................................................................... 22

### Other Authorities

8A Fed. Prac. & Proc. Civ. § 2103 (3d ed.) ...................................................... 38

*The Equal Pay Act; Interpretations*, 51 FR 29816-01, 1986 WL 161897 (Aug. 20, 1986). ........ 13

### Rules

Fed. R. Civ. P. 30(b)(6) ...................................................................................... 37

Local Civil Rule 23.1(b) ...................................................................................... 37

### Treatises

8A Wright, Miller & Marcus § 2103 .................................................................. 37

### Regulations

29 C.F.R. § 1620.13(b)(5) ............................................................................. 25, 43

29 C.F.R. § 1620.9(b) ................................................................................... 12, 13

29 C.F.R. § 1620.15(a) ...................................................................................... 29

29 C.F.R. § 1620.16(b) ................................................................................. 29, 30

29 C.F.R. § 1620.17(a) ...................................................................................... 30

29 C.F.R. § 1620.20 ...................................................................................... 31, 38

## INTRODUCTION

Having repeatedly told associates and the public that the Firm operates as "One Firm Worldwide," and that ███████████████████████████████████ Jones Day now says that neither statement can be credited. The Court should not be fooled.

Jones Day's self-described "narrow" motion for summary judgment focuses on three misguided arguments that ask the Court to ignore years of the Firm's public and private statements. *First*, Jones Day says that, although it touts itself as "One Firm Worldwide," a jury should not be allowed to find that it operates as a single establishment, and therefore Plaintiffs should be forbidden from identifying male comparators outside of their home offices who performed similar work. This position asks the Court to deny Jones Day's own statements ████████████████ █████████████████████████████████████████████████ Three Firm leaders decide the compensation of all U.S. associates. ██████████████████ ███████████████████████ The Firm goes to great lengths to foster a strong central culture and to encourage work across the Firm's geographic offices. ███████████████ ██████████████████████ These facts create a material dispute as to the application of "establishment" to Jones Day.

*Second*, ████████████████████████████████████████████ ███████████████████████████████████ Instead, Jones Day now says the Court must measure work on precisely this basis. But Jones Day does not offer the testimony of those who actually set Plaintiffs' pay—as it must to carry its burden of proof where an employer invokes the affirmative defense of quantity of production to compensate women less.

*Finally*, Jones Day asks the Court to ignore its statements regarding the important function that instructing associates ████████████████████████████████████

████████████████████████████ Jones Day maintains that seeking outside employment cannot be considered work even when partners instruct associates "to prioritize [their] job search and not work on active cases." But Jones Day's position is fundamentally inconsistent with Supreme Court precedent, which holds that "activities that an employee is employed to perform" constitute work. *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33 (2014).

At best, Jones Day has jumped the gun by asking the Court to decide this case on a partial record. Discovery relevant to this Motion has been stayed for most of this case's existence: On September 25, 2019, the parties "agreed to meet and confer following a class certification order to discuss . . . merits discovery and discovery relating to the Plaintiffs' individual claims." Ex. E1, Sept. 25, 2019 Correspondence from T. Chase to K. Mueting. And on November 7, 2019, the Court stayed fact witness depositions pending a decision on Jones Day's Rule 12(c) motion. *See* Dkt. 64 (November 7, 2019 Hearing Tr. 52:2–53:6). That motion was decided on May 19, 2020. Dkt. 110. The instant motion was filed less than two months later—before Jones Day had even produced compensation and evaluation data as required under the Court's July 7, 2020 Order.

Significant time remains in discovery. Expert reports are due in November, and under the current scheduling order, expert and fact discovery is not scheduled to close until June 11, 2021— more than nine months from now. *See* June 10, 2020 Minute Entry. There is no urgency to decide this motion on a partial record when relevant evidence—including the depositions of those at Jones Day who actually set Plaintiffs' compensation—is still outstanding.

But even on the limited record before the Court, Jones Day's case strains credulity. Evidence indicates substantial integration across the Firm's geographic offices, more consistent with its "One Firm Worldwide" message than with the Firm's recent denials. And the record to date does not indicate that hours are the *sine qua non* of success at Jones Day. Rather, Jones Day's

own statements suggest that what constitutes work is fluid, as recognized by its black-box compensation regime. Jones Day's motion should be denied. Discovery should proceed.

## FACTUAL BACKGROUND

### I.      The EPA Plaintiffs Were All Paid Less than Male Associates Who Performed Substantially Equal Work

The EPA forbids paying women less than men for substantially equal work. Plaintiffs Williams, Draper and Henderson have therefore each identified comparators—male associates—who were paid more than them as evidence of their claim that Jones Day violated the EPA.

In her complaint and at her deposition, Plaintiff Williams named multiple male associates whom she believed were paid more for performing similar work. Discovery has borne this out: One male associate was paid $5,000 more as a third-year associate and $10,000 more as a fourth-year associate. SRAMF ¶¶ 139, 140. Another was paid $60,000 more as a third-year associate and $135,000 more as a fourth-year associate. SRAMF ¶¶ 141, 142. And a third was paid $15,000 more as a third-year associate. SRAMF ¶ 143. ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Likewise, in testimony and pleadings, Plaintiff Draper identified four male comparators, all associates in the Atlanta office, who were paid more. Beginning in her third year at the Firm until the end of her tenure at the Firm, Plaintiff Draper was consistently paid less than each of these four when they were of equivalent tenure. SRAMF ¶¶ 150–59. She made $30,000 less than ████████ ████ (Male Associate 3) as a third-year associate, $65,000 less as a fourth-year associate, and $80,000 less as a fifth-year associate. SRAMF ¶¶ 150–2. She made $30,000 less than ████████ ██████████ (Male Associate 4) as a third-year associate and $55,000 less as fourth-year associate. SRAMF ¶¶ 153–54. She made $5,000 less than ██████████████ (Male Associate 2) as a third-

3

year associate, $35,000 less as a fourth-year associate, and $45,000 less as a fifth-year associate. SRAMF ¶¶ 155–57. She made $45,000 less than ███████ (Male Associate 5) when each was a third-year associate. SRAMF ¶ 158. At no point beginning in July of her second year of tenure onward did she make more than these comparators. SRAMF ¶ 159.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

Finally, Plaintiff Henderson named five male comparators in testimony and pleadings, all associates in the New York office, who were paid more beginning in January of their second year. SRAMF ¶¶ 168–72. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

## II.    At Jones Day, the Definition of Establishment Is Not Geographically Constrained

Two unique features of Jones Day particularly bear on this motion. First among them is the high level of integration between Jones Day's offices—a feature the Firm proudly proclaims.

### A.    Jones Day Operates as "One Firm Worldwide"

Jones Day touts its integration. The Firm claims that "One Firm Worldwide" is "more than a motto"; the Firm rejects "artificial boundaries" and operates as "one organization." SRAMF ¶ 177; *see also* Ex. F1, One Firm Worldwide, JONES DAY: INSIGHTS (embedded video). Lawyers across all 18 U.S. offices "understand and operate under the same value system." *Id.* "[T]he ethos, the compensation system, and the governance system, and the culture are all aimed toward: let's find the best resource *wherever in the Firm.*" *Id.* ¶ at178 (emphasis added). The Firm also rejects "individualized profit centers." SRAMF ¶ 177.



Among Jones Day's cases reported on Law360, approximately 50% were staffed across geographic offices between 2016 and 2018.[1] SRAMF ¶ 199.

### B.    Jones Day Has a Centralized Process for Setting Associate Compensation

Critical to this case, all associate compensation decisions at Jones Day, across offices and practice groups, are made by Firm Managing Partner Stephen Brogan. *See* SRAMF ¶ 205 ("[The] Managing Partner has considerable management responsibility at Jones Day; that responsibility

---

[1] This figure is doubtless an undercount because firms do not publicly identify all attorneys who work on a matter, and such information would therefore not have been known to Law360.

includes setting individual lawyer compensation . . . . [F]inal decisions are made by the Managing Partner."). Partners-in-Charge ("PICs") make preliminary compensation recommendations for the associates in their offices following a multi-month evaluation process based on centrally dictated criteria. *See* SRAMF ¶ 209. Administrative Partner Michael Shumaker and Partner Traci Lovitt review the recommendations for each U.S. associate and suggest further revisions. *See* SRAMF ¶ 210. Managing Partner Brogan then reviews the recommendations made by Shumaker and Lovitt and sets each associate's compensation. *See* SRAMF ¶¶ 211–12. The Firm Director of Practice Services, Suzanne Coussons, subsequently conveys these decisions to PICs. *See* SRAMF ¶ 214.

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

### C.    Other Functions at Jones Day Are Equally Centralized

Compensation is not the only centralized function at Jones Day: To name but a few of the others, Managing Partner Brogan has charged a Firmwide Hiring Partner with deciding which law schools and job fairs the Firm will attend, coordinating the recruiting process with the Recruiting Manager, and ensuring that all offices fulfill the Firm's recruiting objectives, including recruiting the kinds of candidates the Firm hopes to hire. *See* SRAMF ¶¶ 218-220. ████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████. The Firm's Administrative Partner and its Firmwide Practice Services department distribute uniform guidance to Practice Leaders (PLs) and PICs on rating associates. *See* SRAMF ¶ 230 ██████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

6

 In sum, the Firm

seeks and achieves a high level of functional integration across offices.

## III.    Jones Day Does Not Define Work by the Billable Hour

The second unique feature of Jones Day that bears on the instant motion is the Firm's

"black box" compensation system in which "work" is measured by factors other than the billable

hour. SRAMF ¶¶ 236, 238, 241; Dkt. 94-10 at 2, Ex. I, Pls.' Cond. Cert. Mot. (excerpt from Jones

Day's website, as of March 18, 2019) ("[W]e focus first and primarily on the quality, not the

quantity, of each lawyer's individual contribution. . . . Jones Day does not believe that elevating

billable hours to the primary determinant of associate compensation is consistent with our

commitment to our clients . . . . We do not want to create the misimpression that associate

compensation at Jones Day is determined by the amount of hours billed.");

Indeed, Jones Day

"refus[es] to base any part of compensation directly on billable hours," and instead "insist[s] on a

subjective (not arithmetic) evaluation of the overall contribution of each lawyer individually." Dkt.

