## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NILAB RAHYAR TOLTON *et al.*, *on behalf of themselves and all others similarly situated*, <br><br> *Plaintiffs*, <br><br> v. <br><br> JONES DAY, a General Partnership, <br><br> *Defendant*. | Civil Action No. 19-945 (RDM) |

## PLAINTIFFS' RESPONSES TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND PLAINTIFFS' ADDITIONAL MATERIAL FACTS

Pursuant to Local Civil Rule 7(h), Plaintiffs submit the following responses to Defendant's Statement of Undisputed Material Facts and additional Statement of Material Facts, both in opposition to Defendant's Motion for Summary Judgment on Count IV of Plaintiffs' Third Amended Complaint (TAC). Plaintiffs reference this document in their Memorandum of Law as their Statement of Responsive and Additional Material Facts ("SRAMF").

### A. KATRINA HENDERSON

1. Jones Day notified Henderson in December 2015 that her employment by the Firm would be terminated. (Dkt. 41 at 81-82 (TAC ¶¶ 300-01); Dkt. 128-25 at 11-12 (Henderson Tr. 276:17-25, 277:22-24).)

**RESPONSE:** Undisputed.

2. After the notice of termination, Jones Day allowed Henderson to stay on the Firm's payroll temporarily while she sought her next job. (Dkt. 128-25 at 13-14 (Henderson Tr. 281:14-282:9).)

**RESPONSE:** Undisputed that Jones Day allowed Henderson to stay on the Firm's payroll temporarily while she sought her next job, but the evidence cited does not support that proposition. Henderson contends the Firm has a policy of keeping associates on the payroll while they search for another job. (Ex. B3 (Henderson Tr. 286:3-9).)

3. At the end of June 2016, Henderson was placed on unpaid leave. (Dkt. 128-25 at 15 (Henderson Tr. 283:15-20); Dkt. 41 at 82 (TAC ¶ 304); *see* Bounds Decl. ¶ 8.)

1

**RESPONSE:** Undisputed that Jones Day placed Henderson on unpaid leave at the end of June 2016. Plaintiff Henderson maintains that she was told it would be beneficial for both Jones Day and for her to extend her employment with Jones Day until July 15 when her process with a prospective employer would be complete. (Ex. B3 (Henderson Tr. 286:18-23; 287:15-18).)

4. Henderson ended her employment at Jones Day on July 15, 2016. (Bounds Decl. ¶ 8.)

**RESPONSE:** Disputed.  (Ex. B3 (Henderson Tr. 141:21-23; 276:17-25).)

5. In calendar year 2016, Henderson recorded zero client billable hours and zero pro bono hours of work. (Dkt. 128-38 at 2 (Chase Decl. Ex. 27).)

**RESPONSE:** Undisputed. In addition, Henderson recorded 910 Firm hours in calendar year 2016. (Dkt. 146-38 at 2 (Chase Decl. Ex. 27, Opp. to Am. Mot. Cond. Cert.).)


**B. SAIRA DRAPER**

6. Draper joined Jones Day's Atlanta office as a first-year associate in October 2011. (Bounds Decl. ¶ 9.)

**RESPONSE:** Undisputed.

7. In calendar year 2015, Draper recorded 394 client billable hours and 281 pro bono hours. (Dkt. 102-15 at 3.)

**RESPONSE:** Undisputed. In addition, Draper recorded 256 "Firm & Public Service" hours in calendar year 2015. (*Id.*)

8. On an annualized basis—meaning proportionally increased to reflect the hours an associate would have recorded had the associate been working for the entire year without leave—Draper recorded 642 client billable hours and 458 pro bono hours in calendar year 2015. (*Id.*)

**RESPONSE:** Undisputed. In addition, on an annualized basis, Draper recorded 417 "Firm & Public Service" hours in calendar year 2015. (*Id.*)

9. In calendar year 2016, Draper recorded 1,134 client billable hours and 370 pro bono hours. (*Id.*)

**RESPONSE:** Undisputed. In addition, Draper recorded 563 "Firm & Public Service" hours in calendar year 2016. (*Id.*)

10. In calendar year 2017, Draper recorded 1,032 client billable hours and 167 pro bono hours. (*Id.*)

**RESPONSE:** Undisputed. In addition, Draper recorded 328 "Firm & Public Service" hours in calendar year 2017. (*Id.*)

11. On an annualized basis, Draper recorded 1,371 client billable hours and 222 pro bono hours in calendar year 2017. (*Id.*)

**RESPONSE:** Undisputed. In addition, on an annualized basis, Draper recorded 435 "Firm & Public Service" hours in calendar year 2017. (*Id.*)

12. In calendar year 2018, Draper recorded 397 client billable hours and 486 pro bono hours. (*Id.* at 2.)

**RESPONSE:** Undisputed. In addition, Draper recorded 306 "Firm & Public Service" hours in calendar year 2018. (*Id.*)

13. On an annualized basis, Draper recorded 631 client billable hours and 774 pro bono hours in calendar year 2018. (*Id.*)

**RESPONSE:** Undisputed. In addition, on an annualized basis, Draper recorded 487 "Firm & Public Service" hours in calendar year 2018. (*Id.*)

14. Draper left the Firm on October 4, 2018. (Bounds Decl. ¶ 9.)

**RESPONSE:** Undisputed.

15. As of July 1, 2014, Draper's compensation was $180,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

16. As of July 1, 2015, Draper's compensation was $195,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

17. As of July 1, 2016, Draper's compensation was $220,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

18. As of July 1, 2017, Draper's compensation was $230,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

19. ███████████ joined Jones Day's Atlanta office as a first-year associate in October 2013. (*Id.* at ¶ 11.)

**RESPONSE:** Undisputed.

20. In calendar year 2015, ▮▮▮▮ recorded 2,144 client billable hours and 58 pro bono hours. (Dkt. 128-37 at 2 (Chase Decl. Ex. 26).)

**RESPONSE:** Materially undisputed. ▮▮▮▮ recorded 2,143.85 client billable hours and 58.25 client "non-billable" hours in calendar year 2015. (Dkt. 123-11 and 146-37 at 2 (public, redacted version of same) (Chase Decl. Ex. 26, Opp. to Am. Mot. Cond. Cert.).) In addition, ▮▮▮▮ recorded 294.25 Firm hours in calendar year 2015. (*Id.*)

21. In calendar year 2016, ▮▮▮▮ recorded 2,185 client billable hours and 0 pro bono hours. (*Id.* at 3.)

**RESPONSE:** Materially undisputed. ▮▮▮▮ recorded 2,185.40 client billable hours in calendar year 2016. (Dkt. 123-11 and 146-37 at 3 (public, redacted version of same) (Chase Decl. Ex. 26, Opp. to Am. Mot. Cond. Cert.).) In addition, ▮▮▮▮ recorded 152 Firm hours in calendar year 2016. (*Id.*)

22. In calendar year 2017, ▮▮▮▮ recorded 2,067 client billable hours and 14 pro bono hours. (*Id.* at 4.)

**RESPONSE:** Materially undisputed. ▮▮▮▮ recorded 2,067.40 client billable hours and 14.25 "client non-billable" hours in calendar year 2017. (Dkt. 123-11 and 146-37 at 4 (public, redacted version of same) (Chase Decl. Ex. 26, Opp. to Am. Mot. Cond. Cert.).) In addition, ▮▮▮▮ recorded 185.75 Firm hours in calendar year 2017. (*Id.*)

