**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NILAB RAHYAR TOLTON et al.,

     *Plaintiffs*,

       v.

JONES DAY,

     *Defendant*.

Case No. 1:19-cv-00945-RDM

**BRIEF OF AMICA CURIAE JULIA SHEKETOFF
IN SUPPORT OF PLAINTIFFS[1]**

---

[1] Amica curiae Julia Sheketoff is submitting a motion for reconsideration covering the same issues in *Savignac v. Jones Day*, No. 1:19-cv-02443-RDM.  To save the Court from reviewing two overlapping briefs, this brief and the motion for reconsideration are identical aside from this cover page.  Amica curiae Julia Sheketoff is a member of the bar of this Court and a plaintiff in *Savignac v. Jones Day*.  Amica has an interest in this case because it raises the same legal issue as the motion for reconsideration that she is filing in the *Savignac* case.  No party's counsel authored the brief in whole or in part.  No person contributed money that was intended to fund the preparation or submission of this brief.

References to "Dkt. __" are to the docket in *Savignac v. Jones Day*, No. 1:19-cv-02443-RDM.
References to "*Tolton* Dkt. __" are to the docket in *Tolton v. Jones Day*, No. 1:19-cv-00945-RDM.

## TABLE OF CONTENTS

Introduction................................................................................................................................1

Argument .................................................................................................................................2

    A.  Statutory text ................................................................................................................2

    B.  Case law ......................................................................................................................6

    C.  Agency guidance ........................................................................................................10

    D.  Jones Day's arguments................................................................................................12

    E.  Julia's allegations ......................................................................................................19

Conclusion ..............................................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Brinkley v. Harbour Recreation Club*,
    180 F.3d 598 (4th Cir. 1999) ........................................................................10

*Carey v. Foley & Lardner LLP*,
    577 F. App'x 573 (6th Cir. 2014) ..................................................................14

*Chiaramonte v. Animal Medical Center*,
    677 F. App'x 689 (2d Cir. 2017) ......................................................15, 16, 17

\* *Corning Glass Works v. Brennan*,
    417 U.S. 188 (1974).............................................3, 5, 6, 7, 8, 13, 20, 21

*EEOC v. Port Authority*,
    768 F.3d 247 (2d Cir. 2014)...........................................................................16

*Glasser v. Hilton Grand Vacations Co.*,
    948 F.3d 1301 (11th Cir. 2020) .......................................................................5

*Goodrich v. International Brotherhood of Electrical Workers*,
    815 F.2d 1519 (D.C. Cir. 1987) .......................................................5, 9, 12, 19

*Ilhardt v. Sara Lee Corp.*,
    118 F.3d 1151 (7th Cir. 1997) ..................................................................14, 15

\* *Laffey v. Northwest Airlines, Inc.*,
    567 F.2d 429 (D.C. Cir. 1976).............................................................6, 9, 10, 20

*Ledbetter v. Goodyear Tire & Rubber Co.*,
    550 U.S. 618 (2007)........................................................................................15

*Miranda v. B&B Cash Grocery Store, Inc.*,
    975 F.2d 1518 (11th Cir. 1992) ................................................................10, 12

*Mulhall v. Advance Security, Inc.*,
    19 F.3d 586 (11th Cir. 1994) ....................................................................10, 12

\* *Musgrove v. District of Columbia*,
    458 F. App'x 1 (D.C. Cir. 2012).................................................................2, 8

*Renstrom v. Nash Finch Co.*,
    787 F. Supp. 2d 961 (D. Minn. 2011)........................................................18, 19

*Schultz v. Department of Workforce Development*,
    2011 WL 13359148 (W.D. Wis. 2011)......................................................17, 18

*Stanziale v. Jargowsky*,
 200 F.3d 101 (3d Cir. 2000) ............................................................3

*Thompson v. Sawyer*,
 678 F.2d 257 (D.C. Cir. 1982) ...................................................6, 9

*Tolton v. Jones Day*,
 2020 WL 2542129 (D.D.C. 2020) ................................................21

\* *Washington County v. Gunther*,
 452 U.S. 161 (1981) ..............................................................5, 7, 8

**Statutes**

29 U.S.C. § 206(d)(1) ......................................................... *passim*

**Rules and regulatory guidance**

29 C.F.R. § 1620.12 ................................................................14

29 C.F.R. § 1620.14 .........................................................13, 20

29 C.F.R. § 1620.16 ................................................................12

EEOC, Section 10: Compensation Discrimination (Dec. 5, 2000),
 available at www.eeoc.gov/laws/guidance/section-10-
 compensation-discrimination .........................................10, 11, 15

Federal Rule of Civil Procedure 54(b) .......................................1

## INTRODUCTION

Plaintiff Julia Sheketoff respectfully requests that the Court reconsider its dismissal of her Equal Pay Act claim.  *See* Fed. R. Civ. P. 54(b).  The Court acknowledged that "many of Defendants' arguments are unpersuasive," but it ultimately dismissed the claim on the ground that Julia "fail[ed] to allege that she worked as many hours or otherwise worked as hard as those who were paid more."  Dkt. 32 at 21, 23.  It observed that "there is a difference between alleging that a plaintiff and her comparators' jobs *require* 'equal … effort' and alleging that the plaintiff and her comparators, in fact, *performed* 'substantially equal work.'"  *Id.* at 23-24 (emphases and ellipses in original).  And it concluded that, "[b]ecause Sheketoff fails to allege that she actually performed work 'substantially equal' to the work performed by her male comparators during the relevant period, she fails to state an EPA claim."  *Id.* at 24.

