# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NILAB RAHYAR TOLTON, *et al.*, | ) | Civ. No. 1:19-00945 (RDM) |
|  | ) |  |
| *Plaintiffs*, | ) |  |
|  | ) | **REPLY MEMORANDUM IN** |
| *v.* | ) | **SUPPORT OF DEFENDANT'S** |
|  | ) | **MOTION FOR SUMMARY** |
| JONES DAY, | ) | **JUDGMENT ON COUNT IV** |
|  | ) | **(EQUAL PAY ACT)** |
| *Defendant.* | ) |  |


Mary Ellen Powers
Beth Heifetz
Yaakov Roth
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939

Terri L. Chase (*pro hac vice* granted)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

*Attorneys for Defendant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................. 3

I.   HENDERSON'S JOB SEARCH DOES NOT CONSTITUTE "EQUAL WORK." .............................. 3

II.  DRAPER CANNOT SATISFY THE "EQUAL WORK" ELEMENT OF HER *PRIMA FACIE*
     CASE WHEN HER COMPARATORS WORKED TWICE AS MUCH ........................................... 6

     A.   Draper Cannot Bear Her *Prima Facie* Burden To Establish "Equal Work"
          When She Billed Fewer Than Half As Many Hours As Her Comparators .......... 6

     B.   Draper Cannot Save Her Claim By Identifying New Comparators .................... 11

III. WILLIAMS EARNED MORE THAN HER AVERAGE IRVINE COMPARATORS, AND
     CANNOT COMPARE HERSELF TO ASSOCIATES IN OTHER JONES DAY OFFICES ................. 14

     A.   Applying the Correct Legal Standard, Jones Day's 18 Offices Across the
          United States Are Not a Single "Establishment" Under the EPA ...................... 15

     B.   Williams Cannot Selectively Cherry-Pick Her Comparators ............................ 23

     C.   Williams' New Comparators Are Inadmissible, Irrelevant, and Inadequate ....... 23

IV.  FURTHER DISCOVERY COULD NOT REVIVE THESE EPA CLAIMS ..................................... 24

CONCLUSION ....................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*A.H. Phillips, Inc. v. Walling*,
    324 U.S. 490 (1945)........................................................................................15

*Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*,
    297 F. Supp. 2d 165 (D.D.C. 2003)...................................................................4

*Brennan v. Goose Creek Consol. Indep. Sch. Dist.*,
    519 F.2d 53 (5th Cir. 1975) ..............................................................17, 19, 21

*Brownlee v. Gay & Taylor, Inc.*,
    642 F. Supp. 347 (D. Kan. 1986).....................................................................21

*Chiaramonte v. Animal Med. Ctr.*,
    677 F. App'x 689 (2d Cir. 2017) ...................................................................7, 8

*Corning Glass Works v. Brennan*,
    417 U.S. 188 (1974)...........................................................................................7

*Cornish v. Dist. of Columbia*,
    67 F. Supp. 3d 345 (D.D.C. 2014)....................................................................5

*Dentons US LLP v. Republic of Guinea*,
    208 F. Supp. 3d 330 (D.D.C. 2016)...................................................................4

*EEOC v. Port Auth. of N.Y. & N.J.*,
    768 F.3d 247 (2d Cir. 2014).............................................................................12

*Evans v. D.E. Foxx & Assocs., Inc.*,
    2013 WL 5278659 (S.D. Ohio Sept. 19, 2013) ...............................................23

*Foster v. Arcata Assocs., Inc.*,
    772 F.2d 1453 (9th Cir. 1985) .........................................................................18

*Freedom Watch, Inc. v. Obama*,
    930 F. Supp. 2d 98 (D.D.C. 2013)...................................................................25

*Goodrich v. Int'l Bhd. of Elec. Workers, AFL-CIO*,
    712 F.2d 1488 (D.C. Cir. 1983)........................................................................7

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Grover v. Smarte Carte, Inc.*,
836 F. Supp. 2d 860 (D. Minn. 2011)...............................................................17, 21

*Grumbine v. United States*,
586 F. Supp. 1144 (D.D.C. 1984) ...........................................................................17

*Gumbs v. Del. Dep't of Labor*,
745 F. App'x 457 (3d Cir. 2018) ...............................................................................7

*Hein v. Ore. Coll. of Educ.*,
718 F.2d 910 (9th Cir. 1983) ...................................................................................23

*Heymann v. Tetra Plastics Corp.*,
640 F.2d 115 (8th Cir. 1981) ...................................................................................23

*Houck v. Va. Polytechnic Inst. & State Univ.*,
10 F.3d 204 (4th Cir. 1993) .....................................................................................23

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
991 F. Supp. 2d 437 (E.D.N.Y. 2014) .......................................................................9

*Integrity Staffing Sols., Inc. v. Busk*,
574 U.S. 27 (2014)......................................................................................................4

*Jaburek v. Foxx*,
813 F.3d 626 (7th Cir. 2016) ...................................................................................18

*Johnson v. Dist. of Columbia*,
947 F. Supp. 2d 123 (D.D.C. 2013)............................................................................7

*Kassman v. KPMG LLP*,
416 F. Supp. 3d 252 (S.D.N.Y. 2018).......................................................................18

*Kent v. City of Chicago*,
814 F. Supp. 2d 808 (N.D. Ill. 2011) .......................................................................14

*Laffey v. Nw. Airlines, Inc.*,
567 F.2d 429 (D.C. Cir. 1976).................................................................................7, 8

*Lamar, Archer & Cofrin, LLP v. Appling*,
138 S. Ct. 1752 (2018)...............................................................................................15

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Lavin-McEleney v. Marist Coll.*,
   239 F.3d 476 (2d Cir. 2001) ................................................................................23

*Lenihan v. Boeing Co.*,
   994 F. Supp. 776 (S.D. Tex. 1998) ......................................................................17

*Lindsley v. TRT Holdings*,
   2019 WL 6467256 (N.D. Tex. Dec. 2, 2019) ..................................................18, 22

*Meacham v. Knolls Atomic Power Lab.*,
   554 U.S. 84 (2008) ..............................................................................................15

*Meeks v. Computer Assocs. Int'l*,
   15 F.3d 1013 (11th Cir. 1994) .........................................................................18, 22

*Mitchell v. Bekins Van & Storage Co.*,
   231 F.2d 25 (9th Cir. 1956) .............................................................................15, 19

*Moccio v. Cornell Univ.*,
   889 F. Supp. 2d 539 (S.D.N.Y. 2012) ...................................................................23

*Price v. Northern States Power Co.*,
   664 F.3d 1186 (8th Cir. 2011) ..............................................................................18

*Renstrom v. Nash Finch Co.*,
   787 F. Supp. 2d 961 (D. Minn. 2011) ............................................................ passim

*Russell v. Placeware, Inc.*,
   2004 WL 2359971 (D. Or. Oct. 15, 2004) ............................................................17

*Schultz v. Dep't of Workforce Dev.*,
   2011 WL 13359148 (W.D. Wis. Mar. 1, 2011) .......................................................8

*Smith v. Allstate Ins. Corp.*,
   24 F. Supp. 2d 870 (N.D. Ill. 1998) .....................................................................17

*Spencer v. Va. State Univ.*,
   919 F.3d 199 (4th Cir. 2019) ..................................................................................7

*Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*,
   321 U.S. 590 (1944) ...........................................................................................4, 21

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Thompson v. Sawyer*,
   678 F.2d 257 (D.C. Cir. 1982) ................................................................................7

