# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

NILAB RAHYAR TOLTON *et al.*, *on behalf of themselves and all others similarly situated*,

       *Plaintiffs*,

    v.

JONES DAY, a General Partnership,

       *Defendant*.

Civil Action No. 19-945 (RDM)

---

## PLAINTIFFS' RESPONSES TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND PLAINTIFFS' ADDITIONAL MATERIAL FACTS

Pursuant to Local Civil Rule 7(h), Plaintiffs submit the following responses to Defendant's Statement of Undisputed Material Facts and additional Statement of Material Facts, both in opposition to Defendant's Motion for Summary Judgment on Count IV of Plaintiffs' Third Amended Complaint (TAC). Plaintiffs reference this document in their Memorandum of Law as their Statement of Responsive and Additional Material Facts ("SRAMF").

### A.  KATRINA HENDERSON

1. Jones Day notified Henderson in December 2015 that her employment by the Firm would be terminated. (Dkt. 41 at 81-82 (TAC ¶¶ 300-01); Dkt. 128-25 at 11-12 (Henderson Tr. 276:17-25, 277:22-24).)

**RESPONSE:** Undisputed.

2. After the notice of termination, Jones Day allowed Henderson to stay on the Firm's payroll temporarily while she sought her next job. (Dkt. 128-25 at 13-14 (Henderson Tr. 281:14-282:9).)

**RESPONSE:** Undisputed that Jones Day allowed Henderson to stay on the Firm's payroll temporarily while she sought her next job, but the evidence cited does not support that proposition. Henderson contends the Firm has a policy of keeping associates on the payroll while they search for another job. (Ex. B3 (Henderson Tr. 286:3-9).)

3. At the end of June 2016, Henderson was placed on unpaid leave. (Dkt. 128-25 at 15 (Henderson Tr. 283:15-20); Dkt. 41 at 82 (TAC ¶ 304); *see* Bounds Decl. ¶ 8.)

**RESPONSE:** Undisputed that Jones Day placed Henderson on unpaid leave at the end of June 2016. Plaintiff Henderson maintains that she was told it would be beneficial for both Jones Day and for her to extend her employment with Jones Day until July 15 when her process with a prospective employer would be complete. (Ex. B3 (Henderson Tr. 286:18-23; 287:15-18).)

4. Henderson ended her employment at Jones Day on July 15, 2016. (Bounds Decl. ¶ 8.)

**RESPONSE:** Disputed. This statement mischaracterizes the cited evidence. The referenced paragraph in the Declaration of Lori Bounds states "Termination Date: 7/15/16." Plaintiff Henderson asserts that the Firm unexpectedly told her to look for other employment despite positive reviews of her work in 2015. (Ex. B3 (Henderson Tr. 141:21-23; 276:17-25).)

5. In calendar year 2016, Henderson recorded zero client billable hours and zero pro bono hours of work. (Dkt. 128-38 at 2 (Chase Decl. Ex. 27).)

**RESPONSE:** Undisputed. In addition, Henderson recorded 910 Firm hours in calendar year 2016. (Dkt. 146-38 at 2 (Chase Decl. Ex. 27, Opp. to Am. Mot. Cond. Cert.).)


**B. SAIRA DRAPER**

6. Draper joined Jones Day's Atlanta office as a first-year associate in October 2011. (Bounds Decl. ¶ 9.)

**RESPONSE:** Undisputed.

7. In calendar year 2015, Draper recorded 394 client billable hours and 281 pro bono hours. (Dkt. 102-15 at 3.)

**RESPONSE:** Undisputed. In addition, Draper recorded 256 "Firm & Public Service" hours in calendar year 2015. (*Id.*)

8. On an annualized basis—meaning proportionally increased to reflect the hours an associate would have recorded had the associate been working for the entire year without leave—Draper recorded 642 client billable hours and 458 pro bono hours in calendar year 2015. (*Id.*)

**RESPONSE:** Undisputed. In addition, on an annualized basis, Draper recorded 417 "Firm & Public Service" hours in calendar year 2015. (*Id.*)

9. In calendar year 2016, Draper recorded 1,134 client billable hours and 370 pro bono hours. (*Id.*)

**RESPONSE:** Undisputed. In addition, Draper recorded 563 "Firm & Public Service" hours in calendar year 2016. (*Id.*)

10. In calendar year 2017, Draper recorded 1,032 client billable hours and 167 pro bono hours. (*Id.*)

**RESPONSE:** Undisputed. In addition, Draper recorded 328 "Firm & Public Service" hours in calendar year 2017. (*Id.*)

11. On an annualized basis, Draper recorded 1,371 client billable hours and 222 pro bono hours in calendar year 2017. (*Id.*)

**RESPONSE:** Undisputed. In addition, on an annualized basis, Draper recorded 435 "Firm & Public Service" hours in calendar year 2017. (*Id.*)

12. In calendar year 2018, Draper recorded 397 client billable hours and 486 pro bono hours. (*Id.* at 2.)

**RESPONSE:** Undisputed. In addition, Draper recorded 306 "Firm & Public Service" hours in calendar year 2018. (*Id.*)

13. On an annualized basis, Draper recorded 631 client billable hours and 774 pro bono hours in calendar year 2018. (*Id.*)

**RESPONSE:** Undisputed. In addition, on an annualized basis, Draper recorded 487 "Firm & Public Service" hours in calendar year 2018. (*Id.*)

14. Draper left the Firm on October 4, 2018. (Bounds Decl. ¶ 9.)

**RESPONSE:** Undisputed.

15. As of July 1, 2014, Draper's compensation was $180,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

16. As of July 1, 2015, Draper's compensation was $195,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

17. As of July 1, 2016, Draper's compensation was $220,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

18. As of July 1, 2017, Draper's compensation was $230,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

19. ███████████ joined Jones Day's Atlanta office as a first-year associate in October 2013. (*Id.* at ¶ 11.)

**RESPONSE:** Undisputed.

20. In calendar year 2015, ███ recorded 2,144 client billable hours and 58 pro bono hours. (Dkt. 128-37 at 2 (Chase Decl. Ex. 26).)

**RESPONSE:** Materially undisputed. ███ recorded 2,143.85 client billable hours and 58.25 client "non-billable" hours in calendar year 2015. (Dkt. 123-11 and 146-37 at 2 (public, redacted version of same) (Chase Decl. Ex. 26, Opp. to Am. Mot. Cond. Cert.).) In addition, ███ recorded 294.25 Firm hours in calendar year 2015. (*Id.*)

21. In calendar year 2016, ███ recorded 2,185 client billable hours and 0 pro bono hours. (*Id.* at 3.)

**RESPONSE:** Materially undisputed. ███ recorded 2,185.40 client billable hours in calendar year 2016. (Dkt. 123-11 and 146-37 at 3 (public, redacted version of same) (Chase Decl. Ex. 26, Opp. to Am. Mot. Cond. Cert.).) In addition, ███ recorded 152 Firm hours in calendar year 2016. (*Id.*)

22. In calendar year 2017, ███ recorded 2,067 client billable hours and 14 pro bono hours. (*Id.* at 4.)

**RESPONSE:** Materially undisputed. ███ recorded 2,067.40 client billable hours and 14.25 "client non-billable" hours in calendar year 2017. (Dkt. 123-11 and 146-37 at 4 (public, redacted version of same) (Chase Decl. Ex. 26, Opp. to Am. Mot. Cond. Cert.).) In addition, ███ recorded 185.75 Firm hours in calendar year 2017. (*Id.*)

23. In calendar year 2018, ███ recorded 1,896 client billable hours and 28 pro bono hours. (*Id.* at 5.)

**RESPONSE:** Materially undisputed. ███ recorded 1,896.20 client billable hours and 28 "client non-billable" hours in calendar year 2018. (Dkt. 123-11 and 146-37 at 5 (public, redacted version of same) (Chase Decl. Ex. 26, Opp. to Am. Mot. Cond. Cert.).) In addition, ███ recorded 86 Firm hours in calendar year 2018. (*Id.*)

24. As of January 2015, ███ compensation was $155,000 per year. (Bounds Decl. ¶ 11.)

**RESPONSE:** Undisputed.

25. As of July 1, 2015, ███ compensation was $170,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

26. As of July 1, 2016, ███ compensation was $210,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

27. As of July 1, 2017, ███████ compensation was $260,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

28. As of July 1, 2018, ███████ compensation was $300,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

29. ███████████████ joined Jones Day's Atlanta office as a first-year associate in October 2014. (Bounds Decl. ¶ 12.)

**RESPONSE:** Undisputed.

30. ███████████ left the Firm on ███████████. (*Id.*)

**RESPONSE:** Undisputed, except to the extent Defendant implies that ███████ left the Firm voluntarily. The referenced paragraph in the Declaration of Lori Bounds states only "Termination Date: ███████." (Dkt. 126-3 and 129-2 (public, redacted version of same) (Bounds Decl. ¶ 12).)

31. In calendar year 2015, ███████ recorded 1,689 client billable hours and 136 pro bono hours. (Dkt. 128-40 at 2 (Chase Decl. Ex. 29).)

