UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KATRINA HENDERSON,<br><br>   *Plaintiff*,<br><br>v.<br><br>JONES DAY,<br><br>   *Defendant*. | Civil Action No. 19-945 (RDM) |

## MEMORANDUM OPINION AND ORDER

  The scope of the case now before the Court has narrowed substantially over the past several months.  In its earlier form, the case included six plaintiffs and twenty-three counts; sought treatment as a class and collective action; and included an array of disparate allegations spanning a 135-page complaint.  Dkt. 41 (3d Am. Compl.).  Last May, the Court issued a decision dismissing some of those claims, while sustaining others.  *See Tolton v. Jones Day*, No. 19-cv-945, 2020 WL 2542129 (D.D.C. May 19, 2020) ("*Tolton I*").  Of particular relevance here, the Court dismissed the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), claims of three of the six named plaintiffs, but concluded that three of the plaintiffs, including Katrina Henderson, had adequately pled EPA claims.  *Id.* at *30–31.  Then, in December 2020, the plaintiffs dropped their class and collective action claims.  Dkt. 181.  And earlier this month, all of the plaintiffs except Henderson voluntarily dismissed their claims against Jones Day with prejudice, Dkt. 186, leaving only four claims that Henderson now asserts solely in her individual capacity, Dkt. 187.

  With this narrowing of the case, the pending motion now involves the only remaining plaintiff, and it addresses only one claim:  Henderson's claim under the Equal Pay Act.  In that claim, Henderson alleges that she was paid at "a lower rate . . . than male colleagues in jobs

requiring the performance of substantially equal work, even though [she] . . . performed . . . similar duties requiring the same skill, effort, and responsibility as [her] male counterparts." Dkt. 41 at 102 (3d Am. Compl. ¶ 405) (Count IV).  In seeking dismissal of that claim, Jones Day contends that no reasonable jury could find in Henderson's favor because she "performed no work—*literally*, *none*—during the period within the statute of limitations."  Dkt. 129 at 7.  As Jones Day sees it, Henderson was "kept on the payroll merely as a courtesy while she looked for other jobs."  *Id.*  Thus, according to Jones Day, Henderson could not possibly have been paid less than her male counterparts for performing "equal work."  *Id.*

Unsurprisingly, Henderson does not agree.  In her view, during the period at issue, she was tasked by Jones Day with finding a new job, and, thus, although she billed no time to client work, she nonetheless performed "work" within the meaning of the Equal Pay Act.  Dkt. 164 at 50–51.  She further argues that she was paid less than male comparators and, finally, that she should at least be afforded the opportunity to take additional discovery in an effort to show that she was engaged in "work" and was paid less than similarly situated male associates.  *Id*. at 52–53.

The Court must therefore decide whether a reasonable jury could find that Henderson was engaged in "work" for her employer during those hours that she searched for a new job. Although most lawyers know what it means to work long hours, the question posed here is an unusual one.  But, as explained below, the Court concludes that no reasonable jury could find that Henderson was engaged in "work" for which she was denied equal pay.  The Court will, accordingly, **GRANT** Jones Day's motion for summary judgment with respect to Henderson's Equal Pay Act claim.

## I. BACKGROUND

A.    **Factual Background**

Only a handful of facts bear on Henderson's Equal Pay Act claim, and for the purpose of evaluating Jones Day's motion for summary judgment, the Court construes those facts in the light most favorable to Henderson.  *Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006).

Katrina Henderson graduated from New York University School of Law in 2013 and joined Jones Day's New York office in October 2013.  Dkt. 41 at  73–74 (3d Am. Compl. ¶¶ 270–71).  Over time, however, "Henderson . . . found herself less and less sought out by Jones Day partners," and she "had difficulty obtaining billable work."  *Id.* at 81 (3d Am. Compl. ¶ 297).  In December 2015, she was invited to a meeting at which she was "informed . . . that [Jones Day] was terminating her employment."  *Id.* at 81–82 (3d Am. Compl. ¶ 301); Dkt. 164-2 at 1 (Response to SUMF ¶ 1).  "Initially, . . . Henderson was told that Jones Day would continue to employ her for 'plenty of time' to find new employment," but "[i]n February 2016, the [f]irm[] . . . told her [that] she would have just another 2 to 4 weeks to find a new position."  Dkt. 41 at 82 (3d Am. Compl. ¶ 303); Dkt. 164-2 at 1 (Response to SUMF ¶ 2).  After "Henderson complained about her situation to . . . Jones Day's Human Resources department," however, the firm agreed to give her "several additional months to search for a new job."  Dkt. 41 at 82 (3d Am. Compl. ¶ 304).