94-10, Ex. I, Pls.' Cond. Cert. Mot. Jones Day claims that this compensation system rewards the

quality of the work an associate performs. *See* SRAMF ¶ 241.[2]

Concomitant with this unique understanding of work,

For example, Jones Day has a practice of instructing associates to

---

[2] The goal of its compensation system is supposedly future-looking, based on a subjective assessment of what is necessary to retain the lawyer. *See* SRAMF ¶ 242.

look for other work while they remain employed by the Firm. *See* SRAMF ¶ 243. ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

## LEGAL STANDARDS

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Evidence must be viewed in the light most favorable to the nonmovant, with all plausible inferences drawn in the nonmovant's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[S]ummary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986). Rule 56(d) permits a party to seek additional discovery before summary judgment. To obtain discovery, the party should (1) "outline the particular facts he intends to discover and describe why those facts are necessary to the litigation," (2) explain why he could not produce the facts, and (3) "show the information is in fact discoverable." *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99–100 (D.C. Cir. 2012). "[D]istrict courts should construe motions that invoke the rule generously, holding parties to the rule's spirit rather than its letter." *Id.* at 99 (quoting *Resolution Tr. Corp. v. N. Bridge Assocs., Inc.*, 22 F.3d 1198, 1203 (1st Cir. 1994)). A Rule 56(d) "motion requesting time for additional discovery should be granted almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence." *Id.* (internal quotation marks omitted). "The nonmoving party should not be railroaded into [its] offer of proof . . . ." *Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989) (internal quotation marks omitted).

The EPA prohibits:

> paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1).

Summary judgment for the defendant in an Equal Pay Act case is appropriate in only two circumstances. First, a court may grant summary judgment if no jury could find that the plaintiff made a prima facie case. To make a prima facie case, a plaintiff must show "[unequal pay to someone of the opposite sex] for jobs requiring 'equal skill, effort, and responsibility' and 'performed under similar working conditions.'" *Musgrove v. Gov't of D.C.*, 458 F. App'x 1, 2 (D.C. Cir. 2012) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). In doing so, the plaintiff's "burden is relatively minimal." *Russell v. Placeware, Inc.*, No. Civ. 03-836-MO, 2004 WL 2359971, at *7 (D. Or. Oct. 15, 2004). The EPA is a strict liability statute and "does not require proof of discriminatory intent." *Rizo v. Yovino*, 950 F.3d 1217, 1223 (9th Cir. 2020).[3] Generally, "the equivalence of two positions pursuant to an EPA claim are best left to the trier of fact." *Jamilik v. Yale Univ.*, 362 F. App'x. 148, 150 (2d Cir. 2009); *Crawford v. ExlService.com, LLC*, No. 16 Civ. 9137 (LAP), 2019 WL 5887214, at *1 (S.D.N.Y. Nov. 12, 2019) (quoting same). Likewise, disputes as to the comparability of pay and of work must be left to the factfinder. *Stough v. Inns*, No. 3:05CV421-SRW, 2006 WL 2009087, at *3 (M.D. Ala. July 17, 2006).

---

[3] *See also EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018) (same); *Bauer v. Curators of Univ. of Mo.*, 680 F.3d 1043, 1045 (8th Cir. 2012) (same); *Belfi v. Prendergast*, 191 F.3d 129, 136 (2d Cir. 1999) (same); *Mitchell v. Jefferson Cty. Bd. of Educ.*, 936 F.2d 539, 547 (11th Cir. 1991) (same); *Patkus v. Sangamon-Cass Consortium*, 769 F.2d 1251, 1260 n.5 (7th Cir. 1985) (same).

Second, summary judgment may be appropriate if the defendant proves—beyond dispute—that a pay differential is based on: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 575 (D.C. Cir. 2010). It is not enough for such factors to play *some* role in differential earnings; rather, "defendants must show that the factor of sex provided *no basis* for the wage differential." *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 590 (11th Cir. 1994); *see also Brennan v. Owensboro-Daviess Cty. Hosp., City of Owensboro*, 523 F.2d 1013, 1031 (6th Cir. 1975) (same); *Hodgson v. Robert Hall Clothes, Inc.*, 473 F.2d 589, 594 n.9 (3rd Cir. 1973) (same).

## ARGUMENT

Jones Day's "narrow" summary judgment motion turns on three faulty arguments.[4] First, the Firm says, Plaintiff Williams cannot compare herself to associates in other offices, because each office constitutes a separate establishment. But this argument ignores that Plaintiff Williams identified male comparators within the Irvine office and therefore has made a prima facie case. *See supra* Factual Background Part I.[5] It also ignores the substantial functional integration of Jones

---

[4] This opposition focuses on these three arguments. Plaintiffs need not address any other elements, including elements of the prima facie case, because Jones Day does not raise them in its motion.

[5] Jones Day's argument that Plaintiff Williams's EPA claim fails because she made more than the average of the three Irvine-based comparators identified in the Complaint is entirely without support. *Lemke v. International Total Services, Inc.*, 56 F. Supp. 2d 472 (D.N.J. 1999), on which Defendant relies for this point, is both unpersuasive and distinguishable. The case is an outlier. The defendant there never argued for averaging a subset of the plaintiff's identified comparators as opposed to the wider pool of men performing similar work, as Jones Day here urges, and the court therefore accepted the methodology. *Id.* at 490. But courts generally credit regression analysis—not averages. *See Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 481– 82 (2d Cir. 2001) ("[M]ultiple regression analysis, which was used by the experts here, is a scientifically valid statistical technique for identifying discrimination . . . . We hold that, under the circumstances of this case, regression analysis, based on a larger pool of male employees . . . properly supported plaintiff's case . . . ."); *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 367 n.2 (2d

Day's offices. Next, Defendant says that Plaintiff Draper did not perform equal work, because she billed fewer hours than her named comparators. But this argument conflates the EPA's prima facie case and its affirmative defenses, while ignoring Jones Day's own statements that it does not measure work by the hour. Finally, Jones Day says that Plaintiff Henderson performed no "work," because she devoted her working time to seeking outside employment. But evidence affirms that Jones Day instructs some associates to do this ███████████████████████████████████ ████████████████████████████████. Plaintiffs address each argument in turn.

## I.   Jones Day Has Not Indisputably Proven that Each Office Operates as a Single Establishment for the Purposes of the Equal Pay Act

Jones Day's U.S. offices do not operate as separate "establishments" under the Equal Pay Act. Managing Partner Brogan and a handful of partners selected by him exercise substantial centralized control and, most critically, set all associate compensation. At the employee level, ███ █████████████████████████████████████████████████████████ Given the fact-intensive nature of the establishment inquiry,[6] and the existing evidence rebutting Jones Day's assertion that each office is a separate establishment, Plaintiff Williams should be permitted to proceed with EPA claims based on comparators who worked in other offices.

---

Cir. 1989) (approving the use of regression analysis). And even if averages are to be applied, there is little reason to average the three Irvine comparators Ms. Williams identified as opposed to some larger group of comparators. *See Heymann v. Tetra Plastics Corp.*, 640 F.2d 115, 122 (8th Cir. 1981) (averaging "the entire male workforce" because larger data set was "more reliable").

[6] *See Finefrock v. Five Guys Operations, LLC*, No. 1:16-cv-1221, 2017 WL 1196509, at *3 (M.D. Pa. Mar. 31, 2017) (noting the establishment question is a "fact intensive question"); *Barrett v. Forest Labs., Inc.*, No. 12 cv. 5224(RA)(MHD), 2015 WL 5155692, at *8 (S.D.N.Y. Sept. 2, 2015) ("Indeed, that question [of whether multiple offices constitute a single establishment] appears to call for a fact-intensive assessment.").

A.    Courts Take a Functional Approach to Defining "Establishment"

Courts reject "a rigid geographic interpretation of 'establishment,' [and] have adopted a more functional approach in determining the relevant establishment for employers with physically dispersed operations." *AFSCME v. County of Nassau*, 609 F. Supp. 695, 705–06 (E.D.N.Y. 1985); *see also Brownlee v. Gay & Taylor, Inc.*, 642 F. Supp. 347, 351 (D. Kan. 1985) (noting a "trend in the law wherein an 'establishment' includes all places of business of one corporation or a multi-location employer"); *accord Lenihan v. Boeing Co.*, 994 F. Supp. 776, 797 (S.D. Tex. 1998); *Vickers v. Int'l Baking Co.*, No. Civ.A. 398CV1864D, 2000 WL 1804612, at *5 (N.D. Tex. Dec. 7, 2000); *see also* 29 C.F.R. § 1620.9(b) (recognizing that a single "establishment" may be comprised of more than one physical location).[7]

This functional approach considers "several factors" rather than "relying on the single factor of geography." *Lenihan*, 994 F. Supp. at 797. Specifically, courts examine the degree of centralization of personnel administration, including salary decisions, job assignments, and job descriptions;[8] the degree to which individuals work across different office locations and perform

---

[7] Jones Day's reliance on *Renstrom v. Nash Finch Co*., 787 F. Supp. 2d 961 (D. Minn. 2011), to insist that "establishment" means a single physical location is misplaced. *Renstrom* has not been followed, even within the district that decided it. *See, e.g.*, *Grover v. Smarte Carte*, *Inc.*, 836 F. Supp. 2d 860, 868 (D. Minn. 2011) (denying summary judgment where comparator reported to same supervisor and performed similar work, even when comparator worked for subsidiary abroad).