23. In calendar year 2018, ▮▮▮▮ recorded 1,896 client billable hours and 28 pro bono hours. (*Id.* at 5.)

**RESPONSE:** Materially undisputed. ▮▮▮▮ recorded 1,896.20 client billable hours and 28 "client non-billable" hours in calendar year 2018. (Dkt. 123-11 and 146-37 at 5 (public, redacted version of same) (Chase Decl. Ex. 26, Opp. to Am. Mot. Cond. Cert.).) In addition, ▮▮▮▮ recorded 86 Firm hours in calendar year 2018. (*Id.*)

24. As of January 2015, ▮▮▮▮ compensation was $155,000 per year. (Bounds Decl. ¶ 11.)

**RESPONSE:** Undisputed.

25. As of July 1, 2015, ▮▮▮▮ compensation was $170,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

26. As of July 1, 2016, ▮▮▮▮ compensation was $210,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

27. As of July 1, 2017, ███████ compensation was $260,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

28. As of July 1, 2018, ███████ compensation was $300,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

29. ███████████████ joined Jones Day's Atlanta office as a first-year associate in October 2014. (Bounds Decl. ¶ 12.)

**RESPONSE:** Undisputed.

30. ████████ left the Firm on ████████████ (*Id.*)

**RESPONSE:** Undisputed, except to the extent Defendant implies that ███████ left the Firm voluntarily. The referenced paragraph in the Declaration of Lori Bounds states only "Termination Date: ████████" (Dkt. 126-3 and 129-2 (public, redacted version of same) (Bounds Decl. ¶ 12.))

31. In calendar year 2015, ████████ recorded 1,689 client billable hours and 136 pro bono hours. (Dkt. 128-40 at 2 (Chase Decl. Ex. 29).)

**RESPONSE:** Materially undisputed. ████████ recorded 1,689 client billable hours and 135.5 "client non-billable" hours in calendar year 2015. (Dkt. 123-13 and 146-40 at 2 (public, redacted version of same) (Chase Decl. Ex. 29, Opp. to Am. Mot. Cond. Cert.).) In addition, ██████ recorded 429 Firm hours in calendar year 2015. (*Id.*)

32. In calendar year 2016, ████████ recorded 1,990 client billable hours and 1 pro bono hour. (*Id.* at 3.)

**RESPONSE:** Materially undisputed. ████████ recorded 1,989.75 client billable hours and 1 "client non-billable" hour in calendar year 2016. (Dkt. 123-13 and 146-40 at 3 (public, redacted version of same) (Chase Decl. Ex. 29, Opp. to Am. Mot. Cond. Cert.).) In addition, ██████ recorded 161.50 Firm hours in calendar year 2016. (*Id.*)

33. In calendar year 2017, ████████ recorded 1,997 client billable hours and 28 pro bono hours. (*Id.* at 4.)

**RESPONSE:** Materially undisputed. ████████ recorded 1,996.70 client billable hours and 28.25 "client non-billable" hours in calendar year 2017. (Dkt. 123-13 and 146-40 at 4 (public, redacted version of same) (Chase Decl. Ex. 29, Opp. to Am. Mot. Cond. Cert.).) In addition, ██████ recorded 203.25 Firm hours in calendar year 2017. (*Id.*)

34. In calendar year 2018, ████████ recorded 1,431 client billable hours and 11 pro bono hours. (*Id.* at 5.)

5

**RESPONSE:** Materially undisputed. ██████ recorded 1,431.20 client billable hours and 11 "client non-billable" hours in calendar year 2018. (Dkt. 123-13 and 146-40 at 5 (public, redacted version of same) (Chase Decl. Ex. 29, Opp. to Am. Mot. Cond. Cert.).)  In addition, ██████ recorded 119.75 Firm hours in calendar year 2018. (*Id.*)

35. On an annualized basis, ██████ recorded 1,908 billable hours and 15 pro bono hours for calendar year 2018. Those figures reflect his raw recorded hours for the nine months of the year during which he was a Firm employee, divided by nine and then multiplied by twelve. (*See id.*)

**RESPONSE:** Materially undisputed. On an annualized basis using the method cited above, ██████ recorded 1908.27 billable hours and 14.67 "client non-billable" hours for calendar year 2018. (*See* Dkt. 123-13 and 146-40 at 5 (public, redacted version of same) (Chase Decl. Ex. 29, Opp. to Am. Mot. Cond. Cert.).)

36. As of January 1, 2015, ██████ compensation was $150,000 per year. (Bounds Decl. ¶ 12.)

**RESPONSE:** Undisputed.

37. As of January 1, 2016, ██████ compensation was $153,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

38. As of July 1, 2016, ██████ compensation was $190,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

39. As of July 1, 2017, ██████ compensation was $210,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

40. As of July 1, 2018, ██████ compensation was $250,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

41. ██████ joined Jones Day's Atlanta office as a first-year associate in October 2012. (Bounds Decl. ¶ 13.)

**RESPONSE:** Undisputed.

42. In calendar year 2015, ██████ recorded 2,003 client billable hours and 9 pro bono hours. (Dkt. 128-31 at 2 (Chase Decl. Ex. 20).)

**RESPONSE:** Materially undisputed. ██████ recorded 2,0003.05 client billable hours and 8.5 "client non-billable" hours in calendar year 2015. (Dkt. 123-5 and 146-31 at 2 (public, redacted

version of same) (Chase Decl. Ex. 20, Opp. to Am. Mot. Cond. Cert.).) Additionally, ███████ recorded 333.75 Firm hours in calendar year 2015. (*Id.*)

43. In calendar year 2016, ██████ recorded 1,773 client billable hours and 107 pro bono hours. (*Id.* at 3.)

**RESPONSE:** Materially undisputed. ██████ recorded 1,772.60 client billable hours and 107 "client non-billable" hours during calendar year 2016. (Dkt. 123-5 and 146-31 at 3 (public, redacted version of same) (Chase Decl. Ex. 20, Opp. to Am. Mot. Cond. Cert.).)  Additionally, ██████ recorded 260 Firm hours during calendar year 2016. (*Id.*)

44. On an annualized basis, ██████ recorded 1,923 client billable hours and 116 pro bono hours in calendar year 2016. (Dkt. 107-5 at 2.)

**RESPONSE:** Undisputed.

45. In calendar year 2017, ██████ recorded 2,067 client billable hours and 97 pro bono hours. (*Id.* at 4.)

**RESPONSE:** Disputed as to citation. Undisputed as to fact. The correct citation appears to be Dkts. 108-2 and 107-5 at 2 (public, redacted version of same) (Second Chase Decl. Ex 3, Mot. for Sanctions).

46. In calendar year 2018, ██████ recorded 2,077 client billable hours and 42 pro bono hours. (*Id.* at 5.)

**RESPONSE:** Disputed, because the evidence does not support this statement. Dkt. 108-2 and 107-5 (public, redacted version of same) contain no information regarding ██████ recorded hours for calendar year 2018.