Respectfully, the ruling turned on an erroneous reading of the EPA.  There is indeed a distinction between the *requirements* of a job (such as the skill, effort, and responsibility that the job requires) and any particular employee's personal *performance* in that job (such as her "quantity … of production").  But the law is clear that only the former is part of the EPA's prima facie case: An EPA plaintiff need only show that she and higher-paid men worked in substantially equal *jobs*, not that her personal *performance* of the job was quantitatively or qualitatively equal to theirs.

The EPA then allows *the defendant* to argue that the plaintiff fell short of her colleagues in terms of "quantity or quality of production" (or "any other factor other than sex").  But that is an affirmative defense.  And it requires the defendant to prove not only that the plaintiff's performance fell short, but also that the disparity in performance *caused* the disparity in pay.  Where, as here, the pay disparity was in fact caused by a false evaluation because of sex, whether it *could have been justified* by job performance is irrelevant.

The same legal question is at the heart of Jones Day's current summary judgment motion in the *Tolton* case. *See Tolton* Dkt. 147 at 19-23. Therefore, Julia is also seeking leave to file these arguments in the form of an amica curiae brief in *Tolton*.

The Court should reconsider its dismissal of Julia's EPA claim, and it should reject Jones Day's summary judgment motion.[2]

## ARGUMENT

A.      **Statutory text.** As relevant here, the EPA provides:

> No employer … shall discriminate … between employees on the basis of sex by paying wages … at a rate less than the rate at which he pays wages to employees of the opposite sex … for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1). Thus, a plaintiff establishes a prima facie case by showing that the employer paid employees of the opposite sex at a higher "rate … for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Id.* The question is: What does "equal work" mean?

---

[2] The parties on both sides in the *Savignac* case devoted little space in their briefs to the issue of whether an associate's hours are part of her prima facie case. But Plaintiffs' briefs make the two crucial points that are made at greater length here. *First*, the EPA *defines* "equal work" to mean "jobs requiring 'equal skill, effort, and responsibility' and 'performed under similar working conditions.'" Dkt. 18 at 48 (quoting *Musgrove v. District of Columbia*, 458 F. App'x 1, 2 (D.C. Cir. 2012)). *Second*, the "quality (reviews) and … quantity (hours)" of a salaried attorney's work go to the EPA's "affirmative defense that pay disparities result from 'a system which measures earnings by quantity or quality of production.'" *Id.* at 50 (quoting Dkt. 15 at 37 and 29 U.S.C. § 206(d)(1)). As Plaintiffs' surreply observed: "Jones Day does not deny that, even if Julia's lower pay had been the result of the 'quality' of her actual performance or the 'quantity' of hours she logged, that would merely enable Jones Day to assert an affirmative defense after discovery—not prevail on a motion to dismiss." Dkt. 21-1 at 18 (quoting Dkt. 19 at 20).

The Court did not address or reject these points in its opinion or at argument.

Julia's position is that the phrase "equal work" is *defined by* the language that follows, meaning that the equal work requirement is satisfied if the plaintiff shows that her better-paid male colleagues worked in "jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1); *see* Dkt. 18 at 48; *see also Tolton* Dkt. 149 at 36-37. Jones Day's position, which the Court embraced in dismissing Julia's claim, is that the phrase "equal work" instead imposes an additional requirement: The plaintiff must also show that her job *performance* (e.g., her quantity of production as measured in billable hours) equaled the performance of her male co-workers. *See* Dkt. 32 at 23-24; *Tolton* Dkt. 147 at 19-23.

The obvious difficulty with Julia's reading is that, under her view, the word "equal" in the phrase "equal work" does no real work of its own: The EPA would have the same meaning if it merely referred to a sex-based disparity in pay "for ~~equal~~ work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." Of course, courts prefer to assume that Congress would not include a word in a statute if the statute would have the same meaning without it.

But Jones Day's reading has the same problem, and to a far greater degree. The EPA provides affirmative defenses that allow an employer to avoid liability by showing (1) that the plaintiff's individual performance of her job fell short of her male comparators' performance in terms of "quantity or quality of production" or "any other factor other than sex," *and* (2) that the pay disparity was *caused by* that disparity in productivity or other non-sex-based factor. 29 U.S.C. § 206(d)(1); *see Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974) (the employer has the "burden … to show that the differential is justified under one of the Act's four exceptions"); *Stanziale v. Jargowsky*, 200 F.3d 101, 107-08 (3d Cir. 2000) (the employer must prove "not merely

that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity" (emphases in original)).  In other words, an employer that is not engaged in sex discrimination *will always win*—but it bears the burden of establishing the absence of discrimination.

It is thus clear that Jones Day would prevail *if* it could show that its female associates' lower hours were in fact the cause of their lower pay—that is, if it could establish the affirmative defense that it paid them less "pursuant to … a system which measures earnings by quantity … of production."  But it is equally clear that Jones Day is not even trying to establish such a defense.  Nor could it, since it claims that associate pay is not determined by billable hours and, indeed, pays extremely high salaries to some associates whose billable hours are well below the standard at peer firms and well below those of associates whom it pays much less.

Rather, Jones Day's position is that *the plaintiff* must show as part of her prima facie case that her "quantity … of production" (billable hours) was substantially similar to that of her better-paid colleagues.  *E.g.*, *Tolton* Dkt. 147 at 19-23; *see also* Dkt. 32 at 23-24 (adopting this view in dismissing Julia's claim).  If the plaintiff fails to do so, Jones Day contends, then the defendant wins—even if it admits that, in fact, the pay disparity was the result of sex rather than a difference in productivity or "any other factor other than sex."  *See Tolton* Dkt. 147 at 19.  (The plaintiff would then have a Title VII claim, but there was no Title VII when the EPA was passed.)