*Toomey v. Car-X Assocs. Corp.*,
   2013 WL 5448047 (N.D. Ill. Sept. 30, 2013) ......................................................18

*United States ex rel. Folliard v. Gov't Acquisitions, Inc.*,
   764 F.3d 19 (D.C. Cir. 2014) ...............................................................................25

*Vickers v. Int'l Baking Co.*,
   2000 WL 1804612 (N.D. Tex. Dec. 7, 2000) ......................................................17

**STATUTES**

29 U.S.C. § 206 .......................................................................................................6, 8, 11

**OTHER AUTHORITIES**

29 C.F.R. § 1620.9 ........................................................................................................16

29 C.F.R. § 1620.13 ........................................................................................................8

## <u>INTRODUCTION</u>

For all their objections about insufficient discovery, Plaintiffs admit all of the critical facts upon which Jones Day's motion relies.  Henderson concedes she performed no legal work at all during the limitations period, or for that matter during her entire final six months at the Firm; she stayed on the payroll, at her own request, merely to facilitate her transition to another job.  Draper admits that, over the relevant years, she billed on average *less than half* as many hours as her male "comparators" (and hundreds fewer than each of them, each and every year).  And Williams agrees she earned more than the average of her comparators in Irvine, and that her other "comparators" worked in other offices across the country.  Based on these undisputed facts, Plaintiffs' EPA claims fail; no fact-finder could conclude that Jones Day paid Plaintiffs less based on their sex.

To avoid that conclusion, Plaintiffs make two basic moves.  *First*, they seek to shrink their own *prima facie* burden to virtually nothing, and recharacterize Jones Day's arguments as going only to possible affirmative defenses.  So Henderson says the Firm needs to prove that it paid her less *because* she did no legal work; Draper says the Firm must establish that it paid her less *because* she billed on average fewer than 1,000 hours per year; and Williams says the Firm bears the burden of demonstrating that it paid her less *because* she worked in Irvine rather than New York.  And all of that, Plaintiffs contend, would require countless more depositions and lots of further discovery, if not statistical analysis and experts.  *Second*, Plaintiffs abandon the comparators they named in their pleadings and depositions, and instead trawl through the comprehensive pay data that Jones Day produced in relation to their Title VII claims to find any associates—in any practice or office, of any seniority, at any time—who ever earned more than them.  (They ignore higher-paid women and lower-paid men.)  Putting these contentions together, Plaintiffs' position is that Jones Day must convince a fact-finder that *every* pay differential between themselves and literally *hundreds* of male associates across the Firm was *in fact* attributable to a factor other than sex.

1

That position is absurd as a practical matter and fundamentally mistaken as a legal matter. Before any affirmative defense becomes relevant, an EPA plaintiff bears the burden of establishing that she performed "equal work" as a male comparator yet was paid less. That is why this Court required, even at the pleading stage, particularized allegations comparing Plaintiffs to comparators, and rejected Plaintiffs' premise that all associates perform equal work. Their current arguments rest on that same, flawed notion. To be sure, "equal" does not mean "identical." But in the context of a law firm, a plaintiff must establish at least rough similarity in type of work and productivity. Henderson, who was not engaged in any client work, cannot compare herself to associates who were. Draper, who was effectively working part time, cannot compare herself to associates who worked twice as much. And because of the statutory rule that limits the EPA to comparisons within an "establishment," Williams, who was recruited and hired by the Irvine Office and whose compensation was determined every year at the office level, cannot base a claim on male associates who were hired and paid in New York or Washington.

Plaintiffs' *new* comparisons are no better, even if the Court were inclined to consider them. Without any testimony or explanation of their origins, they attach six self-created spreadsheets (Opp. Exs. D1-D6) that purport to identify hundreds of male associates who earned more than Plaintiffs in particular years or at supposedly comparable career levels. But even if these were admissible evidence (they are not), Plaintiffs offer no evidence that they performed "equal work" as these associates; they therefore cannot remedy the fundamental defect in Plaintiffs' claims.[1]

---

[1] All of the exhibits combine lawyers in different offices and practices. Exhibits D1, D3, and D5 combine lawyers without regard to seniority. Exhibits D2, D4 and D6 purport to account for seniority but routinely misstate seniority years—and ignore that compensation was affected by major market changes that occurred at different stages in the listed lawyers' careers. Perhaps most disturbing, Plaintiffs misleadingly compare their *full-year* hours to the *partial-year* hours of men who joined or left the Firm during the relevant year—but then list the men's full-year salaries, despite knowing that they did not earn full-year salaries during those truncated years.

Indeed, these exhibits actually further eviscerate any inference of sex-based discrimination. Henderson points to four men who billed no time in 2016—but one was on secondment at a client (and did not record hours) and the others were senior associates who left the Firm within the first *two weeks* of the year, facts Henderson knew but omitted.  Draper says other men of her seniority earned more than her despite billing the same or fewer hours—but only three men in Atlanta fit that description, and all three *joined or left the Firm mid-year*; all of them billed *more* than Draper on an annualized basis, and earned *less* over the year.  As for Williams, she doubles down on her "nationwide" comparisons by pointing, *e.g.*, to 33 men in her class year who earned more than her—but ignores that 33 other men in that class earned *less*.  Courts reject this cherry-picking of higher-paid comparators, which makes a mockery of the EPA's principles.

## ARGUMENT

## I.   HENDERSON'S JOB SEARCH DOES NOT CONSTITUTE "EQUAL WORK."

Henderson does not dispute that her EPA claim stretches only to June 24, 2016, and that she must show unequal pay for equal work within that window.  Nor does she dispute that, for the entirety of 2016 until she left the Firm in July of that year, she did no legal work whatsoever.  She spent that entire six months on Jones Day's payroll while looking for a new job.  (RSAMF ¶¶ 1-5.)  Remarkably, Henderson insists she can still prevail on her EPA claim, because searching for a job supposedly "constitutes 'work'" within the meaning of the statute.  (Opp. 50.)

Incidentally, this is not the claim Henderson pleaded or that this Court sustained on the papers.  The TAC alleged that Jones Day paid Henderson less than certain male associates who "did interchangeable work," meaning "a mix of corporate work and real estate assignments," and that she "billed more hours" than at least two comparators.  (Dkt. 41 at 78 (TAC ¶ 287).)  This Court relied upon those allegations in concluding that Henderson had "alleged enough to state an EPA claim."  (Dkt. 110 at 70.)  As it turns out, those allegations were false.  Faced with that reality,

3

Henderson now tries to reframe her claim as based on her "work" of looking for a new job, as compared to men who performed legal work for clients.  That is a fundamentally different claim.  It "is not the claim that [Henderson] brought, and [Henderson] cannot amend [her pleadings] by simply re-casting [her] claim in [her] opposition brief."  *Dentons US LLP v. Republic of Guinea*, 208 F. Supp. 3d 330, 341 (D.D.C. 2016).  Indeed, it is "axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss."  *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003).  That rule applies *a fortiori* at summary judgment, after the Court subjected the (thrice amended) Complaint to legal scrutiny and Henderson was deposed.  Regardless, this brazen argument fails for three reasons.