**RESPONSE:** Materially undisputed. ███████ recorded 1,689 client billable hours and 135.5 "client non-billable" hours in calendar year 2015. (Dkt. 123-13 and 146-40 at 2 (public, redacted version of same) (Chase Decl. Ex. 29, Opp. to Am. Mot. Cond. Cert.).) In addition, ███████ recorded 429 Firm hours in calendar year 2015. (*Id.*)

32. In calendar year 2016, ███████ recorded 1,990 client billable hours and 1 pro bono hour. (*Id.* at 3.)

**RESPONSE:** Materially undisputed. ███████ recorded 1,989.75 client billable hours and 1 "client non-billable" hour in calendar year 2016. (Dkt. 123-13 and 146-40 at 3 (public, redacted version of same) (Chase Decl. Ex. 29, Opp. to Am. Mot. Cond. Cert.).) In addition, ███████ recorded 161.50 Firm hours in calendar year 2016. (*Id.*)

33. In calendar year 2017, ███████ recorded 1,997 client billable hours and 28 pro bono hours. (*Id.* at 4.)

**RESPONSE:** Materially undisputed. ███████ recorded 1,996.70 client billable hours and 28.25 "client non-billable" hours in calendar year 2017. (Dkt. 123-13 and 146-40 at 4 (public, redacted version of same) (Chase Decl. Ex. 29, Opp. to Am. Mot. Cond. Cert.).) In addition, ███████ recorded 203.25 Firm hours in calendar year 2017. (*Id.*)

34. In calendar year 2018, ███████ recorded 1,431 client billable hours and 11 pro bono hours. (*Id.* at 5.)

**RESPONSE:** Materially undisputed. ███████ recorded 1,431.20 client billable hours and 11 "client non-billable" hours in calendar year 2018. (Dkt. 123-13 and 146-40 at 5 (public, redacted version of same) (Chase Decl. Ex. 29, Opp. to Am. Mot. Cond. Cert.).)  In addition, ███████ recorded 119.75 Firm hours in calendar year 2018. (*Id.*)

35. On an annualized basis, ███████ recorded 1,908 billable hours and 15 pro bono hours for calendar year 2018. Those figures reflect his raw recorded hours for the nine months of the year during which he was a Firm employee, divided by nine and then multiplied by twelve. (*See id.*)

**RESPONSE:** Materially undisputed. On an annualized basis using the method cited above, ███████ recorded 1908.27 billable hours and 14.67 "client non-billable" hours for calendar year 2018. (*See* Dkt. 123-13 and 146-40 at 5 (public, redacted version of same) (Chase Decl. Ex. 29, Opp. to Am. Mot. Cond. Cert.).)

36. As of January 1, 2015, ███████ compensation was $150,000 per year. (Bounds Decl. ¶ 12.)

**RESPONSE:** Undisputed.

37. As of January 1, 2016, ███████ compensation was $153,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

38. As of July 1, 2016, ███████ compensation was $190,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

39. As of July 1, 2017, ███████ compensation was $210,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

40. As of July 1, 2018, ███████ compensation was $250,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

41. ███████ joined Jones Day's Atlanta office as a first-year associate in October 2012. (Bounds Decl. ¶ 13.)

**RESPONSE:** Undisputed.

42. In calendar year 2015, ███████ recorded 2,003 client billable hours and 9 pro bono hours. (Dkt. 128-31 at 2 (Chase Decl. Ex. 20).)

**RESPONSE:** Materially undisputed. ███████ recorded 2,0003.05 client billable hours and 8.5 "client non-billable" hours in calendar year 2015. (Dkt. 123-5 and 146-31 at 2 (public, redacted

version of same) (Chase Decl. Ex. 20, Opp. to Am. Mot. Cond. Cert.).) Additionally, ████████ recorded 333.75 Firm hours in calendar year 2015. (*Id.*)

43. In calendar year 2016, ████████ recorded 1,773 client billable hours and 107 pro bono hours. (*Id.* at 3.)

**RESPONSE:** Materially undisputed. ████████ recorded 1,772.60 client billable hours and 107 "client non-billable" hours during calendar year 2016. (Dkt. 123-5 and 146-31 at 3 (public, redacted version of same) (Chase Decl. Ex. 20, Opp. to Am. Mot. Cond. Cert.).)  Additionally, ████████ recorded 260 Firm hours during calendar year 2016. (*Id.*)

44. On an annualized basis, ████████ recorded 1,923 client billable hours and 116 pro bono hours in calendar year 2016. (Dkt. 107-5 at 2.)

**RESPONSE:** Undisputed.

45. In calendar year 2017, ████████ recorded 2,067 client billable hours and 97 pro bono hours. (*Id.* at 4.)

**RESPONSE:** Disputed as to citation. Undisputed as to fact. The correct citation appears to be Dkts. 108-2 and 107-5 at 2 (public, redacted version of same) (Second Chase Decl. Ex 3, Mot. for Sanctions).

46. In calendar year 2018, ████████ recorded 2,077 client billable hours and 42 pro bono hours. (*Id.* at 5.)

**RESPONSE:** Disputed, because the evidence does not support this statement. Dkt. 108-2 and 107-5 (public, redacted version of same) contain no information regarding ████████s recorded hours for calendar year 2018.

47. As of January 1, 2015, ████████ compensation was $170,000 per year. (Bounds Decl. ¶ 13.)

**RESPONSE:** Undisputed.

48. As of July 1, 2015, ████████ compensation was $185,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

49. As of July 1, 2016, ████████ compensation was $230,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

50. As of July 1, 2017, ████████ compensation was $265,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

51. As of July 1, 2018, ██████s compensation was $315,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

52. ████████ joined Jones Day's Atlanta office as an associate in October 2015. (*Id.* at ¶ 14.)

**RESPONSE:** Undisputed.

53. ████starting salary was $150,000 per year and it was raised to $180,000 as of July 1, 2016. (*Id.*)

**RESPONSE:** Undisputed.

54. As of January 1, 2017, ██████salary was $185,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

55. As of July 1, 2017, ██████ salary was $195,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

56. As of July 1, 2018, ██████ salary was $225,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

57. Between 2016 and 2018, Jones Day increased starting salaries for associates in the Atlanta office by $40,000. (Dkt. 128-2 (Deane Decl. ¶¶ 21-23); *see also* Dkt. 102-8 at 13-14, 27 (Draper Tr. 129:24-130:23; 149:9-24).)

**RESPONSE:** Undisputed. The starting salary increases between 2016 and 2018 were the result of Jones Day taking account of market changes. None of the decisions to increase starting salaries were made at the office level but were approved by Jones Day's Managing Partner Stephen J. Brogan. (Dkt. 146 at 14 (Opp. to Am. Mot. Cond. Cert.).) Moreover, Plaintiffs have not had the opportunity to depose office leaders on their declaratory statements offered in support of Jones Day's assertion of fact.

## C. MEREDITH WILLIAMS

58. Meredith Williams joined Jones Day's Irvine office as a first-year associate in October 2013. (Dkt. 41 at 48 (TAC ¶ 162); Bounds Decl. ¶ 10.)

**RESPONSE:** Undisputed.

59. Williams joined the Intellectual Property practice. (Bounds Decl. ¶ 10.)

**RESPONSE:** Undisputed.

60. Williams earned $160,000 per year as her starting salary. (*Id.*)

**RESPONSE:** Undisputed.

61. As of January 1, 2015, Williams's compensation was $170,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

62. As of July 1, 2015, Williams's compensation was $185,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

63. As of July 1, 2016, Williams's compensation was $205,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

64. As of July 1, 2017, Williams's compensation was $215,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

65. ██████████ joined the Firm's Dallas office as a first-year associate in October 2013. (*Id.* at ¶ 15.)

**RESPONSE:** Undisputed.

66. ██████ joined the ████████████████ practice. (*Id.*)

**RESPONSE:** Undisputed.

67. ██████ earned $160,000 per year as his starting salary. (*Id.*)

**RESPONSE:** Undisputed.

68. As of January 1, 2015, ██████ compensation was $170,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

69. As of July 1, 2015, ██████ compensation was $180,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

70. As of July 1, 2016, ██████ compensation was $185,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

71. ██████ left the Firm on ████████████. (*Id.*)

**RESPONSE:** Undisputed.

72. ████████████ joined the Firm's New York office as a first-year associate in October 2013. (*Id.* at ¶ 16.)

**RESPONSE:** Undisputed.

73. ██████ joined the ████████████████████████ practice. (*Id.*)

**RESPONSE:** Undisputed.

74. ██████ earned $160,000 per year as his starting salary. (*Id.*)

**RESPONSE:** Undisputed.

75. As of January 1, 2015, ████████ compensation was $175,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

76. As of July 1, 2015, ████████ compensation was $210,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

77. As of July 1, 2016, ████████ compensation was $265,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

78. As of July 1, 2017, ████████ compensation was $350,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

79. ████████████ joined the Firm's Pittsburgh office as a first-year associate in October 2014. (*Id.* at ¶ 17.)

**RESPONSE:** Undisputed.

80. ██████ joined the ████████████████████ practice. (*Id.*)

**RESPONSE:** Undisputed.

81. ██████ earned $145,000 per year as his starting salary. (*Id.*)

**RESPONSE:** Undisputed.

82. As of January 1, 2016, ████████ compensation was $150,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

83. As of July 1, 2016, ███████ compensation was $170,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

84. As of July 1, 2017, ███████ compensation was $175,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

85. As of July 1, 2018, ███████ compensation was $190,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

86. ███████ joined the Firm's San Diego office as a first-year associate in October 2013. (*Id.* at ¶ 18.)