Jones Day continued to pay Henderson's salary until "the end of June 2016," when she "was placed on unpaid leave."  Dkt. 164-2 at 1–2 (Response to SUMF ¶ 3); Dkt. 164-9 at 7 (Ex. B3) (confirming that Henderson was paid through June 30, 2016).  She then continued her formal affiliation with the firm, albeit without pay, until July 15, 2016, when her employment

came to an end. Dkt. 164-2 at 2 (Response to SUMF ¶¶ 3–4). According to Henderson, she "was told [that] it would be beneficial for both Jones Day and for her to extend her [formal] employment with Jones Day until July 15 when her process with a prospective employer would be complete." *Id*. at 2 (Response to SUMF ¶ 3). All agree that Henderson recorded zero billable hours and zero pro bono hours of work in 2016. *Id.* (Response to SUMF ¶ 5). Henderson notes, however, that she recorded 910 firm hours in 2016, *id*., representing the time that she spent searching for a new job, Dkt 164 at 50; Dkt. 129-1 at 1 (SUMF ¶ 5); Dkt. 146-38 at 2 (Chase Decl.).

Henderson was not alone in receiving pay for a period of time while looking for new employment. In general, when Jones Day asks an associate to leave the firm, it provides the associate with time to find another job and continues to pay the associate's salary for a period of time. Dkt. 169-9 at 10 (Suppl. Chase Decl.). According to Jones Day, it provides this transition period "to make sure that families can pay their mortgages" and to avoid "forc[ing] people out the door." *Id.* In Henderson's view, in contrast, paying outgoing associates to look for "work serves the firm's interests by promoting client development" (if the firm can place an outgoing associate at a client) and also bolsters "associate recruitment" (presumably by generating good will and by facilitating appealing exit strategies to those who do not make partner). Dkt. 169-1 at 53 (SUMF Reply ¶ 245).

**B.   Procedural Background**

Henderson joined this action on June 24, 2019, alleging a variety of claims related to workplace discrimination. Dkt. 27. Shortly after filing its answer, Dkt. 36, Jones Day moved for partial judgment on the pleadings, Dkt. 37, and the Court granted that motion in part and denied it in part. *Tolton I*, 2020 WL 2542129, at *1. Henderson's EPA claim, along with the EPA

claims of two other plaintiffs, survived Jones Day's motion. *Id.* at *30. As the Court explained, Henderson had adequately alleged that she was paid less than male associates performing substantially equal work, and she identified four male associates who she claimed either billed fewer or similar hours or who performed work that was "interchangeable" with the work she performed. *Id.* She further alleged that, although she did not receive a raise after her first year, two male comparators did. *Id.* Finally, the Court observed that although at least one of these male associates was "a less than perfect comparator," Henderson had "alleged enough to state an EPA claim." *Id.*

Shortly after issuing that decision, the Court authorized "nationwide discovery of associate compensation and numerical evaluation data for the period from January 1, 2012 to December 31, 2018," with all fact discovery to be completed by June 11, 2021. Minute Order (July 9, 2020); *see also* Minute Entry (June 10, 2020). Around that same time, Plaintiffs filed an amended motion to conditionally certify an EPA collective action, Dkt. 118; Dkt. 145, and on July 15, 2020, Jones Day moved for summary judgment with respect to the EPA claims asserted by the three EPA plaintiffs remaining after the Court's May 19, 2020 decision. Dkt. 129. Jones Day opposed Plaintiffs' motion for certification, Dkt. 146, and Plaintiffs, in turn, opposed Jones Day's motion for summary judgment, Dkt. 164. Although discovery has been proceeding for several months since the parties filed their briefs on this matter, neither party has moved to supplement those materials with further information disclosed in the discovery process.