[8] *See e.g.*, *Brennan v. Goose Creek Consol. Indep. Sch. Dist.*, 519 F.2d 53, 57–58 (5th Cir. 1975); *Mulhall*, 19 F.3d at 591 ("The hallmarks of this standard are centralized control of job descriptions, salary administration, and job assignments or functions."); *Lenihan*, 994 F. Supp. at 797; *Brownlee*, 642 F. Supp. at 352 (noting that the standard considers "the degree of centralized control by the executive office, the work performed, and the position description under which the plaintiff operated"); *Glodek v. Jersey Shore State Bank*, No. 4:07–CV–2237, 2009 WL 2778286, at *9 (M.D. Pa. Aug. 28, 2009) (multiple offices were one establishment because "corporate office dictated the conditions of employment"); *Stough*, 2006 WL 2009087, at * 10 (M.D. Ala. July 17, 2006) (finding one establishment where, among other things, salaries were recommended by local decision makers and approved centrally); *see also* 29 C.F.R. § 1620.9 ("For example, a central

similar functions;[9] whether employees are supervised by the same individuals and evaluated using the "same general criteria";[10] and the degree to which different offices interact.[11] Indeed, the D.C. Circuit has held that the entire U.S. civil service constitutes one establishment for purposes of the EPA.[12] But, ultimately, "courts have treated the scope of the relevant 'establishment' as a factual question to be resolved by the trier of fact." *Prise v. Alderwoods Grp., Inc.*, 657 F. Supp. 2d 564, 612 (W.D. Pa. 2009) (citing *Mulhall*, 19 F.3d at 591–92; *Smith v. Allstate Ins. Corp.*, 24 F. Supp. 2d 870, 879 (N.D. Ill. 1998)).

---

administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions."). "*Goose Creek* set a widely followed standard recognizing that central control and administration of disparate job sites can support a finding of a single establishment for the purposes of the EPA." *Stough*, 2006 WL 2009087, at \*9. *Lindsley v. TRT Holdings*, No. 3:17-cv-02942-X, 2019 WL 6467256 (N.D. Tex. Dec. 2, 2019), upon which Jones Day relies, is a district court case in conflict with *Marshall v. Dallas Independent School District*, 605 F.2d 191 (5th Cir. 1979), and an appeal is pending.

[9] *See e.g.*, *Lenihan*, 994 F. Supp. at 800.

[10] *See e.g.*, *Lenihan*, 994 F. Supp. at 800; *see also Grover*, 836 F. Supp. 2d at 868 (holding trier of fact could infer single establishment where plaintiff and comparator, though located on different continents, were supervised by same individual).

[11] *See, e.g.*, *Grumbine v. United States*, 586 F. Supp. 1144, 1147, 1151–52 (D.D.C. 1984); *Lenihan*, 994 F. Supp. at 797; *Russell*, 2004 WL 2359971, at \*8 (finding material issues of fact based on evidence that working closely across offices was made possible by telephone and computer correspondence and where there was a "centralized location from which daily operations were steered").

[12] *Grumbine*, 586 F. Supp. at 1147, 1151–52 (finding the entire civil service was one establishment for the purposes of the EPA and recognizing that "courts have not taken a strictly geographical view of the term 'establishment' but have considered a multi-location employer to be a single establishment"). Jones Day's attempts to distinguish *Grumbine* are unavailing. Neither this Court nor the D.C. Circuit have repudiated *Grumbine*'s holding that an establishment for the purposes of the EPA can extend beyond a single physical location. And the 1986 regulations addressing "establishment," in fact reinforce *Grumbine*'s central holding. The EEOC's 1986 interpretation of 29 C.F.R. § 1620.9 explained that the provision was implemented in part to "allow[] a measure of flexibility whenever called for by the facts of a given case." *The Equal Pay Act; Interpretations*, 51 FR 29816-01, 1986 WL 161897, at \*29817 (Aug. 20, 1986). And courts continue to cite *Grumbine* favorably. *See, e.g.*, *Mulhall*, 19 F.3d at 591 n.11; *AFSCME*, 609 F. Supp. at 705.

Each relevant factor here suggests that the understanding of "establishment," at Jones Day, extends beyond a single geographic office.[13] Plaintiffs address these factors below.

## B. Applying This Functional Approach, Evidence Shows that Jones Day Operates as a Single Establishment for Purposes of the EPA

Jones Day's compensation, evaluation, and hiring processes are centralized, and there is a high degree of functional interdependence between offices. Given these facts, Plaintiff Williams should not be precluded from identifying male comparators who worked in other offices.[14]

### 1. The Associate Compensation Process at Jones Day Is Centralized

Centralization of compensation is a hallmark of a single establishment. *See e.g.*, *Mulhall*, 19 F.3d 586 (noting centralized salary administration as a "hallmark" of a single establishment); *Lenihan*, 994 F. Supp. at 797; *Brownlee*, 642 F. Supp. at 352; *Stough*, 2006 WL 2009087, at *10 (denying summary judgment where, among other things, salaries were recommended by local decision makers and approved centrally).

This factor tilts for Plaintiffs: Compensation at Jones Day begins and ends at its D.C. headquarters. First, Administrative Partner Shumaker distributes the same instructions on the Firm's approach to compensation to each U.S. Office PIC. SRAMF ¶ 206. This communication includes uniform parameters for increases to associate compensation. SRAMF ¶ 206; Dkts. 117-22, Dkt. 145-17 (public, redacted version of same) at 3, Ex. O, Pls.' Am. Cond. Cert. Mot. ("[I]n

---

[13] Courts emphasize that "establishment" should not be defined narrowly in order to "make proof of discrimination more difficult, thus frustrating congressional intent." *Mulhall*, 19 F.3d at 591 (quoting *Brennan*, 519 F.2d at 57); *accord Glodek*, 2009 WL 2778286, at *9; *Stough*, 2006 WL 2009087 at *9.

[14] Contrary to Jones Day's assertion, *Jaburek v. Foxx*, 813 F.3d 626 (7th Cir. 2016), did not rest solely on the fact that identified comparators worked in different cities. Rather, the court emphasized that there was nothing in the record except for comparator names, titles, and offices, *see id.* at 632–33. There was also no evidence that the plaintiff had sought additional discovery as to comparators.

making your compensation recommendations, please . . . ██████████████████████

██████████████ *id.* at 2 (specifying that "there should be a range of compensation paid to associates"); *id.* (instructing that PICS should "be sure that compensation adjustments align" with certain specified metrics).[15]

The Firm centrally budgets each office for associate compensation increases and instructs how that budget should be allocated. *See* SRAMF ¶ 206; *id.* at 3 ("[W]e included in the associate compensation budget a gross amount for each office to cover all of the July 1 adjustments. . . . [W]e expect that for most offices the total of the actual adjustments will be well below budget.").



.[16]

PICs' salary recommendations, based on this centralized guidance and budget, are then reviewed by Administrative Partner Shumaker and Partner Lovitt.[17] *See* Dkt. 147 at 10, Def.'s

---

[15] To be sure, adjusting compensation based on geographic market can be an affirmative defense under the EPA. *See* 29 U.S.C. § 206(D)(1)(iv). But Jones Day has not proven that this is what it does—as it would be required to do. *See supra* at 8–10. █████████████████████████
██████████

[16] Jones Day's only testimony regarding the appointment of office budgets is a self-serving declaration from a witness who has not yet been deposed. *See* SUMF ¶ 129 (citing Lovitt Decl. ¶ 24). Such evidence cannot form the basis for summary judgment. *See Madeira v. United Talmudical Acad.*, 351 F. Supp. 2d 162, 167 (S.D.N.Y. 2004) (The court "could not grant summary judgment" based solely on "the self-serving affidavit of an officer of [defendant]" who "has never been deposed."); *Merrill Iron & Steel, Inc. v. Yonkers Contr. Co.*, No. 05 Civ. 5042, 2006 U.S. Dist. LEXIS 66625, at *22 (S.D.N.Y. Sep. 19, 2006) ("It would be inappropriate to grant summary judgment based solely on [defendant's] self-serving affidavit when [defendant] moved for summary judgment well before discovery in this case was scheduled to close.").

[17] Plaintiffs have sought to depose Partners Shumaker and Brogan. The deposition of Mr.

Mot. for Summary Judgement ("Mot."). Partners Shumaker and Lovitt consider whether PIC recommendations are consonant with each office's budget and whether the individual adjustments match an individual associate's perceived performance. Dkt. 146-5 (Lovitt Decl. ¶ 26). Partners Shumaker and Lovitt may also recommend greater compensation increases because, unlike PICs, they "are not constrained by a set budget for associate compensation." *Id.*

Managing Partner Brogan then deliberates for roughly three weeks and renders final decisions on the compensation of each Jones Day associate.[18] *See* SRAMF ¶ 211. To facilitate these decisions, Managing Partner Brogan is given each U.S. associate's office and practice rating, ranking (if available), billable hours, PIC-recommended salary, █████████ in a "master" spreadsheet for all associates. *See* SRAMF ¶ 211 Managing Partner Brogan does not rubber stamp the recommendations but rather is meaningfully involved in the process, resulting in changes to roughly 23% of associate salaries. SRAMF ¶ 212. PICs are then informed of the Managing Partner's finalized salary decisions by email from the Director of Practice Services.[19] SRAMF ¶

---

Shumaker is set for September 10, 2020, but Jones Day continues to resist Mr. Brogan's testimony. His testimony, however, is critical: Jones Day's Rule 30(b)(6) deponent designated to speak about the associate compensation process was not able to answer questions regarding the rationale of Managing Partner Brogan's changes to associate compensation. *See* Ex. A2, Lovitt Tr. 56:9–22 (discussing instances where Managing Partner Brogan "has been known, at times, to increase the salaries of associates with whom he has worked personally and he feels like he has direct knowledge of the performance and that he can fairly, by himself, determine compensation" and that he will "occasionally, for the purposes of developing a practice . . . increase certain individuals, even less senior individuals, in order to grow the practice and retain the associates").

[18] Partner Lovitt testified at a Rule 30(b)(6) deposition that she and Partner Shumaker can make changes to Managing Partner Brogan's finalized salaries, but she was unable to point to any documentary evidence supporting this assertion and described only two examples from among the thousands of U.S. associates where she or Shumaker did so. Ex. A2, Lovitt Tr. 51:21–52:4; 60:3–61:7. More importantly, by written policy, no one else can alter Managing Partner Brogan's finalized compensation decisions. *See* SRAMF ¶ 215.