47. As of January 1, 2015, ██████ compensation was $170,000 per year. (Bounds Decl. ¶ 13.)

**RESPONSE:** Undisputed.

48. As of July 1, 2015, ██████ compensation was $185,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

49. As of July 1, 2016, ██████ compensation was $230,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

50. As of July 1, 2017, ██████ compensation was $265,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

51. As of July 1, 2018, ███████ compensation was $315,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

52. ███████ joined Jones Day's Atlanta office as an associate in October 2015. (*Id.* at ¶ 14.)

**RESPONSE:** Undisputed.

53. ██████starting salary was $150,000 per year and it was raised to $180,000 as of July 1, 2016. (*Id.*)

**RESPONSE:** Undisputed.

54. As of January 1, 2017, ██████ salary was $185,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

55. As of July 1, 2017, ██████ salary was $195,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

56. As of July 1, 2018, ██████ salary was $225,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

57. Between 2016 and 2018, Jones Day increased starting salaries for associates in the Atlanta office by $40,000. (Dkt. 128-2 (Deane Decl. ¶¶ 21-23); *see also* Dkt. 102-8 at 13-14, 27 (Draper Tr. 129:24-130:23; 149:9-24).)

**RESPONSE:** Undisputed. The starting salary increases between 2016 and 2018 were the result of Jones Day taking account of market changes. None of the decisions to increase starting salaries were made at the office level but were approved by Jones Day's Managing Partner Stephen J. Brogan. (Dkt. 146 at 14 (Opp. to Am. Mot. Cond. Cert.).) Moreover, Plaintiffs have not had the opportunity to depose office leaders on their declaratory statements offered in support of Jones Day's assertion of fact.

## C.  MEREDITH WILLIAMS

58. Meredith Williams joined Jones Day's Irvine office as a first-year associate in October 2013. (Dkt. 41 at 48 (TAC ¶ 162); Bounds Decl. ¶ 10.)

**RESPONSE:** Undisputed.

59. Williams joined the Intellectual Property practice. (Bounds Decl. ¶ 10.)

**RESPONSE:** Undisputed.

60. Williams earned $160,000 per year as her starting salary. (*Id.*)

**RESPONSE:** Undisputed.

61. As of January 1, 2015, Williams's compensation was $170,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

62. As of July 1, 2015, Williams's compensation was $185,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

63. As of July 1, 2016, Williams's compensation was $205,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

64. As of July 1, 2017, Williams's compensation was $215,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

65. ▆▆▆▆▆▆ joined the Firm's Dallas office as a first-year associate in October 2013. (*Id.* at ¶ 15.)

**RESPONSE:** Undisputed.

66. ▆▆▆▆ joined the ▆▆▆▆▆▆▆▆▆▆ practice. (*Id.*)

**RESPONSE:** Undisputed.

67. ▆▆▆▆ earned $160,000 per year as his starting salary. (*Id.*)

**RESPONSE:** Undisputed.

68. As of January 1, 2015, ▆▆▆▆▆ compensation was $170,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

69. As of July 1, 2015, ▆▆▆▆▆ compensation was $180,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

70. As of July 1, 2016, ▆▆▆▆▆ compensation was $185,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

71. ▆▆▆▆ left the Firm on ▆▆▆▆▆▆▆▆. (*Id.*)

**RESPONSE:** Undisputed.

72. ███████████ joined the Firm's New York office as a first-year associate in October 2013. (*Id.* at ¶ 16.)

**RESPONSE:** Undisputed.

73. ██████ joined the ██████████████████████████ practice. (*Id.*)

**RESPONSE:** Undisputed.

74. ██████ earned $160,000 per year as his starting salary. (*Id.*)

**RESPONSE:** Undisputed.

75. As of January 1, 2015, ████████ compensation was $175,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

76. As of July 1, 2015, ████████ compensation was $210,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

77. As of July 1, 2016, ████████ compensation was $265,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

78. As of July 1, 2017, ████████ compensation was $350,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

79. ███████████ joined the Firm's Pittsburgh office as a first-year associate in October 2014. (*Id.* at ¶ 17.)

**RESPONSE:** Undisputed.

80. ███████ joined the ██████████████████ practice. (*Id.*)

**RESPONSE:** Undisputed.

81. ███████ earned $145,000 per year as his starting salary. (*Id.*)

**RESPONSE:** Undisputed.

82. As of January 1, 2016, ████████ compensation was $150,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

83. As of July 1, 2016, ███████████ compensation was $170,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

84. As of July 1, 2017, ███████████ compensation was $175,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

85. As of July 1, 2018, ███████████ compensation was $190,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

86. ███████████ joined the Firm's San Diego office as a first-year associate in October 2013. (*Id.* at ¶ 18.)

**RESPONSE:** Undisputed.

87. ███████ joined the ███████████████████ practice. (*Id.*)

**RESPONSE:** Undisputed.

88. ██████ earned $160,000 per year as his starting salary. (*Id.*)

**RESPONSE:** Undisputed.

89. As of January 1, 2015, ███████████ compensation was $170,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

90. As of July 1, 2015, ███████████ compensation was $180,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

91. As of July 1, 2016, ███████████ compensation was $190,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

92. ███████████ joined the Firm's Dallas office as a second-year associate in October 2013 after completing a judicial clerkship. (*Id.* at ¶ 19.)

**RESPONSE:** Undisputed.

93. ███████ joined the ████████████████ practice. (*Id.*)

**RESPONSE:** Undisputed.

94. ████ earned $160,000 per year as his starting salary, and it was increased to $170,000 as of January 1, 2014. (*Id.*)

**RESPONSE:** Undisputed.

95. As of July 1, 2014, ████ compensation was $185,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

96. As of July 1, 2015, ████ compensation was $205,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

97. As of July 1, 2016, ████ compensation was $220,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

98. ████ joined the Firm's Houston office as a first-year associate in October 2013. (*Id.* at ¶ 20.)

**RESPONSE:** Undisputed.

99. ████ joined the ████. (*Id.*)

**RESPONSE:** Undisputed.

100. ████ transferred to the Firm's Washington, D.C. office on January 1, 2017. (*Id.*)

**RESPONSE:** Undisputed.

101. ████ earned $160,000 per year as his starting salary. (*Id.*)

**RESPONSE:** Undisputed.

102. As of January 1, 2015, ████ compensation was $170,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

103. As of July 1, 2015, ████ compensation was $180,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

104. As of July 1, 2016, ████ compensation was $210,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

105. As of July 1, 2017, ███████ compensation was $225,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

106. ███████ joined the Firm's Irvine office as a first-year associate in October 2007. (*Id.* at ¶ 21.)

**RESPONSE:** Undisputed.

107. █████ joined the ████████████████ practice. (*Id.*)

**RESPONSE:** Undisputed.

108. █████ earned $160,000 per year as his starting salary. (*Id.*)

**RESPONSE:** Undisputed.

109. As of January 1, 2009, ███████ compensation was $175,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

110. As of July 1, 2009, ██████ compensation was $175,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

111. As of July 1, 2010, ██████ compensation was $175,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

112. As of July 1, 2011, ██████compensation was $190,000 per year. (*Id.*)

**RESPONSE:** Undisputed. In addition, as of July 1, 2012, ███████ compensation was $205,000 per year. (Dkt. 126-3 and 129-2 (public, redacted version of same) (Bounds Decl. ¶ 21).)