The textual flaw in Jones Day's position is clear: If the plaintiff must show that her quantitative productivity equaled that of her male co-workers to make out a prima facie case, then the affirmative defense that the employer paid men more "pursuant to … a system which measures earnings by quantity or quality of production" would never come into play.  In any case where the defendant might have established the defense, the plaintiff would have already lost for failure to

make her prima facie case; in any case where the plaintiff made her prima facie case, the defendant would be unable to establish the defense.  Thus, Jones Day's reading also results in a superfluity, and a far larger one than the single word "equal" that Julia's reading appears to treat as superfluous.  *See, e.g.*, *Glasser v. Hilton Grand Vacations Co.*, 948 F.3d 1301, 1307 (11th Cir. 2020) (Sutton, J., sitting by designation) ("we prefer the least superfluous approach—one that acknowledges some redundancy … but does not read a key clause … out of the statute").

And superfluity is not even the principal defect in Jones Day's position.  Congress made a deliberate decision that productivity disparities should be relevant only if *the employer* can show that the disparity in productivity *caused* the disparity in pay.  29 U.S.C. § 206(d)(1).[3]  Jones Day's reading would nullify Congress's choices about where to place the burden and about the need to show a causal link between the supposed productivity disparity and the pay disparity.  It would thus force plaintiffs to allege facts about their colleagues that are within the employer's control and often unavailable to employees.  (Julia does not know how many hours her male colleagues billed and therefore cannot plead those facts; and a cashier at Wal-Mart likely does not know, e.g., how many items her colleagues scan per minute.)  And it would allow employers to avoid liability for pay disparities that in fact resulted from sexism by concocting some post hoc differentiation in one of the many attributes on which employees are (or could be) evaluated.  (Jones Day has long disclaimed basing associate salaries on billable hours, and it paid Julia a very high salary with very

---

[3] *See also, e.g.*, *Corning Glass Works*, 417 U.S. at 204 (employer had the "burden of proving that the higher rate paid [to men] was *in fact* intended to serve as compensation" for working the night shift, which would be a permissible "factor other than sex" (emphasis added)); *Washington County v. Gunther*, 452 U.S. 161, 168 (1981) ("the Act's four affirmative defenses exempt any wage differentials *attributable to* seniority, merit, quantity or quality of production, or 'any other factor other than sex'" (emphasis added)); *Goodrich v. International Brotherhood of Electrical Workers*, 815 F.2d 1519, 1523-24 (D.C. Cir. 1987) ("The burden is on the defendant to prove that unequal payments are made pursuant to some legitimate, non-sex-based factor.").

large raises despite her consistently low billables.)  That is not the law.  *See, e.g.*, *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 450 (D.C. Cir. 1976) ("The employer may not fabricate an after-the-fact rationalization for a sex-based pay difference."), *abrogated on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988).

The text, structure, and manifest purpose of the EPA thus require rejection of Jones Day's position.  *See, e.g.*, *Corning Glass Works*, 417 U.S. at 208 ("The Equal Pay Act is broadly remedial, and it should be construed and applied so as to fulfill the underlying purposes which Congress sought to achieve.").  In any event, the Court need not decide based on the text alone.

**B.**   **Case law.**  Binding case law confirms the correctness of Julia's reading.  The logical starting place is *Corning Glass Works*, the Supreme Court's "only full-scale treatment of the Equal Pay Act," *Thompson v. Sawyer*, 678 F.2d 257, 271 (D.C. Cir. 1982).  There, the Court considered the statutory text and legislative history of the EPA at great length in discussing "the Act's *definition of equal work*."  417 U.S. at 199 (emphasis added); *see id.* at 199-201.

"As originally introduced, the Equal Pay bill required equal pay for 'equal work on jobs the performance of which requires equal skills.'"  *Id.* at 199.  At the House and Senate committee hearings, however, "witnesses were highly critical of the Act's *definition of equal work*" because most companies set wages based on "job evaluation plans" that "took into consideration four separate factors in determining job value—skill, effort, responsibility and working conditions." *Id.* (emphasis added).  Compared to those industry plans, "the definition of equal work used in the first drafts of the Equal Pay bill was criticized as unduly vague and incomplete.  Industry representatives feared that as a result of the bill's definition of equal work, the Secretary of Labor would be cast in the position of second-guessing the validity of a company's job evaluation system."  *Id.* at 199-200.

"[I]n amending the bill's *definition of equal work* to *its present form*, the Congress acted in direct response to these pleas":  "*The concept of equal pay for jobs demanding equal skill [was] expanded to require also equal effort, responsibility, and similar working conditions*."  *Id.* at 200 (emphases added).  In the end, "*the Act's amended definition of equal work incorporated* the specific language of the job evaluation plan described at the hearings by Corning's own representative—that is, *the concepts of 'skill,' 'effort,' 'responsibility,' and 'working conditions.'*" *Id.* at 201 (emphases added).

In short, then, the Supreme Court held that the phrase "equal work" is *defined by* the notion that the "jobs [must] require[] equal skill, effort, and responsibility, and [be] performed under similar working conditions."  29 U.S.C. § 206(d)(1).  *Corning Glass Works* confirms Julia's view that "equal work" simply means that the plaintiff and her better-paid comparators perform work in substantially equal jobs.  The phrase "equal work" does *not* add into the prima facie case any requirement that the plaintiff show that the quality or quantity of her own job *performance* was "equal" to the performance of her male colleagues.  (Indeed, such a showing would hardly be possible in cases like *Corning Glass Works*, where a large group of female workers, or the government on their behalf, challenge a systematic pay disparity.)  Instead, the question of individual performance is addressed by the EPA's affirmative defenses.  The Supreme Court's reading thus gives meaning to the third affirmative defense ("quantity or quality of production"), whereas Jones Day's position would nullify it.