*First*, Henderson's theory that searching for new employment constitutes "work" under the EPA rests on the premise that this activity was "controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer."  *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 31 (2014) (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944)).  Yet Henderson's own allegations contradict any claim that her job search in June of 2016 was at Jones Day's behest and primarily for Jones Day's benefit.  The TAC alleges that, in February 2016, the Firm told Henderson she could stay on the payroll for "another 2 to 4 weeks."  (Dkt. 41 at 82 (TAC ¶ 303).)  She "complained" to HR about that cut-off and, "[i]n response, the Firm gave Ms. Henderson several additional months to search for a new job."  (*Id.* (TAC ¶ 304).)  Those allegations leave no doubt that this additional time to find a new job was given at *Henderson's* insistence and for *Henderson's* benefit.  It was not "work."[2]

_____

[2] Henderson cites Tolton's testimony that it is "mutually beneficial" for the Firm to find positions at clients for departing associates.  (Opp. 50.)  Jones Day never tried to place Henderson at a client, so that is irrelevant.  Henderson also cites her own testimony that *she* thought "it would be beneficial for the firm" if she "stayed on" longer.  (Opp. 42-43.)  That does not suggest Jones Day required this "work" or that it was done for the Firm's benefit.  (SUMF Reply ¶ 245.)

*Second*, even if it were true that "Henderson Performed Work" (Opp. 49), the EPA requires "*equal* work." A plaintiff does not make out a *prima facie* case unless "she was doing substantially equal work" as the higher-paid male employee. *Cornish v. Dist. of Columbia*, 67 F. Supp. 3d 345, 360 (D.D.C. 2014). Even assuming that looking for an alternate job constitutes "work," it is not "substantially equal" to real legal work for Firm clients—work that generates revenue for the Firm. Henderson never actually argues otherwise. Nor does she dispute that the comparators named in her Complaint (a set of six New York associates from her class) performed client work.

Henderson tries to recharacterize Jones Day's argument as in the nature of an affirmative defense, and contends that the Firm bears the burden of proving (perhaps to a jury) that it paid her less than the comparators "because of her low billable hours." (Opp. 49-50.) That misapprehends the legal framework and Jones Day's argument. The EPA's affirmative defenses do not come into play unless a plaintiff demonstrates "substantially equal work" but "a lower wage" than a male comparator. *Cornish*, 67 F. Supp. 3d at 360. That is why, even at the pleading stage, this Court required factual allegations showing "that the work performed by the alleged comparators was substantially similar to that performed by the plaintiff." (Dkt. 110 at 67.) The record now establishes that Henderson's "work" (if it counts as "work" at all) was fundamentally different from her comparators' work. She therefore cannot carry *her* burden of establishing a *prima facie* case. *See also infra* Part II.A.

*Finally*, insofar as Henderson now tries to rely on new comparators (Opp. 52), those efforts fail for reasons that Henderson knows but omits. She points to four associates who billed no hours in 2016 yet were paid at a higher annual rate. (Opp. 12; (Dkt. 154-5 (Opp. Ex. D5).) One, a San Francisco associate, did not record hours because he was ███████████████, as Plaintiffs knew from the files disclosed to them. (Suppl. Bounds Decl. ¶ 5.D.) The other three were 6-9

years senior to Henderson and, as Plaintiffs well know, left the Firm on ██████████████ meaning they were paid for no more than *two weeks* while not working (compared to Henderson's *six months*) and earned just a fraction of her pay in 2016.  (Suppl. Bounds Decl. ¶ 5A-C; SUMF Reply ¶¶ 174-175.)

Henderson's claim was a bait-and-switch.  She alleged that she performed the same work and even billed more hours than certain men in her class, yet was paid less.  She now admits she did no legal work whatsoever during the relevant period.  Yet despite receiving pay and personnel data covering all U.S. associates over a seven-year period, she has not identified any similarly situated man who was paid more for that "work."  Jones Day is entitled to summary judgment.

## II.   DRAPER CANNOT SATISFY THE "EQUAL WORK" ELEMENT OF HER *PRIMA FACIE* CASE WHEN HER COMPARATORS WORKED TWICE AS MUCH.

Draper, too, admits the critical facts underlying Jones Day's motion:  that the three higher-paid men whom Draper identified as her comparators billed, on average over the relevant years, more than twice as many hours as her.  (SRAMF ¶¶ 7-51.)  To salvage her claim, Draper contends, *first*, that an associate's hours are categorically irrelevant to the EPA's "equal work" inquiry; *second*, she tries to shift focus from her self-identified comparators to 152 other male associates across the Firm over a seven-year period of time.  Legally and factually, both arguments dissolve under scrutiny.

### A.   Draper Cannot Bear Her *Prima Facie* Burden To Establish "Equal Work" When She Billed Fewer Than Half As Many Hours As Her Comparators.

Draper's lead argument is that hours bear only on the affirmative defense for payment made under "a system which measures earnings by quantity … of production."  29 U.S.C. § 206(d)(1).  The Firm is not entitled to this defense, she says, unless it "in fact" set her compensation "based on the number of hours that she billed."  (Opp. 42.)  And establishing that subjective, actual basis for each pay differential would, she claims, require mountains more discovery.  (Opp. 42, 44.)

Draper misunderstands both the law and Jones Day's argument.  Only if a plaintiff makes a *prima facie* case of an EPA violation—meaning a showing of unequal pay for equal work—does the burden shift to the defendant, who can then show that the differential arose from a factor other than sex.  *See Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974) ("[O]nce the [plaintiff] has carried his burden of showing that the employer pays workers of one sex more than workers of the opposite sex for equal work, the burden shifts to the employer ...."); *Thompson v. Sawyer*, 678 F.2d 257, 270-71 (D.C. Cir. 1982) (same); *Goodrich v. Int'l Bhd. of Elec. Workers, AFL-CIO*, 712 F.2d 1488, 1491 (D.C. Cir. 1983) (same).  At the first step, "inconsequential differences" are not preclusive, but the employees must "perform[] equal work on essentially the same job."  *Laffey v. Nw. Airlines, Inc.*, 567 F.2d 429, 449 (D.C. Cir. 1976).  Plaintiffs harp on the defenses but, before the law forces an employer to bear the burden of proving that a pay differential was *not* based on sex, a plaintiff must raise a meaningful inference of discrimination by showing equal work.  Courts regularly grant summary judgment when employees fail to do so.[3]

Jones Day's motion did not argue that Draper performed equal work as her comparators but that the Firm nonetheless paid her less "because she billed fewer hours."  (Opp. 36.)  In other words, the Firm was not invoking one of the Act's *exceptions* to the principle of equal pay for equal work.  Rather, Jones Day's point is that Draper has not shown a *prima facie* case of unequal pay for equal work based on the comparators she proffered, because her work was so dramatically different from theirs.  In other words, Draper's case never gets off the ground, because she cannot do enough to generate a sufficiently weighty inference of sex discrimination to justify shifting the burden to Jones Day.  She cannot bear *her* burden given the undisputed facts.

---

[3] *See, e.g.*, *Spencer v. Va. State Univ.*, 919 F.3d 199, 206 (4th Cir. 2019); *Gumbs v. Del. Dep't of Labor*, 745 F. App'x 457, 460 (3d Cir. 2018); *Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689, 691 (2d Cir. 2017); *Johnson v. Dist. of Columbia*, 947 F. Supp. 2d 123, 132 (D.D.C. 2013).

Draper contends that the amount of time an employee works is irrelevant to the *prima facie* case. The only question, she says (Opp. 37-38), is whether the jobs in the abstract require "equal skill, effort, and responsibility." 29 U.S.C. § 206(d)(1). That writes "equal work" out of the text. The EPA forbids disparate wages "*for equal work on* jobs the performance of which requires equal skill, effort, and responsibility." *Id.* (emphasis added). That language requires inquiry into "actual job requirements *and performance*." 29 C.F.R. § 1620.13(e) (emphasis added). And as the D.C. Circuit made clear, there must be "*equal work* on essentially the same job," *Laffey*, 567 F.2d at 449 (emphasis added), not just "the same job." That is why a part-time worker cannot base an EPA claim on a comparison to a full-time employee despite holding the same "job." And it is why a substantial difference in hours legally refutes a showing of "equal work."