**RESPONSE:** Undisputed.

87. ███ joined the ███████████████ practice. (*Id.*)

**RESPONSE:** Undisputed.

88. ███ earned $160,000 per year as his starting salary. (*Id.*)

**RESPONSE:** Undisputed.

89. As of January 1, 2015, ███████ compensation was $170,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

90. As of July 1, 2015, ███████ compensation was $180,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

91. As of July 1, 2016, ███████ compensation was $190,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

92. ███████ joined the Firm's Dallas office as a second-year associate in October 2013 after completing a judicial clerkship. (*Id.* at ¶ 19.)

**RESPONSE:** Undisputed.

93. ███ joined the ███████████████ practice. (*Id.*)

**RESPONSE:** Undisputed.

94. ▆▆▆ earned $160,000 per year as his starting salary, and it was increased to $170,000 as of January 1, 2014. (*Id.*)

**RESPONSE:** Undisputed.

95. As of July 1, 2014, ▆▆▆ compensation was $185,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

96. As of July 1, 2015, ▆▆▆ compensation was $205,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

97. As of July 1, 2016, ▆▆▆ compensation was $220,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

98. ▆▆▆ joined the Firm's Houston office as a first-year associate in October 2013. (*Id.* at ¶ 20.)

**RESPONSE:** Undisputed.

99. ▆▆▆ joined the ▆▆▆ practice. (*Id.*)

**RESPONSE:** Undisputed.

100. ▆▆▆ transferred to the Firm's Washington, D.C. office on January 1, 2017. (*Id.*)

**RESPONSE:** Undisputed.

101. ▆▆▆ earned $160,000 per year as his starting salary. (*Id.*)

**RESPONSE:** Undisputed.

102. As of January 1, 2015, ▆▆▆ compensation was $170,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

103. As of July 1, 2015, ▆▆▆ compensation was $180,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

104. As of July 1, 2016, ▆▆▆ compensation was $210,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

105. As of July 1, 2017, █████████ compensation was $225,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

106. █████████ joined the Firm's Irvine office as a first-year associate in October 2007. (*Id.* at ¶ 21.)

**RESPONSE:** Undisputed.

107. ████████ joined the ███████████████████ practice. (*Id.*)

**RESPONSE:** Undisputed.

108. ██████ earned $160,000 per year as his starting salary. (*Id.*)

**RESPONSE:** Undisputed.

109. As of January 1, 2009, █████████ compensation was $175,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

110. As of July 1, 2009, ████████ compensation was $175,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

111. As of July 1, 2010, ████████ compensation was $175,000 per year. (*Id.*)

**RESPONSE:** Undisputed.

112. As of July 1, 2011, ████████ compensation was $190,000 per year. (*Id.*)

**RESPONSE:** Undisputed. In addition, as of July 1, 2012, █████████ compensation was $205,000 per year. (Dkt. 126-3 and 129-2 (public, redacted version of same) (Bounds Decl. ¶ 21).)

113. ██████ left the Firm on ██████████ . (*Id.*)

**RESPONSE:** Undisputed.

114. █████████ joined the Firm's Irvine office as a first-year associate in October 2009. (*Id.* at ¶ 22.)

**RESPONSE:** Undisputed.

115. ███████ joined the ████████████ practice. (*Id.*)

**RESPONSE:** Undisputed.

116. ███████ earned $160,000 per year as his starting salary. (*Id.*)

**RESPONSE:** Undisputed.

117. ███████ salary remained $160,000 for his entire time at the Firm. (*Id.*)

**RESPONSE:** Undisputed.

118. ███████ left the Firm on ████████████. (*Id.*)

**RESPONSE:** Undisputed.

119. ████████████ joined the Firm's Irvine office as a fourth-year associate in March 2013. (*Id.* at ¶ 23.)

**RESPONSE:** Undisputed.

120. ███████ joined the ████████████ group. (*Id.*)

**RESPONSE:** Undisputed.

121. ███████ starting salary was $220,000 and it was raised to $230,000 as of July 1, 2013. (*Id.*)

**RESPONSE:** Undisputed.

122. ███████ left the Firm on April 1, 2014, before going through an annual evaluation process. (*Id.*)

**RESPONSE:** Undisputed.

**D. JONES DAY'S OFFICE-BASED SYSTEMS FOR RECRUITING, EVALUATING, AND COMPENSATING ASSOCIATES**

123. Associate recruiting at Jones Day is conducted at the office level. (Dkt. 128-30 at 3 (Reisman Tr. 44:4-9).)

**RESPONSE:** Disputed. Jones Day coordinates key aspects of the recruitment process at a Firmwide level through its Firmwide Hiring Partner. (Ex. A1 (Reisman Tr. 61: 2-17).) The Firmwide Hiring Partner coordinates hiring with office hiring partners and recruiting staff, and the Recruiting Department also specifies the recruiting strategies the Firm will undertake, as well as the criteria that the Firm seeks in candidates. (*Id.* (Reisman Tr. 55:4-16, 22-23; 82:9-19); Ex. C7 (JD_00399674 at 675-84, 713-17, 29); Ex. C10 (JD_02111939 at 45, 46, 53, 56); Ex. C11

(JD_00400151 at 72-73, 84, 88); Ex. C12 (JD_02016916).) The Firm expects office leadership to hold meetings in each office with each attorney conducting interviews to reinforce the qualities the Firm seeks. (Ex. A1 (Reisman Tr. 55:3-9, 82:9-19).) The Firmwide Hiring Partner also distributes memos to attorneys who will be conducting on-campus interviews that set logistical rules for attorneys conducting interviews. (Ex. C15 (JD_02111919).) And the Firm employs a Firmwide Recruiting Manager to assist the Firmwide Hiring Partner in coordinating logistics, including centralized guidelines on travel, expenses, and reimbursements. *Id.* Finally, the Firmwide Hiring Partner also communicates Firmwide recruitment statistics to the offices. (Ex. C12 (JD_02016916).)

124. Each office decides which recruiters to send for on-campus interviews. (Dkt. 128-30 at 6-7 (Reisman Tr. 61:22-62:2).)

**RESPONSE:** Undisputed that each office decides which recruiters to send for on-campus interviews. But it is the responsibility of the Firmwide Hiring Partner to approve how many recruiters are sent to each school and how many interviews are scheduled at each. (Ex. A1 (Reisman Tr. 60:23-61:17).) The Firmwide Hiring Partner also directs the process by which recruiters from each office are approved by office leadership. (*Id.* (Reisman Tr. 63:3-9).) And it is also the responsibility of the Firmwide Hiring Partner to ensure that the recruiting attorneys sent out to campuses are "diverse." (*Id.* (Reisman Tr. 83:2-7).)

125. Each office selects candidates that they individually as an office would like to call back for further interviews. (Dkt. 128-30 at 8, 9-10 (Reisman Tr. at 70:4-9, 74:24-75:2).)

**RESPONSE:** Undisputed that each office selects candidates they would like to call back for further interviews. But interviewers from other offices often perform initial on-campus interviews and provide feedback and recommendations for callbacks to other offices to which the candidate is applying. (Ex. A1 (Reisman Tr. 69:18-71:16); Ex. C7 (JD_00399674 at 82); Ex. C10 (JD_02111939 at 54); Ex. C13 (JD_01439406).) Recruiters are also given guidance on when and how to make a referral to another office. (Ex. C11 (JD_004000151 at 85); Ex. C10 (JD_02111939 at 54).)

126. Each office makes independent hiring decisions, both as to summer associates and full-time associate positions. (Dkt. 128-30 at 3, 4-5, 11-12 (Reisman Tr. at 44:4-11, 50:24-51:21, 123:16-124:15).)

**RESPONSE:** Disputed. An office may need to obtain approval from a firmwide practice group before it can extend an offer to a candidate. (Ex. C17 (JD_02018072).) Moreover, an office, in order to attract a particular candidate, may collaborate with another office to offer a position that is split between two cities. (*Id.*) And if an office seeks to hire a lateral candidate who has been out of law school for more than five years, that office must have the approval of the office partner-in-charge, the relevant practice leader, the Firmwide Hiring Partner, and the Firmwide Administrative Partner. (Ex. C6 (JD_00002299 at 384).) Moreover, offices cannot extend offers to an unlimited number of candidates; rather, office headcounts are centrally controlled. (Ex. A1 (Reisman 72:15-22).) Finally, to the extent that this evidence does not suffice to dispute this fact, the record

warrants further development, including through evidence specified in Plaintiffs' Rule 56(d) declaration. (Dkt. 139 (Kornblith Decl. ¶¶ 16, 18).)

127. No approval at the firm-wide level is needed for associate hiring decisions. (Dkt. 128-30 at 11-13 (Reisman Tr. at 123:16-125:7).) The Partner in Charge "PIC" of each office has discretion to set the initial compensation for lateral associate hires. (Dkt. 128-5 (Lovitt Decl. ¶ 21).)

**RESPONSE:** Disputed. An office may need to obtain approval from a firmwide practice group before it can extend an offer to a candidate. (Ex. C17 (JD_02018072).) Moreover, an office, in order to attract a particular candidate, may collaborate with another office to create a position that is split between two cities. (*Id.*) And offices cannot extend offers to an unlimited number of candidates; rather, office headcounts are centrally controlled. (Ex. A1 (Reisman 72:15-22).) In addition, some offices also need the permission of a Regional Partner-in-Charge to make an offer to an associate. (*Id.* (Reisman Tr. 125:2-7).)