While Jones Day's motion for summary judgment on Plaintiffs' EPA claim has been pending, the scope of the case and the issues presented by that motion have narrowed considerably. First, on December 14, 2020, "[a]fter analyzing the nationwide evaluation and compensation data Jones Day produced" in discovery, Plaintiffs withdrew their disparate impact

5

claims, their class and collective action allegations, and their motion for conditional certification of an EPA collective action. Dkt. 181 at 1. In light of that narrowing of the case, the Court amended the discovery schedule, moving the close of discovery up to April 30, 2021. Minute Order (Dec. 15, 2020). Second, on March 11, 2021, all plaintiffs other than Henderson voluntarily dismissed their remaining claims. Dkt. 186. Accordingly, the only motion pending before the Court is Jones Day's motion for summary judgment as to Henderson's individual EPA claim.

## II.  LEGAL STANDARD

A party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if it can "show[] that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it could affect the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

## III.  ANALYSIS

Jones Days argues, and Henderson does not dispute, that the statute of limitations governing her EPA claim reaches back, at most, to June 24, 2016. Dkt. 129 at 18; *see also* 29 U.S.C. § 255(a); *Potts v. Howard Univ. Hosp.*, 598 F. Supp. 2d 36, 39 n.3 (D.D.C. 2009). As a

result, the sole question before the Court is whether Henderson received unequal pay for performing "equal work" as her male comparators during the final week of June—or, perhaps, during that week and the first two weeks of July, when Henderson was on "unpaid leave," Dkt. 164-2 at 1–2 (Response to SUMF ¶ 3).  In Jones Day's view, the answer to this question is easy: "because Henderson did no work—literally no work at all—in 2016," and because she was merely kept "on the payroll as a courtesy while she searched for a new job," she cannot possibly "establish that she was paid less than a man for 'equal work.'"  Dkt. 129 at 18 (emphasis omitted).  In the firm's view, "no further discovery could change these facts or alter this legal conclusion," and thus Jones Day is entitled to summary judgment on Henderson's EPA claim.  *Id.* at 19.

Henderson offers a three-pronged response.  First, she contends that her search for employment constituted "work" for Jones Day and that the firm "has not carried its burden, under the [EPA's] affirmative defenses, of proving that it paid . . . Henderson less than male comparators because of her low billable hours—or even because she devoted her working time to searching for other employment as instructed by the firm."  Dkt. 164 at 50.  Second, Henderson maintains that, even if it is her burden to show that she performed "equal work" to a male comparator, she has identified "numerous male associates [who] billed similar amounts of time . . . in 2016 and yet were compensated at a higher rate."  *Id.* at 52.  Finally, Henderson maintains that, at a minimum, she should be allowed to take additional discovery to show that Jones Day considered her job search to be "work" performed for the firm's benefit and to uncover "potentially hundreds of comparators" who were similarly instructed to conduct job searches by the firm and were paid more than Henderson.  *Id.*

In addressing this dispute, the Court starts, as it must, with the text of the EPA. *See Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). The EPA provides in relevant part that:

> No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1). In keeping with this language, "to make out a case under the [EPA], the [plaintiff] must show that [her] employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1)). "Once [the] plaintiff[] meet[s] [her] burden, the burden then shifts to defendants to show that the pay differential was justified under one of the exceptions to the Act." *Thompson v. Sawyer*, 678 F.2d 257, 271 (D.C. Cir. 1982). Those exceptions cover pay differentials that are justified by "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) . . . any other factor other than sex." 29 U.S.C. § 206(d)(1).