[19] The deposition of Suzanne Coussons, Jones Day's former Director of Firmwide Practice Services and current Global Director of Business Development & Communications, *see* Dkt. 128-9 at ¶ 3, is currently scheduled for September 22, 2020. Plaintiffs anticipate that Ms. Coussons will

214.[20] ███████████████████████████████████████████████████

███████████████████████████████████████████████████ .[21]

### 2. *Recruiting and Hiring at Jones Day Are Directed by the Firm, Not by Offices*

Recruiting and hiring at Jones Day are also centrally controlled. This factor, too, suggests that Jones Day's offices are not separate establishments. *See Glodek*, 2009 WL 2778286, at *8 (concluding multiple offices were part of the same establishment where "hiring, salary determination and production goals, were addressed by the corporate office").

Jones Day's central Recruiting Department ███████████████████████████



███████████████████████████████████████████████████

███████████████████████████████████████████████████ ;

████████████ Firmwide Hiring Partner Sharyl Reisman "make[s] the final decision as to which [law] schools the [Firm] recruit[s] at" and "approve[s] the number of schedules that [the Firm] take[s] at every school, and how many interviewers [the Firm] send[s] to a school . . . ." Ex. A1, Reisman Tr. 61:2-5; 61:12-16; SRAMF ¶ 219.[22] She also provides direction to each local office in order to ensure that all Jones Day employees involved in recruiting understand the Firm's

---

testify that PICs' autonomy in making compensation decisions is circumscribed. Ms. Coussons is the subject of Plaintiffs' Rule 56(d) request, as is Christopher Lovrien, on whose declaration Jones Day relies to suggest that PICs may seek to revise the Managing Partner's decisions. SUMF ¶ 132 But Mr. Lovrien has not been deposed, and his declaration therefore provides no basis for summary judgment. *See supra* note 16.

[20] Although a PIC may hypothetically request changes, Jones Day has pointed to no evidence suggesting that PICs have the unilateral authority to change an associate's compensation.

[21] ███████████████████████████████████████████████████
███████████████████████████████████████████████████

[22] ████████████████████████████ And the Firm employs a Firmwide Recruiting Manager to assist Partner Reisman in centralized administration, functioning as "the go between the offices and [Firmwide Hiring Partner Reisman], and put[ting] together the matrix of interviewers." Ex. A1, Reisman Tr. 65:13-15; SRAMF ¶ 219.

recruiting process and the Firm's recruiting objectives. SRAMF ¶ 220; *see also* ███████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

Recruiting involves collaboration between offices. Jones Day frequently assigns attorneys from one office to interview candidates at a law school and then report their evaluations of those candidates to attorneys in another office. SRAMF ¶ 223; *see also* ████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████ And permanent offers to new associates often require clearance or collaboration beyond the office. SRAMF ¶ 226. Moreover, ██████████████████████████████████████[23]

---

[23] ████████████████████████████████████████████████████
████████████████████████████ *See, e.g., Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1017 (11th Cir. 1994); *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 287 (S.D.N.Y. 2018); *Toomey v. Car-X Assocs. Corp.*, No. 12 C 4017, 2013 WL 5448047, at *7 (N.D. Ill. Sept. 30, 2013). Nonetheless, additional discovery is warranted to ascertain the extent to which PICS are truly free to make independent hiring decisions. *See infra* at Section I.D.

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

3.  *Associates at Jones Day Regularly Work With, and Are Evaluated By, Attorneys in Other Offices*

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████         Approximately 50% of Jones Day's publicly reported cases involved

attorneys from multiple offices. SRAMF ¶ 199. In short, "associates. . . . did a significant amount

of work for partners outside the office." Ex. B4 (Tolton Tr. 130:4–6); ██████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

████████████████████████████████████████████████

████████████████████████████         *See* discussion *supra* at 13.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████ The Firm

also assigns an NLG Coordinator in each office to "assist and facilitate" cross-office work with

attorneys in other offices who want to staff new lawyers on their projects. Ex. A1, Reisman Tr.

208:9, 210:10–14; SRAMF ¶ 179.

Both internally and externally, Jones Day stresses cross-office work as one of the Firm's

"long-term cultural advantages." Ex. B1 Williams Tr. 94:11–23; SRAMF ¶ 178. ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████.[25] "[A]ssociates . . . were all told to be

available for work from any office because Jones Day is one firm worldwide and so it staffs cases

based on the optimal needs of the client and of the matter, and so frequently associates worked

across offices." Ex. B4, Tolton Tr. 130: 4–12; ████████████████████████████

████████████████████████████.

---

[25] *See also* Ex. B1, Williams Tr. 12:25–13:14 (describing a pre-employment conversation in which a partner conveyed that the "caliber of work in the Irvine office was just the same as any other office, that [she] would be involved in top-notch litigation opportunities and that nothing about being in the Irvine office would mean that [she would be] shunted to less sophisticated or less interesting work"); *id.*, Williams Tr. 16:23–17:21 (recalling similar conversation with another Jones Day Irvine partner); Ex. B5, Stahl Tr. 60:9–12 (testifying that she was told when joining the Firm that "it was very frequent for people to work across offices and be staffed on large matters no matter where they were located").

Plaintiff Williams's experience is consistent with the Firm's statements: She devoted substantial time to cross-office cases ████████████████████████████████████



───────────────

[26] *Price v. N. States Power Co.*, 664 F.3d 1186, 1194-95 (8th Cir. 2011), on which Jones Day relies, in fact demonstrate precisely why Jones Day is properly considered a single establishment. In *Price*, there was undisputed evidence that the two offices in question "served different customers," employees "d[id] not transfer between the two locations," each center had its own supervisor who testified that "employees in the two locations were not compared with one another for compensation purposes," and employees at one of the offices provided additional services to customers not provided by employees of the other. *See Price*, 664 F.3d at 1195.

[27] Contrary to Jones Day's insinuation, EPA plaintiffs may name comparators of different seniority levels. *See infra* at note 31.

████████████████████████████████████████████████████████

████████████████████████████████████████ PICs and PLs are also given common

instruction on associate ratings. *See* SRAMF ¶ 230.

This evidence strongly suggests that Jones Day operates as a single establishment. *See Lenihan*, 994 F. Supp. at 800 (finding geographically different sites were "functionally interrelated" given evidence of "the same general criteria" used in evaluations, some commonality in supervision, and regular transfers between the two establishments); *Grover*, 836 F. Supp. 2d at 868 (finding company was a single establishment even though comparator worked for a subsidiary in a different country because comparator and plaintiff reported to the same supervisor, comparator's pay was determined by defendant, and he performed duties on behalf of defendant).

### 4. *Firm Structure, Policy Administration, and "One Firm Worldwide" Operating Principle Offer Additional Evidence of a High Degree of Functional Interdependence Between Offices*

#### i. *Policy Making at the Firm Is Centralized*

The Firm's organization, policy administration, and "One Firm Worldwide" operating principle further evidence substantial functional integration.[28] ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[28] Jones Day's reliance on *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 496 (1945) and *Mitchell v. Bekins Van & Storage Co.*, 352 U.S. 1027, 1027 (1957) (per curiam) is misplaced. Both cases concerned the narrow exemption within the Fair Labor Standards Act for retail establishments. *See* 29 U.S.C. § 213(a)(2). As the Court in *A.H. Phillips* explained, Congress enacted § 13(a)(2) because it "was interested in exempting those regularly engaged in local retailing activities and those employed by small local retail establishments, epitomized by the corner grocery store, the drug store and the department store." 324 U.S. at 497. This, Jones Day is not.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████ And Managing

Partner Brogan personally taps partners for important firmwide roles. SRAMF ¶ 235. *E.g.* Ex. A1

Reisman Tr. 42:20-21 ("The managing partner Steve Brogan asked me if I would take the [hiring

partner] position.); Ex. A2, Lovitt Tr. 265:11-21 ("Steve [Brogan] informed me prior to that

meeting that he intended to give me the position . . . .).

    *ii.   The Firm Facilitates Seamless Transfers Between Offices*

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

    *iii.  At Jones Day, "One Firm Worldwide" Is More than a Slogan*

Jones Day touts that "One Firm Worldwide" is more than a "motto" ███████ SRAMF

¶ 177. Jones Day says that ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

29 ████████████████████████████████████████████████

██████████████████████████████████████████████████████



*See*

*Prise*, 657 F. Supp. 2d at 612 (denying summary judgment on establishment issue where defendant's argument for separate establishments "[was] manifestly inconsistent" with previous statements about centralized control).

### C. Discovery to Date Suggests Additional Comparators for Plaintiff Williams.

As the foregoing analysis shows, the appropriate universe of comparators for Plaintiff Williams expands beyond the Firm's Irvine office—to at least those comparators whom she identified. But Ms. Williams is not limited to the comparators identified in her pleadings or at her deposition.[30] Rather, courts recognize that employees often do not know the full range of their comparators and often identify them through discovery. *See, e.g.*, *Barney v. Zimmer Biomet*

---

[30] As the Court recognized, the authorities cited by Jones Day are not to the contrary: "[B]oth in *Kent* and in *Kellogg* the court said discovery is done now. . . . Nowhere in discovery did [the Plaintiff mention these [additional comparators]." Aug. 3, 2020 Hearing Tr. 40:3-9. Not so here: Discovery is not set to close until June of 2021. Jones Day has plenty of time to investigate any additional comparators. *Cf. Kent v. City of Chicago*, 814 F. Supp. 2d 808, 815–16 (N.D. Ill. 2011) (reasoning that the plaintiff did not "develop adequate evidence of" the comparator); *Kellogg v. Ball State Univ.*, No. 1:18-cv-02564-TAB-TWP, 2020 WL 707846, at *3 (S.D. Ind. Feb. 12, 2020) (limiting plaintiff to one comparator because plaintiff was aware of other potential comparators, but "limited the scope of her claims to focus on only one comparator"), *appeal docketed*, No. 20-1406 (7th Cir. 2020).