113. █████ left the Firm on ████████ (*Id.*)

**RESPONSE:** Undisputed.

114. ████████ joined the Firm's Irvine office as a first-year associate in October 2009. (*Id.* at ¶ 22.)

**RESPONSE:** Undisputed.

115. ████████ joined the ████████████ practice. (*Id.*)

**RESPONSE:** Undisputed.

116.████████ earned $160,000 per year as his starting salary. (*Id.*)

**RESPONSE:** Undisputed.

117. ████████s salary remained $160,000 for his entire time at the Firm. (*Id.*)

**RESPONSE:** Undisputed.

118. ████████ left the Firm on ████████. (*Id.*)

**RESPONSE:** Undisputed.

119. ████████████ joined the Firm's Irvine office as a fourth-year associate in March 2013. (*Id.* at ¶ 23.)

**RESPONSE:** Undisputed.

120. ████████ joined the ████████████ group. (*Id.*)

**RESPONSE:** Undisputed.

121. ████████ starting salary was $220,000 and it was raised to $230,000 as of July 1, 2013. (*Id.*)

**RESPONSE:** Undisputed.

122.████████ left the Firm on ████████, before going through an annual evaluation process. (*Id.*)

**RESPONSE:** Undisputed.

**D.  JONES DAY'S OFFICE-BASED SYSTEMS FOR RECRUITING, EVALUATING, AND COMPENSATING ASSOCIATES**

123. Associate recruiting at Jones Day is conducted at the office level. (Dkt. 128-30 at 3 (Reisman Tr. 44:4-9).)

**RESPONSE:** Disputed. Jones Day coordinates key aspects of the recruitment process at a Firmwide level through its Firmwide Hiring Partner. (Ex. A1 (Reisman Tr. 61: 2-17).) ████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████ (*Id.* (Reisman Tr. 55:4-16, 22-23; 82:9-19); Ex. C7 (JD_00399674 at 675-84, 713-17, 29); Ex. C10 (JD_02111939 at 45, 46, 53, 56); Ex. C11

(JD_00400151 at 72-73, 84, 88); Ex. C12 (JD_02016916).) The Firm expects office leadership to hold meetings in each office with each attorney conducting interviews to reinforce the qualities the Firm seeks. (Ex. A1 (Reisman Tr. 55:3-9, 82:9-19).) ███████████████████████████
██████████████████████████████ (Ex. C15 (JD_02111919).) ███████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████ *Id.* ███████████████████
█████████████████████████████████████████████████████████ (Ex. C12 (JD_02016916).)

124. Each office decides which recruiters to send for on-campus interviews. (Dkt. 128-30 at 6-7 (Reisman Tr. 61:22-62:2).)

**RESPONSE:** Undisputed that each office decides which recruiters to send for on-campus interviews. But it is the responsibility of the Firmwide Hiring Partner to approve how many recruiters are sent to each school and how many interviews are scheduled at each. (Ex. A1 (Reisman Tr. 60:23-61:17).) The Firmwide Hiring Partner also directs the process by which recruiters from each office are approved by office leadership. (*Id.* (Reisman Tr. 63:3-9).) And it is also the responsibility of the Firmwide Hiring Partner to ensure that the recruiting attorneys sent out to campuses are "diverse." (*Id.* (Reisman Tr. 83:2-7).)

125. Each office selects candidates that they individually as an office would like to call back for further interviews. (Dkt. 128-30 at 8, 9-10 (Reisman Tr. at 70:4-9, 74:24-75:2).)

**RESPONSE:** Undisputed that each office selects candidates they would like to call back for further interviews. But interviewers from other offices often perform initial on-campus interviews and provide feedback and recommendations for callbacks to other offices to which the candidate is applying. (Ex. A1 (Reisman Tr. 69:18-71:16); ████████████████████████████
█████████████████████████████████████████████████████████████
████████

126. Each office makes independent hiring decisions, both as to summer associates and full-time associate positions. (Dkt. 128-30 at 3, 4-5, 11-12 (Reisman Tr. at 44:4-11, 50:24-51:21, 123:16-124:15).)

**RESPONSE:** Disputed. ████████████████████████████████████████
█████████████████████████████ (Ex. C17 (JD_02018072).) ███████████████
████████████████████████████████████████████████████████████
█████████████████████████ (*Id.*) █████████████████████████████████
█████████████████████████████████████████████████████████████
██████████ (Ex. C6 (JD_00002299 at 384).) Moreover, offices cannot extend offers to an unlimited number of candidates; rather, office headcounts are centrally controlled. (Ex. A1 (Reisman 72:15-22).) Finally, to the extent that this evidence does not suffice to dispute this fact, the record

warrants further development, including through evidence specified in Plaintiffs' Rule 56(d) declaration. (Dkt. 139 (Kornblith Decl. ¶¶ 16, 18).)

127. No approval at the firm-wide level is needed for associate hiring decisions. (Dkt. 128-30 at 11-13 (Reisman Tr. at 123:16-125:7).) The Partner in Charge "PIC" of each office has discretion to set the initial compensation for lateral associate hires. (Dkt. 128-5 (Lovitt Decl. ¶ 21).)

**RESPONSE:** Disputed. An office may need to obtain approval from a firmwide practice group before it can extend an offer to a candidate. (Ex. C17 (JD_02018072).) Moreover, an office, in order to attract a particular candidate, may collaborate with another office to offer a position that is split between two cities. (*Id.*) And offices cannot extend offers to an unlimited number of candidates; rather, office headcounts are centrally controlled. (Ex. A1 (Reisman 72:15-22).) In addition, some offices also need the permission of a Regional Partner-in-Charge to make an offer to an associate. (*Id.* (Reisman Tr. 125:2-7).)

　　The Firmwide Hiring Partner Sharyl Reisman is involved in the implementation of policies on lateral hiring at the Firm. (*Id.* (Reisman Tr. 45:3-5).) ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ (Ex. C6 (JD_00002299 at 384).) ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ (*Id.*) The lateral's salary is constrained by the office's budget. (Dkt. 117-23 and 145-18 (public, redacted version of same) (Ex. P, Am. Mot. Cond. Cert.).) Finally, to the extent that this evidence does not suffice to dispute this fact, the record warrants further development, including through evidence specified in Plaintiffs' Rule 56(d) declaration. (Dkt. 139 (Kornblith Decl. ¶¶ 16, 18).)

128. The PIC in each office is responsible for making the recommendations for salary adjustments for associates in that office. (Dkt. 128-15 at 8, 10 (Lovitt Tr. at 47:22-23, 50:13-16).)

**RESPONSE:** Undisputed. When making compensation recommendations, Firm Practice Services provides PICs with a salary worksheet that includes a budget, the associate's billing rate, current compensation, billable and non-billable hours, office and practice ratings, and any rankings for the past evaluation cycle. (Dkts. 117-23 and 145-18 (public, redacted version of same), 117-25 and 145-20 (public, redacted version of same), 117-26 and 145-21 (public, redacted version of same), 117-27 and 145-22 (public, redacted version of same), 117-28 and 145-23 (public, redacted version of same) (Exs. P, R, S, T, U, Am. Mot. Cond. Cert.).)