In *County of Washington v. Gunther*, the Supreme Court considered whether, as a result of the so-called Bennett Amendment, a Title VII plaintiff must meet "the equal work standard of the Equal Pay Act of 1963."  452 U.S. 161, 165 (1981).  Like *Corning Glass Works*, *Gunther* treats "the equal work standard" as synonymous with the EPA's requirement that the plaintiffs perform

work in "jobs [that are] substantially equal to those of the male [comparators]." *Id.*; *see also, e.g.*, *id.* at 166 n.8 (referring to the plaintiffs' failure to show that their *jobs* were substantially equal to the *jobs* of their male comparators as a "failure to satisfy *the equal work standard* of the Equal Pay Act" (emphasis added)); *id.* at 168 (similar). The Court noted that "*the 'equal work' standard* of the Equal Pay Act … *means* that a woman who is discriminatorily underpaid could obtain no relief … unless her employer also employed a man *in an equal job*." *Id.* at 178 (emphases added); *see also id.* at 179 ("women holding jobs not equal to those held by men would be denied the right to prove that the system is a pretext for discrimination"); *id.* (the "equal work" requirement means that "a female auditor thus might have a cause of action while a female secretary might not").

The Court nowhere hinted that the "equal work" standard entails a comparison of the plaintiffs' and comparators' productivity. That is because the standard calls for a comparison of the requirements of the jobs, not any individual's performance of the job. The phrase "equal work" is defined by the statutory requirement that the jobs require equal skill, effort, and responsibility, and be performed under similar conditions. The dissenters showed the same understanding: "The Equal Pay Act states that employers shall not discriminate on the basis of sex by paying different wages for *jobs* that require equal skill, effort, and responsibility." *Id.* at 184 (Rehnquist, J., dissenting) (emphasis added).

The D.C. Circuit shares this understanding of the EPA. Citing *Corning Glass Works*, it has explained that an EPA plaintiff must "meet her burden to show that a reasonable jury could find that the [defendant] paid her male counterparts more money 'for equal work'—*that is*, for jobs requiring 'equal skill, effort, and responsibility' and 'performed under similar working conditions.'" *Musgrove v. District of Columbia*, 458 F. App'x 1, 2 (D.C. Cir. 2012) (quoting 29

U.S.C. § 206(d)(1)) (emphasis added).  In other words, "equal work" *means* "jobs requiring 'equal skill, effort, and responsibility' and 'performed under similar working conditions.'"

Another decision says: "The initial burden to prove wage disparity and job equality is on the plaintiff."  *Goodrich v. International Brotherhood of Electrical Workers*, 815 F.2d 1519, 1523 (D.C. Cir. 1987).  So there are two requirements for a prima facie case: (1) the employer paid workers of the opposite sex more ("wage disparity"), and (2) their jobs were substantially equal to the plaintiff's ("job equality").  The phrase "equal work" simply means "job equality": "*Equal work* under the Act does not mean that *the jobs being compared* must be 'identical,' but they must be more than merely 'comparable,' *i.e.*, capable of being compared. … The inquiry focuses on the primary duties of each job, not those which are incidental or insubstantial."  *Id.* at 1524 (emphases added); *see also, e.g.*, *Thompson*, 678 F.2d at 275 ("To prove a violation under the Equal Pay Act, plaintiffs need only show their *jobs* were equal to *the jobs* of some bookbinders" (emphases added)); *Laffey*, 567 F.2d at 449 ("if in the aggregate the *jobs* require substantially similar skills, efforts and responsibilities, *the work will be adjudged equal* despite minor variations" (emphases added)).

Thus, "in comparing two jobs, only the skills *actually required* by those jobs, not the abilities of the persons currently in those positions are relevant."  *Goodrich*, 815 F.2d at 1524 (emphasis added).  And what is true of "skill" is equally true of "effort," which the statute mentions in parallel with skill: Just as only "the skills actually required by th[e] job[]" (and not the skills of the actual employees) are relevant, only the "effort" "require[d]" by the "job" (and not the effort of the persons currently in those positions) is relevant.

To return to this Court's phrasing, once the plaintiff shows that her and "her comparators' jobs *require* 'equal … effort,'" there is no further requirement that she show that she and her

comparators "in fact[] *performed* 'substantially equal work'" in the sense of billing the same number of hours.  Dkt. 32 at 24.  To the contrary, the law is clear that "the phrase 'equal work' … *mean[s] that the jobs* … must be 'substantially equal.'"  *Laffey*, 567 F.2d at 449 (emphases added).  If "two jobs require equal 'skill, effort, and responsibility,'" then they "command equivalent salaries under the Equal Pay Act."  *Id.* at 445.  The prima facie case requires nothing more.

Other courts of appeals agree: "In Equal Pay Act cases, we compare the jobs, not the individual employees holding those jobs.  Only the 'skills and qualifications actually needed to perform the jobs are considered.'"  *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 592 (11th Cir. 1994) (citation omitted); *see also, e.g.*, *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 613 (4th Cir. 1999) ("To establish a prima facie case, [the plaintiff] must prove: (1) that her employer has paid different wages to employees of opposite sexes; (2) that said employees hold *jobs* that require equal skill, effort, and responsibility; and (3) that such *jobs* are performed under similar working conditions." (emphases added)), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992) ("Once the disparity in pay between substantially similar *jobs* is demonstrated, the burden shifts to the defendant. … A plaintiff establishes a *prima facie* case by comparing the *jobs* held by the female and male employees, and by showing that those *jobs* are substantially equal, not by comparing the skills and qualifications of the individual employees holding those jobs." (emphases added)).