Courts recognize as much. Draper wrongly says (Opp. 40 n.36) that *Schultz v. Department of Workforce Development* held that the plaintiff had carried her *prima facie* burden—the opposite is true. *Despite* the jobs' "common core," they differed enough to compel summary judgment for the employer, including because the plaintiff would "leave work at 3:15 every day" while her comparator "work[ed] normal full-day business hours." 2011 WL 13359148, at *4 (W.D. Wis. Mar. 1, 2011). Likewise, Draper argues that *Renstrom v. Nash Finch Co.* turned on the "additional duties" of the comparators, but the court weighed *their* duties against the *plaintiff's* by looking to their "typical work schedule[s]." 787 F. Supp. 2d 961, 970 (D. Minn. 2011). Her comparators worked 50- and 60-hour weeks whereas she worked a 40-hour week—so she lost at the *prima facie* stage. *Id.* at 969-70. Finally, *Chiaramonte* reasoned that "drastic differences" in "patient loads" made it impossible to "demonstrate substantially equal work." 677 F. App'x at 691-92. Draper says that pointed up a difference in "job content," but the same could be said of drastic differences in *client* loads as reflected in low hours: A difference in degree becomes a difference in kind.

Indeed, in the context of a law firm, where "the billable hour is common" as the means of charging clients for services, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 447 (E.D.N.Y. 2014), it strains credulity to deny that an associate's productivity is relevant to whether she performs "equal work" as a colleague. Even at the pleading stage, the Court sustained Williams' and Henderson's claims after specifically noting allegations that they "billed more hours" than their higher-paid comparators. (Dkt. 110 at 70.) Draper had not alleged anything about hours; in the absence of that information, the Court relied on allegations that she and her comparators worked in the same "sub-practice" groups. (*Id.* at 71.) But now that the undisputed facts expose the vast hours differential between Draper and her comparators, she will not be able to prove "equal work" to the satisfaction of any reasonable fact-finder.

To counter this common sense, Plaintiffs insist that Jones Day does not care about hours. (Opp. 41-42.) Yet the record leaves no doubt that productivity plays an important role in associate compensation at Jones Day. True, the Firm does not base compensation "solely" on hours; nor are they the "primary determinant." (SRAMF ¶¶ 236, 241.) Quality is valued over quantity, as Plaintiffs understood. (Opp. 41.) But they also understood—and testified—that hours were an important objective measure of their work.[4] And every document they cite makes that clear. They quote a recruiting presentation that said compensation "is not hours-driven." (Dkt. 152-2 at 26 (Opp. Ex. C7).) The same slide, however, explained that an associate's "work effort is considered as reflection of commitment and demand for services." (*Id.*) Just two slides later the presentation

---

[4] Tolton agreed that "market pay takes into account the ... hours of an associate." (Dkt. 102-5 at 4-5 (Tolton Tr. 239:20-240:2).) Mazingo recognized that "big firms will take into consideration a variety of objective criteria including ... billable hours." (Dkt. 102-6 at 3-4 (Mazingo Tr. 25:7-26:1).) Henderson, too, affirmed that any "law firm … would pay their associates based on the work that they perform for the firm, including client hours." (Dkt. 102-11 at 4 (Henderson Tr. 154:15-20).) And Williams' "understanding coming into the firm was that 2,000 hours was the goal." (Suppl. Chase Decl. Ex. 5 (Williams Tr. 120:5-7).)

advised of a "Billable Hours" "goal" of "2000 hours." (*Id.* at 28.) Plaintiffs also quote a memo to office leaders providing guidance on setting compensation. (Opp. 41.) That memo stated that "each lawyer's productivity should be an important factor in making compensation adjustments," and cited "productivity" twice more. (Dkt. 145-17 at 2.) Every associate's annual review lists hours along with the final assessment. (*E.g.*, Dkt. 93-15 at 2.)[5] The worksheet used to record pay adjustments includes hours columns. (*E.g.*, Dkt. 145-21.) And the Firm's witnesses testified to the importance of hours in compensation. (*E.g.*, Dkt. 125-15 at 65-66 (Lovitt Tr. 242:25-243:25).)

Indeed, Plaintiffs' assertion is belied by how much their own Complaint *obsesses* over hours, representing over and over that Plaintiffs billed lots of them.[6] Williams' EPA claim is specifically grounded on the claim that "Jones Day paid her less than male associates *even though she routinely billed more hours*." (Dkt. 41 at 48 (TAC ¶ 165) (emphasis added); *see also id.* at 78 (TAC ¶ 287) (Henderson "understands she likely billed more hours than" two comparators).) Why plead those facts unless productivity is an important measure of an associate's work?

---

[5] Draper claims that the Firm "'never once mentioned' hours as a justification for setting her compensation until 2017." (Opp. 40.) The contemporaneous record shows otherwise. Draper's assessment statements, which were read to her (Suppl. Chase Decl. Ex. 6 (Draper Tr. 403:3-5)), repeatedly commented on her productivity. In 2014, before her first family leave, she was advised of steps "to improve her productivity." (Dkt. 93-15 at 4.) In 2016, she was told "to focus on increasing her ... case load." (*Id.* at 3.) By early 2017, Draper's *self-assessment* acknowledged her weak hours: "My metrics simply were not what I wanted them to be." (Suppl. Chase Decl. Ex. 7 at 4 (JD_00001496 at 1498).) That sentiment was reflected in the Firm's written assessment of her performance, which stated that, "even by her own account, Saira's exposure within the Firm and workload are not at the level they should be." (Dkt. 93-15 at 3.) And in 2018, her assessment noted that Draper was "becoming known for not answering her phone or emails after 7 p.m. on weekdays or at all on weekends." (*Id.* at 2.) Draper also admitted that she received regular reports showing that her annualized client hours never once met her 2,000 hour goal and did not even come close in six of her seven years. (Suppl. Chase Decl. Ex. 6 (Draper Tr. 171:6-182:14).) There is no doubt that Draper knew that hours mattered and that hers did not meet expectations.

[6] Dkt. 41 at 36 (TAC ¶ 121) (Tolton billed "200 hours per month"); *id.* at 39 (TAC ¶ 134) ("Mazingo ... logg[ed] up to 250 billable hours per month"); *id.* at 50 (TAC ¶ 173) ("Williams ... bill[ed] 2,342 hours"); *id.* at 55 (TAC ¶ 195) ("Draper ... billed in excess of 15 hours per day.").

To be clear, Jones Day does not (unlike some firms) pay every associate the same base salary and then award bonuses as a function of hours billed.  (Opp. 42 n.37.)  That is precisely why Draper is wrong to pigeonhole Jones Day's motion into the defense for "a system which measures earnings by quantity ... of production."  29 U.S.C. § 206(d)(1).  A system that sets a 2,000-hour threshold for a bonus would satisfy that defense, even if it turned a *de minimis* hours differential (1,985 versus 2,020) into a large pay disparity.  Jones Day's point is different:  Productivity is a crucial measure of an associate's "work."  When a productivity gap is dramatic enough—as it is for Draper, who was effectively working part-time—a plaintiff cannot meet her burden of proving substantially equal work.  An employee who works hundreds of hours per year more than another is simply not comparable enough to give rise to any reasonable inference of sex discrimination. Jones Day is accordingly entitled to summary judgment.