      The Firmwide Hiring Partner Sharyl Reisman is involved in the implementation of policies on lateral hiring at the Firm. (*Id.* (Reisman Tr. 45:3-5).) The name of any candidate for a lateral position must be submitted to the Firm's Manager of Lateral Recruiting before any contact is made with a potential candidate. (Ex. C6 (JD_00002299 at 384).) And if an office seeks to hire a lateral candidate who has been out of law school for more than five years, that office must have the approval of the office partner-in-charge, the relevant practice leader, the Firmwide Hiring Partner, and the Firmwide Administrative Partner. (*Id.*) The lateral's salary is constrained by the office's budget. (Dkt. 117-23 and 145-18 (public, redacted version of same) (Ex. P, Am. Mot. Cond. Cert.).) Finally, to the extent that this evidence does not suffice to dispute this fact, the record warrants further development, including through evidence specified in Plaintiffs' Rule 56(d) declaration. (Dkt. 139 (Kornblith Decl. ¶¶ 16, 18).)

128. The PIC in each office is responsible for making the recommendations for salary adjustments for associates in that office. (Dkt. 128-15 at 8, 10 (Lovitt Tr. at 47:22-23, 50:13-16).)

**RESPONSE:** Undisputed. When making compensation recommendations, Firm Practice Services provides PICs with a salary worksheet that includes a budget, the associate's billing rate, current compensation, billable and non-billable hours, office and practice ratings, and any rankings for the past evaluation cycle. (Dkts. 117-23 and 145-18 (public, redacted version of same), 117-25 and 145-20 (public, redacted version of same), 117-26 and 145-21 (public, redacted version of same), 117-27 and 145-22 (public, redacted version of same), 117-28 and 145-23 (public, redacted version of same) (Exs. P, R, S, T, U, Am. Mot. Cond. Cert.).)

129. Each PIC exercises independent discretion in apportioning its office compensation budget. (Dkt. 128-5 (Lovitt Decl. ¶ 24).)

**RESPONSE:** Disputed. Any discretion of PICs to apportion their office compensation budgets is circumscribed by decisions made by Managing Partner Stephen J. Brogan. (Ex. C8 (JD_02202966); Dkts. 117-22 and 145-17 (public, redacted version of same), 117-23 and 145-18 (public, redacted version of same) (Exs. O, P, Am. Cond. Cert. Mot.).) The Firm also constrains the apportionment of budgets through the criteria it directs and through presumptive increases; these expectations are communicated to PICs from Firm leadership. (*Id.*) The Firm also convenes

a Budget Committee that has the responsibility of forecasting both revenue and expenses for each office at the Firm. (Ex. A2 (Lovitt Tr. 36:2-8).) Plaintiffs seek to depose Managing Partner Brogan and the Atlanta, Irvine, and New York Partners-in-Charge during the relevant period in order to ascertain the degree of control they exercise over associate compensation. (Dkt. 139 (Kornblith Decl. ¶¶ 16).)

130. The Firm does not have a compensation structure or ladder that is uniform across all geographic markets. (Dkt. 102-9 at 3.)

**RESPONSE:** Undisputed that the Firm does not have a compensation ladder that is uniform across all geographic markets. The Firm does consider market tiers and groups its U.S. offices into one of two tiers when considering compensation within a particular office. (Dkts. 117-22 and 145-17 (public, redacted version of same), 117-23 and 145-18 (public, redacted version of same) (Exs. O, P, Am. Cond. Cert. Mot.).) Plaintiffs do not understand exactly what Defendant means by the term "structure" in this context and therefore object to the term as ambiguous and further dispute that Jones Day does not have a compensation structure that is uniform across all geographic markets. The Firm has a uniform approach to compensation and a uniform process for salary adjustments that structure and define compensation at the Firm. (Dkts. 117-14 and 145-9 (public, redacted version of same), 117-15 and 145-10 (public, redacted version of same), 117-22 and 145-17 (public, redacted version of same), 117-23 and 145-18 (public, redacted version of same) (Exs. G, H, O, P, Am. Mot. Cond. Cert.)); (Dkt. 146-5 (Lovitt Decl., Opp. to Am. Mot. Cond. Cert.).)

131. Each PIC transmits a list of recommended compensation adjustments to Traci Lovitt (since late 2016) and Michael Shumaker, who review the recommendations and may suggest revisions before forwarding the recommended adjustments to the Managing Partner for approval. (Dkt. 128-5 (Lovitt Decl. ¶¶ 24-27); *see* Dkt. 128-15 at 8-9 (Lovitt Tr. 47:22-48:22).)

**RESPONSE:** Undisputed.

132. Any changes made by the Managing Partner to the recommended compensation adjustments are sent back to the PIC, who conducts another review and can challenge any changes. (Dkt. 128-15 at 9, 11 (Lovitt Tr. 48:10-22, 54:18-55:11); Dkt. 128-6 (Lovrien Decl. ¶ 28); Dkt. 125-14 (Chase Decl. Ex. 3 at 3.))

**RESPONSE:** Undisputed that PICs are informed of the Managing Partner's finalized changes to associate compensation and that PICs are told they may inform Firm leadership if something looks amiss with finalized associate compensation for their office. (Dkts. 145-30, 145-31, 145-32 (Exs. BB, CC, DD, Am. Mot. for Cond. Cert.).) Disputed that "challenge[s]" occur with any meaningful frequency such that they may be described as a meaningful practice. *See* Ex. A2 (Lovitt Tr. 51:21-52:4; 60:3-61:7).) Plaintiffs have also not had the opportunity to depose office leaders on their declaratory statements offered in support of Jones Day's assertion of fact.

133. Of the 29 pay adjustments experienced by the six named Plaintiffs collectively during their tenures at the Firm, 26 adjustments were the amounts recommended by the PICs. (Dkt. 128-10 (Coussons Decl. Ex. 1 cols. U, X, AK, AN, BC, BF, BI, BK, BX, CA, CD, CE, CS, CV, CW, DO, DS, EJ, EO, rows 3, 5, 7, 9, 11, 13).)

**RESPONSE:** Undisputed. The adjustments recommended by the PICs were ultimately approved by Firm Administrative Partner Mike Shumaker, Partner Traci Lovitt, and/or Managing Partner Stephen J. Brogan. (Dkt. 123-14 and 146-10 (public, redacted version of same) (Coussons Decl. Ex. 1, Opp. to Am. Mot. Cond. Cert.).) Furthermore, with regard to the pay decisions for Plaintiffs' named male comparators, Firm Administrative Partner Mike Shumaker, Partner Traci Lovitt, and/or Managing Partner Stephen J. Brogan rejected the local recommendations approximately 20 times. (*Id.* (columns U, X, AK, AN, BD, BC, BD, BE, BF, BI, BK, BX, BY, BZ, CA, CD, CE, CS, CT, CU, CV, CW, CZ, DA, DO, DP, DQ, DR, DS, EJ, EK, EL, EM, EN, EO).)

134. There is no firm-wide system for assigning work to associates. (Dkt. 128-15 at 79-80 (Lovitt Tr. 310:23-311:4).)

**RESPONSE:** Disputed. Jones Day communicates to associates that they are expected to build networks across the Firm, starting from the time they are summer associates, in order to secure work assignments. (Ex. A1 (Reisman Tr. 206:19-209:6)) To foster this practice, Jones Day convenes Firmwide in-person gatherings for summer associates and for new lawyers who join the Firm after graduation from law school. (*Id.* (Reisman Tr. 154:19-156:15)) Jones Day also maintains a system, called Lawyer Availability, that tracks the assignments of New Lawyers. (Ex. E2 at 14 (Def's Responses to Pls.' ESI Interrogatories).)

135. Work assignments for new lawyers are managed by the new lawyer group coordinator in each office. (Dkt. 128-30 at 14, 15-19 (Reisman Tr. 205:5-15, 206:20-210:16).)

**RESPONSE:** Undisputed that work assignments for new lawyers are managed by the new lawyer group coordinator in each office. New lawyer group coordinators use the Firm's centralized Lawyer Availability database to track the work of new lawyers. (Ex. A1 (Reisman Tr. 204:16-206:16).) And new lawyer group coordinators assist new lawyers in obtaining assignments from attorneys in other offices. (*Id.* (Reisman Tr. 210:10-16).)

136. Associates cannot transfer or be transferred to another office without approval from both offices' PICs. (Dkt. 128-5 (Lovitt Decl. ¶ 9).)

**RESPONSE:** Undisputed, but transfer requests must also go through a series of approvals directed by Jones Day's Firmwide Practice Services, a process which concludes with Firmwide Human Resources. (Ex. A3 (Bounds Tr. 90:14-91:6).) If there is an unexpected delay in processing the transfer request, Firmwide Human Resources will investigate the issue alongside Firmwide Practice Services. (*Id.*) Plaintiffs further note that they have not had the opportunity to depose Ms. Lovitt.

137. Inter-office transfers, where approved, are generally an accommodation to an associate, not a management decision for the benefit of the Firm. (*Id.*)

**RESPONSE:** Disputed. Jones Day does not permit transfers unless there is a need for the lawyer in the destination office. (Ex. C7 (JD_00399674 at 728).) And some transfers between offices are initiated by the Firm (Ex. D9; *see infra* ¶¶ 199-204.) To the extent that this evidence does not

suffice to dispute this fact, including because the record does not reflect the frequency with which Jones Day denies transfers and its rationales for doing so, the record warrants further development, including through evidence specified in Plaintiffs' Rule 56(d) declaration. (Dkt. 139 (Kornblith Decl. ¶¶ 16, 18).)