Neither party identifies any authority defining the term "work" for purposes of the EPA, but the parties appear to agree that "work" means activity that is "'controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer.'" Dkt. 169 at 10 (quoting *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 31 (2014) (quoting *Tenn. Coal, Iron & R.R. v. Muscoda Loc. No. 123*, 321 U.S. 590, 598 (1944))); *see also* Dkt. 164 at 51 ("[W]ork is that which is undertaken predomina[ntly] for the benefit of the employer.") (internal quotation marks and citations omitted). That reading of the statute, moreover, makes sense. The EPA was

8

enacted in 1963 as an amendment to the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq. See Corning Glass*, 417 U.S. at 190. The federal courts, in turn, have long construed the term "work," as used in the FLSA, to refer to "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and [its] business." *Tenn. Coal*, 321 U.S. at 598; *see also Integrity Staffing Sols.*, 574 U.S. at 31; *Singh v. City of New York*, 524 F.3d 361, 367 (2d Cir. 2008). Absent good reason, moreover, courts "presume that the same term has the same meaning when it occurs here and there in a single statute," *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007), and, here, neither party suggests that the term "work" should have a different meaning for purposes of the EPA than for purposes of other provisions of the FLSA. To the contrary, the Supreme Court announced its interpretation of the term "work" years before Congress used that same term in adding the EPA to the FLSA, and Congress is presumed to have been aware of that interpretation of the statute, *see Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (presuming that when Congress enacted the Age Discrimination in Employment Act of 1967, it was aware of the preexisting administrative and judicial interpretations of the FLSA).

The construction of the word "work" that the Supreme Court adopted in 1944 does not mean that exertion is invariably required. "[A]n employer, if [it] chooses, may hire a [person] to do nothing." *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944); *see also Dinkel v. MedStar Health Inc.*, No. 11-cv-998, 2015 WL 5168006, at *4 (D.D.C. Sept. 1, 2015). Nor does the primary-benefit test provide a bright-line standard that easily resolves every case. Rather, "[w]hether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case." *Wantock*, 323 U.S. at 133; *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 136–37 (1944); *Dinkel*, 2015 WL 5168006, at *4.

9

As an initial matter, the parties disagree over whether Henderson's lack of any client hours is relevant to whether she can establish a prima facie case or, instead, whether Jones Day has met its burden of establishing an affirmative defense seeking to justify a pay "differential based on any . . . factor other than sex," 29 U.S.C. § 206(d)(1).  *See* Dkt. 164 at 49–50; Dkt. 169 at 11; *see also* Dkt. 162 at 5; Dkt. 166 at 6.  In the Court's view, Jones Day has the better of the arguments.  Henderson claims that the question whether a pay differential is justified based on a disparity in the number of hours worked constitutes an affirmative defense, for which the employer carries the burden of proof.  That might be right, but it is not the argument that Jones Day makes with respect to Henderson.  The firm does not simply argue that, if she was paid less than others, there was good reason for that disparity.  Rather, Jones Day argues that Henderson cannot carry her burden of showing that she was paid less for "equal work," because she engaged in no work at all.

The Court agrees that no reasonable jury could find that Henderson engaged in any "work" within the meaning of the EPA during the final week of June 2016 (or the first two weeks of July, when she was on unpaid leave).  As Jones Day persuasively argues, the only activity that Henderson engaged in during this period was the search for a new job, and that activity was not "necessarily and primarily for the benefit" of Jones Day.  *Tenn. Coal*, 321 U.S. at 598.  To the contrary, even if that effort indirectly benefited Jones Day in some way, there is no escaping the fact that Henderson was the primary beneficiary of her job search.

None of the evidence that Henderson proffers supports her contention that Jones Day was the necessary and primary beneficiary of Henderson's search for a new job.  She first cites the deposition of Nilab Tolton, one of the former plaintiffs in this case, in which Tolton explains that she was told by two Jones Day partners "that they wanted to place [her] at a client because it