*Holdings, Inc.*, No. 3:17-CV-616-JD-MGG, 2020 WL 4368359, at *3 (N.D. Ind. July 30, 2020) ("Moreover, plaintiffs like Barney are entitled to explore information during discovery . . . to discover additional potential comparators."); *Chiaramonte v. Animal Med. Ctr.*, No. 13 CIV. 5117 (KPF), 2014 WL 3611098, at *6 (S.D.N.Y. July 22, 2014) (refusing to limit discovery to comparators identified in the complaint); *Rhoades v. Young Women's Christian Ass'n of Greater Pittsburgh*, No. CIV. A. 09-261, 2009 WL 3319820, at *6 (W.D. Pa. Oct. 14, 2009) (noting "it would be difficult for Plaintiff to know all potential comparators" without discovery); *Pitrolo v. Cty. of Buncombe*, No. 1:06CV199, 2007 WL 1041193, at *1 (W.D.N.C. Apr. 4, 2007) ("As to . . . comparators . . . , it simply is not reasonable to assume that any employee within a large [organization] would know across the board who was being paid what salary and what duties were performed for such compensation.").[31]

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ "If Defendant[] indeed violated the EPA . . . , they should not evade liability simply because they successfully concealed that fact from Plaintiff." *Chiaramonte*, 2014 WL 3611098, at *6. And particularly so here, where Jones Day maintains an unlawful pay secrecy policy. *See* Dkts. 117-7 and 145-1 (public, redacted version of same) at 27, Am. Mot. for Cond. Cert.

---

[31] Plaintiffs may also identify comparators who were either predecessors or successors. *See Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 346 (4th Cir. 1994) ("In the context of the Equal Pay Act, the statute of limitations does not dictate which co-workers the plaintiff may submit as comparators."); 29 C.F.R. § 1620.13(b)(5) ("It is immaterial that a member of the higher paid sex ceased to be employed prior to the period covered by the applicable statute of limitations period for filing a timely suit under the EPA."); *see also Clay v. Howard Univ.*, 128 F. Supp. 3d 22, 31 (D.D.C. 2015) (holding that applicability of non-immediate comparators "is intensely fact-specific") (citing *Broadus v. O.K. Indus., Inc.*, 226 F.3d 937, 942 (8th Cir. 2000) (given the circumstances specific to the complaint, plaintiff could use a non-immediate successor in her position as wage comparator)).

**D.     The Court Should Not Determine that Each Jones Day Office Constitutes a Separate "Establishment" for the Purposes of the EPA on the Partial Record.**

The foregoing evidence suffices to create a triable issue on whether Plaintiff Williams may identify comparators from other geographic locations. But, should the Court find the foregoing evidence insufficient, Plaintiffs should be permitted to finish discovery of testimony and documents that would affirm the high level of functional integration across the Firm.

### 1.   *Plaintiffs Seek Testimony from Individuals Who Exercise Central Control*

First, Plaintiffs have not had an opportunity to depose Irvine PIC Richard Grabowski, New York PIC Wesley R. Johnson, Jr., former Atlanta PICs Richard Deane, Jr. and Deb Sudbury, California PIC Christopher Lovrien, or Southeast Regional PIC Lizanne Thomas. Kornblith Decl. ¶¶ 17-18. Plaintiffs expect that these individuals will testify that the discretion of PICs in budgeting and setting associate compensation is circumscribed. They will also confirm that any differences in the recruiting, hiring, transfer, and compensation processes are immaterial.

Plaintiffs also seek the deposition testimony of the Practice Leaders of the Practice Groups to which Plaintiffs belonged, including John Majoras, Stephanie Parker, Christopher Kelly, and Anthony Insogna. *Id.* These individuals will speak to the high degree of work across offices and the process of assigning work across offices. These individuals will also testify that associates are not evaluated differently based on where the associate is physically located.

Finally, Plaintiffs seek to depose several Firm leaders who exercise substantial cross office responsibilities, including Managing Partner Brogan, Administrative Partner Shumaker, Partner Lovitt, Global Counsel and Director of Human Resources Sarah McClure, and Global Director of Business Development & Communications and former Director of Practice Services Suzanne Coussons. *Id.* Plaintiffs anticipate that Partners Brogan, Shumaker, and Lovitt will testify to the considerations each takes into account when making associate compensation adjustments as well

as the degree of authority they exercise.[32] And Plaintiffs anticipate that Ms. Coussons will testify to the cross-office functions of Firmwide Practice Services, including in the associate evaluation and compensation processes.

### 2. Plaintiffs Seek Further Documents Evidencing Jones Day's Functional Integration

Plaintiffs also seek documents that would further evidence the Firm's integration. Specifically, Plaintiffs seek Firm communications that associates should work across offices.

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

Documents pertaining to the Firm's recruitment of attorneys are also relevant to the establishment inquiry. This includes documents memorializing Partner Resiman's final decisions on participation in specific recruiting programs, how it was determined which recruiters would attend, and what information offices must share with the Recruiting Department before extending offers of employment. *Id.* Plaintiffs anticipate that such documents will confirm the high degree of centralization in Jones Day's recruiting and hiring processes and that Managing Partner Brogan still retains final authority over the conditions of employment at Jones Day.

Finally, Plaintiffs seek documents reflecting any decision by Jones Day to compensate associates based on geographic market or office location. *Id.* Plaintiffs anticipate that this discovery will underscore that Jones Day views its offices (or at least groups of offices) as similar and that all decisions on associate compensation are centralized.

---

[32] Jones Day has yet to produce unredacted versions of documents that show the frequency with which these three centralized decision makers initiate changes to the compensation recommendations of PICs for individual associates. Kornblith Decl. ¶ 19.

\*        \*        \*

In summary, the partial record before the Court suggests significant functional integration of Jones Day's offices. This alone suffices to create a triable issue as to whether Jones Day's offices operate as separate establishments and whether Plaintiff Williams may identify comparators from other offices. But even if this evidence is insufficient, it indicates the availability of additional evidence that would reinforce Plaintiffs' position—discovery that should proceed.

## II. Jones Day Has Not Carried Its Burden of Proving that Plaintiffs' Compensation Was Justified Under the EPA's Affirmative Defenses

Jones Day's "narrow" arguments against the comparators identified by Plaintiffs Draper and Henderson likewise ask the Court to ignore Jones Day's own statements and the law. *See Thompson v. Sawyer*, 678 F.2d 257, 270–71 (D.C. Cir. 1982) ("Determination that an Equal Pay Act violation has occurred involves both a legal and a factual problem. The legal issue is the standard of equality to be applied under the Act. The factual issue is whether the jobs in question met the standard . . . ."). On the law, Jones Day's attempt to define equal work in terms of billable hours turns the EPA on its head. The EPA's equal work inquiry, and the prima facie case, focus on whether the *content* of the jobs in question is substantially equal. Once the plaintiff makes out a prima facie case, the burden then shifts to the defendant to prove that factors, other than sex, account for differential pay. On this, the employer bears the burden of proof under the Act. *See Corning Glass Works*, 417 U.S. at 196.

Jones Day now asserts that it paid Plaintiff Draper less than her comparators because she billed fewer hours than they did, and it says that it paid Plaintiff Henderson less than her comparators because she followed the Firm's instruction to devote her time to searching for other employment. Both post-hoc attempts to justify disparities fail. Jones Day has not carried its burden to prove that it in fact paid them less because of her billable hours, as it is required to do to justify

differential pay based on "a system which measures earnings by quantity . . . of production." *Id.*
And as to Ms. Henderson, Jones Day's argument fails because evidence indicates that searching
for work constitutes work as Jones Day defines it.

### A.   Jones Day Misinterprets the EPA.

"The Equal Pay Act standard is neither 'comparable' work nor 'identical' work. Instead,
the test under the Act is 'substantial equality'—whether the *jobs* in question are substantially
related and substantially similar in skill, effort, responsibility, and working conditions." *Goodrich
v. Int'l Bhd. of Elec. Workers, AFL-CIO*, 712 F.2d 1488, 1492 (D.C. Cir. 1983) (Ginsburg, J.)
(emphasis added); *see also Laffey v. Nw. Airlines, Inc.*, 740 F.2d 1071, 1083 (D.C. Cir. 1984) ("It
is, of course, elementary that 'jobs need not be identical in every respect . . . .'" (quoting *Corning
Glass*, 417 U.S. at 203 n. 24)).

### 1.   *Supreme Court Precedent Confirms that the Equal Work Inquiry Focuses on Whether the Job's Duties Are Equal*

The Supreme Court has explained that "equal work on jobs the performance of which
requires equal skill, effort, and responsibility, and which are performed under similar working
conditions" invokes terms of art. *See Corning Glass*, 417 U.S. at 201. "Congress' intent . . . was
to use these terms to incorporate into the new federal Act the well-defined and well-accepted
principles of job evaluation so as to ensure that wage differentials based upon bona fide job plans
would be outside the purview of the Act."[33] *Id*. And in order to determine whether a "wage

---

[33] The Secretary of Labor has since issued regulations that define "skill, effort, and responsibility."
These regulations—never cited by Jones Day—confirm that "skill, effort, and responsibility" are
measured according to job content. "Skill includes consideration of such factors as experience,
training, education, and ability." 29 C.F.R. § 1620.15(a). "Effort is concerned with the
measurement of the physical or mental exertion needed for the performance of a job." 29 C.F.R. §
1620.16(a). "Where . . . differences in kind of effort expended to perform the job are not ordinarily
considered a factor in setting wage levels," wage differentials cannot be justified on such basis.
29 C.F.R. § 1620.16(b)."Responsibility is concerned with the degree of accountability required in

differential[]" is, in fact, "based upon [a] bona fide job evaluation plan[]", and not a *post hoc* justification concocted by the defendant, the court must examine how the employer has historically viewed the work. *See id.* at 201–03.