129. Each PIC exercises independent discretion in apportioning its office compensation budget. (Dkt. 128-5 (Lovitt Decl. ¶ 24).)

**RESPONSE:** Disputed. ████████████████████████████████████████████ ████████████████ █ ████████ ████ █ ████████ ████████ █ ██████. (Ex. C8 (JD_02202966); Dkts. 117-22 and 145-17 (public, redacted version of same), 117-23 and 145-18 (public, redacted version of same) (Exs. O, P, Am. Cond. Cert. Mot.).) ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ (*Id.*) ██████████████████████████

███████████████████ (Ex. A2 (Lovitt Tr. 36:2-8).) Plaintiffs seek to depose Managing Partner Brogan and the Atlanta, Irvine, and New York Partners-in-Charge during the relevant period in order to ascertain the degree of control they exercise over associate compensation. (Dkt. 139 (Kornblith Decl. ¶¶ 16).)

130. The Firm does not have a compensation structure or ladder that is uniform across all geographic markets. (Dkt. 102-9 at 3.)

**RESPONSE:** Undisputed that the Firm does not have a compensation ladder that is uniform across all geographic markets. ████████████████████████████████████████████
█████████████████████████████████████████████ (Dkts. 117-22 and 145-17 (public, redacted version of same), 117-23 and 145-18 (public, redacted version of same) (Exs. O, P, Am. Cond. Cert. Mot.).) Plaintiffs do not understand exactly what Defendant means by the term "structure" in this context and therefore object to the term as ambiguous and further dispute that Jones Day does not have a compensation structure that is uniform across all geographic markets. The Firm has a uniform approach to compensation and a uniform process for salary adjustments that structure and define compensation at the Firm. (Dkts. 117-14 and 145-9 (public, redacted version of same), 117-15 and 145-10 (public, redacted version of same), 117-22 and 145-17 (public, redacted version of same), 117-23 and 145-18 (public, redacted version of same) (Exs. G, H, O, P, Am. Mot. Cond. Cert.)); (Dkt. 146-5 (Lovitt Decl., Opp. to Am. Mot. Cond. Cert.).)

131. Each PIC transmits a list of recommended compensation adjustments to Traci Lovitt (since late 2016) and Michael Shumaker, who review the recommendations and may suggest revisions before forwarding the recommended adjustments to the Managing Partner for approval. (Dkt. 128-5 (Lovitt Decl. ¶¶ 24-27); *see* Dkt. 128-15 at 8-9 (Lovitt Tr. 47:22-48:22).)

**RESPONSE:** Undisputed.

132. Any changes made by the Managing Partner to the recommended compensation adjustments are sent back to the PIC, who conducts another review and can challenge any changes. (Dkt. 128-15 at 9, 11 (Lovitt Tr. 48:10-22, 54:18-55:11); Dkt. 128-6 (Lovrien Decl. ¶ 28); Dkt. 125-14 (Chase Decl. Ex. 3 at 3.))

**RESPONSE:** Undisputed that PICs are informed of the Managing Partner's finalized changes to associate compensation and that PICs are told they may inform Firm leadership if something looks amiss with finalized associate compensation for their office. (Dkts. 145-30, 145-31, 145-32 (Exs. BB, CC, DD, Am. Mot. for Cond. Cert.).) Disputed that "challenge[s]" occur with any meaningful frequency such that they may be described as a meaningful practice. *See* Ex. A2 (Lovitt Tr. 51:21-52:4; 60:3-61:7).) Plaintiffs have also not had the opportunity to depose office leaders on their declaratory statements offered in support of Jones Day's assertion of fact.

133. Of the 29 pay adjustments experienced by the six named Plaintiffs collectively during their tenures at the Firm, 26 adjustments were the amounts recommended by the PICs. (Dkt. 128-10 (Coussons Decl. Ex. 1 cols. U, X, AK, AN, BC, BF, BI, BK, BX, CA, CD, CE, CS, CV, CW, DO, DS, EJ, EO, rows 3, 5, 7, 9, 11, 13).)

**RESPONSE:** Undisputed. The adjustments recommended by the PICs were ultimately approved by Firm Administrative Partner Mike Shumaker, Partner Traci Lovitt, and/or Managing Partner Stephen J. Brogan. (Dkt. 123-14 and 146-10 (public, redacted version of same) (Coussons Decl. Ex. 1, Opp. to Am. Mot. Cond. Cert.).) Furthermore, with regard to the pay decisions for Plaintiffs' named male comparators, Firm Administrative Partner Mike Shumaker, Partner Traci Lovitt, and/or Managing Partner Stephen J. Brogan rejected the local recommendations approximately 20 times. (*Id.* (columns U, X, AK, AN, BD, BC, BD, BE, BF, BI, BK, BX, BY, BZ, CA, CD, CE, CS, CT, CU, CV, CW, CZ, DA, DO, DP, DQ, DR, DS, EJ, EK, EL, EM, EN, EO).)

134. There is no firm-wide system for assigning work to associates. (Dkt. 128-15 at 79-80 (Lovitt Tr. 310:23-311:4).)

**RESPONSE:** Disputed. Jones Day communicates to associates that they are expected to build networks across the Firm, starting from the time they are summer associates, in order to secure work assignments. (Ex. A1 (Reisman Tr. 206:19-209:6)) To foster this practice, Jones Day convenes Firmwide in-person gatherings for summer associates and for new lawyers who join the Firm after graduation from law school. (*Id.* (Reisman Tr. 154:19-156:15)) ████████████
████████████████████████████████████████████████████████

135. Work assignments for new lawyers are managed by the new lawyer group coordinator in each office. (Dkt. 128-30 at 14, 15-19 (Reisman Tr. 205:5-15, 206:20-210:16).)

**RESPONSE:** Undisputed that work assignments for new lawyers are managed by the new lawyer group coordinator in each office. New lawyer group coordinators use the Firm's centralized ████████████████ to track the work of new lawyers. (Ex. A1 (Reisman Tr. 204:16-206:16).) And new lawyer group coordinators assist new lawyers in obtaining assignments from attorneys in other offices. (*Id.* (Reisman Tr. 210:10-16).)

136. Associates cannot transfer or be transferred to another office without approval from both offices' PICs. (Dkt. 128-5 (Lovitt Decl. ¶ 9).)

**RESPONSE:** Undisputed, but transfer requests must also go through a series of approvals directed by Jones Day's Firmwide Practice Services, a process which concludes with Firmwide Human Resources. (Ex. A3 (Bounds Tr. 90:14-91:6).) If there is an unexpected delay in processing the transfer request, Firmwide Human Resources will investigate the issue alongside Firmwide Practice Services. (*Id.*) Plaintiffs further note that they have not had the opportunity to depose Ms. Lovitt.

137. Inter-office transfers, where approved, are generally an accommodation to an associate, not a management decision for the benefit of the Firm. (*Id.*)

**RESPONSE:** Disputed. ████████████████████████████████████████
████████████████  ████████████████████████████████████████
████████████████████████████████████  To the extent that this evidence does not

suffice to dispute this fact, ███████████████████████████████████ ███████████████████████████ the record warrants further development, including through evidence specified in Plaintiffs' Rule 56(d) declaration. (Dkt. 139 (Kornblith Decl. ¶¶ 16, 18).)