C.    **Agency guidance.**    The EEOC's guidance on compensation discrimination provides further confirmation: "The important comparison in determining whether the 'equal work' requirement is met is the comparison of the jobs, not the people performing the jobs.  Thus, a difference between the comparators has no bearing on whether the jobs are equal."  EEOC,

10

Section 10: Compensation Discrimination 10-IV.E.2 (Dec. 5, 2000).  "The complainant need only demonstrate a sex-based wage disparity in substantially equal jobs in the same establishment."  *Id.* at 10-IV.B.  Of course, "a difference between comparators could qualify *as a defense* to a compensation disparity."  *Id.* at 10-IV.E.2 (emphasis added).

Indeed, the guidance happens to address almost the precise factual scenario at issue here: a female law firm associate who bills fewer hours than a higher-paid man.  The guidance distinguishes between the plaintiff's *job requirements*, which are relevant to the plaintiff's prima facie case, and her *job performance*—specifically, her billable hours—which is relevant (if at all) only to the employer's affirmative defense.  Discussing that affirmative defense issue, the guidance provides these two examples:

> **Example 40:** CP, an associate attorney at a mid-sized law firm, claims that she was hired at a lower starting salary than a male attorney who performs the same work. *The employer proves* that it offered a higher salary to the male *because* he brought clients to the firm who generated substantial revenue, while CP brought in no clients.  This evidence establishes [the affirmative defense] that a factor other than sex justified the compensation disparity.

> **Example 41:** Same as Example 40, except neither CP nor her male comparator brought clients to the firm at the time they were hired.  But in the four years *since their hire*, the male comparator has generated more revenue than CP due to cultivating a better relationship with the firm's clients, bringing in a couple clients of his own, and *consistently producing more billable hours than CP*.  The investigation reveals, however, that the firm has given the male attorney more exposure to firm clients (e.g., more chances to work one-on-one with clients), and provided the male attorney more opportunities to speak at legal seminars, giving him valuable exposure to potential clients.  The evidence also shows that the firm's partners provide CP with less complex work, *exacerbating the difference in billable hours*.  In this variation of the example, *revenue production is not a valid factor other than sex*.

*Id.* at 10-IV.F.2.f (emphases added).  In other words, a difference in billable hours is not fatal—or even relevant—to the plaintiff's prima facie case.  Indeed, a difference in billable hours is not even sufficient to support an employer's affirmative defense unless the employer can show *both* that the difference in hours was the cause of the pay disparity *and* that the difference in hours was not itself

ultimately attributable to sex.  In both *Savignac* and *Tolton*, Jones Day does not even try to make either showing.

    **D.**    **Jones Day's arguments.**  Jones Day's position has no support in the law.  In the *Savignac* case, it never squarely argued that a plaintiff's billable hours were part of her prima facie case; it certainly produced no authority for such a reading of the EPA.  *See* Dkt. 21-1 at 18.  And even in its motion for summary judgment on that ground in the *Tolton* case, it has failed to locate a single authority in its favor, and its textual arguments unravel readily.

    **1.**    Start, again, with the text.  In its *Tolton* brief, Jones Day offers that "[o]ne facet of an employee's work, highlighted by the statute, is the 'effort' that goes into it.  29 U.S.C. § 206(d)(1) (listing 'effort' as one of the elements for comparability)."  *Tolton* Dkt. 147 at 19. Jones Day conveniently omits the accompanying text, which makes clear that the "effort" in question is the effort "require[d]" to do the job, not the amount of effort that any particular employee puts in.  29 U.S.C. § 206(d)(1); *see, e.g.*, *Goodrich*, 815 F.2d at 1524; *Mulhall*, 19 F.3d at 592; *Miranda*, 975 F.2d at 1533; 29 C.F.R. § 1620.16(a) ("The jobs to which the equal pay standard is applicable are jobs that *require* equal effort to perform." (emphasis added)).

    Needless to say, Jones Day's argument is not that its male associates' jobs *require* more effort (i.e., billable hours) than the female plaintiffs' jobs.  To the contrary, its argument is that the female plaintiffs' performance (measured by billable hours) *fell short of its requirements*.  Jones Day says this explicitly in its *Tolton* brief: "[T]he [f]irm … *requires* a reasonable level of productivity on paying work—a level that [the plaintiff] never approached."  *Tolton* Dkt. 147 at 22 n.8 (emphasis added).  Quite plainly, then, Jones Day's argument is not that women's jobs "require[d]" less "effort" than men's jobs (a point that would go to the prima facie case), but rather that the women deserved lower pay on account of their lower "quantity … of production."

If this is not an argument about "quantity or quality of production," then it is hard to imagine what would be.  Jones Day's position would nullify Congress's deliberate inclusion of that affirmative defense.  Yet it never even tries to grapple with this point.[4]

Jones Day also shoots itself in the foot when it claims that it paid one of the *Tolton* plaintiffs "more than all" of her male comparators, even though the comparators "billed vastly more." *Tolton* Dkt. 147 at 13 & n.3; *see also id.* at 15 ("[the plaintiff] earned *more* than most of these associates" but "recorded fewer hours" than most).  It likewise asserts that Julia "was a highly paid associate … despite the fact that … her contribution to billable client representations was below expectations."  Dkt. 26-1 at 22.  But an employer can hardly pay a plaintiff as much as (or more than) her male co-workers and then insist that her job actually deserved *less* pay:

> In determining whether job differences are so substantial as to make jobs unequal, it is pertinent to inquire whether and to what extent significance has been given to such differences in setting the wage levels for such jobs.  Such an inquiry may, for example, disclose that apparent differences between jobs have not been recognized as relevant for wage purposes and that the facts as a whole support the conclusion that the differences are too insubstantial to prevent the jobs from being equal in all significant respects under the law.