### B.      Draper Cannot Save Her Claim By Identifying New Comparators.

Like Henderson, Draper quickly abandons the theory she previously alleged and defended. Recognizing the critical role of hours, Draper argues—using the produced pay data for some 2,300 associates—that "at least 152 men billed approximately as many or fewer hours ... in equivalent class years of seniority but were paid at a higher rate."  (Opp. 44; (Dkt. 154-4 (Opp. Ex. D4).) Jones Day cannot discern, even from the (inadmissible) exhibits, where the 152 figure comes from. Like many other characterizations of the pay data in Plaintiffs' brief, it is not supported by any evidence or even mentioned in their RSAMF.  Regardless, this argument fails for three reasons.

*First*, even if the Court were inclined to scour through Plaintiffs' spreadsheets to find the new comparators, Draper offers no evidence that these 152 unidentified men were performing "equal work."  Even at the pleading stage, the Court required *some* particularized allegations to generate a plausible inference of equal work.  (Dkt. 110 at 69-71.)  Three Plaintiffs who did not make such allegations—including Tolton, who named a higher-paid Irvine associate in her class,

but alleged nothing about his work—had their claims dismissed, because a "general allegation" that "associates all perform substantially similar work" cannot suffice to advance a claim.. (*Id.* at 71.)  *Accord EEOC v. Port Auth. of N.Y. & N.J.,* 768 F.3d 247, 257-58 (2d Cir. 2014) (rejecting argument that all attorneys perform equal work).  Yet that is the premise of Draper's current attempt to compare herself to 152 random associates spread across practices, locations, and years. Draper cannot escape *summary judgment* on a basis that did not suffice for Tolton to *state a claim*.

*Second*, the new comparators fail on their own terms, and confirm how baseless Draper's claim truly is.  Looking at Exhibit D4, *not a single male associate in Atlanta* earned more than Draper as a fourth-year, sixth-year, or seventh-year associate while billing the same or fewer hours. As for fifth-year associates, Draper purports to identify three in Atlanta ██████████████ ██████████ who earned more despite billing fewer hours that year.  Yet as the exhibit itself reflects, the first two were sixth-year associates, not fifth-years (a 2011 graduate in 2017, and a 2012 graduate in 2018).  Even worse, *none* of the three was employed for the entire relevant year, yet Draper compares her *full-year* hours to their *partial-year* hours.[7]  On an annualized basis, each of these male associates billed *substantially* more hours as "fifth-year associates" than Draper.  That this is the best Draper can do, even after being handed all of Jones Day's pay records dating back to 2012, says all that need be said about the viability of her pay equity claim.

The above focuses on Atlanta, since that is the relevant "establishment" for Draper's claim. *Infra* Part III.A.  But the same defects (in particular, misidentifying class years and not annualizing hours) pervasively taint the other new "comparators" too.  For example, Draper points to a New

---

[7] One left on ███████████ (2.5 months); the second left on ███████████ (less than half a year); the third was hired June 12, 2017 (6.5 months).  (Suppl. Bounds Decl. ¶ 5.F-H.)  Similarly, Plaintiffs' Exhibit D3 shows that from 2015-2018, only a single male associate in Draper's class in Atlanta earned more than her, in one year, despite billing fewer hours that year—and it was the associate, referenced above, who left the Firm in mid-March of the relevant year.  (*Id.* ¶ 5.F.)

York associate ███████ who supposedly earned $300,000 as a fourth-year despite billing only 4 hours.  He was actually a fifth-year on Plaintiffs' methodology, and he left the Firm ██████ ████.  (Suppl. Bounds Decl. ¶ 5.I.)  Plaintiffs do not explain, and Jones Day has been unable to decipher, how they counted 152 male associates who billed fewer hours but were paid more, but what is clear is that only 18 of the male associates listed in Exhibit D4 as working fewer hours in the current year were employed for the full year.  (Wallace Decl. ¶ 6.)  Five of the 18 lawyers were former Supreme Court clerks in the Washington Office; and all 18 worked in offices where starting salaries during the relevant time period were higher than Draper's in Atlanta.  (*Id.* ¶ 6.; *see also* SUMF Reply ¶¶ 160-167.)

Merits aside, it is also worth observing that Draper's effort to import new comparators is also procedurally improper.  At the pleadings stage, this Court required each Plaintiff to make "particularized allegations relating to certain specific ... alleged comparators."  (Dkt. 110 at 69.) Draper's EPA claim survived because she pointed to "one Atlanta male associate ... in the Investigations and White Collar Defense sub-practice group" and "two Atlanta male associates in the tobacco litigation sub-practice group."  (*Id.* at 71 (quoting Dkt. 41 at 53-54 (TAC ¶ 187)).) Since "Draper herself worked in both these practice groups," this Court found those allegations "sufficient to state a plausible claim that the comparators ... were performing work that was substantially similar."  (*Id.*)  Tracking her allegations, Jones Day deposed Draper about those comparators and her basis (or lack thereof) for naming them.  (Suppl. Chase Decl. Ex.  6 (Draper Tr. 141:4-149:8).)  Jones Day also produced documents about the comparators, laying a foundation for this motion.  Now, after Jones Day produced—for purposes of Plaintiffs' Title VII disparate-impact claims—comprehensive pay records for all of its associates nationwide from 2012-2018, Draper effectively seeks to amend her Complaint (after the deadline) and moot her own testimony

by rummaging for every male associate who earned more than her despite billing fewer hours. That is an abuse of process, and in these circumstances the Court should forbid Draper from relying on "a new comparator" to "amend her complaint through arguments in her brief opposing summary judgment." *Kent v. City of Chicago*, 814 F. Supp. 2d 808, 816 (N.D. Ill. 2011).

At the end of the day, Draper's effort to identify new comparators is not only improper and a failure in its own right, but it also eliminates any doubt over whether her low pay was unrelated to her low hours. No reasonable factfinder could infer a sex-based pay disparity on these facts.

## III. WILLIAMS EARNED MORE THAN HER AVERAGE IRVINE COMPARATORS, AND CANNOT COMPARE HERSELF TO ASSOCIATES IN OTHER JONES DAY OFFICES.

Williams doubles down on the notion that she can prove an EPA violation by comparisons to male associates anywhere in the country. But Jones Day's 18 U.S. offices are, as a matter of law, not a single "establishment." This is not a factual dispute; the relevant facts about the Firm's structure and operation are materially undisputed following extensive discovery. Rather, this is a legal dispute over the definition of "establishment," and Plaintiffs are wrong. Their exception would swallow the rule, turning virtually every national enterprise into a single establishment, and flout Supreme Court precedent (which they relegate to a footnote). Under the applicable standard, there is no question that Jones Day does not manifest the highly unusual type of centralized control over employees and their work that some courts have held could justify finding an establishment across physical locations. Plaintiffs quote snippets of cases out of context, but *no* court has *ever* found *any* private enterprise to constitute a *nationwide* establishment under the EPA. Williams thus cannot proceed with an EPA claim premised on pay differentials between offices.

Once the analysis is limited to Irvine, as it must be, Williams does not deny that she earned more at every level of seniority than the average of the three Irvine male associates she had named as comparators. As courts around the country have held, that dooms her claim (another legal point

14

she leaves to a footnote).  Nor can Williams rehabilitate her claim by abandoning the lower-paid comparators and listing, without any evidence of equal work, the higher-paid men she fished out of the Firm's recent Title VII production.  Actually, as with Draper, the broader data puts the lie to Williams' core allegation that her salary was tainted by sex discrimination.