138. During the annual review process, each Jones Day office uses its own process to rate and rank its associates and has final say over those rating and rankings. (Dkt. 128-15 at 22, 28-29, 45 (Lovitt Tr. 108:2-10, 123:19-124:4, 186:10-18); Dkt. 128-4 (Laduzinski Decl. ¶¶ 18-22); Dkt. 128-1 (Cottriel Decl. ¶¶ 11, 16, 18).)

**RESPONSE**: Undisputed that each office has final say over office ratings and rankings but disputed that each office uses its own process to rate and rank associates. The Firm provides each Partner-in-Charge with uniform instructions on assigning numerical ratings (1-5). These instructions state that ratings are intended to account for the PIC or PL's:

> overall assessment of the lawyer's performance during the evaluation period, taking into account the evaluators' written evaluations, the lawyer's productivity and other relevant contributions, if any, to the Practice, Office, or Firm. Additional considerations should include, when applicable, whether or not the lawyer assumed responsibilities and performed work of appropriate complexity at a level consistent with the Firm's expectations for lawyers with comparable time in the practice, whether a senior associate is working with and gaining exposure to a range of partners in his or her Office and Practice, and whether any part-time arrangement continues to meet the needs of both the lawyer and the Firm.

(Dkt. 117-24 and 145-19 (public, redacted version of same) (Ex. Q, Am. Mot. Cond. Cert.).) Furthermore, Plaintiffs have not had the opportunity to depose office (or practice) leaders on their declaratory statements offered in support of Jones Day's assertion of fact. Accordingly, to the extent that this evidence does not suffice to dispute this fact, the record warrants further development, including through evidence specified in Plaintiffs' Rule 56(d) declaration and the depositions of Defendant's declarants. (Dkt. 139 (Kornblith Decl. ¶¶ 15, 18).)

### Plaintiffs' Statement of Additional Material Facts

Pursuant to Local Civil Rule 7(h), Plaintiffs submit the following additional material

facts that preclude summary judgment.

### A. Plaintiff Williams Was Paid Less than Men Who Performed Substantially Equal Work

139. When he was a third-year associate, ████████████ (Male Associate 9) was paid $5,000 more than Plaintiff Williams when she was a third-year associate. (Dkts. 87-6 and 115-10 at 2-3 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2-3 (public, redacted version of same); Dkt. 123-14 and 146-10 at 7 (public, redacted version of same).)

140. When he was a fourth-year associate, ███████████ (Male Associate 9) was paid $10,000 more than Plaintiff Williams when she was a fourth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2-3 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2-3 (public, redacted version of same); Dkt. 123-14 and 146-10 at 8 (public, redacted version of same).)

141. When he was a third-year associate, ███████████ (Male Associate 8) was paid $60,000 more than Plaintiff Williams when she was a third-year associate. (Dkt. 87-6 and Dkt 115-10 at 2-3 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2-3 (public, redacted version of same); Dkt. 123-14 and 146-10 at 7 (public, redacted version of same).)

142. When he was a fourth-year associate, ███████████ (Male Associate 8) was paid $135,000 more than Plaintiff Williams when she was a fourth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2-3 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2-3; Dkt. 123-14 and 146-10 at 8 (public, redacted version of same).)

143. When he was a fourth-year associate, ███████████ (Male Associate 14) was paid $15,000 more than Plaintiff Williams when she was a fourth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2-3 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2-3 (public, redacted version of same); Dkt. 123-14 and 146-10 at 24, 68 (public, redacted version of same).)

144. In 2015, Plaintiff Williams was paid less than 332 male Jones Day associates, 9 of whom were located in the Irvine office, 159 of whom billed the same or fewer hours than she did, and 219 of whom billed the same or fewer hours than she did in the previous calendar year. (Ex. D1)

145. In 2016, Plaintiff Williams was paid less than 282 male Jones Day associates, 9 of whom were located in the Irvine office, 175 of whom billed the same or fewer hours than she did, and 96 of whom billed the same or fewer hours than she did in the previous calendar year. (*Id.*)

146. In 2017, Plaintiff Williams was paid less than 281 male Jones Day associates, 9 of whom were located in the Irvine office, 98 of whom billed the same or fewer hours than she did, and 135 of whom billed the same or fewer hours than she did in the previous calendar year. (*Id.*)

147. As a second-year associate, Plaintiff Williams was paid less than at least 222 men when they were second-year associates between 2012 and 2018, 5 of whom were in the Irvine office, 131 of whom billed the same or fewer hours than she did, and 155 of whom billed the same or fewer hours than she did in the previous calendar year. (Ex. D2)

148. As a third-year associate, Plaintiff Williams was paid less than at least 199 men when they were third-year associates between 2012 and 2018, 4 of whom were in the Irvine office, 127 of whom billed the same or fewer hours than she did, and 64 of whom billed the same or fewer hours than she did in the previous calendar year. (*Id.*)

149. As a fourth-year associate, Plaintiff Williams was paid less than at least 261 men when they were fourth-year associates between 2012 and 2018, 8 of whom were in the Irvine office, 91 of whom billed the same or fewer hours than she did, and 103 of whom billed the same or fewer hours than she did in the previous calendar year. (*Id.*)

**B.    Plaintiff Draper Was Paid Less Than Men Who Performed Substantially Equal Work**

150. When he was a third-year associate,  (Male Associate 3) was paid $30,000 more than Plaintiff Draper when she was a third-year associate. (Dkt. 87-6 and Dkt 115-10 at 2, 5 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 5 (public, redacted version of same); Dkt. 123-14 and 146-10 at 5, 7 (public, redacted version of same).)

151. When he was a fourth-year associate, (Male Associate 3) was paid $65,000 more than Plaintiff Williams when she was a fourth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2, 5 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 5 (public, redacted version of same); Dkt. 123-14 and 146-10 at 8 (public, redacted version of same).)

152. When he was a fifth-year associate, (Male Associate 3) was paid $80,000 more than Plaintiff Draper when she was a fifth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2, 5 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 5 (public, redacted version of same); Dkt. 123-14 and 146-10 at 7, 9 (public, redacted version of same).)

153. When he was a third-year associate, (Male Associate 4) was paid $30,000 more than Plaintiff Draper when she was a third-year associate. (Dkt. 87-6 and Dkt 115-10 at 2, 5 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 5 (public, redacted version of same); Dkt. 123-14 and 146-10 at 5, 8 (public, redacted version of same).)

154. When he was a fourth-year associate, (Male Associate 4) was paid $55,000 more than Plaintiff Draper when she was a fourth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2, 5 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 5 (public, redacted version of same); Dkt. 123-14 and 146-10 at 6, 9 (public, redacted version of same).)

155. When he was a third-year associate, (Male Associate 2) was paid $5,000 more than Plaintiff Draper when she was a third-year associate. (Dkt. 87-6 and Dkt 115-10 at 2, 4 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 4 (public, redacted version of same); Dkt. 123-14 and 146-10 at 5, 6 (public, redacted version of same).)

156. When he was a fourth-year associate, (Male Associate 2) was paid $35,000 more than Plaintiff Draper when she was a fourth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2, 4 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 4 (public, redacted version of same); Dkt. 123-14 and 146-10 at 6, 7 (public, redacted version of same).)

157. When he was a fifth-year associate, (Male Associate 2) was paid $45,000 more than Plaintiff Draper when she was a fifth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2, 4 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 4 (public, redacted version of same); Dkt. 123-14 and 146-10 at 7, 8 (public, redacted version of same).)

158. When he was a third-year associate, (Male Associate 5) was paid $30,000 more than Plaintiff Draper when she was a fourth-year associate. (Dkt. 87-6 and Dkt 115-10 at 2,

5 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 5 (public, redacted version of same); Dkt. 123-14 and 146-10 at 6, 9 (public, redacted version of same).)

159. Beginning in July of her second year of tenure onward, Plaintiff Draper never made more than ███████████ (Male Associate 3), ███████████████ (Male Associate 4), ███████ (Male Associate 2), or ███████████ (Male Associate 5) when they were of equivalent tenure. (Dkt. 87-6 and 115-10 at 2, 4, 5, (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 4, 5 (public, redacted version of same); Dkt. 123-14 and 146-10 at 4-9 (public, redacted version of same).) From her third year of tenure onward, Plaintiff Draper was consistently paid less than all of four of these male associates when they were of the same tenure. (*Id.*)

160. In 2015, Plaintiff Draper was paid less than at least 302 male Jones Day associates, 15 of whom were located in the Atlanta office, 33 of whom billed the same or fewer hours than she did, and 140 of whom billed the same or fewer hours than she did in the previous calendar year. (Ex. D3)

161. In 2016, Plaintiff Draper was paid less than at least 228 male Jones Day associates, 15 of whom were located in the Atlanta office, 60 of whom billed the same or fewer hours than she did, and 8 of whom billed the same or fewer hours than she did in the previous calendar year. (*Id.*)

162. In 2017, Plaintiff Draper was paid less than at least 238 male Jones Day associates, 16 of whom were located in the Atlanta office, 58 of whom billed the same or fewer hours than she did, and 22 of whom billed the same or fewer hours than she did in the previous calendar year. (*Id.*)

163. In 2018, Plaintiff Draper was paid less than at least 290 male Jones Day associates, 19 of whom were located in the Atlanta office, 25 of whom billed the same or fewer hours than she did, and 43 of whom billed the same or fewer hours than she did in the previous calendar year. (*Id.*)

164. As a fourth-year associate, Plaintiff Draper was paid less than at least 340 men who were fourth-year associates between 2012 and 2018, 19 of whom were in the Atlanta office, 36 of whom billed the same or fewer hours than she did, and 127 of whom billed the same or fewer hours than she did in the previous calendar year. (Ex. D4.)