10

would be mutually beneficial" to do so and that Tolton should keep the firm informed about her job search, so partners with client relationship could "facilitate . . . recommendation[s] for" her. Dkt. 164-10 at 12–13 (Ex. B4); Dkt. 164 at 50. Tolton further testified that the partners' offer "to help facilitate [her] placement in-house at a client was appealing to [her]." Dkt. 164-10 at 13 (Ex. B4). Henderson herself testified that "Jones Day didn't like to advertise when it was letting people go or firing associates" and that, as result, it was "beneficial for the firm and [Henderson]" to allow her to stay on (even in an unpaid capacity) after June 30, 2016, since she was still in the process of finalizing her future employment. Dkt. 164-9 at 10–11 (Ex. B3); Dkt. 164 at 51. And, Saira Draper, another former plaintiff, testified that a firm partner asked if she would like to meet the general counsel of a firm client for "informational" purposes. Dkt. 164-8 at 3 (Ex. B2); Dkt. 164 at 51. None of that, however, is inconsistent with the uncontroverted testimony of Traci Lovitt, a Jones Day partner responsible for the associate evaluation process, Dkt. 129-1 at 10 (SUMF ¶ 131), explaining that the firm provides outgoing associates with a transition period to look for a new job "because [the firm does not] typically force people out the door" and "like[s] to make sure that families can pay their mortgages," Dkt. 169-9 at 10 (Suppl. Chase Decl.). And none of it supports the implausible contention that Jones Day is the *primary* beneficiary of the job searches conducted by associates who have been asked to leave the firm.

      The undisputed facts surrounding Henderson's departure foreclose any reasonable argument that Jones Day was the primary beneficiary of Henderson's job search during the last days of June (and arguably the first two weeks of July). It is undisputed, for example, that Jones Day told Henderson in February 2016 that "she would have just another 2 to 4 weeks to find a new position" and, only after "Henderson complained about her situation to . . . Jones Day's Human Resources department," did the firm give her "several additional months to search for a

new job." Dkt. 41 at 82 (3d Am. Compl. ¶¶ 303–04). This fits Jones Day's description that the "additional time to find a new job was given at Henderson's insistence and for Henderson's benefit." Dkt. 169 at 10 (emphasis omitted). If Jones Day, rather than Henderson, "primarily . . . benefit[ed]" from her subsidized job search, it is difficult to understand why the firm planned to cut that process short, and why Henderson "complained" to Human Resources. *Integrity Staffing Sols.*, 574 U.S. at 33 (internal quotation marks omitted); *see also* Dkt. 169 at 10. Thus, even if the firm might have benefited from a short transition period, Henderson offers no plausible theory for how—in light of her own allegations—Jones Day remained the primary beneficiary of her paid job search almost six months after the firm "uncheromoniously informed [her] that [it] was terminating her employment," Dkt. 41 at 82 (3d Am. Compl. ¶ 301).

Although this conclusion provides ample basis to grant Jones Day's motion, the Court is also persuaded that, even if Henderson was engaged in "work" subject to the EPA, her claim would fail. In this respect, it makes little difference whether the question is framed—as Jones Day suggests—in terms of whether Henderson has carried her burden of showing that she engaged in "equal work on jobs the performance of which requires equal skill, effort, and responsibility," 29 U.S.C. § 206(d)(1), or—as Henderson suggestions—in terms of whether Jones Day has carried its burden of showing that Henderson was paid less than other associates based on "a system which measures earnings by quantity or quality of production" or "on any other factor other than sex," *id.* To start, when Henderson was told at the end of December 2015 that the firm was terminating her employment, her job indisputably changed. She was no longer employed to provide legal services to the firm's clients, and thus she did not hold a job "the

12

performance of which require[d] equal skill, effort, and responsibility" as most other firm associates.[1]

Anticipating that the Court might have doubts as to her comparability to associates engaged in client work, Henderson contends that "numerous male associates billed similar amounts of time to . . . [her] in 2016 [that is, no client hours] and yet were compensated at a higher rate." Dkt. 164 at 52. The "numerous" comparators to whom Henderson refers seem to be four lawyers among the hundreds surveyed in discovery. Dkt. 164-40 at 2 (Ex. D5). As Jones Day observes, three of the comparators were six-to-nine years senior to Henderson, and all left the firm by mid-January 2016. *Id.*; Dkt. 169 at 11–12. The fourth "did not record hours [during 2016] because he was on secondment to a client" until he left the firm in mid-2016. Dkt. 169 at 11; Dkt. 169-2 at 2–3 (Suppl. Bounds Decl. ¶ 5.D). These facts render the male associates' situations so dissimilar from Henderson's that they cannot serve as plausible comparators.