Where an employer has historically viewed work as equal, it may not, in litigation, disown this or seek to justify this differential with other rationales. *See id.* at 204 ("The question remains, however, whether Corning carried its burden of proving that the higher rate paid for night inspection work, until 1966 performed solely by men, was in fact intended to serve as compensation for night work, or rather constituted an added payment based upon sex."); *see also* 29 C.F.R. § 1620.16(b). Nor can it seek to "differentiate between jobs which the company itself has always equated." *Corning Glass*, 417 U.S. at 203. [34]

### 2. The Act's Affirmative Defenses, on Which the Employer Bears the Burden of Proof, Speak to Differentials in Production—i.e. Hours

Jones Day's attempt to graft a billable hours requirement onto "equal work" runs afoul of the focus on job content emphasized by the Supreme Court and the implementing regulations, as well as the Act's plain text. The Act's four affirmative defenses speak to reasons why men and women performing work of equal skill, effort, and responsibility may still be paid differently. The

---

the performance of the job, with emphasis on the importance of the job obligation." 29 C.F.R. § 1620.17(a).

[34] *See also id.* ("Significantly, it is not the Secretary in this case who is trying to look behind Corning's bona fide job evaluation system to require equal pay for jobs which Corning has historically viewed as unequal work. Rather, it is Corning which asks us to differentiate between jobs which the company itself has always equated. We agree with the Second Circuit that the inspection work at issue in this case, whether performed during the day or night, is 'equal work' as that term is defined in the Act."); *Goodrich*, 712 F.2d at 1494 ("Nor is a plaintiff barred from contesting the genuineness of the reasons an employer proffers for a rule (here, to provide compensation for additional duties and special expertise) because the rule itself does not invoke a sex criterion or because the plaintiff has not attempted to bring herself within the rule.").

third is the "quantity . . . of production."[35] Plainly, where an employer claims that differences in billable hours justify differences in pay, the employer seeks to differentiate based on the "quantity . . . of production." This is a permissible justification, to be sure, but, where the employer seeks to justify salary differentials based on the quantity of production, the employer bears the burden of proof to show that this was actually the rationale for the salary difference. *See Corning Glass*, 417 U.S. at 196 ("[T]he burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions."); *Balk v. U.S. Info. Agency*, No. 81-1565, 1985 WL 1634, at *6 (D.D.C. Mar. 26, 1985) ("[T]he burden shifts to the employer to prove, by a preponderance of the evidence, that the pay differential was justified by one of the four statutory exemptions."). In other words, the employer must prove that gender played no role in the salary decision.

### 3. D.C. Circuit Case Law Affirms that an Employer Who Seeks to Pay More Based on Additional Work Must Demonstrate that the Additional Work Is "genuinely the motivating factor" for the Higher Pay

The D.C. Circuit is in accord: Where an employer argues that additional work merits additional compensation, the court must carefully examine the defendant's practices to ascertain whether it in fact has a practice of paying more for additional work. The employer bears the burden:

> An employer must show a consistent pattern of performance of additional duties in order to demonstrate that added duties are genuinely the motivating factor for the substantially higher pay. It is not sufficient that an increased workload might hypothetically have commanded a higher salary if it is not in fact the basis for a significantly greater wage. ***The employer may not fabricate an after-the-fact rationalization for a sex-based pay difference***.

*Laffey v. Nw. Airlines, Inc.*,  567 F.2d 429, 450 (D.C. Cir. 1976) (emphasis added); *accord* 29 C.F.R. § 1620.20 ("Additional duties may not be a defense to the payment of higher wages to one

---

[35] The Act's exceptions also include "seniority" (for example, in a law firm, the seniority of an associate), "merit" (for example, a legitimate, nondiscriminatory, performance system), or "any other factor than sex" (for example, geography). On each of these, the employer bears the burden of proof to show that a proffered justification was in fact the rationale for any salary differential.

sex where the higher pay is not related to the extra duties. The Commission will scrutinize such a defense to determine whether it is bona fide."); *cf. Goodrich*, 712 F.2d at 1493 (rejecting that additional work need only be alleged to invoke the EPA's affirmative defenses, because doing so would swallow the Act, and holding that such defenses involve contested facts).[36]

### B. On the Partial and One-Sided Record Before the Court, and Drawing All Reasonable Inferences in Plaintiffs' Favor, Jones Day Cannot Sustain Its Burden of Showing It Paid Plaintiff Draper Less Because of the Number of Hours She Billed

Jones Day's motion focuses on the fact that Ms. Draper supposedly billed for "less" work than three of her comparators—"gaps in productivity" as Jones Day terms it. Dkt. 147, Mot. 17, 13. This is an obvious attempt to justify Ms. Draper's compensation based on the "quantity . . . of production," meaning that Jones Day must prove, by a preponderance of the evidence, that this was "genuinely" the justification for Ms. Draper's compensation. *See Laffey*, 567 F.2d at 450.



Jones Day

---

[36] Jones Day ignores this binding authority and instead relies on a series of out-of-circuit opinions, most from district courts. In each case, Jones Day either misstates the holding; the case is distinguishable, if not helpful, to Plaintiffs' position; or both. For starters, *Chiaramonte v. Animal Medical Center* held the plaintiff's "job content" was qualitatively different from that of her colleague because her responsibilities "entailed primarily public-relations-type duties as well as primary care"; by contrast, her "better-paid male colleagues practiced in specialized areas of veterinarian medicine and performed complex procedures." 677 F. App'x 689, 691 (2d Cir. 2017). Differences in the number of patients were thus emblematic of differential job content: the plaintiff was focused on public relations and her comparators on treating patients. *Schultz v. Department of Workforce Development* held that the plaintiff made a prima facie case, because her job duties shared "a common core" with that of her comparator—even though, as Jones Day notes, the plaintiff worked fewer hours than her successor-comparator. The court nonetheless found the salary differential justified by a lack of "facts genuinely calling into question the [employer's] assertion that [the comparator's] higher salary was due to [his] education, analytical skills and experience . . . ." No. 09-CV-274-SLC, 2011 WL 13359148, at *4–5 (W.D. Wis. Mar. 1, 2011). *Renstrom* concerned "additional duties" of grocers. 787 F. Supp. 2d at 970. Specifically, the plaintiff's comparators had additional duties because one "handled military installations" and the other "handled two distribution centers." *Id.*

cites no admissible evidence to carry its burden of proving that Ms. Draper's pay was *genuinely* set below that of her comparators because of the number of hours she billed. The motion thus fails.

### 1. Jones Day Fails to Carry Its Burden of Showing that It Paid Ms. Draper Less than Her Comparators Because of the Number of Hours She Billed

Jones Day has not proven that it sets compensation based on hours—as would be required for it to rely on the EPA's exceptions. ██████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ *see also id.* at 19:18–24; 37:18–19; Ex. B1, Williams Tr. at 120:18-21 ██████████████████████████████

████████████████████████████████████ *id.*, Williams Tr. 120:7–13

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ Ex. B2, Draper Tr. 166:19–22 ("I also understood that there wasn't a stated number of hours that we had to hit."); Ex. B5, Stahl Tr. 85:20–24 ██████████████████████████████

*id.*, Stahl Tr. 369:2–4 ("The quality of the work was stressed over quantity, the types of trainings, the types of experience."); Ex. B3, Henderson Tr.162:2–5 ("And I want to be very clear that what I was told by Jones Day of what was important was the quality of your work, not the quantity."); SRAMF ¶¶ 236, 241.

The record shows that Jones Day's compensation is future looking: designed to "identify[] and retain[] those lawyers who have the interest, appropriate intensity, judgment, ability and commitment to make a meaningful, continuing contribution to the Firm." Dkts. 117-22, 145-17 (public, redacted version of same) at 2; SRAMF ¶ 242. The timing of Jones Day's compensation adjustments confirms that Jones Day does not set compensation based on the number of hours an associate bills: Jones Day sets compensation once per year, in June or July, for the entire year.

Dkts. 117-22, 145-17 (public, redacted version of same); SRAMF ¶ 216.[37] In other words, whether an associate bills 3 hours or 3000 hours, the associate will continue to earn the same salary until the next salary adjustment the following June or July. The clear implication of this evidence and testimony is that Jones Day sets compensation based on a subjective and potentially discriminatory view of what is necessary to retain or reward the lawyer—not based on the number of hours the attorney bills, as its Motion argues and as required to claim the EPA's third affirmative defense.[38]

*Cf.* ████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

Nor has Jones Day carried its burden of proving that it in fact set *Ms. Draper's pay* based on the number of hours that *she* billed. Jones Day cites no admissible evidence purporting to show how Ms. Draper's pay was actually set.[39] To be sure, the record indicates that PICs make compensation recommendations. Dkts. 126, 147 (public, redacted version of same), Mot. 3. These

---

[37] This practice differentiates Jones Day from most other law firms. Most firms pay associates a base salary based on their class year—a "seniority system" under the EPA's exceptions. *See* Dkts. 117-22 , 145-17 (public, redacted version of same). At year's end, associates then receive a bonus tied to performance, hours, or some combination. *Id.* Assuming that this is the actual basis for differentials in compensation, such a system is either a "merit" system or a system that measures earnings based on the "quantity . . . of production" under the EPA. Jones Day does neither: Associates do not automatically receive raises based on their seniority and compensation is not hours based. SRAMF ¶ 239.

[38] At most, the record indicates that Jones Day may take into account the previous year's hours in setting compensation for the following year along with many other factors. But Jones Day has not even moved for summary judgment on this factual basis. *See* Dkt. 126, 147 Mot. 15 (comparing hours year by year). And, in any event, as set forth below, the evidence from which the Court could ascertain whether hours in fact influence compensation at Jones Day, and, if so, to what extent, is still outstanding. *See infra* Section II.B.3.ii.