138. During the annual review process, each Jones Day office uses its own process to rate and rank its associates and has final say over those rating and rankings. (Dkt. 128-15 at 22, 28-29, 45 (Lovitt Tr. 108:2-10, 123:19-124:4, 186:10-18); Dkt. 128-4 (Laduzinski Decl. ¶¶ 18-22); Dkt. 128-1 (Cottriel Decl. ¶¶ 11, 16, 18).)

**RESPONSE**: Undisputed that each office has final say over office ratings and rankings but disputed that each office uses its own process to rate and rank associates. The Firm provides each Partner-in-Charge with uniform instructions on assigning numerical ratings (1-5). These instructions state that ratings are intended to account for the PIC or PL's:

> overall assessment of the lawyer's performance during the evaluation period, taking into account the evaluators' written evaluations, the lawyer's productivity and other relevant contributions, if any, to the Practice, Office, or Firm. Additional considerations should include, when applicable, whether or not the lawyer assumed responsibilities and performed work of appropriate complexity at a level consistent with the Firm's expectations for lawyers with comparable time in the practice, whether a senior associate is working with and gaining exposure to a range of partners in his or her Office and Practice, and whether any part-time arrangement continues to meet the needs of both the lawyer and the Firm.

(Dkt. 117-24 and 145-19 (public, redacted version of same) (Ex. Q, Am. Mot. Cond. Cert.).) Furthermore, Plaintiffs have not had the opportunity to depose office (or practice) leaders on their declaratory statements offered in support of Jones Day's assertion of fact. Accordingly, to the extent that this evidence does not suffice to dispute this fact, the record warrants further development, including through evidence specified in Plaintiffs' Rule 56(d) declaration and the depositions of Defendant's declarants. (Dkt. 139 (Kornblith Decl. ¶¶ 15, 18).)

### Plaintiffs' Statement of Additional Material Facts

Pursuant to Local Civil Rule 7(h), Plaintiffs submit the following additional material facts that preclude summary judgment.

#### A.  Plaintiff Williams Was Paid Less than Men Who Performed Substantially Equal Work

139. When he was a third-year associate, ███████████████ (Male Associate 9) was paid $5,000 more than Plaintiff Williams when she was a third-year associate. (Dkts. 87-6 and 115-10 at 2-3 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2-3 (public, redacted version of same); Dkt. 123-14 and 146-10 at 7 (public, redacted version of same).)

140. When he was a fourth-year associate, █████████ (Male Associate 9) was paid $10,000 more than Plaintiff Williams when she was a fourth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2-3 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2-3 (public, redacted version of same); Dkt. 123-14 and 146-10 at 8 (public, redacted version of same).)

141. When he was a third-year associate, █████████ (Male Associate 8) was paid $60,000 more than Plaintiff Williams when she was a third-year associate. (Dkt. 87-6 and Dkt 115-10 at 2-3 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2-3 (public, redacted version of same); Dkt. 123-14 and 146-10 at 7 (public, redacted version of same).)

142. When he was a fourth-year associate, █████████ (Male Associate 8) was paid $135,000 more than Plaintiff Williams when she was a fourth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2-3 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2-3; Dkt. 123-14 and 146-10 at 8 (public, redacted version of same).)

143. When he was a fourth-year associate, █████████ (Male Associate 14) was paid $15,000 more than Plaintiff Williams when she was a fourth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2-3 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2-3 (public, redacted version of same); Dkt. 123-14 and 146-10 at 24, 68 (public, redacted version of same).)

144. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

145. ████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

146. ████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

147. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

148. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████

149. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████

**B.     Plaintiff Draper Was Paid Less Than Men Who Performed Substantially Equal Work**

150. When he was a third-year associate, ███████████ (Male Associate 3) was paid $30,000 more than Plaintiff Draper when she was a third-year associate. (Dkt. 87-6 and Dkt 115-10 at 2, 5 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 5 (public, redacted version of same); Dkt. 123-14 and 146-10 at 5, 7 (public, redacted version of same).)

151. When he was a fourth-year associate, ███████████ (Male Associate 3) was paid $65,000 more than Plaintiff Williams when she was a fourth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2, 5 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 5 (public, redacted version of same); Dkt. 123-14 and 146-10 at 8 (public, redacted version of same).)

152. When he was a fifth-year associate, ███████████ (Male Associate 3) was paid $80,000 more than Plaintiff Draper when she was a fifth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2, 5 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 5 (public, redacted version of same); Dkt. 123-14 and 146-10 at 7, 9 (public, redacted version of same).)

153. When he was a third-year associate, ███████████████ (Male Associate 4) was paid $30,000 more than Plaintiff Draper when she was a third-year associate. (Dkt. 87-6 and Dkt 115-10 at 2, 5 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 5 (public, redacted version of same); Dkt. 123-14 and 146-10 at 5, 8 (public, redacted version of same).)

154. When he was a fourth-year associate, ███████████████ (Male Associate 4) was paid $55,000 more than Plaintiff Draper when she was a fourth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2, 5 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 5 (public, redacted version of same); Dkt. 123-14 and 146-10 at 6, 9 (public, redacted version of same).)

155. When he was a third-year associate, ███████████ (Male Associate 2) was paid $5,000 more than Plaintiff Draper when she was a third-year associate. (Dkt. 87-6 and Dkt 115-10 at 2, 4 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 4 (public, redacted version of same); Dkt. 123-14 and 146-10 at 5, 6 (public, redacted version of same).)

156. When he was a fourth-year associate, ███████████ (Male Associate 2) was paid $35,000 more than Plaintiff Draper when she was a fourth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2, 4 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 4 (public, redacted version of same); Dkt. 123-14 and 146-10 at 6, 7 (public, redacted version of same).)

157. When he was a fifth-year associate, ███████████ (Male Associate 2) was paid $45,000 more than Plaintiff Draper when she was a fifth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2, 4 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 4 (public, redacted version of same); Dkt. 123-14 and 146-10 at 7, 8 (public, redacted version of same).)

158. When he was a third-year associate, ███████████ (Male Associate 5) was paid $30,000 more than Plaintiff Draper when she was a fourth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2,

5 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 5 (public, redacted version of same); Dkt. 123-14 and 146-10 at 6, 9 (public, redacted version of same).)

159. Beginning in July of her second year of tenure onward, Plaintiff Draper never made more than ██████████████ (Male Associate 3), ████████████████ (Male Associate 4), ██████████ (Male Associate 2), or ████████████ (Male Associate 5) when they were of equivalent tenure. (Dkt. 87-6 and 115-10 at 2, 4, 5, (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 4, 5 (public, redacted version of same); Dkt. 123-14 and 146-10 at 4-9 (public, redacted version of same).) From her third year of tenure onward, Plaintiff Draper was consistently paid less than all of four of these male associates when they were of the same tenure. (*Id.*)

160. ████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████

161. ████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████

162. ████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████

163. ████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████

164. ████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████

165. ████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████

166. ████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████

167. ████████████████████████████████████████████████
██████████████████████████████████████████████████████

███████████████████████████████████████████████████████
███████████████████

**C.   Plaintiff Henderson Was Paid Less Than Men Who Performed Substantially Equal Work**

168. When they were both second-year associates in the New York office, ███████ (Male Associate 18) was paid $20,000 more than Plaintiff Henderson. (Dkt. 87-6 and Dkt 115-10 at 2, 4 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 4 (public, redacted version of same); Dkt. 123-14 and 146-10 at 5, 6 (public, redacted version of same).)