29 C.F.R. § 1620.14.  This reflects the commonsense notion that an employer cannot claim that two jobs do not meet the "equal work" standard when the employer "itself has always equated" them.  *See Corning Glass Works*, 417 U.S. at 203.[5]

---

[4] Jones Day urges that billable hours are important to a law firm's revenue.  *Tolton* Dkt. 147 at 20.  No one doubts that they are, or that many firms reasonably consider hours in setting pay.  *See id.* at 20-21.  But those truisms do not address the legal question at issue here: whether the number of hours billed by a law firm associate goes to her prima facie case ("equal work") or to the affirmative defense based on "quantity … of production."  29 U.S.C. § 206(d)(1).

[5] Of course, an EPA plaintiff must show that (1) she was paid less than co-workers of the opposite sex (2) for substantially equal work.  If she was never paid less than any male co-worker, then she cannot make the first showing (unequal pay).  The point is that the employer's historical practice of paying the plaintiff as much as her male co-workers supports her on the issue of "equal work."

Finally, Jones Day notes that if its salaried employees were viewed as hourly workers, then the female plaintiffs were actually paid at *higher* hourly "rates" than their male comparators. *Tolton* Dkt. 147 at 22.  But "[t]he term wage 'rate,' as used in the EPA, refers to the standard or measure by which an employee's wage is determined."  29 C.F.R. § 1620.12(a).  Jones Day has chosen to pay its associates annual salaries (paid on a bi-monthly basis) rather than by the hour like contract attorneys.  It therefore cannot prevent an associate from making her prima facie case with sophistries about what her "rate" would be if, counterfactually, she were an hourly worker.  Allowing an employer to redefine a plaintiff's "rate" for purposes of the prima facie case using some metric of "quantity … of production" as the denominator would transform Congress's affirmative defense into part of the plaintiff's burden just as surely as redefining "equal work" to incorporate quantity of production.  *See Tolton* Dkt. 147 at 22 (conceding that the "rate" argument is just "[a]nother way of making the same point" as the "equal work" argument).  Again, that is not the law.[6]

**2.**      As for case law, it would be unremarkable if Jones Day, with its vast resources, had found a few non-binding rulings supporting its position.  But it has found none.  Its citations (all of them out-of-circuit) fare no better than its textual arguments.  *See Tolton* Dkt. 147 at 20.

It leads with *Ilhardt v. Sara Lee Corp.*, a Title VII and FMLA case that had *nothing* to do with the EPA and says *nothing* about the EPA's "equal work" standard.  118 F.3d 1151 (7th Cir.

---

[6] Jones Day's sole citation on the "rate" point, *Carey v. Foley & Lardner LLP*, 577 F. App'x 573 (6th Cir. 2014), does not support its position.  There, a male law firm partner claimed that he was paid at a lower "rate" than female partners because his "total compensation divided by billable hours" was lower than theirs.  *Id.* at 579.  The Sixth Circuit did not endorse this measure or discuss whether Foley actually purported to set partner compensation on that basis.  *See id.*  It had no need to get into those "rate" questions, because it affirmed summary judgment against the partner for lack of a valid comparator.  *Id.* at 579-80.  An argument merely raised by a plaintiff but never passed on by a court—not even in dicta in an unpublished, out-of-circuit ruling—is not the law.

1997).  Jones Day cites *Ilhardt* to argue that it is "generally inappropriate to compare part-time and full-time employees."  *Tolton* Dkt. 147 at 20.  "The simple answer to this argument is that the EPA and Title VII are not the same."  *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007).  The issue here is not what Jones Day views as "generally inappropriate," but rather the congressionally established division of labor between the "equal work" standard that defines the prima facie case and the affirmative defense based on "quantity … of production."  A ruling that never mentions the EPA or its "equal work" standard does not move the ball forward.[7]

Anyhow, Jones Day is not suggesting that it actually assigns women to "part-time" jobs while giving their male colleagues "full-time" jobs.  Again, its position is that it "requires a reasonable level of productivity on paying work—a level that [the plaintiff] never approached."  Dkt. 147 at 22 n.8.  In other words, *Jones Day's own position* is that its associate jobs "require[]" equal effort from women and men alike, but that the female plaintiffs "never approached" that "require[d] … level of productivity."  *Id.*  Under the plain text of the statute, Jones Day is *conceding* the prima facie case (the effort "require[d]" by the jobs) and arguing in terms of the third affirmative defense ("quantity … of production").  But it cannot establish that affirmative defense, which requires it to show that the productivity disparity *caused* the pay disparity.  *E.g.*, *Stanziale*, 200 F.3d at 107-08.  It makes no attempt to establish causation.

Jones Day's next case (*see* Dkt. 147 at 20) is the unpublished summary order in *Chiaramonte v. Animal Medical Center*, 677 F. App'x 689 (2d Cir. 2017).  While Jones Day offers

---

[7] The EEOC's position is that, under the EPA, an employee's part-time versus full-time status is relevant only to the employer's affirmative defense that a disparity is based on a factor other than sex, and *not* to the plaintiff's prima facie case.  *See* EEOC, Section 10: Compensation Discrimination 10-IV.F.2.h.  And Jones Day identifies no other cases suggesting that part-time and full-time positions are unequal jobs under the EPA.  So even Jones Day's starting point—that "a formal full-time/part-time dichotomy" would play into the prima facie case—is without support. *See Tolton* Dkt. 147 at 20.