A.  **Applying the Correct Legal Standard, Jones Day's 18 Offices Across the United States Are Not a Single "Establishment" Under the EPA.**

1.  Years before Congress added the EPA to the Fair Labor Standards Act ("FLSA"), the Supreme Court explained that "establishment"—as that term is "normally used in business," and as used in the FLSA—means "a distinct physical place of business."  *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 496 (1945).  Applying that test, the Court later reversed when a lower court treated five "physically separate" warehouses in downtown Los Angeles as one "establishment" because they operated as a single "division" subject to "central control."  *Mitchell v. Bekins Van & Storage Co.*, 231 F.2d 25, 27 (9th Cir. 1956), *rev'd*, 352 U.S. 1027 (1957) (*per curiam*).

Plaintiffs claim the Court's definition of "establishment" is irrelevant because those cases addressed FLSA exemptions.  (Opp. 30 n.28.)  No:  When "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates … intent to incorporate its … judicial interpretations as well."  *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1762 (2018).  That is all the more true here, where Congress placed the EPA *into the FLSA.  See, e.g.*, *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 92 (2008) (noting "particular weight" given to prior construction of FLSA when interpreting EPA).  "Establishment" cannot mean different things in two provisions of the same statute.

True, the EEOC and some courts have crafted an exception to the Supreme Court's rule where, because of highly centralized control over key aspects of the employment relationship, workers in different locations might still be said to work at one "establishment."  But Plaintiffs

want to transform that narrow exception into a sweeping "functional" inquiry that would condemn any integrated firm with some centralized coordination.  (Opp. 20-21.)  That goes far beyond what the EEOC has suggested and what the case law could reasonably support, and it would turn "just about any corporation with a hierarchical management structure and a functioning human-resources department" into a nationwide "establishment."  *Renstrom*, 787 F. Supp. 2d at 965.

Take first Plaintiffs' departure from the regulation.  It states that, in light of the "well settled meaning" of "establishment," "each physically separate place of business is ordinarily considered a separate establishment."  29 C.F.R. § 1620.9(a).  Sometimes, however, "two or more distinct physical portions of a business enterprise" could be treated as one establishment.  *Id.* § 1620.9(b).  The "circumstances" under which such treatment is appropriate are "unusual"; they might exist where "a central administrative unit … hire[s] all employees, set[s] wages, and assigns the location of employment," or where the employees "frequently interchange work locations."  *Id.*  "Barring such circumstances, however, "establishment" means what the Supreme Court said.  *Id.*

Plaintiffs' test looks nothing like this regulation.  Rather than examine whether "a central administrative unit" "hire[s] all employees [and] set[s] wages," Plaintiffs ask this Court to treat Jones Day's offices as one national "establishment" because Firm leadership picks the schools at which its offices recruit, sets budgets for aggregate associate pay, and periodically rejects a local salary recommendation.  (Opp. 20, 22-26.)  And rather than ask whether Jones Day centrally "assigns the location of employment" and "frequently interchange[s] work locations," Plaintiffs point to the fact that the Firm's lawyers *collaborate* across offices, evaluate associates who work elsewhere, and on rare occasions voluntarily transfer (almost always for personal reasons) from one office to another (with the approval of both offices).  (Opp. 26-31.)  These routine aspects of a modern national organization are not the "unusual circumstances" of the EEOC regulation.

Plaintiffs' approach also far outstrips even the most aggressive case law—a mismatch best exposed by describing the facts of the cases they cite.  In the leading case, a school district "hired the janitors, determined their wages, assigned them to the school building in which they were to work, and sometimes switched their assignments from one building to another."  *Brennan v. Goose Creek Consol. Indep. Sch. Dist.*, 519 F.2d 53, 56 (5th Cir. 1975).  The court relaxed the boundaries of the "establishment" to cover the *district*, rather than a particular *building* within it.  *Id.*

Most of the other cited cases involved a few managerial or senior employees who reported to the same leader, had their pay centrally set, and often lacked *any* comparator in their own office.  In *Grover v. Smarte Carte, Inc.*, the court compared a Senior Vice President in Minnesota to one in France, as both "reported to" the same CEO, who "determined" their pay.  836 F. Supp. 2d 860, 863, 868 (D. Minn. 2011).  In *Vickers v. International Baking Co.*, the court compared "District Sales Managers" in Texas, as they "work[ed] under the superintendence of a single supervisor," "manage[d] and compensate[d] as a group."  2000 WL 1804612, at *5 (N.D. Tex. Dec. 7, 2000).  In *Smith v. Allstate Insurance Corp.*, "Chicago area" offices of a nationwide insurer were treated as one establishment because "job assignments" and "compensation" were "conducted on a region basis."  24 F. Supp. 2d 870, 879 (N.D. Ill. 1998).  In *Lenihan v. Boeing Co.*, two plants were treated together because "employees and entire work groups were transferred between the two sites" and there was "commonality" of "supervisors."  994 F. Supp. 776, 800 (S.D. Tex. 1998).  In *Russell v. Placeware, Inc.*, the court looked at four employees—two in California; two in Oregon—whose job was to conduct remote trainings and whose shared supervisor "largely controlled the[ir] day-to-day tasks."  2004 WL 2359971, at *8 (D. Or. Oct. 15, 2004).  In *Grumbine v. United States*, the district court compared Regional Counsels across customs offices since the Chief Counsel directed and supervised them and controlled their pay.  586 F. Supp. 1144, 1151–52 (D.D.C. 1984).

Plaintiffs do not cite—and Jones Day is unaware of—any decision treating hundreds of employees across the country as part of the same "establishment" under *any* circumstances, let alone where those employees were hired, supervised, and compensated locally.  To the contrary, courts—especially circuit courts—have resisted expansion of the judicially-crafted exemption to the humdrum forms of oversight that Plaintiffs identify.  In *Price v. Northern States Power Co.*, for instance, the court refused to treat two Minnesota branches of a power company as the same establishment because they were "75 miles apart," the employees "d[id] not transfer between the two locations," and each location "had its own supervisor."  664 F.3d 1186, 1195 (8th Cir. 2011).  In *Meeks v. Computer Associates International*, the court refused to treat offices of technical writers across the country as one establishment even though a "central personnel office" "g[ave] final approval" on hiring and signed off on "suggested salar[ies]."  15 F.3d 1013, 1017 (11th Cir. 1994).  And in *Foster v. Arcata Associates, Inc.*, the court affirmed summary judgment where two offices "operated under separate budgets" and had "separate project managers who had independent decisionmaking authority over members of their staff."  772 F.2d 1453, 1465 (9th Cir. 1985).  These cases properly reflect the strong "presum[ption] that multiple offices are *not* a 'single establishment.'"  *Meeks*, 15 F.3d at 1017 (emphasis added).[8]

---

[8] *See also, e.g.*, *Jaburek v. Foxx*, 813 F.3d 626, 632-33 (7th Cir. 2016) (refusing to compare FAA personnel in Chicago or Fort Worth with those in Anchorage or Seattle); *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 287 (S.D.N.Y. 2018) (decertifying collective even though local "pay and promotion decisions" were "reviewed by firm leadership on an aggregate basis against budget"); *Renstrom*, 787 F. Supp. 2d at 965 (refusing to compare buyers at Midwest distribution centers even though central management had "authority to approve performance reviews, determine compensation levels, and make personnel decisions regarding head grocery buyers" and "actually exercised [that] authority on occasion and overrode the compensation decisions of division managers"); *Lindsley v. TRT Holdings*, 2019 WL 6467256, at *6 (N.D. Tex. Dec. 2, 2019) (refusing to compare "Food and Beverage Directors" at different hotels because local employees "ha[d] a say in determining their ... salary"); *Toomey v. Car-X Assocs. Corp.*, 2013 WL 5448047, at *6–7 (N.D. Ill. Sept. 30, 2013) (refusing to compare technicians at four "Chicago-area" stores where "manager of each store hired that location's technicians," and "mobility" was "minimal").