165. As a fifth-year associate, Plaintiff Draper was paid less than at least 247 men who were fifth-year associates between 2012 and 2018, 13 of whom were in the Atlanta office, 69 of whom billed the same or fewer hours than she did, and 9 of whom billed the same or fewer hours than she did in the previous calendar year. (*Id.*)

166. As a sixth-year associate, Plaintiff Draper was paid less than at least 234 men who were sixth-year associates between 2012 and 2018, 6 of whom were in the Atlanta office, 45 of whom billed the same or fewer hours than she did, and 23 of whom billed the same or fewer hours than she did in the previous calendar year. (*Id.*)

167. As a seventh-year associate, Plaintiff Draper was paid less than at least 231 men who were seventh-year associates between 2012 and 2018, 7 of whom were in the Atlanta office, 19 of whom

billed the same or fewer hours than she did, and 22 of whom billed the same or fewer hours than she did in the previous calendar year. (*Id.*)

## C.   Plaintiff Henderson Was Paid Less Than Men Who Performed Substantially Equal Work

168. When they were both second-year associates in the New York office, ████████ (Male Associate 18) was paid $20,000 more than Plaintiff Henderson. (Dkt. 87-6 and Dkt 115-10 at 2, 4 (public, redacted version of same); Dkt. 100-5 and 107-10 at 2, 4 (public, redacted version of same); Dkt. 123-14 and 146-10 at 5, 6 (public, redacted version of same).)

169. When they were both second-year associates in the New York office, ████████ (Male Associate 17) was paid $15,000 more than Plaintiff Henderson. (*Id.*)

170. When they were both second-year associates in the New York office, ████████ (Male Associate 19) was paid $15,000 more than Plaintiff Henderson. (*Id.*)

171. When they were both second-year associates in the New York office, ████████ (Male Associate 16) was paid $20,000 more than Plaintiff Henderson. (*Id.*)

172. Beginning in January 2015, when they were both second-year associates in the New York office, ████████ (Male Associate 12) was paid $15,000 more than Plaintiff Henderson. (*Id.*)

173. Beginning in July 2015, when they were both second-year associates in the New York office, ████████ (Male Associate 12) was paid $30,000 more than Plaintiff Henderson. (*Id.*)

174. In 2016, Plaintiff Henderson was paid less than at least 387 male Jones Day associates, 57 of whom were located in the New York office, 4 of whom billed the same or fewer hours than she did, and 5 of whom billed the same or fewer hours than she did in the previous calendar year. (Ex. D5.)

175. As a third-year associate, Plaintiff Henderson was paid less than at least 389 men who were third-year associates between 2012 and 2018, 84 of whom were in the New York  office, 1 of whom billed the same or fewer hours than she did, and 9 of whom billed the same or fewer hour than she did in the previous calendar year. (Ex. D6.)

## D.   Jones Day Operates as "One Firm Worldwide"

176. Jones Day markets itself as "One Firm Worldwide." (*See* Ex. F1 (One Firm Worldwide, JONES DAY:     INSIGHTS     (last     visited     August     19,     2020), https://www.jonesday.com/en/insights/2013/05/one-firm-worldwide)) (video).)

177. At Jones Day, "One Firm Worldwide" is "more than a motto" or a "slogan"; it is shorthand for the Firm's integration across offices, its rejection of "artificial boundaries" and individualized profit centers, and its operation as "one organization." (*Id.* ("One firm worldwide is definitely more

than a motto, and I have to say I was actually very surprised to find that it was more than a motto, because it feels like one of those slogans that isn't really going to have any substance to it, but it really does."); *id.* (Lawyers across all 18 U.S. offices "understand and operate under the same value system."); *id.* (*"*[T]he ethos, the compensation system, and the governance system, and the culture are all aimed toward: let's find the best resource *wherever in the Firm.*") *id.* (emphasis added); Ex. C23 (JD_02199673 at 83) ("not just a slogan").) The Firm also rejects "individualized profit centers." (Ex. F1.)

178. Jones Day purports to serve its clients better than its competitors because of its high level of cross-office integration and its "One Firm Worldwide" ethos. (Ex. F1) "[T]he ethos, the compensation system, and the governance system, and the culture are all aimed toward: let's find the best resource wherever in the Firm." (*Id.*) When Jones Day staffs a matter, it aims to find the best resources to serve the client without regard to where in the Firm those resources are located. (*Id.*) (*See also* Ex. B1 (Williams Tr. 94:11-23); Ex. C7 (JD_0039967 at 93); Ex. C10 (JD_02111939 at 50); Ex. C11 (JD_00400151 at 54, 74, 79).) Jones Day tells recruits that "[c]ases [are] staffed across offices and practice groups according to client needs, experience, and talent" and "[l]awyers are incentivized to share work with other lawyers, offices, and practices." (Ex. C7 (JD_00399673 at 93).)

179. Consistent with its "One Firm Worldwide" ethos, Jones Day encourages associates to develop professional networks across offices and to work with attorneys in other offices and on matters that span multiple offices. (*E.g.* Ex. A1 (Reisman Tr. 132:2-25); *id.* (Reisman Tr. 210:10-14).) Each year, the Firm spends somewhere between ███████████████ on its Summer Academy and on its NLG Academy, as well as devoting substantial attorney time. (*id.* (Reisman Tr. 157:16-158:9).) The goal of this nationwide meeting is to ensure that associates "build[] their network, because [Jones Day attorneys] work cross office and cross practice so much . . . , and . . . can serve our clients better that way and people develop professionally better." (*id.* (Reisman Tr. 132:2-25, 154:22-155:4).) The Firm also assigns an NLG Coordinator in each office to "assist and facilitate" cross office work with attorneys in other offices who want to staff new lawyers on their projects. (*id.* (Reisman Tr. at 208:9, 210:10-14).)

180. Attorneys at Jones Day, including associates, do in fact routinely collaborate across offices. Associates are regularly assigned to matters in other offices and are supervised and reviewed by attorneys in other offices. (Ex. D7; Ex. D10; *see also* Ex. B4 (Tolton Tr. 130:4-12, 465:5-10).)

181. In 2012, approximately 82% of Jones Day associates were evaluated by an attorney from another office. (Ex. D7.)

182. In 2013, approximately 87% of Jones Day associates were evaluated by an attorney from another office. (*Id.*)

183. In 2014, approximately 86% of Jones Day associates were evaluated by an attorney from another office. (*Id.*)

184. In 2015, approximately 88% of Jones Day associates were evaluated by an attorney from another office. (*Id.*)

185. In 2016, approximately 90% of Jones Day associates were evaluated by an attorney from another office. (*Id.*)

186. In 2017, approximately 94% of Jones Day associates were evaluated by an attorney from another office. (*Id.*)

187. In 2018, approximately 94% of Jones Day associates were evaluated by an attorney from another office. (*Id.*)

188. Between 2012 and 2018, approximately 94% of associates were evaluated by an attorney from another office. (*Id.*)

189. Plaintiff Williams was evaluated by attorneys in eight different offices (Irvine, Houston, Los Angeles, Cleveland, Washington, D.C., Atlanta, San Francisco, and Palo Alto). (Ex. D10.)

190. Her Washington, D.C.-based comparator, ▇▇▇▇▇▇▇ (Male Associate 9), was evaluated by attorneys in six different offices (Houston, San Francisco, Los Angeles, Washington, D.C., Dallas, and Cleveland). (*Id.*)

191. Her New York City-based comparator, ▇▇▇▇▇▇▇ (Male Associate 8), was reviewed by attorneys in two offices (New York and Irvine). (*Id.*)

192. One of her Dallas-based comparators, ▇▇▇▇▇▇ (Male Associate 11), was reviewed by attorneys in six offices (Dallas, New York, Washington, D.C., Chicago, Pittsburgh, and San Diego). (Ex. D10.)

193. Her other Dallas-based comparator, ▇▇▇▇▇▇▇ (Male Associate 10) was reviewed by attorneys in two offices (Dallas and Houston). (*Id.*)

194. Her San Diego-based comparator, ▇▇▇▇▇▇▇ (Male Associate 7), was reviewed by attorneys in five offices (San Diego, Washington, D.C., Dallas, Irvine, and Chicago). (*Id.*)

195. Her Pittsburgh-based comparator, ▇▇▇▇▇▇▇ (Male Associate 6), was reviewed by attorneys in 2 offices (Pittsburgh and Irvine). (*Id.*)

196. In at least two instances, the same attorney reviewed Plaintiff Williams and ▇▇▇▇▇▇▇ (Male Associate 11). (*See* Dkt. 117-20 and 145-15 at 8 (public, redacted version of same) (Ex. M, Pls.' Am. Cond. Cert. Mot.) and Ex. C18 (JD_02201679 at 82) (showing reviews by Debra R. Belott and Theresa M. Coughlin).)