In a final effort to avoid summary judgment, Henderson argues that Jones Day's motion is premature and that she needs more discovery regarding (1) whether Jones Day was the primary beneficiary of her job search, and (2) potential comparators. Dkt. 164 at 52. She claims that depositions with the decisionmakers who set Henderson's pay, together with further discovery related to "any associates terminated, disciplined, or otherwise discussed for failing to search for outside employment" could prove that her job search amounted to work for the firm. *Id.* But Plaintiffs did take some discovery before responding to Jones Day's motion, and the

---

[1] Because of Jones Day's prospective salary-setting, one might argue that the relevant time period for assessing Henderson's performance was the previous year leading up to July 2015, the timeframe that served as the basis for setting her salary during the challenged period. *See* Dkt. 148 at 8 (describing this system); Dkt. 129 at 11, 13 (listing July 1 as the date salary changes take effect). But the Court does not consider this argument because neither party makes it. And, in any event, Henderson fails to identify any evidence suggesting that she was paid in 2016 for work performed in 2015.

Court is hard pressed to understand how the additional discovery Henderson seeks could rescue her EPA claim.  For one thing, Henderson's pay was set long before the firm agreed, at Henderson's request, to extend her transition period from February or March to June 2016.  *Compare* Dkt. 129 at 11, *and* Dkt. 129-2 at 3 (Bounds Decl. ¶ 8), *with* Dkt. 41 (3d Am. Compl. ¶¶ 303–04).  Understanding how her pay was set would have no bearing on whether Henderson's job search primarily benefited the firm or Henderson.  Moreover, on the facts of this case—as Henderson herself frames them—it is implausible that any amount of discovery would show that Jones Day was the *primary* beneficiary of *Henderson's* job search.  And, with respect to comparators, Henderson included in her opposition evidence that she obtained from Jones Day in discovery, and there is no reason to believe that further discovery would call Jones Day's reply into question; indeed, Jones Day's reply relies primarily on the chart that Henderson herself proffered.  In sum, further discovery of the sort described by Henderson cannot rescue her EPA claim, because there is no reason to believe that it would create "a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323.

Under Rule 56(d), however, the Court has some flexibility in dealing with a request for discovery, and, in particular, the Court may "issue any . . . appropriate order."  Fed. R. Civ. P. 56(d).  Here, Henderson has now had many months to conduct discovery, and Jones Day has provided copious amounts of discovery to Plaintiffs, and less than two months of discovery remain.  Dkt. 188.  Yet, despite the lengthy period that Henderson has had to conduct discovery, she has not sought to supplement her opposition with any additional evidence.  Under these circumstances, it seems highly unlikely that she found a smoking gun or, indeed, any evidence material to this motion in the discovery she has conducted.  But, out of an abundance of caution and exercising the Court's discretion under Rule 56(d), the Court will entertain a motion for

14

reconsideration of this decision on or before May 28, 2021,[2] *if* Henderson can produce evidence (1) that was previously unavailable to her, and (2) that shows that a genuine dispute exists with respect to any of the factual premises material to this decision.  The Court cautions her, however, that this is not a free pass at relitigating issues already decided but, rather, is intended to guard against the remote possibility that she previously discovered a dispositive fact, which for some reason she has felt constrained not to bring to the Court's attention, or that she is on the verge of discovering such a dispositive fact.

\* \* \*

For these reasons, the Court concludes that Jones Day has carried its burden of showing that no reasonable jury could find in Henderson's favor on her EPA claim.  Accordingly, the Court will grant summary judgment in favor of Jones Day on Count IV of Henderson's complaint.

## CONCLUSION

The Court hereby **GRANTS** Jones Day's motion for summary judgment as to Henderson's EPA claim, Dkt. 129.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 31, 2021

---

[2]  Earlier this month, the Court extended the close of discovery until May 28, 2021.