[39] Former Atlanta PIC Richard Deane's self-serving declaration regarding compensation adjustments in Atlanta must be ignored until he can be deposed. *See supra* note 16.

recommendations are reviewed by Traci Lovitt and Michael Shumaker, "who may suggest revision before forwarding the recommendations to the Managing Partner [Stephen Brogan] for approval." Dkts. 126 147 (public, redacted version of same), Mot. 4; *see* SRAMF ¶ 209. Then, over roughly three weeks, the Managing Partner makes further revisions and final decisions on compensation. *See* SRAMF ¶ 211. *But none of these people have offered testimony about the setting of Ms. Draper's compensation.* Absent such testimony it is impossible for the Court to presage what these witnesses will say, much less to do so in Jones Day's favor. ██████████████████████████

████████████████████████████████████████████████████████

███████████████████. Ex. B2, Draper Tr. 172:7–8. On this record, Jones Day is not entitled to an inference that it "genuinely" set Ms. Draper's pay lower than that of her comparators because of her billable hours.[40]

Jones Day points to testimony to the effect that law firms should pay based on hours. Dkts. 126, 147 (public, redacted version of same), Mot. 15. But this merely restates the statute: A differential in compensation in fact based on the quantity of production is permissible under the Act. Jones Day, however, has not proven that this is what it actually does—and its statements are to the contrary.

---

[40] Nor is Jones Day's other "way of making the same point . . . by looking at the rate" at which Jones Day paid Ms. Draper and her comparators of any value. This is yet another attempt at *post hoc* justification and yet another instance in which Jones Day's case citations are misleading at best. *Carey v. Foley & Lardner LLP*, which Jones Day cites to make this point, actually rejected the plaintiff's attempt to prove a disparity by rate, defined as "total compensation divided by billable hours," because the Court determined that he had never raised a triable issue as to whether he performed equal work. 577 F. App'x 573, 579 (6th Cir. 2014). Moreover, the defendant never disputed this definition of rate. *Id.*

### 2. *Even Measured as Billable Hours, Viable Comparators Exist for Ms. Draper*

Jones Day's "narrow" motion relies exclusively on the fact that the comparators whom Ms.

Draper identified in pleadings and at her deposition allegedly "[b]illed hundreds of hours per year

more than her." ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████ ████████████████████████████████████ *See supra*

Section Argument I.C.

### 3. *Additional Evidence Will Likely Confirm that Ms. Draper's Pay Was Not Set Based on the Number of Hours She Billed*

At the very least, additional discovery is necessary on the equal work inquiry before this

Court determines that Ms. Draper cannot prevail on her equal pay claims as a matter of law.

Specifically, Plaintiffs seek to discover evidence that would allow the Court to evaluate exactly

what factors Jones Day considered in setting Ms. Draper's pay and how Jones Day measures skill,

effort, and responsibility.

##### i. *Plaintiffs Are Seeking the Deposition Testimony of the Individuals Likely Responsible for Setting Ms. Draper's Pay and Documents Related Thereto*

Most importantly, Plaintiffs seek testimony from the individuals responsible for setting

Ms. Draper's pay: Managing Partner Brogan, Administrative Partner Shumaker, and Partner

Lovitt. Plaintiffs also seek testimony from those individuals who made compensation

---

[41] "Often, evidence superficially purporting to justify greater pay as compensation for added work is found upon close examination to have inconsistencies which render its evidentiary value weaker. Where, for example, all male employees receive greater pay but only some perform the extra tasks allegedly justifying that pay, a reasonable inference is that maleness not the added chores is the basis for the higher wage." *Laffey*, 567 F.2d at 450.

recommendations: former Atlanta PICs Deane and Sudbury, and Southeast Regional PIC Thomas. Kornblith Decl. ¶ 18. Only these individuals can speak to whether Ms. Draper's pay was set lower than that of her comparators because of her billable hours—as Jones Day now claims—or because of other factors.

Plaintiffs have not yet taken these fact depositions because discovery is not set to close until June 11, 2021.[42] Although Plaintiffs have taken a Rule 30(b)(6) deposition, such deposition does not preclude factual testimony on the same point; the Federal Rules expressly contemplate that a party may obtain fact witness testimony on the same topic.[43]

---

[42] ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

[43] "Rule 30(b)(6) expressly states that it does not preclude a deposition by any other procedure. 'Thus, a party who wishes the deposition of specific officer . . . may still obtain it . . . .'" *Hilton Hotels Corp. v. Dunnet*, No. 00-2852-GV, 2002 WL 1482543, at *2 (W.D. Tenn. Mar. 15, 2002) (quoting 8A Wright, Miller & Marcus § 2103 at 36); *see also* Fed. R. Civ. P. 30(b)(6) ("[Rule 30(b)(6)] does not preclude a deposition by any other procedure allowed by these rules."); *Sara Lee Corp. v. Kraft Foods Inc.*, 276 F.R.D. 500, 503 (N.D. Ill. 2011) ("For instance, the Court doubts that a Rule 30(b)(6) witness should be allowed to testify about the details of a car accident in lieu of the corporation's truck driver who actually witnessed the event. If he could, Rule 30(b)(6) would severely undercut the requirement, fundamental to our adversary system, that fact witnesses have personal knowledge of the matters upon which they testify."); *cf. Edwards v. Scripps Media, Inc.*, 331 F.R.D. 116, 122 (E.D. Mich. 2019) ("[T]he prior testimony from the individual fact witnesses does not relieve defendant from its obligation to designate a witness under Rule 30(b)(6)."); *Doe v. Trump*, 329 F.R.D. 262, 273 (W.D. Wash. 2018) ("[T]he court rejects the notion that taking a Rule 30(b)(6) deposition is necessarily duplicative of a fact witness deposition even if the same person is being deposed in both instances."). That Jones Day produced a Rule 30(b)(6) deponent prepared to testify on various topics does not absolve it of the obligation to produce fact witnesses.
Plaintiffs had good strategic reasons to prioritize testimony about Jones Day's systemic practices during the Rule 30(b)(6) depositions in this case: At the time that Plaintiffs took the Rule 30(b)(6) deposition, Ms. Draper's EPA claim was the subject of Defendant's Motion for Judgment on the Pleadings, and Plaintiffs presumed, based on Local Civil Rule 23.1(b), that a class certification motion was likely to precede any summary judgment motion—or at the very least that they would have a "a full opportunity to conduct discovery" before opposing summary judgment. *See Anderson*, 477 U.S. at 257; Kornblith Decl. ¶¶ 2-3, 12 n.2. Moreover, the Court had not entered a scheduling order, and the parties had "agreed to meet and confer following a class certification

In order to facilitate these depositions, Plaintiffs also seek documents relevant to this inquiry, including documents reflecting the deliberations of the Managing Partner and those from whom he receives recommendations regarding associate compensation, as well as further documents regarding how such compensation is decided, whether hours are determinative of associate compensation, and any other factors besides hours considered. *Id.* All of this information is plainly central to the inquiry outlined in *Laffey* and 29 C.F.R. § 1620.20: Ascertaining whether increased "workload . . . is . . . in fact the basis for a significantly greater wage" or is, instead, an "after-the-fact rationalization for a sex-based pay difference." 567 F.2d at 450.

> ## ii. *More Broadly, Whether Jones Day Sets Pay Based on Gender, Hours, or Some Other Combination of Factors Is Susceptible to Statistical Analysis*

Plaintiffs also seek objective evidence as to the factors upon which compensation at Jones Day is based—namely expert regression analysis. "A common and judicially accepted method for demonstrating [the impact of challenged policies on a protected class] is the use of multivariant regression models." *Bell v. Lockheed Martin Corp.*, No. 08–6292 (RBK/AMD), 2010 WL 3724271, at *7 (D.N.J. Sept. 15, 2010). This type of regression "measures the impact of each potential explanatory variable upon the dependent variable by holding all other explanatory variables constant. The analysis yields figures demonstrating how much of an observed disparity

---

order to discuss . . . merits discovery and discovery relating to the Plaintiffs' individual claims." Ex. E1. Plaintiffs therefore prioritized topics relevant to the class certification inquiry over testimony on the merits of Plaintiffs' Equal Pay Act claims. Kornblith Decl. ¶ 12 n.2. *cf.* 8A Fed. Prac. & Proc. Civ. § 2103 (3d ed.) ("[I]t might be inappropriate to insist that all topics be explored in a single deposition because various topics are suitable for inquiry at different times in the case."). Plaintiffs sought to follow up on the Rule 30(b)(6) depositions with fact witness testimony, but Jones Day resisted, citing the Court's November 7, 2019 stay on such discovery in the case. Kornblith Decl. ¶ 2; Dkt. 30, Nov. 7, 2019 Hr'g Tr. 52: 8–9; 52:25–53:6. Plaintiffs' reasonable strategic choice is hardly grounds for summary judgment.

Carried to its logical conclusion, Defendant's position would subsume all discovery into a single Rule 30(b)(6) deposition. The Court should reject this radical restructuring of discovery.

in salaries can be traced to race [or gender], as opposed to any other potential explanatory variables." *Segar v. Smith*, 738 F.2d 1249, 1261 (D.C. Cir. 1984). In other words, whether Jones Day pays based on hours, gender, and/or other factors may be ascertainable through multiple regression analysis.

Courts hold that such analyses are relevant to a plaintiff's case under the EPA. *See Beck-Wilson v. Principi*, 441 F.3d 353, 364 (6th Cir. 2006) ("We have previously held that an EPA plaintiff can rely upon statistical evidence of a gender-based disparity in pay when establishing a prima facie EPA case. . . . [W]e hold that plaintiffs properly presented statistical evidence of a gender-based pay disparity in conjunction with individual comparator evidence in order to meet their prima facie burden.") (internal citation omitted); *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 482 (2d Cir. 2001) ("It is undisputed that multiple regression analysis, which was used by the experts here, is a scientifically valid statistical technique for identifying discrimination."); *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 367 (2d Cir. 1989) (approving regression analysis as a means of identifying discriminatory employment decisions).