169. When they were both second-year associates in the New York office, ███████ (Male Associate 17) was paid $15,000 more than Plaintiff Henderson. (*Id.*)

170. When they were both second-year associates in the New York office, ███████ (Male Associate 19) was paid $15,000 more than Plaintiff Henderson. (*Id.*)

171. When they were both second-year associates in the New York office, ███████ (Male Associate 16) was paid $20,000 more than Plaintiff Henderson. (*Id.*)

172. Beginning in January 2015, when they were both second-year associates in the New York office, ███████ (Male Associate 12) was paid $15,000 more than Plaintiff Henderson. (*Id.*)

173. Beginning in July 2015, when they were both second-year associates in the New York office, ███████ (Male Associate 12) was paid $30,000 more than Plaintiff Henderson. (*Id.*)

174. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████

175. ████████████████████████████████████████████████████████
██████████████████████████████████████████████ █ ████████
████████████████████████████████████████████████████████
███████████████████████████████████

**D.   Jones Day Operates as "One Firm Worldwide"**

176. Jones Day markets itself as "One Firm Worldwide." (*See* Ex. F1 (One Firm Worldwide, JONES DAY:   INSIGHTS   (last   visited   August   19,   2020), https://www.jonesday.com/en/insights/2013/05/one-firm-worldwide)) (video).)

177. At Jones Day, "One Firm Worldwide" is "more than a motto" or a ███████; it is shorthand for the Firm's integration across offices, its rejection of "artificial boundaries" and individualized profit centers, and its operation as "one organization." (*Id.* ("One firm worldwide is definitely more

than a motto, and I have to say I was actually very surprised to find that it was more than a motto, because it feels like one of those slogans that isn't really going to have any substance to it, but it really does."); *id.* (Lawyers across all 18 U.S. offices "understand and operate under the same value system."); *id.* ( *"*[T]he ethos, the compensation system, and the governance system, and the culture are all aimed toward: let's find the best resource *wherever in the Firm.*") *id.* (emphasis added); ███████████████████████████████████ The Firm also rejects "individualized profit centers." (Ex. F1.)

178. Jones Day purports to serve its clients better than its competitors because of its high level of cross-office integration and its "One Firm Worldwide" ethos. (Ex. F1) "[T]he ethos, the compensation system, and the governance system, and the culture are all aimed toward: let's find the best resource wherever in the Firm." (*Id.*) When Jones Day staffs a matter, it aims to find the best resources to serve the client without regard to where in the Firm those resources are located. (*Id.)* (*See also* Ex. B1 (Williams Tr. 94:11-23); ████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████

179. Consistent with its "One Firm Worldwide" ethos, ███████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████ The Firm also assigns an NLG Coordinator in each office to "assist and facilitate" cross office work with attorneys in other offices who want to staff new lawyers on their projects. (*id.* (Reisman Tr. at 208:9, 210:10-14).)

180. ███████████████████████████████████████████
███████████████████████████████████████████████

181. ███████████████████████████████████████████
███████████████

182. ███████████████████████████████████████████
█████████████████

183. ███████████████████████████████████████████
████████████████

184. ███████████████████████████████████████████
████████████████

185. 

186.

187.

188.

189.

190.

191.

192.

193.

194.

195.

196.

197.

198. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████

199. Among Jones Day's cases covered by legal news website Law360, approximately 50% were staffed across geographic offices between 2016 and 2018. (Ex. D8.)

200. ████████████████████████████

201. ████████████████████████████████████

202. ████████████████████████████████████
█████████

203. ████████████████████████████████████
███████████

204. ████████████████████████████████████
████████████████████████

**E.    Jones Day Has a Centralized, Firmwide Process for Setting Associate Compensation**

205. All associate compensation decisions at Jones Day, across offices and practices groups, are made by Firm Managing Partner Stephen Brogan. (Ex. F2 (Compensation, JONES DAY (as of March 15, 2019), https://www.jonesday.com/principlesandvalues/compensation/); *see also* Ex. C8 (JD_02202966).) "[The] Managing Partner has considerable management responsibility at Jones Day; that responsibility includes setting individual lawyer compensation . . . . [F]inal decisions are made by the Managing Partner." (Ex. F2).

206. The compensation process begins with budgeting. The Firm centrally determines a budget for each office and offers parameters on how that budget should be allocated. (*See* Dkt. 117-22 and Dkt. 145-17 (public, redacted version of same) (Ex. O, Pls.' Am. Cond. Cert. Mot.); Dkt. 117-23 and Dkt. 145-18 (public, redacted version of same) (Ex. P, Pls' Am. Cond. Cert. Mot.).)

207. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████

208. ████████████████████████████████████
████████████████████████ (*See* Dkt. 117-22 and Dkt. 145-17 at 2 (public, redacted version of same) (Ex. O, Pls.' Am. Cond. Cert. Mot .); Dkt. 117-23 and Dkt. 145-18 at 3 (public, redacted version of same) (Ex. P, Pls' Am. Cond. Cert. Mot.); Ex. C8



(JD_02202966) ████████████████████████████████████████
████████████████████████████████

209. PICs make preliminary compensation recommendations for the associates in their offices following a multi-month evaluation process based on centrally dictated criteria distributed to PICs by Firm Administrative Partner Shumaker. (*See* Dkt. 117-22 and Dkt. 145-17 (public, redacted version of same) (Ex. O, Pls.' Am. Cond. Cert. Mot.); Dkt. 117-23 and Dkt. 145-18 (public, redacted version of same) (Ex. P, Pls' Am. Cond. Cert. Mot.); Dkt. 117-14 and 145-9 (public, redacted version of same) (Ex. G, Pls.' Am. Cond. Cert. Mot) (Evaluation & Compensation Timeline (January 2017)); Dkt. 117-15 and 145-10 (public, redacted version of same) (Ex. H, Pls.' Am. Cond. Cert. Mot.) (Evaluation and Compensation Timeline (February 2015)).)

210. Administrative Partner Michael Shumaker and Partner Traci Lovitt review the PICs' recommendations for each U.S. associate and suggest revisions. (*See* Ex. A2 (Lovitt Tr. 30:24-31:10, 48:10-13, 266:2-4); Dkt. 117-14 and 145-9 (public, redacted version of same) (Ex. G, Pls.' Am. Cond. Cert. Mot) (Evaluation & Compensation Timeline (January 2017)); Dkt. 117-15 and 145-10 (public, redacted version of same) (Ex. H, Pls.' Am. Cond. Cert. Mot.) (Evaluation and Compensation Timeline (February 2015).)