a cherrypicked quotation, the short order supports Julia's view.  It confirms that "the equal work inquiry … requires evidence 'that *the jobs compared* are substantially equal.'"  *Id.* at 691 (quoting *EEOC v. Port Authority*, 768 F.3d 247, 255 (2d Cir. 2014)) (emphasis added).  Thus, "a plaintiff must establish that *the jobs* compared entail *common duties or content*."  *Id.* (first emphasis added).  Chiaramonte, a veterinarian, failed to make her prima facie case because her "responsibilities … entailed primarily public-relations-type duties as well as primary care" and "[s]he performed basic treatments—parallel to those performed by a general practitioner—and would refer patients to specialists if necessary."  *Id.*  Indeed, "the overwhelming majority of [her] work … could be performed by technicians and aides.  By contrast, [her] better-paid male colleagues practiced in specialized areas of veterinarian medicine and performed complex procedures."  *Id.*  Her job further differed from the comparators' in that she "was not responsible for supervising interns or other veterinarians" and "could go months without treating patients," whereas "[s]ome of her better-paid male colleagues … treated up to 15 patients a day."  *Id.*

In short, because the plaintiff's job required "primarily public-relations-type duties" along with some very basic medical work that "could be performed by technicians and aides," whereas the better-paid men did not do public relations work and performed specialist surgical procedures that required more than a technician's or aide's level of skill, the plaintiff's position would have "essentially require[d] the court to embrace the principle that the work of all veterinarians is equivalent."  *Id.*  That would be wrong, because some veterinarian jobs *require* more skill, effort, and responsibility than others, meaning that they are not "equal work" under the EPA.  Nothing in *Chiaramonte* supports the notion that a plaintiff's quantitative or qualitative productivity is part of her prima facie case rather than related (as the text indicates) to the defendant's affirmative defenses.  Chiaramonte's job required much less medical skill and supervisory responsibility than

her male comparators' jobs, so she deserved to lose under the correct understanding of the equal work standard.  The reference to the number of patients treated simply showed that the male comparators' jobs were focused on highly skilled medical work while the plaintiff's job was focused on public relations and low-skilled treatments.  To analogize itself to the defendant in *Chiaramonte*, Jones Day would have to show that associate jobs at Jones Day require men to handle the complex legal work while requiring women to do "public relations" work (on-campus interviews, perhaps) and legal assignments that could just as well be performed by paralegals. Jones Day has yet to embrace that dubious strategy.

Jones Day's next case, *Schultz v. Department of Workforce Development*, 2011 WL 13359148 (W.D. Wis. 2011), rightly acknowledges that, "[t]o meet her prima facie burden, [the plaintiff] … only … need show that *the jobs* are substantially equal."  *Id.* at *4 (emphasis added). By contrast, the plaintiff's "quantity … of production" goes to *the defendant's* "burden."  *Id.* at *3.  The court found that the jobs were not substantially equal because "additional responsibilities beyond those held by" the plaintiff were added to the plaintiff's former position when her male successor replaced her.  *Id.* at *4; *see also id.* at *2-3 (discussing how the employer increased "the responsibilities of the position" when it replaced the plaintiff with her male successor); *id.* at *4 (describing the male successor's "significant additional responsibilities beyond those held by" the plaintiff, such as providing "monthly briefings to high-ranking" officials).

Jones Day omits all of this, quoting only the statement that "unlike [the plaintiff], who was permitted to leave work at 3:15 every day, [the male successor] *is expected* to work normal full-day business hours."  *Id.* at *4 (emphasis added); *see Tolton* Dkt. 147 at 20.  The court was pointing out that though the plaintiff and her successor had the same job *title*, their actual jobs "require[d]" very different things.  Jones Day never suggests that, like the employer in *Schultz*, it "expected"

17

more of its male associates relative to female associates with the same title, practice group, office, and level of seniority.  To the contrary, it avers that it "requires a reasonable level of productivity on paying work" from men and women alike and faults the female plaintiffs for supposedly falling short of that "require[d] … level of productivity."  Dkt. 147 at 22 n.8.  Whether they fell short or not, though, a supposed disparity in quantity of production is an affirmative defense, not a flaw in the prima facie case.  Nothing in *Schultz* suggests otherwise.

Jones Day's final cited ruling on this point, *Renstrom v. Nash Finch Co.*, 787 F. Supp. 2d 961 (D. Minn. 2011), is even more irrelevant.  The plaintiff was head grocery buyer for the defendant's distribution center in St. Cloud, Minnesota.  *Id.* at 962.  She was paid less than two men who held the same title: the head buyer for the Omaha center and the head buyer for both the Fargo and Minot centers.  *Id.* at 963.  The court held that the plaintiff had "not demonstrated that she performed work equal to that of" the male comparators.  *Id.* at 967.  The court made clear that "it is the actual requirements of the job that control" (*id.*), not—as Jones Day suggests—the plaintiff's "level of productivity on paying work" (*Tolton* Dkt. 147 at 22 n.8).  But the two male comparators' jobs "required" substantially more "effort" than the plaintiff's job.  787 F. Supp. 2d at 967-70.  One of the men was "the head grocery buyer for *two* distribution centers that are approximately 300 miles apart," giving him "double the responsibility."  *Id.* at 968 (emphasis added).  And the other man "ha[d] a greater workload than a typical head grocery buyer" because his distribution center in Omaha was "nearly twice as large as" the plaintiff's center and he also "served 18 military facilities."  *Id.*

In short, the male comparators' jobs *required* far more effort than the plaintiff's.  The one fact that Jones Day picks out from the ruling—the plaintiff worked 40 hours per week while one comparator worked 50 and the other worked 60 or more (*Tolton* Dkt. 147 at 20)—simply

confirmed that the two men's jobs required much more effort than the plaintiff's job. It was not comparable to a law office, where some associates bill more hours than others even though they have the same job requirements. The amount of "effort" that a job "requires" is undoubtedly part of the prima facie case. 29 U.S.C. § 206(d)(1). But again, unlike the employer in *Renstrom*, Jones Day does not say that its male associates' jobs require more effort. It simply asserts that men had a higher quantity of production in terms of billable hours. *See Tolton* Dkt. 147 at 19, 21. If that assertion goes to the prima facie case, then Congress's decision to include an express affirmative defense based on "quantity or quality of production" means nothing.