**2.**     Jones Day's 18 U.S. offices are not one establishment.  This is obvious under the Supreme Court's test; if five "central[ly] control[led]" warehouses in L.A. do not qualify, *Mitchell*, 231 F.2d at 27, the Firm's offices from coast to coast surely do not.  The judicial exception also does not apply here.  Again, that test looks for pervasive central control over core aspects of the employment relationship: "hir[ing]" employees, "determin[ing] their wages," "assign[ing] them" to locations, and "switch[ing] their assignments" from one place to another.  *Brennan*, 519 F.2d at 56.  Undisputed facts show that Jones Day's offices exercise significant authority in each regard.

*Hiring.*  Plaintiffs concede that each office selects its own recruiters, selects the candidates to interview, and makes its own associate hiring choices.  (SRAMF ¶¶ 124-127.)  Plaintiffs note a few minor caveats to the latter, but none detracts from the core point.  *First*, offices in some regions need sign-off from the Regional Partner-in-Charge.  *Second*, one office hiring partner discussed a summer associate candidate who was interested in intellectual property with leaders of that highly specialized practice.  *Third*, when a summer associate wishes to "split" between two offices, both offices must agree.  *Fourth*, for practical reasons—such as space constraints—offices cannot hire unlimited associates.  *Finally*, Firm approval is now needed for an office to hire senior lateral associates, though that was not true during Plaintiffs' tenure.  (*See generally* SUMF Reply ¶ 127.)

The first three points do not evince *central* control—only *regional* input where applicable, *practice* input in one context, and office *collaboration* in another.  The fourth claim—that "headcounts are centrally controlled" because offices cannot engage in "unlimited" hiring—has no evidentiary support.  (*See* SUMF Reply ¶¶ 126-27.)  The fifth point provides no evidence that the Firm centrally hires associates and assigns them to offices; rather, in limited circumstances not relevant to Plaintiffs, the Firm reserves the right to veto an office's proposed senior lateral associate hire—and that requirement did not become effective until after Plaintiffs left the Firm.  (*See id.*)

Plaintiffs also observe that a Firmwide Hiring Partner helps coordinate the law school recruiting process, sets broad "criteria that the Firm seeks," and selects (more than 40) schools for on-campus recruiting; a Firmwide Recruiting Manager "coordinate[s] logistics"; and a Manager of Lateral Recruiting is now notified before anyone contacts a potential lateral (to protect against claims from competing headhunters).  (SUMF Reply ¶¶ 123–27.)  None of that is legally relevant. National entities coordinate, set parameters, and keep track of local operations.  Those are not "unusual" circumstances that overcome the rule that distinct physical places of business are separate establishments.  *See Renstrom*, 787 F. Supp. 2d at 965.  Since there is no dispute that the vast majority of Jones Day associates—including all Plaintiffs—were hired at the office level without Firmwide approval, this factor cuts strongly against finding a single establishment.

**Assignments.**  Once associates arrive at Jones Day, individual offices continue to exercise primary control over the employment relationship.  Plaintiffs admit that work assignments for new lawyers are managed at the office level and do not legitimately dispute that there is no Firmwide assignment system.  (SUMF Reply ¶¶ 134-135.)  They argue that Jones Day encourages associates to "build their networks" (SRAMF ¶¶ 134-135), but this bottom-up approach to work assignments is the opposite of central control.  Plaintiffs go to lengths to emphasize that associates often work on matters with, and are evaluated by, lawyers in other offices.  (SRAMF ¶¶ 180-188.)  But that says nothing about "establishment."  *Collaboration* is not *centralization*.  Lawyers work across offices, but associates' work is not assigned, supervised, reviewed, or controlled by the Managing Partner or any other central authority.[9]  The office PIC has principal responsibility for the personnel

---

[9] For example, Williams' 2016 performance was reviewed by 24 lawyers, including six associates (one of whom was Tolton) who supervised projects involving as little as 30 hours of work.  Only one of those lawyers—her office PIC—had any supervisory authority over her that extended beyond the discrete matters on which they worked together.  (Dkt. 118-16 at 4-10.)

function in the office (Suppl. Chase Decl. Ex. 9 at 3-4 (JD_00002299)) and, at the end of the day, it is the office leadership that determines office ratings and rankings, and makes pay decisions (*infra* at 21-22), based on input gathered from lawyers both within the office and around the Firm. (SRAMF ¶ 138.)  This decentralized process is the opposite of a situation, as in Plaintiffs' cases, where distant employees all "report[] to" a common supervisor.  *Grover*, 836 F. Supp. at 868; *see also Brownlee v. Gay & Taylor, Inc.*, 642 F. Supp. 347, 351 (D. Kan. 1986) (same).

**Transfers.**  Unlike in Plaintiffs' cited cases, the Firm does not assign employees to offices or require them to shift between offices.  Plaintiffs point to 14 "Firm-initiated" transfers over 7 years, but that is miniscule relative to the 2,300 associates that the Firm employed during that time; and in each case, associates were offered opportunities—*not required*—to transfer.  (SUMF Reply ¶ 137.)  Even counting transfers motivated by the associate's personal needs, Plaintiffs concede there were only between 13 and 24 transfers per year.  (Dkt. 154-8 at 2 (Opp. Ex. D9).)  Plus, every transfer must be approved by the sending and receiving offices—exhibiting *local* (not *central*) control.  (SRAMF ¶ 136.)  This is a far cry from a situation in which the employer can be said to centrally "assign[] [employees] to the [office] in which they were to work, and sometimes switch[] their assignments from one building to another."  *Brennan*, 519 F.2d at 56.

**Compensation.**  It is undisputed that each office is responsible for recommending the pay adjustments for its own associates, and that the Firm does not have a compensation ladder that is uniform across geographies.  (SRAMF ¶¶ 128, 130.)[10]  Plaintiffs retort that three Firm leaders (Traci Lovitt, Michael Shumaker, and Stephen Brogan) revised pay recommendations some 23%

---

[10] Plaintiffs claim the Firm places offices into two "tiers" for compensation.  While starting salaries and base market compensation are comparable in a number of cities, Plaintiffs' own D Exhibits show wide variation in associate compensation between New York and most other cities with comparable base salary ladders.  (*See* SUMF Reply ¶ 130; *see also* Suppl. Lovitt Decl. ¶ 11.)

of the time.  (Opp. 23-25.)  Using their data, the real number is closer to 8% (SUMF Reply ¶ 212), but even Plaintiffs' figure means that local office decisions governed *more than 75% of the time*. That is more than enough to preclude a "single establishment" finding.  *See Meeks*, 15 F.3d at 1017 (no single establishment even though management approved "suggested salar[ies]"); *Renstrom*, 787 F. Supp. 2d at 965 (management had "ultimate authority" and "on occasion ... overrode" local decisions); *Lindsley*, 2019 WL 6467256, at *6 (local leaders "ha[d] a say" in pay decisions).

Plaintiffs further argue that the Firm sets aggregate "budgets" for compensation, gives guidance on relevant criteria, and uses the Managing Partner's name on memos advising of pay changes.  (Opp. 22-25.)  None of that demonstrates pervasive control over individual compensation that might justify treating associates in Columbus and New York as if they worked a few doors down from each other.  And all of it looks (again) like nothing more than what any "hierarchical management structure" would do.  *Renstrom*, 787 F. Supp. 2d at 965.