197. In at least three instances, the same attorney reviewed Plaintiff Williams and ▇▇▇▇▇▇▇ (Male Associate 7). (*See* Dkt. 117-20 and 145-15 at 6, 11, 15 (public, redacted version of same) (Ex. M, Pls.' Am. Cond. Cert. Mot.) and Ex. C19 (JD_02201743 at 44–45, 48, 50) (showing reviews by Cheryl O'Connor, Bart Green, and Sarah G. Conway).)

198. In at least one instance, the same attorney reviewed Plaintiff Williams and ██████████ (Male Associate 7) and ██████████████ (Male Associate 6). (*See* Dkt. 117-20 and 145-15 at 12, 17 (public, redacted version of same) (Ex. M, Pls.' Am. Cond. Cert. Mot.) and Ex. C19 (JD_02201743 at 44) and Ex. C20 (JD_02209736 at 71) (showing reviews by Michelle M. Blum).)

199. Among Jones Day's cases covered by legal news website Law360, approximately 50% were staffed across geographic offices between 2016 and 2018. (Ex. D8.)

200. Jones Day associates routinely transfer between offices. (Ex. D9.)

201. Between 2012 and 2018, 128 Jones Day associates transferred between offices. (*Id.*)

202. Between 2012 and 2018, over 10% of the associate transfers at Jones Day were initiated by the Firm. (*Id.*)

203. Between 2012 and 2018, 29 of the associate transfers at Jones Day were for reasons other than personal reasons. (*Id.*)

204. Jones Day has a policy of not permitting an associate to transfer to another office unless there is a need for a new associate in the destination office. (Ex. C7 (JD_00399673 at 728).)

## E.    Jones Day Has a Centralized, Firmwide Process for Setting Associate Compensation

205. All associate compensation decisions at Jones Day, across offices and practices groups, are made by Firm Managing Partner Stephen Brogan. (Ex. F2 (Compensation, JONES DAY (as of March 15, 2019), https://www.jonesday.com/principlesandvalues/compensation/); *see also* Ex. C8 (JD_02202966).) "[The] Managing Partner has considerable management responsibility at Jones Day; that responsibility includes setting individual lawyer compensation . . . . [F]inal decisions are made by the Managing Partner." (Ex. F2).

206. The compensation process begins with budgeting. The Firm centrally determines a budget for each office for associate compensation and offers parameters on how that budget should be allocated. (*See* Dkt. 117-22 and Dkt. 145-17 (public, redacted version of same) (Ex. O, Pls.' Am. Cond. Cert. Mot.); Dkt. 117-23 and Dkt. 145-18 (public, redacted version of same) (Ex. P, Pls' Am. Cond. Cert. Mot.).)

207. Budgets are based on Jones Day's view of the market for associates. The Firm discusses market compensation in two clusters, those on par with the New York City market and those that are not. (Dkt. 117-22 and Dkt. 145-17 (public, redacted version of same) (Ex. O, Pls.' Am. Cond. Cert. Mot.).)

208. The ultimate decision on budgets resides with Managing Partner Brogan, after which the budgets are conveyed to Partners-in-Charge ("PICs"). (*See* Dkt. 117-22 and Dkt. 145-17 at 2 (public, redacted version of same) (Ex. O, Pls.' Am. Cond. Cert. Mot .); Dkt. 117-23 and Dkt. 145-18 at 3 (public, redacted version of same) (Ex. P, Pls' Am. Cond. Cert. Mot.); Ex. C8

(JD_02202966) (noting the Managing Partner's decision to increase starting associate salaries by $10,000 was "another unbudgeted expense" for Irvine office).)

209. PICs make preliminary compensation recommendations for the associates in their offices following a multi-month evaluation process based on centrally dictated criteria distributed to PICs by Firm Administrative Partner Shumaker. (*See* Dkt. 117-22 and Dkt. 145-17 (public, redacted version of same) (Ex. O, Pls.' Am. Cond. Cert. Mot.); Dkt. 117-23 and Dkt. 145-18 (public, redacted version of same) (Ex. P, Pls' Am. Cond. Cert. Mot.); Dkt. 117-14 and 145-9 (public, redacted version of same) (Ex. G, Pls.' Am. Cond. Cert. Mot) (Evaluation & Compensation Timeline (January 2017)); Dkt. 117-15 and 145-10 (public, redacted version of same) (Ex. H, Pls.' Am. Cond. Cert. Mot.) (Evaluation and Compensation Timeline (February 2015)).)

210. Administrative Partner Michael Shumaker and Partner Traci Lovitt review the PICs' recommendations for each U.S. associate and suggest revisions. (*See* Ex. A2 (Lovitt Tr. 30:24-31:10, 48:10-13, 266:2-4); Dkt. 117-14 and 145-9 (public, redacted version of same) (Ex. G, Pls.' Am. Cond. Cert. Mot) (Evaluation & Compensation Timeline (January 2017)); Dkt. 117-15 and 145-10 (public, redacted version of same) (Ex. H, Pls.' Am. Cond. Cert. Mot.) (Evaluation and Compensation Timeline (February 2015).)

211. The Managing Partner then has roughly three weeks to make his compensation decisions. (Dkt. 145-9 (Ex. G, Pls.' Am. Cond. Cert. Mot) (Evaluation & Compensation Timeline (January 2017)); Dkt. 117-14 and 145-10 (public, redacted version of same) (Ex. H, Pls.' Am. Cond. Cert. Mot.) (Evaluation and Compensation Timeline (February 2015).) To facilitate his decision, he is provided with each U.S. associate's office and practice ratings, ranking (if any), billable hours, PIC-recommended salary,███████████ in a "master" spreadsheet for all associates. (Dkt. 117-34 and Dkt. 145-29 (public, redacted version of same) (Ex. AA, Am. Cond. Cert Mot.) (June 2016 Salary Decisions).) He also receives the recommendations made by Administrative Partner Shumaker and Partner Lovitt and sets each associate's final compensation. (Dkt. 117-14 and 145-9 (public, redacted version of same) (Ex. G, Pls.' Am. Cond. Cert. Mot) (Evaluation & Compensation Timeline (January 2017)); Dkt. 117-15 and 145-10 (public, redacted version of same) (Ex. H, Pls.' Am. Cond. Cert. Mot.) (Evaluation and Compensation Timeline (February 2015); Dkt. 117-31 and Dkt. 145-26 (public, less redacted version of same) (Ex. X, Plfs.' Am. Cond. Cert. Mot.).)

212. The Managing Partner does not merely rubberstamp the recommendations made by Administrative Partner Shumaker and Partner Lovitt; rather he routinely alters their recommendations resulting in changes to associates' salaries. (*See* Dkt. 123-14 and Dkt. 146-10 (public, redacted version of same) (Ex. 1, Coussons Decl.) (spreadsheet demonstrating that Managing Partner Brogan, Administrative Partner Michael Shumaker, and Partner Traci Lovitt's involvement results in finalized compensation decisions that differ from those proposed by PICs at least 23% of the time); *see* ¶ 133 *supra*.)

213. The Managing Partner may make these changes for any number of reasons. For example, the Managing Partner changes the compensation of associates with whom he has worked personally. (Ex. A2 (Lovitt Tr. 56:9–22).) He also sometimes makes changes to individual associates' compensation as a retention measure. (*Id*.)

214. Once the Managing Partner has determined the compensation for the associates in each office, the Firm Director of Practice Services advises the PIC for each office of the compensation levels set by the Managing Partner. (*See* Dkt. 145-30 (Ex. BB, Pls.' Am. Cond. Cert. Mot.); Dkt. 145-31 (Ex. CC, Pls.' Am. Cond. Cert); Dkt. 145-32 (Ex. DD, Pls.' Am. Mot. for Cond. Cert.); Ex. A2 (Lovitt Tr. 60:3-20).)

215. By written policy, no one else can alter Managing Partner Brogan's finalized compensation decisions. (Dkt. 145-30 (Exhibit BB, , Pls.' Am. Mot. for Cond. Cert.); Ex. A2 (Lovitt Tr. 51: 21-52:4, 60:3-61:7).)

216. The process concludes when, each year, in June or July, all Jones Day associates, regardless of office, are informed of their compensation on the same day through individual letters sent to each associate from the Firm's Managing Partner. (*See* Ex. C1 (compilation of salary letters received by Plaintiffs Williams, Draper, and Henderson).)

217. Partner Traci Lovitt speaks to associates in different offices about the Firm's compensation process. When she does, she uses the same PowerPoint presentation, often changing only the slide with pictures of the respective office's leadership. (Ex. A2 (Lovitt Tr. 262:22-263:24).)

## F.   Other Functions at Jones Day Are Equally Centralized

218. Jones Day has a Firmwide Hiring Partner who plays a central role in recruiting across all offices. (*E.g.*, Ex. A1 (Reisman Tr.  55:22-23; 61:2-5, 12-16).) The Firm's Recruiting Department "coordinat[es] Firmwide recruitment of new lawyers entering the practice from law schools or other training; . . . and establish[es] policies and procedures for the Recruiting Department staff in the Offices." (Ex. C6 (JD_00002299 at 25).)

219. The Firmwide Hiring Partner decides from which law schools and job fairs the Firm recruits associates and supervises a Law School Recruiting Manager, who oversees law school recruitment across offices. *See* Ex. A1 (Reisman Tr. 55: 22-23; 61:2-5, 12-16; 65:13-15).) She also distributes memos to attorneys who will be conducting on campus interviews. (Ex. C15 (JD_02111919).)