*Laffey* confirms that such a data-driven inquiry into how the defendant actually set pay is warranted where, as here, the defendant contends that additional work requires additional pay. There, the defendant sought to justify paying male pursers more than female stewardesses based on supposed additional duties performed by the pursers. But the Court found that the airline's rationale was not borne out by the evidence:

> Nor can NWA reasonably contend that it gives pursers higher salaries because, as a group, they discharge extra duties more frequently than stewardesses, and thus for accounting convenience are recompensed equally. . . . [T]he company maintains records which enable it to determine what flight a given cabin attendant has flown each day, the position held each day, and the time spent by that cabin attendant each day . . . . The records would facilitate the ascertainment of differential salaries for dissimilar portions of the monthly service if in fact the activities purportedly

39

> justifying the larger salary were really the reason for the added compensation.

*Laffey*, 567 F.2d at 452 (internal quotation marks and footnote omitted).

Here, similar data exists: Jones Day maintains records of associates' gender as well as their hours and other demographic information. This information will facilitate an analysis of the factors upon which Jones Day bases compensation: be they gender, hours, geography, or seniority. This is precisely the kind of analysis that *Laffey* commands.

But this analysis is premature. By agreement of the parties, initial expert reports are to be served on November 6, 2020, and expert discovery is not set to close until February 19, 2021. Ex. E3 (July 15, 2020 email from T. Chase to K. Mueting). Data that will facilitate this analysis was not produced until August 3, 2020. Kornblith Decl. ¶ 5. Jones Day's hasty summary judgment motion does not entitle it to renege on these deadlines—nor to ignore this evidence.

### iii. *Plaintiffs Seek Evidence Regarding the Core Tasks of Associates and the Job Market for Such Skills*

Finally, to the extent that the Court extends its inquiry beyond Jones Day's preferred definition of work as the billable hour—something not called for by Jones Day's "narrow" motion—Plaintiffs require broader discovery of Jones Day's view of the associate position. As set forth in *Corning Glass Works*, courts consider job evaluations relevant evidence. 417 U.S. at 201. Accordingly, Plaintiffs seek job evaluations, as well as market surveys of associate compensation, which would reflect the job market's evaluation of similarities in the core tasks of associates. And, to the extent that Jones Day challenges the comparators identified by Plaintiffs on any basis other than billable hours, Plaintiffs seek the time records of such associates to facilitate a more fulsome analysis of the skill, effort, and responsibility expended by Ms. Draper and her comparators.

### iv.  *Plaintiffs Have Been Diligent in Their Discovery Efforts to Date*

Defendant's suggestion that Plaintiffs have not diligently pursued this discovery rings hollow. As set forth in the accompanying declaration, until the Court ruled on the pending Rule 12(c) motion, Plaintiffs were permitted only Rule 30(b)(6) depositions. Plaintiffs did, however, serve 230 requests for production of documents, and discovery is ongoing. Kornblith Decl. ¶¶ 10, 12. This is not a case—like *Convertino*—where Plaintiffs are seeking additional time for discovery after six years of discovery.[44] Defendants have instead opted to file an early summary judgment motion in an effort to close discovery before it is complete. *Anderson* counsels against this "railroad[ing]." *See Trebor Sportswear*, 865 F.2d at 511.

### C.    **Plaintiff Henderson Performed Work**

Jones Day's arguments for dismissal of Plaintiff Henderson's EPA claim similarly ignore precedent and the Firm's own statements. The Firm attempts to justify its decision to pay Plaintiff Henderson less than her male comparators based on the fact that the Firm instructed her to devote her time to searching for new employment, and that she followed the Firm's instruction. In other words, as with Plaintiff Draper, Jones Day says that work must be measured by the billable hour.

### 1.    *Defendant Has Not Carried Its Burden of Proving Why It Set Plaintiff Henderson's Pay at Zero*

As set forth above, the focus of the prima facie case is on job content; any defense based on hours clocked falls within the Act's affirmative defenses, on which the defendant bears the burden of proof. Here, Jones Day has not offered testimony or other *evidence* setting out how the Firm decided to set Ms. Henderson's pay, why it continued paying her if she was, as Jones Day now asserts, doing no work, nor why it decided to place her on unpaid leave (and pay her nothing)

---

[44] In *Convertino*, there was no dispute that plaintiff had "a full opportunity to conduct discovery." 684 F.3d at 99 (quotation marks omitted). Rather, the case concerned whether evidence could ever be obtained at all. *Id.* at 99–102.

for her last two weeks at Jones Day. Accordingly, Jones Day has not carried its burden, under the Act's affirmative defenses, of proving that it paid Ms. Henderson less than male comparators because of her low billable hours—or even because she devoted her working time to searching for other employment as instructed by the Firm. In sum, for the same reasons that Jones Day's "work" argument fails as to Plaintiff Draper, it also fails as to Plaintiff Henderson.

### 2. *Searching for Other Employment Constitutes Work Under the Equal Pay Act*

███████████████████████████████████████████████████████

████████████████████████████████████████████████ Jones Day has a practice of instructing associates to devote working time to searching for employment outside the Firm while they remain employed by the Firm. Ex. B4, Tolton Tr. 511:11–18 ("Consistent with [Partner] Darren[ Cottriel]'s instruction to me to prioritize job search and not work on active cases, to facilitate my job search I did not work on client matters in that period."); Ex. B3, Henderson Tr. 281:2–12 (". . . I must have been under the understanding, that it took people three months -- usually given three months. I'm sure, because I said 'usually,' some people were given more [time to find employment outside of Jones Day]."); SRAMF ¶ 243.

█████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████ Ex. B3, Henderson Tr. 284:21–25 ("I believe I expressed my concerns that my process with [a prospective employer] might not be

complete by June 30, and that it would be beneficial for the firm and myself if I stayed on past that time."); *id.*, Henderson Tr. 285:15-18 ("I mean that Jones Day didn't like to advertise when it was letting people go or firing associates, and I don't think that they would have wanted to have a firing on their record."); Ex. B2, Draper Tr. 27:6–15 ("[I]n 2017, Deb Sudbury asked if I wanted to meet with the general counsel of a company . . . . That general counsel reached out to Deb and asked if there were any associates at the firm that might be interested in transitioning to in-house. . . . . And Deb . . . suggested that I meet with them . . . ."); SRAMF ¶ 245.  Jones Day offers no reason why a jury would not be entitled to find, based on this testimony, that searching for outside employment at Jones Day's direction constitutes work.

Moreover, such an understanding is consistent with the Fair Labor Standards Act ("FLSA"), with which the EPA is codified. Under the FLSA, "work" is that which is "undertaken 'predominately for the benefit of the employer,'" and "the determination of what constitutes work 'is necessarily fact-bound.'" *Sherald v. Embrace Techs., Inc.*, No. 11 Civ. 939(TPG), 2013 WL 126355, at *6 (S.D.N.Y. Jan. 10, 2013) (quoting *Reich v. S. New Eng. Telecoms. Corp.*, 121 F.3d 58, 64 (2d Cir.1997)); *see also Integrity Staffing Sols.*, 574 U.S. at 33 (holding that an activity constitutes work if it is among the "activities an employee is employed to perform"); *cf.* 29 C.F.R. § 1620.13(a) (providing that employers need not "formally assign the equal work to the employee; the EPA applies if the employer knowingly allows the employee to perform the equal work"). Here, where Plaintiffs testified that Jones Day instructs associates to seek outside employment, assists them in doing so, ███████████████████████, a jury could find that searching for outside employment may be considered work for EPA purposes.

### 3. *Discovery Has Identified Other Potential Comparators for Plaintiff Henderson*

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

### 4. *Additional Discovery Is Necessary Before the Court May Decide that Searching for Outside Employment at Jones Day's Direction Cannot Constitute Work*

Finally, should the Court find the foregoing evidence insufficient to create a triable issue, further discovery is nonetheless warranted on the question of whether Plaintiff Henderson's efforts to seek other employment when directed to do so by Jones Day may constitute "work" within the meaning of the EPA. First, Plaintiffs seek the depositions of the individuals actually responsible for setting Plaintiff Henderson's pay: Managing Partner Brogan, Partners Shumaker and Lovitt, as well as Wesley R. Johnson, Jr., the New York PIC. Kornblith Decl. ¶ 18.

Second, Plaintiffs seek the identities of any male associates instructed to devote time to obtaining employment outside the Firm. *Id.* As set forth above, Plaintiffs understand that instructing individuals to seek work outside the Firm is a common practice at Jones Day. ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

Finally, Plaintiffs seek any further documents reflecting the Firm's rationale for keeping associates on payroll while they search for outside employment and its efforts to assist them in

doing so. *Id.* ███████████████████████████████████████████

███████████████████████████████████████████

Until this evidence is discovered—or discovery concludes nearly ten months from now—dismissal is premature. Plaintiffs are entitled to an "opportunity to discover information that is essential to [their] opposition." *Anderson*, 477 U.S. at 250 n.5.

## CONCLUSION

Jones Day has jumped the gun. On the limited record before the Court, it is clear that the definition of establishment at Jones Day is a contested factual issue—as is the actual basis for Plaintiffs' compensation. The motion should be denied.

Date: August 21, 2020

Respectfully submitted,

*/s/ Russell L. Kornblith*
David W. Sanford (D.C. Bar No. 457933)
Russell L. Kornblith*
SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
rkornblith@sanfordheisler.com

Deborah K. Marcuse (D.C. Bar No. 995380)
SANFORD HEISLER SHARP, LLP
111 S. Calvert Street, Ste. 1950
Baltimore, MD 21202
Telephone: (410) 834-7415
Facsimile: (410) 834-7425
dmarcuse@sanfordheisler.com

Kate Mueting (D.C. Bar No. 988177)
Paul Blankenstein (D.C. Bar No. 304931)
SANFORD HEISLER SHARP, LLP
700 Pennsylvania Avenue, SE, Ste. 300
Washington, D.C. 20003
Telephone: (202) 499-5206
Facsimile: (202) 499-5199
kmueting@sanfordheisler.com

*admitted *pro hac vice*

*Attorneys for Plaintiffs, the Proposed Classes,
and the Proposed Collective*