211. The Managing Partner then has roughly three weeks to make his compensation decisions. (Dkt. 145-9 (Ex. G, Pls.' Am. Cond. Cert. Mot) (Evaluation & Compensation Timeline (January 2017)); Dkt. 117-14 and 145-10 (public, redacted version of same) (Ex. H, Pls.' Am. Cond. Cert. Mot.) (Evaluation and Compensation Timeline (February 2015).) To facilitate his decision, he is provided with each U.S. associate's office and practice ratings, ranking (if any), billable hours, PIC-recommended salary, ████████████ in a "master" spreadsheet for all associates. (Dkt. 117-34 and Dkt. 145-29 (public, redacted version of same) (Ex. AA, Am. Cond. Cert Mot.) (June 2016 Salary Decisions).) He also receives the recommendations made by Administrative Partner Shumaker and Partner Lovitt and sets each associate's final compensation. (Dkt. 117-14 and 145-9 (public, redacted version of same) (Ex. G, Pls.' Am. Cond. Cert. Mot) (Evaluation & Compensation Timeline (January 2017)); Dkt. 117-15 and 145-10 (public, redacted version of same) (Ex. H, Pls.' Am. Cond. Cert. Mot.) (Evaluation and Compensation Timeline (February 2015); Dkt. 117-31 and Dkt. 145-26 (public, less redacted version of same) (Ex. X, Plfs.' Am. Cond. Cert. Mot.).)

212. The Managing Partner does not merely rubberstamp the recommendations made by Administrative Partner Shumaker and Partner Lovitt; rather he routinely alters their recommendations resulting in changes to associates' salaries. (*See* Dkt. 123-14 and Dkt. 146-10 (public, redacted version of same) (Ex. 1, Coussons Decl.) (spreadsheet demonstrating that Managing Partner Brogan, Administrative Partner Michael Shumaker, and Partner Traci Lovitt's involvement results in finalized compensation decisions that differ from those proposed by PICs at least 23% of the time); *see* ¶ 133 *supra*.)

213. The Managing Partner may make these changes for any number of reasons. For example, the Managing Partner changes the compensation of associates with whom he has worked personally. (Ex. A2 (Lovitt Tr. 56:9–22).) He also sometimes makes changes to individual associates' compensation as a retention measure. (*Id.*)

214. Once the Managing Partner has determined the compensation for the associates in each office, the Firm Director of Practice Services advises the PIC for each office of the compensation levels set by the Managing Partner. (*See* Dkt. 145-30 (Ex. BB, Pls.' Am. Cond. Cert. Mot.); Dkt. 145-31 (Ex. CC, Pls.' Am. Cond. Cert); Dkt. 145-32 (Ex. DD, Pls.' Am. Mot. for Cond. Cert.); Ex. A2 (Lovitt Tr. 60:3-20).)

215. By written policy, no one else can alter Managing Partner Brogan's finalized compensation decisions. (Dkt. 145-30 (Exhibit BB, , Pls.' Am. Mot. for Cond. Cert.); Ex. A2 (Lovitt Tr. 51: 21-52:4, 60:3-61:7).)

216. 

217.

### F.   Other Functions at Jones Day Are Equally Centralized

218. Jones Day has a Firmwide Hiring Partner who plays a central role in recruiting across all offices. (*E.g.*, Ex. A1 (Reisman Tr.  55:22-23; 61:2-5, 12-16).)

219. The Firmwide Hiring Partner decides from which law schools and job fairs the Firm recruits associates and supervises a Law School Recruiting Manager, who oversees law school recruitment across offices. *See* Ex. A1 (Reisman Tr. 55: 22-23; 61:2-5, 12-16; 65:13-15).)

220. The Firmwide Hiring Partner provides direction to each local office in order to ensure that all Jones Day employees involved in recruiting understand the Firm's recruiting process, the Firm's recruiting objectives, and the relevant criteria for finding candidates that are a good fit for the Firm. (*See* Ex. A1 (Reisman Tr. 55:4-13, 82:9-19).)

221. 

222.

223. Recruiting at Jones Day also involves collaboration between offices. Attorneys from one office frequently interview candidates at a law school and then report their evaluations of those

candidates to attorneys in another office. (Ex. A1 (Reisman Tr. 69:18-70:6); Ex. C13 (JD_01439406); Ex. C14 (JD_02111939).)

224.

225.

226.
Ex. A1 (Reisman Tr. 125:2-7) (explaining that office PICs must get the approval of Regional PIC before extending a permanent offer to a summer associate).)

227.

228.

229.

230. The Firm's Administrative Partner, with the help of the Firmwide Practice Services department, distributes guidance to Practice Leaders (PLs) and PICs on numerically rating associates, guidance that does not vary by office or by practice.
Dkt. 117-24 and 145-19 (public, redacted version of same) (Ex. Q, Pls.' Am. Cond. Cert. Mot.).)

231.
(See Ex.



A1 (Reisman Tr. 20:7-16) (describing Michael Ginsberg as the "firmwide chair of training"); ███

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████

232. ███████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████

233. ███████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
█████████████████████████████████████████████████

234. ███████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████

235. Managing Partner Brogan personally taps partners for important roles. (Ex. A1 (Reisman Tr. 42:20-21); Ex. A2 (Lovitt Tr. 265:11-21).)

### G.   Jones Day Does Not Pay Associates Based on the Number of Hours Billed

236. Jones Day does not pay associates solely based on their hours. (Dkt. 94-10 (Ex. I, Pls.' Cond. Cert. Mot.) (excerpt from Jones Day's website, as of March 18, 2019, explaining the Firm's approach to compensation): ██████████████████████████

237. Unlike many other firms, Jones Day's compensation system is entirely salary-based and does not include a bonus component. (Dkt. 94-10 (Ex. I, Pls.' Cond. Cert. Mot.).)

238. Jones Day does not pay bonuses in part because it does not want to create the impression that compensation at Jones Day is based on associate's billable hours. (*Id.*)

239. Jones Day's compensation system is also not lockstep and therefore associates do not automatically receive raises based on seniority. (*Id.*)

240. Jones Day's compensation system uses a subjective, rather than arithmetic, standard to assess the contribution of each lawyer to the Firm and to set their compensation. (*Id.*)

241. Jones Day's compensation system purports to focus on the quality, not the quantity, of an associate's hours. Jones Day does not believe that using billable hours as a primary determinant of associate compensation is consistent with the Firm's values. (*See* Dkt. 94-10 (Ex. I, Pls.' Cond. Cert. Mot.); ███████████████████████████████████████████████████████████

242. Jones Day's compensation system is future looking, and compensation is set based on a subjective assessment of what is necessary to retain or reward the lawyer. (*See* Dkt. 117-22 and Dkt. 145-17 (public, redacted version of same) (Ex. O, Pls.' Am. Cond. Cert. Mot.); Dkt. 117-23 and Dkt. 145-18 (public, redacted version of same) (Ex. P, Pls' Am. Cond. Cert. Mot.); Ex. A2 (Lovitt Tr. 56:9-22); █████████████

## H.   The Firm Frequently Instructs Associates to Spend Working Time Looking for Employment Elsewhere, and Doing So Serves Important Functions for the Firm

243. Jones Day has a practice of instructing associates to look for other work while they remain employed by the Firm. (*See* Ex. B4 (Tolton Tr. 511:11-18); Ex. B3 (Henderson Tr. 281:2-12); ███

244. ████████████████████████████████████████

245. ████████████████████████████████████████