**E.     Julia's allegations.** Considered under the proper standard, Julia's allegations strongly support the inference that she and higher-paid male Issues & Appeals associates of the same seniority performed substantially "equal work." "A determination of substantial equality involves an inquiry into whether the jobs are substantially related and substantially similar in skill, effort, responsibility and working conditions. The inquiry focuses on the primary duties of each job, not those which are incidental or insubstantial." *Goodrich*, 815 F.2d at 1519 (citation omitted).

"Jones Day's Issues & Appeals practice group" is the firm's "Supreme Court and appellate practice group." Dkt. 1 at 2; *see also id.* at 3 (Julia "is an appellate attorney"). The Issues & Appeals group is led by Defendant Beth Heifetz, who assigns work to associates in the group. *Id.* at 1-2, 4, 7-8, 10. "Issues & Appeals associates frequently draft Supreme Court briefs." *Id.* at 7. Julia, Mark, and another "well-respected male attorney in the Issues & Appeals group" all worked with Partner A. *Id.* at 10. Like others in the Issues & Appeals group, Julia "served as a law clerk at … the Supreme Court." *Id.* at 8. "Supreme Court clerks who join Jones Day's Issues & Appeals group" are generally "enticed by Jones Day's offer of … interesting work [and] substantially lower billable hours expectations than peer firms." *Id.* at 6. "Jones Day does not impose any billable

hours requirement on its associates." *Id.* at 7.  And "a number of Issues & Appeals associates have been promoted [to partner] or given large raises after working substantially fewer [than 1900] hours." *Id.*

Importantly, until her salary was held back as a result of Partner A's sex-based evaluation, Julia was paid the same as other "male Issues & Appeals associates." *Id.* at 12.  That history of pay equality alone raises a plausible inference of job equality: Where "apparent differences between jobs have not been recognized as relevant for wage purposes," such differences may be "too insubstantial to prevent the jobs from being equal in all significant respects under the law." 29 C.F.R. § 1620.14; *see also Laffey*, 567 F.2d at 449.  And here, there are no apparent differences between jobs to begin with.

Moreover, "every Supreme Court clerk since at least 2014 who has remained at Jones Day until becoming eligible for promotion to partner" has "been promoted to partner," showing that Jones Day treats associates with that background (Supreme Court clerk) in that practice group (Issues & Appeals) alike.  *Id.* at 8.  When a law firm groups associates with the same uncommon background into a single practice group where they perform "Supreme Court and appellate work" (that is, "draft[ing] … briefs"), pays them the same salaries, and offers them the same path to partnership, it is an eminently plausible inference that associates at the same level of seniority within that group and in the same office have substantially similar jobs.  *See Corning Glass Works*, 417 U.S. at 203 (declining to differentiate between jobs where the employer "itself has always equated" them).  In short, many facts support the complaint's allegation that the "jobs of Issues & Appeals associates of the same level of seniority are jobs the performance of which requires equal

skill, effort, and responsibility, and which are performed under similar working conditions." Dkt. 32 at 23 (quoting Dkt. 1 at 29).[8]

Needless to say, although Julia is not in a position to allege how many hours her male co-workers billed (and the EPA does not require her to do so), she could easily provide more detail about the work of an associate in the Supreme Court practice of a major D.C. law firm. She respectfully submits, however, that Rule 8 does not require further detail at the pleading stage. *See also Laffey*, 567 F.2d at 449 ("if in the aggregate the jobs require substantially similar skills, efforts and responsibilities, the work will be adjudged equal despite minor variations"). Indeed, Julia's allegations are far more detailed and plausible than the ones held sufficient in the other cases that this Court described with approval in its pleading-stage *Tolton* decision and the ones that the Court held sufficient to state a claim for Plaintiffs Williams and Henderson. *See Tolton v. Jones Day*, 2020 WL 2542129, at *28-30 (D.D.C. 2020); *see also, e.g.*, *id.* at *29 ("The facts that the plaintiff and her alleged comparators occupied 'director' roles and worked in the same department could support a plausible inference that they performed substantially similar work."); *id.* (sufficient "allegations might include that the plaintiff and her alleged comparators worked in the same department, held the same level of seniority, or their job descriptions substantially matched").

---

[8] The Court rightly concluded that, while "the complaint does not identify any comparators by name," it describes them sufficiently to put Jones Day on notice and satisfy Rule 8's requirements. Dkt. 32 at 23; *see also Tolton* Dkt. 47 at 25 (Jones Day brief disclaiming any requirement that a plaintiff identify comparators by name).

**CONCLUSION**

A plaintiff claiming sex discrimination in violation of the EPA is not obliged to show that she "worked as many hours or otherwise worked as hard as those who were paid more."  Dkt. 32 at 23.  Rather, Congress placed the burden on the defendant to establish, if it can, that it paid the plaintiff less than her male colleagues "pursuant to … a system which measures earnings by quantity … of production" or "any other factor other than sex."  29 U.S.C. § 206(d)(1).

The Court should reconsider its dismissal of Julia's EPA claim and deny Jones Day's summary judgment motion in the *Tolton* case.

/s/ Julia Sheketoff
Julia Sheketoff (pro se)
2207 Combes Street
Urbana, IL 61801
(202) 567-7195
sheketoff@gmail.com
D.C. Bar No. 1030225

September 9, 2020