***One Firm Worldwide.***  Plaintiffs also claim inconsistency between Jones Day's model of collaboration and its "establishment" position.  (Opp. 30.)  Not at all.  "One Firm Worldwide" reflects Jones Day's commitment to serve clients with "seamless collaboration" fostered by a "true partnership" of highly skilled lawyers worldwide.  (Dkt. 151-12 at 3 (Opp. Ex. C5).)  Jones Day achieves that goal by empowering lawyers to work together to meet client needs—not by micromanaging every employee's affairs from the Managing Partner's office.

Ultimately, it is undisputed that Jones Day does not centrally control associate hiring, does not centrally direct associate assignments, does not centrally supervise associate performance, and does not centrally assign or transfer associates to or between locations.  It is also undisputed that local offices exercise, at minimum, significant (usually controlling) influence over associate pay. Those facts compel the rejection of Plaintiffs' "single establishment" theory.

### B.       Williams Cannot Selectively Cherry-Pick Her Comparators.

Once the analysis is limited to Irvine, Williams does not dispute that she earned more, on average, than her three hand-selected comparators at every level of seniority.  She insists that does not defeat her claim, but responds to only one of the three cases Jones Day cited (Dkt. 147 at 29)— and even there her only answer is to call it an "outlier."  (Opp. 18 n.5.)  It is not.  Courts across the country reject EPA claims when plaintiffs cherry-pick higher-paid men but ignore lower-paid men in the same comparator pool.  *See Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 482 (2d Cir. 2001) ("[W]here multiple comparators exist, the plaintiff is not permitted simply to select the best-compensated male."); *Hein v. Ore. Coll. of Educ.*, 718 F.2d 910, 916 (9th Cir. 1983) (rejecting such "manipulation" of comparator pool); *Heymann v. Tetra Plastics Corp.*, 640 F.2d 115, 122 (8th Cir. 1981) (rejecting "self-serving" comparison to "highest paid employee"); *Houck v. Va. Polytechnic Inst. & State Univ.*, 10 F.3d 204, 206-07 (4th Cir. 1993) ("[R]andom comparisons ... may be insufficient to draw a *prima facie* inference."); *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 571 (S.D.N.Y. 2012) (rejecting "*prima facie* case" because "many male SEAs earned a lower salary" than plaintiff); *Evans v. D.E. Foxx & Assocs., Inc.*, 2013 WL 5278659, at *11 (S.D. Ohio Sept. 19, 2013) (granting summary judgment because "[P]laintiff cannot 'cherry-pick' only a few highly paid employees").  Williams cannot jettison the two lower-paid men she identified and now rely exclusively on the one lateral associate who (for one year) earned more.

### C.       Williams' New Comparators Are Inadmissible, Irrelevant, and Inadequate.

Nor can Williams salvage her claim by identifying an entirely new set of comparators in her opposition brief.  Williams variously argues that she earned less than "638 comparators nationwide" or "19 Irvine males" of any seniority at some unidentified point over a 7-year period, or that 33 men in the Class of 2013 across the United States earned more than her in 2016, or that 41 earned more in 2017.  (Opp. 11, 33.)  Yet she fails to adduce any evidence that she performed

"equal work" to any of these alternative groups of comparators, all of which are enumerated without identification or support in her brief or are listed without evidentiary foundation in Exhibits D1 and D2.  Like Draper, Williams thus implicitly proceeds on the rejected premise that all lawyers do equal work.  (Dkt. 110 at 68-69.)  If that were true, every associate at the Firm (other than the highest-paid one) would state a *prima facie* claim just by comparison to any higher-paid associate of the opposite sex.  That is untenable and wrong.

Moreover, as with Draper, a closer look at the data only exposes the emptiness of Williams' EPA theory.  For example, while Williams touts that 33 men in her class year (across the United States) earned more than she did in 2016, she fails to mention that the same number of men in the class (33) were paid *less* than her that year.  (Wallace Decl. ¶ 7.)  As explained above, that cherry-picking itself defeats her claim.  *Supra* Part III.B.  Meanwhile, while 41 men in that same class earned more than Williams in 2017 (following her negative performance review), 40 *female* associates in the class also earned more—another fact Williams tellingly ignores.  (Wallace Decl. ¶ 8.)  In short, while Williams' new comparators are improper and irrelevant for a host of reasons, they ultimately destroy any inference that her pay suffered from sex discrimination.

Finally, this tactic is an abuse of process that the Court should not countenance:  Williams admittedly named her initial set of comparators *at random* and invented pay disparities *out of whole cloth*.  (Dkt. 102 at 15.)  After using those false allegations to survive dismissal, she now tosses them aside in favor of freshly caught fish from her discovery expedition, and demands broad discovery as to the work and performance of *hundreds* of other associates.  The practical realities of that position cannot be ignored; nor should Williams' misconduct be rewarded.

## IV.   FURTHER DISCOVERY COULD NOT REVIVE THESE EPA CLAIMS.

Desperate to keep their EPA claims alive long enough to seek certification, Plaintiffs insist they need sweeping discovery into every pay decision and every detail of Firm operations.  This

is a repeat of the rejected approach of their earlier Rule 56(d) declaration, and it fares no better. Their "generalized, speculative request[s]" to conduct more discovery does not satisfy Rule 56(d). *Freedom Watch, Inc. v. Obama*, 930 F. Supp. 2d 98, 102–03 (D.D.C. 2013).  Plaintiffs fail to identify with "particularity" any material fact that more discovery would let them dispute or prove. *United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 26-29 (D.C. Cir. 2014).

Henderson and Draper seek discovery into the process that led to their salaries and those of their "comparators."  (Opp. 44, 48, 52.)  But that is legally irrelevant since the undisputed facts already preclude them from making a *prima facie* case; if two employees do not perform "equal work," their employer does not bear the burden of justifying their pay disparity; further discovery would serve no purpose.  Moreover, this process was the subject of a Rule 30(b)(6) deposition, for which the witness (Ms. Lovitt) prepared by speaking to the very PICs that Plaintiffs want to depose. (Suppl. Chase Decl. Ex. 3 (Lovitt Tr. 8:8-15:3, 17:6-18:15); Suppl. Lovitt Decl. ¶¶ 3-4.)

In connection with the "establishment" issue, Williams demands more discovery into details that do not matter (like "participation in specific recruiting programs" or how many requests for personal transfers are denied), facts that are not disputed (like "the high degree of work across offices"), things Plaintiffs necessarily know from their time at the Firm (like how recruiting is overseen and how work is assigned), and materials already produced (like the comprehensive pay data).  (Opp. 34-35.)  All of these topics were also the subject of depositions of Firm witnesses who were prepared to address them.  (Dkt. 141 at 7-9.)  Plaintiffs also lard up their Statement of Additional Facts with picayune, immaterial details in a bid to manufacture factual issues where none exist.  Based on the core undisputed facts, however, Jones Day's 18 offices are not a single establishment, and that defeats Williams' claim.  No further discovery will change that result.

## CONCLUSION

The Court should grant Jones Day's motion, and dismiss the remaining EPA claims.

September 11, 2020

Respectfully submitted,

/s/ Mary Ellen Powers
Mary Ellen Powers (Bar No. 334045)
Beth Heifetz (Bar No. 417199)
Yaakov Roth (Bar No. 995090)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Phone: (202) 879-3939


Terri L. Chase (*pro hac vice* granted)
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3939

*Attorneys for Defendant*