220. The Firmwide Hiring Partner provides direction to each local office in order to ensure that all Jones Day employees involved in recruiting understand the Firm's recruiting process, the Firm's recruiting objectives, and the relevant criteria for finding candidates that are a good fit for the Firm. (*See* Ex. A1 (Reisman Tr. 55:4-13, 82:9-19).)

221. One of the Firm's criteria for evaluating candidates is that the applicant understand and fit within Jones Day's culture. (Ex. C7 (JD00399673 at 84); Ex. C10 (JD_02111939 at 49); Ex. C11 (JD_00400151 at 72).)

222. The Firmwide Hiring Partner reports Firmwide recruitment statistics back across the Firm. (Ex. C12 (JD_02016916).)

223. Recruiting at Jones Day also involves collaboration between offices. Attorneys from one office frequently interview candidates at a law school and then report their evaluations of those

candidates to attorneys in another office. (Ex. A1 (Reisman Tr. 69:18-70:6); Ex. C13 (JD_01439406); Ex. C14 (JD_02111939).) Recruiters nationwide are instructed not to recommend a call back interview "unless you would have called the candidate back to your own office," thereby ensuring consistency. (Ex. C10 (JD_02111939 at 54); Ex. C11 (JD_004000151 at 85).)

224. At Jones Day, the lateral recruiting process is centralized across offices and administered by a Firm's Manager of Lateral Recruiting. (*See* Ex. C6 (JD_00002299 at 384).) "The name of any lateral attorney candidate that the Firm is considering, regardless of source, must be submitted to the Firm Manager of Lateral Recruiting immediately and before any response or contact is made with the attorney or the source of the information." (*Id*.)

225. Before hiring any associate who has been out of law school for more than five years, an office must obtain the approval of the Firm Hiring Partner and the Firm Administrative Partner. (*Id*.)

226. Permanent offers to summer associates to join the Firm as associates often require clearance or collaboration beyond the office. (Ex. C17 (JD_02018072) (noting permission must be gained from firmwide practice leader before offer could be made to Atlanta associate); Ex. A1 (Reisman Tr. 125:2-7) (explaining that office PICs must get the approval of Regional PIC before extending a permanent offer to a summer associate).)

227. Offices also sometimes work together to offer a cross-office position in order to attract a desired candidate. (Ex. C17 (JD_0201872).)

228. Terms and conditions of employment for associates at Jones Day are uniform. (Ex. C16 (JD_00000024-28, JD_00000464-68, JD_00000757-61, JD_0001389-93) (compiled terms and conditions of employment from Plaintiffs' personnel files); Ex. C6 (JD_00002299 at 388) (excerpt from Firm Manual).)

229. At Jones Day, attorneys are directed to evaluate associates using centrally-determined criteria, which are also built into the Firm's Non-Partner Evaluation (NPE) database. (*See* Ex. A2 (Lovitt Tr. 80:5–17); Ex. E2 at 16 (Def.'s Objs. and Res. to Pls.' First Set of ESI Interrogatories) (describing the contents of the NPE database); *see also* Dkt. 117-20 and 145-15 (public, redacted version of same) (Ex. M, Pls.' Am. Cond. Cert. Mot.) (example of NPE with criteria listed along header); Ex. C18 (JD_02201679) (same); Ex. C19 (JD_02201743) (same); Ex. C20 (JD_02209736) (same).) The Firm expects any attorney for whom an associate worked more than 25 hours on a project and who is at least two years the associate's senior to provide an evaluation for that associate based on centrally directed criteria. (Ex. C24 (JD_01424074) (explaining that associates will be reviewed on projects with 25 or more recorded hours).)

230. The Firm's Administrative Partner, with the help of the Firmwide Practice Services department, distributes guidance to Practice Leaders (PLs) and PICs on numerically rating associates, guidance that does not vary by office or by practice. (*See* Ex. A2 (Lovitt Tr. 83:3-12); Dkt. 117-24 and 145-19 (public, redacted version of same) (Ex. Q, Pls.' Am. Cond. Cert. Mot.).)

231. The Firm has centralized control over lawyer training, maintains a central repository of lawyer training resources, and tracks which trainings are offered to new lawyers in each office. (*See* Ex.

A1 (Reisman Tr. 20:7-16) (describing Michael Ginsberg as the "firmwide chair of training"); Ex. C2 (JD_00005222) (overview of NLG trainings for 2016-2017); Ex. C3 (JD_0000553) (overview of NLG trainings for 2017-2018); Ex. C4 (JD_02133659) (Jones Day Firmwide intranet page for "CLE & Lawyer Training).)

232. At Jones Day, client pitches are standardized in format and content. (Ex. C5 (JD_01770776).) Jones Day's Business Acquisition unit assists lawyers in reinforcing the Firm's differentiated value as reflected in its "One Firm Worldwide" brand. (*Id.*)

233. Jones Day has numerous firmwide departments (e.g. information technology, human resources), multiple partners with firmwide responsibilities, a firmwide Director of Human Resources, and integrated computer systems, all of which ensure consistent administration of Firm policies and practices across the Firm. (*See* Ex. C6 (JD_00002999 at 323-25) (Firm Manual excerpts explaining firmwide departments); *id.* (JD_00002320) (explaining the roles of partners with firmwide responsibilities); *id.* (JD_00002300-07) (table of contents describing firmwide policies and procedures, including expectations for using Firm systems).)

234. Any local variations in Firm policies are subject to central control and not the office's preference. (*id.* (JD_00002309) (noting the provisions of the Firm Manual control "[t]o the extent that any . . . rule or procedure could be interpreted to be inconsistent with [the] Manual"); *id.* (noting that the policies and procedures in the Firm Manual "may only be changed, modified, or discontinued only as may be determined by the Managing Partner or his direct delegee for such purpose").)

235. Managing Partner Brogan personally taps partners for important roles. (Ex. A1 (Reisman Tr. 42:20-21); Ex. A2 (Lovitt Tr. 265:11-21).)

### G.   Jones Day Does Not Pay Associates Based on the Number of Hours Billed

236. Jones Day does not pay associates solely based on their hours. (Dkt. 94-10 (Ex. I, Pls.' Cond. Cert. Mot.) (excerpt from Jones Day's website, as of March 18, 2019, explaining the Firm's approach to compensation); Ex. C7, (JD_00399673 at 97).)

237. Unlike many other firms, Jones Day's compensation system is entirely salary-based and does not include a bonus component. (Dkt. 94-10 (Ex. I, Pls.' Cond. Cert. Mot.).)

238. Jones Day does not pay bonuses in part because it does not want to create the impression that compensation at Jones Day is based on associate's billable hours. (*Id.*)

239. Jones Day's compensation system is also not lockstep and therefore associates do not automatically receive raises based on seniority. (*Id.*)

240. Jones Day's compensation system uses a subjective, rather than arithmetic, standard to assess the contribution of each lawyer to the Firm and to set their compensation. (*Id.*)

241. Jones Day's compensation system purports to focus on the quality, not the quantity, of an associate's hours. Jones Day does not believe that using billable hours as a primary determinant of associate compensation is consistent with the Firm's values. (*See* Dkt. 94-10 (Ex. I, Pls.' Cond. Cert. Mot.); *see also* Ex. B4 (Tolton Tr. 45:7-8, 19:18-24, 37:18-19); Ex. B1 (Williams Tr. 120:19-21; 120:7-13); Ex. B2 (Draper Tr. 166:19-22, 172:7-8); Ex. B5 (Stahl Tr. 85:20-24; 369:2-4); Ex. B3, (Henderson Tr. 162:2-5).)

242. Jones Day's compensation system is future looking, and compensation is set based on a subjective assessment of what is necessary to retain or reward the lawyer. (*See* Dkt. 117-22 and Dkt. 145-17 (public, redacted version of same) (Ex. O, Pls.' Am. Cond. Cert. Mot.); Dkt. 117-23 and Dkt. 145-18 (public, redacted version of same) (Ex. P, Pls' Am. Cond. Cert. Mot.); Ex. A2 (Lovitt Tr. 56:9-22); Ex. C21 (JD_02202867 at 67); Ex. C9 (JD_02206336 at 402).)

## H.  The Firm Frequently Instructs Associates to Spend Working Time Looking for Employment Elsewhere, and Doing So Serves Important Functions for the Firm

243. Jones Day has a practice of instructing associates to look for other work while they remain employed by the Firm. (*See* Ex. B4 (Tolton Tr. 511:11-18); Ex. B3 (Henderson Tr. 281:2-12); *see also* Ex. C22 (JD_02209736) (correspondence from Partner Traci Lovitt and Administrative Partner Michael Shumaker to Managing Partner Brogan regarding status of identified underperforming associates and efforts to find other employment); A2 (Lovitt Tr. 250:12-253:21).)

244. Jones Day associates who are instructed to look for other work, pursuant to this practice, are paid not for their billable hours but for the efforts they expend in securing substitute employment. (*Id.*)

245. Jones Day believes that paying associates to look for other work serves the firm's interests by promoting client development and associate recruitment. (*See* Ex. B2 (Draper Tr. 27:2-15); Ex. B3 (Henderson Tr. 284:21-25, 285:15-18); Ex. B4 (Tolton Tr. 385:11-386:4).)